KENNETH R. O'ROURKE, SBN 120144
JEFF VANHOOREWEGHE, SBN 313371
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: korourke@wsgr.com
        jvanhooreweghe@wsgr.com

*Attorneys for Plaintiffs*
*Seagate Technology LLC, Seagate Technology*
*(Thailand), Ltd., Seagate Singapore*
*International Headquarters Pte. Ltd., and*
*Seagate Technology International*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO: | |
| SEAGATE TECHNOLOGY LLC, SEAGATE TECHNOLOGY (THAILAND), LTD., SEAGATE SINGAPORE INTERNATIONAL HEADQUARTERS PTE. LTD., and SEAGATE TECHNOLOGY INTERNATIONAL, | **SEAGATE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS IN THE SEAGATE COMPLAINT** |
| Plaintiffs, | Judge:      Hon. Maxine M. Chesney |
| v. | Date:       July 17, 2020 |
| | Time:       9:00 a.m. |
| HEADWAY TECHNOLOGIES, INC., HUTCHINSON TECHNOLOGY INC., MAGNECOMP PRECISION TECHNOLOGY PUBLIC CO. LTD., NAT PERIPHERAL (DONG GUAN) CO., LTD., NAT PERIPHERAL (H.K.) CO., LTD., NHK SPRING CO. LTD., NHK INTERNATIONAL CORPORATION, NHK SPRING (THAILAND) CO., LTD., SAE MAGNETICS (H.K.) LTD., and TDK CORPORATION, | Courtroom: 7, 19th Floor |
| | Complaint filed: Feb. 18, 2020 |
| Defendants. | |

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Seagate has stated a claim for breach of contract by alleging the terms of the agreements, breach, and injury to Seagate.

2.      Whether Seagate has stated a claim under the Minnesota Antitrust Law of 1971.

3.      Whether Seagate has stated a claim against Headway Technologies, Inc. by alleging it participated in the conspiracy.

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED...................................................................................i

I.      INTRODUCTION ...................................................................................................... 1

II.     DEFENDANTS BREACHED SEAGATE'S NON-DISCLOSURE
        AGREEMENTS ........................................................................................................ 5

        A.      Seagate Alleges the NDAs and the Parties to the NDAs ............................ 6

        B.      Seagate Alleges How Defendants Breached the NDAs ............................... 9

        C.      Seagate Alleges that Defendants' Breach Proximately Caused Seagate
                Injury ....................................................................................................... 11

III.    SEAGATE HAS AN ADEQUATE BASIS TO PURSUE ITS MINNESOTA
        CLAIM .................................................................................................................. 13

        A.      Seagate Has Article III Standing to Pursue Its Minnesota Claim ............. 14

        B.      Defendants' Conduct Within Minnesota Satisfies Due Process ................ 15

        C.      Seagate Has Alleged a Sufficient Connection to Minnesota to Meet the
                Requirements of the Minnesota Antitrust Law ........................................ 17

IV.     HEADWAY TECHNOLOGIES PARTICIPATED IN THE CONSPIRACY BY
        ELIMINATING A CO-CONSPIRATOR TO MAKE THE CONSPIRACY
        EASIER .................................................................................................................. 18

V.      CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Ins. Co. v. Hague,*
    449 U.S. 302 (1981) ..................................................................................................15

*AlterG, Inc. v. Boost Treadmills LLC,*
    388 F. Supp. 3d 1133 (N.D. Cal. 2019) ......................................................................7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................................................5, 9

*AT&T Mobility LLC v. AU Optronics Corp,*
    707 F.3d 1106 (9th Cir. 2013)...............................................................................15, 16

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................5, 9, 19

*Britz Fertilizers, Inc. v. Bayer Corp.,*
    665 F. Supp. 2d 1142 (E.D. Cal. 2009) ....................................................................11

*Camper v. McDermott,*
    266 Cal. App. 2d 41 (1968) ......................................................................................13

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1993) ....................................................................................................14

*City of St. Paul v. FMC Corp.,*
    No. 89 Civ. 466, 1990 WL 265171 (D. Minn. Feb. 26, 1990)................................18

*eDirect Pub'g, Inc. v. LiveCareer Ltd.,*
    No. 13-CV-1123 JLS (JMA), 2014 WL 11974992 (S.D. Cal. Mar. 18, 2014)............ 10, 12

*First Commercial Mortg. Co. v. Reece,*
    89 Cal. App. 4th 731 (2001).......................................................................................6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,*
    528 U.S. 167 (2000) ..................................................................................................14

*Frontier Contracting, Inc. v. Allen Eng'g Contractor, Inc.,*
    No. CV F11–1590 LJO DLB, 2012 WL 2798809 (E.D. Cal. Jul. 9, 2012).........................6

*Gomez v. Bayview Loan Servicing, LLC,*
    No. 3:14-cv-04004-CRB, 2015 WL 433669 (N.D. Cal. Feb. 2, 2015) ....................12, 13

*Grouse River Outfitters Ltd v. NetSuite, Inc.,*
    No. 16-cv-02954-LB, 2016 WL 5930273 (N.D. Cal. Oct. 12, 2016) ................5, 6

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    No. C-07-5944-SC, 2013 WL 4505701 (N.D. Cal. Aug. 21. 2013) ............................15, 17

*In re Generic Pharm. Pricing Antitrust Litig.*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) ...........................................................................17

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    No. C 09–1967 CW, 2011 WL 1642256 (N.D. Cal. May 2, 2011) ......................................6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    599 F. Supp. 2d. 1179 (N.D. Cal. 2009) ........................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    781 F. Supp. 2d 955 (N.D. Cal. 2011) ............................................................................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    785 F. Supp. 2d 835 (N.D. Cal. 2011) ...................................................................6, 10, 12

*In re TFT-LCD (Flat Panel) Antitrust Litig*,
    Nos. M 07-1827 SI, C 11-2225 SI, 2012 WL 149632 (N.D. Cal. Jan 18, 2012)................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2013 WL 6174683 (N.D. Cal. Nov. 20, 2013) ....................................16

*In re TFT-LCD Flat Pane Antitrust Litig.*,
    37 F. Supp. 3d 1102 (N.D. Cal. 2014) ...........................................................................19

*Int'l Union of Operating Eng'rs, Stationary Eng'rs Local 39 Pension Tr. Fund v.
Bank of New York Mellon Corp.*,
    No. C 11–03620 WHA, 2012 WL 476526 (N.D. Cal. Feb. 14, 2012)..................................8

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*,
    499 F.3d 1048 (9th Cir. 2007).........................................................................................3

*Jackson v. Farmers Ins. Exch.*,
    No. 2:12-CV-01020 WBS GGH, 2012 WL 5337076 (E.D. Cal. Oct. 26, 2012)...........6, 8, 9

*Jajco, Inc. v. Leader Drug Stores, Inc.*,
    No. C 12-05703 PJH, 2013 WL 875957 (N.D. Cal. Mar. 7, 2013) .......................................8

