Aaron M. Sheanin (SBN 214472)
**ROBINS KAPLAN LLP**
46 Shattuck Square, Suite 22
Berkeley, CA 94704
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
asheanin@robinskaplan.com

Christopher T. Micheletti (SBN 136446)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zelle.com

*Interim Co-Lead Class Counsel for End-User Plaintiffs*

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 19-md-02918-MMC<br><br>MDL No. 2918 |
| This Document Relates to:<br>ALL END-USER ACTIONS | **END-USER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Maxine M. Chesney |

1

2

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ............................................................. 1

II.    JURISDICTION AND VENUE ......................................................... 5

III.   THE PARTIES ................................................................................. 7

    A.   Plaintiffs .................................................................................. 7

    B.   TDK Defendants ...................................................................... 19

    C.   NHK Defendants ...................................................................... 20

IV.    AGENTS AND CO-CONSPIRATORS ............................................ 22

V.     INTERSTATE TRADE AND COMMERCE ..................................... 23

VI.    FACTUAL ALLEGATIONS............................................................. 26

    A.   The HDD Suspension Assembly Industry ............................. 26

    B.   The End-Products at Issue:  Standalone Storage Devices and
        Computers ................................................................................ 30

    C.   The Nature of the Conspiracy ................................................. 32

    D.   TDK and NHK Spring Further Conspire to Wound and then
        Eliminate Their Co-Conspirator, HTI ................................... 43

    E.   NHK Spring Pled Guilty to Conspiring to Fix Prices and Allocate
        Market Shares for HDD Suspension Assemblies ................... 44

    F.   Additional Government Investigations ................................... 46

    G.   The Structure and Characteristics of the HDD Suspension
        Assembly Market Support the Alleged Conspiracy................ 50

        1.   The HDD Suspension Assemblies Market Has High Barriers
            to Entry............................................................................ 50

        2.   The HDD Suspension Assemblies Market is Highly
            Concentrated .................................................................... 51

        3.   Market Concentration on the "Buy" Side ....................... 53

        4.   Homogeneity of Products and Inelasticity of Demand ... 55

        5.   Market Maturity and Declining Demand ........................ 56

        6.   Defendants Maintained Close Business Relationships .... 58

    H.   Distribution Chain/Sale to Plaintiffs and the End-Users They
        Represent.................................................................................. 59

    I.   The Markets for Suspension Assemblies, HDDs, and Products
        Incorporating HDDs................................................................ 60

VII.   THE INFLATED PRICES OF SUSPENSION ASSEMBLIES WERE
      PASSED THROUGH TO PLAINTIFFS AND THE END-USERS
      THEY REPRESENT........................................................................ 61

    A.   Suspension Assemblies Are Commodity-Like Products That Are
        Physically Traceable Throughout the Distribution Chain................... 61

B.  Increased Costs Will Be Passed-through to Customers in Competitive Markets ........................................................................ 62

1.  The Markets for Manufacturing and Sales of Standalone Storage Devices and Computers with HDDs are Highly Competitive at Each Level of the Distribution Chain ................................. 63

2.  Economic and Legal Literature Indicates that Unlawful Overcharges on a Component Will Be Passed-through in Prices for Products Containing that Component ........................................... 69

3.  The Precise HDD Suspension Assembly Overcharge Passed Through to the Products End-Users Purchased Can Be Measured with Regression Analysis ............................................................. 70

VIII.  CLASS ACTION ALLEGATIONS ............................................................. 73

IX.  PLAINTIFFS' CLAIMS ARE TIMELY ...................................................... 75

A.  Defendants Have Engaged in a Continuing Violation. ......................................... 75

B.  The Discovery Rule Tolled the Statute of Limitations. ......................................... 75

C.  Fraudulent Concealment Tolled the Statute of Limitations. .................................... 76

D.  The DOJ's Criminal Proceedings Suspended the Statute of Limitations. ........................................................................ 78

X.  VIOLATIONS ALLEGED ......................................................................... 78

FIRST CLAIM FOR RELIEF Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Classes) ........................................................ 78

SECOND CLAIM FOR RELIEF ....................................................................... 97

THIRD CLAIM FOR RELIEF Unjust Enrichment (on behalf of Plaintiffs and members of the Classes) ............................................... 126

XI.  PRAYER FOR RELIEF ........................................................................ 126

XII.  DEMAND FOR JURY TRIAL ................................................................ 128

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief based on the investigation of counsel as to all other matters, bring suit against TDK Corporation ("TDK"), Magnecomp Precision Technology Public Co. Ltd. ("MPT"), Magnecomp Corporation ("Magnecomp"), SAE Magnetics (H.K.) Ltd. ("SAE"), Hutchinson Technology Inc. ("HTI"), NHK Spring Co., Ltd. ("NHK Spring"), NHK International Corporation ("NHK International"), NHK Spring (Thailand) Co., Ltd. ("NHK Thailand"), NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Dong Guan"), and NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") for damages and other relief pursuant to state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, demand a trial by jury, and allege as follows:

## I.     NATURE OF THE ACTION

1.     This lawsuit arises out of a global conspiracy among Defendants and their co-conspirators to fix prices of, and allocate market shares for, hard disk drive ("HDD") suspension assemblies. HDD suspension assemblies are indispensable components of HDDs, which use magnetism to store information electronically. HDDs containing HDD suspension assemblies are sold both as stand-alone storage devices and incorporated into a variety of electronics.

2.     The fact of the price-fixing conspiracy is not in doubt. On July 29, 2019, the U.S. Department of Justice ("DOJ") announced that NHK Spring agreed to plead guilty and pay a $28.5 million fine for its role in the conspiracy.[1] On September 23, 2019, NHK Spring pled guilty.[2]

3.     According to the plea agreement, Defendants "engaged in discussions and attended meetings with each other. During these discussions, [Defendants] reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD

---

[1] *Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives*, DOJ (Jul. 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk; Information at 2-3, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

[2] Rule 11 Plea Agreement, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019); Notice of Criminal Monetary Imposition, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 18, 2019).

suspension assemblies to be sold in the United States and elsewhere. To effectuate these agreements, employees and officers of [Defendants] exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere. The [Defendants] relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale, or delivery to, the United States and elsewhere."[3]

4.      On February 13, 2020, the DOJ indicted Hitoshi Hashimoto and Hiroyuki Tamura for their roles in the "conspiracy to suppress and eliminate competition by agreeing to stabilize, maintain, and fix prices for HDD suspension assemblies sold in the United States and elsewhere." Both were general managers of NHK Spring's disk drive suspension and component sales department, who were involved in the sale and pricing of NHK Spring's HDD suspension assemblies.

5.      Defendants' conspiracy has also drawn the attention of antitrust regulators abroad. On February 9, 2018, the Japanese Fair Trade Commission ("JFTC") issued a cease and desist order to Defendants NHK Spring and NAT H.K., found that they substantially restrained competition in the HDD suspension assemblies market by agreeing to maintain sales prices, and imposed fines of ¥1076.16 million yen. The JFTC's cease and desist order identified cartel activity by Defendants NHK Spring, NAT HK, TDK, MPT, and SAE.

6.      In April 2018, Brazilian antitrust authorities launched an investigation into allegations that TDK, HTI, MPT, SAE, and NHK Spring colluded from 2003 to May 2016 to fix prices of HDD suspension assemblies. The Taiwan Fair Trade Commission and the Competition and Consumer Commission of Singapore also have investigated the cartel.

7.      This conspiracy went to the highest levels of these companies including the President and CEO of TDK, the President and CEO of MPT, the Vice Chairman of SAE, the President and CEO of NHK Spring, the President of NAT, as well as other senior directors, board members, vice presidents and other top management personnel.

---

[3] Rule 11 Plea Agreement, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

8.      Defendants knew that what they were doing was wrong and sought to conceal their conduct. Emails and memoranda containing information from competitors advised recipients to "*handle with care*," "*delete this email and all other related ones*," "*we would be better off not leaving anything in the emails*," and "*please be careful with the handling [of] the information*." After NHK Spring received confidential information from MPT's President Albert Ong, NHK Spring's Tamura—who was subsequently indicted for his role in the conspiracy—instructed, "*Don't mention Mr. Albert, since it's a crime.*"

9.      As a result of Defendants' conspiracy, American consumers have been substantially harmed. In announcing the guilty plea, Assistant Attorney General of the DOJ Antitrust Division Makan Delrahim stated that the "impact on American consumers and businesses is direct and substantial."[4]

10.      NHK confirmed these effects on U.S. commerce in its recent responses to Plaintiffs' Requests for Admissions:

> Defendants ADMIT that NHK Spring Co., Ltd. entered a guilty plea to the charge of "participating in a conspiracy to suppress and eliminate competition by fixing prices for hard disk drive suspension assemblies . . . sold in the United States and elsewhere." (Plea Agreement at ¶2.) Defendants further ADMIT that "[d]uring the relevant period, the conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce."

11.      TDK admitted that it participated in the conspiracy and that the conspiracy affected U.S. commerce, when it applied for leniency with the DOJ on behalf of itself and its subsidiaries pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Public Law 108-237. To enter into the DOJ's leniency program, TDK, like all other leniency applicants, was required to "report to the Antitrust Division . . . activity or other conduct constituting a criminal violation of Section 1 of the Sherman Act," which requires that the activity

---

[4] *Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives*, DOJ (Jul. 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.

affected U.S. commerce.[5]

12.      Plaintiffs and the End-User Classes they represent are limited to purchasers of three product types: (1) personal HDD storage devices, (2) enterprise HDD storage systems, and (3) desktop and portable computers—each of which contain multiple suspension assemblies. Personal HDD storage devices and enterprise HDD storage systems (described in more detail below) are collectively referred herein as "Standalone Storage Devices." Desktop and portable computers are referred to herein as "Computers."

13.      Plaintiffs seek to represent all persons and entities who, during the period from January 2005 through at least May 2016 (the "Class Period"),[6] indirectly purchased Standalone Storage Devices or Computers, not for resale, which included HDD suspension assemblies that were manufactured or sold by Defendants, any current or former subsidiary of Defendants, or any co-conspirator of Defendants.

14.      In the alternative, Plaintiffs seek to represent all persons and entities who, during the Class Period, indirectly purchased Standalone Storage Devices, not for resale, which included HDD suspension assemblies that were manufactured or sold by Defendants, any current or former subsidiary of Defendants, or any co-conspirator of Defendants.

15.      Through the conspiracy, Defendants and their co-conspirators unreasonably restrained interstate and foreign trade and commerce in violation of state antitrust, unfair competition, and consumer protection laws, and the common law of unjust enrichment. As a direct and proximate result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and the Classes paid more during the Class Period for HDD suspension assemblies than they otherwise would have paid in a competitive market, and have thereby suffered antitrust injury to their business

---

[5] *See* Model Corporate Conditional Leniency Letter, *available at* https://www.justice.gov/atr/page/file/1112911/download; *see also* Frequently Asked Questions About the Antitrust Division's Leniency Program and Model Leniency Letters, *available at* https://www.justice.gov/atr/page/file/926521/download ("Q. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter? A. Yes. . . . , the applicant must admit its participation in a criminal antitrust violation[.]").

[6] Plaintiffs reserve the right to extend the Class Period consistent with discovery including to the date when the effects of the conspiracy ceased to impact the Classes.

or property.

## II.   JURISDICTION AND VENUE

16.     Plaintiffs bring this action under state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

19.     On October 8, 2019, the Judicial Panel on Multidistrict Litigation ("JPML") centralized several related actions pertaining to the conspiracy alleged herein in this District before the Honorable Maxine M. Chesney as *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, MDL. No. 2918.

20.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of HDD suspension assemblies throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States,

including in this District, and they have purposefully availed themselves of the laws of the United States.

21.     Defendants' collusive conduct was intended to, and did, cause injury to Plaintiffs and the Classes, who purchased Standalone Storage Devices or Computers containing HDD suspension assemblies manufactured and sold by Defendants, any current or former subsidiary of Defendants, or any co-conspirator of Defendants. Defendants expressly aimed their conspiracy at the U.S. marketplace and their collusive conduct has resulted in an adverse effect on purchasers of HDDs in each state identified in this Complaint.

22.     In addition, NHK Spring, NHK International, NHK Thailand, NAT Dong Guan, and NAT H.K. have subjected themselves to this Court's jurisdiction through the cooperation provisions of NHK Spring's plea agreement in its criminal case. Those provisions require NHK Spring and "its subsidiaries that are engaged in the production or sale of HDD suspension assemblies" to cooperate fully, truthfully, and continuously by, among other things, producing documents, witnesses, and testimony in the United States, in exchange for limitations on further criminal prosecutions of those companies."[7]

23.     This Court already has determined that SAE is subject to the Court's personal jurisdiction.[8] TDK, MPT, Magnecomp, SAE, and HTI also have subjected themselves to this Court's jurisdiction by seeking leniency from the DOJ under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Public Law 108-237. TDK has entered into an antitrust leniency agreement with the DOJ on behalf of itself and its subsidiaries including all named Defendants in this paragraph. Under ACPERA, an antitrust leniency applicant must provide cooperation to plaintiffs in any civil action alleging a violation of Section 1 of the Sherman Act or any similar State law, including, among other things, providing a full account of all relevant facts known to the applicant, producing all relevant documents or other items wherever they are located,

---

[7] Rule 11 Plea Agreement at ¶¶ 12-15, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

[8] Order Denying Defendant SAE Magnetics (H.K.) Ltd.'s Motion to Dismiss Complaints for Lack of Personal Jurisdiction (ECF No. 261).

and using best efforts to secure and facilitate complete and truthful interviews, depositions, or testimony at trial or other court proceedings from covered cooperating individuals.[9] The Court has the authority to determine whether an antitrust leniency applicant has provided timely, satisfactory cooperation with respect to this litigation.[10]

## III.   THE PARTIES

### A.   Plaintiffs

24.     Plaintiff Dustin Lancaster is a citizen of Arkansas. During the Class Period, he purchased in Arkansas at least one HP Pavilion G6 notebook computer with 500GB HDD from Best Buy. The HDD purchased by Lancaster contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

25.     Plaintiff Jonathan Rizzo is a citizen of Arizona. During the Class Period, he purchased in Arizona at least two 1TB Western Digital My Book external HDD from Fry's Electronics, three 2TB Hitachi internal HDD from Newegg.com, and one 320GB Hitachi internal HDD from Ibuypower.com. The HDDs purchased by Rizzo contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

26.     Plaintiff Joanna Katcher is a citizen of California. During the Class Period, she purchased in California at least one Glyph Technologies external 1TB HDD from Amazon.com. The HDD purchased by Katcher contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

27.     Plaintiff Rhonda Glover is a citizen of California. During the Class Period, she purchased in California at least one Apple Macintosh MacBook Pro laptop computer with 500GB HDD from Apple Store. The HDD purchased by Glover contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful

---

[9] Public Law 108-237, § 213(a)–(b).

[10] *Id.* § 213(b)

1    conduct alleged herein.

2        28.    Plaintiff James Walnum is a citizen of California. During the Class Period, he

3    purchased in California at least one Apple MacBook Pro laptop computer with 320GB HDD and

4    one Western Digital My Passport for Mac Portable 2TB external HDD, both from Best Buy. The

5    HDDs purchased by Walnum contained HDD suspension assemblies manufactured or sold by at

6    least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

7        29.    Plaintiff Timothy A. St. Cyr is a citizen of Minnesota. During the Class Period and

8    while residing in California, he purchased in California at least one Dell XPS L702X laptop

9    computer with 750GB HDD from Dell.com. The HDD purchased by St. Cyr contained HDD

10   suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a

11   result of the unlawful conduct alleged herein.

12       30.    Plaintiff David Lietz is a citizen of the District of Columbia. During the Class

13   Period, he purchased in the District of Columbia at least one Dell Vostro A860 laptop computer

14   with 160GB HDD and one Dell Vostro 3550 laptop computer containing 320GB HDD, both from

15   Dell.com. The HDDs purchased by Lietz contained HDD suspension assemblies manufactured or

16   sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged

17   herein.

18       31.    Plaintiff John Hinshaw is a citizen of District of Columbia.  During the Class Period,

19   he purchased in District of Columbia at least one 4TB Seagate Backup Plus portable HDD from

20   Staples. The HDD purchased by Hinshaw contained HDD suspension assemblies manufactured or

21   sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged

22   herein.

23       32.    Plaintiff Jeffrey Greenfield is a citizen of Florida. During the Class Period, he

24   purchased in Florida at least one Toshiba Satellite P855-S5200 laptop containing 500GB HDD

25   from Best Buy, a SimpleTech Simple Drive 1TB external HDD from Costco, a Toshiba V63700-

26   B 750GB external HDD from Costco, and a Western Digital My Cloud 1TB external HDD from

27   Westerndigital.com. The HDDs purchased by Greenfield contained HDD suspension assemblies

28   manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful

1     conduct alleged herein.

2          33.      Plaintiff Ted Ingber is a citizen of Florida. During the Class Period, he purchased in

3   Florida at least one Hewlett Packard Envy all-in-one desktop PC with 320GB HDD from Best Buy.

4   The HDD purchased by Ingber contained HDD suspension assemblies manufactured or sold by at

5   least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

6          34.      Plaintiff Harley Oda is a citizen of Hawaii. During the Class Period, he purchased

7   in Hawaii at least one 1TB Seagate ST1000DM003 internal HDD for desktop and a 1TB Western

8   Digital My Passport Ultra 1TB external HDD, both from Best Buy. The HDDs purchased by Oda

9   contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he

10   suffered injury as a result of the unlawful conduct alleged herein.

11          35.      Plaintiff Benjamin Allen is a citizen of Iowa. During the Class Period, he purchased

12   in Iowa at least one Apple MacBook Pro laptop computer containing 120GB Hitachi Hard Drive

13   from Best Buy, one 1 TB Western Digital My Book Pro Edition external HDD, and one 1TB

14   Western Digital My Book Essential external HDD.  The HDDs purchased by Allen contained HDD

15   suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a

16   result of the unlawful conduct alleged herein.

17          36.      Plaintiff Jeeyoon Lee is a citizen of Kansas.  During the Class Period, she purchased

18   in Kansas at least one Seagate 1TB Backup Plus Portable Drive from Best Buy. The HDD

19   purchased by Lee contained HDD suspension assemblies manufactured or sold by at least one

20   Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

21          37.      Plaintiff John R. Shannon III is a citizen of Kansas. During the Class Period, he

22   purchased in Kansas at least one Apple iMac Desktop computer containing 1TB HDD from

23   Nebraska Furniture Mart.  The HDD purchased by Shannon contained HDD suspension assemblies

24   manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful

25   conduct alleged herein.

26          38.      Plaintiff Brian Fahey is a citizen of Massachusetts. During the Class Period, he

27   purchased in Massachusetts at least one Lenovo B50-80 laptop computer containing 500GB HDD

28   from eBay. The HDD purchased by Fahey contained HDD suspension assemblies manufactured or

1    sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged

2    herein.

3         39.    Plaintiff Martin Gasman is a citizen of Massachusetts. During the Class Period, he

4    purchased in Massachusetts at least one 160GB Seagate external HDD from Walmart, one 160GB

5    Seagate internal HDD from newegg.com, one 80GB Seagate portable HDD from Walmart, one

6    2TB Seagate Black Armor NAS 220 Centralized Network Storage HDD from Newegg.com, and

7    one 1TB Western Digital My Book AV external HDD from Amazon.com. The HDDs purchased

8    by Gasman contained HDD suspension assemblies manufactured or sold by at least one Defendant,

9    and he suffered injury as a result of the unlawful conduct alleged herein.

10        40.    Plaintiff Robert V. Nicastro is a citizen of Massachusetts. During the Class Period,

11   he purchased in Massachusetts at least one 1TB Toshiba external HDD, one 1TB Western Digital

12   My Passport Ultra external HDD, and one 300 GB Seagate Maxtor One Touch II external HDD

13   from Best Buy. The HDDs purchased by Nicastro contained HDD suspension assemblies

14   manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful

15   conduct alleged herein.

16        41.    Plaintiff Karen Needles is a citizen of Maryland. During the Class Period, she

17   purchased in Maryland at least two Seagate Backup Plus 5TB External HDD, one Seagate

18   FreeAgent Desk 1TB external HDD from Amazon.com, as well as several additional internal and

19   external HDDs from Amazon.com, TigerDirect, and Costco. The HDDs purchased by Needles

20   contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she

21   suffered injury as a result of the unlawful conduct alleged herein.

22        42.    Plaintiff Sascha Nelson is a citizen of Maryland. During the Class Period, she

23   purchased in Maryland at least one Dell desktop computer XPS630 with 500GB HDD, one Dell

24   desktop computer XPS 17 (L702x) with a Seagate Momentus 500GB HDD, and a Dell Laptop

25   Inspiron 15z 5523 containing 500 GB HDD. The HDDs purchased by Nelson contained HDD

26   suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as

27   a result of the unlawful conduct alleged herein.

28        43.    Plaintiff Stacey Silver is a citizen of Maryland. During the Class Period, she

purchased in Maryland at least one Apple iMac Retina 4K, 21.5-inch desktop computer containing 1TB HDD from Apple Store.  The HDD purchased by Silver contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

44.     Plaintiff James Marean is a citizen of Maine.  During the Class Period, he purchased in Maine at least one Dell Dimension 4600 Desktop computer with 40GB HDD from Staples.  The HDD purchased by Marean contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

45.     Plaintiff Nate Coffin is a citizen of Maine. During the Class Period, he purchased in Maine at least one G-Tech 500GB G-Drive slim HDD from the Apple Store.  The HDD purchased by Coffin contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

46.     Plaintiff Jordan Leff is a citizen of Michigan. During the Class Period, he purchased in Michigan at least one Lenovo ThinkPad Edge laptop computer containing 320GB HDD from Amazon.com. The HDD purchased by Leff contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

47.     Plaintiff Yitah Wu is a citizen of Michigan. During the Class Period, he purchased in Michigan at least one Iomega 360GB external HDD from Amazon.com.  The HDD purchased by Wu contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

48.     Plaintiff Chad Klebs is a citizen of Minnesota. During the Class Period, he purchased in Minnesota at least one Samsung Seagate HN-M201RAD Momentous SpinPoint ST2000LM003 2TB 2.5-Inch internal hard drive from Amazon.com, one Toshiba HDTC605CK3A1 500GB portable HDD from Sam's Club, and one 500GB Seagate FreeAgent Desktop 9NK2AG-500 external HDD.  The HDDs purchased by Klebs contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

49.     Plaintiff Pamela Uglem is a citizen of Minnesota. During the Class Period, she purchased in Minnesota at least one HP Pavilion dv7 laptop computer containing 320GB HDD, and one Toshiba Satellite C55-B5201 laptop computer containing 500GB HDD, both from Best Buy. The HDDs purchased by Uglem contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

50.     Plaintiff Andrew Syverson is a citizen of Minnesota. During the Class Period, he purchased in Minnesota at least one Hewlett Packard 15z-ba000 ABA laptop computer containing 500GB HDD from HP.com. The HDD purchased by Syverson contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

51.     Plaintiff Kimberly Benjamin is a citizen of Missouri. During the Class Period, she purchased in Missouri at least one Apple Macintosh iMac Retina 4K desktop computer containing 1TB HDD from Apple Store. The HDD purchased by Benjamin contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

52.     Plaintiff Jason Malashock is a citizen of Missouri. During the Class Period, he purchased in Missouri at least one Western Digital My Passport Ultra 2TB Portable External HDD from Amazon.com. The HDD purchased by Malashock contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

53.     Plaintiff Brandy Newsome is a citizen of Mississippi. During the Class Period, she purchased in Mississippi at least one Lenovo B570-1068 containing WD WD5000BPVT-24HXZ 5400RPM 500G HDD from Best Buy. The HDD purchased by Newsome contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

54.     Plaintiff Ethel Cain Carson is a citizen of Mississippi. During the Class Period, she purchased in Mississippi at least one Dell Dimension 4600 05D481 desktop computer containing 80GB HDD, one Dell Inspiron 1564 laptop computer containing 320GB HDD both from Dell.com,

one Hewlett Packard Compaq Presario CQ60-419wm notebook computer containing 160GB HDD, one Hewlett Packard-Compaq Presario 584037-001 notebook computer containing 250GB, and one HP TouchSmart 15-1010 WM notebook computer containing 500GB HDD from Walmart. The HDDs purchased by Carson contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

55.     Plaintiff Joseph Mattingly is a citizen of Montana. During the Class Period, he purchased in Montana at least one Seagate Barracuda 7200, 500GB SATA internal HDD from Amazon.com, one Hewlett Packard laptop Computer G70-257CL containing 320GB HDD from Best Buy, and one Hewlett Packard Computer G60 containing 320GB HDD from Best Buy.  The HDDs purchased by Mattingly contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

56.     Plaintiff Richard Jones is a citizen of Montana. During the Class Period, he purchased in Montana at least one Toshiba L75-B7150 laptop computer containing 500GB HDD from Staples. The HDD purchased by Jones contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

57.     Plaintiff Thomas Leon Meltzer is a citizen of North Carolina. During the Class Period, he purchased in North Carolina at least one 2TB Western Digital internal HDD from TigerDirect.com. The HDD purchased by Meltzer contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

58.     Plaintiff Ashely Boswell is a citizen of North Dakota. During the Class Period, she purchased in North Dakota at least one Hewlett Packard 17-P161DX 17.3" AMD A10 series laptop computer containing 1TB HDD from Best Buy. The HDD purchased by Boswell contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

59.     Plaintiff Chad Nodland is a citizen of North Dakota. During the Class Period, he purchased in North Dakota at least one Western Digital 4TB WD Red Plus NAS Internal Hard

Drive from Amazon.com.  The HDD purchased by Nodland contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

60.     Plaintiff Matthew Carlson is a citizen of North Dakota. During the Class Period, he purchased in North Dakota at least one Seagate 4TB Backup Plus Portable HDD from Best Buy. The HDD purchased by Carlson contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

61.     Plaintiff Leslie Working is a citizen of Nebraska. During the Class Period, she purchased in Nebraska at least one Toshiba Satellite T115D laptop computer containing 230GB HDD and one Hewlett Packard s5000 desktop computer containing 500GB HDD both from either Best Buy or Office Depot. The HDDs purchased by Working contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

62.     Plaintiff Matthew Landry is a citizen of New Hampshire. During the Class Period, he purchased in New Hampshire at least one Dell Latitude E5570 laptop computer containing 500GB HDD from Dell.com. The HDD purchased by Landry contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

63.     Plaintiff Sara Steffen is a citizen of New Hampshire.  During the Class Period, she purchased in New Hampshire at least one G-Technology G-Raid 6TB external HDD and one G-Technology G-Raid 8TB external HDD both from the Apple Store, as well as a Western Digital My Passport 4TB external HDD from Best Buy. The HDDs purchased by Landry contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

64.     Plaintiff Sue McKelvey is a citizen of New Mexico. During the Class Period, she purchased in New Mexico at least one Apple Macintosh MacBook Pro 13-inch laptop computer with 750GB HDD and one WD My Passport for Mac portable external HDD, both from Amazon.com. The HDD purchased by McKelvey contained HDD suspension assemblies

1    manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful

2    conduct alleged herein.

