IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>SEAGATE TECHNOLOGY LLC, et al.,<br>　　Plaintiffs,<br>　v.<br>HEADWAY TECHNOLOGIES, INC.<br>　　Defendants. | Case No. 19-md-02918-MMC<br>Case No. 20-cv-1217-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SEAGATE PLAINTIFFS' AMENDED COMPLAINT** |

Before the Court is the "Motion to Dismiss Seagate's Amended Complaint," which motion was filed October 21, 2020, by defendants NHK Spring Co., Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co, Ltd., NAT Peripheral (H.K.) Co., Ltd., TDK Corporation, Magnecomp Precision Technology Public Co, Ltd., SAE Magnetics (H.K.) Ltd., Headway Technologies, Inc., and Hutchinson Technology Inc. Plaintiffs Seagate Technology LLC, Seagate Technology (Thailand) Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International (collectively, "Seagate Plaintiffs") have filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and

in opposition to the motion, the Court rules as follows.[1]

By order filed August 26, 2020 ("August 26 Order"), the Court dismissed all claims asserted against Headway Technologies, Inc. ("Headway") in Seagate Plaintiff's initial complaint, and, as to the remaining defendants, dismissed Count IV, alleging an antitrust claim under Minnesota law, and Count V, alleging a breach of contract claim. Seagate Plaintiffs were afforded leave to amend and subsequently filed their Amended Complaint ("AC"). By the instant motion, defendants argue the deficiencies identified in the August 26 Order have not been cured, and, consequently, they again seek dismissal of the above-referenced claims.[2] The Court first addresses defendants' arguments as to Counts IV and V.

**A. Count IV**

Count IV, titled "Restraint of Trade in Violation of the Minnesota Antitrust Law of 1971" and asserted against all defendants, is based on a theory that Seagate Plaintiffs were damaged by defendants' alleged conspiracy to fix the price of "suspension assemblies," a "component of hard disk drives" (see AC ¶¶ 1, 279), in that Seagate Plaintiffs "paid higher prices for suspension assemblies than [they] would have in the absence of Defendants' unlawful conduct" (see AC ¶ 244).

Under Minnesota law, specifically, subdivision 1 of Minn. Stat. § 325D.53, a conspiracy to fix "the market price . . . of any commodity" is unlawful. See Minn. Stat. § 325D.53, subdiv. 1. Pursuant to § 325D.54, the scope of § 325D.53 is limited to the following two circumstances:

> (a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and
>
> (b) any contract, combination, or conspiracy, wherever created, formed, or

---

[1] By order filed December 1, 2020, the Court took the matter under submission.

[2] In Count I, Seagate Plaintiffs seek relief under the Sherman Act and, in Counts II and III, they seek relief under California law, all based on the same alleged conspiracy and injury. Defendants do not move to dismiss Counts I, II, or III, other than to the extent those claims are asserted against Headway.

<div style="margin-left: 2em;">
entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce <u>of this state</u>.
</div>

See Minn. Stat. § 325D.54 (emphases added).

In its August 26 Order, the Court dismissed Count IV as asserted in the initial complaint, for the reason that Seagate Plaintiffs had not alleged facts to support a finding that the asserted conspiracy was "created, formed, or entered" in Minnesota, see Minn. Stat. § 325D.54(a), or, alternatively, that the asserted conspiracy "affect[ed] the trade or commerce" of Minnesota, see Minn. Stat. § 325D.54(b), i.e., that any of them had purchased suspension assemblies in Minnesota, see City of St. Paul v. FMC Corp., 1990 WL 265171, at 7 (D. Minn. February 27, 1990) (finding § 325D.54(b) applies only to "purchases made" in Minnesota; dismissing claim based on purchases in other states). By the instant motion, defendants argue the AC still lacks any such factual allegations, thus again failing to plead a viable claim under Minnesota law, and, even if the newly added allegations suffice for such purpose, they do not suffice to plead Article III standing. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (holding plaintiff establishes standing under Article III only where plaintiff shows it "suffered an injury in fact").

