Christopher T. Micheletti
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone:  (415) 693-0700
Facsimile:   (415) 693-0770
cmicheletti@zelle.com

Aaron M. Sheanin
**ROBINS KAPLAN LLP**
2006 Kala Bagai Way, Suite 22
Berkeley, CA 94704
Telephone:  (650) 784-4040
Facsimile:   (650) 784-4041
asheanin@robinskaplan.com

*Interim Co-Lead Class Counsel for the*
*End-User Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 3:19-md-02918-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO | **END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| ALL END-USER ACTIONS | |
| | Judge:       Hon. Maxine M. Chesney |
| | Date:        May 7, 2021 |
| | Time:        9:00 a.m. |
| | Courtroom: 7, 19th Floor |

# **TABLE OF CONTENTS**

GLOSSARY ................................................................................................................... x

STATEMENT OF ISSUES TO BE DECIDED ......................................................... xi

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................... 2

III.    ARGUMENT .................................................................................................... 6

    A.     EUPs Have Article III Standing .......................................................... 6

    B.     EUPs Have Standing to Bring All of Their State Law Claims .............. 11

IV.     EUPS ADEQUATELY ALLEGE ANTITRUST STANDING ........................ 12

    A.     *AGC* Should Not Be Applied to EUPs' State Law Claims ................... 12

    B.     Application of the *AGC* Factors Supports Antitrust Standing ............. 15

    C.     Defendants' Assertions that Certain States Only Permit the State AG to Bring a Claim or Cover Only Intrastate Commerce are Incorrect ..................................... 19

V.      EUPS' SAC SUFFICIENTLY INVOKES STATE CONSUMER PROTECTION STATUTES .......................................................................... 19

    A.     Defendants Improperly Construe "Unconscionable" Conduct Requirement Under Arkansas and New Mexico Consumer Protection Statutes ........................................ 19

    B.     EUPs Can Assert Arkansas, Montana, South Carolina, and Virginia Consumer Protection Claims on a Class Basis ................................................................... 20

    C.     Florida, Michigan, and Minnesota Consumer Protection Claims Are Not Subject to Rule 9(b)'s Heightened Pleading Requirements ............................................. 21

    D.     EUPs Properly Allege Intrastate Effects on Commerce of North Carolina, New Hampshire, and Massachusetts ................................................................... 21

    E.     EUPs Adequately Plead Arkansas, Michigan, Nevada, Oregon, Rhode Island, South Dakota, Utah, and Virginia Consumer Protection Claims ...................... 22

    F.     EUPs Need Not Allege Reliance under Arkansas and California Consumer Protection Statutes ................................................................................................ 23

VI.     UNJUST ENRICHMENT IS A COGNIZABLE CAUSE OF ACTION ......... 23

APPENDIX A:  STATE-BY-STATE STANDING AND *AGC* APPLICABILIY ANALYSIS ...................................................................................................... 24

VII.    CONCLUSION .............................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ............................................................2, 15

*Am. Airlines v. Christensen*,
   967 F.2d 410 (10th Cir. 1992) ...................................................................29

*Arthur v. Microsoft Corp.*,
   676 N.W.2d 29 (Neb. 2004)......................................................................27

*Aryeh v. Canon Bus. Solutions, Inc.*,
   55 Cal. 4th 1185 (2013) ............................................................................24

*Associated General Contractors of California, Inc. v. California State
Council of Carpenters*,
   459 U.S. 519 (1983) ............................................................................ *passim*

*Beckler v. Visa U.S.A., Inc.*,
   2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004)...................................27

*Bergstrom v. Noah*,
   974 P.2d 520 (1999)...................................................................................25

*Bunker's Glass Co. v. Pilkington PLC*,
   75 P. 3d 99 (Ariz. 2003)......................................................................13, 24

*Burton v. Micron Tech, Inc.*,
   Case No. CV 2004-226-1 (Ark. Cir. Ct. 1st Div. Nov. 6, 2009) ............20

*California v. Arc America Corp.*,
   490 U.S. 93 (1989)....................................................................................12

*California v. Infineon Technologies AG*,
   531 F. Supp. 2d 1124 (N.D. Cal. 2007) ...................................................26

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ..............................................................................24

*Cieri v. Leticia Query Realty*,
   80 Haw. 54 (1995) ....................................................................................25

*Clancy v. The Bromley Tea Co.*,
   308 F.R.D. 564 (N.D. Cal. 2013)..............................................................12

*Cox v. Microsoft Corp.*,
   2005 WL 3288130 (N.Y. Sup. Ct. July 29, 2005) ...................................28

*Crouch v. Crompton Corp.*,
   2004 WL 2414027 (N.C. Super Ct., Oct. 28, 2004) ................................27

*D.R. Ward Construction Co. v. Rohm & Haas Co.*,
   470 F. Supp. 2d 485 (E.D. Pa. 2006) .............................................8, 18, 24, 29

*Davis v. Four Seasons Hotel Ltd.*,
228 P.3d 303 (Haw. 2010) ........................................................................25

*Duke Power Co. v. Carolina Envtl. Study Grp.*,
438 U.S. 59 (1978) .......................................................................................7

*Elkins v. Microsoft Corp.*,
817 A.2d 9 (Vt. 2002) ...............................................................................29

*Four B Corp. v. Daicel Chem. Indus., Ltd.*,
253 F. Supp. 2d 1147 (D. Kan. 2003) .....................................................25

*Freeman Indus. LLC v. Eastman Chem. Co.*,
172 S.W.3d 512, 524 (Tenn. 2005).........................................................29

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ...............................................................2, 15

*Hall v. Hall*,
138 S. Ct. 1118 (2018) ..............................................................................10

*Hernandez v. Wells Fargo Bank, N.A.*,
139 N.M. 68 (2005) ...................................................................................20

*Hill v. LLR, Inc.*,
2019 WL 2404900 (D. Mont. Mar. 8, 2019) ...........................................21

*Ho v. Visa USA, Inc.*,
16 A.D.3d 256 (N.Y. App. Div. 2005) ....................................................28

*Holder v. Archer Daniels Midland Co.*,
1998 WL 1469620 (D.C. Super. Nov. 4, 1998).......................................25

*Hood ex rel. State v. BASF Corp.*,
2006 WL 308378 (Miss. Ch. Ct. Jan. 17, 2006) .....................................26

*Howe v. Microsoft Corp.*,
656 N.W.2d 285 (N.D. 2003) ...................................................................27

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)............................................................................ *passim*

*In re Aftermarket Filters Antitrust Litig.*,
2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................20

*In re Aluminum Warehousing Antitrust Litig.*,
95 F. Supp. 3d 419 (S.D.N.Y. 2015).......................................................24

*In re Automotive Parts Antitrust Litig. (Bearings)*,
50 F. Supp. 3d 836 (E.D. Mich. 2014)...............................................17, 19

*In re Automotive Parts Antitrust Litig. (Ceramic Substrates)*,
2017 WL 7689654 (E.D. Mich. May 5, 2017)..........................................17

*In re Automotive Parts Antitrust Litig. (Fuel Senders)*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014)................................................ *passim*

*In re Automotive Parts Antitrust Litig. (Wire Harness)*,
   2013 WL 2456612 (E.D. Mich. June 6, 2013)...................................20

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................... *passim*

*In re Capacitors Antitrust Litig.*,
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................9, 13, 24

*In re Capacitors Antitrust Litig.*,
   154 F. Supp. 3d 918 (N.D. Cal. 2015) ...................................11

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
   78 F. Supp.3d 1051 (N.D. Cal. 2015) ...................................11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...................................16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2013 WL 5429718 (N.D. Cal. June 20, 2013) ...........................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
   2013 WL 4505701 (N.D. Cal. Aug. 21, 2013) .............................15, 18

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) ...................................20

*In re Chocolate Confectionary Antitrust Litig.*,
   749 F. Supp. 2d 224 (M.D. Pa. 2010) ...................................22

*In re Cipro Cases I & II*,
   61 Cal. 4th 116 (2015) ...................................24

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   2015 WL 3988488 (N.D. Ill. June 29, 2015) ...........................24, 25, 27

*In re Disposable Contact Lens Antitrust Litig.*,
   329 F.R.D. 336 (M.D. Fla. 2018)...................................11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ...................................17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...................................17, 27, 28

*In re Dynamic Random Access Memory Indirect Purchaser Litig*,
   2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ...........................*passim*

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...................................*passim*

*In re G-Fees Antitrust Litig.,*
    584 F. Supp. 2d 26 (D.D.C. 2008) ....................................................................23

*In re Generic Pharm. Pricing Antitrust Litig.,*
    368 F. Supp. 3d 814 (E.D. Pa. 2019) ..........................................................21, 23

*In re Graphics Processing Units Antitrust Litig.,*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ..................................................... *passim*

*In re Lidoderm Antitrust Litig.,*
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ...........................................................20

*In re Lithium Ion Batteries Antitrust Litig.,*
    2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)............................................. *passim*

*In re Magnesium Oxide Antitrust Litig.,*
    2011 WL 5008090 (D.N.J. Oct. 20, 2011)........................................................10

*In re Myford Touch Consumer Litig.,*
    2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) .................................................21

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
    350 F. Supp. 2d 160 (D. Me. 2004) ..................................................................23

*In re Optical Disk Drive Antitrust Litig.,*
    2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..............................................13, 17

*In re Optical Disk Drive Antitrust Litig.,*
    2016 WL 467444 (N.D. Cal. Feb 8, 2016) ........................................................10

*In re Packaged Seafood Products Antitrust Litig.,*
    242 F. Supp. 3d 1033 (S.D. Cal. 2017)...................................................... *passim*

*In re South Dakota Microsoft Antitrust Litig.,*
    657 N.W.2d 668 (S.D. 2003) .............................................................................29

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    264 F.R.D. 603 (N.D. Cal. 2009).....................................................1, 9, 10, 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..................................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    787 F. Supp. 2d 1036 (N.D. Cal. 2011) ...........................................................20

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    2012 WL 253298 (N.D. Cal. Jan. 26, 2012) .......................................................9

*ITCO Corp. v. Michelin Tire Corp.,*
    722 F.2d 42 (4th Cir. 1983) ..............................................................................27

*Jones v. Micron Tech. Inc.,*
    400 F. Supp. 3d 897 (N.D. Cal. 2019) .......................................................1, 7, 11

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

*Kanne v. Visa U.S.A. Inc.*,
    723 N.W.2d 293 (Neb. 2006)..........................................................................14, 27

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ...................................................................................14

*Knowles v. Visa, U.S.A.*,
    2004 WL 2475284 (Me. Super. Oct. 20, 2004) ......................................................26

*KPS & Assocs., Inc. v. Designs By FMC, Inc.*,
    318 F.3d 1 (1st Cir. 2003) ........................................................................................22

*LaChance v. U.S. Smokeless Tobacco Co.*,
    931 A.2d 571 (N.H. 2007) .......................................................................................22

*Lantec, Inc. v. Novell, Inc.*,
    146 F. Supp. 2d 1140 (D. Utah 2001) .....................................................................29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...................................................................................................7

*Lindner v. Durham Hosiery Mills, Inc.*,
    761 F.2d 162 (4th Cir. 1985) ...................................................................................27

*Liquid Aluminum Sulfate Antitrust Litig.*,
    2017 WL 3131977 (D.N.J. July 20, 2017)....................................................... *passim*

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007).......................................................12, 13, 14, 26

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
    2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ................................................ *passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................................................6

*Mack v. Bristol-Myers Squibb Co.*,
    673 So. 2d 100 (Fla. 1st Dist. Ct. App. 1996)..........................................................25

*Marolda v. Symantec Corp.*,
    672 F. Supp. 2d 992 (N.D. Cal. 2009) ....................................................................23

*McNulty v. Reddy Ice Holdings, Inc.*,
    2009 WL 1508381 (E.D. Mich. May 29, 2009)......................................................26

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) .................................................................................12

*Merck & Co., Inc. v. Lyon*,
    941 F. Supp. 1443 (M.D.N.C. 1996) ......................................................................27

*Mothershed v. Justices of the Supreme Court*,
    410 F.3d 602 (9th Cir. 2005) ...................................................................................14

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

*Mounce v. CHSPSC, LLC*,
   2017 WL 4392048 (W.D. Ark. Sept. 29, 2017)................................................21

*Nev. Recycling and Salvage, Ltd. v. Reno Disposal Co.*,
   423 P.3d 605 (Nev. 2018)................................................................14, 28

*Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris, Inc.*,
   185 F.3d 957 (9th Cir. 1999) .........................................................14

