Victoria Sims
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone:  (202) 789-3960
Facsimile:   (202) 789-1813
vicky@cuneolaw.com

Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
Telephone:  (651) 312-6518
Facsimile:   (651) 789-4818
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for the*
*Reseller Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 3:19-md-02918-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO | **RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT** |
| RESELLER ACTIONS | |
| | Judge:      Hon. Maxine M. Chesney |
| | Date:       May 7, 2021 |
| | Time:       9:00 a.m. |
| | Courtroom: 7, 19th Floor |

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

# TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ................................................................ vi

I.      INTRODUCTION AND FACTUAL BACKGROUND ...........................................1

II.     PLAINTIFFS HAVE ARTICLE III STANDING ...............................................3

        A.      Plaintiffs' Injuries Are Fairly Traceable to Defendants' Actions. ...........3

        B.      Defendants Improperly Conflate Standing with Class Certification. ....................9

III.    PLAINTIFFS ADEQUATELY ALLEGED ANTITRUST STANDING ..........................9

        A.      *AGC* Should Not Be Applied to IPPs' State Law Claims......................................12

        B.      Application of the *AGC* Factors Supports Antitrust Injury. ...............................17

IV.     PLAINTIFFS PROPERLY PLEAD THEIR ANTITRUST LAW CLAIMS...................23

        A.      Resellers Have Adequately Pleaded a Claim Under North Carolina's Antitrust Law ...................................................................................23

V.      PLAINTIFFS PROPERLY PLEAD CONSUMER PROTECTION STATE LAW CLAIMS ...................................................................................24

        A.      Resellers Properly Allege Intrastate Effects on North Carolina Commerce..........24

        B.      Reliance Is Not Required Under California's Consumer Protection Law .............24

        C.      Resellers Have Standing for California, New York, and North Carolina Consumer Claims. ...................................................................................25

VI.     PLAINTIFFS PROPERLY PLEAD UNJUST ENRICHMENT .......................................26

        A.      Resellers Have Pleaded Cognizable Claims for Unjust Enrichment. ...................26

        B.      Neither Privity of Contract Nor Direct Benefit Is Required. ...............................28

VII.    CONCLUSION ...................................................................................30

APPENDIX A. ...................................................................................30

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999) ............................................ 17

*Anderson v. Hain Celestial Grp., Inc.*, 87 F. Supp. 3d 1226 (N.D. Cal. 2015) ............................ 10

*Ang v. Bimbo Bakeries USA, Inc.,* 2014 U.S. Dist. LEXIS 34443 (N.D. Cal.
    March 13, 2014) ................................................................................................................ 10

*Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185 (2013) ................................................ 15, 30

*Associated General Contractors of California, Inc. v. California State Council of
    Carpenters,* 459 U.S. 519 (1983) ................................................................................... 12, 13

*Astiana v. Dreyer's Grand Ice Cream Inc.*, 2012 U.S. Dist. LEXIS 101371 (N.D.
    Cal. July 20, 2012) ............................................................................................................ 10

*Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015) ...................................... 27

*California v. Arc America Corp.*, 490 U.S. 93 (1989) ............................................................... 13

*Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122 (W.D. Wash. 2010) ............................................. 10

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ................... 26

*Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 571 (N.D. Cal. 2013) ........................................ 10

*Collins v. City of Flint*, 2019 Mich. App. LEXIS 4913 (Ct. App. Aug. 22, 2019)
    (Michigan Supreme Court) ............................................................................................... 27

*Cox v. Microsoft Corp.*, 2005 WL 3288130 (N.Y. Sup. Ct. July 29, 2005) .......................... 16, 30

*Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. Ct., Oct. 28, 2004) ................... 17

*D.R. Ward Construction Co .v. Rohm & Haas Co. ,* 470 F. Supp. 2d 485 (E.D. Pa.
    2006) ............................................................................................................................. 21, 22

*Dairy Farmers' of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488 (N.D. Ill.
    June 29, 2015) ................................................................................................................ 26, 27

*Fisher v. Monster Beverage Corp.*, 656 Fed. App'x 819 (9th Cir. 2016) .................................. 25

*Ho v. Visa USA, Inc.,* 16 A.D.3d 256 (N.Y. App. Div. 2005) ................................................... 16

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ................................................................... 12

*In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) ................... 18

*In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y.
    2015) ............................................................................................................................. 18, 28

*In re Auto. Parts Antitrust Litig. (Fuel Senders)*, 2014 WL 1746121, (E.D. Mich.
    Apr. 30, 2014) ............................................................................................................. passim

*In re Automotive Parts Antitrust Litig. (Bearings)*, 50 F. Supp. 3d 836 (E.D. Mich. 2014) ................................................................................................ 19, 22

*In re Automotive Parts Antitrust Litig. (Ceramic Substrates)*, 2017 WL 7689654 (E.D. Mich. May 5, 2017) ........................................................................... 19

*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ............ 14, 15, 16, 30

*In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................ 13, 14, 15, 30

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000). ............................ 28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................................................................ 17, 18, 22

*In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015) ................................................... 15, 30

*In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................................ 19, 22

*In re Dynamic Random Access Memory (DRAM II) Antitrust Litigation,* 536 F. Supp. 2d 1129 (N.D. Cal. 2008) ............................................................ 16, 19, 26

*In re Dynamic Random Access Memory Indirect Purchaser Litig (DRAM III)*, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ............................................. 6

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..................... passim

*In re Glumetza Antitrust Litig.* __ F. Supp. 3d. __, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) .................................................................................. 25

*In re GM LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 882 (N.D. Cal. 2019) .................... 28

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................................................ 13, 25

*In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ................................................................................................ 14, 22, 30

*In re Graphics Processing Units Antitrust Litigation*. 253 F.R.D. 478 (N.D. Cal. 2008) ................................................................................................ 6

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2020 WL 6270948, (N.D. Cal. Oct. 23, 2020) ............................................................................. 3

*In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F.Supp. 2d 404 (D. Del. 2007) ................................................................................................ 22

*In re Lidoderm Antitrust Litig.*, 103 F.Supp.3d 1155 (N.D. Cal. 2015) ......................... 24

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, (N.D. Cal. Oct. 2, 2014) ................................................................................................ 2

*In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. 2019) ......................... 28

*In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ................... 9

*In re Nexium Antitrust Litig.*, 297 F.R.D. 168 (D. Mass. 2013) ........................................... 8

*In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ................................................................................................. 13, 20

*In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ..................................................................................................... 7

*In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp. 3d 1033, 1083 (S.D. Cal. 2017) ............................................................................................. 24

*In re Processed Egg Products,* 851 F. Supp. 2d 867 (E. D. Pa. 2012) ......................................... 29

*In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 2020 U.S. Dist. LEXIS 242300  (N.D. Cal. Dec. 24, 2020) ................................................. 27

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) ....................................................................................... 7, 19, 29

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665 (E.D. Pa. 2014) ..................................................................... 29

*In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001) ......................................................................................................... 27

*ITCO Corp. v. Michelin Tire Corp.,*722 F.2d 42 (4th Cir. 1983) ................................................. 23

*Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019)........................... 5, 21

*Kelley v. Crosfield Catalysts*, 135 F.3d 1202 (7th Cir. 1998)........................................... 6

*Knevelbaard Dairies v. Kraft Foods, Inc.* 232 F.3d 979 (9th Cir. 2000). .................................. 15

*Koh v. S.C. Johnson & Son, Inc.*, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010) ............................. 10

*Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir. 1985)........................................ 26

*Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977 (D.N.J. July 20, 2017) ................................................................................................. 14, 15, 16, 30

*Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).................................................... passim

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015)................................................................................ passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) .......................................................... 3

*Mednick v. Precor Inc.*, 2014 U.S. Dist. Lexis 159687 (N.D. Ill. Nov. 13, 2014) ................... 11

*Merck & Co., Inc. v. Lyon*, 941 F. Supp. 1443 (M.D.N.C. 1996)............................................ 24

*Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161 (9th Cir. 2016)............................................ 28

*NDC Equities Downtown PS, LLC v. City of Palm Springs*, 2020 WL 6145103
(C.D. Cal. Oct. 12, 2020) ............................................................................... 6

*New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160 (D.
Me. 2004) ..................................................................................................... 28

*Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 617 S.E.2d 664 (N.C.
App. 2005) ................................................................................................... 24

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ........................................... 27, 28, 29

*Siegel v. AU Optronics Corp.*, 2011 U.S. Dist. LEXIS 105151 (N.D. Cal. Sep. 15,
2011) ............................................................................................................ 27

*Sperry v. Crompton Corp.*, 863 N.E.2d 1012 (N.Y. 2007) ........................................... 29

*Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *4 (Cir. Ct. Mich. July 23, 2004) .................... 15

*State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 2005 WL 6056054 (N.Y. Sup.
Ct. Aug. 9, 2005) ......................................................................................... 16

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735 (7th Cir.
2018) ............................................................................................................ 18

*Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009) .............................. 16, 30

*TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................. passim

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C.
1987) ............................................................................................................ 23

*Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589 (Cal. Ct. App. 2009) ........................ 26

*Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337(Cal. Ct. App. 1995) ........................ 15

*W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165 (3d
Cir. 2013) ...................................................................................................... 6

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398 (E.D.N.Y. 2010) ........................ 29

**Other Authorities**

*Exiting the Fun House of Mirrors: Clayworth v. Pfizer and the Handling of Pass-
on in Post-Trial Allocation Proceedings in Federal and State Court*, 20
COMPETITION: J. ANTI. & UNFAIR COMP. L. SEC. ST. B. CAL. 28 (Spring 2011) .................... 8

**Statutes**

N.C. Gen. Stat. § 75.1-1(a) ............................................................................. 23

New York Gen. Bus. Law § 349 ....................................................................... 26

## STATEMENT OF ISSUES TO BE DECIDED

1.  Do Reseller Plaintiffs have Article III standing as indirect purchasers of Hard Disk Drive Suspension Assemblies subject to Defendants' overcharges, when economic theory holds that if a cartel is comprised of manufacturers, "other buyers farther down the distribution channel are also harmed," because "at least some of the overcharge will be passed on by the direct purchaser to the indirect purchaser(s) in the form of a higher price for the good" a study looking at pass-through from direct to indirect purchasers in numerous cases shows that "positive pass-through rates are found in all cases for all industries" and Resellers allege that pass-through depends on the competitiveness of the industry in which the firms up the chain of distribution operate and the HDD and finished product manufacturing industries are highly competitive?

