KENNETH R. O'ROURKE, SBN 120144
JEFF VANHOOREWEGHE, SBN 313371
MIKAELA E. EVANS-AZIZ* (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:    (415) 947-2000
Facsimile:    (415) 947-2099
Email: korourke@wsgr.com
         jvanhooreweghe@wsgr.com
         mevansaziz@wsgr.com

*Admitted to practice only in New York,
supervised by members of the California Bar*

*Attorneys for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>                3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO:<br><br>*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC | **SEAGATE'S NOTICE OF MOTION AND MOTION FOR A SCHEDULING ORDER SETTING TRIAL**<br><br>Judge:     Hon. Maxine M. Chesney<br>Date:      May 7, 2021<br>Time:      9:00 a.m.<br>Courtroom: 7, 19th Floor |

1

### NOTICE OF MOTION AND MOTION

2  PLEASE TAKE NOTICE that on May 7, 2021 at 9:00 a.m., or as soon thereafter as the

3  matter may be heard, in Courtroom 7, 19th Floor, 450 Golden Gate Ave., San Francisco, before

4  the Hon. Maxine M. Chesney, Plaintiffs Seagate Technology LLC, Seagate Technology (Thailand)

5  Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology

6  International (collectively, "Seagate") will and hereby do move the Court for a scheduling order

7  setting a trial in *Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No.

8  3:20-cv-01217-MMC at the Court's convenience in October or November 2022 (or, alternatively,

9  December 2022).  Seagate has requested a jury trial and expects the trial to last approximately

10  three to four weeks.

11  Pursuant to Federal Rule of Civil Procedure 16 and the Court's inherent authority to control

12  and manage its docket, Seagate respectfully requests the Court schedule Seagate's separate trial in

13  the fourth quarter of 2022 for the reasons set out in the accompanying Memorandum of Points and

14  Authorities.  The Motion is supported by this Notice of Motion, the Memorandum of Points and

15  Authorities that follows, all of the Court's files and records in this action, and such other and

16  further argument as the Court may entertain.

17

### STATEMENT OF ISSUE TO BE DECIDED

18  Whether to issue a scheduling order setting a trial in the Seagate action, *Seagate Technology*

19  *LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC, to commence on a

20  date convenient for the Court in October or November 2022 (or, alternatively, December 2022).

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.      OVERVIEW OF ALLEGED CONSPIRACY ..................................................................... 2

II.     A SEPARATE SEAGATE TRIAL IS THE MOST EFFICIENT PATH TO
        RESOLVING THIS CASE ................................................................................................ 4

        A.      A SEPARATE SEAGATE TRIAL AVOIDS COMPLEXITY AND
                POTENTIAL JURY CONFUSION .......................................................................... 5

        B.      A SEPARATE SEAGATE TRIAL WILL FOCUS THE ISSUES FOR THE
                INDIRECT CLASS ACTIONS ................................................................................ 8

        C.      A SEPARATE SEAGATE TRIAL PROMOTES JUDICIAL ECONOMY
                AND AVOIDS DELAY AND PREJUDICE TO SEAGATE ................................. 9

        D.      SEPARATE TRIALS IN ANTITRUST CONSPIRACY CASES ARE
                ROUTINE IN THIS DISTRICT .......................................................................... 11

III.    CONCLUSION .................................................................................................................. 14

# APPENDICES

Appendix A ...................................................................................................................... A-1

Appendix B ...................................................................................................................... B-1

Appendix C ...................................................................................................................... C-1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Best Buy Co. v. AU Optronics Corp.*,
    No. 3:10-cv-04572 (N.D. Cal.) .......................................................................... 4

*Cisco Sys., Inc. v. Sheikh*,
    No. 4:18-CV-07602-YGR,
    2020 WL 7408229 (N.D. Cal. Apr. 17, 2020) ................................................... 9

*Costco Wholesale Corp. v. AU Optronics Corp.*,
    No. 2:13-v-01207 (W.D. Wa.) .......................................................................... 4

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ........................................................................................ 6

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ........................................................................................ 6

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    No. 94 C 897,
    1995 WL 399684 (N.D. Ill. July 7, 1995) ......................................................... 12

*In re Brooklyn Navy Yard Asbestos Litig.*,
    971 F.2d 831 (2d Cir. 1992) ............................................................................ 11

*In re Capacitors Antitrust Litig.*,
    No. 3:17-md-02801, ECF No. 747 (N.D. Cal. July 18, 2019) ............................ 10, 13, 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 3:07-cv-05944 (N.D. Cal.) ....................................................................*passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. MDL 1917,
    2016 WL 7800819 (N.D. Cal. Nov. 15, 2016) ................................................... 6

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. 4:02-md-01486, ECF No. 482 (N.D. Cal. July 19, 2005) ............................ 13

*In re Epipen (Epinephrine Injection, USP) Mktg., Sales
    Practices & Antitrust Litig.*,
    268 F. Supp. 3d 1356 (J.P.M.L. 2017) ............................................................ 11

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 4:13-md-02420 (N.D. Cal.) ....................................................................*passim*

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    No. 3:10-md-02143-RS, ECF No. 1866 (N.D. Cal. Apr. 22, 2016) ................... 13

*In re Optical Disk Drive Prods. Antitrust Litig.*,
No. 3:10-md-02143-RS (N.D. Cal.) ............................................................*passim*

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
460 F.3d 1217 (9th Cir. 2006) ................................................................ 11

*In re Polyurethane Foam Antitrust Litigation*,
No. 1:10-md-02196-JZ, ECF No. 1272 (N.D. Ohio July 3, 2014) ................................ 14

*In re: Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 4:07-md-01819-CW, ECF No. 1206 (N.D. Cal. Dec. 16, 2010).............................. 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. 3:07-md-01827-SI, ECF No. 2165 (N.D. Cal. Nov. 23, 2010) ................................ 13

*Pagtalunan v. Galaza*,
291 F.3d 639 (9th Cir. 2002)................................................................... 9

