1
2
3
4         IN THE UNITED STATES DISTRICT COURT
5      FOR THE NORTHERN DISTRICT OF CALIFORNIA
6

7      IN RE: HARD DISK DRIVE                Case No.  19-md-02918-MMC
8      SUSPENSION ASSEMBLIES
       ANTITRUST LITIGATION                  **ORDER GRANTING IN PART AND
9                                            DENYING IN PART DEFENDANTS'
                                             MOTION TO DISMISS SECOND
10     This Document Relates to:            AMENDED CONSOLIDATED CLASS
           END-USER ACTIONS and            ACTION COMPLAINTS**
11         RESELLER ACTIONS
12

14         Before the Court is defendants' Motion, filed January 29, 2021, "to Dismiss

15   (1) End-Users' Second Amended Consolidated Class Action Complaint and (2) Reseller

16   Plaintiffs' Second Amended Consolidated Class Action Complaint."  End-User Plaintiffs

17   and Reseller Plaintiffs have filed separate oppositions, and defendants have filed a single

18   reply.  Having read and considered the papers filed in support of and in opposition to the

19   motion, the Court rules as follows.[1]

20                                **BACKGROUND**

21         Plaintiffs, in their respective operative complaints, specifically, End-User Plaintiffs'

22   Second Amended Consolidated Class Action Complaint ("End-User SAC") and Reseller

23   Plaintiffs' Second Consolidated Amended Complaint ("Reseller SAC"), assert state law

24   claims based on their allegations that defendants engaged in a conspiracy to fix the

25   prices of "hard disk drive ('HDD') suspension assemblies" ("SAs").  (See End-User SAC

26   ¶ 1; Reseller SAC ¶ 1.)

27   _____

28         [1] By order filed May 3, 2021, the Court took the matter under submission.

United States District Court
Northern District of California

Plaintiffs allege "HDDs use magnetism to write, retrieve and store vast amounts of information electronically" (see End-User SAC ¶ 113; Reseller SAC ¶ 45), and are "comprised of, among other things, spinning magnetic disks and magnetic heads that fly over the disks, reading and writing the information contained on the disks" (see Reseller SAC ¶ 50; see also End-User SAC ¶ 118). Plaintiffs further allege SAs "hold the magnetic heads in position over the disks," and, consequently, are "essential to the functioning of HDDs." (See End-User SAC ¶ 118; Reseller SAC ¶ 50.)

According to plaintiffs, defendants manufacture and sell SAs to "HDD manufacturers, primarily Seagate, Western Digital and Toshiba" (see Reseller SAC ¶ 51; see also End-User SAC ¶ 219), which, in turn, sell HDDs directly to customers or sell them to companies that incorporate HDDs into other products, such as desktop and laptop customers (see End-User SAC ¶¶ 126-27, 219; see also Reseller SAC ¶¶ 46-47, 52, 54).

End-User Plaintiffs, comprising sixty-two individuals (see End-User SAC ¶¶ 24-85), allege they purchased one or more HDDs (see, e.g., End-User SAC ¶¶ 25, 52), and/or one or more products containing an HDD, such as a "HP Pavilion G6 notebook computer" (see End-User SAC ¶ 24). Reseller Plaintiffs, comprising four companies and one individual, allege they purchased "for resale" products "containing HDD suspension assemblies" (see Reseller SAC ¶¶ 23-27, 141), such as "Seagate and Western Digital hard drives" (see Reseller SAC ¶ 23) or an "MSI computer" (see Reseller SAC ¶ 27). In both cases, plaintiffs allege they paid "inflated prices" because the prices defendants charged HDD manufacturers were "passed on" to plaintiffs through the chain of distribution. (See End-User SAC ¶ 260; Reseller SAC ¶¶ 98(d), 99.)

Based on the above allegations, End-User Plaintiffs and Reseller Plaintiffs, on their own behalf and on behalf of putative class members, assert the following claims under the laws of various states: (1) First Claim for Relief, titled "Violation of State Antitrust Statutes," (2) Second Claim for Relief, titled "Violation of State Consumer Protection Statutes," and (3) Third Claim for Relief, titled "Unjust Enrichment."

United States District Court
Northern District of California

**DISCUSSION**

Defendants argue each claim asserted by End-User Plaintiffs and Reseller Plaintiffs is subject to dismissal for lack of standing and failure to state a claim.

**A.  Article III Standing**

To satisfy Article III's standing requirements, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision."  See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

Defendants contend plaintiffs' individual claims are subject to dismissal, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for failure to allege sufficient facts to support a finding that the claimed injury, payment of inflated prices, can be fairly traced to defendants.  Additionally, defendants argue, some of the claims plaintiffs seek to assert on behalf of putative class members are subject to dismissal for lack of an injury in fact.

**1.  Article III Standing:  Traceability**

By order filed October 23, 2020, the Court granted defendants' motion to dismiss plaintiffs' amended complaints, finding plaintiffs had failed to allege sufficient facts to support a finding that the claimed injury was "fairly traceable" to defendants.  (See Order, filed October 23, 2020, at 4:2-5:28.)  In particular, the Court found, the amended complaints were subject to dismissal for failure to allege (1) the types of products each named plaintiff purchased, and (2) facts to support a finding that each participant in the chain of distribution passed on the asserted overcharge to the next participant.  The Court afforded plaintiffs leave to amend to cure those two deficiencies, and plaintiffs subsequently filed the SACs.

The Court finds, and defendants do not dispute, that plaintiffs have cured the first of the above-referenced two deficiencies.  In particular, as to each named plaintiff, plaintiffs have identified the type(s) of product(s) containing SAs that each plaintiff purchased and have alleged the chain of distribution as to each such purchase.  (See,

e.g., End-User SAC ¶¶ 32, 219 (alleging plaintiff Jeffrey Greenfield purchased Western Digital "external HDD" from Western Digital, which had purchased SAs from defendants); Reseller SAC ¶¶ 23, 51, 54 (alleging plaintiff Now Micro, Inc. purchased "computers" and "storage servers" from Dell, which had purchased HDDs from HDD manufacturers, which had purchased SAs from defendants).)  Additionally, plaintiffs have alleged facts to support a finding that the SAs in the product(s) each plaintiff purchased can be traced to the particular manufacturing defendant.  (See End-User SAC ¶ 230 (alleging SAs are "distinct, physically discrete components of the disk drive that do not undergo physical alterations as they move through the distribution chain" and are "identifiable by specific, discrete part numbers," namely, "an English letter identifying the manufacturer," such as "M" for defendant Magnecomp Precision Technology Public Co. Ltd.); see also Reseller SAC ¶ 118.)

Defendants argue, however, that the SACs are subject to dismissal in their entirety for failure to cure the second of the deficiencies identified in the Court's order dismissing the amended complaints, namely, facts to support a finding that the alleged overcharges paid by HDD manufacturers to defendants were passed on to plaintiffs.

In that regard, plaintiffs have added allegations that SAs "comprise approximately 5-10% or more – up to 15% in some instances – of the cost of an HDD" (see End-User SAC ¶ 116; Reseller SAC ¶ 44), that HDDs are the "largest cost components" of "HDD storage systems" (see End-User SAC ¶ 245; Reseller SAC ¶ 49), and "HDDs are one of the highest cost components in a computer" (see End-User SAC ¶ 228; see also Reseller SAC ¶ 116).  Plaintiffs also now allege, citing studies and other works by economists, that "overcharges in a component normally result in higher prices for products containing [a] price-fixed component," and that, "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception," but, rather, "the rule" (see End-User SAC ¶ 253; see also Reseller SAC ¶ 102), particularly in "highly competitive" markets (see

//

//

4

United States District Court
Northern District of California

End-User SAC ¶ 234; Reseller SAC ¶ 105).[2]  Plaintiffs further allege that the markets for HDDs and computers are highly competitive.  (See End-User SAC ¶¶ 236-44; Reseller SAC ¶¶ 106-111).[3]  In addition, plaintiffs repeat the allegations, made in their respective amended complaints, that markets for HDDs and SAs are "inextricably linked and intertwined because the market for [SAs] exists to serve the HDD market" and that, "[w]ithout the HDDs, the [SAs] have little to no value because they have no independent utility."  (See End-User SAC ¶ 222; Reseller SAC ¶ 115.)

Courts have found allegations similar to those made by End-User Plaintiffs and Reseller Plaintiffs suffice at the pleading stage to establish traceability.  See, e.g., In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig. ("In re DRAM"), 2020 WL 8459279, at *2-3 (N.D. Cal. November 24, 2020) (holding plaintiffs sufficiently alleged traceability based on allegations that price-fixed chip made up "5-25% of the bill of costs in electronic devices," that manufacturers of electronic devices "engage[d] in vigorous competition, such that increases in component part prices would be passed on to consumers," and that the relevant markets were "'inextricably linked,' as demonstrated by [chip's] lack of independent utility and tight historical price correlations"); In re Qualcomm Antitrust Litig., 292 F. Supp. 3d 948, 968-69 (N.D. Cal. 2017) (holding plaintiffs sufficiently alleged traceability based on allegations that price-fixed chip made up "substantial portion" of cost of handset, that manufacturers of handsets and manufacturers of products containing handsets were engaged in "vigorous price competition" such that manufacturers "cannot readily absorb" additional prices charged

---

[2] As summarized by End-User Plaintiffs, "[i]n a highly competitive market, all businesses will set their prices slightly above their costs, resulting in narrow profit margins" because, "[i]f they did not, they would go out of business in the long run[,] either by setting prices too low and losing money on every sale, or setting prices too high and losing business to competitors."  (See End-User SAC ¶ 234.)

[3] Consistent therewith, End-User Plaintiffs allege, as an example, NetApp, a manufacturer of "HDD storage systems," has publicly stated that, "[t]o the extent that disk prices increase," it "intend[s] to pass along those price increases . . . to [its] customers while working to maintain relatively constant profit margins on [its] disk drives."  (See End-User SAC ¶ 247.)

United States District Court
Northern District of California

by defendant, and that chip had no use other than to be "incorporated into a handset") (internal quotation and citation omitted).

Although defendants do not challenge the reasoning in the above-cited cases, defendants argue that, in this instance, plaintiffs nonetheless fail to sufficiently allege traceability, given what defendants describe as the "long and complicated" chain of distribution (see Defs.' Mot. at 9:25-26), as well as the SAs being "inexpensive and represent[ing] only [a] small percentage of the total cost of the end-use products at issue" (see id. at 11:10-11).  The Court is not persuaded.

First, with respect to the length of the chain of distribution, although defendants argue the chain may, in some instances, be as long as eight or nine steps, no such facts are alleged in the SACs, making any argument as to the actual length of any chain premature at the pleading stage,[4] and, although defendants point out various hurdles plaintiffs may encounter (see, e.g., Defs.' Mot. at 13:10-16 (noting manufacturers may vary prices due to "sales and discounts")), such arguments, as one district court observed, "address difficulties of proof, not pleading deficiencies."  See In re Automotive Parts Antitrust Litig., 29 F. Supp. 3d 982, 998 (E.D. Mich. 2014) (finding premature at pleading stage defendant's argument that "commercial realities of [relevant market] undermine [plaintiffs'] elongated distribution chain allegations").

Next, with respect to their assertion that SAs represent only a "small percentage" of the cost of the product(s) purchased by plaintiffs (see Defs.' Mot. at 11:10-11), defendants have cited no case setting a particular threshold percentage a plaintiff must meet to establish standing to challenge an alleged price-fixing conspiracy, and no such case appears to exist.[5]  Indeed, as one district court observed, "[d]efendants may not

---

[4] As End-User Plaintiffs observe, the pleaded chain, depending on the specific plaintiff, ranges from two to five steps.  (See End-User Pls.' Opp. at 4:13-5:9.)

[5] The cases defendants cite address claims involving products that potentially contained no more than a "trace" amount of the allegedly price-fixed ingredient.  See Los Gatos Mercantile, Inc. v. E.I. DuPont de Nemours & Co., 2015 WL 4755335, at *14-*15 (N.D. Cal. August 11. 2015); In re Magnesium Oxide Antitrust Litig., 2011 WL 5008090,

United States District Court
Northern District of California

1  shield themselves from liability by fixing prices on a relatively inexpensive item."  See In

2  re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 614 (N.D. Cal.

3  2009); see also, e.g., In re Optical Disk Drive Antitrust Litig., 2016 WL 467444, at *2, *7-

4  11 (N.D. Cal. February 8, 2016) (allowing plaintiffs to proceed in case where price-fixed

5  component "typically represent[ed] a relatively small percentage of the cost of the product

6  as a whole").

7  Accordingly, plaintiffs' individual claims are not subject to dismissal for lack of

8  Article III standing.

9  **2.  Article III:  Standing as to Products Not Purchased by Named Plaintiff**

10  Plaintiffs seek to proceed on behalf of classes consisting of persons who

11  purchased "Standalone Storage Devices or Computers"[6] that included SAs manufactured

12  by or sold by a defendant.  (See End-User SAC ¶ 261; see also Reseller SAC ¶ 142.)

