Shawn M. Raiter (*pro hac vice*)
Larson · King, LLP
2800 Wells Fargo Place
30 East 7th Street
St. Paul, Minnesota 55101
Telephone: (651) 312-6500
Facsimile: (651) 312-6618
Emails: sraiter@larsonking.com

Victoria Sims (*pro hac vice*)
Cuneo Gilbert & LaDuca, LLP
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
vicky@cuneolaw.com

*Interim Co-Lead Counsel for Reseller Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 19-md-02918-MMC<br><br>MDL No. 2918 |
| This Document Relates to:<br><br>ALL CASES | **[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT** |

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, based on the investigation of counsel, bring this class action against Defendants Hutchinson Technology Inc., Magnecomp Precision Technology Public Co. Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co.,

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Ltd., SAE Magnetics (H.K.) Ltd., and TDK Corporation for damages, and other relief pursuant to state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, demand a trial by jury, and allege as follows:

## NATURE OF THE ACTION

1.      This lawsuit arises out of a global conspiracy among Defendants and their co-conspirators to fix prices of and allocate market shares for hard disk drive ("HDD") suspension assemblies. As Assistant Attorney General of the Department of Justice ("DOJ") Antitrust Division Makan Delrahim described, HDD suspension assemblies are "critical to the operation and performance of electronic devices, and their impact on American consumers and business is direct and substantial."

2.      HDD suspension assemblies are a component of hard disk drives, which use magnetism to store information electronically. HDDs use recording heads, attached to sliders, to read from and write onto rapidly spinning disks. HDD suspension assemblies hold the recording heads close to the disks and provide the electrical connection from the recording heads to the hard disk drives' circuitry. HDDs containing HDD suspension assemblies are sold both as stand-alone devices and incorporated into a variety of ubiquitous electronics such as computers.

3.      At all relevant times, Defendants manufactured and sold HDD suspension assemblies throughout and into the United States.  As of 2016, Defendants TDK and NHK, along with their subsidiaries, were the leading

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

manufacturers of HDD suspension assemblies, with a combined worldwide market share of approximately 90%.

4. Starting in approximately 2003, Defendants and their co-conspirators contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices of and allocate market shares for HDD suspension assemblies in the United States.

5. Defendants fixed prices and coordinated bids to two U.S. companies, Western Digital, headquartered in San Jose, California, and Seagate, which has its operational headquarters in Cupertino, California.

6. United States and foreign governments have investigated potential price-fixing of HDD suspension assemblies; and in 2019, Defendant NHK (as defined below) admitted guilt. On July 29, 2019, the DOJ announced that Defendant NHK agreed to plead guilty and pay a $28.5 million fine for its role in a conspiracy to suppress and eliminate competition by fixing prices of HDD suspension assemblies sold in the United States and elsewhere. On February 13, 2020, the Justice Department indicted two NHK executives, Hitoshi Hashimoto and Hiroyuki Tamura, for their participation in the HDD Suspension Assemblies conspiracy.

7. In July 2016, the Japanese Fair Trade Commission ("JFTC") raided both Defendants TDK (as defined below) and NHK (or certain of their subsidiaries) based on suspicion that the two companies fixed prices for HDD suspension components. On February 9, 2018, the JFTC issued a cease and desist

order to both Defendants TDK and NHK and found that they substantially restrained competition in the HDD suspension assemblies market by agreeing to maintain sales prices.

8. Concurrently with the JFTC investigation, the DOJ opened an investigation regarding HDD suspension assemblies. Pursuant to that investigation, on July 26, 2016 Defendant Hutchinson Technology, Inc. received a letter from the DOJ requesting documents relating to the investigation.

9. In April 2018, Brazilian antitrust authorities launched an investigation into allegations that Defendant TDK and four other companies colluded from 2003 to May 2016 to fix prices of HDD suspension assemblies. The international cartel allegedly shared information and allocated customers to maintain artificially high prices on HDD suspension assemblies used in hard disks.

10. The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition for HDD suspension assemblies by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of HDD suspension assemblies sold in the United States and elsewhere. The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

11.     The Reseller Plaintiffs have purchased thousands of hard drives and products containing hard drives, containing HDD SAs.

12.     As a direct and proximate result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid more during the Class Period for HDD suspension assemblies than they otherwise would have paid in a competitive market, and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

13.     Plaintiffs assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under state law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

16.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of HDD suspension assemblies throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

17.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

18.     The activities of Defendants and their co-conspirators were within the flow of, and were intended, to and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

19.     HDD suspension assemblies manufactured abroad by Defendants and sold for use in products in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any HDD suspension assemblies are purchased in the United States, and such HDD suspension assemblies do not constitute import commerce, Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

20.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, and allocate the market and customers in the United States for HDD suspension assemblies, which conspiracy unreasonably restrained trade and adversely affected the market for HDD suspension assemblies.

21.     NHK's Plea Agreement states that the NHK Defendants and their co-conspirators "manufactured HDD suspension assemblies outside the United States and sold them in, or for delivery to, the United States. During the relevant period, [NHK Spring] and its co-conspirators sold foreign-manufactured HDD suspension assemblies outside the United States for incorporation into products—namely, hard disk drives—that were sold in, or for delivery to, the United States. During the relevant period, HDD suspension assemblies and certain hard disk drives incorporating affected HDD suspension assemblies traveled in, and substantially affected, interstate and import trade and commerce. During the relevant period, the conspiracy involved and had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce, including in HDD suspension assemblies and certain hard disk drives incorporating affected HDD suspension assemblies." The plea further states that some of Defendants' "conspiratorial meetings and discussions" "took place in the United States" and that [c]ommunications made in furtherance of the conspiracy and memorializing the conspiratorial meetings and discussions were transmitted through and stored on servers located" in the U.S.

22.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased a product in the United States which included an HDD suspension assembly.

23.     Plaintiff Now Micro, Inc. ("Now Micro") is incorporated in and has its principal place of business in St. Paul, Minnesota. During the Class Period, Plaintiff Now Micro purchased HDD suspension assemblies incorporated in desktop computers, laptop computers, storage servers and hard drives. Now Micro purchased most of its hard drives—primarily Seagate and Western Digital hard drives—from Ingram Micro, as well as D&H, Synnex, MA Labs, ASI, and SED International, and Amazon. Now Micro purchased its desktop and laptop computers, primarily Lenovo and HP, from Ingram Micro, Tech Data, Synnex, and D&H. Now Micro purchased Dell computers directly from manufacturer Dell. Now Micro purchased HP, Dell and Lenovo storage servers from HP, Dell and Lenovo, as well as Ingram Micro, Tech Data, Synnex, and D&H. Now Micro made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in Minnesota. Now Micro was injured in its business or property as a result of Defendants' unlawful conduct alleged herein.

24.     Plaintiff Business Integrated Technical Systems, Inc. d/b/a Network One ("Network One") is incorporated in Delaware and has its principal place of business in Milford, Michigan. During the Class Period, Network One purchased HDD suspension assemblies incorporated in computers, storage servers, and hard drives. Network One purchased computers from Amazon, Synnex, and Ingram Micro. Network One purchased storage servers from Synnex and Ingram Micro.

Network One purchased hard drives from Amazon. Network One made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in Michigan. Network One was injured in its business or property as a result of Defendants' unlawful conduct alleged herein.

25.     Plaintiff IT Worx, Inc. ("IT Worx") is a North Carolina Corporation, with its principal place of business in Greensboro, North Carolina. During the Class Period, IT Worx purchased HDD suspension assemblies incorporated in desktop computers, laptop computers, storage servers and hard drives. IT Worx purchased most of its hard drives, primarily Seagate, Western Digital and Hitachi hard drives, from Computer Warehouse of North Carolina, Other World Computing, Tech Data, Ingram Micro, Intrex Computers, and Newegg. IT Worx purchased desktop and laptop Lenovo, HP and Dell computers from Tech Data, Ingram Micro and D&H. IT Worx purchased Lenovo, IBM and HP storage servers from D&H. IT Worx made its purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in North Carolina. IT Worx was injured in its business or property as a result of Defendants' unlawful conduct alleged herein.

