REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Craig Y. Lee (*pro hac vice*)
craiglee@huntonak.com
Carter C. Simpson (*pro hac vice*)
csimpson@huntonak.com
Christopher J. Dufek (*pro hac vice*)
cdufek@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone: (202) 955-1500

Mark. H. Hamer (State Bar No. 156997)
mark.hamer@bakermckenzie.com
Mark G. Weiss (*pro hac vice*)
mark.weiss@bakermckenzie.com
**BAKER & McKENZIE LLP**
815 Connecticut Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 452-7077

*Counsel for Defendants NHK Spring Co., Ltd., NHK International, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd. and NAT Peripheral (H.K.) Co., Ltd.*

J. Clayton Everett, Jr., (*pro hac vice*)
clay.everett@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 739-3000

Michelle Park Chiu (State Bar No. 248421)
michelle.chiu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

*Counsel for Defendants TDK Corporation, Hutchinson Technology Inc., Magnecomp Precision Technology Public Co., Ltd., Magnecomp Corporation, and SAE Magnetics (H.K.) Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Hard Disk Drive Suspension Assemblies Antitrust Litigation | Case No. 3:19-md-02918-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO | **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FOREIGN COMMERCE** |
| ALL CLASS ACTIONS | Date:　　　TBD |
| | Time:　　　TBD |
| | Crtrm:　　　7, 19th Floor |
| | Before:　　The Hon. Maxine M. Chesney |

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

NOTICE OF MOTION AND MOTION ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ........................................... 1

INTRODUCTION ....................................................................................... 1

STATEMENT OF MATERIAL FACTS .................................................... 3

    A.    HDD Suspensions. .............................................................. 3

    B.    HDD Suspension Prototypes ............................................... 4

    C.    HDD Suspensions for Mass Production. .............................. 5

    D.    The Complex Global Supply Chain for HDD Suspensions. ............................ 6

        1.    The First Step: Foreign Sellers of HDD Suspensions. ......................... 6

        2.    The Second Step: Foreign Sales or Transfers from Defendants to Head Gimbal Assembly Manufacturers. ........................................ 6

        3.    The Third Step: Foreign Incorporation into Head Stack Assemblies. ................................................................................. 7

        4.    The Fourth Step: Foreign Transfers from HSA to HDD Manufacturers. ................................................................................. 7

        5.    The Fifth Step: Sales from HDD Manufacturers to Finished Product Manufacturers. ...................................................................... 7

        6.    The Sixth Step: Resellers .................................................... 8

        7.    The Seventh Step: End-Users ............................................. 8

    E.    Global Investigations. ......................................................... 9

PROCEDURAL POSTURE ....................................................................... 10

STANDARD OF REVIEW ........................................................................ 10

ARGUMENT .............................................................................................. 11

I.    MANY OF CLASS PLAINTIFFS' CLAIMS EXCEED THE EXPLICIT SCOPE OF THE STATUTES ON WHICH THEY RELY ................................. 11

II.    CLASS PLAINTIFFS' CLAIMS ARE BARRED BY THE DORMANT FOREIGN COMMERCE CLAUSE ................................................. 13

III.    CLASS PLAINTIFFS' CLAIMS ARE BARRED BY THE FTAIA ...................... 15

    A.    The FTAIA Bars State Law Claims Involving Foreign Commerce. ............. 15

    B.    Class Plaintiffs' Claims Involve Foreign Commerce. .................................. 16

    C.    The Import Commerce Exclusion Does Not Apply Because Defendants' Conduct Did Not Involve Any Import Commerce. .................. 17

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

i

D.    The Domestic Effects Exception to the FTAIA Does Not Apply to Class Plaintiffs' Purchases of Computers and Enterprise Storage Systems Containing HDD Suspensions Sold Upstream in Foreign Commerce. ....................................................................................... 19

1.    Defendants' Conduct Did Not Have a "Direct" Effect on U.S. Commerce. ............................................................................ 20

2.    Defendants' Conduct Did Not Have a "Substantial" Effect on U.S. Commerce .......................................................................... 22

E.    Class Plaintiffs Cannot Provide Any Evidence That Any Domestic Effect "Gives Rise to a Claim" Under the Sherman Act. ............................. 24

CONCLUSION ................................................................................................ 24

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.*,
5
    477 U.S. 242 (1986).................................................................................................10

6

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
    34 F. Supp. 3d 465 (D. N.J. 2014) .......................................................................16
7

*Association for Accessible Medicines v. Frosh*,
8
    887 F.3d 664 (4th Cir. 2018) ...............................................................................14

9

*Biocad JSC v. F. Hoffmann-La Roche*,
10
    942 F.3d 88 (2d Cir. 2019).....................................................................17, 18, 21

11

*In re Capacitors Antitrust Litig.*,
    No. 14-cv-03264, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016).......................18
12

*In re Capacitors Antitrust Litig. (No. III)*,
13
    No. 14-cv-03264, 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018).................15, 17

14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. C-07-5944, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016)..........................20
15

16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................10
17

*Eurim-Pharm GmbH v. Pfizer Inc.*,
18
    593 F. Supp. 1102 (S.D.N.Y. 1984).....................................................................22

19

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
20
    542 U.S. 155 (2004)........................................................................................15, 19

21

*Global Reinsurance Corp.-U.S. Branch v. Equitas Ltd.*,
    969 N.E.2d 187 (N.Y. 2012)................................................................................13
22

*Healy v. The Beer Inst.*,
23
    491 U.S. 324 (1989)........................................................................................14, 15

24

*IMS Health, Inc. v. Mills*,
    616 F.3d 7 (1st Cir. 2010) ....................................................................................13
25

26

*Japan Line, Ltd. v. Cty. of Los Angeles*,
    441 U.S. 434 (1979)..............................................................................................13
27

*Kinetic Sys., Inc. v. Fed. Fin. Bank*,
28
    65 F. Supp. 3d 731 (N.D. Cal. 2014) ..................................................................10

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

iii

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. C07-01057, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007).................................17

*Kruman v. Christie's Int'l PLC*,
    284 F.3d 384 (2d Cir. 2002).........................................................................16, 17, 24

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)...............................................................................................12

*Longaker v. Boston Sci. Corp.*,
    872 F. Supp. 2d 816 (D. Minn. 2012)....................................................................13

*In re Marine Hose Antitrust Litig.*,
    No. 08-1888-MDL, 2009 WL 10685177 (S.D. Fla. Jan. 28, 2009).........................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................1, 2

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988).................................................................................22

*Minn-Chem, Inc. v. Agrium Inc.*,
    683 F.3d 845 (7th Cir. 2012).....................................................................18, 20, 22

*Motorola Mobility LLC v. AU Optronics Corp.*,
    775 F.3d 816 (7th Cir. 2015)..................................................................................23

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-02143, 2017 WL 11513316 (N.D. Cal. Dec. 18, 2017) ..........................15

*Prevent DEV GmbH v. Adient PLC*,
    No. 20-cv-13137, 2021 WL 5585917 (E.D. Mich. Nov. 30, 2021)..........................22

*In re Rubber Chems. Antitrust Litig.*,
    504 F. Supp. 2d 777 (N.D. Cal. 2007) ...................................................................17

*S.-Central Timber Dev., Inc. v. Wunnicke*,
    467 U.S. 82 (1984)................................................................................................13

*Sam Francis Found. v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) ...............................................................................14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    781 F. Supp. 2d 955 (N.D. Cal. 2011) ....................................................................20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011) ....................................................................10

*Turicentro, S.A. v. Am. Airlines Inc.*,
    303 F.3d 293 (3d Cir. 2002).............................................................................16, 17

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

iv

*United Phosphorus, Ltd. v. Angus Chem. Co.*,
    131 F. Supp. 2d 1003 (N.D. Ill. 2001) ...............................................................22, 24

*United States v. Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ...................................................................15, 18, 20, 22

*United States v. LSL Biotechs.*,
    379 F.3d 672 (9th Cir. 2004) ...............................................................................20, 21

*Valley Bank of Nev. v. Plus Sys., Inc.*,
    914 F.2d 1186 (9th Cir. 1990) ..........................................................................................14

**Statutes**

15 U.S.C. § 6a ...............................................................................1, 2, 15, 17, 19, 24

Arizona Revised Statutes, Title 44, Chapter 10, Article 1, Sec. 44-1402.................................11, 12, 26

District of Columbia Code, Title 28, Chapter 45, Sec. 28-4502.................................11, 12, 26

Hawaii Revised Statutes, Title 26, Chapter 480, Sec. 480-4 ...................................11, 12, 26

Kansas Statutes Annotated, Chapter 50, Sec. 50-112...................................11, 12, 26

Maine Revised Statutes, Tenth Revision, 1964, Title 13, Chapter 5, Subchapter II,
    Section 1101..............................................................................................11, 12, 26

MCL § 445.771(b) ...................................................................................11, 12, 26

MCL § 445.772 ...................................................................................11, 12, 26

Nebraska Revised Statutes, 1943, Chapter 59, Article 8, Section 59-801 ...........................11, 12, 26

New York Consolidated Laws, Chapter 20, Article 22 (Donnelly Antitrust Act),
    Section 340..................................................................................................11, 12, 26

