**Exhibit A**

**Topic 2 Sample TDK Designated Excerpts:**

<u>Arimura Dep. Tr.</u> 65:19-66:5 (5/11/22)

```
19      Q.  And you were helping to set up a meeting with
20   Mr. Hashimoto with NHK; is that right?
21      A.  Meeting?  Well, it is to say hello, so I am
22   setting up that greeting opportunity.
23      Q.  You were setting up a meeting with
24   Mr. Ishiguro and Mr. Hashimoto for an hour at your
25   office, correct?
 1      A.  From what it says here, the conference room
 2   was reserved for one hour.
 3      Q.  And that conference room is at TDK's office?
 4      A.  Well, I think so.  I'm not entirely certain,
 5   but I think so.
```

<u>Drahos Dep. Tr.</u> 205:12-24 (5/3/22)

```
12   Q.  You don't recall the specific discussions,
13       but at the same time, you don't deny that
14       this is the type of information you shared
15       with Mr. Harvey?
16              MS. CHIU:  Object to form.
17   BY MR. O'ROURKE:
18   Q.  Is there an answer?
19   A.  Sorry, what was the question?
20              MR. O'ROURKE:  May we have it read
21       back, please.
22              (Question read back.)
23              MS. CHIU:  Object to form.
24              THE WITNESS:  I can't deny.
```

<u>Drahos Dep. Tr.</u> 260:4-8 (5/3/22)

```
 4   Q.  Who did you speak to at NHK to obtain that
 5       information?
 6   A.  I don't recall.
 7   Q.  Did you speak to Skipp Harvey about it?
 8   A.  It's a possibility.
```

<u>Johnson Dep. Tr.</u> 64:3-11 (6/23/22)

```
 3   I mean, we basically once a year
 4   would, for the most part, get together and hunt
 5   and have a good time.  And other than that, maybe
 6   an occasional text of a hunting -- I think I
 7   remember him sending me something with a picture
 8   of his son -- first buck that he shot or something
```

1

```
 9    like that, or first duck.  But other than that, it
10    was pretty much all hunting related that I can
11    recall, any sort of communications.
```

<u>Johnson Dep. Tr.</u> 78:2-10 (6/23/22)

```
 2         Q.   Okay.  Okay.  And this top email is
 3    one that you received from Mr. Harvey on
 4    December 13, 2011, right?
 5         A.   Yes.
 6         Q.   And he's saying here that he is on his
 7    way to the lodge -- right? -- and he will -- he'll
 8    pick up some beer for you if The Spot is still
 9    open, right?
10         A.   Yes.
```

<u>Nagata Dep. Tr.</u> 55:2-56:6 (5/16/22)

```
 2        Q.  And the source of information for those cost
 3    comparisons, is it fair to say that it would include
 4    information sharing with NHK itself?
 5                MR. CRAIG LEE:  Objection.  Form.
 6                THE WITNESS:  Well, when conducting a
 7    cost comparison, there is also a way where components
 8    can be drawn in from the market and analyzed by
 9    ourselves, so I don't think it is necessarily only in
10    the way that you describe.
11    BY MR. KAKINUKI:
12        Q.  Yes, but my question was, is one of the
13    sources of this information, information exchanges
14    with NHK?
15                MR. EVERETT:  Object to the form.
16                THE WITNESS:  To my knowledge, I don't
17    think I have ever been -- I have ever been told NHK's
18    cost.
19    BY MR. KAKINUKI:
20        Q.  Were you ever told NHK's actual prices?
21                MR. EVERETT:  Object to the form.
22    BY MR. KAKINUKI:
23        Q.  For suspension assemblies?
24        A.  I'm sorry, so may I understand your question
25    to be whether I heard NHK's price in an information
 1    exchange with NHK?
 2        Q.  Yes, that's my question.
 3        A.  I have no such memory.
 4        Q.  Did you ever hear NHK's proposed prices for
 5    suspension assemblies during information exchanges?
 6        A.  No, I did not.
```

**Topic 2 Sample Excerpts Not Designated:**

Kamigama Dep. Tr. 147:16-20 (7/11/22)

```
16      Q.  And your agreement with NHK to try to achieve
17   40 percent for NHK, 40 percent for TDK, 20 percent for
18   Hutchinson was one of the win-win agreements you
19   reached with NHK.
20      A.  Yes, it was.
```

