REDACTED-PUBLIC VERSION

1
2  Victoria Sims
   **CUNEO GILBERT & LADUCA, LLP**
3  4725 Wisconsin Avenue, NW, Suite 200
   Washington, DC 20016
   Telephone:  (202) 789-3960
4  Facsimile:   (202) 789-1813
   vicky@cuneolaw.com
5
6  Shawn M. Raiter
   **LARSON • KING, LLP**
7  30 East Seventh Street, Suite 2800
   Saint Paul, MN 55101
8  Telephone:  (651) 312-6518
   Facsimile:   (651) 789-4818
9  sraiter@larsonking.com

10 *Interim Co-Lead Class Counsel for*
   *Reseller Plaintiffs*
11

12          **UNITED STATES DISTRICT COURT**
13          **NORTHERN DISTRICT OF CALIFORNIA**
            **SAN FRANCISCO DIVISION**
14

15

16 IN RE: HARD DRIVE SUSPENSION        Case No. 19-md-02918-MMC
   ASSEMBLIES ANTITRUST
17 LITIGATION                          MDL No. 2918

18 This Document Relates to:           **RESELLER PLAINTIFFS' NOTICE OF**
   RESELLER ACTIONS                    **MOTION AND MOTION FOR CLASS**
19                                     **CERTIFICATION**
20
21                                     Date:     To be Determined
                                       Time:     9:00 am
22                                     Place:    Courtroom 7, 19th Floor
                                       Judge:    Honorable Maxine M. Chesney
23

24

25

26

27

28

REDACTED-PUBLIC VERSION

## **NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 9:00 a.m. on a date to be determined as soon as the matter may be heard before the Honorable Maxine M. Chesney of the United States District Court for the Northern District of California, San Francisco Division, located at Courtroom 7, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, the Reseller Plaintiffs move the Court pursuant to Federal Rule of Civil Procedure 23 for an order certifying the following class, pursuant to Rule (b)(3) of the Federal Rule of Civil Procedure:

> All persons or entities, in the Indirect Purchaser States,[1] except OEMs,[2] who, during the period from January 2003 through May 2016, purchased a Standalone Storage Device or Computer for resale which included as a component part one or more HDD suspension assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants or indirectly purchased an HDD suspension assembly, for resale, that was manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

In the alternative, Plaintiffs seek certification of separate classes under the laws of each of the Indirect Purchaser States, namely a California class, a Michigan class, a Minnesota class, a New York class, and a North Carolina class.

Plaintiffs also respectfully ask the Court to appoint Cuneo Gilbert & LaDuca, LLP and Larson• King, LLP as Class Counsel, pursuant to Fed. R. Civ. P. 23(g).

This motion is based on this Notice of Motion and Motion for Class Certification, the accompanying Memorandum of Points and Authorities, all accompanying declarations and exhibits, the pleadings and papers on file in this action, oral argument

---

[1] The "Indirect Purchaser States" are: California, Michigan, Minnesota, New York, and North Carolina.
[2] An Original Equipment Manufacturer ("OEM") is a company that manufactures products for sale to the mass market by its customers.

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

1   and such other matters as the Court may consider in hearing this motion.

2

3   Dated:  October 11, 2022

4   Respectfully submitted

5   */s/ Victoria Sims*
    Victoria Sims
6   **CUNEO GILBERT & LADUCA, LLP**
7   4725 Wisconsin Avenue, NW, Suite 200
    Washington, DC 20016
8   Telephone:    (202) 789-3960
    Facsimile:    (202) 789-1813
9   vicky@cuneolaw.com

10  Shawn M. Raiter
11  **LARSON • KING, LLP**
    30 East Seventh Street, Suite 2800
12  Saint Paul, MN 55101
    Telephone:    (651) 312-6518
13  Facsimile:    (651) 789-4818
    sraiter@larsonking.com
14
15  ***Interim Co-Lead Class Counsel for Reseller Plaintiffs***

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**STATEMENT OF ISSUES PRESENTED**

2

3    Whether this Court should certify a class of indirect Reseller Plaintiffs, under the laws of
California, Michigan, Minnesota, New York and North Carolina pursuant to Rule 23(b)(3) of the
Federal Rules of Civil Procedure.

4

5    Whether this Court should appoint Cuneo Gilbert & LaDuca, LLP and Larson• King,
LLP as Class Counsel, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED-PUBLIC VERSION

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. 6

I.     INTRODUCTION ................................................................................................................. 9

II.    FACTUAL BACKGROUND ................................................................................................ 9

   A.   The Hard Drive Suspension Assembly Industry ............................................................. 9

   B.   The Hard Drive Industry .............................................................................................. 11

   C.   Defendants' Conspiracy ................................................................................................ 11

      1.   Defendants Engaged in a Thirteen-Year Conspiracy to Fix the Prices of and Exchange Sensitive Information about Suspension Assemblies ............................................. 12

      2.   TDK Admitted its Participation in the Conspiracy and Sought Leniency .................. 12

      3.   NHK Pleaded Guilty to its Participation in the Conspiracy ......................................... 13

      4.   Defendants Have Been Investigated and Fined by Numerous Foreign Authorities for their Conspiracy ........................................................................................................... 14

III.   LEGAL STANDARD ......................................................................................................... 15

IV.    RULE 23(A) ........................................................................................................................ 16

   A.   Numerosity .................................................................................................................... 16

   B.   Commonality ................................................................................................................. 17

   C.   Typicality ...................................................................................................................... 18

