# EXHIBIT 51

# Public Version of Attachment to Technical Report No. 4/2018 (SEI No. 0459666)

STX0000884



TRANSPERFECT

AFFIDAVIT OF ACCURACY

I, Carrie Russ, hereby certify that the documents
"2018.04.02_CADE_POR_Nota Tecńica 4" and
"2018.04.12_CADE_POR_NotaTécnica Anexo" are, to the best of my
knowledge and belief, a true and accurate translation from Portuguese into
English (US).


Carrie Russ

Sworn to before me this
8th day of May, 2020


Signature, Notary Public

Lisa Chan
Notary Public, District of Columbia
My Commission Expires 3/14/2023

Stamp, Notary Public

Washington, DC



STX0000885



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste] 7**

Administrative Council for Economic Defense

## The attachment herein comprises an integral part of Technical Report No. 4/2018 (SEI No. 0459666)

### ADMINISTRATIVE PROCEEDINGS No. 08700.006006/2017-61 (separate to restricted access No. 08700.007735/2017-35)

**Plaintiff:**   CADE *ex officio*

**Respondents:** Hutchinson Technology Inc.; Magnecomp Precision Technology Public Co. Ltd; NHK Spring Co., Ltd.; TDK Corporation; SAE Magnetics (H.K.) Ltd.; Akihiro Honda; Akihiko Negishi; Albert Ong Kim Guan ("Albert Ong"); Arun Dhawan; Atsuo Kobayashi; Giichi Nagata; Hajime Sawabe; Hidetomo Kajii; Hironori Kajii; Hiroyuki Tamura; Hitoshi Hashimoto; Isamu Ninomiya; Keith David Johnson; Kazuhiko Otake; Kazumi Tamamura; Keiichi Suzuki; Ken Martini; Kenichiro Arimura; Kenji Sasaki; Koji Inada; Lo Kwok Fai ("Frankie Lo"); Masaru Koda; Masato Ishikawa; Richard Michael McHone; Shigeki Kimura; Shigenao Ishiguro; Skipp Harvey; Stephen Andrew Misuta ("Steve Misuta"); Takehiko Amaki; Takehiro Kamigama; Tetsuya Ueda; Thiti Makarabhiromya; Todd Drahos; Toshimi Hamada; Tsutomu Yamaguchi; Wing Sun Clarence Lo ("Clarence Lo"); Yew Ah Ming; and Yuichi Nagase.

Technical Report No. 4/2018 of the General Superintendent's Office

**PUBLIC Technical Report**

**SUMMARY:**   Administrative Proceedings Alleged perpetration of antitrust conduct on a global scale, of *suspension assemblies*[1], in effect in Brazil. **Price fixing in response to customer quotation orders; market division and sharing of commercial and competitively sensitive information, primarily in relation to (i) current, potential and proposed prices, for *suspension assemblies*, (ii) private customer bidding processes, (iii) allocation of customer volumes, (iv) manufacturing capacity of each company; and (v) user fees for each company, for the purposes of stabilizing prices and reducing competition in sales of *suspension assemblies*.** Filing of Administrative Proceedings pursuant to the terms of Articles 13, V, and 69 and subsequent, of Law No. 12.529/11 in conjunction with Article 186 and subsequent of CADE Internal Regulations (Resolution No. 20/2017).

---

[1] *Suspension assemblies* are components of hard disks ("HDD" or merely "HD"), that position a cursor on a surface of fast-spinning disk. The role of a *suspension assembly* is to: (i) Secure the read/write head, enabling it to remain slightly above the surface of the disk; (ii) Maintain a constant height, compensating for microscopic irregularities on the surface of the disk; and (iii) Make the electric interconnection from the read/write head to the electronic circuits of the unit via electric conductors.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)     SEI No. 08700.006006/2017-61 / pg. 1

STX0000886



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste] 7**

## I.     REPORT

**1.       [RESTRICTED ACCESS].**

**2.       [RESTRICTED ACCESS].**

3.       With regard to the market and products affected, the conduct investigated specifically affected the **global market of *suspension assemblies*, with effects in Brazil.**

4.       Said antitrust conduct took place at least from the year **2003** and lasted until at least 2016. **In total, 05 (five) companies and their subsidiaries demonstrated some degree of participation, in addition to dozens of individual employees or former employees of the companies.**

5.       There is compelling evidence of the perpetration of antitrust conduct consisting of (i) **Price fixing in response to customer quotation orders**; (ii) **Market division** and (iii) **Sharing of commercial and competitively sensitive information**. Sharing of commercial and competitively sensitive information included but was not limited to information on (iii.1) Current, potential and proposed prices, for *suspension assemblies*, (iii.2) Private customer bidding processes, (iii.3) Allocation of customer volumes, (iii.4) Manufacturing capacity of each company; and (iii.5) User fees for each company, for the purposes of stabilizing prices and reducing competition in sales of *suspension assemblies*.

6.       These conducts were rendered feasible by way of meetings and bilateral exchanges of emails. Customers potentially involved in this reported conduct are [ACCESS RESTRICTED]

7.       [RESTRICTED ACCESS].

8.       Legal entities and individuals taking part in the alleged antitrust conduct are specified within Section IV ("Recommendation To File Administrative Proceedings") below.

9.       Here is the report.


## II.     ANALYSIS

### II.1     General Aspects of Anti-Cartel Operations

10.       A cartel is an explicit or implicit agreement between competitors in order to primarily fix prices or production quotas, the division of customers and markets they operate within. By way of coordinated action between competitors, the purpose is to eliminate the competition and the subsequent increase in prices and reduction in well-being for consumers. Cartels seriously infringe on consumer by increasing prices and restricting

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 2

STX0000887



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-**
**Geral de Análise Antitruste] 7**

supply, making goods and services more expensive or unavailable, and compromise technological innovation. Of all antitrust conduct, the cartel is the one that cause the most serious damage to competition.

11.        Accordingly, of all antitrust conduct, the cartel is the one that cause the most serious damage to competition. According to the Organization for Economic Cooperation and Development (OECD), cartels:

> *"(...) they cause damages to consumers and business that purchase their products, by way of price increases or restricted supply. As a result, some purchasers decide not to buy the product at the price set by the cartel or to purchase it in lower quantities. Hence, purchasers pay more for that quantity they actually buy, which renders the transfer of wealth to cartel operators even without being aware of this. In addition to this, cartels generate wastage and inefficiency. They protect their members from complete exposure to market forces, reducing pressure by controlling expenditure and innovation, which results in a loss of competitiveness of a national economy[2]".*

12.        Conduct arranged between competitors may take on a range of strategies, but invariably result in the procurement of products and contracting of services subject to more unfavorable conditions or at prices higher than those that would be encountered in effectively competitive markets. Economics' literature is unanimous in pointing out that in the case of cartel crimes, the net effects on Society are always negative. It is no surprise that the majority of countries have policies in defense of free competition that treat cartels as crimes with purposes that are always unlawful, basing their decisions on the presumption of harmful effects from any proof of the existence of such agreements, which renders proof of or any measuring of the net negative effects of said conduct unnecessary[3]. Brazil is one of these countries that regards proof of existence of an agreement is sufficient in order to constitute the illegal status thereof.

13.        According to international experience, in particular that consolidated by the International Competition Network (ICN)[4], companies taking part in cartels in general make use of the following strategies:

---

[2] Free translation of "Hard Core Cartels", drawn up by the Joint Forum on Trade and Competition of the Organization for Economic Cooperation and Development (OCDE): http://webdominio1.oecd.org/comnet/ech/tradecomp.nsf, 2003, pg.2.

[3] Observe, for example, the decision by the European Antitrust Authority - in a case that convicted a cartel that operated in bidding processes to supply piping for residential heating systems - in which proof of the existence of an agreement between competitors, as well as trading practices arranged between them, served as the grounds for determining the existence of the cartel (*Case No. IV/35.691/E-4: - Pre-Insulated Pipe Cartel*).

[4] International Competition Network. **Defining Hard Core Cartel Conduct. Effective Institutions. Effective Penalties.** 2005. Available at http://www.internationalcompetitionnetwork.org/uploads/library/doc346.pdf. Verbatim/free translation: "Conduct falling within the four categories can take many forms. Price fixing is any agreement among competitors to raise, fix, or otherwise maintain the price for a product or service. Price fixing can include agreements to establish a minimum price, to eliminate discounts, or to adopt a standard formula for calculating prices, etc. Output restrictions can involve agreements on production volumes, sales volumes, or percentages of market growth. Market allocation or division schemes are agreements in which competitors divide markets among themselves – competing firms allocate specific customers or types of customers, products or territories. In a bid-rigging conspiracy, competitors may agree to rotate winning bids, may divide bids, or one bidder may agree to submit an artificially high or "comp" or "cover" bid in return for a subcontract or payoff. In other words, competitors agree to restrict or eliminate competition for some piece of defined business, whether it is a sale, a contract, or a project".

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)      SEI No. 08700.006006/2017-61 / pg. 3

STX0000888



*Price Fixing.* A price-fixing agreement is an agreement between competitors to increase, set or otherwise maintain the price for a given product or service. Said conduct may include agreements to set up a minimum price, eliminate discounts or adopt a standard formula for calculating prices, etc.

*Restriction of supply.* A supply restriction agreement may involve agreements on production volumes, sales volumes or percentages for market expansion.

*Division of markets.* Market allocation or market division schemes are agreements in which competitors divide up the market between themselves - allocating specific customers or types of costumers, products or territories.

*Cartels in bidding processes.* In these cases, competitors may agree to submit an artificially high or courtesy bid or cover bid in return for a subcontract or payment. In other words, competitors agree to restrict or eliminate competition in a given commercial variable, be this sales, a contract or project.

14.     In turn, the strategies employed by members of a cartel, in particular within the scope of private or public-sector contracts, as a rule involve mitigation of competition and the private and artificial allocation of contracts between companies which, in fact should compete with one another. Concomitant use of strategies in common enables such agents to determine the precise profile of a market, by way of the allocation of contract and customer portfolios, geographical areas, turnover and other criteria, and for the distribution of additional profit resulting from the reduced competitive pressure rendered possible via the collusive agreement.

15.     Within this context, most countries that have antitrust policies regard cartels as that most damaging to competition. Along the same lines, Brazil regards the practice of cartels as a serious offense, subject to severe repression. Pursuant to the terms of the Antitrust Law (Law 12.529/11), companies participating in a cartels[5] are subject to the administrative fines levied by the Court of the Administrative Council for Economic Defense (CADE) which may range between 0.1 and 20% of the turnover value within the branch of activity in which the violation occurred, in addition to other penalties, such as the publication of a decision in a leading newspaper, a ban on contracting with official financial institutions and participating in public-

---

[5] Law No. 12.529/11:

Art. 36. Acts manifested in any manner that have as their purpose or may produce the following effects albeit not achieved, constitute violations of the economic order, regardless of any negligence:

I - Limiting, forging or otherwise infringing on free competition or free initiative;

II - Dominating a relevant market of goods or services;

III - Arbitrarily increasing profits; and

IV - Exercising a dominant position in an abusive manner.

(...)

§ 3 - The following conducts, in addition to others, characterize a violation of the economic order, to the extent that they constitute the circumstances set forth by the header of the Article herein and sections hereof:

I - Agreeing, combining, manipulating or adjusting the following in any way whatsoever with a competitor:

a) Prices of goods or services supplied individually;

b) Manufacture or marketing of a restricted or limited quantity of goods or provision of a restricted or limited number, volume or frequency of services;

c)     Division of parts of segments of a current or potential market of goods or services subject among others to the distribution of customers, suppliers, regions or periods;

d)     Prices, terms, advantages or abstention during public-sector bidding processes;

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)     SEI No. 08700.006006/2017-61 / pg. 4

STX0000889



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste]** 7

Administrative Council for Economic Defense

sector bidding processes, the demergering of assets, and etc. Individuals involved in said conduct are also subject to CADE fines, that may range from BRL 50,000.00 (fifty thousand Brazilian reals) to BRL 2,000,000,000.00 (two billion Brazilian reals), in in the event of administrators directly or indirectly responsible for the violation committed, the applicable fine is 1 to 20% of that levied on the company.[6]

---

[6] Law No. 12.529/11:

Art. 37. Any violation of the economic order subjects those responsible to the following penalties:

I    - In the case of a company, a fine of 0.1% (one tenth of a percent) to 20% (twenty percent) of the value of the gross turnover of the company, group or conglomerate obtained during the last fiscal year prior to filing of the administrative proceedings, within the branch of business activity in which the violation occurred, which should never be lower than the advantage obtained, whenever it is possible to estimate this;

II   - In the case of other individuals or public or private-sector registered entities, as well as any associations of entities or entities incorporated de facto or by law, albeit temporarily, with or without legal status, that do not exercise business activities, not possible to make use of the criterion of gross turnover value, the fine is between BRL 50,000.00 (fifty thousand Brazilian reals) and BRL 2,000,000,000.00 (two billion Brazilian reals);

III  - In the event of administrators, directly or indirectly responsible for the violation committed, whenever their responsibility or willful intent is proven, fine of 1% (one percent) to 20% (twenty percent) of that levied on the company, in the case set forth by Section I of the header of this Article, or legal entities or entities, in the cases set forth by Section II of the header of the Article herein.

