1  MORGAN, LEWIS & BOCKIUS LLP
   J. Clayton Everett, Jr.
2  clay.everett@morganlewis.com
   1111 Pennsylvania Ave., NW
3  Washington, DC 20004
   Telephone: (202) 739-3000
4  Facsimile: (202) 739-3001

5  MORGAN, LEWIS & BOCKIUS LLP
   Michelle Park Chiu (State Bar No. 248421)
6  michelle.chiu@morganlewis.com
   One Market, Spear Street Tower
7  San Francisco, CA 94105
   Telephone: (415) 442-1000
8  Facsimile: (415) 442-1001

9  *Attorneys for Defendants TDK Corporation,*
   *Magnecomp Precision Technology Public Co.*
10 *Ltd., Hutchinson Technology Inc., and SAE*
   *Magnetics (H.K.) Ltd.*

11
   *[Additional Moving Defendants and Counsel*
12 *Listed on Signature Page]*

13                 **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15                   **SAN FRANCISCO DIVISION**

16
   | IN RE: HDD SUSPENSION ASSEMBLIES | CASE NO.: 3:19-MD-02918-MMC |
17 | ANTITRUST LITIGATION | |
   | | MDL NO. 2918 |
18 | | |
   | THIS DOCUMENT RELATES TO: | **DEFENDANTS' OPPOSITION TO END-** |
19 | | **USER PLAINTIFFS' MOTION FOR** |
   | END-USER ACTION | **CLASS CERTIFICATION** |
20 | | |
   | | Date:    TBD |
21 | | Time:    TBD |
   | | Crtrm:   7, 19th Floor |
22 | | Before:  The Hon. Maxine M. Chesney |

23

24              **Redacted Public Version of Document Filed Under Seal**

25

26

27

28

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

DEFINITIONS ............................................................................................................... v

STATEMENT OF THE ISSUES TO BE DECIDED.................................................... vii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 4

    I.      INDIVIDUAL ISSUES PREDOMINATE, PRECLUDING
            CERTIFICATION. ................................................................................ 4

          A.     "Impact" Cannot Be Determined Based on Common Evidence................. 5

               1.     EUPs' "Pass Through" Analysis Does Not Allow
                      Determination of "Impact" for Individual Class Members.............. 6

               2.     EUPs Have Identified No Methodology That Would
                      Determine Whether Particular Suspension Assembly Prices
                      Were Impacted. ........................................................................... 16

          B.     EUPs Have No Common Method of Calculating Damages ..................... 19

          C.     Liability Questions Are Not Common to All Putative Class
               Members.................................................................................................. 20

    II.     The Class Representatives' Claims Are Not "Typical." ...................................... 22

          A.     The Class Representatives Are All Individuals Who Made Small
               Purchases................................................................................................ 23

          B.     Different Class Members May Want to Pursue Different – and
               Conflicting – Theories of Antitrust Liability ........................................... 24

CONCLUSION ............................................................................................................ 25

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ang v. Bimbo Bakeries USA, Inc.*,
   No. 13-cv-01196, 2018 U.S. Dist. Lexis 149395 (N.D. Cal. Aug. 31, 2018) ........................ 20

*In re Apple iPhone Antitrust Litig.*,
   2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ........................................................................ 13

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ...................................................................................................... 5

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 3-07-5944-SC, 2016 U.S. Dist. Lexis 189474 (N.D. Cal. Oct. 26, 2016) ................ 19, 22

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...................................................................................................... 4, 19, 20

*Conrad v. Jimmy John's Franchise, LLC*,
   No. 18-cv-00133, 2021 WL 3268339 (S.D. Ill. July 30, 2021) ............................................ 22

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) .................................................................................................. 22

*D.C. v. Cnty. of San Diego*,
   2018 WL 36682 (S.D. Cal. Feb. 2, 2018) .............................................................................. 19

*D.C. v. Cnty. of San Diego*,
   783 F. App'x 766 (9th Cir. 2019) .......................................................................................... 19

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) .................................................................................................. 23

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................................................ 22

*In re Flash Memory*,
   No. 07-0086 SBA, 2010 U.S. Dist. Lexis 59491 (N.D. Cal. June 9, 2010) .................... *passim*

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
   No. 1:04-md-1628, 2008 U.S. Dist. Lexis 18388 (S.D.N.Y. Feb. 20, 2008) ........................... 9

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) .................................................................................. *passim*

*In re High Tech Employee Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................................... 19

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    MDL 05-1717, No. 05-485, 2014 WL 6601941 (D. Del. Aug. 6, 2014) .......................... 17, 23

*Levya v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................................................. 19

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420-YGR, 2017 U.S. Dist. Lexis 57340 (N.D. Cal. Apr. 12,
    2017) .................................................................................................................................. 4, 5

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) .............................. 5, 13

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    No. 09-1967 CW, 2013 U.S. Dist. Lexis 160739 (N.D. Cal. Nov. 8, 2013) ....................... 15

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) ....................................................................................................... 22

*Olean Wholesale Grocery Coop., Inc v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (*en banc*) ........................................................................ 4, 5, 15

*Opperman v. Kong Techs*,
    No. 13-cv-00453, 2017 U.S. Dist. Lexis 116333 (N.D. Cal. July 25, 2017) ...................... 20

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311 (N.D. Cal. 2014) .................................................................................. 13, 23

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2283425 (E.D. Pa. Aug. 3, 2007) ...................................................... 8

*Pickett v. Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir. 2000) .......................................................................................... 17

*In re Plastics Additives Antitrust Litig.*,
    No. 03-2038, 2006 WL 6172035 (E.D. Pa. Aug. 31, 2006) ................................................ 20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) ............................................................................................. 5

*Silva v. B&G Foods, Inc.*,
    No. 20-cv-00137, 2022 U.S. Dist Lexis 182923 (N.D. Cal. Aug. 26, 2022) ...................... 15

*Stemmelin v. Matterport, Inc.*,
    No. 20-04168, 2022 U.S. Dist. Lexis 44732 (N.D. Cal. Mar. 14, 2022) ............................ 19

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ............................................................................................................... 22

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................... 7

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ............................................................................................. 21

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ........................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................... 5

*Werdebaugh v. Blue Diamond Growers*,
    No. 12-cv-02724, 2014 U.S. Dist. Lexis 173789 (N.D. Cal. Dec. 15, 2014) ........ 20

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ................................................................................. 21

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................... 23, 24

Fed. R. Civ. P. 23(a)(3) ........................................................................................ 23

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 1, 5

**Other Authorities**

7A Wright, Miller & Kane, Federal Practice and Procedure Civil, 3d § 1768 ........... 24

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>DEFINITIONS</u>

| | |
|---|---|
| Br. or EUP Brief | End-User Plaintiffs' Notice of Motion and Motion for Class Certification, October 11, 2022 (ECF No. 605) |
| Class Period | January 2003 to December 2016, i.e., EUPs' purported class period as defined in EUPs' Notice of Motion and Motion for Class Certification (Br. at 1). |
| Class Products | Laptop computer, desktop computer, stand-alone HDD, network attached storage product, or enterprise storage system that contained a suspension assembly manufactured by one of the Defendants that was purchased during the Class Period |
| EUP States | Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, Oregon, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. |
| EUPs | End-User Plaintiffs |
| Ex. | Exhibit to the Declaration of John Clayton Everett, Jr. filed in support of Defendants' Opposition |
| Compl. | End-User Plaintiffs' Fourth Amended Consolidated Class Action Complaint, Oct. 28, 2022 (ECF No. 693) |
| HDD | Hard Disk Drive |
| HGAs | Head Gimbal Assemblies |
| HTI | Hutchinson Technology Inc. |
| MPT | Magnecomp Precision Technology Public Company Limited |
| NAT | NAT Peripheral (H.K.) Co., Ltd. and NAT Peripheral (Dong Guan) Col, Ltd. |
| Netz Decl. | Declaration of Janet S. Netz, Ph.D. in Support of End-User Plaintiffs' Motion for Class Certification, October 11, 2022, together with the Errata filed on December 16, 2022 |
| Netz Tr. | Deposition of Janet S. Netz, December 6, 2022; excerpts attached as Exhibit 2 to the Declaration of John Clayton Everett, Jr. (filed in support of Defendants' Opposition) |
| OEM | Original Equipment Manufacturer |

