# EXHIBIT 1
# Public Redacted Version

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION<br><br>ALL CASES | Case No.: 19-md-02918-MMC<br>MDL No. 2918 |

# EXPERT REPORT OF LAUREN J. STIROH, PH.D.

## December 22, 2022

Redacted Public Version of Document Filed Under Seal

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table of Contents**

**I.    Introduction**                                                          **1**
    A.   Qualifications                                        1
    B.   Assignment                                            1
    C.   Materials Relied Upon                                 2
    D.   Summary of Plaintiffs' Allegations                    2
    E.   Summary of Opinions                                   3

**II.   Background**                                                            **8**
    A.   The Putative Classes                                  8
    B.   Industry Background                                   9
    1.   SAs and HDDs                                          9
    2.   The Supply Chain for SAs and HDDs                     13
    3.   Changes in the SA and HDD Industry                    14
    4.   The Scope and Complexity of the HDD Industry Mean That It Is
        Not Amenable to Class-Wide Overcharge Analysis       16

**III.  Economics of Class Certification**                                      **17**

**IV.   Overview of Plaintiffs' Experts' Opinions Related
to Class Certification**                                                        **18**
    A.   Dr. Williams' Opinions Related to Class Certification  18
    B.   Dr. Netz's Opinions Related to Class Certification    20

**V.    The Proposed Classes Include Unharmed Class
Members and Plaintiffs Do Not Provide Any Common
Methodology to Identify the Unharmed Class Members**                            **21**
    A.   Resellers That Passed Through the Entirety of the Alleged
        Overcharge Are Not Injured                            22
    B.   Purchasers Buying from Resellers That Did Not Pass on Any of
        the Alleged Overcharge Are Unharmed                   24
    1.   Not All End-Users Suffered Harm Because Resellers Price at
        Focal Points and Employ Other Promotional Pricing Strategies  24
    2.   Varying Competitive Dynamics in the Industry Indicate the
        Presence of Unharmed Class Members                    30
    C.   The Alleged Agreement to Drive HTI out of the Market Is
        Inconsistent with Prices Being Elevated Class-Wide    32
    D.   Even if Plaintiffs' Experts' Overcharge Models Were Valid, Not
        All Suspension Assembly Programs Were Overcharged     34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

E.    Plaintiffs' Experts Assign Damages to Class Members that
      Purchased Products Not Sold by Defendants and for Which No
      Overcharge Has Been Established                                        38

**VI.    Plaintiffs' Experts' Overcharge Models Are
Flawed and Fail to Demonstrate Common Impact           39**
A.    Plaintiffs' Experts' Overcharge Models Omit Relevant Variables         40
B.    Plaintiffs' Experts Overcharge Estimates Are Not Robust to
      Alternative Class Periods                                              45

**VII.    Dr. Netz's Pass-Through Model Is Flawed and
Fails to Support Her Assertion That Impact Is Common
to the End-User Class                                   46**

**VIII.    Plaintiffs' Experts' Models Are Built on
Assumptions That Inflate the Alleged Damages to the
Purported Classes                                       52**
A.    Dr. Williams' Damages Model Is Flawed and Unreliable                   52
1.    Dr. Williams Overstates the Share of U.S. Sales of HDD SA
      Products Attributed to the Reseller Class States                       53
2.    Dr. Williams Includes the Alleged Overcharge Passed Through
      from Resellers to End-Users in His Damages Estimate                    54
B.    Dr. Netz Does Not Propose a Damages Model Capable of
      Assessing Damages to the End-User Class                                55

**IX.    Dr. Williams and Dr. Netz Cannot Identify the
Damages, If Any, Owed to Any Individual Class Member    56**

**X.    Conclusion                                         60**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# I.    Introduction

## A. Qualifications

1.    My name is Lauren J. Stiroh.  I am an economist and Managing Director of NERA Economic Consulting.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation, and finance.  A substantial portion of my work, as well as NERA's consulting work, includes the analysis of impact of alleged anticompetitive conduct and the determination of economic damages.

2.    I have provided economic consulting services and testimony in over 75 antitrust cases in connection with liability, damages, and class certification issues.  I have testified at trial and in deposition regarding a variety of business practices.  These include, for example, cases involving allegations of price-fixing, commercial disputes, business interference, breach of contract, allegations of monopolization, price predation, tie-ins, price discrimination, abuse of market power, and patent infringement.  I have experience with antitrust damages and class certification issues in a range of industries including semiconductors, capacitors, real estate, café franchises, futures trading exchange services, advertising and promotion, labor, sports, industrial chemicals, automotive services, consumer products, pharmaceuticals, biotechnology, medical devices, and agricultural products.

3.    I have testified as an economist in numerous antitrust class actions.  I have been retained as an expert economist and worked on all phases of class action litigation, including assessing whether impact to the proposed class can be established with information and methods common to the class, evaluating the economic merits of antitrust allegations, and determining the competitive impact and resulting damages to the class.

4.    I received my Ph.D. in economics from Harvard University in 1996.  Prior to that, I completed my B.A. in economics from the University of Western Ontario in 1990, and my M.A. from the University of British Columbia in 1991.  My curriculum vitae, which includes a list of my prior expert testimony, is appended to this report as **Exhibit 1**.  NERA is being compensated for my time at a rate of $1,050 per hour. Neither NERA's compensation, nor my compensation, depends on the outcome of this litigation.

## B. Assignment

5.    I have been asked by counsel for NHK Spring Co., Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd. (collectively, "NHK") and TDK Corporation, Magnecomp Precision Technology Public Co. Ltd., Magnecomp Corporation, SAE Magnetics (H.K.) Ltd., Hutchinson Technology, Inc. (collectively, "TDK") to opine on whether the economic evidence and analysis that would be used to assess antitrust impact and damages resulting from antitrust allegations as set out in the Complaints

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

are common to the proposed class members and whether (and to what extent, if at all) any questions in relation to that evidence and analysis affect only individual members.[1]  Plaintiffs' antitrust allegations in this matter relate to an alleged conspiracy to fix prices and allocate market shares for hard disk drive ("HDD") suspension assemblies ("HDD SAs").[2]  Specifically, I have been asked to evaluate and comment on the opinions, methodologies, analyses, and calculations presented in the reports of Dr. Williams and Dr. Netz, served on October 11, 2022, as they pertain to whether impact and damages, if any, resulting from Defendants' alleged anticompetitive behavior can be evaluated using information and methods common to the proposed classes.[3]

## C. Materials Relied Upon

6.      In preparing this report, I, and economists working under my direction, have reviewed the Williams Report and the Netz Report, documents and data referenced therein, the Complaints, documents, deposition transcripts, declarations, other testimony provided in connection with this case, and publicly available information. The opinions expressed in this report are based on my review of this information, my training and experience as an economist, and the application of economic analysis to the information that I have reviewed.  A list of the sources of information and materials I relied upon in forming my opinions is presented in **Exhibit 2**.

## D. Summary of Plaintiffs' Allegations

7.      Plaintiffs allege that Defendants engaged in a conspiracy "to fix, raise, maintain, and/or stabilize prices," and "allocate the market and customers" for HDD SAs.[4]  According to Plaintiffs, Defendants' alleged conspiracy adversely affected persons in the United States who purchased products containing an HDD SA manufactured or sold by Defendants.[5]

8.      Plaintiffs claim that Defendants formed a conspiracy to "monitor[] the demand and prices for HDDs, computers, and other finished production applications" and "used

---

[1]   [Proposed] Reseller Plaintiffs' Third Consolidated Amended Complaint, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* Case No. 19-md-02918-MMC, December 14, 2021 ("Reseller Complaint"); End-User Plaintiffs' Fourth Amended Consolidated Class Action Complaint, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* Case No. 19-md-02918-MMC, October 28, 2022 ("End-User Complaint").

[2]   Reseller Complaint, ¶¶ 1, 20; End-User Complaint, ¶¶ 1, 97.

[3]   Expert Report of Michael A. Williams, Ph.D., *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, United States District Court for the Northern District of California, October 11, 2022 ("Williams Report"); Declaration of Janet S. Netz, Ph.D., in Support of End-User Plaintiffs' Motion for Class Certification, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, United States District Court Northern District of California, October 11, 2022 ("Netz Report").

[4]   Reseller Complaint, ¶¶ 1, 20; End-User Complaint, ¶¶ 1, 97.  I understand that NHK Spring Co., Ltd. agreed to plead guilty for its role in a conspiracy to suppress and eliminate competition by fixing prices of HDD suspension assemblies sold in the United States and elsewhere from May 2008 to April 2016.  Rule 11 Plea Agreement, *United States of America v. D-1: NHK Spring Co., Ltd.*, Case No. 2:19-cr-20503-MAG-DRG, September 23, 2019.

[5]   Reseller Complaint, ¶ 22; End-User Complaint ¶ 102.

industry reports and internal analyses to track the street, or retail, prices of HDDs," which ultimately informed Defendants' business strategies.[6]  Plaintiffs further claim that suspension assemblies are a commodity-like product and suspension assemblies produced by different firms for the same program are interchangeable as HDD components.[7]  Plaintiffs allege that Defendants were able to more easily agree on prices and to monitor those agreed-upon prices because of the commodity nature of HDD SAs.[8]

9.   Plaintiffs also allege that TDK and NHK formed "a conspiracy within a conspiracy" to harm Hutchinson Technology, Inc. ("HTI"), agreeing to avoid a price war with one another and "collectively to take market share from HTI as a way to profit more from their conspiracy."[9]  Thus, they alleged that HTI was a victim of the conspiracy until it was acquired by TDK in 2016.

10.   Plaintiffs are seeking damages on the grounds that "Plaintiffs and the Classes paid more during the Class Period for HDD suspension assemblies than they otherwise would have paid in a competitive market."[10]  According to Plaintiffs, "Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for HDD suspension assemblies purchased indirectly from the Defendants and/or their co-conspirators."[11]

## E.  Summary of Opinions

11.   Based on my analysis to date, I have reached the following opinions:

   a.   The purported class includes unharmed class members and Plaintiffs' experts' models are incapable of distinguishing harmed from unharmed class members.

      i.   My analysis shows that prices were not elevated for a large number of suspension programs.  Resellers and end-users that purchased these suspension programs did not pay purportedly anticompetitively elevated prices, and thus are unharmed.  Individual inquiry is required to identify which resellers or which end-users ultimately purchased products containing these suspension programs.

      ii.   Plaintiffs' experts' pass-through models show that a large number of resellers passed through the entirety of the alleged overcharge to other entities or to end-users and are thus unharmed, according to their own

---

[6]   Reseller Complaint, ¶¶ 57-58.

[7]   Reseller Complaint, ¶ 90; End-User Complaint, ¶ 219.

[8]   Reseller Complaint, ¶ 90; End-User Complaint, ¶ 219.

[9]   End-User Complaint, ¶¶ 145-147.

[10]   Reseller Complaint, ¶ 12; End-User Complaint ¶ 15.

[11]   Reseller Complaint, ¶ 146; End-User Complaint, ¶ 15.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

analyses.  According to Dr. Netz's calculations, this would include nearly every reseller for which she assesses a pass-through rate.

iii. Plaintiffs' experts' proposed methods to estimate pass-through rates improperly assume that each reseller will uniformly respond to a purported cost increase over a 13-year period, without accounting for the fact that most resellers would set their pricing depending on current supply and demand conditions.  Members of the purported classes might thus be unharmed, depending on the timeframe of their purchases and on the specific entities from which they purchased the products at issue.

iv. Plaintiffs' experts and information in the record indicate that HTI was a target, rather than a participant, in one of the alleged conspiracies.  If NHK and TDK conspired to undercut HTI to push it out of the market, suspension assembly prices for sales where HTI was a competitor would have been lower rather than anticompetitively elevated, and the purchasers of these products would not have been harmed.  Individual inquiry is required to identify which resellers or which end-users ultimately purchased these products.

b. My analysis demonstrates that the alleged anticompetitive conduct cannot be established with methods common to the putative class.  The products at issue are part of multiple HDD programs and are complex, technical components of a larger system.  Defendants collaborated with HDD manufacturers to design these products.  In addition, Defendants engaged in communications related to joint ventures and patent licensing.  Further, HTI, one of the entities currently affiliated with the Defendants, is not alleged to have participated in anti-competitive agreements and was instead a target of one of the alleged agreements between other Defendants.  These factors are not incorporated into the Plaintiffs' experts' methodologies and analyses.

c. Plaintiffs' experts' conclusion that the impact, if any, of the conduct at issue is common to the purported classes is based on a flawed and unreliable regression model.

i. The HDD SA industry is characterized by declining prices and declining costs.  The average prices of suspension assemblies tend to be higher in earlier periods than in later periods.  Plaintiffs' experts' overcharge models fail to control for these industry dynamics and misattribute these price differences to the effects of the alleged conspiracy.  Once appropriate controls are included, Plaintiffs' experts' econometric models fail to show that prices were anticompetitively elevated during the alleged class period.

ii. Plaintiffs' experts' purported finding of an overcharge of the magnitude that they assert depends crucially on their counsel-provided assumption

that the class period includes sales from 2003 through mid-2016. Both Dr. Netz and Dr. Williams ████████████████████████████████████ ████████████████████████████████ ████████████████████████

iii. Even if Plaintiffs' experts' models were reliable, they fail to show any overcharge on a large number of suspension programs, which is inconsistent with their claim that impact, if any, of the conduct at issue is common to the purported classes.

d.  Plaintiffs' experts' approach to calculating the pass-through rate throughout the supply chain is flawed.

i.  Neither Dr. Williams' nor Dr. Netz's analyses of pass-through establish that impact is common to the class or that it can be measured with methods common to the class.

ii. 

iii. Variation in pass-through rates, where some pass-through rates are above 100 percent and some are below 100 percent, means that impact is not common to either the Reseller Class or the End-User Class. Resellers who fully passed through the purported overcharge did not suffer economic injury. In contrast, end-users who purchased through a chain of suppliers where some part or all of the alleged overcharge was absorbed by entities further up the chain are differentially impacted compared to end-users who purchased through a chain of supply where overcharges were fully passed through. Dr. Netz provides no methodology by which the Court would be able to identify which members of the End-User Class were not injured because there was no pass-through and which members of the End-User Class were allegedly injured.

iv. Not all end-users paid an overcharge, even if Defendants' conduct caused an increase in HDD SA prices. Dr. Netz provides no analysis to evaluate the extent to which focal point pricing, rebates, and other pricing strategies insulates End-User Class members from the effects of the agreements at issue. While Dr. Netz says that such pricing dynamics can be consistent

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

with pass-through of an overcharge, she provides no analysis to establish that overcharges are in fact passed through to end-users in all of the wide variety of the products they buy. It is unequivocal as a matter of economics that focal point pricing for products that are several hundred dollars will not necessarily shift to a higher focal point if costs increase by less than one dollar.

v.  A comparison of Dr. Williams' and Dr. Netz's pass-through estimates shows conflicting and contradictory results. While Dr. Netz claims to include several controls for factors that might affect product prices in her pass-through calculations, she includes such controls for only three of the 35 entities for which she seeks to calculate a pass-through rate. This omission leads her to overestimate pass-through rates, which she finds are ███████████████████████████████████████████████████ ███████████ Dr. Netz's claim that assuming a 100 percent pass-through rate throughout the supply chain would be a conservative approach to calculating damages to the purported class is thus unfounded.

e.  Dr. Williams' damages model relies on a number of unsupported assumptions that inflate the alleged damages to the purported class.



f.  Dr. Netz does not provide a model capable of assessing damages with information common to the class. Dr. Netz uses a flawed model to calculate the pass-through rate for individual entities but does not opine on how to translate that model into a pass-through rate to members of the purported End-User Class. While she claims

her proposed method could calculate damages by using the "appropriate" pass-through rate, she does not provide any details on how the "appropriate" pass-through rate from direct purchasers to end-users should be calculated.

g.  The products at issue were incorporated into tens of thousands of finished products purchased by resellers and end-users.  These differences led to significant variation in prices across products, customers, and time.  Plaintiffs' experts' models show that, even if there was an overcharge, there are vast differences across class members depending on which products they purchased and from which entities, the number of links in the supply chain separating Defendants and members of the purported classes, and the pass-through rates at each level of the supply chain.  As a matter of economics, these factors are consistent with the need for individualized analyses, rather than a common analysis, to determine antitrust impact and damages for members of the proposed classes.

h.  The damage models proposed by Dr. Williams and Dr. Netz do not provide any means of calculating damages for individual resellers or end-users in the proposed classes.  Neither Dr. Williams nor Dr. Netz provide illustrative calculations of how their respective damages models can be applied to the individual circumstances of the named Plaintiffs in these matters, and indeed such damages cannot be determined using the models put forward by Plaintiffs' experts.

   i.  

   ii. Dr. Netz's damage method suffers from additional flaws in that the necessary data to apply her model to members of the End-User Class simply do not exist.  Even among the named Plaintiffs in the End-User Class, 29 percent did not provide proof of purchase or information on the price paid.

12.     These opinions are based on my review and analysis of information made available to me to date.  I reserve the right to update my opinions should additional information become available to me.

## II.   Background

### A. The Putative Classes

13.     The named Plaintiffs in these matters seek to represent the following classes:

a.  The Reseller Class which includes indirect purchasers in certain states who purchased a computer or standalone storage device for resale that contained a Defendant-manufactured HDD SA between January 2003 and May 2016;[12] and

b.  The End-User Class which includes indirect purchasers in certain states who purchased a computer or standalone storage device not for resale that contained a Defendant-manufactured HDD SA between January 2003 and December 2016.[13] In **Exhibit 3** I summarize available information on purchases made by named End-User Class Plaintiffs, on which they are purportedly claiming damages.

