MORGAN, LEWIS & BOCKIUS LLP
J. Clayton Everett, Jr. (pro hac vice)
clay.everett@morganlewis.com
1111 Pennsylvania Ave., NW
Washington, DC  20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

MORGAN, LEWIS & BOCKIUS LLP
Michelle Park Chiu (State Bar No. 248421)
michelle.chiu@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

*Attorneys for Defendants TDK Corporation, Magnecomp Corporation, Magnecomp Precision Technology Public Co. Ltd., Hutchinson Technology Inc., and SAE Magnetics (H.K.) Ltd.*

*[Additional Moving Defendants and Counsel Listed on Signature Page]*

BAKER & McKENZIE LLP
Mark. H. Hamer (State Bar No. 156997)
mark.hamer@bakermckenzie.com
Mark G. Weiss (pro hac vice)
mark.weiss@bakermckenzie.com
815 Connecticut Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 452-7077

BAKER & McKENZIE LLP
Catherine Y. Stillman (State Bar No. 242440)
catherine.stillman@bakermckenzie.com
452 Fifth Avenue
New York, NY  10018
Telephone: (212) 626-4218

*Attorneys for Defendants NHK Spring Co., Ltd., NHK International, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd. and NAT Peripheral (H.K.) Co., Ltd.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: HARD DISK DRIVE SAS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>END-USER ACTION | CASE NO.: 3:19-MD-02918-MMC<br><br>MDL NO. 2918<br><br>**NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION OF JANET S. NETZ; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:     TBD<br>Time:     TBD<br>Crtrm:   7, 19th Floor<br>Before:   Hon. Maxine M. Chesney |

**Redacted Public Version of Document Filed Under Seal**

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        PLEASE TAKE NOTICE that on a date to be determined suitable for hearing by the

3   Court, before the Honorable Maxine M. Chesney, in Courtroom 7 of the United States District

4   Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA

5   94102, Defendants TDK Corporation, Magnecomp Corporation, Magnecomp Precision

6   Technology Public Co. Ltd., Hutchinson Technology Inc., and SAE Magnetics (H.K.) Ltd. will

7   and hereby do move this Court to exclude the declaration of End-User Plaintiffs' expert Janet S.

8   Netz, Ph.D. (ECF No. 605-4), filed in support of End-User Plaintiffs' motion for class

9   certification (ECF No. 605), on the grounds that Dr. Netz's declaration, the related opinions

10  therein, and her related testimony are unreliable and inadmissible under Federal Rule of Evidence

11  702 as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and related

12  authorities.

13        This motion is based on this Notice and Motion, the accompanying Memorandum of

14  Points and Authorities, the Declaration of J. Clayton Everett, Jr. and exhibit thereto, the Expert

15  Report of Lauren J. Stiroh, Ph.D. and exhibits thereto, all other documents on file in this or

16  related actions, all other matters of which the Court may take judicial notice, and all other

17  evidence that may be presented before or at the hearing on this motion.

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
OF JANET S. NETZ

1  DATED:  December 23, 2022

2  Respectfully submitted,

3

4  */s/ J. Clayton Everett, Jr.*                    */s/ Mark H. Hamer*
   J. Clayton Everett, Jr., (pro hac vice)          Mark. H. Hamer (State Bar No. 156997)
5  clay.everett@morganlewis.com                     mark.hamer@bakermckenzie.com
   **MORGAN, LEWIS & BOCKIUS LLP**                  Mark G. Weiss (pro hac vice)
6  1111 Pennsylvania Ave., N.W.                     mark.weiss@bakermckenzie.com
   Washington, D.C.  20004                          **BAKER & McKENZIE LLP**
7  Telephone: (202) 739-3000                        815 Connecticut Ave., N.W.
                                                    Washington, D.C.  20006
8  Michelle Park Chiu (State Bar No. 248421)        Telephone: (202) 452-7077
   michelle.chiu@morganlewis.com
9  **MORGAN, LEWIS & BOCKIUS LLP**                  Catherine Y. Stillman (State Bar No. 242440)
   One Market, Spear Street Tower                   catherine.stillman@bakermckenzie.com
10 San Francisco, CA  94105                         **BAKER & McKENZIE LLP**
   Telephone: (415) 442-1000                        452 Fifth Avenue
11                                                  New York, NY  10018
                                                    Telephone: (212) 626-4218
12 *Attorneys for Defendants TDK Corporation,*
   *Hutchinson Technology Inc., Magnecomp*
13 *Precision Technology Public Co., Ltd.,*         *Attorneys for Defendants NHK Spring Co.,*
   *Magnecomp Corporation, and SAE*                 *Ltd., NHK International, NHK Spring*
14 *Magnetics (H.K.) Ltd.*                          *(Thailand) Co., Ltd., and NAT Peripheral (Dong*
                                                    *Guan) Co., Ltd. and NAT Peripheral (H.K.)*
15                                                  *Co., Ltd.*

16
                                                    Ann Marie Mortimer (State Bar No. 169077)
17                                                  HUNTON ANDREWS KURTH LLP
                                                    amortimer@HuntonAK.com
18                                                  550 South Hope Street, Suite 2000
                                                    Los Angeles, CA  90071
19                                                  Telephone: (213) 532-2103
                                                    Facsimile: (213) 532-2020
20
                                                    Craig Y. Lee (pro hac vice forthcoming)
21                                                  HUNTON ANDREWS KURTH LLP
                                                    2200 Pennsylvania Ave., NW
22                                                  Washington, D.C.  20005
                                                    Telephone: (202) 419-2114
23                                                  craiglee@huntonak.com

24                                                  *Attorneys for Defendants NHK Spring Co.,*
                                                    *Ltd., NHK International Corporation, NHK*
25                                                  *Spring (Thailand) Co., Ltd., NAT Peripheral*
                                                    *(Dong Guan) Co., Ltd., and NAT Peripheral*
26                                                  *(H.K.) Co., Ltd.*

27

28                                    iii                              3:19-MD-02918-MMC

   DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
                            OF JANET S. NETZ

1

## <u>TABLE OF CONTENTS</u>

I.      ISSUES TO BE DECIDED ........................................................................................ 1

II.     INTRODUCTION .................................................................................................... 1

III.    BACKGROUND ...................................................................................................... 2

IV.     LEGAL STANDARD .............................................................................................. 3

V.      DR. NETZ'S OPINIONS REGARDING DEFENDANTS' ALLEGED
        COLLUSIVE CONDUCT AND AGREEMENTS ARE INADMISSIBLE. ................... 4

VI.     DR. NETZ'S OPINION REGARDING PRICE STRUCTURE IS UNRELIABLE
        AND INADMISSIBLE. ............................................................................................. 9

VII.    DR. NETZ'S OVERCHARGE MODEL AND ANY OPINIONS DERIVED
        FROM IT ARE INADMISSIBLE. .............................................................................. 11

        A.    Dr. Netz's Overcharge Model Is Also Inadmissible Because It Is Not
              Sufficiently Tied to the Facts of this Case. ................................................ 11

        B.    Dr. Netz's Overcharge Model Is Unreliable Because It Omits Key
              Variables. .................................................................................................. 13

        C.    Dr. Netz's Overcharge Model Is Unreliable Because It Is Not Robust ............... 15

VIII.   DR. NETZ'S PASS-THROUGH MODEL AND OPINIONS DERIVED FROM
        THAT MODEL ARE INADMISSIBLE. ....................................................................... 17

        A.    Dr. Netz's Pass-Through Model Is Unreliable Because It Does Not
              Account for Focal Point Pricing and Other Key Factors Affecting Pass-
              Through. .................................................................................................... 17

