Christopher T. Micheletti
**ZELLE LLP**
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zellelaw.com

Victoria Sims
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
vicky@cuneolaw.com

William V. Reiss
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
wreiss@robinskaplan.com

Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
Telephone: (651) 312-6518
Facsimile: (651) 789-4818
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for the
End-User Plaintiffs*

*Interim Co-Lead Class Counsel for the
Reseller Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE: HARD DRIVE SUSPENSION
ASSEMBLIES ANTITRUST
LITIGATION

This Document Relates to:
ALL END-USER AND RESELLER
ACTIONS

Case No. 19-md-02918-MMC

MDL No. 2918

**INDIRECT PURCHASER PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT
REGARDING FOREIGN COMMERCE**

Date:      January 13, 2023
Time:     9:00 AM
Crtrm:   7, 19th Floor
Before:  Hon. Maxine M. Chesney

## REDACTED VERSION

# <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................................................... iii

GLOSSARY ........................................................................................................................... vii

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 1

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

    I.  Nature of the SA Market ................................................................................................. 2

    II. Defendants' Conspiracy Targeted the U.S. Market ........................................................ 4

ARGUMENT .............................................................................................................................. 8

    I.  APPLICABLE LEGAL STANDARDS ......................................................................... 8

    II. THE FTAIA DOES NOT BAR IPPS' CLAIMS ........................................................... 8

        A. Defendants' Arguments are Contrary to Ninth Circuit Precedent .......................... 9

        B. IPPs' Claims Arise from Import Commerce ......................................................... 10

        C. The Domestic Effects of the Conspiracy Give Rise to IPPs' Claims ................... 13

            1. Defendants' Anticompetitive Conduct Had a Direct Effect on U.S.
                Commerce ...................................................................................................... 14

            2. Defendants' Anticompetitive Conduct Had a Substantial Effect on U.S.
                Commerce ...................................................................................................... 16

            3. IPPs' Claims Arise from the Domestic Effect of Defendants'
                Anticompetitive Conduct. .............................................................................. 18

    III. THE DORMANT COMMERCE CLAUSE HAS NO APPLICATION HERE ........... 19

    IV. IPPS' CLAIMS DO NOT EXCEED THE SCOPE OF THE STATE STATUTES ..... 23

    V.  CONCLUSION ............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 8

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Bonta*,
33 F.4th 1107 (9th Cir. 2022) ................................................................................ 21

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) ................................................................................ 20

*Ass'n for Medicines v. Frosh*,
887 F.3d 664 (4th Cir. 2018) ............................................................................ 20, 22

*Barclays Bank PLC v. Franchise Tax Bd.*,
512 U.S. 298 (1994) .............................................................................................. 22

*Biocad JSC v. F. Hoffmann-La Roche*,
942 F.3d 88 (2d. Cir. 2019) .................................................................................. 15

*California v. ARC America Corp.*,
490 U.S. 93 (1989) ............................................................................................ 19, 21

*Costco Wholesale Corp. v. AU Optronics Corp.*,
No. C13-1207RAJ, 2014 WL 4718358 (W.D. Wash. Sept. 22, 2014) ............ 10, 15

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978) .............................................................................................. 21

*F. Hoffmann-LaRoche Ltd, v. Empagran*,
542 U.S. 155 (2004) ...................................................................................... 1, 8, 21

*Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*,
18 N.Y.3d 722 (2012) .......................................................................................... 20

*Healy v. The Beer Inst.*,
491 U.S. 324 (1989) .............................................................................................. 20

*Illinois Brick Co., v. Illinois*,
431 U.S. 720 (1977) ........................................................................................ 17, 24

*IMS Health Inc. v. Mills*,
616 F.3d 7 (1st Cir. 2010), *cert. granted, judgment vacated sub nom. IMS
Health, Inc. v. Schneider*, 564 U.S. 1051, 131 S. Ct. 3091, 180 L. Ed. 2d 911
(2011) .................................................................................................................... 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. MD 06-1775JGVVP, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) *report and recommendation adopted in part,* 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) *aff'd,* 697 F.3d 154 (2d Cir. 2012) .............................................................. 10

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   123 F.3d 599 (7th Cir. 1997) (Posner, J.) *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1988)...................................................... 22, 23

*In re Capacitors Antitrust Litig. (No. III)*,
   No. 17-md-02801, 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018).................................. 10, 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016) ........................... 10, 15-16, 18

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   295 F. Supp. 2d 30 (D.D.C. 2003) ..................................................................................... 23

*In re Optical Disk Drive Antitrust Litig.*,
   10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016)................................................ 19

*In re Optical Disk Drive Antitrust Litig*,
   No. 10-md-2143-RS, 2017 WL 11513316 (N.D. Cal. Dec. 18, 2017) ...................... 10, 13, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   822 F.Supp.2d 953 (N.D. Cal. 2011) ................................................................ 9, 11, 14, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 267 F.R.D. 583 (N.D. Cal. 2010*), amended in part,* 2011 WL 3268649 (N.D. Cal. July 28, 2011) ............................................................... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig., Nokia Corp. et al. v. AU Optronics Corp.*,
   Nos. M 07-1827 SI, No. C 09-5609 SI, 2012 WL 3763616 (N.D. Cal. Aug. 29, 2012*)* ........................................................................................................................... 10

*In re Vitamin C Antitrust Litig., Animal Science Prods., Inc. v. Hebei Welcome Pharm Co.*,
   904 F. Supp.2. 310 (E.D.N.Y. 2012)................................................................................. 11

*Japan Line, Ltd. v. Los Angeles Cnty.*,
   441 U.S. 434 (1979)........................................................................................................ 20

*K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*,
   962 F.2d 728 (7th Cir. 1992) (Easterbrook, J.) ................................................................ 23

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)............................................................................................ 19

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................................................ 24, 25

*Longaker v. Bos. Sci. Corp.*,
  872 F. Supp. 2d 816 (D. Minn. 2012), *aff'd*, 715 F.3d 658 (8th Cir. 2013) ........................... 20

*McBurney v. Young*,
  569 U.S. 221 (2013) .................................................................................................... 20

*Minn-Chem, Inc. v. Agrium, Inc.*,
  683 F.3d 845 (7th Cir. 2012) ....................................................................................... 18

*Motorola Mobility LLC v. AU Optronics Corp.*,
  775 F.3d 816 (7th Cir. 2015) ................................................................................... 17-18

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ..................................................................................... 21

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ..................................................................................................... 24

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ....................................................................................... 8

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) ...................................................................................................... 22

*Pharm. Research & Mfrs. of Am. v. Walsh*,
  538 U.S. 644 (2003) ................................................................................................... 20

*Prevent DEV GmbH v. Adient PLC*,
  No. 20-cv-13137, 2021 WL 5585917 (E.D. Mich. Nov. 30, 2021) ..................................... 18

*Proview Technology Inc., et al. v. AU Optronics Corp, et. Al.*,
  C 12-3802 (N.D. Cal. Sept. 25, 2014) ........................................................................... 11

*S.-Cent. Timber Dev., Inc. v. Wunnicke*,
  467 U.S. 82 (1984) ..................................................................................................... 20

*Sam Francis Found. v. Christies, Inc*.,
  784 F.3d 1320 (9th Cir. 2015) ..................................................................................... 21

*Shields v. Fed'n Internationale de Natation*,
  419 F. Supp. 3d 1188 (N.D. Cal. 2019) ......................................................................... 13

*United Phosphorus, Ltd. v. Angus Chem. Co.*,
  131 F. Supp. 2d 1003 (N.D. Ill. 2001) ........................................................................... 18

*United States v. Anderson*,
  326 F.3d 1319 (11th Cir. 2003) ................................................................................... 13

v

*United States v. Hui Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ............................................................. *passim*

*United States v. LSL Biotechs.*,
    379 F.3d 672 (9th Cir. 2004) ............................................................. 14-15

*Valley Bank of Nevada v. Plus Sys., Inc.*,
    914 F.2d 1186 (9th Cir. 1990) ............................................................. 20

*W. & S. Life Ins. Co. v. State Bd. of Equalization of California*,
    451 U.S. 648 (1981) ............................................................. 22

*Wickard v. Filburn*,
    317 U.S. 111 (1942) ............................................................. 22

**Statutes**

15 U.S.C. § 6a ............................................................. 9

15 U.S.C. § 6a (1)-(2) ............................................................. 13

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1502 (4th ed. 2013) ............................................................. 24, 25

# GLOSSARY

| | |
|---|---|
| "Class Periods" | EUP and Reseller Class Periods, collectively. |
| "Defendants" | NHK Spring Co. Ltd., NHK International, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd.  and NAT Peripheral (H.K.) Co., Ltd.; TDK Corporation, Hutchinson Technology Inc., Magnecomp Precision Technology Public Co., Ltd., Magnecomp Corporation, and SAE Magnetics (H.K.) Ltd. |
| "Defs.' Mtn. for S.J." or "Motion" | Defendants' Motion for Partial Summary Judgment Regarding Foreign Commerce, ECF No. 533/535. |
| "Defs.' Mtn. to Dismiss" | Defendants' Motion to Dismiss the Second Amended Consolidated Class Action Complaint, ECF No. 319. |
| "Defs.' Opp. to Adm. Mtn" | Defendants' Opposition to Class Plaintiffs' Administrative Motion, ECF No. 590. |
| "EUPs" | End-User Plaintiffs. |
| "EUPs' Class Cert Mtn." | End-User Plaintiffs' Motion for Class Certification, ECF No. 605. |
| "EUP Class Period" | January 1, 2003 to May 30, 2016. |
| "EUPs' Complaint" | End-User Plaintiffs' Third Amended Complaint, ECF No. 558. |
| "Ex." | Exhibits to Declaration of William V. Reiss in Support of Indirect Purchaser Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment Regarding Foreign Commerce. |
| "First MTD Order" | Order Granting Defendants' Motion to Dismiss End-User Plaintiffs' Consolidated Class Action Complaint and Reseller Plaintiffs' Consolidated Amended Complaint, filed October 23, 2020, ECF No. 282. |
| "FTAIA" | Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a. |
| "HDD" | Hard disk drive. |
| "IPPs" | Indirect Purchaser Plaintiffs. |