*JP Express Serv. v. KG Admin. Servs.*,
    No. SACV 18-00134-CJC-RAO, 2019 WL 6603176 (C.D. Cal. Sept. 13, 2019)................5

*Kaiser Eng'rs, Inc. v. Grinnell Fire Prot. Sys. Co.*,
    173 Cal. App. 3d 1050 (1985)..........................................................................................8

*Langan v. United Servs. Auto. Ass'n*,
    69 F. Supp. 3d 965 (N.D. Cal. 2014) .............................................................................5, 6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................................14

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .......................................................................................................14

*May v. Semblant, Inc.*,
    No. 5:13-CV-01576-EJD, 2013 WL 5423614 (N.D. Cal. Sept. 27, 2013) .....................9, 11

*McAfee v. Francis*,
   No. 5:11-CV-00821-LHK, 2011 WL 3293759 (N.D. Cal. Aug. 1, 2011) ...........................9

*McDonald v. John P. Scripps Newspaper*,
   257 Cal. Rptr. 473 (1989) ...........................................................................................6

*Mitchell v. Gonzales*,
   54 Cal. 3d 1041 (1991) ..............................................................................................13

*Paroline v. United States*,
   572 U.S. 434 (2014) ...................................................................................................13

*Pellerin v. Honeywell Int'l, Inc.*,
   877 F. Supp. 2d 983 (S.D. Cal. 2012) ..........................................................................9

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   214 F. Supp. 3d 808 (N.D. Cal. 2016), *aff'd*, 890 F.3d 828 (9th Cir. 2018), *amended*,
   897 F.3d 1224 (9th Cir. 2018), *and aff'd*, 735 F. App'x 241 (9th Cir. 2018) ......................8

*Sensible Foods, LLC v. World Gourmet, Inc.*,
   No. 11-2819 SC, 2011 WL 5244716 (N.D. Cal. Nov. 3, 2011) ..........................................11

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) ...................................................................17, 18

*Space Data Corp. v. X*,
   No. 16-cv-03260 BLF, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) ...............................11

*Sutherland v. Francis*,
   No. 12-CV-05110-LHK, 2013 WL 2558169 (N.D. Cal. June 10, 2013) ..............................8

*United States v. Cota*,
   No. CR 08-00160 SI, 2009 WL 412976 (N.D. Cal. Feb. 17, 2009) ...................................13

*United States v. Hitoshi Hashimoto and Hiroyuki Tamura*,
   No. 3:20-cr-00070-JD (N.D. Cal. Feb. 13, 2020) .......................................................1, 3

*United States v. NHK Spring Co. Ltd.*,
   No. 2:19-cr-20503 (E.D. Mich. July 29, 2019) ..............................................................3

*United States v. NHK Spring Co. Ltd.*,
   No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019)..............................................................1

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ........................................................................................3

*US Ecology, Inc. v. State of California*,
   129 Cal. App. 4th 887 (2005).......................................................................................11

**STATUTES**

Minn. Stat. § 325D.54(b) ...........................................................................................17

1

## RULES

2    Fed. R. Civ. P. 8(a)(2) ....................................................................................................5

3    Fed. R. Civ. P. 8(d)(2) ..................................................................................................13

4    Fed. R. Civ. P. 8(d)(3) ..................................................................................................13

5    Fed. R. Evid. 201(b) .......................................................................................................3

6    Fed. R. Evid. 201(b)(2) ...................................................................................................3

7

## MISCELLANEOUS

8    Hutchison Tech. Inc., Current Report (Form 8-K) (Nov. 1, 2015),
        https://www.sec.gov/Archives/edgar/data/772897/000119312515361413/d3

9        8505d8k.htm ....................................................................................................19

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Seagate[1] bought billions of dollars of suspension assemblies from Defendants from 2003 through 2016.[2]  During this time, Defendants secretly conspired to overcharge Seagate.  They did so in three ways:  (i) they agreed among themselves to inflate prices they would quote and charge Seagate; (ii) they agreed on the supply structure of the industry by dividing up and allocating shares of Seagate's and other customers' suspension assembly needs, while also decreasing the number of suppliers; and (iii) they exchanged among themselves Seagate's confidential product demand forecasts, pricing requests, and other sensitive business information, using  this confidential information to carry out their scheme.

Brazil's antitrust agency, CADE, announced in 2018 that there is "robust evidence" of Defendants' wrongdoing.[3]  Japan's Fair Trade Commission found the same.[4]  Defendant NHK then pled guilty in 2019 to violating the U.S. antitrust laws, while Defendant TDK necessarily admitted its violations to the Department of Justice to be eligible for immunity from criminal prosecution.[5]  Earlier this year, the Department of Justice indicted two NHK executives.[6]

---

[1]  "Seagate" includes each of the Seagate plaintiffs bringing the complaint:  Seagate Technology LLC, Seagate Technology (Thailand) Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International.  *See* Complaint ¶ 2.

[2]  As in the Complaint, "Defendants" refers to; (1) NHK Defendants: NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring Co., Ltd., NHK International Corporation, and NHK Spring (Thailand) Co., Ltd.; (2) TDK Defendants: Headway Technologies, Inc., Magnecomp Precision Technology Public Co., Ltd., SAE Magnetics (H.K.) Ltd., and TDK Corporation; and (3) Hutchinson Technology, Inc.  *See* Complaint ¶ 3.  Seagate has agreed not to pursue its claims against NHK Spring Precision (Guangzhou) Co., Ltd.

[3]  Complaint ¶ 72; Administrative Council for Economic Defense, Technical Report No. 4/2018 of the General Superintendent's Office (SEI No. 0459666) ¶ 90 ("CADE Report"); *see also* Complaint ¶ 71 (quoting CADE Report ¶ 27).  A certified translation of CADE's Technical Report No. 4/2018 is attached as Ex. A to the Declaration of Jeff VanHooreweghe.

[4]  Complaint ¶¶ 83-87 (citing Japan Fair Trade Commission, Year 2018 (Measure) No. 5, Cease and Desist Order (Feb. 9, 2018) ("JFTC Cease and Desist Order")).  A certified translation of the JFTC Cease and Desist Order is attached as Ex. B to the Declaration of Jeff VanHooreweghe.

[5]  Rule 11 Plea Agreement ¶¶ 2-3, *United States v. NHK Spring Co. Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019), ECF No. 15.

[6]  Indictment ¶ 5, *United States v. Hitoshi Hashimoto and Hiroyuki Tamura*, No. 3:20-cr-00070-JD (N.D. Cal. Feb. 13, 2020) ("Hashimoto/Tamura Indictment"), ECF No. 1.

Seagate's complaint alleges similar wrongdoing to what these competition agencies have already found:  price fixing and bid rigging, market allocation, and breach of non-disclosure agreements ("NDAs").  Defendants quibble with how Seagate drafted its breach of contract, Minnesota state law, and Headway Technologies claims, yet Defendants' long-running, deeply investigated, and increasingly well-documented criminal conspiracy gives rise to all of Seagate's claims.  Defendants have more than adequate notice of what Seagate is alleging to answer the complaint.  Further details will be determined during discovery.