3        65.    Plaintiff Gregory Painter is a citizen of Nevada. During the Class Period, he

4    purchased in Nevada at least one Apple Macintosh MacBook Pro 15.4" laptop computer with

5    320GB HDD from Apple Store, two units of Gateway DX4720-03 desktop computers with 640GB

6    HDD from Newegg.com, two units of Western Digital My Passport Essential 500GB external HDD

7    and a Seagate FreeAgent GoFlex 320GB external HDD—all three external HDDs from Best Buy.

8    The HDDs purchased by Painter contained HDD suspension assemblies manufactured or sold by

9    at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

10       66.    Plaintiff Michelle Felich is a citizen of Nevada. During the Class Period, she

11   purchased in Nevada at least one 500GB Toshiba external HDD from Best Buy. The HDD

12   purchased by Felich contained HDD suspension assemblies manufactured or sold by at least one

13   Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

14       67.    Plaintiff Vincent Cimino is a citizen of New York. During the Class Period, he

15   purchased in New York at least one LaCie D2 Quadra v3 2TB External HDD from Amazon.com.

16   The HDD purchased by Cimino contained HDD suspension assemblies manufactured or sold by at

17   least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

18       68.    Plaintiff Anthony Cimino is a citizen of New York. During the Class Period, he

19   purchased in New York at least one Western Digital My Book Thunderbolt Duo Dual Drive High-

20   Speed Storage with RAID 6 TB external HDD from Amazon.com.  The HDD purchased by Cimino

21   contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he

22   suffered injury as a result of the unlawful conduct alleged herein.

23       69.    Plaintiff David Anderson is a citizen of Oregon. During the Class Period, he

24   purchased in Oregon at least one Dell Studio XPS 8000 desktop computer with two 750GB HDDs

25   from Dell.com, one Apple Macintosh iMac 12.1 (21.5") desktop computer containing Western

26   Digital WDC WD1001FALS-403AA0 1TB HDD from The Mac Store, and four units of Seagate

27   Barracuda 7200.12 (9SL153-302) 750GB internal HDDs from Amazon.com.  The HDDs

28   purchased by Anderson contained HDD suspension assemblies manufactured or sold by at least

1    one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

2    70.    Plaintiff Angela Gardner is a citizen of Rhode Island. During the Class Period, she

3    purchased in Rhode Island at least one Dell Inspiron 15 3000 series laptop computer with 500GB

4    HDD from Dell.com. The HDDs purchased by Gardner contained HDD suspension assemblies

5    manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful

6    conduct alleged herein.

7    71.    Plaintiff Sara Speziale-Phillips is a citizen of South Carolina. During the Class

8    Period, she purchased in South Carolina at least one Western Digital My Passport 2TB external

9    HDD from Walmart. The HDD purchased by Speziale-Phillips contained HDD suspension

10   assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of

11   the unlawful conduct alleged herein.

12   72.    Plaintiff Tracy Nurzynski is a citizen of California. During the Class Period, and

13   while residing in South Carolina, she purchased in South Carolina at least one Hewlett Packard

14   Pavilion dv7-2185DX laptop computer containing one 250GB Western Digital Scorpio

15   WD2500BEVS- 60USTO internal HDD from Best Buy. The HDD purchased by Nurzynski

16   contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she

17   suffered injury as a result of the unlawful conduct alleged herein.

18   73.    Plaintiff Ann Marie Putzier is a citizen of South Dakota. During the Class Period,

19   she purchased in South Dakota at least one Dell Studio 1558 laptop computer containing 320GB

20   HDD, and one Hewlett Packard 6777c desktop computer containing 1TB HDD, a Western Digital

21   1TB My Book Home Pan-am external HDD, and one Hitachi LifeStudio 250GB external HDD

22   from Best Buy, Walmart, Staples, or Sam's Club.  The HDDs purchased by Putzier contained HDD

23   suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as

24   a result of the unlawful conduct alleged herein.

25   74.    Plaintiff Alex Nicholson is a citizen of Tennessee. During the Class Period, he

26   purchased in Tennessee at least one Dell Inspiron 5720 laptop computer containing 1TB HDD from

27   Affinity Technology Partners (formerly, 3N1 Media), one 500GB Seagate FreeAgent Black

28   external HDD and 250GB WD Red portable HDD both from Office Depot.  The HDD purchased

by Nicholson contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

75.     Plaintiff Yvonne Peychal is a citizen of Tennessee. During the Class Period, she purchased in Tennessee at least one Hewlett-Packard ProBook 4530s Notebook computer with 320GB HDD from Tigerdirect.com. The HDD purchased by Peychal contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

76.     Plaintiff Doug Fuller is a citizen of Utah. During the Class Period, he purchased in Utah at least one 100GB Fujitsu Mobile internal HDD from a Dell Supplier, and one Western Digital 500GB Scorpio Blue Internal HDD from Amazon.com.  The HDDs purchased by Fuller contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

77.     Plaintiff Nicole Laird is a citizen of Utah.  During the Class Period, she purchased in Utah at least one Apple Macintosh Mac Mini 2.3GHz desktop computer with 1TB HDD from Simply Mac. The HDD purchased by Laird contained HDD suspension assemblies manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

78.     Plaintiff Samuel Bringhurst is a citizen of Utah. During the Class Period, he purchased in Utah at least one Dell Inspiron 15.6" Touchscreen i3542-6003BK laptop computer containing 500GB HDD from Amazon.com. The HDD purchased by Bringhurst contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

79.     Plaintiff Eric Klotz is a citizen of Virginia. During the Class Period, he purchased in Virginia at least one Lacie LRD00M1 Rugged Raid 2TB portable HDD from Amazon.com, one Apple Macintosh MacBook Pro 13.3" laptop computer containing 500 GB HDD from NavyExchange.com, and one Lenovo 20179 IdeaPad N585-59343747 laptop computer containing 500 GB HDD from Walmart. The HDDs purchased by Klotz contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the

1   unlawful conduct alleged herein.

2         80.    Plaintiff Lauren Huyck is a citizen of Virginia. During the Class Period, she

3   purchased in Virginia at least one Apple Macintosh Mac Mini 2.66 desktop computer containing

4   two 250 GB HDDs from Apple.com, one Hitachi 500GB internal HDD from Apple Store, a Seagate

5   Backup Plus SRD0SP0 1TB portable HDD, one Western Digital Black WD1003FZEX 1TB

6   internal HDD from Amazon.com, and one Western Digital Blue WD10EZEX 1TB internal HDD

7   from Amazon.com. The HDDs purchased by Huyck contained HDD suspension assemblies

8   manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful

9   conduct alleged herein.

10         81.    Plaintiff Kenny Lai Cheong is a citizen of Virginia. During the Class Period, he

11   purchased in Virginia at least one Dell XPS 14Z laptop computer containing 500GB HDD from

12   eBay, a Western Digital, Elements 1.5TB external HDD from Dell.com, one Toshiba 5400 RPM

13   160GB Internal laptop HDD from eBay, and one Dell XPS M1330 laptop computer containing

14   160GB HDD from eBay. The HDDs purchased by Cheong contained HDD suspension assemblies

15   manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful

16   conduct alleged herein.

17         82.    Plaintiff Jonathan Lewis is a citizen of Florida. During the Class Period and while

18   residing in Vermont, he purchased in Vermont at least two G-Tech 4TB G-Raid OG00273 Gen 4

19   portable HDDs from Macmall.com, one Seagate Backup Plus 1TB portable HDD from

20   Amazon.com, one G-Tech G-RAID 0G00273 4TB portable HDD and one G-Tech G-RAID

21   0G02492 8TB portable HDD from newegg.com.  The HDDs purchased by Lewis contained HDD

22   suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a

23   result of the unlawful conduct alleged herein.

24         83.    Plaintiff Derek McRoberts is a citizen of Wisconsin. During the Class Period, he

25   purchased in Wisconsin at least two Seagate Barracuda 2TB internal HDD and a HGST Travelstar

26   500GB internal HDD for notebooks all from newegg.com. The HDDs purchased by McRoberts

27   contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he

28   suffered injury as a result of the unlawful conduct alleged herein.

84.     Plaintiff Seth Swanson is a citizen of Wisconsin. During the Class Period, he purchased in Wisconsin at least two Western Digital My Book Essential 1TG external HDD from Best Buy, two ASUS G75 Series G75VW-NS71 laptop computers each containing 500GB HDD from Newegg.com, and one MacBook Pro laptop computer containing 160GB HDD from Best Buy. The HDDs purchased by Swanson contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

85.     Plaintiff Larry Steele is a citizen of West Virginia. During the Class Period, he purchased in West Virginia at least two Dell OptiPlex 9010 desktop computers containing HDDs, one Dell Latitude E6330 desktop computer containing HDDs, and one Dell Latitude D630 desktop computer containing 120GB HDD—all four products from Dell.com, one Western Digital WD1600ME 160GB portable HDD and one HP Simple Save hp sd500a 500GB external HDD—both from Staples, and three Dell OptiPlex 760 Minitower desktop computers each containing 160 GB HDD from Dell Shop Direct. The HDDs purchased by Steele contained HDD suspension assemblies manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

**B.     TDK Defendants**

86.     Defendant TDK Corporation is a Japanese corporation with its principal place of business located at 2-5-1 Nihonbashi 2-chome, Chuo-ku, Tokyo, 103-8272, Japan. TDK has a California-based branch located at 1745 Technology Drive, Suite 200, San Jose, CA 95110. TDK—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

87.     Defendant Magnecomp Precision Technology Public Co. Ltd. is a Thai corporation with its principal place of business located at 162 M.5 Phaholyothin Road, T.Lamsai A. Wangnoi, Ayutthaya 13170, Thailand. It is an affiliate of and wholly controlled by TDK. Defendant MPT—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in

this District, during the Class Period.

88.     Defendant Magnecomp Corporation is a California corporation with its principal place of business located at 38975 Sky Canyon Drive, Suite 111, Murrieta, CA 92563. It is an affiliate of and wholly controlled by TDK. Defendant Magnecomp—directly and/or through its affiliates—manufactured, marketed, and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

89.     Defendant SAE Magnetics (H.K.) Ltd. is a Chinese corporation with its principal place of business located at 6 Science Park East Avenue, Hong Kong Science Park, Hong Kong, Shatin, N.T., Hong Kong, China. It is an affiliate of and wholly controlled by TDK. Defendant SAE—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

90.     Defendant Hutchinson Technology, Inc. is a Minnesota corporation with its principal place of business located at 40 West Highland Park Drive NE, Hutchinson, Minnesota 55350. HTI was an independent company until it was acquired by TDK on October 6, 2016.[11] It is an affiliate of and wholly controlled by TDK. HTI—directly and/or through its affiliates— manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

## C.     NHK Defendants

91.     Defendant NHK Spring Co., Ltd. is a Japanese corporation with its principal place of business located at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004, Japan. NHK Spring— directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

92.     Defendant NHK International Corporation is a Michigan corporation and U.S.

---

[11] *TDK Corporation Announces Completion of Hutchinson Acquisition*, TDK Global (Oct. 6, 2016).

subsidiary established by NHK Spring in 1976, with its principal place of business located at 46855 Magellan Drive, Novi, Michigan. NHK International maintains offices in this District at 2350 Mission College Boulevard, Suite 1090, Santa Clara, California. It is an affiliate of and wholly controlled by NHK Spring. NHK International—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

93. Defendant NHK Spring (Thailand) Co., Ltd. is a Thai corporation with its principal place of business located at Bangna Tower A, 6th-7th floor, 2/3 Moo 14, Bangna-Trad Rd., (km. 6.5), Bangkaew, Bangplee, Samutprakarn, 10540 Thailand. It is an affiliate of and wholly controlled by NHK Spring. NHK Thailand—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

94. Defendant NAT Peripheral (Dong Guan) Co., Ltd. is a Chinese corporation with its principal place of business located at Conrad Hi-Tech Park, Shangsha, ZhenAn Road, ChangAn Town, Dongguan, Guangdong, 523830 China. It is an affiliate of and wholly controlled by NHK Spring. Defendant NAT Dong Guan—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States, including in this District, during the Class Period.

95. Defendant NAT Peripheral (H.K.) Co., Ltd. is a Chinese corporation with its principal place of business located at Suite 15b-17, 9/F, Tower 3, China Hong Kong City, 33 Canton Rd., T.S.T., Kowloon, Hong Kong, China. It was formed as a joint venture between SAE and NHK Spring in 2003, and operated as such until March 31, 2015. During this period, SAE had one seat on NAT H.K.'s board of directors and owned 19% of the joint venture, while NHK Spring owned the remainder. On April 10, 2015, SAE transferred 100% of its voting rights in NAT H.K. to NHK Spring, at which time NAT H.K. become a wholly-owned subsidiary of NHK Spring. Defendant NAT H.K.—directly and/or through its affiliates—manufactured, marketed and/or sold HDD suspension assemblies that were sold, purchased, and/or delivered throughout the United States,

1  including in this District, during the Class Period.[12] NAT H.K. and NAT Dong Guan are referred

2  to herein collectively as "NAT."

3  ## IV.  AGENTS AND CO-CONSPIRATORS

4  96.    The acts alleged against Defendants in this Complaint were authorized, ordered, or

5  done by their officers, agents, employees, or representatives, while actively engaged in the

6  management and operation of Defendants' business or affairs. Defendants' officers, directors,

7  agents, employees, or representatives engaged in the conduct alleged in the usual management,

8  direction, or control of Defendants' business affairs. Defendants are also liable for acts done in

9  furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

10  97.    When Plaintiffs refer to a corporate family or companies by a single name in this

11  Complaint, they are alleging that one or more employees or agents of entities within that corporate

12  family engaged in conspiratorial acts on behalf of every company in that family. The individual

13  participants in the conspiratorial acts did not always know the corporate affiliation of their

14  counterparts, nor did they distinguish between the entities within a corporate family. Customers

15  often did not recognize these distinctions either, because Defendants marketed themselves as

16  corporate families.

17  98.    Defendants obscured the differences between members of their corporate families

18  by using networks and/or domain names associated with their affiliates for email communications.

19  For example, during the Class Period email addresses for both MPT and Magnecomp employees

20  used the @magnecomp.com domain name. Personnel at MPT based in Asia used U.S.-based email

21  servers, conveying to recipients that they held dual roles or dual responsibilities at both MPT and

22  Magnecomp.

23  99.    Personnel often shifted back and forth between different entities within the same

24  Defendant corporate family, further blurring the distinctions between the entities. A number of

25  Defendants' employees engaged in collusive conduct during the Class Period and then brought their

26  _____

27  [12] TDK Press Release, *TDK Subsidiary dissolve Joint Venture of HDD Suspension Manufacturing Company* (Apr. 1, 2014), *available at*
https://www.tdk.com/corp/en/news_center/press/201504011768.htm.

28

knowledge with them when they moved between members of their corporate families. For example, in 2009, NHK Thailand's Vice President and General Manager of the Disk Drive Suspension Division, returned to NHK Spring in Japan after four years in Thailand.

100.     The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

101.     Various persons and/or firms not named as Defendants participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the conspiracy. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

102.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

103.     Each Defendant or co-conspirator acted as the principal, agent, or joint venture of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for HDD suspension assemblies made by its parent company.

## V.     INTERSTATE TRADE AND COMMERCE

104.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States in that, among other things, during the Class Period:

a.     Defendants and their co-conspirators sold HDD suspension assemblies in, or for delivery to, the United States;

b.     Defendants and their co-conspirators sold foreign-manufactured HDD suspension assemblies outside the United States for incorporation into HDDs that were sold in, or for delivery to, the United States;

c.    HDD suspension assemblies and HDDs traveled in, and substantially affected, interstate and import trade and commerce;

d.    The conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce, including in HDD suspension assemblies and HDDs; and

e.    The conspiracy alleged herein affected billions of dollars of commerce. Defendants collectively controlled 97% of the global HDD suspension parts market. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and other entities who are themselves engaged in commerce.

105.    According to NHK Spring's plea agreement, "[d]uring the relevant period, [NHK Spring] and its co-conspirators manufactured HDD suspension assemblies outside the United States and sold them in, or for delivery to, the United States. During the relevant period, [NHK Spring] and its co-conspirators sold foreign-manufactured HDD suspension assemblies outside the United States for incorporation into products—namely, hard disk drives—that were sold in, or for delivery to, the United States. During the relevant period, HDD suspension assemblies and certain hard disk drives incorporating affected HDD suspension assemblies traveled in, and substantially affected, interstate and import trade and commerce. During the relevant period, the conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce, including in HDD suspension assemblies and certain hard disk drives incorporating affected HDD suspension assemblies."[13]

106.    In announcing the guilty plea, Assistant Attorney General of the DOJ Antitrust Division Makan Delrahim stated that the "impact on American consumers and businesses is direct and substantial."[14]

---

[13] Rule 11 Plea Agreement at ¶ 4(d), *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

[14] *Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives*, DOJ (Jul. 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.

107. Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, including activities to fix, raise, maintain and/or stabilize prices, and to allocate the market and customers for HDD suspension assemblies, and which conspiracy unreasonably restrained trade and adversely affected the market for HDD suspension assemblies.

108. NHK confirmed these effects on U.S. commerce in its recent responses to Plaintiffs' Requests for Admissions:

> Defendants ADMIT that NHK Spring Co., Ltd. entered a guilty plea to the charge of "participating in a conspiracy to suppress and eliminate competition by fixing prices for hard disk drive suspension assemblies . . . sold in the United States and elsewhere." (Plea Agreement at ¶2.) Defendants further ADMIT that "[d]uring the relevant period, the conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce."

109. TDK has admitted that the conspiracy affected U.S. commerce as well via the leniency application it entered into with the DOJ on behalf of itself and its subsidiaries pursuant to the ACPERA, which required that TDK "report to the Antitrust Division . . . activity or other conduct constituting a criminal violation of Section 1 of the Sherman Act," which requires that the activity affected U.S. commerce. *See* Model Corporate Conditional Leniency Letter, available at https://www.justice.gov/atr/page/file/1112911/download.

110. Defendants' transactional sales data include bill-to and ship-to addresses in the United States.

111. Products containing HDD suspension assemblies manufactured and sold by Defendants and their subsidiaries and co-conspirators during the Class Period were imported into, and sold in, the United States, ultimately to end-users including Plaintiffs.

112. Defendants' conspiracy and wrongdoing described herein harmed persons in the United States who purchased Standalone Storage Devices and Computers in the United States not for resale which included as a component one or more HDD suspension assemblies that were manufactured or sold by Defendants, any current or former subsidiary of Defendants, or any co-

conspirator of Defendants.

## VI.   FACTUAL ALLEGATIONS

### A.   The HDD Suspension Assembly Industry

113.    HDDs use magnetism to write, retrieve and store vast amounts of information electronically[15] and are installed in a variety of electronic products including portable and external hard drives, desktop and laptop computers, game consoles, set-top boxes/DVRs, network servers and enterprise storage arrays.

114.    HDD suspension assemblies are indispensable components of HDDs.[16] HDDs cannot read and write data without a suspension assembly. Suspension assemblies serve the essential functions of (i) securing the read/write head in position over the disk, (ii) maintaining a constant height, and (iii) linking the read/write head to the electronic circuitry of the HDD.

115.    Defendants acknowledge the importance of suspension assemblies to HDDs. For example, according to MPT, "[t]he suspension assembly is a critical component of a HDDs performance and reliability whose function is to enable the magnetic head to fly at a precise height, frequently less than a millionth of an inch, above the spinning magnetically coated disk."[17] In fact, MPT describes the suspension assembly as "one of the three most critical mechanical components in the HDD."[18] HTI acknowledged in public securities filings that, "Suspension assemblies are a critical component of disk drives, and our results of operations are highly dependent on the disk drive industry."[19]

116.    Defendants' customers echo the importance of these components. For example, Seagate, one of the largest purchasers of HDD suspension assemblies and manufacturers of HDDs,

---

[15] *Hard Drives*, EXPLAINTHATSTUFF, *available at* https://www.explainthatstuff.com/ harddrive.html (last visited Jul. 30, 2015).

[16] *Hutchinson Shares Extend Slide on Continued FTC Antitrust Review*, THESTREET (Jan. 5, 2016), *available at* https://www.thestreet.com/story/13412469/1/hutchinson-shares-keep-falling-on-extended-ftc-antitrust-review.html.

[17] MPT 2006 Annual Report.

[18] http://capital.sec.or.th/webapp/corp_fin/datafile/56/20050520E06.DOC.

[19] HTI 2007 Annual Report and Form 10-K.

has stated, "suspension assemblies are one of the *highest cost* components of an HDD (and for certain HDDs are the highest cost component)."[20] Seagate credits this fact to the importance of suspension assemblies to the essential functions of HDDs.[21]   Suspension assemblies comprise approximately 5-10% or more—up to 15% in some instances—of the cost of an HDD.[22] Suspension assemblies are therefore a significant cost component of an HDD.

117.     Western Digital also acknowledges the importance of HDD suspension assemblies, describing it as a "[p]articularly important component[]."[23]

118.     HDDs are comprised of, among other things, spinning magnetic disks (sometimes called platters) and magnetic heads that fly over the disks, reading and writing the information contained on the disks (*see* Figures 1 & 2).[24] HDD suspension assemblies hold the magnetic heads in position over the disks.[25] Thus, HDD suspension assemblies are essential to the functioning of HDDs.

---

[20] *See, e.g.,* Seagate Plaintiffs' Amended Complaint for Damages and Other Relief at ¶ 54, *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, No. 19-md-2918 (N.D. Cal. Oct. 2, 2020) (ECF No. 271).

[21] *Id.*

[22] These figures are based on preliminary information and productions.  Plaintiffs reserve the right to revise these estimates consistent with full discovery from Defendants and third parties related to suspension assembly and HDD cost data and information.

[23] *See* Western Digital 2012 Annual Report, at 23, *available at* https://www.annualreports.com/HostedData/AnnualReportArchive/s/NASDAQ_STX_2012.pdf

[24] *Id.*; *Hard Disk Drives*, Texas A&M University, *available at* https://microtribodynamics.engr.tamu.edu/hard-disk-drives/ (last visited Jul. 30, 2019).

[25] *Hard Drives*, ExplainThatStuff.

(Figure 1)[26]

(Figure 2)[27]



119.    The number of suspension assemblies used per disk drive may be decreased or increased according to the number of magnetic disks or platters installed, and was, in part, driven by the market demand for disk drive storage capacity. An HDD typically includes two suspension assemblies for each platter. HDDs use as many as six platters and therefore up to twelve suspension assemblies.

120.    As platters and storage capacity of an HDD increase, the number of and cost of suspension assemblies incorporated into the HDD increase as well.  As a result, the number of platters and suspension assemblies is positively correlated with HDD capacity, and HDD capacity is positively correlated with HDD price.

---

[27] TDKHDD000289413 at '31.

121.     Defendants manufacture and sell HDD suspension assemblies in the United States and elsewhere to companies that install HDD suspension assemblies into HDDs. End-users then purchase HDDs as either stand-alone products, or as part of larger systems, such as computers.

122.     From 2005 through 2016, over six billion units of HDDs were shipped worldwide.[28] On information and belief, of those six billion units, approximately 30%-35% were sold in the United States as HDDs or in other products. In 2018, global unit shipments of HDDs were nearly 400 million.[29]

**B.     The End-Products at Issue:  Standalone Storage Devices and Computers**

123.     Suspension assemblies are used in personal HDD storage devices and in enterprise HDD storage devices purchased by end-user consumers and businesses.  These storage device products are comprised predominantly of HDDs, and are referred to herein as "Standalone Storage Devices."

124.     Personal HDD storage devices include: (i) "bare" HDDs, which are purchased by end-users for installation in a storage device or computer; (ii) external hard drives, which consist of an HDD, a simple USB adapter and/or power cord, and plastic housing; and (iii) network attached storage (NAS) drives, which are similar to an external hard drive but have a separate power supply and some additional hardware and/or software features.  External hard drives and NAS drives thus comprise little more than their HDDs.

125.     Enterprise HDD storage systems are storage servers and arrays, and include bare HDDs purchased for installation in the systems.  For example, a storage server or array generally comprises a chassis with multiple bays for installation of multiple HDDs (four, eight or more).  As

[28] *See Worldwide Unit Shipments of Hard Disk Drives (HDD) from 1976 to 2022*, *available at* https://www.statista.com/statistics/398951/global-shipment-figures-for-hard-disk-drives/; *Market Views: Hard Drive Shipments Drop by Nearly 17% in 2015*, AnandTech (Mar. 2, 2016), *available at* https://www.anandtech.com/show/10098/market-views-2015-hard-drive-shipments; *Seagate and Western Digital Led the HDD Market Last Year*, Market Realist (Jun. 29, 2017), *available at* https://marketrealist.com/2017/06/seagate-and-western-digital-led-the-hdd-market-last-year/.

[29] *Worldwide Unit Shipments of Hard Disk Drives (HDD) from 1976 to 2022 (in millions)*, STATISTA, *available at* https://www.statista.com/statistics/398951/global-shipment-figures-for-hard-disk-drives/ (last visited Jul. 30, 2019).

1    a result, the HDDs can comprise a substantial portion of the cost of enterprise HDD storage systems.

2          126.    HDDs containing suspension assemblies are also incorporated into computers that

3    are sold to end-user consumers and businesses.  HDDs are used in computers to store operating

4    system software, programs and other files.   When used in a computer, an HDD is a critical

5    component of the computer's operation and storage capabilities.

6          127.    Desktop and laptop computers typically identify the type and level of storage

7    contained therein. End-users purchasing a computer may also be provided with options for selecting

8    or increasing the HDD storage level in the computer at the time of purchase, with higher storage

9    levels generally increasing the price of the internal HDD and the computer.  For example, as shown

10   on the Dell website, an end-user purchasing a Dell Inspiron 560 Desktop available in February

11   2010 could purchase an "Essential Plus Package" at $379 that included a standard 320 GB SATA

12   Hard Drive (7200RPM, 16 MB Cache) and certain memory upgrades.  Alternatively, the end-user

13   could increase storage capacity with the purchase of the "Performance Package" at $449, that

14   includes all of the same memory upgrades plus a 640 GB SATA Hard Drive (7200 RPM, 16 MB

15   Cache), thereby doubling the HDD storage capacity for an additional $70.

16       (Figure 3)

17

18   Inspiron 560 Desktop




27         128.    Similarly, as shown on the Apple website, an end-user purchasing a MacBook Pro

28   13-inch laptop available in January 2012 could increase HDD storage capacity from 500 GB to 750

1  GB for an additional $100.

2      (Figure 4)



15  129.      HDDs are one of the highest cost components in a computer, and are therefore a

16  significant cost component of computers.  As the storage capacity of an HDD used in a computer

17  increases, the cost of the computer increases.  As a result, HDD capacity and price are positively

18  correlated with total computer price.