As defendants point out, district courts, in considering the showing a non-resident plaintiff must make to establish it has Article III standing to bring a price-fixing antitrust claim under a state law, have found such plaintiff must have purchased the price-fixed product in that state. See In re Capacitors Antitrust Litig., 154 F. Supp. 3d 918, 925-27 (N.D. Cal. 2015) (noting, "[i]t is of no moment that a state statute might purport to expressly give the plaintiff a right to sue") (citing cases); see also, e.g., In re Glumetza Antitrust Litig., 2020 WL 1066934, at *10 (N.D. Cal. March 5, 2020) (holding, where "the injury alleged is the overcharge at each purchase . . ., the scope of standing is limited to the locations of the purchases"); In re Packaged Seafood Products Antitrust Litig., 242 F. Supp. 3d 1033, 1095 (S.D. Cal. 2017) (holding "[i]n the absence of a named Plaintiff who has purchased a product within the relevant state . . . [,] there can be no determination

3

that an interest was harmed that was legally protected under the relevant state's laws") (emphasis omitted).  The Court finds such cases persuasive, and, consequently, considers whether Seagate Plaintiffs have "clearly" alleged any of those entities purchased suspension assemblies in Minnesota.  See Spokeo, 136 S. Ct. at 1547 (holding, "at the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing) (internal quotation, alteration, and citation omitted).

In arguing they have alleged such purchases, Seagate Plaintiffs first cite to ¶ 280 of the AC, which states:  "Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to purchasers, including Seagate, in Minnesota and outside of Minnesota for hard disk drives delivered to Minnesota."  (See AC ¶ 280.)  Such allegation, however, does not state whether "Seagate" was one of the purchasers who purchased "in Minnesota" as opposed to "outside of Minnesota" (see id.), and, consequently, does not "clearly allege," see Spokeo, 136 S. Ct. at 1547, the requisite injury in fact.

The additional allegations on which Seagate Plaintiffs rely likewise fail to allege a purchase in Minnesota.  Although Seagate Plaintiffs allege an entity described as "Seagate's Commodities Management Team" engaged in "negotiations" with "Defendants" in Minnesota, including "negotiating the pricing for . . . suspension assemblies" (see AC ¶¶ 155-157), Seagate Plaintiffs do not allege any contract resulting from such negotiations was entered in Minnesota.  Similarly, although Seagate Plaintiffs allege "Defendants shipped certain suspension assemblies to Seagate's offices," both "in" and "outside of" Minnesota (see AC ¶¶ 158-59), Seagate Plaintiffs do not allege any contract for any such shipment was entered in Minnesota.  See In re Capacitors, 154 F. Supp. 3d at 927-28 (holding "receiving deliveries of price-fixed goods that were purchased elsewhere does not constitute an Article III injury-in-fact under the antitrust . . . laws").

Accordingly, Count IV is subject to dismissal.

**B. Count V**

Count V, titled "Breach of Contract – Nondisclosure Agreements" and asserted against all defendants other than Headway, is based on the allegations (1) that each defendant "signed or was otherwise bound by" a nondisclosure agreement with plaintiff Seagate Technology LLC (see AC ¶ 176), (2) that "Seagate" disclosed to defendants "confidential business information pursuant to these NDAs" (see AC ¶ 288), (3) that defendants NHK Spring Co. Ltd. ("NHK") and its subsidiaries, TDK Corporation ("TDK") and its subsidiaries, and Hutchinson Technology Inc. ("HTI") constitute three "Defendant families," (4) that "NHK, TDK, and HTI each shared information that Seagate had provided it under the NDAs with each of the other Defendant families" (see SAC ¶ 292), and (5) that, as a result, Seagate Plaintiffs "paid more than [they] otherwise would have paid in the absence of the Defendants' improper use of Seagate's confidential information." (See SAC ¶ 294.)

In its August 26 Order, the Court dismissed Count V as asserted in the initial complaint, finding Seagate Plaintiffs had not alleged facts to establish a causal connection between the alleged breaches of the NDAs and the claimed injury, namely, the payment of higher prices for suspension assemblies. By the instant motion, defendants argue the AC lacks sufficient facts to show any claimed breach of the NDAs, and, in any event, again fails to plead causation. As set forth below, the Court is not persuaded.