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
   868 So. 2d 331 (Miss. 2004)..........................................................26

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
   514 F.3d 856 (9th Cir. 2007) ...........................................................8

*Pardini v. Unilever United States, Inc.*,
   961 F. Supp. 2d 1048 (N.D. Cal. 2013) .......................................11

*Patterson Dental Co. v. McGaughey*,
   1985 WL 25732 (D. Or. Dec. 9, 1985)..........................................28

*Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*,
   617 S.E.2d 664 (N.C. App. 2005)..................................................22

*Pleasant v. McDaniel*,
   550 S.W.3d 8 (Ark. Ct. App. 2018)...............................................23

*Pooler v. R.J. Reynolds Tobacco Co.*,
   2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001) ...........................28

*Precourt v. Fairbank Reconstruction Corp.*,
   856 F. Supp. 2d 327 (D.N.H. 2012)...............................................22

*S.C. Cotton Growers' Co-op. Ass'n v. English*,
   133 S.E. 542 (S.C. 1926)...............................................................28

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010).......................................................................20

*Southard v. Visa U.S.A. Inc.*,
   734 N.W.2d 192 (Iowa 2007) ...............................................14, 25

*State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*,
   2005 WL 6056054 (N.Y. Sup. Ct. Aug. 9, 2005)..........................28

*Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*,
   2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000)......................29

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
   902 F.3d 735 (7th Cir. 2018) .........................................................12

*Szukalski v. Crompton Corp.*,
   726 N.W.2d 304 (Wis. Ct. App. 2006),
   *abrogated on other grounds, Meyers v. Bayer AG, Bayer Corp.*,
   735 N.W.2d 448 (Wis. 2007)..................................................29, 30

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

*Teague v. Bayer AG*,
    671 S.E.2d 550 (N.C. Ct. App. 2009) ................................................................27

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*,
    663 F. Supp. 494 (M.D.N.C. 1987) ...................................................................27

*Troyk v. Farmers Group, Inc.*
    171 Cal. App. 4th 1305 (2009) .........................................................................24

*United States ex rel. Joshi v. St. Luke's Hosp.*,
    441 F.3d 552 (8th Cir. 2006) ............................................................................21

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
    721 F. App'x 662 (9th Cir. 2018) .....................................................................21

*Williams v. Wells Fargo Bank, N.A.*,
    2011 WL 4368980 (S.D. Fla. Sept. 19, 2011) .................................................24

*Wrobel v. Avery Dennison Corp.*,
    2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006) .............................................25

**Federal Statutes**

28 U.S.C. § 2072(b) ...............................................................................................20

Fed. R. Civ. P. 8(d)(3) ...........................................................................................24

Fed. R. Civ. P. 9(b) ................................................................................................21

Fed. R. Civ. P. 23 .............................................................................................20, 21

**State Statutes**

Ariz. Rev. Stat. Ann.§ 44-1412 .............................................................................24

Ark. Code § 4-88-113(f) ........................................................................................23

Ark. Stat. Ann. § 4-88-107(a)(10) .........................................................................20

Ark. Stat. Ann. § 4-88-107(b) ...............................................................................20

Fla. Stat. § 501.204(1) ...........................................................................................21

Haw. Rev. Stat. § 480-3 .........................................................................................25

Mass. Gen. Laws Ann. ch. 93A, § 11 ....................................................................22

Md. Code Com. Law § 11-209(b)(2)(i) .............................................................19, 26

Mich. Comp. Laws § 445.903 ...........................................................................21, 23

Minn. Stat. § 325F.69 ............................................................................................21

Mont. Code Ann. 30-14-133 ..................................................................................21

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

Nev. Rev. Stat. § 598.0915(13) ........................................................................................23

Nev. Rev. Stat. § 598.0923(2) ..........................................................................................23

Nev. Rev. Stat. § 598.0923(3) ..........................................................................................23

Or. Rev. Stat. § 646.607 ...................................................................................................23

Or. Rev. Stat. § 646.715 (2) .............................................................................................28

R.I. Gen. Laws § 6-13.1-1 ................................................................................................23

R.I. Gen. Laws § 6-36-11(a) .............................................................................................28

R.I. Gen. Laws § 6-36-12(g) .......................................................................................19, 28

S.D. Code § 37-24-6 .........................................................................................................23

Utah Code § 13-11-4 .........................................................................................................23

Utah Code § 13-11-5 .........................................................................................................23

Utah Code Ann. § 76-10-3109(7)-(8) ...............................................................................29

Va. Code § 59.1-200 .........................................................................................................23

W. Va. Code St. R. § 142-9-1.6 ........................................................................................30

**<u>Other Authorities</u>**

Newberg on Class Actions §2:6 .........................................................................................12

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

## **GLOSSARY**

| | |
|---|---|
| "Computers" | portable and desktop computers |
| "DOJ" | United States Department of Justice |
| "EUPs" | End-User Plaintiffs |
| "FAC" | EUPs' Consolidated Class Action Complaint (ECF No. 167) |
| "HDD" | hard disk drive |
| "MTD" | Notice of Motion and Motion to Dismiss (1) End-Users' Second Amended Consolidated Class Action Complaint and (2) Reseller Plaintiffs' Second Amended Consolidated Class Action Complaint (ECF No. 319) |
| "NAS" | network attached storage |
| "Order" | Order Granting Defendants' Motion to Dismiss End-User Plaintiffs' Consolidated Class Action Complaint and Reseller Plaintiffs' Consolidated Amended Compliant; Affording Plaintiffs Leave to Amend (ECF No. 282) |
| "SA" | suspension assembly |
| "SAC" | EUPs' Second Amended Consolidated Class Action Complaint (ECF No. 311) |
| "Standalone Storage Devices" | bare HDDs, external hard drives, NAS drives, enterprise storage servers and arrays |
| "¶ __" | paragraphs of the SAC |

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether EUPs have Article III standing when they allege, *inter alia*, that price-fixed HDD SAs are discrete products following a traceable path through the distribution chain, overcharges for the SAs were passed through every level of the distribution chain from Defendants to EUPs, and such overcharges are quantifiable through well-accepted economic methods.

2.     Whether EUPs have Article III standing to bring each state law claim, where the named End-User purchased at least one type of the relevant finished product incorporating SAs in each state.

3.     Whether EUPs have antitrust standing, either because *AGC* does not apply or, assuming *AGC* applies to a particular state-law claim, because their allegations satisfy the *AGC* factors at the pleading stage.

4.     Whether EUPs sufficiently state claims under the antitrust laws of Maryland, Rhode Island, Mississippi, North Carolina, Tennessee, and Wisconsin.

5.     Whether EUPs sufficiently state claims under the consumer protection laws of Arkansas, California, Florida, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New York, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, and Virginia.

6.     Whether EUPs sufficiently plead unjust enrichment claims.

## I.      INTRODUCTION

There is no question that Defendants' well-documented, decade-long conspiracy to fix prices and allocate markets for HDD SAs harmed EUPs in a traceable, cognizable way. As the DOJ explained in announcing NHK Spring's guilty plea, the "impact on American consumers and businesses is direct and substantial." ¶ 9. In fact, the DOJ expressly did not require an NHK restitution order given the pendency of *this very action*. ¶ 168. The only question is whether NHK Spring and its co-conspirator TDK can get away with it. Granting Defendants' motion to dismiss would not only contravene well-established antitrust law and deprive injured consumers of their day in court, but teach Defendants that crime does pay so long as the object of their conspiracy is a small, ubiquitous component part. That is not the law: "Defendants may not shield themselves from liability by fixing prices on a relatively inexpensive item." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) ("*SRAM*"). This Court should not sanction Defendants' criminal conduct with a dismissal.

Two concerns led the Court to dismiss EUPs' FAC: (1) "plaintiffs [did] not allege the type(s) of product(s) any named plaintiff purchased and from whom in the chain of distribution any named plaintiff made such purchase(s)"; and (2) the FAC did not "contain facts setting forth directly, or from which a reasonable inference can be drawn, that each participant in the chain necessarily passed on the asserted overcharge to the next participant." Order at 5. Defendants concede that EUPs' SAC satisfies the first concern. The SAC also readily satisfies the second. The SAC alleges how Defendants' conspiratorial overcharge was passed on to EUPs through each level of the distribution chain, provides detailed economic analysis to support these allegations, and explains that well-accepted economic methods will quantify the exact overcharge.

Defendants rely heavily on *Jones v. Micron Tech, Inc.*, 400 F. Supp.3d 897 (N.D. Cal. 2019), to challenge EUPs' Article III and antitrust standing, but they fail to mention that the end-user plaintiffs in *Jones* surmounted both of these hurdles in a subsequent amended complaint which narrowed the class definition to a handful of electronic devices and provided additional detailed traceability allegations. *See In re Dynamic Random Access Memory Indirect Purchaser Litig.*, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ("*DRAM III*"). So does the SAC here. EUPs

limit the class definition only to purchasers of HDDs, Computers, and Standalone Storage Devices, and they provide similarly detailed traceability allegations. EUPs' allegations plausibly show that they overpaid for those products as the result of Defendants' conspiracy.

Defendants' remaining arguments are equally lacking. Defendants are wrong to contend that Article III requires EUPs to have purchased each product at issue in every state. *DRAM III* rejected this exact argument as "meritless." 2020 WL 8459279, at *3. All EUPs purchased products containing price-fixed SAs and are capable of bringing each state law claim.

EUPs allege a classic antitrust injury. As consumers, EUPs "are most likely to suffer antitrust injury," *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999), and are "presumptively the proper plaintiffs to allege antitrust injury." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). Although the federal standards under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), do not apply to EUPs' state-law antitrust claims, each *AGC* factor nonetheless favors antitrust standing. Among other things, the markets for HDDs and SAs are inextricably linked and intertwined. The products have no independent utility and are valueless on their own. SAs are one of the largest cost components of HDDs, compromising as much as 15% of the HDDs. HDDs are significant cost components of computers, and HDD price positively correlates with computer price. SAs also are discrete physically traceable components throughout the chain of distribution. As a result, EUPs' injuries are direct, non-speculative, and traceable throughout the chain of distribution. Their damages can readily be calculated and apportioned through economic analysis.

Moreover, the SAC satisfies the pleading requirements for EUPs' state antitrust and consumer protection claims. Finally, the unjust enrichment claim is viable on its own or in the alternative to the other causes of action.

Defendants' arguments lack merit, and the Court should deny their motion to dismiss.

## II.    FACTUAL BACKGROUND

Defendants engaged in an admitted, well-documented conspiracy to fix prices of, and allocate the market for, SAs which resulted in criminal indictments, guilty pleas, leniency

applications, and assorted fines and penalties in the U.S. and across the globe. ¶¶ 1-11; 130-85.

Defendants' Summary of Relevant Allegations ("Summary") is a model of overreach. Rather than address the plausible, well-pled allegations of EUPs' SAC, Defendants attempt to import allegations from Resellers' first and second amended complaints, EUPs' inoperative FAC, and even websites for products that are well outside of the Class Period and unaffected by their price-fixing conspiracy. Accepting Defendants' Summary is an invitation to error.

Defendants describe SAs as "critical mechanical components" of HDDs. ¶ 115. So do their customers. ¶¶ 116-17. SAs have no independent utility separate from HDDs; similarly, HDDs cannot function without SAs. ¶¶ 118, 222. In this way, the markets for HDDs and SAs are inextricably linked and intertwined. ¶ 222. Defendants actively monitored demand and street prices of HDDs, computers and finished products in recognition that the markets for those goods are inseparable from the SA market. ¶¶ 223-25.

SAs are a significant cost component, comprising 5-15%, of an HDD. ¶ 116, 227-28. HDD manufacturer Seagate recognizes that SAs "are one of the *highest cost* components of an HDD (and for certain HDDs are the highest component)," because SAs serve essential functions of HDDs. *Id.* HDDs can contain up to twelve SAs, two to hold in place each of as many as six magnetic platters that read and write information. ¶¶ 118-19, 227. More platters and greater storage capacity translates into an increased number and cost of SAs per HDD. As a result, the number of platters and SAs is positively correlated with HDD capacity, and HDD capacity is positively correlated with HDD price. ¶ 120.  SAs are commodity-like products, whose interchangeability made it easier for Defendants to agree on prices and increased the likelihood that their conspiratorial overcharge would be passed through the distribution chain to EUPs. ¶ 229. Between 2005 and 2016, approximately 2 billion HDDs were sold into the U.S. ¶ 122.