2.  Do Defendants have any valid basis for dismissal of Reseller Plaintiffs' claims for certain products containing hard drives that Reseller Plaintiffs did not purchase when they cite no caselaw in support of their position and, when in this district, plaintiffs have standing to assert claims on behalf of all class members who purchased the price-fixed input, regardless of the finished product in which it was purchased in?

3.  Do Reseller Plaintiffs have antitrust standing, when *AGC* does not apply to state law claims and,  even if *AGC* were applicable, Plaintiffs' allegations satisfy the *AGC* factors at the pleading stage when they allege that the price-fixed HDD suspension assemblies are discrete products following a traceable path through the distribution chain, overcharges for the suspension assemblies were passed through the distribution chain from Defendants to Reseller Plaintiffs, and such overcharges are quantifiable through well-accepted economic methods?

4.  Do Reseller Plaintiffs sufficiently allege intrastate effects on the commerce of North Carolina, and meet the pleading requirements under that state's antitrust and consumer protection statutes, when Plaintiff IT Worx is domiciled and made its purchases of products containing HDD

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THEIR SECOND
CONSOLIDATED AMENDED COMPLAINT

Suspension Assemblies in North Carolina and Plaintiffs allege that Defendants' conspiracy and inflated prices affected North Carolina commerce?

5.  Do Reseller Plaintiffs sufficiently plead their California consumer protection claim, when pleading reliance upon misrepresentations is not required by that statute?

6.  Reseller Do Plaintiffs have standing under the California, New York and North Carolina consumer statutes when such statutes impose no heightened standing requirements?

7.  Do Reseller Plaintiffs sufficiently plead independent or alternative unjust enrichment claims when such claims have been accepted in numerous other cases, and when there have been no requirements of privity or direct benefit imposed by other courts for the maintenance of such claims?

1

## I.      INTRODUCTION AND FACTUAL BACKGROUND

2        On July 29, 2019, NHK Spring Co. Ltd. admitted, in a criminal Information, that it

3   (collectively with its subsidiaries "NHK") participated in a conspiracy with TDK Corporation

4   (collectively with its subsidiaries "TDK") (collectively "Defendants") to "refrain from

5   competing on prices for, fix prices on and allocate their respective market shares for, HDD

6   Suspension Assemblies . . . ."  a product whose "impact on American consumers and business is

7   direct and substantial," according to Assistant Attorney General Makan Delrahim.  *See* NHK

8   Criminal Information, at ¶7; July 29, 2019 DOJ Press Release.[1] NHK pleaded guilty, after TDK

9   advised the U.S. Justice Department in its leniency application that NHK was its co-conspirator.

10  *See* SAC ¶ 63. Defendants knew their conduct was illegal but continued it for over a decade and

11  even acted to conceal their collusion.

12       At the time of their conspiracy, Defendants collectively controlled approximately 97% of

13  the global HDD suspension parts market, meaning the effects of their conduct were market-wide.

14  SAC ¶ 43(d). Defendants sold their price-fixed Hard Disk Drive Suspension Assemblies ("HDD

15  SAs") to Hard Disk Drive ("HDD") manufacturers, like Seagate. SAC ¶ 51. HDD manufacturers

16  sell hard drives to distributors, like Ingram Micro and Amazon, and computer manufacturers,

17  like Dell, who sell them to Reseller Plaintiffs. SAC ¶¶ 52, 54.

18       As explained by economics Professor John Connor, "[d]irect purchasers from an effective

19  sellers' cartel are the immediate losers. However, if the cartel is comprised of manufacturers (the

20  most common story), then other buyers farther down the distribution channel are also harmed."

21  SAC ¶ 100 (quoting Connor, J. (2014), "Cartel Overcharges," Research in Law and Economics,

22  Vol. 26, Emerald Group Publishing Limited, p. 256). As stated by an American Bar Association

23  publication on antitrust damages, "at least some of the overcharge will be passed on by the direct

24  purchaser to the indirect purchaser(s) in the form of a higher price for the good." *Id.* ¶ 101. As

25  found in a recent study looking at pass-through from direct to indirect purchasers "[p]ositive

26

27  _____

[1] https://www.justice.gov/atr/case-document/file/1256991/download

28

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

1    pass-through rates are found in all cases for all industries." *Id*. ¶ 102.

2        Neither NHK nor TDK deny that they engaged in the criminal conspiracy or that their

3    conduct inflated the prices of HDD SAs, "one of the highest cost components of an HDD." SAC

4    ¶ 44; Seagate Plaintiffs' Amended Complaint at ¶ 54 (Oct. 2, 2020) (ECF No. 271). Instead, they

5    say they should walk away without having to compensate the American businesses who purchased

6    hard drives containing their price-fixed products, because such victims have to trace their

7    overpayments through the chain of distribution—as many other indirect purchasers have done in

8    this and other districts in numerous other cases involving more levels of distribution than are at

9    issue here. *See e.g. In re Auto. Parts Antitrust Litig. (Fuel Senders)*, No. 12-MD-02311, 2014 WL

10   1746121, at *1 (E.D. Mich. Apr. 30, 2014); *In re Automotive Parts Antitrust Litig. (Fuel Senders)*,

11   29 F. Supp. 3d 982, 992-93 (E.D.Mich. 2014) (fuel senders were sold by defendants to

12   manufacturers of larger components, like fuel tanks, which were then sold to automakers, to

13   dealerships, and ultimately to consumers,); *see also In re Lithium Ion Batteries Antitrust Litig.*,

14   No. 13-MD-2420 YGR, 2014 WL 4955377, at *14 (N.D. Cal. Oct. 2, 2014) ("*LIB*") (upholding

15   indirect purchasers' complaint where the alleged distribution chain had five levels from defendants

16   to consumers) *compare with* Defendants Memo ISO MTD, at 7 asserting that the chain of

17   distribution here involves "least four different companies."

18       Defendants seem to believe that Reseller Plaintiffs, who have purchased tens of millions

19   of dollars of products containing Defendants' price-fixed HDD SAs, are not entitled to

20   compensation. The state antitrust laws (as well as accepted economic principles) see things

21   differently. Each Reseller Plaintiff and the class members it seeks to represent have been granted

22   the right, by their state legislatures, to recover for Defendants' decade-long *per se* illegal collusion.

23   Defendants' mental gymnastics and misconstructions of Plaintiffs' allegations cannot change that.

24       The Seagate complaint has now been twice upheld and discovery is proceeding apace, with

25   depositions underway. Class Plaintiffs should also be given a chance to seek compensation for

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

their damages, as contemplated by the Justice Department in accepting NHK's guilty plea.[2]

## II.    PLAINTIFFS HAVE ARTICLE III STANDING

Reseller Plaintiffs' amended pleadings, setting forth the products they purchased and the vendors from whom they purchased them, and describing all of the factual and economic reasons why the overcharges wrought by Defendants' criminal conspiracy were passed down to them demonstrate (1) an "injury in fact" (2) a "causal connection" between the overcharges Plaintiffs paid and Defendants' collusion; and that (3) a favorable decision would likely redress Plaintiffs' injury by requiring Defendants to compensate them for the overcharges they paid. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 75 n.20 (1978) (Article III standing "require[s] no more than a showing that there is a substantial likelihood" of causation.).

### A.    Plaintiffs' Injuries Are Traceable to Defendants' Actions.

In its opinion granting Defendants' Motion to Dismiss the Class Plaintiffs' complaints, this Court stated that 1) Plaintiffs did not "allege the type(s) of product(s) any named plaintiff purchased and from whom in the chain of distribution any named plaintiff made such purchase" and 2) the complaints did not contain "facts setting forth directly, or from which a reasonable inference can be drawn, that each participant in the chain necessarily passed on the asserted overcharge to the next participant." *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.* ("*HDD SAs*"), No. 19-MD-02918-MMC, 2020 WL 6270948, at *3 (N.D. Cal. Oct. 23, 2020). The Court granted "leave to amend to cure the deficiencies identified above." *Id.*

Resellers have, in response to the Court's order, amended their complaints to include "the type(s) of product(s)" the named Plaintiffs purchased and the vendors from whom they made those purchases. *See* SAC ¶ 23 (Now Micro purchased desktop computers, laptop computers, storage servers and hard drives from Ingram Micro, D&H, Synnex, MA Labs, ASI, SED International, Amazon, Tech Data, HP, Lenovo and Dell); SAC ¶ 24 (Voyager Technology Solutions purchased

---

[2] *See* NHK Guilty Plea ¶ 9(c) (stating that the recommended sentence does not include a civil penalty "in light of the availability of civil causes of action, which potentially provide for a recovery of a multiple of actual damages[.]").

desktop computers, laptop computers, storage servers and hard drives from Amazon, Best Buy and Newegg); SAC ¶ 25 (IT Worx purchased desktop computers, laptop computers, storage servers and hard drives from Computer Warehouse of North Carolina, Other World Computing, Tech Data, Ingram Micro, Intrex Computers, Newegg and D&H): SAC ¶ 26 (Willow Bay purchased desktop computers, laptop computers, storage servers and hard drives from Ingram Micro, Newegg, Amazon and Dell); ¶ 27 (Michael Medeiros purchased hard drives and a computer from MA Labs, Amazon and Newegg).[3]

Resellers also alleged that "HDD suspension assemblies are a critical component of HDDs" and that "suspension assemblies are one of the highest cost components of an HDD," a statement with which hard drive manufacturer Seagate agrees as well. SAC ¶ 44. Reseller Plaintiffs also allege that "Suspension assemblies comprise approximately 5-10% or more—up to 15% in some instances—of the cost of an HDD" and that there may be "as many as twelve HDD SAs" in an HDD. *Id.*

Resellers also include allegations demonstrating that the markets for HDD SAs, on the one hand, and HDDs and computers, on the other hand, are inextricably intertwined, stating that:

- "[t]he markets for HDDs and HDD suspension assemblies are inextricably linked and intertwined because the market for HDD suspension assemblies exists to serve the HDD market. Without the HDDs, the HDD suspension assemblies have little to no value because they have no independent utility." SAC ¶ 115

- "[C]omputer prices increase as the amount of available storage increases." *Id.* at ¶ 116.