*Royal Printing Co. v. Kimberly Clark Corp.*,
621 F.2d 323 (9th Cir. 1980)................................................................... 6

*Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*,
720 F. Supp. 805 (N.D. Cal. 1989) ........................................................ 9, 11

*United States v. NHK Spring Co. Ltd.*,
No. 2:19-cr-20503, ECF No. 15 (E.D. Mich. Sept. 23, 2019) ............................... 1

**RULES**

Fed. R. Civ. P. Rule 23(f)....................................................................... 10

**MISCELLANEOUS**

*Corporate Profile - Overview*,
https://www.nhkspg.co.jp/eng/company/outline/outline.html ............................. 3

*TDK Electronics*,
https://www.tdk-electronics.tdk.com/en/180332/company/tdk-electronics....................... 3

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

Seagate asks for trial without the complexities inherent in the class cases and concomitant

3

delays.   While pre-trial consolidation makes sense for discovery, the Seagate and class cases

4

inevitably diverge at class certification and for trial.  Proof at trial will differ.

5

Seagate's case is straightforward.  Seagate is the only *direct purchaser* and only *individual*

6

action before this Court, and both Defendants have already admitted their guilt.  NHK[1] admitted

7

to participating in a suspension assembly conspiracy with TDK[2] in violation of the Sherman Act.

8

Rule 11 Plea Agreement ¶ 4(a), *United States v. NHK Spring Co. Ltd.*, No. 2:19-cr-20503 (E.D.

9

Mich. Sept. 23, 2019), ECF No. 15.  Similarly, TDK admitted to participating in a suspension

10

assembly conspiracy with NHK in violation of the Sherman Act.  Seagate Am. Compl. ¶¶ 7, 19,

11

No. 19-md-02918-MMC, ECF No. 271 ("Seagate Compl.").  Defendants may contest the length

12

of their conspiracy, whether certain subsidiaries were also co-conspirators, and the amount of

13

damage to Seagate.[3]  But these will be the core issues in a Seagate trial.

14

The classes, on the other hand, will be focused on proving the fact and amount of

15

overcharges to *other* direct purchasers (*e.g.*, Western Digital, Hitachi), in addition to Seagate, and

16

on proving pass-through of these overcharges in distribution chains including at least computer

17

OEMs, distributors, retailers, and consumers.  And this is only after lengthy class certification

18

proceedings—proceedings in which Seagate has no stake.

19

By this Motion, Seagate requests its own trial date for the following reasons:

20

**First**, Seagate, as both the largest victim of Defendants' suspension assembly conspiracy

21

and only direct purchaser seeking redress, is differently situated than the indirect putative classes.

22

23

24

[1] NHK Spring Co. Ltd. entered the guilty plea.  "NHK" hereinafter refers collectively to the NHK Defendants: NHK Spring Co. Ltd., NHK International Corporation, NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., and NHK Spring (Thailand) Co., Ltd.

25

26

[2] "TDK" refers collectively to the TDK Defendants: TDK Corporation, Headway Technologies, Inc., Magnecomp Precision Technology Public Co., Ltd., SAE Magnetics (H.K.) Ltd, and Hutchinson Technology Inc.

27

28

[3] Seagate defines the Conspiracy Period as "as early as 2003 through at least April 2016 with the effects continuing thereafter."  Seagate Compl. ¶ 6.  This is consistent with the Brazilian antitrust agency (CADE) findings that the conspiratorial conduct began as early as 2003 and continued until at least 2016.  *Id.* ¶ 74.

**Second**, Seagate's case is simpler compared to the indirect class actions in many ways. A Seagate-only trial avoids the complexities and confusion associated with trying a *direct* purchaser action with *indirect* purchaser actions and trying an *individual* action with *multiple class actions*.

**Third**, by resolving Seagate's case first, the class actions will be more focused given the potential collateral estoppel benefits. Seagate's case also provides an opportunity for the other parties to evaluate the strength and presentation of their respective positions before their own trial, encouraging trial efficiency and settlement.

**Fourth**, resolving Seagate's case first avoids substantial prejudice to Seagate that would result from Seagate's individual action otherwise having to await resolution of class certification—a process that may take a year or more.

**Finally** (and for all of these reasons), separating Seagate's case for trial is consistent with how this District has approached trial setting in most other antitrust cases with similar allegations of component price fixing.

Accordingly, Seagate respectfully requests that the Court enter a scheduling order setting trial in the Seagate action at the Court's convenience in the fourth quarter of 2022.

## I.    OVERVIEW OF ALLEGED CONSPIRACY

As alleged, Defendants carried out a conspiracy not to compete with one another for over thirteen years. Their conspiracy pervaded all levels of their business and all aspects of their operations. Defendants effectively operated as one company to improve their margins at the expense of Seagate and the other large suspension assembly customers. In doing so, Defendants' conspiracy manifested itself in several ways: fixing prices, allocating market shares, coordinating costs and production capacities, aligning product designs and technologies, and orchestrating acquisitions.

Then, to simplify their conspiracy, TDK and NHK turned on their co-conspirator, Hutchinson Technology, Inc. ("HTI") (at one time the largest supplier of suspension assemblies), to further consolidate their dominance and control over the suspension assembly market. TDK and NHK strategically cannibalized HTI's market share, and then coordinated to eliminate HTI completely in 2016 by acquisition. When TDK asked whether this plan would be "OK for NHK,"

NHK responded, "Please go ahead […] we feel comfortable of [sic] 40% share."  Seagate Compl. ¶ 138(c).  And after TDK announced the acquisition, one NHK Senior Sales Manager noted, "I can't say it out loud, but this should make the price easier to control."  *Id.* ¶ 141.