13  The SACs define "Standalone Storage Devices" as (1) "personal HDD storage devices"

14  (see End-User SAC ¶ 12; Reseller SAC ¶ 46), comprising (a) "'bare' HDDs, which are

15  purchased for installation in a storage device or computer," (b) "external hard drives,

16  which consist of an HDD, a simple USB adapter and/or power cord, and plastic housing,"

17  and (c) "network attached storage (NAS) drives, which are similar to an external hard

18  drive but have a separate power supply and some additional hardware and/or software

19  features" (see Reseller SAC ¶ 47; see also End-User SAC ¶ 124) and (2) "[e]nterprise

20  HDD storage systems," which are "storage servers and arrays, and include bare HDDs

21  purchased for installation in the systems" (see End-User SAC ¶ 125; see also Reseller

22  SAC ¶¶ 46, 48).[7]  The SACs define "Computers" as "[d]esktop and portable computers."

23  _____

24  at *7 (D. N.J. October 20. 2011), a circumstance not present in the instant litigation.

25  [6] In the alternative, plaintiffs seek certification of classes limited to persons who
   purchased "Standalone Storage Devices."  (See End-User SAC ¶ 262; see also Reseller

26  SAC ¶ 141.)

27  [7] According to plaintiffs, "a storage server or array generally comprises a chassis
   with multiple bays for installation of multiple HDDs (four, eight or more)."  (See End-User

28  SAC ¶ 125; see also Reseller SAC ¶ 48.)

United States District Court
Northern District of California

1   (See End-User SAC ¶ 12; see also Reseller SAC ¶ 45.)

2        The class claims are brought under the law of each state in which one or more

3   named plaintiffs made a purchase of a product containing an SA manufactured or sold by

4   a defendant.  Defendants contend the named plaintiffs lack standing to bring a class

5   claim on behalf of individuals who purchased a product different from those purchased by

6   the named plaintiffs.  For example, citing End-User Plaintiffs' allegation that one product

7   was purchased by a named plaintiff in Arkansas, specifically, an "HP Pavilion G6

8   notebook computer with 500 GB HDD" (see End-User SAC ¶ 24), defendants,

9   understanding said product to be a laptop computer, contend End-User Plaintiffs' class

10  claims under Arkansas law may only be brought on behalf of class members who

11  purchased laptop computers in Arkansas, not Standalone Storage Devices or desktop

12  computers.  As another example, citing Reseller Plaintiffs' failure to identify a named

13  plaintiff who purchased an NAS drive, defendants contend Reseller Plaintiffs' class

14  claims, irrespective of the state law under which they are brought, cannot be brought on

15  behalf of individuals who purchased NAS drives.

16        As plaintiffs point out, however, the Ninth Circuit, in Melendres v. Arpaio, 784 F.3d

17  1254 (9th Cir. 2015), has held that "once the named plaintiff demonstrates [his/her]

18  individual standing, the standing inquiry is concluded, and the court proceeds to consider

19  whether the Rule 23(a) prerequisites for class certification have been met."  See id. at

20  1261-62 (stating "any issues regarding the relationship between the class representative

21  and the passive class members — such as dissimilarity in injuries suffered — are

22  relevant only to class certification, not to standing") (internal quotation and citation

23  omitted).

24        In Melendres, the Ninth Circuit found a plaintiff asserting a civil rights deprivation

25  claim based on a racially motivated traffic stop had standing to bring claims on behalf of

26  putative class members who allegedly were subjected to traffic stops based on the same

27  race-based animus but under different factual circumstances.  See id.  In reliance

28  thereon, district courts have held a named plaintiff who asserts a misleading advertising

claim based on his/her purchase of a particular product has standing to assert the same claim on behalf of putative class members who purchased different products.  See, e.g., Grimm v. APN Inc., 2017 WL 6398148, at *3-4 (C.D. Cal. August 31, 2017) (holding plaintiff, who alleged defendants engaged in "deceptive marketing practices" in selling pet foods, had standing to assert claims on behalf of putative class members who purchased pet food products differing from those purchased by plaintiff and who allegedly were subjected to same marketing practices); Stotz v. Mophie Inc., 2017 WL 1106104, at *5-6 (C.D. Cal. February 27, 2017) (holding "whether [p]laintiffs may be allowed to present claims on behalf of others in the class who have purchased similar, but not identical, products" was to be "determined on an assessment of typicality and adequacy of representation at the motion for class certification stage").

Here, every product purchased by the named plaintiffs and the putative class members contained SAs, the component alleged to have been price-fixed by defendants. Although the named plaintiffs and putative class members may have purchased different products containing SAs, the Court finds such distinctions do not warrant dismissal of the class claims for lack of standing.  See Mednick v. Precor, Inc., 2014 WL 647915, at *3-4 (N.D. Ill. November 13, 2014) (holding, where named plaintiffs alleged they purchased treadmill sold by defendant, plaintiffs had standing to bring claims on behalf of putative class members who purchased other types of exercise equipment sold by defendant, where all such products allegedly contained same defect); In re DRAM, 2020 WL 8459279, at *3 (holding, where named plaintiffs alleged defendants conspired to fix price of component found in numerous products, named plaintiffs had standing to bring claims on behalf of putative class members who purchased products differing from those purchased by named plaintiffs; observing, fact "[t]hat members of the class purchased [the price-fixed component] through different intermediate products creates neither a different legal claim (antitrust violation) nor a different from of relief (damages and injunction)").

//

United States District Court
Northern District of California

Accordingly, plaintiffs' class claims are not subject to dismissal for lack of Article III standing.

**B.  Failure To State A Claim**

Defendants argue plaintiffs' claims, for several reasons, are subject to dismissal for failure to state a claim, pursuant to Rule 12(b)(6).

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.  Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

**1.  First Claim for Relief**

As noted, the First Claim for Relief in each SAC asserts violations of state antitrust statutes.  Reseller Plaintiffs assert such claims under the laws of California, Michigan, Minnesota, New York, and North Carolina.  End-User Plaintiffs assert claims under the

laws of those five states, and, in addition, under the laws of Arizona, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Maryland, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

### a.  Retroactivity

Defendants argue that, to the extent End-User Plaintiffs' First Claim for Relief is based on violations of antitrust statutes enacted by Maryland and Rhode Island, the First Claim for Relief is subject to dismissal for the asserted reason the statutes "only allow the Attorney General to bring suit on behalf of indirect purchasers."  (See Defs.' Mot. at 29:2-3.)  In opposition, End-User Plaintiffs note that Maryland and Rhode Island have statutes that allow indirect purchasers to bring suit on their own behalf.  In reply, defendants, implicitly acknowledging that indirect purchasers may now bring claims under Rhode Island and Maryland statutes, observe End-User Plaintiffs have not argued the statutes allowing such claims apply retroactively.

### (1)  Maryland

Under the Maryland Antitrust Act ("MAA"), any person injured by reason of a violation of the state's antitrust laws may file suit "regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation."  See Md. Code Ann. Com. Law § 11-209(b)(2)(i).  The quoted language, which gives indirect purchasers the right to file suit, however, was added to the statute by amendment enacted October 1, 2017.  See 2017 Md. Laws Ch. 842 (S.B. 858).

Under Maryland law, statutes "operate prospectively," unless "the statute contains a clear expression of intent that it operative retrospectively" or "the statute affects only procedures or remedies."  See State Comm'n on Human Relations v. Amecom Div. of Litton Systems, Inc., 278 Md. 120, 123-24 (1976).  Here, nothing in the MAA, see Md. Code Ann. Com. Law §§ 11-201-213, contains any expression of intent that the 2017 amendment operate retrospectively.  Further, the amendment cannot be characterized as affecting only procedures or remedies, as the amendment created a substantive right on

11

the part of indirect purchasers to bring suit on claims they had no right to bring prior to the amendment.  See State Comm'n on Human Relations, 278 Md. at 125 (holding amendment "effect[s] a new substantive right," and, consequently, does not apply retroactively, where it provides a "remedy" based on a right that is not "preexisting").

Accordingly, as End-User Plaintiffs allege the "Class Period" ended in "May 2016" (see End-User SAC ¶ 13), a date preceding the above-referenced amendment, End-User Plaintiffs' claim under the MAA is subject to dismissal.

### (2)  Rhode Island

Under the Rhode Island Antitrust Act ("RIAA"), any person injured by reason of a violation of the state's antitrust laws may file suit, and "the fact that a person . . . has not dealt directly with the defendant shall not bar or otherwise limit recovery."  See R. I. Gen. Laws § 6-36-11(a).  The quoted language, which gives indirect purchasers the right to file suit, was added to the statute by amendment enacted July 15, 2013.  See 2013 R. I. Pub. Laws Ch.13-274 (13-H 5944A).

Numerous courts have found, and this Court agrees, that the amendment does not operative retroactively.  See, e.g., United Food & Commercial Workers v. Teikoku Pharma USA, Inc., 74 F. Supp. 3d 1052, 1088 (N.D. Cal. 2014) (citing Rhode Island law that substantive amendments are not retroactive; finding 2013 amendment to RIAA "conveyed substantive rights" as it "allow[ed] indirect purchasers to sue on claims they had no standing to before"); In re Aggrenox Antitrust Litig., 94 F. Supp. 3d 224, 252-53 (D. Conn. 2015) (citing presumption under Rhode Island law that amendments apply prospectively and noting "absence of evidence" state legislature intended amendment to RIAA to apply retroactively); see also In re Effexor Antitrust Litig., 337 F. Supp. 3d 435, 460 (D. N.J. 2018) (observing "courts have consistently held that [amendment to RIAA] applies prospectively"; collecting cases).

In this case, however, prospective application of the 2013 amendment to the RIAA does not compel dismissal of End-User Plaintiffs' claim thereunder, as End-User Plaintiffs do not allege facts that establish the claim of the named plaintiff who purchased a

1    product in Rhode Island accrued prior to July 15, 2013.  (See End-User SAC ¶ 13

2    (alleging "Class Period" runs "from January 2005 through at least May 2016"); End-User

3    SAC ¶ 70 (alleging named plaintiff purchased laptop computer in Rhode Island "[d]uring

4    the Class Period").)[8]

5            Accordingly, End-User Plaintiffs' claim under the RIAA is not subject to dismissal.

6            **b.  Antitrust Standing**

7            Defendants argue all of the state antitrust claims are subject to dismissal for failure

8    to allege sufficient facts to demonstrate "antitrust standing."  (See Defs.' Mot. at 18:22.)[9]

9            "Antitrust standing," referred to by some courts as "prudential standing," see, e.g.,

10   Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc., 902 F.3d 735, 743 (7th Cir.

11   2018), has "nothing to do with Article III," see id.  Rather, "prudential standing

12   considerations . . . determine whether a particular plaintiff can sue under a particular

13   statutory or constitutional provision."  See D.R. Ward Constr. Co. v. Rohm & Haas Co.,

14   470 F. Supp. 2d 485, 493 (E.D. Penn. 2006).

15           Here, defendants argue, the Court, in determining whether plaintiffs have antitrust

16   standing to bring their state antitrust claims, should consider various factors identified in

17   Associated General Contractors of California, Inc. v. California State Council of

18   Carpenters, 459 U.S. 519 (1983), in which the Supreme Court set forth the test for

19   determining whether a plaintiff has antitrust standing to bring a claim under the Sherman

20   Act.  Those factors, which defendants refer to as the "AGS factors," are:  "(1) the nature

21   of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were

22   intended to forestall; (2) the directness of the injury; (3) the speculative measure of the

23   harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

24   ───────────────────

25           [8] Defendants do not challenge End-User Plaintiffs' lack of detail as to when the
     claim of the named Rhode Island plaintiff accrued.

26
             [9] The Court does not consider this argument to the extent it pertains to End-User
27   Plaintiffs' claims under the antitrust statute enacted by Maryland, the Court having found,
     for the reasons stated above, End-User Plaintiffs' claim under that statute is subject to
28   dismissal for other reasons.

United States District Court
Northern District of California

damages." See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000) (internal quotation and citation omitted).  Courts balance the above-quoted five factors to determine whether a plaintiff has antitrust standing; "no single factor is decisive." See American Ad Management, Inc. v. General Telephone Co. of California, 190 F.3d 1051, 1055 (9th Cir. 1999) (internal quotation and citation omitted).

Here, assuming, arguendo, each of the states under which plaintiffs bring their statutory antitrust claims require a plaintiff to demonstrate antitrust standing under the AGS factors, the Court finds plaintiffs have sufficiently pleaded antitrust standing.