26.     Plaintiff Stephen Arvay ("Arvay") is a resident of and does business in Rouses Point, New York. Arvay purchased HDD suspension assemblies incorporated into computers, storage servers, and hard drives. Arvay purchased computers from Best Buy. Arvay purchased hard drives, primarily Seagate and

Western Digital hard drives, from Best Buy, Amazon, B&H, Newegg, and Walmart. Arvay made purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in New York. Arvay was injured in his business or property as a result of Defendants' unlawful conduct alleged herein.

27.     Plaintiff Michael Medeiros ("Medeiros") is a resident of and does business in Atwater, California. Medeiros purchased HDD suspension assemblies incorporated in hard drives and a computer. Medeiros purchased its hard drives--primarily Seagate, as well as Samsung, Maxtor, and Western Digital hard drives--primarily from MA Labs, as well as from Amazon and Newegg. Medeiros purchased an MSI computer from Ma Labs. Medeiros made purchases of the above-described products containing HDD suspension assemblies, during the Class Period, in California. Medeiros was injured in his business or property as a result of Defendants' unlawful conduct alleged herein.

## A.     TDK Defendants

28.     Defendant TDK Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. TDK Corporation – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

29.     Defendant Magnecomp Precision Technology Public Co. Ltd. is a

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Thai corporation with its principal place of business in Ayutthaya, Thailand. It is an affiliate of and wholly controlled by TDK Corporation. Defendant Magnecomp Precision – directly and/or through its affiliates – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

30.     Defendant Magnecomp Corporation is a U.S. corporation with its principal place of business in Murrieta, California. Defendant Magnecomp Corporation is the U.S. location and, according to the Magnecomp website, the "technology center" of Magnecomp, consistent with Magnecomp's stated policy of being "strategically positioned close to its customers' design and manufacturing centers,"[1] including in the U.S. Magnecomp Corporation is a subsidiary of Magnecomp Precision Technology and TDK. Defendant Magnecomp Corporation – directly and/or through its affiliates – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period. Magnecomp Precision and Magnecomp Corporation will collectively be referred to as "Defendant Magnecomp."

31.     Defendant SAE Magnetics (H.K.) Ltd. is a Chinese corporation with its principal place of business in Hong Kong, China. Defendant SAE Magnetics –

---

[1] https://www.magnecomp.tdk.com/Home/About

directly and/or through its affiliates – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period. At times, TDK dealt with certain hard drive manufacturers, such as Toshiba and Western Digital through SAE. NHK Defendants also sold HDD Suspension Assemblies to SAE as part of their contracts with certain hard drive manufacturers.

32.     Defendant Hutchinson Technology Inc. is a Minnesota corporation with its principal place of business in Hutchinson, Minnesota. TDK Corporation acquired Hutchinson Technology Inc. on October 6, 2016. It is an affiliate of and wholly controlled by TDK Corporation. Hutchinson Technology Inc. – directly and/or through its affiliates – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

**B.     NHK Defendants**

33.     Defendant NHK Spring Co., Ltd. is a Japanese corporation with its principal place of business in Yokohama, Japan. NHK Spring Co., Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

34.     Defendant NHK International Corporation is a Michigan corporation with its principal place of business in Novi, Michigan. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

35.     Defendant NHK Spring (Thailand) Co., Ltd. is a Thai corporation with its principal place of business in Samutprakarn, Thailand. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

36.     Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Dong Guan") is a Chinese corporation with its principal place of business in Guangdong, China. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd. – Defendant Nat Dong Guan directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HDD suspension assemblies that were sold and purchased throughout the United States, including in this District, during the Class Period.

37.     Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a Chinese corporation with its principal place of business in Hong Kong, China. It is

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

an affiliate of and wholly controlled by NHK Spring Co., Ltd. – Defendant NAT

H.K. directly and/or through its subsidiaries, which it wholly owned and/or

controlled – manufactured, marketed and/or sold HDD suspension assemblies that

were sold and purchased throughout the United States, including in this District,

during the Class Period. Defendants NAT H.K. and NAT Dong Guan will be

collectively referred to as NAT. From 2004 until 2015, NAT was a joint venture

between Defendants SAE and NHK, that manufactured and sold HDD Suspension

Assemblies. In 2015, NHK purchased acquired all of SAE's shares and NAT

became a wholly-owned subsidiary of NHK. NAT served to facilitate the collusion

between TDK and NHK, including as a conduit for information and as a

continuous opportunity to engage in competitor contacts.

## AGENTS AND CO-CONSPIRATORS

38.     The acts alleged against the Defendants in this Complaint were

authorized, ordered, or done by their officers, agents, employees, or

representatives, while actively engaged in the management and operation of

Defendants' business or affairs.

39.     Various persons and/or firms not named as Defendants herein may

have participated as co-conspirators in the violations alleged herein and may have

performed acts and made statements in furtherance thereof. Plaintiffs reserve the

right to name some or all of these persons as defendants at a later date.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

40.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

41.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for HDD suspension assemblies made by its parent company.

42.     Individuals alleged to have engaged in conspiratorial conduct are alleged to have done so on behalf of all members of their corporate family, i.e. the TDK Defendants or the NHK Defendants. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. TDK and NHK Defendants each affirmatively represent themselves as one corporate global family, rather than separate subsidiaries and parents. For instance, TDK's website states "As a global company, ensuring business moves forward smoothly requires a governance structure that is also compatible with the standards of countries in Europe and the Americas."

## INTERSTATE TRADE AND COMMERCE

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

43. The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States in that, *inter alia*:

(a) During the Class Period, Defendants and their co-conspirators sold and distributed HDD suspension assemblies throughout the United States;

(b) Defendants and their co-conspirators have each used instrumentalities of interstate commerce to manufacture, sell, distribute, and/or market HDD suspension assemblies throughout the United States;

(c) Defendants and their co-conspirators manufactured, sold, and shipped substantial quantities of HDD suspension assemblies in a continuous and uninterrupted flow of interstate commerce to customers; and

(d) The conspiracy alleged herein affected billions of dollars of commerce. During the Class Period, Defendants collectively controlled approximately 97% of the global HDD suspension parts market. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and other entities who are themselves engaged in commerce.

## **FACTUAL ALLEGATIONS**

**A.    The HDD Suspension Assembly Industry.**

44.     HDD suspension assemblies are a critical component of HDDs. As stated by Seagate, one of the main manufacturers of HDDs, "suspension assemblies are one of the highest cost components of an HDD."[2] The average HDD contains four HDD SAs and may contain as many as twelve HDD SAs, in the case of HDDs that use as many as six platters. Suspension assemblies comprise approximately 5-10% or more—up to 15% in some instances—of the cost of an HDD.[3]

45.     HDDs use magnetism to write, retrieve and store vast amounts of information electronically. HDDs are installed in electronic products including desktop and laptop computers, and storage servers.

46.     Suspension assemblies are used in Personal HDD storage devices and in Enterprise HDD storage systems.   These storage products are comprised predominantly of HDDs and are referred to herein as "Standalone Storage Devices."

47.     Personal HDD Storage Devices include: (i) "bare" HDDs, which are purchased for installation in a storage device or computer; (ii) external hard drives, which consist of an HDD, a simple USB adapter and/or power cord, and plastic

---

[2] *See, e.g.,* Seagate Plaintiffs' Amended Complaint for Damages and Other Relief at ¶ 54, *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, No. 19-md-2918 (N.D. Cal. Oct. 2, 2020) (ECF No. 271).

[3] These figures are based on preliminary information and productions. Plaintiffs reserve the right to revise these estimates consistent with full discovery from Defendants and third parties related to suspension assembly and HDD cost data and information.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

housing; and (iii) network attached storage (NAS) drives, which are similar to an external hard drive but have a separate power supply and some additional hardware and/or software features. External hard drives and NAS drives thus comprise little more than their HDDs.