North Carolina General Statutes, Volume 2C, Chapter 75, Sec. 75.1 ...................................11, 12, 26

N.D. Cent. Code, § 51-08.1-01 ...................................................................11, 12, 26

Utah Constitution, Article 12, Section 20.........................................................11, 12, 26

West Virginia Code, Chapter 47, Article 18, Sec. 47-18-3(a)................................11, 12, 26

**Other Authorities**

Fed. R. Civ. P. 16(c)(2)(A) .........................................................................................10

Fed. R. Civ. P. 56(a) .................................................................................................10

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust Principles and Their Application</u> (4th ed. 2013)..........................................................12, 18

U.S. CONST. art. 1, § 2, cl. 3 ...........................................................................................13

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on January 11, 2023, or as soon thereafter as the matter may be heard in Courtroom 7, located on the 19th Floor of this Court, 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Maxine M. Chesney, Defendants[1] will and hereby do move for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure for entry of partial summary judgment finding that  Defendants' transactions in foreign commerce are beyond the scope of the laws asserted in Class Plaintiffs' Complaints and enforcement of such laws would violate the Dormant Foreign Commerce clause and exceed the scope of claims permitted under the Foreign Trade Antitrust Improvements Act ("FTAIA"). NHK and TDK respectfully request that this Court grant their motion for partial summary judgment and enter judgment as to Class Plaintiffs' claims with prejudice.

### MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

Whether Defendants are entitled to summary judgment dismissing Class Plaintiffs' indirect purchaser claims for damages arising from component sales that took place outside the United States based on (a) application of the state law statutory provisions on which their claims depend; (b) Constitutional limits on the exercise of prescriptive jurisdiction by the states pursuant to Dormant Foreign Commerce clause principles and jurisprudence; or (c) the limitations of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, for the application of U.S. antitrust laws to conduct involving foreign commerce.

### INTRODUCTION

Class Plaintiffs "cannot recover antitrust damages based solely on an alleged cartelization of [foreign] markets, because American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). There is no dispute of material fact that *all* of Class Plaintiffs' claims are based "solely on alleged

---

[1] NHK Spring Co. Ltd. ("NHK Spring"), NHK International ("NHKI"), NHK Spring (Thailand) Co., Ltd. ("NHK Thailand"), NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Dong Guan") and NAT Peripheral (H.K.) Co., Ltd. ("NAT HK," and collectively "NHK") and Defendants TDK Corporation (TDK Corp.), Hutchinson Technology Inc. ("HTI"), Magnecomp Precision Technology Public Co., Ltd. ("MPT"), Magnecomp Corporation ("Magnecomp"), and SAE Magnetics (H.K.) Ltd. ("SAE," and collectively "TDK").

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

1

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

cartelization" of foreign markets and that they seek, through their lawsuit, to apply American laws to "regulate the competitive conditions of other nations' economies." *Id*. Class Plaintiffs' claims exceed the permitted territorial scope of the laws they assert, and judgment on those claims should be entered in Defendants' favor.

Summary judgment on Class Plaintiffs' claims is appropriate for three independent reasons.

*First*, many of the state statutes on which Class Plaintiffs' claims are based explicitly limit their application to conduct that "restrains trade or commerce" *in the state*. But there is no evidence of any "restraint of trade or commerce" within the states where Class Plaintiffs assert their claims. Instead, Class Plaintiffs allege a foreign conspiracy to fix prices and allocate customers and markets for hard disk drive suspension assemblies ("HDD Suspensions"). *All* of the sales of HDD Suspensions that were incorporated into products purchased by the putative classes were made in overseas markets. Class Plaintiffs claim that the prices of downstream products that they purchased in the United States were higher than they otherwise would have been. Even if true (which is extremely unlikely), they do not and cannot claim that competition in the markets for those downstream products in the United States was "restrained" by Defendants' alleged conduct, and so those potential downstream effects fail to provide a basis for application of state laws that require a restraint of trade "within the state."

*Second*, application of the state laws asserted in Class Plaintiffs' complaints here would violate Constitutional limits on the exercise of state authority. The Constitution reserves to Congress the right to regulate "commerce with foreign nations," and the inverse principle—the so-called "dormant foreign commerce clause"—precludes applications of state laws that unduly burden foreign commerce. Class Plaintiffs seek to apply state antitrust, unfair competition and consumer protection statutes to regulate the competitive conditions of other nations' economies, which is precluded by the dormant foreign commerce clause.

*Third*, the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, bars the vast majority of Class Plaintiffs' claims. Pursuant to that statute, antitrust claims "involving" foreign commerce are limited to those that either (a) are "in" import commerce or (b) have a (i) "direct, substantial and reasonably foreseeable effect" on U.S. commerce that would (ii) "give[] rise" to a claim for violation of the Sherman Act, the primary federal antitrust statute. *Id*. Here, there can be no

2

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

dispute that Class Plaintiffs' claims "involve" foreign commerce: all of their claims derive from alleged restraints on competition for the sale of HDD Suspensions in foreign markets. And the indisputable factual record confirms that (a) Defendants' sales of HDD Suspensions were not in import commerce, and (b) except with respect to bare or external HDDs sold to direct purchasers in the U.S., any "effects" on U.S. trade or commerce were indirect and insubstantial. HDD Suspensions are tiny, inexpensive electronic parts whose sole use is in hard disk drives ("HDDs"). Class Plaintiffs did not purchase any HDD Suspensions, in the United States or otherwise. The supply chains through which HDD Suspensions were incorporated into HDDs—most of which were then incorporated into other products (e.g., computers) that were ultimately purchased by Class Plaintiffs—involved many steps outside of U.S. commerce before any transactions in domestic or import commerce. Any effects on U.S. commerce were necessarily indirect; and Class Plaintiffs cannot establish that such effects were "substantial" given the HDD Suspension's tiny proportion of the overall cost of the products.

NHK and TDK respectfully request that this Court grant their motion for summary judgment and enter judgment for Defendants on all claims asserted by Class Plaintiffs.

## STATEMENT OF MATERIAL FACTS

### A.    HDD Suspensions.

Defendants NHK, MPT, and HTI manufactured and sold the vast majority of HDD Suspensions during the alleged class period.[2] The NHK entities that manufacture, market and sell HDD Suspensions include NHK Spring, NHK Thailand, and NAT Dong Guan.[3] NHKI is a U.S.-based subsidiary of NHK Spring located in Novi, Michigan—it does not manufacture or sell HDD Suspensions, but assists as a marketing liaison from its branch office in San Jose, California with HDD manufacturers located in the U.S., primarily to address challenges posed by the language barrier and time zone difference.[4] MPT, a subsidiary of TDK, also designed, manufactured, and sold HDD Suspensions from its factories in Asia.[5] Finally, HTI was an independent manufacturer of HDD

---

[2] *See* Deposition of Robert Legendre, former Senior Vice President of Global Supply Chain at Seagate Tech. 340:7–9, 343:15–18, May 31–June 1, 2022 [hereinafter "Legendre Dep. (Ex. 4)"] [attached as Ex. 4 to the Declaration of Craig Y. Lee [hereinafter "Lee Decl."]].
[3] Declaration of Akira Okuma, Director of Disk Drive Suspension Sales at NHK Spring Co., Ltd. ¶ 7 [hereinafter "Okuma Decl."].
[4] *Id.* ¶ 7(e).
[5] *See* Declaration of Stephen Misuta, CEO of Magnecomp Corp. ¶¶ 4, 32 [hereinafter "Misuta

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

Suspensions until it was purchased by TDK in 2016.[6]

HDDs are comprised of more than a dozen main components, each of which can be broken down into several further subcomponents.[7] HDD Suspensions are a subcomponent of a HDD component called a head gimbal assembly ("HGA"), which itself is a subcomponent of another intermediate component called a head stack assembly ("HSA").[8] There are more than a dozen other components of HDDs besides the HSA.[9]

HDDs are used in a wide range of consumer and other products, a subset of which are alleged to have been purchased downstream by the Class Plaintiffs: (1) laptop and desktop computers ("Computers"), (2) "Enterprise Storage Systems," which include servers and arrays, (3) "network attached storage" devices ("NAS Devices"), and (4) "bare" or "external HDDs."[10]

**B.    HDD Suspension Prototypes.**

A very small percentage of HDD Suspensions—not relevant to Class Plaintiffs' claims or this Motion—were imported directly to the United States, as prototypes used for testing purposes (not resale) by HDD manufacturers.[11] Such sales to the U.S. included sales of prototypes to Hitachi GST ("HGST"), Western Digital, and Seagate U.S.[12] Seagate witness Eric Isom explained ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[13] Mr. Isom confirmed ████████████████████████████████████████████████████████████████████████████████

---

[6] *Id*. ¶ 6.
[7] Okuma Decl. ¶ 11.
[8] *Id*. ¶ 12.
[9] *Id*. ¶ 11. Diagrams of the component parts of HDDs can be found in the Misuta Decl., ¶ 15, and the Okuma Decl. ¶ 11.
[10] Plaintiffs define a product collection as "Standalone Storage Devices," which include bare or external HDDs as well as NAS Devices and Enterprise Storage Systems. *See* End-User Pls.' Second Am. Compl. ¶¶ 123–25, 127, 261–62, ECF No. 311; Reseller Pls.' Third Am. Compl. ¶¶ 46–48, 141–42, ECF No. 418. However, Enterprise Storage Systems and NAS Devices fall into a separate category because they are vastly more expensive and complex compared to bare or external HDDs, *see* Okuma Decl. ¶¶ 45–46; Misuta Decl. ¶ 39.
[11] *See* Okuma Decl. ¶¶ 19–20; *see also* Deposition of Bruce Sanders, former Vice President of Global Materials at Seagate Tech. 110:1–16, July 12–13, 2022 [hereinafter "Sanders Dep. (Ex. 3)"] [attached as Ex. 3 to Lee Decl.] (████████████████████████████); Misuta Decl. ¶¶ 26–27.
[12] Okuma Decl. ¶ 22, Ex. B.
[13] Deposition of Eric Isom, former Senior Director of Cloud Storage Systems at Seagate Tech. 121:8–14, May 4–5, 2022 [hereinafter "Isom Dep. (Ex. 1)"] [attached as Ex. 1 to Lee Decl.].