Kobayashi Dep. Tr. 53:14-55:24 (7/13/22)

```
14      Q.  Mr. Kobayashi, do you understand that TDK and
15   NHK reached agreements on which company would be first
16   and which would be second for certain suspension
17   assembly customers?
18              MR. LEE:  Objection.  Form.
19              THE WITNESS:  In my understanding, I
20   understand that what was done was confirmation of
21   maintaining the then-current situation.
22   BY MR. MICHELETTI:
23      Q.  And what current situation were you referring
24   to?
25      A.  My understanding is that it was the current
 1   situation as of the time that that discussion took
 2   place.
 3      Q.  Current situation --
 4              MR. KAKINUKI:  Madam Interpreter, rather
 5   than "situation" would "status" be more appropriate?
 6              MR. BLANDFORD:  This is the check
 7   interpreter.  I'm fine with "current situation" or
 8   "status quo."
 9              MR. KAKINUKI:  I'm fine with status quo
10   as well.
11              MR. MICHELETTI:  Accepted?
12              THE INTERPRETER:  I accept status quo.
13   BY MR. MICHELETTI:
14      Q.  My question was, the status quo of what?
15      A.  That is from the sense of being the number one
16   supplier position or in the number two supplier's
17   position for each of the customers.
18      Q.  And did that apply to customers that did
19   business with Hutchinson as well?
20      A.  Yes.
21      Q.  So part of the agreement -- strike that.
22              It's your testimony that part of the agreement
23   between NHK and TDK was to maintain the status quo of
24   Hutchinson as number one for a particular customer if
25   that was then in place?
```

```
 1                    MR. EVERETT:  Object to the form.
 2                    THE WITNESS:  From what I remember right
 3   now, I don't remember specifically what the situation
 4   was for the different positions, but in my
 5   understanding, what I remember is that number one --
 6   the number of number one -- strike that -- number one
 7   and number two orders were for TDK and NHK, excluding
 8   Hutchinson.
 9   BY MR. MICHELETTI:
10      Q.  What about for customers for which NHK had no
11   business, was part of the agreement or mutual
12   understanding that was reached that NHK would be
13   brought in as number two?
14                    MR. LEE:  Objection.  Form.
15                    THE WITNESS:  At the discussions at that
16   time I think the substance was for NHK to try to
17   become number two in Toshiba.
18   BY MR. MICHELETTI:
19      Q.  And there was a mutual understanding that TDK
20   and NHK would work towards that goal?
21                    MR. LEE:  Objection.  Form.
22                    THE WITNESS:  There was confirmation that
23   we would cooperate with NHK trying to enter into
24   Toshiba's business.
```

**Topic 3 Sample TDK Designated Excerpts:**

Drahos Dep. Tr. 54:25-55:2 (5/3/22)
```
25   Q.  This is an email you sent to your
 1       colleagues, correct?
 2   A.  Yeah, I don't remember doing this, but yeah.
```

Drahos Dep. Tr. 134:16-25 (5/3/22)
```
16   Q.  So we've -- I've handed you what's been
17       marked as Exhibit 202, Mr. Drahos.  It's a
18       one-page email chain, the top one is from
19       Todd Drahos to Albert Ong, Rick McHone, and
20       others at Magnecomp.  It has a date of
21       April 19, 2007.
22               Have you had a chance to look at
23       Exhibit 202?
24   A.  Yes.
25   Q.  And the top email, April 19, 2007, from you
```

<u>McHone Dep. Tr.</u> 393:23-25 (10/8/21)
```
23       Q.   And, of course, Mr. Drahos is the one who
24   had contacts with HTI, true?
25       A.   Yes.
```

<u>Nass Dep. Tr.</u> 54:1-4 (3/24/22)
```
 1           DEPOSITION OF RICK NASS
 2       was provided by the customers was ever used
 3       in any Hutchinson Technology pricing
 4       decisions.
```

<u>Ong Dep. Tr.</u> 292:24-293:3 (6/3/22)
```
24       Q   And again, he's attributing the information
25   to his HTI source.
 1           You don't have any information on who his
 2   HTI source was?
 3       A   I don't, no.
```

**Topic 3 Sample Excerpts Not Designated:**

<u>Harvey Dep. Tr.</u>123:15-23 (9/29/21)
```
15       Q.   Did you exchange competitive
16   information with anyone else aside from those
17   four:  Rick McHone, Todd Drahos, Albert Ong
18   and Ken Martini?
19       A.   Possibly Keith Johnson of HTI.
20       Q.   And how many times per year?
21       A.   Maybe two times a year.  Maybe.
22       Q.   Is that average or maximum?
23       A.   That would be max.
```