   D.   Adequacy ...................................................................................................................... 18

V.     RULE 23(B)(3) ................................................................................................................... 19

   A.   Predominance ................................................................................................................ 19

      1.   Common Questions Predominate Regarding Defendants' Liability ............................ 21

      2.   Common Questions Predominate Regarding Impact .................................................... 22

      3.   Common Questions Predominate Regarding Aggregate Damages ............................... 24

   B.   Superiority ..................................................................................................................... 26

VI.    APPOINTMENT OF CUNEO GILBERT & LADUCA AND LARSON KING AS CLASS COUNSEL .......................................................................................................................... 27

CONCLUSION ............................................................................................................................. 27

CERTIFICATE OF SERVICE ..................................................................................................... 29

REDACTED-PUBLIC VERSION

## **TABLE OF AUTHORITIES**

### **Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................. 19

*Amgen v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455 (2013) .................................. 14, 18, 19

*Bates v. United Parcel Serv.*, 204 F.R.D. 440 (N.D. Cal. 2001) ................................................. 15

*Bazemore v. Friday*, 478 U.S. 385 (1986) ................................................................................... 22

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................................ 25

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .......................................................................... 24

*Dow Chem. Co. v. Seegott Holdings, Inc. (In re Urethane Antitrust Litig.)*, 768 F.3d 1245 (10th
    Cir. 2014) ................................................................................................................................ 21

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)................................................................... 14

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................................ 13, 16

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 2008) ............................................... 15, 16, 25

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972)...................................................................... 14

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002)...................................................... 22

*In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19,
    2015)........................................................................................................................................ 23

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993) ......................................... 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015)............... 14, 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5429718 (N.D. Cal.
    June 20, 2013) ......................................................................................................................... 25

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159 (N.D.
    Cal. Sept. 24, 2013).............................................................................................................. 22, 23

*In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791 (N.D. Cal.
    Oct. 2, 1996) ........................................................................................................................... 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Master File No. M-02-1486-

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) .............................................................. 20, 23

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Circ. 2002) ........................ 23

*In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017) ................................................................................................................... 19, 23

*In re Online DVD Rental Antitrust Litig.,* No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ........................................................................................................................... 20

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) 25

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ........................... 14, 20

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ............................................... 19

*In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592 (N.D.Cal. Sept. 29, 2008) ................................................................................................. 15, 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009)20

*In re Sugar Indus. Antitrust Litig.*, No. 201, 1976 WL 1374 (N.D. Cal. May 21, 1976) ............. 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) .................... 14, 20

*In re: High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................. 20, 23

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ......................................................................... 16

Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004) .............................................................. 25

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ................................................ 19, 24

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) .................................................................................................... 17

*Meijer, Inc. v. Abbott Labs*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)23

*Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ........................ 14

*Nitsch v. Dreamwork Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) ..................... 20, 25

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). 14, 18, 19, 20, 21

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) ........................... 20, 24

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ........................................................................ 14

*Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ..................................... 19, 24

*Story Parchment v. Paterson Parchment Paper*, 282 U.S. 555 (1931) ........................................ 24

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159

    (C.D. Cal. 2002) ................................................................................................................. 20

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ........................................................... 18

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802 (9th

    Cir. 2010) .......................................................................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ......................................................... 15, 16

*Yokoyama v. Midland Nat'l Life Ins. Co.,* 504 F.3d 1087 (9th Cir. 2010) ................................. 24

**Rules**

Fed. R. Civ. P. 23(a) .................................................................................................................. 15

Fed. R. Civ. P. 23(a)(1) ............................................................................................................. 15

Fed. R. Civ. P. 23(a)(2) ............................................................................................................. 15

Fed. R. Civ. P. 23(a)(3) ............................................................................................................. 16

Fed. R. Civ. P. 23(a)(4) ............................................................................................................. 17

Fed. R. Civ. P. 23(b)(3) ............................................................................................................. 18

Fed. R. Civ. P. 23(g)(2) ............................................................................................................. 17

**Treatises**

NEWBERG ON CLASS ACTIONS (5th ed. 2012) ............................................................................ 16

Wright, Miller & Kane, *Federal Practice and Procedure: Civil Procedure* (3d ed. 2004) ......... 25

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Reseller Class Plaintiffs IT Worx, Inc., Now Micro, Inc., Business Integrated Technical Systems, Inc. d/b/a Network One, Michael Medeiros and Stephen Arvay ("Plaintiffs") respectfully seek certification of the Reseller Class, as described above, in this price-fixing conspiracy case against two defendant families: the TDK Defendants (collectively referred to as "TDK"): TDK Corporation, SAE Magnetics (H.K.) Ltd., Hutchinson Technology Inc., Magnecomp Precision Technology Public Co. Ltd. ("MPT"), and the NHK Defendants ("collectively "NHK"): NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., (collectively "Defendants"). Plaintiffs' proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), as more fully set forth below. This Motion is supported by the Expert Report of Dr. Michael A. Williams ("Williams Report"), attached as Ex.1.