§1 - In the event of re-incidence, any fines imposed are levied in double.

§2 - When calculating the value of the fine that Section I of the header of this Article refers to, CADE may take into account total turnover of the company or group of companies, whenever the value of the turnover from the branch of business activity in which the violation occurred, defined by CADE, is not available, or whenever this is submitted in an incomplete manner and/or not demonstrated in an unequivocal or reputable manner.

Art. 38. Without infringing on the penalties imposed by Art. 37 of this Law, whenever the severity of the facts or interest of the general public requires accordingly, the following penalties may be imposed separately or accumulatively:

I    - Publication, in a half page and at the expense of the party in violation, in a newspaper indicated by said decision, of a summary of the conviction sentence, for 02 (two) subsequent days of 01 (one) to 03 (three) consecutive weeks;

II   - Ban on contracting with official financial institutions and taking part in bidding processes for the purposes of acquisitions, sales, conducting of works and services, concession of public services within state, municipal or federal and Federal District public-sector administration, as well as entities of indirect administration, for a term of not less than 05 (five) years;

III - Registration of the violator in the National Consumer Protection Register [Cadastro Nacional de Defesa do Consumidor]; IV - Recommendation to the relevant public-sector entities in order for:

a)   A compulsory license be granted for the right to the intellectual property of ownership of the perpetrator, whenever the violation relates to use of said right;

b)   The perpetrator not be granted any installment payment plan of federal taxes owed by them or that any tax incentives or public subsidies be canceled, wholly or in part;

V    - Demerger of the company, transfer of shareholder control, sale of assets or partial cessation of activity;

VI  - Ban on exercising commerce in their own name or as the representative of a legal entity, for a term of up to 05 (five) years; and

VII - Any other act or measure necessary in order to eliminate said harmful effects to the economic order.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 5

STX0000890



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste] 7**

16.　　　In addition to being administratively repressed by CADE, in Brazil, cartels are also the target of prosecution within the criminal sphere, hence demonstrating the severity of the violation. The crime of cartel, investigated in court based on the investigations of police authorities and the Public Prosecution Service [Ministério Público], subjects individuals involved in said conduct to terms of imprisonment of two to five years and a fine[7]. According to the Law of Crimes against the Economic Order (Law No. 8.137/90), this sanction may be increased by one third to one half if the crime causes serious damage to the collective, is committed by a public-sector employee or relates to goods or services essential to life or health[8].

17.　　　It is worth noting that the members of a cartel are also subject within the civil sphere to private lawsuits for reparations for damages that may be filed by any injured party[9], and also to public civil lawsuits[10] brought by the Prosecution Service and other legitimate parties[11].

---

[7] Law No. 8.137/90:

Art. 4 - The following constitute a crime against the economic order:

I　　- Abuse of economic power, dominating the market or eliminating competition, wholly or in part, via any means of accord or agreement by companies;

II　　- Enter into agreements, covenants, agreements or alliances between suppliers, envisaging:

a)　　Artificial fixing of prices or quantities sold or produced;

b)　　Regionalized control of market by company or group of companies;

c)　　Control over a chain of distribution or suppliers, in detriment of competition. Penalty - Imprisonment, of 02 (two) to 05 (five) years and a fine.

[8] Law No. 8.137/90:

Art. 12. The following are circumstances that may aggravate by 1/3 (one third) to one half, the penalties specified by Arts. 1, 2 and 4 to 7.

I　　- Causing serious damages to the collective;

II　　- If the crime is committed by a public-sector employee while exercising their office;

III　　- Crime is committed in relation to the provision of services or trade in goods essential to life or health.

[9] Law No. 12.529/11:

Art. 47. Those infringed, by themselves or via those legitimated referred to by Art. 82 of Law No. 8.078, of September 11, 1990, may file in court in order to defend their individual interests or homogeneous interests, obtaining the cessation of practices that constitute a violation of the economic order, as well as receipt of indemnity for any losses and damages endured, regardless of any inquiry or administrative proceedings, which are not suspended as a result of filing of said lawsuit.

[10] Law No. 7.347/85:

Art. 1 - Lawsuits for liability due to moral and asset damages are governed by the provisions of the law herein, without infringing on any citizen lawsuit when caused:

(...)

V - By violations of the economic order;

[11] Law No. 7.347/85:

Art. 5 - The following have the legitimacy to file principal lawsuits and injunctions:

I - The Prosecution Service;

II　　- The Public Defender's Office [Defensoria Pública];

III　　- The Federal Union, States, Federal District and Municipalities;

IV　　- Autarky, public-sector company, foundation or joint-stock corporation;

V - Association that, concomitantly:

a)　　Has been incorporated for at least 01 (one) year pursuant to the terms of civil law;

b)　　Including, among its institutional purposes, protection for the environment, consumers, the economic order, free competition or artistic, esthetic, historic, tourist and scenic assets.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)　　　SEI No 08700.006006/2017-61 / pg. 6

STX0000891



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-**
**Geral de Análise Antitruste] 7**

18.        Aware of the illegal nature of the conduct that they are committing and the administrative, criminal and civil repercussions they are subject to, the members of a cartel tend to conceal evidence of their acts, which makes gathering evidence and clues as to said conduct a herculean task. Meetings, contacts, exchanges of information on prices and customers, and others, are generally conducted with extreme discretion and secrecy, very often with the use of codes and acronyms, in order to prevent any illegal action from becoming apparent. Cartels are, without doubt, one of the most difficult conducts to be investigated. For this reason, more sophisticated techniques of detection and investigation have increasingly become fundamental tools for a successful cartel investigation.

19.        This is the case of so-called "Leniency Agreements". This instrument, used by antitrust authorities in a number of countries, enables Public-Sector Administration to identify conduct that, otherwise would remain concealed, at the same time as ensuring the investigation is conducted as efficiently and effectively as possible[12]. In Brazil, the Leniency Program is provided for under Articles 86 and 87 of the Antitrust Act [Lei de Defesa da Concorrência] (Law No. 12.529/11)[13]. The basic premise thereof is that the beneficiaries of

---

[12] Benefits from adopting a leniency program are studied and celebrated by a number of authorities around the world. This instrument is indicated as an important tool in obtaining an effective anti-cartel plan, to the extent that: i) It discourages participation by companies in cartels; ii) It stimulates waiving of participation in preexisting cartels; iii) It increases the probability of detecting a cartel and iv) It increases the possibility of sanctions from Public-Sector Administration.  In this respect, observe:  International Competition Network. *Anti-cartel enforcement manual.* 2009. Available at: http://www.internationalcompetitionnetwork.org/uploads/library/doc341.pdf. As duly emphasized by the OECD in its report in order to combat Hard-Core Cartels (2002, pg. 7), the key challenge for an anti-cartel policy is precisely its detection and it is precisely this point that is reflects the importance of the leniency program. In reality, a duly structured leniency program and used by an antitrust authority naturally generates an instability by itself only in cartels under enforcement, as well as reducing the advantage of enrolling in or incorporating a new coordinated antitrust conduct, as it weakens the relation of trust between the participants and encourages notification of Public-Sector Authorities regarding the existence of antitrust conduct.

[13] Law No. 12.529/11:

Art. 86. By intermediary of the Superintendent General's Office, CADE can enter into leniency agreements, waiving any punitive lawsuit of public-sector administration or reducing from 01 (one) to 2/3 (two-thirds) the applicable penalty, pursuant to the terms of this article, with individuals and legal entities that are the perpetrators of the violation of the economic order, providing they collaborate effectively with investigations and administrative proceedings and that said collaboration results in:

I   - Identification of all others involved in the violation; and

II  - Obtaining of information and documents that attest to the violation reported or under investigation.

§1 - The agreement that the header of this Article refers to may only be signed if the following requirements are accumulatively met:

I   - The company being the first to qualify itself with regard to the violation reported or under investigation;

II  - The company ceases its involvement in the violation reported or under investigation, fully, from the date the agreement is filed;

III - The Superintendent General's Office does not have sufficient evidence in order to secure the conviction of the company or individual at the time the agreement is filed; and

I   - Company confesses to its participation in the illegal act and fully and permanently cooperates with investigations and administrative proceedings, appearing at all procedural acts whenever requested to do so, at its own expense, until termination thereof.

§2 - With regard to individuals, they may enter into leniency agreements providing the requirements of II, III and IV of §1 of this Article are complied with.

§3 - Leniency agreements signed with CADE by intermediary of the Superintendent General's Office, stipulate the terms necessary in order to ensure the effectiveness of said collaboration and the useful result of said proceedings.

§4 - On verification of compliance with the agreement during sentencing of administrative proceedings, Courts are responsible for:

I   - Declaring punitive action of public-sector administration as dismissed in favor of the perpetrator, in circumstances in which the purpose of the agreement has been submitted to the Superintendent General's Office without the latter being aware in advance of the violation reported; or

II  - In all other circumstances, reducing from 01 (one) to 2/3 (two-thirds) any applicable penalties, compliant with that set forth by Art. 45 of this Law, also required to take into account when setting the penalty, the effectiveness of the

---

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)      SEI No. 08700.006006/2017-61 / pg. 7

STX0000892



the agreement, in exchange for total or partial immunity in relation to applicable administrative and criminal penalties, confess to and collaborate with the investigations, yielding information and documents that enable the authorities to identify all other co-perpetrators and prove the violation reported or under investigation. In order to guarantee immunity to one of the participants of a cartel, Administration not only generates a factor of destabilization in existing cartels, but also detects conducts and punishes violators that it would otherwise not have the conditions to do.

20.           Used in conjunction with other measures at the disposal of the antitrust authority - such as search and seizure operations, inspections, the signing of cessation terms of commitment, requisitioning of information, and others - the Leniency Program is potentialized as one of the most effective instruments for detecting, investigating and coercing antitrust conduct with a potentially damaging effect on competition and social well-being[14]. This herein constitutes an important pillar of the anti-cartel policy.

---

collaboration provided and good faith of the perpetrator during compliance with the leniency agreement.

§5 - In the case of Section II of §4 of this Article, the penalty on which the reducing factor is incurred is no higher than the lower of the penalties levied on the other co-perpetrators of the violation, relating to the percentages stipulated for levying the fines as set forth by Section I of Art. 37 of this Law.

§6 - The effects of the leniency agreement are to be extended to companies of the same group, of fact or by law, and to the respective directors, administrators and employees involved in the violation, providing they jointly sign, subject to the conditions imposed.

§7 - The company or individual that does not qualify in order to enter into the agreement this Article refers to, during the course of the inquiry or administrative proceedings, may enter into a leniency agreement that CADE has no prior knowledge of whatsoever, with the Superintendent General relating to another violation, until proceedings are referred for judgment.

§8 - In the event of §7 of this Article, perpetrators may benefit from a reduction of 1/3 (one third) of the penalty that is applicable to them in those proceedings, without infringing on obtaining the benefits that Section I of §4 of this Article in relation to the new violation reported.

§9 - Proposal of the agreement that this Article refers to is regarded as confidential, except in the interests of the respective investigations and administrative proceedings.

§10. Rejected proposals for leniency agreements are not valid as confessions with regard to the matter of fact, nor acknowledgment of the unlawful nature of the conduct analyzed.

§11. Application of that set forth by the Article herein is subject to the rules to be edited by the Court.

§12. In the event of breach of a leniency agreement, the beneficiary is banned from entering into a new leniency agreement for a term of 03 (three) years, subsequent to the date of their judgment.

Art. 87. In crimes against the economic order typified by Law No. 8.137, of December 27, 1990, and in other crimes directly relating to the cartel practices, such as those typified by Law No. 8.666, of June 21, 1993, and those typified by Art. 288 of Decree-Law No. 2.848, of December 7, 1940 - Criminal Code [Código Penal], signing of a leniency agreement pursuant to the terms of this law, results in a suspension of the course of the statute of limitations and prevents any offering up of a complaint in relation to the agent and beneficiary of the leniency.

Sole paragraph. Once the leniency agreement is complied with by the agent, punishment of the crimes that the header of this Article refers to is automatically waived.