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

| | |
|---|---|
| Resellers | Reseller Plaintiffs |
| SAE | SAE Magnetics (HK) Ltd. |
| Seagate or SGT | Seagate Technology, LLC, Seagate Technology (Thailand) Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International |
| Stiroh Rep. | Expert Report of Lauren J. Stiroh, Ph.D., December 22, 2022; attached as Exhibit 1 to the Declaration of John Clayton Everett, Jr. (filed in support of Defendants' Opposition) |
| Suncall | Suncall Corporation |
| Toshiba | Toshiba Electronics & Device Storage Corporation |
| TDK | TDK Corporation |
| WD or Western Digital | Western Digital Corporation |

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>STATEMENT OF THE ISSUES TO BE DECIDED</u>

Whether End-User Plaintiffs ("EUPs") have met their burden to establish each of the requirements of Federal Rule of Civil Procedure 23 to certify their proposed 29 state-wide damages classes.  *See* Br. at 1.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **INTRODUCTION**

In order to certify their action as a class action, EUPs bear the burden of establishing that common issues, subject to proof by common evidence, predominate over issues for which the evidence will vary among members of the putative class.  *See* Fed. R. Civ. P. 23(b)(3).  EUPs fail to meet that burden.  Individual proof issues proliferate in the claims for which they seek class certification, and those individual issues swamp the issues subject to proof by common evidence.

As an initial matter, EUPs have not identified any way of proving that each putative class member was "impacted" by Defendants' conduct on the basis of common evidence.  While their hired expert, Dr. Netz, has proffered regressions that purport to show that (a) the prices of Defendants' suspension assemblies were inflated ***overall*** during the alleged class period and (b) ***in general***, cost increases are "passed-on" by sellers of products containing suspension assemblies, those regressions, and Dr. Netz's analysis in general, do not purport to show and cannot show whether the purchases of ***particular putative class members*** were "impacted" by Defendants' alleged conduct.  The evidence shows, and Dr. Netz, acknowledges, that there are "class product" transactions in which prices were not inflated due to factors such as focal point pricing, individual negotiations, and component substitution.  EUPs have identified no way of determining which "class products" transactions were impacted by Defendants' alleged conduct and which were not impacted without undertaking an analysis of each transaction.

These problems of proof are well-recognized in the case law addressing the certification of indirect purchaser classes in "component product" antitrust cases, including in opinions considering (and rejecting) testimony and proposed methodologies from the same expert that EUPs rely on here. In fact, this court, in many cases, has refused to certify indirect purchaser classes in "component product" antitrust cases because there is no way to determine whether particular downstream sales of products containing allegedly price-fixed components were "impacted" without engaging in individual inquiry.  The need for individual transaction-by-transaction analysis to determine impact precludes certification of the EUP classes.

In addition, unlike most antitrust cases, the liability issues here are not common to all class members.  Although EUPs obscure differences among the claims of putative class members by

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

using the "conspiracy" label, they allege at least three different agreements in restraint of trade: (1) an agreement to "fix prices" and "allocate customers and markets" between two of the alleged conspirators (TDK and NHK) that was reached in the 2007 to 2009 period (Compl. ¶¶ 124-126, 129); (2) an agreement between the same two alleged conspirators (TDK and NHK) to "kill" the third (HTI) also reached in the 2007 to 2009 period (*id.* ¶¶ 144-150); and (3) a purported agreement or agreements to "share competitively sensitive information" that involved all three alleged conspirators (TDK, NHK and HTI) which EUPs allege started in 2003 (*id.* ¶¶ 122-123, 127-138, 141). The evidence varies by agreement, as does (potentially) the standard applicable to determine whether an agreement violated the law. Thus, liability evidence is not common to all class members.

Finally, in addition to the issues of predominance, the claims of the class representatives are not "typical" of all putative class members. All 52 of the class representatives are individuals who purchased one class product or a small number of them (invariably either a computer or a stand-alone personal HDD) at retail, where they paid non-negotiated "retail" prices. The EUP classes, however, also include massive companies that purchased millions of dollars of enterprise storage systems, computers, and other class products through negotiated contracts with widely varying terms. The claims of the individuals designated to serve as class representatives are not typical of those corporations' claims. Courts in similar circumstances have denied certification because the class representatives' claims were not sufficiently "typical" of the putative class. The Court should do the same here.

## BACKGROUND

EUPs are 52 individuals who purchased a computer, a stand-alone HDD, or—in few cases—more than one computer or stand-alone HDD. None purchased any enterprise storage system or other class products (such as network attached storage devices) that are used solely or largely by businesses. The named representatives' purchases were all made from retailers (to the extent they identified the place of purchase); none involved separately negotiated prices.

They seek to pursue claims on behalf of all persons and entities in the 29 EUP States that purchased any laptop computer, desktop computer, stand-alone HDD, network attached storage product, or enterprise storage system (collectively, "the class products") between January 1, 2003

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

and December 31, 2016 (the "class period") that contained a suspension assembly sold by one of the Defendants. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████       *See* Netz Tr. at 47:6-49:1, 51:17-25, 52:18-53:20; 54:19-16.

EUPs claim that all prices of the tens of thousands of different class products[1] were inflated due to Defendants' alleged conduct relating to suspension assemblies.  Suspension assemblies are tiny precision parts that hold magnetic read-write heads a precise distance above spinning magnetic wafers that store data in HDDs.  *See* Compl. ¶ 104; Stiroh Rep. ¶¶ 17-19 & n.25.  According to EUPs' own expert, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████  *See* Netz Tr. at 106:14-19, 104:1-15.  Those are averages:  suspension assemblies are bespoke products designed to meet detailed, and varying, specifications provided by HDD manufacturers.  *See* Stiroh Rep. ¶ 19.  ███████████████████████████████ █ █████████████████████████████ ████████████████████████████████████████████████[3]  *See id.* ¶¶ 19-21 & Stiroh Rep. Ex. 4.

Suspension assemblies were procured either by HDD manufacturers themselves or by manufacturers of intermediate components called head gimbal assemblies.  *See id.* ¶ 26 & n.37. ███████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████  *See id.* ¶¶ 21, 34, 80 & n.131; *see also* Ex. 4 (Bell Tr. at 36:2-36:13, 95:17-96:25); Ex. 5 (Kajii Tr. 207:15-208:15). ███████████████████████████████████████████████████████████████████████████████

---

[1] *See* Expert Report of Lauren J. Stiroh ("Stiroh Rep.") ¶¶ 11(g), 34.

[2] ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████  Ex. 3 (Sanders Tr. at 436:7-436:15).

[3] Prices of prototypes were in many cases substantially higher than the high end of this range.  *See* Stiroh Rep. ¶¶ 77, 94 & n.124; Netz Decl. at 27.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

████████████████████████████████[4]

Suspension assemblies were incorporated into HDDs that were themselves either (a) sold as stand-alone HDDs (after in many cases filtering through several layers of distribution between the HDD makers and the ultimate consumer) or (b) incorporated into other complex products such as computers or enterprise storage systems. *See* Stiroh Rep. ¶¶ 26-27, 34. The prices of class products varied over a very wide range from around $20 (for certain stand-alone HDDs) to more than ten thousand dollars (for certain enterprise storage systems). *See id.* ¶ 34.