14.     For both proposed classes, standalone storage devices include personal storage systems and enterprise storage systems.[14]

---

[12]  The Plaintiffs seek to certify a Reseller Class defined as "[a]ll persons or entities, in the Indirect Purchaser States, except OEMs, who, during the period from January 2003 through May 2016, purchased a Standalone Storage Device or Computer for resale which included as a component part one or more HDD suspension assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants or indirectly purchased an HDD suspension assembly, for resale, that was manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants."  Reseller Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* Case No. 19-md-02918-MMC, October 11, 2022, p. 2.  The Indirect Purchaser States in the Reseller Class are California, Michigan, Minnesota, New York, and North Carolina.  Reseller Complaint, ¶¶ 161-182.  The Reseller Class definition used in the Williams Report differs from the class definition in the Reseller Complaint.  Williams Report, Footnote 1; Reseller Complaint, ¶¶ 141-142.  Dr. Williams testified ███████████████████████████████████████████████████████████
Deposition of Michael A. Williams, Ph.D., Managing Director, Berkeley Research Group, December 14, 2022 ("Williams Deposition"), 116:5-117:23.

[13]  The Plaintiffs seek to certify an End-User Class as "[a]ll persons and entities who, during the time period January 1, 2003 to December 31, 2016 ('Class Period'), in the Indirect Purchaser States, purchased Standalone Storage Devices or Computers, not for resale, which included hard disk drive ('HDD') suspension assemblies ('SAs') that were manufactured or sold by Defendants (the 'Classes')."  End-User Plaintiffs' Motion for Class Certification, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* Case No. 19-md-02918-MMC, October 11, 2022, p. 1.  The Indirect Purchaser States in the End-User Class are Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  End-User Complaint, ¶¶ 286-337.

[14]  The Complaints use the term "Standalone Storage Devices" to refer to personal HDD storage devices and enterprise HDD storage systems.  Personal HDD storage devices include HDDs purchased for installation in a computer or storage device, external hard drives, and network attached storage (NAS) drives, which are similar to external hard drives but have a separate power supply among other different features.  Enterprise HDD storage systems are storage servers or arrays and generally comprise of multiple HDDs.  Desktop and portable computers, such as laptops, are referred to as "Computers."  Reseller Complaint, ¶¶ 46-48; End-User Complaint, ¶ 12.

## B. Industry Background

15.     The Defendants design and manufacture HDD SAs.  SAs are one of many parts of an HDD.  An HDD is a data storage device that stores digital information such as computer operating systems, applications, documents, pictures, and music.[15]  It is a non-volatile device, which means that data are retained even when no power is supplied to the device.[16]  HDDs can be sold as either stand-alone devices or incorporated as a component of electronic systems such as computers, gaming systems, printers, and copy machines.[17]

16.     HDD manufacturers sell their products through multiple channels including sales to original equipment manufacturers ("OEMs") which incorporate HDDs into other products, distributors who often sell products to other resellers, and retailers who sell products directly to end-users.  In this section, I describe HDDs and SAs, the supply chain for HDDs and SAs, changes to the HDD and SA industry over time, and the variety of end uses for HDDs, as background information to provide context for my opinions.

### 1. SAs and HDDs

17.     An HDD is comprised of many components all of which need to be engineered together to meet the specifications of the HDD manufacturer.[18]  SAs are a complex, engineered component of HDDs.[19]  SAs are designed for specific HDDs with cooperation from HDD manufacturers.[20]  An HDD is also comprised of other components such as one or more platters, a motor, a head stack assembly (which can include multiple SAs), and a protective casing.[21]

---

[15]     "Everything You Want to Know About Hard Drives," *Seagate Website*.

[16]     IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022.

[17]     Reseller Complaint, ¶ 2; IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022; "Explore Gaming Hard Drives & SSDs," *Seagate Website*; "Hard Disk Security for Printers, MFPs, and Copiers," *Xerox*, 2010, p. 1.

[18]     "Hutchinson Technology 2004 Annual Report," *AnnualReports.com Website*, 2004, p. 3.

[19]     "What is a Suspension Assembly?," *Magnecomp Corporation Website*.

[20]     Declaration of Akira Okuma in Support of NHK Defendants' Motions for Partial Summary Judgment Based on Foreign Commerce, *In re: Hard Disk Drive Suspension Assemblies Antitrust Litigation*, Case No. 3:19-md-02918-MMC, August 2, 2022 ("Okuma Declaration"), ¶ 18 ("The design process starts when HDD Manufacturers request that NHK design and develop custom-built prototypes based on specifications specific to certain HDD Projects.  These prototypes must be approved and tested by the HDD Manufacturers to confirm the HDD Suspensions work when incorporated into the relevant HGAs and HSAs ... During this process, HDD Manufacturers will demand multiple changes to the prototypes over time requiring many adjustments from NHK's product engineers.  For this reason, prototypes are significantly more expensive than mass-produced suspension assemblies.")

[21]     Artem Rubtsov, "HDD from Inside: Hard Drive Main Parts," *HDDScan Website*; Okuma Declaration, ¶ 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

18.     HDDs access and store data on rotating magnetic disks.[22]  These magnetic disks, sometimes referred to as platters, are held in place and spin at a rate of thousands of rotations per minute by a motorized spindle fixed at the center of the disks.[23] Read/write heads access the data stored on the platters and must be kept a precise distance away from the platters to properly operate.[24]

19.     An SA is the component of an HDD that holds the read/write head over the disk.[25] On average, a typical HDD contains two to six SAs.[26]  SAs are engineered for particular HDDs and are designed in close collaboration with HDD manufacturers.[27] HDD manufacturers organize their HDD designs into different programs. ███████ ████████████████████████████████████████[28]

20.     My review of the record in this case indicates that there were at least ███ programs, with each HDD program integrating only one HDD SA design.[29]  Programs varied in size with the largest program involving more than 2 billion SAs and the smallest program involving fewer than 10,000 SAs.  Programs varied in duration as well: the longest lasting programs were in place more than 10 years while other programs appear to have been in place for two years or less.[30]  In **Exhibit 4** I show the sales and dates for which each of the ███ programs were sold.

21.     The SAs developed through these programs were sold at different price points and during different periods of time.  In **Figure 1**, I show transaction prices for SAs sold by NHK and TDK.  Each dot represents a single transaction between NHK or TDK and one of their customers.  At each point of time, different SAs were sold at different

---

[22]  IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022.

[23]  Chris Woodford, "How does a hard drive work?," *Explain that Stuff Website,* November 9, 2021.

[24]  Chris Woodford, "How does a hard drive work?," *Explain that Stuff Website*, November 9, 2021.

[25]  TDK Corporation SAE Magnetics (H.K. Ltd.), February 25, 2016, TDKHDD005946443-704 at 475 ("The function of the suspension is to enable the read/write head to position at a precise 'flying height', frequently at 0.3 or lower micro-inch, over the surface of the magnetically coated disk ….") Deposition of Eric Isom, Former Senior Director of Cloud Storage Systems, Seagate Technology, May 4, 2022, ("Isom Deposition"), 27:11-24 ("Q. … What is a suspension?  A. A suspension holds the slider, which is one of the key components in the disc drive for it to work, so the suspension holds the Read-Rite head over the disc so that the disc drive can actually function.")

[26]  Declaration of Stephen Misuta in Support of Defendants' Motion for Summary Judgment Regarding Foreign Commerce, *In Re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, August 2, 2022 ("Misuta Declaration"), ¶ 13.

[27]  Okuma Declaration, ¶ 18.

[28]  Deposition of Daniel Floeder, Senior Director of Commodities Management Team, Seagate Technology, September 29, 2022 ("Floeder Deposition"), 129:18-130:6 (████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████)

[29]  Floeder Deposition, 129:18-130:6; Netz Report, p. 23.

[30]  Netz turnover materials (Programs by Drive Manufacturer.xlsx).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

price levels.  For example, ████████████████████████████████████
████████████████████████████

**Figure 1**[31]
**Transaction Prices of SAs**
**Sold during the Class Period**



22.   Each program typically follows a similar life cycle where costs are initially high and
      then decline over time.  This structure reflects the prototype nature of the early period
      of a program.  As volumes increase and SA manufacturers work out production
      issues, pricing falls.[32]

23.   The HDDs that are developed from these programs are used for a variety of purposes.
      HDDs vary in specifications such as physical size, rotation speed, storage capacity,
      and interface based on the intended use of the end-user.[33]

---

[31]    Source: Williams turnover materials (defendant_sales_data.dta).

[32]   Okuma Declaration, ¶¶ 18, 27.

[33]   Peter Krogh, "Hard Drive 101," *dpBestflow.org Website,* September 22, 2015.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

24.     In **Figure 2** I summarize some characteristics of the HDDs that Seagate sold between 2003 and 2016. 



**Figure 2[34]**
**Summary of Selected HDD Characteristics**
**For Seagate Sales to All Customers**
**2003 – 2016**



25.     There is a wide price range for HDDs corresponding to the wide range of capacity and speed.  For example, there are 16 pages of HDDs marketed as "For Enterprise Storage" on Newegg's website.[35]  **Figure 3** shows examples of products ranging in price from $49.00 for a Seagate 4TB Constellation ES.3 128MB Cache Enterprise

---

[34]     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     Source: Netz turnover materials (Seagate_Sales_and_Cost_Data_Combined.dta).

[35]     "For Enterprise Storage Desktop Internal Hard Drives," *Newegg Website*, accessed on December 17, 2022.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Internal Hard Drive to $319.99 for a Seagate 16TB Exos X18 256MB Cache Enterprise Hard Drive.

**Figure 3[36]**
**Examples of Seagate HDDs Sold on Newegg**



## 2. *The Supply Chain for SAs and HDDs*

26.    HDD SAs are sold through a complex supply chain that begins with the manufacturing of the SA and other HDD components which are then sold to manufacturing companies that incorporate the components into larger assemblies and into HDDs.[37]  HDDs are sold through a multi-level supply chain to resellers and eventually to end-users as stand-alone products or as a part of finished electronics. Products may be sold and resold many times before reaching an end-user.

---

[36]    Products and prices as of December 17, 2022 as shown on *Newegg Website*.

[37]    For example, HDD SAs are incorporated into a Head Gimbal Assembly ("HGA") by connecting the HDD SA with a read/write head.  Multiple HGAs can be attached to an actuator arm and stacked around a pivot/bearing and a coil to form a Head Stack Assembly ("HSA").  Okuma Declaration, ¶¶ 21, 42; Misuta Declaration, ¶¶ 14, 22, 38.

27.     Stand-alone HDDs and HDDs integrated into devices are sold to electronics
        manufacturers, distributors, and retailers.[38]  There is a wide range of distributors and
        retailers in the supply chain.  For example, ███████████████████████████████
        ████████████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████████████
        ███████████████████████████████████████████████████████████.[39]

28.     The different scales of the distributors and retailers in the Reseller Class has
        important implications for any economic analysis.  ████████████████████████
        ████████████████████████████████████████████████████████████████████████
        █████████████████████████████████████████[40]  This means that analyses of transactions
        between sellers of products that contain HDDs and the providers of those products
        need to account for seller-specific factors.

### 3.  Changes in the SA and HDD Industry

29.     Competitive dynamics changed in the HDD industry during the alleged 2003 through
        2016 class period.  Some changes affected the ability of SA and HDD manufacturers
        to produce their products.  For example, the flooding in Thailand shut down some
        HDD manufacturing plants.[41]  Other events, such as the Great Recession in 2008 and
        2009 also affected the demand for HDDs and products that contain HDDs.[42]  The
        alleged class period also saw technological advancement that reduced the cost of
        storage.[43]  Potential substitute technology for HDDs also developed during the period
        as there was increasing usage of an alternative non-volatile storage device called solid
        state drives ("SSDs").[44]

30.     As noted in Plaintiffs' Complaints, the alleged class period saw consolidation among
        both SA manufacturers and HDD manufacturers.[45]  In 2003, the beginning of the
        alleged class period, there were 5 SA manufacturers.[46]  By the end of 2016, there

---

[38]  Misuta Declaration, ¶ 38; "Distributors," *Western Digital Website*; "Where to Buy – Distributors," *Toshiba Website*.

[39]  ████████████████████████████████████████████████████████████  Williams turnover materials
     ([Third-party]_reg_data.dta).

[40]  Sales figures come from Williams turnover materials ([Third-party]_reg_data.dta).

[41]  Western Digital Earnings Call, April 26, 2012, NHKI-M-00302534-552 at 537.

[42]  Digital Storage Technology Newsletter, January 2009, TDKHDD005709668-704 at 692.

[43]  The average cost per gigabyte of HDD storage was approximately $1.33 in 2003, compared to $0.06 in 2013.  Overview of
     the HDD Market in 2006 and Outlook for 2007, 2007, TDKHDD000714178, tab "112;" Summary of CY2013 HDD Market
     and Forecast of the Coming Years, 2013, TDKHDD000714476, tab "113."

[44]  Worldwide Hard Disk Drive 2012-2017 Forecast: Adjusting to the IT's Industry Transformation, March 2013, NHKI-M-
     00055924-972 at 933, 939.

[45]  Reseller Complaint, ¶¶ 80-88; End-User Complaint, ¶¶ 184-191.

[46]  NHK General Overview DDS Division, April 20, 2004, NHKI-M-00257920-944 at 936.

were three SA manufacturers: NHK, TDK, and Suncall.[47]  In addition to consolidation, NHK and TDK both have operations in multiple countries.  NHK currently manufactures SAs in Japan, Thailand, and China, while TDK has SA-related operations in Thailand and China.[48]  Moreover, before HTI was acquired by TDK, HTI had its manufacturing operations in the United States until it started transitioning operations to Thailand in 2011.[49]  This consolidation and dispersed manufacturing has implications for economic analysis.  For example, HTI disclosed that its Thailand production was lower cost than the United States.[50]

31.    HDD manufacturers also consolidated during the 2003 to 2016 period.[51]  In 2003, there were at least eight different HDD manufacturers.  By 2006, Seagate acquired Maxtor Corporation's HDD business.[52]  In 2009, Toshiba purchased Fujitsu's HDD business and in 2011 Seagate purchased Samsung's HDD business.[53]  By 2016, there were three main HDD manufacturers remaining: Western Digital, Seagate, and Toshiba.[54]

32.    HDD technology also changed during the 2003 through 2016 period.  Storage densities became greater: in 2006, HDDs with the highest number of units sold had a capacity range of 80.0 to 99.9 GB and by 2014, HDDs with the highest number of units sold had a capacity range of 500 to 599 GB.[55]  From 2012 to 2016, weighted average capacity of HDDs nearly doubled by increasing from 687 GB to 1,335 GB.[56]  These increases in capacity were also associated with decreased costs of storage.  For example, the cost per GB of storage for mobile HDDs decreased by a factor of eight from 2006 to 2010; the storage cost declined from $0.83 per GB in 2006 to $0.10 per GB in 2010.[57]

---

[47]    HDD Market Update, December 2016, NHKI-M-00485649-665 at 663.  In 2005, MPT was formed by the merger of the data storage division of Magnecomp International Ltd. and KR Precision Public Company.  MPT was then purchased by TDK in 2007.  TDK also purchased HTI in 2016.  End-User Complaint, ¶¶ 188-191.

[48]    NHK currently has subsidiaries NHK Spring (Thailand) Co., Ltd. which started producing SAs in 2006, NAT Peripheral (Dong Guan) Co., Ltd. in China, and NAT Peripheral (H.K.) Co., Ltd. in Hong Kong.  NAT Hong Kong was a joint venture between 2004 and 2015 between NHK and SAE that manufactured HDD SAs.  NAT Hong Kong became solely owned by NHK in 2015.  Netz Report, pp. 9-10; Williams Report, Table 1.

[49]    Hutchinson Technology Incorporated, Form 10-K for Fiscal Year Ending September 30, 2012, pp. 1, 19.

[50]    Hutchinson Technology Incorporated, Form 10-K for Fiscal Year Ending September 27, 2015, p. 1.

[51]    Changes of HDD Market After Two Acquisition, 2011, TDKHDD000714358, tab "95."

[52]    "Seagate Technology completes Acquisition of Maxtor Corporation," *Seagate Website*, May 22, 2006.

[53]    "Toshiba and Fujitsu Conclude Definitive Agreement on HDD Business Transfer," *Fujitsu Website*, April 30, 2009; Supantha Mukherjee and Miyoung Kim, "Seagate buys Samsung hard disk unit," *Reuters Website*, April 19, 2011.

[54]    Williams Report, ¶ 28; Netz Report, p. 12; Reseller Complaint, ¶ 88.

[55]    CQ2 HDD Shipments Surpass Forecast at 138M, August 12, 2014, TDKHDD000712820-889 ("2014 HDD Market Report") at 832; Seasonally Strong CQ4 Totals 119 M HDDs, February 7, 2007, TDKHDD000709483-531 at 491.

[56]    2014 HDD Market Report at 826; CQ1 '16 HDD Shipments Fall to 100.54 Million, May 4, 2016, TDKHDD000713616-654 at 623.

[57]    HDD Shipment Q2/CY2011 Preliminary, July 15, 2011, TDKHDD000714389, tab "ssd2."