        B.    Dr. Netz's Opinion Assuming Pass-Through Exceeds 100% Is
              Inadmissible Because It Is Not Based On Sufficient Data. .............................. 20

IX.     DR. NETZ'S PROPOSED DAMAGES CALCULATION METHOD IS
        INADMISSIBLE. ..................................................................................................... 22

X.      CONCLUSION ....................................................................................................... 24

3:19-MD-02918-MMC

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
OF JANET S. NETZ

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple iPhone Antitrust Litig.*,
No. 11-cv-6714-YGR, 2022 WL 1284104 (N.D. Cal. 2022) .................................. 17

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
No. 17cv205-MMA (MDD), 2020 WL 2553181 (S.D. Cal. 2020) ......................... 7

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d. Cir. 1999).................................................................................. 13

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
55 F. Supp. 2d 1024 (N.D. Cal. 1999) .................................................................. 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......................................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995)................................................................................... 4

*DSU Med. Corp. v. JMS Co.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003) ............................................................ 3, 13

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)................................................................................... 3

*FTC v. Vyera Pharm., LLC*,
No. 20cv706 (DLC), 2021 U.S. Dist. LEXIS 219493 (S.D.N.Y. Nov. 12, 2021).................. 22

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ......................................................................................... 4, 22

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-02885-LHK, 2014 U.S. Dist. LEXIS 53234 (N.D. Cal. Apr. 16,
2014) ..................................................................................................................... 23

*Grodzitsky v. Am. Honda Motor Co.*,
No. 2:12-cv-001142-SVW-PLA, 2017 U.S. Dist. LEXIS 222399 (C.D. Cal.
Oct. 30, 2017)..................................................................................................... 4, 23

*Highland Capital Mgmt., L.P. v. Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008)...................................................................... 7

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
OF JANET S. NETZ

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................ 6, 11, 20

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. 2018) ................................ 17

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .............................................................. 13, 16

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*,
   SACV 16-01841-CJC(KESx), 2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ..................... 11

*Olean Wholesale Grocery Coop., Inc v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) .................................................................. 22

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ................................................................................. 8

*In re Plastics Additives Antitrust Litig.*,
   No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135 (E.D. Pa. Aug. 31, 2010) ...................... 9

*Rai v. Santa Clara Valley Trans.*,
   308 F.R.D. 245 (N.D. Cal. 2015) ........................................................................... 4

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ......................................................................... 7

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................. 13

*In re Rezulin Prods. Liability Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................................................... 7

*Tyson Foods Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ........................................................................................ 20

*United States v. Hermanek*,
   289 F.3d 1076 (9th Cir. 2002) ........................................................................... 4, 20

**Court Rules**

Fed. R. Evid. 702(a) ............................................................................................. 1, 6

Fed. R. Evid. 702(b) ....................................................................................... 1, 20, 22

Fed. R. Evid. 702(b)-(d) ......................................................................................... 4

Fed. R. Evid. 703(d) ............................................................................................... 1

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
OF JANET S. NETZ

Federal Rule of Evidence 702 ................................................................................. 2, 1, 20

Local Rule 5-1(h)(3) .................................................................................................. 1

Rule 23 ....................................................................................................................... 1

**Other Authorities**

ECF No. 605-4, "Netz Decl." ..................................................................................... 1

Expert Report of Lauren J. Stiroh, Ph.D .................................................................... 2

Expert Report of Lauren J. Stiroh, Ph.D. ............................................................. *passim*

Stiroh Rep., Figure 5 ................................................................................................ 18

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATION
OF JANET S. NETZ

1  **I.**    **ISSUES TO BE DECIDED**

2       Whether this Court should exclude the expert declaration of Janet S. Netz, Ph.D. (ECF

3  No. 605-4, "Netz Decl.") and her related opinions and testimony as evidence in support of End-

4  User Plaintiffs' ("EUPs") motion for class certification (ECF No. 605).

5  **II.**    **INTRODUCTION**

6       EUPs seek to carry their burden to establish the Rule 23 prerequisites for certifying a class

7  by introducing the opinion testimony of Dr. Janet Netz.  That opinion testimony is, in many

8  respects, demonstrably unreliable and therefore inadmissible under Federal Rule of Evidence 702.

9       Dr. Netz offers opinions that certain documents and testimony evidence agreements in

10  restraint of trade even though she has no "scientific, technical or specialized knowledge that will

11  help the trier of fact" in interpreting that evidence.  *Cf.* Fed. R. Evid. 702(a).  Courts routinely

12  exclude expert testimony from economists (including Dr. Netz in prior cases) purporting to act as

13  ciphers for communications evidence.

14       Dr. Netz offers opinions that all hard disk drive ("HDD") suspension assembly ("SA")

15  prices were impacted by Defendants' alleged conduct because the pricing of suspension

16  assemblies exhibits a "price structure," but the analysis she conducts and points to in relation to

17  "pricing structure" demonstrably fails to support her conclusions.  That opinion is unsupported by

18  "sufficient facts or data."  *See* Fed. R. Evid. 702(b).

19       Dr. Netz creates an "overcharge" regression of suspension assembly prices that (a) is not

20  tailored to, and fails to model for, the conduct that EUPs allege; (b) fails to account for non-

21  conspiratorial competitive dynamics; and (c) is not robust.  Those regressions do not "reliably

22  apply the principles and methods [employed by expert economists] to the facts" of this case.  *See*

23  Fed. R. Evid. 703(d).

24       Dr. Netz opines that overcharges on the tiny, inexpensive component products at issue in

25  this case (SAs) would have invariably resulted in higher prices paid by "end-users" in the United

26  States for computers, enterprise storage systems and other devices that cost hundreds, if not

27  thousands, of times as much as the SAs.  But the models she relies on to support that opinion are

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE DECLARATION OF JANET S. NETZ

unrepresentative, fail to account for key competitive dynamics, and are ultimately incapable of answering the question about which Dr. Netz offers an opinion (i.e., that all class members were "impacted").  That analysis too is unreliable and inadmissible.

Dr. Netz's testimony should be excluded.

### III.   <u>BACKGROUND</u>

EUPs allege that Defendants engaged in a conspiracy "to fix, raise, maintain, and/or stabilize prices," and "allocate the market and customers" for SAs, and that two of the Defendants (TDK and NHK) conspired to drive another of the Defendants (HTI) out of business.  ECF No. 693, EUPs' Fourth Amended Consolidated Class Action Complaint ("EUP Compl.") ¶¶ 1, 144-155.  EUPs seek to certify a class of "[a]ll persons and entities who, during the time period January 1, 2003 to December 31, 2016 ('Class Period'), in the Indirect Purchaser States [footnote], purchased Standalone Storage Devices or Computers, not for resale, which included hard disk drive ('HDD') suspension assemblies ('SAs') that were manufactured or sold by Defendants."  ECF No. 605, EUPs' Motion for Class Certification ("Mot.") at 1.

SAs are one of many component parts of an HDD.  *See generally* ECF No. 533 (Defendants' Motion for Partial Summary Judgment) at 4.  SAs comprise a small fraction of the cost of making HDDs, and a vanishingly small portion of the cost of the complex products containing HDDs and, by extension, SAs that putative class members purchased.  Mass-produced SAs cost on average $0.68 during the Class Period.  *Id.* at 5.  The products purchased by EUP putative class members include external HDDs that can cost $80 or more, network attached storage devices that can cost in the range of $200 to $500, laptop computers that, at the high end, can cost thousands of dollars and enterprise storage systems costing tens of thousands of dollars or more.  *See* ECF No. 533-3 (Declaration of Steve Misuta) ¶ 39.