| | |
|---|---|
| "Misuta Decl." | Declaration of Stephen Misuta in Support of Defendants' Motion for Summary Judgment Regarding Foreign Commerce, ECF No. 533-3. |
| "Motion to Amend" | End-User Plaintiffs' Unopposed Motion For Leave To Amend The Third Amended Consolidated Class Action Complaint, ECF No. 595. |
| "Netz Decl." | Declaration of Janet S. Netz, Ph.D., in Support of End-User Plaintiffs' Motion for Class Certification, ECF No. 605-4. |
| "NHK" | NHK Spring Co. Ltd., NHK International, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd.  and NAT Peripheral (H.K.) Co., Ltd. |
| "NHK Plea Agreement" | Rule 11 Plea Agreement, *United States v. NHK Spring Co.,* No. 2:19-cr-20503 (E.D. Mich. Sept.23, 2019), attached as Ex. 9 to Declaration of Craig Lee in Support of Defendants' Motion for Partial Summary Judgment Regarding Foreign Sales. ECF No. 533-1 and Ex. 9 to Lee Decl. ECF No. 535-1. |
| "NHK Rog Resp. No. 1" | NHK Defendants' Amended Response To End-User Plaintiffs' Interrogatory No. 1, dated August 27, 2022 |
| "Okuma Decl." | Declaration of Akira Okuma in Support of NHK Defendants' Motions for Partial Summary Judgment on Foreign Commerce, ECF Nos. 533-2, 535-2. |
| "Reiss Decl." | Declaration of William V. Reiss in Support of Indirect Purchaser Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment Regarding Foreign Commerce, filed herewith. |
| "Resellers" | Reseller Plaintiffs. |
| "Resellers' Complaint" | Reseller Plaintiffs' Third Consolidated Amended Complaint, ECF No. 418. |
| "Resellers' Class Cert Mtn." | Reseller Plaintiff's Motion for Class Certification, ECF No. 611. |
| "Reseller Class Period" | January 1, 2003 to May 30, 2016. |
| "SAs" | Hard disk drive suspension assemblies. |
| "Second MTD Order" | Order Granting in Part and Denying in Part. |

|    |                        |                                                                                                                                    |
|----|------------------------|------------------------------------------------------------------------------------------------------------------------------------|
| 1  |                        | Defendants' Motion to Dismiss Second Amended                                                                                        |
| 2  |                        | Consolidated Class Action Complaints, filed September 22, 2021, ECF No. 390.                                                        |
| 3  | "Sentencing Memo"      | United States Sentencing Memorandum (Dkt. 21),                                                                                      |
| 4  |                        | *United States v. NHK Spring Co., Ltd.*, No. 2:19-cr-20503 (E.D. Mich. Dec. 15, 2019).                                             |
| 5  |                        |                                                                                                                                    |
| 6  | "TDK"                  | Defendants TDK Corporation, Hutchinson Technology Inc., Magnecomp Precision Technology                                              |
| 7  |                        | Public Co., Ltd., Magnecomp Corporation, and SAE Magnetics (H.K.) Ltd.                                                              |
| 8  | "TDK Rog Resp. No. 1"  | TDK Defendants Second Supplement Responses and                                                                                      |
| 9  |                        | Objections to End-User Plaintiffs' Interrogatory No. 1, dated August 26, 2022.                                                      |
| 10 |                        |                                                                                                                                    |
| 11 | "Williams Report"      | Report of Dr. Michael A. Williams in Support of Reseller Plaintiffs' Motion for Class Certification,                                |
| 12 |                        | ECF No. 606-4.                                                                                                                      |
| 13 |                        |                                                                                                                                    |
| 14 |                        |                                                                                                                                    |
| 15 |                        |                                                                                                                                    |
| 16 |                        |                                                                                                                                    |
| 17 |                        |                                                                                                                                    |
| 18 |                        |                                                                                                                                    |
| 19 |                        |                                                                                                                                    |
| 20 |                        |                                                                                                                                    |
| 21 |                        |                                                                                                                                    |
| 22 |                        |                                                                                                                                    |
| 23 |                        |                                                                                                                                    |
| 24 |                        |                                                                                                                                    |
| 25 |                        |                                                                                                                                    |
| 26 |                        |                                                                                                                                    |
| 27 |                        |                                                                                                                                    |
| 28 |                        |                                                                                                                                    |

IPPs' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 3:19-md-02918-MMC

## STATEMENT OF ISSUES TO BE DECIDED

Whether Defendants' Motion should be denied where genuine issues of material fact exist that: (a) the FTAIA does not bar IPPs'[1] claims because Defendants were engaged in import commerce and Defendants' unlawful conduct had a direct, substantial and reasonably foreseeable effect on domestic commerce that proximately caused IPPs' injury; (b) the dormant Commerce Clause does not bar IPPs' State law claims because the application of state laws does not discriminate against interstate commerce, and alternatively, Defendants' commerce caused injury within the relevant States; and (c) the State laws challenged by Defendants do not prohibit IPPs from recovering damages for finished products incorporating price-fixed components.

## INTRODUCTION

"[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is … reasonable," and reflects a legislative effort "to redress domestic antitrust injury that foreign anticompetitive conduct has caused." *F. Hoffmann-LaRoche Ltd, v. Empagran*, 542 U.S. 155, 165 (2004). Consistent with the FTAIA, IPPs may recover damages resulting from Defendants' overseas sales of price-fixed SAs that were incorporated into finished products purchased in the U.S. by IPPs. Defendants' arguments to the contrary are foreclosed by controlling law. Decisions by the Ninth Circuit and courts in the Northern District of California have applied the FTAIA to strikingly similar facts and rejected arguments nearly identical to those made by Defendants here.

The Ninth Circuit's decision in *United States v. Hui Hsiung,* 778 F.3d 738, 757-60 (9th Cir. 2015) ("*Hsiung*") demonstrates that Defendants' conduct, and thus IPPs' claims, are exempt from the FTAIA because Defendants' conduct constitutes import commerce. As part of Defendants' unified price-fixing scheme – which Defendants concede – they directly imported substantial amounts of SAs into the U.S. Defendants negotiated prices in the U.S., participated in conspiratorial communications in the U.S., sold SAs to companies they knew incorporated SAs into finished products for import to the U.S., and directed their conspiracy at the U.S. import market. The Ninth Circuit and other courts have routinely held such conduct exempt from the

---

[1] IPPs consist of putative classes of Resellers and EUPs.

1   FTAIA as import commerce.

2         The Ninth Circuit in *Hsiung* also held – contrary to what the Defendants urge here –that

3   the fact that conspirators sell a price-fixed component of a finished product abroad does not

4   render the effect on domestic commerce indirect under the FTAIA's "domestic effects"

5   exception. 778 F.3d at 757-60. Where U.S. consumers and companies buy finished products in

6   the U.S., for which prices have been elevated because their components were sold at collusively

7   elevated prices, the FTAIA's domestic effects exception is met. This is particularly true where,

8   like here, IPPs have submitted unrebutted expert reports demonstrating that all or nearly all of

9   Defendants' overcharge was passed-on to IPPs.

10        Given that their arguments under the FTAIA are foreclosed by controlling law, it is no

11   surprise Defendants resort to radical constitutional and statutory construction arguments not

12   supported by any authority (and Defendants cite none). But these arguments fare no better than

13   their FTAIA challenge.

14        <u>Defendants' Dormant Commerce Clause Challenge</u>: Under controlling Supreme Court and

15   Ninth Circuit precedent, none of IPPs' state law claims run afoul of the dormant Commerce

16   Clause for at least two independent reasons. *First,* none of IPPs' state law claims discriminate

17   against interstate commerce. *Second*, all of IPPs' State law claims seek to redress injury resulting

18   from IPPs' in-state purchases of finished products containing Defendants' price-fixed SAs. Under

19   modern Supreme Court jurisprudence and common sense, the commerce subject to IPPs' claims

20   clearly took place within the applicable States.

21        <u>Defendants' Repackaged Standing Argument</u>: Finally, Defendants' argument that certain

22   of IPPs' State claims warrant dismissal because products incorporating SAs are in a different

23   market than SAs should be rejected for the same reasons the Court previously rejected it and

24   because Defendants cite no relevant authority to suggest that IPPs' claims are barred under

25   relevant State law.

26                  **STATEMENT OF FACTS**

**I.**    **Nature of the SA Market**

27        Defendants conspired to fix prices and allocate the market for SAs, a crucial component of

28

the ubiquitous HDD[2] which is in turn used in a variety of end-user electronic products such as portable external storage devices, desktop and laptop computers, enterprise servers and storage arrays[3]. HDDs store digitally encoded data on rapidly rotating disks with magnetic surfaces.[4] SAs "are critical components of HDDs that hold the read/write heads in position above the spinning magnetic disks."[5] There is no market for SAs other than as a critical component to the functioning of an HDD, as SAs have no independent utility.[6]

███████████████████████████████████████████████████████████████████

██████████████████████████████.[7]

Throughout the Class Periods, Defendants NHK, TDK and HTI controlled well over 95% of the global production and sales of SAs.[8] Defendants (either themselves or through their affiliates) manufactured and sold SAs in the U.S. and elsewhere.[9] Defendants manufactured a substantial portion of the SAs during the Class Periods ████████████████████████████ ████████████████████████████████████████[10] ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████[11]

Contrary to Defendants' characterization, the distribution chain for SAs is not complex.[12] At the top of the chain are three HDD makers (*i.e.*, Seagate, Western Digital, and Toshiba) to

---

[2] The story of Defendants' worldwide conspiracy to fix prices and allocate markets for SAs is detailed in IPPs' respective complaints as well as their recently filed motions for class certification and accompanying expert reports, which IPPs incorporate herein. *See* EUPs' Complaint ¶¶ 130-185; Resellers' Complaint ¶¶ 59-71; EUPs' Class Cert Mtn. at 4-9; Resellers' Class Cert Mtn. at 11-15; and the accompanying expert reports of Dr. Janet Netz at 28-34 and Dr. Michael Williams ¶¶ 49-77. EUPs have filed an Unopposed Motion to Amend EUPs' Complaint, which, *inter alia*, seeks to extend the class period commensurate with the EUP Class Period defined herein.
[3] *See* Ex. 1 at 4.
[4] *See id.*
[5] *See* Ex. 2 at 1; Ex. 3 at 547.
[6] Ex. 4 (Ong Dep.) 402:9-12; Ex. 5 (Nagata Dep.) 271:24-272:4.
[7] Ex. 6 (Bell Dep.) 383:13-384:12; Ex. 7 (STX0249591-'9598) at '9591-9592, Ex. 8 (STX0076811-'6843) at '6822.
[8] Netz Decl. at 8; Netz Decl. Ex. 4; Ex. 9.
[9] *See* NHK Plea Agreement ¶ 4 (b); Okuma Decl. ¶¶ 8, 23; Misuta Decl. ¶¶ 3-7, 27.
[10] Netz Decl. at 20; Netz Decl. Ex. 15. This figure excludes protypes sold by Defendants.
[11] Defendants' data indicates the sale of ████████████████ directly into the U.S., including over ████████████. Netz Decl. at 38; Netz Decl. Ex. 18.
[12] Netz Decl. at 13; Netz Decl. Ex. 10.