Indeed, at the Court's suggestion during the February status conference, Seagate approached Defendants before their motion was filed.  Seagate reiterated the factual allegations underlying its breach of contract, Minnesota antitrust law, and Headway Technologies claims to Defendants' counsel.  Seagate even went farther to outline additional non-controvertible factual allegations such as:  Defendants know they negotiated certain of their supply contracts in Minnesota and shipped products there.[7]   Undeterred, Defendants ask this Court to require unnecessary specificity over Rule 8's "notice."  Their motion should be denied for this reason alone—as well as for the following reasons:

***First***, as to the contract claim, Defendants are on notice of the agreements they breached to effectuate their conspiracy, the parties subject to those agreements, and the relevant terms of these agreements.  As alleged, each of the Defendants played a significant role in the supply of suspension assemblies to Seagate for many years.[8]   To allow Seagate to share proprietary, confidential information necessary to these supply relationships, Seagate negotiated and entered non-disclosure agreements binding each of the Defendant entities.  The agreements and their periodic supplements require all Defendants to use the confidential information provided by

---

[7] In light of these disclosures and given the Court's suggestion to avoid motions to dismiss on topics that are easily addressed in discovery, Seagate requested that Defendants reconsider filing their planned motion.  Defendants refused.

[8] The one exception to this is Defendant Headway Technologies, Inc. ("Headway").  As alleged and explained herein, Headway purchased and then controlled one of the co-conspirators, Hutchinson Technologies, Inc. ("HTI"), to further carry-out the conspiracy.  Headway did this in concert with its parent corporation and fellow co-conspirator, TDK Corporation.  Headway was not otherwise involved in the supply of suspension assemblies to Seagate.

Seagate only for the purpose of supplying suspension assemblies to Seagate.  The confidential information was not to be shared with unaffiliated entities or used to conspire against Seagate.

And as for the breach itself, Seagate identifies, in multiple places in the Complaint, the protected confidential information that Defendants unlawfully exchanged with each other, in violation of the agreements, and how these exchanges enabled them to charge Seagate artificially high prices.  The government investigations cited in Seagate's complaint also describe exchanges of confidential customer information in furtherance of Defendants' conspiracy.[9]  For instance, Brazil's antitrust agency found there is "robust evidence" that:

> 27.    [T]here were various exchanges of sensitive information between the competitors . . .[that] included…information on (iii.1) **Current, potential and proposed prices . . . ,** (iii.2) **Private customer bidding processes,** (iii.3) **Allocation of customer volumes,** (iii.4) **Manufacturing capacity of each company**; and (iii.5) **User fees for each company, for the purpose of stabilizing prices and reducing competition in the sales of** *suspension assemblies*.

> 28.    There is strong evidence that this exchange of commercially sensitive information rendered the establishment of strategic long-term relations feasible between the competitors, based on the elimination or softening of the price war[] or price competition, which meant avoiding aggressive price competition in private bidding processes and quotations, and in the division of the world market of *suspension assemblies*.[10]

---

[9] *See* Complaint ¶¶ 70-89; *see also* JFTC Cease and Desist Order, Factual Background ¶ 3(2) (VanHooreweghe Decl. Ex. B) (finding one way the parties implemented the conspiracy was the exchange of price and demand forecast information); Information ¶ 8, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Jul. 29, 2019), ECF No. 1; Hashimoto/Tamura Indictment ¶ 8.

[10] Complaint ¶ 71; CADE Report ¶¶ 27, 28, 90 (VanHooreweghe Decl. Ex. A) (emphases in original). Under Federal Rule of Evidence 201, the Court may take judicial notice of a "fact that is not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b), (2).  Public records, such as a government agency report, qualify.  *See Intri-Plex Techs.. Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) ("[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," as long as the facts noticed are not "subject to reasonable dispute") (citations omitted); *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including 'the records and reports of administrative bodies.'") (citations omitted). Seagate respectfully requests the Court take judicial notice of the CADE Report and JFTC Cease and Desist Order.

Similarly, Japan's FTC found that the five companies it investigated[11] were, among other wrongful conduct, "[e]xchanging information on suspension demand forecasts and selling prices as well as quoted prices presented when foreign HDD manufacturer-sellers issued [Requests for Quotations.]"[12]  These investigations are discussed in Seagate's complaint as additional support for Seagate's claims.  At the pleading stage, Seagate's breach of contract allegations could not have a much firmer foundation.

**Second**, Seagate has adequately alleged a claim under the Minnesota Antitrust statute by alleging that Defendants intentionally directed their anticompetitive acts at Minnesota and supplied suspension assemblies in Minnesota and for HDDs destined for Minnesota.  Those allegations encompass suspension assemblies sold to Seagate.  These sales render Defendants' Article III challenge baseless.

Given that Seagate was harmed by Defendants' conduct in and directed to Minnesota, Minnesota's interest in the facts underlying Seagate's claim is more than enough to satisfy Due Process.  The more detailed facts Defendants demand be included in the Complaint are unnecessary.  Seagate reminded Defendants before Defendants filed their motions that Defendants  negotiated the supply  of  suspensions in  Minnesota, Defendants  quoted their artificially  inflated  prices  to  Seagate  in  Minnesota,  and  Defendants  shipped  suspensions  to Seagate in Minnesota.  Defendants have ample information to bring forward whatever defense they may have to Seagate's claim.

**Third**, Seagate has adequately alleged Headway Technologies, Inc.'s involvement in the price-fixing  and  supply  allocation  conspiracy.   Headway  was  the  TDK  entity  deployed  to eliminate HTI as part of Defendants' efforts to allocate the supply of suspension assemblies – decreasing the number of conspirator-suppliers and eliminating the risk that HTI would disturb a successful  price-fixing  and  bid-rigging  conspiracy  by  breaking  ranks  with  TDK  and  NHK.

---

[11]  TDK  Co.,  Ltd.,  and  Defendants  SAE  Magnetics  (H.K.)  Ltd.;  Magnecomp  Precision Technology Public Co., Ltd.; NHK Spring Co., Ltd., and Nat Peripheral (H.K.) Co., Ltd.

[12]  Complaint  ¶  85;  JFTC  Cease  and  Desist  Order,  Factual  Background  ¶  3(2) (VanHooreweghe Decl Ex. B).

1    Headway is liable for its role in acquiring HTI in order to further reduce competition for the

2    purpose of carrying out the conspiracy, and is properly included as a defendant co-conspirator.

3    Headway should answer the complaint as alleged.

4    **II.      DEFENDANTS BREACHED SEAGATE'S NON-DISCLOSURE AGREEMENTS**

5           Defendants violated the NDAs referenced in each of their supply agreements by

6    improperly sharing Seagate's confidential information to charge artificially high prices and

7    allocate supply.  Seagate now seeks redress for this blatant breach of contract.