19  **C.      The Nature of the Conspiracy**

20  130.      During the Class Period, Defendants reached agreements to refrain from competing

21  on prices, fix prices, and allocate market shares for HDD suspension assemblies. To effectuate

22  these agreements, Defendants' high-level executives and managers exchanged competitively-

23  sensitive information and coordinated the manufacturing and sale of HDD suspension assemblies.

24  Such competitively-sensitive information included actual, potential, or projected prices; market

25  share and customer volumes; manufacturing capacity; utilization rates; timing of bid responses; bid

26  information; and product design development. These communications took place at all levels within

27  the Defendant corporate families including between and among senior executives with ultimate

1  pricing authority.

2      131.    Participants in these competitors communications and agreements included, but

3  were not limited to:

| INDIVIDUAL | ENTITY | ROLE |
|---|---|---|
| Shigenao Ishiguro | TDK | President & CEO, Representative Director, Corporate Officer, General Manager ("GM") of Head Business Group |
| | SAE | Director, Board Member |
| Takehiro Kamigama | TDK | President & CEO, COO, GM of Electronic Components Sales & Marketing Group, GM of Head Business Group |
| | SAE | Vice Chairman |
| Atsuo Kobayashi | TDK | GM, Managing Executive Officer, Board Member, Executive Vice President, GM of Head Business Group |
| | SAE | Vice Chairman |
| Albert Ong | TDK | CEO, Corporate Officer, GM of HDD Components Business Group |
| | MPT | President, CEO, COO |
| | SAE | Director |
| Hajime Sawabe | TDK | Executive Advisor, Chairman, Representative Director & President |
| Tetsuya Ueda | TDK | GM, Department Head of Corporate Planning Group, Leader of Sales Planning Department for HDD Head Business Division |
| Giichi Nagata | TDK | Leader of Planning Group, Leader of Business Strategy Group – Head Business Group |
| | MPT | Senior Director of Corporate Planning |
| | SAE | Director |
| Kenichiro Fujihara | TDK | GM of Electronic Components Sales & Marketing Group, Senior Vice President, Corporate Officer |
| Kenichiro Arimura | TDK | President and Director of TDK Philippines Corp., Leader of Business Strategy Group – Head Business Group |
| | SAE | Senior Manager of Planning & Administration |
| Shigeki Kimura | TDK | Leader of Applied Head Operation and Product Marketing Group in the HDD Head Business Division, Leader of Sales Group in the HDD Head Business Division |

| INDIVIDUAL | ENTITY | ROLE |
|---|---|---|
| Richard Han | SAE | Vice President, Senior Vice President, Director |
| | TDK | GM of HDD Heads Business Group, Magnetic Heads & Sensors Business Company |
| Takao Tsutsui | TDK | Deputy GM, HDD Head Business Group |
| | SAE | Vice President in charge of Suspension Organization, Director |
| Kwok Fai ("Frankie") Lo | TDK | General Manager, HDD Head Business Group |
| | SAE | Director, Senior Vice President |
| Arun Dhawan | MPT | Vice President, CMT |
| Rick McHone | MPT | Vice President of Sales |
| | Magnecomp | Sales Manager |
| Hidetomo Nishi | MPT | Senior Manager of Corporate Planning |
| Steve Mitsuta | Magnecomp | Executive Vice President, COO, Senior Vice President |
| Ken Martini | Magnecomp | Senior Director of Sales |
| Todd Drahos | Magnecomp | Director of Sales |
| Wayne Fortun | HTI | President & CEO |
| Keith Johnson | HTI | MA OIS Strategic Business Unit Director, New Business Development Director, SBU Director of Seagate and Western Digital Accounts |
| Kiyotaka Hayakawa | HTI | Japan Country Manager |
| Kazumi Tamamura | NHK Spring | Chairman of the Board, President & CEO, Member of the Board, Corporate Executive Officer, President of Sales Department, Senior Corporate Officer, Director |
| Kenji Sasaki | NHK Spring | Chairman of the Board, President & CEO |
| Takehiko Amaki | NHK Spring | President, CEO, Director, Advisor |
| Akihiro Honda | NHK Spring | Senior Vice President, Director of Disk Drive Suspension Division, GM of Disk Drive Suspension Division |
| | NHK Thailand | Executive Vice President |
| Kazuhiko Otake | NHK Spring | Senior Corporate Officer, President of Precision Spring & Component Division, Director of Disk Drive Suspension Division, |
| | NAT | President |
| Hitoshi Hashimoto[30] | NHK Spring | Department Manager, Sales |

---

[30] The U.S. Department of Justice indicted Hitoshi Hashimoto for his role in the conspiracy

| INDIVIDUAL | ENTITY | ROLE |
|---|---|---|
| Hiroyuki Tamura[31] | NHK Spring | Senior Manager, Director, Director of Sales for Disk Drive Suspension Division |
| Kenji Nagai | NHK Spring | Deputy GM for Disk Drive Suspension Division |
| Isamu Ninomiya | NHK Spring | Deputy Director and Manager, Disk Drive Suspension & Component Sales Department |
| | NHK Thailand | Sales Manager |
| | NHK International | Sales |
| Richard "Skipp" Allen Harvey | NHK International | Vice President, General Manager |
| Yusuke Inami | NHK Spring | Section Manager, Disk Drive Suspension & Component Sales Department |
| Hironori Kajii | NHK Spring | Section Manager, Disk Drive Suspension & Component Sales Department |
| Junichiro Mizutani | NHK Spring | Senior Manager for Marketing & Strategy Department, Manager for Disk Drive Suspension & Component Sales Department |
| Yuichi Nagase | NHK Spring | Senior Corporate Officer, President, Precision Spring & Components Division |
| | NHK Thailand | Executive Vice President |
| Keiichi Suzuki | NHK Spring | Executive Vice President, Senior Managing Executive Officer, Senior Managing Director, Board Member |
| Hiroshi Takei | NHK Spring | Manager, Sales Department, Disk Drive Suspension Division |
| | NHK Spring (H.K.) | Director |
| | NAT (H.K). | CFO |
| | NAT (Dong Guan) | CFO |
| | NHK International | Senior Director, Sales Planning & Management Group |
| Masahiro Futakami | NHK Spring | Manager, Disk Drive Suspension Division |
| | NHK Thailand | Executive Managing Coordinator, Disk Drive Suspension Division |

alleged herein on February 13, 2020.

[31] The U.S. Department of Justice indicted Hiroyuki Tamura for his role in the conspiracy alleged herein on February 13, 2020.

| INDIVIDUAL | ENTITY | ROLE |
|---|---|---|
| Susumu Senkawa | NHK Spring | Division President |
| | NHK Thailand | Executive Vice President |
| Tsutomu Yamaguchi | NHK Spring | Representative Deputy President, Director Member of the Board, Sales Department, Disk Drive Suspension Division |
| Eddie Lam | NHK Spring (H.K.) | Sales Manager |
| Kunihiko Saika | NHK Spring | Manager, Precision Spring & Component Sales Department, Sales Division |

132.     Contact between and among Defendants began as early as 2003, when MPT's Ong and NHK Spring's Tamura negotiated a cross-licensing agreement. Cross-licensing discussions between NHK and HTI similarly occurred in 2005, and these discussions were in turn conveyed by NHK executives to MPT executives. From 2005 to 2007, Tamura and Ong met one or two times a year, and shared with each other competitively-sensitive information including future pricing to specific customers, sales volumes, actual and projected shipments, customer information, component supplies, and capacity forecasts. For example, at a meeting prior to the SAE annual dinner in December 2005, Tamura identified NHK Thailand's "starting price" for HDD suspension assemblies to customer Western Digital, while Ong sought pricing information regarding customer Seagate.

133.     In April 2005, HTI's Fortun and Hayakawa met with NHK Spring's Tamura, Suzuki, and Yamaguchi. They discussed HTI's production capacity, future capacity plans, yield, and market demand. The parties also discussed SAE's business plans and the impact of HDD business development would have on profitability.

134.     In August 2007, TDK acquired MPT and its subsidiary, Magnecomp. Just after the announcement of the acquisition, NHK Spring's Nagase spoke with TDK's Kobayashi and expressed NHK Spring's displeasure with the deal. The following day, TDK's Kobayashi and Ueda met with NHK Spring's Nagase and Suzuki "to massage them." The meeting took place in Yokohama, Japan. During that meeting, TDK and NHK Spring agreed to maintain a positive relationship by not competing with each other and allocating market shares. The parties also agreed

1    to avoid a "price war" and achieve a "win-win" relationship.

2    135.    At subsequent meetings from August 2007 through at least January 2009, senior

3    executives of NHK Spring (including Amaki, Hashimoto, Nagase, and Suzuki) and TDK/SAE

4    (including Kamigama, Kimura, Kobayashi, and Ueda) agreed to maintain market share and profit

5    for themselves, and to maintain sales price by collaborating with each other. TDK communicated

6    this plan to SAE and MPT. All five companies—TDK, SAE, MPT, NHK Spring, and NAT—then

7    worked together to exchange information about price and market share. Specific activities among

8    the five companies included coordinating quotes for customers, and sharing information about

9    demand forecast, sales price, and strategies to stabilize pricing.

10    136.    From 2007 to 2015, executives and sales managers from TDK, SAE, NHK Spring

11    and NAT met for dinner, New Year's events, and farewell gatherings in Asia. At such meetings,

12    they discussed specific customers (including Seagate, Western Digital, Hitachi, and Toshiba) as

13    well as the companies' long-term strategy of agreeing to allocate market shares and not to compete

14    with each other on price. Attendees of these meetings for TDK/SAE included Kamigama,

15    Kobayashi, Kimura, Ueda, Arimura, Fujihara, Ishiguro, and Sawabe. NHK Spring/NAT's attendees

16    included Amaki, Hashimoto, Nagase, Ninomiya, Suzuki, Tamura, Honda, Imami, Mizutani, Otake,

17    Sasaki, Senkawa, Takei, and Tamamura.

18    137.    In addition to the meetings described above, Defendants' executives and sales

19    managers held quarterly meetings in Asia from at least 2014 until 2016. Participants for

20    TDK/MPT/SAE included Ishiguro, Nagata, and Nishi. Participants for NHK Spring included

21    Hashmoto, Otake, Kajii, and Nagai. At these meetings, the parties discussed bids and exchanged

22    broader market information, including past and expected shipments, capacity, utilization,

23    expansion plans, customers, and collaboration on components. They also discussed the companies'

24    long-term non-competition strategy and market share allocations.

25    138.    Throughout the Class Period, Defendants' senior executives and sales managers

26    engaged in similar conversations in the United States. For example, HTI's Johnson and NHK

27    International's Harvey met in-person on a regular basis for nearly a decade, during which they

28    discussed market demand and customer pricing.

139.     Officials from Magnecomp and NHK International communicated quarterly about shipments and volumes, including actual results, future projections, and future price information to specific customers. For instance, in a telephone call in June 2006, NHK International's Harvey informed Magnecomp's Martini of NHK Spring's shipment volume and pricing for the following quarter to Western Digital. In August 2008, Harvey and Martini exchanged shipment volume and pricing information and discussed plans to stabilize prices to avoid competing with each other. Other discussions of a similar nature took place between these individuals at least in June 2005, October 2005, January 2006, August 2006, June 2007, November 2007, May 2008, and August 2008.

140.     Magnecomp's Drahos, who previously worked for HTI, also exchanged information about present and future prices, capacities, shipments, market demand, and plans for other customers, including Seagate, with executives and sales personnel from HTI and NHK International. He repeatedly communicated with his prior HTI colleagues to obtain competitively-sensitive sales and pricing information from HTI. For example, in December 2006, Drahos learned HTI's capacity, pricing, and market share for Seagate for specific HDD suspension assembly projects, and conveyed that information to senior executives and sales managers at MPT and Magnecomp including Ong, McHone, Misuta, and Dhawan. At or about the same time, MPT's Ong communicated with an NHK employee about NHK's price target for the same Seagate project.

141.     From at least 2008 until April 2016, NHK International's Harvey and MPT/Magnecomp's McHone communicated with each other in face-to-face meetings, telephone calls, and by text in the United States. In these communications, they discussed actual and forecasted shipments, capacity, utilization, bids, new program designs, and present and future prices to specific customers. They spoke on the phone at least once per month, and more frequently when customers issued requests for quotations on specific products. A goal of these conversations was to avoid lowering prices for customers.

142.     Harvey and McHone then shared the information they learned from their competitors with their team members, supervisors, and other executives including individuals with ultimate pricing authority at their respective corporate families in the U.S. and Asia, particularly in

Japan and Thailand. Thus, Magnecomp provided competitor information to its corporate parents at MPT and TDK. Similarly, NHK International provided competitor information to its corporate parent NHK Spring and other corporate affiliates including NHK Thailand. The information was often confirmed between contacts among the companies in Asia. For example, on July 8, 2011 NHK Spring's Ninomiya reported that "Seagate's comparison of pricing between MPT and NHK coincides with what Skipp [Harvey] confidentially obtained from MPT." Defendants then used the information to make decisions on market share, pricing, production, and capacity.

143.    Similar conversations took place in Japan and Thailand between executives at TDK, MPT, NHK Spring, and NHK Thailand, with the results being relayed back to the United States. Among the participants in these communications were the recently-indicted NHK Spring executives Hashimoto and Tamura, MPT's Ong, and NHK Spring's Ninomiya. These conversations took place at least four to five times per year, and more often when the companies were responding to customer requests for quotations on specific products. Communications by these sales managers and top management occurred in face-to-face meetings, as well as through telephone calls, emails, and text messages, where Defendants exchanged competitively-sensitive information about customers, bids, capacity, utilization, technology, actual and potential bid prices, and component supplier issues.

144.    NHK International's Harvey also received sensitive production and pricing information from HTI about both HTI and MPT, which he then shared with his colleagues at NHK Spring.  For example, in January 2009, Harvey wrote to NHK Spring's Tamura and Ninomiya: "Had a conversation with my friend at HTI … he actually called and woke me up this afternoon … Q4 155m … Q1 110m … We both have MPT at ~65m for the Q4 period and I will work to provide these on Monday. He mentioned that they have been meeting on pricing, but have not dropped anything significant due to overall volumes and issues with cost structure."

145.    SAE also acted as a conduit for the exchange of competitive information among the conspirators.  SAE's Tsutsui and NHK Spring's Takei met with each other thirty-nine times between June 2010 and April 2014.  During these meetings and other telephone calls, Tsutsui and Takei agreed on how NAT would allocate supplies to Samsung and Toshiba, shared HTI's pricing

to Samsung, and discussed plans for Toshiba's business.

146.     For example, in June 2011, Eddie Lam of NHK Spring (Hong Kong) internally circulated MPT's confidential quarterly business review ("QBR"), which he had obtained from SAE. The QBR included confidential information concerning MPT's quality performance, shipment results, forecasts, and line readiness. Lam's email distributing the material to NHK International's Harvey, Hiroshi Takei, and Kunihiko Saika stated: "It is confidential info as you knew well that why I hope all of them use it carefully and don't tell other I am source for it. Also, please don't ask me how to get this one."  In response, Harvey sought to avoid a paper trail but still obtain this type of competitive information, writing, "In the future, please omit my name from the distribution. If you care to discuss this type of information, please call me anytime."  When Lam continued to respond, Harvey reiterated, "Please call. … I would like to discuss why I sent you the prior note."

147.     In January 2014, at the request of NHK Spring's Ninomiya, Lam obtained detailed HTI and MPT suspension assembly price information for Western Digital from SAE. Lam provided an SAE chart that included company-specific allocation volumes for MPT, HTI, and NHK for several quarters. The chart included unit prices for specific suspension programs.  Lam then met with his contact at SAE, confirmed the competitive information in the chart, obtained updated pricing information on certain projects, and reported back to Ninomiya and Takei.

148.     In January 2016, NHK International's Harvey emailed Ninomiya with MPT's and HTI's pricing information for a specific Western Digital project, which Harvey had obtained from MPT/Magnecomp's McHone. Lam then confirmed MPT's and HTI's pricing and volume allocation for the same Western Digital project with his contact at SAE.

149.     Over the course of the conspiracy, Defendants' senior executives, directors, and sales managers engaged in dozens of face-to-face meetings with each other. These face-to-face meetings occurred at each other's corporate headquarters, coffee shops, customer events, golf courses, hotels, hunting lodges, and restaurants in China, Hong Kong, Japan, Thailand, California, and elsewhere in the United States.

150.     Specific face-to-face meetings included:

a.      an April 16, 2004 meeting attended by Ong and Dhawan (MPT) and Tamura and Yamaguchi (NHK Spring) at NHK Spring's headquarters in Yokohama, Japan followed by lunch;

b.      a late 2005 meeting at the Mauna Kea Coffee Lounge at the Tokyo Shinagawa Prince Hotel attended by Ong and McHone (MPT/Magnecomp) and Tamura and Yamaguchi (NHK Spring);

c.      an August 31, 2007 lunch meeting near NHK Spring headquarters in Yokohama, Japan, attended by Kobayashi and Ueda (TDK) and Nagase, Suzuki and Tamura (NHK Spring);

d.      a November 2007 dinner meeting at the Bangkok Intercontinental Hotel attended by Ong and Dhawan (MPT) and Nagase, Tamura, and Futakami (NHK Spring/NHK Thailand);

e.      annual meetings from 2003 to at least 2012 at a South Dakota hunting lodge between Johnson (HTI) and Harvey (NHK International);

f.      a May 28, 2008 meeting and dinner in Japan attended by Amaki, Hashimoto, Honda and Tamamura (NHK Spring) and Kamigama, Kobayashi and Fujihara (TDK);

g.      an August 26, 2009 meeting at TDK headquarters in Tokyo, Japan, attended by Kamigama, Kobayashi and Arimura (TDK) and Honda, Tamura, Hashimoto and Takei (NHK Spring);

h.      an August 3, 2010 meeting at TDK's headquarters in Tokyo, Japan, attended by Amaki, Hashimoto, Honda, and Tamamura (NHK Spring) and Kamigama, Kobayashi, and Fujihara (TDK);

i.      a November 30, 2010 meeting at NHK Spring's headquarters in Yokohama, Japan, attended by Amaki, Hashimoto, Honda and Tamamura (NHK Spring) and Kamigama, Kobayashi, and Fujihara (TDK);

j.      a March 11, 2011 meeting attended by Ong and Dhawan (MPT) and Ninomiya (NHK Spring) at NHK Spring's headquarters in Yokohama, Japan followed by lunch;

k.      a March 22, 2011 business dinner attended by Sasaki, Tamamura, Honda and Hashimoto (NHK Spring) and Sawabe, Kamigama and Kobayashi (TDK);

l.      a June 2011 dinner meeting attended by Arimura (TDK) and Hashimoto, Tamura and Ninomiya (NHK Spring) at a restaurant near NHK Spring's headquarters in Yokohama, Japan;

m.    a June 29, 2012 meeting attended by Ong (MPT) and Tamura (NHK Spring) at NHK Spring's headquarters in Yokohama;

n.    a July 13, 2012 meeting attended by Kobayashi (TDK/SAE), Arimura (TDK/TDK Philippines) and Ishiguro (TDK) and Honda, Senkawa, Otake, Mizutani and Takei (NHK Spring) at TDK headquarters in Tokyo, Japan, followed by a dinner at the Yaesu Saryo restaurant;

o.    an April 13, 2013 meeting attended by Ishiguro (TDK/SAE) and Hashimoto, Ninomiya and Imami (NHK Spring) at the Nadaman Garden restaurant near TDK headquarters in Tokyo, Japan;

p.    an August 2, 2013 meeting in Asia attended by Ong (MPT) and Hashimoto, Imami and Kajii (NHK Spring);

q.    a January 22, 2014 meeting attended by Ishiguro (TDK/SAE) and Nagata (TDK) and NHK Spring's Hashimoto, Kajii and Otake (NHK Spring) in Japan;

r.    a July 22, 2014 meeting attended by Ishiguro (TDK/SAE) and Nagata (TDK) and Otake, Hashimoto, Kajii and Nagai (NHK Spring) in Japan;

s.    a meeting on Thanksgiving Day in 2015 at a South Dakota hunting lodge between Johnson (HTI) and Harvey (NHK International); and

t.    a January 2016 meeting attended by Ong and Dhawan (MPT) and Ninomiya (NHK Spring) at a Bangkok restaurant.

151.    Defendants knew that what they were doing was wrong and sought to conceal their conduct. For example, after meeting with MPT's Albert Ong on November 30, 2010, NHK's Hironori Kajii circulated a memo containing competitive information, which advised recipients that "*Manager T[amura] has said to handle with care*."

152.    Later that year, an NHK employee wrote to Ninomiya: "*Mr. Tamura instructed me 'Don't mention Mr. Albert [Ong], since it's a crime' . . . . He also directed me 'You must delete this email and all other related ones*.' I am sorry to trouble you, but please take care of them. I apologize for my careless conducts." Ninomiya replied to that email: "I understood. From a CSR's perspective, *we would be better off not leaving anything in the* emails."

153.    The need for caution continued throughout the conspiracy, with NHK Spring's Kajii

reminding his conspirators to, "***please be careful with the handling [of] the information***."

> **D.     TDK and NHK Spring Further Conspire to Wound and then Eliminate Their Co-Conspirator, HTI**

154.     In or around 2007, TDK and NHK Spring started discussing how to profit more from their price-fixing conspiracy. As part of these discussions, TDK and NHK Spring started plotting against their fellow co-conspirator, HTI. TDK and NHK Spring began to view their co-conspirator HTI as a common threat, forming a conspiracy within a conspiracy to harm HTI.

155.     In an August 2007 meeting, after TDK's acquisition of MPT, TDK's Kobayashi and Ueda met with NHK Spring's Nagase, Suzuki and Tamura and agreed to avoid a price war with one another and collectively to take market share from HTI as a way to profit more from their conspiracy.

156.     In June 2009, NHK Spring's Hashimoto, who was subsequently indicted by DOJ for his role in the conspiracy, spoke with TDK's Kobayashi and agreed that "TDK and NHK should focus to kick out HTI ASAP."

157.     For several years thereafter, TDK/MPT and NHK Spring secretly plotted to gain market share from their co-conspirator HTI and allocate the additional share between them, all while maintaining supra-competitive pricing to HDD manufacturers.

158.     On January 22, 2014, TDK Corp.'s Ishiguro and Nagata met with NHK Spring's Otake, Hashimoto and Kajii to continue these discussions. In reporting on the meeting, NHK Spring observed, "[s]omething needs to be done under mutual cooperation" to better control their co-conspirator HTI.

159.     These discussions culminated in an agreement between TDK and NHK Spring that TDK would acquire HTI in or around July 2014.

160.     At a meeting on July 22, 2014, senior executives including TDK's Ishiguro and Nagata and NHK Spring's Otake, Hashimoto, Kajii, and Nagai agreed that TDK would acquire HTI to prevent an HDD manufacturer from acquiring and vertically integrating the company. TDK confirmed that an acquisition of HTI would be "OK for NHK," and NHK Spring responded, "Please go ahead […] we feel comfortable of [sic] 40% share." The companies also agreed that that NHK

Spring would buy out SAE Magnetics' share of NAT, a joint venture between SAE Magnetics and NHK Spring, in order to facilitate antitrust clearance of TDK's acquisition of HTI.

161.    NHK bought out SAE Magnetics' share of NAT and subsumed NAT as a wholly-owned subsidiary in April 2015.

162.    TDK then announced its intention to acquire HTI on or about November 2, 2015.

163.    On or about one day later, NHK Spring's Ninomiya reported that he had received TDK's legal strategy to obtain antitrust clearance from a "local source." He later wrote: "I can't say it out loud, but this should make the price easier to control."

164.    Prior to closing the transaction, TDK/MPT provided updates to NHK Spring on the status of the HTI acquisition and discussed opportunities for the companies to collaborate post-merger.

165.    TDK completed its acquisition of HTI on or about October 6, 2016.

**E.    NHK Spring Pled Guilty to Conspiring to Fix Prices and Allocate Market Shares for HDD Suspension Assemblies**

166.    On July 29, 2019, NHK Spring agreed to plead guilty and pay a $28.5 million fine for its role in the global conspiracy.[32] On September 23, 2019, NHK Spring entered into a Rule 11 plea agreement, and the fine was imposed on December 18, 2019.[33] Judgment was entered against NHK Spring on December 23, 2019.[34]

167.    According to the plea agreement, from May 2008 to April 2016, NHK Spring engaged in a conspiracy in which Defendants "engaged in discussions and attended meetings with each other. During these discussions, [Defendants] reached agreements to refrain from competing

[32] *Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives*, DOJ (Jul. 29, 2019), *available at* https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.

[33] Rule 11 Plea Agreement, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019); Notice of Criminal Monetary Imposition, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 18, 2019).

[34] Judgment in a Criminal Case, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere. To effectuate these agreements, employees and officers of [Defendants] exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere. The [Defendants] relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale, or delivery to, the United States and elsewhere."[35]

168.    NHK Spring and the DOJ also "agree[d] that, in light of the availability of civil causes of action, which potentially provide for a recovery of a multiple of actual damages, the recommended sentence does not include a restitution order for the offense charged in the Information," and in this regard, the DOJ expressly referenced the pendency of these indirect purchaser actions.[36]

169.    The cooperation provisions of NHK Spring's plea agreement apply to "[t]he defendant and its subsidiaries that are engaged in the production or sale of HDD suspension assemblies, including but not limited to NHK International Corporation (collectively 'related entities')[.]"[37] The "related entities" subject to these cooperation provisions therefore include all of the NHK Defendants in this action—NHK Spring, NHK International, NHK Thailand, NAT H.K., and NAT Dong Guan—as each of those Defendants was engaged in the production or sale of HDD suspension assemblies.

170.    The cooperation provisions require "[t]he full, truthful, and continuing cooperation of the current directors, officers, and employees of the *defendant and its related entities*," including, among other things, "*producing in the United States* and at other mutually agreed-upon locations

---

[35] Rule 11 Plea Agreement, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

[36] United States' Sentencing Memorandum at 8, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 5, 2019).

[37] Rule 11 Plea Agreement at ¶ 12, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019).

all documents, including [non-privileged] claimed personal documents, and other materials, wherever located," "making himself or herself available for interview *in the United States* and at other mutually agreed-upon locations," and "testifying in grand jury, trial, and other judicial proceedings *in the United States* fully, truthfully, and under oath, subject to the penalties of perjury[.]"[38]

171.   In exchange for cooperation under the plea agreement and the court's acceptance of NHK Spring's guilty plea and imposition of the recommended sentence, the DOJ "agrees that it will not bring further criminal charges against the defendant or any of its related entities for any act or offense committed before the date of signature of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the sale of HDD suspension assemblies."[39]

172.   According to the sentencing hearing transcript, NHK Spring "fully and timely cooperated with the government in connection with this criminal episode."[40]

173.   As a result of the conspiracy and subsequent guilty plea, NHK Spring stated that it "overhauled its antitrust compliance program. It appointed high-level individuals to oversee compliance in all major geographic regions. It's utilizing technology to monitor possible misconduct and it's taken remedial measures to discipline individuals involved in the offense."[41]

## F.   Additional Government Investigations

174.   In July 2016, the JFTC raided Defendants TDK and NHK Spring based on suspicion that the two companies and/or their subsidiaries fixed prices for HDD suspension components. On February 9, 2018, the JFTC issued a cease and desist order to NHK Spring and NAT H.K., found that they substantially restrained competition in the HDD suspension assemblies market by agreeing to maintain sales prices, and imposed penalties of ¥714,220,000 on NHK Spring and

---

[38] *Id.* ¶ 13(a), (b) and (f) (emphasis added).