In the AC, Seagate Plaintiffs identify various categories of "confidential" information allegedly disclosed by a defendant to one or more of the other defendants (See, e.g., AC ¶ 206.b (alleging NHK disclosed to defendant Magnecomp Precision Technology Public Co. Ltd. ("MPT") "production volumes for current Seagate programs" and "new capacity for upcoming Seagate programs").) Defendants argue the AC nonetheless fails to allege such assertedly disclosed information was protected under the terms of the NDAs. Seagate Plaintiffs allege, however, that, after entering into the NDAs, the parties then entered into "periodic Supplements for Disclosure describing categories

5

of confidential information" (see AC ¶ 176; see also AC ¶¶ 184, 189, 190, 197, 201), and that each of the categories identified in the AC is a category listed in such a Supplement (see AC ¶¶ 206.a-206.g), which allegations the Court finds sufficient to plead a breach.

With respect to the issue of causation, the question presented is whether Seagate Plaintiffs have added allegations sufficient to show a "'casual connection' between the asserted exchanges of Seagate Plaintiffs' confidential information and the claimed damages." (See August 26 Order at 4:17-19 (quoting St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co., 101 Cal. App. 4th 1038, 1061 (2002).)  In the AC, Seagate Plaintiffs now allege defendants, by improperly receiving confidential pricing information, "had no reason to lower prices to increase (or at least maintain) their share of TAM"[3] because they now "knew Seagate's target TAM allocations and pricing for other suppliers." (See AC ¶ 213.)  Additionally, Seagate Plaintiffs now allege defendants, by sharing "product roadmaps, development timing, and forecasts" disclosed under the NDAs, "could coordinate their utilization and costs across projects to inflate the material cost provided to Seagate and support a higher price." (See AC ¶ 217.)

Defendants argue Seagate Plaintiffs, given their allegations as to an antitrust conspiracy, nonetheless cannot "claim that any breach of the confidentiality provisions was a 'substantial factor' in causing allegedly supracompetitive prices to Seagate," and that "any breach of the NDAs would be merely incidental." (See Defs.' Mot. at 9:4-7.)  In essence, defendants are contending parties to a conspiracy to charge supracompetitive prices would charge supracompetitive prices irrespective of whether they also exchanged confidential information disclosed under an NDA.  A plaintiff, however, "may set out 2 or more statements of a claim . . . alternatively." See Fed. R. Civ. P. 8(d)(2).  Moreover, "the law recognizes that there may be multiple causes of a plaintiff's injury." See Third

---

[3] "TAM," or "total available market," is a reference to "demand volumes." (See AC ¶ 205.)  Seagate Plaintiffs allege that, under the terms of the NDAs, they disclosed their "preferred allocation of TAM among suppliers" with "the expectation and understanding that the Defendant would not share it with other Defendants." (See id.)

Eye Blind, Inc. v. Near North Entertainment Ins. Services, LLC, 127 Cal. App. 4th 1311, 1319 (2005); (see AC ¶ 212) (alleging defendants used information obtained through breaches of NDAs "in furtherance of the conspiracy . . . to allocate market shares [and] raise prices").)

Accordingly, Count V is not subject to dismissal.

**C. Claims Against Headway**

Seagate Plaintiffs bring the instant action against ten defendants, one of which is Headway, an entity alleged to be "wholly owned by TDK." (See AC ¶ 47.) Specifically, Seagate Plaintiffs assert, as against Headway, Counts I, II, and III, each of which seeks relief based on the allegation that defendants conspired to fix the prices of suspension assemblies, in violation of either federal law (Count I) or California law (Counts II and III).[4]

In its August 26 Order, the Court dismissed Counts I, II, and III as asserted against Headway, for the reason that the initial complaint included no factual allegations pertaining to said defendant. By the instant motion, defendants argue any newly asserted facts pertaining to Headway are insufficient to support a finding of liability.

As it did in its initial complaint, Seagate Plaintiffs allege that, "as early as 2003," defendants NHK, TDK, and HTI, along with "certain of their subsidiaries," entered into the price-fixing conspiracy. (See AC ¶ 74; Compl. ¶ 70.) In the initial complaint, Seagate Plaintiffs alleged HTI "was acquired by TDK" in 2016. (See Compl. ¶ 44.) The AC contains several new allegations pertaining to said acquisition, and, in particular, Headway's role therein.