HDDs are critical components of Standalone Storage Devices (bare HDDs, external hard drives, NAS drives, enterprise storage servers and arrays) and desktop and portable Computers. ¶¶ 12-13, 123-28. HDDs are one of the highest cost components of, and can comprise a substantial portion of, the cost of HDD storage systems. ¶¶ 116, 125, 227, 245. As the storage capacity of an HDD used in a computer increases, so does the computer cost. ¶ 129. HDDs are one of the highest

cost components of Computers. ¶ 129. SAs are distinct, physically discrete components of HDDs that do not undergo physical alteration at any point in the distribution chain. ¶ 230. SAs are individually marked with a unique English letter identifying the manufacturer and are therefore physically traceable from Defendants to EUPs. *Id.*

The SA market is susceptible to collusion. Defendants collectively controlled 97% of the global SA market. ¶ 104(e). The characteristics of that market include: high barriers to entry, ¶¶ 187-91; high concentration on the "sell" side of the market, now comprising NHK Spring and TDK, ¶¶ 192-201; high concentration on the market's "buy" side, with three major producers, ¶¶ 202-08; homogeneous, commodity-like products and, in the absence of close substitutes, inelasticity of demand, ¶¶ 209-12, 229; a maturing market and declining demand, ¶¶ 213-14; and close relationships among Defendants including a joint venture and industry organizations that provided opportunities for collusion, ¶¶ 215-17.

The distribution chain for SAs is simple, notwithstanding Defendants' improper efforts to make it appear more convoluted than the allegations in EUPs' SAC. Defendants sold SAs to a few HDD manufacturers (Seagate, Western Digital, Toshiba). ¶ 219. In turn, they sold HDDs to Computer and Standalone Storage Devices OEMs (Dell, Apple, Cisco, Sun Microsystems), which sold to distributors (Avnet, Ingram Micro) or retailers (BestBuy, Newegg), and to EUPs. ¶¶ 219-21, 245, 250-52.[1] This chain is fairly depicted as follows:

---

[1] At times the chain of distribution is simpler, for example, where OEM Apple sold Computers with HDDs to EUPs Glover, Benjamin, Painter, Huyck, and Silver, ¶¶ 27, 43, 51, 65, 80 (2 links), or where HDD manufacturer Western Digital sold an HDD to EUP Greenfield, ¶ 32 (1 link).



The Court previously dismissed EUPs' FAC because it did not "contain facts setting forth directly, or from which a reasonable inference can be drawn, that each participant in the chain necessarily passed on the asserted overcharge to the next participant." Order at 5. EUPs' SAC now details 12 pages of factual allegations showing:

- The conspiratorial overcharge was passed on to EUPs through each of the various intermediate levels of the distribution chain. SAC at 61-72.

- Industry observers and market participants acknowledge, and profit margin data shows, the existence of intense price competition at each level of the distribution chain, where thin net margins required firms to pass on price increases at each stage of the manufacturing and distribution process for even the smallest components. ¶¶ 236-52.

- Economic theory predicts, and antitrust scholarship shows, that pass-through will occur at each distribution level and, in highly competitive markets such as the SA distribution chain, pass-through is likely to be near 100%. ¶¶ 232-35, 253-54 ("[I]n a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule.").

- Defendants' cartel caused EUPs to pay more for SAs, Standalone Storage Devices, and Computers than they would have paid in a competitive market. ¶¶ 226, 259-60. The overcharge, like the SA itself, is discrete, identifiable, and traceable throughout the distribution chain. ¶ 231, 259-60.

- OEMs and resellers passed on Defendants' conspiratorial overcharge because it was an industry-wide, non-transitory variable cost increase in a distribution channel characterized by intense competition at all levels. ¶ 256.

- Well-accepted economic models can isolate and identify the specific impact of an SA price increase on prices for Standalone Storage Devices and Computers, even though those products contain other components with prices that may have been changing over time. ¶ 257. As a result, the precise overcharge that was passed through to EUPs can and will be measured and quantified. ¶ 255.

The Court also dismissed EUPs' FAC because, "plaintiffs [did] not allege the type(s) of product(s) any named plaintiff purchased and from whom in the chain of distribution any named plaintiff made such purchase(s)." Order at 5. The SAC remedies that defect, identifying the specific product each EUP purchased, the seller, the state in which the purchase occurred, and the fact that the product contains SAs manufactured and sold by Defendants. ¶¶ 24-85.[2] Defendants concede as much. MTD at 10. Thus, EUPs "allege facts to support a finding that defendants overcharged the individuals or entities who purchased directly from them and that some or all of that overcharge was passed on to each plaintiff through each of the various intermediate levels of the distribution chain." Order at 4 (citations and quotations omitted).

## III.   ARGUMENT

### A.   EUPs Have Article III Standing.

EUPs satisfy all elements of standing. Defendants do not dispute that EUPs properly allege that the overcharges they paid constitute an "injury in fact" and that a favorable decision would redress that injury. Defendants only contest whether EUPs allege injuries that are traceable to Defendants' cartel. Their efforts to heighten the pleading standard are inappropriate. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly

---

[2] EUPs do not purport to represent purchasers of used products.

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Article III standing "require[s] no more than a showing that there is a substantial likelihood" of causation. *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 75 n.20 (1978). EUPs' allegations that Defendants' overcharges were passed through the distribution chain to them easily satisfy Article III.

Defendants concede that EUPs "now reveal which specific products they purchased and from whom." MTD at 10.[3] Their assertion that EUPs do not explain how the conspiratorial overcharge was passed on to EUPs through each of the intermediate levels of the distribution chain is meritless. To support their flawed argument, Defendants rely heavily on *Jones v. Micron Tech, Inc.*, but they fail to inform the Court that the *Jones* plaintiffs satisfied Article III and antitrust standing in a subsequent amended complaint. *See DRAM III*, 2020 WL 8459279.[4] The *DRAM III* court found that the end-user plaintiffs had standing after they amended their complaint to narrow the class definition to six electronic devices and added additional allegations detailing traceability. *Id*. at *2. The end-user plaintiffs alleged that:

> DRAM is a stand-alone and physically traceable component, and that the DRAM and the OEM markets are highly concentrated, such that the OEMs from whom Plaintiffs purchased the devices (Lenovo, Apple, Samsung, and Motorola) likely purchased the DRAM from Defendants. … DRAM makes up 5-25% of the bill of costs in electronic devices; that the markets are "inextricably linked," as demonstrated by their lack of independent utility and tight historical price correlations; and that OEMs engage in vigorous competition, such that increases in component part prices would be passed on to consumers.

*Id*. The court held, "These allegations are sufficient to show that Plaintiffs likely overpaid for electronic devices as the result of Defendants' DRAM prices." *Id.* So too here. EUPs narrow the class definition and provide detailed traceability allegations including that: (1) SAs are stand-alone and physically traceable components sold in highly concentrated markets to a limited set of OEMs; (2) SAs comprise one of the highest cost components of HDDs; (3) the markets for SAs and HDDs

---

[3] As Defendants controlled 97% of the global SA market, ¶ 104(e), there can be little question that the products EUPs purchased contained Defendants' SAs.

[4] "Written materials submitted to the court should always be factual and . . . accurately state current law." N.D. Cal. Guidelines for Professional Conduct No. 7.

are inextricably linked and intertwined because they cannot function independently; (4) the number and cost of SAs per HDD are positively correlated with HDD capacity and price, which in turn correlate with Computer price; and (5) OEMs, distributors, and resellers engage in such intense competition that prices would be passed to EUPs. ¶¶ 116, 120, 129, 202-08, 222-25, 227-28, 230-60. EUPs thereby satisfy the standard for Article III standing set in *DRAM III*.

EUPs need not plead every detail of the distribution chain or their purchases. Rather, Article III standing exists where indirect purchasers allege the price-fixed component "follow[s] a traceable path through the distribution chain and that overcharges for [those components] were passed through that distribution chain" to EUPs. *In re Automotive Parts Antitrust Litig.*, 29 F. Supp.3d 982, 994-96 (E.D. Mich. 2014) ("*Fuel Senders*"); *D.R. Ward Construction Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 492-93 (E.D. Pa. 2006) (standing satisfied where "[p]laintiffs allege that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain"). EUPs plausibly allege that path and that "each participant in the chain necessarily passed on the asserted overcharge to the next participant." Order at 5.

EUPs identify the distribution chain for SAs and explain how the overcharges are passed through to EUPs. SAs reach EUPs through a straightforward distribution chain consisting of (1) HDD makers, (2) OEMs, (3) distributors, (4) resellers, and (5) EUPs. ¶¶ 218-21.[5] With relatively few HDD manufacturers and OEMs, most SAs pass through a similar distribution chain. ¶¶ 219-20. Courts regularly allow indirect purchasers to proceed with similar claims. *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ("*LIB*") (upholding indirect purchaser complaint where distribution chain had 5 levels from defendants to

---

[5] Defendants accuse EUPs of "purging" allegations from their SAC, demanding that the Court consider cherry-picked allegations from EUPs' FAC. MTD at 5 n.6, 10 n.9. Yet "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007). Naturally, "[a]s the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside . . . ." *Id*. at 859. Here, discovery had yet to begin when EUPs filed their initial complaint, while the SAC was filed more than six months after the Court lifted the discovery stay.

consumers); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 253298, at *1 & n.2 (N.D. Cal. Jan. 26, 2012) (denying motion to decertify indirect purchaser class though the "manufacturers of LCD products frequently buy panels from multiple sources" and did "not keep detailed records about the panels used in their products"); *SRAM*, 264 F.R.D. at 606, 610–11 (denying motion to dismiss and later certifying an indirect purchaser class where "Defendants [sold] SRAM to various customers, both large and small scale, through a variety of distribution paths").[6]

The distribution chain in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718 (N.D. Cal. June 20, 2013), was notably similar. There, end-user plaintiffs were granted class certification upon showing that the chain of distribution for CRT components included, among others, defendants' sales of CRT components to distributors; CRT component sales from distributors to finished product makers (OEMs); finished product sales from OEMs to distributors; finished product sales from distributors to retailers; and retailer sales of finished products to consumers and end-user businesses. *Id.* at *3. The chain here is no more complex. Defendants' assertion that SAs travel in the longest chain of distribution of any antitrust case is wrong.

EUPs also provide detailed allegations about how the overcharges can be traced. As Defendants acknowledge, EUPs "allege that pass-through is more likely in highly competitive markets made up of undifferentiated products and that each step of the chain meet[s] this description." MTD at 13. Given the vigorous competition at each level of the distribution chain, pass-through is economically necessary and likely close to 100%. ¶ 234; *see also* ¶ 242 (HDD manufacturers operate in a highly competitive market); ¶¶ 243-50 (OEMs); ¶¶ 251-52 (resellers).[7] The precise amount of overcharge passed through each distribution level can be measured and quantified. ¶¶ 255-60. *See Fuel Senders*, 29 F. Supp. 3d at 998 (traceability issues pertain to

---

[6] The SA distribution chain is more straightforward than in *In re Capacitors Antitrust Litig.*, a case involving a far more ubiquitous product contained within "virtually every electronic device we use, from toasters to cellphones." 106 F. Supp.3d 1051, 1058-59 (N.D. Cal. 2015).

[7] The Court should reject Defendants' attempts to dispute EUPs' well-pled allegations. For example, Defendants may not argue that EUPs' allegation concerning the commoditization of Computers is too recent to be relevant, especially as EUPs support their allegation with an industry report published in the middle of the Class Period. MTD at 14; SAC ¶ 241 & n.77. Nor is it appropriate for Defendants to ask the Court to consider a website advertising products well outside the Class Period. MTD at 12 & n.10.

"difficulties of proof, not pleading deficiencies"). With an identifiable distribution chain and traceable overcharges, EUPs have standing to proceed with their claims.

Defendants' argument that SAs are too cheap to be traceable is baseless. Defendants and their customers publicly acknowledge that SAs are critical components of HDDs and indeed "one of the *highest cost* components of an HDD." ¶¶ 115-17. While Defendants fixate on the cost (according to *Resellers' prior, inoperative complaint*) of a single SA, they ignore EUPs' allegations that HDDs may contain as many as twelve SAs and account for up to 15% of the cost of an HDD. ¶¶ 116, 119.[8] HDD prices, meanwhile, positively correlate with prices of Computers and other products, ¶ 129, and courts within this District recognize that correlation between price changes of component parts and computers supports traceability, *DRAM III*, 2020 WL 8459279, at *2. Regression analyses will quantify the precise overcharge and pass-through rate. ¶ 255.