Reseller Plaintiffs' SAC also illustrates that the overcharge would have been passed on to

---

[3] Defendants fault Reseller Plaintiffs, who have purchased tens of thousands of these products, for not identifying every model of every one of the listed products purchased during the 17-year conspiracy period. That is what the transactional data production is for. Defendants can query Resellers' transactional data if they wish to see the specifics of each product purchased. Defendants have had samples of Resellers' data since October. Defendants also state that Resellers have not specified the types of hard drives they purchased. This is not necessary, because they need to have purchased only one product from those set forth in the class definition. In any event, they purchased both.

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

them, given the competitiveness of the HDD and PC industries:

- "[b]asic economic theory indicates that the percentage of a given cost increase passed through by a firm to its customers in the form of higher prices depends on the competitiveness of the industry in which the firm operates." SAC ¶ 105 (citing Ritz, R. (2017), "Oligopolistic Competition and Welfare," *Handbook of Game Theory and Industrial Organization*, L. Corchon and M. Marini (eds.), Edward Elgar; *see also* Reny, P., Wilkie, S., and Williams, M. (2012), "Tax Incidence Under Imperfect Competition: Comment," *International Journal of Industrial Organization*, vol. 30, pp. 399-402.).

- "A report from MPT, an HDD SA maker acquired by TDK, concludes: "The HDD industry is intensively competitive" SAC ¶ 107

- "a report by Standard & Poor's notes that "price competition has been the hallmark of the PC market." SAC ¶ 110.

Resellers' complaint also explains that "[t]he commodity-like nature of suspension assemblies, and in particular the interchangeability of suspension assemblies manufactured by Defendants, made it easier for Defendants to agree on prices and also increased the likelihood of the pass-through of the overcharges caused by the collusion through the distribution chain." *Id.* at ¶ 117. Defendants claim they do not understand the relevance of the numerous economic studies cited by Resellers to show the constant presence of overcharges passed-through to indirect purchasers. The relevance is that, whatever the product, there is always pass-through. "Positive pass-through rates are found in all cases for all industries." *Id.* ¶ 102.

Resellers' Second Amended Complaint more than sufficiently meets the requirements set forth in this Court's October 23 Order, that Resellers "allege the type(s) of product(s)" purchased and from whom they were purchased, and set forth facts "from which a reasonable inference can be drawn, that each participant in the chain necessarily passed on the asserted overcharge." *HDD SAs*, at 2020 WL 6270948 3.

Defendants heavily rely on Judge White's opinion dismissing claims in *Jones v. Micron Tech, Inc.*, 400 F. Supp.3d 897 (N.D. Cal. 2019). In his opinion on the plaintiffs' amended

complaint, Judge White found that "Plaintiffs allege that DRAM makes up 5-25% of the bill of costs in electronic devices; that the markets are 'inextricably linked,' as demonstrated by their lack of independent utility and tight historical price correlations; and that OEMs engage in vigorous competition, such that increases in component part prices would be passed on . . ." *In re Dynamic Random Access Memory Indirect Purchaser Litig. (DRAM III)*, No. 4:18-CV-2518-JSW-KAW, 2020 WL 8459279, at *2 (N.D. Cal. Nov. 24, 2020). Reseller Plaintiffs make the same allegations. SAC ¶ 44 (HDD SAs make up 5-10% and sometimes up to 15% of the cost of an HDD); ¶¶ 115-116 (markets for HDD SAs are inextricably intertwined with HDD and PC markets); SAC ¶¶ 107 & 110 (HDD and PC OEMs engage in vigorous price competition).

Defendants also rely on *In re Graphics Processing Units Antitrust Litigation*, a class certification opinion, not an opinion on a motion to dismiss, which is therefore irrelevant here. 253 F.R.D. 478, 500 (N.D. Cal. 2008).

Defendants point to allegations regarding HDD SA costs not found in the Reseller Plaintiffs' Second Amended Complaint, to argue that HDD SAs may be inexpensive. First, Defendants must take on the allegations of the operative complaint in their motions to dismiss, and may not attempt to redraft Plaintiffs' complaint to re-introduce allegations no longer found in the operative complaint. "Plaintiff is not bound to the allegations within a prior version of its Complaint." *NDC Equities Downtown PS, LLC v. City of Palm Springs*, No. EDCV19100JGBSHKX, 2020 WL 6145103, at *3 (C.D. Cal. Oct. 12, 2020) (citing *Kelley v. Crosfield Catalysts*, 135 F.3d 1202 (7th Cir. 1998) ("Any facts that Kelley had pleaded in his first two complaints were effectively nullified for 12(b)(6) purposes when he filed his Second Amended Complaint, which did not reference those facts."); *W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165 (3d Cir. 2013) ("This approach is consistent with how other courts of appeals have treated the issue.")). To do otherwise is to expressly disregard this Court's order allowing leave to amend. There is no point in amending if a complaint can be dismissed based on discontinued allegations.

Further, Defendants point to two isolated discussions of potential prices for HDD SAs for two programs, for one customer, fifteen years ago, with no indication as to whether those prices

were ever accepted, or if they included all parts of the HDD SAs and took into account all costs involved in their manufacture. In fact, the document these quotations come from states, several lines down from the quotations, that "[t]here is no agreement between HTI and Seagate at this time." TDKM0003560. Further, these figures come not from any full production (which Plaintiffs had not yet received at the time of the first Consolidated Complaint), but from a discrete set of documents selected by one of the Defendants to show to Plaintiffs. In fact, Seagate's transactional data shows significantly higher costs, for certain HDD SAs, that are many multiples of the prices Defendants point to.

Even if the figures Defendants have picked out of an inoperative pleading were the costs for all of Defendants' HDD SAs, for all customers, for all programs, for the next fifteen years of the Class Period (which, of course, they are not), as Defendants acknowledge, there are numerous HDD SAs in each HDD. As Resellers' SAC explains, there may be as many as twelve HDD SAs in each HDD, which, even at $0.75 each, would total $9 of an HDD's cost. SAC ¶ 44.

In any event, Defendants' argument—repeated in multiple different ways—that their price-fixed product is not sufficiently expensive for them to be liable for inflating its price, has been rejected in this District, in another indirect purchaser component case. As Judge Wilken stated in *SRAM* "Defendants may not shield themselves from liability by fixing prices on a relatively inexpensive item." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009) ("*SRAM*"); *See also In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2016 WL 467444, at *2 (N.D. Cal. Feb. 8, 2016) (certifying indirect purchaser class where component "typically represent[s] a relatively small percentage of the cost of the product . . .").

Defendants also claim that Plaintiffs "never allege the suspension assembly within any HDD is identified." Memo ISO MTD, at 8. This is incorrect. Resellers allege that:

> HDD suspension assemblies are identifiable, discrete physical products that remain essentially unchanged when incorporated into an HDD. They are identifiable by specific, discrete part numbers that permit tracing to Defendants. Each suspension assembly is marked with an English letter identifying the manufacturer: "M" for MPT; "H" for HTI; and "N" for NHK.

SAC, at ¶118.

It is also certainly untrue that Reseller Plaintiffs, who deal with hard drives on a regular basis, as part of their business, are not "aware that suspension assemblies exist" as Defendants claim. Memo ISO MTD, at 8-9.

Defendants go on to claim that it is problematic that the Reseller Plaintiffs purchased from other resellers and assert this gives rise to a conflict. There is no conflict here. Each member of the class purchased a product containing a price-fixed component. Expert analysis will determine how much of the overcharge was absorbed by each reseller.[4] Rule 23 does not require that the named plaintiffs represent each sector of the putative class equally. *In re Nexium Antitrust Litig.*, 297 F.R.D. 168, 172 (D. Mass. 2013). "A showing of an alignment of incentives can sufficiently overcome a challenge on conflict of interest grounds." *Id.* In any event, conflict issues are to be evaluated at class certification, not on a motion to dismiss. Arguments relating to the ability to certify a class are not proper in a motion brought pursuant to Rule 12(b)(6). *McDonald v. Gen. Mills, Inc.*, 387 F.Supp. 24, 38 (E.D.Cal.1974) ("Compliance with [ Rule] 23 ... is not properly tested by a motion to dismiss for failure to state a claim.") (*citing Gillibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir.1969) ("[C]ompliance with Rule 23 is not to be tested by a motion to dismiss for failure to state a claim ....")).

Defendants also cite to *Los Gatos Mercantile, v. E.I. DuPont*, but, in that case, the plaintiffs' claims were dismissed because they covered "indefinite markets" and the court gave the plaintiffs leave to amend "to set forth a precise definition of the market." *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2015 WL 4755335, at *13 (N.D. Cal. Aug. 11, 2015). Unlike the situation in that case, here, as Defendants themselves state, Plaintiffs' "amended pleadings now limit the class to only seven end-use products," and there is

---

[4] *See Exiting the Fun House of Mirrors: Clayworth v. Pfizer and the Handling of Pass-on in Post-Trial Allocation Proceedings in Federal and State Court*, 20 COMPETITION: J. ANTI. & UNFAIR COMP. L. SEC. ST. B. CAL. 28 (Spring 2011) ("pass-on be handled as an equitable matter in post-trial allocation proceedings").

no dispute about what markets are at issue. Memo. ISO MTD, at 9.

Contrary to Defendants' allegation, the *Los Gatos* court did *not* dismiss the case because the plaintiffs alleged that "[p]aint contains 17% (by weight) of titanium dioxide." *Los Gatos*, 2015 WL 4755335, at *15. In fact, it noted "that based upon the allegations in the SAC, it is likely that Plaintiffs *could* successfully allege Article III standing with respect to the market for architectural paint," based in part on the above allegation. *Id.* at *15 (emphasis added).