Nor was this a run-of-the-mill conspiracy conceived by lower and mid-level sales staff. This conspiracy was orchestrated and carried out by Defendants' top brass including, *inter alia*, the President and CEO of TDK, the President and CEO of MPT, the Vice Chairman of SAE, the President and CEO of NHK Spring, the President of NAT, as well as other senior directors, board members, vice presidents and other senior management personnel.  The brazen decisions of top-level management to personally participate in the conspiratorial meetings and communications and to direct key aspects of the conspiracy are all the more astonishing in light of the enormous size and diverse product offerings of these global conglomerates.[4]  Suspension assemblies are a small part of TDK's and NHK's overall business.  Yet, conspiratorial success was instrumental to these immense institutions.

The evidence at trial will show that Defendant executives and employees participated in hundreds of conspiratorial communications and in-person meetings (many of which were in the United States).  The evidence will also show that top-level employees often held dual roles at different Defendant companies—for example, concurrent positions at TDK and SAE, or NHK and

---

[4] Suspension assemblies and head gimbal assemblies fall within "magnetics"—just one of the many segments of TDK's expansive business.  "TDK's comprehensive, innovation-driven portfolio features passive components such as ceramic, aluminum electrolytic and film capacitors, as well as magnetics, high-frequency, and piezo and protection devices.  The product spectrum also includes sensors and sensor systems such as temperature and pressure, magnetic, and MEMS sensors.  In addition, TDK provides power supplies and energy devices, magnetic heads and more. . . . The company has a network of design and manufacturing locations and sales offices in Asia, Europe, and in North and South America.  In fiscal 2020, TDK posted total sales of USD 12.5 billion and employed about 107,000 people worldwide."  *TDK Electronics*, https://www.tdk-electronics.tdk.com/en/180332/company/tdk-electronics.

Suspension assemblies are likewise just one of NHK's many products, which include "Automotive Suspension Springs, Automotive Seats, Precision Spring & Components, HDD suspensions and mechanical components, Industrial Machinery & Equipment (Semiconductor Process Components, Ceramic Products, Pipe Support Systems, Security Product, Polyurethane Products, Integrated Metal Substrate, Parking systems)."  *Corporate Profile - Overview*, https://www.nhkspg.co.jp/eng/company/outline/outline.html.

1  NAT—that facilitated information sharing and price fixing under the guise of legitimate intra-

2  company or supplier-customer relationships.

3       In addition to the contemporaneous conspiracy evidence, there are ample after-the-fact

4  confirmations and admissions of wrongdoing.  The company admissions of guilt are noted above.

5  Multiple individual employees, including top executives, were disciplined for participating in this

6  cartel.  Disciplinary records that have come to light describe or refer to the wrongful conduct, pay

7  reductions, and employee "apology letters."  And despite TDK's efforts to shield this information

8  from discovery, Magistrate Judge Westmore compelled its production, explaining that the

9  disciplinary records are "highly relevant."  *See* Order Regarding Disc. Letters at 2, No. 19-md-

10  02918-MMC, ECF No. 334.

11       While this much and more of the evidence adduced at trial will be common to Seagate and

12  the Class Plaintiffs, there are important differences in the parties' evidentiary showings.  Thus,

13  although Seagate's claims and the Class Plaintiffs' claims stem from the same conspiracy,[5]

14  Seagate's claims and the Class Plaintiffs' claims are not the same, nor do they present the same

15  factual and legal issues at trial.  The differences between the Seagate and class cases render them

16  unsuitable for a consolidated trial.

17  **II.    A SEPARATE SEAGATE TRIAL IS THE MOST EFFICIENT PATH TO RESOLVING THIS CASE**

18

19       The Seagate case can be ready for trial next year, assuming discovery proceeds at an

20  appropriate pace.[6]  Seagate has requested a jury trial and anticipates the trial to last approximately

21  three to four weeks.[7]  Setting a trial date at this time will provide the parties with reference points

---

[5] Unlike Resellers and End-Users, Seagate has named Headway Technologies, Inc. as a Defendant.

[6] If the continuing impact of the pandemic continues to slow depositions, then the trial date may need to adjust, just as the schedule for Defendants' FTAIA extraterritoriality motion for summary judgment may need to adjust.

[7] Seagate's trial estimate is consistent with the actual or requested Direct Action Plaintiff ("DAP") trial lengths in other component price-fixing cases.  For example, in *LCD*, the Best Buy trial in N.D. Cal. lasted six weeks and the Costco trial remanded to W.D. Wa. lasted five weeks.  *See Best Buy Co. v. AU Optronics Corp.*, No. 3:10-cv-04572 (N.D. Cal.); *Costco Wholesale Corp. v. AU Optronics Corp.*, No. 2:13-v-01207 (W.D. Wa.).  In *CRT*, the parties estimated four weeks for trial in the Sharp case.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-05944 (N.D.

(continued...)

for the timing of discovery and motion practice, and allow for an efficient resolution of the case. The parties can work together to propose interim deadlines for events after the close of fact discovery—already set as May 20, 2022—and up to trial.  The illustration Seagate provided to Defendants on March 31 is set out in Appendix A.[8]  Defendants provided their counterproposal, contained in Appendix B, on April 9.  Defendants' proposed schedule is unworkable as it, *inter alia*, combines Seagate with the class cases for trial; delays resolution in the Seagate case until after class certification; imposes a compressed schedule on the Court to decide two major class certification motions; and does not acknowledge the further delay to Seagate should there be multiple rounds of class certification.

### A.   A SEPARATE SEAGATE TRIAL AVOIDS COMPLEXITY AND POTENTIAL JURY CONFUSION

Seagate's claims and the defenses to those claims are different than the indirect purchaser class actions.  Seagate will present more straightforward antitrust claims at trial than the indirect classes, in which disparate interests of the indirect purchaser classes will be represented.  Seagate will only need to demonstrate that the Defendants' actions impacted Seagate's purchases—a narrower set of issues than in the Reseller and End-User actions.  As for Seagate's breach of contract claim, Seagate will show Defendants' misuse of confidential information in violation of non-disclosure agreements with Seagate, which has not been teed up as an issue in the Reseller and End-User cases.  Likewise, the class cases involve state-law claims under 47 antitrust acts and consumer protection statutes not at issue in the Seagate case.  *See* App. C.  Defendants will potentially have specific defenses to a number of these, including state-specific statute of limitations defenses.