With regard to the first factor, courts consider whether the defendant engaged in "unlawful" conduct "causing an injury to the plaintiff" that "flows from that which makes the conduct unlawful" and "is of the type the antitrust laws were intended to prevent." See id.  Here, as noted, plaintiffs allege defendants engaged in a conspiracy to fix the prices of SAs, that said conspiracy resulted in plaintiffs' paying higher prices for products containing SAs, and that each SA in the purchased products can be physically traced to its defendant manufacturer.  District courts have found, and this Court agrees, that such allegations are sufficient to establish the first factor, at least where the plaintiff alleges the price-fixed component lacks utility on its own and the markets for the component and products containing the component are "inextricably intertwined." See, e.g., Automotive Parts, 29 F. Supp. 3d at 1002 (finding first factor "satisfied" based on allegations price-fixed automobile part served no "function" until "inserted into vehicles" and "markets for [component] and cars [were] inextricably intertwined," i.e., "demand for cars creates the demand for [component]"); In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 WL 4505701, at *10 (N.D. Cal. August 21, 2013) (finding plaintiffs "sufficiently pled an antitrust injury" based on allegations price-fixed "CRT" component was "virtually valueless on its own" and "markets for CRTs themselves and CRT products" were "inextricably intertwined").  Here, plaintiffs allege SAs have no value independent of their use in HDDs and that the market for SAs and the markets for HDDs/products containing HDDs are inextricably intertwined.  (See End-User SAC ¶¶ 222-23, 227-28; Reseller SAC

14

¶¶ 57, 93, 115-16.)  Accordingly, the Court finds the first factor weighs in favor of finding plaintiffs have antitrust standing.

With regard to the second factor, directness of the injury, courts, in the context of claims brought by indirect purchasers, consider whether the plaintiff alleges the overcharge was passed on to them through the chain of distribution.  See In re DRAM, 2020 WL 8459279, at *3 (finding second factor "satisf[ied]" where plaintiffs alleged facts to support finding "DRAM costs would likely be passed down to the customers of the specific end products [p]laintiffs purchased"); In re Lithium Ion Batteries Antitrust Litig., 2014 WL 4955377, at *14 (N.D. Cal. October 2, 2014) (finding second factor weighed in favor of antitrust standing where plaintiffs alleged they "paid the overcharge because it was 'passed on to them by direct purchaser manufacturers, distributors, and retailers'").  Here, for the reasons discussed above with respect to Article III traceability, the Court finds the second factor weighs in favor of finding plaintiffs have antitrust standing.  See In re DRAM, 2020 WL 8459279, at *3 (finding allegations sufficient to establish Article III standing suffice to establish second antitrust standing factor).

The third factor, that the measure of harm is not speculative, weighs in favor of finding the plaintiff has antitrust standing where the plaintiff alleges the price-fixed component is "physically distinct" from the product in which it is contained, see In re Lithium, 2014 WL 4955377, at *15, as, in such circumstances, "regression analysis" may be employed to determine the "precise" amount of the overcharge passed down to the plaintiff, see In re DRAM, 2020 WL 8459279, at *3.  Here, as noted, plaintiffs allege SAs are "distinct, physically discrete components" within HDDs (see End-User SAC ¶ 230; see also Reseller SAC ¶ 118), and that the "precise" amount of the overcharge passed on through the chain of distribution can be measured using "regression analysis" (see End-User SAC ¶¶ 255-57; Reseller SAC ¶¶ 120-21).  Although defendants argue "any number of intervening factors affect consumer prices, including the many separate pricing decisions made at multiple levels of commerce" (see Defs.' Mot. at 23:5-6), such observation does not identify a pleading deficiency, but, rather, difficulties plaintiffs may

United States District Court
Northern District of California

United States District Court
Northern District of California

encounter in attempting to prove their allegations.  See In re Lithium, 2014 WL 4955377, at *15 (noting defendants' argument that "it will be difficult to disentangle the alleged overcharge from other pricing factors" set forth "a problem of proof," and not a basis for finding third factor weighed against finding antitrust standing).  Accordingly, the Court finds the third factor weighs in favor of finding plaintiffs have antitrust standing.

The fourth factor, the possibility of duplicative recoveries, weighs in favor of finding antitrust standing as to price-fixing claims brought by indirect purchasers under the laws of states that do not follow the rule set forth in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), as such states "have necessarily made the policy decision that duplicative recovery may permissibly occur."  See In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009) (internal quotation and citation omitted); see also Automotive Parts, 29 F. Supp. 3d at 1003 (finding fourth factor did not weigh against finding indirect purchasers had antitrust standing, as "states that repealed Illinois Brick did so in order to allow indirect purchasers to bring claims").[10]  As one district court explained, "[d]uplicative recovery is, in many if not most cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser recovery."  See In re Flash, 643 F. Supp. 2d at 1156 (internal quotation and citation omitted).  With respect to the possibility that, in the instant consolidated cases, duplicative recoveries by putative End-User class members and putative Reseller class members might be sought,[11] the Court observes that no party has requested separate trials be conducted for the class plaintiffs, and, if the class claims are tried together, the parties can propose instructions that would alleviate possible

_____

[10] In reaction to Illinois Brick, in which the Supreme Court held that indirect purchasers could not bring damages claims under the Sherman Act, a number of states enacted statutes allowing indirect purchasers to sue for overcharges passed on to them through the chain of distribution.  See California v. ARC America Corp., 490 U.S. 93, 98 and n.3 (1989) (identifying states that, as of 1989, had enacted such laws).

[11] None of the named End-User Plaintiffs alleges he or she purchased a product from any of the named Reseller Plaintiffs.

16

United States District Court
Northern District of California

duplication of damages.  Accordingly, the Court finds the fourth factor weighs in favor of finding plaintiffs have antitrust standing.

Lastly, in considering the fifth factor, whether apportionment of damages would be complex, the Court first notes that the Supreme Court, in determining indirect purchasers should not be permitted to bring suit under the Sherman Act, found such a bar would avoid interjecting into antitrust lawsuits "extremely complex" apportionment issues.  See Illinois Brick, 431 U.S. at 745.  Consequently, states that allow indirect purchasers to bring suit necessarily have found such possibility does not warrant a rule prohibiting all indirect purchaser suits.  See Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., 2012 WL 3841397, at 5 (E. D. Wis. September 5, 2012) (finding fifth factor weighed in plaintiff's favor, as states "rejected the Supreme Court's reasoning in Illinois Brick barring damage suits by indirect purchasers because they . . . make the apportionment of damages too complex'").  To the extent defendants appear to argue that, in this instance, apportionment issues will be so complex as to warrant a finding that plaintiffs lack antitrust standing, the Court finds such argument premature at the pleading stage.  See In re Cathode Ray Tube, 2013 WL 4505701, at *11 (finding fifth factor weighed in plaintiffs' favor at pleading stage, given absence of "more developed factual record" identifying "complex and intensely factual damage issues"); D.R. Ward Constr., 470 F. Supp. 2d at 504 (finding fifth factor did not weigh of favor of dismissal, where court was not able to conclude at pleading stage "a determination of the existence and amount of any overcharge suffered by the [named] plaintiffs require[d] inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert discovery").  Accordingly, the fifth factor weighs in plaintiffs' factor.

In sum, all AGS factors weigh in favor of finding antitrust standing exists.  The Court thus finds End-User Plaintiffs' and Reseller Plaintiffs' respective First Claims for Relief are not subject to dismissal for lack of antitrust standing.

### c. Application of State Antitrust Statutes to Interstate Sales

Defendants argue that, to the extent End-User Plaintiffs' First Claim for Relief is

1   based on violations of antitrust statutes enacted by Mississippi, Tennessee, and

2   Wisconsin, and the End-User Plaintiffs' and Reseller Plaintiffs' respective First Claims for

3   Relief are based on violations of an antirust statute enacted by North Carolina, the claims

4   are subject to dismissal for the asserted reason that the antitrust statutes enacted by

5   those four states "do not apply to the interstate sales alleged here."  (See Defs.' Mot. at

6   29:12-13.)

7                             **(1) Mississippi**

8        The Supreme Court of Mississippi has held that a "material element" of a claim

9   under the Mississippi Antitrust Act ("MSAA") is that "the illegal object of the trust be

10  accomplished in part at least by transactions lying wholly within the state," and, with

11  respect to price-fixing claims, the plaintiff must allege the defendant sold or distributed

12  the price-fixed product in Mississippi.  See Mississippi ex rel. Fitch v. Yazaki North

13  America, Inc., 294 So. 3d 1178, 1189-90 (Miss. 2000) (internal quotation and citation

14  omitted); see also Hood ex rel. State v. BASF Corp., 2006 WL 308373, at *6 (Ch. Ct.

15  January 17, 2006) (holding plaintiff stated claim under MSAA where plaintiff alleged

16  defendant, as well as its "co-conspirators, agents, [and] employees," sold price-fixed

17  products to customers in Mississippi).

18        Here, the named plaintiffs are alleged to have purchased in Mississippi products

19  containing SAs bought from Best Buy (see End-User SAC ¶ 5), Dell (see End-User SAC

20  ¶ 54), and Walmart (see id.).  Such allegations are, as a matter of Mississippi law,

21  insufficient to state a claim under the MSAA.  See Fitch, 294 So. 3d at 1189-90 (finding

22  allegation that price-fixed components were "purchased, directly or indirectly, throughout

23  the State of Mississippi after they became a part of interstate and intrastate commerce"

24  insufficient to plead claim, as plaintiff failed to allege "any 'wholly intrastate' transactions

25  by defendants"); see also California v. Infineon Technologies AG, 531 F. Supp. 2d 1124,

26  1158-59 (N.D. Cal. 2007) (dismissing claim under MSAA, where plaintiffs alleged they

27  purchased in Mississippi products containing price-fixed component, but failed to allege

28  "intrastate" activity by defendants).

Accordingly, End-User Plaintiffs' claim under the MSAA is subject to dismissal.

### (2) North Carolina

Under Chapter 75 of the North Carolina General Statues, specifically, § 75-2.1, it is "unlawful for any person to . . . combine or conspire with any other person or persons to monopolize . . . any part of trade or commerce in the State of North Carolina." See N.C. Gen. Stat. § 75-2.1.

Defendants cite to district court cases that have found plaintiffs who purchased in North Carolina products that included price-fixed components failed to state a cognizable claim under § 75-2.1 where the defendant did not engage in wrongful conduct in North Carolina, see, e.g., In re Refrigerant Compressors Antitrust Litig., 2013 WL 1431756, at *18-19 (E.D. Mich. April 9, 2013), while plaintiffs cite to district court cases that have found plaintiffs who purchased such products in North Carolina did state a claim, without considering where the defendant engaged in wrongful conduct.  see, e.g., In re Packaged Seafood Products Antitrust Litig., 242 F. Supp. 3d 1033, 1082-83 (S.D. Cal. 2017).

The Court finds more persuasive the cases cited by plaintiffs, particularly given a decision by the North Carolina Court of Appeals, in which that court, without considering where the defendant engaged in wrongful conduct, found "allowing indirect purchasers to sue for Chapter 75 violations will best advance the legislative intent that such violations be deterred, and that aggrieved consumers have a private cause of action to redress Chapter 75 violations." See Hyde v. Abbott Laboratories, Inc., 123 N.C. App. 572, 584 (1996).

Accordingly, plaintiffs' respective claims under § 75-2.1 are not subject to dismissal.

### (3) Tennessee

Under the Tennessee Trade Practices Act ("TTPA"), "[a]ny arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of [a] product or article, are declared to be against public

United States District Court
Northern District of California

1   policy, unlawful, and void." See Tenn. Code Ann. § 47-25-101.

2       In Freeman Indus. LLC v. Eastman Chemical Co., 172 S.W.3d 512, 522–23

3   (Tenn.2005), the Supreme Court of Tennessee held that a claim by an indirect purchaser

4   of a product containing a price-fixed component "falls within the scope of the TTPA"

5   where the defendants' conduct "affects Tennessee trade or commerce to a substantial

6   degree." See id. at 520, 523.  In so holding, however, the Supreme Court did not identify

7   what type of price-fixing conduct would have an effect on Tennessee trade to a

8   "substantial degree," but, rather, stated "the test is pragmatic, turning on the particular

9   facts of the case." See id. at 523.

10      In applying that test, the Supreme Court then held an indirect purchaser who

11  purchased products in New York failed to state a claim, there being no "effects" on

12  Tennessee trade or commerce from such purchases, see id. at 524, and, consistent

13  therewith, a district court dismissed a claim under the TTPA brought by indirect

14  purchasers who failed to allege any plaintiff purchased a product in Tennessee, see In re

15  Refrigerant Compressors, 2013 WL 1431756, at *3, *15.  By contrast, district courts have

16  found the requisite connection existed based on allegations that indirect purchasers

17  bought in Tennessee products containing price-fixed components.  See, e.g., Fond du

18  Lac Bumper Exchange, 2012 WL 3841397, at *7 (holding indirect purchasers stated

19  claim under TTPA based on allegation defendants' conspiracy "forced consumers in the

20  state to pay unreasonably high prices"); D.R. Ward Constr., 470 F. Supp. 2d 485 at 505

21  (holding indirect purchaser stated claim under TTPA, where plaintiff alleged he "paid

22  higher prices in Tennessee for products containing [price-fixed component] as a result of

23  the price-fixing conspiracy").