48. Enterprise HDD Storage Systems are storage servers and storage arrays, and include bare HDDs purchased for installation in the systems. For example, a storage server or storage array generally comprises a chassis with multiple bays for installation of multiple HDDs (four, eight or more). As a result, the HDDs can comprise a substantial portion of the cost of enterprise HDD storage systems.

49. Enterprise HDD storage systems are manufactured by a limited number of companies including BlueArc, Cisco Systems, Dot Hill, EMC, Isilon, LSI, NetApp, Seagate, Sun Microsystems/Oracle, Western Digital, and Xyratex. These companies acknowledge that HDDs are the largest cost components of, and indispensable to, their products. According to Dot Hill, "[h]ard disk drives are a critical component in our AssuredSAN storage array products and can represent 30%-70% of the cost of such products." BlueArc notes that, "[t]he largest component of our cost of product revenue is disk drives and disk arrays that we integrate into and sell with our storage systems." EMC states, "[a]mong the most important components that we use are disk drives, high density memory components and power supplies.

Case No. 19-md-02918-MMC

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

50. HDDs are comprised of, among other things, spinning magnetic disks and magnetic heads that fly over the disks, reading and writing the information contained on the disks (*see* Figure 1). HDD suspension assemblies hold the magnetic heads in position over the disks. Thus, HDD suspension assemblies are essential to the functioning of HDDs. As explained in a report from MTP, an HDD SA maker acquired by TDK, an HDD SA "is a critical component of a[n] HDD[']s performance and reliability whose function is to enable the magnetic head to fly at a precise height, frequently less than a millionth of an inch, above the spinning magnetically coated disk."[4] "The suspension is considered one of the three most critical mechanical components in the HDD."[5] Moreover, HTI acknowledged in public securities filings that, "Suspension assemblies are a critical component of disk drives, and our results of operations are highly dependent on the disk drive industry."[6]

---

[4] *See, e.g.*, http://capital.sec.or.th/webapp/corp_fin/datafile/56/20050520E06.DOC ("20050520E06.DOC")
[5] *See, e.g.,* 20050520E06.DOC, p.10.
[6] HTI 2007 Annual Report and Form 10-K, NHKS-M-00159579 at 607.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

1  (Figure 1)



2

3

4  Top Magnetic Disk

5  Suspension

6  E-Block

7

8  Spindle Motor

9

10  Voice Coil Motor

11

12

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25

26

27

28

Case No. 19-md-02918-MMC
[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(Figure 2: HDD Suspension Assembly)



51.     The Defendants manufacture and sell HDD suspension assemblies in the United States and elsewhere to HDD manufacturers, primarily Seagate, Western Digital and Toshiba (who purchased the vast majority of Defendants' HDD SAs), who install HDD suspension assemblies into HDDs.

**1.     HDD Sales and Purchases**

52.     Seagate, Western Digital, Toshiba and other HDD manufacturers sell bare HDDs (i.e., an HDD that has not been incorporated into another product), external HDDs and NAS drives to distributors, like Ingram Micro, D&H, MA Labs and Synnex, who sell them to resellers.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

53.     According to Seagate, ". . . The markets that we participate in are highly competitive."[7]

## 2.     Computer and Storage Device Sales and Purchases

54.     HDD manufacturers like Seagate, Western Digital, and Toshiba also sell HDDs to enterprise storage device and computer manufacturers, like HP, Dell, and Lenovo, who sell their computers and enterprise storage devices to distributors and resellers.

55.     As Professor Eli Noam (Paul Garrett Professor of Public Policy and Business Responsibility at the Columbia Business School) explained: "The hard disk market has been dominated by a shifting handful of firms providing devices to computer manufacturers with fickle requirements. … Price competition is fierce, especially since most sales are to a handful of computer makers who themselves are engaged in energetic competition."

56.     From 2005 through 2016, over six billion units of HDDs were shipped worldwide.  On information and belief, of those six billion units, approximately 30%-35% were sold in the United States as HDDs or in other products. In 2018, global unit shipments of HDDs were nearly 400 million.

57.     Defendants recognize that the market for Suspension Assemblies and

---

[7]     Seagate Technology, 05 August 2016, Form 10-K Seagate, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001137789/00e81fd7-bd56-46ea-89ef-7eb546784769.pdf, accessed 06 November 2020, at 12.

the markets for HDD and the various finished product applications are inseparable in that one would not exist without the other. For this reason, Defendants monitored the demand and prices for HDDs, computers, and other finished production applications. For example, MPT subscribed to the quarterly reports of HDD shipments prepared by Techno Systems Research Co., Ltd. The quarterly reports list HDD OEM trends by application type and storage size (in inches, a measurement only used in the U.S.), HDD Average Selling Price (ASP) in U.S. dollars, shipment trends, and HDD makers' profits & loss results. Key players in the conspiracy routinely used such reports to inform their business strategies.

58.    Defendants also used industry reports and internal analyses to track the street, or retail, prices of HDDs.[8]  Notably, Defendants monitored the demand and pricing for Standalone Storage Devices and HDDs used in computers and other applications.[9]

---

[8] NHKI-M-00096374; NHKI-M-00097043; NHKI-M-00097045

[9] *See, e.g.*, NHKI-M-00097047; TDKHDD000209143 (Industry report by IDC titled "Worldwide Hard Disk Drive Forecast Update, 2015-2019" showing shipment volumes of PCs, enterprise systems, personal storage devices, video surveillance systems, and consumer electronic products that use HDDs and listing ASPs for HDDs used in desktop PCs, enterprise systems, personal storage devices, consumer electronics, and video surveillance systems from 2014 through 2019).

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

**B.  NHK Defendants Plead Guilty and Agree to Pay a Criminal Fine for Conspiring to Fix Prices and Allocate Market Shares for HDD Suspension Assemblies.**

59.     On July 29, 2019, Defendant NHK Spring Co., Ltd., on behalf of itself and its "subsidiaries engaged in the production or sale of HDD Suspension Assemblies, including but not limited to NHK International Corporation" agreed to plead guilty and pay a $28.5 million fine for its role in the global conspiracy alleged herein. According to the criminal information, NHK Spring Co., Ltd. and its subsidiaries engaged in a conspiracy consisting of a continuing agreement, understanding, and concert of action among Defendant NHK and its co-conspirators to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for HDD suspension assemblies to be sold in the United States and elsewhere.

60.     According to the Information, Defendant NHK and its co- conspirators effectuated their conspiracy by, among other things:

(a)     engaging in discussions and attending meetings during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for HDD suspension assemblies;

(b)     exchanging HDD suspension assemblies pricing information;

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(c)     relying on their agreements not to compete and using the exchange pricing information to inform their negotiations with U.S. and foreign customers;

(d)     selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices;

(e)     accepting payment for HDD suspension assemblies sold in, or for delivery to the United States and elsewhere at collusive and noncompetitive prices.

61.     NHK's plea agreement states that the NHK Defendants and their co-conspirators, including high-level personnel, participated in a conspiracy "the primary purpose of which was to fix the prices of HDD suspension assemblies sold in the United States and elsewhere." The agreement states that they "engaged in discussions and attended meetings with each other, and that during these discussions, they "reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere." It further states that to effectuate these agreements, employees and officers "exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere" and they relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with U.S. and

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale, or delivery to, the United States and elsewhere."

62.    As part of their plea agreement, the NHK Defendants, including NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., and NAT Peripheral (H.K.) Co., Ltd. are required to provide cooperation in the United States, including producing "documents, witnesses, and testimony in the United States, in exchange for limitations on further criminal prosecutions of those companies."

63.    The competitor with whom NHK's Criminal Information and Guilty Plea describe it conspiring is the TDK defendant family. The TDK Defendants, including TDK Corporation, Magnecomp Precision Technology Public Co. Ltd., Magnecomp Corporation, SAE Magnetics (H.K.) LTD. and Hutchinson Technology, Inc. are applicants in the DOJ's Leniency Program, under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Public Law 108-237. An applicant may participate in the program by advising the Department of Justice of, and admitting, its and its co-conspirators' criminal conduct, and providing satisfactory and timely cooperation to civil plaintiffs.