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

4

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ▮▮▮▮▮▮▮▮▮▮▮▮.[14] Prototypes for Seagate are delivered to the United States and Thailand

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[15] and are <u>not</u> subsequently sold to customers

3   or incorporated into final HDDs.[16] Class Plaintiffs did not purchase any prototypes or samples, either

4   directly or indirectly.

5       **C.   HDD Suspensions for Mass Production.**

6           Once the HDD manufacturer qualifies the prototype for use, HDD Suspension manufacturers

7   then ramp up mass production of HDD Suspensions on factory lines based on purchase orders

8   specifying the HDD manufacturers' foreign subsidiaries as the "bill to" and "ship to" location.[17] The

9   larger volume significantly reduces the unit costs.[18] HDD Suspensions comprise an insubstantial

10  fraction of the cost of making HDDs, and an even less substantial fraction of the price of products

11  purchased by Class Plaintiffs. A mass-produced HDD Suspension costs on average $0.68, or between

12  $0.40 and $1.20, according to NHK's and TDK's data for mass-produced HDD Suspensions.[19]

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[20] This

14  component cost is a tiny fraction of the cost of an HDD. ▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮.[21] Using those averages,

16  HDD Suspensions make up under 4% of the cost of producing an HDD (and necessarily an even

17  smaller percentage of final HDD sales prices). By another measure, the typical HDD has between two

18  and six HDD Suspensions[22] and, ▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮[23] This fraction is drastically smaller for finished electronic

20  products like Computers that incorporate HDDs. For example, ▮▮▮▮▮▮

---

[14] *Id.* 121:8–23, 124:16–125:22; *see also* Okuma Decl. ¶ 18.
[15] Isom Dep. (Ex. 1) 152:4–10.
[16] Okuma Decl. ¶ 19; Sanders Dep. (Ex. 3) 110:1–16; Legendre Dep. (Ex. 4) 69:4–23; Misuta Decl. ¶ 27.
[17] Okuma Decl. ¶ 21, Ex. A; Sanders Dep. (Ex. 3) 373:1–374:7; Isom Dep. (Ex. 1) 154:13–155:8.
[18] Okuma Decl. ¶ 27; Sanders Dep. (Ex. 3) 64:18–65:7.
[19] Okuma Decl. ¶ 34; *see also* Misuta Decl. ¶ 16, 27. The produced data from Plaintiffs, Defendants, and third-parties in this case are voluminous Excel spreadsheets containing, in some cases, almost 20 years of transactional data. They are far too large to append to this brief. Defendants will provide a flash drive containing all cited data upon request from the Court.
[20] WD-SUS-LIT-10000009 [attached as Ex. 13 to Lee Decl.]; *see also* Isom Dep. (Ex. 1) 124:24–125:22 (▮▮▮▮▮▮▮▮▮▮▮▮▮).
[21] WD-SUS-LIT-10000009 [attached as Ex. 13 to Lee Decl.].
[22] Misuta Decl. ¶ 13.
[23] *See supra* note 21.

5

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

██████████████████████████████[24]███████████████████████████████████

█████████████████████████████[25]█████████[26] HDD Suspensions represent an insubstantial portion of the cost of making these complex downstream products, and an even more insubstantial portion of the prices charged for such products in downstream markets.

### D. The Complex Global Supply Chain for HDD Suspensions.

#### 1. The First Step: Foreign Sellers of HDD Suspensions.

Defendants are the first step in the long supply chain that precedes any purchases by Class Plaintiffs. The Defendants' facilities that handled the manufacture and sale of HDD Suspensions during the relevant time period were located outside of the U.S.[27]

#### 2. The Second Step: Foreign Sales or Transfers from Defendants to Head Gimbal Assembly Manufacturers.

Defendants typically deliver HDD Suspensions to factories that manufacture HGAs which, in turn, then deliver completed HGA subassemblies to factories that manufacture HSAs.[28] During the relevant time period, there were only three HGA manufacturers in the world—two were subsidiaries of Seagate and Western Digital, and the third was SAE, a subsidiary of TDK (hereinafter, "HGA Manufacturers")—and *all* HGA manufacturing facilities where Defendants delivered HDD Suspensions were located outside the United States.[29] Seagate's and Western Digital's mass production facilities were located in Thailand, the Philippines, Malaysia, and China, and SAE's facilities were located in China and Hong Kong.[30]

Data shows that over 99% of Defendants' sales of HDD Suspensions were billed and shipped to these foreign entities, which include all of the mass-produced HDD Suspensions that might be

---

[24] Data produced by third-party Dell Techs., Inc. Defendants will provide a flash drive containing all cited data upon request from the Court, *see supra* note 19.
[25] *See* ARVAYDATA-000000001 [attached as Ex. 16 to Lee Decl.].
[26] *See* MEDEIROSDATA-000000001 [attached Ex. 17 to Lee Decl.].
[27] Okuma Decl. ¶ 7(a)–(d); Misuta Decl. ¶ 19.
[28] *See* Isom Dep. (Ex. 1) 127:18–128:16; Deposition of Keith Johnson, former Director of Marketing at HTI, 36:20–37:3, June 23, 2022 [attached as Ex. 18 to Lee Decl.]; STX0343549 [attached as Ex. 5 to Lee Decl.].
[29] *See* Okuma Decl. ¶ 21; Misuta Decl. ¶ 27; Isom Dep. (Ex. 1) 92:6–23, 97:2–99:7, 130:12–16; STX0541084 [attached Ex. 15 to Lee Decl.]; STX0343549; Western Digital Corp., Annual Report (Form 10-K) (Aug. 29, 2016) [hereinafter "Western Digital 2016 10-K"].
[30] *See* Isom Dep. (Ex. 1) 92:6–93:4; Legendre Dep. (Ex. 4) 51:23–25, 273:8–9; STX0541083 [attached as Ex. 2 to Lee Decl.]; Okuma Decl. ¶ 21(a)–(c); Western Digital 2016 10-K; Misuta Decl. ¶¶ 21–22.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

incorporated into products purchased by class members.[31] The remaining sales of HDD Suspensions included prototypes,[32] some of which were billed and shipped directly to the U.S., but are not relevant to Class Plaintiffs' claims and thus not at issue in this motion.[33]

### 3. The Third Step: Foreign Incorporation into Head Stack Assemblies.

Once the HGAs were manufactured, the HGA Manufacturer would either incorporate the HGA into an HSA at the same facility, or transfer the completed HGA to another foreign facility where it was incorporated into an HSA.[34] During the relevant time period, the facilities that manufactured HSAs were owned by Seagate, Western Digital or SAE—all of which used facilities outside the United States.[35] Seagate's and Western Digital's facilities were located in China, Thailand, and Malaysia, and SAE's facilities were located in China.[36]

### 4. The Fourth Step: Foreign Transfers from HSA to HDD Manufacturers.

Next, HSAs, which incorporate the HGAs, HDD Suspensions, and more than a dozen other components, were sold or transferred to HDD manufacturing facilities, again all in Asia.[37] Throughout the relevant time period, *all* HDD manufacturing facilities were outside the United States, primarily in Thailand, Malaysia, China, and the Philippines.[38] Since 2012, there have been only three manufacturers of HDDs in the world: Seagate, Western Digital, and Toshiba.[39]

### 5. The Fifth Step: Sales from HDD Manufacturers to Finished Product Manufacturers.

Except for the small portion of bare or external HDDs sold directly to the Classes by HDD manufacturers, once the HDD manufacturers complete the fabrication process, they sell the HDDs to