**Topic 14 Sample TDK Designated Excerpts:**

<u>Misuta Dep. Tr.</u> 129:22-131:14 (4/28/22)
```
22       Q.   You make a reference to ASP here.  What is
23   that?
24       A.   Average selling price.
25       Q.   And do you use ASP in costing and pricing?
 1   A.   We use the term ASP in general to refer to
 2   pricing, yes.
 3       Q.   Average --
 4       A.   Selling --
 5       Q.   Well --
 6       A.   -- price.
 7       Q.   Okay.  And so you -- engaging in some of
 8   your costing models or pricing models, you use ASP
 9   or average sales price in those calculations?
10       A.   That's correct.
11       Q.   And would you agree that use of average
```

5

```
12   sales prices in this fashion is well accepted in the
13   suspension assembly business?
14             MR. EVERETT:  Object to the form.
15             THE WITNESS:  ASP is a little bit
16   ambiguous, I would say, depending on the application
17   or the -- yeah, the application that you want to use
18   it for.
19             MR. MICHELETTI:  Q.  Well, the acronym
20   is not ambiguous, is it?
21        A.   Well, the intent is somewhat ambiguous.
22   What you mean to say by it could be ambiguous.
23        Q.   Uhm, well, ASP means average selling
24   price?
25        A.   Right.
 1        Q.   And so that's an average of some group of
 2   prices that run across either a time period
 3   generally?
 4        A.   Yes, where -- where I say the ambiguity
 5   is, sometimes people will say ASP and then they'll
 6   list by quarter what the actual price is.  Well,
 7   that's not an ASP.  That's price.
 8        Q.   Okay.  The ASP would be the average of
 9   those?
10        A.   Yeah, yeah, exactly.  That's where
11   sometimes bantering around the term ASP gets a
12   little bit --
13        Q.   Okay.
14        A.   -- imprecise.  That's all I meant to say.
```

Ong Dep. Tr. 411:2-414:25 (6/3/22)

```
 2             Mr. Ong, how did you come up with prices
 3   you quoted for new programs?
 4        A    We get a number of factors, inputs from the
 5   customer itself to their request, our internal cost,
 6   understanding of the market.
 7        Q    And Mr. Ong, did you -- was one of the
 8   inputs pricing from prior programs?
 9        A    That could be a factor, depending on how
10   close the next program resembles the prior one.
11        Q    And were programs generally subject to
12   RFQs?
13        A    Sometimes they do.  It all depends on
14   customers.  Other customers may not have an RFQ
15   process.
16        Q    Which customers had RFQ processes as well?
17        A    Seagate.
18        Q    Seagate.
```

6

```
19              Any others out of those that we spoke about
20   earlier?
21         A    There's a process, but not as formal.
22         Q    There is a bidding process still, is that
23   what I'm understanding from your response, Mr. Ong?
24         A    No.  I mean, Seagate's conduct of business
25   starts with an RFQ and they like their business to be
 1   governed by supply agreements.  The other customers
 2   don't have supply agreements and so it tends to be
 3   more ad hoc.
 4         Q    So Mr. Ong, how long --
 5              MR. EVERETT:  Excuse me, I don't believe
 6   he's done with his answer.  Were you done?
 7              THE WITNESS:  No.  So the other customers
 8   who don't operate under a supply agreement tend to be
 9   more ad hoc and they would inform us through
10   typically sales and then engineering groups they
11   would like us to engage.  We would start engaging
12   without a request of quote.
13   BY MR. SIMS:
14         Q    I'm going to move to strike that portion as
15   nonresponsive.
16              Mr. Ong, how long do the Seagate supply
17   agreements typically last?
18         A    They typically last, I believe, anywhere
19   from three to five years.
20         Q    Okay.  And how long does the price
21   negotiated for the agreement last?
22         A    Typically a Seagate supply agreement will
23   have a pricing table and it will last for a number of
24   years.  But negotiations are still conducted on a
25   quarterly basis, even though there's a supply
 1   agreement reference.
 2         Q    Okay.  And when negotiations are conducted
 3   on a quarterly basis, the starting point is the price
 4   of the contract; is that right?
 5              MR. EVERETT:  Object to form.
 6              THE WITNESS:  The pricing tables in the
 7   supply agreement would be a reference point.
 8   BY MS. SIMS:
 9         Q    Meaning when you perform your quarterly
10   renegotiations, you begin with the price set forth in
11   the agreement and negotiate the price from there; is
12   that correct?
13         A    Well, it doesn't always start from there
14   but it's a reference that we both use, but it can go
15   anywhere.  And there have been times that I recall
```

7

```
16  whereby a customer would say I need to renegotiate
17  because of a change in the business demand and they
18  go out of that pricing reference table.
19       Q   Meaning they need to renegotiate down from
20  the price that is in the contract, right?
21           MR. EVERETT:  Object to form.
22           THE WITNESS:  They basically do not want to
23  follow what was in the pricing table and volumes and
24  all the conditions.  They can wipe the slate clean
25  and start all over.
```