### II.    Factual Background

#### A.    The Hard Drive Suspension Assembly Industry

Hard disk drives ("Hard Drives" or "HDDs") use magnetic recording heads attached to sliders to read from and write onto rapidly spinning disks for the purpose of storing and retrieving information electronically.[3] HDD suspension assemblies ("Suspension Assemblies") are "critical components of hard disk drives that hold the recording heads in position above the spinning magnetic disks."[4] As explained by in a report MPT, a suspension maker acquired by Defendant TDK, a Suspension Assembly "is a critical component of a[n] HDD[']s performance and reliability whose function is to enable the magnetic head to fly at a precise height, frequently less than a millionth of an inch, above the spinning magnetically coated disk."[5]

---

[3] Ex. 2, at 3514; *Hard Drives*, EXPLAINTHATSTUFF, *available at* https://www.explainthatstuff.com/harddrive.html, *Hard Disk Drives*, TEXAS A&M UNIVERSITY, *available at* https://microtribodynamics.engr.tamu.edu/hard-disk-drives/. All exhibit cites are to exhibits attached to the Declaration of Victoria Sims.

[4] Ex. 3, at 5.

[5] *See, e.g.*, Ex.4, at 1.

REDACTED-PUBLIC VERSION

1

2

[6] As of

3

2016, the leading manufacturers of Suspension Assemblies were TDK and NHK along with their

4

subsidiaries, with a combined worldwide market share of approximately 95-96%.[7]

5

6

7

8

9

10

11

12

Suspension Assemblies have

13

markings showing which manufacturer made them.[16]

14

15

16

[6] Ex. 5, at 368: 18-21; Ex. 6 at STX0665345; Ex. 4, at 20 (Reporting that as of 2005, HTI accounted for "approximately 55% of the world market share" NHK Spring accounted for

17

"approximately 22% of the world market share" and the fourth supplier in the market accounted "approximately 3% of the world market share," with MPT, the third largest supplier, holding the

18

remainder).

19

[7] Ex. 7 at 239; Ex. 8 at 254.

[8] Ex. 9 at 4 ("Suspension assemblies are critical to disk drive performance and reliability"); Ex.

20

5, 27:17-20; Ex. 10, 93:25-94:3; Ex. 11.

21

[9] Ex. 6, 397:23-398:14 (
)

22

[10] Ex. 12, 479:22-25.

23

[11] Ex. 13 at 126:2-18, 384:2-18 (
).

24

[12] Ex. 14 at 436:7-11 (
); Ex. 5, at 370:21-25; Ex. 14, at 134:4-135:20; Ex. 5, at 369:12-370:11.

25

[13] Ex. 12, at 481:10-13 (
); Ex. 10, at 94:16-20.

26

[14] Ex. 13, at 394:18-23.

27

[15] Ex. 12, at 489:10-13.

28

[16] Ex. 15, at 321:6-323:4.

Case No. 19-md-02918-MMC
RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

████████████████████████████████████████████

As of 2012, Toshiba, Seagate, and Western Digital already accounted for 97% of the overall unit market share for the hard drive market.[18] The barriers to entry in the Suspension Assembly industry are high, it is difficult to enter the market and new entrants are unlikely.[19]

**B.      The Hard Drive Industry**

The direct purchasers of Defendants' Suspension Assemblies during the Class Period and now, are manufacturers of hard drives, including Seagate, Western Digital and Toshiba, who, as stated above, are the only major remaining hard drive manufacturers.[20]

Suspension assemblies are found in all hard drives, which can be sold as internal, or "bare" hard drives, or external hard drives.[21] Hard drive manufacturers sell their hard drives to manufacturers of laptop and desktop computers, storage servers, network attached storage and store arrays.[22]

████████████████████████████████████████████

**C.      Defendants' Conspiracy**

---

[17] Ex. 16, at 72:20-23; Ex. 5, at 373:8-373:20.

[18] Ex. 17, at 930; *see also* Ex. 18.

[19] Ex. 19; Ex. 10, at 350:2-352:12.

[20] Ex. 16, at 72:20-23; Ex. 5, at 373:8-373:20.

[21] Ex. 5, at 397:23-398:9; Ex. 20.

[22] Ex. 21, at 41; Ex. 22, at  6; Ex. 23, at 18.

[23] Ex. 16, at 324:22-325:7; Ex. 16, at 344:13-345:14; Ex. 16, at 346:1-8.

████████████████████████████████████████

[25] Ex. 24, at 16 ("We operate in highly competitive markets . . . .")

████████████████████████████████████████

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

1.     **Defendants Engaged in a Thirteen-Year Conspiracy to Fix the Prices of and Exchange Sensitive Information about Suspension Assemblies**

Defendants engaged in a conspiracy regarding the Suspension Assembly market that involved hundreds of competitor meetings, telephone calls, emails, and text messages over the course of more than a decade.[27] Defendants' conspiracy included illegal competitor contacts between members of the TDK and NHK families, including HTI,[28] which was, at the time, an independent Suspension Assembly manufacturer. As part of the conspiracy, NHK and MPT shared information on all major programs.[29] The conspiracy lasted from 2003 until May 2016,[30] and was aimed at the Defendants' customers—HDD manufacturers Seagate, Western Digital, Toshiba and the companies they later acquired.[31] Sharing competitive information was part of the culture at MPT/TDK and NHK.[32] The conspiracy involved agreements on price, capacity, volume, shipments and allocation among NHK, MPT/TDK and HTI.[33]

2.     **TDK Admitted its Participation in the Conspiracy and Sought Leniency**

On May 6, 2016, TDK applied for leniency with the Japanese Fair Trade Commission ("JFTC")[34] and subsequently in July 2016, both TDK and NHK were raided by the JFTC, based

---

[27] *See e.g.* Ex. 25 at 7-2 (listing 90 competitor meetings and communications between January 20, 2003 through July 14, 2016.); ███████████████████████████████████

[28] *See e.g.* Ex. 25, at 7-2; Ex. 26, at 10-21; Ex. 27, at 105:5-12, 172:19-173:5; Ex. 15, at 171:24—173:7.