[14] In this respect, observe: "The Leniency Program is not an means to an end, but an important mechanism for dissuading uniform conduct that is damaging to competition, this is the purpose of an antitrust policy. The same is applicable to the elimination of 'obstacles to the administrative and criminal persecution of cartels', search and seizure warrants, statistical methods for detecting cartels and the TCC itself, which as observed, comprises part of the anti-cartel program" (Vote of the Rapporteur, Application No 08700.004992/2007-43, Rapporteur Counselor Paulo Furquim de Azevedo, judged on 12/17/2008)

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)          SEI No 08700.006006/2017-61 / pg. 8

STX0000893



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste]** 7

21.        Based on that set forth above, we now move onto analysis of the robust evidence investigated in the case in point, against the Respondents and justification for filing of the Administrative Proceedings and substantiated by Art. 69 of Law No. 12.529/2011.

## II.2.        General Aspects of Exchanging Commercially Sensitive Information between competitors

22.        Exchanging of information between competitors typically involves the sharing of specific information that relates directly to the performance of the activity-purposes of economic agents[15]. It is not necessarily the exchanging of commercially sensitive information that results in negative effects on the market, given that this type of interaction between competitors may generate both positive and negative effects: on the one hand, an increase in transparency within the market may result in gains in efficiency, but at the same time, may result in risks to competition.

23.        So much so that according to the Organization for Economic Cooperation Development (OECD), the exchanging of information between competitors may occur within three main contexts: (i) As part of a cartel, in which the exchanging of information is one of the facilitators of a collusive agreement; (ii) As part of a wider cooperation agreement, such as, for example, a joint venture; or (iii) when the exchanging of information is an independent and autonomous practice, that is, it is not conducted in one of the previous contexts[16].

24.        In relation to the **possible pro-competitive effects** of exchanges of information between bidders, debate centers around gains provided by the reduction of informational asymmetries, since the benefits generated during the gain in efficiency of companies may be passed onto consumers. In theory, with the increase in transparency on the market, competitors acquire more market know-how and in some sectors may facilitate the entry of new competitors who may assess the costs of entry and risks to be faced with greater precision. In addition to this, said increase in transparency might also facilitate improvements in performance of companies that, by way of access to market information, may adopt more efficient strategies[17].

---

[15] The CADE *Gun Jumping* guide signals that one may take as the hypotheses of information exchange between competitors as: a) Costs of the companies involved; b) Level of capacity and expansion plans; c) Marketing strategies; d) Pricing of products (prices and discounts); e) Key customers and discounts guaranteed; f) Employee Wages; g) Key suppliers and terms of contracts signed with these; h) Non-public information on trademarks and patent and Research and Development; i) (R&D); j) Future acquisition plans; k) Competitive strategies, etc.

[16] Organization for Economic Cooperation and Development (OCDE), *Information Exchanges Between Competitor Under Competition Law*, 2010, p. 9. Available at http://www.oecd.org/competition/cartelsandanti-competitiveagreements/48379006.pdf, accessed on June 24, 2016.

[17] AKERLOF, George A. Market for "lemons": quality, uncertainty and the market mechanism. The Quarterly [sic] Journal of Economics. 1970. Vol. 84. No. 3 pp. 488 – 500.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 9

STX0000894



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste] 7**

25.        In relation to the **possible antitrust effects**, the suggestion is that the exchanging of information may facilitate collusion between competitors in order to enable them to coordinate themselves, monitoring adherence to the collusive conduct and punishing those who do not act pursuant to the terms of the agreement. In order to verify the possibility of the production of negative effects, the following aspects must be taken into account, pursuant to the terms of the OECD[18] and the Federal Economic Competition Commission (COFECE)[19]:

(i) **Nature of the information:** the nature of the exchange may, in itself, reveal the collusive purpose when the conditions are present for interfering with an exchange for no other purpose than that of coordinating activities in detriment of competition. The sharing of strategic information between competitors may originate or facilitate collusive conduct by (i) facilitating a common understanding of the terms of said coordination; (ii) helping coordinated agents to monitor whether the terms of the agreement are being complied with; and (iii) facilitating and reducing the costs of punishing deviations. In addition to this, it is necessary to observe not just the information content but also how recent the information is, the level of detail, the frequency with which this message is share and whether the information shared is public or accessible to other agents.

(ii) **Structure of the market affected:** it would be easier to conduct and sustain a coordinated conduct when this occurs within a concentrated market. Hence, the exchanging of information in markets in which few players operate, must be analyzed with greater caution. In addition to this, in order to verify the illegal nature of exchanges, it is important to take into account, for example, the transparency of the market, the symmetry between competitors, the characteristics of the product (collusion is facilitated when products are homogeneous), the dynamics of the market (markets that frequently change tend to generate greater uncertainty and create a series of incentives for a number of agents, hindering collusive agreements) and innovation (the lessor, the easier coordination is between competitors).

(iii) **Manner in which information exchange occurs:** Companies can typically exchange information in a direct way or by way of third parties, and also in a formal or informal manner. Despite direct and private exchanges being regarded as the most suspect, there is also a major risk of collusion within the scope of exchanges that are made by way of third parties (such as unions). Accordingly, albeit information exchanges are formal [sic] and by way of third parties, analysis must be conducted in full.

---

[18] OECD, Policy roundtables – Information Exchanges Between Competitors Under Competitions Law
[19] Federal Economic Competition Commission, *Guidelines on Information Exchange Between Competitors* [sic], 2015, p. 3. Available at https://awards.concurrences.com/IMG/pdf/guidelines_on_information_exchange_cofece.pdf, accessed on June 24, 2016.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 10

STX0000895



26.         Having observed the considerations set out above, we now pass onto analysis of the competitive effects in the actual case in point that justify filing of Administrative Proceedings.

27.         In the case investigated herein, there were various exchanges of sensitive information between the competitors of the global market of *suspension assemblies*, with effects in Brazil. Sharing of commercial and competitively sensitive information included but was not limited to information on (iii.1) **Current, potential and proposed prices, for** *suspension assemblies,* (iii.2) **Private customer bidding processes**, (iii.3) **Allocation of customer volumes**, (iii.4) **Manufacturing capacity of each company**; and (iii.5) **User fees for each company, for the purposes of stabilizing prices and reducing competition in sales of** *suspension assemblies.*

28.         There is strong evidence that this exchange of commercially sensitive information rendered the establishment of strategic long-term relations feasible between the competitors, based on the elimination or softening of the price ware or price competition, which meant avoiding aggressive price competition in private bidding processes and quotations, and in the division of the world market of *suspension assemblies*.

29.         As MOTTA states, the announcement of current and future prices, or production strategics, may favor collusion to the extent that companies better coordinate a balance between prices and the production conditions enacted by them[20]. In the case herein, one notes that these adverts were not public, but occurred directly between the competitors of the market, and exercised a direct influence on the strategies adopted by the companies participating in the Cartel.

30.         The exchanges included **recent, current and future data, not shared within other circles, with a view to permitting the companies to align their operations within the market based on the commercially sensitive information shared**. As a result thereof, there was the need for this information to be provided with a **high level of detail and separately**.

**II.3.        Conduct investigated.**

31.         [RESTRICTED ACCESS].

---

[20] MOTTA, Massimo. *Competition policy: theory and practice.* Cambridge: University Press, 2004, p. 153.

Case Records No. 08700.006006/2017-61

Technical Report in Attachment (0464976)       SEI No. 08700.006006/2017-61 / pg. 11

STX0000896



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [Coordenação-Geral de Análise Antitruste]** 7

32. [RESTRICTED ACCESS].

33. [RESTRICTED ACCESS].



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept. [X]**

## III.        RELEVANT MARKET

[RESTRICTED ACCESS].

34.        It is known that in the cases of cartels, conduct is illegal due to the respective goal thereof, rendering examination of the respective effects unnecessary, since the damages to the economic order are clear, presuming the potential to produce effects prejudicial to free competition. Within this context, analysis of relevant market only works as a mechanism for verifying whether it is appropriate, practical and reasonable to isolate or fragment the area of economic activity over which the law is incurred[21], when the very definition of the market waived as a result of the clearly antitrust nature of the conduct, is the unlawful act by nature, and not the effects thereof[22].

35.        In this respect, pursuant to case law established by CADE, in the case of cartels, the actual actions of the Respondents contributed towards delimiting the sector of the economy affected by said conduct. In other words, the behavior of those under investigation - by coordinating their actions by way of a durable and institutionalized organization, fixing prices, dividing up the market and determining in advance the winners in public or private sector procurement proceedings (bidding process cartels), dividing up markets and customers and setting and standardizing prices and business conditions between them - clearly indicates to the antitrust authority what a relevant market it is, with an even higher degree of certainty than that made possible via the exclusive analysis of economic evidence. Accordingly, the task of identifying the scope of the agreement - in terms of it geographical scope and of the product23[23] - is combined with that of determining the relevant market affected by said conduct.

---

[21] Administrative Proceedings No. 08012.007602/2003-11 (Plaintiff: Sintáxi - Taxi Union of Porto Alegre [Sintáxi-Sindicato dos Taxistas de Porto Alegre]; Respondents: Táxi Sul- Accessories for Taxis Ltd. [Táxi Sul-Acessórios para Táxis Ltda.] and others) and 08012.008024/1998-49. (Plaintiff: SDE ex-officio; Respondent: TBA Informática Ltda, Microsoft Informática Ltda.). As stated in the vote of the rapporteur counselor in this latter case: "There are cases in which the very definition of the market is waived in the light of business conduct or behavior that is clearly detrimental to free competition and free initiative. Analysis of the relevant market therefore, only works as a mechanism for checking whether it is appropriate to separate out an area of economic activity which is to be subject to application of antitrust laws."

[22] Case law of the illustrious CADE is already established in this respect, as may be ascertained from a reading of sections of recent judgments: "In summary, pursuant to Law No. 8.884/94 and CADE precedents, in cases in which there are the actions of a classic cartel, only proof of the existence of said conduct in order to configure a violation is required, with the potential for harmful effects on competition to be produced duly presumed." (Administrative Proceedings No. 08012.004702/2004-77, Rapporteur Counselor Carlos Emmanuel Joppert Ragazzo, sentence 05.09.2012) and "(...) in proceedings in which it is proven that the competitors worked in organized collusion for the sole purpose of raising prices in detriment of consumers, there is no need to analyze elements such as the relevant market affected, the market share retained by the agents under investigation and the existence or not of entry barriers, since the damaging potential of said conduct on the competitive order - which constitutes a central criterion under Brazilian law in order to configure a violation of the economic order - results directly from material evidence of organized price collusion." (Administrative Proceedings No. 08012.004472/2000-12. Rapporteur Counselor Ana Frazão, sentence 03.06.2013.)

[23] The scale of the product refers to the characteristics of the product or service marketed, in particular the factors that determine this, from the view of the consumer, the degree of substitution in place between the different services and products. In turn, when delimiting under the geographical aspect, the relevant market is the geographical space or area in which the practice under analysis produces (or may produce) effects.

---

Case Records No. 08700.006006/2017-61

STX0000898



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

36.     It is worth mentioning that information collected by CADE until this time and referring to key aspects of the market under investigation are to be considered within this Technical Report. This is a preliminary indication of the market affected by the antitrust conduct, carried out in a non-exhaustive or restrictive manner, since it is when the investigation gets underway that the scale of the actions of the companies may be ascertained and the scope of the market potentially affected indicated.

## IV.   RECOMMENDATION FOR FILING OF ADMINISTRATIVE PROCEEDINGS

37.     In the light of all the foregoing, it is understood that the existence of robust evidence of violations of the economic order perpetrated by the Respondents has been shown, giving rise to the filing of Administrative Proceedings pursuant to the terms of Arts. 13, V, and 69 and subsequent of Law No. 12.529/11 in conjunction with Art. 186 and subsequent of CADE Internal Regulations.

38.     Below is a list of the entities, individuals and companies against whom the recommendation is made to file Administrative Proceedings.