EUPs allege that Defendants—which include 3 of the 4 suspension assembly manufacturers—engaged in "a conspiracy" to "fix prices" and "allocate customers and markets" for suspension assemblies between 2003 and 2016. Although EUPs characterize their allegations as involving a single "conspiracy," they actually allege at least three separate purported "agreements in restraint of trade" that involve (a) different conduct, (b) different time periods, and (c) different conspirators.

## **ARGUMENT**

### I. **INDIVIDUAL ISSUES PREDOMINATE, PRECLUDING CERTIFICATION.**

EUPs bear the burden of establishing that common issues "predominate" over issues that require individual proof and adjudication. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To satisfy this predominance requirement, EUPs must show that they will be able to prove ***using evidence common to the class***: (1) the existence of an antitrust violation by Defendants; (2) that each class member suffered antitrust injury as a result of that alleged violation (*i.e.,* impact or antitrust injury); and (3) a measure of damages caused by the alleged violation. *See In re Lithium Ion Batteries Antitrust Litig.* ("Lithium I"), No. 13-MD-2420-YGR, 2017 U.S. Dist. Lexis 57340, at *79 (N.D. Cal. Apr. 12, 2017).

The class device does not change or abridge the substantive rights of defendants or obligations of plaintiffs to prove their claims. *Olean Wholesale Grocery Coop., Inc v. Bumble Bee*

---

[4] *See* Ex. 6 (Legendre Tr. at 39:1-43:2); *see also* Stiroh Rep. ¶¶ 80, 95; Netz Decl. at 27 ("Throughout the life of a suspension program, HDD manufacturers and suspension assembly suppliers engaged in regular re-negotiations concerning pricing and allocations, often on a quarterly basis.").

*Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (*en banc*).  Thus, to succeed on their claims, EUPs must prove each element of an antitrust claim for each putative class member.  *Id.* at 66.  The putative class members here are all "end-users" of products that contain suspension assemblies.  None purchased suspension assemblies as stand-alone products.  Instead, they purchased at retail or through separately negotiated contracts either computers, enterprise storage systems, or stand-alone hard drives.  A particular individual class member would need to establish ***first*** that the price of the particular suspension assembly incorporated into the product that she purchased was the subject of some agreement in restraint of trade; ***second***, that the restraint of trade resulted in the price of that suspension assembly to be inflated; ***third***, that the inflated suspension assembly price resulted in the class member paying more for the computer, enterprise storage system or stand-alone HDD purchased; and ***finally***, that there is a methodology to determine the damages owed to the putative class member.  If individual proof is required for these elements—or some of them—common issues will not predominate, and a class may not be certified.  That is the case here.

## A.    <u>"Impact" Cannot Be Determined Based on Common Evidence.</u>

"The question of whether each member of the [EUP] class suffered antitrust impact 'is central to the validity of each one of the [EUP] claims.'"  *Olean*, 31 F.4th at 670 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  "Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured class members will predominate."  *Olean*, 31 F.4th at 669 n.13 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) and *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018)).

Because EUPs are indirect purchasers, they must solve the impact puzzle twice:  ***first***, by establishing that injury to the direct purchasers can be determined using only common proof, and ***second***, by establishing that the pass-through issue is capable of being determined by common proof as well.  *See In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 503 (N.D. Cal. 2008).  If EUPs fail on either prong, they cannot proceed with a class action.  *Id.* ███

███████████████████████████████████ (Netz Tr. at 87:25-88:17, 90:15-91:2), which inherently makes class certification in an indirect purchaser class harder to achieve.  *See In re Lithium Ion Batteries Antitrust Litig.* ("*Lithium II*"), No. 13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D.

1    Cal. Mar. 5, 2018) ("proof of class-wide antitrust impact is made more complex because plaintiffs

2    must offer a model of impact and damages that demonstrates the alleged overcharge was passed

3    through *to each successive link in the distribution chain*, and ultimately to the plaintiffs.")

4    (emphasis added); *see also In re Flash Memory* ("Flash Memory"), No. 07-0086 SBA, 2010 U.S.

5    Dist. Lexis 59491, at *44-45 (N.D. Cal. June 9, 2010).

6    █████████████████████████████████████████████████████

7    █████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████

10   ████████████████████████████████ (Netz Tr. at 109:17-24, 117:7-14).  The claim that

11   the analysis of Dr. Netz provides such a methodology does not withstand scrutiny.

12   There are clearly and admittedly certain transactions where the prices paid by class

13   members were not affected: █████████████████████████████████

14   █████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   ██████████████████████ *See* Netz Decl. at 82-84.[5]  But the only "common" methodology

17   offered by EUPs is unable to differentiate between these instances of no injury and instances in

18   which prices paid by class members may have been affected.

19          **1.    EUPs' "Pass Through" Analysis Does Not Allow Determination of
                    "Impact" for Individual Class Members.**

20   The problems of individual proof are multiplied as the tiny, inexpensive component

21   products at issue in this case are incorporated into much more complex and expensive products

22   before ultimately being sold (often at retail) to putative class members.  EUPs must show that

23   common evidence can be used to establish that small changes in the prices of suspension assemblies

24   resulted in higher prices for the literally thousands of different downstream products, such as

25   _____

26   [5] ███████████████████████████████████████████████████

27   █████████████████████████████████████████████████████

28   ███████████████████████████ Netz Tr. at 168:23-170:9.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

computers, that were purchased by putative class members.[6]  A typical class member that purchased a computer at retail was separated from sales of suspension assemblies by as many as seven different steps and transactions, as suspension assemblies are incorporated first into HGAs, then HDDs, then computers, before passing through several layers of distribution, before finally being sold at retail.  *See* Netz Decl. at 14-17.  In order for such a class member to have been "impacted," any "overcharge" on suspension assemblies (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Netz Tr. at 107:13-24)) would need to be "passed on" in the form of higher prices through all of those different distribution levels.  *See* Netz Decl. at 60-61 ("class members were harmed" only if "some portion of the overcharge imposed on direct purchasers was passed though the distribution chain").[7]

EUPs rely exclusively on the analysis of Dr. Netz to argue that they can rely on common evidence to prove that any suspension assembly price effects resulted in higher prices paid for class products by putative class members; but Dr. Netz's methodology (a) itself involves individual issues and (b) cannot actually differentiate between transactions in which there was no pass through and those for which cost increases were passed through.[8]  Dr. Netz constructed regressions for 53 firms that she identifies as "operating at all levels of distribution channel" and relies on those

---

[6] EUPs' reliance on three electronics components cases in which this court has granted class certification (*see* Br. at 19-20) is misplaced.  In those cases, the component cost was a substantial proportion of the finished downstream products.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 588 (N.D. Cal. 2010) (LCD panels constituted 50% to 80% of price of computer monitors, 33% to 70% of the price of televisions, and 10% to 25% of the cost of a notebook computer); *CRT*, No. 3-07-5944-SC (N.D. Cal. Jan. 10, 2013), Compl. (ECF No. 1526) at 53 (components at issue were alleged to represent roughly "60% of the total cost to manufacture the computer monitor"); *SRAM*, No. 07-md-01819 (N.D. Cal. Jan. 19, 2010) Indirect Purchaser Pls.' Reply Mem. Supp. Class Certification Mot. (ECF 936) at 17 n.15 (SRAM accounted for up to 40% and "substantial portion of the price" of finished products).

[7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Netz Tr. at 15:8-15.