33.     The competitive landscape also changed substantially over the class period.  The
        primary alternative to HDDs in terms of non-volatile data storage devices are SSDs.[58]
        Global SSD shipments increased from 7.9 million in 2008 to over 333 million in
        2020, while HDD shipments decreased from 540 million to 260 million over the same
        time frame.[59]  Like HDDs, SSDs are sold as either stand-alone devices or
        incorporated into electronics like computers, laptops, computer games, digital
        cameras, digital music players, smartphones, and tablets.[60]  Unlike HDDs, which rely
        on magnetism, SSDs utilize flash memory to store and retrieve data.[61]  Flash memory
        uses memory chips that can be erased and programmed electronically, and therefore
        SSDs, unlike HDDs, require no internal moving parts.[62]

### 4.   The Scope and Complexity of the HDD Industry Mean That It Is Not Amenable to Class-Wide Overcharge Analysis

34.     My review of the HDD SA industry and the distribution chain for products that
        contain SAs indicates to me that the SA industry is not amenable to a class-wide
        impact analysis that seeks to establish a single overcharge for all products regardless
        of characteristics, end use, or competitive circumstance.  The complexity of the
        supply chains, the wide range of products and prices, and sheer scope of
        technological change over the 13-year proposed class period, indicates that as a
        matter of economics, any impact from the conspiracy alleged would vary by time
        period, program, product, sales channel, market circumstance, and customer.  As I
        have shown, the Defendants produced a large number of different HDD SAs each of
        which had to be engineered for a specific HDD manufacturer.  The number and
        identity of those HDD manufacturers changed over time with at least eight HDD
        manufacturers in 2003 declining to three by the end of the class period.  Each of those
        HDD manufacturers would have had to negotiate and work with SA manufacturers to
        initially design and then contract for production of SAs.  Those HDD manufacturers
        then manufacture hundreds of different HDDs that have changed over the class
        period.  HDDs are sold as stand-alone devices or incorporated into computers or other
        electronic devices.  The tens of thousands of products that include HDDs are sold at a
        wide range of different price points from less than $50 to more than $10,000.[63]  These
        factors all indicate to me that it is economically implausible that there would be a

---

[58]   "Hard Disk Drive (HDD) and Solid-State Drive (SSD)," *Dell Website*; IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022.

[59]   SPI Forum in Y2011, March 22, 2011, TDKHDD002449699, tab "17"; Netz turnover materials (Historical HDD Units by Vendor, Industry Exabytes (CQ1 '01-CQ1 '22).xlsx); Shawn Knight, "SSD shipments outpaced HDDs in 2020, but capacity still favors mechanical drives," *TechSpot Website*, February 16, 2021; Netz Report, pp. 21-22.

[60]   Alexander S. Gillis and Garry Kranz, "What is an SSD (Solid-State Drive)?," *TechTarget Website*.

[61]   IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022.

[62]   "Flash Memory," *Techopedia Website*, March 7, 2018; IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022.

[63]   ██████████████████████████████████████████████████

single, class-wide method for calculating the overcharge affecting substantially all class members across the entire 13-year proposed class period.

35.    In the remainder of this report, I demonstrate that the models that Dr. Williams and Dr. Netz put forward are inadequate to establish that every class member suffered injury that can be calculated using information common to the class and to identify which class members would have suffered injury (and those who did not).  As will be explained further below, both experts sweep aside all the individual issues and instead propose a model to calculate an alleged overcharge that they then seek to apply to every sale regardless of the nature of the product, circumstances of the transaction, and evolution of the industry.  Their models are class-wide only insofar as the average applies to everyone, but as I demonstrate, the average is not a meaningful overcharge paid by anyone.

## III.   Economics of Class Certification

36.    I understand that to obtain class certification, plaintiffs must establish, among other things, that the essential elements of their claim—such as liability under the appropriate law, impact, and damages—can be established through evidence common to the class.  If any of these issues or elements require individual treatment, then the issue or element is not one common to the proposed class, and individualized issues may predominate.

37.    There are two relevant questions for an economist to consider at the class certification stage of a class action.  The first is whether impact to individual class members can be determined using evidence and methods common to the proposed class, as opposed to economic evidence specific to any individual class member.[64]  The second question is whether damages attributable to the alleged conduct can be measured on a class-wide basis through use of a common method and evidence common to the class.[65]  Further, for a proposed class to be certified, I understand that the class members must have suffered injury from the challenged conduct.[66]

---

[64]   See, e.g., ABA Section of Antitrust Law, "Chapter 13: Applying Econometrics to Address Class Certification," in Econometrics: Legal, Practical, and Technical Issues (2nd Edition) (Chicago, IL: American Bar Association, 2014), p. 349 ("Economists typically consider a variety of information when assessing whether a class should be certified, including detailed institutional information about marketplace structure and transactions… Other factors, such as statistical evidence of which prices were affected by the conspiracy, need to be considered to determine whether impact can be shown by common evidence and thus whether common issues predominate over individual issues.")

[65]   See, e.g., ABA Section of Antitrust Law, "Chapter 2: Formulating Empirical Questions of Interest," in Econometrics: Legal, Practical, and Technical Issues (2nd Edition) (Chicago, IL: American Bar Association, 2014) ("2014 ABA Econometrics Chapter 2"), p. 22 ("Empirical analysis undertaken by an economic expert can address the following questions relevant to class certification matters: Can a common economic framework for assessing damages be specified for the putative class of plaintiffs?  For example, is there a common damages theory that applies to all class members?")

[66]   See, e.g., 2014 ABA Econometrics Chapter 2, p. 22 ("Empirical analysis undertaken by an economic expert can address the following questions relevant to class certification matters: … Were all or almost all of the class members injured by the alleged antitrust violation?  Were there any members of the class that benefited from the challenged conduct while others were allegedly harmed?")

38.   Properly calculated, economic damages should reflect the magnitude of impact suffered, if any, and estimate the payment required to make the harmed party "whole"—*i.e.*, to restore them to the financial position they would have held but for the alleged misconduct (also referred to as the "but-for world").[67]  As this standard implies, the difference in the class member's financial position, if any, must flow from the acts alleged.  Therefore, it is necessary for an economist assessing damages to specify the economic circumstances that would have transpired absent the alleged violation.  The assumptions that are used to construct this but-for world must be grounded in market facts and economic theory.  Without satisfying these conditions, an estimate of damages will lack basis in the facts of the case and thus be economically meaningless.

## IV.  Overview of Plaintiffs' Experts' Opinions Related to Class Certification

### A. Dr. Williams' Opinions Related to Class Certification

39.

40.



---

67   Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington D.C.: The National Academies Press, 2011), pp. 429, 432, 477.

68   Williams Report, ¶¶ 145, 251.

69   Williams Report, ¶ 156.

70   Williams Report, ¶ 156.                                                         Williams turnover materials (defendant_sales_reg_data.dta; 02_overcharge_regression.do); Williams Deposition, 134:14-136:18.

71   Williams Report, Table 2.



41.

42.

43.

72 Williams Report, ¶ 119.

73 Williams Report, ¶¶ 176, 214.

74 Williams Report, ¶¶ 214, 243, Table 3, Table 10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ Williams Deposition, 221:2-222:7.

75 Williams Report, ¶ 218.

76 Williams Report, ¶ 13.

77 Williams Report, ¶ 13.

78 Williams Report, ¶ 9. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ Deposition of Matthew Bell, Product Manager, Seagate Technology, August 18, 2022, 243:25-244:14;
Deposition of Bruce Sanders, Vice President of Electronics, Seagate Technology, July 13, 2022, 436:7-436:15, 437:13-

19



## B. Dr. Netz's Opinions Related to Class Certification

44.    Dr. Netz purports to present a model capable of establishing class-wide impact and damages to the End-User Class. ███████████████████████████████████

45.    Dr. Netz claims that evidence in the record and economic theory are consistent with a pass-through rate at or greater than 100 percent.[81]  Based on her analysis as of the date of her report, Dr. Netz opines that "100% of any overcharge" to direct purchasers is passed through to the End-User Class and that "all class members suffer common harm in the amount of 100% of the overcharge imposed by Defendants at the top of the distribution channel."[82]

46.    While Dr. Netz performs an econometric analysis of various reseller data and finds pass-through rates ranging from ████████████, she opines that "a pass-through rate below 100% does not indicate that class members were unharmed, only that they

---

437:19.  In his deposition, Dr. Williams stated ██████████████████████████████████ Williams
Deposition, 70:15-71:5.

[79]    Netz Report, Exhibit 20.

[80]    Netz Report, pp. 93, 102, Exhibit 20.  Dr. Netz calculates her ███ percent overcharge as a percentage on actual sales, which can be converted to an equivalent percentage on but-for sales by the following formula: $overcharge_{but-for} = overcharge_{actual}/(1 - overcharge_{actual})$. ██████████████████████████ *See*, Williams Report, ¶ 239.

[81]    Netz Report, p. 87.

[82]    Netz Report, pp. 101-102.

suffered somewhat less than the full burden of Defendants' direct overcharges."[83] Dr. Netz states that total class-wide damages can be calculated by determining the total global HDD SA sales, and then finding the proportion of relevant finished goods that were purchased by class members.[84] Dr. Netz finds that Defendants' sales of at-issue HDD SAs during the class period totaled ███████, of which ███████ in sales is attributable to members of the purported End-User Class.[85] Dr. Netz then proposes multiplying HDD SA sales attributable to class members by the overcharge percentage, and then by the "relevant" pass-through rate.[86] She does not, however provide a final estimate of alleged damages to the End-User Class or opine on how she would determine the "relevant" pass-through rate for all of the distribution channels in the supply chain, or how she would calculate damages to individual end-users if pass-through rates of the alleged direct overcharge are anything less than 100 percent.[87]

47.    Like Dr. Williams' analysis, Dr. Netz's analysis suffers from substantial flaws and shortcomings rendering it incapable of demonstrating class-wide impact.  First, flaws in Dr. Netz's analysis of pass-through rates demonstrate that she has significantly overestimated the pass-through rates for the entities she analyzes.  There is no valid basis in the reseller data for assuming 100 percent pass-through.  Moreover, she waves off such pricing dynamics as focal point pricing and fails to consider the ways in which this common and widespread pricing strategy would insulate many members of the purported End-User Class from suffering any overcharge.  In addition, while Dr. Netz's own data show that at least some products were sold with no pass-through, thereby resulting in unharmed members of the proposed class, she does not provide any method by which these unharmed class members can be identified.  Finally, while she purports to be presenting a model to assess impact from the conduct at issue, she fails to acknowledge that the very nature of the conduct at issue would be anticipated to have different effects depending on whether Defendants were purportedly acting to reduce competition with each other to raise price or conspiring to drive a competitor out of the market by lowering HDD SA prices.

## V.    The Proposed Classes Include Unharmed Class Members and Plaintiffs Do Not Provide Any Common Methodology to Identify the Unharmed Class Members

48.    Dr. Williams' and Dr. Netz's purported finding of class-wide impact using a damages model common to the putative classes depends critically on their ability to establish that there was an overcharge on all sales of HDD SAs during the alleged class period, and that this overcharge was passed through all distribution channels, with resellers at

[83]   Netz Report, pp. 101-102, Exhibit 7.
[84]   Netz Report, p. 102.
[85]   Netz Report, p. 105, Exhibit 15.  Errata to the Declaration of Janet S. Netz, Ph.D., December 15, 2022, p. 2.
[86]   Netz Report, p. 102.
[87]   Netz Report, pp. 105-106.

each node absorbing some of the overcharge and passing some of it on to purchasers at the next level of the supply chain such that, ultimately, some part of the overcharge is paid by all resellers and end-users.  In fact, even if the allegations in the Complaint were true and Plaintiffs' experts' models were reliable, their own analyses demonstrate that there are numerous unharmed class members but offer no means of identifying those class members or extracting them from the class.

49.     First, Plaintiffs' experts' own findings ███████████████████████████ ██████████ mean that there are members of the Reseller Class who are unharmed because their economic position is no worse than it would have been absent the conduct at issue.  Second, even if some overcharge was passed through to resellers in the supply chain, the presence of focal point pricing, short-term changes in competitive dynamics, and other pricing strategies mean that there are members of the purported End-User Class who are insulated from the effects of a conspiracy that is alleged to have raised the price of a small component of their product by less than one dollar.  Even if cost increases are passed through to consumers on average over a long time horizon, not all resellers will pass on small cost increases on all sales concurrently with the increase in cost.  Third, the conduct at issue is not expected to raise the price of all products, as the nature of the challenged conduct with respect to competition for HTI's customers would have a different impact from conduct with respect to an agreement not to compete.  The very nature of the alleged conduct at issue means that some products would be expected to have a price overcharge while others would be expected to have a price undercharge.  Investigating Plaintiffs' experts' models on a program-by-program basis verifies that their own models show that not every HDD SA sold bore an overcharge.  Without establishing that every product bore an overcharge, Plaintiffs' experts have no basis to assert that their purported finding of an industry-wide average overcharge means that every class member was injured.  Moreover, Plaintiffs' experts offer no basis to identify the buyers of products sold by manufacturers outside the alleged conspiracy, such as products containing HDD SAs sold by Suncall, which are not included in the class.

50.     Plaintiffs' experts propose a model ████████████████████████████ ████████████████████████████████████████████████████████████████ In fact, their own models and analyses disprove the purported "finding" of class-wide impact.  Neither Dr. Williams nor Dr. Netz considers the abundant economic evidence that program-specific pricing, competition from non-coconspirators, and the alleged conduct with respect to trying to push HTI out of the market mean that there is an *a priori* expectation that not all sales would be affected by the anticompetitive conduct at issue.  Plaintiffs' experts propose only models ████████████████████ ██████████████████████████ have no way of determining which individual class members were injured and which are uninjured by the alleged conduct.

## A. Resellers That Passed Through the Entirety of the Alleged Overcharge Are Not Injured

51.     Even if Plaintiffs' experts' pass-through models were reliable, both Dr. Williams' and Dr. Netz's models show substantial variation in pass-through rates, ████████████████

███████████████████████████████████████████[88] These results
are inconsistent with the purported "finding" that impact is common to the Reseller
Class or the End-User Class.  Resellers who fully passed through the purported
overcharge did not suffer economic injury.

52.   

53.   █████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

54.   Dr. Williams' opinions of class-wide impact for the Reseller Class ████████████
████████████████████████████████████  Seeking to support her opinion
that damages to the purported End-User Class can be estimated as the entirety of the
alleged overcharge at the top of the distribution chain, Dr. Netz calculates a pass-
through rate of over 100 percent for nearly all resellers in her analysis and claims that,
based on her review of the economic literature, assuming a 100 percent pass-through
rate for all sales of products containing HDD SAs would be conservative.[91]  If Dr.
Netz's findings and opinions were accurate, nearly every distributor, retailer, and
other member of the purported Reseller Class would be unharmed, as they would
have passed through the entirety of the alleged overcharge to other entities.

55.   Dr. Williams does not address the implications of his findings ████████████
██████████████████████████████████.  Taken at face value, his
purported findings demonstrate both that impact is not common to the class, and that

---

[88]   Williams Report, Table 3; Netz Report, Exhibit 7.

[89]   Williams Report, Table 3.

[90]   Williams Report, Table 3.  Dr. Williams testified ███████████████████████████
████████████████████████████████████████████████████████ Williams
Deposition, 173:23-25, 174:11, 194:4-10, 194:13.  Dr. Williams ████████████████████
███████████████████████.

[91]   Netz Report, pp. 100-102, Exhibit 7.

entities in the putative Reseller Class are not economically injured by the conduct at issue.

## B. Purchasers Buying from Resellers That Did Not Pass on Any of the Alleged Overcharge Are Unharmed

56.     Plaintiffs' experts' purported findings of an average overcharge or positive pass-through rates over a 13-year time horizon do not mean that all class members in either the purported Reseller or End-User Class necessarily paid an overcharge. ███████

███████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████[92]

### 1. Not All End-Users Suffered Harm Because Resellers Price at Focal Points and Employ Other Promotional Pricing Strategies

57.     Retailers utilize a variety of pricing strategies to attract customers.  These strategies include focal point pricing, discounts, rebates, and loss-leaders.  Dr. Netz has not performed any empirical analysis to determine how these pricing strategies affect pass-through rates for cost changes in HDD SAs.  Specifically, while she has conducted aggregate pass-through studies, she has not analyzed how quickly retail prices respond to cost changes or whether the magnitude of the purported cost increases due to the alleged conspiracy will be passed through to all end-users over the entirety of the proposed class period.

58.     Dr. Netz acknowledges that some retailers employ pricing strategies such as focal point pricing but only asserts that such pricing strategies can be consistent with pass-through.[93]  Dr. Netz also acknowledges that focal point pricing may be used by a retailer for some products, but not others.[94]  Dr. Netz does not incorporate this observation into her analysis by allowing different pass-through rates by product.

---

[92]   Deposition of Janet Netz, Ph.D., Founding Partner, applEcon, December 6, 2022 ("Netz Deposition"), 160:18-22, 161:19-24; Williams Report, ¶ 96.  Dr. Netz describes HDD manufacturers engaging in a price war in 2003 and Best Buy reporting negative operating margins (negative 0.3 percent) in 2013 due to a highly competitive environment.  Netz Report, pp. 68, 71.

[93]   Netz Report, pp. 78-86. ██████████████████████████████ These purchases are summarized on **Exhibit 3.**
███████████████████████████████████████
████████████████ Deposition of Michael Medeiros, Reseller Named Plaintiff, March 31, 2022, 82:4-23, Exhibits 7 and 9.

[94]   Netz Report, pp. 82-83, Footnote 344. ████████████████████████████████


24

Even though she recognizes that some retailers exhibit focal point pricing, she also does not identify the set of retailers that employ focal point pricing strategies or test whether such retailers actually do pass through cost changes of the magnitude that she estimates are associated with the Defendants' alleged conduct in all instances.

59.     Focal point pricing is a marketing strategy in which sellers set prices at specific pricing points, such as prices ending at "9" such as $99, or "5" such as $195.  For example, **Figure 4** shows HDDs sold by Best Buy.  Each HDD in the figure has a price that ends in "9.99" and is an example of focal point pricing.  Dr. Netz argues that retailers employing such strategies may pass on cost increases by marking their prices up to a new higher focal point when costs increase, but she does not analyze the frequency with which this actually occurs with resellers of products that include HDD SAs.[95]  Nor does she analyze what level of a cost increase would be required to trigger a reseller to respond by shifting to a higher focal point price.