Defendants sold SAs to HDD makers, which then in many cases sold finished HDDs to OEMs that manufactured other products (e.g., computers) that wound their way through various distribution levels before being purchased by "end-users."  Declaration of J. Clayton Everett, Jr. in Support of Defendants' Opposition to EUPs' Motion for Class Certification, Ex. 1 (Expert

Report of Lauren J. Stiroh, Ph.D. ("Stiroh Rep.")) ¶ 26.  There are a wide variety of electronics manufacturers (OEMs), distributors, resellers, and retailers in the supply chain. *Id.* ¶ 27.  These entities differ vastly in terms of scale and other features, such as negotiating and purchasing power. *Id.* ¶ 28.  At issue in this case are transactions involving potentially millions of class members that must be traced through thousands of retailers or resellers and through hundreds of firms up the distribution chain—all the way through HDD manufacturers—before reaching the Defendants and the products (SAs) that are the subject of the alleged conduct in this case.

Dr. Netz opines, based on her review of evidence from the case, that Defendants engaged in conspiratorial conduct and that it is possible to determine whether individual class members were "impacted" by that conspiratorial conduct utilizing common evidence. *See, e.g.*, Netz Decl. at 2, 28-34.  She conducts regressions of SA prices, purportedly to determine whether those prices were the subject of an "overcharge" (*id.* at 89-93), and of OEM, reseller and retailer prices, purportedly to determine whether those "overcharges" were "passed through" by those sellers (*id.* at 93-96).  Her overcharge analysis assumes that prices increased immediately at the beginning of the alleged conspiracy period (January 1, 2003) and that a handful of cost and demand-based factors explain all price changes. *Id.* at 92-93.  Her "pass-through" analysis involves separate regressions of 53 entities in the distribution chain (out of thousands), each resulting in different "pass-through" rates (suggesting a lack of commonality among the sample), that only considered changes in overall cost (*see* Netz Decl. at 95), without taking into account different product attributes or any other factors that clearly and demonstrably affected pricing decisions (such as focal point pricing) (Stiroh Rep. ¶¶ 107-113).

## IV.   LEGAL STANDARD

Plaintiffs have the burden to prove that Dr. Netz's testimony is admissible. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146–47 (N.D. Cal. 2003).  The court acts as a "gatekeeper" to ensure that expert testimony is reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  "To warrant admissibility . . . it is critical that

1    an expert's analysis be reliable at every step." *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-cv-

2    001142-SVW-PLA, 2017 U.S. Dist. LEXIS 222399, at *15 (C.D. Cal. Oct. 30, 2017) (citation

3    omitted).   At class certification, "the relevant inquiry is a tailored *Daubert* analysis which

4    scrutinizes the reliability of the expert testimony in light of the criteria for class certification and

5    the current state of the evidence." *Rai v. Santa Clara Valley Trans.*, 308 F.R.D. 245, 264 (N.D.

6    Cal. 2015).

7        The Court must first ensure that Dr. Netz possesses scientific, technical, or other specialized

8    knowledge that will assist the trier of fact, as required by Federal Rule of Evidence ("Rule") 702(a).

9    A court must then scrutinize "what basis [Dr. Netz] has" for her opinions. *Daubert v. Merrell Dow*

10   *Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).   The Court must ensure that Dr. Netz's

11   methodology is "based on sufficient facts or data," that her testimony is the "product of reliable

12   principles and methods," and that she has "reliably applied the principles and methods to the facts

13   of the case." Fed. R. Evid. 702(b)-(d); *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir.

14   2002) (citation omitted).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a

15   district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of

16   the expert.  A court may conclude that there is simply too great an analytical gap between the data

17   and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

18   **V.    DR. NETZ'S OPINIONS REGARDING DEFENDANTS' ALLEGED COLLUSIVE**
     **CONDUCT AND AGREEMENTS ARE INADMISSIBLE.**
19

20       Dr. Netz repeatedly opines in her declaration that Defendants "conspired to suppress

21   competition in the market for suspension assemblies" and engaged in other improper challenged

22   conduct.  *See* Netz Decl. at 28-34,[1] 47-57.[2]  Those opinions are based solely and wholly on her

23   interpretation of documents and testimony produced in discovery that were selected for her by

24   counsel for EUPs.  *See, e.g.*, *id.* at 29, 32, 33, 48.  For example, Dr. Netz opines, based on her

25   review of documents and testimony, that there were meetings and communications in which

26   _____

27   [1] Netz Decl. Section III.A.2.
     [2] Netz Decl. Section III.B.4-III.C.2.

28                                                    4                        3:19-MD-02918-MMC

Defendants "agreed to not compete on price and to allocate market shares, and regularly shared competitively sensitive information." *Id.* at 29-32; 32-34; *see also id.* at 48-57, Appendix 1, Exhibit 17 and Exhibit 19. She purports, among other things, to be able to discern Defendants' intentions from this document review and to assess whether there were "agreements" in restraint of trade. *See* Netz Decl. at 29-31, 48-54. These opinions are outside the scope of any expertise Dr. Netz could reasonably claim, they invade the province of the jury, and they are not helpful to the trier of fact. They must be excluded.

Dr. Netz derives the following conclusions, among others, about Defendants' conduct based solely on her review and interpretation of documents:

- "Defendants agreed to reduce competition by agreeing not to compete on price, allocating overall market shares and shares for specific customers, and regularly sharing confidential information about current and future prices . . . ." *Id.* at 48.

- "Defendants agreed not to compete on price. Sometimes the agreements took the form of a general agreement to avoid a 'price war' or 'unnecessary competition.' On other occasions Defendants agreed to a specific price floor." *Id.*

- "Defendants also agreed to allocate market shares and specific customer shares. For example, at a May 28, 2008 meeting between NHK's and TDK's top management, the firms agreed to allocate a 40% market share for NHK, a 40% market share for TDK, and a 20% market share for HTI and other suppliers." *Id.* at 49-50.

- "Defendants knew information sharing raised competitive concerns and attempted to conceal it." *Id.* at 50.

- "The evidence indicates that Defendants' course of collusive conduct was in fact broad in scope. Defendants' agreements to suppress price competition appear to have applied to the entire market for SAs. Defendants' market and customer allocation agreements similarly applied to the entire market." *Id.* at 53.

- "Defendants engaged in collusive conduct involving all or nearly all of the SAs they sold. The fact that Defendants attempted to conceal their collusive conduct indicates that they understood that it came with legal, financial, or reputational risks." *Id.*

- "There is evidence that Defendants did in fact allocate global market shares and their shares of the business at individual HDD makers. It appears that this applied to all major HDD makers. On several occasions, Defendants agreed to

allocate global market shares."  Netz Decl. at 54.

- "There is also evidence that Defendants sought to conceal their information sharing."  *Id.* at 56.