1    which Defendants sold their SAs.[13] HDD makers in turn sold external HDDs directly to end-users

2    or Resellers, and sold bare HDDs directly to consumers, or to OEMs that incorporated them into

3    storage devices (e.g., EMC, NetApp, IBM) or computers (e.g., Acer, Dell, Lenovo).[14] These

4    finished goods were then sold to Resellers, and to EUPs either directly, or via Resellers, i.e.

5    distributors (e.g., Avnet, Arrow, Synnex), "big box" resellers (e.g., Best Buy, Staples, Costco), or

6    online merchants (e.g., Amazon, Dell, Newegg).[15] As a result, most SAs "travel through a few

7    levels" of a straightforward distribution chain before being purchased by IPPs.[16]

8    **II.    Defendants' Conspiracy Targeted the U.S. Market**

9           No matter the distribution channel, Defendants' price-fixing cartel expressly targeted the

10   U.S. market, and its effects were substantial and direct. Defendants knew their conspiracy would

11   impact U.S. commerce and intended that result.[17] Indeed, NHK admitted as much in its plea

12   agreement.[18]

13          Defendants' ████████████████, Seagate and Western Digital, were headquartered in

14   the U.S.[19] ████████████████████████████████████████████████████[20]

15

16   [13] Netz Decl. at 14; Netz Decl. Ex. 10; Williams Report, at ¶41.
     [14] Id. at 14-15; Ex. 10 at 3231; Williams Report ¶¶ 41, 46.

17   [15] Netz Decl. at 14-17; Williams Report ¶ 46.
     [16] Id. at 13; Netz Decl. Ex. 10.

18   [17] See, e.g., Ex. 11 (Ishiguro Dep.) 252:14-253:24; Ex. 12 (McHone Dep.) 311:21-312:8, 317:18-
     318:11; Ex. 13 (Misuta Dep.) 91:17-97:1, 187:10-15, 191:19-193:13; Ex. 14 (Drahos Dep.)

19   274:21-279:4; Ex. 15 (TDKHDD002056649-'6650) at '6649.
     [18] NHK Plea Agreement ¶ 4(c) & (d) ("During the relevant period, the conspiracy involved and

20   had a direct, substantial, and reasonably foreseeable effect on interstate and import trade and
     commerce."). Consistent with NHK Spring's guilty plea, the TDK Defendants applied for

21   leniency pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004
     ("ACPERA"). ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████

23   ███████████████ Ex. 16 at 1.
     Ex. 17 (Saika Dep.) 105:13-15.

24   [20] Ex. 12 (McHone Dep.) 22:14-27:24; Ex. 18 (Sanders Dep.) 399:18-406:11; Ex. 19 (Isom Dep.)
     386:13-387:11, 389:21-396:19; Ex. 20 (NHKI-M-00124116) at slide 7; Ex. 21 (Johnson Dep.)

25   40:25-42:13, 47:10-49:15. In addition to Seagate and Western Digital, Hitachi Global Storage
     Technologies, a former Hitachi subsidiary that made HDDs and was acquired by Western Digital,

26   was headquartered in San Jose, CA. See Press Release, Hitachi, Hitachi Establishes "Hitachi
     Global Storage Technologies," Taking a bold new Step for Storage Innovation (Jan. 6, 2003),

27   https://www.hitachi.com/New/cnews/E/2003/0106a/ (Last accessed October 10, 2022). Samsung
     Information Systems America Inc., which conducted R&D for HDDs was headquartered in San

28   Jose, CA. See Press Release, Samsung, Samsung Electronics Announces New Silicon Valley
     R&D Center (Sept. 19, 2012), https://www.businesswire.com

4



21

22

23

24

25

26

27

28

---

/news/home/20120919005456/en/Samsung-Electronics-Announces-New-Silicon-Valley-RD-Center (Last accessed October 10, 2022).

[21] Ex. 18 (Sanders Dep.) 55:6-9, 57:24-58:17, 406:18-407:20

[22] Ex. 4 (Ong Dep.) 23:1-9; Ex. 12 (McHone Dep.) 14:25-16:5, 22:14-27:24; Ex. 22 (Nass Dep.) 178:8-181:24, 223:19-224:10; Ex. 21 (Johnson Dep.) 40:25-42:13, 47:10-49:15; Ex. 23 (Harvey Dep.) 93:21-97:17; Ex. 24 (NHKI-M-00044912) at Slide 38; Ex. 25 (Otake Dep.) 67:19-72:20; Ex. 26 (Inami Dep.) 16:5-18:9, 21:10-15, 24:6-25:12, 65:13-22; Ex. 17 (Saika Dep.) 17:14-20:19, 369:1-370:15; Ex. 27 (NHKI-M-00022655-'2659) at '2656; Ex. 28 (Kiriya Dep.) 10:6-11:7, 31:1-7, 232:13-233:16, 234:18-235:13; Ex. 29 (Tsutsui Dep.) 71:23-74:7.

[23] Ex. 23 (Harvey Dep.) 89:3-93:9, 96:3-97:17, 307:4-11; Ex. 12 (McHone Dep.) 274:7-275:18, 282:18-283:22, 302:10-304:14; Ex. 25 (Otake Dep.) 67:19-72:20; Ex. 17 (Saika Dep.) 382:6-384:20; Ex. 30 (Pselos Dep.) 47:8-14, 123:20-125:2; Ex. 22 (Nass Dep.) 178:8-181:24.

[24] Ex. 31 (NHKS-M-00009680_EN).

[25] Ex. 32 (Dhawan Dep.) 26:12-29:16; Ex. 4 (Ong Dep.) 21:23-25:19, 30:4-16; Ex. 13 (Misuta Dep.) 293:13-294:6; Ex. 33 (Kamigama Dep.) 190:11-192:5; Ex. 34 (NHKI-M-00081021-'1022) at '1021.

[26] *See* Ex. 35 (TDKHDD006018641) at slide 72; Ex. 65 (Fujiwara Dep.) 321:2-322:24 (Fujiwara took regular trips to U.S. because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[27] Ex. 36 (Arimura Dep.) 234:22-235:15; Ex. 21 (Johnson Dep.) 111:10-113:16; Ex. 29 (Tsutsui Dep.) 97:4-100:3; Netz Decl. at 17-21; Netz Decl. Ex. 11; Ex. 37 (NHKS-M-01712717).

[28] *See, e.g.* Ex. 11 (Ishiguro Dep.) 273:1-274:14; Ex. 33 (Kamigama Dep.) 252:2-253:18, 371:21-374:21; Ex. 29 (Tsutsui Dep.) 165:12-169:4; Ex. 5 (Nagata Dep.) 300:7-24; Ex. 22 (Nass Dep.) 201:7-203:19; Ex. 13 (Misuta Dep.) 91:17-97:1, 187:10-188:15, 191:19-193:13.



1    ████████████████████████████████.[29]

2    ████████.[30]████████████████████████████████

3    ████████████████████████████████████

4    ████████████████████████[31]████████████

5    ████████████████████████████

6    ████████████[32] Defendants knew this not just because of their own efforts to pin

7    down the demand for SAs, they were directly informed by their customers. For example, ████

8    ████████████████████████████████████

9    ████████████████████████████████

10   ████████████████████[33]████████████

11   ████████████████████████████████████

12   ████████████████████████████████████

13   ████████.[34]

14   ████████████████████████████████████

15   ████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████[35] They leveraged these information exchanges and

18

19   [29] *See e.g.,* Ex. 21 (Johnson Dep.) 33:19-35:6, 106:16-111:25, 262:4-263:5 (U.S. demand for products containing HDDs helped determine demand for SAs); Ex. 32 (Dhawan Dep.) 150:7-153:19; Ex. 38 (TDKHDD002165567-'5568) at '5567; Ex. 26 (Inami Dep.) 256:5-257:20, 271:5-274:8; Ex. 39 (NHKS-M-00239447_EN); Ex. 33, (Kamigama Dep.) 240:6-11; Ex. 40 (TDKHDD0043034243 EN) at 1-3; Ex. 4, (Ong Dep.) 370:21-372:12. For a more fulsome description, *see* Netz Decl. at 18-20.

20

21

22   [30] Ex. 41 (TDKHDD003412331-'2334) at '2332-2333; Ex. 26 (Inami Dep.) 322:15-326:9; Ex. 22 (Nass Dep.) 203:21-207:22.

23   [31] Ex. 42 (TDKHDD002730557) at '0557; Ex. 14 (Drahos Dep.) 271:1-275:25; Ex. 23 (Harvey Dep.) 43:22-47:12.

24   [32] Ex. 36 (Arimura Dep.) 202:12-21; Ex. 43 (NHKS-M-02412053) at 1-3; Ex. 26 (Inami Dep.) 264:8-24; Ex. 33 (Kamigama Dep.) 259:7-260:16; Ex. 18 (Sanders Dep.) 415:9-416:5.

25   [33] Ex. 44 (Floeder Dep.) 465:4-470:6.

     [34] Ex. 30 (Pselos Dep.) 158:15 161:23; Ex. 45 (TDKHDD004099808-'9809) at '9808; Ex. 18 (Sanders Dep.) 411:17-416:5, 442:1-444:23; Ex. 46 (NHKI-M-00032110) at 5.