8           Defendants contend that the Complaint does not provide enough "specifics" about the

9    contracts, parties to those contracts, conduct in breach of the contracts, and harm to Seagate.

10   Neither Rule 8 nor *Twombly* / *Iqbal* requires the heightened specificity Defendants insist upon.

11   *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("we do not require heightened

12   fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its

13   face"); *see also Grouse River Outfitters Ltd v. NetSuite, Inc.*, No. 16-cv-02954-LB, 2016 WL

14   5930273, at *12 (N.D. Cal. Oct. 12, 2016) ("A plaintiff need not plead the contract terms with

15   unusual specificity.").  Rule 8 requires only "a short and plain statement of the claim showing

16   that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Indeed, a breach of contract claim

17   is subject to dismissal only when the complaint offers "no way for the Court [to] know even

18   generally what the terms of the contract or contracts were."  *JP Express Serv. v. KG Admin.*

19   *Servs.*, No. SACV 18-00134-CJC-RAO, 2019 WL 6603176, at *2 (C.D. Cal. Sept. 13, 2019)

20   (alteration in original) (citations omitted).  This is not a high bar.

21          A breach of contract claim requires just four elements: "the existence of the contract,

22   performance by or excuse for nonperformance by the plaintiff, breach by the defendant, and

23   damages."  *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 979 (N.D. Cal. 2014)

24   (quoting *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001)).  Seagate is

25   required only to allege facts that provide Defendants fair notice of (i) the substance of the

26   material terms or legal effect of the contracts breached, (ii) how Defendants breached those

27

28

terms, and (iii) injury to Seagate that the breach proximately caused.[13]  *See id.* ("While it is unnecessary for a plaintiff to allege the terms of the alleged contract with precision, the Court must be able generally to discern at least what material obligation of the contract the defendant allegedly breached.") (citations omitted); *see also Frontier Contracting, Inc. v. Allen Eng'g Contractor, Inc.*, No. CV F11–1590 LJO DLB, 2012 WL 2798809, at *6 (E.D. Cal. Jul. 9, 2012) (finding that complaint sufficiently identified the terms of the contract and "satisfactorily places [defendant] on notice" of the claims).

Seagate's complaint alleges facts sufficient to notify Defendants of the terms, the breach, and the effect.  Defendants' amnesic contention of confusion about the "boundaries of this case" (Motion at 7) rings hollow given the investigations, criminal indictments, fines, and their own admissions to agencies.  *See* Complaint ¶¶ 7, 11, 13, 15; *see also id.* ¶¶ 10, 71, 81, 85.

## A.  Seagate Alleges the NDAs and the Parties to the NDAs

To adequately allege the contracts that were breached, "[a] plaintiff 'must plead . . . the contract either by its terms . . . or ***by its legal effect***.'"  *Jackson v. Farmers Ins. Exch.*, No. 2:12-CV-01020 WBS GGH, 2012 WL 5337076, at *4 (E.D. Cal. Oct. 26, 2012) (emphasis added) (citations omitted); *see* Motion at 4 (**omitting** language "or by its legal effect").  Pleading a contract by its legal effect requires only allegations of the "substance of its relevant terms." *Grouse River Outfitters Ltd*, 2016 WL 5930273, at *12.

This District has instructed repeatedly that not every contract term needs to be cited; indeed, a court can, and often does, make reasonable inferences of ambiguities.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835, 846 (N.D. Cal. 2011) (denying motion to dismiss contract claim because "ambiguities" including the "precise terms of the contracts at issue" and which contracts "are alleged to have been violated . . . are properly explored in discovery"); *In re NCAA Student-Athlete Name & Likeness Litigation*,  No. C 09-1967 CW, 2011 WL 1642256, at *7-8 (N.D. Cal. May 2, 2011) (denying motion to dismiss contract claim

---

[13] Defendants do not challenge the sufficiency of the pleading as to Seagate's performance, the second element of a breach of contract claim.  *See* Motion at 3-4 (citing *McDonald v. John P. Scripps Newspaper*, 257 Cal. Rptr. 473, 475 (1989)).

because "neither law nor equity requires that every term and condition be set forth in a contract" and court can make reasonable inferences) (citation omitted). Further, any objection that a complaint "references multiple confidentiality agreements but does not specify which particular ones were breached" is "easily disposed of" when "the complaint indicates that Defendants breached all of the agreements." *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1147 (N.D. Cal. 2019) (denying motion to dismiss).

Here, Seagate plainly alleges the agreements that Defendants breached and terms that Defendants breached. Seagate alleges: "During and throughout the Conspiracy Period, Seagate LLC and Defendants entered into various nondisclosure agreements and Supplements to the same (collectively, "NDAs") that applied to the negotiations of all purchases at issue in this complaint." Complaint ¶ 97. Seagate then refers specifically to Master NDAs with Defendants MPT, TDK, and NHK as examples, which are expressly referenced in Defendants' supply agreements. *Id.* ¶ 99.

Seagate alleged the "legal effect" of these NDAs was for Defendants to receive Seagate's confidential information for their business transactions and use such information for the benefit of Seagate only. *Id.* ¶¶ 97-98, 173. The NDAs "were intended to protect such disclosures, which are integral to the business operations and well-being of all of the Seagate entities." *Id.* ¶ 99.

Seagate further alleged the primary term that was breached; Seagate alleged that all the NDAs contained terms that limited the use of Seagate's confidential information to these business purposes. *Id.* ¶¶ 98-101, 176 ("Pursuant to the nondisclosure agreements, Defendants were required to, among other things, use Seagate's confidential business information only as specified therein and protect Seagate's confidential business information from unauthorized use.")

Seagate also plainly identifies the parties to the NDAs that Defendants breached. Seagate alleges that each parent entity was party to a nondisclosure agreement that applied to the signatories and "their affiliates." *Id.* ¶ 99. This is enough. The allegations for a breach of contract claim can be sufficient for related entities even though only one defendant is a signatory

1   to the contract, when the complaint alleges all defendants breached the contract. *See Int'l Union*

2   *of Operating Eng'rs, Stationary Eng'rs Local 39 Pension Tr. Fund v. Bank of New York Mellon*

3   *Corp.*, No. C 11–03620 WHA, 2012 WL 476526 (N.D. Cal. Feb. 14, 2012) (denying motion to

4   dismiss two defendants because they were properly named as the former parents of other

5   defendants; only one defendant signed the contract at issue).