[39] *Id.* ¶ 14.

[40] Sentencing Hearing Transcript at 8:22-23, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 18, 2019).

[41] Sentencing Hearing Transcript at 8:24-9:4, *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 18, 2019).

1  ¥361,940,000 on NAT H.K. The JFTC did not impose any penalties on TDK, SAE, and MPT,

2  which had jointly filed for a penalty reduction under the JFTC's leniency policy.

3      175.    The JFTC determined that NAT H.K. manufactured and sold HDD suspension

4  assemblies according to NHK Spring's business policies, and that SAE and MPT manufactured and

5  sold suspension assemblies according to TDK's business policies. According to the JFTC's

6  findings, NHK, NAT H.K., TDK, SAE, and MPT coordinated with each other to maintain market

7  share and profit, and agreed to maintain sales prices of HDD suspension assemblies sold to HDD

8  manufacturers and sellers. The JFTC found that these five companies confirmed with each other

9  price quotes and sales prices to be submitted in response to requests for quotations from Japanese

10  HDD manufactures and sellers. According to the JFTC, these same companies exchanged

11  information with each other about demand forecast, sales price, and price quotes to be submitted in

12  response to requests for quotations from HDD manufacturers and sellers outside of Japan.

13      176.    Concurrently with the JFTC investigation, the DOJ opened an investigation

14  regarding HDD suspension assemblies. On July 26, 2016, Defendant HTI received a letter from the

15  DOJ requesting documents relating to the investigation and expressed its intent to cooperate. At the

16  time HTI received the DOJ's letter, TDK's pending acquisition of HTI was under review by the

17  U.S. Federal Trade Commission. That same day, the JFTC and DOJ performed an on-site inspection

18  of an NHK company.[42]

19      177.    In April 2018, Brazil's antitrust authority, the Administrative Counsel for Economic

20  Defense ("CADE"), launched an investigation into the HDD suspension assembly cartel. CADE

21  reported that the conspiratorial conduct among TDK, HTI, SAE, NHK Spring, and MPT began as

22  early as 2003 and continued until at least 2016.

23      178.    CADE reported that it has "compelling evidence of the perpetration of antitrust

24  conduct consisting of (i) [p]rice fixing in response to customer quotation orders; (ii) [m]arket

25  division and (iii) [s]haring of commercial and competitively sensitive information." This

26  conspiratorial conduct was "rendered feasible by way of meetings and bilateral exchanges of

---

[42] NHK Spring 2018 Consolidated Financial Statements at 20, *available at*
https://www.nhkspg.co.jp/eng/ir/pdf/Annual%20Report%202018.pdf.

1    emails."[43]

2         179.    CADE's analysis noted "there were various exchanges of sensitive information

3    between the competitors of the global market of suspension assemblies. … Sharing of commercial

4    and competitively sensitive information included but was not limited to information on (iii.1)

5    [c]urrent, potential and proposed prices, for suspension assemblies, (iii.2) [p]rivate customer

6    bidding processes, (iii.3) [a]llocation of customer volumes, (iii.4) [m]anufacturing capacity of each

7    company, and (iii.5) [u]ser fees for each company, for the purposes of stabilizing prices and

8    reducing competition in sales of suspension assemblies."[44]

9         180.    Based on the existence of such "strong evidence," CADE found that "this exchange

10   of commercially sensitive information rendered the establishment of strategic long-term relations

11   feasible between the competitors, based on the elimination or softening of the price war or price

12   competition, which meant avoiding aggressive price competition in private bidding processes and

13   quotations, and in the division of the world market of suspension assemblies."[45]

14        181.    Exchange of pricing and production strategy information "may favor collusion to

15   the extent that companies better coordinate" their prices and production conditions. CADE noted

16   that in this case, the information was not public and the exchanges occurred directly between

17   competitors and "exercised a direct influence on the strategies adopted by the companies

18   participating in the Cartel."[46]

19        182.    These exchanges "included recent, current and future data, not shared within other

20   circles, with a view to permitting the companies to align their operations within the market based

21   on the commercially sensitive information shared."[47] To accomplish this, the Defendants provided

22   highly detailed information.[48]

23   _____

24   [43] Administrative Council for Economic Defense, Technical Report No. 4/2018 of the General
     Superintendent's Office (SEI No. 0459666) ¶¶ 5, 6 ("CADE Report").

25   [44] *Id*. ¶ 27 (emphasis omitted); *see also id.* ¶ 5.

     [45] *Id*. ¶ 28 (emphasis omitted).

26   [46] *Id*. ¶ 29.

27   [47] *Id*. ¶ 30 (emphasis omitted).

28   [48] *Id*.

183.    CADE concluded that it had uncovered "robust evidence of violations" of the competition laws in Brazil.[49]

184.    CADE indicated that anticompetitive practices were conducted by at least 38 of Defendants' present and former directors, senior executives, senior managers, sales managers, including individuals with pricing authority. The individuals identified by CADE include: Akihiro Honda; Akihiko Negishi; Albert Ong Kim Guan ("Albert Ong"); Arun Dhawan; Atsuo Kobayashi; Giichi Nagata; Hajime Sawabe; Hidetomo Nishi; Hironori Kajii; Hiroyuki Tamura; Hitoshi Hashimoto; Isamu Ninomiya; Keith David Johnson; Kazuhiko Otake; Kazumi Tamamura; Keiichi Suzuki; Ken Martini; Kenichiro Arimura; Kenji Sasaki; Koji Inada; Lo Kwok Fai ("Frankie Lo"); Masaru Koda; Masato Ishikawa; Richard Michael McHone; Shigeki Kimura; Shigenao Ishiguro; Skipp Harvey; Stephen Andrew Misuta; Takehiko Amaki; Takehiro Kamigama; Tetsuya Ueda; Thiti Makarabhiromya; Todd Drahos; Toshimi Hamada; Tsutomu Yamaguchi; Wing Sun Clarence Lo ("Clarence Lo"); Yew Ah Ming; and Yuichi Nagase.[50]

185.    On February 13, 2020, the DOJ indicted two NHK Spring senior executives, Hitoshi Hashimoto and Hiroyuki Tamura, for their roles in the HDD suspension assembly price-fixing conspiracy. According to the indictment, Hashimoto, Tamura, and their co-conspirators engaged in the following conduct for the purpose of forming and carrying out the conspiracy:

a.    attended meetings and engaged in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

b.    agreed during those meetings and communications to refrain from competing on prices for and stabilize, maintain, and fix the prices of HDD suspension assemblies to be sold in the United States and elsewhere;

c.    agreed during those meetings and communications to allocate their respective market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

---

[49] *Id.* ¶ 37.

[50] *Id.* ¶ 90.

d.   discussed and exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

e.   communicated with sales employees in the United States and elsewhere and directed those employees to exchange HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

f.   relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with the U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere;

g.   sold HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices; and

h.   accepted payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices. [51]

### G.   The Structure and Characteristics of the HDD Suspension Assembly Market Support the Alleged Conspiracy

186.   Like other electronic product markets that have been the subject of antitrust investigations (cathode ray tubes, lithium ion batteries, and capacitors), the HDD suspension assemblies market has all the hallmark features that make it susceptible to collusion. Together, these characteristics support the ability of the cartel to increase prices of Suspension Assemblies above competitive levels. Some of the relevant characteristics include: the existence of barriers to entry, the lack of an alternative source of supply of Suspension Assemblies, and regular meetings and interactions that allowed Defendants to exchange information, come to agreements, and monitor cheating.

### 1.   The HDD Suspension Assemblies Market Has High Barriers to Entry

187.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants to the market seeking to benefit from the

---

[51] Indictment at ¶ 8, *United States v. Hitoshi Hashimoto and Hiroyuki Tamura*, No. 3:20-cr-00070-JD (N.D. Cal. Feb. 13, 2020).

1  supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are

2  much less likely to enter the market. Thus, barriers to entry help facilitate the formation and

3  maintenance of cartels.

4      188.    This is particularly true here where manufacturing HDD suspension assemblies

5  requires the ability to produce precision assemblies in sufficient volume. As Defendant HTI

6  conceded, "We believe that the number of entities that have the technical capability and capacity

7  for producing precision suspension assemblies or components in large volumes will remain

8  small."[52]

9      189.    Moreover, increased demand for other types of data storage technology, such as

10  those that utilize flash memory, limit opportunities for new entrants to the HDD suspension

11  assembly market, which caters to hard disk drives.[53]

12      190.    In addition, heavy capital investments are required in order to enter the market. For

13  example, HTI noted that it spent nearly $50 million between 2012 and 2014 on research and

14  development.[54]

15      191.    Defendants also own the majority of the patents for HDD suspension assemblies.

16  These patents place a significant and costly burden on potential new entrants, which must avoid

17  infringing on the patents when entering the market with a new product. In connection with the

18  conspiracy, Defendants discussed using their joint intellectual property to preclude entry by at least

19  one upstart competitor.

20          **2.    The HDD Suspension Assemblies Market is Highly Concentrated**

21      192.    Price fixing is when participants in a market band together to artificially set the price

22  of some good or service. When a price-fixing conspiracy is successful, the consumer has no choice

23  but to accept the higher prices or lower quality goods. The more concentrated the market, the easier

24  ─────────────

25  [52] *Hutchinson Shares Extend Slide on Continued FTC Antitrust Review*, THESTREET (Jan. 5, 2016), *available at* https://www.thestreet.com/story/13412469/1/hustchinson-shares-keep-falling-on-extended-ftc-antitrust-review.html.

26  [53] *Id.*

27  [54] See HTI Form 10-K for fiscal year ending September 28, 2014, *available at*

28  http://www.annualreports.com/HostedData/AnnualReportArchive/h/NASDAQ_HTCH_2014.pdf.

it is for the market participants to come together to set prices. The Suspension Assembly market is highly concentrated, with Defendants holding a lion's share of the market.

193.     A process of market consolidation of the HDD suspension assembly market began in the 1990s. By the mid-1990s, the market had already become concentrated with HTI becoming the main producer of HDD suspension assemblies, holding at least a 65% market share and generating approximately $450 million per year in revenue.[55]

194.     Over the past two decades, this trend has been further aggravated by two factors: (a) further consolidation among HDD suspension assembly manufacturers, and (b) the vertical integration of companies like TDK that formerly depended on independent component suppliers in their manufacturing of HDD suspension assemblies.

195.     In recent years, market consolidation has continued to the point where globally, there are now only two major suppliers of HDD suspension assemblies: TDK and NHK Spring.

196.     Defendants knew that this consolidation of the HDD suspension assembly market would enable them to increase prices rather than expand market share. As one senior executive of MPT explained: "Once we are down to 2 suppliers, then we need to concentrate on margin more and less on volume."

197.     In 2004, HTI held a 63% share of the HDD suspension assembly market and MPT held 18%.[56]

198.     In 2005, three companies—HTI, NHK Spring, and MPT—collectively controlled approximately 97% of the global HDD suspension assembly market. HTI held a 55% market share, NHK Spring held a 22% market share, and MPT, created through the merger 2005 merger between the Data Storage Division of Magnecomp International Ltd. and KR Precision Public Company,[57]

---

[55] Hutchinson Technology Incorporated, 5th Annual Technology Conference PowerPoint, *available at* http://media.corporate-ir.net/media_files/irol/61/61195/presentations/htch_51403.pdf (last visited Oct. 10, 2019).

[56] Chris Prystay, *Why Disk-Drive Parts Makers in Singapore Look Attractive*, Wall Street Journal, Jan. 6, 2004, *available at* https://www.wsj.com/articles/SB107332640744760100.

[57] News Release, KR Precision PCL, *KR Precision Implements New Management Structure and Appoints New Director, available at* http://www.idema.org/wp-content/downloads/1171.doc.

held a 20% market share.[58]

199.     In 2007, TDK announced its acquisition of a majority share of MPT. TDK acquired a formerly independent HDD suspension assembly manufacturer in 2007 and had fully integrated that acquisition by 2009.

200.     By 2012, TDK, NHK Spring, and HTI collectively controlled 96% of the global market.[59]

201.     In November 2015, TDK announced its acquisition of HTI. The acquisition was completed in October 2016. Following the acquisition, TDK's market share grew to 55-60%, and TDK noted that NHK Spring was its only competitor in the global market for HDD suspension assemblies.[60] Prior to the acquisition, HTI had gone through its own process of consolidation and was a principal supplier of HDD suspension assemblies to Western Digital (headquartered in San Jose, CA); Seagate (Cupertino, CA); and SAE/TDK (Tokyo, Japan). That HTI business is now contained within the TDK family.

### 3.     Market Concentration on the "Buy" Side

202.     In the 1980s, the HDD market was quite competitive with more than 20 suppliers. But by 2005, there were only five major producers left in the market: Western Digital Corporation ("Western Digital"), Seagate Technology, LLC ("Seagate"), Toshiba Electronics & Device Storage Corporation ("Toshiba"), Hitachi Global Storage Technologies ("Hitachi"), and Samsung Electronics Co. ("Samsung").[61] By 2012, that number dwindled to three, as Seagate acquired Samsung's HDD business in 2011 and Western Digital acquired Hitachi's HDD business in 2012.

203.     Figure 5 below identifies the relative market shares of Seagate, Western Digital, and Toshiba for 15 quarters during 2012-16:

---

[58] MPT, Form 56-1, Part 3, *Business Operation of MPT and its Subsidiaries*, at 10.

[59] Dr. R. Castellano, The Dynamics of the HDD Industry and Its Impact on CMP, at 9, *available at* https://pdfs.semanticscholar.org/c293/573aec70fec1d3abcd79f1e86bcdc005c044.pdf

[60] TDK Annual Report 2017, at 45.

[61] My Data Recovery Lab, *Consolidation of Hard Disk Drive Makers (Part 5) – Into The Future*, (March 3, 2015), *available at* https://mydatarecoverylab.com/consolidation-of-hard-disk-drive-makers-part-5-into-the-future/.

(Figure 5)



**Market Shares (in %) of HDD Makers**

*All numbers are percentages. Numbers are based on shipments data provided by Seagate and Western Digital. Shipments of Toshiba are estimates.*

204.     As of 2017, estimated market shares for Seagate, Western Digital, and Toshiba were approximately 40%, 37%, and 23% respectively.[62]

(Figure 6)[63]



2018 HDD Market Share - IMAGE FROM COUGHLIN ASSOCIATES

---

[62] *HDD Growth in Nearline Markets*, Forbes (Feb. 5, 2018), *available at* https://www.forbes.com/sites/tomcoughlin/2018/02/05/hdd-growth-in-nearline-markets/#6c4e88292997.

[63] Tom Coughlin, *2018 Hard Disk Drive Results*, Forbes (Feb. 4, 2019), *available at*

205.     All else equal, large buyers possess market power to negotiate lower prices from sellers. Price-fixing conspiracies limit that market power. The existence of a small number of large buyers made it easier for Defendants to exchange pricing information and otherwise create, facilitate, and enforce market-allocation agreements.

206.     For instance, beginning in April 2009, Toshiba procured supplies from SAE, NHK Spring, MPT, and NAT. While NHK Spring, MPT, and NAT directly sold HDD suspension assemblies, SAE procured HDD suspension assemblies (generally from its affiliate MPT) and incorporated them into other HDD components. Toshiba negotiated price directly with NHK Spring for purchases from NHK Spring and NAT, and the price with MPT for purchases from MPT and SAE. As NHK knew, "MPT decides [SAE's Suspension Organization's] suspension price and SAE does not get involved in the decisions."  During this period, Defendants coordinated and agreed upon their prices to Toshiba.

207.     Because of the limited number of customers in the market, the conspiracy alleged herein enabled Defendants to coordinate and agree upon pricing. As an example, in March 2009, Magnecomp and MPT communicated with their affiliate SAE to obtain information about NHK Spring's pricing to Hitachi. In December 2010, recently-indicted NHK Spring executive Hiroyuki Tamura informed a senior executive of MPT that NHK Spring would follow SAE's pricing to Samsung and Toshiba. The following month, NHK Spring and SAE met to discuss pricing to Toshiba.

208.     The limited number of customers also facilitated Defendants' allocation agreements. As an example, in or about April 2008, MPT held strategy meetings with SAE to allocate customers. MPT agreed not to quote pricing for a particular HDD suspension assembly project directly to Samsung or Western Digital, instead allowing SAE to quote pricing for components that incorporated MPT's HDD suspension assemblies to those customers.

### 4.     Homogeneity of Products and Inelasticity of Demand

209.     HDD suspension assemblies are commodity-like products that are interchangeable

https://www.forbes.com/sites/tomcoughlin/2019/02/04/2018-hard-disk-drive-results/#d1ba69045a76.

at the design stage among products of the same type and across manufacturers. One Defendant's product for a particular application is substitutable for another Defendant's during the design stage. Because of the commodity-like nature of the products, suspension assembly manufacturers typically did not have sole-source agreements with HDD manufacturers, except for certain legacy programs. Forming and sustaining a cartel when the product in question is commodity-like makes it easier to agree on prices to charge and to monitor those prices once an agreement is formed.

210.    "Elasticity" describes the sensitivity of supply and demand to changes in one or the other such that demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any, such that customers have nowhere to turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

211.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

212.    Demand for HDD suspension assemblies is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase HDD suspension assemblies as an essential part of an HDD, or a product containing an HDD, even if the prices are at supra-competitive level.

### 5.    Market Maturity and Declining Demand

213.    There is declining demand in the HDD suspension assembly market, characterized by slim profit margins, which creates a motivation to collude. Demand for HDDs and therefore for suspension assemblies experienced a general downward trend during the Class Period.[64] This makes the formation of an effective collusive arrangement more likely because it provides a greater incentive for firms to avoid price competition.

---

[64] *Global shipments of hard disk drives (HDD) from 4th quarter 2010 to 3rd quarter 2019 (in millions)*, STATISTA, *available at* https://www.statista.com/statistics/275336/global-shipment-figures-for-hard-disk-drives-from-4th-quarter-2010/ (last visited Dec. 27, 2019).

(Figure 7)[65]



214.   In addition, increased demand for other types of data storage technology, such as those that utilize solid state storage or flash memory, has limited growth opportunities for HDD-based storage.

---

[65] *Global shipments of hard disk drives (HDD) from 4th quarter 2010 to 3rd quarter 2019 (in millions)*, STATISTA, *available at* https://www.statista.com/statistics/275336/global-shipment-figures-for-hard-disk-drives-from-4th-quarter-2010/ (last visited Dec. 27, 2019).

(Figure 8)[66]



6. **Defendants Maintained Close Business Relationships**

215.    For example, until March 2015, TDK and NHK Spring—two of the only three major competitors in the suspension assembly market—maintained a joint venture to manufacture suspension assemblies.[67] Specifically, TDK's wholly owned subsidiary SAE and NHK Spring operated a joint venture, NAT, to manufacture HDD suspension assemblies.[68] While operating as a joint venture, NAT served as a vehicle to facilitate communications between and among Defendants. As the majority owner of NAT, NHK Spring was also able to, and did, communicate NAT's sales plans to MPT.

---

[66] *Shipments of hard and solid (HDD/SSD) drives from 2015 to 2021 (in millions)*, STATISTA, *available at* https://www.statista.com/statistics/285474/hdds-and-ssds-in-pcs-global-shipments-2012-2017/ (last visited Jan. 7, 2020).

[67] TDK Press Release, *TDK Subsidiary dissolve Joint Venture of HDD Suspension Manufacturing Company* (Apr. 1, 2014), *available at* https://www.tdk.com/corp/en/news_center/press/201504011768.htm.

[68] *See TDK Subsidiary Dissolve Joint Venture of HDD Suspension Manufacturing Company*, *available at* https://www.tdk.com/corp/en/news_center/press/201504011768.htm; Hutchinson 2012 Form 10-K, at 4 ("Our principal competitors for suspension assemblies are Nihon Hatsujo Kabusikigaisha ('NHK'), Magnecomp Precision Technology Public Company Limited ('MPT'), a subsidiary of TDK Corporation, and NAT Peripheral (H.K.) Co., Ltd. (a joint venture of NHK and TDK Corporation).").

216.     Throughout the Class Period, SAE was also one of HTI's top three customers.[69] In addition, Defendants also cross-licensed each other's products, including HDD suspension assemblies.[70]

217.     Opportunities to effectuate the conspiracy also took place at meetings and social events of IDEMA, the International Disk Drive Equipment & Materials Association, to which NHK Spring, SAE, and TDK all belong. IDEMA has two operating subsidiaries, one in Japan and another in the United States. Among other things, IDEMA sponsors Diskcon industry conferences, such as the one held in Japan in July, 2010 and those held or to be held in the United States in October, 2011 and October of this year. One of the asserted benefits to belonging to IDEMA is that it offers "unique networking opportunities for all industry participants."

**H.     Distribution Chain/Sale to Plaintiffs and the End-Users They Represent**

218.     The distribution chain for HDD suspension assemblies is simple and highly competitive.

219.     Defendants sold the vast majority of HDD suspension assemblies that were used in Standalone Storage Devices and Computers to a handful of HDD manufacturers (i.e., Seagate, Western Digital, Toshiba). HDD manufacturers incorporated the suspension assemblies into HDDs. Some HDDs were sold as bare HDDs (*i.e.*, an HDD that has not been incorporated into another product), while others were incorporated into storage devices or computers by a small number of OEMs. These finished goods were then sold to end-users either directly or via distributors or resellers.

220.     Most HDDs only travel through a few levels of a straightforward distribution chain: HDD makers, firms that use HDDs as inputs for finished goods, and firms that distribute and resell finished goods. Relatively few firms account for the majority of HDD and finished goods

---

[69] *See, e.g.*, Hutchinson 2008 Form 10-K, at 5, 2012 Form 10-K, at 4, and 2015 Form 10-K, at 4. In 2015, Hutchinson's three largest customers were Western Digital, Seagate, and SAE Magnetics, representing 52%, 27%, and 16% of net sales, respectively.

[70] *See Hutchinson*, *Magnecomp Drop Lawsuits, Cooperate,* Minneapolis/St. Paul Business Journal (Dec. 3, 2001), *available at* https://www.bizjournals.com/twincities/stories/2001/12/03/daily8.html.

manufacturing.

221.     During the Class Period, end-users purchased HDDs either directly from HDD manufacturers (e.g., Western Digital) or from resellers (e.g., Best Buy, Newegg).  End-users also purchased Computers and other storage devices either from finished product OEMs (e.g., Dell, Apple) or from resellers (e.g., Best Buy, Newegg).

## I.     The Markets for Suspension Assemblies, HDDs, and Products Incorporating HDDs

222.     The markets for HDDs and HDD suspension assemblies are inextricably linked and intertwined because the market for HDD suspension assemblies exists to serve the HDD market. Without the HDDs, the HDD suspension assemblies have little to no value because they have no independent utility. Similarly, HDDs cannot read and write data without suspension assemblies.

223.     Defendants recognize that the market for suspension assemblies and the markets for HDD and the various finished product applications are inseparable in that one would not exist without the other. For this reason, Defendants monitored the demand and prices for HDDs, computers, and other finished production applications. For example, MPT subscribed to the quarterly reports of HDD shipments prepared by Techno Systems Research Co., Ltd. from at least 2008 to at least 2016. The quarterly reports list HDD OEM trends by application type and storage size, HDD Average Selling Price (ASP) in U.S. dollars, shipment trends, and HDD makers' profits & loss results. Key players in the conspiracy, including Albert Ong, Rick McHone, Steve Misuta, and Arun Dhawan, routinely used such reports to inform their business strategies.

224.     Defendants also travelled to the United States to visit OEMs that incorporate HDDs into finished products for end-use markets. For example, an NHK "June 2016 US Trip Report" indicates that NHK employees had meetings with HP, Dell, and NetApp to "get HDD Users' situation."[71]

225.     Defendants also used industry reports and internal analyses to track the street, or retail, prices of HDDs.[72] Notably, Defendants monitored demand and pricing for Standalone

---

[71] NHKS-M-00004748 at slide 2; *see also id.* at slide 6 (showing enterprise OEM prices for HDDs).

[72] *See, e.g.,* NHKI-M-00097042 at 047 (July 2015 presentation by NHK Disk Drive Suspension & Component Sales showing external HDD retail prices in 2013-2015 based on "US BestBuy retail

Storage Devices and HDDs used in Computers and other applications.[73] Active street price monitoring underscores that Defendants are aware of the connection between the price charged to direct purchasers and the amount paid by end-users.

## VII.   THE INFLATED PRICES OF SUSPENSION ASSEMBLIES WERE PASSED THROUGH TO PLAINTIFFS AND THE END-USERS THEY REPRESENT

226.     Defendants' conspiracy to fix prices of, and allocate market shares for, suspension assemblies harmed Plaintiffs and the End-User Classes because they paid higher prices for Standalone Storage Devices and Computers than they would have in the absence of Defendants' conspiracy.

227.     Suspension assemblies are critical components of an HDD.  Multiple suspension assemblies (up to 12) are used in every HDD.  As the number of platters and storage capacity of an HDD increase, the number of and cost of suspension assemblies used therein increases as well. According to Seagate, suspension assemblies are either the highest cost components, or one of the highest cost components in an HDD.  Suspension assemblies comprise approximately 5-10% or more—up to 15% in some instances—of the cost of an HDD.

228.     HDDs and the suspension assemblies used in them are also critical components of Computers.  As the storage capacity and cost of an HDD used in a computer increases, the cost of the computer increases.  HDDs are one of the highest cost components in a computer, and are therefore a significant cost component of Computers.

### A.     Suspension Assemblies Are Commodity-Like Products That Are Physically Traceable Throughout the Distribution Chain

229.     Suspension assemblies are commodity-like products with functionally equivalent

---

prices), 043(showing production volumes of desktop and laptop PCs), and 045 (showing OEM HDD pricing trends).