Specifically, Seagate Plaintiffs now allege (1) that, "[i]n or around 2007," TDK and NHK "started plotting against their fellow co-conspirator, HTI," which entity TDK and NHK viewed "as a common threat" (see AC ¶ 132), (2) that, "[f]or several years thereafter," TDK and NHK, along with MPT, a subsidiary of TDK, "continued to conspire on ways to

---

[4] Seagate Plaintiffs also bring Count IV against Headway. As discussed above, however, Count IV is subject to dismissal in its entirety.

'kick out' HTI" so they could "allocate the additional share between them" (see AC ¶ 136), (3) that, in June 2014, TDK and NHK "agreed that TDK would acquire HTI to prevent an HDD manufacturer from acquiring and vertically integrating HTI" (see AC 138), (4) that "TDK selected its subsidiary Headway to be the acquiring entity" (see AC ¶ 143), and (5) that "Headway entered [into] an agreement to acquire HTI on or about November 1, 2015," which "acquisition was completed on or about October 6, 2016" (see AC ¶ 152).

Additionally, Seagate Plaintiffs allege that "TDK used four of its senior executives to carry out the scheme to eliminate HTI through Headway" and that each of those four executives also held, at such time, "positions" in "Headway" (see AC ¶ 145), two as Directors," one as "the Executive Vice President," and the remaining individual as "President" of "Hydra Merger Sub," an entity described by Seagate Plaintiffs as "the Headway subsidiary that effectuated the acquisition" of HTI (see AC ¶¶ 147-50).

Defendants argue the above-referenced new allegations are, for two reasons, insufficient. As set forth below, the Court disagrees.

First, defendants argue that, if "HTI was a knowing participant in the alleged conspiracy, an object of that conspiracy cannot have been eliminating it." (See Defs.' Mot. at 10:7-9.) The Court understands defendants to be contending Headway's acquisition of HTI removed HTI from the conspiracy and, consequently, was not in furtherance of the conspiracy. As alleged in the AC, however, the elimination of an independent conspirator, HTI, furthered the aims of the other conspirators, NHK and TDK (see AC ¶ 133 (alleging NHK and TDK "agreed to 'get more share from HTI together,' as a way to profit more from their conspiracy")), and, as also alleged in the AC, Headway played a significant role in accomplishing that goal.

Next, defendants assert the AC does not include sufficient facts to support a finding that "Headway consciously participated in the alleged conspiracy." (See Defs.' Mot. at 11:1-2.) Seagate Plaintiffs, however, allege that, prior to Headway's acquisition of HTI, one of Headway's Directors "had discussions with NHK about how the Defendants could 'kick out' HTI" (see AC ¶ 149) and that a Headway Vice President "had regular

discussions with NHK about the acquisition" (see AC ¶ 147).  At this stage of the proceedings, these allegations suffice to support an inference of knowledge.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986) (holding allegations in complaint must be construed in "the light most favorable" to plaintiff); see also Safeway Stores, Inc. v. FTC, 366 F.2d 795, 801 (1966) (holding, "[o]nce the existence of the common scheme is established, very little is required to show that [a] defendant became a party – slight evidence may be sufficient to connect a defendant to it.")[5]

Accordingly, other than Count IV, Seagate Plaintiffs' claims against Headway are not subject to dismissal.

## CONCLUSION

Defendants' motion to dismiss the Amended Complaint is hereby GRANTED in part and DENIED in part, as follows:

1. To the extent defendants seek dismissal of Count IV, the motion is GRANTED, and Count IV is hereby DISMISSED.

2. In all other respects, the motion is DENIED.

**IT IS SO ORDERED.**

Dated: February 2, 2021

MAXINE M. CHESNEY
United States District Judge

---

[5] Defendants have not, for purposes of the instant motion, challenged the sufficiency of Seagate Plaintiffs' allegations that all defendants other than Headway were members of the conspiracy at the time Headway acquired HTI.