Irrespective of price, Defendants do not have *carte blanche* to fix SA prices. "Defendants may not shield themselves from liability by fixing prices on a relatively inexpensive item." *SRAM*, 264 F.R.D. at 614.  *See In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *2 (N.D. Cal. Feb. 8, 2016) (certifying indirect purchaser class where component "typically represent[s] a relatively small percentage of the cost of the product as a whole"); *Fuel Senders*, 29 F. Supp.3d at 998 (finding that indirect purchasers had Article III standing despite a fuel sender costing less than $5 in an expensive vehicle containing thousands of parts).[9]

Defendants seek to hold EUPs to a heightened standard that the law does not require. EUPs need not identify the precise overcharge, specify the ratio of component cost to finished product

---

[8] Resellers' allegations—especially those from an inoperative complaint—cannot be held against EUPs. *See Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (recognizing that "consolidated cases should remain separate as to parties [and] pleadings").

[9] *Los Gatos Mercantile, Inc. v. E.I. Dupont De Nemours & Co.*, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015), is inapt. There, the *physical* traceability of the product was at issue, leaving the court "to speculate what quantum of those raw materials is actually titanium dioxide as opposed to some other raw material not at issue." *Id*. at *14. *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090 (D.N.J. Oct. 20, 2011), is similarly off-point. There the court dismissed because plaintiffs had not alleged the specific products they purchased, *id.* at *7, while here Defendants concede EUPs have done so, *see* MTD at 10.

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

cost, or account for discounts at particular pricing levels in the SAC. Those are matters for expert analysis at later stages of the case.[10] As the *DRAM III* court explained, "Ultimately, there is no formula for pleading traceability or other Article III requirements. While quantifying the exact correlation between end product and component prices satisfies traceability, so do Plaintiffs' general allegations that the prices are tightly correlated and likely to be passed on due to market conditions." *DRAM III*, 2020 WL 8459279, at *3. "At bottom, the purpose is to show that plaintiffs' injury is not speculative, not to require an in-depth economic analysis at the pleading stage." *Id*. EUPs have done so, and have standing to proceed with their claims.

### B.   EUPs Have Standing to Bring All of Their State Law Claims.

Although "standing is claim-and-relief specific," *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp.3d 1051, 1064-65 (N.D. Cal. 2015) (citations omitted), Article III does not require EUPs to have purchased each particular product at issue in every state.[11] Defendants again ignore *DRAM III*, but that case remains on-point:

> Defendants now claim that Plaintiffs cannot seek recovery on behalf of a class for products they did not purchase. The argument is meritless. The product that Plaintiffs purchased is DRAM, same as the other purported class members. That the members of the class purchased DRAM through different intermediate products creates neither a different legal claim (antitrust violation) nor a different form of relief (damages and injunction).

2020 WL 8459279, at *3.[12] Here, EUPs bring suit on behalf of purchasers of SAs contained within Standalone Storage Devices and Computers. EUPs have named class representatives capable of bringing each state law claim. "'[A]ny issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are

---

[10] For instance, econometric analysis will address discounts, as is regularly done in antitrust cases. *See In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 384-90 (M.D. Fla. 2018).

[11] EUPs allege details about their purchases including the HDD, seller, state of purchase, and that the HDD contains Defendants' SAs. ¶¶ 24-85. Defendants' claim to the contrary is false.

[12] Defendants' authorities do not hold otherwise. *See Los Gatos Mercantile*, 2015 WL 4755335, at *16 (finding lack of standing due to traceability, not claim-specific standing requirements); *Jones*, 400 F. Supp. 3d at 909 (dismissing IPP claims under law of 25 states where plaintiffs were residents of only 5); *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 926-27 (N.D. Cal. 2015) (dismissing claims arising under state law where no plaintiff made any purchase); *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) (same).

relevant only to class certification, not to standing.'" *Melendres v. Arpaio,* 784 F.3d 1254, 1262 (9th Cir. 2015) (quoting Newberg on Class Actions §2:6); *see also Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 571 (N.D. Cal. 2013) ("Transmogrifying typicality or commonality into an issue of standing would undermine the well-established principles that [i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements … and that [t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.") (citations and quotations omitted). Accordingly, EUPs have standing to assert all of their state law claims.

**IV.    EUPS ADEQUATELY ALLEGE ANTITRUST STANDING**

   **A.    <u>*AGC* Should Not Be Applied to EUPs' State Law Claims.</u>**

   State, not federal, law governs antitrust standing for EUPs' state-law damages claims. *LIB*, 2014 WL 4955377, at *7. In response to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), many states created "repealer" provisions that permitted, by statute or case law, indirect purchasers to maintain damages claims under state antitrust statutes. *See In re TFT-LCD (Flat Panel) Antitrust Litig.,* 586 F. Supp. 2d 1109, 1120 (N.D. Cal. 2008) ("*TFT-LCD I*"); *California v. Arc America Corp.*, 490 U.S. 93, 105-06 (1989) (repealer states' antitrust laws not preempted by federal law). Because the *AGC* antitrust standing analysis was guided by "[t]he same concerns" underlying *Illinois Brick* (*AGC*, 459 U.S. at 544-45), multiple courts hold repealer jurisdictions necessarily rejected *AGC*.[13] The Court should do the same here.

   Courts in this District expressly hold that *AGC* does not apply to state antitrust and/or

---

[13] *See, e.g., Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007) (*AGC* not applicable to Minnesota law, noting the Minnesota legislature did not repudiate *Illinois Brick* only to invite dismissals based on that which motivated *Illinois Brick*); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp.3d 772, 816 (N.D. Ill. 2017) ("*Broiler Chicken*") (*AGC* does not apply to <u>any</u> repealer states); *Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *19-20 (D.N.J. July 20, 2017) ("*Liquid Aluminum*") (same). Defendants' reliance on *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743-44 (7th Cir. 2018) is misplaced. The Seventh Circuit did not address whether repealer laws bar application of *AGC*, but held only that repeal of *Illinois Brick* does not create a "*per se* rule . . . allow[ing] all indirect-purchaser suits . . . no matter how far removed the purchasers are from the production process and no matter how speculative the damages award would be." EUPs make no such argument here.

consumer protection claims under the laws of the following EUP states: Arizona, Arkansas, California, District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.[14] These courts reason that *AGC* is not applicable under state law without a "clear directive" or "express adoption" from the relevant state's legislature, highest court, or at least an intermediate court.[15] These courts also hold that statutory or common law harmonization provisions, as well as state trial court decisions, do not justify applying *AGC* to state law.[16]

The Ninth Circuit authorities Defendants claim are "binding precedent" do not address the

---

[14] *See, e.g.*, *Capacitors*, 106 F. Supp.3d at 1073 (*AGC* not applicable under CA law); *Los Gatos Mercantile*, 2015 WL 4755335, at *18-19 (*AGC* not applicable under AZ, CA, DC, KS, MI, MN, MS, NH, NC, OR, TN, WI law); *LIB*, 2014 WL 4955377, at *4 nn.6, 7, *11 (*AGC* not applicable under AR, AZ, CA, DC, FL, KS, MA, ME, MI, MN, MO, MS, MT, NH, NY, NC, ND, OR, SC, TN, UT, VT, WV, WI law); *In re Flash Memory Antitrust Litig.*, 643 F. Supp.2d 1133, 1150-53 (N.D. Cal. 2009) ("*Flash Memory*") (*AGC* not applicable under AZ, DC, KS, ME, MI, MN, MS, NV, NM, NC, SD, TN, WV, WI law); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp.2d 1085, 1097 (N.D. Cal. 2007) ("*GPUs II*") (*AGC* not applicable under KS, MN, MS, NM, TN, WV law); *TFT-LCD I*, 586 F. Supp.2d 1109, 1123 (*AGC* not applicable "under the repealer states' laws in the absence of a clear directive" from those states' legislatures or highest courts).

[15] *See, e.g.*, *Capacitors*, 106 F. Supp. 3d at 1073 (*AGC* not "clearly applied by the California Supreme Court to claims brought under California's Cartwright Act"); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *10 n.9, *12 (N.D. Cal. Aug. 3, 2011) ("*ODD*") ("it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts"); *TFT-LCD I*, 586 F. Supp.2d at 1123 (same); *Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* not applicable unless "the state's legislature, highest court, or intermediate court expressly has adopted [it]"); *GPUs II*, 540 F. Supp.2d at 1097 (declining to apply *AGC* to state-law claims "[a]bsent clearer directive from the courts and legislatures of those states").

[16] *See, e.g., Los Gatos Mercantile*, 2015 WL 4755335, at *18 (harmonization provisions and state trial court decisions insufficient to show *AGC* is applicable); *Flash Memory*, 643 F. Supp.2d at 1153 (questioning whether statutory or common law harmonization provision "is an appropriate means of predicting how a state's highest court would rule regarding the applicability of *AGC*"); *LIB*, 2014 WL 4955377, at *10 ("[S]imply because a state statute encourages reference to federal law does not impose a mandate on state courts to conform in fact to federal law."); *GPUs II*, 540 F. Supp. 2d at 1097 (holding that a harmonization provision is not a "clear directive"); *see also Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 106 (Ariz. 2003) (harmonization does not extend to "procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct"); *Lorix*, 736 N.W.2d at 626 ("[t]he desire for harmony between federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit").

application of *AGC* under California law. *Knevelbaard Dairies v. Kraft Foods, Inc.*, for example, confirms that standing under the Cartwright Act is governed by California law, the role of federal antitrust precedent is "limited" and "not necessarily decisive" in construing the Cartwright Act, and "California law affords standing more liberally than does federal law." 232 F.3d 979, 985, 987 (9th Cir. 2000).[17]

Defendants' assertion that Iowa, Nebraska, and Nevada high courts have applied the *AGC* factors to determine standing for state antitrust claims is unavailing. The Iowa and Nebraska cases are *Visa* cases in which plaintiffs alleged that the defendants had engaged in tying arrangements that forced merchants to pay inflated fees for processing transactions, which the merchants then passed on to consumers. Unlike EUPs, who purchased products containing the price-fixed component in the stream of commerce, the *Visa* plaintiffs "did not purchase, directly or indirectly, the product that is the subject of anticompetitive activity by Visa and MasterCard."[18] Defendants incorrectly rely on *Visa* cases, many of which are trial court decisions. *See* MTD at 27 n.17. In Nevada, the high court did not need to apply *AGC* because plaintiffs "did not make any showing [at summary judgment] that they suffered any injuries (i.e., damages) from respondents' alleged conspiracy, and thus, they lack antitrust standing." *Nevada Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 608 (Nev. 2018).

---

[17] Defendants' reliance on *Mothershed v. Justices of the Supreme Court*, 410 F.3d 602 (9th Cir. 2005), and *Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 185 F.3d 957 (9th Cir. 1999), to show *AGC* applies to Arizona and Oregon antitrust laws is specious. The court in *Mothershed* addressed whether a disbarred attorney may collaterally attack his state bar disciplinary proceedings in federal court, and never discussed antitrust standing or *AGC*. The *Oregon-Laborers* case involved claims for "damages-expenses to treat smokers' personal injuries" that the court held are not recoverable under the Oregon antitrust statute. 185 F.3d at 968. The court did not address the applicability of *AGC* to Oregon's antitrust statute.

[18] *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 196-97 (Iowa 2007) ("*Southard*"); *see also id.* at 199 (*Visa* plaintiffs are not indirect purchasers because they are "not in the chain of distribution"); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 298-99 (Neb. 2006) (same); *see also Lorix*, 736 N.W.2d at 631 (distinguishing the *Visa* cases from an indirect-purchaser component case because the latter involves a purchaser injured by an overcharge passing through the chain of distribution). EUPs recognize that courts in this District (*e.g., Flash, LIB*), relying primarily on *Visa* cases, have held that *AGC* applies to Iowa, Nebraska and Nevada, but respectfully submit that for the reasons stated above, the *Visa* cases are inapposite, and *AGC* should not be applied to any *Illinois Brick* repealer states.

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendants' remaining cases are either cited incorrectly, distinguishable, or contrary to the weight of authority in this District. As detailed further in Appendix A, Defendants fail to justify categorical application of *AGC* to EUPs' state law claims.

**B.     Application of the *AGC* Factors Supports Antitrust Standing.**

The *AGC* factors, even if applicable, weigh in favor of EUPs' antitrust standing.