Defendants also point to *Magnesium Oxide*, but the court dismissed that case because the plaintiffs "fail[ed] to specify which MgO products . . . they purchased," not because the price-fixed product did not comprise a sufficient portion of the products purchased. *In re Magnesium Oxide Antitrust Litig.*, No. CIV. 10-5943 DRD, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011). Here, of course, Reseller Plaintiffs do describe the products they purchased.

Defendants' arguments regarding the length of the distribution chain all fail. As Judge Battani found in *Fuel Senders*, a long chain of distribution was not too "elongated" to support Article III standing, holding that traceability issues go to "difficulties of proof, not pleading deficiencies." 29 F. Supp. 3d at 998.

### B.   Defendants Improperly Conflate Standing with Class Certification.

Defendants claim that although Reseller Plaintiffs each purchased multiple products containing HDD suspension assemblies, the fact that they did not purchase every one of the products listed in their class definitions gives rise to dismissal. But typicality arguments like this have no place in a motion to dismiss. Defendants erroneously conflate standing with class certification.[5] Defendants have also focused on the wrong "product." Here, the price-fixed products at issue are Defendants' HDD suspension assemblies, not the external packaging of those products. *See, e.g.,* SAC at ¶¶ 44-51. Accordingly, Resellers have standing to move forward with their class action for *all* indirect purchases of HDD suspension assemblies in each jurisdiction in

---

[5] All of the cases cited by Defendants relate to this Court's prior ruling, *i.e.*, whether Resellers can assert claims on behalf of resellers in other states. These cases do not address whether Resellers can sue on behalf of purchasers in their respective states who bought items containing HDD suspension assemblies that Resellers did not specifically buy.

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINTS

which they have alleged harm.  As Judge White stated in *DRAM III*:

> Defendants now claim that Plaintiffs cannot seek recovery on behalf of a class for products they did not purchase. The argument is meritless. The product that Plaintiffs purchased is DRAM, same as the other purported class members. That the members of the class purchased DRAM through different intermediate products creates neither a different legal claim (antitrust violation) nor a different form of relief (damages and injunction).

2020 WL 8459279, at * 3. Multiple courts in this District and elsewhere in this Circuit have found Defendants' argument to be premature at the motion to dismiss stage and reserve challenges for class certification.  *See, e.g., Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 571 (N.D. Cal. 2013) (whether plaintiffs can adequately represent purchasers of "substantially similar" products is not a standing inquiry but a class certification question); *Koh v. S.C. Johnson & Son, Inc.*, No. C-09-0927 RMW, 2010 U.S. Dist. LEXIS 654, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010) (rejecting defendant's argument that plaintiff lacked standing to pursue claims based on a product he did not purchase as opposed to those that he did, and deferring issue to class certification); *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1134 (W.D. Wash. 2010) (deferring issue until class certification).

Other courts have applied a "substantially similar" test to determine standing in this scenario.  *See, e.g., Astiana v. Dreyer's Grand Ice Cream Inc.*, No. C-11- 2910 EMC, 2012 U.S. Dist. LEXIS 101371, *13 (N.D. Cal. July 20, 2012) (plaintiffs had standing at motion to dismiss stage where they alleged sufficient similarity between the products they did purchase and those that they did not).  Products which plaintiffs did purchase are deemed "substantially similar" to products which they did not purchase if "'the resolution of the asserted claims will be identical between the purchased and unpurchased products.'" *See also Anderson v. Hain Celestial Grp., Inc.*, 87 F. Supp. 3d 1226, 1233 (N.D. Cal. 2015) (quoting *Ang v. Bimbo Bakeries USA, Inc.,* No. 13–cv–01196–WHO, 2014 U.S. Dist. LEXIS 34443, at *28-29 (N.D. Cal. March 13, 2014)).

When the product at issue is a component of another product, the exterior housing of that component product is not a factor in determining whether one product is "substantially similar" to

another.  For example, in *Mednick v. Precor Inc.*, 2014 U.S. Dist. Lexis 159687 (N.D. Ill. Nov. 13, 2014), a case regarding faulty touch sensors in exercise equipment (including a treadmill which the named plaintiffs purchased, as well as other treadmills, ellipticals, and stationary bicycles, which they did not), the court ruled in exactly that fashion.  The *Mednick* court declined to accept defendant's standing argument regarding products not purchased by named plaintiffs because plaintiffs' claims were for a specific component of the machine—the touch sensor—and not the machines as a whole.  *See id.* at *10.

Like the plaintiffs in *Mednick*, the named Resellers and the class members they seek to represent have all purchased the same component product:  Defendants' HDD suspension assemblies.  Defendants' argument seeks to divert this Court's attention from the price-fixed product—HDD suspension assemblies—to the housing of the price-fixed product.  But, as *Mednick* illustrates, whether the HDD suspension assembly stands alone or is contained in a computer, hard disk drive or some other type of housing, the type of housing does not bear on the question of whether the HDD suspension assemblies purchased by Resellers are "substantially similar" to other HDD suspension assemblies.  Because the resolution of the asserted claims will be identical for both the purchased and unpurchased products, the HDD suspension assemblies are, indeed, "substantially similar."

Defendants also claim that Plaintiffs do not allege the manufacturer of the hard drives in the desktop or laptop computers they purchased, but do not explain why such an allegation would be necessary when, "[d]uring the Class Period, Defendants collectively controlled approximately 97% of the global HDD suspension parts market," SAC ¶ 43(d). Defendants' products went into just about every hard drive that was manufactured, meaning that whatever hard drives are located in the many desktops and laptops Plaintiffs purchased, they most likely contain Defendants' HDD SAs. In any event, Plaintiffs did not have access to the information showing which HDDs every

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

model of computer contains and will not have it until they complete third party discovery. For this reason, this level of detail is not required at the motion to dismiss stage.

Defendants also claim that Plaintiffs do not allege that each product was purchased in each state where they bring claims. This is inaccurate, with respect to Reseller Plaintiffs, all of whom allege that they made their purchases in their states of residence. SAC ¶ 23 ("Now Micro made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in Minnesota."); ¶ 24 ("Voyager made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in Michigan.); ¶ 25 ("IT Worx made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in North Carolina.); ¶ 26 ("Willow Bay made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in New York."); ¶ 27 ("Medeiros made purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in California.).

## III.   PLAINTIFFS ADEQUATELY ALLEGED ANTITRUST STANDING

### A.   *AGC* Should Not Be Applied to IPPs' State Law Claims.

The question of antitrust standing for Plaintiffs' state-law damages claims is one of "*state* law," not federal law. *LIB*, 2014 WL 4955377, at *6 (emphasis in original). Defendants' argument that the injury standards applicable to claims based on *federal* law, articulated in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC*"), should be rejected with respect to Plaintiffs' *state* law antitrust claims.

In response to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which restricted antitrust standing to direct purchasers, many state legislatures and some courts "repealed" the effects of *Illinois Brick* by permitting, through statute or case law, indirect purchasers to maintain damages claims under state antitrust statutes. *See TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1120 (N.D. Cal. 2008). The Supreme Court rejected a preemption challenge to these repealer provisions, and affirmed states' rights to provide indirect purchasers with redress for antitrust

injuries. *California v. Arc America Corp.*, 490 U.S. 93, 105-06 (1989). The court in *AGC* acknowledged its antitrust standing analysis was guided by "[t]he same concerns" underlying the holding in *Illinois Brick* (*see* 459 U.S. at 544) that were rejected by the state legislatures and courts that repealed *Illinois Brick*. In assessing indirect purchaser allegations of antitrust injury, courts should be chary to apply strictures on indirect purchaser claims that states expressly loosened.

Courts in this District repeatedly hold that *AGC* either does not apply to state-law claims given the absence of a clear directive from state legislatures, highest courts or other sources, or even assuming it applies, *AGC* does not preclude standing at the pleading stage on facts like those present here. *See, e.g.*, *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1073 (N.D. Cal. 2015) (*AGC* not applicable under California law); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *14 (N.D. Cal. Oct. 2, 2014) ("*LIB*"), at *4 nn.6, 7 (states at issue), *11 (*AGC* not applicable under laws of 25 states including, CA, MI, MN, NY and NC); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2011 WL 3894376, at *10 n.9, *12 (N.D. Cal. Aug. 3, 2011) ("*Optical Disk Drive*") ( "it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the [29] repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts," and if applied, the *AGC* test "does not conclusively rule out standing . . . at the pleading stage") (quotations omitted); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) (*AGC* not applicable under laws of 15 states including, MI, MN, and NC); *TFT-LCD I*, 586 F. Supp. 2d at 1123 refusing to dismiss plaintiffs' claims under 17 states' laws including CA, MI, NY, and NC), and holding that it is "inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts," and that even if *AGC* applied, plaintiffs met that test); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007) ("*GPUs I*"). Defendants avoid recognizing these cases.

As the Minnesota Supreme Court emphasized in rejecting *AGC*'s application, the state legislature did not "repudiate [] *Illinois Brick* and invite [] indirect purchaser suits only for courts to dismiss those suits on the pleadings based on the very concerns that motivated *Illinois Brick*." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007). Other federal courts recognize that

1   *AGC* does not apply to *any* repealer states. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp.

2   3d 772, 816 (N.D. Ill. 2017) ("*Broiler Chicken*"); *Liquid Aluminum Sulfate Antitrust Litig.*, No.

3   16-md-2687 (JLL), 2017 WL 3131977, at *19-20 (D.N.J. July 20, 2017) ("*Liquid Aluminum*").

4         Most federal courts have held that *AGC* does not apply in the absence of a clear directive

5   from the relevant state's legislature or highest court, even in the face of statutory or judicially-

6   created harmonization provisions. *See, e.g.*, *Capacitors*, 106 F. Supp. 3d at 1073 ("*AGC* has not

7   been clearly applied by the California Supreme Court to claims brought under California's

8   Cartwright Act"); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097

9   (N.D. Cal. 2007) ("*GPUs II*") (declining to apply *AGC* to state-law claims); *TFT-LCD I*, 586 F.