_____

Cal.).  In *Batteries*, TracFone requested four weeks for trial, Acer requested four weeks, and Flextronics requested three to four weeks.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.).

[8] The parties' experts will be working on preparing their reports during fact discovery, so will be in a position to serve opening expert reports shortly after the close of fact discovery.  Expert depositions can occur shortly after submitting their reports.  *Daubert* motions can occur concurrently with the summary judgment briefing schedule, if that is the Court's preference. Defendants will be filing a separate summary judgment motion on FTAIA and extraterritoriality topics ahead of this summary judgment schedule, which will streamline the remaining summary judgment motions the parties will file.

Notably, as this Court observed during the last Case Management Conference, Resellers and End-Users must each establish pass-through of the overcharges to prove their respective injuries. The Resellers and End-Users will each present substantial and varied evidence on whether overcharges were passed through distribution channels—including at least OEMs, distributors, and retailers—to reach the indirect purchasers. Moreover, Resellers and End-Users are indirect purchasers at *two different levels* of the distribution chain. They will thus be presenting competing evidence on whether the Resellers passed through the overcharge to the End-Users—Resellers will say no, End-Users will say yes. This will require separate expert methodologies and testimony.

None of this pass-through evidence is relevant to Seagate's Sherman Act claim. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968).[9] As recognized by this District in *CRT*, the court excluded such evidence and argument regarding downstream pass-through in the trial of direct purchaser individual actions as irrelevant because "***the [direct purchaser] would have been harmed the moment they paid an illegal overcharge***." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. MDL 1917, 2016 WL 7800819, at *8–9 (N.D. Cal. Nov. 15, 2016) (emphasis added) (citing *Hanover Shoe*, 392 U.S. 481, at 494; *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980)).

Combining the class trial, in which there will be *at least* two plaintiff experts opining on pass-through—with the Seagate case, in which Seagate will present its own expert testimony on its direct purchases—presents substantially different expert testimony and methodologies that will be practically impossible for the jury to keep straight. There is a significant risk of jury confusion and prejudice if the jury must spend days or perhaps weeks focusing on pass-through for the class cases—but must ignore that same evidence when considering Seagate's Sherman Act claim.

Apart from Seagate naming Headway as a Defendant, the conspiracy evidence in the Seagate cases and the class cases largely overlaps. But the evidentiary differences are significant. Seagate's breach of contract claim falls outside the ambit of the class cases and, likewise, pass-

---

[9] In *Illinois Brick*, the Supreme Court reaffirmed its holding in *Hanover Shoe* that "in general a pass-on theory may not be used defensively by an antitrust violator against a direct purchaser plaintiff." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726 (1977).

1   through in complex distribution chains will be a significant focus of trial in the class cases.  This

2   is shown in the diagram below:



## B.     A SEPARATE SEAGATE TRIAL WILL FOCUS THE ISSUES FOR THE INDIRECT CLASS ACTIONS

Resolution of the Seagate action first has potential collateral estoppel benefits for the parties in the class actions.  If Seagate prevails at trial, the preclusive effect of the verdict will reduce the scope of the subsequent trial in the class cases.  There could potentially be collateral estoppel on, *inter alia*:

- the scope of the conspiracy (price fixing, agreements on market shares, customer and supply allocation, etc.);
- how long the conspiracy lasted;
- the conspiracy's effect on United States commerce;
- whether SAE participated in the conspiracy as a hub for facilitating information sharing;
- which other TDK and NHK subsidiaries were members of the conspiracy;
- the amount of the overcharge paid by Seagate; and
- whether TDK acquired HTI as part of a plan with NHK to consolidate the market in furtherance of the conspiracy.

Because Resellers, End-Users, and Seagate allege similar conspiracy periods, a finding that the conspiracy began in 2003 in the Seagate case would have demonstrative collateral estoppel effects in the trial of the class cases.  And even if the jury in the Seagate trial found that Defendants did not conspire outside of the NHK guilty plea period (2008-2016), this would be valuable information for the parties in the class cases to know in advance of that trial.

Because a trial outcome favorable to Seagate will be dispositive of several issues in the class cases, the trial in the class cases would then focus even more specifically on injury to the Resellers and End-Users, pass-through, and damages.  This would reduce the amount of time needed for the Reseller and End-User trial.

Regardless of the outcome, trying the Seagate case first will also promote settlement of the Reseller and End-User cases.  An earlier Seagate trial will provide the parties in the class cases the opportunity to see the conspiracy and Seagate overcharge evidence presented at trial, which will

allow the parties to evaluate the strength of the Reseller and End-User cases, encouraging settlement.

### C.   A SEPARATE SEAGATE TRIAL PROMOTES JUDICIAL ECONOMY AND AVOIDS DELAY AND PREJUDICE TO SEAGATE

Class certification in antitrust cases is often complex, and always takes time. Putting the Seagate case on ice potentially for a year or more pending resolution of two different class certifications (Resellers and End Users) would be an inefficient use of judicial resources and would prejudice Seagate. This Court has an interest in resolving cases quickly, and not unnecessarily keeping the Seagate case on its docket for years despite the case being ready for trial. It would also impose substantial costs on Seagate during the waiting period continuing to attend to this case.

And aside from continuing costs, Seagate has a substantive need to expeditiously prosecute its case. "[C]ase law is replete with examples of the need to resolve cases expeditiously. Trials can be significantly impacted by a delay from the underlying events as memories fade." *Cisco Sys., Inc. v. Sheikh*, No. 4:18-CV-07602-YGR, 2020 WL 7408229, at *1 (N.D. Cal. Apr. 17, 2020); *see also Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 809 (N.D. Cal. 1989) ("Plaintiff has an interest in proceeding expeditiously with [its] action. Witnesses relocate, memories fade, and persons allegedly aggrieved are unable to seek vindication or redress for indefinite periods of time on end.") (internal quotation marks omitted); *Pagtalunan v. Galaza*, 291 F.3d 639, 643 (9th Cir. 2002) ("Unnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale.").