24      Here, End-User Plaintiffs have alleged that named plaintiffs purchased in

25  Tennessee products containing SAs (see End-User SAC ¶¶ 74-75), and the Court finds

26  such allegations sufficient.

27      Accordingly, End-User Plaintiffs' claim under the TTPA is not subject to dismissal.

28  //

United States District Court
Northern District of California

United States District Court
Northern District of California

### (4) Wisconsin

Under the Wisconsin Antitrust Act ("WAA"), conspiracies "in restraint of trade" are unlawful.  See Wis. Stat. § 133.03(1).

The Supreme Court of Wisconsin has held that, to state a cognizable claim under the WAA, the plaintiff must allege the defendants' conduct "'substantially affects' the people of Wisconsin, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside [the] state."  See Olstad v. Microsoft Corp., 284 Wis. 2d 224, 263 (2005).  Applying that test, the Supreme Court has held indirect purchasers seeking to proceed on behalf of a class stated a cognizable claim where they alleged "thousands of Wisconsin consumers paid supracompetitive prices as a result of monopolistic conduct by an interstate seller," see Meyers v. Bayer AG, 303 Wis. 2d 295, 305, 322 (2007), and, in so holding, rejected the defendants' arguments that the plaintiffs were required to plead that the "impacts of the challenged conduct on Wisconsin [were] distinguishable from or disproportionate to its impacts on other states," see id. at 320, and to include more than what the defendants described as "bare allegations" that "indirect purchasers in Wisconsin paid higher prices as a result of the challenged conduct," see id. at 321.

Here, End-User Plaintiffs have alleged that named plaintiffs purchased in Wisconsin HDDs and computers, each of which contained SAs manufactured or sold by defendants (see End-User SAC ¶¶ 83-84), that defendants controlled "97% of the global [SA] market" (see End-User SAC ¶ 104.e), that SAs are "indispensable components of HDDs" and "a significant cost component" of HDDs (see End-User SAC ¶ 116), that approximately two billion HDDs were sold in the United States during the class period (see End-User SAC ¶ 122), and that, according to the United States Department of Justice, the "impact on American consumers" from defendants' price-fixing conspiracy was "direct and substantial" (see End-User SAC ¶ 106).  The Court finds the above-cited allegations suffice under the standard set forth by the Supreme Court of Wisconsin.

Accordingly, End-User Plaintiffs' claim under the WAA is not subject to dismissal.

21

United States District Court
Northern District of California

### 2. Second Claim for Relief

As noted, the Second Claim for Relief, in each SAC, asserts violations of state consumer protection statutes.  Reseller Plaintiffs assert claims under the laws of California, New York, and North Carolina.  End-User Plaintiffs assert claims under the laws of those three states, and, in addition, under the laws of Arkansas, the District of Columbia, Florida, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, and Virginia.

#### a. AGS Factors

Defendants argue that, to the extent End-User Plaintiffs' Second Claim for Relief is based on violations of consumer protection statutes enacted by Arkansas, Florida, Nebraska, and Vermont, and End-User Plaintiffs' and Reseller Plaintiffs' respective Second Claims for Relief are based on violations of consumer protection statutes enacted by California, New York, and North Carolina, the claims are subject to dismissal on the asserted ground that those seven states "either apply the AGS factors or have standing requirements comparable to the AGS analysis sufficient to bar [Plaintiffs'] claims."  (See Defs.' Mot. at 35:3-5.)

Assuming, arguendo, each of the above-referenced seven states requires an indirect purchaser seeking relief under a consumer protection statute to demonstrate antitrust standing under the AGS factors or comparable factors, the Court finds, for the reasons set forth above with respect to plaintiffs' statutory antitrust claims, plaintiffs have sufficiently pleaded antitrust standing.

Accordingly, none of plaintiffs' claims alleging violations of consumer protection statutes is subject to dismissal for lack of antitrust standing.

#### b. Unconscionable Conduct

Defendants argue that, to the extent End-User Plaintiffs' Second Claim for Relief is based on violations of consumer protection statutes enacted by Arkansas and New Mexico, the claims, which are based solely on defendants' having engaged in a price-

fixing conspiracy (see End-User SAC ¶¶ 328, 341), are subject to dismissal for failure to allege any "unconscionable conduct" by defendants (see Defs.' Mot. at 30:4).

### (1) Arkansas

The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "[d]eceptive and unconscionable trade practices."  See Ark. Code Ann. § 4-88-107(a)

As the parties note, a split of authority exists among district courts that have considered whether price-fixing conspiracies can be characterized as "unconscionable trade practices" for purposes of the ADTPA.  The Court finds persuasive those cases that have found price-fixing conspiracies constitute unconscionable behavior for purposes of the ADTPA, see, e.g., Fond du Lac Bumper Exchange, 2012 WL 3841397, at *6 (citing cases), in light of a decision by the Supreme Court of Arkansas, which held the ADTPA must be provided a "liberal construction" and that the legislative purpose prompting its enactment was to protect the interests of the "consumer public," see Arkansas ex rel. Bryant v. R & A Investment Co., 336 Ark. 289, 295 (1999).

Accordingly, End-User's claim under the ADTPA is not subject to dismissal for failure to allege an unconscionable act.

### (2) New Mexico

The New Mexico Unfair Practices Act ("NMUPA") provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."  See N.M. Stat. Ann. § 57-12-3.

In response to defendants' argument that End-User Plaintiffs fail to allege any unconscionable trade practices, End-User Plaintiffs first point out that the statute, as noted, also prohibits "unfair or deceptive trade practices."  The NMUPA defines "unfair or deceptive trade practices" as "an act specifically declared unlawful pursuant to the [NMUPA], a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or

23

does deceive or mislead any person."  See N.M. Stat. Ann. § 57-12-2(D).  Price fixing is not, however, "an act specifically declared unlawful" under the NMUPA, see N.M. Stat. Ann §§ 57-12-1 – 57-12-26, nor can it be characterized as fitting within the other definitions of "unfair or deceptive trade practices" listed above, see N.M. Stat. Ann § 57-12-2(D).[12]  The Court next turns to defendants' argument that price fixing is not, for purposes of the NMUPA, an unconscionable trade practice.

The NMUPA defines "unconscionable trade practice" as "an act or practice in connection with the sale . . . of any goods . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."  See N.M. Stat. Ann. § 57-12-2(E).  In the instant case, End-User Plaintiffs rely on a theory of "gross disparity."  (See End-User SAC ¶ 341.c.)

Courts have found indirect purchasers have stated viable NMUPA claims under a "gross disparity" theory where, for example, the plaintiff alleged he paid "approximately 30% more for a product as a result of price fixing" or alleged facts to support a finding that the price-fixing conspiracy "produced significant artificial increases" in the product's price.  See In re Chocolate Confectionary Antitrust Litig. ("In re Chocolate I"), 602 F. Supp. 2d 538, 585-86 (M.D. Penn. 2009) (citing cases; internal quotation and citation omitted); see also Fond du Lac Bumper Exchange, 2012 WL 33841397, at *7 (finding NMUPA claim not subject to dismissal where plaintiffs alleged "defendants increased the price of [price-fixed] parts by as much as 100% while simultaneously taking steps to cut costs").

Here, the named plaintiff who purchased products in New Mexico allegedly bought "at least one Apple MacIntosh MacBook Pro 13-inch laptop computer" and "one WD My Passport for Mac portable external HDD."  (See End-User SAC ¶ 64.)  End-User Plaintiffs

---

[12] End-User Plaintiffs do not allege defendants made any "oral or written statement" to any named plaintiff who purchased products in New Mexico or provided any "visual description" in connection with those purchases.

United States District Court
Northern District of California

do not allege, however, any facts as to the difference between the value of those products and the price said plaintiff paid, and, without more, the SAC's characterization of that figure as a "gross disparity" (see End-User SAC ¶ 341.c) is insufficient.  See Iqbal, 556 U.S. at 681 (holding "conclusory" allegations are "not entitled to be assumed true" for purposes of motion to dismiss).

Accordingly, End-User Plaintiff's claim under the NMUPA is subject to dismissal.

### c. Rule 9(b)

Defendants argue that, to the extent End-User Plaintiffs' Second Claim for Relief is based on violations of consumer protection statutes enacted by Florida, Michigan, and Minnesota, the claims are subject to dismissal for the asserted reason those statutes only apply to claims "based in fraud" and End-User Plaintiffs have not complied with the heightened pleading requirements of Rule 9(b).  (See Defs.' Mot. at 31:14-16.)

### (1) Florida

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  See Fla. Stat. § 501.204.

End-User Plaintiffs base their FDUTPA claim in part on defendants' having engaged in price-fixing (see End-User SAC ¶¶ 331.b, 331.f), a claim that is not based in fraud.  Consequently, to the extent the FDUTPA claim is based on price fixing, Rule 9(b) does not apply.  See Los Gatos Mercantile, 2015 WL 4755335, at *2, *24 (holding Rule 9(b) not applicable to claim under FDUTPA where plaintiffs alleged defendants engaged in conspiracy to fix prices of chemical used in paint).

End-User Plaintiffs also base their FDUTPA claim on defendants' allegedly having "concealed, suppressed, and omitted to disclose material facts to . . . [Florida] Plaintiff[s] . . . concerning Defendants' unlawful activities and artificially inflated prices for [SAs]" (see End-User SAC ¶ 331.c), and having "misrepresented the real cause of price increases and/or the absence of price reductions in [SAs] by making public statements

25

that were not in accord with the facts."  (See End-User SAC ¶ 331.d.)  According to End-User Plaintiffs, such "statements and conduct concerning the price of [SAs] were deceptive as they had the tendency or capacity to mislead Florida Plaintiffs . . . to believe that they were purchasing [SAs] at prices established by a free and fair market" (see End-User SAC ¶ 331.e).  Although End-User Plaintiffs do not allege any of the three Florida Plaintiffs who purchased products containing SAs detrimentally relied on any such statements or conduct, a plaintiff, under Florida law, need not plead reliance where the claim is based on a theory that the defendant engaged in a "deceptive" act or practice. See PNR, Inc. v. Beacon Property Management, Inc., 842 So. 2d 773, 777 (Fla. 2003) (holding "deception," for purposes of FDUTPA, "occurs if there is a representation, omission, or practice that is likely to mislead the consumer") (internal quotation and citation omitted).  Stated otherwise, the "plaintiff need not prove the elements of fraud to sustain an action under the [FDUTPA]" where the claim is based on deception.  See Davis v. Powertel, Inc., 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000).  Consequently, as a plaintiff pleading a FDUTPA claim based on deception need not prove "detrimental reliance, one of the traditional elements of fraud," Rule 9(b) does not apply.  See Fond du Lac Bumper Exchange, 2012 WL 3841397, at *7.

Accordingly, End-User Plaintiffs' claim under the FDUTPA is not subject to dismissal under Rule 9(b).

**(2) Michigan**

The Michigan Consumer Protection Act ("MCPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts or practices in the conduct of any trade or commerce," see Mich. Comp. Laws § 445.903(1), and defines such prohibited conduct therein, see Mich. Comp. Laws §§ 445.903(1)(a)-(kk) (listing thirty-seven methods, acts, or practices covered by MCPA).

Under Michigan law, all claims under the MCPA are "construe[d] . . . with reference to the common-law tort of fraud," and, consequently, the plaintiff must allege he "suffered injury as a result of his reliance on the defendant's false representation."  See

26

United States District Court
Northern District of California

Mayhall v. A.H. Pond Co., 129 Mich. App. 178, 182-83, 186 (1983) (holding plaintiff stated claim under MCPA based on allegation he purchased product in reliance on defendants' false statements as to product's attributes).  Consequently, any claim alleged under the MCPA sounds in fraud.

Here, End-User Plaintiffs' claim under the MCPA, much like their claim under the FDUTPA, is based on theories that defendants engaged in price-fixing (see End-User SAC ¶¶ 334.b-c), "concealed, suppressed, and omitted to disclose material facts to Michigan Plaintiffs . . . concerning Defendants' unlawful activities and artificially inflated prices for [SAs]" (see End-User SAC ¶ 334.d), and "misrepresented the real cause of price increases and/or the absence of price reductions in [SAs] by making public statements that were not in accord with the facts" (see End-User SAC ¶ 334.e), thereby causing the Michigan Plaintiffs to have "suffered ascertainable loss of money or property" as "a direct and proximate result" of those statements and omissions (see End-User SAC ¶ 334.h).

End-User Plaintiffs, however, allege no facts to support a finding that the Michigan Plaintiffs relied to their detriment on any of the conduct, omissions, or statements on which they base their claim under the MCPA, nor have they pleaded any facts regarding those omissions or statements with the specificity required by Rule 9(b).  See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (holding Rule 9(b) requires plaintiff to plead "the who, what, when, where, and how of the misconduct charged") (internal quotation and citation omitted).