**C.    Indictments of Hashimoto and Tamura, of NHK**

64.    On February 13, 2020, the DOJ indicted senior executives, Hitoshi Hashimoto and Hiroyuki Tamura, from NHK. The indictment states that they

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

engaged in the following conduct, in, among other places, the Northern District of California:

(a) attended meetings and engaged in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

(b) agreed during those meetings and communications to refrain from competing on prices for and stabilize, maintain, and fix the prices of HDD suspension assemblies to be sold in the United States and elsewhere;

(c) agreed during those meetings and communications to allocate their respective market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

(d) discussed and exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

(e) communicated with sales employees in the United States and elsewhere and directed those employees to exchange HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere;

(f) relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with the U.S. and foreign customers that purchased HDD suspension assemblies and produced

hard disk drives for sale in, or delivery to, the United States and elsewhere;

(g)    sold HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices; and

(h)    accepted payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.

## D.    Additional Government Investigations

65.    In July 2016, the Japanese Fair Trade Commission ("JFTC") raided both Defendants TDK and NHK based on suspicion that the two companies and or their subsidiaries fixed prices for HDD suspension components. On February 9, 2018, the JFTC issued a cease and desist order to both Defendants TDK and NHK and found that they substantially restrained competition in the HDD suspension assemblies market by agreeing to maintain sales prices.

66.    According to the JFTC, NHK Spring and NAT shared pricing and market share information with TDK and SAE. The JFTC also found that NHK and NAT agreed with TDK, SAE and Magnecomp to maintain sales prices for Hard Disk Drive Suspension Assemblies. TDK told MPT and SAE to coordinate pricing with NAT and NHK. The companies coordinated bids to hard drive manufacturers, and exchanged pricing information, as well as information about demand. The companies coordinated on market share, profit, and price quotes and worked

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

together to maintain prices for HDD Suspension Assemblies. As part of the collusion, SAE invested in NAT, the joint venture between NHK and SAE, and purchased HDD Suspension Assemblies from NHK.

67. Concurrently with the JFTC investigation, the DOJ opened an investigation regarding HDD suspension assemblies. On July 26, 2016, Defendant Hutchinson Technology Inc. received a letter from the DOJ requesting documents relating to the investigation and expressed its intent to cooperate. At the time Hutchinson received the DOJ's letter, TDK Corporation's pending acquisition of Hutchinson Technology Inc. was under review by the U.S. Federal Trade Commission.

68. In April 2018, Brazilian antitrust authorities launched an investigation into allegations that Defendant TDK and four other companies colluded from 2003 to May 2016 to fix prices of HDD suspension assemblies. The international cartel allegedly shared information and allocated customers to maintain artificially high prices on HDD suspension assemblies used in hard disks.

69. The technical note published by the Brazilian antitrust authorities states that "Such anti-competitive conduct would have occurred, at least, since 2003, and would have lasted until at least 2016. In total, 5 (five) companies and their subsidiaries present some degree of participation, in addition to dozens of individuals employees or former employees of the companies." The note listed TDK, Hutchinson, SAE, NHK Spring, and Magnecomp Precision, as the

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

companies being investigated and 38 individuals whose involvement it was investigating, including now-indicted executives Hiroyuki Tamura and Hitoshi Hashimoto, from NHK Spring, Skipp Harvey from NHK International, the U.S. NHK entity, Todd Drahos, Ken Martini and Rick McHone, from Magnecomp Corporation, Arun Dhawan, from Magnecomp Precision Technology and Keith Johnson from Hutchinson Technology.

70.    The Note states that "[t]here are strong indications of the practice of anticompetitive conduct consistent in (i) combination of prices in response to requests for quotations from customers; (ii) market division and (iii) sharing of commercial information and competitively sensitive. The sharing of business information and competitively sensitive information included, but was not limited to, information on (iii.1) current, potential and proposed prices, for suspension assemblies, (iii.2) tenders private customers, (iii.3) allocation of customer volumes, (iii.4) productive capacity each company; and (iii.5) user fees for each company, with the objective of stabiliz[][ing] prices and reduc[][ing[] competition in sales of suspension assemblies."

71.    The Note states that "[t]here is strong evidence that this exchange of information commercially sensitive areas enabled the establishment of a long-term strategic relationship between competitors, based on the elimination or smoothing of the price war or the price competition, which meant avoiding aggressive price

competition in private bids and quotations, and the division of the world suspension market assemblies."

**E. The Characteristics of the HDD Suspension Assembly Market Render the Conspiracy More Plausible.**

72. Like other electronic product markets that have been the subject of antitrust investigations (cathode ray tubes, lithium ion batteries, and capacitors), the HDD suspension assemblies market has characteristics that make it susceptible to collusion, including high barriers to entry, high market concentration, inelasticity of demand and opportunities to collude. Together, these characteristics increase the probability and feasibility of anticompetitive conduct in the HDD suspension assemblies market.

**1. The HDD Suspension Assemblies Market Has High Barriers to Entry.**

73. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants to the market seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels.

74. This is particularly true here where manufacturing HDD suspension assemblies requires the ability to produce precision assemblies in sufficient volume. As Defendant Hutchinson Technology Inc. conceded, "We believe that the number

of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."

75.     Moreover, increased demand for other types of data storage technology, such as those that utilize flash memory, limit opportunities for new entrants to the HDD suspension assembly market, which caters to hard disk drives.

76.     In addition, heavy capital investments are required in order to enter the market. For example, HTI noted that it spent nearly $50 million between 2012 and 2014 on research and development.

77.     Defendants also own the majority of the patents for HDD suspension assemblies. These patents place a significant and costly burden on potential new entrants, which must avoid infringing on the patents when entering the market with a new product. In connection with the conspiracy, Defendants discussed using their joint intellectual property to preclude entry by at least one competitor.

### 2.     The HDD Suspension Assemblies Market and the Hard Drive Market are Highly Concentrated.

78.     When a price-fixing conspiracy is successful, the consumer has no choice but to accept the higher prices or lower quality goods. The more concentrated the market, the easier it is for the market participants to come together to set prices.

79.     A process of market consolidation of the HDD suspension assembly market began in the 1990s. By the mid-1990s, the market had already become

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

concentrated with Hutchinson becoming the main producer of HDD suspension assemblies, holding at least a 65% market share and generating approximately $450 million per year in revenue.

80. Over the past two decades, this trend has been further aggravated by two factors: (a) further consolidation among HDD suspension assembly manufacturers, and (b) the vertical integration of companies like TDK that formerly depended on independent component suppliers in their manufacturing of HDD suspension assemblies.

81. In recent years, market consolidation has continued to the point where globally, there are now only two major suppliers of HDD suspension assemblies: TDK and NHK Spring.

82. Defendants knew that this consolidation of the HDD suspension assembly market would enable them to increase prices rather than expand market share. As one senior executive of MPT explained: "Once we are down to 2 suppliers, then we need to concentrate on margin more and less on volume."

83. In 2004, HTI held a 63% share of the HDD suspension assembly market and MPT held 18%.

84. In 2005, three companies—HTI, NHK Spring, and MPT—collectively controlled approximately 97% of the global HDD suspension assembly market. HTI held a 55% market share, NHK Spring held a 22% market share, and MPT, created through the merger 2005 merger between the Data Storage Division of

Magnecomp International Ltd. and KR Precision Public Company, held a 20% market share.

85. In 2007, TDK announced its acquisition of a majority share of MPT. TDK acquired a formerly independent HDD suspension assembly manufacturer in 2007 and had fully integrated that acquisition by 2009.

86. By 2012, TDK, NHK Spring, and HTI collectively controlled 96% of the global market.

87. In November 2015, TDK announced its acquisition of Hutchinson. The acquisition was completed in October 2016. Following the acquisition, TDK's market share grew to 55-60%, and TDK noted that NHK Spring was its only competitor in the global market for HDD suspension assemblies. Prior to the acquisition, Hutchison had gone through its own process of consolidation and was a principal supplier of HDD suspension assemblies to Western Digital (headquartered in San Jose, CA); Seagate (Cupertino, CA); and SAE/TDK (Tokyo, Japan). That Hutchinson business is now contained within the TDK family.