---

[31] *See* Okuma Decl. ¶ 23; Misuta Decl. ¶¶ 29–30.
[32] *See* Isom Dep. (Ex. 1) 122:14–19, 152:4–21; Sanders Dep. (Ex. 3) 374:24–375:1, 376:12–377:13.
[33] *See* Okuma Decl. ¶ 40, Ex. B; Misuta Decl. ¶¶ 26–27.
[34] *See* Sanders Dep. (Ex. 3) 95:6–96:21, 98:8–24, 99:15–22; 100:21–25.
[35] STX0343596 [attached as Ex. 6 to Lee Decl.]; Western Digital Corp., Annual Report (Form 10-K) (Aug. 17, 2012) [hereinafter "Western Digital 2012 10-K"]; Misuta Decl. ¶¶ 22, 35.
[36] STX0343596; STX0541083; Western Digital 2012 10-K; Misuta Decl. ¶¶ 21–22.
[37] Okuma Decl. ¶ 43; Misuta Decl. ¶ 35.
[38] *See* Okuma Decl. ¶ 16.
[39] Okuma Decl. ¶ 15; Isom Dep. (Ex. 1) 373:13–20. Prior to 2012, there were a handful of other HDD manufacturers, including HGST, Samsung, Maxtor, and Fujitsu. *See* Okuma Decl. ¶ 15. The industry has been subject to significant consolidation throughout the class period. *Id.* Seagate purchased Maxtor in 2005. *Id.* Toshiba purchased Fujitsu's hard disk drive business in 2009. *Id.* Seagate purchased Samsung's hard disk drive business in 2011. *Id.* Western Digital purchased HGST in 2012. *Id.*

electronics manufacturers, including manufacturers of Computers, Electronic Storage Systems, and NAS Devices. These include, among others, Acer, Dell, HP/Compaq, IBM, Fujitsu/Siemens, NEC, Gateway, Toshiba, Apple, and Sony.[40]

This fifth step often is splintered further among multiple intervening companies, as electronics manufacturers often contract with independent intermediaries known as Electronic Manufacturing Services ("EMS") or original design manufacturers ("ODMs") to handle final product fabrication. Many of the major Computer manufacturers use these types of subcontractors. Apple, for example, uses Foxconn, Pegatron, or Wistron (all Chinese or Taiwanese-based manufacturers) for its Computer manufacturing.[41] Another party in this MDL, Flextronics, describes itself as an "Electronic Manufacturing Service" which "purchases HDDs for installation in computers that Flex assembles and sells to its customers."[42]

### 6. The Sixth Step: Resellers

The five Reseller Plaintiffs seek to represent a class of all persons or entities who "purchased a Standalone Storage Device or Computer for resale" from 2003–2016.[43] They assert claims under the laws of five states: California, New York, Michigan, Minnesota, and North Carolina. As noted below, many resellers within the putative Reseller Class purchased from other resellers, including distributors,[44] and brick and mortar and online electronics retailers.[45]

### 7. The Seventh Step: End-Users

---

[40] STX0403494 [attached as Ex. 14 to Lee Decl.] (listing 8 manufacturers which accounted for 52–54% of the PC market share at the time).

[41] See Apple Inc., Apple Supplier List, (2020), https://www.apple.com/supplier-responsibility/pdf/Apple-Supplier-List.pdf; Apple, Inc., Annual Report (Form 10-K) at 6 (Oct. 28, 2021) ("[A] majority of the Company's supplier facilities, including manufacturing and assembly sites, are located outside the U.S.").

[42] Flextronics Compl. ¶ 76, ECF No. 499-1 (originally filed in Case No. 3:22-CV-02798-MMC, ECF No. 1).

[43] Reseller Pls.' Third Am. Compl. ¶ 141–42, ECF No. 418.

[44] Many products containing HDDs are purchased in large quantities from Avnet, Ingram Micro, MA Laboratories, and Microland, and then resold to a varied customer base. See, e.g., Where to Buy, Toshiba, https://storage.toshiba.com/storagesolutions/where-to-buy/where-to-buy---distributors; Where to Buy, Western Digital, https://www.westerndigital.com/company/distributors; Top 5 Reasons to Buy Through a Distributor, Electronics 360 (Aug. 26, 2020), https://electronics360.globalspec.com/article/15576/top-5-reasons-to-buy-through-a-distributor.

[45] Products containing HDDs are sold by electronic retailers like Amazon.com and Newegg.com, and hybrid retailers like Best Buy, Wal-Mart, Staples, and Target, among many others. See, e.g., Harris Andrea, 20 Electronic Stores & Sites Like Best Buy, Tech 21 Century, https://www.tech21century.com/electronic-stores-sites-like-best-buy/.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

8

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

The End-User Class consists of 52 individual consumer class representatives asserting claims under 29 different state laws. They seek to represent a class of end-users who purchased three separate types of products in the states where those proposed class representatives resided: personal HDD storage devices, Enterprise Storage Systems, and Computers.[46] They also pleaded an alternative class that only includes purchases of standalone storage devices, which includes personal HDD storage devices, and Enterprise Storage Systems.[47] End-Users sit at the end of the long supply chain and include any individual or company who actually uses the end-use electronic product for its intended purpose. These purchases could have come from any of the resellers that sell finished products.

**E.    Global Investigations.**

Plaintiffs allege a conspiracy between NHK and TDK to fix prices of and allocate market shares for HDD Suspensions between 2003 and 2016.[48] The alleged conduct in the case has already been investigated throughout the world. In the United States, NHK Spring entered into a Plea Agreement with DOJ to resolve criminal charges and agreed to pay a $28.5 million fine.[49] NHK admitted to "U.S. sales of unincorporated HDD suspension assemblies,"[50] which are prototypes as described above. NHK also admitted that it "sold foreign-manufactured HDD suspension assemblies outside the United States for incorporation into products—namely, hard disk drives—that were sold in, or for delivery to, the United States."[51] The Plea Agreement acknowledges that these two categories of sales "had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and commerce."[52] As set forth herein, Defendants are not asserting that FTAIA bars claims based on sales of HDD Suspensions (prototypes) or bare or external HDDs sold by HDD Manufacturers to direct purchasers in the U.S.

---

[46] End-User Pls.' Second Am. Compl. ¶ 12, ECF No. 311.

[47] *Id.* ¶¶ 261–62.

[48] Reseller Pls.' Third Am. Compl. ¶¶ 4, 162, ECF No. 418. End-Users allege a shorter Class Period of "January 2005 through at least May 2016." End-User Pls.' Second Am. Compl. ¶ 13, ECF No. 311.

[49] Rule 11 Plea Agreement, *United States v. NHK Spring Co.*, No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019), ECF No. 15 [hereinafter "Plea Agreement"] [attached as Ex. 9 to Lee Decl.].

[50] United States' Sentencing Memorandum at 5, *NHK Spring Co.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 5, 2019), ECF No. 21 [attached as Ex. 10 to Lee Decl.].

[51] Plea Agreement at 5.

[52] *Id.*

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

## PROCEDURAL POSTURE

On November 25, 2020, this Court granted in part Defendants' Motion for a Scheduling Order, allowing them to "file an early motion for partial summary judgment on the issue of whether the Foreign Trade Antitrust Improvements . . . and other laws limiting the extraterritorial reach of U.S. antitrust laws foreclose[ ] [p]laintiffs' claims based on sales of HDD Suspensions outside the United States." ECF No. 296 at 1. As confirmed by the ruling, "defendants will not be precluded from bringing a later motion for summary judgment." *Id.* The Court subsequently entered an Amended Order stating that "Defendants' Motions . . . will be due on August 2, 2022." *See* ECF No. 503.[53]

## STANDARD OF REVIEW

Courts have wide discretion to simplify or narrow an issue or claim, *see* Fed. R. Civ. P. 16(c)(2)(A), or to grant summary judgment on any issue or claim that can be determined as a matter of law, *see* Fed. R. Civ. P. 56(a). A court "shall" grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Kinetic Sys., Inc. v. Fed. Fin. Bank*, 65 F. Supp. 3d 731, 736 (N.D. Cal. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Defendants are the moving party and "bear[] the initial burden of demonstrating the absence of a genuine issue of material fact. The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 956 (N.D. Cal. 2011) (internal citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[53] After the entry of this order, Flextronics International USA, Inc. ("Flextronics") filed a complaint on May 11, 2022. ECF No. 499-1 (originally filed in Case No. 3:22-CV-02798-MMC, ECF No. 1). Defendants moved to dismiss this complaint on July 15, 2022. Defs.'Mot. to Dismiss, ECF No. 515. Defendants have not received any discovery from Flextronics as of the filing of this motion and thus reserve their right to request permission to file another motion for partial summary judgment on the issue of whether the FTAIA and other laws limiting the extraterritorial reach of U.S. antitrust laws foreclose Flextronics' claims based on sales of HDD Suspensions outside the United States.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

1

## ARGUMENT

2

## I.   MANY OF CLASS PLAINTIFFS' CLAIMS EXCEED THE EXPLICIT SCOPE OF THE STATUTES ON WHICH THEY RELY

3

4    Class Plaintiffs assert claims for damages under various state antitrust statutes.[54] Most of those

5    statutes explicitly limit their application to conduct that "restrains trade or commerce," at least part of

6    which is "in the state" whose law is being applied. *See* Appendix A (identifying statutes and statutory

7    language). *None* of the "trade or commerce" that Class Plaintiffs allege was restrained in this case and

8    which underlies their claims for damages occurred in any of the states on whose laws Class Plaintiffs

9    rely. Thus, summary judgment should be entered on those claims.