████████████████████████████████████████████████████

[30] *See e.g.* Ex. 25, at 7-2; Ex. 26, at 10-21.

████████████████████████████████████████████████████

[32] Ex. 15, at 175:15-176:18; Ex. 28, at 129:8-14.

████████████████████████████████████████████ Ex. 31 at 39:11-14; Ex. 32; Ex. 33, at 48:11-48:21; Ex. 34; Ex. 35; Ex. 10, at 161:18—163:17; Ex. 35; Ex. 37; Ex. 38.

[34] Ex. 39; Ex. 40.

REDACTED-PUBLIC VERSION

on the belief that the two companies and or their subsidiaries were involved in price fixing of HDD suspension components.[35] TDK, MPT, Magnecomp, SAE, and HTI also sought leniency from the DOJ under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Public Law 108-237. TDK entered into a leniency agreement with the DOJ on behalf of itself and its subsidiaries.[36]

Under ACPERA, an antitrust leniency applicant must provide cooperation to plaintiffs in any civil action alleging a violation of Section 1 of the Sherman Act or any similar State law, including, among other things, providing a full account of all relevant facts known to the applicant, producing all relevant documents or other items wherever they are located, and using best efforts to secure and facilitate complete and truthful interviews, depositions, or testimony.[37]

### 3.   NHK Pleaded Guilty to its Participation in the Conspiracy

On July 29, 2019, Defendant NHK Spring pleaded guilty to price-fixing in the sale of Suspension Assemblies sold in the United States and elsewhere.[38] NHK Spring agreed "to pay to the United States a criminal fine of $28.5 million. . . ."[39] as part of its plea agreement. On September 23, 2019, NHK Spring entered into a Rule 11 plea agreement, and the fine was imposed on December 18, 2019.[40] The plea agreement states:

> . . . . the defendant, through its officers and employees working in its hard disk drive division, including its high-level personnel, participated in a conspiracy with other persons and an entity (Company A) engaged in the production and sale of H[D]D suspension assemblies, the primary purpose of which was to fix the prices of HDD suspension assemblies sold in the United States and elsewhere.
>
> . . . .the defendant and Company A reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for,

---

[35] Ex. 41.

[36] Ex. 42; Ex. 43, at 5.

[37] Ex. 43, at 6-7: Sec. 213(a) & 213(b).

[38] Ex. 44.

[39] Ex. 45.

[40] Ex. 46.

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

HDD suspension assemblies to be sold in the United States and elsewhere. To effectuate these agreements, employees and officers of the defendant and Company A exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere. [41]

On February 13, 2020, the DOJ indicted two NHK Spring senior executives Hitoshi Hashimoto and Hiroyuki Tamura, who were involved in the sale and pricing of HDD suspension assemblies at NHK Spring. Hitoshi Hashimoto was the general manager of NHK Spring's disk drive suspension and component sales department from approximately April 2013 through April 2016. Hiroyuki Tamura was the general manager of NHK Spring's disk drive suspension and component sales department from approximately 2007 through April 2013.[42]

According to the indictment, Messrs. Hashimoto and Tamura and their co-conspirators:

- "attended meetings and engaged in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;"

- "agreed during those meetings and communications to refrain from competing on prices for and stabilize, maintain, and fix the prices of HDD suspension assemblies to be sold in the United States and elsewhere;"

- "agreed during those meetings and communications to allocate their respective market shares for HDD suspension assemblies to be sold in the United States and elsewhere;" [43]

### 4. Defendants Have Been Investigated and Fined by Numerous Foreign Authorities for their Conspiracy

In addition to seeking leniency from the JFTC and agreeing to plead guilty with the DOJ, Defendants have also been investigated and fined by foreign authorities. The JFTC issued cease and desist orders to both Defendants TDK and NHK on February 9, 2018, as it found that NHK Spring and NAT worked together with TDK, SAE and Magnecomp to substantially restrain competition in the Suspension Assemblies market by agreeing to maintain sales prices[44] "to

---

[41] Ex. 46 at ¶4(c).

[42] Ex. 47 at ¶¶3-4.

[43] Ex. 47 at ¶8.

[44] Ex. 48; Ex. 49; Ex. 50; Ex. 40 at 625.

REDACTED-PUBLIC VERSION

secure the[ir] market share and profits," and by holding multiple meetings with sales managers to facilitate their price-fixing strategy.[45] On April 27, 2018, the Brazilian Administrative Counsel for Economic Defense ("CADE") [46] launched an investigation into Defendants' collusion and found that they had engaged in anticompetitive conduct.[47] The Taiwan Fair Trade Commission ("TFTC") also imposed fines of NT$159.09 million on both TDK and MPT, and NT$285.55 million on NHK.[48]

## III.   Legal Standard

In moving for class certification, plaintiffs "bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). In facing a motion for class certification, district courts need not determine whether plaintiffs will prevail on the merits of their claims, and instead plaintiffs need only show whether the requirements of Rule 23 have been satisfied. *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)). The Ninth Circuit requires only that plaintiffs satisfy these Rule 23 requirements "by a preponderance of the evidence." *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). In addition, the district court must only evaluate the merits of plaintiffs' claims to the extent necessary to determine whether certification is warranted. *Amgen v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013).