*Legal Entities participating in conduct of*

*Hutchinson Technology Inc. ("HTI")*

39.   [RESTRICTED ACCESS]

40.   [RESTRICTED ACCESS]

41.   [RESTRICTED ACCESS]

| COMPANY | Corporate Tax Registration (CNPJ) No. | ADDRESS (HEADQUARTERS, OFFICE, PLANTS) | WEBSITE/ TEL. | LEGAL REPRESENTATIVES | ADDRESS FOR NOTIFICATION |
|---------|---------------------------------------|----------------------------------------|---------------|-----------------------|--------------------------|
|         |                                       |                                        |               |                       |                          |

---

Case Records No. 08700.006006/2017-61                              Page 14 of 29

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 14

STX0000899



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| | | | | | |
|---|---|---|---|---|---|
| Hutchinson Technology Inc. ("HTI") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Magnecomp Precision Technology, PLC ("MPT")*

42.    [RESTRICTED ACCESS]

43.    [RESTRICTED ACCESS]

44.    [RESTRICTED ACCESS]

| COMPANY | Corporate Tax Registration (CNPJ) No. | ADDRESS (HEADQUARTERS, OFFICE, PLANTS) | WEBSITE/ TEL. | LEGAL REPRESENTATIVES | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Magnecomp Precision Technology Public Co. Ltd. ("MPT") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*NHK Spring Co., Ltd. ("NHK")*

45.    [RESTRICTED ACCESS]

| COMPANY | Corporate Tax Registration (CNPJ) No. | ADDRESS (HEADQUARTERS, OFFICE, PLANTS) | WEBSITE/ TEL. | LEGAL REPRESENTATIVES | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| NHK Spring Co., Ltd. | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*SAE Magnetics (H.K.) Ltd. ("SAE")*

46.    [RESTRICTED ACCESS]

47.    [RESTRICTED ACCESS]

48.    [RESTRICTED ACCESS]

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 15

STX0000900



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste]** 7

| COMPANY | Corporate Tax Registration (CNPJ) No. | ADDRESS (HEADQUARTERS, OFFICE, PLANTS) | WEBSITE/ TEL. | LEGAL REPRESENTATIVES | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| SAE Magnetics (H.K.) Ltd. ("SAE") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*TDK Corporation ("TDK")*

49. [RESTRICTED ACCESS]

50. [RESTRICTED ACCESS]

51. [RESTRICTED ACCESS]

| COMPANY | Corporate Tax Registration (CNPJ) No. | ADDRESS (HEADQUARTERS, OFFICE, PLANTS) | WEBSITE/ TEL. | LEGAL REPRESENTATIVES | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| TDK Corporation | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Individuals participating in conduct of Akihiro Honda*

52. [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / Taxpayer Reg. (CPF) No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Akihiro Honda | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 16

STX0000901



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

---

*Akihiko Negishi*

53.     [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Akihiko Negishi | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Albert Ong Kim Guan ("Albert Ong")*

54.     [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Albert Ong Kim Guan ("Albert Ong") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Arun Dhawan*

55.     [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Arun Dhawan | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Atsuo Kobayashi*

56.     [RESTRICTED ACCESS]

---

Case Records No. 08700.006006/2017-61                              Page **17** of **29**

STX0000902



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Atsuo Kobayashi | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Giichi Nagata*

57.    [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Giichi Nagata | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Hajime Sawabe*

58.    [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Hajime Sawabe | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Hidetomo Nishi*

59.    [RESTRICTED ACCESS]

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 18

STX0000903



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Hidetomo Nishi | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Hironori Kajii*

60.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Hironori Kajii | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Hiroyuki Tamura*

61.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Hiroyuki Tamura | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Hitoshi Hashimoto*

62.   [RESTRICTED ACCESS]

---

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 19

STX0000904



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Hitoshi Hashimoto | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Isamu Ninomiya*

63.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Isamu Ninomiya | RESTRICTED ACCESS | RESTRICTED ACCESS | RESTRICTED ACCESS | RESTRICTED ACCESS | RESTRICTED ACCESS |

*Keith David Johnson*

64.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Keith David Johnson | RESTRICTED ACCESS | RESTRICTED ACCESS | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Kazuhiko Otake*

65.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Kazuhiko Otake | [RESTRICTED] | [RESTRICTED] | [RESTRICTED] | [RESTRICTED] | [RESTRICTED] |

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 20

STX0000905



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| | ACCESS] | ACCESS] | ACCESS] | ACCESS] | ACCESS] |
|---|---|---|---|---|---|
| | | | | | |

*Kazumi Tamamura*

66.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Kazumi Tamamura | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

*Keiichi Suzuki*

67.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Keiichi Suzuki | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

*Ken Martini*

68.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Ken Martini | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 21

STX0000906



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
[Coordenação-Geral de Análise Antitruste] 7

---

*Kenichiro Arimura*

69.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Kenichiro Arimura | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Kenji Sasaki*

70.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Kenji Sasaki | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Koji Inada*

71.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Koji Inada | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Lo Kwok Fai ("Frankie Lo")*

72.   [RESTRICTED ACCESS]

---

Case Records No. 08700.006006/2017-61                                   Page **22** of **29**

STX0000907



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Lo Kwok Fai ("Frankie Lo") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Masaru Koda*

73.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Masaru Koda | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Masato Ishikawa*

74.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Masato Ishikawa | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Richard Michael McHone ("Richard McHone")*

75.   [RESTRICTED ACCESS]

---

Case Records No. 08700.006006/2017-61                                      Page **23** of **29**

STX0000908



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Richard Michael McHone ("Richard McHone") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Shigeki Kimura*

76.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Shigeki Kimura | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Shigenao Ishiguro*

77.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Shigenao Ishiguro | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Skipp Harvey*

78.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Skipp Harvey | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 24

STX0000909



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

*Stephen Andrew Misuta ("Steve Misuta")*

79.    [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Stephen Andrew Misuta ("Steve Misuta") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Takehiko Amaki*

80.    [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Takehiko Amaki | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Takehiro Kamigama*

81.    [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK; HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Takehiro Kamigama | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 25

STX0000910



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

*Tetsuya Ueda*

82.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Tetsuya Ueda | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

*Thiti Makarabhiromya ("Thiti Makarabhirom")*

83.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Thiti Makarabhiromya ("Thiti Makarabhirom") | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

*Todd Drahos*

84.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Todd Drahos | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS | [RESTRICTED ACCESS |

*Toshimi Hamada*

85.   [RESTRICTED ACCESS]

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 26

STX0000911



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Toshimi Hamada | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Tsutomu Yamaguchi*

86.     [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Tsutomu Yamaguchi | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Yew Ah Ming*

87.     [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Yew Ah Ming | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Wing Sun Clarence Lo ("Clarence Lo")*

88.     [RESTRICTED ACCESS]

---

Case Records No. 08700.006006/2017-61                                              Page 27 of 29

Technical Report in Attachment (0464976)          SEI No. 08700.006006/2017-61 / pg. 27

STX0000912



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Wing Sun Clarence Lo ("Clarence Lo") | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

*Yuichi Nagase*

89.   [RESTRICTED ACCESS]

| NAME | POSITIONS HELD (PER PERIOD) AT COMPANY | LEGAL ENTITY (INCL. PLACE OF WORK: HEADQUARTERS, OFFICE, PLANTS) | PASSPORT No. / CPF No. | EMAIL / ADDRESS | ADDRESS FOR NOTIFICATION |
|---|---|---|---|---|---|
| Yuichi Nagase | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] | [RESTRICTED ACCESS] |

## V.      CONCLUSION

90.      In the light of the foregoing and subject to the existence of robust evidence of a violation of the economic order, filing of Administrative Proceedings is hereby suggested, pursuant to the terms of Arts. 13, V, and 69 and subsequent of Law No. 12.529/11 in conjunction with Art. 186 and subsequent of CADE Internal Regulations, to be brought against the Respondents: Hutchinson Technology Inc.; Magnecomp Precision Technology Public Co. Ltd; NHK Spring Co., Ltd. TDK Corporation; SAE Magnetics (H.K.) Ltd.; Akihiro Honda; Akihiko Negishi; Albert Ong Kim Guan ("Albert Ong"); Arun Dhawan; Atsuo Kobayashi; Giichi Nagata; Hajime Sawabe; Hidetomo Nishi; Hironori Kajii; Hiroyuki Tamura; Hitoshi Hashimoto; Isamu Ninomiya; Keith David Johnson; Kazuhiko Otake; Kazumi Tamamura; Keiichi Suzuki; Ken Martini; Kenichiro Arimura; Kenji Sasaki; Koji Inada; Lo Kwok Fai ("Frankie Lo"); Masaru Koda; Masato Ishikawa; Richard Michael McHone; Shigeki Kimura; Shigenao Ishiguro; Skipp Harvey; Stephen Andrew Misuta; Takehiko Amaki; Takehiro Kamigama; Tetsuya Ueda; Thiti Makarabhiromya; Todd Drahos; Toshimi Hamada; Tsutomu Yamaguchi; Wing Sun Clarence Lo ("Clarence Lo"); Yew Ah Ming; and Yuichi Nagase, in order to investigate conduct subject to classification under Articles 20, I to IV, and 21, I, III, VIII and X, of Law No. 8.884/94, as well as Art. 36, Sections I to IV in conjunction with §3, Section I, paragraphs "a", "b", "c" and "d" and Section VIII of Law No. 12.529/2011, pursuant to that set forth by Article 69 and subsequent of Law No. 12.529/2011.

Technical Report in Attachment (0464976)          SEI Nº 08700.006006/2017-61 / pg. 28

STX0000913



**SUPERINTENDENT-GENERAL'S OFFICE**
**Antitrust Analysis General Coordination Dept.**
**[Coordenação-Geral de Análise Antitruste] 7**

91.      Notification of the Respondents is also suggested, pursuant to the terms of Art. 70 of the referred legal statute, in order for a defense to be submitted within a period of 30 (thirty) days. During this same period, the Respondents should specify and justify the evidence they intend to submit that is to be analyzed by the authority pursuant to the terms of Art. 195 of CADE Internal Regulations. If the Respondent has an interest in submitting witness evidence it should indicate the details in full of up to 03 (three) witnesses in the defense statement, to provide testimony at CADE headquarters, pursuant to that set forth by Art. 70 of Law No. 12.529/2011 in conjunction with Art. 195, §2 of CADE Internal Regulations.

This concludes the conclusions.


**LUCAS FREIRE SILVA**
Coordinator-General
Antitrust Analysis General Coordination Dept. 7



In agreement. Refer to the Hon. Superintendent General.


**DIOGO THOMSON DE ANDRADE**
Assistant Superintendent General

Technical Report in Attachment (0464976)        SEI No. 08700.006006/2017-61 / pg. 29

STX0000914



**SUPERINTENDÊNCIA-GERAL**
Coordenação-Geral de Análise Antitruste **7**

---

**O presente anexo integra a Nota Técnica 4/2018 (nº SEI 0459666)**

---

**PROCESSO ADMINISTRATIVO nº 08700.006006/2017-61 (apartado de acesso restrito nº 08700.007735/2017-35)**

**Representante:**  Cade *ex officio*

**Representados:** Hutchinson Technology Inc.; Magnecomp Precision Technology Public Co. Ltd; NHK Spring Co., Ltd.; TDK Corporation; SAE Magnetics (H.K.) Ltd.; Akihiro Honda; Akihiko Negishi; Albert Ong Kim Guan ("Albert Ong"); Arun Dhawan; Atsuo Kobayashi; Giichi Nagata; Hajime Sawabe; Hidetomo Nishi; Hironori Kajii; Hiroyuki Tamura; Hitoshi Hashimoto; Isamu Ninomiya; Keith David Johnson; Kazuhiko Otake; Kazumi Tamamura; Keiichi Suzuki; Ken Martini; Kenichiro Arimura; Kenji Sasaki; Koji Inada; Lo Kwok Fai ("Frankie Lo"); Masaru Koda; Masato Ishikawa; Richard Michael McHone; Shigeki Kimura; Shigenao Ishiguro; Skipp Harvey; Stephen Andrew Misuta ("Steve Misuta"); Takehiko Amaki; Takehiro Kamigama; Tetsuya Ueda; Thiti Makarabhiromya; Todd Drahos; Toshimi Hamada; Tsutomu Yamaguchi; Wing Sun Clarence Lo ("Clarence Lo"); Yew Ah Ming; e Yuichi Nagase.

---

Nota Técnica n.º 4/2018 da Superintendência-Geral

Nota Técnica PÚBLICA

**EMENTA:**  Processo Administrativo. Suposta prática de condutas anticompetitivas no mercado global de *suspension assemblies*[1], com efeitos no Brasil. **Combinação de preços em resposta a pedidos de cotação de clientes; divisão de mercado e compartilhamento de informações comercial e concorrencialmente sensíveis, principalmente com relação a (i) preços atuais, potenciais e propostos, para *suspension assemblies,* (ii) licitações privadas de clientes, (iii) alocação de volumes de clientes, (iv) capacidade produtiva de cada empresa; e (v) taxas de utilização de cada empresa, com o objetivo de estabilizar preços e reduzir a concorrência nas vendas de *suspension assemblies.* Instauração de Processo Administrativo, nos termos dos artigos 13, V, e 69 e seguintes, da Lei nº 12.529/11 c/c artigo 186 e seguintes do Regimento Interno do Cade (Resolução n.20/2017).