[8] Dr. Netz's opinion that impact to end users can be proven formulaically based on her account of "economic theory" (Netz Decl. at 61-66) has no real-world relevance, and more importantly, is contradicted by empirical analysis of actual price data (Stiroh Rep. §§V.B.1-2, VII).  Her invocation of "theory" is a highly stylized way of saying that increased costs are generally passed on, but this does not answer the question as to whether any particular class members were injured.  *See GPU*, 253 F.R.D. at 496.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

regressions to "estimate the pass-through rate for the entire distribution channel." Netz Decl. at 99-10.  While Dr. Netz estimates that at least 100% of any overcharges were passed through, a review of her actual regressions reveals that pass-through rates vary widely, and if they are corrected to account for product differences, many of them are well below 100%, with some showing no pass through for particular products.    Stiroh Rep. ¶¶ 46, 110-115, Figure 9.   Moreover, those regressions—and Dr. Netz's testimony in general—are unable to account for various issues that admittedly resulted in no pass through for particular sales or to differentiate those class members who were not injured from those that were.

a.    Dr. Netz's Pass Through Methodology Is Not Common.

Although Dr. Netz characterizes her regressions as "a formulaic method," it is anything but. Dr. Netz's own methodology ███████████████████████████████████████ (Netz Tr. at 100:10-24) ██████████████████████████████████████████ ████████████████████████████████████████████████████████████[9]  *See* Stiroh Rep. §VII.   Thus, even utilizing Dr. Netz's proposed methodology would require each putative class member to offer individualized evidence about the separate pass-through rates for each entity in the distribution chain above her to show that she was actually injured by the overcharge that occurred at the top of the distribution chain.[10]  *See, e.g.*, *GPU*, 253 F.R.D. at 505; *Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *55-56 ("The tracing process requires more than the one-size-fits all theoretical construct proposed by Dr. Netz"); *In re OSB Antitrust Litig.*, No.

---

[9] Dr. Netz's own explanation of the methodology for application of the pass-through rate to calculate damages implies different pass-through rates will be needed for different "resellers" at different levels of the distribution chain.  Netz Decl. at 105 (explaining that methodology would "accommodate" variations in pass-through rates by adjusting the rates for "a particular retailer" in damages model).

[10] EUPs allege that class products are traceable to particular Defendants (Br. at 12), but the evidence does not support this claim.  *See, e.g.*, Ex. 7 (Ver Meer Tr. 72:20–76:11 (████████████████████████ ███████████████████████████████████.  And, as Dr. Netz admitted, ███████████████████████████ ████████████████████████████████████████████████████████████████████ *See* Netz Tr. 76:24-77:12 ████████████████████████████████ ██████████████

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

06-826, 2007 WL 2283425, at *1, 11 (E.D. Pa. Aug. 3, 2007) (denying certification of indirect purchaser homebuyers in part because "[t]he OSB in homes may have been distributed through home improvement centers, lumber yards, or retailers before reaching building contractors and finally, the homes themselves"); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 1:04-md-1628, 2008 U.S. Dist. Lexis 18388, at *33-34 n.10 (S.D.N.Y. Feb. 20, 2008) (refusing to certify indirect purchaser class where expert failed to address differences among resellers with common proof).[11]

Similar issues resulted in the denial of class certification in *GPU*, 253 F.R.D. 478, and *Flash Memory*, 2010 U.S. Dist. Lexis 59491.  Like the suspension assemblies incorporated into HDDs that could then further be incorporated into other products, the products in those cases (graphics processing units and flash memory modules) were sold and incorporated into other products that could then be integrated into different downstream products.  In those cases, this court was presented with the same class certification argument developed by the same expert—Dr. Netz—that EUPs rely on here.  Dr. Netz's proposed methodology—and EUPs' argument that impact could be established on the basis of common evidence—were strikingly similar in those cases to what she, and EUPs, have proposed and argued here.  And, in both cases, the court concluded that Dr. Netz's analysis was insufficient to allow determination of impact on the basis of class-wide evidence, holding that individual fact issues relating to "pass-through" precluded class certification.  *See GPU*, 253 F.R.D. at 505 ("Class certification is problematic where a plaintiff's method of providing pass-through requires a reseller-by-reseller analysis."); *Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *58 (regression analysis based on data from specific entities "actually underscore the *individualized* nature of the evidence that will be required to show impact" as it "amounts to a retailer-by-retailer, manufacturer-by-manufacturer and product-by-product analysis of pass-through") (emphasis in original).  As the *Flash Memory*, 2010 U.S. Dist. Lexis 59491 at *59, court held:

---

[11] Even if EUPs wanted to conduct a regression analysis to determine the pass-through rate for the relevant products for every firm in the putative class's distribution chain, as Dr. Netz acknowledges, this is impossible because such data may not exist or may not be obtained.  *See* Netz Decl. at 99.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The products, channels and markets are sufficiently numerous and diverse to preclude application of a reliable and meaningful method of calculating pass-through rates on a class-wide basis. An individualized inquiry will be necessary . . .

> b. Dr. Netz's Pass Through Methodology Cannot Identify Which <u>Class Members Were Injured and Which Were Not.</u>

Even if Dr. Netz's proposed pass-through regressions were considered a common methodology, they are incapable of determining whether individual putative class members were "impacted" by Defendants' alleged conduct because they do not, and cannot, differentiate between transactions for which there was no pass through and those for which there was pass through. Dr. Netz admitted as much: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Netz Tr. at 99:24-100:4. In other words, despite Dr. Netz's admission that ████████████████████████████████████████ ██████ (Netz Tr. at 99:6-23), Dr. Netz's method will not allow the Court to determine which transactions in the distribution chain had no pass-through and, thus, which putative class members were not injured—*i.e.*, were not "impacted" by Defendants' alleged conduct.

Real-world evidence demonstrates that OEMs, distributors, or resellers of the products that would fall within the class definition did not consistently pass-through cost increases. For example, a representative for Fry's Electronics stated that, between 2003 and 2011, "a change in Fry's cost of [laptops and desktops] did not necessarily change Fry's sales price of that same [p]roduct. . . Fry's did not always pass on price increases to its customers, either in full or in part, for [laptops and computers] it purchased from suppliers." Ex. 8. Hewlett-Packard ("HP") similarly reported in 2008 that it had "experienced . . . increases in component and manufacturing costs resulting from higher labor and material costs borne by [its] manufacturers and suppliers that, as a result of competitive pricing pressures or other factors, [it was *unable to pass on to [its] customers*." Ex. 9 (HP, Form 10-K at 19, Dec. 15, 2008 (emphasis added)). Also in 2008, Ingram Micro reported its "*inability to pass through to [its] reseller customers* the impact of" the "rapid and significantly adverse changes in their sales terms and conditions" that its "suppliers have the ability to make,

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

and in the past have made." Ex. 10 (Ingram Micro, Form 10-K at 13, Feb. 27, 2008 (emphasis added)).

Dr. Netz's pass-through regressions themselves—if she controlled for product types as would be necessary to provide anything approximating economically valid inferences and as she said she intended to do—show that there was no pass through for certain products. Dr. Netz ███ ████████████████████████████████████████████ (Netz Tr. at 141:22-144:3),[12] but controlling for product types, as Dr. Stiroh explains, yields different pass-through rates for each product type across the same retailer and results in a number of products having no pass-through at all. *See* Stiroh Rep. ¶¶ 110-113, Figures 10-11 (████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ ).