**Figure 4[96]**
**Examples of Focal Point Pricing in HDDs Sold by Best Buy**

---

95      Netz Report, pp. 83-84.

96      Products and prices as of December 14, 2022 as shown on *Best Buy Website*.

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

60.     Dr. Netz uses an example of Best Buy selling an external HDD for $59 to suggest that Best Buy could increase the price to $69 (the next focal point) if Best Buy's costs increase by $9.[97]  That may be true, but is irrelevant.  Cost changes of that magnitude are not consistent with her analysis.  If an HDD has four SAs that each cost about $0.60, an eight percent increase in the SA price that is 100 percent passed through to Best Buy would mean that the cost of the HDD to Best Buy increased by $0.19.[98]  Dr. Netz does not analyze whether it would be rational for Best Buy to increase the price of a $59 HDD by $10 if its costs to purchase the drive increased by under $0.20.  Moreover, if Best Buy were to increase the price of the HDD by $10, this would imply a pass-through rate of more than 5,000 percent.[99]  Even if her pass-through regressions were otherwise correct, Dr. Netz does not observe rates of that magnitude in any of her pass-through models, or in any of the literature she cites.

61.     Without presenting any data to support her thesis, Dr. Netz states that "resellers can easily pass-through cost increases by setting prices at new, higher focal points."[100]  This assertion, combined with her overcharge analysis, yields pass-through rates that are substantially higher than those suggested by Dr. Netz's regression results.  Under focal point pricing, the retail price can remain the same despite small changes in costs, especially for higher-priced products.  In these instances, Dr. Netz's regression analysis for estimating the pass-through rate is unreliable as a means to establish class-wide impact because it cannot account for the fact that some resellers might not adjust their prices to pass through small changes in input costs, while others might shift their prices to the next focal point entirely.

62.     **Figure 5** presents examples from third-party data



---

[97]   Netz Report, p. 82.

[98]   This is 4 × $0.60 × 8% = $0.192.

[99]   With a $0.192 increase in costs, the pass-through rate is 10/0.192 = 5,208 percent.

[100]   Netz Report, p. 83.

**Figure 5[101]**
**Selected HDD Transactions Demonstrating Focal Point Pricing**
**From Third-Party Data**



63.　Dr. Netz states that another reason why she believes that focal point pricing does not impact whether pass-through occurs is "a product manufacturer can make quality adjustments to offset cost changes, so that the original focal price can remain unchanged."[102]  However, she conducts no analysis on how such a quality reduction might have been accomplished, whether it is an economically rational outcome given the varying competitive dynamics at various points in the distribution chain, or whether electronic device manufacturers would reduce the quality of a ▮▮▮▮▮ computer or electronic device in response to a purported cost increase of a component costing less than a dollar.[103]  Dr. Netz's pass-through models purport to estimate the



[101] ▮▮▮▮▮

[102] Netz Report, p. 85.

[103] ▮▮▮▮▮ PUTZIER_00000001-002; End-User Complaint, ¶ 66.

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

correlation between price and cost over a long data period; but does not test whether any product manufacturers adjust product quality when costs change or the rates at which they do so.  Moreover, she does not identify the magnitude of a cost increase required to spur a change in quality.  Dr. Netz's model does not and cannot determine whether HDD or HDD-containing product manufacturers would have made quality adjustments to their products absent the alleged overcharge.

64.     Dr. Netz's damages model cannot account for any individualized discounts and rebates, which can change the amount of an overcharge paid by end-users, that are not included in the data sets she analyzes.[104]  With regard to discounts, rebates, and loss-leaders, Dr. Netz states that "[n]one of these pricing strategies impact whether the pass-through of cost changes does or does not occur."[105]  She acknowledges that "discounts, coupons, or other types of promotional prices … can complicate the measurement of pass-through" but claims that she knows "specific retailers generally do not offer those promotions and instead apply a constant markup."[106]  Dr. Netz opines—without reference to specific evidence or studies—that these pricing strategies are generally not used by specific retailers and that she "can make reliable inferences that those resellers pass-through cost changes to class members."[107]  Dr. Netz's assertions, assumptions, and inferences do not, in any way, support her opinion that impact from the conduct at issue is class-wide or can be measured with methods common to the class.  ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████[108]  *See*, **Exhibit 3**.

---

[104]   Dr. Netz states in her deposition that ███████████████████████████████ Netz Deposition, 150:14-151:4.  However, some customers may have received additional discounts not reflected in the sales data sets used by Dr. Netz. ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████

[105]   Netz Report, p. 80.

[106]   Netz Report, p. 77.

[107]   Netz Report, p. 77.

[108]   ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

65.     A discount or rebate can change the damage amount for a member of the proposed class even if the retailer passed through some of the alleged overcharge.  For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Such competitor match discounts also demonstrate that discounts or rebates may be idiosyncratic to individual class members and require individual inquiry.  For example, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

66.     Different putative class members paid different prices for the same HDD or HDD-containing products at the same time.  In **Figure 6**, I show an example of Seagate HDDs that are available at different resellers for different prices.  If one end-user purchased this HDD from Insight and another end-user purchased it from Amazon, those two end-users would have paid a different price for the identical product.  In addition, the same HDD may be incorporated into different products, which are themselves sold at different prices.  For example, ██████████████████████████ ████████████████████████████████████████████████████████[111]

Nevertheless, Dr. Netz offers no reliable methodology to account for the



███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ End-User Complaint, ¶¶ 31, 33-35, 39, 42, 49, 51, 53, 57, 62, 70.

[109] ███████████████████████████████████████████████████████████ "MacBook Pro (15-inch, Mid 2009) and (15-inch, 2.53 GHz, Mid 2009) – Technical Specifications," *Apple Website*, February 3, 2010; End-User Complaint, ¶ 35.

[110] █████████████████████████████████████████ End-User Complaint, ¶ 33.

[111] ███████████████████████████████████████████████████████████████████████████████████████

individualized nature of these practices.  She simply states that they have no effect on her pass-through analysis.

**Figure 6[112]**
**Example of Pricing Differences for Seagate's BarraCuda 2.5" Hard Drive 2TB**



## 2. *Varying Competitive Dynamics in the Industry Indicate the Presence of Unharmed Class Members*

67.    Dr. Williams and Dr. Netz both present pass-through models that, even if they were otherwise correct, can only measure an average pass-through over the entire time period where they have data.  This approach is necessarily flawed because there is no reason to assume that any pass-through rates would be constant across products or

---

[112]  "BarraCuda Hard Drives," *Seagate Website*, accessed on December 13, 2022.  The price of a Seagate BarraCuda 2.5" Hard Drive 2TB from the Amazon "Buy Now" link is $66.99.  "Seagate BarraCuda 2TB Internal Hard Drive HDD – 2.5 Inch SATA 6 Gb/s 5400 RPM 128MB Cache for PC Laptop (ST2000LM015)," *Amazon Website*, accessed on December 13, 2022.

across time in this industry.  Companies can adjust pass-through rates in response to competitive dynamics that reflect the circumstances in the industry as well as any changes in supply or demand.  The models used by Dr. Williams and Dr. Netz do not and cannot account for these changes because ████████████████████████████ ████████████.

68.   Information cited by Dr. Williams and Dr. Netz in their reports refutes that the assumption of a single, unchanging pass-through rate is warranted.  Dr. Netz cites an article that states "the HDD industry has quickly entered periods of extremely aggressive pricing.  For example, in 2003 HDD manufacturers reduced prices aggressively to protect market share as inventories built quickly through [the] distribution on the heels of Seagate's IPO late in 2002.  Industry gross profit margins suffered accordingly."[113]  This single quote, which references an episode of "extreme" price competition and "suffering margins" among HDD manufacturers takes place during the class period where Plaintiffs assert that overcharges are passed through in a consistent manner from one layer of the supply chain to the next.  The very fact that gross margins suffered indicates that prices in this aggressive pricing episode fell by more than costs in this year from other years.  Yet Plaintiffs' models do not allow for differences in pass-through rates at different levels of the supply chain in different years to allow for expected variations in the competitive conditions and unique economic circumstances facing particular resellers at different points in time.  If gross margins are falling because of aggressive pricing, this necessarily means that costs are not getting passed through to customers to the extent that they were previously.  Neither Dr. Williams' nor Dr. Netz's models can address these changes in gross margins.

69.   In addition, both Dr. Williams and Dr. Netz identify instances where retailers have negative margins.  As reported in Table 3 of his report, Dr. Williams ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████  Dr. Netz also notes that the retailer Best Buy reported a negative operating margin in 2013.[116]  Similarly, this means that Best Buy was unable to fully pass through the cost of products that it sold to its customers.  Yet Dr. Williams and Dr. Netz do not account for these negative margins in their pass-through analyses.

---

[113]   Netz Report, p. 68, citing Initiating on HDD Industry: STX-U-PF; WDC-O-PF, June 22, 2009, NHKS-M-00500263-310 at 269.

[114]   Williams Report, Table 3.

[115]   Williams turnover materials (02a_pass_through_regression.do).

[116]   Netz Report, p. 69.

70. 

I summarize the results of my analysis in **Exhibit 5**.

[117] Dr. Williams and Dr. Netz do not account for the variability of pass-through or allow their pass-through rates to vary by customer or through time.

71. The presence of negative margins and aggressive pricing by HDD manufacturers illustrates that competitive dynamics change throughout the alleged class period and that not all costs are passed through on every sale. The pass-through models that Dr. Williams and Dr. Netz  They cannot address these changes in competitive dynamics. The negative margins and aggressive pricing demonstrate that the alleged overcharge may not have been passed through to at least some customers and therefore it is wrong for Dr. Williams and Dr. Netz to conclude that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

## C. The Alleged Agreement to Drive HTI out of the Market Is Inconsistent with Prices Being Elevated Class-Wide

72. Dr. Netz describes the conduct at issue as including the following types of agreements: (1) Defendants agreed not to compete on price; (2) Defendants agreed to allocate market shares, both overall and for specific customers; (3) Defendants shared competitively sensitive information; and (4) Defendants NHK and TDK agreed to work together to eliminate HTI.[118] Even if Defendants engaged in the conduct as alleged, Dr. Netz ignores the fact that predatory behavior with respect to HTI would tend to lower prices when NHK or TDK were in competition with HTI. This means that, all else equal, the conduct at issue would be expected to have an undercharge where NHK and TDK were aggressively competing to drive HTI out of the market and an overcharge where NHK and TDK were in agreement not to compete on price when competing only with each other. Neither Dr. Williams nor Dr. Netz explore this feature of the conduct at issue. Even if their results were reliably establishing an average overcharge on products sold by NHK and TDK during the alleged class period, they have no basis to assert that the conduct at issue would improperly raise the prices of products sold by HTI. Moreover, there is no means of determining which resellers and end-users purchased products incorporating HDD SAs sold by

---

[117] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Reseller Plaintiffs' Supplemental Responses to TDK Defendants' First Set of Interrogatories, *In Re: Hard Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, United States District Court for the Northern District of California, December 16, 2022, pp. 9-11.

[118] Netz Report, pp. 1-2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HTI and which purchased products incorporating HDD SAs sold by one of the Defendants prior to the acquisition of HTI.

73.     Until its acquisition by TDK in 2016, HTI was the third major supplier of HDD SAs.[119]  Thus, for nearly the entire alleged class period, NHK and TDK were competing with a major supplier that was not alleged to be part of NHK and TDK's purported agreement not to compete on price.  Dr. Netz does not take account of this fact when she evaluates whether the market at issue is susceptible to price-fixing and that the impact of the conduct at issue is to elevate price class-wide.[120]

74.     In particular, Dr. Netz notes that "Defendants NHK and TDK agreed to work together to eliminate the third major supplier of suspension assemblies, HTI," but does not explain how Defendants NHK and TDK could have achieved such an outcome if not by undercutting HTI's prices.[121]  In fact, information in the record shows that MPT wrote about a strategy to "kill" HTI by pursuing an aggressive pricing strategy and such a strategy was attempted.  For example, in an email, MPT President Albert Ong stated "[i]f we want to target killing HTI, we will have to sacrifice profit in short term to give more aggressive pricing, especially to [Western Digital] and [Seagate] and even [Hitachi Global Storage Technologies]."[122]  A subsequent 2015 communication

---

[119]   NHK San Jose Office SBU Presentation, 2013, NHKI-M-00425471-487 (Saika Deposition, Exhibit 56) at 479; Netz Report, p. 2, Exhibit 4; Williams Report, ¶ 27.

[120]   Dr. Netz discusses how "Defendants' collective market power provided the incentive and ability to increase prices above the competitive level" and "[t]he nature of Defendants' challenged conduct indicates that it would cause prices to increase." However, Dr. Netz does not address how HTI, as an independent entity in the beginning of the class period, affects her evaluation of market power.  Netz Report, Sections III.B.2 and III.B.3.

[121]   Netz Report, p. 2.  In her deposition, Dr. Netz testified ███████████████████████████████ ████████████████████████████████████████  Netz Deposition, 120:14-22, 122:3-9.  There are documents in the record that indicate that the non-HTI Defendants reduced their pricing in response to HTI.  For example, a 2009 TDK internal email states that "[s]ince last quarter MPT has decided to the be lowest price supplier for WD in order to gain market share. … We want to grow our 3.5" share so that overall is 40% and that will be enough to squeeze HTI."  Email from Albert Ong (Magnecomp Corporation) to Ishikawa Masato (TDK), Subject: Re: SAE Suspension Justification *CONFIDENTIAL*, March 19, 2009, TDKHDD001919742-746 at 742.  A 2010 communication suggests that TDK would provide Samsung an aggressive quote "[i]f HTI gives [Samsung] a nice quotation … [w]e have to take action not to let HTI back into this business."  Email from Takao Tsutsui (SAE) to Atsuo Kobayashi (TDK), Subject: Re TSA+, December 16, 2010, TDKHDD001729690.  There is also a 2011 communication where HTI offered a price quotation and MPT lowered its price in its initial proposal after learning of HTI price and a discussion of a price war in 2011: "Price war is really coming. … Seems to me their offer is almost crazy;" Ong responds: "Yes, it is price war also in [Seagate] and [Western Digital]. We are busy trying to make sure we don't lose allocations."  Email from Arun Dhawan (Magnecomp Corporation) to Albert Ong (Magnecomp Corporation), Subject: RE: Samsung and Toshiba Updates, March 25, 2011, TDKHDD001851962-964 at 962-963.  See also, Email from Arun Dhawan (Magnecomp Corporation) to Steve Misuta (Magnecomp Corporation), Subject: Re Cougar Price Competition, January 13, 2011, TDKHDD001937555-557.

[122]   Email from Albert Ong (Magnecomp Corporation) to Giichi Nagata (Magnecomp Corporation), et al., Subject: Today's TDK HQ Meeting results, March 11, 2009, TDKHDD001691213-215 at 214.  See also ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

by NHK states that "MPT has been lowering prices to kill HTI at [Western Digital] and [Seagate]."[123]

75.     Despite these claims being inconsistent with Defendants imposing a uniform overcharge on all suspension programs, Dr. Netz includes HDD SA for programs where Defendants TDK and NHK were directly competing with HTI in her damages model.  Between August 2007, when End-User Plaintiffs alleged TDK and NHK allegedly "started plotting against their fellow co-conspirator," and November 2015, when TDK announced its intention to acquire HTI, ███████ were sourced by both HTI and one of the other Defendants' subsidiaries.[124]  Had NHK and TDK colluded to "eliminate" HTI from the market, such allegedly predatory behavior would have resulted in lower prices for the HDD SA programs where NHK or TDK were in competition with HTI. ████████████████████████████████
████████████████.  In addition, those programs would be a conservative measure of where any effects of the alleged predatory behavior would be seen.  Any instances where HTI bid on a Request for Quotation ("RFQ") and did not win any business because NHK and TDK successfully won the business by colluding to bid a lower amount would not have an overcharge.

76.     Class members who purchased products for which TDK and NHK competed to undercut HTI's pricing have not paid anticompetitively elevated prices and may thus be unharmed.  Since it is not possible to trace which resellers and end-users purchased products containing SAs from one of these ███████████████ with data or information common to the class, it is not possible to identify which class members are unharmed because they purchased an HDD SA containing no overcharge.

## D. Even if Plaintiffs' Experts' Overcharge Models Were Valid, Not All Suspension Assembly Programs Were Overcharged

77.     Suspension assemblies are specialized components of larger systems, where each suspension assembly program is tailored to the specifications of each HDD manufacturer.[125]  Program development is a collaborative process between suspension assembly makers and HDD manufacturers, starting with initial prototype development and a collaborative process to ensure the interoperability of the

---

[123]  ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

[124]  End-User Complaint, ¶¶ 144-145, 152.

[125]  "Hutchinson Technology 2004 Annual Report," *AnnualReports.com Website*, 2004, p. 3 ("Each new suspension assembly may also require a higher level of compliance with specific tolerances in order to achieve the customer's desired product performance and differentiation.")  Williams Report, ¶ 20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

suspension assemblies produced by different manufacturers within each program.[126] Thus, while suspension assemblies produced by different HDD SA manufacturers for a specific program are interchangeable, suspension assemblies produced by the same manufacturer for different HDD programs are effectively differentiated products.[127]

78.     Dr. Netz states that "[c]ommon impact arises if there is a price structure" and by performing a correlation analysis she opines that "there is a structure to the prices of suspension assemblies" and the "impact of the challenged conduct would be felt across all, or nearly all, suspension models, customers, and Defendants."[128] However, correlation analysis is insufficient to reach such a conclusion.  First, the degree of correlation that Dr. Netz appears to be relying on to draw her conclusions is fairly low.  Dr. Netz states that ███████████████████████████████ ████████████████████████[129]  This is not a substantial degree of correlation in the data. ███████████████████████████████████████████████████████████



███████████████████  Furthermore, ███████████████████████████████████ ████████████████████████████████████.[130]  Finally, ██████████ ███████████████████████████████  is not informative of whether two suspension models' prices are related via a "price structure."  **Figure 7** below shows two lines that have a 0.70 correlation coefficient but would not be described as being meaningfully related or subject to the same price structure.

[126]    Okuma Declaration, ¶ 18 ("The design process starts when HDD Manufacturers request that NHK design and develop custom-built prototypes based on specifications specific to certain HDD Projects.  These prototypes must be approved and tested by the HDD Manufacturers to confirm the HDD Suspensions work when incorporated into the relevant HGAs and HSAs. ...  During this process, HDD Manufacturers will demand multiple changes to the prototypes over time requiring many adjustments from NHK's product engineers. For this reason, prototypes are significantly more expensive than mass-produced suspension assemblies.")