The above pages of Dr. Netz's declaration, as well as Appendix 1, Exhibit 17, and Exhibit 19, should be excluded because these portions of the declaration are not based on any "scientific, technical, or other specialized knowledge" that would assist the trier of fact, as required by Rule 702(a).  Similar testimony by Dr. Netz was excluded by the court in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018).  There, Dr. Netz submitted a report containing numerous conclusions that, based on her "review of trader communications, certain challenged conduct in fact occurred and . . . plaintiffs were in fact impacted."  *Id.* at 490.  For example, Dr. Netz opined there that "[t]he discovery record show[ed] that Defendants manipulated their LIBOR submissions in ways that were inconsistent with the reporting rules," that "Defendants engaged in coordinated trader-based manipulation," and that "Defendants engaged in suppression manipulation."  *Id.*

The court in *LIBOR* excluded Dr. Netz's opinions about defendants' culpability that were not based on any expertise or specialized knowledge, did nothing to aid the trier of fact, and which merely narrated plaintiffs' allegations in the case:

> To the extent Dr. Netz offers her interpretation of trader communications to conclude that manipulation in fact occurred, these opinions are not based on Dr. Netz's "scientific, technical, or other specialized knowledge" as required by Rule 702(a).  While Exchange plaintiffs correctly suggest that an expert's testimony may be permissible, for example, "to translate esoteric terminology," [citation], the trader communications that Dr. Netz interprets are clear on their face and "address issues of fact that [the trier of fact] is capable of understanding without the aid of expert testimony [citation]."

> Exchange plaintiffs fail to explain what specialized knowledge Dr. Netz drew upon to conduct her review of trader communications, and "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise."  [citation].  Our concern is heightened here, as Dr. Netz offers no explanation of how the communications that she reviewed were selected.

> *Id.*

In antitrust actions, "an expert may not opine as to whether there was a conspiracy or an agreement to engage in price fixing; that is a question for the fact-finder."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 50 (D.D.C. 2017).  In *Rail Freight Fuel Surcharge*, for example, plaintiffs' expert's opinion involved "an analysis of the documentary evidence in the case" and examined whether "there was factual support from the discovery record for an agreement to collude."  *Id.*  In granting the motion to exclude, the court explained that, while "an expert may opine as to whether particular conduct, assuming it occurred, is consistent with a conspiracy," he may not "give any opinion concerning whether a particular event actually occurred."  *Id.*  (citations and quotations omitted).  The court held "because this portion of Dr. Rausser's expert testimony seeks to establish that there was in fact an agreement to collude based only on facts in the documentary record, the Court will exclude this portion of his testimony."  *Id.* at 51.  Further, the court excluded "those statements in Dr. Rausser's expert reports in which he opines that defendants intended or agreed to collude . . . ."  *Id.*

Courts generally exclude expert opinions that merely narrate plaintiffs' allegations of their case and are not based on an any specialized knowledge that would aid the trier of fact.  *See, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17cv205-MMA (MDD), 2020 WL 2553181 (S.D. Cal. 2020) (granting motion to exclude expert testimony because it "intrudes on the province of the jury, who is capable of evaluating the same evidence and drawing conclusions without [the expert's testimony]" and essentially provided nothing more than "a narrative of [plaintiff's] theory of the case"); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008) (holding that an expert may not provide a "factual narrative of events giving rise to this action" where the expert "has no personal knowledge of these facts and they are lay matters that the jury is capable of understanding and deciding without [the expert's] testimony" and further, an expert "cannot testify as to ultimate legal conclusions"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) (granting motion to exclude where Plaintiffs' expert testimony was "merely a narrative of the case which a juror is equally capable of constructing" and "the glosses that [the expert] interpolates into his narrative are simple

1    inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the

2    case").

3        Here, the referenced parts of Dr. Netz's declaration do nothing more than recite Plaintiffs'

4    attorneys' interpretation of meetings and communications involving Defendants.  Dr. Netz lacks

5    any specialized knowledge that would assist the trier of fact in evaluating the various

6    communications among Defendants.  Appendix 1 exemplifies the flaws with Dr. Netz's opinions

7    about Defendants' conduct and communications.  As Dr. Netz noted in her declaration, the 645

8    communications in Appendix 1 were identified by Plaintiffs' counsel (Netz Decl. at 32), and ███

9    ██████████████████████████████████████ Declaration of J. Clayton Everett, Jr. in

10   Support of Defendants' Motion To Exclude, Ex. 1 (Excerpts of Transcript of December 6, 2022

11   Deposition of Janet S. Netz) ("Netz Tr.") at 36:5-14, 58:13-59:5.  Appendix 1 contains a column

12   "Information Exchange" that purports to describe the substance of meetings and communications

13   and another column "Source Document(s)" lists the alleged documentary support for the

14   narrative.  Dr. Netz admitted ██████████████████████████████████████████

15   ███████████████████████████████ but also *removed* a handful of entries.  *Id.* at

16   36:5-37:10, 59:7-61:4.  It is improper for Dr. Netz to proffer opinions about 645 communications

17   for which neither she nor her staff have reviewed the underlying documents or have any personal

18   knowledge.

19       It is also unclear what criteria or methodology, if any, Dr. Netz and her staff used to

20   evaluate the material drafted by Plaintiffs' counsel; but whatever that methodology was, it did not

21   involve any special skill or expertise possessed by Dr. Netz that would aid the trier of fact.  *Id.* at

22   37:14-19 ██████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ██████████████████████████.  To be admissible, expert opinions must be based on an

26   adequate analysis of the evidence.  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861

27   (9th Cir. 2014) (excluding testimony based on "superficial inspections" of the evidence).

28

In addition, the above pages and attachments to the Netz declaration should be excluded because they contain Dr. Netz's opinions on Defendants' motives and states of mind, as was the case in *LIBOR*. *See, e.g.*, Netz Decl. at 53 ("The fact that Defendants attempted to conceal their collusive conduct indicates that they understood that it came with legal, financial, or reputational risks."); *LIBOR*, 430 F. Supp. 3d at 490 ("Similarly, to the extent Dr. Netz interprets trader communications to opine on the traders' actual motives and states of mind, these opinions are impermissible.").[3]

## VI.   DR. NETZ'S OPINION REGARDING PRICE STRUCTURE IS UNRELIABLE AND INADMISSIBLE.

Dr. Netz opines that SA prices exhibit a "price structure" that "suggests that the impact of the challenged conduct would be felt across models, customers, and Defendants."  Netz Decl. at 58-60.  Her opinion regarding a "price structure" is based solely on a "pairwise correlation" analysis, however, that is facially insufficient to support the conclusion she reaches.  Dr. Netz's "price structure" opinion is not based on "sufficient facts or data" and must be excluded.

There is no price structure if the expert's tests do not in fact reflect co-movement of prices.  For example, the court in *In re Plastics Additives Antitrust Litigation* criticized the expert's analysis regarding pricing structure where the data "do not even superficially show prices moving similarly throughout the class period."  *In re Plastics Additives Antitrust Litig.*, No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135, at *50-51 (E.D. Pa. Aug. 31, 2010) ("Dr. Beyer testified that he viewed the prices 'moving similarly' in this graph, but the prices only move along parallel lines for certain times periods.").  The court there also observed that "[a]t other times, the prices

---

[3] In addition, Dr. Netz opines that there are other documents in existence that show Defendants improperly sharing information.  Netz Decl. at 55 ("This analysis almost surely understates the degree of information sharing.  There is reason to think that the evidence of information sharing compiled to date is incomplete.  The evidence compiled in Exhibits 17 and 19 only includes instances in which Defendants clearly shared competitively sensitive information.").  These speculations are inadmissible too.  *See LIBOR*, 430 F. Supp. 3d at 491 ("Finally, to the extent that Dr. Netz opines on the existence of documents, these opinions are also excluded.").

show marked variation, with the prices for some products remaining steady while the prices for others either fall or rise."  *Id.*

Here, Dr. Netz's correlation analysis is insufficient to reach a conclusion that there is a price structure for the SAs market.  First, the degree of correlation that Dr. Netz appears to be relying on to draw her conclusions is low.  Stiroh Rep. ¶ 78.  Of the 1,465 pairwise price correlations performed by Dr. Netz, she finds that 267 (18 percent) are negative and 519 (35 percent) are neither positive nor statistically significant.  *Id.*; Netz Decl. at 59.  In other words, for 18 percent of the programs for which Dr. Netz compared prices through correlations, the prices were either moving in opposite directions (one increasing while the other decreasing) or there was no statistically discernible relationship between the prices.  For the others, Dr. Netz is able to say only that 907 of the 1,456 pairwise correlations that she calculated were greater than 0.50.  Netz Decl. at 59.  More than a third of the correlations 558 (38 percent) fall below Dr. Netz's 0.50 threshold.  Stiroh Rep. ¶ 78; Netz Decl. at 59.  And a correlation of 0.50 is not statistically substantial and thus not informative of whether two suspension models' prices are related via a "price structure."  Stiroh Rep. ¶ 78.  Furthermore, the fact that some "pairs" of programs may have some degree of correlation does not indicate that all suspension prices move together—i.e., that they exhibit a "price structure" that would allow the inference that changes in the prices of one or a few SAs imply similar changes across all SAs.