26   [35] NHK Plea Agreement ¶ 4(e); s*ee also, e.g.* Ex. 23 (Harvey Dep.) 273:13-276:19 (Richard "Skipp" Harvey, the Vice President and General Manager of NHK Spring's San Jose office, ████████

27   ████████████████████████████); Ex. 47 (TDK Rog Resp. No. 1) (showing hundreds of meetings between competing SA manufacturers, including dozens of meetings between Mr. Harvey and employees of HTI or a TDK affiliate); Ex. 48 (NHK Rog. Resp. No. 1) (same); Ex. 28 (Kiriya Dep.) 111:19-116:10 (████████████████████

28

1    agreements with competitors to inform their respective negotiations with HDD manufacturers,

2    making use of such information as pricing proposals and bid-pricing, allocation volumes,

3    customer demand, manufacturing capacity, utilization rates, and product design development,

4    among other things.[36] The evidence shows that Defendants were well aware that their price-fixing

5    cartel was in violation of U.S. antitrust laws, and that they took steps to conceal their actions.[37]

6    With their combined effect, these successful conspiratorial efforts translated to a direct and

7    targeted impact on commerce in the United States, felt as increased prices for HDDs and the

_____

[blacked out]: Ex. 49 (NHKI-M-00072474-'2477) at '2475 ([blacked out]); Ex. 50 (NHKI-M-00119495-'9497) at '9495; Ex. 26 (Inami Dep.) 168:7-172:12, 173:1-175:20 ([blacked out]; Ex. 51 (NHKI-M-00070912-'0915) at '0914 [blacked out]); Ex. 52 (NHKI-M-00101565-'1570) ([blacked out]); Ex. 4 (Ong Dep.) 304:11-306:25; Ex. 53 (TDKHDD000002047-'2048) at '2047-2048 (August 7, 2008 email in which MPT's Ken Martini requests and receives NHK's shipment totals from Skipp Harvey); Ex. 12 (McHone Dep.) 38:14-42:3 (testifying that members of the U.S. based MPT sales team exchanged pricing information with HTI's Keith Johnson based in Minnesota and NHK's Skipp Harvey); Ex. 54 (TDKHDD000004639-'4641) at '4639-4641 (December 16, 2006 emails from MPT's Albert Ong and Todd Drahos relaying pricing and allocation information from HTI and NHK for use in Seagate negotiations); Ex. 55 (TDKHDD002167294-'7297) at '7296 (email from Creighton Burrows, sales associate at HTI, discussing pricing information he obtained from Todd Drahos, Director of Seagate account at MPT); Ex. 56 (NHKI-M-00425471-'5487) at '5481 [blacked out]").

[blacked out] NHK Plea Agreement ¶ 4(c); Ex. 17 (Saika Dep.) 265:24-273:17 and Ex. 57 (NHKI-M-00183356_EN) at '3356_EN-3357_EN [blacked out]; Ex. 13 (Misuta Dep.) 222:2-231:19 (testifying to a 2008 discussion between MPT's U.S. based sales team and NHK regarding the price, product cost, and future shipment volumes of a Western Digital suspension program that would violate TDK's antitrust compliance policy) and Ex. 58 (TDKHDD000005269-'5280) at '5270-71.

[37] Ex. 64 (NHKS-M-01911692-'1699; NHKS-M-01911692_EN-'1699_EN) at '1694_EN (September 5, 2016 email from [blacked out]; Ex. 4 (Ong Dep.) 301:4-302:23 (testifying that after sending an email to colleagues at MPT to report on competitor information provided by NHK, he instructed those colleagues to delete the email because "[Ong] didn't want to keep it on record") and Ex. 59 (TDKHDD002708320) at '8320 (Albert Ong instructs recipients to delete email as it contains information from NHK.); *See also* Ex. 60 (NHKS-M-00019637-'9460) at '9637-9368 [blacked out].

1   products that contain them.[38] The expert reports of Drs. Janet Netz and Michael Williams

2   demonstrate that all or nearly all of the overcharge passed-through to IPPs' purchases.[39]

3   Defendants' unlawful conduct therefore had a direct, substantial and reasonably foreseeable effect

4   not only on their direct customers, but also on the Resellers and EUPs of devices containing their

5   products.

6   **ARGUMENT**

7   **I.      APPLICABLE LEGAL STANDARDS**

8            Defendants, as the moving parties, have both the initial burden of production and the

9   ultimate burden of persuasion on this Motion. *See Nissan Fire & Marine Ins. Co. v. Fritz*

10  *Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). To carry their burden, Defendants must

11  produce either evidence negating an essential element of IPPs' claims or show that IPPs do not

12  have enough evidence to carry their ultimate burden of persuasion at trial. *Id*. Defendants may not

13  require IPPs to produce evidence supporting their claims by saying that they have no such

14  evidence. *Id.* at 1105. In deciding a summary judgment motion, the Court must view the evidence

15  in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.

16  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

17  **II.     THE FTAIA DOES NOT BAR IPPS' CLAIMS**

18           The FTAIA excludes from the Sherman Act's reach "only foreign injury." *Empagran*, 542

19  U.S. 155 at 158. It generally places all (non-import) activity involving foreign commerce outside

20  the Sherman Act's reach, then brings such conduct within the Act's reach so long as the conduct

21  meets the domestic effects exception. *Id*. at 162. The statute "boils down to two principles. First,

22  the Sherman Act applies to import trade or import commerce with foreign nations . . . . Second . .

23  . the Sherman Act does not apply to nonimport trade or commerce with foreign nations, unless the

24  domestic effects exception is met." *Hsiung*, 778 F.3d at 751.

25           No court—either in the Ninth Circuit or in any other circuit—has ever accepted

26  _____

27  [38] IPPs' experts have conducted analyses of Defendants' SA sales and cost data and that of HDD
    and finished product makers, and determined the changes in SA prices relate directly to changes
    in retail prices of HDDs and Computers in the U.S. *See, e.g.*, Netz Decl. at 78-87.

28  [39] Netz Decl. at 60-87, 93-102 (100% of the overcharge was passed-on to indirect purchasers);
    Netz Decl. Exs. 31. 32; Williams Report, at 79, Table 3.

8

1    Defendants' erroneous reading of the FTAIA and its case law. Defendants' construction of the

2    FTAIA would create gaping holes in enforcement of the antitrust laws. Specifically, indirect

3    purchasers—who courts recognize suffer the real harm in a price-fixing conspiracy—would have

4    no remedy in the vast majority of cases, and potential foreign price-fixers would have a roadmap

5    for immunity from U.S. antitrust liability, despite engaging in a conspiracy that involves import

6    commerce and has a "direct, substantial, and reasonably foreseeable" effect on the U.S. 15 U.S.C.

7    § 6a. This was not Congress's intent in drafting the FTAIA. *See, e.g., In re TFT-LCD (Flat Panel)*

8    *Antitrust Litig.,* 822 F.Supp.2d 953, 964 ("*TFT-LCD*") (N.D. Cal. 2011) (Defendants' position

9    would exclude from the antitrust laws' "reach a significant amount of anticompetitive conduct

10   that has real consequences for American consumers."). Counsel is unaware of a single price-

11   fixing case—and Defendants have pointed to none—where purchasers of a price-fixed product in

12   the U.S. were barred by the FTAIA from bringing antitrust or consumer protection claims.

13              **A.     Defendants' Arguments are Contrary to Ninth Circuit Precedent**

14              In *Hsiung*, the Ninth Circuit rejected an argument strikingly similar to the one made by

15   Defendants here and held that the U.S. antitrust laws apply even where conspirators first sold a

16   price-fixed component abroad that was later sold in the U.S. as part of a finished product. 778

17   F.3d at 756. The defendants argued that the FTAIA barred application of the antitrust laws

18   because the price-fixing conduct occurred overseas and the bulk of the component parts (*i.e.*,

19   panels) were sold to overseas third-parties, who incorporated the panels into finished products,

20   such as televisions and mobile phones, that were ultimately imported to the U.S. by non-

21   defendants and resold to U.S. consumers. Like here, defendants argued that such commerce "is

22   too attenuated from the United States and that the intervening development, manufacture [of

23   finished products by overseas third-parties incorporating the price-fixed component], and sale of

24   the products worldwide resulted in a diffuse effect." *Id*. at 758. The Ninth Circuit disagreed and

25   found that the foreign sale of the price-fixed panels did not bar application of the antitrust laws. It

26   further held that "the impact on the United States market [from such sales] was direct and

27   followed 'as an immediate consequence' of the price fixing." *Id*. at 759. In *TFT-LCD*, Judge

28   Illston found similarly, holding that even where there were ***seven layers*** in the distribution chain,

1   many of which were purely foreign, purchasers of end products in the U.S. were not barred by the

2   FTAIA. *See* 822 F.Supp.2d at 964. As discussed below, every court to consider Defendants'

3   argument has rejected it.

4   **B.    IPPs' Claims Arise from Import Commerce**

5          As multiple courts have correctly concluded, IPPs' claims here occurred as part of

6   "import" commerce, and thus they are not subject to the FTAIA at all. It is undisputed that each

7   and every IPP purchased its finished product in the U.S. Defendants attempt to avoid the "import"

8   commerce exclusion by narrowly reading it: they contend it must be the Defendant itself that does

9   the importing and that Defendants' activities cannot be found to constitute import commerce

10  where "multiple layers of commerce exist between" Defendants' unlawful conduct and IPPs'

11  injury. Defs' Mtn for S.J. at 18-19.[40] Defendants' contention is contrary to substantial controlling

12  law on the issue, including from the Ninth Circuit itself. *See Hsiung*, 778 F.3d at 756 ("[T]hat

13  [defendant] was not an 'importer' misses the point.").[41] As the foregoing makes clear, because

---

[40] Tellingly, Defendants concede that SAs "incorporated into bare or external HDDs sold by HDD manufacturers to direct purchases in the U.S" are not subject to the FTAIA. Defs.' Mtn. for S.J. at 19.