6   In much the same way, all the Seagate entities are able to enforce the NDAs.  Each

7   named Plaintiff is a subsidiary of Seagate Technology plc. *See* Complaint ¶¶ 29-32.  Seagate

8   Technology LLC (Seagate LLC) had primary responsibility for negotiating purchases of HDD

9   suspension assemblies, and the other three Seagate Plaintiffs assisted it with these purchases. *Id.*

10  Further, the allegations of breach can be sufficient for third-party beneficiaries of NDAs that did

11  not sign the NDA at issue.  *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,

12  214 F. Supp. 3d 808, 832 (N.D. Cal. 2016), *aff'd*, 890 F.3d 828 (9th Cir. 2018), *amended*, 897

13  F.3d 1224 (9th Cir. 2018), *and aff'd*, 735 F. App'x 241 (9th Cir. 2018) ("Given the language of

14  the agreements at issue, their alleged purpose, and the alleged circumstances under which they

15  were entered, plaintiffs have alleged plausible facts showing the *intent* to consider plaintiffs as

16  third-party beneficiaries of the [conference] confidentiality agreements") (emphasis in

17  original).[14]

18  Defendants' cited cases do nothing to counter the sufficiency of Seagate's allegations of

19  the NDAs that were breached and the parties to the NDAs. *See* Motion at 4.  Indeed, the facts

20  and legal issues in Defendants' cases are distinguishable:  *Sutherland v. Francis* evaluated a

21  complaint with various deficiencies, including whether there was even offer and acceptance of

22  the contract.  No. 12-CV-05110-LHK, 2013 WL 2558169, at *4 (N.D. Cal. June 10, 2013).  The

23  plaintiffs in *Jackson v. Farmers Insurance Exchange* alleged they were "denied the right of

---

24  [14] Each Seagate LLC affiliate is, at the very least, a third-party beneficiary of the NDAs and

25  entitled to bring a breach of contract claim.  The NDAs are intended to confer a direct benefit
    upon Seagate LLC's corporate affiliates, meaning all Seagate Plaintiffs.  Complaint ¶ 100.

26  Allegations that the terms of the contracts "express an intent to benefit third parties" are
    sufficient. *Jajco, Inc. v. Leader Drug Stores, Inc.*, No. C 12-05703 PJH, 2013 WL 875957, at *1

27  (N.D. Cal. Mar. 7, 2013); *Kaiser Eng'rs, Inc. v. Grinnell Fire Prot. Sys. Co.*, 173 Cal. App. 3d
    1050, 1055 (1985)).  Seagate International was also a signatory to the Master Nondisclosure

28  Agreement with TDK.  Complaint ¶ 97 n.17.

1  inspection," but failed to allege the contract actually gave them this right.  2012 WL 5337076, at

2  *4.  The court in *McAfee v. Francis* was evaluating a complaint removed from state court.  It

3  granted the motion to dismiss with leave to amend because the complaint used the state court's

4  form pleadings, "which contain check boxes and limited spaces for factual allegations."  No.

5  5:11-CV-00821-LHK, 2011 WL 3293759, at *1 (N.D. Cal. Aug. 1, 2011).  The counterclaim

6  plaintiff in *Pellerin v. Honeywell Int'l, Inc.* provided only "boilerplate allegations" and did not

7  plead that the information was actually within the terms of the agreements.  877 F. Supp. 2d 983,

8  990–91 (S.D. Cal. 2012).[15]

9  **B.      Seagate Alleges How Defendants Breached the NDAs**

10      Defendants imply that Seagate's allegations amount to nothing more than a tautology:

11  Defendants breached the contracts because they "did not honor or did not intend to honor the

12  terms of the agreement."  Motion at 7 (quoting *May v. Semblant, Inc.*, No. 5:13-CV-01576-EJD,

13  2013 WL 5423614, at *6 (N.D. Cal. Sept. 27, 2013)).  But Seagate's factual allegations do much

14  more than that.  They show that all Defendants violated the terms of their confidentiality

15  agreements with Seagate by sharing Seagate's protected information.  That is, Seagate pleads

16  enough facts to allow the Court to "draw the reasonable inference that the defendant is liable for

17  the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

18  at 556).

19      ***First,*** Seagate identifies, in multiple places in the Complaint, the protected information

20  Defendants unlawfully exchanged.  Complaint ¶¶ 71 ("[c]urrent, potential and proposed prices";

21  "customer bidding processes"; "customer volumes"; "[m]anufacturing capacity"; and "[u]ser

22  fees"), 81 ("pricing information"), 85 ("demand forecast of suspensions"), 98 ("pricing and

23  volume information, forecasts, and product designs").  The NDAs applied to "confidential

24

25

26      [15] Defendants also complain that Seagate does not provide the effective dates of the NDAs.
   Seagate alleges the confidentiality agreements were in effect for the full relevant period and
27  applied to all purchases at issue.  Complaint ¶ 97.  Defendants do not explain why an effective
   date is needed to plead a claim, particularly for evergreen master agreements with numerous
28  supplements as here.

Seagate business information – including pricing and volume information, forecasts, and product designs" disclosed as part of Defendants' supplier relationships with Seagate.  *Id.* ¶ 98.

The findings of antitrust agencies around the world support the allegations that Defendants unlawfully used ***customer*** confidential information to charge inflated prices.  *See id.* ¶¶ 71 (finding by CADE in Brazil that the confidential information exchanged included but was not limited to "current, potential and proposed prices, for suspension assemblies, private customer bidding processes, allocation of customer volumes, manufacturing capacity of each company, and user fees for each company") (alterations omitted);[16] 85 (finding by Japanese Fair Trade Commission that "TDK and NHK would confirm the pricing that they would quote with each other and exchange information about the demand forecast of suspensions"); *see also id.* ¶ 81 (DOJ indictment of two NHK executives alleging the conspirators "discuss[ed] and exchang[ed] HDD suspension assemblies pricing information, including anticipated pricing quotes").

These allegations are sufficient as even "broad categories of information," defining the "general boundaries" of the protected information, provide sufficient notice of the information at issue for breach of contract claims.  *eDirect Pub'g, Inc. v. LiveCareer Ltd.*, No. 13-CV-1123 JLS (JMA), 2014 WL 11974992, at *3-4 (S.D. Cal. Mar. 18, 2014).  Without the benefit of discovery, Seagate cannot be expected to identify the precise information shared between Defendants throughout their conspiracy lasting over a decade.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d at 846-47 (denying motion to dismiss).  Defendants' assertion that Seagate does not allege the "actual information" disclosed in violation of the NDAs, Motion at 7, provides no basis for dismissing Seagate's claim.

---

[16] CADE also reported that the "exchanges included **recent, current and future data, not shared within other circles, with a view to permitting the companies to align their operations within the market based on the commercially sensitive information shared**"; the information shared was "provided with a **high level of detail**."   CADE Report ¶ 30 (VanHooreweghe Decl. Exhibit A) (emphasis in original); *see also id.* ¶ 28 (finding "strong evidence that this exchange of commercially sensitive information rendered the establishment of strategic long-term relations feasible between the competitors, based on the elimination or softening of the price war or price competition, which meant avoiding aggressive price competition in private bidding processes and quotations, and in the division of the world market of *suspension assemblies*") (emphasis in original).