[73] *See, e.g.,* NHKI-M-00096374 (May 9, 2016 PowerPoint presentation by NHK to Western Digital in San Jose analyzing demand and shipment volume for nearline, desktops, mobile devices, and servers and showing numbers of Suspension Assemblies per finished product, as well as mobile OEM HDD prices); TDKHDD000209143 (Industry report by IDC titled "Worldwide Hard Disk Drive Forecast Update, 2015-2019" showing shipment volumes of PCs, enterprise systems, personal storage devices, video surveillance systems, and consumer electronic products that use HDDs and listing ASPs for HDDs used in desktop PCs, enterprise systems, personal storage devices, consumer electronics, and video surveillance systems from 2014 through 2019).

products available from Defendants. Defendants manufacture suspension assemblies pursuant to standard specifications. HDD manufacturers generally source suspension assemblies from multiple Defendants. It is common for multiple suppliers of suspension assemblies to be qualified for a specific HDD project. The commodity nature of suspension assemblies, and in particular the interchangeability of suspension assemblies between Defendants made it easier for Defendants to agree on prices and also increased the likelihood of the pass-through of the overcharges caused by the collusion through the distribution chain.

230. When suspension assemblies are purchased as part of a Standalone Storage Device or a Computer, they are distinct, physically discrete components of the disk drive that do not undergo physical alterations as they move through the distribution chain. They are also identifiable by specific, discrete part numbers that permit tracing to Defendants. Each suspension assembly is marked with an English letter identifying the manufacturer: "M" for MPT; "H" for HTI; and "N" for NHK. As a result, suspension assemblies are physically traceable throughout the distribution chain from Defendants to Plaintiffs and members of the Classes.

231. Just as suspension assemblies can be physically traced through the supply chain, so can any costs attributable to suspension assemblies in a Standalone Storage Device or Computer be traced through the chain of distribution to Plaintiffs and members of the Classes.

**B.   Increased Costs Will Be Passed-through to Customers in Competitive Markets**

232. When a firm's costs increase due to an overcharge or increasing raw materials costs, the firm will tend to pass-through the cost increase by raising its price. Otherwise, it would lose money on each sale and be driven out of business. Similarly, when a firm's costs decrease, for example due to improved production efficiency or decreasing energy costs, the firm will tend to pass-through the cost decrease by lowering its price. Otherwise, competitors would be able to undercut its prices, taking market share.

233. Economic theory predicts that pass-through occurs at each stage of the manufacturing and distribution process. When the manufacturer faces an industry-wide, non-transitory increase in the cost of inputs, it increases its prices. Similarly, when the distributor (and all its competitors) pays a higher price for the product, it also increases its prices. This process

1    continues throughout the entire distribution chain.

2         234.    The economic necessity of passing through cost changes increases with the degree

3    of competition a firm faces. Economic theory shows that pass-through is likely to be close to 100%

4    in markets that are highly competitive, as are the levels of the HDD distribution chain. In a highly

5    competitive market, all businesses will set their prices slightly above their costs, resulting in narrow

6    profit margins. If they did not, they would go out of business in the long run either by setting prices

7    too low and losing money on every sale, or setting prices too high and losing business to

8    competitors.

9         235.    Given the highly competitive nature at each level of the distribution chain, economic

10    theory predicts that the prices for Standalone Storage Devices and Computers (i.e., the amount class

11    members pay) increase when suspension assembly prices (i.e. the amount HDD manufacturers pay)

12    increase.

13         **1.    The Markets for Manufacturing and Sales of Standalone Storage Devices
              and Computers with HDDs are Highly Competitive at Each Level of the
14            Distribution Chain**

15         236.    Manufacturing of HDDs and finished goods containing them is characterized by

16    intense competition between a small number of companies.

17         237.    Profit margin data for HDD manufacturers show a high degree of price competition.

18         238.    Industry observers characterize price competition among HDD manufacturers

19    during the class period as "fierce." As Professor Eli Noam (Paul Garrett Professor of Public Policy

20    and Business Responsibility at the Columbia Business School) explained: "The hard disk market

21    has been dominated by a shifting handful of firms providing devices to computer manufacturers

22    with fickle requirements. … Price competition is fierce, especially since most sales are to a handful

23    of computer makers who themselves are engaged in energetic competition."[74]

24

25    ───────────────
      [74] Noam, Eli M., 2009, Media Ownership and Concentration in America, Oxford University
      Press,
26    https://books.google.com/books?id=Kd_1STqyGFcC&pg=PA201&lpg=PA201&dq=HDD+manu
      facturer+seagate+toshiba++western+market+share+2005&source=bl&ots=5tanMzAi5w&sig=AC
27    fU3U35EWAXhTDUq8tZUNrCy-
      2bHucH5A&hl=en&sa=X&ved=2ahUKEwjItIyD2LXpAhXJQc0KHezvBhYQ6AEwCXoECAk
      QAQ#v=onepage&q&f=false, p. 200.
28

239.     In their peer-reviewed article on the HDD industry, Professors Peter Gourevitch, Roger E. Bohn, and David G. McKendrick of University of California at San Diego concluded that "Hard disk drives are 'high-tech commodities,' with intense technological development yet low product differentiation and fierce price competition."[75]

240.     Similarly, Professors Mitsuru Igami and Kosuke Uetake of Yale University conclude in a peer-reviewed article: "HDDs are also one of the simplest products in terms of economics because they are completely undifferentiated product according to Peter Knight, former vice president of Conner Peripherals and Seagate Technology, and former president of Conner Technology."[76]

241.     With respect to the personal computers (PC) market, a report by Standard & Poor's notes that "price competition has been the hallmark of the PC market. One reason is that PCs have become more commodity-like with the standardization of their primary components."[77]

242.     HDD manufacturers acknowledge that the industry is intensely price competitive and describe a long-term trend of price erosion. According to Seagate, "Our competitors have historically offered new or existing products at lower prices as part of a strategy to gain or retain market share and customers, and we expect these practices to continue. Even during periods when demand for disc drives is growing, our industry is price competitive and vendors experience price erosion over the life of a product. … We expect that price erosion in our industry will continue for the foreseeable future."[78] Seagate also explains: "We compete primarily with manufacturers of hard drives used in the enterprise, client compute and client non-compute applications. … The markets

---

[75] Gourevitch, P., Bohn, R., and McKendrick, D. (2000), Globalization of Production: Insights from the Hard Disk Drive Industry. World Development, vol. 28, pp. 301-319, at 302.

[76] Igami, M. and Uetake, K. (2019), Mergers, Innovation, and Entry-Exit Dynamics: Consolidation of the Hard Disk Drive Industry, 1996–2016, The Review of Economic Studies, vol. 87 no. 6, at 2682.

[77] Duque, S. (2010), Standard & Poor's Industry Surveys: Computers, Hardware – October 28, 2010.

[78] Seagate Technology, August 1, 2005, Seagate Form 10-K, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001137789/b2d97347-69a2-4a32-a1f4-43ca47dc9620.pdf, at 10-11.

1  that we participate in are highly competitive."[79] Western Digital similarly acknowledges that, "[t]he
2  hard disk drive industry is intensely competitive, with hard disk drive suppliers competing for sales
3  to a limited number of major customers."[80]

4      243.     Similarly, the OEM and retail markets for Standalone Storage Devices and
5  Computers are subject to vigorous price competition.

6      244.     The OEMs and retailers have very thin net margins. They are therefore at the mercy
7  of their component costs, such that increases in the price of Suspension Assemblies lead to quick,
8  corresponding price increases at the OEM and retail levels for HDD and HDD-incorporating
9  products.

10      245.     Enterprise HDD storage systems are manufactured by a limited number of
11  companies including BlueArc, Cisco Systems, Dot Hill, EMC, Isilon, LSI, NetApp, Seagate, Sun
12  Microsystems/Oracle, Western Digital, and Xyratex. These companies acknowledge that HDDs are
13  the largest cost components of, and indispensable to, their products. According to Dot Hill, "[h]ard
14  disk drives are a critical component in our AssuredSAN storage array products and can represent
15  30-70% of the cost of such products."[81] BlueArc notes that, "[t]he largest component of our cost of
16  product revenue is disk drives and disk arrays that we integrate into and sell with our storage
17  systems."[82] EMC states, "[a]mong the most important components that we use are disk drives, high
18  density memory components and power supplies."[83]

19      246.     These manufacturers also recognize the intense price competition for enterprise
20  HDD storage systems. According to NetApp: "We derive a significant portion of our sales from
21  the resale of disk drives as components of our storage systems, and the resale market for hard disk

22  [79] Seagate Technology, August 5, 2016, Form 10-K Seagate,
23  https://d18rn0p25nwr6d.cloudfront.net/CIK-0001137789/00e81fd7-bd56-46ea-89ef-
7eb546784769.pdf, at 12.

24  [80] Western Digital Corporation, September 13, 2005, Western Digital Corp Form 10-K,
25  https://www.sec.gov/Archives/edgar/data/106040/000095013705011286/a12474e10vk.htm, at 9-
10.

26  [81] https://www.sec.gov/Archives/edgar/data/1042783/000119312512117255/d280931d10k.htm,
p. 62.

27  [82] https://www.sec.gov/Archives/edgar/data/1139023/000119312511210940/ds1a.htm, pp. 20-21.

28  [83] https://www.sec.gov/Archives/edgar/data/790070/000119312506045961/d10k.htm, p. 6.

drives is highly competitive and subject to intense pricing pressures."[84] Dot Hill states, "The storage market is intensely competitive and is characterized by rapidly changing technology[.]"[85] LSI agrees that, "[t]he market for our storage systems products is highly competitive, rapidly evolving and subject to changing technology, customer needs and new product introductions."[86] Xyratex explains that, "[t]he market for network and storage systems and storage infrastructure products is competitive, and we expect this competition to increase."[87] The company also, "derive[s] a significant proportion of our sales from the sale of disk drives as components of our enterprise storage systems and the market is highly competitive and subject to intense pricing pressures."[88]

247.    Enterprise HDD storage systems manufacturers acknowledge that they pass increases and decreases in component prices through to customers. NetApp is clear: "Disks are a significant component of our storage systems. … To the extent that disk prices increase or decrease, we intend to pass along those price increases or decreases to our customers while working to maintain relatively constant profit margins on our disk drives."[89] Dot Hill also states that, "Pricing pressures exist in the data storage market[.] … Decreases in component prices are customarily passed on to customers by storage companies through a continuing decrease in price of storage hardware systems."[90]

248.    Manufacturers of enterprise HDD storage systems are not alone in experiencing intense price competition. The same is true of Computer OEMs. Acer, Apple, Dell, Gateway,

---

[84] https://www.sec.gov/Archives/edgar/data/1002047/000095013406013059/f21341e10vk.htm, p. 23.

[85] https://www.sec.gov/Archives/edgar/data/1042783/000104278315000017/hill-20141231x10k.htm, p. 16.

[86] https://www.sec.gov/Archives/edgar/data/703360/000095012311019787/f57362e10vk.htm, pp. 8-9.

[87] https://www.sec.gov/Archives/edgar/data/1284823/000104746906002205/a2167443z20-f.htm, p. 37.

[88] https://www.sec.gov/Archives/edgar/data/1284823/000104746912001462/a2207352z20-f.htm, p. 8.

[89] https://www.sec.gov/Archives/edgar/data/1002047/000119312512275547/d328654d10k.htm, p. 52.

[90] https://www.sec.gov/Archives/edgar/data/1042783/000093639206000221/a18083e10vk.htm, pp. 19-20.

Hewlett-Packard, Lenovo, and Toshiba accounted for between 69% and 81% of Computer sales in the United States for each year of the Class Period. Profit margin data for these OEMs show highly competitive industry where component price increases are passed-through to purchasers.

249.    OEMs track even the smallest costs for their Computers, because even the smallest costs matter collectively. OEMs then set prices based on the total cost of manufacturing their devices. Because OEMs track costs and use simple rules to set prices, even the smallest price increases will be passed-through to customers.

250.    Computer OEMs characterize competition during the Class Period as tough, aggressive, severe, intense, and fierce:

- Acer: "The IT industry has reached saturation level and profits are diminishing, there is tough competition between local and foreign brands."[91]

- Apple: "The market for personal computers and related software and peripheral products is highly competitive. … Over the past several years, price competition in the market for personal computers has been particularly intense. The Company's competitors who sell personal computers based on other operating systems have aggressively cut prices and lowered their product margins to gain or maintain market share."[92]

- Lenovo: "The Group operates in a highly competitive industry which faces rapid changes in market trends, consumer preferences and constantly evolving technological advances in hardware performance, software features and functionality. It faces aggressive product and price competition from competitors."[93]

- Toshiba: "The business areas of energy and electronics, the Group's main business areas, require highly advanced technology for their operation. At the same time, the

---

[91] https://static.acer.com/up/Resource/AcerGroup/Investor_Relations/Annual_Reports/20170407/annual_reports_2005.pdf, p. 29.

[92] https://www.sec.gov/Archives/edgar/data/320193/000110465905058421/a05-20674_110k.htm, p. 13.

[93] https://investor.lenovo.com/en/publications/reports/ar_1617.pdf, p. 22.

1    Group faces fierce global competition."[94]

2    251.    The primary Computer distributors include Arrow Electronics, Avnet, D&H,

3    Ingram Micro, Synnex, and Tech Data. These companies also operate on a low-margin basis, pass-

4    through cost increases to their customers, and recognize the highly-competitive nature of the

5    market. Arrow explains, "The company operates in a highly competitive environment, both in the

6    United States and internationally."[95] Avnet states, "The electronic components industry continues

7    to be extremely competitive."[96] According to Ingram Micro, "We continually experience intense

8    competition across all markets for our products and services."[97] And Synnex recognizes that, "The

9    market for IT products and services is generally characterized by declining unit prices and short

10   product life cycles. Our overall business is also highly competitive on the basis of price."[98]

11   252.    Major resellers of Standalone Storage Devices and Computers publicly state that

12   they face enormous price competition as well:

13   •    Amazon: "The worldwide marketplace in which we compete is evolving rapidly and

14        intensely competitive, and we face a broad array of competitors from many different

15        industry sectors around the world."[99]

16   •    Best Buy: "While we constantly strive to offer consumers the best value, the retail

17        sector is highly competitive. Price is of great importance to most customers, and

18        price transparency and comparability continues to increase, particularly as a result

19        of digital technology."[100]

20

21   [94] https://www.toshiba.co.jp/about/ir/en/finance/ar/ar2012/tar2012e_fr.pdf, p. 13.

22   [95] https://www.sec.gov/Archives/edgar/data/7536/000177547420000003/arw1231201910-k.htm, p. 5.

23   [96] https://www.sec.gov/Archives/edgar/data/8858/000000885820000025/avt-20200627x10k.htm, p. 5.

24   [97] https://www.sec.gov/Archives/edgar/data/1018003/000101800316000071/im201510k.htm, pp. 17-18.

25   [98] https://www.sec.gov/Archives/edgar/data/1177394/000156459020002467/snx-10k_20191130.htm, p. 28.

26   [99] https://www.sec.gov/Archives/edgar/data/1018724/000101872420000004/amzn-20191231x10k.htm, p. 4.

27

28   [100] https://www.sec.gov/Archives/edgar/data/764478/000076447820000017/bby-

- Office Depot: "We operate in a highly competitive environment. Our Business Solutions and Retail Divisions compete with office supply stores, wholesale clubs, discount stores, mass merchandisers, online retailers, food and drug stores, computer and electronics superstores and direct marketing companies."[101]

- Staples: "Our top priority is to continue to improve the service and value we offer customers in a highly competitive industry."[102]

- Walmart: "We face strong competition from other retailers and wholesale club operators which could materially adversely affect our financial performance."[103]

    **2.**    **Economic and Legal Literature Indicates that Unlawful Overcharges on a Component Will Be Passed-through in Prices for Products Containing that Component**

253.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[104]

254.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class

---

20200201x10k.htm, p. 7.

[101] https://www.sec.gov/Archives/edgar/data/800240/000156459020006770/odp-10k_20191228.htm, p. 8.

[102] https://www.sec.gov/Archives/edgar/data/791519/000079151917000020/spls10-k01282017.htm, p. 1.

[103] https://www.sec.gov/Archives/edgar/data/104169/000010416920000011/wmtform10-kx1312020.htm, p. 14.

[104] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

1  certification):

> As is well known in economic theory and practice, at least some of
> the overcharge will be passed on by distributors to end consumers.
> When the distribution markets are highly competitive, as they are
> here, all or nearly the entire overcharge will be passed on through to
> ultimate consumers . . . . Both of Microsoft's experts also agree upon
> the economic phenomenon of cost pass through, and how it works in
> competitive markets. This general phenomenon of cost pass through
> is well established in antitrust laws and economics as well.[105]

### 3.  The Precise HDD Suspension Assembly Overcharge Passed Through to the Products End-Users Purchased Can Be Measured with Regression Analysis

255.    The precise amount of the overcharge impacting the prices of products containing HDD suspension assemblies can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through each level in the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

256.    First, it is well established that producers of a product will pass through variable cost increases (as opposed to increases in fixed costs) to avoid lost profits.[106] Here, HDD suspension assemblies were important variable costs for HDD producers.[107] Second, it is well established that producers of a product will pass through cost increases in inelastic markets.[108] Here, the markets for HDDs were inelastic. Demand in the market for HDDs was derived from consumer demand for Standalone Storage Devices and Computers. Sellers of HDDs could therefore pass through cost

[105] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

[106] *See, e.g.*, European Commission, Guidelines for national courts on how to estimate the share of overcharge which was passed on to the indirect purchaser (July 1, 2019) ("Guidelines"), at 17-18, *available at* https://ec.europa.eu/competition/antitrust/actionsdamages/quantification_en.html. Variable costs are those that change with the level of output, e.g. raw materials. Fixed costs are those that stay constant whatever the quantity of goods or services produced, e.g. rent. Economic theory recognizes that sellers ordinarily take variable costs into account in making price-setting decisions. *Id.* at 45.

[107] *See, e.g.*, Seagate 2015 Annual Report, at 24 (identifying suspension assemblies as among handful of "particularly important" cost components for HDDs).

[108] Guidelines at 17-18. An inelastic market is one in which prices do not significantly affect consumer demand for a product.

increases without fear of losing sales. Similarly, OEMs could pass through cost increases without fear of losing sales. Third, it is well established that where, as here, there is an industry-wide overcharge, competing purchasers will generally pass through overcharges.[109] Here, the markets for HDDs were highly competitive. In addition, Defendants' conduct was not directed at just one HDD purchaser. Defendants sought to, and did, extract an industrywide overcharge. As a result, HDD manufacturers passed through the market-wide overcharges they paid for HDD suspension assemblies, and Finished Product manufacturers passed the market-wide overcharges they paid for HDDs through to their customers. Finally, it is established that firms are more likely to pass through non-transitory price increases. Here, the alleged conspiracy increased prices for HDD suspension assemblies over at least a thirteen-year period. These were not transitory increases.

257.     Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the business world, academia, and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of HDD suspension assemblies on prices for products containing HDD suspension assemblies even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of HDD suspension assemblies affects changes in the price of assembled products, such as Standalone Storage Devices and Computers. In such models, the price of HDD suspension assemblies would be treated as an independent or explanatory variable. The

---

[109] Guidelines at 17-18. In a hypothetical scenario in which a cartel targets just one purchaser, that purchaser would have to decide whether consumers would switch to its competitors in response to a price increase passed on by that purchaser. By contrast, when the overcharge is imposed on all purchasers, they all bear similar cost increases which makes it more attractive for each of those purchasers to pass-through those increased costs. *Id.; see also* George Kosicki and Miles B. Cahill, *Economics of cost pass through and damages in indirect purchaser antitrust cases*, The Antitrust Bulletin, Vol. 51, No.3/Fall 2006 at 623 ("When all firms in an industry experience a cost increase and start to increase prices, the reduction in quantity suffered by any particular firm will be less than if it had to raise price in an environment where all other competitor prices are constant.").

model can isolate how changes in the price of HDD suspension assemblies impact the price of products containing HDD suspension assemblies while controlling for the impact of other price-determining factors. Such models can estimate pass-through rates for each participant at every level of the distribution chain.

258.     To the extent that distributors and retailers selling to End-Users or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an additional reason for pass-through to exceed 100 percent through these channels.[110] Further, because retailers ultimately compete with direct sales to purchasers by OEM manufacturers, competitive forces would likely work to equalize end-purchaser prices between channels, after controlling for the value of differences in support across different distribution channels. This would tend to push the total pass-through rate in end-purchaser pricing above 100 percent, since manufacturers could not sustain a pricing policy to distributors that did not cover their costs, and an additional fixed markup on top of distributor cost would result in a total pass-through rate to final consumers in excess of 100 percent.

259.     As a result, the inflated prices of HDD suspension assemblies from Defendants' anticompetitive practices have been passed on to the Plaintiffs and members of the proposed End-User Classes by direct-purchaser manufacturers, distributors, and resellers.

260.     Thus, Plaintiffs and members of the proposed End-User Classes have been forced to pay supra-competitive prices for Standalone Storage Devices and Computers. These inflated prices have been passed on to them by direct purchaser manufactures, distributors, and resellers, injuring Plaintiffs and End-Users in a manner that is traceable through every level of the distribution chain to the supra-competitive prices for Suspension Assemblies caused by Defendants' collusion. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

---

[110] For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price. Certain distributor costs, like the costs of holding inventory, and "shrinkage," may be approximately proportional to the value of the products held, and thus be one factor creating this pricing policy.

1

## VIII. CLASS ACTION ALLEGATIONS

2      261.      Plaintiffs bring this action on behalf of themselves and as a class action under Rule

3   23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust,

4   unfair competition, and consumer protection laws as well as common law unjust enrichment on

5   behalf of the following classes (the "Classes"):

6            All persons and entities who, during the Class Period, in the Indirect
             Purchaser States[111] purchased Standalone Storage Devices or
7            Computers, not for resale, which included HDD suspension
             assemblies that were manufactured or sold by Defendants, any
8            current or former subsidiary of Defendants, or any co-conspirator of
             Defendants.
9
10      262.      In the alternative, Plaintiffs bring this action on behalf of themselves and as a class

11   action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages

12   pursuant to state antitrust, unfair competition, and consumer protection laws as well as common

13   law unjust enrichment on behalf of the following classes:

14           All persons and entities who, during the Class Period, in the Indirect
             Purchaser States purchased Standalone Storage Devices, not for
15           resale, which included HDD suspension assemblies that were
             manufactured or sold by Defendants, any current or former
16           subsidiary of Defendants, or any co-conspirator of Defendants.

17      263.      Excluded from the Classes are Defendants, their parent companies, subsidiaries and

18   affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal

19   government, states and their subdivisions, agencies and instrumentalities, and persons who

20   purchased HDD suspension assemblies directly or for resale.

21      264.      While Plaintiffs do not know the exact number of members of the Classes, Plaintiffs

22   believe there are (at least) thousands of members in each Class.

23      265.      Common questions of law and fact exist as to all members of the Classes. This is

24   particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

25   members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.

26   Such questions of law and fact common to the Classes include, but are not limited to:

27           a.      Whether Defendants and their co-conspirators engaged in a combination and

---

[111] The Indirect Purchaser States are the states listed in the First and Second Claims for Relief.

28

1   conspiracy among themselves to fix, raise, maintain or stabilize the prices of HDD suspension

2   assemblies sold in the United States;

3         b.    The identity of the participants of the alleged conspiracy;

4         c.    The duration of the alleged conspiracy and the acts carried out by Defendants and

5   their co-conspirators in furtherance of the conspiracy;

6         d.    Whether the alleged conspiracy violated state antitrust, unfair competition, and/or

7   consumer protection laws;

8         e.    Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and

9   members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement

10   of all benefits derived by Defendants;

11         f.    Whether the conduct of Defendants and their co-conspirators, as alleged in this

12   Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

13         g.    The effect of the alleged conspiracy on the prices of HDD suspension assemblies

14   sold in the United States during the Class Period;

15         h.    Whether Plaintiffs and members of the Classes had any reason to know or suspect

16   the conspiracy, or any means to discover the conspiracy;

17         i.    Whether Defendants and their co-conspirators fraudulently concealed the

18   conspiracy's existence from Plaintiffs and members of the Classes; and

19         j.    The appropriate class-wide measure of damages for the Classes.

20      266.    Plaintiffs' claims are typical of the claims of members of the Classes, and Plaintiffs

21   will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the

22   Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated

23   prices for HDD suspension assemblies purchased indirectly from Defendants and/or their co-

24   conspirators.

25      267.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the

26   claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not

27   antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel

28   who are competent and experienced in the prosecution of antitrust and class action litigation.

268.     The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

269.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

270.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.   PLAINTIFFS' CLAIMS ARE TIMELY

### A.     Defendants Have Engaged in a Continuing Violation.

271.     This Complaint alleges a continuing course of unlawful conduct by which Defendants have inflicted continuing and accumulating harm within the applicable statutes of limitations.

272.     Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Plaintiffs and other members of the Classes.

273.     For these reasons, the statutes of limitations have been tolled with respect to the claims of Plaintiffs and members of the Classes asserted in this Complaint.

### B.     The Discovery Rule Tolled the Statute of Limitations.

274.     The discovery rule tolled any statute of limitations otherwise applicable to any claims asserted in this Complaint.

275.     Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants entered into a combination

and conspiracy to fix prices of, and allocate markets for, HDD suspension assemblies, until July 29, 2019, when the DOJ filed criminal charges against NHK Spring for violating Section 1 of the Sherman Act.

276.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein.

277.    Plaintiffs and members of the Classes are consumers who purchased HDDs for their own use and not for resale. Defendants' conspiracy was elaborate and well-concealed. No information concerning the conspiracy was in the public domain or available to Plaintiffs and members of the Classes. Moreover, Plaintiffs and members of the Classes had no direct contact or interaction with Defendants and had no means from which they could have discovered that Defendants were engaged in the conspiracy combination and conspiracy alleged herein.

### C.    Fraudulent Concealment Tolled the Statute of Limitations.

278.    Defendants' fraudulent concealment tolled the statute of limitations on the claims asserted by Plaintiffs and the Classes.

279.    Under the fraudulent concealment doctrine, the claims of Plaintiffs and members of the Classes alleged in this Complaint did or will only accrue upon discovery of the Defendants' conspiracy to fix prices of, and allocate markets for, HDD suspension assemblies, as a result of Defendants' concealment of the material facts.

280.    Plaintiffs and members of the Classes were kept ignorant by Defendants of crucial information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the alleged conspiracy alleged.

281.    Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supra-competitive prices for HDD suspension assemblies throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that they were being injured by Defendants' unlawful conduct.

282.     To the contrary, during the Class Period, Defendants fraudulently concealed their anticompetitive conduct by publicly touting policies to comply with international fair competition laws. For example, in a set of guidelines published on NHK Spring's website, the company stated:

> Compliance with competition law
>
> We shall comply with competition laws of respective country or region (Anti-Monopoly Act, Act against Delay in Payment of Subcontract Proceeds, Etc. to Subcontractors, etc. in Japan), and shall not commit any act such as private monopolization, restriction of transactions (cartel, bid rigging, etc.), unfair transaction method and abuse of superior bargaining position.