***Nature of Plaintiffs' Injury.*** The first *AGC* factor evaluates whether plaintiffs plead "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055. EUPs allege a *per se* antitrust violation caused them to pay higher prices for SAs. ¶¶ 15, 226, 260. This is classic antitrust injury. As the Ninth Circuit has observed, consumers "are *most* likely to suffer antitrust injury," *Am. Ad Mgmt.*, 190 F.3d at 1057 (emphasis added), and are "presumptively the proper plaintiffs to allege antitrust injury." *Glen Holly Entm't*, 352 F.3d at 372. Indeed, in announcing NHK Spring's guilty plea, the DOJ stated that the "impact on American consumers and businesses is direct and substantial." ¶ 9.

Contrary to Defendants' assertion, courts do not impose a strict "market participation" requirement for indirect-purchaser claims. *LIB*, 2014 WL 4955377, at *12 ("[B]eing a consumer or competitor in the allegedly restrained market is not strictly required."). To the extent *AGC* requires market participation, courts regularly find that price-fixed components and the finished products containing them "reside in the same market, or inextricably linked markets." *Id*. (citing cases). Defendants wrongly claim that the court in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013), found "market participation" satisfied because CRTs were "directly incorporated" into finished products. MTD at 20. *CRT* said nothing about direct incorporation; rather, it found the first factor supported standing because plaintiffs alleged that a CRT is "virtually valueless on its own," the markets for the component and finished products containing it "are plausibly pled to be inextricably intertwined," and "the alleged anticompetitive activity surrounding a component affects the market for the finished product in a traceable way." *Id*. at *10. EUPs make similar allegations, virtually all of which Defendants ignore.

EUPs allege that: (1) SAs are "indispensable components of HDDs," which cannot function without them (¶¶ 114-18); (2) HDDs are critical components of Standalone Storage Devices and Computers (¶¶ 126, 228, 245); (3) HDDs and SAs "are inextricably linked and intertwined" and SAs have "no independent utility" and "little to no value" on their own (¶¶ 222-23); (4) "Defendants monitored demand and pricing for Standalone Storage Devices and HDDs used in Computers and other applications" (¶ 225); (5) SAs used in Standalone Storage Devices or Computers "are distinct, physically discrete components of the disk drive that do not undergo physical alterations as they move through the distribution chain," and are "identifiable" by part numbers and lettering traceable to Defendants, and "are physically traceable throughout the distribution chain from Defendants to Plaintiffs and members of the Classes" (¶ 230); (6) any "costs" or "inflated prices" "attributable to suspension assemblies in a Standalone Storage Device or Computer [can] be traced through the chain of distribution to Plaintiffs and members of the Classes" (¶ 231, 260); and (7) "customers must purchase HDD suspension assemblies as an essential part of an HDD, or a product containing an HDD" and "[d]emand in the market for HDDs was derived from consumer demand for Standalone Storage Devices and Computers" (¶¶ 212, 256), such that the component and finished product markets are economic complements. These allegations plausibly show market participation sufficient to confer antitrust standing. *See, e.g., DRAM III*, 2020 WL 8459279, at *3; *LIB*, 2014 WL 4955377, at *12-13; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp.2d 1011, 1023-24 (N.D. Cal. 2010); *TFT-LCD I,* 586 F. Supp.2d at 1123; *Flash Memory*, 643 F. Supp.2d 1133, 1154 (N.D. Cal. 2009).

As noted above (§ II), EUPs have also alleged that: (1) SAs comprise 5-15% of an HDD; (2) "External hard drives and NAS drives . . . comprise little more than their HDDs;" (3) "HDDs can comprise a substantial portion of the cost of enterprise HDD storage systems;" and (4) HDDs are "one of the highest cost components in . . . [and] a significant cost component of computers." ¶¶ 116, 124, 125, 129. EUPs further allege that the "number of and cost of suspension assemblies incorporated into the HDD . . . is positively correlated with HDD capacity, and HDD capacity is positively correlated with HDD price" (¶ 120); and "HDD capacity and price are positively correlated with total computer price" (¶ 129). *See also* ¶¶ 126-28 (providing foundational facts for

the foregoing allegations). As in *DRAM III*, these allegations, in conjunction with those set out above, are sufficient to show that the suspension assembly and "relevant electronic product markets are inextricably linked, sufficient to satisfy the first factor" under *AGC*. 2020 WL 8459279, at *3.

There is no merit to Defendants' attempt to distinguish other cases which involved components that comprised a higher percentage of the cost of the relevant end products. MTD at 20-21. To begin, these factual questions cannot be decided on a pleading motion,[19] and defendants are not immunized "by fixing prices on a relatively inexpensive item." *SRAM*, 264 F.R.D. at 614-15. Second, in *DRAM III*, the court rejected a similar argument by defendants, recognizing that where plaintiff alleges that (1) a component comprises 5-25%, or a substantial portion, of the end product cost, (2) the end products' prices are correlated with the component cost, and (3) the component at issue is a "critical part" of the electronic device, the inextricable link requirement is satisfied. 2020 WL 8459279, at *3 and n.5. EUPs' allegations plausibly meet these requirements. Finally, in *Auto Parts*, the court repeatedly held that auto dealers and consumers who purchased new vehicles adequately pled participation in the market for the price-fixed automotive parts notwithstanding defendants' assertions that the part was "one of thousands" in the vehicle, or comprised a "negligible" portion of the value of the vehicle.[20] The same result is warranted here.[21]

**Direct and Non-speculative Injury.** On the second *AGC* factor, "directness of the alleged injury," "courts have determined that discrete injuries traceable through a distribution chain tilt

---

[19] *LIB*, 2014 WL 4955377, at *13 (whether markets are "inextricably intertwined likely will require sophisticated economic analysis and is a factual matter not amenable to resolution at the pleadings stage"); *DRAM III*, 2020 WL 8459279, at *3 n.5 ("For purposes of antitrust standing, Plaintiffs' claim need only be plausible, not fail-proof.").

[20] *See In re Automotive Parts Antitrust Litig. (Bearings)*, 50 F. Supp.3d 836, 851, 855 (E.D. Mich. 2014); *Fuel Senders*, 29 F. Supp.3d at 998, 1002-03; *In re Automotive Parts Antitrust Litig. (Ceramic Substrates)*, 2017 WL 7689654, at *10-11 (E.D. Mich. May 5, 2017).

[21] Defendants' reliance on the older *DRAM* decisions is unavailing. In *In re Dynamic Random Access Memory Antitrust Litig.*, the court recognized that its ruling was not without controversy, 536 F. Supp.2d 1129, 1142 (N.D. Cal. 2008) ("*DRAM II*"), and multiple courts have since declined to follow the *DRAM* court's analyses on market participation. *See, e.g., LIB*, 2014 WL 4955377, at *13 (declining to follow *DRAM II*); *ODD*, 2011 WL 3894376, at *12 (declining to follow *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp.2d 1072 (N.D. Cal. 2007) and *DRAM II*); *TFT-LCD I*, 586 F. Supp.2d at 1121-23 (same).

this factor in favor of antitrust standing." *LIB*, 2014 WL 4955377, at *14. Here, EUPs allege that (1) they paid an overcharge that was passed on to them by makers of the relevant finished products; (2) the SA and its cost can be traced through the chain of distribution; (3) the finished product markets were inelastic, thereby permitting cost increases; (4) the cost increases here were industry-wide and the finished product markets highly competitive, economically necessitating pass-on of variable cost increases; and (5) regression analyses will "isolate and identify only the impact of an increase in the price of HDD suspension assemblies[.]" ¶¶ 212, 226, 229-60. These allegations support antitrust standing. *See LIB*, 2014 WL 4955377, at *15; *TFT-LCD I*, 586 F. Supp.2d at 1123-24; *Fuel Senders*, 29 F. Supp.3d at 1002-03; *DRAM III*, 2020 WL 8459279, at *3.

EUPs also allege that their harm is not speculative, which supports antitrust standing under the third *AGC* factor. *LIB*, 2014 WL 4955377, at *15; *TFT-LCD I*, 586 F. Supp.2d at 1124; *Fuel Senders*, 29 F. Supp.3d at 1003. Defendants' assertion that "pricing decisions made at multiple levels of commerce" impact "final consumer prices" is insufficient to overcome EUPs' detailed allegations regarding the market, causation and impact. Courts in this District regularly reject claims that causation and damages are too complicated and therefore speculative, recognizing that "it would be inappropriate to determine complex and intensely factual damages issues without a more fully developed factual record." *TFT-LCD I*, 586 F. Supp.2d at 1124 (quotations omitted); *LIB*, 2014 WL 4955377, at *15 (courts should "avoid substituting defendants' speculation for the complaint's allegations of causation"). Finally, Defendants ignore that EUPs are suing under state repealer laws that seek to protect downstream purchasers who often "suffer[ ] the greatest, if not the most direct, injury of the price-fixing conspiracy." *D.R. Ward*, 470 F. Supp.2d at 503.

**Risk of Duplicative Recovery and Complexity in Apportioning Damages.** The fourth and fifth *AGC* factors can be considered alongside each other. *CRT*, 2013 WL 4505701, at *11; *LIB*, 2014 WL 4955377, at *15 (these factors evaluate whether plaintiffs have sufficiently alleged that duplicative recovery can be avoided and apportionment of any overcharge passed on in the distribution chain is possible). First, courts recognize that vis-à-vis direct purchasers, the risk of duplicative recovery "generally is inapposite in the context of [*Illinois Brick* repealer] state law antitrust claims." *Flash Memory*, 643 F. Supp.2d at 1156. Second, in indirect purchaser cases

involving price-fixed component parts, the risks of duplicative recovery and undue complexity in apportioning damages are adequately addressed by allegations that the "overcharges are distinct and traceable." *Bearings*, 50 F. Supp.3d at 855 (holding that "the existence of three classes does not render the IPPs' claims ripe for duplicative recovery"); *see also Fuel Senders*, 29 F. Supp.3d at 1003 (finding antitrust standing where both auto dealers' and downstream consumer purchasers' allegations that "overcharges are distinct and traceable . . . lessen the risk of duplicative recovery"); *TFT-LCD I*, 586 F. Supp.2d at 1124 ("plaintiffs have sufficiently alleged that damages are traceable and thus apportionable because [the parts at issue] are a separate component"). Indeed, "defendants do not explain why damages could not be apportioned in this case, as they have been in other complex antitrust cases, . . . [and] [i]t is a rule of long standing that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *LIB*, 2014 WL 4955377, at *16 (quotations omitted). Finally, EUPs and Resellers can rely on well-established regression analyses to apportion damages.

### C.   Defendants' Assertions that Certain States Only Permit the State AG to Bring a Claim or Cover Only Intrastate Commerce are Incorrect.

Defendants' attack on EUPs' standing to sue under Maryland and Rhode Island antitrust statutes is unfounded. *See* Appendix A (citing Md. Code Com. Law § 11-209(b)(2)(i) and R.I. Gen. Laws § 6-36-12(g), both of which permit private suits by indirect purchasers). Their argument that Mississippi, North Carolina, Tennessee, and Wisconsin antitrust laws reach only conduct within the state also lacks merit. *See id.* (antitrust laws in those states apply to in-state purchases of products containing price-fixed component).

## V.   EUPS' SAC SUFFICIENTLY INVOKES STATE CONSUMER PROTECTION STATUTES[22]

### A.   Defendants Improperly Construe "Unconscionable" Conduct Requirement Under Arkansas and New Mexico Consumer Protection Statutes.

Arkansas Deceptive Trade Practices Act ("ADTPA") and New Mexico Unfair Practices

---

[22] EUPs address in Appendix A Defendants' erroneous arguments (MTD at § VI.G and VI.H) regarding indirect purchasers' right to sue under Missouri and Virginia consumer protection statutes and EUPs' standing under Arkansas, California, Florida, Nebraska, New York, North Carolina, and Vermont consumer protection laws.

1  Act ("NMUPA") address both unconscionable act *and* unfair or deceptive trade practices. Ark.

2  Stat. Ann. § 4-88-107(a)(10) & (b); N.M. Stat. § 57-12-3.  Federal courts generally permit claims

3  under the ADTPA and NMUPA in price-fixing cases.  *See, e.g., In re Packaged Seafood Products*

4  *Antitrust Litig.*, 242 F. Supp.3d 1033, 1072 (S.D. Cal. 2017) ("*Packaged Seafood*") (collecting

5  cases); *LIB*, 2014 WL 4955377, at *22; *Flash Memory*, 643 F. Supp.2d at 1156-57 (rejecting *GPUs*

6  *I* analysis Defendants here rely on and finding price-fixing was "substantively unconscionable");

7  *In re Automotive Parts Antitrust Litig. (Wire Harness),* 2013 WL 2456612, at *24-25 (E.D. Mich.