10  Supp. 2d at 1123 (same). Defendants cite few, if any, such directives. *See generally* Appendix A

11  ("App. A"), *infra* (state-by-state list of cases rejecting or limiting *AGC*'s application to state law

12  claims, and distinguishing Defendants' cases).

13        Defendants' reliance upon "harmonization statutes" or "equivalent caselaw" fails to

14  recognize that federal and state antitrust law may differ on issues such as antitrust plaintiffs'

15  standing to pursue damages. *See, e.g., Lorix*, 736 N.W. at 626 ("[t]he desire for harmony between

16  federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit").

17  References to federal law do not establish that *AGC* has been adopted as the law of repealer states,

18  and courts have repeatedly rejected the harmonization argument. *See*, *e.g.*, *Flash Memory*, 643 F.

19  Supp. 2d at 1153 (questioning whether "a state's harmonization provision, whether created by

20  statute or common law, is an appropriate means of predicting how a state's highest court would

21  rule regarding the applicability of *AGC*"); *LIB*, 2014 WL 4955377, at *10 ("[S]imply because a

22  state statute encourages reference to federal law does not impose a mandate on state courts to

23  conform in fact to federal law."); *Broiler Chicken,* 290 F. Supp. 3d at 816 n. 17 (rejecting

24  "harmonization" statutes as a basis to apply *AGC*). To stretch those harmonizing provisions to

25  apply federal law to indirect purchaser standing would distort principles of comity beyond

26  recognition, where, as here, state legislatures and courts repealed the restrictions on indirect

27  purchasers that were propelled by the concerns expressed in *Illinois Brick* and *AGC*. Defendants

28  rely on *Knevelbaard Dairies v. Kraft Foods, Inc.* But *Knevelbaard* confirms standing under the

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

Cartwright Act is governed by California law, and that federal antitrust precedent has "limited" value and is "not necessarily decisive" in construing the Cartwright Act, because "California law affords standing more liberally than does federal law." 232 F.3d 979, 987 (9th Cir. 2000).

### 1.   California

*AGC* is not applicable to California's antitrust statute. *See Capacitors*, 106 F. Supp. 3d at 1072-73 (analyzing recent California law and holding *AGC* not applicable); *Los Gatos Mercantile*, 2015 WL 4755335, at *19 (same); *LIB*, 2014 WL 4955377, at *10-11 (same); *Broiler Chicken*, 290 F. Supp. 3d at 816 n.15 (same); *see also Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century"); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015) ("The Cartwright Act is broader in range and deeper in reach than the Sherman Act."). Defendants' citation to *Clayworth v. Pfizer, Inc.*, and *Vinci v. Waste Management* (Def. Br. at 27 n.2) are inapposite. *See Capacitors*, 106 F. Supp. 3d at 1072 (*Clayworth* "did not involve a question of standing under the California antitrust laws, and the court's reference to *AGC* was at most a passing one made in discussing an intermediate appellate court's opinion"). *Vinci* reasoned that plaintiff's job loss "was not the type of loss the antitrust statute was intended to forestall." *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 339-40 (Cal. Ct. App. 1995).

### 2.   Michigan

*AGC* is not applicable to Michigan's antitrust laws. *See Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* does not apply to Michigan claims); *LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (same); *Flash Memory,* 643 F. Supp. 2d at 1152 (same); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). Defendants' citation to *Stark v. Visa U.S.A.* (Def. Br. at 27 n.17) is inapposite. In *Stark v. Visa U.S.A. Inc.*, No. 03–055030–CZ, 2004 WL 1879003, at *4 (Cir. Ct. Mich. July 23, 2004), although the trial court analyzed the factors of *AGC*, the court's decision ultimately fell short of adopting the *AGC* factors as applicable to Michigan antitrust law, and instead recognized that "no Michigan trial or appellate court has ever applied the *Association General Contractors*

factors in a case under MARA's indirect purchaser provisions."

### 3.    Minnesota

*AGC* is not applicable to Minnesota's antitrust statute. *Lorix,* 736 N.W.2d at 632 (Minnesota Supreme Court expressly rejecting *AGC*).

### 4.    New York

*AGC* is not applicable to New York antitrust laws. *See LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (*AGC* not applicable under laws of 25 states, including New York); *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states at issue, including New York); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same); *see also Cox v. Microsoft Corp.*, No. 105193/2000, 2005 WL 3288130, at *5 (N.Y. Sup. Ct. July 29, 2005) (holding that computer purchaser plaintiffs had adequately alleged injury because Microsoft's "inflated [software] prices [were] passed [on] to consumers."). Defendants' cited authorities (Def. Br. at 27, 36) are inapposite. The *Ho* court did not involve indirect purchasers of a price-fixed product and did not even mention *AGC*, much less engage in analysis of its factors. *Ho v. Visa USA, Inc.,* 16 A.D.3d 256, 257 (N.Y. App. Div. 2005). *State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, No. 0403878/2002, 2005 WL 6056054 (N.Y. Sup. Ct. Aug. 9, 2005) (holding alleged chemical preservatives price-fixing conspiracy "only had an ancillary effect" on consumers of food). *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* 536 F. Supp. 2d 1129, 1142-44 (N.D. Cal. 2008) (*DRAM II*), was decided after the parties received the full benefit of discovery and a majority of courts have declined to follow *DRAM II*. *See LIB,* 2014 WL 4955377, at *13.

### 5.    North Carolina

*AGC* is not applicable to North Carolina's antitrust statute. *See Teague v. Bayer AG,* 671 S.E.2d 550, 555-58 (N.C. Ct. App. 2009) (holding that *AGC* factors do not apply in determining indirect-purchaser standing in a component case); *see also Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* does not apply to North Carolina); *LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (same); *Flash Memory,* 643 F. Supp. 2d at 1152-53 (same); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). Defendants' authorities (Memo. ISO MTD, at 27 n.17) are

inapposite. In *Crouch v. Crompton Corp.*, the North Carolina trial court provided an example of a case in which antitrust injury would exist: "Where a component, *such as a computer chip*, is price fixed, and its costs passed through directly to purchasers of the product in which it is incorporated." 2004 WL 2414027, at *23 (N.C. Super. Ct., Oct. 28, 2004) (emphasis added).

### B.   Application of the *AGC* Factors Supports Antitrust injury.

Even if the *AGC* factors were applicable, they weigh in favor of finding that Plaintiffs have more than adequately alleged antitrust injury.

**Factor 1: Nature of Plaintiffs' Injury.** The first *AGC* factor evaluates whether plaintiffs have pled "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Here, Plaintiffs allege a *per se* antitrust violation which caused them to pay higher prices for Defendants' products. *See, e.g.*, SAC ¶¶ 122. This is classic antitrust injury.

Contrary to Defendants' assertions, courts do not impose a strict "market participation" requirement for indirect-purchaser claims. *See LIB*, 2014 WL 4955377, at *12 ("[B]eing a consumer or competitor in the allegedly restrained market is not strictly required."). To the extent *AGC* requires market participation, numerous courts have found that allegedly price-fixed components and the finished products containing them "reside in the same market, or inextricably linked markets." *Id.* (citing cases). Courts in this District have recognized, for instance, that price-fixed components and finished products containing them are in inextricably intertwined markets:

> The Court finds that where a product like a CRT itself is virtually valueless on its own, and the markets for CRTs themselves and CRT products are plausibly pled to be inextricably intertwined, a plaintiff adequately pleads an antitrust injury when the alleged anticompetitive activity surrounding a component affects the market for the finished product in a traceable way.

*CRT*, 2013 WL 4505701, at *10 (N.D. Cal. August 21, 2013).

Defendants misstep again by ignoring Plaintiffs' detailed allegations that the price-fixed suspension assemblies and the finished product markets are inextricably intertwined. For example, Plaintiffs allege that: (1) suspension assemblies are "a critical component of HDDs" (SAC ¶ 44);

(2) they purchased HDDs or Finished Products containing the price-fixed suspension assemblies that were manufactured by Defendants (SAC ¶¶ 23-27); (3) while HDD suspension assemblies have no independent utility, they have no substitutes and are thus a required part of an HDD (SAC ¶ 114, 115); (4) suspension assemblies are "identifiable, discrete physical products that remain essentially unchanged when incorporated into an HDD," that they "are physically traceable throughout the distribution chain from Defendants to Plaintiffs and members of the Classes" and the costs of which "can be traced through the chain of distribution to Plaintiffs and members of the Classes" (SAC ¶ 118); and (5) "customers must purchase HDD suspension assemblies as an essential part of an HDD, or a product containing an HDD" and "[w]ithout the HDDs, the HDD suspension assemblies have little to no value because they have no independent utility." SAC ¶ 115, such that the component and Finished Product markets are economic complements. These allegations plausibly show that these products reside in the same, or inextricably intertwined markets. *See, e.g., LIB*, 2014 WL 4955377, at *12-13; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010); *TFT-LCD I,* 586 F. Supp. 2d at 1123; *Flash Memory*, 643 F. Supp. 2d at 1154. Defendant's reliance on *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, is misguided. That court held that the injury was too remote because the component at issue, steel, had "gone through numerous manufacturing alterations and lines of distribution. In many of these products, steel is not even a primary or necessary ingredient." 902 F.3d 735, 744 (7th Cir. 2018). Here, the price-fixed product is not elemental metal, from which any number of things can be made. It is a manufactured component that does not change form or function once forged. Defendants' reliance on *Aluminum* is also unwarranted. There, the court held the plaintiffs failed to "allege a market in which antitrust injury is experienced." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 KBF, 2014 WL 4277510, at *21 (S.D.N.Y. Aug. 29, 2014), *supplemented*, No. 13-MD-2481 KBF, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *and aff'd*, 833 F.3d 151 (2d Cir. 2016), *and aff'd*, 833 F.3d 151 (2d Cir. 2016). There is no such problem here.