The possibility of significant delay is real. In this District, *Batteries* and *ODD* are the most recent examples of component price-fixing cases involving a class of indirect, finished product purchasers.[10] *See Batteries*, No. 4:13-md-02420; *ODD*, No. 3:10-md-02143. Both cases required two rounds of class certification efforts because Indirect Purchaser Plaintiffs ("IPPs") were not successful on their first attempt (in *ODD*, IPPs eventually certified their class on the second try; in

---

[10] In another recent example from this District, *Capacitors*, the indirect purchaser putative class did not include finished, consumer product purchasers but rather indirect purchasers of the components themselves (unlike in *Batteries*, *ODD*, and here). Nonetheless, it still took nearly **three-and-a-half years** from the IPPs' motion for class certification (June 2017) until denial (November 2020).

1   *Batteries*, IPPs failed both times and even filed a third—unsanctioned—motion for class

2   certification).

3          In *Batteries*, **over two years** elapsed between the first motions for class certification

4   (January 2016) and the second-round denial of class certification in the IPP case (March 2018).

5   There was then a Rule 23(f) petition for permission to appeal the class certification order to the

6   Ninth Circuit, which added on several additional months to the class certification phase.

7          In *ODD*, **nearly three years** elapsed between the first motions for class certification (May

8   2013) and the second-round grant of class certification in the IPP case (February 2016).  After

9   each round of class certification orders, there was a Rule 23(f) petition for permission to appeal to

10  the Ninth Circuit, adding on additional time to the class certification phase.[11]

11         Because *Batteries* and *ODD* also involved classes of indirect purchasers of finished,

12  consumer goods, these are appropriate examples to gauge how long the class certification stage—

13  including briefing, expert reports, *Daubert* motions, hearings, decisions, and 23(f) appeals—may

14  take here.  Resellers and End-Users will have to demonstrate that they have viable methodologies

15  for establishing class-wide antitrust injury and damages.  As in *Batteries* and *ODD*, that inquiry

16  will require assessing pass-through in distribution channels including at least OEMs, distributors,

17  and retailers.

18         Defendants can offer no reason to delay trial in the Seagate case pending what may be a

19  year or more of class certification efforts and other proceedings in the Reseller and End-User cases.

20  There are no countervailing efficiencies.  While Seagate takes no position on the ultimate

21  likelihood of class certification, there is of course no guarantee that Resellers and End-Users will

22  be able to certify their classes on their first attempts or at all.  There is thus a possibility that Seagate

23  could be put on hold for years, only to *still* proceed to trial alone at the end of the day if the class

24  cases do not get certified.

25

26

27

28  [11] Defendants also thereafter moved to decertify the IPP class in July 2017, which the court denied
    in December 2017.

1

2

### D.   SEPARATE TRIALS IN ANTITRUST CONSPIRACY CASES ARE ROUTINE IN THIS DISTRICT

3

4   Defendants claim that "[a] single, integrated, pretrial schedule is the norm in antitrust

5   MDLs, with class cases and individual cases proceeding in parallel."  Joint Case Management

6   Statement 14, ECF No. 333.  There is no requirement that all cases in an MDL proceed to trial at

7   the same time.[12]  Nor could there be, as this would impose an absurd result.  Cases that are

8   transferred to an MDL in another district are typically remanded back to the original district court

for trial (and it is usually the original district court that then sets the trial schedule).

9   Even for cases that will remain in the MDL district for trial, there is no requirement that

10  they proceed to trial together.  This is particularly true where, as here, setting a uniform trial date

11  in all cases would force a single direct purchaser who is otherwise ready for trial to wait around

12  for what may be years of class certification efforts.  *See In re Phenylpropanolamine (PPA) Prods.*

13  *Liab. Litig.*, 460 F.3d 1217, 1250 (9th Cir. 2006) (cautioning that in an MDL proceeding, "due

14  process and fundamental fairness may not be sacrificed to provide assembly-line justice"); *see also*

15  *id.* (plaintiffs in an MDL "retain[] their individual identities").

16

> [I]n deciding whether to consolidate particular cases for trial, the court must weigh "***the interest of judicial convenience against the potential for delay, confusion and prejudice caused by consolidation***."  *Southwest Marine, Inc. v. Triple A Machine Shop, Inc.*, 720 F. Supp. 805, 807 (N.D. Cal. 1989).  Although the possibility of conserving resources by aggregating the litigation is attractive, ***a party's individual rights must "not be lost in the shadow of a towering mass litigation***."  *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir. 1992).

17

18

19

20

21  *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, MDL 997, 1995 WL 399684

22  at *2 (N.D. Ill. July 7, 1995) (emphases added).

23

24  ---

[12] Indeed, sequencing various actions in an MDL is squarely within the transferee court's

25  discretion.  *See, e.g.*, *In re Epipen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust*

26  *Litig.*, 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017) (centralizing an individual action with class actions because "to the extent [the individual action] presents unique factual and legal issues, the

27  transferee judge has the discretion to address those issues through the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice.  Additionally, the transferee

28  judge may recommend Section 1407 remand of [the individual action] in advance of other actions if he deems it appropriate").