Accordingly, End-User Plaintiff's claim under the MCPA is subject to dismissal.

### (3) Minnesota

The Minnesota Consumer Fraud Act ("MCFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise."  See Minn. Stat. § 325F.69, subd. 1.  The MCFA does not require a plaintiff to establish reliance, unless such plaintiff

1   alleges his injury was caused by "deceptive, misleading, or fraudulent statements," in

2   which case such plaintiff must "prove reliance on those statements."  See Group Health

3   Plan, Inc. v. Philip Morris Inc., 621 N.W. 2d 2, 12-13 (Minn. 2001).

4       Here, End-User Plaintiffs base their MCFA claim in part on defendants' having

5   engaged in price-fixing.  (See End-User SAC ¶¶ 335.b-c.).  As reliance is not required to

6   establish such a claim, see Group Health Plan, 621 N.W. 2d at 12-13, Rule 9(b) is not

7   applicable.

8       End-User Plaintiffs also base their claim under the MCFA on theories that

9   defendants "concealed, suppressed, and omitted to disclose material facts to Minnesota

10  Plaintiffs . . . concerning Defendants' unlawful activities and artificially inflated prices for

11  [SAs]"" (see End-User SAC ¶ 335.d), and "misrepresented the real cause of price

12  increases and/or the absence of price reductions in [SAs] by making public statements

13  that were not in accord with the facts" (see End-User SAC ¶ 335.e).  Rule 9(b) applies to

14  this part of End-User Plaintiffs' MCFA claim, as End-User Plaintiffs allege the Minnesota

15  Plaintiffs "suffered ascertainable loss of money or property" as "a direct and proximate

16  result" of those statements and omissions (see End-User SAC ¶ 335.h), thus requiring

17  End-User Plaintiffs to establish the Minnesota Plaintiffs relied to their detriment on those

18  omissions or statements.  See Group Health Plan, 621 N.W. 2d at 13.  End-User

19  Plaintiffs, however, allege no facts to support a finding that the Minnesota Plaintiffs

20  detrimentally relied on any omission or statement by a defendant, let alone plead those

21  facts with the specificity required by Rule 9(b).

22      Accordingly, except to the extent such claim is based on price fixing, End-User

23  Plaintiff's claim under the MCFA is subject to dismissal.

24              **d.  Application of Statutes to Interstate Sales**

25      Defendants argue that, to the extent End-User Plaintiffs' Second Claim for Relief is

26  based on violations of consumer protection statutes enacted by Massachusetts and New

27  Hampshire, and the End-User Plaintiffs' and Reseller Plaintiffs' respective Second

28  Claims for Relief are based on violations of a consumer protection statute enacted by

North Carolina, the claims are subject to dismissal for the asserted reason that the consumer protection statutes enacted by those three states "do not reach the interstate sales alleged here."  (See Defs.' Mot. at 32:14-15.)

### (1) Massachusetts

Under Chapter 93A of the General Laws of Massachusetts, "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce" are "unlawful."  See Mass. Gen. Laws ch. 93A, § 2(a).

Defendants, citing § 11 of Chapter 93A, argue End-User Plaintiffs fail to state a claim under Chapter 93A for the asserted reason that such claim can only be brought where the challenged practice "'occurred primarily and substantially'" within Massachusetts.  (See Defs.' Opp. at 32:20-22 (citing § 11).)

Chapter 93A includes two sections creating private causes of action.  The first is § 9, the section on which End-User Plaintiffs rely (see End-User SAC ¶ 332.g), which "affords a private remedy to the individual consumer who suffers a loss as a result of the use of an unfair or deceptive act or practice," and the second is § 11, which "grants a cause of action to . . . persons acting in a business context."  See In re Pharmaceutical Industry Average Wholesale Price Litig., 582 F.3d 156, 191 (1st Cir. 2009) (internal quotation and citation omitted).  Although § 11 includes the limitation on which defendants rely, see Mass. Gen. Laws ch. 93A, § 11 (providing "[n]o action shall be brought under this section unless the . . . unfair or deceptive act or practice occurred primarily and substantially within the commonwealth"), no such limitation is found in § 9. See Mass. Gen. Laws ch. 93A, § 9.

Accordingly, End-User Plaintiff's claim under Chapter 93A is not subject to dismissal.

### (2) New Hampshire

New Hampshire's Consumer Protection Act ("NHCPA") prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  See N.H. Rev. Stat. Ann. § 358-A:2.  Defendants,

relying on the term "within this state," argue the NHCPA does not govern interstate sales.

District courts have disagreed as to whether the term "within this state" requires that the defendant itself engage in conduct within New Hampshire, see, e.g., Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 342-44 (D. N.H. 2012) (holding plaintiff who purchased contaminated meat in New Hampshire failed to state claim against meat supplier who sold subject meat to distributor in New York and made no representations about meat in New Hampshire), or only that, irrespective of where the defendant acted, the harm is felt in New Hampshire, see In re Chocolate Confectionary Antitrust Litig., ("In re Chocolate II") 749 F. Supp. 2d 224, 234-35 (M.D. Penn. 2010) (holding claim against "multinational corporate families" for conspiring to fix price of chocolate candy sufficient under NHCPA, as, "at the very least," price-fixing conspiracy alleged therein "had indirect effects on the New Hampshire market and its residents").

Having considered the above authority, the Court finds the first of the two lines of cases, which appears to be the majority view, more persuasive, particularly given the statute's placement of the phrase "within the state," which comes directly after "conduct of any trade or commerce." See N.H. Rev. Stat. Ann. § 358-A:2.

Accordingly, as the End-User SAC lacks any allegation that a defendant engaged in any trade or commerce in New Hampshire, End-User's claim under the NHCPA is subject to dismissal.

### (3) North Carolina

The North Carolina Unfair Trade Practices Act ("NCUTPA") prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." See N.C. Gen. Stat. § 75-1.1(a).

Defendants argue the NCUTPA does not apply to purchases of products containing price-fixed components, where the defendant did not itself engage in wrongful conduct in North Carolina. For the reasons stated above with respect to North Carolina's state antitrust statute, which, like the NCUTPA, is included within Chapter 75, the Court disagrees. See Hyde, 123 N.C. App. at 584 (holding, without considering where

30

United States District Court
Northern District of California

1  defendants engaged in wrongful conduct, "allowing indirect purchasers to sue for Chapter

2  75 violations will best advance the legislative intent that such violations be deterred, and

3  that aggrieved consumers have a private cause of action to redress Chapter 75

4  violations").

5        Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective claims under

6  the NCUTPA are not subject to dismissal.

7  **e.  Lack of Enumerated Violation**

8        Defendants argue that, to the extent End-User Plaintiffs' Second Claim for Relief is

9  based on violations of consumer protection statutes enacted by Arkansas, Nevada,

10  Oregon, Rhode Island, South Dakota, Utah, and Virginia, the claim is subject to dismissal

11  on the asserted ground that the statutes in those states "are limited in coverage to

12  specified enumerated conduct" that does not include the conduct on which End-User

13  Plaintiffs base their claims.  (See Defs.' Mot. at 33:6.)[13]

14  **(1) Arkansas**

15        Contrary to defendants' argument, the ADTPA, Arkansas' consumer protection

16  statute, is not limited to enumerated conduct.  See Ark. Code Ann. § 4-88-107(a)

17  (providing ADTPA prohibits "[d]eceptive and unconscionable trade practices" that

18  "include, but are not limited to," twelve enumerated practices).  Further, for the reasons

19  set forth above, the Court finds the ADTPA does prohibit price-fixing conspiracies, see

20  Fond du Lac Bumper Exchange, 2012 WL 3841397, at *6 (finding price-fixing

21  conspiracies constitute "unconscionable" conduct for purposes of ADTPA), which, as

22  noted, is the sole basis upon which End-User Plaintiffs base their ADTPA claim.

23        Accordingly, End-User Plaintiffs' ADTPA claim is not subject to dismissal.

24  //

25

26              [13] To the extent defendants also make this argument as to Michigan's consumer
27  protection statute, the Court does not address the argument herein, in light of its finding
that End-User Plaintiffs' claim under said statute is subject to dismissal for failure to
28  comply with Rule 9(b).

United States District Court
Northern District of California

### (2) Nevada

The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits five enumerated "deceptive trade practices."  See Nev. Stat.§ 598.0923.

Contrary to defendants' argument that none of the enumerated practices includes price fixing, the NDTPA prohibits knowing violations of "a state or federal statute," see Nev. Stat. § 598.0923(3), and Nevada law prohibits price fixing, see Nev. Stat. § 598A.060(1)(a).  Consequently, to the extent End-User Plaintiffs' NDTPA claim is based on defendant's having knowingly engaged in price fixing (see End-User SAC ¶ 339.b-c), End-User Plaintiffs have stated a cognizable claim under the NDTPA.

End-User Plaintiffs' NDTPA claim is also based on the theory that defendants "concealed, suppressed, and omitted to disclose material facts to Nevada Plaintiff[s] . . . concerning Defendants' unlawful activities and artificially inflated prices for [SAs]" (see End-User SAC ¶ 339.d), and "misrepresented the real cause of price increases and/or the absence of price reductions in [SAs] by making public statements that were not in accord with the facts" (see End-User SAC ¶ 339.e).  Although End-User Plaintiffs argue such allegations fit within one of the NDTPA's enumerated prohibited practices, specifically, "fail[ing] to disclose a material fact in connection with the sale or lease of goods or services," see Nev. Stat. § 598.0923(2), End-User Plaintiffs fail to identify any omission or misrepresentation pertaining to the named plaintiffs' purchases in Nevada (see End-User SAC ¶¶ 65-66, 339), and the above-quoted conclusory allegations do not suffice to plead a viable claim, see Iqbal, 556 U.S. at 681.

Accordingly, End-User Plaintiffs' NDTPA claim is subject to dismissal to the extent it is based on omissions and misrepresentations, but not to the extent it is based on price fixing.

### (3) Oregon

The Oregon Unlawful Trade Practices Act ("OUTPA") prohibits thirteen enumerated "unlawful trade practice[s]."  See Or. Rev. Stat. § 646.607.

End-User Plaintiffs' OUTPA claim is based on defendants' having engaged in price

fixing (see End-User SAC ¶¶ 345.b-c), on defendants' having "concealed, suppressed, and omitted to disclose material facts to Oregon Plaintiff . . . concerning Defendants' unlawful activities and artificially inflated prices for [SAs]" (see End-User SAC ¶ 345.d), and having "misrepresented the real cause of price increases and/or the absence of price reductions in [SAs] by making public statements that were not in accord with the facts" (see End-User SAC ¶ 345.e).

The only enumerated practice arguably applicable to the above allegations is the employment of "any unconscionable tactic in connection with selling . . . goods." See Or. Rev. Stat. § 646.607(1). In that regard, the OUTPA provides: "'Unconscionable tactics' include, but are not limited to, actions by which a person: (a) [k]nowingly takes advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement; (b) [k]nowingly permits a customer to enter into a transaction from which the customer will derive no material benefit; (c) [p]ermits a customer to enter into a transaction with knowledge that there is no reasonable probability of payment of the attendant financial obligation in full by the customer when due; or (d) [k]nowingly takes advantage of a customer who is a disabled veteran, a disabled servicemember or a servicemember in active service, or the spouse of a disabled veteran, disabled servicemember or servicemember in active service." See Or. Rev. Stat. § 646.605(9).

Although the list of "unconscionable tactics" is not exclusive, there is nothing to suggest the OUTPA is intended to cover price-fixing conspiracies, statements denying price fixing, or omissions about fixed prices, conduct that is not, in any manner, similar to conduct specified in the statute. Indeed, End-User Plaintiffs fail to identify any case, state or federal, that has found price-fixing conspiracies and/or statements/omissions concerning them constitute "unconscionable tactics" for purposes of the OUTSA, and the authority cited by defendants holds to the contrary. See In re Lidoderm Antitrust Litig., 103 F. Supp. 3d 1155, 1170-71 (N.D. Cal. 2015) (dismissing OUTSA claim alleging "conspiracy to maintain prices/profits"; finding such conduct "not sufficiently similar to the examples provided in the statute").

United States District Court
Northern District of California

1

Accordingly, End-User Plaintiffs' OUTPA claim is subject to dismissal.

2

### (4) Rhode Island

3

The Rhode Island Unfair Trade Practices and Consumer Protection Act

4

("RIUTPCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or

5

practices in the conduct of any trade or commerce."  See R.I. Gen. Laws § 6-13:1-2.

6

Although, as defendants point out, the RIUTPCPA does enumerate twenty

7

methods, acts, and practices as constituting the prohibited conduct, see R.I. Gen. Laws

8

§ 6-13.1-1(6), that list includes "[e]ngaging in any act or practice that is unfair or

9

deceptive to the consumer," see R.I. Gen. Laws § 6-13.1-1(6)(xiii), a provision the Court

10

finds, as have other district courts, encompasses price-fixing conspiracies.  See, e.g., In

11

re Chocolate I, 602 F. Supp. 2d at 586-87 (finding price-fixing conspiracies constitute

12

"unethical" conduct that "affront[s] public policy" and "cause[s] substantial injury to

13

consumers," and, as such, is prohibited by RIUTPCPA; citing cases).