88. In the 1980s, the HDD market was quite competitive with more than 20 suppliers. But by 2005, there were only five major producers left in the market: Western Digital Corporation ("Western Digital"), Seagate Technology, LLC ("Seagate"), Toshiba Electronics & Device Storage Corporation ("Toshiba"), Hitachi Global Storage Technologies ("Hitachi"), and Samsung Electronics Co. ("Samsung"). By 2012, that number dwindled to three, as Seagate acquired

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

Samsung's HDD business in 2011 and Western Digital acquired Hitachi's HDD business in 2012. As of 2017, estimated market shares for Seagate, Western Digital, and Toshiba were approximately 40%, 37%, and 23% respectively. The existence of a small number of large buyers made it easier for Defendants to exchange pricing information and otherwise create, facilitate, and enforce market-allocation agreements.

89.     The limited number of customers also facilitated Defendants' allocation agreements. As an example, in or about April 2008, MPT held strategy meetings with SAE to allocate customers. MPT agreed not to quote pricing for a particular HDD suspension assembly project directly to Samsung or Western Digital, instead allowing SAE to quote pricing for head gimbal assemblies that incorporated MPT's HDD suspension assemblies to those customers.

### 3.     Homogeneity of Product and Inelasticity of Demand

90.     HDD suspension assemblies are commodity-like products that are interchangeable at the design stage among products of the same type and across manufacturers. One Defendant's product for a particular application is substitutable for another Defendant's during the design stage. Forming and sustaining a cartel when the product in question is commodity-like makes it easier to agree on prices to charge and to monitor those prices once an agreement is formed.

91.     "Elasticity" describes the sensitivity of supply and demand to changes in one or the other such that demand is "inelastic" if an increase in the price of a

product results in only a small decline in the quantity sold of that product, if any, such that customers have nowhere to turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

92. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

93. Demand for HDD suspension assemblies is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase HDD suspension assemblies as an essential part of an HDD, or a product containing an HDD, even if the prices are at a supracompetitive level.

**4. Opportunities to Collude**

94. Defendants had multiple opportunities to collude during the conspiracy period.

95. Defendants SAE and NHK Spring were involved in a joint venture, NAT.

96. Defendants often cross-licensed intellectual property with one another and had to meet to negotiate such cross-licensing agreements.

97. Defendants belong to the same trade associations, such as IDEMA, the

International Disk Drive Equipment & Materials Association, to which NHK Spring, SAE, and TDK all belong, and which has locations in the U.S. and in Japan.

**PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

98.     Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to HDD suspension assemblies;

(b)     The prices of HDD suspension assemblies have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Plaintiffs and the putative class members, who purchased HDD suspension assemblies have been deprived of free and open competition; and

(d)     Plaintiffs and the putative class members, who purchased HDD suspension assemblies paid artificially inflated prices for HDD suspension assemblies.

99.     During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for HDD suspension assemblies. HDD manufacturers and other purchasers of HDD suspension assemblies passed on inflated prices to Plaintiffs and the members of the Classes, as demonstrated below.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

## A. Economic Theory Supports the Fact that Overcharges were Passed on to Resellers

100. As summarized by Professor John Connor of Purdue University and the American Antitrust Institute in his seminal paper on estimating cartel damages, part of or all of the overcharge contained in the direct purchase will be passed on to indirect purchasers:

> Direct purchasers from an effective sellers' cartel are the immediate losers. However, if the cartel is comprised of manufacturers (the most common story), then other buyers farther down the distribution channel are also harmed.[10]

101. Although the specific share of overcharges passed through to indirect purchasers is an empirical question specific to facts and data in each case, there is almost always positive pass-through of upstream overcharges by direct purchasers.[11] As stated by an American Bar Association publication on antitrust damages, "at least some of the overcharge will be passed on by the direct purchaser to the indirect purchaser(s) in the form of a higher price for the good." *Id.*

102. The prediction of economic theory and the ABA's conclusion of positive pass-through of cost increases to indirect purchasers are supported by

---

[10] Connor, J (2014), "Cartel Overcharges," *Research in Law and Economics*, Vol. 26, Emerald Group Publishing Limited, p. 256. Professor Connor's paper is based on a database of overcharge estimates caused by known cartels. This dataset contains the most comprehensive collection of cartel overcharge estimates compiled to date, with economic and legal details on 522 product market cartels.

[11] American Bar Association, Antitrust Section, *Proving Antitrust Damages* 3rd ed., Section 8.G (emphasis added).

empirical evidence from a wide range of industries. As shown in Table 1 below, pass-through rates of different cost components across different industries range from 14% to 103%. Positive pass-through rates are found in all cases for all industries.

TABLE 1 SUMMARY OF ESTIMATED PASS-THROUGH ACROSS DIFFERENT COST COMPONENTS AND DIFFERENT INDUSTRIES

| Author | Year | Paper | Industry | Factor Passed Through | Passed-through rate |
|---|---|---|---|---|---|
| Sharat Ganapati, Joseph S. Shapiro, and Reed Walker | 2020 | Energy Cost Pass-Through in US Manufacturing: Estimates and Implications for Carbon Taxes | A select set of US industries | Energy-price-driven changes in production costs | 70 percent of energy price-driven changes in input costs get passed through to consumers in the short to medium run |
| Matthew Chesnes | 2016 | Asymmetric Pass-Through in U.S. Gasoline Prices | Gasoline market in the United States | Input Cost | This means that based on the contemporary coefficients, retail prices rise 2.4 times as fast when the rack price increases, than they fall when the rack price declines. |
| Jens-Peter Loy, Thore Holm, Carsten Steinhagen and Thomas Glauben | 2015 | Cost pass-through in differentiated product markets: a disaggregated study for milk and butter | Dairy market in German | Transportation Cost | Results for milk and butter indicate significant positive asymmetries in cost pass-through processes, which vary between brands and outlets. In particular, low-price private labels adjust prices faster than high-price national brands; but cost pass-through is slightly more (positive) asymmetrical for private labels than for national brands. |
| Celine Bonnet, Pierre Dubois, Sofia B. Villas Boas, and Daniel Klapper | 2013 | Empirical Evidence on the Role of Nonlinear Wholesale | Coffee market in German | General cost shocks | Resale price maintenance between manufacturers and retailers increases the pass-through rate of a |

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| Author | Year | Paper | Industry | Factor Passed Through | Passed-through rate |
|---|---|---|---|---|---|
| | | Pricing and Vertical Restraints on Cost Pass-Through | | | 10% cost shock by more than 10 percentage points relative to the case when resale price maintenance is not allowed in nonlinear pricing contracts or when double marginalization along the distribution chain is present. |
| Donghun Kim and Ronald W. Cotterill | 2008 | Cost Pass-Through in Differentiated Product Markets: The Case of U.S. Processed Cheese | Processed cheese market in the United States | Input Cost | Cost pass-through rates for the different brands under collusion lie between 21% and 31%. The corresponding pass-through rates under Nash-Bertrand pricing are much higher, between 73% and 103%. |
| Ephraim Leibtag, Alice Nakamura, Emi Nakamura, and Dawit Zerom | 2007 | Cost Pass-Through in the U.S. Coffee Industry | Coffee Industry in the United States | Input Cost | On average, a 10-cent increase in the cost of a pound of green coffee beans in a given quarter results in a 2-cent increase in manufacturer and retail prices in that quarter. |
| Donald S. Kenkel | 2005 | Are Alcohol Tax Hikes Fully Passed through to Prices? Evidence from Alaska | Alcoholic Beverage Prices in Alaska | Sales tax | This study of the Alaskan tax hike provides evidence that alcohol taxes are more than fully passed through to beverage prices. |
| Douglas J. Young and Agnieszka Bielińska-Kwapisz | 2002 | Alcohol Taxes and Beverage Prices | Beverage Prices in the United States | Sales tax | Controlling for state and period effects, excise taxes appear to be over-shifted: Retail prices rise by more than the amount of the tax, and the rise occurs within 3 months. |
| Sophia Delipalla and Owen O'Donnell | 2001 | Estimating tax incidence, market power and market conduct: The European | European cigarette industry | Sales tax | Overshifting of the specific tax is particularly marked – subtracting the ''multiplier effect'', a unit increase in tax is |