10    Class Plaintiffs allege that Defendants engaged in a conspiracy to fix prices and allocate

11    customers and market shares for HDD Suspensions. None of the named Class Plaintiffs purchased

12    HDD Suspensions; and the putative class definitions do not encompass purchasers of HDD

13    Suspensions. There were only four direct purchasers of HDD Suspensions (Seagate, Western Digital,

14    Toshiba and SAE), or their predecessors during the relevant period, and those purchasers consumed

15    all of the HDD Suspensions they purchased to produce HGAs, HSAs, and HDDs or for testing

16    purposes.

17    Class Plaintiffs instead purchased *other products* that incorporated HDDs, and by extension,

18    incorporated HDD Suspensions. Specifically, the putative classes are limited to purchases of bare or

19    external HDDs, Computers, NAS Devices, and Enterprise Storage Systems, all of which contain, use,

20    or are forms of HDDs.[55] Defendants do not sell any of those products. Each are complex products that

21    incorporate multiple other components, are sold in different markets, and have different competitors.

22    All of the sales of mass-produced HDD Suspensions that were incorporated into HDDs and

23    then incorporated into products allegedly purchased by the putative classes were made outside the

---

24    [54]   Reseller Plaintiffs assert claims under the state antitrust statutes of California, New York,
25    Minnesota, Michigan, and North Carolina. Reseller Pls.' Third Am. Compl. ¶¶ 167–71, ECF No. 418.
       End-Users allege violations of antitrust statutes in 25 states: Arizona, California, District of Columbia,
26    Hawaii, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New
       Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South
27    Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia. End-
       User Pls.' Second Am. Compl. ¶¶ 296–321, ECF No. 311.
28    [55]   End-User Pls.' Second Am. Compl. ¶¶ 261–62, ECF No. 311; Reseller Pls.' Third Am. Compl. ¶¶
       141–42, ECF No. 418.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

11

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

United States. *Supra* pp. 4–7. It is those foreign sales of HDD Suspensions—that foreign commerce—that Class Plaintiffs allege was restrained.[56] No part of that allegedly restrained commerce was in any of the states whose laws Class Plaintiffs seek to apply. Those laws are inapplicable on their face to regulate such commerce because they require that trade allegedly restrained was at least in part in the state. *See* Appendix A (identifying state statutes).

The fact that Class Plaintiffs made in-state purchases of other products that contained HDD Suspensions does not change the analysis or bring their claims within the scope of the state antitrust statutes identified in Appendix A. Class Plaintiffs have not claimed and cannot claim that trade in the products that they allegedly purchased was "restrained" in the state. Thus, judgment should be entered on Class Plaintiffs' claims under the laws identified in Appendix A.

"Restraint of trade or commerce" has a very specific meaning in the context of antitrust claims: it means that *competition* in the *market at issue* was limited or annulled. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1502 (4th ed. 2013) (noting that a "'restraint on trade' means [a] restraint on competition" and thus "[t]o avoid dismissal, the plaintiff must allege that competition in a specified market has been 'restrained.'") (emphasis added). Charging (or being charged) higher prices is not a restraint of trade. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (noting that the respondent "is mistaken in relying on pricing effects absent a further showing of anticompetitive conduct"). Here, the only trade allegedly restrained that is relevant to Class Plaintiffs' claims are Defendants' sales of HDD Suspensions in foreign markets. Regardless of whether prices for other products (Computers, bare or external HDDs, NAS Devices, or Enterprise Storage Systems) were higher in the states at issue than they otherwise would have been, no trade in those products in the states was "restrained" within the meaning of the antitrust laws. Thus, judgment should be entered on Class Plaintiffs' claims under the laws identified in Appendix A.[57]

---

[56] End-User Pls.' Second Am. Compl. ¶ 291, ECF No. 311; Reseller Pls.' Third Am. Compl. ¶ 162, ECF No. 418.

[57] Defendants challenge claims under statutes in Arizona, Washington, D.C., Hawaii, Kansas, Maine, Michigan, Nebraska, New York, North Carolina, North Dakota, Utah, and West Virginia.

## II.   CLASS PLAINTIFFS' CLAIMS ARE BARRED BY THE DORMANT FOREIGN COMMERCE CLAUSE

Class Plaintiffs' attempts to apply various state laws to regulate the competitive conditions of other nations' economies violate the general presumption against extraterritorial application of state laws and Constitutional limits on the exercise of state prescriptive jurisdiction. All of the commerce underlying Class Plaintiffs' damages claims that they assert was restrained by Defendants' alleged conduct—and thus all of the commerce that Class Plaintiffs seek to regulate through their lawsuits—is foreign. Their claims would unduly burden foreign commerce, deprive foreign nations of the right to regulate their own economies, and violate the dormant foreign commerce clause, requiring summary judgment of dismissal.

Statutes are generally presumed to operate only within the territorial limits of the sovereign and not to apply extraterritorially. *See, e.g.*, *Global Reinsurance Corp.-U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012) ("The established presumption is, of course, against the extraterritorial operation of New York law . . . .").[58] This presumption takes on special force when state laws are applied to regulate foreign (i.e., non-U.S.) commerce and markets. *See S.-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) ("It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny."). The Constitution reserves to Congress the right to regulate commerce with foreign nations (*see* U.S. CONST. art. 1, § 2, cl. 3), and that right is broader and more exclusive than Congress's right to regulate interstate commerce because of the need for the "[n]ation [to] 'speak[] with one voice' in regulating foreign commerce." *Japan Line, Ltd. v. Cty. of Los Angeles*, 441 U.S. 434, 451 (1979).

Consistent with "dormant foreign commerce clause" principles, state laws cannot be applied in cases where they would unduly burden foreign commerce. *See S.-Central Timber Dev.*, 467 U.S. at 100–01. "[T]he 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the

---

[58] *See also IMS Health, Inc. v. Mills*, 616 F.3d 7, 26 (1st Cir. 2010) ("Maine, like other states, generally presumes its statutes do not apply extraterritorially in the absence of contrary indications of legislative intent."), *vacated on other grounds sub nom.*, *IMS Health, Inc. v. Schneider*, 564 U.S. 1051 (2011); *Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 819 (D. Minn. 2012) ("A general presumption exists against the extra-territorial application of a state's statutes.").

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

State.'" *Healy v. The Beer Inst.*, 491 U.S. 324, 336 (1989). "[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015).

The application of state laws that Class Plaintiffs seek here would "directly regulate" foreign commerce and is thus "invalid per se," regardless of whether it produced some downstream ripple effect in any of the states within the scope of the Class definitions. *See Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1189–90 (9th Cir. 1990) ("'Direct regulation' occurs when a state law directly affects transactions that 'take place' . . . entirely outside the state's borders. Such a statute is invalid per se . . . .") (citations omitted).

A recent decision by the Fourth Circuit is illustrative. In *Association for Accessible Medicines v. Frosh*, the Fourth Circuit evaluated a Maryland price gouging law prohibiting "[a] manufacturer or wholesale distributor" from "engag[ing] in price gouging in the sale of an essential off-patent or generic drug." 887 F.3d 664, 666 (4th Cir. 2018) (citing Md. Code Ann., Health-Gen. § 2-802(a)). There, the Fourth Circuit agreed that the statute violated the dormant commerce clause because it regulated the prices charged for prescription drugs in wholly out-of-state transactions. The court first explained that the dormant commerce clause incorporates the constitutional principle against the extraterritorial reach of State law because "[it] is driven by concern about economic protectionism and seeks to prevent state regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 667 (internal quotation marks omitted). The court added that this principle against extraterritoriality "is derived from the notion that a State may not regulate commerce occurring wholly outside of its borders." *Id.* (internal quotation marks omitted). Accordingly, the court held that the Maryland law violated the dormant commerce clause because (1) the Act was "not triggered by any conduct that takes place within Maryland," meaning that it "targets conduct that occurs entirely outside Maryland's borders," and (2) "the Act controls the prices of transactions that occur outside the state." *Id.* at 670–71.

This case is a paradigmatic case of an attempted use of state law to "directly regulate" foreign commerce. All of the commerce that Class Plaintiffs claim was restrained is foreign. All of

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants' sales of mass-produced HDD Suspensions that were incorporated into HDDs and then products containing HDDs that might have been purchased by Class Plaintiffs or any putative class members were made in foreign commerce—billed to and shipped to foreign customers in Thailand, China, Japan, Malaysia or the Philippines. *Supra* pp. 6–7. That is the commerce that their lawsuit seeks to regulate and that Class Plaintiffs assert gives rise to their claims for damages. Such regulation by state laws contravenes constitutional limits on state authority pursuant to the dormant foreign commerce clause, requiring dismissal of Class Plaintiffs' claims. *See Healy*, 491 U.S. at 336.