Moreover, antitrust class actions play a critical role in enforcing the antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972);  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 591–92 (N.D. Cal. 2010) ("*LCDs II*") ("[W]hen courts are in doubt as to whether certification is warranted, courts

---

[45] Ex. 40 at 629.

[46] Ex. 52, at 13, ¶ 30

[47] Ex. 52, at 4, ¶ 5. The report as translated contains minor linguistic differences.

[48]   Taiwan   FTC   Newsletter,   No.   098,   2021.4,   *available   at* https://www.ftc.gov.tw/upload/d5d8d8d4-7165-4c96-814c-806e87556f25.pdf.

tend to favor class certification . . . . Courts have stressed that price-fixing cases are appropriate for class certification . . . ."); *see also In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (And courts must, at the class certification stage of antitrust cases, "resolve doubts in these actions in favor of certifying the class.")  As stated in *CRT II*, courts "a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) ("*CRT II*") (quoting *LCD II*, 267 F.R.D. at 592). Antitrust conspiracy cases are often considered the prototypical cases for the class device. In conducting its analysis, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ; *see Amgen*, 568 U.S. at 466.

## IV.    Rule 23(a)

Class certification requires proof of four elements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

### A.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requirement does not require that joinder be impossible.  *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 444 (N.D. Cal. 2001).  Plaintiffs do not bear the burden of stating the exact number of putative class members, and need not prove that the class includes more than any specific number of members.  *Id*. Rather, whether joinder is impracticable "depends on the facts and circumstances of each case."  *Id.*

Plaintiffs have satisfied the numerosity requirement here. They have pleaded a class numbering in the thousands—Resellers of suspension assemblies (including computer, hard drive

and server resellers) in five highly-populated states. In addition, the putative class is comprised of members spread throughout the nation. *Id.* (a putative class that included "members who are scattered geographically throughout the nation" weighed in favor of numerosity). Where "'general knowledge and common sense indicate that it [the putative class] is large, the numerosity requirement is satisfied.'" *In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592, at \*3 (N.D.Cal. Sept. 29, 2008) ("*SRAM I*").

## B.     Commonality

Rule 23(a)(2) is satisfied if there exist class-wide common "questions of law or fact." Fed. R. Civ. P. 23(a)(2). For a question to be sufficiently "common" to merit class certification, the question "must be of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is satisfied where "determination of [the question's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Courts find commonality in the "existence of shared legal issues with divergent factual predicates." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 2008). Moreover, courts do not require that *every* question relating to the claims be common to the class, and instead require only one question in common to find commonality. *See Wal-Mart, Inc.*, 564 U.S. at 359. In price-fixing cases alleging a conspiracy that affected a class of purchasers, the existence of the conspiracy is a common question. *See In re Sugar Indus. Antitrust Litig.*, No. 201, 1976 WL 1374, at \*13 (N.D. Cal. May 21, 1976) ("price-fixing conspiracy litigations, by their nature, involve common legal and factual questions concerning the existence, scope and effect of the alleged conspiracy."); *see also* NEWBERG ON CLASS ACTIONS § 20:38 (5th ed. 2012) ("antitrust claims are particularly suited for class treatment . . . . In particular, an allegation of a price-fixing conspiracy is usually considered to be a common question of sufficient importance to satisfy Rule 23(a)(2)."). Here, there are numerous common questions of law or fact, including, as set forth in Plaintiffs' Third Amended Complaint, Doc. No.418, ¶145:

(a) Whether Defendants and their co-conspirators engaged in a conspiracy to fix, raise, maintain or stabilize the prices of HDD suspension assemblies sold in the United States;

REDACTED-PUBLIC VERSION

(b) Whether the alleged conspiracy raised the prices of HDD suspension assemblies sold in the United States during the Class Period;

(c) Whether the conduct of the Defendants and their coconspirators caused injury to the business or property of Plaintiffs and the members of the Class;

(d) Whether the overcharge to the Reseller Class may be measured using a common method.

## C.    Typicality

Rule 23(a)(3) requires that the "claims or defenses" of the putative class representatives be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "'[t]ypicality refers to the nature of the claim . . . and not to the specific facts from which it arose or the relief sought.'" *Ellis*, 657 F. 3d at 984. A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998).  Plaintiffs' claims need not be "substantially identical" to those of the class, and instead Plaintiffs must only demonstrate the representative claims are "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. Courts find the typicality requirement satisfied in antitrust cases where "defendants engaged in a common scheme relative to all members of the class . . . ." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993). Plaintiffs' claims are typical if "they stem from the same event, practice, or course of conduct that forms the basis of the claims of the class and are based on the same legal or remedial theory." *In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996).

Here, Plaintiffs and all class members indirectly purchased Defendants' Suspension Assemblies and allege that they were overcharged for these products as a result of Defendants' conduct in carrying out their conspiracy. Plaintiffs and Class members were all injured as a result of the same conduct by Defendants. Plaintiffs' claims are thus typical of those of the class.

## D.    Adequacy

Rule 23(a)(4) requires that the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequate representation 'depends on

REDACTED-PUBLIC VERSION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Plaintiffs and Class members share a common interest—to demonstrate Defendants' liability for engaging in the conspiracy, there is no antagonism and the suit is not collusive. The Plaintiffs have produced documents, data and Interrogatory responses, as well as submitting to depositions, having expended considerable time and effort to lead this action on behalf of the Class, further demonstrating their adequacy to serve as class representatives.

Further, as this Court has recognized in its order appointing Interim Co-Lead Counsel, Doc. No. 127, counsel is competent and "are 'best able to represent the interests of' the Reseller Class.'" (quoting Fed. R. Civ. P. 23(g)(2)).