---

[1] *Suspension assemblies* são componentes de discos rígidos ("HDD" ou, simplesmente, "HD") que posicionam o cursor sobre a superfície de um disco girando rapidamente. A função do *suspension assembly* é: (i) segurar a cabeça de leitura / gravação, permitindo ficar um pouco acima da superfície do disco; (ii) manter constante a altura, compensando as irregularidades microscópicas na superfície do disco; e (iii) para fazer a interconexão elétrica a partir da cabeça de leitura / gravação para circuitos eletrônicos da unidade através de condutores elétricos.
Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 1

STX0000915



**SUPERINTENDÊNCIA-GERAL**
Coordenação-Geral de Análise Antitruste 7

## I.   RELATÓRIO

1.          [ACESSO RESTRITO].

2.          [ACESSO RESTRITO].

3.          Quanto ao mercado e aos produtos afetados, a conduta investigada afetou especificamente o **mercado global de *suspension assemblies*, com efeitos no Brasil.**

4.          Tal conduta anticompetitiva teria ocorrido, pelo menos, a partir de **2003**, e teria durado até, pelo menos, 2016. **No total, 5 (cinco) empresas e suas subsidiárias apresentam algum grau de participação, além de dezenas de pessoas físicas funcionárias ou ex-funcionárias das empresas.**

5.          Existem fortes indícios da prática de conduta anticompetitiva consistentes em (i) **combinação de preços em resposta a pedidos de cotação de clientes**; (ii) **divisão de mercado** e (iii) **compartilhamento de informações comercial e concorrencialmente sensíveis**. O compartilhamento de informações comercial e concorrencialmente sensíveis incluiu, mas não se limitou a, informações sobre (iii.1) preços atuais, potenciais e propostos, para *suspension assemblies,* (iii.2) licitações privadas de clientes, (iii.3) alocação de volumes de clientes, (iii.4) capacidade produtiva de cada empresa; e (iii.5) taxas de utilização de cada empresa, com o objetivo de estabilizar preços e reduzir a concorrência nas vendas de *suspension assemblies.*

6.          Essas condutas foram viabilizadas por meio de reuniões e troca de e-mails, bilaterais. Os clientes potencialmente envolvidos na conduta relatada são [ACESSO RESTRITO]

7.          [ACESSO RESTRITO].

8.          As pessoas jurídicas e físicas participantes da suposta conduta anticompetitiva são descritas na Seção IV ("Da Recomendação De Abertura De Processo Administrativo") abaixo.

9.          É o relatório.

## II.   ANÁLISE

### II.1   Aspectos Gerais do Combate a Cartéis

10.         Cartel é um acordo explícito ou implícito entre concorrentes para, principalmente, fixação de preços ou quotas de produção, divisão de clientes e de mercados de atuação. O objetivo é, por meio da ação coordenada entre concorrentes, eliminar a concorrência, com o consequente aumento de preços e redução de bem-estar para o consumidor. Cartéis prejudicam seriamente os consumidores ao aumentar preços

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)          SEI 08700.006006/2017-61 / pg. 2

STX0000916



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

e restringir a oferta, tornando os bens e serviços mais caros ou indisponíveis, e comprometendo a inovação tecnológica. Dentre as condutas anticompetitivas, o cartel é a mais grave lesão à concorrência.

11.     Com efeito, dentre as condutas anticompetitivas, o cartel é a mais grave lesão à concorrência. Segundo a Organização para a Cooperação e Desenvolvimento Econômico (OCDE), os cartéis:

> *"(...) causam danos a consumidores e negócios que adquirem seus produtos, por meio do aumento de preço ou da restrição da oferta. Como resultado, alguns adquirentes decidem não comprar o produto ao preço determinado pelo cartel ou compram-no em menor quantidade. Assim, os adquirentes pagam mais por aquela quantidade que realmente compram, o que possibilita, mesmo sem que saibam, a transferência de riquezas aos operadores do cartel. Além disso, os cartéis geram desperdício e ineficiência. Eles protegem seus membros da completa exposição às forças de mercado, reduzindo a pressão pelo controle de gastos e para inovação, o que acarreta a perda de competitividade de uma economia nacional[2]".*

12.     As condutas concertadas entre concorrentes podem assumir estratégias múltiplas, mas resultam, invariavelmente, na aquisição de produtos e contratação de serviços em condições mais desvantajosas ou por valores acima daqueles que seriam encontrados em mercados efetivamente competitivos. A literatura econômica é unânime em apontar que, no caso de infrações de cartel, os efeitos líquidos à sociedade são sempre negativos. Não por outra razão é que grande parte dos países que possui políticas de defesa da concorrência trata os cartéis como delitos cujo objeto sempre será ilícito, calcando suas decisões na presunção dos efeitos nocivos a partir da prova da existência do acordo, o que torna desnecessária a comprovação e mensuração dos efeitos líquidos negativos da conduta[3]. O Brasil é um desses países que considera suficiente a prova da existência do acordo para configurar sua ilicitude.

13.     Conforme a experiência internacional, especialmente consolidada pela International Competition Network (ICN)[4], as empresas participantes de cartéis em geral utilizam-se das seguintes estratégias:

---

[2] Tradução livre de "Hard Core Cartels", preparado pelo Fórum Conjunto de Comércio e Concorrência da Organização para a Cooperação e Desenvolvimento Econômico (OCDE): http://webdominio1.oecd.org/commet/ech/tradecomp.nsf, 2003, p.2.
[3] Vide, por exemplo, a decisão da autoridade europeia de defesa da concorrência – em caso que condenou cartel que atuou em licitações para fornecimento de tubulação para sistemas de calefação residencial – na qual a comprovação da existência de acordo entre os concorrentes, bem como de práticas comerciais concertadas entre eles, serviu como fundamento para se determinar a existência do cartel (*Case Nº IV/35.691/E-4: — Pre-Insulated Pipe Cartel*).
[4] International Competition Network. **Defining Hard Core Cartel Conduct. Effective Institutions. Effective Penalties.** 2005. Disponível em http://www.internationalcompetitionnetwork.org/uploads/library/doc346.pdf. Tradução livre de: "Conduct falling within the four categories can take many forms. Price fixing is any agreement among competitors to raise, fix, or otherwise maintain the price for a product or service. Price fixing can include

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 3

STX0000917



*Fixação de Preços.* Um acordo de fixação de preços é um acordo entre concorrentes para aumentar, fixar ou de qualquer forma manter o preço para um produto ou serviço. Tal conduta pode incluir acordos para estabelecer um preço mínimo, para eliminar descontos ou adotar uma fórmula padrão para calcular preços etc.

*Restrição de oferta.* Um acordo de restrição de oferta pode envolver acordos sobre volumes de produção, volume de vendas, ou percentuais de crescimento de mercado.

*Divisão de mercados.* Esquemas de alocação de mercado ou divisão de mercado são acordos nos quais os competidores dividem o mercado entre si – alocam clientes específicos ou tipos de consumidores, produtos ou territórios.

*Cartéis em licitações.* Nesses casos, os competidores podem acordar em submeter uma proposta artificialmente alta ou de cortesia ou de cobertura como retorno a uma subcontratação ou pagamento. Ou seja, os concorrentes acordam em restringir ou eliminar a concorrência em alguma variável comercial, seja ela vendas, um contrato ou um projeto.

14. Por sua vez, as estratégias utilizadas pelos integrantes do cartel, especialmente no âmbito de contratações privadas ou públicas, envolvem, regra geral, a mitigação da competição e a alocação privada e artificial de contratos entre empresas que, na verdade, deveriam competir entre si. O uso concomitante de estratégias comuns permite que tais agentes definam os contornos precisos do mercado, por intermédio da alocação de carteiras de contratos e clientes, áreas geográficas, faturamento, dentre outros critérios, e para a distribuição dos lucros adicionais advindos da redução da pressão competitiva possibilitada pelo acordo colusivo.

15. Nesse contexto, grande parte dos países que possui políticas de defesa da concorrência considera o cartel a mais grave lesão à concorrência. Na mesma linha, o Brasil considera a prática de cartel um ilícito grave, passível de severas repressões. Nos termos da Lei de Defesa da Concorrência (Lei 12.529/11), empresas participantes de um cartel[5] estão sujeitas a multas administrativas aplicadas pelo Tribunal do Conselho

---

agreements to establish a minimum price, to eliminate discounts, or to adopt a standard formula for calculating prices, etc. Output restrictions can involve agreements on production volumes, sales volumes, or percentages of market growth. Market allocation or division schemes are agreements in which competitors divide markets among themselves – competing firms allocate specific customers or types of customers, products or territories. In a bid-rigging conspiracy, competitors may agree to rotate winning bids, may divide bids, or one bidder may agree to submit an artificially high or "comp" or "cover" bid in return for a subcontract or payoff. In other words, competitors agree to restrict or eliminate competition for some piece of defined business, whether it is a sale, a contract, or a project".

[5] Lei nº 12.529/11:

Art. 36. Constituem infração da ordem econômica, independentemente de culpa, os atos sob qualquer forma manifestados, que tenham por objeto ou possam produzir os seguintes efeitos, ainda que não sejam alcançados:

I - limitar, falsear ou de qualquer forma prejudicar a livre concorrência ou a livre iniciativa;

II - dominar mercado relevante de bens ou serviços;

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 4

STX0000918



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

Administrativo de Defesa Econômica (Cade) que podem variar entre 0,1 a 20% do valor do faturamento no ramo de atividade em que ocorreu a infração, além de outras penas, como a publicação da decisão em jornal de grande circulação, a proibição de contratar com instituições financeiras oficiais e de participar de licitações públicas, a cisão de ativos, entre outras. Indivíduos envolvidos na conduta também estão sujeitos a multas do Cade, que podem variar entre R$ 50.000,00 e R$ 2.000.000.000,00, sendo que, no caso de administradores direta ou indiretamente responsáveis pela infração cometida, a multa cabível é de 1 a 20% daquela aplicada à empresa.[6]

---

III - aumentar arbitrariamente os lucros; e
IV - exercer de forma abusiva posição dominante.
(...)
§ 3º As seguintes condutas, além de outras, na medida em que configurem hipótese prevista no caput deste artigo e seus incisos, caracterizam infração da ordem econômica:
I - acordar, combinar, manipular ou ajustar com concorrente, sob qualquer forma:
a) os preços de bens ou serviços ofertados individualmente;
b) a produção ou a comercialização de uma quantidade restrita ou limitada de bens ou a prestação de um número, volume ou frequência restrita ou limitada de serviços;
c) a divisão de partes ou segmentos de um mercado atual ou potencial de bens ou serviços, mediante, dentre outros, a distribuição de clientes, fornecedores, regiões ou períodos;
d) preços, condições, vantagens ou abstenção em licitação pública;
[6] Lei nº 12.529/11:
Art. 37. A prática de infração da ordem econômica sujeita os responsáveis às seguintes penas:
I - no caso de empresa, multa de 0,1% (um décimo por cento) a 20% (vinte por cento) do valor do faturamento bruto da empresa, grupo ou conglomerado obtido, no último exercício anterior à instauração do processo administrativo, no ramo de atividade empresarial em que ocorreu a infração, a qual nunca será inferior à vantagem auferida, quando for possível sua estimação;
II - no caso das demais pessoas físicas ou jurídicas de direito público ou privado, bem como quaisquer associações de entidades ou pessoas constituídas de fato ou de direito, ainda que temporariamente, com ou sem personalidade jurídica, que não exerçam atividade empresarial, não sendo possível utilizar-se o critério do valor do faturamento bruto, a multa será entre R$ 50.000,00 (cinquenta mil reais) e R$ 2.000.000.000,00 (dois bilhões de reais);
III - no caso de administrador, direta ou indiretamente responsável pela infração cometida, quando comprovada a sua culpa ou dolo, multa de 1% (um por cento) a 20% (vinte por cento) daquela aplicada à empresa, no caso previsto no inciso I do caput deste artigo, ou às pessoas jurídicas ou entidades, nos casos previstos no inciso II do caput deste artigo.
§ 1º Em caso de reincidência, as multas cominadas serão aplicadas em dobro.
§ 2º No cálculo do valor da multa de que trata o inciso I do caput deste artigo, o Cade poderá considerar o faturamento total da empresa ou grupo de empresas, quando não dispuser do valor do faturamento no ramo de atividade empresarial em que ocorreu a infração, definido pelo Cade, ou quando este for apresentado de forma incompleta e/ou não demonstrado de forma inequívoca e idônea.
Art. 38. Sem prejuízo das penas cominadas no art. 37 desta Lei, quando assim exigir a gravidade dos fatos ou o interesse público geral, poderão ser impostas as seguintes penas, isolada ou cumulativamente:
I - a publicação, em meia página e a expensas do infrator, em jornal indicado na decisão, de extrato da decisão condenatória, por 2 (dois) dias seguidos, de 1 (uma) a 3 (três) semanas consecutivas;
II - a proibição de contratar com instituições financeiras oficiais e participar de licitação tendo por objeto aquisições, alienações, realização de obras e serviços, concessão de serviços públicos, na administração pública federal, estadual, municipal e do Distrito Federal, bem como em entidades da administração indireta, por prazo não inferior a 5 (cinco) anos;
III - a inscrição do infrator no Cadastro Nacional de Defesa do Consumidor;
IV - a recomendação aos órgãos públicos competentes para que:
a) seja concedida licença compulsória de direito de propriedade intelectual de titularidade do infrator, quando a infração estiver relacionada ao uso desse direito;
Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 5

STX0000919



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

16.        Além de reprimidos administrativamente pelo Cade, no Brasil cartéis também são alvo de persecuções no âmbito penal, o que demonstra a gravidade da infração. O crime de cartel, apurado judicialmente a partir de investigações das autoridades policiais e do Ministério Público, sujeita os indivíduos envolvidos na conduta a penas de reclusão de dois a cinco anos e multa[7]. De acordo com a Lei de Crimes contra a Ordem Econômica (Lei nº 8.137/90), essa sanção pode ser aumentada de um terço até metade se o crime causar grave dano à coletividade, for cometido por um servidor público ou se relacionar a bens ou serviços essenciais para a vida ou para a saúde[8].