Moreover, we know that small price increases of the type at issue here did not result in higher retail prices for the products purchased by putative class members in some cases based on pricing strategies utilized by retailers. Stiroh Rep. ¶¶ 60, 62, 98, 126. Dr. Netz acknowledges that retailers (and even entities further up the distribution chain) often engage in "focal point pricing" in which prices are pegged to certain psychologically relevant values such as prices that end in $0.99 or $99. Netz Decl. at 82. Evidence in the case demonstrates that focal point pricing was used by retailers and other sellers of "class products," and was, in fact, a common pricing strategy. Thirty-three of the 52 proposed class representatives purchased a product at a focal point price. Stiroh Rep. ¶ 58 n.93. The third-party retailers who produced transaction-level data that would allow analysis of particular prices charged demonstrates further how common focal point pricing was for the class products. For example, ████████████████████████████████ ████████████████████████████████████████████████████████████ ████. *Id.* ¶ 58 n.94. ██████████████████████████████ ████████████████████████████████████████████████████████████

---

[12] Dr. Netz stated that she used a variable to control for "HDD product attributes" when "the data permit[ted]," which was limited to 7 of her 53 regressions. Netz Decl. at 95. This alone confirms that her work does not use common proof to demonstrate impact to all EUPs because it is a concession that she cannot offer a regression with one set of variables. *See* Stiroh Rep. ¶ 114.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1 ███████████████████████████████████████████████████████████

2 ████████████████████████ *Id.*

3 Dr. Netz conceded in her deposition that, ███████████████████████

4 ███████████████████████████████████████████████████████████

5 ████████████████████████████████████ Netz Tr. at 168:8-169:10.  Dr. Netz

6 ███████████████████████████████████████████████████████████

7 ███████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████ Netz Tr. at 104:6-

9 19, 105:23-108:3, 114:24-117:18.   However, the record here demonstrates that retailers used focal

10 points of $10 and $100 dollars too.  *See, e.g.*, Stiroh Rep. ¶¶ 49, 59-62, Figure 5 & n.91 & n.92.

11 As Dr. Stiroh explains, as a matter of economics, focal point pricing, whether it is $1, $10,

12 or $100, would not shift to the next focal point based on nominal costs increases that are a matter

13 of cents.  *See id.*  Dr. Netz's own data shows that retailers kept their focal point prices the same,

14 even when costs for a particular product increased.  *See id*. at Figure 5 (e.g., ████████████

15 ███████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████████).

17 And, even when retailers' cost for a particular product decreased, they kept the focal point price for

18 the product the same rather than adjusting the price downwards.  *See id*. (e.g., ███████████

19 ███████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████).

23 Dr. Netz admitted that she ███████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ████████████████████████████ (Netz Tr. at 167:1-14).  Her analysis and proposed "pass

26 through" methodologies both (a) fail to account for focal point pricing and (b) are unable to

27 differentiate those transactions that had no pass through due to focal point pricing from those that

28 had positive pass-through rates.  Stiroh Rep. ¶¶ 49-50, 59-62.  This defect is grounds for denying

certification because some end users who bought products at focal point prices would not suffer any price impact from any alleged conspiracy, and individual inquiry is necessary to determine which putative class members were unaffected as a result.  *See Lithium II*, 2018 WL 1156797, at *3 (denying certification where expert failed to "adequately account for the effects of focal point pricing"); *In re Optical Disk Drive Antitrust Litig.* ("ODD I"), 303 F.R.D. 311, 325 (N.D. Cal. 2014) (same where expert did not address "the common practice in the industry of selling products costing in the hundreds of dollars at prices just under the next $100 mark"); *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022) (same in part because expert's model failed to address focal point pricing and, thus, did not reliably determine but-for pricing).

Likewise, Dr. Netz acknowledges that ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ Netz Decl. at 85; Netz Tr. at 163:3-16.  Dr. Netz claims that ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ Netz Tr. at 163:17-164:3; *see also* Stiroh Rep. ¶63.  Indeed, this court has considered and rejected indirect purchaser plaintiffs' attempt to claim that any focal point pricing would still reflect impact through reduced product quality.  *See Lithium II*, 2018 WL 1156797, at *3 (rejecting class certification and finding that indirect purchaser plaintiffs' expert did "not demonstrate that any products (and thus the purchasers of those products) actually experienced a quality reduction, rather than an increased cost, as a result of the alleged price-fixing conspiracy").  Additionally, Dr. Netz does not explain how any reductions in quality—which would occur at the manufacturer level of the distribution chain—"would affect pass-through rates for points later in the distribution chain, particularly the retailer level where pricing decisions would be most volatile and, seemingly, most likely to be affected by the focal point pricing strategy." *Id.* (ruling that injury

1    cannot be determined on a common basis as to the class where indirect purchaser plaintiffs "failed

2    to provide an explanation for the effect of focal point pricing on pass-through analysis").

3         Dr. Netz's pass through regressions also fail to account for █████████████████████

4    ████████████████████████████████████████████████████████████████████████████████

5    █████ (Netz Tr. at 144:15-145:11).  As Dr. Netz concedes, ██████████████████████████

6    ██████████████████████████████████████████████ Netz Tr. at 51:17-25, 52:12-

7    53:13, 53:16-20.  However, Dr. Netz admitted that ███████████████████████████████

8    ████████████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████████

10   █████████████████ Netz Tr. at 52:1-15, 53:14-15, 54:17-23, 145:12-16.  In particular with respect

11   to an intermediary in the distribution chain that purchases the products at issue through long-term

12   purchasing contracts, there may not be pass through if, for example, the company's prices have

13   been forced downward by market pressure but it continues to buy products under a pre-existing,

14   fixed price purchase contract.  *See, e.g.*, Ex. 9 (HP Form 10-K (Dec. 15, 2008) at 22:  "As a result

15   of binding price or purchase commitments with vendors, we may be obligated to purchase supplies

16   at prices that are higher than those available in the current market and be limited in our ability to

17   respond to changing market conditions."); Ex. 8 (Fry's Electronics representative stating that

18   "[p]rice competition, at times, required Fry's to sell [desktops and laptops] at or below the cost of

19   the [products].").

20        The only way for EUPs to account for these variables would be through "thousands of mini-

21   trials assessing the extent to which prices paid by individual class members for downstream class

22   products were higher as a result of Defendants' alleged conduct, considering focal point pricing,

23   individual negotiations throughout the distribution chain, and variations in individual sellers' pass-

24   through rates, rendering this case unmanageable and unsuitable for class action treatment."  *GPU*,

25   253 F.R.D. at 505; *Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *50 (showing pass-through

26   requires analysis on a "customer-by-customer, product-by-product, and contract-by-contract

27   basis").

28

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

At most, Dr. Netz's pass-through regressions may suggest that cost increases were passed through "overall" over the "long term"—i.e., that over the long term the pricing of firms in the distribution chain were high enough to cover their costs.  *See* Stiroh Rep. ¶ 49 ("Even if cost increases are passed through to consumers on average over a long time horizon, not all resellers will pass on small cost increases on all sales concurrently with the increase in cost."); *see also* Netz Decl. at 62-63 (economic theory showing that costs are passed through "in the long run").  But it is not enough to say that suspension assembly prices were higher than they would have been "overall" from 2003 to 2016.  EUPs need a methodology that would allow them to say that *all* of those prices were higher, or else to differentiate between those that were inflated and those that were not.  *See Silva v. B&G Foods, Inc.*, No. 20-cv-00137, 2022 U.S. Dist Lexis 182923, at *7 (N.D. Cal. Aug. 26, 2022) (plaintiff failed to provide common method to prove injury plaintiffs "present no mechanism for determining which class members suffered the economic injury asserted by the two named plaintiffs and which have not").  Otherwise, it is impossible to say whether the price of the suspension assembly incorporated into the lone computer (or enterprise storage system) purchased by a class member was "impacted" and whether such a class member suffered an "antitrust injury."

The need for individualized proof to actually "identify uninjured class members" alone suffices to "render an adjudication unmanageable." *Olean*, 31 F.4th at 669 n.13; *see also In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-1967 CW, 2013 U.S. Dist. Lexis 160739, at *33-34 (N.D. Cal. Nov. 8, 2013) (rejecting class certification because plaintiffs "failed to satisfy the manageability requirement because they have not identified a feasible way to determine which members . . . were actually harmed by the NCAA's allegedly anticompetitive conduct").  EUPs cannot satisfy their burden of proving that they can establish "impact" or identify uninjured class members by relying on the testimony and analysis of Dr. Netz because that analysis is incapable of determining whether individual class members were injured or impacted.  But that is the only proof of common impact that they offer.  The EUP class cannot be certified because impact cannot be determined on a common basis.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

2. **EUPs Have Identified No Methodology That Would Determine Whether Particular Suspension Assembly Prices Were Impacted.**

EUPs claim that Dr. Netz's quantitative analyses will establish that there was an overcharge through evidence common to all class members (Br. at 10-11), but this is not true.