[127]    "Hutchinson Technology 2004 Annual Report," *AnnualReports.com Website*, 2004, p. 3 ("For many disk drive programs, the suspension assembly is among the components critical to achieving the desired functionality and performance that differentiate a particular product from another.")  Williams Report, ¶ 20; Netz Report, pp. 23-24.

[128]    Netz Report, pp. 58, 60.

[129]    Netz Report, p. 59.

[130]    Netz Report, p. 59, Exhibit 23.

**Figure 7**
**Illustrative Example of 70 Percent Correlation**



79.    Moreover, as I discuss below, prices for SAs generally trended downward.
Therefore, some overall correlation would be expected even if there were no pricing
structure.  In addition, if two SA manufacturers are selling interchangeable SAs for
the same HDD program, then those HDD SAs will have the same exact specifications
and thus are likely to display some degree of pairwise correlation.  Similarly, SAs
manufactured by the same SA manufacturer are also likely to have a degree of
correlation because of common cost components.  There is also an expectation that
firms in the same industry would be affected by similar industry-wide external factors
and thus products produced by those firms are likely to have correlated prices.  Given
these industry-specific factors, Dr. Netz's correlation analysis does not indicate or
even suggest that there was a price structure across all HDD SAs that would support
her contention that all HDD SA prices would have been uniformly impacted.

80.    Prices for HDD SAs are negotiated and determined on a program basis.  The price for
each suspension assembly program is initially determined by the responses to an RFQ
issued by HDD manufacturers, where each suspension assembly manufacturer would
provide a range of prices depending on the number of suspension assembly units to be
supplied.[131]   After the initial phase of program development, HDD manufacturers and

---

[131]    Isom Deposition, 104:15-105:12 (████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████)

suspension assembly manufacturers would typically renegotiate prices and sales volumes for each suspension assembly program at regular intervals.[132]

81.     Given these program-specific pricing dynamics, there is no basis to assume that a uniform overcharge is applied to all suspension programs over the entirety of the class period.  Even if Plaintiffs' experts' overcharge models were otherwise correctly specified (which they are not), the structure of their models is only capable of estimating an average overcharge across all sales during the class period.[133]  Applying a small adjustment to the models so that they allow for more flexibility by individual HDD SA programs demonstrates that even Plaintiffs' experts' own models show that there is not an overcharge on every HDD SA program sold over the alleged class period.

82.     By design, the regression models used by Dr. Williams and Dr. Netz c███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████         █████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

83.     **Exhibits 6A** and **6B** summarize the results of these analyses.  As shown in **Exhibit 6A,** ████████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████████████████████

██████████████████) Seagate's Opposition to NHK's Motion for Partial Summary Judgment Regarding Foreign Commerce, In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation, Case Nos. 3:19-md-02918-MMC, 3:20-cv-01217-MMC, January 13, 2023 ("Seagate Opposition Motion,") p. 7 ("Negotiation of Pricing, Volume, and Supply Terms: After receiving responses/quotes, Seagate CMT negotiated with Defendants over the pricing, volume, and other supply specifications.")

[132] Deposition of Rick Nass, Senior Director/Sales, HTI, March 24, 2022, 180:22-181:5 ("Q. But the price that you have negotiated with Seagate was for a specific model of suspension assembly?  In other words, everybody, Seagate, HTI, they know what the suspension is going to look like?  A. We negotiated prices on individual suspensions, correct."), 252:7-252:16 ("Q. [I]t would typically take two to three years to develop a program, and after the program goes into mass production, how often would you renegotiate the price?  A. Typically the development was not two to three years.  It was typically one to two years, but the negotiation cycle, as you described, varied by customer.  The frequency varied by customer.")  A similar process occurred with Western Digital.  *See also*, for example, Email from Steve Misuta (Magnecomp) to Rick McHone (Magnecomp), Subject: Re: Samed Updated proposal based on MA2 and WD VMI Specs, July 7, 2011, TDKHDD002900673-678 at 673 ("WD sure played us on this one.")

[133] I discuss in **Section VI** the flaws in plaintiffs' experts' models that render them incapable of correctly estimating a purported price increase resulting from the conspiracy as alleged.

[134] Note that this adjustment neither forces all programs to have the same overcharge, nor forces all programs to have a different overcharge.  Rather, the adjustment adds flexibility to Plaintiffs' experts' own models to more precisely measure market outcomes in a way that is more consistent with actual pricing dynamics in the industry.



Similarly, as shown in **Exhibit 6B**, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ [135]

84.    This finding of differential impact of the alleged conspiracy by HDD SA program is consistent with pricing dynamics in the industry and fundamentally more plausible than the single uniform overcharge imposed by assumption in Plaintiffs' experts' models.  By Plaintiffs' own theories, programs where NHK and TDK were primarily competing with each other and had agreed not to compete on price would be expected to demonstrate a higher overcharge than programs where NHK or TDK were competing with a competitor with whom they had not reached such an agreement.  As noted above, Plaintiffs' allegations in fact contain claims of different competitive dynamics in circumstances where NHK or TDK were competing with HTI. [136] Adjusting their models so that they are consistent with Plaintiffs' theories of harm demonstrates that there were programs with no overcharges.

85.    Resellers and end-users who only purchased products containing HDD SAs from one of the programs for which Plaintiffs' experts' models find no overcharge are unharmed.  Since it is not possible to trace which resellers and end-users purchased products containing specific suspension assembly programs with data or information common to the class, it is not possible to identify which resellers and end-users purchased products containing suspension assembly programs that were not subject to alleged overcharges.

### E.  Plaintiffs' Experts Assign Damages to Class Members that Purchased Products Not Sold by Defendants and for Which No Overcharge Has Been Established

86.    While Plaintiffs' experts purport to calculate an overcharge on all HDD SAs sold in the Reseller and End-User Class States, Plaintiffs' experts acknowledge that Defendants and their subsidiaries were not the only HDD SA manufacturers during the alleged class period.  Dr. Williams finds that ████████████████████████████ ████████████████████████████████ during the class period, while Dr.

---

[135]    ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

[136]    The different competitive dynamics across programs are consistent with testimony and documents in the record that demonstrate that the Defendants reduced prices in some instances.  For example, Rick McHone from MPT testified that if he knew that NHK were holding firm on price, then "it also tells me that I have an opportunity if I reduce it."  Deposition of Rick McHone, Senior Vice President of Operations, Magnecomp Corporation, October 27, 2021, 208:21-23.  Internal communications also show the Defendants reduced prices in response to other Defendants or to Defendant-specific factors. For example, in 2011 an MPT email notes that NHK reduced its pricing to become "more competitive and aggressive" against MPT and a 2006 email discussed that "NHK low-balled the price so they could fill their Thailand factory."  Email from Rick McHone (Magnecomp) to Albert Ong (Magnecomp), Subject: RE: NHK, July 21, 2011, TDKHDD001606381-382 at 381; Email from Ken Martini (Magnecomp) to Steve Misuta (Magnecomp), Subject: FW: Call with NHK, June 7, 2006, TDKHDD001989778-779 at 779.

Netz claims Suncall produced between 2.0 and 4.8 percent of all suspension assemblies, throughout the class period.[137] I understand that transaction data for Suncall have not been produced and are therefore not included in Plaintiffs' experts' analyses of overcharges or pass-through. This means that Plaintiffs' experts have no basis to establish that there was an overcharge on HDD SA products sold by Suncall or that resellers or end-users who purchased HDD products containing a Suncall SA were harmed.

87.    I understand that it is not possible to identify with methods or information common to the class the identities of class members who purchased a product containing a Suncall HDD SA or the amounts paid for products containing Suncall HDD SAs. The damages models put forward by Plaintiffs' experts fail to establish a common methodology to identify which resellers and which end-users purchased products containing an HDD SA, much less provide a method by which to distinguish whether the HDD SA contained in these products was manufactured by a Defendant or a non-Defendant. Thus, Plaintiffs' experts' damages models would assign positive damages to purported class members who purchased products for which no overcharge has been established.

88.    The foregoing discussion establishes that the proposed classes include unharmed class members and Plaintiffs' experts have not and cannot provide any method to extract unharmed class members or their purchases from their proposed "class-wide" damage methods. As noted, program-specific pricing, competition from non-coconspirators, the alleged conduct with respect to trying to push HTI out of the market, and the intermingling of non-Defendant sales with Defendant sales all mean that there is an *a priori* expectation that not all sales would be affected by the anticompetitive conduct at issue, much less affected in a uniform manner. Plaintiffs' experts propose only models with broad averages to overcome these market realities and have no way of determining which individual class members were injured and which are uninjured by the alleged conduct.

## VI.    Plaintiffs' Experts' Overcharge Models Are Flawed and Fail to Demonstrate Common Impact

89.    As noted above, Plaintiffs' experts' opinions regarding common impact depend critically on their ability to identify an overcharge at the top of the supply chain and demonstrate that some part of the overcharge was passed through on every sale to every reseller and end-user. Without a showing of an overcharge on every sale, Plaintiffs' experts have no basis to assert that impact is class-wide or to assess which class members may have been impacted and which not. In the prior section, I noted that there are unharmed class members even if Plaintiffs' experts' analyses were correct. In this section, I explain why flaws in their models reveal that Plaintiffs'

---

[137]    Williams Report, Table 1; Netz Report, p. 10, Exhibit 4. Dr. Williams ███████████ ███████████ while Dr. Netz measures Suncall's share in terms of the number of suspension assembly products shipped. There is a discrepancy in Dr. Netz's report, in which Dr. Netz states that Suncall produced between 2.3 and 4.5 percent on page 10 of her report but reports a range of 2.0 to 4.8 percent in Exhibit 4 of her report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

experts cannot establish impact on any class members because their initial overcharge indicator is not robust to reasonable changes to the models to make the models consistent with competitive pricing dynamics in the industry, or to align with alternate liability theories that the Court may ultimately find.

90.     I show that Plaintiffs' experts' overcharge models suffer from flaws that lead them to conclude that there is a measurable overcharge on sales, when in fact there is none. First, I show that including relevant economic pricing variables into Plaintiffs' experts' damages models overturns the very basis for their assumptions that impact is class-wide and can be measured with methods common to the class.  Second, I demonstrate that Plaintiffs' experts' opinions about common impact depend critically on the assumptions they employ regarding the class period, and their results and opinions are not robust to changes in the damages period.

## A. Plaintiffs' Experts' Overcharge Models Omit Relevant Variables

91.     Plaintiffs' experts estimate the purported effects of the alleged conspiracy using an econometric model that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

92.     The crucial assumption for the overcharge indicator to correctly measure the extent to which prices are purportedly elevated because of the alleged conduct is for the regression model to include as controls all other factors that could influence HDD SA prices.  It is well established in the econometrics literature that omitting relevant factors from the regression model would result in incorrect estimates for the alleged overcharge indicator, misattributing the effect of the omitted factors to the alleged conduct.[140]

---

[138]   Williams Report, ¶¶ 13, 145; Netz Report, pp. 88-89.

[139]   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. Netz controls for demand factors (the number of HDD units sold globally per quarter), supply factors (material cost, labor cost in Thailand, electricity price in Thailand, the cumulative number of HDD SA units sold since introduction for each suspension program and Defendant combination, the effects of the 2011 Thailand flood, the effects of the 2008 financial recession), a purportedly contaminated period from June through December 2016, quarterly price variation, variation in prices associated with each HDD SA program and Defendant combination, variation in prices across HDD manufacturers, and variation in prices across customers.  Netz Report, Exhibit 20; Netz turnover materials (overcharge_price_regression.do); Williams Report, ¶¶ 161-171; Williams turnover materials (02_overcharge_regression.do).

[140]   Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage Learning, 2021) ("Wooldridge 2021"), pp. 84-87.

93.     Plaintiffs' experts' overcharge models fail to account for factors that affect HDD SA prices over time.  Specifically, they do not appropriately account for the fact the price of each HDD SA program tends to decline the longer the program is in production, due to periodic contract renegotiations and competitive pricing dynamics in the industry, in addition to improvements in production yields and falling per unit costs of production over time.[141]

94.     Suspension assembly prices follow a predictable pattern, where the first sales of each suspension assembly program are for prototypes, which tend to sell for a much higher price than the same model once it reaches mass production.[142]  Once mass production begins, prices decline, at first rapidly, then slowing down over time.  **Figure 8** illustrates this pattern for select HDD SA programs.[143]  Plaintiffs' experts acknowledge that HDD SA prices fall over time due to improvements in production yields resulting in lower per-unit costs as HDD manufacturers gain more experience at producing a particular HDD SA program.[144]

---

[141]   Netz Report, pp. 6, 27, 91-93.

[142]   Email from Robin Glass (Magnecomp Corporation) to John Joseph (Western Digital), *et al.*, Subject: MPT Quote #3224 - Firebird, September 26, 2009, TDKHDD000042079-080 at 079; ███████████████████████████████████████████████  *See also*, Netz Report, pp. 6, 27.

[143]   Similar illustrations for all programs in the data are shown in **Exhibits 7A** and **7B**.

[144]   Netz Report, pp. 91-92; Netz Deposition, 124:17-25; Williams Report, ¶ 168; Williams Deposition, 64:24-65:10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 8[145]**
**Average Monthly Price of HDD SAs**
**For Selected Programs**



95.     Dr. Williams states that ██████████████████████████████
████████████████████████████████████████████[146]  Similarly, Dr.
Netz includes the cumulative sales of a given suspension assembly program at the
time of sale among the control variables in her overcharge model to account for the
fact that "as a product matures and cumulative volume increases, the production yield
increases, resulting in lower per-unit costs of production."[147]  The cumulative number
of units produced for each program is, however, insufficient to account fully for the
pricing pattern observed for each program. ██████████████████████

---

[145]   Average price is calculated by dividing the total monthly sales by the total monthly quantity sold.  Source: Williams
turnover materials (defendant_sales_reg_data.dta).

[146]   Williams Report, ¶ 168.

[147]   Netz Report, pp. 91-92.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ [148]

96.     Adding an additional control for how long each program has been in production has a substantial impact on Plaintiffs' experts' results and undermines their opinion that impact can be established on a class-wide basis.  Including an additional control to account for the length of time each program has been in production to Dr. Williams' overcharge model results in ███████████████████████████████ ███████████████████████████████████████████████████ **Exhibit 8A** compares the results of Dr. Williams' regression as it appears in his analysis and the results with the addition of a control variable for the number of months each HDD SA program has been in production.  As can be seen from the exhibit, the overcharge is reduced to ███████████████████████████████████████████████████████████████

97.     Including the same control in Dr. Netz's regression model results in a substantial reduction in her original estimate, undermining her opinion that pass-through of an overcharge to all members of the End-User Class is likely.  **Exhibit 8B** compares the results of Dr. Netz's regression as it appears in her analysis and the results with the addition of a control variable for the number of months each HDD SA program has been in production.  As can be seen from the exhibit, the overcharge coefficient becomes ████ of the magnitude that Dr. Netz reported in her report.

98.     The reduction in magnitude of the overcharge coefficient has important implications for Dr. Netz's opinions about class-wide impact.  ████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ [149]  It is simply not plausible that retailers would have uniformly incorporated a price increase of this magnitude into the prices of all products that are at issue in the End-User Class.

99.     As stated above, Plaintiffs' experts both claim to have accounted for HDD SA program pricing dynamics by including a variable in their regressions to control for the cumulative volume of products sold over time in each HDD SA program.  The fact that adding a control variable for the number of months each program was in production substantially affects the results of their analyses indicates that Plaintiffs' experts' initial control variable is not sufficient to account for the pricing dynamics in

---

[148] ██████████████████████████████████████████████ Deposition of Albert Ong, Former Director, SAE Magnetics, June 3, 2022 ("Ong Deposition"), 412:20-413:18.  ("Q. Okay.  And how long does the price negotiated for the agreement last?  A. Typically a Seagate supply agreement will have a pricing table and it will last for a number of years.  But negotiations are still conducted on a quarterly basis, even though there's a supply agreement reference.  Q. Okay.  And when negotiations are conducted on a quarterly basis, the starting point is the price of the contract; is that right?  …  A. The pricing tables in the supply agreement would be a reference point.  Q. Meaning when you perform your quarterly renegotiations, you begin with the price set forth in the agreement and negotiate the price from there; is that correct?  A. Well, it doesn't always start from there but it's a reference that we both use, but it can go anywhere.  And there have been times that I recall whereby a customer would say I need to renegotiate because of a change in the business demand and they go out of that pricing reference table.")

[149] ███████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

this industry.  If it were sufficient, then adding additional controls should have no effect.

100.   Another way to capture the dynamic pricing effects is simply to add a time trend to Plaintiffs' experts' overcharge regression models.  As acknowledged by Dr. Netz, average prices for HDDs have been trending downward over time.[150]  One of the factors likely contributing to this pattern is increasing competition from other memory technologies such as SSDs.[151]  Competition from such other memory technologies is not captured in Plaintiffs' experts' analyses, but indisputably has an impact on market prices of HDDs.[152]  Adding a simple time trend to the overcharge analyses of Plaintiffs' experts has a similar effect to that of adding a control for HDD SA pricing dynamics:  The overcharge coefficient in Dr. Williams' model ███ █████████████████ and the overcharge in Dr. Netz's model is reduced by more than ████  *See*, **Exhibits 9A** and **9B**.

101.   As explained above, the fact that adding an additional control variable to Plaintiffs' experts' model overturns or undermines their results indicates that their initial models suffer from omitted variable bias:  There is something outside of their models that is significantly affecting their results.  As such, the models are fundamentally flawed, and cannot reliably establish that members of the purported classes suffered impact flowing from the alleged conduct.  If the additional controls discussed above were superfluous, the inclusion of these variables in Dr. Williams or Dr. Netz's regression models would not have affected their overcharge estimates.