As a matter of economics, some overall correlation would be expected even if there were no pricing structure.  *Id.* ¶ 79.  SAs manufactured by the same SA manufacturer are likely to have a degree of correlation because of common cost components.  *Id.*  There is also an expectation that firms in the same industry would be affected by similar industrywide external factors and thus products produced by those firms are likely to have correlated prices.  *Id.*  Given these industry-specific factors, Dr. Netz's correlation analysis does not indicate or even suggest that there was a price structure across all SAs that would support her contention that all SA prices were uniformly impacted.  *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE DECLARATION OF JANET S. NETZ

1

**VII.  DR. NETZ'S OVERCHARGE MODEL AND ANY OPINIONS DERIVED FROM IT ARE INADMISSIBLE.**

2

3

**A.  Dr. Netz's Overcharge Model Is Also Inadmissible Because It Is Not Sufficiently Tied to the Facts of this Case.**

4

Dr. Netz's overcharge analysis is inadmissible because it does not accurately model

5

Plaintiffs' allegations about Defendants' conduct.  To be admissible, an expert report must be

6

"sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

7

*Daubert*, 509 U.S. at 591 (citation omitted); *Mission Viejo Florist, Inc. v. Orchard Supply Co.,*

8

*LLC*, SACV 16-01841-CJC (KESx), 2019 WL 13045054, at *2 (C.D. Cal. Feb. 28, 2019)

9

("Courts reject or exclude expert testimony that fails to connect damages calculations to the

10

theory of liability.").  A model based on assumptions at odds with the underlying facts of a case is

11

unreliable.  *See LIBOR*, 299 F. Supp. 3d at 501 (excluding regression analysis for producing

12

"nonsensical results" when applied to real-world data).

13

Here, EUPs allege three (and potentially four) separate agreements: (1) agreement(s)

14

between NHK and TDK starting no earlier than August 2007 to fix prices and allocate customers

15

and markets;[4] (2) an agreement between NHK, TDK, and HTI starting in 2003 to share

16

competitively sensitive information (with this agreement changing to include only NHK and TDK

17

(and not HTI) by 2008, and thus, potentially becoming a separate alleged agreement);[5] and (3) an

18

agreement between NHK and TDK "to wound and then eliminate" HTI from 2008 until TDK

19

acquired HTI in 2016.[6]  Dr. Netz's "overcharge" analysis, however, does not account for or

20

address the different conduct that EUPs allege.

21

In particular, Dr. Netz's model does nothing to account for allegations that TDK and NHK

22

Defendants conspired to drive HTI out of the market.  Under EUPs' own theory, HTI was a *target*

23

of the alleged conspiracy.  Dr. Netz is fully aware of this.  Netz Decl. at 3 (stating under

24

"Summary of Plaintiffs' Allegations": "Defendants NHK and TDK agreed to work together to

25

---

26

[4] *See, e.g.*, EUP Compl. ¶¶ 124-26, 129.

27

[5] *See, e.g.*, EUP Compl. ¶¶ 122-23, 127-28, 129-38, 141.

[6] *See, e.g.*, EUP Compl. ¶¶ 144-50.

28

1   eliminate the third major supplier of SAs, HTI."); Netz Tr. at 120:8-13 ███████████

2   ████████████████████████████████████████████████████████████

3   ███████████████████   *see also* Stiroh Rep. ¶¶ 72-74.

4        But Dr. Netz's model does nothing to address the potential effects of the purported

5   conspiracy to drive HTI from the market.  If NHK and TDK colluded to "eliminate" HTI from the

6   market, such behavior would have resulted in lower prices for the SA programs where NHK or

7   TDK were in competition with HTI.  *See id.* ¶¶ 75-76.  Dr. Netz admitted that ███████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████ Netz

11  Tr. at 120:14-122:23.  Indeed, as discussed in more detail in Defendants' Opposition to EUPs'

12  class certification motion, the record is replete with examples of a Defendant lowering its price on

13  SAs to be more competitive with HTI.  Defendants' Opposition to End-User Plaintiffs' Motion

14  for Class Certification at 17-18, n.15.

15       Dr. Stiroh found that there are 12 SA programs in which customers sourced equivalent

16  SAs from HTI and from one of the other Defendants during the period of the alleged agreement to

17  drive HTI from the market.  Those programs account for 4.3 billion SAs, about 30 percent of the

18  HDD SA units sold between August 2007 and November 2015.  Stiroh Rep. ¶ 75.  The pricing

19  dynamics for those programs were presumably different than the pricing dynamics where there

20  was competition only between the other Defendants.  *Id.*  But Dr. Netz's model does nothing to

21  address those differences.

22       Dr. Netz's overcharge model is thus inadmissible because of the disconnect between

23  EUPs' allegations of several distinct conspiracies and Dr. Netz's assumption ███████████

24  ████████████████████████████████████████████████[7] from 2003

25  through 2016.

26

27  _____
    [7] *See* Netz Tr. at 55:7-12.

28
_____
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE DECLARATION OF JANET S. NETZ

### B.      Dr. Netz's Overcharge Model Is Unreliable Because It Omits Key Variables.

Dr. Netz's overcharge model is also unreliable because it fails to account for crucial non-conspiratorial factors that are important to understanding pricing dynamics and is not robust to reasonable changes to make the model consistent with competitive pricing dynamics in the industry.  "[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (citations omitted) (granting motion to exclude where expert's multivariate regression analysis to assess the impact of disclosures on stock prices did not account for alternative causes such as "market-specific news" or other "measurable macroeconomic variables"); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1157-59 (N.D. Cal. 2003) (excluding opinion as "speculation" for failure to account for relevant "market circumstances" and "economic reality").  "Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that other major factors have been accounted for in a regression analysis." *REMEC*, 702 F. Supp. 2d at 1273; *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d. Cir. 1999) (affirming district court's exclusion of Title VII plaintiff's expert's multiple regression analysis, which controlled for experience, rank, productivity, and discipline to conclude that a salary variance was attributable to discrimination but did not control for such "nondiscriminatory causes" such as "teaching and service").  "A regression may be unreliable, and therefore excludable . . . for being misspecified (including by failing to account for significant explanatory variables), among other reasons." *LIBOR*, 430 F. Supp. 3d at 484 n.31.  "The importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation."  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012).  As Dr. Stiroh also explains, "[i]t is well established in the econometrics literature that omitting relevant factors from the regression model would result in incorrect estimates for the alleged overcharge indicator, misattributing the effect of the omitted factors to the alleged conduct."  Stiroh Rep. ¶ 92.