[41] *See also In re Capacitors Antitrust Litig. (No. III)*, No. 17-md-02801, 2018 WL 4558265, at *5 (N.D. Cal. Sept. 20, 2018) ("*Capacitors III*") (denying summary judgment and finding import exclusion may be satisfied where defendant sold price-fixed component abroad and plaintiff purchased finished product containing price-fixed component in the U.S.); *In re Optical Disk Drive Antitrust Litig*, No. 10-md-2143-RS, 2017 WL 11513316 at *4 (N.D. Cal. Dec. 18, 2017) *("ODD")* (denying summary judgment and finding import exclusion applied "despite the complicated global manufacturing supply chain" where plaintiffs proffered evidence that defendants' anticompetitive conduct was directed at import commerce); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2016 WL 5725008, *4 (N.D. Cal. Sept. 30, 2016) ("*CRTs*") ("it is not necessary that a conspirator itself have physically imported the price-fixed good itself directly into the United States . . . . It is sufficient that the [plaintiffs] imported finished products *containing* price-fixed CRTs."); *Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207RAJ, 2014 WL 4718358 at *3(W.D. Wash. Sept. 22, 2014) ("Costco's purchases from foreign conspirators of finished products containing price-fixed panels are import commerce, regardless of the supply chain that brought the finished product to the conspirator who made the sale"); *id.* at * 4 ("provided the price-fixed product ultimately moved from a member of the conspiracy to a United States customer, the conspirators have engaged in import trade regardless of prior movement of the price-fixed product in foreign commerce among the conspirators."); *In re TFT-LCD (Flat Panel) Antitrust Litig., Nokia Corp. et al. v. AU Optronics Corp.*, Nos. M 07-1827 SI, No. C 09-5609 SI, 2012 WL 3763616, at *2 (N.D. Cal. Aug. 29, 2012*)* (denying summary judgment where LCDs were shipped to the United States, transferred to Mexico, and then, following assembly, returned to the United States for sale); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775JGVVP, 2008 WL 5958061, at *14 (E.D.N.Y. Sept. 26, 2008), *report and recommendation adopted in part*, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009), *aff'd*, 697 F.3d 154 (2d Cir. 2012) (rejecting the contention that the import commerce exclusion should be read "narrowly to include only anticompetitive conduct that fixes prices on

10

1  IPPs purchased their goods in import commerce and because the FTAIA excludes claims based

2  on conduct "involving import commerce," Defendants' motion must be denied.

3  Moreover, as made clear in *Hsiung* and its progeny, any civil claims regarding a

4  conspiracy that took place in part in import commerce—as this conspiracy did—qualifies all of

5  the commerce at issue in the case as import commerce. In other words, because Defendants

6  indisputably engaged in some import commerce[42], even Defendants' sales to foreign purchasers

7  qualify as import commerce. *See e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 3:10-CV-

8  03205-SI, 2014 WL 4652126 (N.D. Cal. Sept. 18, 2014) ("*TracFone*") (because the conspiracy's

9  intent… was to "'suppress and eliminate competition' by fixing prices" of products sold in the

10  United States, defendants' conduct was not subject to the FTAIA); *In re: TFT-LCD (Flat Panel)*

11  *Antitrust Litig.;* Order re: Defendants Joint Motion to Dismiss Proview's Third Amended

12  Complaint, Dkt. 76 at 2 [attached as Ex. 61 to Reiss Decl.] ("[I]t is not the plaintiff's 'purchases

13  that determine whether the FTAIA applies; rather it is defendants' conduct – the same conduct

14  that the Ninth Circuit held constituted import trade in *Hsiung*,' and was therefore outside of the

15  scope of the FTAIA.").

16  ████████████████████████████████████████████

17  ██████████████.[43] Substantial evidence, including NHK's guilty plea, demonstrates that

18  Defendants' conspiracy targeted the U.S. For instance, record evidence demonstrates: (1) The

19  design, development, marketing and procurement offices of Defendants' top two customers were

20  located in the U.S;[44] ██████████████████████████████████████

21  ████████████████████████████[45] ████████████████████

22  ████████████████████████████████████████████

23

24  imported goods"); *In re Vitamin C Antitrust Litig., Animal Science Prods., Inc. v. Hebei Welcome*
   *Pharm Co.,* 904 F.Supp.2d 310, 317 (E.D.N.Y. 2012) (the import exclusion "does not require that

25  the defendants function as the physical importers of goods.") (internal citations and quotations
   omitted).

26  [42] Defendants admit to selling millions of dollars of SAs into the U.S. *See, e.g.,* NHK Plea
   Agreement at ¶4(b); Misuta Decl. ¶ 27. Moreover, Defendants' sales data shows they shipped

27  $10.1 million of SAs directly into the U.S. during the EUP Class Period. Netz. Decl. at 34.
   [43] *See supra* n.10.

28  [44] *See supra* n.20.
   [45] *See supra* n.22.

1   ███████████████████████████████████████ [46]

2   ███████████████████████████████████████ [47]

3   ███████████████████████████████████████

4   ███████████████████████████████████████

5   ███████████████████ [48] ████████████████████

6   ███████████████████████████████████████

7   ████████████████████████ [49] In short, the evidence demonstrates that Defendants

8   acted with the knowledge and intent that the SAs they manufactured and sold would enter the

9   U.S.

10          Moreover, NHK pled guilty to (a) participating in a conspiracy, "the primary purpose of

11   which was to fix the prices of suspension assemblies sold in the United States and elsewhere"; (b)

12   "reach[ing] agreements to refrain from competing on prices for, fix the prices of, and allocate

13   their respective market shares for, HDD suspension assemblies to be sold in the United States and

14   elsewhere"; (c) "effectuat[ing] these agreements [by] . . . exchang[ing] HDD suspension

15   assemblies pricing information, including anticipated pricing quotes in the United States and

16   elsewhere; (d) rely[ing] on their agreements not to compete and us[ing] the exchanged pricing

17   information to inform their negotiations with U.S. and foreign customers that purchased HDD

18   suspension assemblies and produced hard disc drives for sale in, or delivery to, the United States

19   and elsewhere; (e) "[a]cts in furtherance of this conspiracy [that] were carried out within the

20   United States and the Eastern District of Michigan"; and (f) "[c]ommunications made in

21   furtherance of the conspiracy and memorializing the conspiratorial meetings and discussions were

22   transmitted through and stored on the servers located in [the Eastern District of Michigan] and

23   operated by NHK's U.S. subsidiary, which was headquartered in [the Eastern District of

---

[46] *See supra* n.23.
[47] *See supra* n.23; Ex. 26 (Inami Dep.) 317:23-322:6; Ex. 62 (NHKS-M-01707345-'7348) at '7346.
[48] *See supra* nn.29-33.
[49] *See supra* n.35.

1    Michigan." NHK Plea Agreement ¶ 4 (c) and (e).[50]

2    　　Multiple courts in this district have held that the above-described facts satisfy the import

3    exclusion. *Capacitors III*, 2018 WL 4558265, at *5 (following *Hsiung's* lead that "import trade"

4    applies to defendants "whose 'conduct is directed at a U.S. import market,' even if the defendants

5    did not engage in importation of products into the United States"); *ODD*, 2017 WL 11513316, at

6    *4 (noting that the Ninth Circuit has never rejected a targeting theory, the court considered all of

7    the above factors and found that a genuine issue of material fact existed as to whether the

8    FTAIA's import exclusion applied).[51]

9    　　Defendants contend that, contrary to case law in this District, import commerce must be

10   cabined to instances in which plaintiffs purchase directly from foreign defendants because to hold

11   otherwise would improperly conflate import commerce with the FTAIA's "domestic effects"

12   exception, thus ***rendering*** the "domestic effects exception" superfluous. Defs' Mtn for S.J. at 17,

13   19. Not so. As the case law demonstrates, there are frequent instances in which a plaintiff may

14   successfully invoke the domestic effects exception and not the import commerce exclusion. *See,*

15   *e.g., Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188 (N.D. Cal. 2019) (holding

16   that the complaint plausibly alleged that the rules by the international governing body for

17   Olympic water sports satisfied domestic effects exception where no sales took place in the U.S.);

18   *United States v. Anderson*, 326 F.3d 1319, 1330 (11th Cir. 2003) (holding that there was

19   sufficient evidence that the bid rigging in USAID programs satisfied domestic effects exception

20   where no products were imported into U.S.).

21   　　**C.　　The Domestic Effects of the Conspiracy Give Rise to IPPs' Claims**

22   　　Even if the Court were to adopt a narrow definition of import commerce, IPPs satisfy the

23   FTAIA, which does not apply to international cartels (1) having a "direct, substantial, and

24   reasonably foreseeable effect" on the U.S.; and whose conduct (2) "gives rise to a claim" under

25   U.S. law. 15 U.S.C. § 6a (1)-(2). The evidence is overwhelming that IPPs' claims meet this

26   

---

27   [50] TDK admitted that it participated in the conspiracy and that the conspiracy affected U.S. commerce when it applied for leniency with the DOJ on behalf of itself and its subsidiaries. Ex. 16 at 1.

28   [51] To the extent relevant, IPPs have adduced ample evidence that SAs have no use other than as a component of an HDD. *See* Exs. 4 (Ong Dep.) 402:9-12, 5 (Nagata Dep.) 271:24-272:4.

13

1    standard. At the very least, the record presents disputed questions of material fact. In their motion,

2    Defendants do not dispute that their conduct had a reasonably foreseeable effect on domestic

3    commerce. Instead, Defendants distort case law and omit critical facts to argue that as indirect

4    purchasers, IPPs cannot raise genuine issues of material fact as to "direct" and "substantial"

5    effects flowing from Defendants' unlawful conduct and that such effects gave rise to IPPs' injury.

6    **1.    Defendants' Anticompetitive Conduct Had a Direct Effect on U.S. Commerce**

7         Rejecting an argument analogous to the one Defendants make here (*i.e.,* that an arguably

8    complex chain of distribution renders the injury suffered by a domestic purchaser insufficiently

9    direct to invoke the FTAIA's domestic effects exception), the Ninth Circuit held in *Hsiung* that

10   the domestic effects exception can apply (and indeed did) even where defendants first sold a

11   price-fixed component abroad that was later sold in the U.S. as part of a finished product.  If the

12   evidence shows that the prices paid in the U.S. for the finished product "follows as an immediate

13   consequence of the defendant[s']" price-fixed foreign sales, the direct effects prong of the

14   domestic effects test is met. *Hsiung*, 778 F.3d at 758 (quoting *United States v. LSL Biotechs.*, 379

15   F.3d 672, 680-81 (9th Cir. 2004)). The decision in *Hsiung* interpreted and applied the "immediate

16   consequence" explication of the direct effects test stated in *LSL Biotechs*, the case relied on by

17   Defendants, and rejected the same argument Defendants make here. *Hsiung*, 778 F.3d at 758-59.

18        On strikingly similar facts to those present in this case, Judge Illston's FTAIA decision in

19   *TFT-LCD*– addressing claims made by indirect purchaser plaintiffs – interpreted *LSL Biotechs* the

20   same way as the Ninth Circuit did in *Hsiung* and reached the same conclusion. *TFT-LCD,* 822 F.