1    **Second,** Seagate alleges that the Defendants did in fact exchange Seagate's confidential

2    information for the purpose of charging Seagate artificially higher prices—information Seagate

3    did not intend for the Defendants to exchange.   Complaint ¶ 102 ("Defendants misused,

4    exchanged, and/or disclosed Seagate's confidential business information to one another in breach

5    of the NDAs, in order to charge Seagate artificially high prices").   This is the "how" that

6    Defendants contend is missing.  Motion at 7.

7    Defendants' cited cases do nothing to counter the adequacy of Seagate's pleading of the

8    breach at issue.   If anything, the distinctions in Defendants' cases further support holding

9    Seagate's allegations sufficient.  *See Space Data Corp v. X*, No. 16-cv-03260 BLF, 2017 WL

10   5013363, at *2 (N.D. Cal. Feb. 16, 2017) (finding plaintiff failed to "offer any factual allegations

11   about what information [defendant] used, how [defendant] used that information, or how that

12   purported use violated the NDA's confidentiality provisions"); *Semblant, Inc.*, 2013 WL

13   5423614, at *6 (making conclusory allegation that defendants "breached [their] agreement with

14   Plaintiff by not honoring the terms of the agreement"); *Sensible Foods, LLC v. World Gourmet,

15   Inc.*, No. 11-2819 SC, 2011 WL 5244716, at *5 (N.D. Cal. Nov. 3, 2011) (granting motion to

16   dismiss when plaintiff alleged only that defendant "disclos[ed] all or a portion of Plaintiff's

17   Confidential Information without the express or implied consent of Plaintiff").

18   Seagate's factual allegations describe the protected information disclosed to the other

19   Defendants in violation of identified terms of NDAs applicable to all Defendants and are

20   sufficient at the pleadings stage to put Defendants on adequate notice of their breach.

21   **C.    Seagate Alleges that Defendants' Breach Proximately Caused Seagate Injury**

22   To plead proximate cause, the plaintiff must "demonstrate[] that the defendant's breach

23   was a 'substantial factor' in causing the damage."  *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F.

24   Supp. 2d 1142, 1167-68 (E.D. Cal. 2009) (citations omitted).  "Substantial factor," in turn, means

25   "something which is more than a slight, trivial, negligible, or theoretical factor in producing a

26   particular result."  *Id.* at 1168 (quoting *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th

27   887, 909 (2005)).

28

1   Seagate sufficiently alleges that Defendants' exchanges of Seagate's confidential

2   information to facilitate their price fixing, bid rigging, and market allocations were a "substantial

3   factor" in producing the overcharges Seagate was charged on suspension assemblies.  Seagate

4   specifies that Defendants "misused, exchanged, and/or disclosed Seagate's confidential business

5   information to one another in breach of the NDAs, **in order to charge Seagate artificially high**

6   **prices**."  Complaint ¶ 102 (emphasis added).  In support, Seagate describes CADE's finding that

7   the Defendants shared "commercially and competitively sensitive information . . . **for the**

8   **purpose of stabilizing prices and reducing competition** in sales of suspension assemblies."  *Id.*

9   ¶ 71 (emphasis added).

10   Seagate's allegations permit the reasonable inference that the purpose of Defendants'

11   information exchanges was to more effectively rig bids and allocate market shares with shared

12   knowledge of Seagate's present and future pricing, volume needs, and product plans.  *See*

13   *eDirect Publ'g Inc.*, 2014 WL 11974992, at *6 (denying motion to dismiss and making inference

14   that defendant's use of confidential information "to gain a commercial advantage" over the

15   plaintiff, in violation of a contract, harmed plaintiff).  And Defendants successfully charged

16   Seagate artificially high prices and allocated supply as intended, proximately causing Seagate's

17   damages.  *See, e.g.*, Complaint ¶¶ 94, 103.

18   This District has found very similar allegations sufficient to plead proximate cause.  *See*

19   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 967 (N.D. Cal. 2011)

20   (rejecting defendants' argument that "to plead proximate cause for purposes of the breach of

21   contract claims Dell must allege that each breach by each specific defendant proximately caused

22   it to pay an overcharge"); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d

23   at 846 ("A plain reading of the [complaint] sets forth Motorola's theory of relief in clear terms;

24   that is, that each of the contracting defendants breached its contractual obligation . . . by

25   engaging in a widespread price-fixing conspiracy").

26   Defendants' cited cases provide no basis to conclude otherwise.  The breach of contract

27   claim in *Gomez v. Bayview Loan Servicing, LLC* failed because the plaintiff did not allege a

28   breach from which to evaluate resulting damages.  No. 3:14-cv-04004-CRB, 2015 WL 433669,

at *3 (N.D. Cal. Feb. 2, 2015).   Here, Seagate alleges it would have paid lower prices to Defendants if they had not anticompetitively shared confidential information.  *See* Complaint ¶¶ 94, 102-03.  *Camper v. McDermott* says even less about the pleading standard for proximate cause:  it was an appeal of a damages ruling *after trial*.  266 Cal. App. 2d 41, 46 (1968) (finding plaintiff's damages model did not account for other causes of vacancy in his apartment complex unrelated to his contractor's breach).[17]

Defendants' quibbles with Seagate's allegations do nothing to undermine Seagate's breach of contract claim.   Seagate provides sufficient facts to state a claim and to give Defendants sufficient notice of same.

## III.   SEAGATE HAS AN ADEQUATE BASIS TO PURSUE ITS MINNESOTA CLAIM

Defendants argue that Seagate's complaint does not allege the requisite connection to Minnesota necessary for Seagate (i) to have Article III standing, (ii) to satisfy Due Process or (iii) to satisfy the requirements of the Minnesota Antitrust Law itself.   Defendants' three challenges boil down to a single complaint that Seagate should have included more allegations connecting Defendants' own conspiratorial conduct to Minnesota.   While discovery will flush out more facts, the current allegations are more than sufficient to allege the requisite connection to Minnesota.   It is not in dispute that Defendants negotiated suspension assembly prices with Seagate in Minnesota, quoted prices to Seagate in Minnesota, and shipped suspension assemblies to Minnesota.

These are the very negotiations that, unbeknownst to Seagate, were compromised by Defendants' conspiracy.   The alleged connections sufficiently support Seagate's claim under Minnesota law already, and there is no need to add allegations of undeniable facts of Defendants' own conduct in Minnesota.

---

[17] Defendants also argue that any alleged harm was caused by the conspiracy rather than their breaches of contract, suggesting that Seagate should identify a separate and distinct injury for each cause of action.   But a single injury can "have more than one proximate cause."  *United States v. Cota*, No. CR 08-00160 SI, 2009 WL 412976, at *3 (N.D. Cal. Feb. 17, 2009) (citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991)); *see also Paroline v. United States*, 572 U.S. 434, 444 (2014) ("Every event has many causes, however, and only some of them are proximate, as the law uses that term") (internal citation omitted). Further, Defendants ignore Seagate's ability to plead alternative statements of claims.  *See* Fed. R. Civ. P. 8(d)(2)-(3).