283.     Similarly, TDK's Code of Conduct provides:

> Maintenance and promotion of fair, transparent and free competition
>
> It is the TDK Group's basic policy to participate in fair, transparent, and free competition and to carry out appropriate activities in compliance with the competition laws in each country. These laws are intended to preserve fair and vigorous competition and to prohibit business practices that interfere with competition. For example, the TDK Group shall not engage in cartel acts such as agreeing with competitors on prices, production volumes (production plans), sales areas, and the like, which are illegal acts and behavior that damages the reputation of the company. The TDK Group and TDK members shall at all times comply with the letter and spirit of these laws. In addition, in pursuing profits in the course of carrying out corporate activities, TDK members shall always seek to conduct themselves with integrity and corporate ethics in mind.

284.     By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. HDD suspension assemblies are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the HDD suspension assemblies industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' prices for HDD suspension assemblies.

285.     Defendants actively concealed their conduct. Emails and memoranda containing information from competitors advised recipients to "***handle with care***," "***delete this email and all***

1  *other related ones*," "*we would be better off not leaving anything in the emails*," "*please be*
2  *careful with the handling [of] the information*." They also instructed participants in the conspiracy
3  to avoid mentioning their co-conspirators, "*since it's a crime.*"

4      286.    Because the alleged conspiracy was self-concealing and affirmatively concealed by
5  Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of
6  the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent
7  person to investigate whether a conspiracy existed until July 29, 2019, when the DOJ filed criminal
8  charges against NHK Spring for violating Section 1 of the Sherman Act.

9      287.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes'
10  claims was tolled and did not begin to run.

11      **D.**    **The DOJ's Criminal Proceedings Suspended the Statute of Limitations.**

12      288.    Criminal proceedings instituted by the DOJ against NHK Spring and against Hitoshi
13  Hashimoto and Hiroyuki Tamura also have suspended the running of the statute of limitations
14  pursuant to Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i). Each of those actions is a "criminal
15  proceeding … instituted by the United States to prevent, restrain, or punish violations of" the
16  Sherman Act. Plaintiffs' claims are "based in whole or in part on [the] matter complained of" in
17  the criminal proceedings. Under Section 5(i), the statute of limitations is "suspended during the
18  pendency" of the criminal proceedings "and for one year thereafter[.]"

19      **X.**    **VIOLATIONS ALLEGED**

20  **FIRST CLAIM FOR RELIEF**
   **Violation of State Antitrust Statutes**
21  **(on behalf of Plaintiffs and the Classes)**

22      289.    Plaintiffs assert these state law claims on behalf of the Classes.

23      290.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

24      291.    During the Class Period, Defendants and their co-conspirators engaged in a
25  continuing contract, combination or conspiracy with respect to the sale of HDD suspension
26  assemblies in unreasonable restraint of trade and commerce and in violation of the various state
27  antitrust and other statutes set forth below.

28      292.    The contract, combination, or conspiracy consisted of an agreement among

Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive levels the prices for HDD suspension assemblies and to allocate customers for these products in the United States.

293.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: participating in meetings and conversations among themselves in the United States and elsewhere during which they exchanged pricing information and agreed to price HDD suspension assemblies at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Classes with respect to HDD suspension assemblies sold in the United States; allocating customers and markets for HDD suspension assemblies sold in, or for delivery to, the United States in furtherance of their agreements; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

294.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to HDD suspension assemblies.

295.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

296.    Plaintiff Jonathan Rizzo ("**Arizona Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants entered into an unlawful agreement in restraint of trade in violation of the **Arizona** Revised Statutes, §§ 44-1401, *et seq*.

b.    Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Arizona; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Arizona Plaintiff and members of the Arizona Class were deprived of free and open competition; and (4) Arizona Plaintiffs and members of the Arizona

1    Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

2         b.    During the Class Period, Defendants' illegal conduct substantially affected Arizona

3    commerce.

4         c.    As a direct and proximate result of Defendants' unlawful conduct, Arizona Plaintiff

5    and members of the Arizona Class were injured in their business and property and are threatened

6    with further injury.

7         d.    Accordingly, Arizona Plaintiff and members of the Arizona Class seek all forms of

8    relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

9    297.    Plaintiffs Joanna Katcher, Rhonda Glover, James Walnum, and Timothy A. St. Cyr.

10   ("**California Plaintiffs**") incorporate and reallege each and every allegation set forth in the

11   preceding paragraphs of this Complaint and further allege as follows:

12        a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

13   the **California Cartwright Act**, California Business and Professions Code, §§ 16700, *et seq*.

14        b.    During the Class Period, Defendants and their co-conspirators entered into and

15   engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

16   violation of Section 16720, California Business and Professions Code. Each Defendant has acted

17   in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets

18   for, HDD suspension assemblies at supra-competitive levels.

19        b.    The aforesaid violations of Section 16720, California Business and Professions

20   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

21   Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain,

22   and stabilize the prices of, and to allocate markets for, HDD suspension assemblies.

23        c.    For the purpose of forming and effectuating the unlawful trust, Defendants and their

24   co-conspirators have done those things which they combined and conspired to do, including but

25   not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing,

26   raising, stabilizing, and pegging the price of HDD suspension assemblies; and (2) allocating among

27   themselves the production of HDD suspension assemblies.

28        d.    The combination and conspiracy alleged herein has had, *inter alia*, the following

END-USER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  effects: (1) price competition in the sale of HDD suspension assemblies has been restrained,

2  suppressed, and/or eliminated in the State of California; (2) prices for HDD suspension assemblies

3  sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at

4  artificially high, non-competitive levels in the State of California and throughout the United States;

5  and (3) those who purchased HDD suspension assemblies have been deprived of the benefit of free

6  and open competition.

7      e.    As a direct and proximate result of Defendants' unlawful conduct, California

8  Plaintiffs and members of the California Class were injured in their business and property in that

9  they paid more for HDD suspension assemblies than they otherwise would have paid in the absence

10  of Defendants' unlawful conduct. As a result of Defendants' violation of the Cartwright Act,

11  California Plaintiffs and members of the California Class seek treble damages and their cost of suit,

12  including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and

13  Professions Code.

14      298.   Plaintiffs John Hinshaw and David Lietz ("**DC Plaintiffs**") incorporate and reallege

15  each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

16  as follows:

17      a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

18  the **District of Columbia** Code Annotated §§ 28-4501, *et seq.*

19      b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

20  suspension assemblies price competition was restrained, suppressed, and eliminated throughout the

21  District of Columbia; (2) HDD suspension assemblies prices were raised, fixed, maintained and

22  stabilized at artificially high levels throughout the District of Columbia; (3) DC Plaintiffs and

23  members of the District of Columbia Class were deprived of free and open competition; and (4)

24  DC Plaintiffs and members of the District of Columbia Class paid supra-competitive, artificially

25  inflated prices for HDD suspension assemblies.

26      c.    During the Class Period, Defendants' illegal conduct substantially affected District

27  of Columbia commerce.

28      d.    As a direct and proximate result of Defendants' unlawful conduct, DC Plaintiffs and

1    members of the District of Columbia Class were injured in their business and property and are

2    threatened with further injury.

3           e.      Accordingly, DC Plaintiffs and members of the DC Class seek all forms of relief

4    available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

5    299.    Plaintiff Harley Oda ("**Hawaii Plaintiff**") incorporates and realleges each and every

6    allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

7           a.      Defendants entered into an unlawful agreement in restraint of trade in violation of

8    the **Hawaii** Antitrust Act, Haw. Rev. Stat. § 480-4.

9           b.      Defendants' combinations or conspiracies had the following effects: (1) HDD

10   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

11   Hawaii; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

12   artificially high levels throughout Hawaii; (3) Hawaii Plaintiff and members of the Hawaii Class

13   were deprived of free and open competition; and (4) Hawaii Plaintiff and members of the Hawaii

14   Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

15          c.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii

16   commerce.

17          d.      As a direct and proximate result of Defendants' unlawful conduct, Hawaii Plaintiff

18   and members of the Hawaii Class were injured in their business and property and are threatened

19   with further injury.

20          e.      Accordingly, Hawaii Plaintiff and members of the Hawaii Class seek all forms of

21   relief available under the Hawaii Antitrust Act.

22   300.    Plaintiff Benjamin Allen ("**Iowa Plaintiff**") incorporates and realleges each and

23   every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

24   follows:

25          a.      Defendants entered into an unlawful agreement in restraint of trade in violation of

26   the **Iowa** Code §§ 553.1, *et seq.*

27          b.      Defendants' combinations or conspiracies had the following effects: (1) HDD

28   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

Iowa; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Iowa Plaintiff and members of the Iowa Class were deprived of free and open competition; and (4) Iowa Plaintiff and members of the Iowa Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

      c.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

      d.    As a direct and proximate result of Defendants' unlawful conduct, Iowa Plaintiff and members of the Iowa Class were injured in their business and property and are threatened with further injury.

      e.    Accordingly, Iowa Plaintiff and members of the Iowa Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

301.    Plaintiffs Jeeyoon Lee and John R. Shannon III ("**Kansas Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

      a.    Defendants entered into an unlawful agreement in restraint of trade in violation of the **Kansas** Statutes Annotated, §§ 50-101, *et seq*.

      b.    Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Kansas; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Kansas Plaintiffs and members of the Kansas Class were deprived of free and open competition; and (4) Kansas Plaintiffs and members of the Kansas Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

      c.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      d.    As a direct and proximate result of Defendants' unlawful conduct, Kansas Plaintiffs and members of the Kansas Class were injured in their business and property and are threatened with further injury.

      e.    Accordingly, Kansas Plaintiffs and members of the Kansas Class seek all forms of

1    relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

2        302.    Plaintiffs Nate Coffin and James Marean ("**Maine Plaintiffs**") incorporate and

3    reallege each and every allegation set forth in the preceding paragraphs of this Complaint and

4    further alleges as follows:

5        a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

6    the **Maine** Revised Statutes, Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

7        b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

8    suspension assemblies price competition was restrained, suppressed, and eliminated throughout

9    Maine; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

10   artificially high levels throughout Maine; (3) Maine Plaintiffs and members of the Maine Class

11   were deprived of free and open competition; and (4) Maine Plaintiffs and members of the Maine

12   Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

13       b.    During the Class Period, Defendants' illegal conduct substantially affected Maine

14   commerce.

15       c.    As a direct and proximate result of Defendants' unlawful conduct, Maine Plaintiffs

16   and members of the Maine Class were injured in their business and property and are threatened

17   with further injury.

18       d.    Accordingly, Maine Plaintiffs and members of the Maine Class seek all relief

19   available under Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*

20       303.    Plaintiffs Karen Needles, Sascha Nelson, and Stacey Silver ("**Maryland**

21   **Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs

22   of this Complaint and further allege as follows:

23       a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

24   the **Maryland** Antitrust Act, Md. Code. Ann., Com. Law § 11-201, *et seq.*

25       b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

26   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

27   Maryland; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

28   artificially high levels throughout Maryland; (3) Maryland Plaintiffs and members of the Maryland

1    Class were deprived of free and open competition; and (4) Maryland Plaintiffs and members of the

2    Maryland Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

3         c.    During the Class Period, Defendants' illegal conduct substantially affected

4    Maryland commerce.

5         d.    As a direct and proximate result of Defendants' unlawful conduct, Maryland

6    Plaintiffs and members of the Maryland Class were injured in their business and property and are

7    threatened with further injury.

8         e.    Accordingly, Maryland Plaintiffs and members of the Maryland Class seek all relief

9    available under Md. Code Ann., Com. Law § 11-201, *et seq*.

10    304.    Plaintiffs Yitah Wu and Jordan Leff ("**Michigan Plaintiffs**") incorporate and

11    reallege each and every allegation set forth in the preceding paragraphs of this Complaint and

12    further alleges as follows:

13         a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

14    the **Michigan** Compiled Laws Annotated §§ 445.771, *et seq*.

15         b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

16    suspension assemblies price competition was restrained, suppressed, and eliminated throughout

17    Michigan; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

18    artificially high levels throughout Michigan; (3) Michigan Plaintiffs and members of the Michigan

19    Class were deprived of free and open competition; and (4) Michigan Plaintiffs and members of the

20    Michigan Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

21         c.    During the Class Period, Defendants' illegal conduct substantially affected

22    Michigan commerce.

23         d.    As a direct and proximate result of Defendants' unlawful conduct, Michigan

24    Plaintiffs and members of the Michigan Class were injured in their business and property and are

25    threatened with further injury.

26         e.    Accordingly, Michigan Plaintiffs and members of the Michigan Class seek all relief

27    available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

28    305.    Plaintiffs Chad Klebs, Pamela Uglem, and Andrew Syverson ("**Minnesota**

**Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.   Defendants entered into an unlawful agreement in restraint of trade in violation of the **Minnesota** Annotated Statutes §§ 325D.49, *et seq.*

b.   Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Minnesota Plaintiffs and members of the Minnesota Class were deprived of free and open competition; and (4) Minnesota Plaintiffs and members of the Minnesota Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c.   During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Minnesota Plaintiffs and members of the Minnesota Class were injured in their business and property and are threatened with further injury.

e.   Accordingly, Minnesota Plaintiffs and members of the Minnesota Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

306.   Plaintiffs Brandy Newsome and Ethel Cain Carson ("**Mississippi Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.   Defendants entered into an unlawful agreement in restraint of trade in violation of the **Mississippi** Code Annotated §§ 75-21-1, *et seq.*

b.   Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Mississippi Plaintiffs and members of the Mississippi Class were deprived of free and open competition; and (4) Mississippi Plaintiffs and

1  members of the Mississippi Class paid supra-competitive, artificially inflated prices for HDD

2  suspension assemblies.

3      c.    During the Class Period, Defendants' illegal conduct substantially affected

4  Mississippi commerce.

5      d.    As a direct and proximate result of Defendants' unlawful conduct, Mississippi

6  Plaintiffs and members of the Mississippi Class were injured in their business and property and are

7  threatened with further injury.

8      e.    Accordingly, Mississippi Plaintiffs and members of the Mississippi Class seek all

9  relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

10     307.   Plaintiff Leslie Working ("**Nebraska Plaintiff**") incorporates and realleges each

11  and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

12  follows:

13     a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

14  the **Nebraska** Revised Statutes §§ 59-801, *et seq.*

15     b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

16  suspension assemblies price competition was restrained, suppressed, and eliminated throughout

17  Nebraska; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

18  artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and members of the Nebraska

19  Class were deprived of free and open competition; and (4) Nebraska Plaintiff and members of the

20  Nebraska Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

21     c.    During the Class Period, Defendants' illegal conduct substantially affected

22  Nebraska commerce.

23     d.    As a direct and proximate result of Defendants' unlawful conduct, Nebraska

24  Plaintiff and members of the Nebraska Class were injured in their business and property and are

25  threatened with further injury.

26     e.    Accordingly, Nebraska Plaintiff and members of the Nebraska Class seek all relief

27  available under Nebraska Revised Statutes §§ 59-801, *et seq.*

28     308.   Plaintiff Michelle Felich and Gregory Painter ("**Nevada Plaintiffs**") incorporate and

reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendants entered into an unlawful agreement in restraint of trade in violation of the **Nevada** Revised Statutes Annotated §§ 598A.010, *et seq.*

b.   Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Nevada; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Nevada Plaintiffs and members of the Nevada Class were deprived of free and open competition; and (4) Nevada Plaintiffs and members of the Nevada Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Nevada Plaintiffs and members of the Nevada Class were injured in their business and property and are threatened with further injury.

e.   Accordingly, Nevada Plaintiffs and members of the Nevada Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

309.   Plaintiffs Sara Steffen and Matthew Landry ("**New Hampshire Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendants entered into an unlawful agreement in restraint of trade in violation of the **New Hampshire** Revised Statutes §§ 356:1, *et seq.*

b.   Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiffs and members of the New Hampshire Class were deprived of free and open competition; and (4) New Hampshire Plaintiffs and members of the New Hampshire Class paid supra-competitive, artificially

1    inflated prices for HDD suspension assemblies.

2          c.    During the Class Period, Defendants' illegal conduct substantially affected New

3    Hampshire commerce.

4          d.    As a direct and proximate result of Defendants' unlawful conduct, New Hampshire

5    Plaintiffs and members of the New Hampshire Class were injured in their business and property

6    and are threatened with further injury.

7          e.    Accordingly, New Hampshire Plaintiffs and members of the New Hampshire Class

8    seek all relief available under New Hampshire Rev. Stat. Ann. §§ 356:1, *et seq.*

9          310.    Plaintiff Sue McKelvey ("**New Mexico Plaintiff**") incorporates and realleges each

10   and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

11   follows:

12         a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

13   the **New Mexico** Statutes Annotated §§ 57-1-1, et seq.

14         b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

15   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

16   New Mexico; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized

17   at artificially high levels throughout New Mexico; (3) New Mexico Plaintiff and members of the

18   New Mexico Class were deprived of free and open competition; and (4) New Mexico Plaintiff and

19   members of the New Mexico Class paid supra-competitive, artificially inflated prices for HDD

20   suspension assemblies.

21         c.    During the Class Period, Defendants' illegal conduct substantially affected New

22   Mexico commerce.

23         d.    As a direct and proximate result of Defendants' unlawful conduct, New Mexico

24   Plaintiff and members of the New Mexico Class were injured in their business and property and

25   are threatened with further injury.

26         e.    Accordingly, New Mexico Plaintiff and members of the New Mexico Class seek all

27   relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

28         311.    Plaintiffs Vincent Cimino and Anthony Cimino ("**New York Plaintiffs**")

incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

    a.    Defendants entered into an unlawful agreement in restraint of trade in violation of the **New York** General Business Laws §§ 340, et seq.

    b.    Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout New York; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) New York Plaintiffs and members of the New York Class were deprived of free and open competition; and (4) New York Plaintiffs and members of the New York Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies when they purchased HDDs containing HDD suspension assemblies.

    c.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, New York Plaintiffs and members of the New York Class were injured in their business and property and are threatened with further injury.

    e.    The conduct set forth above is a *per se* violation of the Act. Accordingly, New York Plaintiffs and members of the New York Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

312.    Plaintiff Thomas Leon Meltzer ("**North Carolina Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants entered into an unlawful agreement in restraint of trade in violation of the **North Carolina** General Statutes §§ 75-1, *et seq*.

    b.    Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and

1   members of the North Carolina Class were deprived of free and open competition; and (4) North

2   Carolina Plaintiff and members of the North Carolina Class paid supra-competitive, artificially

3   inflated prices for HDD suspension assemblies.

4         c.    During the Class Period, Defendants' illegal conduct substantially affected North

5   Carolina commerce.

6         d.    As a direct and proximate result of Defendants' unlawful conduct, North Carolina

7   Plaintiff and members of the North Carolina Class were injured in their business and property and

8   are threatened with further injury.

9         e.    Accordingly, North Carolina Plaintiff and members of the North Carolina Class seek

10   all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

11         313.    Plaintiff Matthew Carlson, Chad Nodland, and Ashely Boswell ("**North Dakota**

12   **Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs

13   of this Complaint and further alleges as follows:

14         a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

15   the **North Dakota** Century Code §§ 51-08.1-01, *et seq*.

16         b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

17   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

18   North Dakota; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized

19   at artificially high levels throughout North Dakota; (3) North Dakota Plaintiffs and members of the

20   North Dakota Class were deprived of free and open competition; and (4) North Dakota Plaintiffs

21   and members of the North Dakota Class paid supra-competitive, artificially inflated prices for HDD

22   suspension assemblies.

23         c.    During the Class Period, Defendants' illegal conduct had a substantial effect on

24   North Dakota commerce.

25         d.    As a direct and proximate result of Defendants' unlawful conduct, North Dakota

26   Plaintiffs and members of the North Dakota Class were injured in their business and property and

27   are threatened with further injury.

28         e.    Accordingly, North Dakota Plaintiffs and members of the North Dakota Class seek

1   all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

2   314.   Plaintiff David Anderson ("**Oregon Plaintiff**") incorporates and realleges each and

3   every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

4   follows:

5       a.   Defendants entered into an unlawful agreement in restraint of trade in violation of

6   the **Oregon** Revised Statutes §§ 646.705, *et seq.*

7       b.   Defendants' combinations or conspiracies had the following effects: (1) HDD

8   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

9   Oregon; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

10  artificially high levels throughout Oregon; (3) Oregon Plaintiff and members of the Oregon Class

11  were deprived of free and open competition; and (4) Oregon Plaintiff and members of the Oregon

12  Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

13      c.   During the Class Period, Defendants' illegal conduct had a substantial effect on

14  Oregon commerce.

15      d.   As a direct and proximate result of Defendants' unlawful conduct, Oregon Plaintiff

16  and members of the Oregon Class were injured in their business and property and are threatened

17  with further injury.

18      e.   Accordingly, Oregon Plaintiff and members of the Oregon Class seek all relief

19  available under Oregon Revised Statutes §§ 646.705, *et seq.*

20  315.   Plaintiff Angela Gardner ("**Rhode Island Plaintiff**") incorporates and realleges

21  each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

22  as follows:

23      a.   Defendants entered into an unlawful agreement in restraint of trade in violation of

24  the **Rhode Island** Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.*

25      b.   Defendants' combinations or conspiracies had the following effects: (1) HDD

26  suspension assemblies price competition was restrained, suppressed, and eliminated throughout

27  Rhode Island; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized

28  at artificially high levels throughout Rhode Island; (3) Rhode Island Plaintiff and members of the

Rhode Island Class were deprived of free and open competition; and (4) Rhode Island Plaintiff and members of the Rhode Island Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Rhode Island Plaintiff and members of the Rhode Island Class were injured in their business and property and are threatened with further injury.

e. Accordingly, Rhode Island Plaintiff and members of the Rhode Island Class seek all relief available under R.I. Gen. Laws §§ 6-36-1, *et seq.*

316. Plaintiff Ann Marie Putzier ("**South Dakota Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants entered into an unlawful agreement in restraint of trade in violation of the **South Dakota** Codified Laws §§ 37-1-3.1, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) South Dakota Plaintiff and members of the South Dakota Class were deprived of free and open competition; and (4) South Dakota Plaintiff and members of the South Dakota Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, South Dakota Plaintiff and members of the South Dakota Class were injured in their business and property and are threatened with further injury.

e. Accordingly, South Dakota Plaintiff and members of the South Dakota Class seek

1    all relief available under S.D. Codified Laws Ann. §§ 37-1, *et seq.*

2        317.    Plaintiffs Alex Nicholson and Yvonne Peychal ("**Tennessee Plaintiffs**")

3    incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

4    Complaint and further allege as follows:

5            a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

6    the **Tennessee** Code Annotated §§ 47-25-101, *et seq.*

7            b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

8    suspension assemblies price competition was restrained, suppressed, and eliminated throughout

9    Tennessee; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

10   artificially high levels throughout Tennessee; (3) Tennessee Plaintiffs and members of the

11   Tennessee Class were deprived of free and open competition; and (4) Tennessee Plaintiffs and

12   members of the Tennessee Class paid supra-competitive, artificially inflated prices for HDD

13   suspension assemblies.

14           c.    During the Class Period, Defendants' illegal conduct had a substantial effect on

15   Tennessee commerce.

16           d.    As a direct and proximate result of Defendants' unlawful conduct, Tennessee

17   Plaintiffs and members of the Tennessee Class were injured in their business and property and are

18   threatened with further injury.

19           e.    Accordingly, Tennessee Plaintiffs and members of the Tennessee Class seek all

20   relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

21       318.    Plaintiffs Doug Fuller, Nicole Laird and Samuel Bringhurst ("**Utah Plaintiffs**")

22   incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

23   Complaint and further allege as follows:

24           a.    Defendants entered into an unlawful agreement in restraint of trade in violation of

25   the **Utah** Code Annotated §§ 76-10-3101, *et seq.*

26           b.    Defendants' combinations or conspiracies had the following effects: (1) HDD

27   suspension assemblies price competition was restrained, suppressed, and eliminated throughout

28   Utah; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at

artificially high levels throughout Utah; (3) Utah Plaintiffs and members of the Utah Class were deprived of free and open competition; and (4) Utah Plaintiffs and members of the Utah Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c.      During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Utah Plaintiffs and members of the Utah Class were injured in their business and property and are threatened with further injury.

e.      Accordingly, Utah Plaintiffs and members of the Utah Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

319.    Plaintiff Jonathan Lewis ("**Vermont Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants entered into an unlawful agreement in restraint of trade in violation of the **Vermont** Stat. Ann. 9 §§ 2453, *et seq*.

b.      Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Vermont; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Vermont Plaintiff and members of the Vermont Class were deprived of free and open competition; and (4) Vermont Plaintiff and members of the Vermont Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

c.      During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Vermont Plaintiff and members of the Vermont Class were injured in their business and property and are threatened with further injury.

e.      Accordingly, Vermont Plaintiff and members of the Vermont Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

320. Plaintiff Larry Steele ("**West Virginia Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a. Defendants entered into an unlawful agreement in restraint of trade in violation of the **West Virginia** Code §§ 47-18-1, *et seq.*

    b. Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) West Virginia Plaintiff and members of the West Virginia Class were deprived of free and open competition; and (4) West Virginia Plaintiff and members of the West Virginia Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

    c. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

    d. As a direct and proximate result of Defendants' unlawful conduct, West Virginia Plaintiff and members of the West Virginia Class were injured in their business and property and are threatened with further injury.

    e. Accordingly, West Virginia Plaintiff and members of the West Virginia Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

321. Plaintiff Seth Swanson ("**Wisconsin Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a. Defendants entered into an unlawful agreement in restraint of trade in violation of the **Wisconsin** Statutes §§ 133.01, *et seq.*

    b. Defendants' combinations or conspiracies had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) HDD suspension assemblies prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Plaintiff and members of the

Wisconsin Class were deprived of free and open competition; and (4) Wisconsin Plaintiff and members of the Wisconsin Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

      c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

      d.    As a direct and proximate result of Defendants' unlawful conduct, Wisconsin Plaintiff and members of the Wisconsin Class were injured in their business and property and are threatened with further injury.

      e.    Accordingly, Wisconsin Plaintiff and members of the Wisconsin Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

322.    Plaintiffs and members of the Class in each of the above states were injured in their business and property by Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Class have paid more for HDD suspension assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

323.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Class.

324.    Accordingly, Plaintiffs and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## SECOND CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Classes)

325.    Plaintiffs assert these state law claims on behalf of the Classes.

326.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

327.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

1   fraudulent acts or practices in violation of the state consumer protection and unfair competition

2   statutes listed below.

3       328.    Plaintiff Dustin Lancaster ("**Arkansas Plaintiff**") incorporates and realleges each

4   and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

5   follows:

6       a.    Defendants have engaged in deceptive and unconscionable acts or practices in

7   violation of the **Arkansas** Code Annotated, § 4-88-101, *et seq.*

8       b.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or

9   commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially

10  inflated levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained

11  in Arkansas and took efforts to conceal their agreements from Arkansas Plaintiff and members of

12  the Arkansas Class.

13      c.    The    aforementioned    conduct    on    the    part    of    Defendants    constituted

14  "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-

15  88-107(a)(10).