8  June 6, 2013); *In re Chocolate Confectionary Antitrust Litig.,* 602 F. Supp.2d 538, 586 (M.D. Pa.

9  2009); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5,

10  2009).[23] EUPs' price-fixing claims under these statutes should stand.

##    B.    EUPs Can Assert Arkansas, Montana, South Carolina, and Virginia Consumer Protection Claims on a Class Basis.

12          A state law that permits individual suits by indirect purchasers but prohibits class actions

13  in state court does not preclude plaintiffs from bringing a class action in federal courts under Rule

14  23. *See Shady Grove Orthopedic Assoc, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406-10 (2010).

15  Rule 23 must be applied in federal court unless its application would "abridge, enlarge or modify

16  any substantive right" under the Rules Enabling Act. 28 U.S.C. § 2072(b). Given that Rule 23

17  "addresses not the remedy, but the procedural right to maintain a class action," *Shady Grove*, 559

18  U.S. 393, 401 n.4, it is procedural, and thus supersedes the state law restrictions. Relying upon

19  *Shady Grove*, federal courts hold that state class action bans do not apply to state law claims

---

23  Defendants cite inapposite cases (MTD at 30). *Lidoderm* involved "conduct that occurred exclusively before the [US]PTO and was not directed to consumers." *In re Lidoderm Antitrust Litig.*, 103 F. Supp.3d 1155, 1167 (N.D. Cal. 2015). *TFT-LCD* noted the "absence of any Arkansas authority interpreting the ADTPA to apply to price-fixing." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp.2d 1036, 1042 (N.D. Cal. 2011). However, such authority exists. *See, e.g., Fuel Senders*, 29 F. Supp.3d at 1008-09 (discussing *Burton v. Micron Tech, Inc.* (Ark. Cir. Ct. 1st Div. Nov. 6, 2009), which upheld ADTPA claim regarding price-fixing conspiracy). Defendants' reliance on an affirmed summary judgment ruling in *Hernandez v. Wells Fargo Bank, N.A.*, 139 N.M. 68, 69 (2005), is misplaced. Here, EUPs allege a gross disparity and price increases, and these allegations are sufficient to state a claim under the NMUPA. *See* ¶ 341(c).

proceeding under Rule 23.[24] Defendants cite only pre-*Shady Grove* law.

### C.   Florida, Michigan, and Minnesota Consumer Protection Claims Are Not Subject to Rule 9(b)'s Heightened Pleading Requirements.

Contrary to Defendants' assertion, Rule 9(b) is inapplicable to EUPs' Florida, Michigan, and Minnesota consumer protection claims because those claims are based on unlawful and unfair business practices as distinguished from fraud. None of those states' statutes are limited to fraud-based claims. *See* Fla. Stat. § 501.204(1); Mich. Comp. Laws § 445.903; Minn. Stat. § 325F.69. *See In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp.3d 814, 846 (E.D. Pa. 2019) ("*Generics*") ("consumer protection claims [under the laws of Minnesota, Michigan and Florida] rest on Defendants' alleged unconscionable or deceptive conduct [in carrying out their conspiracy], not on fraud. Therefore, their claims do not require application of the heightened pleading standard," where conspiracy was "hatched in secret and maintained through deception"); *Packaged Seafood,* 242 F. Supp.3d at 1077-78 (price-fixing allegations of "secret meetings" and "surreptitious communications among Defendants and their co-conspirators" sufficed to state a valid claim under Michigan and Minnesota consumer protection statutes). Even if Rule 9(b) applied, EUPs' detailed allegations of Defendants' active concealment are sufficient.[25]

### D.   EUPs Properly Allege Intrastate Effects on Commerce of North Carolina, New Hampshire, and Massachusetts.

Defendants argue that North Carolina, New Hampshire, and Massachusetts require in-state sales or purchases to invoke their respective state consumer protection statutes. MTD at 32. Defendants ignore that their price-fixed products entered North Carolina, New Hampshire, and

---

[24] *LIB,* 2014 WL 4955377, at *21 (denying dismissal of South Carolina class claims because Rule 23 would not modify state-law substantive rights); *Hill v. LLR, Inc.*, 2019 WL 2404900, at *10-11 (D. Mont. Mar. 8, 2019) (Mont. Code Ann. § 30-14-133 class action ban does not apply in federal court); *Mounce v. CHSPSC, LLC*, 2017 WL 4392048, at *7 (W.D. Ark. Sept. 29, 2017) (same for ADTPA's class action bar); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) (same for Virginia Consumer Protection Act's class action bar).

[25] SAC ¶¶ 8, 151-52, 282-85. *See United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 663 (9th Cir. 2018) (Rule 9 requirements may be relaxed "[w]here, as here, the relevant information is within the defendant's exclusive possession and control."); *United States ex rel. Joshi v. St. Luke's Hosp.*, 441 F.3d 552, 557 (8th Cir. 2006) (holding that to satisfy the requirements of Rule 9(b), the plaintiff need not allege specific details of every fraudulent claim; instead, the plaintiff need only "allege *some* representative examples of the fraudulent conduct").

Massachusetts and caused EUPs' injury in the form of unlawfully inflated prices, which is precisely the type of violation recognized by each state. North Carolina's Unfair Trade Practices Act requires conduct "in or affecting [North Carolina] commerce" not purely intrastate. *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 617 S.E.2d 664, 671 (N.C. App. 2005); *see also Packaged Seafood*, 242 F. Supp.3d at 1083 ("the Court is not convinced that the NCDUPTA requires a plaintiff to show 'substantial effects'" in North Carolina and there is nothing to indicate the "conspiracy's effect in North Carolina was somehow less than in all the other affected states"). New Hampshire's consumer protection law has been interpreted to permit claims similar to those of EUPs. *See, e.g., In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010) (allegation that defendants colluded to fix the price of chocolate products that were "then introduced into the New Hampshire market" sufficient to state a claim) (citing *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 578 (N.H. 2007)). [26] Finally, the Complaint contains sufficient allegations that thousands of consumers were on the "receiving end" of Defendants' conduct in Massachusetts. *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 24-25 (1st Cir. 2003) (applying Massachusetts consumer statute where "receiving end" and loss "situs" factors "weigh[ed] heavily" in Massachusetts, despite unfair conduct occurring elsewhere). The burden is on the Defendants to prove otherwise at trial. Mass. Gen. Laws Ann. ch. 93A, § 11.

### E.   EUPs Adequately Plead Arkansas, Michigan, Nevada, Oregon, Rhode Island, South Dakota, Utah, and Virginia Consumer Protection Claims.

Defendants contend that the consumer protection statutes of Arkansas, Michigan, Nevada, Oregon, Rhode Island, South Dakota, Utah, and Virginia do not encompass price-fixing claims.[27] Courts have rejected such arguments when plaintiffs' price-fixing claims also include allegations of false or misleading statements or the concealment, suppression or omission of any material fact. *See, e.g., Packaged Seafood.*, 242 F. Supp.3d at 1080, 1083-85, 1086-87 (upholding Nevada,

---

[26] *Precourt v. Fairbank Reconstruction Corp.,* cited by Defendants, is inapposite. 856 F. Supp. 2d 327, 344 (D.N.H. 2012). Unlike the plaintiff in *Precourt* who alleged no misconduct that reached New Hampshire, EUPs allege that Defendants' anticompetitive conduct reached and affected the New Hampshire marketplace. *See* SAC ¶ 340.

[27] EUPs do not allege any claim under West Virginia's Consumer Credit and Protection Act.

Oregon, Utah, and Rhode Island consumer protection claims). EUPs allege the price-fixing conduct includes misrepresentations, omissions, concealment and suppression of material facts. ¶¶ 130-52, 334, 339, 345, 346, 348-49, 351. The consumer protection statutes at issue here prohibit such conduct.[28] *See* Ark. Stat. Ann. § 4-88-107(a)(10) & (b); Mich. Comp. Laws § 445.903; Nev. Rev. Stat. §§ 598.0915(13), 598.0923(2), 598.0923(3); Or. Rev. Stat. §646.607; R.I. Gen. Laws §6-13.1-1; S.D. Code § 37-24-6(1); Utah Code § 13-11-4 and 13-11-5; Va. Code § 59.1-200.

### F.   EUPs Need Not Allege Reliance under Arkansas and California Consumer Protection Statutes.

Reliance is not an element of the ADTPA.[29] *Pleasant v. McDaniel,* 550 S.W.3d 8, 12 (Ark. Ct. App. 2018) ("Knowledge of the deceptive nature of one's actions, intent to induce action, reliance, and damages are conspicuously missing from the elements of the ADTPA."). Likewise, fraud is "not a necessary element" for a California UCL claim. *Marolda v. Symantec Corp.,* 672 F. Supp.2d 992, 1004 (N.D. Cal. 2009). Because EUPs allege that Defendants' cartel is an unlawful and unfair business practice under the UCL, there is no requirement for pleading reliance.

## VI.   UNJUST ENRICHMENT IS A COGNIZABLE CAUSE OF ACTION

EUPs allege viable unjust enrichment claims regardless of the applicable state antitrust laws. *In re G-Fees Antitrust Litig.*, 584 F. Supp.2d 26, 46 (D.D.C. 2008) ("No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy."); *Generics*, 368 F. Supp. 3d at 850 (holding that *Illinois Brick* does not bar unjust enrichment claims). Moreover, "defendants' focus on the lack of a 'direct relation' between plaintiffs and defendants [is] misplaced. Rather than looking at the relationship between the parties, courts typically focus on the relation between the plaintiffs' injury and the defendants' conduct." *TFT-LCD,* 2011 WL 4501223, at *7 (N.D. Cal. Sept. 28,

---

[28] Unlike in *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp.2d 160 (D. Me. 2004) (cited in MTD at 33), where the plaintiffs made no allegation of deception or omission of material fact under the Michigan consumer statute, EUPs have alleged both here.

[29] Ark. Code § 4-88-113(f) (cited in MTD at 34) went into effect on August 1, 2017 and therefore does not apply to EUPs' claims here.

2011); *Williams v. Wells Fargo Bank, N.A.*, 2011 WL 4368980, at \*9 (S.D. Fla. Sept. 19, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant."). Finally, EUPs may plead unjust enrichment in the alternative.[30]

### APPENDIX A:  STATE-BY-STATE STANDING AND *AGC* APPLICABILIY ANALYSIS

| State | EUPs' Authorities and Defendants' Authorities Distinguished |
|---|---|
| AR | **<u>Standing under ADTPA? Yes.</u> *AGC* not applicable.** *See LIB*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at \*9, \*19-20. Defendants concede that no federal court has applied *AGC* to ADTPA claims (MTD App. B). *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, cited by Defendants (MTD at 35), "is driven by several key factors, including [] that this is a *mixed-market case*, where damages inflicted on the physical commodity market are not derivative of injuries in the futures market *and the price-fixed products are not components of the finished goods*." 2015 WL 3988488, at \*16 (N.D. Ill. June 29, 2015) (emphasis added). |
| AZ | ***AGC* not applicable.** *See Los Gatos Mercantile, LIB, Flash Memory, supra*, n.14. *See also D.R. Ward*, 470 F. Supp. 2d at 497-98 (analyzing Arizona case law in detail, including a trial court's application of *AGC* in a *Visa* case, and rejecting application of *AGC* under Arizona law); Ariz. Rev. Stat. Ann.§ 44-1412 (Arizona's antitrust statute's harmonization provision is permissive, not mandatory). ***Defendants' authorities are inapposite***: In *Bunker's Glass*, the Arizona Supreme Court implicitly declined to apply *AGC* (75 P.3d at 102-10), as held in *D.R. Ward* (470 F. Supp. 2d at 497-98). |
| CA | ***AGC* not applicable.** *See Capacitors, Los Gatos Mercantile, LIB, supra*, n.14; *Broiler Chicken*, 290 F. Supp. 3d at 816 n.15; *see also Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states . . ."); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015) ("The Cartwright Act is broader in range and deeper in reach than the Sherman Act."). ***Defendants' authorities are inapposite***: *Clayworth v. Pfizer, Inc.* (MTD at 27 n.16) "did not involve a question of standing under the California antitrust laws, and the court's reference to *AGC* was at most a passing one made in discussing an intermediate appellate court's opinion." *Capacitors*, 106 F. Supp. 3d at 1072.<br><br>**<u>Standing under UCL? Yes.</u>** Courts in this district have allowed indirect-purchaser UCL claims predicated on price-fixed components of finished goods. *See* n.14, *supra*. ***Defendants' authorities are inapposite*** (MTD at 35): *Dairy Farmers* is inapposite for the reasons stated above. *See* AR, *supra*. *Troyk* did not decide what standard of causation applies in determining whether a plaintiff has standing to prosecute a UCL claim. The footnote Defendants cite only speaks to "negligence actions." 171 Cal. App. 4th 1305, 1349 and n.33 (2009); *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 n.12 (1999) ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. |