    Plaintiffs need not allege that suspension assemblies comprise a "substantial proportion" of an HDD or Finished Product to show market participation. Defendants cite no case holding that

a component's cost must reach a certain percentage of a finished product to show antitrust standing. Rather, courts recognize that defendants "may not shield themselves from liability by fixing prices on a relatively inexpensive item." *SRAM*, 264 F.R.D. at 614-15. Indeed, in the *Automotive Parts Antitrust Litigation*, the court repeatedly held that auto dealers and consumers who purchased new vehicles adequately pleaded participation in the market for the price-fixed automotive component parts at issue notwithstanding defendants' assertions that the part at issue was "one of thousands" in vehicle, or comprised a "negligible" portion of the value of the vehicle.[6] The same result is warranted here. Defendants' statement that Plaintiffs do not allege that "these suspension assemblies—inexpensive subcomponents-within-components used in HDDs—make up a significant proportion of the cost of any final electronic product, or even of an HDD," is baldly incorrect; it is as if Defendants did not review the amended complaint. Plaintiffs have more than adequately alleged that "suspension assemblies are one of the highest cost components of an HDD," and that HDD suspension assemblies account for 5-15% of an HDD's cost. SAC ¶ 44. In any event, these factual questions cannot be decided on a pleading motion. *See LIB*, 2014 WL 4955377, at *13 (whether markets are "inextricably intertwined likely will require sophisticated economic analysis and is a factual matter not amenable to resolution at the pleadings stage").[7]

Defendants' reliance on a number of *DRAM* decisions is unavailing.[8] In *DRAM II*, the court recognized that its ruling was not without controversy, 536 F. Supp. 2d at 1142, and multiple courts

---

[6] *In re Automotive Parts Antitrust Litig. (Bearings)*, 50 F. Supp. 3d 836, 851, 855 (E.D. Mich. 2014) (market participant requirement met despite defendants' claim "that the price-fixed product *does not make up a substantial portion* of the finished good's costs") (emphasis added); *Fuel Senders*, 29 F. Supp. 3d at 998, 1002-03 (antitrust standing upheld despite defendants' argument regarding "the cost of a Fuel Sender relative to the final price of a vehicle containing *thousands of component parts*") (emphasis added); *In re Automotive Parts Antitrust Litig. (Ceramic Substrates)*, No. 12-md-02311, 2017 WL 7689654, at *10-11 (E.D. Mich. May 5, 2017) (antitrust standing upheld despite defendant's argument regarding "*a part's negligible price relative to the vehicle*") (emphasis added).

[7] Defendants state that "suspension assemblies are not directly incorporated into finished products—they are first incorporated into head gimbals, which are incorporated into HDDs[.]" Def. Br. at 20. Even if Defendants' unsolicited fact dispute was relevant, which it is not, it would be the subject of discovery and summary judgment, not a motion to dismiss a pleading.

[8] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007) ("*DRAM I*"); *DRAM II*.

have since declined to follow the *DRAM* court's analyses on market participation.[9]  Plaintiffs' allegations cover essentially all of the allegations made in *LIB* and *TFT-LCD* that the *Jones v. Micron* court found lacking. Compare *Jones v. Micron.*, 400 F. Supp. 3d at 912  (citing detailed allegations in *LIB* and *TFT-LCD*), *with* SAC ¶¶ 44, 107-110, 115-116, 118-120,  (allegations similar to those in *LIB* and *TFT-LCD*). Moreover, the plaintiffs' claims in *Jones* encompassed a "ubiquitous" universe of finished products that contain DRAM. *Id.* at 908, 913. Here, Plaintiffs' Finished Products are limited and they have alleged that HDD suspension assemblies are a critical component of HDDs. SAC ¶ 44.

Finally, Defendants argue Plaintiffs fail to allege that the pricing of HDD SAs is inextricably intertwined with the pricing of finished HDDs because nothing "suggest[s] that the component itself is a feature or selling point known to *purchasers* which factors into a purchaser's purchasing decision." Plaintiffs allege, "[t]he markets for HDDs and HDD suspension assemblies are inextricably linked and intertwined because the market for HDD suspension assemblies exists to serve the HDD market. *Without the HDDs, the HDD suspension assemblies have little to no value because they have no independent utility*" and "HDD suspension assemblies are essential to the functioning of HDDs." SAC ¶¶ 50m 115. In other words, no SA, no functioning HDD. The component is a selling point because all purchasers wanted functional HDDs.

There is no caselaw requiring that purchasers know that a particular price-fixed component exists in a finished product they purchased or make their purchasing decisions based on that price-fixed component, in order to recover damages for the illegal inflation of that component's price, nor do Defendants cite any. Certainly, indirect purchasers in the *Auto Parts* cases were not aware their vehicles contained fuel senders or ceramic substrates.

**Factors 2 and 3: Direct and Non-speculative Injury.** On the second AGC factor, Defendants argue, without citation to any caselaw, that this factor cannot be demonstrated "where the price-fixed component is but one of many components," Memo ISO MTD, at 22. However,

---

[9] *See, e.g., LIB*, 2014 WL 4955377, at *13 (declining to follow *DRAM II*); *Optical Disk Drive*, 2011 WL 3894376, at *12 (declining to follow *DRAM I and II*); *TFT-LCD I,* 586 F. Supp. 2d at 1121-23 (same).

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINTS

"courts have determined that discrete injuries traceable through a distribution chain tilt this factor in favor of antitrust standing" when it comes to "directness of the alleged injury." *LIB*, 2014 WL 4955377, at *14. Here, Plaintiffs allege that (1) they paid an overcharge that was passed on to them by HDD and Finished Product makers; (2) the product and its cost can be traced through the chain of distribution; (3) the markets for HDDs and Finished Products were inelastic, thereby permitting cost increases; (4) the cost increases here were industry-wide and the HDD and Finished Product markets highly competitive, economically necessitating pass-on of variable cost increases; and (5) regression analyses will "isolate and identify only the impact of an increase in the price of HDD suspension assemblies[.]" *See* SAC ¶¶ 91-93, 100-101, 105-106 118-21. These allegations support antitrust standing. *See LIB*, 2014 WL 4955377, at *15; *TFT-LCD I*, 586 F. Supp. 2d at 1123-24; *Auto Parts (Fuel Senders)*, 29 F. Supp. 3d at 1002-03. Defendants cite *Jones v. Micron*, but the court in that case stated the problem was that the market at issue, unlike that at issue here, included "a wide variety of consumer electronics." *Jones v. Micron.*, 400 F. Supp. 3d at 913.

Plaintiffs' allegations also support antitrust standing under the third *AGC* factor, because Plaintiffs' harm is not speculative. *See LIB*, 2014 WL 4955377, at *15; *TFT-LCD I*, 586 F. Supp. 2d at 1124; *Auto Parts(Fuel Senders)*, 29 F. Supp. 3d at 1003. Defendants' bald assertion that "any number of intervening factors affect final consumer prices, including the many separate pricing decisions made at multiple levels of commerce" is insufficient to overcome Plaintiffs' detailed allegations regarding the market, causation and impact set out above. Courts in this District repeatedly hold that defendants' claims that causation and damages in an antitrust case will be complicated is not grounds for finding harm speculative, and that "it would be inappropriate to determine complex and intensely factual damages issues without a more fully developed factual record." *TFT-LCD I*, 586 F. Supp. 2d at 1124 (quotations omitted); *LIB*, 2014 WL 4955377, at *15 (courts should "avoid substituting defendants' speculation for the complaint's allegations of causation"). Finally, Defendants ignore that Plaintiffs are suing under state repealer laws that are based on a policy decision to protect downstream purchasers who often "suffer[ ] the greatest, if not the most direct, injury of the price-fixing conspiracy." *D.R. Ward Construction Co .v. Rohm & Haas Co.* , 470 F. Supp. 2d 485, 503 (E.D. Pa. 2006).

1   Defendants cite *GPU II*, claiming that Plaintiffs did not allege that HDD SAs are
2   separately-invoiced. Resellers did allege that HDD SAs are purchased by HDD makers on their
3   own. In any event, the *GPU II* court stated that what is most important is that the price of the
4   component "is traceable," as Resellers have alleged. *GPU II*, 540 F. Supp. 2d at 1098.

5   **Factors 4 and 5: Risk of Duplicative Recovery and Complexity in Apportioning**
6   **Damages.** The fourth and fifth *AGC* factors can be considered alongside each other. *CRT*, 2013
7   WL 4505701, at *11; *see also LIB*, 2014 WL 4955377, at *15 (these factors evaluate whether
8   plaintiffs have sufficiently alleged that duplicative recovery can be avoided and apportionment of
9   any overcharge passed on in the distribution chain is possible). First, courts recognize that vis-à-
10  vis direct purchasers, the risk of duplicative recovery "generally is inapposite in the context of
11  [*Illinois Brick* repealer] state law antitrust claims." *Flash Memory*, 643 F. Supp. 2d at 1156. Many
12  courts that have looked at these factors have determined that neither is relevant in a case brought
13  under *Illinois Brick* repealer laws. *D.R.Ward,* 470 F. Supp. 2d at 504; *In re Intel Corp.*
14  *Microprocessor Antitrust Litig.*, 496 F.Supp. 2d 404, 410 (D. Del. 2007); *In re Dynamic Random*
15  *Access Memory (DRAM) Antitrust Litigation ("DRAM I")*, 516 F. Supp.2d 1072, 1093 (N.D. Cal.
16  2007); *Lorix,* 736 N.W.2d at 628; *Flash*, 643 F. Supp. 2d at 1155 ("States . . . which have repealed
17  *Illinois Brick* and allowed indirect purchasers to sue for antitrust violations, have necessarily made
18  the policy decision that duplicative recovery may permissibly occur . . . ."). Second, in indirect
19  purchaser cases involving price-fixed component parts, the risks of duplicative recovery and undue
20  complexity in apportioning damages are adequately addressed by allegations that the "overcharges
21  are distinct and traceable." *Auto Parts (Bearings)*, 50 F. Supp. 3d  at 855 (holding that "the
22  existence of three classes does not render the IPPs' claims ripe for duplicative recovery"); *see also*
23  *Auto Parts (Fuel Senders)*, 29 F. Supp. 3d at 1003 (finding antitrust standing where both auto
24  dealers' and downstream consumer purchasers' allegations that "overcharges are distinct and
25  traceable . . . lessen the risk of duplicative recovery"); *TFT-LCD I*, 586 F. Supp. 2d at 1124
26  ("plaintiffs have sufficiently alleged that damages are traceable and thus apportionable because
27  [the parts at issue] are a separate component"). Indeed, "defendants do not explain why damages
28  could not be apportioned in this case, as they have been in other complex antitrust cases, . . . [and]

[i]t is a rule of long standing that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *LIB*, 2014 WL 4955377, at *16 (quotations omitted). Moreover, if necessary, Resellers would rely on the types of well-established regression analyses that have been used in similar indirect purchaser component cases to apportion damages.