Scheduling separate trials in the different cases within a component price-fixing MDL in this District is the norm, not the exception:

| Case | Separate Trials Scheduled? |
|------|----------------------------|
| *Capacitors* | Yes, separate.  The parties in *Capacitors* all agreed that the DPP,[13] IPP, and DAP cases required separate trials.  *See* Joint Status Conference Statement, *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801, ECF No. 747 (N.D. Cal. July 18, 2019).  The parties in *Capacitors* recognized that separate trials were necessary because "[t]he ***three groups of Plaintiffs have alleged distinct theories and distinct claims regarding the conspiracy, [and] will rely on different experts presenting analyses premised on different methodologies*** . . . thereby potentially confusing issues further for a lay jury."  *Id.* (emphasis added). |
| *CRT* | Yes, separate. Judge Conti scheduled multiple trials—even scheduling a separate trial for one of the DAPs, Sharp, who was positioned slightly differently from the other DAPs over objections from defendants that the cases should all be consolidated for a single trial.  He scheduled another trial for the remaining DAPs, and a third trial for the DPPs.  Tr. of Proceedings at 11:1-4, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-05944, ECF No. 3969 (N.D. Cal. Aug. 11, 2015) ("So, the order of trial is going to be this: The first trial I'm going to have are the Sharp cases. [] The second order will be the Direct Action Plaintiffs.  And the third order will be the Direct Purchaser Plaintiffs."); *id.* at 12:4–9.

Defendants objected to separate trials in the Sharp DAP case versus the remaining DAP cases, specifically raising that two trials would require defendants to "bring the same witnesses twice.  Many of the witnesses come from Japan and other far-flung places.  Many of them are non-party witnesses that we have to convince to come voluntarily."  *Id.* at 12:15–19.

Defendants also cited the "additional burdens on the Court" from "selection and the [e]mpanelment of juries twice."  *Id.* at 13:5–7.  Judge Conti proceeded with scheduling separate trials despite Defendants' arguments.  *See id.* at 13:19–20. |

---

[13] This case is unique from the other components cases in this District, as there is no Direct Purchaser Plaintiff (DPP) class here.  Seagate is also the only DAP in the case.  Thus, Seagate is not similarly situated to any other plaintiff currently in the MDL.

| Case | Separate Trials Scheduled? |
|------|----------------------------|
| **DRAM** | Yes, separate. The direct purchaser class filed its action first, followed by indirects and then DAPs. The court entered a trial schedule specifically for DPPs at the onset and, after the IPPs joined the MDL, ordered the IPPs to follow a separate pretrial schedule. *See* Further Case Management Order, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 4:02-md-01486, ECF No. 482 (N.D. Cal. July 19, 2005); Pretrial Scheduling Order, ECF No. 480 (N.D. Cal. July 19, 2005). The defendants later requested that the court enter a new, joint trial schedule and push back DPPs' trial date. Defendants' Joint Proposal for Revised Pre-Trial and Trial Schedule for All Actions, ECF No. 1030 (N.D. Cal. Aug. 18, 2006). The court declined to do so, and set separate schedules for each with the DPP trial preceding all others. Case Management Order, ECF No. 1042 (N.D. Cal. Aug. 29, 2006). |
| **Lithium Ion Batteries ("Batteries")** | Yes, separate. Judge Gonzalez-Rogers scheduled an earlier date for the DAP trial than the IPP trial, even though IPPs filed their complaint nearly two-and-a-half years before the first DAP. *See* Scheduling and Trial Setting Order for Direct Actions, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420, ECF No. 1964 (N.D. Cal. Oct. 2, 2017) (setting trial date as Oct. 22, 2018); Civil Mins., ECF No. 1870 (N.D. Cal. July 14, 2017) (setting trial date as Jan. 28, 2019). Note that, at the time the court entered this scheduling order on DAP trials in October 2017, the DPP case had settled. All cases in *Batteries* ended up settling prior to trial. |
| **Optical Disk Drive Prods. ("ODD")** | Would likely have gone forward separately. Judge Seeborg contemplated trying the DAP and IPP cases separately, but the *ODD* cases in this District settled prior to trial. While he originally set a single trial date for all actions that were to be tried in the Northern District of California, he set the date explicitly "without prejudice to any determination that one or more of the Direct Action Purchaser cases should be tried separately from the Indirect Purchaser Consolidated action." *See* Scheduling Order at 2 & n.1, *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 3:10-md-02143-RS, ECF No. 1866 (N.D. Cal. Apr. 22, 2016). |
| **SRAM** | Yes, separate. The court ordered separate trials for the direct and indirect purchasers. *See* Order on Motions in Limine and for Pre-Trial Preparation at 1-2, *In re: Static Random Access Memory (SRAM) Antitrust Litig.*, No. 4:07-md-01819-CW, ECF No. 1206 (N.D. Cal. Dec. 16, 2010). |
| **TFT-LCD** | Yes, separate. Judge Illston scheduled multiple trials for the different plaintiff groups. The DPPs proceeded to trial first, and the court scheduled three separate tracks of DAPs with different trials for each (depending on when each DAP filed its complaint). *See* Order Re: Pre-Trial and Trial Schedule at 1-3, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI, ECF No. 2165 (N.D. Cal. Nov. 23, 2010); Civil Pre-Trial Mins. at 1, ECF No. 6419 (N.D. Cal. Aug. 9, 2012); Stipulation and Order Setting Track 3 Deadlines at 1-2, ECF No. 9020 (N.D. Cal. May 12, 2014). |

1    None of these component price-fixing cases held a consolidated DAP and indirect

2    purchaser trial—much less forced a DAP who was otherwise ready for trial to wait for years until

3    the resolution of class certification.[14]  This is not the situation where the first DAP in the MDL

4    filed years after the putative classes, such that class certification efforts are already underway, and

5    therefore both DAP and class cases might naturally progress to trial at the same time.  Unlike the

6    DAPs in other components price-fixing cases in this District, Seagate has been in this case since

7    only a few months after MDL consolidation.[15]  Seagate's decision to expeditiously file suit and

8    join this MDL early on should not now subject it to unnecessary delay.

9    **III.    CONCLUSION**

10    Seagate respectfully requests that the Court enter a scheduling order setting trial in the

11    Seagate action to commence in October or November of 2022 at the Court's convenience, or, in

12    the alternative, on the first available date thereafter.