14

To the extent the RIUTPCPA claim is based on misrepresentations and omissions,

15

however (see End-User SAC ¶¶ 346.d), such claim, for the reasons stated above with

16

respect to the NDTPA, is subject to dismissal as conclusory.

17

Accordingly, End-User's RIUTPCPA claim is subject to dismissal to the extent it is

18

based on omissions and misrepresentations, but not to the extent it is based on price

19

fixing.

20

### (5) South Dakota

21

The South Dakota Deceptive Trade Practices and Consumer Protection Act

22

("SDDTPCPA") prohibits sixteen enumerated "deceptive" acts or practices.  See S.D.

23

Codified Laws § 37-24-6(1)-(16).

24

End-User Plaintiffs' SDDTPCPA claim is based on defendants' having engaged in

25

price fixing (see End-User SAC ¶¶ 348.b-c), having "concealed, suppressed, and omitted

26

to disclose material facts to South Dakota Plaintiff . . . concerning Defendants' unlawful

27

activities and artificially inflated prices for [SAs]" (see End-User SAC ¶ 348.d), and having

28

"misrepresented the real cause of price increases and/or the absence of price reductions

in [SAs] by making public statements that were not in accord with the facts" (see End-User SAC ¶ 348.e).

None of the sixteen enumerated acts or practices pertain to price fixing, and, consequently, End-User Plaintiffs cannot base their SDDTPCPA claim on price fixing.

With respect to End-User Plaintiffs' allegations that defendants failed to disclose material facts about prices and made misrepresentations about prices, End-User Plaintiffs rely on the SDDTPCPA's including in its enumeration any person's "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damages thereby." See S.D. Codified Laws § 37–24–6(1).  For the reasons stated above with respect to End-User Plaintiffs' claim under the NDTPA, however, the claim, to the extent, based on omissions and misrepresentations, is subject to dismissal as conclusory.

Accordingly, End-User Plaintiffs' SDDTPCPA claim is subject to dismissal.

### (6) Utah

The Utah Consumer Sales Practices Act ("UCSPA") prohibits "deceptive" and "unconscionable" acts by "suppliers." See Utah Code Ann. §§ 13-11-4, 13-11-5.

The UCSPA defines a "supplier" as "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." See Utah Code Ann. § 13-11-3(6). A "consumer transaction" is, in turn, defined as "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance) to, or apparently to, a person for: (i) primarily personal, family, or household purposes; or (ii) purposes that relate to a business opportunity that requires: (A) expenditure of money or property by the person . . .; and (B) the person . . . to perform personal services on a continuing basis and in which the person described in Subsection (2)(a) has not been previously

United States District Court
Northern District of California

1    engaged."  See Utah Code Ann. § 13-11-3(2).

2        Assuming, arguendo, the acts on which End-User Plaintiffs base their UCSPA

3    claim, specifically, price fixing, failing to disclose material facts about prices, and making

4    misrepresentations about prices (see End-User SAC ¶¶ 349.b-e), constitute "deceptive"

5    or "unconscionable" acts for purposes of the UCSPA, End-User Plaintiffs fail to allege

6    facts to support a finding that any defendant is a "supplier" within the meaning of the

7    UCSPA, as End-User Plaintiffs do not allege any facts to support a finding that any

8    defendant regularly solicits, engages in, or enforces consumer transactions.

9        Accordingly, End-User Plaintiffs' UCSPA claim is subject to dismissal.

10       **(7) Virginia**

11       The Virginia Consumer Protection Act ("VCPA") prohibits sixty-six enumerated

12   "fraudulent acts or practices," see Va. Code Ann. § 59.1-200(A)(1)-(66), when committed

13   by a "supplier in connection with a consumer transaction," see Va. Code Ann. § 59.1-

14   200(A).  The only enumerated act or practice arguably applicable to End-User Plaintiffs'

15   claim is "[u]sing any other deception, fraud, false pretense, false promise, or

16   misrepresentation in connection with a consumer transaction."  See Va. Code Ann.

17   § 59.1-200(A)(14).[14]

18       Assuming, arguendo, the acts on which End-User Plaintiffs base their VCPA claim,

19   specifically, price fixing, failing to disclose material facts about prices, and making

20   misrepresentations about prices (see End-User SAC ¶¶ 351.b-e), fall within the above-

21   quoted enumerated act/practice, such claim, for the reasons stated above with respect to

22   End-User Plaintiffs' claim under the NDTPA, is subject to dismissal as conclusory.[15]

23

24       [14] The thirteen enumerated acts/practices immediately preceding § 59.1-
25   200(A)(14) set forth specific types of misrepresentations, none of which pertain to price
     fixing.  See Va. Code Ann. § 59.1-200(A)(1)-(12).

26       [15] Although not addressed by the parties, the Court notes a question may exist as
27   to whether defendants are "suppliers."  In particular, the VCPA includes within the
     definition of "supplier" one who sells "goods" that are "to be resold, leased, or
28   sublicensed by other persons in consumer transactions," see Va. Code Ann. § 59.1-198,
     and it is unclear if "goods" includes components subsequently incorporated in products

1    Accordingly, End-User Plaintiffs' VCPA claim is subject to dismissal.

2         **f. Reliance**

3    Defendants contend End-User Plaintiffs' claims under the ADTPA, i.e., the

4    consumer protection statute enacted by Arkansas, as well as End-User Plaintiffs' and

5    Reseller Plaintiffs' respective claims under a consumer protection statute enacted by

6    California, are subject to dismissal for failure to plead reliance.

7         **(1) Arkansas**

8    As noted, End-User Plaintiff's claim under the ADTPA is based on defendants'

9    alleged price-fixing conspiracy.  Defendants argue such claim cannot be stated in the

10   absence of reliance, an allegation End-User Plaintiffs do not make and argue they need

11   not make.

12   Defendants first rely on the current version of § 4-88-113, the statute creating a

13   private cause of action for violations of the ADTPA.  The current version, effective August

14   1, 2017, provides that a "person who suffers an actual financial loss as a result of his or

15   her reliance on the use of a practice declared unlawful by [the ADTPA] may bring an

16   action to recover his or her actual financial loss proximately caused by the offense or

17   violation," see Ark. Code Ann. § 4-88-113(f)(1)(A), and that "[t]o prevail on a claim

18   brought under this subsection, a claimant must prove individually that he or she suffered

19   an actual financial loss proximately caused by his or her reliance on the use of a practice

20   declared unlawful under [the ADTPA]," see Ark. Code Ann. § 4-88-113(f)(2).

21   Under the current statute, End-User Plaintiffs would be required to prove reliance

22   on the wrongful conduct upon which they base their claim under the ADTPA, and End-

23   User Plaintiffs do not argue otherwise.  Rather, End-User Plaintiffs rely on the prior

24   version of § 4-88-133(f), the version in effect during the entirety of the period in which

25   defendants are alleged to have engaged in price fixing, which prior version provided that

26   "[a]ny person who suffers actual damage or injury as a result of an offense or violation as

27   _____

28   sold to consumers.

United States District Court
Northern District of California

defined in this chapter has a cause of action to recover actual damages, if appropriate." <u>See</u> former Ark. Code Ann. § 4-88-113(f).

Arkansas courts "indulge in the presumption that the legislature intends statutes, or amendments thereof, to operative prospectively only and not retroactively" and that "[o]nly when the General Assembly expressly provides that an act should be applied retroactively will [courts] do so." <u>See</u> <u>Bolin v. State</u>, 2015 Ark. 149, 459 S.W. 3d 788, 791 (2015).  Here, as nothing in the 2017 amendment to § 4-88-113 provides it is retroactive, the Court finds it operates only prospectively.

Defendants next argue the 2017 amendment did not effectuate a change in Arkansas law, but, rather, clarified then-existing law.  In support of such argument, defendants rely on an Eighth Circuit case that, applying Arkansas law, so held.  <u>See</u> <u>Apex Oil Co. v. Jones Stephens Corp.</u>, 881 F.3d 658, 662-63 (8th Cir. 2018) (interpreting prior version of § 4-88-113 to require reliance on allegedly unlawful act; characterizing 2017 amendment as "clarification").  Several months after the Eighth Circuit's opinion was issued, however, the Court of Appeals of Arkansas found to the contrary; specifically, the Court of Appeals held that, under the prior version of § 4-88-113, a plaintiff, although required to prove "injury resulting from [the] act" violating the ADTPA, was not required to prove "reliance."  <u>See</u> <u>Pleasant v. McDaniel</u>, 2018 Ark. App. 254, *7 (2018).  The Court finds the Court of Appeal's decision more persuasive, particularly given its reliance on the plain language of the former statute, in which, as the Court of Appeals noted, a number of the elements of a fraud claim, including reliance, are "conspicuously missing."  <u>See</u> <u>id.</u>

Accordingly, End-User Plaintiffs' ADTPA claim is not subject to dismissal for failure to allege reliance.

### (2) California

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."  <u>See</u> Cal. Bus. & Prof. Code § 17200.

Here, End-User Plaintiffs' and Reseller Plaintiffs' respective UCL claims are, in

38

part, based on "misrepresentations" and "non-disclosures" by defendants (see End-User SAC ¶ 329.d; Reseller SAC ¶ 174(d)), which alleged misrepresentations and omissions End-User Plaintiffs and Reseller Plaintiffs characterize as "fraudulent" and "deceptive" (see End-User SAC ¶ 329.g; Reseller SAC ¶ 174(h)).  End-User Plaintiffs and Reseller Plaintiffs do not, however, allege any named plaintiff who purchased products in California relied on any such misrepresentation or omission.  Consequently, the UCL claims, to the extent based on misrepresentations and omissions, are subject to dismissal.  See In re Tobacco II Cases, 46 Cal. 4th 298, 325, 328 (2009) (holding plaintiff alleging § 17200 claim "based on a fraud theory involving . . . misrepresentations to consumers" must "plead and prove actual reliance" on misrepresentations).

To the extent the UCL claims are based on the theory that defendants' alleged price-fixing conspiracy violated federal and state antitrust statutes, i.e., that the conspiracy was "unlawful" (see End-User SAC ¶ 329.d; Reseller SAC ¶ 174(d)), plaintiffs need not plead reliance, as such theory does not require plaintiffs to establish any false statement or omission of a material fact.  See In re Tobacco Cases, 46 Cal. 4th at 326 n.17 (observing "[t]here are doubtless many types of unfair business practices in which the concept of reliance . . . has no application").

Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective UCL claims are subject to dismissal to the extent based on misrepresentations and omissions, but not to the extent based on price fixing.

### g.  Applicability of Missouri Statute to Indirect Purchasers

Defendants contend End-User Plaintiffs' claim under the consumer protection statute enacted by Missouri does not encompass price-fixing claims brought by indirect purchasers.[16]

The Missouri Merchandising Practices Act ("MMPA") prohibits "any deception,

---

[16] To the extent defendants also make this argument as to Virginia's consumer protection statute, the Court does not address the argument herein, in light of its finding that End-User Plaintiff's claim under said statute is subject to dismissal for other reasons.

fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri." See Mo. Rev. Stat. § 407.020.

Missouri, by statute, requires that its state antitrust statutes "be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." See Mo. Rev. Stat. § 416.141.  Consequently, its antitrust statutes do not encompass price-fixing claims by indirect purchasers.  See Ireland v. Microsoft Corp., 2001 WL 1868946, at *1 (Cir. Ct. January 24, 2001) (citing Illinois Brick).  The parties cite conflicting authority on the issue of whether the above-quoted Missouri harmonization statute bars price-fixing claims under the MMPA as well.

In that regard, End-User Plaintiffs point out that courts finding indirect purchasers may bring claims under the MMPA correctly observe that the harmonization statute, by its express terms, applies to the state's antitrust statute and not to the MMPA.  See, e.g., In re Packaged Seafood, 242 F. Supp. 3d at 1079-80.  As defendants note, however, the policy set forth in the harmonization statute represents the Missouri legislature's determination that antitrust claims asserted under Missouri law be harmonized with federal authority, and the Court agrees with the district courts that have found such stated policy would be undermined by allowing an indirect purchaser to bring an otherwise barred antitrust claim under the guise of a general consumer protection statute.  See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxene) Antitrust Litig., 64 F. Supp. 3d 665, 701-02 (E.D. Penn. 2014) (holding that allowing indirect purchaser to bring price-fixing claim under MMPA "would provide an end-run around the state's prohibition of antitrust claims by indirect purchasers").

Accordingly, End-User Plaintiffs' MMPA claim is subject to dismissal.