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

| Author | Year | Paper | Industry | Factor Passed Through | Passed-through rate |
|---|---|---|---|---|---|
| | | cigarette industry | | | estimated to raise price by more than two. |
| Anne Gron and Deborah L. Swenson | 2000 | Cost Pass-Through in the U.S. Automobile Market | Automobile market in the United States | Input Cost | Accounting for the input-substitution response increases the estimated cost pass-through by 14% to 18%. |
| Severin Borenstein, A. Colin Cameron, Richard Gilbert | 1997 | Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes? | Gasoline market in the United States | Input Cost | A one cent increase in crude oil prices leads to a 0.55c increase in the first two weeks and a further 0.12c increase in the next two weeks, for a 0.67c increase after four weeks, and so on. |

103.    The literature summarized in Table 1 demonstrates that price increases in important product components would be passed down the supply chain to Resellers. The HDD SA is one of the most critical components in the HDD. As explained in a report from MTP, an HDD SA maker acquired by TDK, HDD SA "is a critical component of a HDDs performance and reliability whose function is to enable the magnetic head to fly at a precise height, frequently less than a millionth of an inch, above the spinning magnetically coated disk."[12]

104.    Downstream firms may switch to a different supplier or a different input if a price charged by a specific manufacturer for a specific input increases. However, in the present case, (1) there is no substitute product for HDD SAs in

---

[12] *See, e.g.,* 20050520E06.DOC, p.1.

Case No. 19-md-02918-MMC

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

manufacturing HDDs,[13] and (2) price increases as a result of the conspiracy (i.e., overcharges) are market wide. Therefore, cost increases faced by HDD producers caused by overcharges on HDD SAs cannot be avoided by switching to a different supplier or a different input. Similarly, cost increases faced by computer manufacturers who purchased HDDs as a product component also cannot be avoided by switching to a different supplier or a different input.

105.    Basic economic theory indicates that the percentage of a given cost increase passed through by a firm to its customers in the form of higher prices depends on the competitiveness of the industry in which the firm operates.[14] In particular, the more competitive is an industry, the higher is the pass-through rate.[15] In highly competitive industries, profit margins are small, leaving firms little to no room to absorb cost increases.[16] Therefore, in a highly competitive market, not only

---

[13] 20050520E06.DOC, p.1. ("[O]nly a small number of major companies in the world have the independent capability of manufacturing [HDD SA].")

[14] Ritz, R. (2017), "Oligopolistic Competition and Welfare," *Handbook of Game Theory and Industrial Organization*, L. Corchon and M. Marini (eds.), Edward Elgar; see also Reny, P., Wilkie, S., and Williams, M. (2012), "Tax Incidence Under Imperfect Competition: Comment," *International Journal of Industrial Organization*, vol. 30, pp. 399-402.

[15] Ritz, R. (2017), "Oligopolistic Competition and Welfare," *Handbook of Game Theory and Industrial Organization*, L. Corchon and M. Marini (eds.), Edward Elgar; see also Reny, P., Wilkie, S., and Williams, M. (2012), "Tax Incidence Under Imperfect Competition: Comment," *International Journal of Industrial Organization*, vol. 30, pp. 399–402.

[16] Even if a market is not highly competitive, it does not mean that there would be no pass-through in such a market. It simply means that pass-through rates likely would be lower than they typically are in highly competitive markets.

pass-through rates would be high, but pass-through would be market-wide, affecting all or almost all buyers.

106. Empirical evidence demonstrates that the HDD and finished product manufacturing industry are highly competitive.

107. A report from MTP, an HDD SA maker acquired by TDK, concludes: "The HDD industry is intensively competitive."[17]

108. In their peer-reviewed article on the HDD industry, Professors Gourevitch, Bonn, and Mckendrick of University of California at San Diego concluded that "Hard disk drives are 'high-tech commodities,' with intense technological development yet low product differentiation and fierce price competition."[18]

109. Similarly, Professors Igami and Uetake conclude in a peer-reviewed article: "HDDs are also one of the simplest products in terms of economics because they are a completely undifferentiated product according to Peter Knight, former vice president of Conner Peripherals and Seagate Technology, and former president of Conner Technology."

110. With respect to the personal computers (PC) market, a report by Standard & Poor's notes that "price competition has been the hallmark of the PC

---

[17] 20050520E06.DOC, p.11.
[18] Gourevitch, P., Bonn, R., and Mckendrick, D. (2000), Globalization of Production: Insights from the hard Disk Drive Industry. *World Development*, vol. 28, pp. 301-319, at 302.

market. One reason is that PCs have become more commodity-like with the standardization of their primary components."

111.   These findings are confirmed in the 10-Ks of major HDD manufacturers. A leading manufacturer of HDDs, Seagate Technology noted: "We operate in highly competitive markets" and "[w]e experience competition from other companies that produce alternative storage technologies such as flash memory, where increasing capacity, decreasing cost, energy efficiency and improvements in performance have resulted in increased competition with our lower capacity, smaller form factor disk drives. Some customers for both mass capacity storage and legacy markets have adopted SSDs as an alternative to hard drives in certain applications. Further adoption of alternative storage technologies may limit our total addressable HDD market, impact the competitiveness of our product portfolio and reduce our market share." Similarly, Western Digital, another leading manufacturer of HDD concludes the "industry is highly competitive."

112.   Less differentiated products are subject to higher pass-through rates than more differentiated products, including products sold with services. Products are defined based on their physical attributes as well as locations and services associated with the physical production. For instance, customized products sold by local businesses, coupled with services, will be more differentiated than commodity products sold nationally with no accompanying services.

113.    Basic economic theory demonstrates that overcharges would not be passed through only in the extreme case that demand is perfectly elastic. In practice, demand for a given product is rarely perfectly elastic, indicating that at least some portion of the overcharges in HDD SA would be passed through. As stated by the American Bar Association ("ABA"), Antitrust Section: "The overcharge will stick with the direct purchaser (or any subsequent indirect purchaser) if demand for the product is perfectly elastic, but demand curves are rarely, if ever, horizontal in practice."

114.    Empirical evidence demonstrates that demand for HDD products is not perfectly elastic. There are no perfect substitutes for HDDs. A small price increase in HDDs would not drive the demand for HDDs to zero, demonstrating that the demand for HDDs is not perfectly elastic. Therefore, at least some portion of the overcharges in HDD SA prices will be passed through to indirect purchasers, such as Reseller Class Members.

**B.    Passed-Through Overcharges are Traceable**

115.    The markets for HDDs and HDD suspension assemblies are inextricably linked and intertwined because the market for HDD suspension assemblies exists to serve the HDD market. Without the HDDs, the HDD suspension assemblies have little to no value because they have no independent utility.

116. Similarly, HDDs are key components of computers. Computers typically identify the type and level of storage contained, and computer prices increase as the amount of available storage increases.

117. HDD suspension assemblies are commodity-like products with functionally equivalent products available from Defendants. Defendants manufacture suspension assemblies pursuant to standard specifications, and thus it is common for multiple suppliers of suspension assemblies to be qualified for a specific HDD project. The commodity-like nature of suspension assemblies, and in particular the interchangeability of suspension assemblies manufactured by Defendants, made it easier for Defendants to agree on prices and also increased the likelihood of the pass-through of the overcharges caused by the collusion through the distribution chain.

118. HDD suspension assemblies are identifiable, discrete physical products that remain essentially unchanged when incorporated into an HDD. They are identifiable by specific, discrete part numbers that permit tracing to Defendants. Each suspension assembly is marked with an English letter identifying the manufacturer: "M" for MPT; "H" for HTI; and "N" for NHK. As a result, suspension assemblies are physically traceable throughout the distribution chain from Defendants to Plaintiffs and members of the Classes, and costs attributable to HDD suspension assemblies can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

119. Just as HDD suspension assemblies can be physically traced through the supply chain, so can their prices be traced to show that changes in the prices paid by direct purchasers of HDD suspension assemblies affect prices paid by indirect purchasers for HDDs containing HDD suspension assemblies.