## III.   CLASS PLAINTIFFS' CLAIMS ARE BARRED BY THE FTAIA

### A.   The FTAIA Bars State Law Claims Involving Foreign Commerce.

The Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, provides standards for the application of the federal antitrust laws to conduct "involving" foreign commerce, but it has also been applied to state law claims. *See, e.g., In re Capacitors Antitrust Litig. (No. III)*, No. 14-cv-03264-JD, 2018 WL 4558265, at *2–3 (N.D. Cal. Sept. 20, 2018) ("*Capacitors III*") (affirming for IPPs that "the FTAIA governed their state antitrust and consumer protection claims in the same way it applies to claims under the Sherman Act"); *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-02143, 2017 WL 11513316, at *2 (N.D. Cal. Dec. 18, 2017) (concluding that the "[p]laintiffs' state law claims will be deemed limited by the FTAIA to the same extent as any federal law claims" because "the few courts to have considered this question have concluded that the FTAIA does indeed limit state law claims by the reach of their applicable federal counterparts") (collecting cases).

Applying the FTAIA requires the Court to answer three questions:

> *First*, does Defendants' conduct at issue "involve[]" foreign commerce? If it does, then pursuant to the FTAIA, such conduct is presumptively outside the scope of the antitrust laws. *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004).

> *Second*, is Defendants' conduct "in" import commerce? Conduct that is in import commerce is subject to regulation by the U.S. antitrust laws. *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015).

> *Third*, if Defendants' conduct involves foreign commerce but is not in import commerce, did Defendants' conduct produce "direct, substantial and reasonably foreseeable effects" on U.S. commerce that would "give rise to a claim" that the Sherman Act was violated? If not, then the U.S. antitrust laws will not apply. *Id.* at 756.

**B.**     **Class Plaintiffs' Claims Involve Foreign Commerce.**

The first question is whether competition was allegedly restrained in U.S. domestic markets. If not, then the U.S. antitrust laws presumptively do not apply. The focus of the analysis thus must be on the *markets* in which trade was restrained. It is irrelevant whether **(a)** Defendants allegedly reached agreements in the United States (*see Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 305 (3d Cir. 2002)), *overruled on other grounds by Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) (affirming dismissal of an alleged conspiracy involving four U.S. air carriers because the FTAIA codified well-established precedent that "it is the situs of the effects, as opposed to the conduct, that determines whether United States antitrust law applies") (internal quotation marks omitted); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002) (*abrogated on other grounds by Empagran S.A.*, 542 U.S. at 155 (recognizing that the FTAIA incorporated long-standing precedent holding that "it is the effect and not the location of the conduct that determines whether the antitrust laws apply . . . regardless of whether some of the conduct occurred in the United States")); **(b)** Defendants took steps in furtherance of the alleged conspiracy in the United States (*see Turicentro*, 303 F.3d at 305 ("That certain activities might have taken place in the United States is irrelevant if the economic consequences are not felt in the United States economy.")); **(c)** Defendants are United States domiciled entities; or **(d)** plaintiffs or other affected individuals or entities are United States citizens or domiciliaries (*see Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 524 (D. N.J. 2014) (stating that "a foreign injury does not become a U.S. injury merely because a foreign injured party assigns its cause of action to a U.S. plaintiff"); *In re Marine Hose Antitrust Litig.*, No. 08-1888-MDL-Graham/Turnoff, 2009 WL 10685177, at *4 (S.D. Fla. Jan. 28, 2009) (holding that "for purposes of the FTAIA, the citizenship of the parties is irrelevant")). Thus, the fact that certain HDD manufacturers that purchased HDD Suspensions have a U.S parent company (*i.e.,* Western Digital) or an intermediate U.S. holding company (*i.e.* Seagate), is irrelevant to determining whether the claims at issue involve foreign commerce.

Here, the only markets allegedly restrained, at least as relevant to Class Plaintiffs' claims, were the markets for mass-produced HDD Suspensions, which were all sold outside the United States. *See supra* pp. 4–7. The conduct at issue here clearly "involves foreign commerce" and thus presumptively

16

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

cannot be regulated through application of U.S. antitrust laws.[59] *See generally In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 784 (N.D. Cal. 2007) (rejecting argument that Plaintiffs' claims "cannot be split or analyzed for its separate domestic and foreign components.").

### C. The Import Commerce Exclusion Does Not Apply Because Defendants' Conduct Did Not Involve Any Import Commerce.

The second question is whether Defendants' alleged foreign conduct is "in" import commerce. The FTAIA provides that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or commerce) with foreign nations." 15 U.S.C. § 6a. "The dispositive inquiry is whether the conduct of *defendants*, not plaintiffs, involves 'import trade and commerce.'" *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2007 WL 2318906, at *4, n.6 (N.D. Cal. Aug. 13, 2007), quoting *Turicentro*, 303 F.3d at 303. *See also Biocad*, 942 F.3d at 96.

This strict construction of the import commerce exclusion is necessary to differentiate it from the domestic effects exception, which separately allows for the application of United States antitrust laws in appropriate cases where the conduct has a direct, substantial and reasonably foreseeable effect on U.S. domestic *or import* commerce. For example, defendants' subjective intent or knowledge, the extent of negotiations in the U.S., or the hazy notion of whether defendants' conduct was "directed" at a U.S. import market—if injected into the import exclusion analysis, as suggested in *Capacitors III*, 2018 WL 4558265, at *4–6[60]—would conflate the import exclusion analysis with the domestic effects exception analysis (discussed *infra* at III.D). The domestic effects exception addresses "directness" of the effect of defendants' conduct—*i.e.*, whether defendants' conduct had a direct, substantial, and reasonably foreseeable effect on U.S. commerce that gives rise to plaintiffs' claims, bringing the

---

[59] There can be no question that the relevant "conduct" referenced in the FTAIA is the <u>defendant's</u> conduct. *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 96 (2d Cir. 2019); *Kruman*, 284 F.3d at 398 ("The text of the FTAIA clearly reveals that its focus is not on the plaintiff's injury but on the defendant's conduct, which is regulated by the Sherman Act.").

[60] While *Capacitors III* did consider whether commerce was "directed at, but not consummated within, an import market" as part of its import exclusion analysis, 2018 WL 4558265, at *5, it is distinguishable. Flextronics in that case (unlike here) was a *direct* purchaser of capacitors and it was an uncontested fact that the foreign defendant manufacturers "knew a substantial portion of the capacitors purchased by the Flex Affiliates were purchased in order to manufacture goods for Flex's U.S. customers or were intended to be and were incorporated into electronic goods shipped to the U.S. for sale in the U.S. market." *Id.* (internal quotation marks omitted). The purchases by the classes in this case are substantially more attenuated than the direct foreign purchases by Flex that survived summary judgment in *Capacitors III*. *Capacitors III* also is wrongly decided and cannot be squared with other precedent.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

conduct back within the ambit of the Sherman Act. For the "domestic effects" exception to have any meaning, the import commerce exclusion must necessarily be very narrow. The issue, in other words, is not whether Defendants' alleged conduct may have produced some effect on import commerce (that is what is addressed by the domestic effects exception), it is whether the foreign commerce that Defendants' conduct "involves" is import commerce. *See Biocad*, 942 F.3d at 96 ("That the statutory language contemplates conduct that directly interferes with the act of importing goods or services to the United States is supported by the legislative history, as the House Report repeatedly refers to import 'transactions' in its discussion of the import exclusion."). Although the Ninth Circuit "has not defined 'import trade' for purposes of FTAIA," it noted in 2015 that "not much imagination is required to say that this phrase means precisely what it says." *Hsiung*, 778 F.3d at 754–55. Import commerce "involves transactions in which the seller is located abroad while the buyer is domestic and the goods flow into the United States." Areeda & Hovenkamp, *supra*, ¶272i1. "'[T]ransactions that are directly between the [U.S.] plaintiff purchasers and the defendant cartel members *are* the import commerce of the United States.'" *Hsiung*, 778 F.3d at 755 (quoting *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 855 (7th Cir. 2012)). Class Plaintiffs' claims do not meet this standard.

Here, multiple layers of commerce exist between Defendants located primarily in Asia and U.S.-based Resellers and End-Users. The HDD Suspensions were manufactured, delivered, and paid for outside the U.S., and reached the U.S. only at the end of a complex distribution path in which they repeatedly changed hands, changed form, were incorporated into multiple rounds of increasingly complex products, and became a smaller and smaller part of the whole. *See supra* pp. 6–9. Defendants' activities and focus was solely on HDD manufacturers, and over 99% of the products they sold were to those customers' foreign entities. *See supra* pp. 6–7.

To the extent the import commerce test focuses on "whether the defendants' alleged anticompetitive behavior 'was directed at an import market,'" *In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2016 WL 5724960, at *3 (N.D. Cal. Sept. 30, 2016) (quoting *Animal Sci.*, 654 F.3d at 470), the evidence establishes that it was not. Defendants' behavior was directed at sales to foreign HGA, HSA, and HDD manufacturers and markets. The import of desktop computers, for example, was conducted by companies multiple levels of commerce removed from the initial sale of HDD

18

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

Suspensions—by Computer manufacturers, whom Defendants also did not deal with or sell to. *See supra* pp 7–8. Defendants were not involved in that import, have no direct knowledge of how that import may have entered the U.S., and did not directly target the U.S. market for Computers, or any other products containing HDDs. *See supra* pp. 3–7.