## V.  Rule 23(b)(3)

In addition to the requirements in Rule 23(a), Plaintiffs satisfy the requirements of Rule 23(b)(3).  This rule requires plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods . . . ." Fed. R. Civ. P. 23(b)(3).

### A.  Predominance

The predominance inquiry is focused on whether "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The Rule requires a showing that questions common to the class predominate; but it does not require proof that those questions will be answered in the classes' favor on the merits. *Amgen*, 568 U.S. at 459.  Moreover, a class may be certified under Rule 23(b)(3) where "one or more of the central issues in the action are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately" for matters "peculiar to some individual class members." *Tyson Foods, Inc.*, 577 U.S. at 453; *accord Olean Wholesale*, 31 F.4th at 668 ("Nor can a district court decline to certify a class that will require determination of some individualized questions at trial,

REDACTED-PUBLIC VERSION

so long as such questions do not predominate over the common questions.").

In evaluating whether the plaintiffs have satisfied their burden with respect to this predominance inquiry, "a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 666–67; *see also id.* at 667. This rule holds true whether the common question "concerns an element of plaintiffs' claim" or "a fact that must be determined to establish liability." *Id.* at 668.

The predominance inquiry requires the Court to evaluate whether common questions exist as to a "central issue of the plaintiffs' claim." *Olean Wholesale*, 31 F.4th at 665. The antitrust causes of action here require proof of "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation (i.e., the conspiracy); and (iii) measurable damages." *Id.* at 666. Plaintiffs alleging an antitrust class action need only demonstrate that "the existence of an antitrust violation or antitrust impact" are "capable of being established through a common body of evidence, applicable to the whole class." *Id.* This requirement is "readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Olean Wholesale*, 31 F.4th at 684 (concluding that predominance existed where "the common question of antitrust impact predominated over individualized questions concerning a passed-on overcharge"); *accord In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[P]roof of the conspiracy is a common question that is thought to predominate over the other issues of the class.").

Here, the classwide questions of whether Defendants engaged in a conspiracy and whether that conspiracy raised prices predominate. The plaintiffs are able to establish "the existence of an antitrust violation or antitrust impact" using "a common body of evidence, applicable to the whole class," *Olean Wholesale*, 31 F.4th at 666, namely evidence of Defendants' conspiratorial conduct and its price effects.

The Supreme Court and the Ninth Circuit have held that Rule 23(b)(3) is satisfied if common issues predominate in the case as a whole, and that each element of Plaintiffs' claims

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

need not be predominantly common. *See Amgen*, 568 U.S. at 469. Courts have certified classes even where some elements of a claim may give rise to individualized issues, such as proof of impact or injury. *See, e.g., Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016) (certifying class because common issues predominated in the case as a whole, even though plaintiffs had not shown that the fact of injury element was common to the class); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) (holding common issues predominated despite individualized damages issues) *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017) (certifying class even though "determining whether any particular plaintiff was injured and how to apportion damages between the plaintiffs necessarily involves individualized questions that are undeniably complex"). Here, Plaintiffs can demonstrate that common questions predominate, with respect to the elements of the antitrust violation, the impact of that violation and damages.

### 1.    Common Questions Predominate Regarding Defendants' Liability

"In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002) (internal quotation omitted). In antitrust cases, "proof of an alleged conspiracy will focus on defendant's conduct and not on the conduct of individual class members." *Nitsch v. Dreamwork Animation SKG Inc.*, 315 F.R.D. 270, 283 (N.D. Cal. 2016) (quotation omitted), *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015). Thus, whether an anticompetitive conspiracy exists is a common question that predominates over other issues. *LCD II*, 267 F.R.D. at 291, 310 (citing cases)."[T]he existence, scope, and efficacy of the alleged conspiracy. . . are common questions that all plaintiffs must address." *In re Online DVD Rental Antitrust Litig.,* No. M 09-2029 PJH, 2010 WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010), aff'd, 779 F.3d 934 (9th Cir. 2015). If the Court finds that common proof of Defendants' antitrust conspiracy will be the predominant issue, the Court may find class certification is warranted on that basis alone. *In re: High-Tech Emp. Antitrust Litig.*, 985 F. Supp.

2d 1167, 1227 (N.D. Cal. 2013) ("*High-Tech*") (The "question [of defendants' antitrust violation] is likely to be central to this litigation."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("*SRAM II*").

Here, the question of whether Defendants engaged in a conspiracy concerning the Suspension Assembly industry will predominate in the determination of Defendants' liability and common evidence across all class members—that of Defendants' competitor contacts—will be used to establish the existence of Defendants' conspiracy.

### 2. Common Questions Predominate Regarding Impact

As many courts have held, evidence of coordinated price setting behavior is evidence of impact by itself. *See Olean Wholesale*, 31 F.4th at 679 (noting the "presumption of class-wide impact in price-fixing cases"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Master File No. M-02-1486-PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006) (hereinafter "*DRAM*"); (collecting cases recognizing a presumption of impact); *Rubber*, 232 F.R.D. 346, 352. Under "the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Dow Chem. Co. v. Seegott Holdings, Inc. (In re Urethane Antitrust Litig.)*, 768 F.3d 1245, 1254 (10th Cir. 2014). Although the presumption of impact exists, Plaintiffs do not rely on it alone; Plaintiffs also demonstrate that there are common questions and evidence of impact based on the structure of the Suspension Assembly and Hard Drive markets, and on their expert's regression analysis.