17.        Cabe notar que os membros de um cartel estão sujeitos ainda, no âmbito civil, a ações privadas de reparação de danos que podem ser ajuizadas por qualquer prejudicado[9], e também a ações civis públicas[10] de autoria do Ministério Público e outros legitimados[11].

---

b) não seja concedido ao infrator parcelamento de tributos federais por ele devidos ou para que sejam cancelados, no todo ou em parte, incentivos fiscais ou subsídios públicos;
V - a cisão de sociedade, transferência de controle societário, venda de ativos ou cessação parcial de atividade;
VI - a proibição de exercer o comércio em nome próprio ou como representante de pessoa jurídica, pelo prazo de até 5 (cinco) anos; e
VII - qualquer outro ato ou providência necessários para a eliminação dos efeitos nocivos à ordem econômica.
[7] Lei nº 8.137/90:
Art. 4º Constitui crime contra a ordem econômica:
I - abusar do poder econômico, dominando o mercado ou eliminando, total ou parcialmente, a concorrência mediante qualquer forma de ajuste ou acordo de empresas;
II - formar acordo, convênio, ajuste ou aliança entre ofertantes, visando:
a) à fixação artificial de preços ou quantidades vendidas ou produzidas;
b) ao controle regionalizado do mercado por empresa ou grupo de empresas;
c) ao controle, em detrimento da concorrência, de rede de distribuição ou de fornecedores.
Pena - reclusão, de 2 (dois) a 5 (cinco) anos e multa.
[8] Lei nº 8.137/90:
Art. 12. São circunstâncias que podem agravar de 1/3 (um terço) até a metade as penas previstas nos arts. 1º, 2º e 4º a 7º:
I - ocasionar grave dano à coletividade;
II - ser o crime cometido por servidor público no exercício de suas funções;
III - ser o crime praticado em relação à prestação de serviços ou ao comércio de bens essenciais à vida ou à saúde.
[9] Lei nº 12.529/11:
Art. 47. Os prejudicados, por si ou pelos legitimados referidos no art. 82 da Lei nº 8.078, de 11 de setembro de 1990, poderão ingressar em juízo para, em defesa de seus interesses individuais ou individuais homogêneos, obter a cessação de práticas que constituam infração da ordem econômica, bem como o recebimento de indenização por perdas e danos sofridos, independentemente do inquérito ou processo administrativo, que não será suspenso em virtude do ajuizamento de ação.
[10] Lei nº 7.347/85:
Art. 1º Regem-se pelas disposições desta Lei, sem prejuízo da ação popular, as ações de responsabilidade por danos morais e patrimoniais causados:
(...)
V - por infração da ordem econômica;
[11] Lei nº 7.347/85:
Art. 5º Têm legitimidade para propor a ação principal e a ação cautelar:
I - o Ministério Público;
Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 6

STX0000920



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

18.        Cientes da ilicitude da conduta que estão cometendo e das repercussões administrativas, criminais e civis a que estão sujeitos, os membros de um cartel costumam ocultar as evidências de seus atos, o que torna a reunião de provas e indícios da conduta tarefa hercúlea. Reuniões, contatos, trocas de informações sobre preços e clientes, entre outros, são geralmente realizados com extrema discrição e sigilo, muitas vezes com a utilização de códigos e siglas, de forma a não deixar transparecer qualquer ilicitude. Cartéis são, sem dúvida, umas das condutas mais difíceis de ser investigada. Por essa razão, técnicas de detecção e apuração mais sofisticadas têm cada vez mais se tornado ferramentas fundamentais para uma investigação de cartel bem-sucedida.

19.        É o caso do chamado "Acordo de Leniência". Esse instrumento, utilizado por autoridades de defesa da concorrência em diversos países, permite à Administração Pública identificar condutas que, de outra maneira, continuariam às escuras, ao mesmo tempo em que garante a realização de uma investigação mais eficiente e efetiva[12]. No Brasil, o Programa de Leniência encontra previsão nos artigos 86 e 87 da Lei de Defesa da Concorrência (Lei nº 12.529/11)[13]. Sua premissa básica é a de que os beneficiários

---

II - a Defensoria Pública;

III - a União, os Estados, o Distrito Federal e os Municípios;

IV - a autarquia, empresa pública, fundação ou sociedade de economia mista;

V - a associação que, concomitantemente:

a) esteja constituída há pelo menos 1 (um) ano nos termos da lei civil;

b) inclua, entre suas finalidades institucionais, a proteção ao meio ambiente, ao consumidor, à ordem econômica, à livre concorrência ou ao patrimônio artístico, estético, histórico, turístico e paisagístico.

[12] Os benefícios da adoção de um programa de leniência são estudados e celebrados por diversas autoridades ao redor do mundo. O instrumento é indicado como uma ferramenta importante para se obter um plano de combate a cartéis efetivo, na medida em que: i) desencoraja a participação de empresas em cartel; ii) estimula a desistência de participação em cartéis pré-estabelecidos; iii) aumenta a probabilidade de detecção de um cartel e iv) aumenta a possibilidade de sanção pela Administração Pública. Nesse sentido, ver: International Competition Network. *Anti-cartel enforcement manual*. 2009. Disponível em: http://www.internationalcompetitionnetwork.org/uploads/library/doc341.pdf. Conforme devidamente ressaltado pela OCDE em seu relatório para combate de cartéis Hard-Core (2002, p. 7), o principal desafio para uma política de combate a cartéis é justamente a sua detecção e é justamente este ponto que traduz a importância do programa de leniência. De fato, um programa de leniência devidamente estruturado e utilizado por uma autoridade de defesa da concorrência produz naturalmente uma instabilidade por si só nos cartéis em execução, bem como diminui a vantagem de adesão ou constituição de uma nova conduta coordenada anticoncorrencial, pois fragiliza a relação de confiança entre os partícipes e incentiva a comunicação à Autoridade Pública da existência da conduta anticompetitiva.

[13] Lei nº 12.529/11:

Art. 86. O Cade, por intermédio da Superintendência-Geral, poderá celebrar acordo de leniência, com a extinção da ação punitiva da administração pública ou a redução de 1 (um) a 2/3 (dois terços) da penalidade aplicável, nos termos deste artigo, com pessoas físicas e jurídicas que forem autoras de infração à ordem econômica, desde que colaborem efetivamente com as investigações e o processo administrativo e que dessa colaboração resulte:

I - a identificação dos demais envolvidos na infração; e

II - a obtenção de informações e documentos que comprovem a infração noticiada ou sob investigação.

§ 1º O acordo de que trata o caput deste artigo somente poderá ser celebrado se preenchidos, cumulativamente, os seguintes requisitos:

I - a empresa seja a primeira a se qualificar com respeito à infração noticiada ou sob investigação;

II - a empresa cesse completamente seu envolvimento na infração noticiada ou sob investigação a partir da data de propositura do acordo;

III - a Superintendência-Geral não disponha de provas suficientes para assegurar a condenação da empresa ou pessoa física por ocasião da propositura do acordo; e

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 7

STX0000921



**SUPERINTENDÊNCIA-GERAL**
Coordenação-Geral de Análise Antitruste 7

do acordo, em troca de imunidade total ou parcial em relação às penas administrativas e criminais aplicáveis, confessem e colaborem com as investigações, trazendo informações e documentos que permitam à autoridade identificar os demais co-autores e comprovar a infração noticiada ou sob investigação. Ao garantir a imunidade a um dos participantes de um cartel, a Administração não apenas gera um fator de desestabilização nos cartéis existentes, como detecta condutas e pune infratores que de outra forma não teria condições de fazer.

20.         Utilizado em conjunto com outras medidas à disposição da autoridade de defesa da concorrência – tais como operações de busca e apreensão, inspeções,

<hr/>

IV - a empresa confesse sua participação no ilícito e coopere plena e permanentemente com as investigações e o processo administrativo, comparecendo, sob suas expensas, sempre que solicitada, a todos os atos processuais, até seu encerramento.

§ 2º Com relação às pessoas físicas, elas poderão celebrar acordos de leniência desde que cumpridos os requisitos II, III e IV do § 1º deste artigo.

§ 3º O acordo de leniência firmado com o Cade, por intermédio da Superintendência-Geral, estipulará as condições necessárias para assegurar a efetividade da colaboração e o resultado útil do processo.

§ 4º Compete ao Tribunal, por ocasião do julgamento do processo administrativo, verificado o cumprimento do acordo:

I - decretar a extinção da ação punitiva da administração pública em favor do infrator, nas hipóteses em que a proposta de acordo tiver sido apresentada à Superintendência-Geral sem que essa tivesse conhecimento prévio da infração noticiada; ou

II - nas demais hipóteses, reduzir de 1 (um) a 2/3 (dois terços) as penas aplicáveis, observado o disposto no art. 45 desta Lei, devendo ainda considerar na gradação da pena a efetividade da colaboração prestada e a boa-fé do infrator no cumprimento do acordo de leniência.

§ 5º Na hipótese do inciso II do § 4º deste artigo, a pena sobre a qual incidirá o fator redutor não será superior à menor das penas aplicadas aos demais coautores da infração, relativamente aos percentuais fixados para a aplicação das multas de que trata o inciso I do art. 37 desta Lei.

§ 6º Serão estendidos às empresas do mesmo grupo, de fato ou de direito, e aos seus dirigentes, administradores e empregados envolvidos na infração os efeitos do acordo de leniência, desde que o firmem em conjunto, respeitadas as condições impostas.

§ 7º A empresa ou pessoa física que não obtiver, no curso de inquérito ou processo administrativo, habilitação para a celebração do acordo de que trata este artigo, poderá celebrar com a Superintendência-Geral, até a remessa do processo para julgamento, acordo de leniência relacionado a uma outra infração, da qual o Cade não tenha qualquer conhecimento prévio.

§ 8º Na hipótese do § 7º deste artigo, o infrator se beneficiará da redução de 1/3 (um terço) da pena que lhe for aplicável naquele processo, sem prejuízo da obtenção dos benefícios de que trata o inciso I do § 4º deste artigo em relação à nova infração denunciada.

§ 9º Considera-se sigilosa a proposta de acordo de que trata este artigo, salvo no interesse das investigações e do processo administrativo.

§ 10. Não importará em confissão quanto à matéria de fato, nem reconhecimento de ilicitude da conduta analisada, a proposta de acordo de leniência rejeitada, da qual não se fará qualquer divulgação.

§ 11. A aplicação do disposto neste artigo observará as normas a serem editadas pelo Tribunal.

§ 12. Em caso de descumprimento do acordo de leniência, o beneficiário ficará impedido de celebrar novo acordo de leniência pelo prazo de 3 (três) anos, contado da data de seu julgamento.

Art. 87. Nos crimes contra a ordem econômica, tipificados na Lei nº 8.137, de 27 de dezembro de 1990, e nos demais crimes diretamente relacionados à prática de cartel, tais como os tipificados na Lei nº 8.666, de 21 de junho de 1993, e os tipificados no art. 288 do Decreto-Lei nº 2.848, de 7 de dezembro de 1940 - Código Penal, a celebração de acordo de leniência, nos termos desta Lei, determina a suspensão do curso do prazo prescricional e impede o oferecimento da denúncia com relação ao agente beneficiário da leniência.

Parágrafo único. Cumprido o acordo de leniência pelo agente, extingue-se automaticamente a punibilidade dos crimes a que se refere o caput deste artigo.

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 8

STX0000922



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

celebração de termo de compromisso de cessação, requisição de informações, dentre outros –, o Programa de Leniência potencializa-se como um dos instrumentos mais eficazes para detectar, investigar e coibir condutas anticompetitivas com potencial lesivo à concorrência e ao bem-estar social[14]. Constitui, assim, um importante pilar da política de combate a cartéis.