Dr. Netz conducts a "before and after" regression of suspension assembly prices in an attempt to establish that prices were impacted by Defendants' alleged conduct. Netz Decl. at 89-91. She concludes, based on that analysis, that direct purchasers of Defendants' suspension assemblies paid 7.93% more overall than they otherwise would have from January 2003 to May 2016, and they paid 3.64% more overall than they otherwise would have between June and December 2016. *Id.* at 93. But her proposed overcharge model cannot show whether individual putative class members were impacted because it is unable to answer the following question: Were prices in particular suspension assembly transactions inflated?[13] Even if Dr. Netz's overcharge regression analysis was not fundamentally flawed, which as we explain below it was, at most, it is only able to support the proposition that prices of suspension assemblies "overall" were higher during the class period; it cannot say whether particular transactions had "inflated" prices.

Defendants sold unique suspension assemblies for each program they participated in, and pricing was determined on a program-by-program basis, and generally renegotiated on a quarterly basis. *See* Stiroh Rep. ¶¶ 19-21, 80-82. Any impact assessment would then necessarily need to be able to account for program-by-program and negotiation-by-negotiation pricing dynamics of this industry to determine what impact, if any, actually existed, for any particular Defendants' suspension assemblies (which would necessarily depend on which alleged agreement is implicated).[14] *See Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *47, 59 ("The fact that price patterns varied over time among different direct purchasers means that any meaningful analysis of impact or overcharges would have to be performed separately for each direct purchaser.").

---

[13] This court has rejected Dr. Netz's reliance on averaging, recognizing that her "model obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data." *Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *52.

[14] Evidence on impact will vary for those who purchased products containing different Defendants' suspension assemblies (and when they were purchased) in part due to the different conspiracies spanning different time periods, and involving different Defendants as explained above.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Moreover, here, there is every reason to believe that at least some end users would have benefitted – through better priced products – from Defendants engaging in the alleged conduct because of the separate, concurrent, "conspiracy" that EUPs allege to "kill HTI." *See* Stiroh Rep. § V.C.  There can be no common or class-wide proof of impact where some class members may have benefited from the conduct at issue.  *See In re Intel Corp. Microprocessor Antitrust Litig.*, MDL 05-1717, No. 05-485, 2014 WL 6601941, at *14 (D. Del. Aug. 6, 2014); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("a class cannot be certified when . . . it consists of members who benefit from the same acts alleged to be harmful to other members of the class.").

EUPs allege that NHK and TDK engaged in conspiratorial conduct to "wound and eliminate" HTI from the market between August 2007 and 2016 (Compl. ¶¶ 144-50), but EUPs disregard the consequences of this alleged conduct.  In many instances, TDK and NHK undercut HTI's pricing to eliminate HTI from the market.  For example, during a bidding battle for Toshiba's Cougar program, HTI offered a price quotation that would have saved Toshiba nearly $1.8 million on suspensions for this one program compared to MPT's initial proposal; after learning about HTI's lower-priced offer, MPT reduced its pricing to match HTI's pricing and achieve Toshiba's target pricing.  *See* Exs. 11-12.[15]  Any putative class members who purchased products with MPT suspension assemblies that were sold to Toshiba for the Cougar program would have benefitted from a more favorable price—and certainly could not prove antitrust impact because there was no overcharge.

Similarly, EUPs' claim that Defendants were exchanging competitively sensitive information also resulted in at least some instances through which an end-user received a lower-priced product.  Indeed, the record is replete with examples in which one of the Defendants, upon

---

[15] *See also* Ex. 13 (Mar. 19, 2009 email from MPT CEO Albert Ong stating "[s]ince last quarter MPT has decided to [] be lowest price supplier for WD in order to gain market share. . . . We want to grow our 3.5" share so that overall is 40% and that will be enough to squeeze HTI especially since we are already squeezing HTI out of SGT.  If SAE can get over 50% of Toshiba then together we can kill HTI."); Ex. 14 (Mar. 24, 2011 MPT email stating: there is a "price war" with HTI for Seagate and WD business,  that MPT is "busy trying to make sure we don't lose allocations [to HTI]," and two objectives as "1) Keep HTI out of Samsung (and TSB)" and "2) Give lowest price to Samsung."); Ex. 15 (Dec. 4, 2015 NHK email stating that "MPT has been lowering prices to kill HTI at WD and SGT").

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

being informed of a potential competitor's price, actually reduced its price to be more competitive. *See, e.g.*, Ex. 16 (July 21, 2011 email noting that NHK reduced its pricing for Iris program to become more competitive and aggressive against MPT's price); Ex. 17 (Jan. 1, 2012 email from Mr. Ong directing others at MPT to "[g]o for the allocation especially when it comes to SO" after learning of NAT's latest quotation for Seagate's M8 program); Ex. 18 (June 6, 2006 email and how "NHK low-balled the price" for Aries and Capitola program). Moreover, MPT's Vice-President of Sales for most of the class period testified: "If [NHK's Vice-President/General Manager Skipp Harvey] tells me he's holding firm on pricing, it also tells me that I have an opportunity if I reduce it." Ex. 19 (McHone Tr. at 208:21-23).

The evidence establishes that there were suspension assembly sales during the class period that were not inflated. Using Dr. Netz's own regression model with separate "controls" for different programs results in a finding of ***no overcharge*** on 26 of the 44 programs that were sold both during the alleged class period and the benchmark period, accounting for 34.6% of suspension assembly units sold for these programs. *See* Stiroh Rep. ¶ 83 & Stiroh Ex. 6B; Netz Decl. at 55. This "differential impact" by program also shows that, when Dr. Netz's model is adjusted to account for the various alleged agreements, as Dr. Stiroh finds, "there were programs with no overcharges" at all. Stiroh Rep. ¶ 84. But the methodology proposed by EUPs is incapable of differentiating between those transactions that were impacted and those that were not. *Id.* ¶ 85 ("it is not possible to trace" which EUP class members purchased products derived from which suspension assembly programs "with data or information common to the class").

As noted in Section I.A.1, the very similar fact pattern and nearly-identical argument proffered by indirect purchasers in *Flash Memory* (via the same expert, Dr. Netz), that this court rejected warrants the same result here. In that case, the court rejected Dr. Netz's regression model to determine whether there was an overcharge, explaining that "[t]he flaw in Dr. Netz's analysis is that it fails to take into account the fact the wide range of different types of products with equally varied attributes . . . and prices." *Flash Memory*, 2010 U.S. Dist. Lexis 59491, at *52. The court also held that "Dr. Netz'[s] regression analysis does not take into account individual variances in price trends based on a particular chip or a particular chip purchased by a specific Direct-Purchaser-

1    -or even more generally, by *category* of chip or *category* of customer." *Id.* (emphasis in original).

2    **B.   EUPs Have No Common Method of Calculating Damages**

3    The proposed class also cannot be certified because the complexity of damages calculations

4    defeats predominance.  While individualized damages do not alone defeat class certification, *Levya*

5    *v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), EUPs' damages model must establish

6    that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34; *D.C.*

7    *v. Cnty. of San Diego*, 783 F. App'x 766, 767 (9th Cir. 2019) (affirming denial of class

8    certification).  It does not.