102.   Plaintiffs' experts' overcharge models are fundamentally flawed because they fail to account for relevant factors influencing HDD SA prices, such as competitive dynamics in the HDD industry.  Simple adjustments to Plaintiffs' experts' regression models to account for these factors results in the estimated overcharge becoming statistically insignificant or substantially decreased, eliminating the basis for their opinions that impact to the respective classes is likely to be class-wide.

---

[150]   Netz Report, p. 46.

[151]   Seagate Technology, Form 10-K for Fiscal Year Ending July 1, 2016, p. 13 ("We are seeing direct competition from SSD's that is adversely impacting demand for HDD[s] in some markets including Notebook and Enterprise Mission Critical.") Netz Report, pp. 21-22 ("The rise in SSD sales coincided with the decline in HDD demand over the class period.  While from 2011 to 2014 global shipments of HDDs declined by 9.38% and shipments of SSDs increased by a factor of 4.66 … By 2020, sales of SSDs surpassed those of HDDs, at 333 million units compared to 260 million units, respectively.")

[152]   ████████████████████████████████████████████████████ Williams Report, ¶¶ 96-97; Netz Report, pp. 66-68. ████████████████████ August '15 GSM Meeting, August 26, 2015, NHKS-M-00009926-9978 at 930.  This competition is also reflected in third-party reports, for example, in a report from TrendFocus.  Rigid Disk Media & Substrate Information Service, April 2005, TDKHDD000709132-341 at 286 ("However, disk drives are not the only storage option.  Flash storage has many benefits that make it a viable storage solution for this market.  Flash capacity has gone up 100% annually, while prices have fallen 30%-50% during the same period.  So, in order for HDDs to be a viable option for mobile phones, they must offer higher capacity at lower prices.")

## B. Plaintiffs' Experts Overcharge Estimates Are Not Robust to Alternative Class Periods

103.     Plaintiffs' experts' models seek to assess a class-wide overcharge assuming the alleged conspiracy affected suspension assembly prices between January 2003 and May 2016.[153]  Dr. Williams states [154] Dr. Netz

[155]

Moreover, neither expert ████████████████████. Both Dr. Netz and Dr. Williams ████████████████████████████████████████████████[156]  However the plea agreement between the DOJ and NHK only covers sales between May 2008 and April 2016.[157]  In addition, Dr. Netz appears to have instructed her team to review information in the record regarding meetings where the Defendants appeared to explicitly agree on allocations of market shares or limit price competition, but the earliest document she notes in that recitation is from March 30, 2006.[158]  Thus, neither expert appears to provide any analysis linking a purported anticompetitive overcharge beginning in January 2003 to the conduct at issue, other than the fact that their models produce an apparent class-wide overcharge if January 2003 through May 2016 is part of the damage period rather than some part of that period being part of the benchmark period.

104.     By adopting counsel's assumption for the class period, Plaintiffs' counsel and their experts pick a period that appears to maximize damages, both in terms of the estimated overcharge rate and in terms of the volume of commerce on which the alleged overcharge was purportedly applied.  Examining alternative class periods more consistent with Plaintiffs' experts own theories of impact fails to show class-wide impact or yields smaller overcharges and greatly reduced damages.

105.     For example, Dr. Williams' overcharge model 

---

[153]  Williams Report, ¶ 156; Netz Report, p. 90.

[154]  Williams Report, ¶ 156.

[155]  Netz Report, p. 32.  Dr. Netz testified ████████████████ Netz Deposition, 120:1-7. ██ Netz Deposition, 126:3-127:3.

[156]  Williams Report, ¶¶ 48, 58; Netz Report, pp. 28-29.

[157]  Rule 11 Plea Agreement, *United States of America v. D-1: NHK Spring Co., Ltd.*, Case No. 2:19-cr-20503-MAG-DRG, September 23, 2019, ¶¶ 2, 4.

[158]  Netz Report, p. 55, Exhibit 17.



*See*, **Exhibit 10A**.

106.  Applying the same change to Dr. Netz's overcharge model (*i.e.*, changing the damages period to correspond to the DOJ plea period) has the effect of greatly reducing her estimate of the class-wide overcharge.  As shown in **Exhibit 10B**, making this change to Dr. Netz's model reduces her estimated overcharge from ██ ████████████████  This substantial reduction in the estimated overcharge has important implications for the likelihood of class-wide impact.  Dr. Williams ██████ ████████████████████████████████████████████████[159]  This directly acknowledges that the smaller the overcharge at the top of the supply chain, the greater the likelihood that the small resulting cost increase would not be passed through to all members of the Reseller or End-User Classes.[160]

## VII.   Dr. Netz's Pass-Through Model Is Flawed and Fails to Support Her Assertion That Impact Is Common to the End-User Class

107.  Dr. Netz states she expects "pass-through of an industry-wide cartel overcharge to be positive and close to 100%."[161]  She bases this assertion on her assessment of economic literature but also acknowledges that the magnitude of pass-through must be measured empirically.[162]  Dr. Netz's empirical measurement of pass-through rates is flawed and causes her to overstate pass-through rates.  After correcting for her omission of important factors, I find that Dr. Netz's models do not support the assertion that some part of the alleged overcharge (which as described above, is also overstated in the Plaintiffs' experts' models) would be passed through to all members of the End-User Class.

108.  Dr. Netz uses a linear regression model to measure pass-through for particular sellers by quantifying the relationship between the price of HDDs or HDD-containing

---

[159]  Williams Report, ¶ 218.

[160]  Dr. Netz seeks to refute this theory (*see*, Netz Report, p. 83), however, as demonstrated above, she provides no evidence that cost changes of the magnitude at issue in this matter will be passed through to end-users, at all, much less in a common manner.  In addition, Dr. Netz's expectation of 100 percent pass-through is undermined by testimony from reseller plaintiffs in these matters.  Moreover, I have found economic evidence to the contrary.  ██████████████████████████ ████████████████████████████████████████████████████████  Reseller Plaintiffs' Supplemental Responses to TDK Defendants' First Set of Interrogatories, *In Re: Hard Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, United States District Court for the Northern District of California, December 16, 2022.  As explained in this report, below cost pricing implies less than 100 percent pass-through of price increases.

[161]  Netz Report, p. 87.

[162]  Netz Report, p. 87.

products and those products' costs for those sales.[163]  To perform her estimation, Dr. Netz uses purchase and sales data of direct and indirect purchasers of HDD SAs, conducting separate pass-through regressions for 53 different data sets for sellers of products that contain HDD SAs.[164]  As a matter of economics, a pass-through estimate needs to account for the fact that products (*e.g.*, external HDDs, notebooks) are composed of characteristics valued by consumers and that the resulting bundle of characteristics—often defined as product quality—is what is associated with a cost and price.  Dr. Netz's regression models fail to account for this fact and thus fail to address the question of pass-through because they do not account for product characteristics.

109.   Below, I show that failing to control for product characteristics in Dr. Netz's regression analysis leads to an overstatement of the extent to which cost changes are passed along to consumers in the form of changes to quality-adjusted prices.  Furthermore, I show that Dr. Netz's regression analysis masks substantial variation in the pass-through across different products.

110.   To illustrate how Dr. Netz has overestimated pass-through rates, I compared the results of her analyses with those of similar analyses performed by Dr. Williams.



---

[163]   Netz Report, p. 95, Exhibit 7.

[164]   Netz Report, p. 98.

[165]   ████████████████████████████████████████████████████████ Williams turnover materials (02a_pass_through_regression.do).  ████████████████████ ████████████████████████ Netz Report, Exhibit 7.  ████████████████████ ████████████████████ Netz Deposition, 144:4-14.  However, as I discussed above with respect to overcharge estimates, omitting relevant variables, in this case product features, would result in incorrect estimates for the pass-through rate.  Wooldridge 2021, pp. 84-87.

[166]   I am using Dr. Williams' model to illustrate the importance of attempting to control for product quality.  It is not my opinion that Dr. Williams correctly estimates pass-through rates.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 9[167]**
**Comparison of Dr. Williams' and Dr. Netz's Estimated Pass-Through Rates**
**For Third-Party Entities**



[167]

111.    The omission of controls for product attributes has significant implications for Dr.
Netz's opinions.  The basis for her assumption that impact is common to the End-
User Class and can be measured by common methods is her opinion that pass-through
is greater than 100 percent and therefore class-wide impact can be inferred and
damages measured by looking only at what she claims is the overcharge at the top of
the supply chain.[168]  The comparison of Dr. Netz's results with those of Dr. Williams
illustrates the fallacy of that conclusion.  By failing to account for product
characteristics, Dr. Netz's measure of pass-through is substantially inflated, and leads
her to erroneous and unsubstantiated conclusions.  This comparison should not be
interpreted as an endorsement of Dr. Williams' model.  Rather, it aims at showing
how Dr. Netz's choice not to control for product attributes leads her to systematically
overestimate the rate at which purported cost increases are passed through the HDD
supply chain.

112.    As noted elsewhere in this report, both Dr. Netz and Dr. Williams ███████████
████████████████████████████████████████████████████████████
████████████████████████  This approach causes them to assert that there is impact
where there is none.  **Figure 10** below demonstrates the fallacy of their opinions that
impact is common to the class and can be measured with information and methods
common to the class.  In **Figure 10**, ████████████████████████████████████



████████████████████  There is no common pass-through rate even for products sold
through a single retailer, and no support for an assumption that pass-through is greater
than 100 percent.

---

████████████████████████████████████████████████████████
███████████████████████████████████

[168]    Netz Report, p. 102.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 10[169]**



113.    I further analyze the reliability of Dr. Netz's pass-through model by estimating pass-through rates that incorporate product-specific factors for ████████████████████████ ████████████████████████████████████████ I summarize the

---

[169] ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

results of this analysis in **Figure 11**, where I report information showing the distribution of measured pass-through rates for each product type.  My analysis shows numerous products with pass-through estimates below 100 percent, which is inconsistent with Dr. Netz's estimate for ████████████████.  In addition, the finding that a number of products have pass-through rates below zero does not support a finding that customers who purchased those products paid an overcharge.

**Figure 11[170]**



114.   In addition to the errors I identified in Dr. Netz's pass-through regression analysis, Dr. Netz's analysis is further flawed because she does not address how she will conduct this analysis with information common to the proposed classes.  Each of the 53 data sets she evaluates in her pass-through analysis contains different information, does not specify how the "cost" variable was calculated, and requires individual review and analysis.  Moreover, there is no expectation that costs would be measured similarly across the different entities in the supply chain.  This means Dr. Netz's regression models will result in disparate methods of assessing pass-through.  In addition, besides disregarding additional product characteristics where they exist in the data, she states that many data sets lack sufficient data to perform her analysis and in other cases disregards the data because it lacks information on costs.[171]  These situations demonstrate that individual inquiry is required into each data set and

---

[170] ).

[171]   Netz Report, p. 98, Footnote 383; Netz Deposition, 172:5-173:15.

critical elements of Dr. Netz's pass-through analysis cannot be evaluated class-wide.[172]

115.     My analyses demonstrate that Dr. Netz's estimated pass-through rates are overstated and do not support a conclusion that pass-through rates are 100 percent or more. Moreover, my analyses reveal that Dr. Netz's opinions regarding common impact are unsupported.  I demonstrate that by applying her model to specific products, that some products have pass-through rates below zero which indicates, according to her model, that customers who purchased those products would not have been passed through any of the alleged overcharge and are thus unharmed.

# VIII.   Plaintiffs' Experts' Models Are Built on Assumptions That Inflate the Alleged Damages to the Purported Classes

116.     Plaintiffs' experts' damages models rely on a number of unsupported assumptions that inflate the alleged damages to the purported classes. ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████ Dr. Netz, on the other hand, does not propose a method to assess damages to the purported End-User Class beyond claiming that at least 100 percent of the alleged overcharge was passed on to its members.  As discussed above, pass-through rates equal to or in excess of 100 percent are unsupported by the data for a large number of third-parties in the HDD supply chain.  Dr. Netz does not provide an alternative method to calculate damages for a pass-through rate below 100 percent relying on data or information common to the class.

## A. Dr. Williams' Damages Model Is Flawed and Unreliable

117.     ████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

---

[172] ████████████████████████████████████████████████████ ████████████████████████████ Williams Deposition, 46:23-47:10, 48:6-50:8.

### 1. Dr. Williams Overstates the Share of U.S. Sales of HDD SA Products Attributed to the Reseller Class States



118.

119.

120.

121.

173 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ Williams Report, ¶¶ 238, 241, Figure A1.

174  Williams Report, Appendix III.B.

175  Williams Report, ¶¶ 261-262. ██████████████████

176  Williams Deposition, 215:9-12.

177  ████████████████████████████ Williams Report, Table 11.

### 2. Dr. Williams Includes the Alleged Overcharge Passed Through from Resellers to End-Users in His Damages Estimate



122.

123.

124.

---

[178]   Williams Report, ¶ 246.

**Figure 12[179]**
**Dr. Williams' Damages Method Substantially Overstates Damages to the Reseller Class**



## B. Dr. Netz Does Not Propose a Damages Model Capable of Assessing Damages to the End-User Class

125.    The model put forth by Dr. Netz cannot assess damages with information common to the putative End-User Class.  Dr. Netz purports to calculate class-wide damages by first multiplying the HDD SA sales attributable to class members by the alleged overcharge rate to obtain the aggregate overcharge allegedly paid by direct purchasers for suspension assemblies consumed by class members.[180]  She then claims that she would multiply the result of this calculation by "the relevant pass-through rate" to calculate alleged damages to class members.[181]

126.    Dr. Netz does not provide any details on how the "appropriate" pass-through rate from direct purchasers to end-users should be calculated, except by claiming that "[m]ost of the estimated pass-through rates are approximately 100% or slightly

---

[179]  ███████████████████████████████████████████████████████████

       ████    Source: Williams turnover materials (Damages Calculation.xlsx).

[180]  Netz Report, pp. 104-105.

[181]  Netz Report, p. 105.

higher" based on her flawed pass-through analysis.[182]  As discussed above, pass-through rates throughout the supply chain vary substantially by entity, product, and over time.  Dr. Netz has no valid basis to claim that a 100 percent pass-through rate is conservative given that the flaws in her analysis lead her to systematically overestimate the extent to which increases in cost are passed through the supply chain, and that her pass-through analysis cannot account for common pricing strategies such as focal point pricing or promotional sales that might result in price increases not being passed through at all to certain end-users.

127.  Dr. Netz does not provide an alternative method to assess how she would calculate the cumulative pass-through rate for the entire distribution chain, from direct purchasers to members of the purported End-User Class, without relying on her assumption of a 100 percent pass-through rate to all members of the putative class.[183]  Thus, Dr. Netz does not provide a valid model to calculate the economic damages flowing to the purported End-User Class as a result of the alleged conduct.

## IX.   Dr. Williams and Dr. Netz Cannot Identify the Damages, If Any, Owed to Any Individual Class Member

128.  The Plaintiffs' experts do not identify a method to calculate damages, if any, that are attributed to individual class members using information common to the proposed classes.  This omission extends to calculations regarding the named Plaintiffs as neither expert has estimated the damages owed for any of the named Plaintiffs seeking to represent the two proposed classes.  Moreover, my review of the data sets and information relied upon by Dr. Williams and Dr. Netz indicates that those data sets and information are insufficient to make damages calculations for individual class members even if an overcharge is established and measured reliably.

129.



---

[182]  Netz Report, pp. 100, 105.

[183]  One of the economic articles cited by Plaintiffs' experts recognizes that "[i]f the chain of sellers in the vertical distribution system is long, then a pass-through rate below one will shrink greatly before it reaches the consumer."  John M. Connor, "Cartel Overcharges," *Research in Law and Economics* 26 (2014), pp. 249-388.  Dr. Netz does not address the implications of this, if it is found that her pass-through rates are inflated (and I show that, in fact, her pass-through rates are inflated).

[184]  ██████████████████████████████████████████  Reseller Complaint, ¶¶ 23-27; Williams Report, Table 3.

[185]  Netz Report, Footnote 383.  ██████████████████████████  They are shown in **Exhibit 3**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Figure 13[187]**
**Summary of Available Data for Reseller Class Members**



130.     In addition, even if he were to have access to complete data for a member of the proposed Reseller Class,  However, the same distributor may operate at more than one node.  A distributor may purchase some products from another

---

[186]   Dr. Netz states it is not possible to measure pass-through for every firm for, among other reasons, that "some firms no longer exist, some firms are located outside of the U.S. … , and some firms do not maintain the data required to estimate pass-through."  Netz Report, p. 99 (footnotes omitted). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[187]   Sources: Williams turnover materials ([Third-party]_reg_data.dta; third_party_list.xlsx).

[188]   In fact, Dr. Williams testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Williams Deposition, 191:25-192:2.

[189]   Williams Report, Figure A1.

distributor, or from an OEM.  The products purchased from an OEM may have come directly from an HDD maker, from a different OEM, from a Distributor, or some combination of the three.  The alleged overcharge, however, depends on how many times a product was resold and by which entity type.  Thus, the products purchased by a given distributor will have different alleged overcharges depending on each product's route through the supply chain, but ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████.

131.    Moreover, even if a class member were assigned to only one level in the distribution chain, ████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████

132.    Dr. Netz also fails to provide any method or means of determining damages to any end-user in the class, absent the demonstrably false assumption that overcharges to direct purchasers would be 100 percent passed through to all end-users.  Moreover, even if Dr. Netz did opine on a method to determine damages to individual end-users, the model could not be applied to members of the class.  Dr. Netz does not have information about which products class members purchased, or how many HDD SAs are included in the products they purchased.  Many of the third-party data sets that have been produced in this matter do not have information that identify individual purchasers.  In fact, 27 out of 53 third-party data sets do not include individual transaction information and instead contain aggregated price or cost data on a weekly, monthly, quarterly, semi-annually, or yearly basis.[190]  This means that in addition to not containing purchaser-identifying information, many of the data sets do not contain sufficient information to identify the price that the end-user paid for a product.  This is important because not every end-user paid the same price for a product.  In addition, some end-users receive discounts or rebates that differ by end-user.  For example, ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

---

[190]    Netz Report, Exhibit 7.