Here, Dr. Netz's overcharge model fails to account for critical factors that affect SA prices over time. Her overcharge model omits multiple economic pricing variables, which once included, eliminate the basis for Dr. Netz's assumption that impact is classwide and can be measured with methods common to the class. For instance, her model does not account for the fact the price of SA programs tend to decline the longer the program is in production, due to periodic contract renegotiations and competitive pricing dynamics in the industry, in addition to improvements in production yields and falling per-unit costs of production over time. *Id.* ¶¶ 93-94.[8] While Dr. Netz includes a control for the cumulative number of units sold since introduction of a program, her model still fails to account for the pricing pattern observed for each program because program prices are renegotiated periodically by Defendants and SA manufacturers, often independently of the cumulative number of units sold since the introduction of a given program. *Id.* ¶ 95.

Adding an additional control for how long each program has been in production has a significant impact on Dr. Netz's results. *Id.* ¶ 96. Including some control for this factor changes the results of Dr. Netz's regressions dramatically. *Id.* ¶ 97.

Another key flaw that renders Dr. Netz's overcharge model unreliable is her failure to control for changes in market dynamics over time resulting from changes in technology and the availability (and competitiveness) of other forms of data storage such as solid-state drives ("SSDs"). Average prices for HDDs trended downward over the class period, due to factors such as increasing competition from other memory technologies like SSDs. *Id.* ¶ 100. Dr. Stiroh found that adding a simple time trend to Dr. Netz's overcharge analysis reduces the overcharge in Dr. Netz's model by more than half. *Id.* The impact of adding the above additional control variables to Dr. Netz's overcharge model "indicates that her initial model suffers from omitted

---

[8] *See* Netz Decl. at 6 ("The prices of suspension assemblies follow a predictable pattern. The first sales of a given suspension assembly are typically prototypes, which sell for a much higher price than suspension assemblies sold for mass production. Once mass production begins, the price of the suspension assembly continues to decline, rapidly at first and then more slowly throughout the remainder of the product lifecycle.").

1    variable bias: there is something outside of their models that is significantly affecting their

2    results." *Id.* ¶ 101.  If the additional controls discussed above were superfluous, the inclusion of

3    these variables in Dr. Netz's overcharge model would not have affected her estimates.  *Id.*

4           The reduction in magnitude of the overcharge has important implications to Dr. Netz's

5    opinions about classwide impact.  For example, an overcharge of 4.3 percent, if fully passed

6    through to the end-user, represents an increase in prices of roughly 10.3 cents for an HDD that

7    contains four SAs, each costing about $0.60.  *Id.* ¶ 98.  Dr. Stiroh concludes it is not plausible that

8    retailers would have uniformly incorporated price increases of this magnitude into the prices of

9    all products that are at issue in the end-user class.  *Id.*

10          Therefore, adding the necessary controls to Dr. Netz's overcharge model shows that the

11   model cannot be relied upon to accomplish its very purpose of showing common impact.  Dr.

12   Netz confirmed this at her deposition:



20          Netz Tr. at 81:6-15.

21   Accordingly, Dr. Netz's overcharge model is unreliable and should be excluded.[9]

22   **C.    Dr. Netz's Overcharge Model Is Unreliable Because It Is Not Robust.**

23          "Robustness testing of an expert's methodology—by applying that methodology to

24   ───────────────

25   [9] Even assuming Dr. Netz's overcharge model were valid, the structure of her model is only
     capable of finding an average overcharge across all suspension assembly programs.  Replicating
26   Dr. Netz's overcharge model on individual HDD SA programs sold by Defendants allows the
     purported overcharge estimate to vary by program, and there is in fact no overcharge on
27   numerous specific SA programs.  Stiroh Rep. ¶¶ 80-83; *id.* Ex. 6B.

28                                          15                            3:19-MD-02918-MMC

1    different data or with different assumptions and examining the results produced by the

2    methodology so applied—is not an impermissible challenge to the expert's results." *LIBOR*, 430

3    F. Supp. 3d at 468.  "Rather, this robustness and sensitivity testing relates directly to two of the

4    *Daubert* factors articulated by the Supreme Court: whether the methodology 'can be (and has

5    been) tested' and the methodology's 'known or potential rate of error.'" *Id.* (quoting Daubert,

6    509 U.S. at 594).  "Robustness testing and sensitivity testing that produces contradictory or

7    otherwise implausible results strongly suggest that a methodology has been insufficiently tested

8    and that the methodology has a high potential rate of error." *Id.*  "Damage estimates in antitrust

9    cases hinge on careful statistical analysis, reasonable assumptions, reliable data, and the

10   robustness of the results.  If any of these areas are circumspect, then the analysis could provide

11   faulty conclusions as to the existence or the amount of damages." *Live Concert*, 863 F. Supp. 2d

12   at 974 (granting motion to exclude).

13        The concern about the lack of robustness of Dr. Netz's model is exacerbated by the

14   disconnect between the allegations and Dr. Netz's analysis, discussed above.  Given the different

15   alleged agreements and conspiracy periods, it is especially important here that Dr. Netz's model

16   be robust to changes in time.  Here, Dr. Stiroh finds that Dr. Netz's opinions about common

17   impact depend critically on her assumptions regarding the class period, and her overcharge model

18   results are not robust to changes in the damages period.  Stiroh Rep. ¶¶ 103-106.

19        Dr. Netz assumes a damages period starting in January 2003 but does not articulate any

20   logical basis for doing so other than information from counsel.  Dr. Netz stated in deposition that

21   ██████████████████████████████████████████████████████████████████

22   ████████████████████████████████████   Netz Tr. at 79:8-11, 81:16-82:5.  She further

23   acknowledged ████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████ *Id.* at

26   82:6-83:6.  With this in mind, Dr. Stiroh tested Dr. Netz's model using the alternative period of

27   May 2008-April 2016 (period in the NHK and DOJ plea agreement) and found that this change

28

1   reduced Dr. Netz's estimated overcharge to 2.8 percent.  Stiroh Rep. ¶ 106.  This shows that Dr.

2   Netz's overcharge model is not robust to reasonable changes and is therefore unreliable and

3   inadmissible.

4   **VIII.   DR. NETZ'S PASS-THROUGH MODEL AND OPINIONS DERIVED FROM
        THAT MODEL ARE INADMISSIBLE.**

5

6       **A.      Dr. Netz's Pass-Through Model Is Unreliable Because It Does Not Account
                for Focal Point Pricing and Other Key Factors Affecting Pass-Through.**

7           As noted, where an expert conducts a regression analysis and fails to incorporate major

8   independent variables, such analysis may be excluded.  *See supra Section* VII.B.  Here, Dr. Netz

9   uses a simple linear regression model to measure pass-through by quantifying the relationship

10  between the price of HDDs or HDD-containing products and those products' costs.  As discussed

11  below, Dr. Netz's failure to assess the impact of focal point pricing, product characteristics, and

12  other pricing strategies in her pass-through model render it unreliable.

13          Focal point pricing is necessary to incorporate because it can block the pass-through of

14  small overcharges of SAs at issue in this case.  Stiroh Rep. ¶¶ 61-62.  Courts have excluded

15  expert opinions that do not sufficiently factor in the effects of focal point pricing in their

16  regressions.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL

17  1156797, at *3 (N.D. Cal. 2018) (granting motion to exclude expert report that failed to

18  "adequately account for the effects of focal point pricing"); *In re Apple iPhone Antitrust Litig.*,

19  No. 11-cv-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. 2022) (same in part because "focal

20  pricing" showed that expert's model did not reliably "determine[e] but-for pricing").