21   Supp. 2d at 959-67. The court found that the impact on U.S. consumers was an "immediate

22   consequence" of defendants' conspiracy even though there were ***seven*** "possible steps" between

23   foreign manufacturing by defendants and the domestic purchases of the finished product by the

24   indirect purchaser plaintiffs. *Id.* at 961-62, 964. Specifically, the court held that where the illegal

25   overcharge of a component of a finished product is "passed-on" in the form of overcharges paid

26   by U.S. consumers for that finished product, the effect is an "'immediate consequence' of the

27   defendant's anticompetitive behavior" because it has "'proceeded without deviation or

28

1  interruption'" from the defendant "manufacturer to the American retail store." *Id.* at 964 (*quoting*

2  *LSL Biotechs*, 379 F.3d at 680).[52]

3       Defendants here argue that because there were six or seven transactions between

4  Defendants' initial sale and IPPs' purchase, IPPs cannot recover as a matter of law. Defs.' Mtn

5  for S.J. at 21-22.[53] The *TFT-LCD* court correctly rejected this argument, explaining that "an

6  effect does not become 'indirect' simply because the American OEMs use a complex

7  manufacturing process." 822 F. Supp. 2d at 964.  That decision squares with the Ninth Circuit's

8  holding in *Hsiung* and other courts in this District have held similarly.[54]

9       Like in *TFT-LCD*, IPPs' experts, Drs. Janet Netz and Michael Williams, have

10  exhaustively demonstrated through extensive pass-through empirical work that the overcharge

11  was an "immediate consequence of" Defendants' conspiracy, positively passed through to IPPs in

12  the U.S., and did so at a high rate.[55] IPPs' unrebutted[56] empirical evidence shows that no

13  intervening events broke the direct economic relationship between the overcharge associated with

14  Defendants' initial sale of price-fixed SAs and the final price class members paid in the U.S.

15

16

17  [52] *Biocad JSC v. F. Hoffmann-La Roche*, an out-of-circuit case cited by Defendants, is readily
distinguishable. The immediate effect of the conduct in that case was to impair Biocad's ability to

18  compete in the Russian market for a product that it did not yet sell in the U.S. market and thus
any effect was "remote and speculative." 942 F.3d 88, 95, 100 (2d Cir. 2019).

19  [53] As set forth, *supra* n.12, the chain of distribution from Defendants to IPPs was not nearly as
complex as Defendants suggest.

20  [54] *Hsiung,* 778 F.3d at 759-60; *see also ODD,* 2017 WL 11513316, at *5 (rejecting the argument
that the eventual sale of the finished product is too far removed from the anticompetitive

21  conduct); *CRTs*, 2016 WL 5725008, at *4-5 (holding that multiple-step distribution chains do not
make an effect indirect).

22  [55] Netz Decl. at 100-102 (Pass-through of the overcharge to IPPs was 100%); Williams Report, at
79, Table 3; *see TFT-LCD*, 822 F. Supp. 2d at 966-67 (direct effects' prong satisfied where

23  indirect purchaser plaintiffs evidenced "domestic injury that is concrete and quantifiable" and
"directly traceable back to the defendants' anticompetitive conduct"); *see also Hsiung,* 778 F.3d at

24  759; *Costco Wholesale Corp.,* 2014 WL 4718358, at *6 (increased cost of component may have
direct or indirect effect on price of finished product, and as plaintiff planned to introduce

25  evidence that impact was direct, summary judgment was inappropriate because "there is no basis
to stop [plaintiff] from attempting to [prove that] at trial").

26  [56] Defendants did not submit any evidence in their motion suggesting that the overcharge was not

27  passed-on to IPPs and are not permitted to do so for the first time in their reply, a fact which
Defendants concede in their recent filing. *See* Defs' Opp. to Adm. Mtn at 2 (collecting cases)

28  (reply briefs should not be "an opportunity to introduce new arguments, analysis, law, or facts
that should have been more properly raised in their opening motions").

15

1    Defendants observe that in *Hsiung* and *CRTs*, the courts concluded that the "alleged

2  domestic effect 'was neither speculative nor insulated by multiple disconnected layers of

3  transactions'" based on their finding that "the component part[s] at issue [were] a substantial cost

4  component of the finished products." Defs.' Mtn for S.J. at 20 (*quoting CRTs*, 2016 WL 5725008,

5  at *5). As an initial matter, IPPs have proffered evidence that SAs do comprise a substantial

6  portion of the cost of HDDs, which in turn comprise a substantial portion of the cost of products

7  purchased by IPPs. (supra at n.7). More importantly, neither of the cases cited by Defendants hold

8  that the cost of the component in relation to the cost of the finished product is dispositive in

9  determining whether plaintiffs' injury was direct. Defendants fail to cite a case for this

10  proposition, presumably because none exist. In any event, as explained above, IPPs here have

11  submitted unrebutted expert evidence demonstrating that the overcharge suffered by class

12  members "was neither speculative nor insulated by multiple disconnected layers of transactions."

13    **2.    Defendants' Anticompetitive Conduct Had a Substantial Effect on U.S.**
14         **Commerce**

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████ [57] Defendants do not dispute that they sold tens of millions

18  of dollars in SAs that were incorporated into standalone HDDs sold in the U.S. and that their

19  anticompetitive conduct relating to these SAs had a direct, substantial and reasonably foreseeable

20  effect on U.S. commerce.[58] Based on this evidence, Defendants' anticompetitive conduct

21  undeniably had a substantial effect on U.S. commerce.

22    Grasping at straws, Defendants argue that their anticompetitive conduct could not have a

23  substantial effect on U.S. commerce because SAs make up a relatively small portion of the

24  finished products that IPPs purchased. No court has held such and the cases that Defendants cite

25  are either wholly irrelevant or undermine rather than support their position.[59]

26

27  [57] *See supra* nn.10, 11.
   [58] *See* Defs.' Mtn for S.J. at 9; Ex. 63 (Sentencing Memo); *supra* n.18.
28  [59] Moreover, this argument is belied by the admission in NHK's plea agreement that "HDD
   suspension assemblies and certain hard disk drives incorporating affected HDD suspension

16

1    *Hsiung*, cited by Defendants, did not address the "substantial" prong of the domestic

2    effects exception. 778 F.3d at 758 ("As an initial matter, the parties acknowledge that the conduct

3    was both substantial and had a reasonably foreseeable impact on United States commerce."). And

4    while the Ninth Circuit in *Hsiung* did observe that the cost of LCD panels comprised a substantial

5    portion of the cost of the finished products sold in the U.S., it did so in the context of determining

6    that the effect of defendants' anticompetitive conduct on the U.S. was sufficiently direct. *Id.* at

7    758-59. Here, for the reasons set forth *supra*, IPPs' unrebutted evidence does the same.

8        Defendants' reliance on *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th

9    Cir. 2015) is similarly unavailing. Like *Hsiung*, that case did not address the substantiality prong

10   of the domestic effects exception. *Motorola,* 775 F.3d at 819 ("We'll assume that the requirement

11   of a direct, substantial, and reasonably foreseeable effect on domestic commerce has been

12   satisfied."). As the Ninth Circuit in *Hsiung* explained, *Motorola* merely involved the application

13   of the Supreme Court's *Illinois Brick* doctrine that indirect purchasers may not sue for damages

14   under the federal antitrust laws. *See Hsiung,* 778 F.3d at 760 *(citing Illinois Brick Co., v. Illinois,*

15   431 U.S. 720 (1977)).[60] That issue is not present in this case.[61]

16       And while the Seventh Circuit did speculate whether Motorola had demonstrated any

17   injury from its lost profits damages theory, such speculation was based on the "dearth of evidence

18   from which to infer actual harm to Motorola." *Motorola,*775 F.3d at 821, 823 (holding that

19   "Motorola waived in the district court any argument that it could base damages on the effect of

20   the cartel's pricing of components on the cost to Motorola of [finished products] incorporating

21

22   assemblies traveled in, and ***substantially affected***, interstate and import trade and commerce."
     NHK Plea Agreement ¶ 4(d) (emphasis added).

23   [60] Motorola sought recovery under the Sherman Act for the price-fixed purchases of LCDs by its
     separate corporate foreign-subsidiaries, which then resold the products to Motorola itself in the

24   United States. *Motorola*, 775 F.3d at 818. Motorola attempted to argue that it and its foreign
     subsidiaries operated as a "single-enterprise" such that the foreign-subsidiaries' purchases should

25   be considered Motorola's purchases. The court reasoned that the "antitrust laws are not to be used
     for injury to foreign customers" (*id.* at 820) and "[t]he parent [i.e., Motorola] has no right to seek

26   relief on their behalf in the United States." *Id.*.
     [61] In its First MTD Order, the Court granted Defendants' motion to dismiss IPPs' federal damages

27   claims, which is subject to challenge on appeal. *Id.* at 9-10.  As IPPs predicted in the briefing
     leading up to that ruling, Defendants are attempting to avoid virtually all liability in the United

28   States by positing that the *Illinois Brick* doctrine bars IPPs from recovering damages under
     federal law while the FTAIA bars their state claims. The Court should reject such efforts.

17

1    those components."). Here, unlike Motorola, IPPs' theory of injury is based on unrebutted

2    evidence that Defendants' unlawful overcharge was passed-through to them. *Compare Motorola*,

3    775 F.3d at 824 (Motorola's damages expert "made no attempt to estimate the increase in the

4    price paid by Motorola for finished cellphones . . . Motorola even refused to respond to one of

5    Defendants' requests for an admission by saying: 'Motorola is not basing its claims on the

6    purchase of finished LCD products [i.e., cell phones].'" Put simply, *Motorola* has no application

7    to the FTAIA's substantiality prong, Motorola proceeded on an entirely different damages theory

8    than IPPs here, and unlike IPPs, Motorola submitted a "dearth" of evidence supporting its

9    damages theory.[62]

10              **3.    IPPs' Claims Arise from the Domestic Effect of Defendants'
                        Anticompetitive Conduct.**

11           IPPs present evidence showing that all or nearly all of Defendants' overcharge was

12   passed-on to IPPs.[63] It is well recognized that such evidence sufficiently demonstrates that the

13   Defendants' conduct proximately caused IPPs' antitrust injury. *See Hsiung*, 778 F.3d at 759 ("It

14   was well understood that substantial numbers of finished products were destined for the United

15   States and that the practical upshot of the conspiracy would be and was increased prices to

16   customers in the United States"); *CRTs,* 2016 WL 5725008, at *5.