1          **A.        Seagate Has Article III Standing to Pursue Its Minnesota Claim**

2          To invoke the jurisdiction of the federal courts, a plaintiff must satisfy the threshold

3    requirement of Article III standing.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1993).  The

4    Supreme Court has prescribed a three-part test to satisfy Article III's standing requirements:  "a

5    plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized

6    and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

7    challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

8    injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

9    *Serv. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

10   555, 560-61 (1992)).   Defendants question only whether Seagate adequately *alleges* facts

11   satisfying the first prong of this test:  whether Seagate sufficiently alleged an "injury in fact."

12   Motion at 10-11.

13         The answer is a definitive "yes."  Seagate alleged:  "In particular, Defendants and their

14   co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the

15   prices of and allocate market shares for HDD suspension assemblies sold to purchasers in

16   Minnesota during the Conspiracy Period."  Complaint ¶ 163.   The Supreme Court has held

17   analogous allegations sufficient for Article III purposes: "general factual allegations of injury

18   resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e]

19   that general allegations embrace those specific facts that are necessary to support the claim.'"

20   *Lujan,* 504 U.S at 561 (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

21   871, 889 (1990)).

22         Seagate's allegation that suspension assemblies were sold to purchasers in Minnesota

23   properly comprises sales of suspension assemblies that Defendants negotiated with and made to

24   Seagate in Minnesota.   Defendants themselves assert that allegations that Defendants sold

25   suspension assemblies *to Seagate* in Minnesota are sufficient for Article III, Motion at 11; thus,

26   the allegations of Seagate's Complaint suffice to establish Seagate's Article III standing to bring

27   a claim under the Minnesota Antitrust Law.

28

1    And there is more if additional allegations are needed in a more detailed form.  For

2    instance, none of these facts are controversial or controvertible:

3         • Defendants negotiated terms of sales for suspension assemblies to Seagate in
            Minnesota throughout the relevant period;
4

5         • Many of the Seagate employees responsible for procuring suspension assemblies,
            including those procured from Defendants, operated mostly out of Minnesota;
6

7         • Defendants regularly traveled to Minnesota to negotiate in person with members
            of Seagate's team for the purchase of suspension assemblies;
8

9         • After negotiating the pricing and supply terms with Seagate, Defendants shipped
            some suspension assemblies to Seagate's offices in Minnesota; and
10        • One or more defendant suppliers supplied suspension assemblies to Seagate in
            Minnesota on a regular basis every year since at least 2003, the beginning of the
11          alleged conspiracy period.

12

13   Defendants' conduct in Minnesota resulted in Seagate being injured.  The allegations in

14   the current Complaint alone adequately allege this, and Defendants have acknowledged notice of

15   these facts.

16   **B.    Defendants' Conduct Within Minnesota Satisfies Due Process**

17   Defendants next argue that Seagate's Complaint does not satisfy the Due Process Clause

18   because it lacks allegations connecting the conduct to Minnesota.  In the Ninth Circuit, "[t]he

19   Due Process Clause . . . requires a court to invalidate the application of a state's law *only* where

20   the state has 'no significant contact or significant aggregation of contacts, creating state interests,

21   with the parties and the occurrence of transaction.'"  *AT&T Mobility LLC v. AU Optronics Corp*,

22   707 F.3d 1106, 1111 (9th Cir. 2013) (recognizing that contacts of a "somewhat tenuous nature"

23   suffice) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981)).

24   Following the Ninth Circuit, this District Court has held that allegations by individual

25   plaintiffs that defendants had conspired to fix prices and directed the price-fixed goods into a

26   state satisfies Due Process.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC,

27   2013 WL 4505701, at *6-7 (N.D. Cal. Aug. 21. 2013) (finding sufficient allegations that

28   defendants conspired to fix prices and then sold the price-fixed goods to "businesses and

1    consumers" in-state).  Indeed, this District Court has held that even absent an in-state purchase or

2    in-state conspiratorial conduct by defendants, "[T]he Due Process Clause [may be] satisfied . . .

3    where the agreement to purchase price fixed goods was negotiated and entered into in that state."

4    *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 6174683, at *4 (N.D.

5    Cal. Nov. 20, 2013).

6         Here, as noted above and as alleged, there are many significant contacts by Defendants in

7    Minnesota, carrying out their price-fixing conspiracy in Minnesota and directing it to Seagate in

8    Minnesota.   Simply put, "In particular, Defendants and their co-conspirators have agreed,

9    combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market

10   shares for HDD suspension assemblies sold to purchasers in Minnesota during the Conspiracy

11   Period."  Complaint ¶ 163.  Seagate has pled that Minnesota has substantial interests in the facts

12   underlying its claim and satisfied Due Process.[18]

13        Defendants rely almost exclusively on *AT&T Mobility* as support for their Due Process

14   argument.  Motion at 12.  But *AT&T Mobility* supports finding that Due Process is satisfied here.

15   *AT&T Mobility* concerned plaintiffs who alleged conspiratorial conduct within California, but

16   did not allege in-state purchases of the price-fixed goods.  The Ninth Circuit held that the district

17   court should have considered "*all* of the Defendants' conduct within California leading to the

18   sale of price-fixed goods outside the state."  707 F.3d at 1112 (emphasis in original).

19        Defendants also cite *AT&T Mobility* to assert that the Court's Due Process analysis must

20   be performed with respect to each defendant, citing the Ninth Circuit's instruction to the District

21   Court on remand.  Motion at 12 (quoting *AT&T Mobility*, 707 F.3d at 1114).  But that instruction

22   was specific to allegations of in-state conspiratorial conduct among defendants.  Here, Seagate's

23   allegations concern conduct by Defendants in Minnesota leading to sales of price-fixed goods to

24   Seagate in Minnesota.

25   _____

26   [18] As outlined in the discussion of Article III above and previously communicated to
     Defendants, Seagate and the Defendants also engaged in negotiations in Minnesota in which
27   Defendants agreed to sell suspension assemblies at prices set through Defendants' illegal price-
     fixing agreements.   Seagate can add that Defendants negotiated with Seagate in Minnesota,
28   quoted prices there, and shipped suspension assemblies to the state.