16      d.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

17  assemblies price competition was restrained, suppressed, and eliminated throughout Arkansas; (2)

18  HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

19  levels throughout Arkansas; (3) Arkansas Plaintiff and members of the Arkansas Class were

20  deprived of free and open competition; and (4) Arkansas Plaintiff and members of the Arkansas

21  Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

22      e.    During the Class Period, Defendants' illegal conduct substantially affected

23  Arkansas commerce and consumers.

24      f.    As a direct and proximate result of the unlawful conduct of Defendants, Arkansas

25  Plaintiff and members of the Arkansas Class were injured in their business and property and are

26  threatened with further injury.

27      g.    Accordingly, Arkansas Plaintiff and members of the Arkansas Class seek all relief

28  available under that statute.

329.    **California Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **California** Business and Professions Code § 17200, *et seq.*

b.    During the Class Period, Defendants marketed, sold, or distributed HDD suspension assemblies in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

c.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law (the "UCL").

d.    Defendants' conduct as alleged herein violates the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

e.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

f.    Defendants' acts or practices are unfair to consumers of HDD suspension assemblies (or products containing them) in California within the meaning of Section 17200, California Business and Professions Code.

g.    Defendants' acts and practices are fraudulent or deceptive within the meaning of

Section 17200 of the California Business and Professions Code.

h.    California Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business acts or practices.

i.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.    The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause California Plaintiffs and members of the California Class to pay supra-competitive and artificially-inflated prices for HDD suspension assemblies (or products containing them). California Plaintiffs and members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. California Plaintiffs and members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

330.    **DC Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of **District of Columbia** Code § 28-3901, *et seq.*

b.    DC Plaintiffs and members of the District of Columbia Class purchased HDD suspension assemblies for personal, family, or household purposes.

c.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed or obtained in the District of Columbia.

d.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of

D.C. Code § 28-3904. DC Plaintiffs were not aware of Defendants' price-fixing conspiracy and was therefore unaware that she was being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for HDD suspension assemblies. Defendants had the sole power to set that price and DC Plaintiffs had no power to negotiate a lower price. Moreover, DC Plaintiffs lacked any meaningful choice in purchasing HDD suspension assemblies because they were unaware of the unlawful overcharge and there was no alternative source of supply through which DC Plaintiffs could avoid the overcharges. Defendants' conduct with regard to sales of HDD suspension assemblies, including their illegal conspiracy to secretly fix the price of HDD suspension assemblies at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of DC Plaintiffs and the public. Defendants took grossly unfair advantage of DC Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for HDD suspension assemblies.

e.     Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) DC Plaintiffs and members of the District of Columbia Class were deprived of free and open competition; and (4) DC Plaintiffs and members of the District of Columbia Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

f.     As a direct and proximate result of Defendants' unlawful conduct, DC Plaintiffs and members of the District of Columbia Class were injured and are threatened with further injury. Accordingly, DC Plaintiffs and members of the District of Columbia Class seek all relief available under that statute.

331.     Plaintiffs Jeffrey Greenfield and Ted Ingber ("**Florida Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and

1  further allege as follows:

2        a.    Defendants have engaged in unfair competition or unfair, unconscionable, or

3  deceptive acts or practices in violation of the **Florida** Deceptive and Unfair Trade Practices Act,

4  Fla. Stat. §§ 501.201, *et seq*.

5        b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

6  affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the

7  prices at which HDD suspension assemblies were sold, distributed or obtained in Florida.

8        c.    Defendants concealed, suppressed, and omitted to disclose materials facts to North

9  Dakota Plaintiff and members of the Florida Class concerning Defendants' unlawful activities and

10  artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted

11  facts would have been important to Florida Plaintiffs and members of the Florida Class as they

12  related to the cost of HDD suspension assemblies they purchased.

13        d.    Defendants misrepresented the real cause of price increases and/or the absence of

14  price reductions in HDD suspension assemblies by making public statements that were not in

15  accord with the facts.

16        e.    Defendants' statements and conduct concerning the price of HDD suspension

17  assemblies were deceptive as they had the tendency or capacity to mislead Florida Plaintiffs and

18  members of the Florida Class to believe that they were purchasing HDD suspension assemblies at

19  prices established by a free and fair market.

20        f.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

21  assemblies price competition was restrained, suppressed, and eliminated throughout Florida; (2)

22  HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

23  levels throughout Florida; (3) Florida Plaintiffs and members of the Florida Class were deprived of

24  free and open competition; and (4) Florida Plaintiffs and members of the Florida Class paid supra-

25  competitive, artificially inflated prices for HDD suspension assemblies.

26        g.    During the Class Period, Defendants' illegal conduct substantially affected Florida

27  commerce and consumers.

28        h.    As a direct and proximate result of Defendants' unlawful conduct, Florida Plaintiffs

1   and members of the Florida Class were injured and are threatened with further injury. Accordingly,

2   Florida Plaintiff and members of the Florida Class seek all relief available under that statute.

3       332.   **Hawaii Plaintiff** incorporates and realleges each and every allegation set forth in

4   the preceding paragraphs of this Complaint and further alleges as follows:

5           a.   Defendants have engaged in "unfair methods of competition and unfair or deceptive

6   acts or practices in the conduct of any trade or commerce" within the meaning of **Hawaii** Rev. Stat.

7   § 480-2. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting,

8   fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at

9   which HDD suspension assemblies were sold, distributed or obtained in Hawaii.

10          b.   Hawaii Plaintiff and members of the Hawaii Class purchased HDD suspension

11  assemblies for personal, family, or household purposes.

12          c.   Defendants' unlawful conduct had the following effects: (1) HDD suspension

13  assemblies price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)

14  HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

15  levels throughout Hawaii; (3) Hawaii Plaintiff and members of the Hawaii Class were deprived of

16  free and open competition; and (4) Hawaii Plaintiff and members of the Hawaii Class paid supra-

17  competitive, artificially inflated prices for HDD suspension assemblies.

18          d.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii

19  commerce and consumers.

20          e.   As a direct and proximate result of Defendants' unlawful conduct, Hawaii Plaintiff

21  and members of the Hawaii Class were injured and are threatened with further injury. Accordingly,

22  Hawaii Plaintiffs and members of the Hawaii Class seek all relief available under the statute.

23      333.   Plaintiffs Martin Gasman and Brian Fahey ("**Massachusetts Plaintiffs**")

24  incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

25  Complaint and further alleges as follows:

26          a.   Defendants have engaged in unfair competition or unfair, unconscionable, or

27  deceptive acts or practices in violation of **Massachusetts** G.L. c. 93A, §2.

28          b.   Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

c.     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Massachusetts Plaintiffs and members of the Massachusetts Class.

d.     Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts Plaintiffs and members of the Massachusetts Class were deprived of free and open competition; and (4) Massachusetts Plaintiffs and members of the Massachusetts Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

e.     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce and consumers.

f.     As a direct and proximate result of Defendants' unlawful conduct, Massachusetts Plaintiff and members of the Massachusetts Class were injured and are threatened with further injury.

g.     Certain of Defendants have or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

h.     Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Massachusetts Plaintiffs and members of the Massachusetts Class to multiple damages.

334.    **Michigan Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Michigan** Consumer Protection Act, Mich. Comp.

1    Laws Ann. § 445.901, *et seq*.

2            b.      Defendants engaged in the conduct described in this Complaint in connection with

3    the sale of HDD suspension assemblies in trade or commerce in a market that includes Michigan.

4            c.      Defendants and their co-conspirators agreed to, and did in fact affect, fix, control,

5    and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension

6    assemblies were sold, distributed, or obtained in Michigan, which conduct constituted unfair

7    practices in that it was unlawful under federal and state law, violated public policy, was unethical,

8    oppressive and unscrupulous, and caused substantial injury to Michigan Plaintiffs and members of

9    the Michigan Class.

10           d.      Defendants concealed, suppressed, and omitted to disclose material facts to

11   Michigan Plaintiffs and members of the Michigan Class concerning Defendants' unlawful activities

12   and artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and

13   omitted facts would have been important to Michigan Plaintiffs and members of the Michigan Class

14   as they related to the cost of HDD suspension assemblies they purchased.

15           e.      Defendants misrepresented the real cause of price increases and/or the absence of

16   price reductions in HDD suspension assemblies by making public statements that were not in

17   accord with the facts.

18           f.      Defendants' statements and conduct concerning the price of HDD suspension

19   assemblies were deceptive as they had the tendency or capacity to mislead Michigan Plaintiffs and

20   members of the Michigan Class to believe that they were purchasing HDD suspension assemblies

21   at prices established by a free and fair market.

22           g.      Defendants' unlawful conduct had the following effects: (1) HDD suspension

23   assemblies price competition was restrained, suppressed, and eliminated throughout Michigan; (2)

24   HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

25   levels throughout Michigan; (3) Michigan Plaintiffs and members of the Michigan Class were

26   deprived of free and open competition; and (4) Michigan Plaintiffs and members of the Michigan

27   Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

28           h.      As a direct and proximate result of the above-described unlawful practices,

1    Michigan Plaintiff and members of the Michigan Class suffered ascertainable loss of money or

2    property. Accordingly, Michigan Plaintiffs and members of the Michigan Class seek all relief

3    available under the Michigan Consumer Protection Act.

4        335.    **Minnesota Plaintiffs** incorporate and reallege each and every allegation set forth in

5    the preceding paragraphs of this Complaint and further allege as follows:

6        a.    Defendants have engaged in unfair competition or unfair, unconscionable, or

7    deceptive acts or practices in violation of the **Minnesota** Consumer Fraud Act, Minn. Stat. §

8    325F.68, *et seq.*

9        b.    Defendants engaged in the conduct described in this Complaint in connection with

10   the sale of HDD suspension assemblies in trade or commerce in a market that includes Minnesota.

11       c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control,

12   and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension

13   assemblies were sold, distributed, or obtained in Minnesota, which conduct constituted unfair

14   practices in that it was unlawful under federal and state law, violated public policy, was unethical,

15   oppressive and unscrupulous, and caused substantial injury to Minnesota Plaintiffs and members

16   of the Minnesota Class.

17       d.    Defendants concealed, suppressed, and omitted to disclose material facts to

18   Minnesota Plaintiffs and members of the Minnesota Class concerning Defendants' unlawful

19   activities and artificially inflated prices for HDD suspension assemblies. The concealed,

20   suppressed, and omitted facts would have been important to Minnesota Plaintiffs and members of

21   the Minnesota Class as they related to the cost of HDD suspension assemblies they purchased.

22       e.    Defendants misrepresented the real cause of price increases and/or the absence of

23   price reductions in HDD suspension assemblies by making public statements that were not in

24   accord with the facts.

25       f.    Defendants' statements and conduct concerning the price of HDD suspension

26   assemblies were deceptive as they had the tendency or capacity to mislead Minnesota Plaintiffs and

27   members of the Minnesota Class to believe that they were purchasing HDD suspension assemblies

28   at prices established by a free and fair market.

g.     Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Minnesota Plaintiffs and members of the Minnesota Class were deprived of free and open competition; and (4) Minnesota Plaintiffs and members of the Minnesota Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

h.     As a direct and proximate result of the above-described unlawful practices, Minnesota Plaintiffs and members of the Minnesota Class suffered ascertainable loss of money or property. Accordingly, Minnesota Plaintiffs and members of the Minnesota Class seek all relief available under the Minnesota Consumer Fraud Act.

336.     Plaintiffs Jason Malashock and Kimberly Benjamin ("**Missouri Plaintiffs**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Missouri** Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

b.     Missouri Plaintiffs and members of the Missouri Class purchased HDD suspension assemblies for personal, family, or household purposes.

c.     Defendants engaged in the conduct described herein in connection with the sale of HDD suspension assemblies in trade or commerce in a market that includes Missouri.

d.     Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Missouri Plaintiffs and members of the Missouri Class.

e.     Defendants concealed, suppressed, and omitted to disclose material facts to Missouri Plaintiffs and members of the Missouri Class concerning Defendants' unlawful activities

and artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted facts would have been important to Missouri Plaintiffs and members of the Missouri Class as they related to the cost of HDD suspension assemblies they purchased.

f.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in HDD suspension assemblies by making public statements that were not in accord with the facts.

g.    Defendants' statements and conduct concerning the price of HDD suspension assemblies were deceptive as they had the tendency or capacity to mislead Missouri Plaintiffs and members of the Missouri Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

h.    Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Missouri; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Missouri Plaintiffs and members of the Missouri Class were deprived of free and open competition; and (4) Missouri Plaintiffs and members of the Missouri Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

i.    As a direct and proximate result of the above-described unlawful practices, Missouri Plaintiffs and members of the Missouri Class suffered ascertainable loss of money or property.

j.    Accordingly, Missouri Plaintiffs and members of the Missouri Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

337.    Plaintiffs Joseph Mattingly and Richard Jones ("**Montana Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and

1   further allege as follows:

2        a.     Defendants have engaged in unfair competition or unfair, unconscionable, or

3   deceptive acts or practices in violation of the **Montana** Consumer Protection Act of 1973, Mont.

4   Code, §§ 30-14-101, *et seq.*

5        b.     Montana Plaintiffs and members of the Montana Class purchased HDD suspension

6   assemblies for personal, family, or household purposes.

7        c.     Defendants' unlawful conduct had the following effects: (1) HDD suspension

8   assemblies price competition was restrained, suppressed, and eliminated throughout Montana; (2)

9   HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

10  levels throughout Montana; (3) Montana Plaintiffs and members of the Montana Class were

11  deprived of free and open competition; and (4) Montana Plaintiffs and members of the Montana

12  Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

13       d.     During the Class Period, Defendants' illegal conduct substantially affected Montana

14  commerce and consumers.

15       e.     As a direct and proximate result of Defendants' unlawful conduct, Montana

16  Plaintiffs and members of the Montana Class were injured and are threatened with further injury.

17  Accordingly, Montana Plaintiffs and members of the Montana Class seek all relief available under

18  that statute.

19       338.   **Nebraska Plaintiff** incorporates and realleges each and every allegation set forth in

20  the preceding paragraphs of this Complaint and further alleges as follows:

21       a.     Defendants have engaged in unfair methods competition and unfair or deceptive acts

22  or practices in the conduct of trade or commerce in violation of the **Nebraska** Consumer Protection

23  Act, Neb. Rev. Stat. § 59-1602, *et seq.*

24       b.     Defendants' unlawful conduct had the following effects: (1) HDD suspension

25  assemblies price competition was restrained, suppressed, and eliminated throughout Nebraska; (2)

26  HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

27  levels throughout Nebraska; (3) Nebraska Plaintiff and members of the Nebraska Class were

28  deprived of free and open competition; and (4) Nebraska Plaintiff and members of the Nebraska

1    Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

2        c.    During the Class Period, Defendants' illegal conduct substantially affected

3    Nebraska commerce and consumers.

4        d.    As a direct and proximate result of Defendants' unlawful conduct, Nebraska

5    Plaintiff and members of the Nebraska Class were injured and are threatened with further injury.

6    Accordingly, Nebraska Plaintiff and members of the Nebraska Class seek all relief available under

7    that statute.

8    339.    **Nevada Plaintiffs** incorporate and reallege each and every allegation set forth in the

9    preceding paragraphs of this Complaint and further alleges as follows:

10       a.    Defendants have engaged in deceptive trade practices in violation of the **Nevada**

11   Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*

12       b.    Defendants engaged in the conduct described herein in connection with the sale of

13   HDD suspension assemblies in trade or commerce in a market that includes Nevada.

14       c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control,

15   and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension

16   assemblies were sold, distributed or obtained in Nevada, which conduct constituted unfair practices

17   in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive

18   and unscrupulous, and caused substantial injury to Nevada Plaintiffs and members of the Nevada

19   Class.

20       d.    Defendants concealed, suppressed, and omitted to disclose material facts to Nevada

21   Plaintiff and members of the Nevada Class concerning Defendants' unlawful activities and

22   artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted

23   facts would have been important to Nevada Plaintiffs and members of the Nevada Class as they

24   related to the cost of HDD suspension assemblies they purchased.

25       e.    Defendants misrepresented the real cause of price increases and/or the absence of

26   price reductions in HDD suspension assemblies by making public statements that were not in

27   accord with the facts.

28       f.    Defendants' statements and conduct concerning the price of HDD suspension

1    assemblies were deceptive as they had the tendency or capacity to mislead Nevada Plaintiffs and

2    members of the Nevada Class to believe that they were purchasing HDD suspension assemblies at

3    prices established by a free and fair market.

4         g.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

5    assemblies price competition was restrained, suppressed, and eliminated throughout Nevada; (2)

6    HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

7    levels throughout Nevada; (3) Nevada Plaintiffs and members of the Nevada Class were deprived

8    of free and open competition; and (4) Nevada Plaintiffs and members of the Nevada Class paid

9    supra-competitive, artificially inflated prices for HDD suspension assemblies. As a direct and

10   proximate result of the above-described unlawful practices, Nevada Plaintiffs and members of the

11   Nevada Class suffered ascertainable loss of money or property. Accordingly, Nevada Plaintiffs and

12   members of the Nevada Class seek all relief available under Nev. Rev. Stat. § 598.0993.

13        340.   **New Hampshire Plaintiffs** incorporate and reallege each and every allegation set

14   forth in the preceding paragraphs of this Complaint and further alleges as follows:

15        a.    Defendants have engaged in unfair competition or unfair, unconscionable, or

16   deceptive acts or practices in violation of the **New Hampshire** Consumer Protection Act, N.H.

17   Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

18        b.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

19   assemblies price competition was restrained, suppressed, and eliminated throughout New

20   Hampshire; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized

21   at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiffs and members

22   of the New Hampshire Class were deprived of free and open competition; and (4) New Hampshire

23   Plaintiffs and members of the New Hampshire Class paid supra-competitive, artificially inflated

24   prices for HDD suspension assemblies.

25        c.    During the Class Period, Defendants' illegal conduct substantially affected New

26   Hampshire commerce and consumers.

27        d.    As a direct and proximate result of Defendants' unlawful conduct, New Hampshire

28   Plaintiffs and members of the New Hampshire Class were injured and are threatened with further

1   injury. Accordingly, New Hampshire Plaintiffs and members of the New Hampshire Class seek all

2   relief available under N.H. Rev. Stat. Ann. tit. XXXI § 358-A:10 and 358A:10-a.

3        341.    **New Mexico Plaintiff** incorporates and realleges each and every allegation set forth

4   in the preceding paragraphs of this Complaint and further alleges as follows:

5            a.    Defendants have engaged in unfair competition or unfair, unconscionable, or

6   deceptive acts or practices in violation of **New Mexico** Stat. § 57-12-1, *et seq.*

7            b.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of

8   trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and

9   artificially inflated levels, the prices at which HDD suspension assemblies were sold, distributed

10  or obtained in New Mexico and took efforts to conceal their agreements from New Mexico Plaintiff

11  and members of the New Mexico Class.

12           c.    The aforementioned conduct on the part of Defendants constituted "unconscionable

13  trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted

14  in a gross disparity between the value received by New Mexico Plaintiff and members of the New

15  Mexico Class and the prices paid by them for HDD suspension assemblies as set forth in N.M.S.A.,

16  § 57-12-2E. New Mexico Plaintiff was not aware of Defendants' price-fixing conspiracy and were

17  therefore unaware that she was being unfairly and illegally overcharged. There was a gross disparity

18  of bargaining power between the parties with respect to the price charged by Defendants for HDD

19  suspension assemblies. Defendants had the sole power to set that price and New Mexico Plaintiff

20  had no power to negotiate a lower price. Moreover, New Mexico Plaintiff lacked any meaningful

21  choice in purchasing HDD suspension assemblies because they were unaware of the unlawful

22  overcharge and there was no alternative source of supply through which New Mexico Plaintiff

23  could avoid the overcharges. Defendants' conduct with regard to sales of HDD suspension

24  assemblies, including their illegal conspiracy to secretly fix the price of HDD suspension

25  assemblies at supra-competitive levels and overcharge consumers, was substantively

26  unconscionable because it was one-sided and unfairly benefited Defendants at the expense of New

27  Mexico Plaintiff and the public. Defendants took grossly unfair advantage of New Mexico Plaintiff.

28  The suppression of competition that has resulted from Defendants' conspiracy has ultimately

1    resulted in unconscionably higher prices for consumers so that there was a gross disparity between

2    the price paid and the value received for HDD suspension assemblies.

3          d.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

4    assemblies price competition was restrained, suppressed, and eliminated throughout New Mexico;

5    (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially

6    high levels throughout New Mexico; (3) New Mexico Plaintiff and members of the New Mexico

7    Class were deprived of free and open competition; and (4) New Mexico Plaintiff and members of

8    the New Mexico Class paid supra-competitive, artificially inflated prices for HDD suspension

9    assemblies.

10         e.    During the Class Period, Defendants' illegal conduct substantially affected New

11   Mexico commerce and consumers.

12         f.    As a direct and proximate result of the unlawful conduct of Defendants, New

13   Mexico Plaintiff and members of the New Mexico Class were injured and are threatened with

14   further injury. Accordingly, New Mexico Plaintiff and members of the New Mexico Class seek all

15   relief available under that statute.

16         342.  **New York Plaintiffs** incorporate and reallege each and every allegation set forth in

17   the preceding paragraphs of this Complaint and further allege as follows:

18         a.    Defendants have engaged in unfair competition or unfair, unconscionable, or

19   deceptive acts or practices in violation of **New York** Gen. Bus. Law § 349, *et seq.*

20         b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

21   affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices

22   at which HDD suspension assemblies were sold, distributed or obtained in New York and took

23   efforts to conceal their agreements from New York Plaintiffs and members of the New York Class.

24         c.    Defendants and their co-conspirators made public statements about the prices of

25   HDD suspension assemblies and products containing HDD suspension assemblies that Defendants

26   knew would be seen by New York consumers; such statements either omitted material information

27   that rendered the statements that they made materially misleading or affirmatively misrepresented

28   the real cause of price increases for HDD suspension assemblies and products containing HDD

1  suspension assemblies; and Defendants alone possessed material information that was relevant to

2  consumers, but failed to provide the information.

3        d.     Because of Defendants' unlawful trade practices in New York, New York Plaintiffs

4  and members of the New York Class who indirectly purchased HDD suspension assemblies were

5  misled to believe that they were paying a fair price for HDD suspension assemblies or the price

6  increases for HDD suspension assemblies were for valid business reasons; and similarly situated

7  consumers were potentially affected by Defendants' conspiracy.

8        e.     Defendants knew that their unlawful trade practices with respect to pricing HDD

9  suspension assemblies would have an impact on New York consumers and not just Defendants'

10  direct customers.

11        f.     Defendants knew that their unlawful trade practices with respect to pricing HDD

12  suspension assemblies would have a broad impact, causing consumer class members who indirectly

13  purchased HDD suspension assemblies to be injured by paying more for HDD suspension

14  assemblies than they would have paid in the absence of Defendants' unlawful trade acts and

15  practices.

16        g.     The conduct of Defendants described herein constitutes consumer-oriented

17  deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in

18  consumer injury and broad adverse impact on the public at large, and harmed the public interest of

19  New York State in an honest marketplace in which economic activity is conducted in a competitive

20  manner.

21        h.     Defendants' unlawful conduct had the following effects: (1) HDD suspension

22  assemblies price competition was restrained, suppressed, and eliminated throughout New York; (2)

23  HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

24  levels throughout New York; (3) New York Plaintiffs and members of the New York Class were

25  deprived of free and open competition; and (4) New York Plaintiffs and members of the New York

26  Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

27        i.     During the Class Period, Defendants marketed, sold, or distributed HDD suspension

28  assemblies in New York, and Defendants' illegal conduct substantially affected New York

1    commerce and consumers.

2         j.     During the Class Period, each Defendant, directly, or indirectly and through

3    affiliates, dominated and controlled, manufactured, sold and/or distributed HDD suspension

4    assemblies in New York.

5         k.     New York Plaintiffs and members of the New York Class seek all relief available

6    pursuant to N.Y. Gen. Bus. Law § 349(h).

7    343.    **North Carolina Plaintiff** incorporates and realleges each and every allegation set

8    forth in the preceding paragraphs of this Complaint and further alleges as follows:

9         a.     Defendants have engaged in unfair competition or unfair, unconscionable, or

10   deceptive acts or practices in violation of **North Carolina** Gen. Stat. § 75-1.1, *et seq*.

11        b.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by

12   affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices

13   at which HDD suspension assemblies were sold, distributed or obtained in North Carolina and took

14   efforts to conceal their agreements from North Carolina Plaintiff and members of the North

15   Carolina Class.

16        c.     Defendants' price-fixing conspiracy could not have succeeded absent deceptive

17   conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation,

18   implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed

19   inherently deceptive and self-concealing actions, of which North Carolina Plaintiff could not

20   possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and

21   false justifications regarding their price increases. Defendants' public statements concerning the

22   price of HDD suspension assemblies created the illusion of competitive pricing controlled by

23   market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy.

24   Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to

25   divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in

26   secret, confining the plan to a small group of higher-level officials at each company and avoiding

27   the creation of documents which would reveal the antitrust violations.

28        d.     The conduct of Defendants described herein constitutes consumer-oriented

deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

e.    Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and members of the North Carolina Class were deprived of free and open competition; and (4) North Carolina Plaintiff and members of the North Carolina Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

f.    During the Class Period, Defendants' marketed, sold, or distributed HDD suspension assemblies in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

g.    During the Class Period, each Defendant, directly, or indirectly and through affiliates, dominated and controlled, manufactured, sold and/or distributed HDD suspension assemblies in North Carolina.

h.    North Carolina Plaintiff and members of the North Carolina Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury and seek all relief available under that statute.

344.    **North Dakota Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **North Dakota** Unfair Trade Practices Law, N.D. Cent. Code § 51-10, *et seq.*

b.    Defendants engaged in the conduct described in this Complaint in connection with the sale of HDD suspension assemblies in trade or commerce in a market that includes North Dakota.

c.     Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in North Dakota, which conduct constituted a fraudulent or deceptive act or practice and caused substantial injury to North Dakota Plaintiffs and members of the North Dakota Class.

d.     Defendants concealed, suppressed, and omitted to disclose materials facts to North Dakota Plaintiffs and members of the North Dakota Class concerning Defendants' unlawful activities and artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted facts would have been important to North Dakota Plaintiffs and members of the North Dakota Class as they related to the cost of HDD suspension assemblies they purchased.

e.     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in HDD suspension assemblies by making public statements that were not in accord with the facts.

f.     Defendants' statements and conduct concerning the price of HDD suspension assemblies were deceptive as they had the tendency or capacity to mislead North Dakota Plaintiffs and members of the North Dakota Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

g.     Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) North Dakota Plaintiffs and members of the North Dakota Class were deprived of free and open competition; and (4) North Dakota Plaintiffs and members of the North Dakota Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

h.     As a direct and proximate result of the above-described unlawful practices, North Dakota Plaintiffs and members of the North Dakota Class suffered ascertainable loss of money or property. Accordingly, North Dakota Plaintiffs and members of the North Dakota Class seek all relief available under N.D. Cent. Code § 51-10-06.