---

[30] Fed. R. Civ. P. 8(d)(3). Defendants' reliance on *In re Aluminum Warehousing Antitrust Litig.* is misplaced. MTD at 37. In a later opinion, the court ruled that "there [wa]s no bar to pleading both [unjust enrichment and antitrust] claims simultaneously at the pleading stage." 95 F. Supp. 3d 419, 457 (S.D.N.Y. 2015).

| | |
|---|---|
| | Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law . . .”). |
| **DC** | ***AGC* not applicable.** *See Los Gatos Mercantile, LIB, Flash Memory, supra,* n.14. *See also Holder v. Archer Daniels Midland Co.,* 1998 WL 1469620, at \*2, \*5 (D.C. Super. Nov. 4, 1998) (noting that “core of the standing issue” is controlled by intent behind state law and that “a broad application of the District of Columbia’s antitrust statute seems particularly important to effectuate the purpose of the statute”); *id.* at \*3 n.4 (“[s]ince the D.C. [Antitrust] Act was passed to distinguish D.C. antitrust law from federal law with respect to standing for indirect purchasers, there is no ‘comparable’ federal antitrust statute in this respect”). ***Defendants’ authorities are inapposite***: *Peterson v. Visa* (MTD at 27 n.17) did not involve indirect purchasers of price-fixed component products, but plaintiffs claiming derivative injuries arising out of others’ antitrust claims. *Holder,* in contrast, involved indirect purchasers of a price-fixed ingredient contained in consumer food products, is analogous to this case, and should be followed over *Peterson.* |
| **FL** | ***AGC* not applicable.** *See LIB, supra,* n.14; *Liquid Aluminum,* 2017 WL 3131977, at \*9, \*19-20 (refusing to apply *AGC* to states at issue, including Florida). Florida state courts have not addressed *AGC* applicability. Defendants acknowledge that no court has applied *AGC* under Florida law. MTD  App. A.

**Standing under FDUTPA? Yes.** *Mack v. Bristol-Myers Squibb Co.,* 673 So. 2d 100, 110 (Fla. 1st Dist. Ct. App. 1996) (confirming that FDUTPA permits indirect purchasers to sue for damages for price-fixing as an unfair method of competition and the FDUTPA claim “is not adverse to the purposes of the Antitrust Act”). ***Defendants’ authorities are inapposite*** (MTD at 35): *Dairy Farmers* is inapposite for the reasons stated above. *See* AR section, *supra.* |
| **HI** | ***AGC* not applicable.** Hawaii’s “harmonization statute” expressly carves out indirect purchaser actions. Haw. Rev. Stat. § 480-3 (“This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, *except that lawsuits by indirect purchasers may be brought as provided in this chapter.*”) (emphasis added); *see also Liquid Aluminum,* 2017 WL 3131977, at \*9, \*19-20 (refusing to apply *AGC* to states at issue, including Hawaii). ***Defendants’ authorities are inapposite*** (MTD at 27 n.16): Defendants’ cited cases counsel against applying *AGC* and/or are irrelevant. *See Davis v. Four Seasons Hotel Ltd.,* 228 P.3d 303, 324 n.33 (Haw. 2010) (declining to consider *AGC*’s applicability); *Cieri v. Leticia Query Realty,* 80 Haw. 54, 66 (1995) (suit concerned whether real estate purchasers had standing to sue as “consumers” under HRS chapter 480). |
| **IA** | ***AGC* not applicable.** *Broiler Chicken,* 290 F. Supp. 3d at 816, n.17 (refusing to apply *AGC* to Iowa, reasoning that “*Illinois Brick* repealers work to save the claims of true indirect purchasers,” *i.e.,* “plaintiffs down a distribution chain”); *Liquid Aluminum,* 2017 WL 3131977, at \*9, \*19-20 (refusing to apply *AGC* to states at issue, including Iowa). ***Defendants’ authorities are inapposite*** (MTD at 27 n.15): *Southard v. Visa* only cited *AGC* in determining whether “persons who were *not* indirect purchasers and who suffered injuries *even more remote than those sustained by indirect purchasers* had standing” under Iowa antitrust law due to Iowa’s “common-law remoteness doctrine.” 734 N.W.2d at 196-99 (emphasis added); *see also Broiler Chicken,* 290 F. Supp. 3d at 815-16 (distinguishing *Southard* on similar grounds). |
| **KS** | ***AGC* not applicable.** *See Los Gatos Mercantile, LIB, Flash Memory, supra,* n.14. Kansas Supreme Court has made clear that its state courts are not bound by federal decisions interpreting federal antitrust law. *Bergstrom v. Noah,* 974 P.2d 520, 531 (Kan. 1999) (“such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws”); *see also Four B Corp. v. Daicel Chem. Indus., Ltd.,* 253 F. Supp. 2d 1147, 1150-53 (D. Kan. 2003) (finding standing for indirect purchasers of price-fixed products). ***Defendants’ authorities are inapposite*** (MTD at 27 n.17): *Wrobel v. Avery* |

| | |
|---|---|
| | *Dennison Corp.* does not provide a sufficient basis to conclude that Kansas courts would apply the *AGC* factors. *See* 2006 WL 7130617, at *3-4 (Kan. Dist. Ct. Feb. 1, 2006) (unpublished trial court opinion finding that an indirect purchaser had alleged antitrust standing, and that if applied, the court would modify *AGC* factors to ensure indirect purchasers' claims). |
| **MD** | <u>**Private right to sue?**</u> **Yes.** *See* Md. Code Com. Law § 11-209(b)(2)(i) (permitting "an action for damages . . . regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation"). Defendants cite an irrelevant subsection of the statute.<br><br>***AGC* not applicable.** Maryland state courts have not addressed *AGC* applicability. Given repealer state status, court should not "*ipse dixit* style" bypass the state legislature and revise state antitrust laws. *GPUs I*, 527 F. Supp. 2d at 1026; *see also Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states). |
| **ME** | ***AGC* not applicable.** *See LIB, Flash Memory, supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (AGC not applicable to Maine). **Defendants' authorities are inapposite** (MTD at 27, n.17): In *Knowles v. Visa*, the trial court noted that Maine's highest court would *not* apply *AGC* factors where "those factors cannot be reconciled with the legislature's adoption of the *Illinois Brick* repealer." 2004 WL 2475284, at *5 (Me. Super. Oct. 20, 2004). Because EUPs are "plaintiffs down a distribution chain," application of *AGC* cannot be reconciled with Maine's repeal of *Illinois Brick*. *See Broiler Chicken*, 290 F. Supp. 3d at 816 n.15. |
| **MI** | ***AGC* not applicable.** *See Los Gatos Mercantile, LIB, Flash Memory, supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (refusing to apply *AGC* to states at issue, including Michigan). **Defendants' authorities are inapposite** (MTD at 27 n.17): In *McNulty v. Reddy Ice Holdings, Inc.*, the court did not analyze whether Michigan state law requires application of the *AGC* factors; instead, the court summarily dismissed plaintiff's state law antitrust claim based on its standing analysis of plaintiff's Sherman Act claim. 2009 WL 1508381, at *21 (E.D. Mich. May 29, 2009). |
| **MN** | ***AGC* not applicable.** *Lorix*, 736 N.W.2d at 632 (Minnesota Supreme Court expressly rejecting *AGC*). Defendants concede *Lorix* "declin[ed] to adopt *AGC* . . .." MTD at 28. |
| **MO** | <u>**Standing under MMPA?**</u> **Yes.** *See Packaged Seafood*, 242 F. Supp. 3d at 1079 (rejecting similar arguments raised by Defendants (MTD at 34), providing detailed analysis of the Missouri Merchandising Practices Act ("MMPA"), and joining the majority of courts in concluding that "*Illinois Brick* does not bar indirect-purchaser [price-fixing] claims under the MMPA.").<br><br>***AGC* not applicable.** *See LIB*, 2014 WL 4955377 at *4 nn.6 and 7, *11. Defendants concede no federal court has applied *AGC* to MMPA claims (MTD App. B), and their further representation of a harmonization provision (*id*. App. A) is wrong. *See LIB*, 2014 WL 4955377, at *19 (the "MMPA lacks a federal harmonization clause") (quotations omitted). |
| **MS** | ***AGC* not applicable.** *See Los Gatos Mercantile, LIB, Flash Memory, GPUs II, supra*, n.14. Mississippi state courts have not addressed *AGC* applicability. **Defendants' authorities are inapposite** (MTD at 27 n. 16): *Owens Corning v. R.J. Reynolds Tobacco Co.* involved claimed derivative injuries, not indirect purchases of price-fixed components, and the court's discussion of "antitrust injury" makes no reference to *AGC*. 868 So. 2d 331, 336-37, 344 (Miss. 2004) (rejecting asbestos maker's contribution claims against tobacco industry for claimed overpayments for respiratory injuries allegedly caused by smoking).<br><br><u>**Intrastate limitation?**</u> **No.** *See California v. Infineon Technologies AG*, 531 F. Supp. 2d 1124, 1158-59 (N.D. Cal. 2007) (rejecting the argument that the Mississippi Antitrust Act is limited to intrastate conspiracies); *Hood ex rel. State v. BASF Corp.*, 2006 WL |

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

308378, at *5 (Miss. Ch. Ct. Jan. 17, 2006) (explaining that Mississippi Antitrust Act reaches "all monopolies that exist in both interstate and intrastate commerce."). EUPs allege in-state purchases of products containing the price-fixed component in Mississippi and that Defendants' illegal conduct substantially affected Mississippi commerce. SAC ¶¶ 53-54, 306(b)-(c). Defendants' price-fixed products—as part of the HDD products—were transported to their final destination and purchased by EUPs and class members; they entered the state's commerce and caused injury. ***Defendants' authorities are inapposite*** (MTD at 29): *GPUs II*, 540 F. Supp. 2d at 1099 (finding allegations that defendants' conspiracy affected commerce within the state sufficient).

| NC | **Standing under NCUDTPA? Yes.** *See Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 165 (4th Cir. 1985) (stating that the NCUDPTA "grew out of antitrust laws in an effort to protect the consuming public from anticompetitive business practices"). *Dairy Farmers* is inapposite. *See* Arkansas section, *supra*.

***AGC* not applicable.** *See Teague v. Bayer AG,* 671 S.E.2d 550, 555-58 (N.C. Ct. App. 2009) (*AGC* inapplicable to North Carolina antitrust and consumer protection claims in a price-fixing component case); *see also Los Gatos Mercantile*, *LIB*, *supra*, n.14 (*AGC* inapplicable to North Carolina antitrust claims); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). ***Defendants' authorities are inapposite*** (MTD at 27 n. 17 and 36): *Crouch v. Crompton Corp.* is a trial court decision and acknowledged antitrust injury would exist "[w]here a component, *such as a computer chip*, is price fixed, and its costs passed through directly to purchasers of the product in which it is incorporated." 2004 WL 2414027, at *23 (N.C. Super Ct., Oct. 28, 2004) (emphasis added).

**Intrastate limitation? No.** Defendants' cited cases merely establish that the touchstone of the North Carolina Unfair Trade Practices Act is the protection of in-state businesses and consumers. *See ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 49 n.11 (4th Cir. 1983) ("[I]njuries sustained by ITCO, a North Carolina corporation with its principal place of business in North Carolina, were sustained in the state of North Carolina."); *Merck & Co., Inc. v. Lyon,* 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (dismissing claim where *foreign* plaintiffs failed to allege in-state injury); *The 'In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F. Supp. 494, 501 (M.D.N.C. 1987) (same). Here, in-state Plaintiffs allege that they purchased products containing a price-fixed component in North Carolina. *See* SAC ¶¶ 57, 312(b)-(c). |

| ND | ***AGC* not applicable.** *See LIB*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (refusing to apply *AGC* to states at issue, including North Dakota); *see also Howe v. Microsoft Corp.,* 656 N.W.2d 285 (N.D. 2003) (upholding certification of indirect-purchaser class of computer purchasers in a Microsoft case). ***Defendants' authorities are inapposite*** (MTD at 27 n.17): The court in *Beckler v. Visa U.S.A., Inc.* cited *AGC*, but did not discuss any of its factors, and like other *Visa* cases, distinguished between indirect purchasers and the *Visa* plaintiffs, who "are not indirect purchasers" within the scope of North Dakota Antitrust Act. 2004 WL 2115144, at *3 (N.D. Dist. Ct. Aug. 23, 2004). |

| NE | ***AGC* not applicable.** *See Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* inapplicable to Nebraska antitrust claims); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (*AGC* not applicable to Nebraska antitrust and consumer protection claims).