## IV.   PLAINTIFFS PROPERLY PLEAD THEIR ANTITRUST LAW CLAIMS

### A.   Resellers Have Adequately Pleaded a Claim Under North Carolina's Antitrust Law.

Citing only *ITCO Corp.*, Defendants contend North Carolina's antitrust law was "designed to address primarily local concerns." The footnote Defendants quote from that case does not hold that North Carolina businesses may only recover for antitrust injury caused by conspiracies that took place inside the state. *ITCO Corp. v. Michelin Tire Corp.*,722 F.2d 42, 48, n. 9 (4th Cir. 1983). The *ITCO* court instead noted that Chapter 75 is coextensive with the Sherman Act, as "proof of conduct violative of the Sherman Act is proof sufficient to establish a violation of the North Carolina Unfair Trade Practices Act." *Id.*,722 F.2d at 48.

Defendants next note that "IPPs do not allege that Defendants manufactured or distributed products from locations" in North Carolina or "bought any products directly from Defendants in" North Carolina. Memo ISO MTD, at 32. Defendants do not cite any authority for these statements because North Carolina law does not require Resellers to allege either. All Resellers need to allege is that Defendants' admitted conspiracy caused injury in North Carolina or affected commerce in North Carolina. N.C. Gen. Stat. § 75.1-1(a) provides "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." *Id.* North Carolina law focuses on where the injury was felt. *See also Packaged Seafood*, 242 F. Supp. 3d at 1083 (declining to follow *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42 (4th Cir. 1983), *Merck*, 941 F. Supp. 1443, and *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C. 1987)).

1

## V.  PLAINTIFFS PROPERLY PLEAD CONSUMER PROTECTION CLAIMS

2

### A.  Resellers Properly Allege Intrastate Effects on North Carolina Commerce.

3

4    Citing an inapplicable case, Defendants argue Resellers' consumer-protection claim

5 under North Carolina's Unfair Trade Practices Act ("NCDUTPA") was "designed to address

6 primarily local concerns." The NCDUPTA provides remedies for conduct that affected

7 commerce or caused injury in North Carolina. Resellers have alleged that named Plaintiff IT

8 Worx, Inc. and similar businesses were injured in North Carolina by Defendants' misconduct

9 and that the conspiracy affected commerce in North Carolina. *See* SAC ¶¶ 25, 171.

10    The NCDUTPA applies to conduct "in or affecting [North Carolina] commerce." *Phelps-*

11 *Dickson Builders, L.L.C. v. Amerimann Partners*, 617 S.E.2d 664, 671 (N.C. App. 2005); *see*

12 *also In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp. 3d 1033, 1083 (S.D. Cal.

13 2017) ("the Court is not convinced that the NCDUPTA [sic] requires a plaintiff to show

14 'substantial effects'" in North Carolina).

15

16    The NCUDTPA focuses on injury or commerce in North Carolina and does not require

17 that the conspiratorial conduct occur inside the state. *Merck & Co., Inc. v. Lyon,* 941 F. Supp.

18 1443, 1463 (M.D.N.C. 1996) (NCUDTPA applies where conduct had "a substantial effect on any

19 in-state business operations"). This Court, and others, have rejected the arguments Defendants

20 put forth. *In re Lidoderm Antitrust Litig.*, 103 F.Supp.3d 1155, 1173-1174 (N.D. Cal. 2015)

21 (denying motion to dismiss NCUDTPA claim where Plaintiff "alleged in-state injury and that

22 defendants' products were being sold in North Carolina").

23

24

### B.  Reliance Is Not Required Under California's Consumer Protection Law.

25    Defendants argue Resellers' consumer protection claims under California law should be

26 dismissed because Resellers do not allege reliance. But "California courts have repeatedly held

27 that relief under the UCL is available without individualized proof of deception, reliance and

28 injury." *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) (quotation omitted). Only for claims

24                          Case No. 3:19-md-02918-MMC

based on fraud or misrepresentation, do plaintiffs need to show reliance. *Id.*, 207 P.3d at 29–30.

Defendants cite cases that considered reliance in the context of Section 17200's prohibition of fraudulent conduct that were decided before the *Tobacco II Cases. In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1160; *see also GPU I*, 527 F. Supp. 2d at 1031 (N.D. Cal. 2007). The subsequent decision in *Tobacco II* made clear pleading reliance is not required under the unlawful or unfair practices components of Section 17200. *Id.*, 207 P.3d at 29–30. Similarly, courts that recently addressed this issue have held that pleading reliance is not required in antitrust cases. *In re Pork Antitrust Litig.,* Civil Nos. 18-1776, 19-1578 and 19-2723, 2020 WL 6149666, *14 (D. Minn. Oct. 20, 2020) (rejecting argument that plaintiffs needed to plead reliance under Section 17200); *In re Effexor Antitrust Litig.*, 357 F.Supp.3d 363, 395 (D.N.J. 2018) (same); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F.Supp.3d 145, 159 (E.D. N.Y. 2018); *see also In re Ditropan XL Antitrust Litig.,* 529 F.Supp.2d 1098, 1108-09 (N.D. Cal. 2007) (same). Because Resellers allege Defendants' cartel is an unlawful and unfair business practice, reliance is not required.[10]

**C.** **Resellers Have Standing for California, New York, and North Carolina Consumer Claims.**

Defendants argue Resellers do not meet standing requirements for California, New York, and North Carolina consumer protection claims.

In California, "indirect purchases may support UCL standing." *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010). Defendants' citations are inapposite. *Cel-Tech Comm'ns, Inc.*

---

[10] Defendants rely on *Fisher v. Monster Beverage Corp.*, 656 Fed. App'x 819, 822 (9th Cir. 2016) for the assertion that the UCL requires plaintiffs to demonstrate reliance on misrepresentations made by a defendant. (Def. Mem. at 48–49). Fisher's claim was premised on deceptive advertising. Resellers' UCL claim is not based on fraud or misrepresentations. For the same reason, *In re Glumetza Antitrust Litig.* is inapposite. __ F. Supp. 3d. __, 2020 WL 1066934, at *11 (N.D. Cal. Mar. 5, 2020) is inapposite. The consumer protection claim failed because the complaint did "not plausibly allege consumer reliance—the crux of the claim—on any deceptive conduct by defendants." *Id.* Resellers' UCL claim is premised on unlawful and unfair practices.

*v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 n. 12 (1999) ("Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law . . . ."). *Troyk* did not decide what standard of causation applies in determining whether a plaintiff has standing to prosecute a UCL claim. *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 626 n. 33 (Cal. Ct. App. 2009). The footnote Defendants cite only speaks to "negligence actions." *Id.* The *Dairy Farmers*' decision, also inapposite, was "driven by several key factors, including [] that this is a mixed-market case, where damages inflicted on the physical commodity market are not derivative of injuries in the futures market *and the price-fixed products are not components of the finished goods*." *In re Dairy Farmers' of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *16 (N.D. Ill. June 29, 2015) (emphasis added).

Defendants cite *DRAM II* claiming that Resellers fail to satisfy New York's standing requirements. *DRAM II* was decided after the parties received the full benefit of discovery and most courts have declined to follow it. *See LIB,* 2014 WL 4955377, at *13. *DRAM II* also held that the plaintiffs successfully stated a claim under New York Gen. Bus. Law § 349. *Id.* at 1144.

Defendants do not cite any authority applying *AGC* factors or imposing similar requirements for NCUDTPA.<sup>11</sup> The Fourth Circuit has acknowledged that the NCUDTPA "grew out of antitrust laws in an effort to protect the consuming public from anticompetitive business practices." *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 165 (4th Cir. 1985).

## VI.    PLAINTIFFS PROPERLY PLEAD UNJUST ENRICHMENT

### A.    Resellers Have Pleaded Cognizable Claims for Unjust Enrichment

Resellers sufficiently plead claims for unjust enrichment "under the laws of all states listed

---

<sup>11</sup> Defendants provide a citation only to *Dairy Farmers*, where the court dismissed the plaintiffs' claim under NCUDTPA "because it [wa]s premised on the same allegations as Plaintiffs' insufficiently-pled-price-fixing claims." 2015 WL 3988488, at *19. Also, in that case, "the price-fixed products [we]re not components of the finished goods." *Id.* at *16.

in the First and Second Claims." SAC ¶ 178. There is no need to cite any statute, as even Defendants acknowledge that Resellers "reference 'the common law of each state….'" MTD , at 36.[12]

Defendants, who rely on cases interpreting California claims under California law, ignore the Ninth Circuit, which has held that "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753, 762 (9th Cir. 2015) (internal quotation omitted). *See also In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, No. 16-cv-06391-BLF, 2020 U.S. Dist. LEXIS 242300, at *37 (N.D. Cal. Dec. 24, 2020) (quoting *Astiana* and other 9th Circuit and California cases allowing independent claims for unjust enrichment). Such claims are permissible in "regardless of the precise label assigned to the cause of action." *Siegel v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, Nos. M 07-1827 SI, 1827, 2011 U.S. Dist. LEXIS 105151, at *23 (N.D. Cal. Sep. 15, 2011).  Plaintiffs have alleged such facts here on behalf of resellers in only those states under the laws of which they seek recovery. *See* SAC ¶178. That is permissible and not an "end-run," around *Illinois Brick*. *See, e.g., Dairy Farmers,* 2015 U.S. Dist. LEXIS 84152, at *120-21 (rejecting motion to dismiss independent unjust enrichment claims under Minnesota, New York and North Carolina law); *Pork*, 2020 U.S. Dist. LEXIS 191675, at *62 (unjust enrichment is an independent claim in California); *Collins v. City of Flint*, No. 345203, 2019 Mich. App. LEXIS 4913, at *6-7 (Ct. App. Aug. 22, 2019) (Michigan Supreme Court recognizes unjust enrichment as cause of action independent of tort and contract); *New Motor*

---

[12] Defendants cite *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001) and *Sheet Metal Workers Local 441 Health & Welfare Plan*, 737 F. Supp. 2d 380, 430 (E.D. Pa. 2010).  As to the former, the court dismissed plaintiffs' unjust enrichment claim with leave to replead because it was not clear whether they were proceeding under state or federal law.  In the latter, the court permitted indirect purchasers to proceed with certain unjust enrichment claims, only dismissing those for which plaintiffs did not provide authority of an autonomous claims.

1   *Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 211-12 (D. Me. 2004); *In re*

2   *Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669-70 (E.D. Mich. 2000).[13]

3

4       Resellers' unjust enrichment claims are autonomous, and not dependent upon success of

5   Resellers' antitrust or consumer claims.[14] As explained in *Cardizem*, "[r]ather than allegations and

6   proof of the elements necessary for its antitrust claims, Plaintiffs' common law claims for unjust

7   enrichment depend upon allegations and proof that the defendant has unjustly retained a benefit to

8   the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental

9   principles of justice, equity, and good conscience.'" 105 F. Supp. 2d at 669.

10      Further, as acknowledged Defendants' cases, there is no bar to a plaintiff pleading claims

11  in the alternative. Fed. R. Civ. P. 8(d)(3). *See also In re Loestrin 24 Fe Antitrust Litig.*, 410 F.

12  Supp. 3d 352, 382 (D.R.I. 2019); *In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d at 412 n.11; *In*

13  *re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 457 (S.D.N.Y. 2015).

14

15      **B.      Neither Privity of Contract Nor Direct Benefit Is Required**

16      Defendants make no attempt to specify which of these requisites is required by which state.

17  None of the cases Defendants cite suggest privity of contract is required for Resellers to maintain

18  an unjust enrichment claim in any of their five states. *See, e.g., In re GM LLC CP4 Fuel Pump*

19  *Litig.*, 393 F. Supp. 3d 871, 882 (N.D. Cal. 2019) (California law imposes no requirement of privity

20  to make out an unjust enrichment claim). Nor would there be—privity is a creature of contract.

21  *See, e.g., Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161, 1172 (9th Cir. 2016).

22

23      Moreover, it is not necessary for Resellers to allege that this benefit was "directly"

24

25  _____

    [13] Defendants' reliance on *In re Aluminum Warehousing Antitrust Litigation* is misplaced. In a

26  later opinion that court held "there [wa]s no bar to pleading both [unjust enrichment and
    antitrust] claims simultaneously at the pleading stage." 95 F. Supp. 3d 419, 457 (S.D.N.Y. 2015).

27  [14] Defendants cite one case in support of their argument, *Sheet Metal Workers Local 441 Health*
    *& Welfare Plan*, 737 F. Supp. 2d 380.  There, the derivative unjust enrichment claims dismissed

28  were in jurisdictions that did not have an *Illinois Brick* repealer or its equivalent. *Id.* at 424-426.

conferred upon Defendants.[15] In *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010), cited by Defendants, the court explicitly rejected the idea that the unjust enrichment law of Michigan and North Carolina require the plaintiff to confer a "direct" benefit. *Id.* at 438-439, 442.[16] *See also In re Processed Egg Products,* 851 F. Supp. 2d 867, 930-931 (E. D. Pa. 2012) (rejecting direct benefit requirement under NY and NC law); *In re Pork Antitrust Litig.*, Nos. 18-1776, 19-1578, 19-2723, 2020 U.S. Dist. LEXIS 191675, at *73 (D. Minn. Oct. 16, 2020). Defendants have cited no case requiring a benefit to be conferred directly by plaintiffs under California or Minnesota unjust enrichment law.

Defendants' argument that the relationship between Resellers and Defendants is "too attenuated" only implicates the New York claim. The cases cited by Defendants in support rely upon *Sperry v. Crompton Corp.*, 863 N.E.2d 1012 (N.Y. 2007), where the court found the connection between tire purchasers and the defendant producers of chemicals used in the rubber-making process to be too attenuated. *Id.* at 1018.  Resellers' case is different. As explained by Eastern District of New York, "the indirect purchaser can assert such an unjust enrichment claim against the manufacturer of the *product* itself." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010). *Accord In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 710 (E.D. Pa. 2014). Here, the products made by Defendants are not ingredients that dissolve into another product and become untraceable; HDD SAs remain unchanged in the manufacturing process. SAC ¶ 118. If a product is physically traceable and

---

[15] The use of the term "direct" is not intended to refer to privity between the parties, but rather to a benefit that is not "incidental." *In re Processed Eggs Products*, 851 F. Supp. 2d 867, 934 (E.D. Pa. 2012).  Indirect benefits are not incidental.  *Digital Music*, 812 F. Supp. 2d at 412 n.11.

[16] Defendants cite *In re Static Random Access Memory Antitrust Litig.*, No. 07-md-01819, 2010 U.S. Dist. LEXIS 131002 (N.D. Cal. December 8, 2010), to argue that a direct benefit is required for unjust enrichment under Michigan law.  In fact, the *SRAM* court held that Michigan does not require a direct benefit and did not dismiss the Michigan unjust enrichment claim.  *Id.* at *45-46.

1  unchanged, the relationship between manufacturer and indirect purchaser is not "too attenuated."

2  **VII.   CONCLUSION**

3      For all of the reasons set forth above, the Court should deny Defendants' Motion to

4  Dismiss Reseller Plaintiffs' Second Amended Complaint.

5  **APPENDIX A**

6  **PLAINTIFFS' STATE-BY-STATE**
**RESPONSE TO DEFENDANTS' APPENDICES A - C**

| State | Reseller Plaintiffs' Authorities |
|---|---|
| CA | *AGC* **applicable? No.** *See Capacitors*, 106 F. Supp. 3d at 1072-73 (analyzing recent California law and holding *AGC* not applicable); *Los Gatos Mercantile*, 2015 WL 4755335, at *19 (same); *LIB*, 2014 WL 4955377, at *10-11 (same); *Broiler Chicken*, 290 F. Supp. 3d at 816 n.15 (same); *see also Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century"); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015) ("The Cartwright Act is broader in range and deeper in reach than the Sherman Act."). |
| MI | *AGC* **applicable? No.** *See Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* does not apply to Michigan); *LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (same); *Flash Memory*, 643 F. Supp. 2d at 1152 (same); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). |
| MN | *AGC* **applicable? No.** *Lorix*, 736 N.W.2d at 632 (Minnesota Supreme Court expressly rejecting *AGC*). |
| NY | *AGC* **applicable? No.** *See LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (*AGC* not applicable under laws of 25 states, including New York); *Broiler Chicken*, 290 F. Supp. 3d at 815-16 (*AGC* does not apply to repealer states at issue, including New York); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same); *see also Cox v. Microsoft Corp.*, No. 105193/2000, 2005 WL 3288130, at *5 (N.Y. Sup. Ct. July 29, 2005) (holding that computer purchaser plaintiffs had adequately alleged injury because Microsoft's "inflated [software] prices [were] passed [on] to consumers."). ***Defendants miscite cases*** (App. B): *See GPUs II*, 540 F. Supp. 2d at 1097 (New York not discussed.) |
| NC | *AGC* **applicable? No.** *See Teague v. Bayer AG*, 671 S.E.2d 550, 555-58 (N.C. Ct. App. 2009) (holding that *AGC* factors do not apply in determining indirect-purchaser standing in a component case); *see also Los Gatos Mercantile*, 2015 WL 4755335, at *19 (*AGC* does not apply to North Carolina); *LIB*, 2014 WL 4955377, at *4 nn.6-7, *11 (same); *Flash Memory*, 643 F. Supp. 2d at 1152-53 (same); *Liquid Aluminum*, 2017 WL 3131977, at *9, *19-20 (same). ***Defendants miscite cases*** (App. B): *See GPUs II*, 540 F. Supp. 2d at 1097 (North Carolina not discussed). |

1    Dated: March 15, 2021

2    Respectfully submitted,

3        *s/ Victoria Sims*
         Victoria Sims
4        **CUNEO GILBERT & LADUCA, LLP**
         4725 Wisconsin Avenue, NW, Suite 200
5        Washington, DC 20016
         Telephone:   (202) 789-3960
6        Facsimile:   (202) 789-1813
         vicky@cuneolaw.com

7
         */s/ Shawn M. Raiter*
8        Shawn M. Raiter
         **LARSON • KING, LLP**
9        30 East Seventh Street, Suite 2800
         Saint Paul, MN 55101
10       Telephone:   (651) 312-6518
         Facsimile:   (651) 789-4818
11       sraiter@larsonking.com

12       ***Interim Co-Lead Class Counsel for the***
         ***Reseller Plaintiffs***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTORNEY ATTESTATION**

I, Victoria Sims, hereby attest, pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, that the concurrence to the filing of this document has been obtained from each signatory hereto.

*/s/ Victoria Sims*
Victoria Sims

*Interim Co-Lead Class Counsel for the Reseller Plaintiffs*

RESELLER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
AMENDED COMPLAINTS

1

### CERTIFICATE OF SERVICE

2    The undersigned hereby certifies that a true and correct copy of the above and foregoing

3 document has been served on March 15, 2021, to all counsel of record who are deemed to have

4 consented to electronic service via the Court's CM/ECF system. Any other counsel of record will

5 be served by electronic mail, facsimile and/or overnight delivery.

6

7

8    */s/ Victoria Sims*
     Victoria Sims

9
     *Interim Co-Lead Class Counsel for the Reseller*
10   *Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28