---

[14] Ordering separate trials in antitrust cases for different categories of plaintiffs is not unique to this District.  For example, the court in *In re Polyurethane Foam Antitrust Litigation* ordered separate trials for the DPPs, IPPs, and DAPs on the basis that separate trials would avoid "passthrough issues" and be "more manageable for this Court and the jury."  Order Selecting Initial Trial, Requiring Party Mediation, and Revising Remaining Deadlines at 3, No. 1:10-md-02196-JZ, ECF No. 1272 (N.D. Ohio July 3, 2014).

[15] There were only a few months between consolidation in this MDL (October 8, 2019) and the filing of the Seagate complaint (February 18, 2020).  In contrast, several years passed before the filing of DAP cases in other MDLs.  *See Batteries* (MDL consolidation in February 2013; first DAP case filed in June 2015); *Capacitors* (first class complaints in July 2014; first DAP case filed in June 2015); *CRT* (MDL consolidation in February 2008; first DAP case filed in March 2012); *LCD* (MDL consolidation in April 2007; first DAP case filed in March 2009).

1    Dated: April 9, 2021                           Respectfully submitted,

2                                                   WILSON SONSINI GOODRICH & ROSATI

3                                                   Professional Corporation

4                                                   /s/ Kenneth R. O'Rourke

                                                    Kenneth R. O'Rourke
5                                                   Jeff VanHooreweghe

                                                    Mikaela E. Evans-Aziz* (admitted pro hac vice)
6                                                   One Market Plaza

7                                                   Spear Tower, Suite 3300
                                                    San Francisco, CA 94105
8                                                   Telephone:     (415) 947-2000
                                                    Facsimile:     (415) 947-2099
9                                                   Email: korourke@wsgr.com
                                                           jvanhooreweghe@wsgr.com
10                                                         mevansaziz@wsgr.com

11                                                  *Admitted to practice only in New York,

12                                                  supervised by members of the California Bar

13                                                  Attorneys for Plaintiffs Seagate Technology LLC,

                                                    Seagate Technology (Thailand), Ltd., Seagate
14                                                  Singapore International Headquarters Pte. Ltd.,

                                                    and Seagate Technology International
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 9, 2021, the foregoing document was filed with the Clerk of the Court for the United States District Court for the Northern District of California, San Francisco by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ *Kenneth R. O'Rourke*
Kenneth R. O'Rourke

1

## APPENDIX A
**Seagate's Example Schedule to Trial (Sent to Defendants on March 31, 2021)**

2

3

| Date | Event |
|------|-------|
| **Friday, 7/30/2021 – Court already set** | **Substantial Completion of Document Production** |
| **Friday, 5/20/2022 – Court already set** | **Close of Fact Discovery** |
| Monday, 5/23/2022 | Expert Reports (from parties bearing burden) |
| Friday, 6/24/2022 | Rebuttal Expert Reports |
| Friday, 7/8/2022 | Reply Expert Reports |
| Friday, 7/15/2022 | Summary Judgment Motion |
| Friday, 8/5/2022 | Summary Judgment Opposition |
| Tuesday, 8/16/2022 | Summary Judgment Reply |
| Friday, 9/2/2022 | Summary Judgment Hearing |
| Monday, 10/24/2022 | Seagate Trial Commences |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX B**
**Overlap in the Seagate Case vs. Reseller and End-User Cases**

| Claim/Issue | At Issue in Seagate Case? | At Issue in the End-User or Reseller Cases? |
|---|:---:|:---:|
| Suspension assembly price fixing & supply restraint conspiracy | ✓ | ✓ |
| Conspiracy Defendants NHK & TDK including HTI & MPT | ✓ | ✓ |
| Conspiracy time period[16] | ✓ | ✓ |
| Seagate's purchasing process for suspension assemblies & amount | ✓ | ✓ |
| Overcharge on sales of suspension assemblies to Seagate | ✓ | ✓ |
| Amount of Seagate's impacted products imported into US | ✓ | ✓ |
| California Business and Professions Code, § 16700, *et seq.* (antitrust) | ✓ | ✓ |
| California Business and Professions Code § 17200, *et seq.* (consumer protection) | ✓ | ✓ |
| Minnesota Statutes Annotated § 325D.49, *et seq.* (antitrust) | ✓ | ✓ |
| Breach of contract | ✓ | X |
| Sherman Act § 1 | ✓ | X |
| Arkansas Code Annotated, § 4-88-101, *et seq.* (consumer protection) | X | ✓ |
| Arizona Revised Statutes, § 44-1401, *et seq.* (antitrust) | X | ✓ |
| District of Columbia Code Annotated § 28-4501, *et seq.* (antitrust) | X | ✓ |
| District of Columbia Code § 28-3901, *et seq.* (consumer protection) | X | ✓ |
| Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (consumer protection) | X | ✓ |
| Hawaii Antitrust Act, Haw. Rev. Stat. § 480-4 | X | ✓ |
| Hawaii Rev. Stat. § 480-2 (consumer protection) | X | ✓ |
| Iowa Code § 553.1, *et seq.* (antitrust) | X | ✓ |
| Kansas Statutes Annotated, § 50-101, *et seq.* (antitrust) | X | ✓ |
| Maine Rev. Stat. Ann. tit. 10, § 1101, *et seq.* (antitrust) | X | ✓ |
| Maryland Antitrust Act, Md. Code. Ann., Com. Law § 11-201, *et seq.* | X | ✓ |
| Massachusetts G.L. c. 93A, § 2 (consumer protection) | X | ✓ |
| Michigan Compiled Laws Annotated § 445.771, *et seq.* (antitrust) | X | ✓ |
| Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.* (consumer protection) | X | ✓ |
| Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* | X | ✓ |
| Mississippi Code Annotated § 75-21-1, *et seq.* (antitrust) | X | ✓ |
| Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* (consumer protection) | X | ✓ |
| Montana Consumer Protection Act of 1973, Mont. Code, § 30-14-101, *et seq.* | X | ✓ |
| Nebraska Revised Statutes § 59-801, *et seq.* (antitrust) | X | ✓ |
| Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq.* (consumer protection) | X | ✓ |

---

[16] Like Seagate, Resellers allege a conspiracy period of 2003-2016.  *See* Reseller Pls.' Second Consolidated Am. Compl. ¶¶ 4, 7, No. 19-md-02918-MMC, ECF No. 303.  End-Users allege a conspiracy period of 2005-2016.  *See* End-User Pls.' Second Am. Consolidated Class Action Compl. ¶ 13, No. 19-md-02918-MMC, ECF No. 311.

| Claim/Issue | At Issue in Seagate Case? | At Issue in the End-User or Reseller Cases? |
|---|---|---|
| Nevada Revised Statutes Annotated § 598A.010, *et seq.* (antitrust) | X | ✓ |
| Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* | X | ✓ |
| New Hampshire Revised Statutes § 356:1, *et seq.* (antitrust) | X | ✓ |
| New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq.* | X | ✓ |
| New Mexico Statutes Annotated § 57-1-1, *et seq.* (antitrust) | X | ✓ |
| New Mexico Stat. § 57-12-1, *et seq.* (consumer protection) | X | ✓ |
| New York General Business Laws § 340, *et seq.* (antitrust) | X | ✓ |
| N.Y. Gen. Bus. Law § 349, *et seq.* (consumer protection) | X | ✓ |
| North Carolina General Statutes § 75-1, *et seq.* (antitrust) | X | ✓ |
| North Carolina Gen. Stat. § 75-1.1, *et seq.* (consumer protection) | X | ✓ |
| North Dakota Century Code § 51-08.1-01, *et seq.* (antitrust) | X | ✓ |
| North Dakota Unfair Trade Practices Law, N.D. Cent. Code § 51-10, *et seq.* | X | ✓ |
| Oregon Revised Statutes § 646.705, *et seq.* (antitrust) | X | ✓ |
| Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.* (consumer protection) | X | ✓ |
| Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.* | X | ✓ |
| Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* | X | ✓ |
| South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* | X | ✓ |
| South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24, *et seq.* | X | ✓ |
| South Dakota Codified Laws § 37-1-3.1, *et seq.* (antitrust) | X | ✓ |
| Tennessee Code Annotated § 47-25-101, *et seq.* (antitrust) | X | ✓ |
| Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.* | X | ✓ |
| Utah Code Annotated § 76-10-3101, *et seq.* (antitrust) | X | ✓ |
| Vermont Stat. Ann. 9 § 2453, *et seq.* (antitrust) | X | ✓ |
| Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et seq.* | X | ✓ |
| Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, *et seq.* | X | ✓ |
| West Virginia Code § 47-18-1, *et seq.* (antitrust) | X | ✓ |
| Wisconsin Statutes § 133.01, *et seq.* (antitrust) | X | ✓ |
| Western Digital's, Hitachi's, and Toshiba's purchasing process & amounts | X | ✓ |
| Overcharge on sales of suspension assemblies to WD, Hitachi, and Toshiba | X | ✓ |
| Amount of WD's, Hitachi's, and Toshiba's impacted products imported into US | X | ✓ |

**APPENDIX C**
**Defendants' Proposed Schedule (Sent to Seagate on April 9, 2021)**

| Date | Deadline |
|---|---|
| July 30, 2021 | Substantial completion of document production |
| October 4, 2021 (est.) | Opening FTAIA Motion for Summary Judgment |
| December 18, 2021 (est.) | Opposition to FTAIA Motion for Summary Judgment |
| February 1, 2022 (est.) | Reply in Support of FTAIA Motion for Summary Judgment |
| May 20, 2022 | Close of fact discovery |
| March 6, 2022 | Class Certification Motions & Expert Reports in Support of Class Certification<br>*(Expert backup to be provided 3 days after service of report.*<br>*Expert to be available for deposition within 3 weeks of serving report.)* |
| May 5, 2022 | Class Certification Opposition & Expert Reports<br>*(Expert backup to be provided 3 days after service of report. Expert to be available for deposition within 2 weeks of serving report.)* |
| June 4, 2022 | Class Certification Replies<br>*(No further class expert reports.)* |
| July 3, 2022 | Deadline for Class Certification Sur-Replies |
| May 23, 2022 (or 21 days after decision on FTAIA motion, whichever is later) | Deadline for plaintiffs' opening expert reports<br>*(Backup to be provided 3 days after service of report.*<br>*Expert to be available for deposition within 3 weeks of serving report)* |
| July 21, 2022 (or 60 days after plaintiffs' expert reports, whichever is later) | Deadline for defendants' expert reports (rebuttal reports)<br>*(Backup to be provided 3 days after service of report.*<br>*Expert to be available for deposition within 2 weeks of serving report.)* |
| September 5, 2022 (or 45 days after defendants' rebuttal reports, whichever is later) | Deadline for reply expert reports<br>*(Backup to be provided 3 days after service of report*<br>*Expert to be available for deposition within 2 weeks of serving report.)* |
| October 5, 2022 (or 30 days after reply reports, whichever is later) | Close of expert discovery |
| October 20, 2022 (or 15 days after close of expert discovery, whichever is later) | Deadline for dispositive motions and Daubert motions |
| December 19, 2022 (or 60 days after dispositive/Daubert motion deadline, whichever is later) | Opposition to dispositive motions and Daubert motions |

| Date | Deadline |
|---|---|
| January 19, 2023 (or 30 days after dispositive/Daubert motion opposition briefs, whichever is later) | Reply in support of dispositive motions and Daubert motions |
| February 9, 2023 | Deadline for settlement conference |
| February 16, 2023 | Motions in limine due |
| March 16, 2023 | Motions in limine response briefs due |
| April 6, 2023 | Motions in limine reply briefs due |
| April 13, 2023 | Last day to meet and confer re: pretrial order |
| April 24, 2023 | Exchange proposed exhibit and witness lists |
| 10 days before Pretrial Conference | Last day to file Pretrial Statement, proposed jury instructions, voir dire, proposed verdict forms, proposed findings of fact and conclusions of law |
| May [XX], 2023 | Pretrial Conference Date |