### h.  Class Action Bar

Defendants argue that End-User Plaintiffs' claims under consumer protection statutes enacted by Montana and South Carolina cannot be brought on behalf of a

United States District Court
Northern District of California

1   class.[17]  In so arguing, defendants rely on statutes enacted by those states that prohibit

2   class actions.

3   **(1) Montana**

4   The Montana Consumer Protection Act ("MCPA") prohibits "[u]nfair methods of

5   competition and unfair or deceptive acts or practices in the conduct of any trade or

6   commerce."  See Mont. Code Ann. § 30-14-103.  The MCPA further provides that "[a]

7   consumer who suffers any ascertainable loss of money or property, real or personal, as a

8   result of the use or employment by another person of a method, act, or practice declared

9   unlawful by [the MCPA] may bring an individual but not a class action."  See Mont. Code

10  Ann. § 30-14-133(1).

11  In Shady Grove Orthopedic Associates, P.A. v Allstate Ins. Co., 559 U.S. 393

12  (2010), the Supreme Court considered whether a New York state statute prohibiting a

13  plaintiff from proceeding on behalf of a class is applicable in diversity cases pending in

14  federal court, and the majority found, albeit for differing reasons, Rule 23 of the Federal

15  Rules of Civil Procedure, rather than the state statute at issue, governed the question of

16  whether the plaintiff could pursue his state law claim on behalf of a class.  District courts

17  that have examined the differing views announced in Shady Grove have concluded that

18  district courts are to apply Rule 23, rather than a state statute prohibiting a plaintiff from

19  proceeding on behalf of a class, unless the state statute is "substantive" in nature, see In

20  re Lithium, 2014 WL 4955377, at *20, i.e., whether the statute "add[s], subtract[s], or

21  define[s] any of the necessary elements of the [state law] claim," see Wittman v. CB1,

22  Inc., 2016 WL 3093427, at *6 (D. Mont. June 1, 2016).

23  In that regard, the Court finds persuasive the analysis of the district courts in

24  Montana that have considered the matter, both of which found the MCPA's preclusion of

25  class actions does not apply in federal court, as the statute in which it is contained

26

27      [17] Although defendants, in their moving papers, also make this argument with
respect to the states of Arkansas and Virginia, they have withdrawn those arguments in
28  their reply.  (See Defs.' Reply at 14:6-18, 28.)

United States District Court
Northern District of California

1   "affects only the process of enforcing the litigants' rights" and "alters only the procedural

2   means" by which an injured party may seek to recover under the MCPA.  See id. at *6

3   (noting "[e]ach individual plaintiff could proceed with a suit under the MCPA and receive

4   the same remedy regardless of whether the plaintiff brought the suit individually or as part

5   of a class action"); Hill v. LLR, Inc., 2019 WL 3024896, at *5 (D. Mont. July 11, 2019)

6   (characterizing MCPA's prohibition on class actions as "procedural"); see also In re

7   Toyota RAV4 Hybrid Fuel Tank Litig., 2021 WL 1338949, at *31 (N.D. Cal. April 16, 2021)

8   (finding decisions of Montana district courts persuasive; holding MCPA's prohibition of

9   class actions inapplicable in federal court).

10          Accordingly, End-User Plaintiffs' MCPA class claims are not subject to dismissal.

11                          **(2) South Carolina**

12          The South Carolina Unfair Trade Practices Act ("SCUTPA") prohibits "[u]nfair

13   methods of competition and unfair or deceptive acts or practices in the conduct of any

14   trade or commerce."  See S.C. Code Ann. § 39-5-20(a).  Similar to the Montana statute

15   discussed above, the SCUTPA also provides that "[a]ny person who suffers any

16   ascertainable loss of money or property, real or personal, as a result of the use or

17   employment by another person of an unfair or deceptive method, act or practice declared

18   unlawful by [the SCUTPA] may bring an action individually, but not in a representative

19   capacity, to recover actual damages."  See S.C. Code Ann. § 39-5-140(a).

20          The Court finds persuasive the analysis set forth by district courts that have found

21   the SCUTPA's class action bar does not apply in federal court.  See In re Packaged

22   Seafoods, 242 F. Supp. 3d at 1086 (characterizing SCUTPA class action bar as

23   "procedural rather than substantive rule"; noting bar "does not in any way affect the

24   putative South Carolina litigants' ability to pursue claims under the statute"; In re Lithium,

25   2014 WL 4955377, at 21 (holding "substantive rights of [putative class members] are not

26   affected" by SCUTPA's class action bar, which bar "only affect[s] how the claims are

27   processed") (internal quotation and citation omitted).

28          Accordingly, End-User Plaintiffs' SCUTPA class claims are not subject to

United States District Court
Northern District of California

1  dismissal.

2  **3. Third Claim for Relief**

3  As noted, the Third Claim for Relief in each SAC asserts claims for "unjust

4  enrichment."  Reseller Plaintiffs assert their claims under the laws of California, Michigan,

5  Minnesota, New York, and North Carolina.  End-User Plaintiffs assert claims under the

6  laws of those five states, and, in addition, under the laws of Arizona, Arkansas, the

7  District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Maryland, Massachusetts,

8  Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North

9  Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah,

10  Vermont, Virginia, West Virginia and Wisconsin.

11  Defendants argue certain of the unjust enrichment claims are subject to dismissal,

12  for several reasons, which the Court next considers in turn.

13  **a.  Unjust Enrichment Not Recognized As Cause of Action**

14  Defendants first argue unjust enrichment is not a recognized cause of action.  As

15  the authorities cited by defendants address only California law and Mississippi law, the

16  Court understands the argument pertains only to those two states.

17  **(1) California**

18  Under California law, "[u]njust enrichment" itself is "not a cause of action . . . or

19  even a remedy, but rather a general principle, underlying various legal doctrines and

20  remedies"; it is "synonymous with restitution."  See McBride v. Boughton, 123 Cal. App.

21  4th 379, 387 (2004) (internal quotation and citation omitted).  A cause of action titled

22  "unjust enrichment," however, can be construed as a claim that the plaintiff is entitled to

23  restitution under a theory that "the defendant obtained a benefit from the plaintiff by

24  fraud" and the plaintiff "choose[s] not to sue in tort, but instead to seek restitution on a

25  quasi-contract theory (an election referred to at common law as waiving the tort and

26  suing in assumpsit)."  See id. at 388.

27  Here, plaintiffs, by proceeding with their respective claims for restitution under the

28  UCL, have not waived the tort, but, rather, have chosen to sue in tort.  (See End-User

43

SAC ¶ 329.c, k; Reseller SAC ¶ 174.c, k.)  Under such circumstances, plaintiffs' unjust enrichment claims under California law are "duplicative" and subject to dismissal.  See In re Apple and AT&T iPad Unlimited Data Plan Litig., 802 F. Supp. 2d 1070, 1077 (N.D. 2011) (holding "plaintiffs cannot assert unjust enrichment claims that are merely duplicative of statutory or tort claims"; dismissing claim for unjust enrichment as duplicative) (citing cases).

Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective unjust enrichment claims under California law are subject to dismissal.

### (2) Mississippi

Under Mississippi law, "unjust enrichment" is not itself a cause of action, but, rather, "an equitable remedy closely associated with implied contracts and trusts."  See Estate of Johnson v. Adkins, 513 So. 2d 922, 926 (Miss. 1987).  To the extent Mississippi law might allow a claim titled "unjust enrichment" to be construed as a claim for breach of an implied contract or for imposition of a constructive trust, End-User Plaintiffs allege no facts to warrant such recharacterization of their claim.  First, with respect to implied contracts, Mississippi law provides that "unjust enrichment applies when one party has mistakenly paid another party," see Willis v. Rehab Solutions, PPLC, 82 So. 2d 583, 588 (Miss. 2012), a circumstance not alleged by End-User Plaintiffs.  With respect to constructive trusts, Mississippi law requires that the defendant have a "confidential relationship" with the plaintiff, see Braddock Law Firm, PLLC v. Becnel, 949 So. 2d 38, 48 (Miss. Ct. App. 2006), likewise a circumstance not alleged by End-User Plaintiffs.

Accordingly, End-User Plaintiffs' unjust enrichment claim under Mississippi law is subject to dismissal.

### b.  Lack of Illinois Brick Repealer Statute

Defendants argue unjust enrichment claims that are "nothing more than an attempted end-run around Illinois Brick's prohibition" should be dismissed.  (See Defs.' Mot. at 37:1-3.)  Although defendants do not expressly identify the particular unjust enrichment claims they believe fail as a result of Illinois Brick, the Court construes the

United States District Court
Northern District of California

argument to be directed to claims brought under Missouri and Virginia law, those being the only states as to which, in earlier sections of the motion to dismiss, defendants argue Illinois Brick bars plaintiffs from pursuing state law claims based on alleged price fixing. (See Defs.' Mot. at 13-14.)

### (1)  Missouri

As discussed above with respect to End-User Plaintiffs' claim under the MMPA, Missouri requires its antitrust statutes "be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes," see Mo. Rev. Stat. § 416.141, and the Court has found that same law bars indirect purchasers' price-fixing claims brought under the MMPA.  For the reasons stated above, the Court also finds indirect purchasers' unjust enrichment claims are barred when based on price fixing.  See In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231-32 (S.D. N.Y. 2012) (holding states that have adopted Illinois Brick "did not intend to allow an end run around the policies allowing only direct purchasers to recover") (internal quotation and citation omitted).

Accordingly, End-User Plaintiffs' unjust enrichment claim under Missouri law is subject to dismissal.

### (2)  Virginia

Similar to Missouri, Virginia has a statute providing that its state antitrust statute "shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions."  See Va. Code Ann. § 59.1-9.17.  For the reasons stated above with respect to End-User Plaintiffs' unjust enrichment claim under Missouri law, the Court finds End-User Plaintiffs' unjust enrichment claim under Virginia law likewise fails.  See In re Lidoderm, 103 F. Supp. 3d at 1175 (dismissing unjust enrichment claim under Virginia law; characterizing such claim as attempt to make "end run" around Illinois Brick).

Accordingly, End-User Plaintiffs' unjust enrichment claim under Virginia law is subject to dismissal.

United States District Court
Northern District of California

### c.  No Direct Benefit Conferred/Lack of Privity

Defendants argue unjust enrichment claims should be dismissed where "the purchasers are 'too attenuated,' not in privity with the defendant, or where plaintiffs have conferred no benefit directly on defendants."  (See Defs.' Mot. at 37:5-7.)  The Court understands defendants' argument to be directed at unjust enrichment claims asserted under the laws of Arizona, Florida, Kansas, Maine, Michigan, New York, North Carolina, and North Dakota.  (See id. at 37:8-11, 26-28.)

#### (1) Arizona

Relying on a single case, In re Pork Antitrust Litig., 495 F. Supp. 3d 753 (D. Minn. 2020), defendants argue Arizona requires a plaintiff bringing an unjust enrichment claim to be in privity with the defendant or to confer a direct benefit on the defendant.  The cited case, however, includes no such holding; rather, it expressly rejects the argument that, under Arizona law, "a degree of directness is required."  See id. at 792-93.[18]  Moreover, in numerous other cases, district courts have found Arizona does not require that a plaintiff have any direct contact with, or confer any direct benefit on, a defendant.  See, e.g., Sandee's Catering v. Agri Stats, Inc., 2021 WL 963812, at *4 (N.D. Ill. March 15, 2021) (holding Arizona law does not require "direct benefit"; citing cases); In re Packaged Seafood, 242 F. Supp. 3d at 1089 (observing "the Court has been unable to locate a single Arizona case which required conferral of a direct benefit").

Accordingly, End-User Plaintiffs' unjust enrichment claim under Arizona law is not subject to dismissal.

#### (2) Florida

The Supreme Court of Florida has held that, "to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant."  See Kopel v. Kopel,

---

[18] The unjust enrichment claim asserted in In re Pork was dismissed for a different reason, specifically, that the plaintiff therein had failed to allege facts to support a finding that there existed any "connection" between the plaintiff's purchase and the defendant's alleged conduct, see id. at 793, an argument defendants do not make here.

229 So. 3d 812, 814, 818 (Fla. 2017).  As End-User Plaintiffs do not allege there was any benefit to any defendant by reason of the named End-User Plaintiffs' purchases in Florida, End-User Plaintiffs have not established an unjust enrichment claim under Florida law.  See In re Namenda Indirect Purchaser Antitrust Litig., 2021 WL 2403727, at *35 (S.D. N.Y. June 11, 2021) (dismissing unjust enrichment claim under Florida law, where plaintiff did not purchase allegedly price-fixed product directly from defendant).

Accordingly, End-User Plaintiffs' unjust enrichment claim under Florida law is subject to dismissal

### (3) Kansas

The Supreme Court of Kansas has held an unjust enrichment claim "does not depend on privity."  See Haz–Mat Response, Inc. v. Certified Waste Servs. Ltd., 259 Kan. 166, 177 (1996).  To the extent the Supreme Court's decision may, as defendants appear to argue, leave room for a finding that Kansas nonetheless would require a plaintiff to show he directly conferred a benefit on the defendant, the Court finds persuasive the reasoning set forth in district court opinions holding Kansas law does not so require. See, e.g., In re Packaged Seafood, 242 F. Supp. 3d at 1090 (rejecting, for lack of supporting authority, argument that Kansas law requires "a showing of a 'direct benefit' in order for a plaintiff to assert a valid unjust enrichment claim").

Accordingly, End-User Plaintiff's unjust enrichment claim under Kansas law is not subject to dismissal.

### (4) Maine

In Platz Associates v. Finley, 973 A.2d 743 (Me. 2009), the Supreme Judicial Court of Maine held that, to establish an unjust enrichment claim, the plaintiff must show he "conferred a benefit" on the defendant.  See id. at 750 (internal quotation and citation omitted).  The Supreme Judicial Court, however, did not hold in Platz Associates, nor has any party brought to the Court's attention any opinion in which a Maine court has held, the requisite benefit must be directly conferred on the defendant or that the plaintiff be in privity with the defendant.  Moreover, the Supreme Judicial Court appears to be of the

view that the requisite benefit can be conferred indirectly, given its finding that the plaintiff therein had failed to establish the defendant received a benefit either from that plaintiff or from "anyone else." See id. at 751.  Under such circumstances, the Court agrees with district courts that have found Maine does not require a plaintiff to directly confer a benefit on the defendant.  See, e.g., Sandee's Catering, 2021 WL 963812, at 4 (finding "Maine's unjust enrichment laws do not require a showing of a direct benefit").

Accordingly, End-User Plaintiffs' unjust enrichment claim under Maine law is not subject to dismissal.

### (5) Michigan

Under Michigan law, a plaintiff seeking to bring an unjust enrichment claim need not have directly conferred a benefit on the defendant or be in privity with the defendant, see Kammer Asphalt Paving Co. v. East China Township Schools, 443 Mich. 176, 187-88 (1993) (holding plaintiff who "indirectly provided defendant a benefit," and had "no contract" with defendant, entitled to proceed with unjust enrichment claim), and numerous district courts have allowed indirect purchasers to bring unjust enrichment claims against allegedly price-fixing defendants, see, e.g., Sandee's Catering, 2021 WL 963812, at *4-5 (citing cases).

Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective unjust enrichment claims under Michigan law are not subject to dismissal.

### (6) New York

In Sperry v. Crompton Corp., 863 N.E. 3d 204 (N.Y. 2007), the Court of Appeals of New York considered whether an unjust enrichment claim could be brought by an indirect purchaser, who alleged the defendants conspired to fix the price of "rubber-processing chemicals" they sold to tire manufacturers and that "the overcharges trickled down the distribution chain to consumers" who purchased tires.  See id. at 209.  The Court of Appeals concluded the "connection between the purchasers of tires and the producers of chemicals used in the rubber-making process [was] simply too attenuated" to support an unjust enrichment claim.  See id. at 216.  Subsequent thereto, a number of courts

United States District Court
Northern District of California

considering unjust enrichment claims brought by indirect purchasers have examined the holding in Sperry and have reached differing conclusions as to the meaning of "too attenuated."

Some courts have found Sperry used the phrase "too attenuated" to apply where the plaintiff's claim is based on a chain of distribution, and consequently, have found New York does not recognize unjust enrichment claims by indirect purchasers, including claims wherein the chain of distribution involves very few steps.  See, e.g., In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 216, 272 (S.D. N.Y. 2019) (dismissing unjust enrichment claim as "too attenuated," where chain of distribution encompassed two steps); Sheet Metal Workers Local 441 v. GlaxoSmithKline, PLC, 263 F.R.D. 205, 216 (E.D. Penn. 2009) (dismissing unjust enrichment claim where plaintiff purchased price-fixed drug from "direct purchaser" and not from defendant).

Other courts have found Sperry's use of "too attenuated" refers to a lack of facts allowing one to trace the alleged price-fixed product to the product purchased by the end user.  Consistent therewith, those courts have dismissed claims where the price-fixed product was, as in Sperry, a chemical or ingredient mixed into an end-product and there was no apparent way to trace the ingredient to a defendant, see e.g., New York ex rel. Spitzer v. Daicel Chemical Industries, Ltd., 840 N.Y.S. 2d 8, 12 (N.Y. App. Div. 2007) (affirming dismissal of unjust enrichment claim brought on behalf of end-users who purchased food products containing, "among the ingredients," price-fixed "food additives"; finding relationship between end users and additive manufacturers "too attenuated"), and have denied motions to dismiss unjust enrichment claims where the defendant was the manufacturer of the completed product the plaintiff indirectly purchased, see, e.g., Waldman v. New Chapter, Inc., 714 F. Supp. 2d 398, 403-04 (E.D. N.Y. 2010), or the price-fixed item, although a component of the product the indirect purchaser bought, was traceable to the defendant, In re TFT-LCD (Flat Panel) Antitrust Litig., 2011 WL 4501223, at *9 (N.D. Cal. September 28, 2011) (finding unjust enrichment

49

claim cognizable where price-fixed component in televisions did "not change form or become an indistinguishable part of [end product]" and "follow[ed] a traceable physical chain from [defendants] to [indirect] purchasers").

The Court agrees with the reasoning of the courts allowing indirect purchasers to proceed where an adequate factual showing as to traceability has been made, in particular, given Sperry's rejection of the holding in the decision it reviewed, which had found an unjust enrichment claim subject to dismissal on the ground that "no privity existed between [the plaintiff] and defendants." See Sperry, 863 N.E. 3d at 215.  Sperry expressly rejected that reasoning, finding "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment."  See id.  Although, as noted, Sperry affirmed the dismissal on the ground the connection between the purchaser and manufacturer was "too attenuated," see id. at 215-16, the Court of Appeals, in holding privity was not required, left open the possibility that indirect purchasers, in at least some instances, could proceed with unjust enrichment claims.

Here, plaintiffs allege the SAs are "discrete" components in the product(s) each plaintiff purchased and that the SAs do not undergo any alteration when incorporated into an HDD.  (See End-User SAC ¶ 230; Reseller SAC ¶ 118.)  Additionally, as noted, plaintiffs allege the SAs in the product(s) each plaintiff bought are marked with a letter identifying the specific manufacturer.  Under such circumstances, the concerns set forth in Sperry and other cases regarding attenuation are not present in the instant cases. Consequently, dismissal is not warranted on the ground that the connection between defendants' alleged conspiracy and the named plaintiffs' respective purchases in New York is too attenuated.

Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective unjust enrichment claims under New York law are not subject to dismissal.

### (7) North Carolina

The North Carolina Court of Appeals has, on at least three occasions, expressly held that unjust enrichment claims are limited to plaintiffs who confer a benefit "directly"

on the defendant.  See Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 178

(1998) (holding "essential element" of unjust enrichment claim is "direct receipt by

[defendant] of any benefit in consequence of plaintiff's [act]"); Effler v. Pyles, 94 N.C.

App. 349, 353 (N.C. Ct. App. 1989) (holding plaintiff failed to establish unjust enrichment

claim, where plaintiff conferred benefit on individual, who, in turn, conferred benefit on

defendant); Baker Contr. Co. v. City of Burlington, 200 N.C. App. 435, at *6 (N.C. Ct.

App. 2009) (holding "benefit conferred must be conferred directly from plaintiff to

defendant, not through a third party").

Where, as here, the highest court of a state has not ruled on an issue, the

Supreme Court has directed district courts as follows:  "Where an intermediate appellate

state court rests its considered judgment upon the rule of law which it announces, that is

a datum for ascertaining state law which is not to be disregarded by a federal court

unless it is convinced by other persuasive data that the highest court of the state would

decide otherwise."  See West v. American Telephone & Telegraph Co., 311 U.S. 223,

237 (1940).

In this instance, plaintiffs have not cited to any opinion by the Supreme Court of

North Carolina that suggests it would reject the reasoning set forth in the above-cited

intermediate court cases, which were decided over a lengthy period of time and without

any contrary holding having been announced.  Consequently, the Court finds North

Carolina requires a plaintiff, for purposes of establishing an unjust enrichment claim, to

have directly conferred a benefit on the defendant, see In re Flonase Antitrust Litig., 692

F. Supp. 2d 524, 545-46 (E.D. Penn. 2010) (dismissing indirect purchaser's unjust

enrichment claim under North Carolina law; finding decisions by North Carolina

intermediate courts set forth "clear statement" that plaintiff must directly confer benefit on

defendant), a requirement that the named End-User and Reseller Plaintiffs who

purchased in North Carolina have not met.

Accordingly, End-User Plaintiffs' and Reseller Plaintiffs' respective unjust

enrichment claims under North Carolina law are subject to dismissal.

**(8) North Dakota**

The Supreme Court of North Dakota has held that, to bring a viable unjust enrichment claim, the plaintiff must establish the defendant "obtained a benefit at the direct expense of the [plaintiff]."  See Midland Diesel Service v. MDU Resources Group, Inc., 307 N.W. 2d 555, 557 (N.D. 1981) (affirming judgment in favor of plaintiff on unjust enrichment claim, where "[d]efendant received a direct benefit or improvement to his property" from plaintiff).

As End-User Plaintiffs do not allege defendants received a direct benefit from the named End-User Plaintiffs who purchased products in North Dakota, End-User Plaintiffs are unable to establish an unjust enrichment claim under North Dakota law.  See Thompson v. Bayer Corp., 2009 WL 362982, at *5 (E.D. Ark. February 12, 2009) (holding plaintiffs who purchase products in North Dakota cannot establish unjust enrichment claim in absence of showing defendant "obtained a 'direct benefit'" from plaintiffs).

Accordingly, End-User Plaintiffs' unjust enrichment claim under North Dakota law is subject to dismissal.

**d.  Lack of Viable Antitrust or Consumer Protection Claim**

Lastly, defendants argue that, as to any given state, to the extent plaintiffs' price-fixing claims and consumer protection claims have been dismissed, i.e., the only remaining claim under the laws of that state is an unjust enrichment claim based on price fixing, such claim likewise should be dismissed.  At this point, in light of the Court's findings set forth above, the Court addresses such argument only as it pertains to the unjust enrichment claim brought by End-User Plaintiffs under Maryland law.

As discussed, End-User Plaintiffs' claim under the MAA is subject to dismissal because, at the time of the alleged price-fixing conspiracy, Maryland barred state antitrust claims by indirect purchasers,[19] and, for the reasons set forth above with respect to

---

[19] End-User Plaintiffs have not asserted a claim under any Maryland consumer protection statute.

52

United States District Court
Northern District of California

dismissal of End-User Plaintiffs' unjust enrichment claims under Missouri and Virginia law, the Court finds End-User Plaintiffs' unjust enrichment claim under Maryland law likewise fails; specifically, the Court finds allowing such claim to proceed would undermine then-existing Maryland state policy.  See United Food & Commercial Workers, 74 F. Supp. 3d at 1089-90 (dismissing unjust claim under Maryland law; observing "majority of courts" have found allowing such claim would "circumvent the Illinois Brick prohibition" recognized in Maryland).

Accordingly, End-User Plaintiffs' unjust enrichment claim under Maryland law is subject to dismissal.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the SACs is hereby GRANTED in part and DENIED in part, as follows:

1.  To the extent End-User Plaintiffs' First Claim for Relief is brought under the laws of Maryland and Mississippi, the motion is GRANTED.

2.  To the extent End-User Plaintiffs' Second Claim for Relief is brought under the laws of Michigan, Missouri, New Hampshire, New Mexico, Oregon, South Dakota, Utah, and Virginia, the motion is GRANTED.

3. To the extent End-User Plaintiffs' and Reseller Plaintiffs' respective Second Claims for Relief are brought under the law of California and are based on alleged omissions or misrepresentations, the motion is GRANTED.

4.  To the extent End-User Plaintiffs' Second Claim for Relief is brought under the laws of Minnesota, Nevada, and Rhode Island and is based on alleged omissions or misrepresentations, the motion is GRANTED.

5.  To the extent End-User Plaintiffs' Third Claim for Relief is brought under the laws of Florida, Maryland, Mississippi, Missouri, North Dakota, and Virginia, the motion is GRANTED.

6.  To the extent End-User Plaintiffs' and Reseller Plaintiffs' respective Third Claims for Relief are brought under the laws of California and North Carolina, the motion

is GRANTED.

7.  In all other respects, the motion is DENIED.

8.  The instant actions shall proceed on the remaining claims in the SACs.  In the event, however, End-User Plaintiffs and/or Reseller Plaintiffs wish to file a Third Amended Complaint for purposes of curing any of the above-discussed deficiencies, such amended pleading shall be filed no later than October 22, 2021; plaintiffs may not, however, add any new claims or new defendants without first obtaining leave of court. See Fed. R. Civ. P. 15(a)(2).

**IT IS SO ORDERED.**

Dated:  September 22, 2021

MAXINE M. CHESNEY
United States District Judge