120. The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig or stabilize the prices of HDD suspension assemblies and, as a direct and foreseeable result, the price of products containing HDD suspension assemblies. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of HDD suspension assemblies on prices for products containing HDD suspension assemblies even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of HDD suspension assemblies affects changes in the price of assembled products, such as computers. In such models, the price of HDD suspension assemblies would be treated as an independent or explanatory variable and the price of assembled

Case No. 19-md-02918-MMC
[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

products would be treated as the dependent variable. The model can isolate how changes in the price of HDD suspension assemblies impact the price of products containing HDD suspension assemblies while controlling for the impact of other price-determining factors.

121.   The precise amount of the overcharge impacting the prices of products containing HDD suspension assemblies can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

122.   By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for HDD suspension assemblies than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## DEFENDANTS' CONSPIRATORIAL CONDUCT

123.   Beginning in 2003, Senior Executive A of Defendant Magnecomp, now owned by and part of TDK, began communicating regularly with indicted executive Hiroyuki Tamura, a Suspension Sales Deputy Manager at NHK.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

124.   Employees at the Thai, Hong Kong and U.S. offices of Magnecomp Precision and Magnecomp Corporation participated in the collusion. For instance, Magnecomp's Senior Executive A, in Thailand, and Customer Support and Sales Representative Arun Dhawan, in Hong Kong, as well as Rick McHone, VP of MTP's Sales in the U.S., were involved in communications with various offices of NHK. NHK's U.S., Thai, Hong Kong and Japanese offices were involved in the collusion as well. Specifically, Magnecomp Defendants' employees and executives communicated with Skipp Harvey at NHK International, which has offices in Santa Clara, California; indicted Executive Hiroyuki Tamura and Executive Vice President B, at NHK Spring, in Japan; and Sales Representative Masahiro Futakami, who handled sales at NHK Spring Thailand.   The conspirators communicated regarding pricing information, bids, shipments, capacity, market and customer allocation.

125.   The conspirators met in a variety of locations and a variety of offices of both Defendant groups. For instance, in April 2004, Senior Executive A and Sales Representative Arun Dhawan, from Defendant Magnecomp met with Tamura, and Executive Vice President B, from Defendant NHK at the Nanakamado restaurant at the Shinagawa Prince Hotel.

126.   As a further example, in November 2007 Senior Executive A and Sales Representative Arun Dhawan, from Defendant Magnecomp, had dinner in Bangkok with NHK executives and employees Tamura, Senior Executive C, and Sales

Representative Masahiro Futakami, who handled sales for NHK in Thailand, to discuss customer issues and commercially sensitive information regarding forecasting, capacity and shipments.

127.   Executives from SAE were also involved in collusive communications with NHK. For instance, an SAE executive spoke with indicted NHK Executive Hashimoto, among others. For example, in March 2009 an SAE employee reported to McHone, in the US, and to Customer Support and Sales Representative Arun Dhawan, in Hong Kong, that he had spoken with Hashimoto, of NHK, about Hitachi Global Storage Technologies business and certain costs for Hitachi's projects involving HDD Suspension Assemblies.

128.   In December 2010, Senior Executive A stated that NHK had agreed that, with respect to pricing for customers Samsung and Toshiba, "they will discuss with and follow SAE."

129.   Collusive agreements, prices and other commercially sensitive information exchanged between the conspirators was communicated back-and-forth between the U.S. and foreign entities in each Defendant family and between U.S. and foreign employees. Employees also often moved between different jurisdictions and different offices.

130.   In January 2011, McHone, of Magnecomp emailed his supervisor to advise that Harvey, of NHK, had provided him with Defendant Hutchinson's offer to Toshiba, and that SAE was to meet with NHK to discuss the matter.

131.   Ken Martini, Hank Pselos and Todd Drahos, of Defendant Magnecomp Corporation, in the U.S., also had contacts with Skipp Harvey, of NHK International, in the US.

132.   Senior Executive Ken Martini exchanged pricing information and discussed shipments and volumes for Western Digital with Skipp Harvey. In May 2008, Martini passed on to his superiors Hutchinson Technology's prices for HDD Suspension Assemblies, that he had obtained from NHK.

133.   Senior Executive Todd Drahos discussed information about prices, capacity, and inputs for certain Seagate programs with Skipp Harvey.

134.   Senior Executive Todd Drahos was a former employee of Defendant Hutchinson, now part of TDK, and also discussed Seagate programs with employees at Hutchinson. For example, in December 2006, Senior Executive Drahos advised McHone of HTI's and NHK's pricing for Seagate's Argon and Cadmium programs.

135.   Drahos also maintained his contacts at Defendant Hutchinson and, in addition to facilitating exchanges of information between Hutchinson and Magnecomp, he also connected employees at the two companies. For instance, in early 2002, Drahos introduced Keith Johnson, currently a director at Hutchinson, to Skipp Harvey, of NHK, at a lunch in San Jose, organized by Drahos. Johnson invited Harvey to join him at a hunting lodge in South Dakota. The two met at the hunting lodge from 2003 until at least 2012 and again in 2015, often bringing

friends and associates. Johnson and Harvey also had discussions, at other times, regarding HDD Suspension Assemblies.

136.   TDK executives also attended meetings with NHK executives. For instance, in August 2007, NHK and TDK convened a meeting attended on NHK's behalf, by Tamura and at least two other NHK employees and senior executives, as well as two executives, including a senior executive from TDK.  The meeting took place at NHK's headquarters in Yokohama, Japan and was preceded by lunch. TDK and NHK agreed to continue their positive relationship and avoid a price war. The attendees also discussed allocation of market share and customers.

137.   Executives and sales people from TDK and NHK continued meeting throughout the conspiracy period to discuss their long-term market allocation agreement, as well as customer allocation and coordinating on bids and pricing. These meetings occurred in the contexts of farewell and greetings meetings, New Year's celebrations, and other meetings that occurred on a regular basis.

138.   There were also quarterly meetings and dinners. The attendees discussed specific RFQs, shipments, capacity, utilization, customers, future expansion plans and future collaboration on components.

139.   In the U.S., McHone also had frequent contacts with Harvey. The two spoke on the phone at least once a month, for at least eight years, more frequently when RFQs were issued, met for lunch and exchanged texts regarding pricing, bids, capacity and other commercially sensitive information.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

140.   They both understood they needed to avoid letting prices get too low too quickly and sometimes traded market share for prices.

## CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Standalone Storage Device Class"):

> All persons or entities, in the Indirect Purchaser States[19] who, during the period from and including 2003 through such time as the anticompetitive effects of Defendants' conduct ceased, purchased a Standalone Storage Device for resale which included as a component part one or more HDD suspension assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants or indirectly purchased an HDD suspension assembly, for resale, that was manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

142.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Standalone Storage Device and Computer Class"):

> All persons or entities, in the Indirect Purchaser States  who, during the period from and including 2003 through such time as the

---

[19] The Indirect Purchaser States are the states listed in the First and Second Claims for Relief.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

anticompetitive effects of Defendants' conduct ceased, purchased a Standalone Storage Device or Computer for resale which included as a component part one or more HDD suspension assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants or indirectly purchased an HDD suspension assembly, for resale, that was manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

143.    The Standalone Storage Device and Computer Class and the Standalone Storage Device Class will be collectively referred to as the "Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court and persons who purchased HDD suspension assemblies directly or not for resale.

144.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in the Class.

145.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(a)     Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of HDD suspension assemblies sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the First and Second Claims for Relief;

(e)     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

(f)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)     The effect of the alleged conspiracy on the prices of HDD suspension assemblies sold in the United States during the Class Period;

(h)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(j)     The appropriate class-wide measure of damages for the Classes.

146.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for HDD suspension assemblies purchased indirectly from the Defendants and/or their co-conspirators.

147.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

148.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

149.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

150.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.   Defendants Have Engaged in a Continuing Violation

151.   This Complaint alleges a continuing course of unlawful conduct by which Defendants have inflicted continuing and accumulating harm within the applicable statutes of limitations.

152.   Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Plaintiffs and other members of the Classes.

### B. Plaintiffs Could not Have Discovered and Did Not Discover Defendants' Collusion Earlier than the Date of the NHK Plea Agreement

153. Plaintiffs repeat and re-allege the allegations set forth above.

154. Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein prior to July 29, 2019.

155. No information in the public domain was available to Plaintiffs and members of the Classes prior to July 29, 2019 sufficient to place them on inquiry notice of the claims set forth herein. Moreover, Plaintiffs and members of the Classes had no direct contact or interaction with the Defendants and had no means from which they could have discovered that the Defendants were engaged in the conspiracy alleged herein before July 29, 2019 sufficient to place them on inquiry notice of the claims.

### C. Fraudulent Concealment Tolled the Statute of Limitations

156. In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and members of the Classes did not discover, and could not discover, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 29, 2019, when NHK's agreement to plead guilty to the conspiracy became public.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

157. Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for HDD suspension assemblies throughout the United States during the Class Period.

158. By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. HDD suspension assemblies are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the HDD suspension assemblies industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' HDD suspension assemblies prices before July 29, 2019.

159. Because the alleged conspiracy was self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes did not have information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 29, 2019.

160. For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until July 29, 2019.

## <u>VIOLATIONS ALLEGED</u>

### FIRST CLAIM FOR RELIEF
**Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Classes)**

161. Plaintiffs incorporate by reference the allegations in the preceding

1
2 paragraphs.

3 162. From as early as 2003, Defendants and their co-conspirators engaged

4
5 in a continuing contract, combination, or conspiracy with respect to the sale of HDD

6 Suspension Assemblies in unreasonable restraint of trade and commerce and in

7 violation of the various state antitrust statutes set forth below.

8
9 163. The contract, combination, or conspiracy consisted of an agreement

10 among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or

11 maintain artificially supra-competitive prices for HDD Suspension Assemblies, to

12
13 rig bids for the sale of HDD Suspension Assemblies and to allocate customers for

14 HDD Suspension Assemblies in the United States.

15 164. In formulating and effectuating this conspiracy, Defendants and their

16
17 co-conspirators performed acts in furtherance of the combination and conspiracy,

18 including:

19 (a)    participating in meetings and conversations among themselves

20 in the United States and elsewhere during which they agreed to price HDD

21 Suspension Assemblies at certain levels, and otherwise to fix, increase,

22
23 inflate, maintain, or stabilize effective prices paid by Plaintiffs and members

24 of the Classes with respect to HDD Suspension Assemblies sold in the United

25 States;

26
27 (b)    allocating customers and markets for HDD Suspension

28 Assemblies in the United States in furtherance of their agreements; and

Case No. 19-md-02918-MMC

(c)     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

165.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to HDD Suspension Assemblies.

166.   Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust laws.

167.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, HDD Suspension Assemblies, at supra-competitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful

trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, HDD Suspension Assemblies.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of HDD Suspension Assemblies; and (2) Allocating among themselves the production of HDD Suspension Assemblies.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of HDD Suspension Assemblies has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for HDD Suspension Assemblies sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased HDD Suspension Assemblies manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Classes have been injured in their business and property in that they paid more for HDD Suspension Assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

168. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout Michigan; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Classes were deprived of free and open competition; and (4) Plaintiffs and members of the Classes paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Classes seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

169.   Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Classes were deprived of free and open competition; and (4) Plaintiffs and members of the Classes paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies.

(b)     During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Classes seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

170. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout New York; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Classes, including those who resided in New York and/or purchased HDD Suspension Assemblies in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Classes, including those who resided in New York, paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies when they purchased, including in New York, HDD Suspension Assemblies, or purchased, including in New York, HDD Suspension Assemblies that were otherwise of

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase HDD Suspension Assemblies that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Classes seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

171.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Classes, including those who resided in North Carolina and/or purchased

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

HDD Suspension Assemblies in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Classes, including those who resided in North Carolina and/or purchased HDD Suspension Assemblies in North Carolina, paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Classes seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

**SECOND CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**on behalf of Plaintiffs and the Classes**

172.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173. Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

174. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a) During the Class Period, Defendants marketed, sold, or distributed HDD Suspension Assemblies in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b) During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c) This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d) The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common,

continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of HDD Suspension Assemblies in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout California; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Classes, including those who resided in California and/ or purchased HDD Suspension Assemblies in California, were deprived of free and open competition,

Case No. 19-md-02918-MMC

including in California; and (4) Plaintiffs and members of the Classes, including those who resided in California and/or purchased HDD Suspension Assemblies in California, paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for HDD Suspension Assemblies. Plaintiffs and the members of the Classes suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Classes are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

175. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HDD Suspension Assemblies were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Classes.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the HDD Suspension Assemblies they had purchased had been sold at legal, competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased HDD Suspension Assemblies were misled to believe that they were paying a fair price for HDD Suspension Assemblies or the price increases for HDD Suspension Assemblies were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout New York; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Classes, who resided in and/or made purchases of HDD Suspension Assemblies in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Classes, who resided in and/or made purchases of HDD Suspension Assemblies in New York, paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies and were subjected to Defendants' deceptive practices.

(f)     Defendants knew that their unlawful trade practices with respect to pricing HDD Suspension Assemblies would have an impact on all purchasers in New York and not just the Defendants' direct customers.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(g)     Defendants knew that their unlawful trade practices with respect to pricing HDD Suspension Assemblies would have a broad impact, causing class members who indirectly purchased HDD Suspension Assemblies to be injured by paying more for HDD Suspension Assemblies than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants marketed, sold, or distributed HDD Suspension Assemblies in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed HDD Suspension Assemblies in New York.

(j)     Plaintiffs and members of the Classes seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

176.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HDD Suspension Assemblies

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Classes.

(b) The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of HDD Suspension Assemblies, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c) Defendants' unlawful conduct had the following effects upon purchasers of HDD Suspension Assemblies in North Carolina: (1) HDD Suspension Assemblies price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HDD Suspension Assemblies prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Classes, including those who resided in North Carolina and/or purchased HDD Suspension Assemblies in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiffs and members of the Classes, including those who resided in North Carolina and/or purchased HDD Suspension Assemblies in North Carolina, paid supra-competitive, artificially inflated prices for HDD Suspension Assemblies, including in North Carolina.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

(d) During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of HDD Suspension Assemblies. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e) During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed HDD Suspension Assemblies in North Carolina.

(f) Plaintiffs and members of the Classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Classes seek all relief available under that statute.

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

# **THIRD CLAIM FOR RELIEF**
## **Unjust Enrichment on behalf of Plaintiffs and the Classes**

177.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

178.    Plaintiffs bring this claim under the laws of all states listed in the First and Second Claims, save for California and North Carolina.

179.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of HDD Suspension Assemblies.

180.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Classes for HDD Suspension Assemblies.

181.    Plaintiffs and the members of the Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Classes may make claims on a pro rata basis.

182.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased HDD Suspension Assemblies subject to Defendants'

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT

conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

183. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

184. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

    (a)    An unlawful combination, trust, agreement, understanding and/or concert of action and an unreasonable restraint of trade or commerce in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

    (b)    Acts of unjust enrichment by Defendants as set forth herein.

185. Plaintiffs and the members of the Classes recover damages, including umbrella damages as appropriate, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

186.   Plaintiffs and the members of the Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

187.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

188.   Plaintiffs and the members of the Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

189.   Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

190.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

191.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

# **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated:  12/14/2021

*/s/ Shawn M. Raiter*
Shawn M. Raiter
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Jonathan W. Cuneo
Victoria Sims
Joel Davidow
Daniel Cohen
**CUNEO GILBERT & LaDUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
vicky@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

[PROPOSED] RESELLER PLAINTIFFS' THIRD CONSOLIDATED AMENDED COMPLAINT