It would be too great a leap to argue that imports occurring multiple levels of commerce down the chain from an initial foreign sale are sufficient to constitute "conduct" by Defendants "involving . . . import trade or import commerce." 15 U.S.C. § 6a. Were this the case, FTAIA's differentiation between import commerce on the one hand, and foreign commerce that has the requisite domestic effects on the other, would be meaningless; the domestic effects exception would be swallowed by the import exclusion rule.

> **D.    The Domestic Effects Exception to the FTAIA Does Not Apply to Class Plaintiffs' Purchases of Computers and Enterprise Storage Systems Containing HDD Suspensions Sold Upstream in Foreign Commerce.**

The third question is whether any of defendants' conduct involving foreign non-import commerce had a "direct, substantial and reasonably foreseeable effect" on U.S. domestic or import commerce—called the "domestic effects" exception—that gives rise to their claims. *Id.* Because Defendants' conduct did not involve import trade or commerce, the burden is on Class Plaintiffs to prove that it nevertheless had a (1) direct, (2) substantial, and (3) reasonably foreseeable effect on a U.S. market that (4) gives rise to their various state antitrust and consumer protection claims. 15 U.S.C. § 6a; *Empagran*, 542 U.S. at 158. Failure to demonstrate *any* one of these four prongs is fatal to the domestic effects exception.

Defendants seek summary judgment for sales of HDD Suspensions to foreign customers that did not have a direct or substantial effect on U.S. trade or commerce. This includes, but is not limited to, HDD Suspensions incorporated into bare or external HDDs sold by HDD manufacturers to customers outside the U.S., Computers, NAS Devices, and Enterprise Storage Systems. For these purchases, Class Plaintiffs' claims should fail. At this stage, Defendants do not seek summary judgment on sales of HDD Suspensions incorporated into bare or external HDDs sold by HDD manufacturers to direct purchases in the U.S.[61]

---

[61] Defendants do not concede that this impact resulted in a measurable or provable overcharge

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

### 1.    Defendants' conduct did not have a "direct" effect on U.S. Commerce.

First, the domestic effects exception requires that the alleged impact to the U.S. market be "direct." To determine directness, courts analyze the product's supply chain and market characteristics underlying the link between the initial sale of the allegedly price-fixed products and final purchase by the alleged victim. Directness is found where the domestic effect "'follows as an *immediate consequence of the defendant[s'] activity*.'" *Hsiung*, 778 F.3d at 758 (quoting *United States v. LSL Biotechs.*, 379 F.3d 672, 680–81 (9th Cir. 2004)) (emphasis added). In contrast, effects are not direct where the "'action in a foreign country filters through many layers and finally *causes a few ripples in the United States*'" or "'where it depends on such uncertain intervening developments.'" *Hsiung*, 778 F.3d at 758, 760 (quoting *Minn-Chem*, 683 F.3d at 860 and *LSL Biotechs.*, 379 F.3d at 680–81) (emphasis added); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 963 (N.D. Cal. 2011) ("[T]he 'intervening steps' between the negotiation and signing of a contract and a plaintiffs' [sic] actual expenditure of funds on the product at issue may, in some cases, destroy the proximal link required under the FTAIA . . . .").

In *Hsiung*, the Ninth Circuit found persuasive that the component part at issue was a substantial cost component of the finished products (70-80% of the cost of a computer monitor; and 30-40% of the cost of a computer); that witnesses had testified that "'[i]f the panel price goes up, then it will directly impact the monitor set price'"; that the defendants held "'price stabilization' meetings" that led to direct negotiations with U.S. companies; and that by one estimate, $23.5 billion of the relevant components were imported directly into the United States during the relevant time period. *See* 778 F.3d at 759. The court found that the alleged domestic effect "was neither speculative nor insulated by multiple disconnected layers of transactions." *Id.* at 759; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2016 WL 5725008, at *1, 5 (N.D. Cal. Sept. 30, 2016) (finding direct effect where CRTs were the "primary component of old tube-style televisions" and "Defendants were well aware of the effect their price-fixing agreements were having on . . . products containing CRTs").

Here, unlike the facts found persuasive in *Hsiung*, there are many layers of commerce between

---

passed through to any Reseller and End-User Plaintiff and reserve all rights to contest that common class-wide evidence can be used to prove that questions of law or fact predominate over individual issues of the class or that any class plaintiff was injured.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

(1) the sale of HDD Suspensions by foreign Defendants to foreign HGA manufacturers, and (2) the sale of end products such as Computers, NAS Devices, and Enterprise Storage Systems that incorporate HDD Suspensions. *See supra* pp. 6–8. An HDD Suspension goes through multiple stages of production where it is incorporated into other intermediate and final products (e.g., HGAs, HSAs, and HDDs) that affect how numerous other parties set prices for subsequent finished products. *See supra* pp. 6–7. These intervening production stages, sometimes involving multiple independent actors with different and separate economic incentives provide multiple intervening junctures that break the causal chain and reset the price paid by the classes. *See LSL Biotechs.*, 379 F.3d at 693–94 (Aldisert, J., dissenting) (noting a "public policy imperative of cutting off liability when a causal chain of events becomes excessively complex or attenuated").

As established, over 99% of Defendants sales of HDD Suspensions were billed and shipped to HGA, HSA, or HDD manufacturers abroad.[62] And with each sequential transaction and layer of the supply chain, the HDD Suspension, most of which cost, on average $0.68 or between $0.40 and $1.20,[63] will have become progressively more insignificant in both its size and cost in proportion to the finished product that is ultimately purchased by Class Plaintiffs. The disparity in pricing, widening with each link in the supply chain of components-within-components, underscores the indirectness of the transactional link between Defendants' conduct and Class Plaintiffs' alleged injury.

For example, the supply chain for Computers and Enterprise Storage Systems is exceptionally long and complicated. HDD Suspensions installed in Computers and Enterprise Storage Systems will change hands multiple times, between foreign HGA manufacturers, foreign HSA manufacturers, foreign HDD manufacturers, often foreign OEM Computer manufacturers (and potential intervening foreign EMS and ODM entities), before even entering the U.S. *See supra* pp. 6–8. In these cases, Defendants' conduct lacked a direct effect on U.S. import trade or import commerce or U.S. domestic commerce. At most, Defendants' products were introduced into the stream of commerce abroad, with some finding their way—as small components of completely different, more complex and vastly more expensive products—to the United States. That is not enough. *See Biocad*, 942 F.3d at 101 ("[T]he

---

[62] *See* Okuma Decl. ¶ 23; Misuta Decl. ¶¶ 29–30.
[63] Okuma Decl. ¶ 34; Misuta Decl. ¶ 16.

fact that some of Defendants' goods might end up in the stream of imports to the United States is insignificant because the effect on import trade is too removed and the harm to the Russian markets precedes any eventual effect on American imports.").

### 2. Defendants' Conduct Did Not Have a "Substantial" Effect on U.S. Commerce

Second, the impact of Defendants' foreign commerce on the domestic market was insubstantial. The Ninth Circuit has found "substantial" domestic effects in a "classic horizontal price-fixing scheme[]" where the sale of the allegedly price-fixed components "occurred in large part in the United States" and where those components "are a substantial cost component of the finished products—70-80 percent in the case of monitors and 30-40 percent for notebook computers." *Hsiung*, 778 F.3d at 750, 759. Other appellate courts have looked to the quantity of sales of the price-fixed product sold directly into the United States, and the degree of the domestic price increases relating to these goods or finished products. *See, e.g.*, *Minn-Chem*, 683 F.3d at 856; *Prevent DEV GmbH v. Adient PLC*, No. 20-cv-13137, 2021 WL 5585917, at *16 (E.D. Mich. Nov. 30, 2021) (noting that "[t]o be 'substantial,' the conduct must have more than a 'spillover effect on the domestic commerce'") (quoting *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F. Supp. 1102, 1106–07 (S.D.N.Y. 1984)). In addition, "[a] plaintiff's showing of domestic effects must include a demonstration of 'antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms.'" *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009 (N.D. Ill. 2001) (quoting *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 815 (9th Cir. 1988)).

Here, for HDD Suspensions incorporated into end use products such as Computers, NAS Devices, and Enterprise Storage Systems, there is no substantial effect on domestic commerce due to the small cost of the HDD Suspensions relative to the prices of the finished goods sold in the United States.[64] As in *Motorola*, where the overcharge of a component is relatively low compared to the cost of finished products, it is difficult to ascertain that a direct purchaser has been injured, much less an

---

[64] To be clear, sales of finished products containing HDDs may have a substantial impact on U.S. commerce, but Plaintiffs need to show more than that—they need to demonstrate that the alleged price-fixing of the HDD Suspensions *within* those HDDs had a substantial impact on U.S. markets. Because HDD Suspensions are inexpensive components-within-components, the subsequent sale of more complex finished products like Computers cannot have a substantial impact on U.S. commerce.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

DEFENDANTS' NOTICE OF MOTION & FTAIA MOTION FOR PARTIAL SUMMARY JUDGMENT

entire downstream market. *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 822 (7th Cir. 2015). There, the court considered a hypothetical whereby a 20% overcharge on the price-fixed product from $10 to $12 would presumably change the final prices of cell phones from $150 to $152. *Id.* The Court observed that "[t]hat would be only a 1.33 percent increase. Would Motorola lose sales and therefore profits? Who knows? The price increase is tiny, and competitors might think it more profitable to match it than to undercut it; they might think their sales would not fall appreciably and that their profit margins would be slightly higher." *Id.*

Performing the same exercise here results in the same outcome. The cost of HDD Suspensions is a small fraction of the cost of a Computer or Enterprise Storage System. ████████████████████████████████████████████████████████████████████████████████████████████ [65] On average, an HDD contains 4 HDD Suspensions, suggesting that the total cost of HDD Suspensions in the average HDD is only $2.20.[66] For the products Defendants are challenging—Computers, NAS Devices, and Enterprise Storage Systems—the cost of an HDD Suspension is a tiny fraction of the cost of those products. For example, ██████████ ████████████████████████████, suggesting that HDD Suspensions make up roughly 0.2% of the computer's cost (an NAS Device similarly can be several hundred dollars).[67] Since any overcharge would be only a fraction of this 0.2% (e.g., 20% as assumed in *Motorola*), the increase in the price of the computer would be around only 0.05%—one twentieth of one percent. Enterprise Storage Systems similarly can retail for tens of thousands of dollars,[68] suggesting the percentage of that cost made up of HDD Suspensions is even smaller.

By the time Class Plaintiffs purchased Computers, NAS Devices, or Enterprise Storage Systems in the United States, there will have been a minimum of four layers of commerce typically *outside of the United States* in which three independent companies negotiated prices and transacted sales of components that incorporate HDD Suspensions. With each of these sequential transactions,

---

[65] WD-SUS-LIT-10000009 [attached as Ex. 13 to Lee Decl.].
[66] Misuta Decl. ¶ 13 (stating that, on average, there are two to six HDD Suspensions in a HDD).
[67] Conducting the same exercise with the average cost of an NHK HDD Suspension from NHK's produced data—$0.68—results in a similar outcome. NHK's HDD Suspensions make up, on average, about 0.3% of the total sales price of the average Dell computer. Defendants will provide a flash drive containing all cited data upon request from the Court.
[68] Misuta Decl. ¶ 39; Okuma Decl. ¶ 39.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

the HDD Suspension will have become progressively more infinitesimal in both size and cost in proportion to the finished computer that is ultimately purchased by Class Plaintiffs. These miniscule price increases may have a measurable effect on the first link in the supply chain, but certainly would not have a substantial effect "to the market or to competition in general" in downstream markets many levels removed from Defendants' initial sale. *See United Phosphorus*, 131 F. Supp. 2d at 1009.

Defendants' conduct abroad does not have either a "direct" or "substantial" effect on U.S. commerce for Computers and Enterprise Storage Systems under the Sherman Act, and on these two separate bases independently, Class Plaintiffs' claims must be dismissed.

**E.    Class Plaintiffs Cannot Provide Any Evidence That Any Domestic Effect "Gives Rise to a Claim" Under the Sherman Act.**

The FTAIA provides that any actionable "effect" on U.S. commerce "gives rise to a claim under the provisions of sections 1 to 7 of this title." 15 U.S.C. § 6a(2). By definition, this means that the effect on U.S. domestic or import commerce must, itself, constitute in relevant part a "restraint of trade" that would violate Section 1 of the Sherman Act. *See Kruman*, 284 F.3d at 399 (holding that the "gives rise to a claim" language "requires that the 'effect' on domestic commerce violate the substantive provisions of the Sherman Act"). As described above, in the context of the state claims asserted by Class Plaintiffs, "restraint of trade" has a very specific meaning in the context of antitrust claims. It means a restriction of competition in a relevant market. Whatever effects may have been felt on U.S. commerce that are relevant to Class Plaintiffs' claims, those effects were not a restraint of trade in domestic or import commerce. The only products imported into the United States—as relevant to Class Plaintiffs' claims—or sold to Class Plaintiffs were finished products; not HDD Suspensions. There is no claim, and could be no claim, that the markets for those finished products (with the exception of bare or external HDDs sold by HDD manufacturers to direct purchasers in the U.S.) were restrained as a result of Defendants' alleged conduct. Thus, there are no domestic effects in this case that would "give rise to a claim" that Sections 1 to 7 of the Sherman Act were violated. This independently requires dismissal of Class Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court grant this motion with prejudice.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Dated: August 2, 2022

Respectfully submitted,

*/s/ Craig Y. Lee*

Craig Y. Lee (*pro hac vice*)
craiglee@huntonak.com
Carter C. Simpson (*pro hac vice*)
csimpson@huntonak.com
Christopher J. Dufek (*pro hac vice*)
cdufek@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone: (202) 955-1500

Mark. H. Hamer (State Bar No. 156997)
mark.hamer@bakermckenzie.com
Mark G. Weiss (*pro hac vice*)
mark.weiss@bakermckenzie.com
**BAKER & McKENZIE LLP**
815 Connecticut Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 452-7077

*Counsel for Defendants NHK Spring Co.,
Ltd., NHK International, NHK Spring
(Thailand) Co., Ltd., NAT Peripheral (Dong
Guan) Co., Ltd. and NAT Peripheral (H.K.)
Co., Ltd.*

*/s/ Michelle Park Chiu*

Michelle Park Chiu (State Bar No. 248421)
michelle.chiu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

J. Clayton Everett, Jr., (*pro hac vice*)
clay.everett@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 739-3000

*Counsel for Defendants TDK Corporation,
Hutchinson Technology Inc., Magnecomp
Precision Technology Public Co., Ltd.,
Magnecomp Corporation, and SAE
Magnetics (H.K.) Ltd.*

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

**Appendix A**

| State | Statutory language |
|---|---|
| AZ | Arizona Revised Statutes, Title 44, Chapter 10, Article 1, Sec. 44-1402:  A contract, combination or conspiracy between two or more persons **in restraint of, or to monopolize, trade or commerce, any part of which is within this state**, is unlawful. |
| DC | District of Columbia Code, Title 28, Chapter 45, Sec. 28-4502:  Every contract, combination in the form of a trust or otherwise, or conspiracy **in restraint of trade or commerce all or any part of which is within the District of Columbia** is declared to be illegal. |
| HI | Hawaii Revised Statutes, Title 26, Chapter 480, Sec. 480-4 specifically limits application of the statute to acts "**in the State or any section of the State.**" |
| KS | Kansas Statutes Annotated, Chapter 50, Sec. 50-112:  Except as provided in section 1, and amendments thereto, all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent **full and free competition in the importation, transportation or sale of articles imported into this state**, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, or for the loan or use of money, or to fix attorney or doctor fees, and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, or to control the cost or rate of insurance, or which tend to advance or control the rate of interest for the loan or use of moneys to the borrower, or any other services, are hereby declared to be against public policy, unlawful and void. |
| ME | Maine Revised Statutes, Tenth Revision, 1964, Title 13, Chapter 5, Subchapter II, Section 1101:  Every contract, combination in the form of trusts or otherwise, or conspiracy, **in restraint of trade or commerce in this State** is declared to be illegal. Whoever makes any such contract or engages in any such combination or conspiracy is guilty of a Class C crime. |
| MI | "A contract, combination, or conspiracy between 2 or more persons **in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.**" MCL § 445.772. **A "relevant market" means** "the geographical area of actual or potential competition **in a line of trade or commerce, all or any part of which is within this state.**" MCL § 445.771(b). |
| NE | Nebraska Revised Statutes, 1943, Chapter 59, Article 8, Section 59-801:  Every contract, combination in the form of trust or otherwise, or conspiracy **in restraint of trade or commerce, within this state**, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a Class IV felony. |
| NY | New York Consolidated Laws, Chapter 20, Article 22 (Donnelly Antitrust Act), Section 340:  1. Every contract, agreement, arrangement or combination whereby A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby **Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained** or whereby for the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void. |
| NC | North Carolina General Statutes, Volume 2C, Chapter 75, Sec. 75.1:  Every contract, combination in the form of trust or otherwise, or conspiracy **in restraint of trade or commerce in the State of North Carolina** is hereby declared to be illegal. |
| ND | "A contract, combination, or conspiracy between two or more persons **in restraint of, or to monopolize, trade or commerce in a relevant market** is unlawful." N.D. Cent. Code, § 51-08.1-01. **A "relevant market" means "the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state."** |
| UT | Article 12, Section 20 of the Utah Constitution:  It is the policy of the state of Utah that a free market system **shall govern trade and commerce in this state** to promote the dispersion of economic and political power and the general welfare of all the people. Each contract, combination in the form of trust or otherwise, or **conspiracy in restraint of trade or commerce** is prohibited. Except as otherwise provided by statute, it is also prohibited for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce. |
| WV | West Virginia Code, Chapter 47, Article 18, Sec. 47-18-3(a):  Every contract, combination in the form of trust or otherwise, or **conspiracy in restraint of trade or commerce in this state** shall be unlawful. |

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave.
NW Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
DEFENDANTS' NOTICE OF MOTION & FTAIA PARTIAL MOTION FOR SUMMARY JUDGMENT