### a. Plaintiffs' Expert Provides a Widely Accepted and Scientifically Reliable Method by which to Measure the Common Impact of the Conspiracy.

Plaintiffs' economic expert, Dr. Michael Williams performed a set of multiple regression analyses on Defendants' transactional data that demonstrate classwide impact. *See* Williams Report, attached as Ex.1. Dr. Williams has evaluated both Defendants' data, to determine that

REDACTED-PUBLIC VERSION

[REDACTED]

were passed down through the supply chain and all or almost all Reseller Class Members were injured by Defendants' alleged conduct").

    i.    **Dr. Williams's Regression Analyses Show Industrywide Overcharge and Classwide Pass-Through to the Reseller Class**

Courts in the Ninth Circuit have determined that multiple regression analysis provides a reliable measure of impact and damages in class actions and is widely accepted. For example, the *Olean Wholesale* court stated that "[i]n antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean Wholesale*, 31 F.4th at 677; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, *7 (N.D. Cal. Sept. 24, 2013) ("*CRTs I*"); *LCD II.*, 267 F.R.D. 291, 313; *SRAM II*, 264 F.R.D. at 616. Further, the standard for admissibility of regression models is liberal. As the Supreme Court has held, regression analyses are probative even if they contain "less than all measurable variables . . . ." *See Bazemore v. Friday*, 478 U.S. 385 (1986); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (The law does not require eliminating all possible factors.).

Dr. Williams' report demonstrates a common impact on the Reseller Class. Dr. Williams' report determines that Defendants' conspiracy resulted in an overcharge to their direct purchasers across the industry. Williams Report ¶216 ("The model's statistical reliability and robustness based on the Defendants' datasets lead me to conclude that all or virtually all direct purchasers paid supracompetitive prices as a result of the alleged conspiracy."). Dr. Williams' report also determines that Defendants' overcharge was passed through to the Reseller Class. Williams ¶236 ("overcharges were passed down through the supply chain and all or almost all Reseller Class

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Members were injured by Defendants' alleged conduct"). Dr. Williams' Report determines the impact on the Reseller Class on a classwide basis, using a common formula. Williams ¶172.

### ii. Dr. Williams's Market Structure Analysis Also Demonstrates Classwide Impact

Dr. Williams' report also explains that the structural characteristics of the Suspension Assembly market caused the impact of Defendants' conspiracy to be widespread. Williams Report, at ¶ 222 ("all, or nearly all, HDD SA direct purchasers paid higher prices than they would have paid absent the alleged conspiracy" due to the facts that "(1) the HDD SA industry is highly concentrated; (2) there are no significant substitutes for HDD SAs; and (3) there are substantial antitrust barriers to entry."). As a result of these aspects of the market structure in the Suspension Assemblies market, "HDD manufacturers would have very limited, if any, ability to avoid price effects caused by the alleged conspiracy." Williams Report ¶224. Dr. Williams also explains that the structure of the Hard Drive market caused Defendants' overcharges to be passed through to Resellers on a classwide basis. Williams Report ¶¶230-235 (the Hard Drive, and computer industries are highly competitive and hard drives and are commodity products, therefore passthrough of Defendants' overcharges would be marketwide).

Courts routinely accept expert opinions concerning the structural characteristics of a market in support of common impact and class certification in antitrust conspiracy cases. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Circ. 2002) (crediting expert opinion that market structure is conducive to cartelization and common impact); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *CRT II.*, 308 F.R.D. 606, 627.

### 3. Common Questions Predominate Regarding Aggregate Damages

In addition to the antitrust violation and impact, common questions also predominate with respect to damages.

REDACTED-PUBLIC VERSION

### a. Plaintiffs' Expert Provides a Reliable Method by Which to Measure Class Damages

Plaintiffs also demonstrate that they can calculate aggregate damages to the class using a common formula. Courts hold that the amount of damages Defendants must pay is a common issue if plaintiffs demonstrate that they can use common evidence to calculate aggregate class damages. *See Lidoderm*, 2017 WL 679367, at *15 (approving use of aggregate damages) (citing *Meijer, Inc. v. Abbott Labs*, No. C 07-5985 CW, 2008 WL 4065839, at *7 (N.D. Cal. Aug. 27, 2008)); *High-Tech.,* 985 F. Supp. 2d 1167, 1223-26 (approving aggregate damages model); *CRT I*, 2013 WL 5391159, at *5-8.

Courts have further held that plaintiffs in price-fixing cases "are not required to supply a precise damage formula at the class certification stage." *SRAM II*, 2008 WL 4447592, at *6. Plaintiffs need only provide a methodology for calculating aggregate damages that is "not so insubstantial as to amount to no method at all." ." *DRAM.*, 2006 WL 1530166, at *10;  *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (confirming that damages "[c]alculations need not be exact") (citing *Story Parchment v. Paterson Parchment Paper*, 282 U.S. 555, 563 (1931)). A need to perform individual damages calculations will not defeat class certification. *See Torres,* 835 F.3d at 1136 ("The presence of individualized damages calculations. . . does not defeat predominance." (citing *Leyva*, 716 F.3d at 513–14)); *see also Pulaski & Middleman, LLC.,* 802 F3d at 987; *Yokoyama v. Midland Nat'l Life Ins. Co.,* 504 F.3d 1087, 1093 (9th Cir. 2010).

Dr. Williams has demonstrated not only that he is able to calculate aggregate class damages using a common formula; he has, in fact, calculated aggregate class damages. Williams Report ¶13 (finding that total damages incurred by Reseller Class Members equal $163.3 million, and $106.2 million, if the pass-on defense is successfully applied in the laws of each of the Indirect Purchaser States). Thus, common issues predominate with respect to class damages as well.

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**b. The Pass Through of Damages Does Not Defeat Predominance**

Neither does the plaintiffs' reliance upon "pass-through" damages undermine the predominance analysis. Even in complicated distribution chains, courts certify indirect purchaser classes and determine that damages have been passed through. *See  SRAM II*, 264 F.R.D. at 603 (certifying a class of indirect purchasers of price-fixed SRAM incorporated into a range of highly complex electronic products, including computers); *CRT I*, 2013 WL 5391159 at *7 (overcharge on CRTs passed through the end-product TVs).

**c. The Laws of the Indirect Purchaser States are Sufficiently Similar to Allow a Finding of Predominance**

The fact that Plaintiffs come from different Indirect Purchaser States does not prevent the Court from finding predominance. The Ninth Circuit stated in *Mazza v. American Honda Motor Co., Inc.* that the relevant inquiry is whether there is a "material," difference between state laws—namely whether they would produce a different outcome in the litigation. 666 F.3d 581, 590 (9th Cir. 2012).  If there is no material difference, as there is not here, then there is no bar to proceeding on behalf of Plaintiffs and Class Members from those different states. *See also In re Lidoderm Antitrust Litigation,* No. 14-md-02521-WHO, 2017 WL 679367, at *3 (N.D. Cal. Feb. 21, 2017) (certifying single class of plaintiffs with claims under the laws of 17 states.).

Other Circuits take the same approach. *In re Nexium Antitrust Litigation*, 777 F.3d 9, 14 (1st Cir. 2015) (affirming certification of a nationwide class of indirect purchasers pursuing claims "under the antitrust and consumer protection laws of 24 states and the District of Columbia"); *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 302 (3d Cir. 2011)  ("Where 'a sufficient constellation of common issues binds class members together,' differences in state law treatment of indirect purchaser claims likely fall into a handful of clearly discernible statutory schemes." (citation omitted)); *Klay v. Humana, Inc.,* 382 F.3d 1241, 1262 (11th Cir. 2004)

**B. Superiority**

Rule 23(b)(3) also requires that the class action be "superior to other available methods for

REDACTED-PUBLIC VERSION

fairly and efficiently adjudicating the controversy." In antitrust conspiracy cases, courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied where common questions predominate. *LCD I*, 267 F.R.D. at 314; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5429718, at *23 (N.D. Cal. June 20, 2013) ("*CRT III*") (quoting Wright, Miller & Kane, *Federal Practice and Procedure: Civil Procedure* § 1781, at 25455 (3d ed. 2004)), *see also Nitsch*, 315 F.R.D. at 316. Moreover, class actions are generally superior where there is no realistic alternative. *See Hanlon*, 150 F.3d at 1023 (individual claims would "not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), *cert. denied*, 543 U.S. 1051 (2005) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original). "In antitrust cases such as this, . . . damages . . . are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress." *LCDs II.*, 267 F.R.D. 583, 608, *amended in part*, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (quoting *SRAM I*, 2008 WL 4447592, at *7. Most resellers who purchased Hard Drives and computers containing Defendants' Suspension Assemblies are unlikely to bring suit on their own, therefore, there is no realistic alternative to a class action for their recovery of damages. In order to avoid duplicative discovery and costs, as well as inconsistent rulings, this case should proceed as a class action, in this forum.

## VI.  Appointment of Cuneo Gilbert & LaDuca and Larson King as Class Counsel

Plaintiffs also respectfully ask the Court to appoint Cuneo Gilbert & LaDuca, LLP and Larson• King, LLP as Class Counsel, pursuant to Fed. R. Civ. P.23(g). These firms have performed extensive work on behalf of the class, including filing briefs and pleadings, taking and defending depositions, serving and responding to written discovery and spearheading expert work. These firms will represent the Reseller Class fairly and adequately. Fed. R. Civ. P. 23(g).

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully request this Court to certify the Reseller Class and appoint Class Counsel.

REDACTED-PUBLIC VERSION

1

2          Dated:  10/11/2022

3                                              */s/ Victoria Sims*
                                              Jonathan W. Cuneo
4                                              Victoria Sims
                                              Joel Davidow
5                                              Daniel Cohen
                                              **CUNEO GILBERT & LaDUCA, LLP**
6                                              4725 Wisconsin Ave., NW, Suite 200
                                              Washington, DC 20016
7                                              Telephone: (202) 789-3960
                                              jonc@cuneolaw.com
8                                              vicky@cuneolaw.com
                                              joel@cuneolaw.com
9                                              danielc@cuneolaw.com

10

11

12                                             Shawn M. Raiter
                                              LARSON • KING, LLP
13                                             2800 Wells Fargo Place
                                              30 East Seventh Street
14                                             St. Paul, MN  55101
                                              Telephone: (651) 312-6500
15                                             sraiter@larsonking.com

16                                             *Attorneys for Plaintiffs and the Proposed Classes*

17

18

19

20

21

22

23

24

25

26

27

28

RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED-PUBLIC VERSION

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2022, I electronically filed the foregoing document entitled **RESELLER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION** with the Clerk of the Court for the United States District Court, Northern District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.


*/s/ Victoria Sims*
Victoria Sims