21. A partir do acima exposto, passa-se à análise dos robustos indícios apurados no presente caso, contra os Representados, que justificam a instauração de Processo Administrativo, com fundamento no art. 69 da Lei nº 12.529/2011.

**II.2.** **Aspectos Gerais da Troca de informações Comercialmente Sensíveis entre concorrentes**

22. A troca de informações entre concorrentes tipicamente envolve o compartilhamento de informações específicas que versam diretamente sobre o desempenho das atividades-fim dos agentes econômicos[15]. Não necessariamente a troca de informações concorrencialmente sensíveis acarreta em efeitos negativos no mercado, dado que esse tipo de interação entre concorrentes pode produzir tanto efeitos positivos quanto negativos: de um lado, o aumento de transparência no mercado pode resultar em ganhos de eficiência, mas, ao mesmo tempo, pode trazer riscos concorrenciais.

23. Tanto é assim que, segundo a Organização para Cooperação e Desenvolvimento Econômico (OCDE), a troca de informações entre concorrentes pode ocorrer em três principais contextos: (i) como parte de um cartel, em que a troca de informação é um dos facilitadores do acordo colusivo; (ii) como parte de um acordo de cooperação mais amplo, como, por exemplo, uma joint venture; ou (iii) quando a troca de informações é uma prática independente e autônoma, ou seja, não se dá em um dos contextos anteriores[16].

24. Em relação aos **possíveis efeitos pró competitivos** da troca de informações entre concorrentes, se discute sobre os ganhos proporcionados pela redução das assimetrias informacionais, uma vez que os benefícios gerados no ganho de eficiência das empresas podem ser repassados para os consumidores. Em tese, com o aumento da

---

[14] Neste sentido, ver: "O Programa de Leniência não é um fim em si mesmo, mas um importante mecanismo para dissuadir condutas uniformes lesivas à concorrência, este sim um fim da política de defesa da concorrência. O mesmo se aplica à eliminação de 'obstáculos à persecução administrativa e criminal de cartéis', mandados de busca e apreensão, métodos estatísticos para detecção de cartéis e o próprio TCC que, como visto, é parte do programa de combate a cartéis" (Voto do relator, Req. nº 08700.004992/2007-43, Relator Conselheiro Paulo Furquim de Azevedo, julgado em 17/12/2008)

[15] O Guia de *Gun Jumping* do CADE sinaliza o que se pode entender como hipóteses de troca de informações entre concorrentes: a) Custos das empresas envolvidas; b) Nível de capacidade e planos de expansão; c) Estratégias de marketing; d) Precificação de produtos (preços e descontos); e) Principais clientes e descontos assegurados; f) Salários de funcionários; g) Principais fornecedores e termos de contratos com eles celebrados; h) Informações não públicas sobre marcas e patentes e Pesquisa e Desenvolvimento; i) (P&D); j) Planos de aquisições futuras; k) Estratégias comerciais, etc.

[16]Organisation for Economic Co-operation and Development (OCDE), *Information Exchanges Between Competitor Under Competitive Law*, 2010, p. 9. Disponível em http://www.oecd.org/competition/cartelsandanti-competitiveagreements/48379006.pdf, acesso em 24 de junho de 2016.

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)   SEI 08700.006006/2017-61 / pg. 9

STX0000923



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

transparência no mercado, os concorrentes adquirem maior conhecimento de mercado e, em alguns setores, pode facilitar a entrada de novos competidores que podem avaliar com mais precisão os custos de entrada e os riscos a serem enfrentados. Além disso, tal aumento de transparência também poderia facilitar a melhoria da performance das empresas que, por meio do acesso a informações do mercado, podem adotar estratégias mais eficientes[17].

25.      Em relação aos **possíveis efeitos anticompetitivos**, sugere-se que a troca de informações pode facilitar a colusão entre concorrentes ao permitir que eles se coordenem, monitorem a adesão ao comportamento colusivo e punam aqueles que não atuam nos termos do acordo. Para que se verifique a possibilidade de produção de efeitos negativos, os seguintes aspectos devem ser considerados, nos termos da OCDE[18] e da COFECE[19]:

(i)      **a natureza da informação:** a natureza da troca pode, por si mesma, revelar o objetivo colusivo quando estão presentes condições de inferir que a troca não tem outro propósito se não o de coordenar atividades em detrimento da concorrência. O compartilhamento de informações estratégicas entre concorrentes pode originar ou facilitar comportamentos colusivos ao (i) facilitar um entendimento comum sobre os termos da coordenação; (ii) auxiliar os agentes coordenados a monitorar se os termos do acordo estão sendo cumpridos; e (iii) facilitar e reduzir os custos de punição de desvios. Além disso, é necessário observar não apenas o conteúdo informação, mas também, o quão recente é a informação, o nível de detalhamento, a frequência com que essa mensagem é compartilhada e se a informação compartilhada é pública ou acessível a outros agentes.

(ii)      **a estrutura do mercado afetado:** seria mais fácil realizar e sustentar uma conduta coordenada quando ela ocorre em um mercado concentrado. Assim, troca de informações em mercados em que atuam poucos players, devem ser analisados com maior cautela. Além disso, a fim de verificar a ilicitude das trocas, é importante levar em consideração, por exemplo, a transparência do mercado, a simetria entre os concorrentes, as características do produto (a colusão é facilitada quando os produtos são homogêneos), a dinâmica do mercado (mercados que mudam com frequência tendem a gerar maior incerteza e criar uma série de incentivos a diversos agentes, dificultando acordos colusivos) e inovação (quanto menor, mais fácil a coordenação entre concorrentes).

(iii)      **a forma como ocorre a troca de informações:** as empresas tipicamente podem trocar informações de forma direta ou através de terceiros, e

---

[17] AKERLOF, George A. Market for "lemons": quality, uncertainty and the market mechanism. The Quaterly Journal of Economics. 1970. Vol. 84. No. 3 pp. 488 – 500.
[18] OECD. Policy roundtables – Information Exchanges Between Competitors Under Competitions Law
[19] Comisión Federal de Competencia Económica, *Guidelines on Information Exchange Between Competitiors*, 2015, p. 3. Disponível em https://awards.concurrences.com/IMG/pdf/guidelines_on_information_exchange_cofece.pdf, acesso em 24 de junho de 2016.
Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 10

STX0000924



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

> também de modo formal ou informal. Apesar das trocas diretas e privadas serem consideradas as mais suspeitas, também existe grande risco de colusão no âmbito das trocas que são realizadas por meio de terceiros (como sindicatos). Dessa forma, ainda que a troca de informações seja forma e através de terceiros, a análise deve ser feita de modo completo.

26.     Observadas as considerações acima traçadas, passamos para a análise dos efeitos concorrenciais no caso concreto que justificam a instauração do Processo Administrativo.

27.     No caso ora investigado, houve diversas trocas de informações sensíveis entre concorrentes do mercado global de *suspension assemblies*, com efeitos no Brasil. O compartilhamento de informações comercial e concorrencialmente sensíveis incluiu, mas não se limitou a, informações sobre (iii.1) **preços atuais, potenciais e propostos, para *suspension assemblies*, (iii.2) licitações privadas de clientes, (iii.3) alocação de volumes de clientes, (iii.4) capacidade produtiva de cada empresa; e (iii.5) taxas de utilização de cada empresa, com o objetivo de estabilizar preços e reduzir a concorrência nas vendas de *suspension assemblies*.**

28.     Há fortes indícios de que essa troca de informações comercialmente sensíveis viabilizou o estabelecimento de um relacionamento estratégico de longo prazo entre os concorrentes, baseado na eliminação ou suavização da guerra de preços ou da competição de preços, o que significava evitar uma competição agressiva de preços em licitações privadas e cotações, e na divisão do mercado mundial de *suspension assemblies*.

29.     Como assevera MOTTA, o anúncio de preços atuais e futuros, ou de estratégias de produção, pode favorecer a colusão na medida em que permite que as empresas coordenem melhor um equilíbrio entre os preços e as condições de produção por elas praticados[20]. No presente caso, verifica-se que esses anúncios não eram públicos, mas ocorriam diretamente entre os competidores do mercado, e exerceram influência direta nas estratégias adotadas pelas empresas participantes do cartel.

30.     As trocas abarcavam **dados recentes, atuais ou futuros, não compartilhados em outros foros, com vistas a permitir que as empresas alinhassem sua atuação no mercado com base nas informações comercialmente sensíveis compartilhadas**. Em razão disso, existia a necessidade de que essas informações fossem fornecidas com **alto nível de detalhamento e de forma segregada**.

**II.3.    Da conduta investigada**

31.     [ACESSO RESTRITO].

---

[20] MOTTA, Massimo. *Competition policy: theory and practice*. Cambridge: University Press, 2004, p. 153.

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 11

STX0000925



**SUPERINTENDÊNCIA-GERAL**
Coordenação-Geral de Análise Antitruste 7

32.  [ACESSO RESTRITO].

33.  [ACESSO RESTRITO].

Nota Técnica Anexo (0464976)  SEI 08700.006006/2017-61 / pg. 12

STX0000926



**SUPERINTENDÊNCIA-GERAL**
Coordenação-Geral de Análise Antitruste [X]

## III.    DO MERCADO RELEVANTE

[ACESSO RESTRITO].

34.     Sabe-se que em casos de cartel, a conduta é ilícita pelo seu próprio objeto, sendo desnecessário o exame dos efeitos, já que a lesividade à ordem econômica é evidente, presumindo-se a potencialidade de produção de efeitos prejudiciais à concorrência. Nesse contexto, a análise de mercado relevante funciona tão somente como mecanismo para averiguar se é adequado, prático e razoável isolar ou fragmentar a área da atividade econômica em que a lei incidirá[21], sendo a própria definição do mercado dispensada em face do caráter obviamente anticompetitivo da conduta, que é ilícita por objeto, e não por seus efeitos[22].

35.     Nesse sentido, conforme jurisprudência pacificada do CADE, em casos de cartéis a própria atuação dos Representados contribui para delimitar o setor da economia afetado pela conduta. Em outras palavras, o comportamento dos investigados – ao coordenarem suas ações por meio de uma organização durável e institucionalizada, combinando preços, dividindo o mercado e definindo previamente os vencedores em processos de compras públicos (cartel de licitações) ou privados, dividindo mercados e clientes e fixando e uniformizando preços e condições comerciais entre si – indica claramente à autoridade antitruste qual é o mercado relevante, com um grau de certeza ainda maior do que o possibilitado pela análise exclusiva de indícios econômicos. Assim, a tarefa de identificar o escopo do acordo – em termos de sua

---

[21] Processos Administrativos n° 08012.007602/2003-11 (Representante: Sintáxi-Sindicato dos Taxistas de Porto Alegre; Representados: Táxi Sul-Acessórios para Táxis Ltda e outros) e 08012.008024/1998-49. (Representante: SDE ex-officio; Representada: TBA Informática Ltda, Microsoft Informática Ltda.). Como afirmado no voto do conselheiro relator neste último caso: "Há casos em que a própria definição do mercado é dispensada diante de conduta ou comportamento empresarial obviamente deletério à livre concorrência e à livre iniciativa. A análise do mercado relevante, portanto, funciona tão-somente como um mecanismo para averiguar se é adequado separar uma área de atividade econômica onde a aplicação das leis antitruste incidirá."

[22] A jurisprudência do E. Cade já se encontra pacificada nesse sentido, conforme se depreende da leitura de trechos de julgados recentes: "Em suma, conforme a Lei n° 8.884/94 e precedentes do CADE, nos casos em que houver a atuação de um cartel clássico, será exigida apenas a prova da existência da conduta para a configuração da infração, presumindo-se a potencialidade de que sejam produzidos efeitos prejudiciais à concorrência." (Processo Administrativo N° 08012.004702/2004-77, Rel. Cons. Carlos Emmanuel Joppert Ragazzo, j. 09.05.2012.) e "(...) em processos em que restar comprovado que concorrentes realizaram um conluio organizado com o único objetivo de elevar preços em detrimento do consumidor, é desnecessária a análise de elementos como o mercado relevante afetado, a participação de mercado detida pelos agentes investigados e a existência ou não de barreiras à entrada, já que a potencialidade lesiva da conduta sobre a ordem concorrencial – que constitui o critério central no direito brasileiro para a configuração da infração à ordem econômica – decorre diretamente das provas da materialidade do conluio organizado de preços." (Processo Administrativo n° 08012.004472/2000-12. Rel. Cons. Ana Frazão, j. 06.03.2013.)

---

Autos n° 08700.006006/2017-61

Nota Técnica Anexo (0464976)        SEI 08700.006006/2017-61 / pg. 13

STX0000927



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

---

abrangência geográfica e do produto[23] – se confunde com a de definir o mercado relevante afetado pela conduta.

36.     Cumpre mencionar que serão consideradas nesta Nota Técnica as informações coletadas pelo Cade até o presente momento, referentes às principais características do mercado investigado. Trata-se que a indicação preliminar do mercado afetado pela conduta anticompetitiva, feita de modo não taxativo ou restritivo, haja vista que é o transcorrer da investigação que permitirá que seja aferida a amplitude de atuação das empresas e indicado o alcance do mercado potencialmente afetado.

## IV.  DA RECOMENDAÇÃO DE ABERTURA DE PROCESSO ADMINISTRATIVO

37.     Diante de todo o exposto, entende-se estar demonstrada a existência de indícios robustos de infrações à ordem econômica praticadas pelos Representados, a ensejar a instauração de Processo Administrativo, nos termos dos arts. 13, V, e 69 e seguintes, da Lei nº 12.529/11 c.c. art. 186 e seguintes do Regimento Interno do Cade.

38.     Abaixo é apresentada a relação de pessoas, físicas e jurídicas, contra as quais se recomenda a abertura de Processo Administrativo.

*Pessoas Jurídicas participantes da conduta*

*Hutchinson Technology Inc. ("HTI")*

39.     [ACESSO RESTRITO]

40.     [ACESSO RESTRITO]

41.     [ACESSO RESTRITO]

| EMPRESA | CNPJ | ENDEREÇO (SEDE, ESCRITÓRIO, FÁBRICAS) | WEBSITE/TEL | REPRESENTANTES LEGAIS | ENDEREÇO PARA NOTIFICAÇÃO |
|---------|------|----------------------------------------|-------------|------------------------|----------------------------|
|         |      |                                        |             |                        |                            |

---

[23] A dimensão do produto se refere a características do produto ou serviço comercializado, em particular os fatores que determinam, da ótica do consumidor, o grau de substituibilidade existente entre os diferentes serviços e produtos. Por sua vez, na delimitação sob o aspecto geográfico, o mercado relevante é o espaço geográfico ou área em que a prática sob análise produz (ou pode produzir) efeitos.

Nota Técnica Anexo (0464976)       SEI 08700.006006/2017-61 / pg. 14

STX0000928



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | | | | | |
|---|---|---|---|---|---|
| Hutchinson Technology Inc. ("HTI") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Magnecomp Precision Technology, PLC ("MPT")*

42.     [ACESSO RESTRITO]

43.     [ACESSO RESTRITO]

44.     [ACESSO RESTRITO]

| EMPRESA | CNPJ | ENDEREÇO (SEDE, ESCRITÓRIO, FÁBRICAS) | WEBSITE/TEL | REPRESENTANTES LEGAIS | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Magnecomp Precision Technology Public Co. Ltd. ("MPT") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*NHK Spring Co., Ltd. ("NHK")*

45.     [ACESSO RESTRITO]

| EMPRESA | CNPJ | ENDEREÇO (SEDE, ESCRITÓRIO, FÁBRICAS) | WEBSITE/TEL | REPRESENTANTES LEGAIS | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| NHK Spring Co., Ltd. | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*SAE Magnetics (H.K.) Ltd. ("SAE")*

46.     [ACESSO RESTRITO]

47.     [ACESSO RESTRITO]

48.     [ACESSO RESTRITO]

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 15

STX0000929



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| EMPRESA | CNPJ | ENDEREÇO (SEDE, ESCRITÓRIO, FÁBRICAS) | WEBSITE/TEL | REPRESENTANTES LEGAIS | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| SAE Magnetics (H.K.) Ltd. ("SAE") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

**TDK Corporation ("TDK")**

49.   [ACESSO RESTRITO]

50.   [ACESSO RESTRITO]

51.   [ACESSO RESTRITO]

| EMPRESA | CNPJ | ENDEREÇO (SEDE, ESCRITÓRIO, FÁBRICAS) | WEBSITE/TEL | REPRESENTANTES LEGAIS | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| TDK Corporation | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

**Pessoas físicas participantes da conduta**

**Akihiro Honda**

52.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Akihiro Honda | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 16

STX0000930



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste**

---

*Akihiko Negishi*

53. [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Akihiko Negishi | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Albert Ong Kim Guan ("Albert Ong")*

54. [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Albert Ong Kim Guan ("Albert Ong") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Arun Dhawan*

55. [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Arun Dhawan | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Atsuo Kobayashi*

56. [ACESSO RESTRITO]

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 17

STX0000931



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Atsuo Kobayashi | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Giichi Nagata*

57.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Giichi Nagata | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Hajime Sawabe*

58.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Hajime Sawabe | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Hidetomo Nishi*

59.   [ACESSO RESTRITO]

| NOME | CARGOS | PESSOA JURÍDICA | Nº | E-MAIL / | ENDEREÇO |
|---|---|---|---|---|---|

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 18

STX0000932



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | OCUPADOS (POR PERÍODO) NA EMPRESA | (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | PASSAPORTE / Nº CPF | ENDEREÇO | PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Hidetomo Nishi | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Hironori Kajii*

60.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Hironori Kajii | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Hiroyuki Tamura*

61.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Hiroyuki Tamura | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Hitoshi Hashimoto*

62.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, | Nº PASSAPORTE / Nº | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 19

STX0000933



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | EMPRESA | ESCRITÓRIO, FÁBRICAS) | CPF | | O |
|---|---|---|---|---|---|
| Hitoshi Hashimoto | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Isamu Ninomiya*

63.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Isamu Ninomiya | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Keith David Johnson*

64.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Keith David Johnson | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Kazuhiko Otake*

65.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Kazuhiko Otake | [ACESSO | [ACESSO | [ACESSO | [ACESSO | [ACESSO |

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 20

STX0000934



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | RESTRITO] | RESTRITO] | RESTRITO] | RESTRITO] | RESTRITO] |
|---|---|---|---|---|---|

*Kazumi Tamamura*

66.     [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Kazumi Tamamura | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Keiichi Suzuki*

67.     [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Keiichi Suzuki | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Ken Martini*

68.     [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Ken Martini | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 21

STX0000935



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

---

*Kenichiro Arimura*

69.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Kenichiro Arimura | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Kenji Sasaki*

70.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Kenji Sasaki | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Koji Inada*

71.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Koji Inada | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Lo Kwok Fai ("Frankie Lo")*

72.    [ACESSO RESTRITO]

---

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 22

STX0000936



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Lo Kwok Fai ("Frankie Lo") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Masaru Koda*

73.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Masaru Koda | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Masato Ishikawa*

74.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Masato Ishikawa | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Richard Michael McHone* ("Richard McHone")

75.      [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR | PESSOA JURÍDICA (COM LOCAL DE | Nº PASSAPORTE | E-MAIL / ENDEREÇO | ENDEREÇO PARA |
|---|---|---|---|---|---|

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 23

STX0000937



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste**

| | PERÍODO) NA EMPRESA | TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS | RTE / Nº CPF | | NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Richard Michael McHone ("Richard McHone") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Shigeki Kimura*

76.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Shigeki Kimura | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Shigenao Ishiguro*

77.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Shigenao Ishiguro | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Skipp Harvey*

78.   [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Skipp Harvey | [ACESSO | [ACESSO | [ACESSO RESTRIT | [ACESSO | [ACESSO |

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 24

STX0000938



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | RESTRITO] | RESTRITO] | O] | RESTRITO] | RESTRITO] |
|---|---|---|---|---|---|

*Stephen Andrew Misuta ("Steve Misuta")*

79.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Stephen Andrew Misuta ("Steve Misuta") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Takehiko Amaki*

80.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Takehiko Amaki | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Takehiro Kamigama*

81.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Takehiro Kamigama | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 25

STX0000939



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

---

*Tetsuya Ueda*

82.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Tetsuya Ueda | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Thiti Makarabhiromya ("Thiti Makarabhirom")*

83.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Thiti Makarabhir omya ("Thiti Makarabhir om") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Todd Drahos*

84.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPO RTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Todd Drahos | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Toshimi Hamada*

85.    [ACESSO RESTRITO]

---

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)     SEI 08700.006006/2017-61 / pg. 26

STX0000940



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | N° PASSAPO RTE / N° CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Toshimi Hamada | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Tsutomu Yamaguchi*

86.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | N° PASSAPO RTE / N° CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Tsutomu Yamaguchi | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Yew Ah Ming*

87.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | N° PASSAPO RTE / N° CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃ O |
|---|---|---|---|---|---|
| Yew Ah Ming | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRIT O] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Wing Sun Clarence Lo ("Clarence Lo")*

88.    [ACESSO RESTRITO]

| NOME | CARGOS | PESSOA JURÍDICA | N° | E-MAIL / | ENDEREÇO |
|---|---|---|---|---|---|

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)    SEI 08700.006006/2017-61 / pg. 27

STX0000941



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

| | OCUPADOS (POR PERÍODO) NA EMPRESA | (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | PASSAPORTE / Nº CPF | ENDEREÇO | PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Wing Sun Clarence Lo ("Clarence Lo") | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

*Yuichi Nagase*

89.    [ACESSO RESTRITO]

| NOME | CARGOS OCUPADOS (POR PERÍODO) NA EMPRESA | PESSOA JURÍDICA (COM LOCAL DE TRABALHO: SEDE, ESCRITÓRIO, FÁBRICAS) | Nº PASSAPORTE / Nº CPF | E-MAIL / ENDEREÇO | ENDEREÇO PARA NOTIFICAÇÃO |
|---|---|---|---|---|---|
| Yuichi Nagase | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] | [ACESSO RESTRITO] |

## V.    CONCLUSÃO

90.    Diante do exposto, e ante a existência de indícios robustos de infração à ordem econômica, sugere-se a instauração de Processo Administrativo, nos termos dos arts. 13, V, e 69 e seguintes, da Lei nº 12.529/11 c.c. art. 186 e seguintes do Regimento Interno do Cade, em face dos Representados: Hutchinson Technology Inc.; Magnecomp Precision Technology Public Co. Ltd; NHK Spring Co., Ltd.TDK Corporation; SAE Magnetics (H.K.) Ltd.; Akihiro Honda; Akihiko Negishi; Albert Ong Kim Guan ("Albert Ong"); Arun Dhawan; Atsuo Kobayashi; Giichi Nagata; Hajime Sawabe; Hidetomo Nishi; Hironori Kajii;   Hiroyuki Tamura;   Hitoshi Hashimoto; Isamu Ninomiya; Keith David Johnson; Kazuhiko Otake; Kazumi Tamamura; Keiichi Suzuki; Ken Martini; Kenichiro Arimura; Kenji Sasaki;  Koji Inada;   Lo Kwok Fai ("Frankie Lo"); Masaru Koda; Masato Ishikawa; Richard Michael McHone; Shigeki Kimura; Shigenao Ishiguro; Skipp Harvey; Stephen Andrew Misuta; Takehiko Amaki; Takehiro Kamigama; Tetsuya Ueda; Thiti Makarabhiromya; Todd Drahos; Toshimi Hamada; Tsutomu Yamaguchi; Wing Sun Clarence Lo ("Clarence Lo"); Yew Ah Ming; e Yuichi Nagase, a fim de investigar as condutas passíveis de enquadramento nos artigos 20, I a IV, e 21, I, III, VIII e X, da Lei nº 8.884/94, bem como art. 36, incisos I a IV c/c seu § 3º, inciso I, alíneas "a", "b", "c" e "d" e inciso VIII da Lei nº 12.529/2011, na forma do artigo 69 e seguintes da Lei nº 12.529/2011.

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)      SEI 08700.006006/2017-61 / pg. 28

STX0000942



**SUPERINTENDÊNCIA-GERAL**
**Coordenação-Geral de Análise Antitruste 7**

91.    Sugere-se, ainda, a notificação dos Representados, nos termos do art. 70 do referido diploma legal, para que apresentem defesa no prazo de 30 (trinta) dias. Neste mesmo prazo, os Representados deverão especificar e justificar as provas que pretendem sejam produzidas, que serão analisadas pela autoridade nos termos do art. 195 do Regimento Interno do Cade. Caso o Representado tenha interesse na produção de prova testemunhal, deverá indicar na peça de defesa a qualificação completa de até 3 (três) testemunhas, a serem ouvidas na sede do Cade, conforme previsto no art. 70 da Lei nº 12.529/2011 c.c. art. 195, §2º, do Regimento Interno do Cade.

Estas as conclusões.

**LUCAS FREIRE SILVA**
Coordenador-Geral
Coordenação-Geral de Análise Antitruste 7

De acordo. Encaminhe-se ao Sr. Superintendente-Geral.

**DIOGO THOMSON DE ANDRADE**
SuperintendenteGeral-Adjunto

---

Autos nº 08700.006006/2017-61

Nota Técnica Anexo (0464976)    SEI 08700.006006/2017-61 / pg. 29

STX0000943