9    EUPs state that all that is required at this stage is an "approximate damages formulation"

10   that provides a "method for calculating aggregate damages for overcharges" (Br. at 22-23), but this

11   misses the point.  EUPs may offer a model for calculating damages, but it must "translat[e] the

12   *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*,

13   569 U.S. at 38 (emphasis in original).  As this court explained, "[i]n *Comcast*, the Supreme Court

14   rejected the concept that 'at the class-certification stage any method of measurement is acceptable

15   so long as it can be applied classwide' and required plaintiffs bringing an antitrust suit to tie each

16   theory of liability to a calculation of damages." *Stemmelin v. Matterport, Inc.*, No. 20-04168, 2022

17   U.S. Dist. Lexis 44732, at *26 (N.D. Cal. Mar. 14, 2022) (quoting *Comcast*, 569 U.S. at 35); *see*

18   *also D.C. v. Cnty. of San Diego*, 2018 WL 36682, at *3 (S.D. Cal. Feb. 2, 2018).

19   EUPs have alleged multiple theories of liability[16] but only offered one damages model that

20   purports to assess the "total class-wide damages" over a period corresponding to one alleged theory

21   of liability (Netz Decl. at 102).  On its face, the damages model ████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████   Netz Tr. at 120:14-123:9.  Even if the Court finds that all other requirements for class

25   

26   [16] As this court acknowledged in *CRT*, the fact pattern here raises the same "multiple theories of

27   liability" issue that was a concern in *Comcast* – and which the court considered and found was not

     present in *CRT* or in another case cited by EUPs, *In re High Tech Employee Antitrust Litig.*, 289

28   F.R.D. 555 (N.D. Cal. 2013) because plaintiffs in both cases alleged only "one theory of antitrust

     harm." *CRT*, 2013 WL 5391159, at *7 (N.D. Cal. Sept. 24, 2013).

**DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1    certification are met, this failure is fatal to EUP's ability to obtain class certification.

2    Moreover Dr. Netz cannot plausibly explain how she can provide a method for calculating

3    damages on a class-wide basis that would be workable and effective in accounting for this different

4    theory of liability. *See Werdebaugh v. Blue Diamond Growers*, No. 12-cv-02724, 2014 U.S. Dist.

5    Lexis 173789, at *47 (N.D. Cal. Dec. 15, 2014) (court "is obligated to do more than rubberstamp a

6    proposed damages class merely because the plaintiff's expert purports to have used a peer reviewed

7    methodology such as a regression analysis"). And, any promise to perform "subsequent analysis"

8    after a class is certified runs afoul of *Comcast*, which "does not permit the Court to wait until after

9    certification to assess whether [the proposed model] is capable of measuring economic injury

10   attributable" to a particular theory on a class-wide basis. *Ang v. Bimbo Bakeries USA, Inc*., No. 13-

11   cv-01196, 2018 U.S. Dist. Lexis 149395, at *40-41 (N.D. Cal. Aug. 31, 2018); *see also Opperman*

12   *v. Kong Techs*, No. 13-cv-00453, 2017 U.S. Dist. Lexis 116333, at *39 (N.D. Cal. July 25, 2017)

13   (expert's "assurance that he c[ould] build a model to calculate damages" tied to plaintiffs' theory

14   of liability was inadequate).

15       **C.**    **Liability Questions Are Not Common to All Putative Class Members.**

16   The "liability" issues are not—and cannot be, based on EUPs' own allegations in this

17   action—uniform for all class members. Although EUPs label their claims as involving "a

18   conspiracy" stretching over the entire class period of fourteen years (Br. at 17), they have alleged

19   at least three separate alleged agreements that they claim restrained trade: (1) an agreement

20   between TDK and NHK to "fix prices" and "allocate customers and markets" reached in the 2007

21   to 2009 period; (2) an agreement between TDK and NHK to "kill HTI" from around 2007 or 2008

22   to 2016; and (3) agreements between MPT and NHK, between NHK and HTI, and between MPT

23   and HTI to share "competitively sensitive information" potentially as early as 2003.[17] The proof of

24   those agreements will necessarily differ. *See, e.g.*, *In re Plastics Additives Antitrust Litig*., No. 03-

25   2038, 2006 WL 6172035, at *6 (E.D. Pa. Aug. 31, 2006) (holding "that plaintiffs have not met their

26

27   ───────────────

[17] Dr. Netz similarly testified that ███████████████████████████████████

28   ████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Netz Tr. at 120:8-13.

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

burden of showing the predominance of common proof of a single, class-wide conspiracy, but, instead, that plaintiffs' evidence at the class certification stage supports a theory of establishing multiple, segment-specific conspiracies through segment-wide proof"); *see also Windham v. Am. Brands, Inc.*, 565 F.2d 59, 67 (4th Cir. 1977) (recognizing the "problem" caused by "the variety of claims as asserted by the various plaintiffs themselves arising out of the several violations alleged by the plaintiffs").[18]

As such, each class member will need to show individualized proof to establish that there is a violation of antitrust law based on, at a minimum, which of the different subsets of the class any particular class members falls into (i.e., which alleged agreement is the theory of liability that is applicable to them, which will depend on: when they made their qualifying transaction, which Defendant's suspension assemblies are in the product that they purchased, and through which suspension assembly program did the Defendants sell the suspension assemblies that are in their product).  For example, the evidence on which a putative class member who purchased a computer containing HTI suspension assemblies in 2004 would need to rely is different from the evidence on which a putative class member who purchased a computer containing MPT suspension assemblies in 2010 will need to rely.

The fact that EUPs cannot establish liability with evidence common to the class is further underscored by the fact that the different agreements that EUPs have alleged are subject to different process, standards, and evidentiary showings.  While the alleged agreement(s) between TDK and NHK to fix prices and allocate customers and market is subject to a per se liability standard, the claims of agreements between any of the Defendants to exchange competitively sensitive information and between TDK and NHK to remove HTI from the market are potentially subject to the more robust (and otherwise "presumptive") rule of reason standard.  *See United States v. U.S.*

---

[18] In *Windham*, the Fourth Circuit affirmed the district court's denial of class certification.  It explained that "[c]onfronted with this congeries of both separate allegations of conspiracy violations and individualized claims of injury and damage, all intertwined, the district judge found that, if he certified this action as a class action, the court would be swamped by an overwhelming deluge of mini-trials."  *Windham*, 565 F.2d at 67.  As a result, the "issue of violation did not predominate nor was a class action a superior remedy in the case." *Id.*

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("exchange of price data and other information among competitors does not invariably have anticompetitive effects" and it not a *per se* violation of antitrust law); *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3-07-5944-SC, 2016 U.S. Dist. Lexis 189474, at *129 (N.D. Cal. Oct. 26, 2016) (rule of reason applies to direct action plaintiffs' claim that defendants exchanged competitive information);  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1143 (N.D. Cal. 2009) (applying rule of reason analysis to allegations that information exchange between competitors of pricing and competitively sensitive information violated antitrust laws); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (application of rule of reason is "presumptive").  While here, the different evidentiary burdens required to prove the different alleged agreements that EUPs claim violate antitrust laws alone defeat class certification, the mere fact that a claim is subject to the rule of reason may result in individual issues "overwhelming" any common questions.[19]  *See, e.g., Conrad v. Jimmy John's Franchise, LLC*, No. 18-cv-00133, 2021 WL 3268339, at *9 (S.D. Ill. July 30, 2021).

Based on EUPs' claims and their putative class definition (which includes all end-users who purchased standalone storage devices or laptop or desktop computers containing any of the Defendants' suspension assemblies in the 29 EUP States between 2003 and 2016), the putative class will include different class members who would be affected by different alleged conspiracies that covered different time periods.  Thus, no common questions or issues will predominate over the individualized issues that will be required for class members to establish liability.  Moreover, the nature of the different violations alleged calls into question whether there is ***any*** common question of liability across all putative class members.

## II.    The Class Representatives' Claims Are Not "Typical."

In addition to establishing that common issues predominate, EUPs also bear the burden of

---

[19] The rule of reason requires a full-blown analysis of (i) the definition of the relevant product and geographic markets, (ii) market power of the parties in the relevant market, (iii) the existence of anticompetitive effects, and (iv) any pro-competitive justifications, with the court hearing evidence and argument on the positive and negative effects of any alleged restraint before determining whether there is a violation. *See NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).

establishing each of the Rule 23(a) prerequisites for certifying a class, including that the claims of the proposed class representatives are "typical" of the class claims.  *See* Fed. R. Civ. P. 23(a)(3). To assess typicality, the Court must consider whether the class representatives' "individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based."  *ODD I*, 303 F.R.D. at 317 (citation omitted).

### A.    The Class Representatives Are All Individuals Who Made Small Purchases.

Courts have found that class representatives' claims are not typical and that they may not serve as adequate representatives for other class members if there is not a class representative for discrete customer sets who, for example, purchase the product differently.  *See id.* at 318; *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467-68 (4th Cir. 2006); *Intel Corp.*, 2014 WL 6601941, at *11-12 ("class consisting of both individual and enterprise customers cannot be certified when the representatives do not also include both individual and enterprise customers" because they enterprise customers purchase "larger volumes and different types of computers" that are "negotiated in a different competitive landscape" from individuals).

Here, EUPs are individuals who claim to have purchased one or a few products, in person at a store (such as Best Buy) or online (through retailer or OEM websites such as Amazon, Newegg, or HP).[20]  However, the named EUPs seek to represent a class that comprises end users who are very differently situated from them: large corporate consumers that would purchase different types of products at much higher volumes, likely pursuant to agreements with negotiated prices and terms that may include other benefits such as bundled services or products, warranties, or volume/relationship discounts.  *See Intel Corp.*, 2014 WL 6601941, at *11-12.  EUPs' expert acknowledged that ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Netz Tr. at 51:17-52:22.

---

[20] For example, twenty EUPs allege that they purchased a class product at Best Buy.  *See* Compl. ¶¶ 24, 28 32-36, 40, 46, 48, 51, 53-54, 56, 58-59, 65-66, 74.  And, nineteen EUPs allege that they purchased a class product from Amazon, Newegg, and/or HP.com.  *See id.* at ¶¶ 25-26, 39, 43-45, 47-48, 52, 57-58, 60-62, 69, 71-74.

The differences in the corporate end users—and the nature of their purchase transactions—and the individual end user plaintiffs reveal that they do not satisfy the typicality or adequacy requirements.

### B. Different Class Members May Want to Pursue Different – and Conflicting – Theories of Antitrust Liability

A putative class representative with "interests [that] are antagonistic to or in conflict with the objectives of those [class members] he purports to represent" cannot adequately protect the class. 7A Wright, Miller & Kane, Federal Practice and Procedure Civil, 3d § 1768; *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1195 (11th Cir. 2003) ("[D]isparate groups cannot be mixed together under Rule 23(a) where the economic reality of the situation leads some class members to have economic interests that are significantly different from—and potentially antagonistic to—the named representatives purporting to represent them.").

Merely based on the distinct claims and conspiracies alleged by EUPs, there will be class members with different—and antagonistic—economic interests. For example, a class member who purchased a laptop that contains MPT's suspension assemblies that may have been impacted by the alleged conspiracy between TDK/MPT and NHK to take market share from HTI may not have an interest in pursuing that theory if he likely benefitted from MPT selling those suspension assemblies at a lower price to undercut HTI in furtherance of the alleged conspiracy. *See, e.g.*, *supra* Section I.A.2 for examples. In another example, EUPs' claim as to the exchange of competition or price sensitive information between certain Defendants may have resulted in a particular Defendant, upon receiving that information, reducing its suspension assembly pricing to increase its own business. A putative class member who ultimately purchased a laptop that contained that Defendant's suspension assemblies that were sold through a program in which it actually reduced its price similarly would have benefitted from that particular alleged conduct. In fact, the record is replete with examples of a Defendant lowering its price on suspension assemblies to be more competitive, as provided above in Section I.A.2. As these examples demonstrate, it is likely that different putative class members (depending on which Defendant's suspension assemblies are in their product and the specific conduct or conspiracies in which that Defendant is alleged to have engaged) will want to pursue (or not pursue) different theories of antitrust liability—and those

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   theories may be in economic tension with one another.

2   <u>**CONCLUSION**</u>

3       For the foregoing reasons, Defendants respectfully request that the court deny EUPs'

4   motion for class certification.

5

6     Dated: December 23, 2022                       Respectfully submitted,

7                                           */s/ J. Clayton Everett, Jr.*

8                                  J. Clayton Everett, Jr.
                                   **MORGAN, LEWIS & BOCKIUS LLP**

9                                  1111 Pennsylvania Ave., NW
                                   Washington, DC 20004

10                                 Telephone: (202) 739-3000
                                   clay.everett@morganlewis.com

11                                 Michelle Park Chiu (State Bar No. 248421)

12                                 **MORGAN, LEWIS & BOCKIUS LLP**
                                   One Market, Spear Street Tower

13                                 San Francisco, CA 94105
                                   Telephone: (415) 442-1000

14                                 michelle.chiu@morganlewis.com

15                                 *Attorneys for Defendants TDK Corporation,*
                                   *Magnecomp Precision Technology Public*

16                                 *Co. Ltd., Hutchinson Technology Inc., and*
                                   *SAE Magnetics (H.K.) Ltd.*

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

2
                                                     */s/ Mark H. Hamer*
                                             Mark H. Hamer (State Bar No. 156997)
3                                            mark.hamer@bakermckenzie.com
                                             Mark G. Weiss (pro hac vice)
4                                            mark.weiss@bakermckenzie.com
                                             **BAKER & McKENZIE LLP**
5                                            815 Connecticut Ave., N.W.
                                             Washington, D.C. 20006
6                                            Telephone: (202) 452-7077

7                                            Catherine Y. Stillman (State Bar No.
                                             242440)
8                                            catherine.stillman@bakermckenzie.com
                                             **BAKER & McKENZIE LLP**
9                                            452 Fifth Avenue
                                             New York, New York 10018
10                                           Telephone: (212) 626-4218

11                                           Craig Y. Lee (*pro hac vice*)
                                             craiglee@huntonak.com
12                                           Carter C. Simpson (*pro hac vice*)
                                             csimpson@huntonak.com
13                                           Christopher J. Dufek (*pro hac vice*)
                                             cdufek@huntonak.com
14                                           **HUNTON ANDREWS KURTH LLP**
                                             2200 Pennsylvania Ave., N.W.
15                                           Washington, D.C. 20037
                                             Telephone: (202) 955-1500

16                                           *Attorneys for Defendants NHK Spring Co.,*
                                             *Ltd., NHK International Corporation, NHK*
17                                           *Spring (Thailand) Co., Ltd., NAT Peripheral*
                                             *(Dong Guan) Co., Ltd., and NAT Peripheral*
18                                           *(H.K.) Co., Ltd.*

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO END-USER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

I, J. Clayton Everett, Jr., hereby attest, pursuant to Civil Local Rule 5-1(i)(3) of the

Northern District of California, that the concurrence to the filing of this document has been

obtained from each signatory hereto.

*/s/ J. Clayton Everett, Jr.*
J. Clayton Everett, Jr.

1

## **CERTIFICATE OF SERVICE**

2        I, J. Clayton Everett, Jr., hereby certify that on December 23, 2022, I electronically filed

3  the foregoing document with the Clerk of the Court of the United States District Court for the

4  Northern District of California by using the Court's CM/ECF System and served a copy of same

5  upon all counsel of record via the Court's electronic filing system.

6

7                                           */s/ J. Clayton Everett, Jr.*

8                                          J. Clayton Everett, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

3:19-MD-02918-MMC

CERTIFICATE OF SERVICE