133. Given the lack of data with sufficient information about end-user purchases, class members would have to themselves identify any purchases they made. If class members do not have itemized receipts with prices, there is no way to determine which product the class member purchased and at what price. For example, Mr. Larry Steele, one of the named Plaintiffs in the proposed End-User Class, disclosed that ████████████████████████████████████████ [192] Dr. Netz provides no method to estimate the price that Mr. Steele paid for these items or whether either contains an SA manufactured by one of the Defendants. ████████████ ████████████████████████████████ Dr. Netz has not identified any way to determine how many SAs were contained in the product or if those SAs were manufactured by the Defendants.[193]

134. In **Figure 14** I show a sample of observations from the reseller data sets ████████ The table illustrates that the common information available to Dr. Williams and Dr. Netz does not allow anyone to identify if a product contained an SA manufactured by one of the Defendants, much less if that SA was part of a program that may ultimately be established to have an overcharge. ████████████████████████████████ Yet, according to the Plaintiffs' experts both of these products would have the same pass-through rate of any overcharge in SAs. Even if an end-user was able to provide a more detailed receipt, individual inquiry is still required to identify the type of HDD contained in the product. For example, Mr. Steele's packing slip ████ ████████████████████████████████████ [194]

---

[191] ████████████████████████████████████████████████████████

[192] End-User Plaintiffs' Second Revised Responses and Objections to NHK Defendants' First Set of Interrogatories, *In Re: Hard Drive Suspension Assemblies Antitrust Litigation*, Case No. 19-md-02918-MMC, United States District Court for the Northern District of California, p. 4. Mr. Steele did not recall the price he paid for these HDDs and that any estimate he could provide would be a "wild guess." Deposition of Larry Steele, September 7, 2022, 86:17-87:9, 92:20-93:5.

[193] Larry Steele Packing Slip, July 11, 2008, STEELE_00000003-006 ("Steele Packing Slip") at 003. Dr. Netz also has not addressed how her model could account for changing in the cost of HDD SAs or changes in the number of HDD SAs in the device.

[194] Steele Packing Slip at 003.

Figure 14[195]



135.    There is therefore, no means, with information common to the class to identify the damages owed to any individual class member in either the Reseller Class or the End-User Class.  The data do not identify with specificity which SA or how many SAs are in each product and in many cases, cannot identify which HDD is in which product.  Moreover, there is no basis to assume that the relevant information is in the possession of the class members themselves.  Dr. Williams and Dr. Netz have not demonstrated how they will calculate damages even for the Class members named as Plaintiffs in these lawsuits, and as shown, the necessary information to do so does not exist.

## X.    Conclusion

136.    There are unharmed class members in the classes proposed by Plaintiffs and their experts, even if Plaintiffs establish that the Defendants are liable for the conduct at issue.  None of these unharmed class members can be identified with information common to the class or utilizing the methodologies proposed by Plaintiffs' experts for assessing impact.  I show that a number of SA programs did not have elevated prices, and thus there is no basis to assert harm to those purchasers.  I also find that according to the Plaintiffs' experts, a number of resellers passed through the entirety of the alleged overcharge and thus were unharmed.  In addition, I find that the Plaintiffs' experts do not account for competitive dynamics and do not account for the allegation that HTI was a target of the alleged conspiracy.  These results demonstrate the presence of substantial number of unharmed members of the proposed class and that individual inquiry is required to identify these unharmed members.  The models used by Dr. Williams and Dr. Netz are not capable of identifying members of the proposed classes who did not suffer impact using information common to the proposed class.

137.    The Plaintiffs' experts' overcharge regression models are flawed and fail to show elevated prices during the proposed class period with reasonable adjustments.  In particular, I find that accounting for the length of time each program is in production leads to significant reductions in overcharge estimates.  In addition, I show that the

195 ████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

results of the overcharge models depend crucially on the counsel-provided assumption regarding the beginning of the class period.  These results demonstrate that the overcharge models used by the Plaintiffs' experts are not reliable and therefore cannot be used to reliably measure any overcharge experienced by the proposed class.

138.    My review of Dr. Netz's pass-through analysis demonstrates that her assertion that pass-through is close to 100 percent is unsupported and flawed.  I show that her analysis fails to control for product characteristics.  Dr. Netz proposes no method to calculate damages when pass-through rates are below 100 percent.  Finally, I show that Dr. Williams improperly calculates shares of the products at issue and improperly includes damages that were passed on from resellers to end-users.  My analysis demonstrates that the damages estimated by Dr. Williams are unreliable and that Dr. Netz does not provide any reliable means for estimating damages to the proposed End-User Class.

139.    Finally, neither Dr. Williams nor Dr. Netz demonstrate how their proposed damages methods can be applied even to the named Plaintiffs in the two classes.  Dr. Williams ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Dr. Netz does not even address the insurmountable problem of how she will determine damages to any individual class member when the necessary data to do so simply do not exist.


Signed this 22nd day of December 2022:


_Lauren Stiroh_
_____

Lauren J. Stiroh

**Exhibit**



**Lauren J. Stiroh**
Managing Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York  10601
Tel: +1 914 448 4143  Fax: +1 914 448 4040
lauren.stiroh@nera.com
www.nera.com

# LAUREN J. STIROH
## Managing Director

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy*, *Litigation and Management*, published in 2005.

Much of Dr. Stiroh's work and research focuses on the intersection of antitrust and intellectual property litigation. She has written articles and given speeches on this subject for the American Bar Association, Law Seminars International, the Practicing Law Institute, and the 2002 US Department of Justice and Federal Trade Commission joint hearings on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy." She has analyzed market power in technology markets and evaluated the competitive implications of licensing arrangements, including tying and patent pooling provisions.  In 2010, she participated in the ABA Stanford Law School Symposium on Antitrust and Innovation.

Dr. Stiroh has presented her research before the FTC, the DOJ, the Canadian Competition Bureau, and in expert testimony.  In 2010, she was inducted into the YWCA-NYC Academy of Women Leaders.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia, and a B.A. in Economics from the University of Western Ontario.

**Lauren J. Stiroh**

## Education

**Harvard University**
Ph.D., Economics, August 1996

**University of British Columbia**
M.A., Economics, November 1991

**University of Western Ontario**

B.A., Economics, June 1990

## Professional Experience

| | **NERA Economic Consulting** |
|---|---|
| 2021- | *Managing Director* |
| 2016-2021 | *Chair, Global Antitrust and Competition Practice* |
| 2005-2016 | *Managing Director/Senior Vice President* |
| 2002-2005 | *Vice President* |
| 1999-2002 | *Senior Consultant* |
| 1996-1999 | *Senior Analyst* |

| | **Unidad de Desarrollo Social** |
|---|---|
| March 1994 - August 1994 | *Consultant.*  Prepared two studies for the National Planning Department concerning the effect of the trade liberalization in Colombia on the distribution of income. |

| | **Harvard University** |
|---|---|
| 1994-1996 | *Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts. |

| | **Harvard University** |
|---|---|
| 1993-1996 | *Teaching Fellow in Economics.*  Taught principles of economics, the introductory and core course in economics at Harvard College. |

## Honors and Professional Activities

Member, American Bar Association.

Member, American Economic Association.

Adjunct member, NY City Bar Association, Antitrust and Trade Regulation Committee.

YWCA-NYC Academy of Women Leaders, Class of 2010.

2

**Lauren J. Stiroh**

Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.

Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.

Huron College Corporation Scholarship (University of Western Ontario) 1987-1989.

## Expert Testimony and Reports (2018-2022)

*David Toms, et al., v. State Farm Life Insurance Company*

Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 23, 2022.

Second Declaration and Expert Report on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* August 1, 2022.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *David Toms, et al., v. State Farm Life Insurance Company,* April 15, 2022.

*Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.*

Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with *Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.,* August 9-10, 2022.

Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with *Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Sawbill Strategic, Inc., Daniel Umpa, and Jane Ruh v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.,* May 31, 2022.

**Lauren J. Stiroh**

*In Re: Broiler Chicken Antitrust Litigation*

Deposition testimony, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* June 28, 2022.

Declaration and Expert Report, on behalf of Defendant, Wayne Farms, LLC in connection with *In Re: Broiler Chicken Antitrust Litigation,* February 21, 2022.

*Earl L. McClure, et al., v. State Farm Life Insurance Company*

Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* June 23, 2022.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* April 8, 2022.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* December 9, 2021.

*Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.*

Testimony, on behalf of Defendants, The National Association of Realtors, et al., in the United States District Court for the Western District of Missouri, Western Division in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc*., April 18, 2022.

Expert Report and Declaration, on behalf of Defendants, The National Association of Realtors, et al., in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc*., November 12, 2021, and January 28, 2022.

Deposition testimony, on behalf of Defendants, The National Association of Realtors, et al., in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc*., January 17, 2022.

***In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation***

Deposition testimony, on behalf of Defendants, *In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation,* March 25, 2022.

Expert Report, on behalf of Defendants, *In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation,* January 12, 2022.

***Chandra B. Singh, et al., v. State Farm Life Insurance Company***

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Chandra B. Singh, et al., v. State Farm Life Insurance Company,* March 11, 2022.

***Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company***

Declaration, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* February 25, 2022.

Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 22, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 3, 2021.

***William T. Whitman, et al., v. State Farm Life Insurance Company***

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *William T. Whitman, et al., v. State Farm Life Insurance Company,* March 29, 2021, and February 15, 2022.

***John E. Jaunich, et al., v. State Farm Life Insurance Company***

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* December 13, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* August 5, 2021.

Exhibit 3

**Lauren J. Stiroh**

### *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company*

Supplemental Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* September 23, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* December 21, 2020.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* February 3, 2020.

### *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC*

Deposition testimony, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* August 9, 2021.

Expert Report, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* June 2, 2021.

### *Anna Gonzalez and Ronald K Page, et al., v. State Farm Life Insurance Company*

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Anna Gonzalez and Ronald K. Page, et al., v. State Farm Life Insurance Company,* August 9, 2021.

### *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*

Deposition testimony, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* March 25, 2021.

Expert Reply Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* February 1, 2021.

Expert Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* August 28, 2020.

### *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.*

Deposition testimony, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* March 2, 2021.

**Lauren J. Stiroh**

Expert Report, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* January 25, 2021.

**Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited**

Deposition testimony, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* October 14, 2020.

Expert Reply Report, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* September 30, 2020.

Expert Report, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* June 30, 2020.

**In Re: Zetia (Ezetimibe) Antitrust Litigation**

Deposition testimony, on behalf of Defendants, Merck & Co., Inc., and Glenmark Pharmaceuticals, Ltd., in connection with *In Re: Zetia (Ezetimibe) Antitrust Litigation,* March 10, 2020.

Expert Report, on behalf of Defendants, Merck & Co., Inc., and Glenmark Pharmaceuticals, Ltd., in connection with *In Re: Zetia (Ezetimibe) Antitrust Litigation,* February 28, 2020.

**X One, Inc. v. Uber Technologies, Inc.**

Deposition testimony, on behalf of Plaintiff, X One, Inc., in connection with *X One, Inc. v. Uber Technologies, Inc.,* September 20, 2019.

Expert Report, on behalf of Plaintiff, X One, Inc., in connection with *X One, Inc. v. Uber Technologies, Inc.,* August 2, 2019.

**The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.**

Deposition testimony, on behalf of Defendant, Sandoz, Inc., in connection with *The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* August 6, 2019.

**Lauren J. Stiroh**

Expert Report, on behalf of Defendant, Sandoz, Inc., in connection with *The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* July 5, 2019.

### *In Re Capacitors Antitrust Litigation*

Deposition testimony, on behalf of Defendants, KEMET Corporation, and KEMET Electronics Corporation, in connection with *In Re Capacitors Antitrust Litigation,* May 30, 2019.

Expert Report, on behalf of Defendants, KEMET Corporation, and KEMET Electronics Corporation, in connection with *In Re Capacitors Antitrust Litigation,* February 22, 2019.

### *Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.*

Deposition testimony, on behalf of Defendant, Sandoz, Inc., in connection with *Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* April 5, 2019.

Expert Report, on behalf of Defendant, Sandoz, Inc., in connection with *Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.* February 15, 2019.

### *Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*

Deposition testimony, on behalf of Defendant, Atrium Health, Inc., in connection with *Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System,* March 13, 2019.

Expert Report, on behalf of Defendant, Atrium Health, Inc., in connection with *Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System,* December 7, 2018.

### *Crest Foods, Inc., v. Nestlé USA, Inc.*

Deposition testimony, on behalf of Defendant, Nestlé USA, Inc., in connection with *Crest Foods, Inc., v. Nestlé USA, Inc.,* January 31, 2019.

Expert Report, on behalf of Defendant, Nestlé USA, Inc., in connection with *Crest Foods, Inc., v. Nestlé USA, Inc.,* January 7, 2019.

### *James Pudlowski, et al., v. The St. Louis Rams, LLC, et al.*

Affidavit, on behalf of Defendants, The St. Louis Rams, LLC, et al., in connection with *James Pudlowski, et al, v. The St. Louis Rams, LLC, et al.,* January 24, 2019.

**Lauren J. Stiroh**

Affidavit, on behalf of Defendants, The St. Louis Rams, LLC, et al., in connection with *James Pudlowski, et al, v. The St. Louis Rams, LLC, et al.,* January 10, 2019.

***Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.***

Deposition testimony, on behalf of Defendants, Union Pacific Railroad Company, et al., in connection with *Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.,* November 9, 2018.

Expert Report, on behalf of Defendants, Union Pacific Railroad Company, et al., in connection with *Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.,* September 10, 2018.

***Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.***

Testimony, on behalf of Defendants, FedEx Corporation, et al., in the United States District Court for the Eastern District of Texas, Marshall Division, in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.,* May 17, 2018.

Supplemental Expert Rebuttal Report, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.,* February 12, 2018.

Deposition testimony, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.,* January 26, 2018.

Expert Report, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.,* January 11, 2018.

***U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.***

Deposition testimony, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* March 16, 2018.

Expert Reply Report, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* February 26, 2018.

Deposition testimony, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* January 30, 2018.

**Lauren J. Stiroh**

Expert Report, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* January 8, 2018.

***Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al., Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.***

Expert Report, on behalf of Defendants, Progressive Casualty Insurance Company, et al., in connection with *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al., Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.,* March 15, 2018.

***Johana Paola Beltran, et al., v. Interexchange, Inc., et al.***

Deposition testimony, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* March 14, 2018.

***In Re Dental Supplies Antitrust Litigation***

Deposition testimony, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *In Re Dental Supplies Antitrust Litigation,* January 5, 2018.

# Presentations (2012-2022)

Panelist, "Proving Market Power in Unilateral Conduct Cases," presented by the *ABA Section of Antitrust Law, Unilateral Conduct Committee*, June 30, 2020.

Panelist, "A View of Class Actions from Both Sides of the Atlantic," presented by *Monckton Chambers and NERA Economic Consulting Summer Webinar Series: Competition Law in the UK and EU*, June 25, 2020.

Panelist, "Honest Broker or Advocate: Effective Expert Testimony," presented by the *Antitrust Magazine and Economics Committee*, *Our Curious Amalgam Podcast Release,* April 29, 2020.

Panelist, "Algrithms, Textual Analysis, and Collusion," presented at New York University, School of Law, New York, New York, January 31, 2020.

Panelist, "Wage the Battle to Win the War: Expert Challenges at Class Certification," presented at McDermott, Will & Emery, Chicago, Illinois, September 24, 2019.

**Lauren J. Stiroh**

Panelist, "College Sports – Beyond Pay," presented by *The Trade, Sports, and Professional Associations Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 11, 2018.

Panelist, "The Nexus between Competition and Innovation," presented by *GCR Live: Women in Antitrust*, Washington, DC, November 9, 2017.

Panelist, "2015 Canadian Bar Association Roundtable: IP and Competition Law," presented by *The Economics and Law Committee of the CBA National Competition Law Section, Borden Ladner Gervais, LLP*, Toronto, ON, June 22, 2015.

Panelist and Expert Economist for Plaintiff at "Mock Trial," presented by *The Antitrust Law and Economics Institute*, Co-sponsored by American Bar Association Section on Antitrust, George Mason School of Law, Arlington, VA, October 9, 2013.

Panelist, "Fundamentals-Antitrust Economics," presented by *The Economics Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 10, 2013.

## Publications (2012-2022)

"Checking in on *PeaceHealth*: Providing Some Clearer Guidance to Bundling Sellers," co-authored with David Reichenberg, Cozen O'Connor, *The Antitrust Source,* American Bar Association, Volume 19, Issue 2, October 2019.

"Sports, Student-Athletes, and Antitrust," *Ass'n: The Newsletter of the Trade, Sports, & Professional Associations Committee*, American Bar Association, Section of Antitrust Law, Summer 2018.

"Demonstrating Faulty Predictions in Class Certification Analysis," co-authored with Christine Siegwarth Meyer and Claire (Chunying) Xie, NERA Economic Consulting, American Bar Association, Section of Antitrust Law, *Antitrust Magazine*, Vol. 30, No. 2, Spring 2016.

Chapter 6: "Interpreting Regression Results," co-authored with G. Steven Olley, Adjunct Assistant Professor of Economics at Columbia University in Econometrics: Legal, Practical and Technical Issues, Second Edition, American Bar Association Section of Antitrust Law, 2014.

**Lauren J. Stiroh**

"Considerations in Defining the Relevant Product Market for Antitrust Analysis," published as part of the course materials in connection with the 61st Spring Meeting of the Section of Antitrust Law, American Bar Association, *Fundamentals-Antitrust Economics*, April 10, 2013.

August 2022

12

**Exhibit 2**                    HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Materials Relied Upon by Lauren J. Stiroh, Ph.D.

### Court Filings

*In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* No. 19-md-02918-MMC, United States Court District for the Northern District of California:

Reseller Plaintiffs' Supplemental Responses to TDK Defendants' First Set of Interrogatories, December 16, 2022

End-User Plaintiffs' Fourth Amended Consolidated Class Action Complaint, October 28, 2022

End-User Plaintiffs' Motion for Class Certification, October 11, 2022

Reseller Plaintiffs' Notice of Motion and Motion for Class Certification, October 11, 2022

End-User Plaintiffs' Third Revised Responses and Objections to NHK Defendants' First Set of Interrogatories (Gasman), September 22, 2022

End-User Plaintiffs' Second Revised Responses and Objections to NHK Defendants' First Set of Interrogatories, August 30, 2022

End-User Plaintiffs' First Supplemental Responses and Objections to NHK Defendants' First Set of Interrogatories, August 23, 2022

[Proposed] Reseller Plaintiffs' Third Consolidated Amended Complaint, December 14, 2021

End-User Plaintiffs' Revised Responses and Objections to NHK Defendants' First Set of Interrogatories, May 19, 2021.

*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.,* Case No. 3:20-cv-01217-MMC, United States District Court for the Northern District of California:

Seagate's Opposition to NHK's Motion for Partial Summary Judgment Regarding Foreign Commerce, October 14, 2022

*United States of America, Plaintiff, v. NHK Spring Co., Ltd., Defendant*, Case 2:19-cr-20503-MAG-DRG, United States District Court of the Eastern District of Michigan:

Rule 11 Plea Agreement, September 23, 2019

### Expert Reports

*In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation,* No. 19-md-02918-MMC, United States Court District for the Northern District of California:

Exhibit 2                    HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Expert Report of Michael A. Williams, Ph.D., October 11, 2022

Declaration of Janet S. Netz, Ph.D., in Support of End-User Plaintiffs' Motion for Class
   Certification, October 11, 2022, and Accompanying Errata, December 15, 2022


**Declarations**

Declaration of Lenovo (United States) Inc., October 21, 2022

Declaration of Stephen Misuta in Support of Defendants' Motion for Summary Judgment
   Regarding Foreign Commerce, August 2, 2022

Declaration of Akira Okuma in Support of NHK Defendants' Motions for Partial Summary
   Judgment Based on Foreign Commerce, August 2, 2022


**Depositions and Accompanying Exhibits**

Deposition of Matthew Bell, August 18, 2022

Deposition of Daniel Floeder, September 29, 2022

Deposition of Eric Isom, May 4, 2022

Deposition of Michael Medeiros, March 31, 2022

Deposition of Rick McHone, October 27, 2021

Deposition of Rick Nass, March 24, 2022

Deposition of Janet Netz, December 6, 2022

Deposition of Albert Ong, June 3, 2022

Deposition of Bruce Sanders, July 13, 2022

Deposition of Larry Steele, September 7, 2022

Deposition of Michael Williams, December 14, 2022


**Bates Stamped Documents**

| | | |
|---|---|---|
| A_CIMINO_00000001 | ANDERSON_00000002 | BOSWELL_00000001-003 |
| ALLEN_00000001-002 | ANDERSON_00000004-008 | |
| ANDERSON_00000001 | | BRINGHURST_00000001-002 |

Exhibit 2                    **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

CARLSON_00000001-002

COFFIN_00000001

CORDOVA_00000001

CORDOVA_00000019

CYR_00000001-005

FAHEY_00000003-006

FULLER_00000001

FULLER_00000002-003

GASMAN_00000004-006

GASMAN_00000008-009

GASMAN_00000010

GLOVER_00000001-069

GREENFIELD_00000017-020

HANSHAW_00000001

INGBER_00000001-004

JONES_00000001-010

KATCHER_00000001

KLEBS_00000002-003

LAIRD_00000001-002

LEFF_00000001-007

LEWIS_00000004

MATTINGLY_00000001-012

MCROBERTS_00000003-004

MCROBERTS_00000005-006

NHKI-M-00055924-972

NHKI-M-00179435-436

NHKI-M-00205370-400

NHKI-M-00257920-944

NHKI-M-00302534-552

NHKI-M-00425471-487

NHKI-M-00485649-665

NHKS-M-00000426-427

NHKS-M-00009926-9978

NHKS-M-00500263-310

NHKS-M-00000426-427

NICHOLSON_00000001-004

NODLAND_00000001

ODA_00000001

PAINTER_00000004-006

PEYCHAL_00000001-003

PUTZIER_00000001-002

RIZZO_00000005

SHANNON_00000001-003

STAPLES000008

STEELE_00000003-006

STEFFEN_00000001-004

STEFFEN_00000005-008

STX0000435-471

SWANSON_00000001-002

TDKHDD000042079-080

TDKHDD000709132-341

TDKHDD000709483-531

TDKHDD000712820-889

TDKHDD000713616-654

TDKHDD000714178

TDKHDD000714358

TDKHDD000714389

TDKHDD000714476

TDKHDD001606381-382

TDKHDD001691213-215

TDKHDD001729690

TDKHDD001851962-964

TDKHDD001919742-746

TDKHDD001937555-557

TDKHDD001989778-779

TDKHDD002449699

TDKHDD002900673

TDKHDD005709668-704

TDKHDD005946443-704

V_CIMINO_00000001

WU_00000001

Exhibit 2                                          HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## SEC and Investor Filings

Seagate Technology, Form 10-K for the Fiscal Year Ended July 1, 2016

Hutchinson Technology Incorporated, Form 10-K for the Fiscal Year Ended September 27, 2015

Hutchinson Technology Incorporated, Form 10-K for the Fiscal Year Ended September 30, 2012

## Publicly Available Information

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues (2nd Edition) (Chicago, IL: American Bar Association 2014)

Allen, Mark A. et al., "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence* (3rd Edition), (Washington D.C.: National Academies Press, 2011), available at https://nap.nationalacademies.org/read/13163/chapter/10, accessed January 1, 2022

"BarraCuda Hard Drives," *Seagate Website*, available at https://www.seagate.com/products/hard-drives/barracuda-hard-drive/, accessed December 13, 2022

Connor, John M., "Cartel Overcharges," *Research in Law and Economics* 26 (2014), available at https://heinonline.org/HOL/Page?handle=hein.journals/rlwe26&collection=journals&id=257&startid=257&endid=396, accessed December 2, 2022

"Distributors," *Western Digital Website*, available at https://www.westerndigital.com/company/distributors, accessed November 29, 2022

"Everything You Want to Know About Hard Drives," *Seagate Website*, available at https://www.seagate.com/blog/everything-you-wanted-to-know-about-hard-drives-master-dm/, accessed December 13, 2022

"Explore Gaming Hard Drives & SSDs," *Seagate Website*, available at https://www.seagate.com/products/gaming-drives/, accessed December 17, 2022

"Flash Memory," *Techopedia Website*, March 7, 2018, available at https://www.techopedia.com/definition/24481/flash-memory, accessed December 7, 2022

"For Enterprise Storage Desktop Internal Hard Drives," *Newegg Website*, available at https://www.newegg.com/p/pl?N=100167523 600374778&Order=2, accessed December 16, 2022

Gillis, Alexander S. and Garry Kranz, "What is an SSD (Solid-State Drive)?," *TechTarget Website*, available at https://www.techtarget.com/searchstorage/definition/SSD-solid-state-drive, accessed December 17, 2022

"Hard Drive," *Best Buy Website*, available at https://www.bestbuy.com/site/searchpage.jsp?st=hard+drive&_dyncharset=UTF-

Exhibit 2                    HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

8&_dynSessConf=&id=pcat17071&type=page&sc=Global&cp=1&nrp%E2%80%A6, accessed December 14, 2022

"Hard Disk Drive (HDD) and Solid-State Drive (SSD)," *Dell Website*, available at https://www.dell.com/support/contents/en-us/article/product-support/self-support-knowledgebase/data-storage-backup-and-recovery/support-for-hard-disk-drive, accessed December 7, 2022

"Hard Disk Security for Printers, MFPs, and Copiers," *Xerox*, 2010, available at https://www.office.xerox.com/latest/SECWP-01UA.pdf, accessed December 17, 2022

"Hutchinson Technology 2004 Annual Report", *AnnualReports.com Website*, 2004, available at https://www.annualreports.com/HostedData/AnnualReportArchive/h/NASDAQ_HTCH_2004.pdf, accessed December 6, 2022

IBM Cloud Education, "Hard Disk Drive (HDD) vs. Solid State Drive (SSD): What's the Difference?," *IBM Website*, February 2, 2022, available at https://www.ibm.com/cloud/blog/hard-disk-drive-vs-solid-state-drive, accessed December 16, 2022

Knight, Shawn, "SSD shipments outpaced HDDs in 2020, but capacity still favors mechanical drives," *TechSpot Website*, February 16, 2021, available at https://www.techspot.com/news/88645-ssd-shipments-outpaced-hdds-2020-but-capacity-favors.html, accessed December 18, 2022.

Krogh, Peter, "Hard Drive 101," *dpBestflow.org Website*, September 22, 2015, available at https://dpbestflow.org/data-storage-hardware/hard-drive-101, accessed December 7, 2022

"MacBook Pro (15-inch, Mid 2009) and (15-inch, 2.53 GHz, Mid 2009) – Technical Specifications," *Apple Website*, February 3, 2010, available at https://support.apple.com/kb/sp544?locale=en_US, accessed December 18, 2022

Mukherjee, Supantha and Miyoung Kim, "Seagate buys Samsung hard disk unit," Reuters Website, April 19, 2011, available at https://www.reuters.com/article/us-samsung-seagate/seagate-buys-samsung-hard-disk-unit-idUSTRE73I1CG20110419, accessed December 17, 2022

Rubtsov, Artem, "HDD from Inside: Hard Drive Main Parts," *HDDScan Website*, available at https://hddscan.com/doc/HDD_from_inside.html, accessed December 13, 2022

"Seagate BarraCuda 2TB Internal Hard Drive HDD – 2.5 Inch SATA 6 Gb/s 5400 RPM 128MB Cache for PC Laptop (ST2000LM015)," *Amazon Website*, available at https://www.amazon.com/dp/B01LX13P71/, accessed December 13, 2022

"Seagate Technology completes Acquisition of Maxtor Corporation," *Seagate Website*, May 22, 2006, available at https://www.seagate.com/news/news-archive/seagate-technology-completes-acquisition-of-maxtor-corporation-master-pr/, accessed December 14, 2022

"Toshiba and Fujitsu Conclude Definitive Agreement on HDD Business Transfer*," Fujitsu Website*, April 30, 2009, available at

Exhibit 2                              **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

https://www.fujitsu.com/global/about/resources/news/press-releases/2009/0430-09.html, accessed December 18, 2022

"What is a Suspension Assembly?," *Magnecomp Corporation Website*, available at https://www.magnecomp.tdk.com/Education/edu?view=01, accessed December 13, 2022

"Where to Buy – Distributors," *Toshiba Website*, available at https://storage.toshiba.com/storagesolutions/where-to-buy/where-to-buy---distributors, accessed November 29, 2022

Woodford, Chris, "How Does a Hard Drive Work?," *Explain that Stuff Website*, November 9, 2021, available at https://www.explainthatstuff.com/harddrive.html, accessed December 16, 2022

Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach* (7th Edition) (Boston, MA: Cengage Learning, 2021)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 3: Summary of Purchases of Products**
**Containing HDD SAs by End-User Named Plaintiff**
**During the Class Period**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 3: Summary of Purchases of Products**
**Containing HDD SAs by End-User Named Plaintiff**
**During the Class Period**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 3: Summary of Purchases of Products**
**Containing HDD SAs by End-User Named Plaintiff**
**During the Class Period**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 3: Summary of Purchases of Products**
**Containing HDD SAs by End-User Named Plaintiff**
**During the Class Period**



Sources: End-User Complaint, ¶¶ 24-75.

End-User Plaintiffs' Revised Responses and Objections to NHK Defendants' First Set of Interrogatories, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation* , Case No. 19-md-02918-MMC, May 19, 2021.

End-User Plaintiffs' Second Revised Responses and Objections to the NHK Defendants' First Set of Interrogatories, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation* , Case No. 19-md-02918-MMC, August 30, 2022.

End-User Plaintiffs' First Supplemental Responses and Objections to NHK Defendants' First Set of Interrogatories, *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation* , Case No. 19-md-02918-MMC, August 23, 2022.

End-User Plaintiffs' Third Revised Responses and Objections to NHK Defendants' First Set of Interrogatories (Gasman), *In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation* , Case No. 19-md-02918-MMC, September 22, 2022.

NICHOLSON_00000001-004 at 003; PUTZIER_00000001-002 at 002; A_CIMINO_00000001 at 001; BOSWELL_00000001-003 at 002-003; ALLEN_00000001-002 at 001; FAHEY_00000003-006 at 003-004; KLEBS_00000002-003 at 002-003; NODLAND_00000001 at 001; CORDOVA_00000001 at 001; CORDOVA_00000019 at 019; ANDERSON_00000001 at 001; ANDERSON_00000002 at 002; ANDERSON_00000004-008 at 004, 007; MCROBERTS_00000003-004 at 003; MCROBERTS_00000005-006 at 005; FULLER_00000001 at 001; FULLER_00000002-003 at 002; PAINTER_00000004-006 at 004-005; ODA_00000001 at 001; GREENFIELD_00000017-020 at 019; KATCHER_00000001 at 001; HANSHAW_00000001 at 001; SHANNON_00000001-003 at 001; LEWIS_00000004 at 004; RIZZO_00000005 at 005; LEFF_00000001-007 at 001; MATTINGLY_00000001-012 at 001; STEELE_00000003-006 at 003-006; GASMAN_00000004-006 at 004; GASMAN_00000008-009 at 008; GASMAN_00000010 at 010; CARLSON_00000001-002 at 001; COFFIN_00000001 at 001; LAIRD_00000001-002 at 001; GLOVER_00000001-069 at 060; JONES_00000001-010 at 003-006; BRINGHURST_00000001-002 at 001; STEFFEN_00000001-004 at 001; STEFFEN_00000005-008 at 005; SWANSON_00000001-002 at 001-002; INGBER_00000001-004 at 002; CYR_00000001-005 at 004; V_CIMINO_00000001 at 001; WU_00000001 at 001; PEYCHAL_00000001-003 at 003.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 4: HDD SA Programs**
**Manufactured by Defendants**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 4: HDD SA Programs**
**Manufactured by Defendants**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 4: HDD SA Programs**
**Manufactured by Defendants**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 4: HDD SA Programs**
**Manufactured by Defendants**



Source: Williams turnover materials (defendant_sales_reg_data.dta).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 5: Share of Sales with Price-Cost Ratio below 1**
**For Third-Parties**



Sources:  Williams turnover materials ([Third-Party]_reg_data.dta); Netz Report, Exhibit 7.

NERA Economic Consulting

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6A: Summary of Overcharge Estimates**
**For Programs Sold During Both the Alleged Class Period and Benchmark Period**
**Using Dr. Williams' Overcharge Model**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6A: Summary of Overcharge Estimates**
**For Programs Sold During Both the Alleged Class Period and Benchmark Period**
**Using Dr. Williams' Overcharge Model**



Source: Williams turnover materials (defendant_sales_reg_data.dta).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6B: Summary of Overcharge Estimates**
**For Programs Sold During Both the Alleged Class Period and Benchmark Period**
**Using Dr. Netz's Overcharge Model**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6B: Summary of Overcharge Estimates**
**For Programs Sold During Both the Alleged Class Period and Benchmark Period**
**Using Dr. Netz's Overcharge Model**



Source: Netz turnover materials (NHK_TDK_SA Sales Data_Combined.dta).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 7A: Average Monthly Price of HDD SAs**
**For Programs 1 to 100 Sorted Alphabetically**



Source: Williams turnover materials (defendant_sales_reg_data.dta).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 7B: Average Monthly Price of HDD SAs**
**For Programs 101 to 196 Sorted Alphabetically**



Source: Williams turnover materials (defendant_sales_reg_data.dta).

NERA Economic Consulting

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 8A: Dr. Williams' Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Number of Months in Production**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 8A: Dr. Williams' Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Number of Months in Production**



Sources:  Williams turnover materials (defendant_sales_reg_data.dta).

Williams Report, Table 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 8B: Dr. Netz's Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Number of Months in Production**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 8B: Dr. Netz's Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Number of Months in Production**



Sources: Netz turnover materials (NHK_TDK_SA Sales Data_Combined.dta).

Netz turnover materials (Overcharge Price Regressions and Sensitivity Analyses.xlsx).

Netz Report, Exhibit 20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 9A: Dr. Williams' Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Year Trend**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 9A: Dr. Williams' Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Year Trend**



Sources:  Williams turnover materials (defendant_sales_reg_data.dta).

Williams Report, Table 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 9B: Dr. Netz's Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Year Trend**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 9B: Dr. Netz's Overcharge Regression Analysis**
**Including Additional Control Variable**
**For Year Trend**



Sources: Netz turnover materials (NHK_TDK_SA Sales Data_Combined.dta).

Netz turnover materials (Overcharge Price Regressions and Sensitivity Analyses.xlsx).

Netz Report, Exhibit 20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 10A: Dr. Williams' Overcharge Regression Analysis**
**After Restricting Class Period to DOJ Plea Period**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 10A: Dr. Williams' Overcharge Regression Analysis
After Restricting Class Period to DOJ Plea Period**



Sources:  Williams turnover materials (defendant_sales_reg_data.dta).

Williams Report, Table 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 10B: Dr. Netz's Overcharge Regression Analysis**
**After Restricting Class Period to DOJ Plea Period**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 10B: Dr. Netz's Overcharge Regression Analysis
After Restricting Class Period to DOJ Plea Period**



Sources:  Netz turnover materials (NHK_TDK_SA Sales Data_Combined.dta).

Netz turnover materials (Overcharge Price Regressions and Sensitivity Analyses.xlsx).

Netz Report, Exhibit 20.