21          Here, Dr. Netz admitted that ██████████████████████████████

22  ██████████████████████████████████████████████ Netz Tr. at 167:1-14.

23  Dr. Netz has offered no methodology for determining which proposed class members would or

24  would not have been shielded from a price impact through focal point pricing.  Stiroh Rep. ¶¶ 49-

25  50, 59-62.

26          The record shows that focal point pricing is a common practice among different entities of

27  the supply chain at issue.  *See* Stiroh Rep. ¶ 58 n.93, n.94. (██████████████████

28                                        17                          3:19-MD-02918-MMC

████████████████████████████████████████████████████████

██████████████████ and that Dr. Netz's own data set reflects widespread focal point pricing, e.g.,

████████████████████████████████████). Dr. Netz ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ Netz Tr. at 104:6-19, 105:23-108:3, 114:24-117:18.  Dr. Netz stated

in her deposition that ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ *Id.* at 168:8-169:19.  However, the record here demonstrates that retailers used

focal points of $10 and $100 dollars too.  *See, e.g.*, Stiroh Rep. ¶¶ 49, 59-62, Figure 5 & n.91 &

n.92.

As a matter of economics, focal point pricing does not shift to the next focal point based

on nominal cost increases that are a matter of cents.  *See id.*  Dr. Netz's own data shows that

retailers kept their focal point prices the same, even when costs for a particular product increased.

*See* Stiroh Rep., Figure 5 (e.g., ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████).  Even when retailers' cost for a particular

product decreased, they kept the focal point price for the product the same rather than adjusting

the price downward.  *See id.* (e.g., ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████; ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████).

In sum, under focal-point pricing, the retail price can remain the same despite small

changes in costs, especially for higher-priced products.  *Id.* ¶ 61.  Dr. Netz's regression analysis

for estimating the pass-through rate is unreliable as a means to establish common impact because

it cannot distinguish between resellers/retailers using focal point pricing—who might not adjust

their prices to pass through small changes in costs and shift their prices to the next focal point entirely—and resellers/retailers who fully pass on changes in costs.  Stiroh Rep. ¶ 61

Dr. Netz also fails to incorporate rebate and pricing data—at any level in the distribution chain—into her pass-through analysis.  This is a fatal flaw because a rebate or discount would change or eliminate any alleged overcharge that would be passed on.[10]  Here, this is particularly problematic because, even if Dr. Netz's overcharge regressions were reliable, the effects on SA prices that she estimates represented a vanishingly small portion of the cost of the class products at issue, such that any small rebate or discount could easily overwhelm any cost increase relating to SA prices.  *See* Stiroh Rep. ¶¶ 64-65.  Dr. Netz acknowledged that, ████████████ ████████████████████████████████████████████ ███████████████████████████████████ (Netz. Tr. at 150:3-151:4), and she thus could not uniformly account for rebates and discounts in all of her regression analyses.  *See* Stiroh Rep. ¶ 64.  Importantly, Dr. Netz's pass-through regression models do not even attempt to determine ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████.  Netz Tr. at 99:6-100:4.

In addition, Dr. Netz's pass-through model is unreliable because ████████████████ ████████████████████████████████ *Id.* at 141:22-144:3.  Under economic theory, a pass-through estimate needs to account for the fact that products (e.g., external HDDs, notebooks) are composed of characteristics valued by consumers and that the resulting bundle of characteristics—often defined as product quality—is what is associated with a cost and price. Stiroh Rep. ¶ 108.  The basis for Dr. Netz's opinion that impact is common to the End-User class and can be measured by common methods is her assumption that pass-through is greater than 100 percent and therefore classwide impact can be inferred by looking only at the overcharge from Defendants to HDD product manufacturers.  However, once Dr. Netz's pass-through regressions

---

[10] Such rebates and promotional pricing discounts were common during the class period, including among the named Plaintiffs.  Stiroh Rep. ¶ 65, Ex. 3.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE DECLARATION OF JANET S. NETZ

include controls for product type, they show much lower "pass-through" rates that vary over a much wider range, calling into question the reliability of those regressions.  Dr. Stiroh tested and confirmed that different pass-through rates exist for different product types across the same the same retailer and that a number of products have no pass-through at all.  *See* Stiroh Rep. ¶¶ 109-113, Figures 10-11 (█████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████).

Despite relying on the ***same underlying data***, because of the differences in how they structured their models (███████████████████████████████████████████████████████ ████████████████████████████████), Dr. Williams and Dr. Netz estimate different pass-through rates for every entity they analyze.  *Id.* ¶¶ 110-113.  ███████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████  *Id.*  These "inconsistent results . . . produced by the same methodology" are a sign of deficiencies in Dr. Netz's (and Dr. Williams') models.  *See LIBOR*, 299 F. Supp. 3d at 468; *United States v. Hermanek*, 289 F.3d 1076, 1097 (9th Cir. 2002) ("Inconsistent results may be an indicator of unreliability.").

Dr. Netz's pass-through model omits key variables that make it impossible to accomplish its very purpose—to prove common impact to the class.  Rather, Dr. Netz's pass-through model simply cannot distinguish between impacted and non-impacted class members.  Netz Tr. at 99:24-100:4 ("███████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████); *id.* at 98:23-25 (██████████████████ ███████████████████████████████).

### B.  Dr. Netz's Opinion Assuming Pass-Through Exceeds 100 Percent Is Inadmissible Because It Is Not Based On Sufficient Data.

Rule 702 requires that expert testimony be "based on sufficient facts or data."  Fed. R. Evid. 702(b).  In the class action context, an expert's use of representative data must be such that

1   every single proposed class member can rely on the expert's opinion to prove that they were

2   impacted. *Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046-47 (2016). Courts routinely

3   reject expert opinions offered in support of classwide injury and damages that rely on non-

4   representative—and thus biased—data or that fail to account for relevant data that would address

5   differences among putative class members. *See Carnegie Mellon Univ. v. Hoffmann-LaRoche,*

6   *Inc.*, 55 F. Supp. 2d 1024, 1034-35 (N.D. Cal. 1999) (excluding expert testimony that, among

7   other things, "selectively examin[es] only portions of the data").

8           In this case, Dr. Netz assumes the distribution channel for SAs contains HDD suspension

9   assembly manufacturers, HDD manufacturers, distributors, HDD-containing product

10  manufacturers, and retailers/resellers. Netz Decl., Ex. 10. Dr. Netz opines that "100% of any

11  overcharge" to direct purchasers is passed through to the End-User Class and that "all class

12  members suffer common harm in the amount of 100% of the overcharge imposed by Defendants

13  at the top of the distribution channel." *Id.* at 87, 101-102. In the first place, however, her

14  contention of a common pass-through rate of at least 100% is unreliable given that those results

15  are not obtained when relevant variables are included in the regressions. In addition, the highly

16  variable nature of her results (*see* Netz Decl., Ex. 7, showing pass-through rates from 88% to

17  271%) show that there is no "common" pass-through rate that can be assumed. This is

18  particularly true given that Dr. Netz has done pass-through regressions for only 53 entities out of

19  the literally thousands of entities in the distribution chain to the End-User Plaintiff putative class

20  that were handpicked by her with no indication that those entities were individually or

21  collectively representative in a statistically reliable way.

22          Dr. Netz recognizes that ███████████████████████████████

23  ███████████████████████████████████████████████

24  ██████████ Netz Tr. at 100:20-24, 168:4-7. ███████████████████

25  ██████████████████ *Id.* at 100:20-101:20. ████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████

28

1  ███████████████████████████████████████████████████████

2  ████████████  Netz Tr. 102:2-13.  There is no basis to conclude that analysis of these 19

3  resellers/retailers indicates that *all retailers/resellers* passed on 100% of any overcharges,

4  particularly given how much her estimates from those 19 regressions vary.

5        Moreover, Dr. Netz's inference of a 100% pass-through rate is unreliable even when

6  factoring in all 53 reseller regressions.  There is no indication that those 53 entities, are, in fact,

7  "representative" in a statistical sense, so that conclusion is not supported by her regressions.  *See,*

8  *e.g.*, *FTC v. Vyera Pharm., LLC*, No. 20cv706 (DLC), 2021 U.S. Dist. LEXIS 219493, at *17

9  (S.D.N.Y. Nov. 12, 2021) (excluding expert analysis of insurance claims data to assess extent of

10  use of certain drug as "too unrepresentative to provide reliable support for any expert opinion or

11  fact-finding").  In *Vyera*, for example, the court that held the expert's sample was not sufficiently

12  representative because it excluded data for "hospitalized patients or those without private

13  insurance." *Id.*  Similarly, here, Dr. Netz states her generalized opinion that there was complete

14  pass-through on a small sample of pass-through regressions that, in addition to their fundamental

15  statistical failure to account for relevant factors affecting prices, varied dramatically from one to

16  another.  There is no basis in the record to believe that this small sample is statistically

17  "representative," such that it could reliably support the broad opinion that Dr. Netz renders.  Dr.

18  Netz's *ipse dixit* statement that she selected "representative" retailers certainly is not sufficient.

19  *See generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Dr. Netz's opinion that pass-

20  through rates exceed 100 percent throughout the distribution chain is not based on "sufficient

21  facts or data" and therefore must be excluded.  *See* Fed. R. Evid. 702(b).

22  **IX.  DR. NETZ'S PROPOSED DAMAGES CALCULATION METHOD IS INADMISSIBLE.**

23

24        Dr. Netz's damages model should be excluded because it does not provide a model

25  capable of assessing damages with information common to the class and it itself depends on other

26  unreliable assumptions.

27        An expert's opinion is not reliable as common proof of damages for class certification

28

1   unless "each class member could have relied on [the model] to establish liability if he or she had

2   brought an individual action." *Olean Wholesale Grocery Coop., Inc v. Bumble Bee Foods LLC*,

3   31 F.4th 651, 679-80 (9th Cir. 2022) (en banc) (quoting *Tyson Foods*, 577 U.S. at 455).  A

4   proffered expert must set forth "some discernable methodology, and may not be a black box into

5   which data is fed at one end and from which an answer emerges at the other." *GPNE Corp. v.*

6   *Apple, Inc.*, No. 12-CV-02885-LHK, 2014 U.S. Dist. LEXIS 53234, at *17-18 (N.D. Cal. Apr.

7   16, 2014) (internal citation omitted).

8        Here, no single class member can use Dr. Netz's model to determine whether he or she is

9   injured, let alone to calculate any damages.  Dr. Netz purports to calculate classwide damages

10  merely by multiplying the HDD SA sales attributable to class members by the alleged overcharge

11  rate to obtain the aggregate overcharge for SAs consumed by class members.  Netz Decl. at 104-

12  105.  She then claims that she would multiply the result of this calculation by "the relevant" or

13  "appropriate" pass-through rate to calculate alleged damages to class members.  *Id.* at 105.

14       Dr. Netz does not provide any details on how the "relevant" or "appropriate" pass-through

15  rate from direct purchasers to end-users should be calculated but opines that "[m]ost of the

16  estimated pass-through rates are approximately 100% or slightly higher" based on her flawed

17  pass-through analysis.  *Id.* at 100.  As discussed above, however, pass-through rates throughout

18  the supply chain vary substantially by entity, product, and over time—and are sometimes negative

19  if the appropriate controls are used.  *See* Stiroh Rep. ¶¶ 110-113, Figures 10-11; *Grodzitsky*, 2017

20  U.S. Dist. LEXIS 222399, at *15 ("To warrant admissibility . . . it is critical that an expert's

21  analysis be reliable at every step.").  Further, Dr. Netz has no valid basis to claim a 100 percent

22  pass-through rate given that her pass-through analysis cannot account for common pricing

23  strategies such as focal point pricing, rebates, or discounts.  *See supra* Section VIII.A.

24       Dr. Netz does not provide an alternative method to assess how she would calculate the

25  cumulative pass-through rate for the entire distribution chain, from direct purchasers to members

26  of the purported End-User Class, without relying on her assumption of a 100 percent pass-through

27  rate to all members of the putative class.  Stiroh Rep. ¶ 127.

28

1    Thus, Dr. Netz does not provide a reliable model to calculate damages to the putative

2  class.

3  **X.    <u>CONCLUSION</u>**

4    For the foregoing reasons, Defendants respectfully request the Court grant its motion to

5  exclude Dr. Netz's declaration and her related testimony.

6

7  Dated: December 23, 2022                              Respectfully submitted,

8                                                        */s/ J. Clayton Everett, Jr.*

9                                                        J. Clayton Everett, Jr. (pro hac vice)
                                                         MORGAN, LEWIS & BOCKIUS LLP
10                                                       1111 Pennsylvania Ave., NW
                                                         Washington, DC  20004
11                                                       Telephone: (202) 739-3000
                                                         clay.everett@morganlewis.com

12                                                       *Attorneys for Defendants TDK Corporation,*
                                                         *Magnecomp Corporation, Magnecomp*
13                                                       *Precision Technology Public Co. Ltd.,*
                                                         *Hutchinson Technology Inc., and SAE*
14                                                       *Magnetics (H.K.) Ltd.*

15                                                       Michelle Park Chiu (State Bar No. 248421)
                                                         MORGAN, LEWIS & BOCKIUS LLP
16                                                       One Market, Spear Street Tower
                                                         San Francisco, CA  94105
17                                                       Telephone: (415) 442-1000
                                                         michelle.chiu@morganlewis.com

18

19

20

21

22

23

24

25

26

27

28
                                             24                         3:19-MD-02918-MMC

/s/  *Mark H. Hamer*

Mark H. Hamer (State Bar No. 156997)
mark.hamer@bakermckenzie.com
Mark G. Weiss (pro hac vice)
mark.weiss@bakermckenzie.com
BAKER & McKENZIE LLP
815 Connecticut Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 452-7077

Catherine Y. Stillman (State Bar No. 242440)
catherine.stillman@bakermckenzie.com
BAKER & McKENZIE LLP
452 Fifth Avenue
New York, NY  10018
Telephone: (212) 626-4218

*Attorneys for Defendants NHK Spring Co., Ltd., NHK International, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd. and NAT Peripheral (H.K.) Co., Ltd.*

Ann Marie Mortimer (State Bar No. 169077)
HUNTON ANDREWS KURTH LLP
amortimer@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, CA  90071
Telephone: (213) 532-2103
Facsimile: (213) 532-2020

Craig Y. Lee (pro hac vice forthcoming)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW
Washington, D.C.  20005
Telephone: (202) 419-2114
craiglee@huntonak.com

*Attorneys for Defendants NHK Spring Co., Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., and NAT Peripheral (H.K.) Co., Ltd.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE DECLARATION OF JANET S. NETZ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTORNEY ATTESTATION

I, J. Clayton Everett, Jr., hereby attest, pursuant to Civil Local Rule 5-1(h)(3) of the United States District Court for the Northern District of California, that the concurrence to the filing of this document has been obtained from each signatory hereto.

/s/   *J. Clayton Everett, Jr.*

ATTORNEY ATTESTATION

DB1/ 134871294.2