17           Without citation to a single authority, Defendants posit that their anticompetitive conduct

18   cannot give rise to IPPs' claims because the finished products containing Defendants' price-fixed

19   SAs purchased by IPPs are in a different market than SAs. No court has ever held such and for

20   good reason. If Defendants' interpretation were correct, the FTAIA, a federal statute, would

21   effectively nullify state laws permitting businesses and consumers to recover for precisely the

22   type of injury that occurred here. But the Supreme Court expressly rejected this proposition. *See*

23

---

24   [62] The other cases cited by Defendants are similarly inapposite. *See Minn-Chem, Inc. v. Agrium,
     Inc.*, 683 F.3d 845, 856 (7th Cir. 2012) ("There is little dispute that the Complaint has alleged
25   substantial effects: The Complaint alleges that 5.3 million tons of potash were imported into the
     United States in 2008 alone, and the Complaint elsewhere asserts that the vast majority of these
26   imports came from the defendants."); *Prevent DEV GmbH v. Adient PLC*, No. 20-cv-13137, 2021
     WL 5585917, at *17 (E.D. Mich. Nov. 30, 2021) (analyzing only the "gives rise to" element of
27   direct effects prong); *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009
     (N.D. Ill. 2001) (finding there was no domestic effect because the chemical was not sold in the
28   United States and plaintiffs did not intend to sell the chemical in the United States).
     [63] Netz Decl. at 60-87, 93-102; Williams Report at 79, Table 3.

1    *California v. ARC America Corp.*, 490 U.S. 93, 101-02 (1989) (holding indirect purchasers may

2    recover for damages under state law despite prohibition under federal law because Congress "has

3    not pre-empted the field of antitrust law." Rather, "the federal antitrust laws . . . supplement, not

4    displace, state antitrust remedies.").[64][65]

5        Because IPPs present evidence that Defendants' overcharge was passed-onto them, a

6    genuine issue of material fact exists as to whether Defendants' anticompetitive conduct gives rise

7    to IPPs' claims.

8    ### III.     THE DORMANT COMMERCE CLAUSE HAS NO APPLICATION HERE

9        It is well-settled that the dormant Commerce Clause does not bar IPPs' claims here. As

10    the Ninth Circuit held, the "the Supreme Court has made clear that neither the Sherman Act nor

11    the Commerce Clause preempts state antitrust laws." *Knevelbaard Dairies v. Kraft Foods, Inc.*,

12    232 F.3d 979, 993-4 (9th Cir. 2000) (citing *ARC America*, 490 U.S. 93) (upholding Cartwright

13    Act claims involving a conspiracy conducted out-of-state because the milk at issue was purchased

14    "in California . . . at prices artificially depressed by their combination in restraint of trade.").

15        Defendants baldly assert that IPPs' state claims are barred by the dormant Commerce

16    Clause because "[a]ll of the commerce underlying [IPPs'] damages claims that they assert was

17    restrained by Defendants' alleged conduct . . . is foreign." Defs.' Mtn for S.J. at 13. If accepted,

18    Defendants' radical argument would render every state antitrust and consumer protection law

19    unconstitutional to the extent they allow an in-state consumer to seek relief against an upstream

20    out-of-state seller which sold the price-fixed product in an out-of-state transaction.[66]

---

[64] Defendants assume, without support, that the FTAIA applies to state antitrust and consumer protection claims even though the statute only expressly applies to the Sherman Act on its face. IPPs do not concede that their claims are subject to the FTAIA.

[65] As discussed *infra*, at 23, Defendants' argument is also contrary to the Court's Second MTD Order, which expressly rejected Defendants' argument that IPPs' claims must be dismissed where the products purchased by IPPs (finished products containing SAs) are in a different market than the product sold by Defendants (SAs). Second MTD Order at 14.

[66] It bears emphasizing that Defendants are unable to cite a single antitrust price-fixing case where a court declined to apply state antitrust and consumer protection laws to a conspiracy affecting the residents of those states, simply because the initial sale of the price-fixed product took place outside the state. To the contrary, multiple courts in this District have certified classes alleging state antitrust and consumer protection claims against foreign defendants on these facts. *See e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 267 F.R.D. 583 (N.D. Cal. 2010*), amended in part,* 2011 WL 3268649 (N.D. Cal. July 28, 2011); *In re Optical Disk Drive Antitrust Litig.*, 10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016).

19

1     Defendants rely heavily on the majority opinion in *Association for Medicines v. Frosh*,

2   887 F.3d 664 (4th Cir. 2018) to support their meritless argument. Defs.' Mtn for S.J. at 14. As an

3   initial matter, *Frosh* is a divided out-of-circuit opinion subject to a vigorous dissent and is not

4   binding on this Court. Moreover, the majority's decision in *Frosh* was animated by its concern

5   that the price gouging state statute at issue there effectively and impermissibly served as a price

6   control on out-of-state transactions. 887 F.3d at 672[67]. Defendants have made no such arguments

7   with respect to the state statutes asserted here, nor could they. To the extent *Frosh* stands for the

8   proposition that a state law runs afoul of the dormant Commerce Clause whenever it regulates the

9   price of an out-of-state transaction (dubbed the extraterritoriality principle), the Ninth Circuit

10  expressly held that the extraterritoriality principle is not applicable to instances where, like here,

11  the state statute "does not dictate the price of a product and does not 't[ie] the price of its in-state

12  products to out-of-state prices." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,

13  729 F.3d 937, 951 (9th Cir. 2013) (*quoting Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S.

14  644, 669 (2003)). Instead, the proper analysis is "whether the burden [the statute] imposes on

15  interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* (internal

16  citations omitted).[68]

---

17  [67] The court in *Frosh* also emphasized that the state statute at issue violated the dormant
18  Commerce Clause because it "requires manufacturers and wholesale distributors to do more than
    alter their distribution channels. It sets prescription drug prices in a way that 'interfere[s] with
19  the natural function of the interstate market' by superseding market forces that dictate the price of
    a good." *Id.* at 673 (quoting *McBurney v. Young*, 569 U.S. 221, 235 (2013)). Here, the state
20  statutes at issue do the opposite. Rather than "superseding market forces that dictate the price of
    a good," they seek to preserve them by declaring Defendants' price-fixing and market allocation
21  cartel unlawful.
    [68] The remaining cases cited by Defendants are either wholly irrelevant or involve instances where,
22  unlike here, the state statute: (i) involved the imposition of a fee or restriction on out-of-state
    transactions or (ii) discriminated against foreign states. *See S.-Cent. Timber Dev., Inc. v. Wunnicke*,
23  467 U.S. 82, 101 (1984) (Alaska could not impose export controls on unprocessed timber); *Japan
    Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 453-54 (1979) (California was not permitted to
24  impose a tax on Japanese shipping containers); *Global Reinsurance Corp. U.S. Branch v. Equitas
    Ltd.*, 18 N.Y.3d 722, 735-36 (2012) (no mention of applicability or violation of the Commerce
25  Clause); *Valley Bank of Nevada v. Plus Sys., Inc.*, 914 F.2d 1186, 1197 (9th Cir. 1990) (Nevada
    law prohibiting agreements to limit or waive ATM fees not in conflict with or a *per se* violation of
26  the Commerce Clause); *IMS Health Inc. v. Mills*, 616 F.3d 7, 25 (1st Cir. 2010), *cert. granted,
    judgment vacated sub nom. IMS Health, Inc. v. Schneider*, 564 U.S. 1051, 131 S. Ct. 3091, 180 L.
27  Ed. 2d 911 (2011) (Maine law permitting prescribers to withhold identifying patient information
    for use in marketing was not a violation of the dormant Commerce Clause); *Longaker v. Bos. Sci.
28  Corp.*, 872 F. Supp. 2d 816 (D. Minn. 2012), *aff'd*, 715 F.3d 658 (8th Cir. 2013) (No mention of
    applicability or violation of the Commerce Clause); *Healy v. The Beer Inst.*, 491 U.S. 324, 340

20

1      The Supreme Court's holding in *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117

2  (1978) is instructive. *Exxon* concerned a Maryland statute designed to foster competition by

3  requiring oil refiners to divest themselves of retail service stations and charge a uniform price to

4  all stations they supplied. *Id*. at 119-21. The refiners challenged the statute, arguing that the

5  dormant Commerce Clause precluded enforcement of the Maryland statute because the refiners

6  were out-of-state companies whose out-of-state transactions should not be subjected to regulation

7  by a state in which no refiners were located. *Id.* at 125. The Supreme Court rejected the argument

8  and upheld the right of Maryland to apply its competition statute unless lack of uniformity would

9  impede the flow of goods. *Id*. at 128**;** *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*,

10  682 F.3d 1144, 1148 (9th Cir. 2012) ("The principal objects of dormant Commerce Clause

11  scrutiny are statutes that discriminate against interstate commerce. The central rationale for the

12  rule against discrimination is to prohibit state or municipal laws whose object is local economic

13  protectionism . .  .") (internal citations and quotations omitted).

14      Here, Defendants raise no concerns that enforcement of the state antitrust and consumer

15  protection laws asserted by IPPs would lead to a lack of uniformity that would impede the flow of

16  goods in interstate commerce, nor could they. *See Ass'n des Eleveurs de Canards et d'Oies du*

17  *Quebec v. Bonta*, 33 F.4th 1107, 1118 (9th Cir. 2022) ("State laws that effectively burden only

18  out-of-state businesses (because there are no comparable in-state businesses) are not necessarily

19  discriminatory. . . .[states] are free to regulate commerce and contracts within their boundaries

20  with the goal of influencing the out-of-state choices of market participants.") (internal quotations

21  omitted). To the contrary, Defendants argue that the FTAIA governs IPPs' claims here. Defs.'

22  Mtn. for S.J. at 16-17. And, for the reasons discussed, *supra* at Section II, IPPs' State claims are

23  authorized under the FTAIA. *See also Empagran,* 542 U.S. at 165 ("[O]ur courts have long held

24  that application of our antitrust laws to foreign anticompetitive conduct is … reasonable, and

25  hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort

26

27  (1989) (Connecticut's beer pricing affirmation statute was discriminatory and controlled beer
pricing in other states.); *Sam Francis Found. v. Christies, Inc*., 784 F.3d 1320, 1323 (9th Cir. 2015)

28  (California law dictating royalties for the sale of fine art, including in other states, was violative of
the dormant Commerce Clause).

21

1    to redress domestic antitrust injury that foreign anticompetitive conduct has caused.") (internal

2    citations omitted); *ARC America*, 490 U.S. at 101 (upholding plaintiffs' right to bring claims

3    under state indirect purchaser laws such as those at issue here). Accordingly, Defendants'

4    dormant Commerce Clause challenge should be rejected.  *See W. & S. Life Ins. Co. v. State Bd. of*

5    *Equalization of California*, 451 U.S. 648, 652–53 (1981) ("If Congress ordains that the States

6    may freely regulate an aspect of interstate commerce, any action taken by a State within the scope

7    of the congressional authorization is rendered invulnerable to Commerce Clause challenge.");

8    *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 327 (1994) (holding dormant Commerce

9    Clause inapplicable given "indicia of Congress' willingness to tolerate" state regulation "applied

10   to foreign corporations").

11        Even if the extraterritorial principle were the proper standard by which to analyze

12   Defendants' dormant Commerce Clause challenge, Defendants' argument still fails. This is

13   because Defendants improperly limit the definition of "commerce" to the initial transaction

14   between the manufacturer and direct purchaser. Modern Supreme Court jurisprudence rejects

15   such a narrow definition. *See, e.g., NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 40 (1937)

16   (holding that labor contracts are a part of commerce); *Wickard v. Filburn*, 317 U.S. 111, 124

17   (1942) ("Whether the subject of the regulation in question was 'production,' 'consumption,' or

18   'marketing' is ... not material for purposes of deciding the question" of whether an activity

19   constitutes commerce.). "Accordingly, in cases involving the scope of the federal government's

20   power under the Commerce Clause, the Supreme Court now interprets the term 'commerce' as

21   encompassing a stream of transactions—including those transactions necessary to produce a

22   good, such as labor contracts, and those by virtue of which the good is distributed and sold to

23   end-users." *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 682 (4th Cir. 2018) (Dissent,

24   Wynn, J.).

25        That is precisely the conclusion the Seventh Circuit reached in *Brand Name Prescription*

26   *Drugs*. There, a group of pharmacies alleged that certain prescription drug manufacturers were

27   engaged in a price-fixing conspiracy. *In re Brand Name Prescription Drugs Antitrust Litig.*,123

28   F.3d 599, 602–03 (7th Cir. 1997) (Posner, J.) *abrogated on other grounds by Rivet v. Regions*

22

1   *Bank of La*., 522 U.S. 470 (1988). Like IPPs here, the pharmacies did not purchase the drugs

2   directly from the manufacturers. *Id.* at 606. Rather, the manufacturers sold the drugs to

3   wholesalers, which in turn sold the drugs to the pharmacies. *Id*. Because, like here, as indirect

4   purchasers, the pharmacies were barred from seeking damages under federal law, they sought

5   relief under Alabama's antitrust statute. *Id*. at 607. Notwithstanding that the sales between

6   manufacturers and wholesalers were consummated outside of Alabama, the Seventh Circuit held

7   that Alabama pharmacies—but not pharmacies in other States—could seek relief under the

8   Alabama statute without violating the extraterritoriality doctrine. *Id*. at 613; *see also K-S*

9   *Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 731 (7th Cir. 1992) (Easterbrook, J.)

10  (holding that Wisconsin statute did not violate extraterritoriality principle because statute did not

11  regulate "sales outside Wisconsin for *resale outside Wisconsin*") (emphasis added); *In re*

12  *Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 48-49 (D.D.C. 2003) (relying on

13  the analysis in *Brand Name Prescription Drugs* to hold that the Illinois Antitrust Act's

14  extraterritorial reach did not violate the Commerce Clause).

15      Similarly, here, because IPPs' claims are limited to finished products containing

16  Defendants' price-fixed SAs *purchased within the relevant states or as residents of the relevant*

17  *states,* their state claims do not implicate the dormant Commerce Clause.

18  **IV.    IPPS' CLAIMS DO NOT EXCEED THE SCOPE OF THE STATE STATUTES**

19      In its Second MTD Order, the Court rejected Defendants' argument that IPPs' state claims

20  were barred because the products IPPs purchased were in a different market than the products

21  sold by Defendants:

22      Here, as noted, plaintiffs allege defendants engaged in a conspiracy to fix the
        prices of SAs, that said conspiracy resulted in plaintiffs' paying higher prices for
23      products containing SAs, and that each SA in the purchased products can be
        physically traced to its defendant manufacturer. District courts have found, and
24      this Court agrees, that such allegations are sufficient to establish the first factor, at
        least where the plaintiff alleges the price-fixed component lacks utility on its own
25      and the markets for the component and products containing the component are
        inextricably intertwined.
26

27  *Id*. at 14. Defendants make the identical challenge here with respect to IPPs' claims under the

28  laws of eleven States and the District of Columbia. *Compare* Defs.' Mtn for S.J. at 11-12

1   (Arguing that the complaints allege the conspiracy to fix prices took place in the market for SAs

2   and since "[n]one of the named Class Plaintiffs purchased HDD Suspensions," "Class Plaintiffs

3   have not claimed and cannot claim that trade in the products that they allegedly purchased was

4   'restrained' in the state.") *with* Defs.' Mtn. to Dismiss at 19 ("IPPs are not participants in the

5   allegedly restrained market for suspension assemblies. Rather, End-Users and Resellers are

6   participants in a market removed from that sale by multiple levels of commerce."). This time,

7   however, Defendants claim that it is the laws of the States themselves rather than principles of

8   federal antitrust standing that bar IPPs' claims. Strikingly, Defendants fail to cite a single

9   authority interpreting the State laws they challenge that would support their radical position that

10   these States' *Illinois Brick* repealer laws do not reach conduct that resulted in harm to their

11   citizens.

12          Instead, Defendants argue that the definition of "restraint of trade" requires that a plaintiff

13   be injured in the same market as that which the alleged restraint occurred. Defendants' primary

14   citation for this unsupported proposition is an out-of-context quote taken from the *Areeda* treatise.

15   Defs.' Mtn for S.J. at 12 (*citing* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An*

16   *Analysis of Antitrust Principles and Their Application*, ¶ 1502 (4th ed. 2013)). But a cursory

17   review shows that the passage cited by Defendants merely stands for the unremarkable and

18   irrelevant proposition that a plaintiff proceeding under the rule of reason is required to identify

19   the relevant market in which the alleged restraint took place. *Id.* Defendants sole remaining

20   citation is to a Supreme Court decision holding that vertical restraints are not *per se* illegal. *See*

21   *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007). Here, it is

22   undisputed that Defendants engaged in a horizontal cartel to fix prices – a *per se* violation of

23   antitrust laws. *See id.* at 893. ("A horizontal cartel among competing manufacturers or competing

24   retailers that decreases output or reduces competition in order to increase price is, and ought to

25   be, *per se* unlawful."). Accordingly, IPPs are not required to define a relevant market. *See Nat'l*

26   *Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984)

27   (recognizing that in a price-fixing case there is no need to inquire "into the particular market

28

1   context in which it is found"). Nonetheless, IPPs have done so in their respective complaints and

2   the Court upheld those allegations. Second MTD Order at 14.

3     IPPs here present evidence establishing that: (i) SAs had no independent utility other than

4   as a component for HDDs,[69] (ii) SAs purchased by IPPs can be physically traced to Defendants;[70]

5   (iii) Defendants monitored the markets for HDDs and products containing HDDs to inform their

6   understanding of demand for SAs;[71] and (iv) that all or nearly all of the overcharge associated

7   with Defendants' price-fixing conspiracy was passed-on to IPPs.[72] Accordingly, IPPs' claims are

8   not barred simply because they purchased finished products containing Defendants' price-fixed

9   SAs. Defendants present no facts and *Areeda* and *Leegin* provide no support for Defendants'

10  position.

11  **V.      CONCLUSION**

12    For the foregoing reasons, IPPs respectfully request that the Court deny Defendants'

13  Motion for Partial Summary Judgment regarding Foreign Commerce.

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27  [69] *See supra* n.6.
[70] *See, e.g.,* Ex. 13 (Misuta Dep.) at 97:2-99:25, 102:2-103:7,189:12-191:13, 192:15-193:13.
28  [71] *See supra* n.29.
[72] *See supra* n.39.

Dated: October 14, 2022

*/s/William V. Reiss*
William V. Reiss (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
1325 Avenue of Americas, Suite 2601
New York, NY 10019
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
wreiss@robinskaplan.com

*/s/Christopher T. Micheletti*
Christopher T. Micheletti (SBN 136446)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zellelaw.com

*Interim Co-Lead Class Counsel for End-User Plaintiffs*

*/s/Victoria Sims*
Victoria Sims (admitted *pro hac vice*)
**CUNEO GILBERT & LaDUCA LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-9360
Facsimile: (202) 789-1813
vicky@cuneolaw.com

*/s/Shawn Raiter*
Shawn Raiter (admitted *pro hac vice*)
**LARSON KING LLP**
30 E. 7th Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6500
Facsimile: (651) 789-4818
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for Reseller Plaintiffs*

**ATTORNEY ATTESTATION**

I, William V. Reiss, hereby attest, pursuant to Civil Local Rule 5-1(i)(3) of the Northern District of California, that the concurrence to the filing of this document has been obtained from each signatory hereto.

*/s/ William V. Reiss*
William V. Reiss

1

## <u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on October 14, 2022, I electronically filed the foregoing document

3   entitled **INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS'**

4   **MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FOREIGN**

5   **COMMERCE** with the Clerk of the Court for the United States District Court, Northern District

6   of California using the CM/ECF system and served a copy of same upon all counsel of record via

7   the Court's electronic filing system.

8                                                  */s/ William V. Reiss*
                                                   William V. Reiss
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IPPs' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 3:19-md-02918-MMC