1    There is not a "slight and casual [*sic*] connection" to Minnesota in this case, "nor is the

2    application of [Minnesota law] to Defendants' conduct arbitrary or unfair." *In re Cathode Ray*

3    *Tube*, 2013 WL 4505701, at *7 (citing *AT&T Mobility,* 707 F.3d at 1113).  Defendants targeted

4    Seagate and its procurement team in Minnesota.  There is no basis to dismiss Seagate's

5    Minnesota Antitrust Law claim under the Due Process Clause.

6    **C.    Seagate Has Alleged a Sufficient Connection to Minnesota to Meet the
            Requirements of the Minnesota Antitrust Law**

7

8    The Minnesota Antitrust Law prohibits: "any contract, combination, or conspiracy,

9    wherever created, formed, or entered into . . . *whenever any of the foregoing affects the trade or*

10   *commerce of this state*."  Minn. Stat. § 325D.54(b) (emphasis added).  The plain language of the

11   Minnesota statute permits a plaintiff to pursue a price-fixing conspiracy claim "whenever [that

12   conspiracy] affects the trade or commerce of this state." *Id.*

13   Seagate alleged:   "In particular, Defendants and their co-conspirators have agreed,

14   combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market

15   shares for HDD suspension assemblies sold to purchasers in Minnesota during the Conspiracy

16   Period."   Complaint ¶ 163.   Seagate further alleged that "[t]he anticompetitive acts were

17   intentionally directed at the Minnesota market for HDD suspension assemblies and had a

18   substantial and foreseeable effect on trade and commerce in Minnesota by raising and fixing

19   prices for HDD suspension assemblies throughout Minnesota and elsewhere." *Id.* ¶ 166.

20   Those allegations are sufficient to invoke the Minnesota statute.  Indeed, one district

21   court held that allegations that the defendants' actions forced purchasers *nationwide* to pay more

22   for generic drugs were sufficient because subsection (b) of Minn. Stat. § 325D.54 "does not on

23   its face require any substantial in state effect." *In re Generic Pharm. Pricing Antitrust Litig.*, 368

24   F. Supp. 3d 814, 837 n.99 (E.D. Pa. 2019) (citing *Sheet Metal Workers Local 441 Health &*

25   *Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 397 (E.D. Pa. 2010)).

26   Defendants provide no authority for finding Seagate's allegations concerning their

27   conduct and its effect in Minnesota insufficient to state a claim under Minnesota's Antitrust Law.

28   Defendants rely on one case for the proposition that general allegations of purchases within

1    Minnesota are not enough to plead a claim under the Minnesota Antitrust Law.  Motion at 9-10

2    (citing *City of St. Paul v. FMC Corp.*, No. 89 Civ. 466, 1990 WL 265171, at *7 (D. Minn. Feb.

3    26, 1990).  But nothing about *St. Paul* is on point.

4         In that case, plaintiffs sought to recover on behalf of a nationwide class of *indirect*

5    purchasers, whose only possible connection to defendants' conduct was through their indirect

6    purchases of defendants' goods.  The defendants were moving to limit the claims that an already-

7    certified nationwide class of indirect purchasers could bring to purchases within the State of

8    Minnesota, not moving to dismiss for failure to state a claim.  *Id.; see Sheet Metal Workers*, 737

9    F. Supp. 2d at 397 (denying motion to dismiss class plaintiffs' claims under Minnesota Antitrust

10   Law).  *St. Paul* says nothing about whether a direct purchaser like Seagate suing on its own

11   behalf must specifically allege that it made purchases of the products at issue from Defendants in

12   Minnesota.

13   **IV.   HEADWAY TECHNOLOGIES PARTICIPATED IN THE CONSPIRACY BY
         ELIMINATING A CO-CONSPIRATOR TO MAKE THE CONSPIRACY EASIER**

14

15        Headway Technologies, Inc. ("Headway") argues that Seagate failed to allege Headway

16   participated in the conspiracy.   To make this argument, Headway cites only to Seagate's

17   allegations that Headway is a subsidiary of TDK, and then contends that general allegations

18   about "Defendants" or "TDK" is not enough to avoid dismissal.  But Headway ignores the many

19   allegations supporting Headway's role in the conspiracy.  Headway ignores the allegations that it

20   was the vehicle used to eliminate one of the co-conspirators to make it easier for the remaining

21   co-conspirators to carry out their price-fixing scheme.

22        For much of the Conspiracy Period, there were three principal suppliers to which Seagate

23   could turn for suspension assemblies:   the NHK Defendants, the TDK Defendants, and

24   Hutchinson Technology Inc. ("HTI").   Complaint ¶¶ 3, 59.   These three principal suppliers

25   conspired to fix prices of suspension assemblies for well over a decade.  *Id.* ¶ 6.  That was until

26   two of the conspirators decided to eliminate the third.  Defendant TDK acquired Defendant HTI,

27   at times the largest manufacturer of HDD suspension assemblies, in 2016.  *Id.* ¶ 61. To eliminate

28

1   HTI, Defendant TDK used Headway Technologies, Inc., as the acquiring entity.[19]   HTI was a

2   principal supplier of HDD suspension assemblies to Seagate and other direct customers.  *Id.*; *see*

3   *also id.* ¶ 60.

4           Headway's acquisition of HTI further consolidated the market for HDD suspension

5   assemblies, making it easier for the remaining suppliers to carry on the conspiracy.  Complaint

6   ¶¶ 60, 62 (alleging a highly concentrated market is more susceptible to collusion).  Headway's

7   acquisition of HTI was intended to guarantee the scheme's continued success by reducing the

8   number of conspirators.  The remaining conspirators needed only to consult with each other

9   when determining who should bid and at what price.  In this sense, Headway played a significant

10  role in ensuring the conspiracy's continued success.  These "facts …are suggestive enough to

11  render [Headway's participation in the] conspiracy plausible."  *Twombly*, 550 U.S. at 556.

12  Seagate has adequately alleged claims against Headway, and those claims should not be

13  dismissed.[20]

14  **V.   CONCLUSION**

15          Based on the arguments presented above, Seagate respectfully requests that this Court

16  deny Defendants' motion to dismiss Counts IV and V of the Seagate Complaint and all claims

17

18

19

20

21          [19]   Hutchison   Tech.   Inc.,   Current   Report   (Form   8-K)   (Nov.   1,   2015),

22  https://www.sec.gov/Archives/edgar/data/772897/000119312515361413/d38505d8k.htm.

23          Seagate respectfully requests that the Court take judicial notice of this matter of public
     record, since the fact that Headway was the acquiring entity is not subject to reasonable dispute.

24

25          [20] Even if Seagate relied only on "group pleading" (which it does not), Headway ignores how
     this District has held group pleading to be sufficient, so long as allegations plausibly suggest

26  each defendant participated in the alleged conspiracy – as Seagate's complaint does for
     Headway. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d at 1184-

27  85; *see also, e.g.*, *In re TFT-LCD Flat Pane Antitrust Litig.*, 37 F. Supp. 3d 1102, 1108 (N.D.
     Cal. 2014); *In re TFT-LCD (Flat Panel) Antitrust Litig*, Nos. M 07-1827 SI, C 11-2225 SI, 2012

28  WL 149632, at *4 (N.D. Cal. Jan 18, 2012) (denying motion to dismiss on the basis of group
     pleading).

against Headway Technologies.  Should the Court determine that additional allegations are necessary, Seagate respectfully requests leave to amend.

Dated:  June 1, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Kenneth R. O'Rourke*
      Kenneth R. O'Rourke

Attorneys for Plaintiffs
*Seagate Technology LLC, Seagate Technology (Thailand), Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International*