345.   **Oregon Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Oregon** Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*.

b.   Defendants engaged in the conduct described in this Complaint in connection with the sale of HDD suspension assemblies in trade or commerce in a market that includes Oregon.

c.   Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in Oregon, which conduct constituted unlawful trade practices by employing unconscionable tactics in connection with the sale of HDD suspension assemblies, and caused substantial injury to Oregon Plaintiff and members of the Oregon Class.

d.   Defendants concealed, suppressed, and omitted to disclose material facts to Oregon Plaintiff and members of the Oregon Class concerning Defendants unlawful activities and artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted facts would have been important to Oregon Plaintiff and members of the Oregon Class as they related to the cost of HDD suspension assemblies they purchased.

e.   Defendants misrepresented the real cause of price increased and/or the absence of price reductions in HDD suspension assemblies by making public statements that were not in accord with the facts.

f.   Defendants' statements and conduct concerning the price of HDD suspension assemblies were deceptive as they had the tendency or capacity to mislead Oregon Plaintiff and members of the Oregon Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

g.   Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Oregon; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Oregon Plaintiff and members of the Oregon Class were deprived of

1  free and open competition; and (4) Oregon Plaintiff and members of the Oregon Class paid supra-
2  competitive, artificially inflated prices for HDD suspension assemblies.

3      h.    As a direct and proximate result of the above-described unlawful practices, Oregon
4  Plaintiff and members of the Oregon Class suffered ascertainable loss of money or property.
5  Accordingly, Oregon Plaintiff and members of the Oregon Class seek all relief available under Or.
6  Rev. Stat. § 646.638.

7      346.    **Rhode Island Plaintiff** incorporates and realleges each and every allegation set
8  forth in the preceding paragraphs of this Complaint and further alleges as follows:

9      a.    Defendants have engaged in unfair competition or unfair, unconscionable, or
10  deceptive acts or practices in violation of the **Rhode Island** Unfair Trade Practice and Consumer
11  Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

12      b.    Members of this Class purchased HDD suspension assemblies for personal, family,
13  or household purposes.

14      c.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a
15  market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial
16  and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed,
17  or obtained in Rhode Island.

18      d.    Defendants deliberately failed to disclose material facts to Rhode Island Plaintiff
19  and members of the Rhode Island Class concerning Defendants' unlawful activities and artificially
20  inflated prices for HDD suspension assemblies. Defendants owed a duty to disclose such facts, and
21  considering the relative lack of sophistication of the average, non-business consumer, Defendants
22  breached that duty by their silence. Defendants misrepresented to all consumers during the Class
23  Period that Defendants' prices for HDD suspension assemblies were competitive and fair.

24      e.    Defendants' unlawful conduct had the following effects: (1) HDD suspension
25  assemblies price competition was restrained, suppressed, and eliminated throughout Rhode Island;
26  (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially
27  high levels throughout Rhode Island; (3) Rhode Island Plaintiff and members of the Rhode Island
28  Class were deprived of free and open competition; and (4) Rhode Island Plaintiff and members of

1  the Rhode Island Class paid supra-competitive, artificially inflated prices for HDD suspension

2  assemblies.

3        f.      As a direct and proximate result of Defendants' violations of law, Rhode Island

4  Plaintiff and members of the Rhode Island Class suffered an ascertainable loss of money or property

5  as a result of Defendants' use or employment of unconscionable and deceptive commercial

6  practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as

7  described herein.

8        g.      Defendants' deception, including their affirmative misrepresentations and

9  omissions concerning the price of HDD suspension assemblies, likely misled all consumers acting

10 reasonably under the circumstances to believe that they were purchasing HDD suspension

11 assemblies at prices set by a free and fair market. Defendants' affirmative misrepresentations and

12 omissions constitute information important to Rhode Island Plaintiff and members of the Rhode

13 Island Class as they related to the cost of HDD suspension assemblies they purchased.

14       h.      Accordingly, Rhode Island Plaintiff and members of the Rhode Island Class seek

15 all relief available under that statute.

16       347.    Plaintiffs Sara Speziale-Phillips and Tracy Nurzynski ("**South Carolina**

17 **Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs

18 of this Complaint and further alleges as follows:

19       a.      Defendants have engaged in unfair competition or unfair, unconscionable, or

20 deceptive acts or practices in violation of **South Carolina** Unfair Trade Practices Act, S.C. Code

21 Ann. §§ 39-5-10, *et seq.*

22       b.      Defendants' combinations or conspiracies had the following effects: (1) HDD

23 suspension assemblies price competition was restrained, suppressed, and eliminated throughout

24 South Carolina; (2) HDD suspension assemblies prices were raised, fixed, maintained, and

25 stabilized at artificially high levels throughout South Carolina; (3) South Carolina Plaintiffs and

26 members of the South Carolina Class were deprived of free and open competition; and (4) South

27 Carolina Plaintiffs and members of the South Carolina Class paid supra-competitive, artificially

28 inflated prices for HDD suspension assemblies.

1        c.     During the Class Period, Defendants' illegal conduct had a substantial effect on

2    South Carolina commerce.

3        d.     As a direct and proximate result of Defendants' unlawful conduct, South Carolina

4    Plaintiffs and members of the South Carolina Class were injured in their business and property and

5    are threatened with further injury. Accordingly, South Carolina Plaintiffs and the members of the

6    South Carolina Class seek all relief available under that statute.

7        348.    **South Dakota Plaintiff** incorporates and realleges each and every allegation set

8    forth in the preceding paragraphs of this Complaint and further alleges as follows:

9        a.     Defendants have engaged in unfair competition or unfair, unconscionable, or

10    deceptive acts or practices in violation of the **South Dakota** Deceptive Trade Practices and

11    Consumer Protection Law, S.D. Codified Laws § 37-24 *et seq.*

12        b.     Defendants engaged in the conduct described in this Complaint in connection with

13    the sale of HDD suspension assemblies in trade or commerce in a market that includes South

14    Dakota.

15        c.     Defendants and their co-conspirators agreed to, and did in fact affect, fix, control,

16    and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension

17    assemblies were sold, distributed, or obtained in South Dakota, which conduct constituted a

18    deceptive act or practice, and caused substantial injury to South Dakota Plaintiff and members of

19    the South Dakota Class.

20        d.     Defendants concealed, suppressed, and omitted to disclose material facts to South

21    Dakota Plaintiff and members of the South Dakota Class concerning Defendants' unlawful

22    activities and artificially inflated prices for HDD suspension assemblies. The concealed,

23    suppressed, and omitted facts would have been important to South Dakota Plaintiff and members

24    of the South Dakota Class as they related to the cost of HDD suspension assemblies they purchased.

25        e.     Defendants misrepresented the real cause of price increases and/or the absence of

26    price reductions in HDD suspension assemblies by making public statements that were not in

27    accord with the facts.

28        f.     Defendants' statements and conduct concerning the price of HDD suspension

assemblies were deceptive as they had the tendency or capacity to mislead South Dakota Plaintiff and members of the South Dakota Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

g.    Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) South Dakota Plaintiff and members of the South Dakota Class were deprived of free and open competition; and (4) South Dakota Plaintiff and members of the South Dakota Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

h.    As a direct and proximate result of the above-described unlawful practices, South Dakota Plaintiff and members of the South Dakota Class suffered ascertainable loss of money or property. Accordingly, South Dakota Plaintiff and members of the South Dakota Class seek all relief available under S.D. Codified Laws § 37-24-31.

349.    **Utah Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Utah** Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*

b.    Defendants engaged in the conduct described in this Complaint in connection with the sale of HDD suspension assemblies in trade or commerce in a market that includes Utah.

c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in Utah, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Utah Plaintiffs and members of the Utah Class.

d.    Defendants concealed, suppressed, and omitted to disclose material facts to Utah Plaintiffs and members of the Utah Class concerning Defendants' unlawful activities and artificially

inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted facts would have been important to Utah Plaintiffs and members of the Utah Class as they related to the cost of HDD suspension assemblies they purchased.

e.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in HDD suspension assemblies by making public statements that were not in accord with the facts.

f.    Defendants' statements and conduct concerning the price of HDD suspension assemblies were deceptive as they had the tendency or capacity to mislead Utah Plaintiffs and members of the Utah Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

g.    Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Utah; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Utah Plaintiffs and members of the Utah Class were deprived of free and open competition; and (4) Utah Plaintiffs and members of the Utah Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

h.    As a direct and proximate result of the above-described unlawful practices, Utah Plaintiffs and members of the Utah Class suffered ascertainable loss of money or property. Accordingly, Utah Plaintiffs and members of the Utah Class seek all relief available under Utah Code Ann. § 13-11-19(5) and 13-11-20.

350.    **Vermont Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Vermont** Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et seq.*:

b.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HDD suspension

1    assemblies were sold, distributed, or obtained in Vermont.

2        c.    Defendants deliberately failed to disclose material facts to Vermont Plaintiff and

3    members of the Vermont Class concerning their unlawful activities and artificially inflated prices

4    for HDD suspension assemblies. Defendants owed a duty to disclose such facts, and considering

5    the relative lack of sophistication of the average, non-business purchaser, Defendants breached that

6    duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their

7    prices for HDD suspension assemblies were competitive and fair.

8        d.    Defendants' unlawful conduct had the following effects: (1) HDD suspension

9    assemblies price competition was restrained, suppressed, and eliminated throughout Vermont; (2)

10   HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high

11   levels throughout Vermont; (3) Vermont Plaintiff and members of the Vermont Class were

12   deprived of free and open competition; and (4) Vermont Plaintiff and members of the Vermont

13   Class paid supra-competitive, artificially inflated prices for HDD suspension assemblies.

14       e.    As a direct and proximate result of Defendants' violations of law, Vermont Plaintiff

15   and members of the Vermont Class suffered an ascertainable loss of money or property as a result

16   of Defendants' use or employment of unconscionable and deceptive commercial practices as set

17   forth above. That loss was caused by Defendants' willful and deceptive conduct, as described

18   herein.

19       f.    Defendants' deception, including their omissions concerning the price of HDD

20   suspension assemblies, likely misled all purchasers acting reasonably under the circumstances to

21   believe that they were purchasing HDD suspension assemblies at prices born by a free and fair

22   market. Defendants' misleading conduct and unconscionable activities constitutes unfair

23   competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and,

24   accordingly, Vermont Plaintiff and members of the Vermont Class seek all relief available under

25   that statute.

26       351.   Plaintiffs Eric Klotz, Lauren Huyck, and Kenny Lai Cheong ("**Virginia Plaintiffs**")

27   incorporate and reallege each and every allegation set forth in the preceding paragraphs of this

28   Complaint and further allege as follows:

a. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Virginia** Consumer Protection Act, Va. Code Ann. § 59.1-196, *et seq*.

b. Defendants engaged in the conduct described in this Complaint in connection with the sale of HDD suspension assemblies in trade or commerce in a market that includes Virginia.

c. Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which HDD suspension assemblies were sold, distributed, or obtained in Virginia, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Virginia Plaintiffs and members of the Virginia Class.

d. Defendants concealed, suppressed, and omitted to disclose material facts to Virginia Plaintiffs and members of the Virginia Class concerning Defendants' unlawful activities and artificially inflated prices for HDD suspension assemblies. The concealed, suppressed, and omitted facts would have been important to Virginia Plaintiffs and members of the Virginia Class as they related to the cost of HDD suspension assemblies they purchased.

e. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in HDD suspension assemblies by making public statements that were not in accord with the facts.

f. Defendants' statements and conduct concerning the price of HDD suspension assemblies were deceptive as they had the tendency or capacity to mislead Virginia Plaintiffs and members of the Virginia Class to believe that they were purchasing HDD suspension assemblies at prices established by a free and fair market.

g. Defendants' unlawful conduct had the following effects: (1) HDD suspension assemblies price competition was restrained, suppressed, and eliminated throughout Virginia; (2) HDD suspension assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Virginia Plaintiffs and members of the Virginia Class were deprived of free and open competition; and (4) Virginia Plaintiffs and members of the Virginia Class paid

1    supra-competitive, artificially inflated prices for HDD suspension assemblies.

2         h.    As a direct and proximate result of the above-described unlawful practices, Virginia

3    Plaintiffs and members of the Virginia Class suffered ascertainable loss of money or property.

4    Accordingly, Virginia Plaintiffs and members of the Virginia Class seek all relief available under

5    Va. Code Ann. § 59.1-204(A), *et seq*.

6    <div align="center">**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**</div>
7    <div align="center">**(on behalf of Plaintiffs and members of the Classes)**</div>

8    352.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

9    353.    Plaintiffs bring this claim under the laws of all states listed in the First and Second

10   Claims, *supra*.

11   354.    As a result of their unlawful conduct described above, Defendants have and will

12   continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a

13   minimum, unlawfully inflated prices and unlawful profits on sales of HDD suspension assemblies.

14   355.    Defendants have benefited from their unlawful acts and it would be inequitable for

15   Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments

16   made by Plaintiffs and members of the Classes for HDD suspension assemblies.

17   356.    Plaintiffs and members of the Classes are entitled to the amount of Defendants' ill-

18   gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and members

19   of the Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten

20   gains from which Plaintiffs and members of the Classes may make claims on a pro rata basis.

21   357.    Pursuit of any remedies against the firms from which Plaintiffs and members of the

22   Classes purchased HDDs containing HDD suspension assemblies subject to Defendants'

23   conspiracy would have been futile.

24   <div align="center">**XI.   PRAYER FOR RELIEF**</div>

25   Accordingly, Plaintiffs respectfully request that:

26   358.    The Court determine that this action may be maintained as a class action under Rule

27   23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice

28   of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to

1    each and every member of the Classes;

2         359.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be

3    adjudged and decreed:

4              a.    An unlawful combination, trust, agreement, understanding and/or concert of action

5    in violation of the state antitrust and unfair competition and consumer protection laws as set forth

6    herein; and

7              b.    Acts of unjust enrichment by Defendants as set forth herein.

8         360.    Plaintiffs and members of the Classes recover damages including umbrella damages

9    as appropriate, to the maximum extent allowed under such laws, and that a joint and several

10   judgment in favor of Plaintiffs and members of the Classes be entered against Defendants in an

11   amount to be trebled to the extent such laws permit;

12        361.    Plaintiffs and members of the Classes recover damages, to the maximum extent

13   allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained

14   from them;

15        362.    Defendants, their affiliates, successors, transferees, assignees and other officers,

16   directors, partners, agents and employees thereof, and all other persons acting or claiming to act on

17   their behalf or in concert with them, be permanently enjoined and restrained from in any manner

18   continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged

19   herein, or from entering into any other contract, conspiracy, or combination having a similar

20   purpose or effect, and from adopting or following any practice, plan, program, or device having a

21   similar purpose or effect;

22        363.    Plaintiffs and members of the Classes be awarded restitution, including

23   disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts

24   of unjust enrichment;

25        364.    Plaintiffs and members of the Classes be awarded pre- and post- judgment interest

26   as provided by law, and that such interest be awarded at the highest legal rate from and after the

27   date of service of this Complaint;

28        365.    Plaintiffs and members of the Classes recover their costs of suit, including

1 │ reasonable attorneys' fees, as provided by law; and

2 │      366.     Plaintiffs and members of the Classes have such other and further relief as the case

3 │ may require and the Court may deem just and proper.

4 │ **XII.  DEMAND FOR JURY TRIAL**

5 │      Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all

6 │ issues so triable.

7 │ Dated:  December 3, 2020

*/s/ Aaron M. Sheanin*
Aaron M. Sheanin (SBN 214472)
**ROBINS KAPLAN LLP**
46 Shattuck Square, Suite 22
Berkeley, CA 94704
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
asheanin@robinskaplan.com

Kellie Lerner (*admitted pro hac vice*)
Adam C. Mendel (*admitted pro hac vice*)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
amendel@robinskaplan.com

*/s/ Christopher T. Micheletti*
Christopher T. Micheletti (SBN 136446)
Judith A. Zahid (SBN 215418)
Qianwei Fu (SBN 242669)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zelle.com
jzahid@zelle.com
qfu@zelle.com

James R. Martin (SBN 173329)
Jennifer Duncan Hackett (*admitted pro hac vice*)
**ZELLE LLP**
1775 Pennsylvania Avenue, NW, Suite 375
Washington, D.C. 20006
Telephone: (202) 899-4100
jmartin@zelle.com
jhackett@zelle.com

*Interim Co-Lead Counsel for End-User Plaintiffs*

Shpetim Ademi (admitted *pro hac vice*)
Mark Eldridge
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Telephone: (414) 482-8000
Facsimile:  (414) 482-8001
sademi@ademilaw.com
meldridge@ademilaw.com

James P. Allen, Sr.
**ALLEN BROTHERS, PLLC**
400 Monroe, Suite 620
Detroit, MI 48226
Telephone: (313) 962-7777
jamesallen@allenbrotherspllc.com

Heather M. Sneddon
Jason E. Greene
**ANDERSON & KARRENBERG, P.C.**
50 West Broadway, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 534-1700
Facsimile:  (801) 364-7697
hsneddon@aklawfirm.com
jgreene@aklawfirm.com

Jennie Lee Anderson
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
jennie@andrusanderson.com

Shawn J. Wanta
Frances E. Baillon
**BAILLON THOME JOZWIAK &
WANTA LLP**
100 South Fifth St., Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile:  (612) 252-3571
sjwanta@baillonthome.com
febaillon@baillonthome.com

Nyran R. Rasche (admitted *pro hac vice*)
Christopher P.T. Tourek
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
150 S. Wacker Dr., Suite 3000
Chicago, IL 60606
Telephone: (312) 782-4880
Facsimile:  (312) 782-4485
nrasche@caffertyclobes.com
ctourek@caffertyclobes.com

Bryan L. Clobes
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Telephone: (215) 864-2800
Facsimile:  (215) 864-2810
bclobes@caffertyclobes.com

Patrick E. Cafferty
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
220 Collingwood, Suite 130
Ann Arbor, MI 48103
Telephone: (734) 769-2144
Facsimile:  (215) 864-2810
pcafferty@caffertyclobes.com

| | |
|---|---|
| 1 | M. Stephen Dampier |
| 2 | **THE DAMPIER LAW FIRM, P.C.** |
| | 55 North Section St. |
| 3 | Fairhope, AL 36532 |
| | Telephone: (251) 929-0900 |

M. Stephen Dampier
**THE DAMPIER LAW FIRM, P.C.**
55 North Section St.
Fairhope, AL 36532
Telephone: (251) 929-0900
Facsimile:  (251) 929-0800
stevedampier@dampierlaw.com

Kevin F. Ruf
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
kruf@glancylaw.com

Lee Albert (admitted *pro hac vice*)
Brian P. Murray
Gregory Linkh
**GLANCY PRONGAY & MURRAY LLP**
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile:  (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

Brian D. Penny
Paul J. Scarlato
**GOLDMAN SCARLATO & PENNY, P.C.**
161 Washington St., Suite 1025
Conshohocken, PA 19428
Telephone: (484) 342-0700
penny@lawgsp.com
scarlato@lawgsp.com

Catherine K. Smith (admitted *pro hac vice*)
Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth St., Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile:  (612) 339-6622
csmith@gustafsongluek.com
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

George F. Farah
**HANDLEY FARAH & ANDERSON PLLC**
81 Prospect St.
Brooklyn, NY 11201
Telephone: (212) 477-8090
Facsimile:  (804) 300-1952
gfarah@hfajustice.com

Matthew K. Handley
**HANDLEY FARAH & ANDERSON PLLC**
777 6th St. NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2411
Facsimile:  (804) 300-1952
mhandley@hfajustice.com

Richard M. Hagstrom (admitted *pro hac vice*)
Michael R. Cashman
Nathan D. Prosser
Nicholas S. Kuhlmann
**HELLMUTH & JOHNSON PLLC**
8050 West 78th St.
Edina, MN 55439
Telephone: (952) 941-4005
Facsimile:  (952) 941-2337
rhagstrom@hjlawfirm.com
mcashman@hjlawfirm.com
nprosser@hjlawfirm.com
nkuhlmann@hjlawfirm.com

Michael E. Jacobs
**HINKLE SHANOR LLP**
218 Montezuma Ave.
Santa Fe, NM 87501
Telephone: (505) 982-4554
mjacobs@hinklelawfirm.com

Christopher D. Jennings
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, AR 72201
Telephone: (501) 372-1300
Facsimile:  (888) 505-0909
chris@yourattorney.com

Daniel R. Karon
**KARON LLC**
700 W. St. Clair Ave., St. 200
Cleveland, OH 44113
Telephone: (216) 622-1851
Facsimile:  (216) 241-8175
dkaron@karonllc.com

Cari Campen Laufenberg
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile:  (206) 623-3384
claufenberg@kellerrohrback.com

Sylvie K. Kern
**LAW OFFICES OF SYLVIE KULKIN KERN**
2532 Lake Street
San Francisco, CA 94121
Telephone: (415) 310-6098
kernantitrustglobal@gmail.com

Eli R. Greenstein
Stacey M. Kaplan
Jenny Paquette
**KESSLER TOPAZ MELTZER & CHECK, LLP**
One Sansome St., Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile:  (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
jpaquette@ktmc.com

Joseph H. Meltzer (admitted *pro hac vice*)
Melissa L. Troutner (admitted *pro hac vice*)
Lisa M. Port (admitted *pro hac vice*)
Natalie Lesser (admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
llambport@ktmc.com
nlesser@ktmc.com

Robert J. Gralewski, Jr.
Samantha Greenberg
**KIRBY McINERNEY LLP**
600 B Street, Suite 2110
San Diego, CA 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com
sgreenberg@kmllp.com

Daniel Hume
Sawa Nagano
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Facsimile:   (212) 751-2540
dhume@kmllp.com
snagano@kmllp.com

David P. McLafferty
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette St.
Conshohocken, PA 19428
Telephone: (610) 940-4000
Facsimile:   (610) 940-4007
dmclafferty@mclaffertylaw.com

Peggy J. Wedgworth (admitted *pro hac vice*)
Elizabeth McKenna (*pro hac vice* pending)
**MILBERG PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile:   (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com

E. Powell Miller
Sharon S. Almonrode
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile:   (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

Adam Moskowitz
Howard M. Bushman
Adam A. Schwartzbaum
Joseph M. Kaye
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423
adam@moskowitz-law.com
howard@moskowitz-law.com
adams@moskowitz-law.com
joseph@moskowitz-law.com

Lawrence G. Papale
**LAW OFFICES OF LAWRENCE G. PAPALE**
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
lgpapale@papalelaw.com

Garrett D. Blanchfield (admitted *pro hac vice*)
Mark Reinhardt (admitted *pro hac vice*)
Brant D. Penney (admitted *pro hac vice*)
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota St.
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
m.reinhardt@rwblawfirm.com
b.penney@rwblawfirm.com

Brent J. LaPointe (admitted *pro hac vice*)
Laurence M. Rosen
Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave., 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:   (212) 202-3827
blapointe@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com

END-USER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Ike Diel
**SHARP BARTON**
6900 College Blvd, Suite 285
Overland Park, KS 66211
Telephone: (913) 661-9931
ike@sharpbarton.com

J. Barton Goplerud
Brandon M. Bohlman
**SHINDLER, ANDERSON, GOPLERUD &**
**WEESE P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: (515) 223-4567
Facsimile:  (515) 223-8887
goplerud@sagwlaw.com
bohlman@sagwlaw.com

William G. Caldes (admitted *pro hac vice*)
Eugene A. Spector
**SPECTOR ROSEMAN & KODROFF PC**
2001 Market St., Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611
BCaldes@srkattorneys.com
ESpector@srkattorneys.com

Timothy D. Battin
Nathan M. Cihlar
Christopher V. Le
Shinae Kim-Helms
**STRAUS & BOIES, LLP**
4041 University Dr., Fifth Floor
Fairfax, VA 22201
Telephone: (703) 764-8700
Facsimile:  (703) 764-8704
tbattin@straus-boies.com
ncihlar@straus-boies.com
cle@straus-boies.com
skimhelms@straus-boies.com

Melissa R. Emert (admitted *pro hac vice*)
**KANTROWITZ, GOLDHAMER,**
**& GRAIFMAN**
747 Chestnut Ridge Rd.
Chestnut Ridge, NY 10977
Telephone: (866) 574-4692
memert@kgglaw.com

Kevin Landau
Miles Greaves
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile:  (212) 931-0703
klandau@tcllaw.com
mgreaves@tcllaw.com

Vildan Teske
Marisa C. Katz
**TESKE KATZ KITZER &**
**ROCHEL PLLP**
222 South Ninth St., Suite 4050
Minneapolis, MN 55402
Telephone: (612) 746-1558
Facsimile:  (651) 846-5339
teske@tkkrlaw.com
katz@tkkrlaw.com

Mario N. Alioto
Joseph M. Patane
Lauren C. Capurro
**TRUMP, ALIOTO, TRUMP &**
**PRESCOTT, LLP**
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile:  (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

END-USER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    Samuel J. Strauss                            John L. Walker
     **TURKE & STRAUSS LLP**                      Kevin B. Bass
2    613 Williamson Street #201                   **WALKER GROUP, P.C.**
     Madison, WI 53703                            P.O. Box 22849
3    Telephone: (608) 237-1775                    Jackson, MS 39225-2849
     Facsimile:  (608) 509-4423                   Telephone: (601) 948-4589
4    sam@turkestrauss.com                         Facsimile:  (601) 354-2507
                                                  jwalker@walkergrouppc.com
5                                                 kbass@walkergrouppc.com

6    Paul F. Novak (admitted *pro hac vice*)      John H. Weston
     Diana Gjonaj (admitted *pro hac vice*)       Jerome H. Mooney
7    Gregory Stamatopoulos                        G. Randall Garrou
     Tiffany Ellis                                **WESTON, GARROU & MOONEY**
8    **WEITZ LUXENBERG, P.C.**                    12121 Wilshire Boulevard, Suite 525
     3011 W. Grand Blvd., Suite 2150              Los Angeles, CA 90025
9    Detroit, MI 48202                            Telephone: (310) 442-0072
     Telephone: (313) 800-4170                    Facsimile:  (310) 442-0899
10   pnovak@weitzlux.com                          johnhweston@wgdlaw.com
     dgjonaj@weitzlux.com                         jerrym@mooneylaw.com
11   gstamatopoulos@weitzlux.com                  randygarrou@wgdlaw.com
     tellis@weitzlux.com

12

13   *Counsel for End-User Plaintiffs*

14

15

16

17                            **ATTORNEY ATTESTATION**

18        I, Christopher T. Micheletti, hereby attest, pursuant to Civil Local Rule 5-1(i)(3) of the

19   Northern District of California, that the concurrence to the filing of this document has been obtained

20   from each signatory hereto.

21                                                 */s/ Christopher T. Micheletti*
                                                   _____
22                                                 Christopher T. Micheletti

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3          I hereby certify that on January 6, 2021, I electronically filed the foregoing document

4   entitled **END-USER PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS

5   ACTION COMPLAINT** with the Clerk of the Court for the United States District Court, Northern

6   District of California using the CM/ECF system and served a copy of same upon all counsel of

7   record via the Court's electronic filing system.

8                                              */s/ Christopher T. Micheletti*
                                                Christopher T. Micheletti
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28