**Standing under Neb. CPA? Yes.** *Arthur v. Microsoft Corp.,* 676 N.W.2d 29, 38 (Neb. 2004) ("[t]o deny the indirect purchaser, who in this case is the ultimate purchaser, the right to seek relief from unlawful conduct would essentially remove the word 'consumer' from the Consumer Protection Act"). ***Defendants' authorities are inapposite*** (MTD at 36): *Kanne v. Visa* case is inapposite for the same reasons stated above. *See* Arizona, D.C., Iowa sections, *supra*. *DRAM II* was decided after the parties received full benefit of discovery and a majority of courts have declined to follow *DRAM* |

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| | | *II*'s wholesale application of *AGC* to state law. *See LIB*, 2014 WL 4955377, at *13. |
| | **NM** | **AGC not applicable.** *See Flash Memory*, *GPUs II*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (refusing to apply *AGC* to states at issue in New Mexico). **Defendants' authorities are inapposite** (MTD at 27): *Nass-Romero v. Visa* is inapposite for the same reason stated above. *See* Arizona, D.C., Iowa sections, *supra*. |
| | **NV** | **AGC not applicable.** *See Flash Memory*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (*AGC* not applicable under Nevada law); *see also Pooler v. R.J. Reynolds Tobacco Co.*, 2001 WL 403167, at *1 (Nev. Dist. Ct. Apr. 4, 2001) (holding that the state's repealer statute was enacted to reverse a decision that relied on Nevada's harmonization provision to deny standing to indirect purchasers under *Illinois Brick*). **Defendants' authorities are inapposite** (MTD at 26-27 n.15): *Nev. Recycling and Salvage, Ltd. v. Reno Disposal Co.*, 423 P.3d 605 (Nev. 2018) is a summary judgment decision which does not involve indirect purchasers of price-fixed component products. *See supra*, §IV.A. |
| | **NY** | **AGC not applicable.** *See LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (*AGC* inapplicable to New York antitrust and consumer protection claims); *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states at issue, including New York); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). |
| | | **Standing under GBL §349?** Yes. *Cox v. Microsoft Corp.*, 2005 WL 3288130, at *5 (N.Y. Sup. Ct. July 29, 2005) (holding that computer purchaser plaintiffs had adequately alleged injury because Microsoft's "inflated [software] prices [were] passed [on] to consumers."). **Defendants' authorities are inapposite** (MTD at 27, 36): *Ho v. Visa* is inapposite for the same reason stated above (*see* Arizona, D.C., Iowa sections, *supra*), and because the court did not engage in a thorough analysis of whether New York law requires application of the *AGC* factors. 16 A.D.3d 256 (N.Y. App. Div. 2005). *State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 2005 WL 6056054 (N.Y. Sup. Ct. Aug. 9, 2005) (unpublished) also involved derivative or incidental harms. *Id.* (holding that alleged chemical preservatives price-fixing conspiracy "only had an ancillary effect" on consumers of food products). Neither case involved indirect purchases of a price-fixed component. *DRAM II* is also not persuasive for the reasons stated above. *See* Nebraska. |
| | **OR** | **AGC not applicable.** *See Los Gatos Mercantile*, *LIB*, *supra*, n. 14; *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states at issue, including Oregon); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). Moreover, Or. Rev. Stat. § 646.715 (2) is merely permissive and only looks to federal antitrust statutes for guidance. **Defendants' authorities are inapposite** (MTD at 26, 28 n.18): *Patterson Dental Co. v. McGaughey* did not analyze whether Oregon law requires application of *AGC*. 1985 WL 25732 (D. Or. Dec. 9, 1985). Neither did the court in *Oregon-Laborers*. *See supra*, n.17. |
| | **RI** | **Private right to sue?** Yes. R.I. Gen. Laws § 6-36-12(g) expressly permits private suits by indirect purchasers: "No provision of this chapter shall be construed to limit the standing of any person or public body, whether the person or public body is a direct or indirect purchaser, from bringing suit on his or her own behalf." *See id.* § 6-36-11(a). |
| | | **AGC not applicable.** *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (refusing to apply *AGC* to states at issue, including Rhode Island); *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* should not apply to any repealer states). Rhode Island courts have not addressed *AGC* applicability. |
| | **SC** | **AGC not applicable.** *LIB*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (*AGC* not applicable under South Carolina law). No court has held *AGC* applies under South Carolina law. **Defendants' authority is inapposite** (MTD App. C): *S.C. Cotton Growers' Co-op. Ass'n v. English*, 133 S.E. 542, 542-43, 544 (S.C. 1926) did not address harmonization; rather, it separately addressed state and federal antitrust laws. |

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

| | |
|---|---|
| **SD** | ***AGC* not applicable.** *Flash Memory*, *supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20; *see also In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d 668 (S.D. 2003) (upholding certification of indirect-purchaser class of computer purchasers in a Microsoft case). ***Defendants' authorities are inapposite*** (MTD at 26 n.17): *Cornelison v. Visa* is inapposite for the same reasons stated above. *See* Arizona, D.C., Iowa sections, *supra*. |
| **TN** | ***AGC* not applicable.** *See D.R. Ward,* 470 F. Supp. 2d at 499 (recognizing that indirect purchasers are "real victims" of antitrust conduct, the court "predicts that the Supreme Court of Tennessee . . . would apply traditional standing requirements rather than the *AGC* analysis to determine whether the injuries suffered by an indirect purchaser are too remote to confer standing under the TTPA"); *see also Los Gatos Mercantile*, *LIB*, *GPUs* II, *supra*, n.14. Tennessee has no harmonization statute. ***Defendants' authorities are inapposite*** (MTD at 28): *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.* did not discuss *AGC*, did not address antitrust claims that had been dismissed below, and involved derivative cost-recovery claims against tobacco companies for medical expenses that union health and welfare funds paid for members who had smoking-related diseases. *See* 2000 WL 1390171, at *5, *7 (Tenn. Ct. App. Sept. 26, 2000). |
| | **Intrastate limitation?** No. In *Freeman Indus. LLC v. Eastman Chem. Co.*, the court concluded that the *effect* of anticompetitive conduct on Tennessee commerce, not the anticompetitive conduct itself, is determinative. 172 S.W.3d 512, 524 (Tenn. 2005). Here EUPs allege purchases of products containing a price-fixed component in Tennessee and that Defendants' illegal conduct substantially affected Tennessee commerce. *See* SAC ¶¶ 74-75, 317(b)-(c). |
| **UT** | ***AGC* not applicable.** *LIB*, *supra*, n.14; *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states at issue, including Utah); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same); *see also* Utah Code Ann. § 76-10-3109(7)-(8) (West) (Utah Antitrust law includes rebuttable presumption "that each level in a product's . . . distribution chain passed on . . . all increments in its cost due to an increase in the cost of . . . a component," and that indirect purchasers "incurred . . and shall . . . recover at least ⅓ of the awarded damages"). ***Defendants' authorities are inapposite*** (MTD at 28 n.18): In *Lantec, Inc. v. Novell, Inc.*, on a FRCP 50(a) motion, the court cited *AGC* in its discussion of plaintiffs' antitrust standing under the Sherman Act and did not consider whether *AGC* would apply to state-law antitrust claim. 146 F. Supp. 4 1140, 1152-54 (D. Utah 2001). *Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992), similarly, did not address *AGC* or its applicability under Utah's antitrust law. |
| **VA** | **Standing under VCPA? Yes.** *See Packaged Seafood*, 242 F. Supp. 3d at 1118 (denying defendants' motion to dismiss indirect purchasers' price-fixing claim under Virginia Consumer Protection Act). |
| | ***AGC* not applicable.** No state or federal courts have addressed *AGC* applicability. |
| **VT** | ***AGC* not applicable.** *LIB*, supra, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (refusing to apply *AGC* to Vermont antitrust and consumer protection laws); *see also D.R. Ward,* 470 F. Supp. 2d 485 at 501 (casting doubt that the Vermont Supreme Court would adopt *AGC* factors to determine standing under the VCPA); *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002) (rejecting the argument "that the definition of who may sue under the [VCPA] must be consistent with the definition of who may sue under federal antitrust law"). ***Defendants' authorities are inapposite*** (MTD at 27 n.17, 36): *Fucile v. Visa* is inapposite for the same reasons stated above. *See* Arizona, D.C., Iowa sections, *supra*. |
| **WI** | ***AGC* not applicable.** *See Los Gatos Mercantile*, *LIB*, *Flash Memory*, *supra*, n.14; *Szukalski v. Crompton Corp.*, 726 N.W.2d 304, 307 n.6 (Wis. Ct. App. 2006), *abrogated on other grounds, Meyers v. Bayer AG, Bayer Corp.*, 735 N.W.2d 448 (Wis. 2007) |

29

| | |
|---|---|
| | (holding that indirect purchasers in a tire-chemical case have standing based on the Wisconsin legislature's direction that its antitrust statute "be interpreted in a manner which gives the most liberal construction to achieve the aim of competition," and the Wisconsin's Supreme Court's direction "not to construe the standing requirement narrowly."). ***Defendants' authorities are inapposite*** (MTD at 27 n.17): *Strang v. Visa* is inapposite for the same reasons stated above. *See* Arizona, D.C., Iowa sections, *supra*. |
| | **Intrastate limitation?** **No.** *Szukalski*, 726 N.W.2d at 308 ("After a thorough analysis of the legislative history, . . . the court in *Olstad* expressly withdrew the language from *Conley* that read that 'the scope of [Wisconsin's antitrust statute] is limited to intrastate transactions.'"). EUPs allege purchases of products containing a price-fixed component in Wisconsin and that Defendants' illegal conduct substantially affected Wisconsin commerce. *See* SAC ¶¶ 83-84, 321(b)-(c). |
| WV | ***AGC* not applicable.** *See LIB, Flash Memory, GPUs II, supra*, n.14; *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (*AGC* not applicable under West Virginia law); *see also* W. Va. Code St. R. § 142-9-1.6 (requiring that the repealer statute "be liberally construed to effectuate the beneficial purposes of the West Virginia Antitrust Act"). Defendants assert that a high court of West Virginia decision supports application of *AGC*, but cite no case for that proposition. *See* MTD at 27 n.16. |

## VII.    CONCLUSION

For the foregoing reasons, EUPs respectfully request that the Court deny Defendants' motion in its entirety.

Dated: March 15, 2021                                    Respectfully submitted,

/s/ Christopher T. Micheletti                            /s/ Aaron M. Sheanin
Christopher T. Micheletti                                Aaron M. Sheanin
Qianwei Fu                                               **ROBINS KAPLAN LLP**
**ZELLE LLP**                                            2006 Kala Bagai Way, Suite 22
555 12th Street, Suite 1230                              Berkeley, CA 9404
Oakland, CA 94607                                        Telephone:   (650) 784-4040
Telephone:   (415) 693-0700                              Facsimile:    (650) 784-4041
Facsimile:    (415) 693-0770                             asheanin@robinskaplan.com
cmicheletti@zelle.com
qfu@zelle.com                                            Kellie Lerner
                                                         Adam C. Mendel
James R. Martin                                          **ROBINS KAPLAN LLP**
**ZELLE LLP**                                            399 Park Avenue, Suite 3600
1775 Pennsylvania Avenue, NW,                            New York, NY 10022
Suite 375                                                Telephone:   (212) 980-7400
Washington, D.C. 20006                                   Facsimile:    (212) 980-7499
Telephone:  (202) 899-4100                               klerner@robinskaplan.com
Facsimile:   (612) 336-9100                              amendel@robinskaplan.com
jmartin@zelle.com

***Interim Co-Lead Class Counsel for the End-User Plaintiffs***

1

## <u>**ATTORNEY ATTESTATION**</u>

2     I, Christopher T. Micheletti, hereby attest, pursuant to Civil Local Rule 5-1(i)(3) of the

3 Northern District of California, that the concurrence to the filing of this document has been

4 obtained from each signatory hereto.

5                                         */s/ Christopher T. Micheletti*
                                         Christopher T. Micheletti
6
                                    *Interim Co-Lead Class Counsel for the End-User*
7                                    *Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

END-USER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT