Craig Y. Lee (*Pro Hac Vice*)
craiglee@huntonak.com
Carter C. Simpson (*Pro Hac Vice*)
csimpson@huntonak.com
Christopher J. Dufek (*Pro Hac Vice*)
cdufek@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone: (202) 955-1500

Ann Marie Mortimer (State Bar No. 169077)
amortimer@huntonak.com
**HUNTON ANDREWS KURTH LLP**
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Telephone: (213) 532-2103

*Counsel for Defendants NHK Spring Co., Ltd.,
NHK International, NHK Spring (Thailand) Co.,
Ltd., NAT Peripheral (Dong Guan) Co., Ltd. and
NAT Peripheral (H.K.) Co., Ltd.*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Hard Disk Drive Suspension Assemblies Antitrust Litigation | Case No. 3:19-md-02918-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO | **REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FOREIGN COMMERCE** |
| *Seagate Tech. LLC et al. v. Headway Techs., Inc. et al.*, Case No. 3:20-cv-01217-MMC | Date:       January 13, 2023<br>Time:       9:00 AM<br>Crtrm:    7, 19th Floor<br>Before:    Hon. Maxine M. Chesney |

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    The FTAIA Applies Because the Alleged Conduct Involves Commerce With Foreign Nations (All HDD Suspensions – NHK Categories 1–4, Seagate Categories A and B). ........ 2

  A.    Seagate Grossly Distorts the Sales Process by Characterizing Its Foreign Purchases of HDD Suspensions as "Assembly." ........................................................ 2

  B.    Foreign Purchases from Foreign Manufacturers by Foreign Purchasers Involve Trade or Commerce With Foreign Nations. ............................................................ 5

II.   HDD Suspensions That Entered the United States as Components in Finished Products Are Not Import Commerce (NHK Categories 2 and 3, Seagate Category B). ......... 8

  A.    Importation by a Foreign Entity Other Than a Defendant Or the Direct Purchaser Precludes a Finding of Import Commerce. .................................................. 9

  B.    In Addition, Category 2/B and Category 3 Sales Do Not Constitute Import Commerce Under *Hsiung* and *Motorola* .................................................................. 14

III.  The FTAIA's Effects Exception Is Not Met. ..................................................................... 16

  A.    No Domestic Effect "Gives Rise To" Seagate's Claims Based on Foreign Purchases (NHK Categories 1, 2, and 3; Seagate Categories A and B). ................... 16

    1.    HDD Suspensions That Did Not Enter the U.S. Did Not Affect Domestic Commerce (NHK Category 1, Seagate Category A). .................... 17

    2.    Negotiating and Setting Prices in the U.S. Does Not Give Rise to Seagate's Sherman Act Claims (NHK Categories 2 and 3, Seagate Category B). ................................................................................................ 18

  B.    No Effect on Import Commerce "Gives Rise to" Seagate's Claims Based on Foreign Purchases (NHK Categories 2 and 3, Seagate Category B). ........................ 21

  C.    Seagate Cannot Pursue Claims as an Indirect Purchaser (Seagate Category C) ........ 23

IV.   Seagate's Objection to NHK's Evidence Is Meritless. ....................................................... 24

CONCLUSION ..................................................................................................................... 25

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

i

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anhing Corp. v. Thuan Phong Co.*,
  215 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................................24, 25

*Biocad JSC v. F. Hoffmann-La Roche*,
  942 F.3d 88 (2d Cir. 2019).................................................................................5, 13

*In re Capacitors Antitrust Litig.*,
  No. 14-cv-03264, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016)............................6, 18

*In re Capacitors Antitrust Litig.*,
  No. 17-md-02801, 2018 WL 4558265 (N.D. Cal. Sept. 20, 2018)....................... *passim*

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. C-07-5944, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016)............................10, 11

*Costco Wholesale Corp. v. AU Optronics Corp.*,
  No. C13-1207, 2014 WL 4718358 (W.D. Wash. Sept. 22, 2014)...................11, 20, 21

*Dee-K Enters., Inc. v. Heveafil Sdn. Bhd*,
  299 F.3d 281 (4th Cir. 2002) ...............................................................................6, 7

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  546 F.3d 981 (9th Cir. 2008) ............................................................................20, 21

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004).......................................................................................... *passim*

*Fraser v. Goodale*,
  342 F.3d 1032 (9th Cir. 2003) .................................................................................25

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993)...................................................................................................7

*In re Hydrogen Peroxide Antitrust Litig.*,
  702 F. Supp. 2d 548 (E.D. Pa. 2010) .......................................................................19

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)..................................................................................................13

*Kruman v. Christie's Int'l PLC*,
  284 F.3d 384 (2d Cir. 2002)........................................................................................6

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-md-02420, 2017 WL 2021361 (N.D. Cal. May 12, 2017) ..............8, 19, 20, 21

ii

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-md-02420, 2017 WL 6497597 (N.D. Cal. Dec. 19, 2017) ...............................................21

*Los Angeles Times Commc'ns, LLC v. Dep't of Army*,
    442 F. Supp. 2d 880 (C.D. Cal. 2006) .....................................................................................25

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) ..............................................................................6, 11, 15, 16

*Motorola Mobility, Inc. v. AU Optronics Corp.*,
    No. 09 C 6610, 2014 WL 258154 (N.D. Ill. Jan. 23, 2014) ...............................................20, 21

*Motorola Mobility LLC v. AU Optronics Corp.*,
    775 F.3d 816 (7th Cir. 2015) ............................................................................................. *passim*

*Newton v. Am. Debt Servs.*,
    75 F. Supp. 3d 1048 (N.D. Cal. 2014) .....................................................................................23

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-02143, 2017 WL 11513316 (N.D. Cal. Dec. 18, 2017) ..................................... *passim*

*Prevent DEV GmbH v. Adient PLC*,
    No. 20-cv-13137, 2021 WL 5585917 (E.D. Mich. Nov. 30, 2021)...........................................6

*Seagate Tech. LLC v. NHK Spring Co.*,
    Rei 4 (wa) no. 450 (Yokohama Chihō Saibansho [Yokohama Dist. Ct.] Feb. 9,
    2022) ......................................................................................................................................5

*Stockroom Inc. v. XR LLC*,
    No. 08-01046, 2009 WL 10674303 (C.D. Cal. Oct. 19, 2009)...................................................25

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
    987 F. Supp. 2d 1023 (C.D. Cal. 2013) .....................................................................................24

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    534 F. Supp. 2d 1101 (N.D. Cal. 2007) ...................................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    637 F. App'x 981 (9th Cir. 2016) ............................................................................................4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    781 F. Supp. 2d 955 (N.D. Cal. 2011) ...................................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011) ...............................................................................12, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827, 2012 WL 3276932 (N.D. Cal. Aug. 9, 2012)...........................................19, 20

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

iii

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827, 2012 WL 5411590 (N.D. Cal. Nov. 6, 2012).....................................23

*United States v. Hui Hsiung*,
778 F.3d 738 (9th Cir. 2015) ................................................................................. *passim*

*United States v. LSL Biotechs.*,
379 F.3d 672 (9th Cir. 2004) ....................................................................................15

*United States v. NHK Spring Co.*,
No. 2:19-cr-20503 (E.D. Mich. Sept. 23, 2019) ........................................................22

*United States v. Thompson*,
559 F.2d 552 (9th Cir. 1977) ....................................................................................25

*Vasserman v. Henry Mayo Newhall Mem'l Hosp.*,
65 F. Supp. 3d 932 (C.D. Cal. 2014) ........................................................................24

*Wasco Prods. v. Southwall Techs.*,
435 F.3d 989 (9th Cir. 2006) ....................................................................................23

**Federal Statutes**

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ..................................... *passim*

Sherman Act, 15 U.S.C. § 1, *et. seq*.......................................................................... *passim*

**Federal Rules**

Fed. R. Evid. 602 .....................................................................................................24

Fed. R. Evid. 701 .....................................................................................................25

Fed. R. Evid. 801 .....................................................................................................25

**Other Authorities**

Allan Sloan, *Corporate Tax Dodgers Leave the Rest of Us to Foot the Bill*, WASH.
POST (July 12, 2014)...................................................................................................5

Matt Krantz & Kevin McCoy, *Feds Move to Slam Shut Tax Inversion Loophole*, USA
TODAY (Apr. 4, 2016).................................................................................................5

Seagate, *Our Leaders*, https://www.seagate.com/our-story/ ..........................................4

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

iv

**INTRODUCTION**

Billions of dollars' worth of mass-produced HDD Suspensions purchased abroad by the Seagate family of companies never entered the United States. Those that did had been sold at least three times before entering the U.S.—and at least four times if they entered as part of a larger product that contained an HDD. Seagate nonetheless seeks to recover damages for all of its foreign purchases under U.S. antitrust law, instead of the laws of the countries where Seagate chose to set up affiliates and make those purchases. The FTAIA prevents such manipulation and abuse of the U.S. legal system and bars the majority of Seagate's claims.

Seagate's FTAIA analysis is deeply flawed. First, Seagate contends that a foreign entity's foreign purchases of a foreign-manufactured product do not "involv[e] trade or commerce . . . with foreign nations." 15 U.S.C. § 6a. This argument fails on its face. Because the alleged conduct plainly and primarily concerns commerce with and among foreign nations, the FTAIA bars Seagate's claims unless Seagate can demonstrate that the transactions at issue either (1) constitute import commerce or (2) had a direct, substantial, and reasonably foreseeable effect on domestic or import commerce that gave rise to Seagate's claims.

Seagate cannot demonstrate either. Seagate concedes that HDD Suspensions that never entered the U.S. (NHK's Category 1 and Seagate's Category A, hereinafter "Category 1/A") do not constitute import commerce. And purchases of HDD Suspensions that never entered the U.S. have no effect on domestic commerce. These purchases are thus barred. The HDD Suspensions that did enter the U.S. (NHK's Category 2 and Seagate's Category B, hereinafter "Category 2/B") are not import commerce because they were imported after *at least* three levels of sales, by a foreign entity who was neither a defendant nor the direct purchaser. Nor is the effects test satisfied. As to HDDs brought into the U.S. by a Seagate entity, no effect on domestic commerce gave rise to Seagate's claims based on earlier foreign purchases of HDD Suspensions. As to downstream products incorporating HDDs (e.g., computers), Seagate concedes that HDD Suspension purchases had no direct or substantial effect on domestic commerce. These purchases are thus barred. Finally, Seagate cannot pursue unpleaded claims as an indirect purchaser (Seagate's Category C) via summary judgment briefing.

In short, when the Court applies the FTAIA analysis to the facts of this case, it will find that

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  the purchases at issue were non-import commerce that involved foreign nations, and no direct or

2  substantial effect of the alleged conspiracy gave rise to Seagate's claims.[1]

3  **ARGUMENT**

4  **I.   The FTAIA Applies Because the Alleged Conduct Involves Commerce With Foreign
       Nations (All HDD Suspensions – NHK Categories 1–4, Seagate Categories A and B).**

6  Seagate Technology LLC ("Seagate LLC") says it purchased $5 billion worth of HDD

7  Suspensions from Defendants for use in HDDs. Opp'n at 15, ECF No. 619. As in *Motorola Mobility*

8  *LLC v. AU Optronics Corp.* ("*Motorola*"), 775 F.3d 816, 818 (7th Cir. 2015), "[t]hat's a critical

9  misstatement. All but 1 percent of the purchases were made by [Seagate LLC]'s foreign [affiliates]."

10  As much as two-thirds to three-quarters of these foreign-manufactured, foreign-purchased HDD

11  Suspensions *never* entered the U.S. (Category 1/A). And those that did enter the U.S. typically did so

12  only after passing from (at least) the foreign manufacturer (Defendants) to the foreign direct purchaser

13  (Seagate Thailand) and then to a foreign indirect purchaser ███████████. Seagate's argument

14  that this case does not involve commerce with foreign nations is belied by these facts.

15  **A.   Seagate Distorts the Sales Process by Characterizing Its Foreign Purchases of
        HDD Suspensions as "Assembly."**

16  Seagate's portrayal of its "purchase process"—contending that the actual purchases of HDD

17  Suspensions by Seagate Thailand are not purchases at all, but rather part of the "assembly" process—

18  is misleading.[2] The material facts are undisputed.

19  First, Seagate LLC is a subsidiary of an Irish holding company. FL Decl. ¶ 7, ECF No. 622-6.

20  Its finances are handled by ████████████████████. Opp'n at 4; SH Decl. ¶ 2, ECF No. 622-7.

21  ████████████████████████████████████████████████████████████

---

[1] Seagate exaggerates NHK's summary judgment burden throughout its Opposition. Because proving that allegedly anticompetitive conduct is subject to an exclusion from or exception to the FTAIA is a substantive element of a Sherman Act claim, Seagate bears the burden of proof that either the import commerce exclusion or the effects exception applies to its claims. *See* Mot. at 11. At this stage of the case (after the close of fact discovery), Seagate must have developed evidence sufficient to support a finding of this essential element of its claims.

[2] Seagate's disingenuity commences on the first page of its brief and continues throughout. Seagate argues that NHK admitted to the existence of "the cartel" in an email, ignoring the testimony of the email's author (not a native English speaker): that the email was about newly implemented antitrust training, including training related to cartels, and had nothing to do with the existence of an actual cartel. *See* Dep. of Hironori Kajii, former Sales Manager at NHK Spring Co., Ltd. 132:12–134:14, Sept. 8–10, 2022 [attached as Ex. 1 to the Second Decl. of Craig Y. Lee [hereinafter "2d Lee Decl."]]. Seagate repeats this mischaracterization three more times. *See* Opp'n at 11, 17, 31.

████████████████████████████████████████████████████████████

██████████████████████. SH Decl. ¶¶ 2–7, 17 n.3, 19–20, ECF No. 622-7. NHK Spring Co., Ltd. ("NHK Spring") is a Japanese company with subsidiaries related to HDD Suspensions in Thailand, Hong Kong, and the U.S. Mot. at 3, ECF No. 533.

NHK negotiated the specifications and pricing of HDD Suspensions directly with Seagate. Mot. at 5; Opp'n at 6.[3] As reflected in NHK's responses to Seagate's RFQs, the negotiations concerned a product to be manufactured and shipped abroad.[4] NHK then sold and delivered HDD Suspensions to entities that manufacture HGAs, including Seagate Thailand and SAE in China. Mot. at 5; FL Decl. ¶¶ 77–79, ECF No. 622-6. Over 99% of HDD Suspensions were billed and shipped to these foreign entities. Mot. at 6. These foreign entities were NHK's customers for HDD Suspensions.

Seagate emphasizes that NHK received *thousands* of Purchase Orders ("POs") from Seagate Thailand for mass-produced HDD Suspensions during the relevant period (Opp'n at 35)—and does not deny that every one of them designated foreign bill-to and ship-to locations, as in this example:[5]



| Seagate | PURCHASE ORDER | | Page 1 of 2 |
|---|---|---|---|
| SUPPLIER DUNS: 690541545 | SHIP TO | | BILL TO |
| Name:  NHK SPRING CO LTD  DDS YOKOHAMA SALES OFFICE NHK SPRING  MINATOMIRAI BUSINESS SQUARE 10F  MINATOMIRAI 3 6 4  220 0012 | Seagate Technology (Thailand) Ltd.  1627 Moo 7, Teparuk Road T. Teparuk, A. Muang  Samutprakarn 10270  FAX:  (662) 715 2415/ShipCode: JT  TEL:  (662) 715 2999 | | Seagate Technology (Thailand) Ltd.  1627 Moo 7, Teparuk Road T. Teparuk, A. Muang  Samutprakarn 10270 |
| PO NO:  47519866 | PO  DATE:  APPROVED  13 Jan 2009 06:30 AM | | BUYER NAME:  SOFAI, Ms. SUREEPHAN |
| PO REVISION NO:  01 | TRANSMISSION  DATE:  04 Apr 2009 12:00 AM | | REQUESTOR  NAME: |
| PO STATE:  PO CHANGES | | | |

[3] U.S.-based NHKI employees did not have pricing authority; only NHK Spring employees did. Okuma Decl. ¶ 24, ECF No. 533-2. Recognizing this, Seagate does not argue that NHKI's sales personnel actually had pricing authority, only that Seagate "understood" that they did. Opp'n at 7–8.
[4] *See* NHKI-M-00257774 ¶ 3 [attached as Ex. 2 to 2d Lee Decl.].
[5] HDD Suspensions manufactured by NHK were stored ████████████████████████████████████████████████. *See* FL Decl. Ex. D at STX0065215, ECF No. 622-6 ("██████████████████████████████████████████████████."). ██████████████████████████████████████████████████████████████. *See* Seagate 30(b)(6) (Floeder) Dep. 215:25–216:6; 217:5–11, Sept. 29–30, 2022 [attached as Ex. 3 to 2d Lee Decl.]. While Seagate's Commodity Management Team negotiated long-term prices based on its estimate of the future "total available market" for HDD Suspensions, the actual purchase price was not determined until Seagate Thailand pulled inventory from the warehouse and issued a PO for the corresponding volume.

3

1    The Seagate Thailand employee responsible for purchasing is listed as the "buyer" on the POs,

2    and that person is NHK's main contact for all matters related to the order. Seagate Thailand was

3    invoiced[6] and remitted payment for the order; no money changed hands between Seagate LLC and

4    any NHK entity with respect to these purchases.[7]

5    Seagate ignores these undisputed facts in favor of repeating the mantra that ███████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████" Opp'n at 7, 9, 19.[8] Seagate also emphasizes that its Commodity Management

8    Team ("CMT") that negotiated the PSA is based in Minnesota. But Seagate does not dispute that the

9    CMT's involvement concerned a product manufactured abroad, purchased and paid for abroad, and

10   delivered abroad.[9] Moreover, it is evident from both *the PSA itself* and Seagate's ████████████

11   ███████████████████████████████████. The PSA provides that ████████████████████

12   ████████████████████████████████ Opp'n Ex. 25 ¶ 1.2. ████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████ Opp'n Ex. 28 ¶ 3.7. This "████████████" is the actual sale—from

15   NHK Spring to Seagate Thailand. Unless and until a purchase order was submitted, there was no sale.

16   Seagate is attempting to recover under U.S. antitrust law for foreign transactions. Seagate

17   chose to center its procurement and manufacturing operations in Asia for the benefits attendant to that

18   choice.[10] It cannot cherry-pick for which purposes it wants to be foreign and enjoy the benefits of

---

[6] *See* NHKI-M-00582220 [attached as Ex. 4 to 2d Lee Decl.]; SH Decl. ¶ 14, ECF No. 622-7.

[7] Later in its brief, Seagate cites *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 637 F. App'x 981, 984–85 (9th Cir. 2016), for the proposition that "[t]he antitrust injury experienced by the subsidiaries was necessarily experienced by the parent." Opp'n at 33. Seagate LLC is not the parent of any of the other Seagate Plaintiffs, and thus did not "experience" injury based on Seagate Thailand's direct purchases of HDD Suspensions from Defendants.

[8] ████████████████████████████████████████████████████████████████
████ FL Decl. App'x 1, ECF No. 622-6. The notion that this PSA "████████████" for all HDD Suspension purchases from NHK over a 13-year period (much of which precedes it) is both incorrect and illogical. *See* Okuma Decl. ¶¶ 20–21, 33, ECF No. 533-2 (describing purchase orders specifying bill-to and ship-to locations as the means by which customers purchased HDD Suspensions).

[9] Indeed, Seagate's senior leadership of global supply chain and procurement—to whom CMT reported—was positioned in Asia near its production factories. *See* Dep. of Robert Legendre, former Senior Vice President of Global Supply Chain at Seagate LLC 35:19–36:5; 37:10–12, May 31–June 1, 2022 [attached as Ex. 5 to 2d Lee Decl.]. Seagate's Executive Vice President of Global Sales and Marketing is stationed in Singapore, while its Executive Vice President of Operations and Technology is stationed in Thailand. *See* Seagate, *Our Leaders*, https://www.seagate.com/our-story/.

[10] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

foreign laws, and for which it wants to be American and enjoy the benefits of American law. Recognizing that its claims are not viable in the U.S., Seagate has filed a separate lawsuit against certain NHK entities in Japan based on the same alleged conduct and foreign purchases at issue here.[11]

But no matter. Even under Seagate's characterization of the supply chain, the sales are billed and shipped abroad, and products containing HDD Suspensions are imported only after at least three steps, by an entity other than the direct purchaser. The FTAIA still applies to bar Seagate's claims.

## B. Foreign Purchases From Foreign Manufacturers by Foreign Purchasers Involve Trade or Commerce With Foreign Nations.

Seagate seeks to rewrite the FTAIA, which applies to "conduct involving trade or commerce . . . with foreign nations." 15 U.S.C. § 6a. With a myopic focus on discrete events that occurred in the United States, Seagate argues that the FTAIA instead should apply only to conduct *taking place exclusively in* foreign nations. *See* Opp'n at 15 (conflating foreign conduct and foreign commerce). Seagate's position is incorrect. "[I]t is the situs of the effects, as opposed to the conduct," that determines whether an FTAIA analysis must be undertaken. *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 98 (2d Cir. 2019) (quotation and citations omitted). It is undisputed that the HDD Suspensions at issue were manufactured by, billed to, paid for by, and shipped to foreign entities in Asia—the situs of the effects for which Seagate seeks to recover.

Knowing that as much as two-thirds to three-quarters of Seagate HDD Suspension purchases should be barred at the outset under the FTAIA (because, having never entered the U.S., they are not import commerce and do not affect domestic or import commerce), Seagate invents a novel theory of antitrust liability: that "loss of competition" is a standalone Sherman Act violation untethered to commerce with foreign nations, despite the fact that the competition at issue was for the sale of a

---

██████████  *See* STX1258668 [attached as Ex. 6 to 2d Lee Decl.]. By locating in Ireland, Seagate eludes corporate income taxes that it would owe if it were incorporated in the U.S. *See* Allan Sloan, *Corporate Tax Dodgers Leave the Rest of Us to Foot the Bill*, WASH. POST (July 12, 2014), https://www.washingtonpost.com/business/economy/corporate-tax-dodgers-leave-the-rest-of-us-to-foot-the-bill/2014/07/11/de311d1a-06c2-11e4-a0dd-f2b22a257353_story.html; Matt Krantz & Kevin McCoy, *Feds Move to Slam Shut Tax Inversion Loophole*, USA TODAY (Apr. 4, 2016), https://www.usatoday.com/story/money/markets/2016/04/04/feds-move-slam-shut-tax-loophole/82628804/. Seagate seeks to take advantage of whichever country's laws are most advantageous for a given purpose—including Irish tax law, Thai labor law, and U.S. antitrust law. Because Seagate's purchases of HDD Suspensions occurred abroad, the FTAIA prevents this.
[11] *See Seagate Tech. LLC v. NHK Spring Co.*, Rei 4 (wa) no. 450 (Yokohama Chihō Saibansho [Yokohama Dist. Ct.] Feb. 9, 2022).

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

component part by a foreign manufacturer to a foreign purchaser. This argument has no merit. "The purpose of the FTAIA is not to exclude wholly foreign conduct . . . it is to exclude 'conduct that causes only foreign injury.'" *Prevent DEV GmbH v. Adient PLC*, No. 20-cv-13137, 2021 WL 5585917, at *15 (E.D. Mich. Nov. 30, 2021) (quoting *F. Hoffmann-La Roche Ltd. v. Empagran S.A.* ("*Empagran*"), 542 U.S. 155, 158 (2004)). Even where conduct in the U.S. is part of an alleged anticompetitive conspiracy, claims based on *foreign* sales must either constitute import commerce or meet the effects test to be actionable.

Unsurprisingly, the notion that sales of component parts in foreign nations do not involve foreign commerce has been soundly rejected: "The first question—whether the conduct alleged in this case 'involves' foreign commerce—is readily answered. The Complaint alleges an international cartel in a commodity . . . . This alleged arrangement plainly involves foreign commerce, and so we move immediately to the second inquiry—the task of parsing the [FTAIA]'s central requirements." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 856 (7th Cir. 2012). *See also In re Capacitors Antitrust Litig.* ("*Capacitors I*"), No. 14-cv-03264, 2016 WL 5724960, at *5 (N.D. Cal. Sept. 30, 2016) ("The category of capacitors that were billed and shipped to a foreign entity raises the question of FTAIA's domestic effects exception and its causation requirement.").[12]

There is *no* precedent that just because some—or even most—conspiratorial acts took place in the U.S., foreign sales by foreign manufacturers to foreign purchasers do not implicate the FTAIA. The actual debate, where the Court will "earn [its] keep," *Dee-K Enters., Inc. v. Heveafil Sdn. Bhd* ("*Dee-K*"), 299 F.3d 281, 287 (4th Cir. 2002), is on the categories of purchases for which HDD Suspensions ultimately ended up in the U.S. as sub-components of finished products. Seagate's argument to the contrary is based exclusively on *Dee-K*, a case "obviously [] not directly govern[ed]" by the FTAIA because it involved purely import commerce. *Id.* at 287. Rather than analyzing the

---

[12] *See also Prevent*, 2021 WL 5585917, at *16 (where an alleged anticompetitive agreement was between two companies headquartered in Michigan and a company headquartered in Germany and concerned another company headquartered in Germany, "it necessarily 'involve[d] trade or commerce with foreign nations' and [fell] within the FTAIA's general rule"); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by Empagran*, 542 U.S. 155 ("Clearly, when there is conduct directed at reducing the competitiveness of a foreign market, as there was in this case, such conduct involves foreign trade or commerce, regardless of whether some of the conduct occurred in the United States."); Mot. at 10–11.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

FTAIA standard, the Fourth Circuit reviewed whether the test set forth in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 796 (1993), applied to a conspiracy to fix the price of rubber thread purchased by the plaintiffs in the U.S. *Dee-K*, 299 F.3d at 285–86. *Hartford Fire* provides that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." 509 U.S. at 796. Thus, the court analyzed what was meant by "foreign conduct."

Unlike the *Hartford Fire* test, the FTAIA does not require foreign conduct, let alone wholly foreign conduct. Rather, it applies when "conduct involv[es] trade or commerce . . . with foreign nations." 15 U.S.C. § 6a.[13] It is the foreign nature of the *commerce*, not the *conduct*, that matters.[14] Thus, "meetings in the United States to negotiate an agreement to fix prices in an overseas foreign market that had no effect on domestic commerce do not yield antitrust jurisdiction in our courts." *Dee-K*, 299 F.3d at 294 (quotation omitted). It is inappropriate to consider "only the location of certain acts [because] the Supreme Court's jurisdictional analysis has emphasized above all else the effects, i.e., the intended location, actual location, and magnitude of those effects." *Id.* Here, the parties negotiated sales that would take place in Asia (primarily Thailand). Asia was the intended and actual location of the commerce at issue in Seagate's complaint. As such, and as set forth in both NHK's motion and Seagate's operative complaint, authorities in Japan, Taiwan, and Singapore have investigated the same conduct Seagate complains of in this case, highlighting that it involves commerce with foreign nations. Mot. at 8; Seagate Pls.' Second Am. Compl. ¶ 6, ECF No. 352.

Even under the inapplicable test Seagate urges, Seagate's analysis fails. Seagate's leading argument is that "[t]he United States *was* the situs of the purchaser (Seagate LLC) [and] the suppliers (NHKI, Magnecomp, and HTI) . . . ." Opp'n at 15 (emphasis in original).[15] Both representations are false on their face. As Seagate admits, Seagate Thailand was the direct purchaser of HDD

---

[13] Even if the PSA were determinative, as Seagate urges, NHK Spring (a Japanese company) is the counterparty to it—so the conduct that gave rise to the PSA necessarily involved trade or commerce with foreign nations.

[14] Seagate begins its argument that the FTAIA does not apply by misstating the law: Seagate asserts that conduct involves trade or commerce with foreign nations if the *conduct* is wholly foreign. Opp'n at 15. But the cases Seagate cites speak about wholly foreign *commerce* and *transactions*, not wholly foreign *conduct*. *Id.*

[15] *See also* Opp'n at 2.

1   Suspensions.[16] And NHKI did not "supply" anything. Okuma Decl. ¶ 7(e), ECF No. 533-2. Also false

2   is Seagate's statement that each Defendant had at least one signatory from its U.S. subsidiary sign the

3   PSA. *See* Opp'n at 17. As reflected in Seagate's ███████████████████████████████████████

4   ████████████████████████████████████████, the President of the Disk Drive Suspension,

5   Component & Microcontactor ("DDS") Division of NHK Spring in Japan, on behalf of NHK Spring

6   (a Japanese company). *See* FL Decl. App'x I (chart), Ex. P (PSA), ECF No. 622-6.[17] The alleged

7   participant (NHK Spring), targets (foreign purchasers of HDD Suspensions), and effects (increased

8   prices for HDD Suspensions manufactured and sold abroad) were primarily foreign.

9       Seagate concludes its argument by citing *In re Lithium Ion Batteries Antitrust Litigation* for

10   the proposition that the "locus of a transaction is not dispositive under the FTAIA." No. 13-md-02420,

11   2017 WL 2021361, at *4 (N.D. Cal. May 12, 2017). NHK agrees; the FTAIA "does not state or support

12   a per se rule excluding foreign purchasers just because they did their buying abroad." *Id.* But for such

13   purchases to be actionable, they must either constitute "import commerce" or have a direct and

14   substantial effect on domestic or import commerce that gives rise to the plaintiff's claim. *Id.* ("The

15   Supreme Court has held that the FTAIA removes overseas transactions and business arrangements

16   from the purview of the Sherman Act '*unless* those activities adversely affect domestic commerce [or]

17   imports to the United States . . . .'" *Id.* (emphasis in original) (quoting *Empagran*, 542 U.S. at 161).[18]

18   The facts of this case mandate an FTAIA analysis.

19   **II.    The HDD Suspensions That Entered the United States as Components of Finished
        Products Are Not Import Commerce (NHK Categories 2 and 3, Seagate Category B).[19]**

20

21       Exaggerating what constitutes "import commerce" in this Circuit, Seagate asks this Court to

22   go further than any court has gone before. Because at least three layers of commerce precede any

---

[16] Seagate LLC admits its status as an indirect purchaser. Opp'n at 25, n.110 .

[17] The single ███████████████████████████████, then-President of the DDS Division
in Japan, on behalf of NHK Spring. *Id.*

[18] As for Seagate's state law claims, no discussion beyond a footnote is warranted because it is
settled that state law claims cannot reach further than Sherman Act claims. *See* Opp'n at 15 n.74.
Seagate does not disagree that its state law claims are barred to the same extent as its Sherman Act
claims—it simply implores the Court not to entertain this issue. As noted by Judge Seeborg, "the few
courts to have considered this question have concluded that the FTAIA does indeed limit state law
claims by the reach of their applicable federal counterparts." *In re Optical Disk Drive Antitrust
Litig.*, No. 10-md-02143, 2017 WL 11513316, at *2 (N.D. Cal. Dec. 18, 2017).

[19] Seagate did not adequately explain the relationship between its Category B and Category C, so
NHK will clarify as follows: Seagate's Category C consists of Seagate LLC's internal purchases that

8

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

mass-produced HDD Suspension's importation to the U.S., and because those imports were made by a foreign entity other than a defendant or the direct purchaser, purchases by foreign Seagate entities do not constitute "import commerce," and must instead be analyzed under the effects test.

> **A.    Importation by a Foreign Entity Other Than a Defendant or the Direct Purchaser Precludes a Finding of Import Commerce.**

No matter where any negotiating, pricing decisions, or other conduct took place, no court in this Circuit has endorsed the view that commerce can be "import commerce" when the product containing a price-fixed component was brought to the U.S. by a foreign entity other than a defendant or the direct purchaser.[20] Because *no* Seagate HDD that entered the U.S. (either as a standalone HDD or part of a larger product) was imported by a defendant or the direct purchaser, Seagate Thailand's purchases of HDD Suspensions from Defendants are not import commerce.

As an initial matter, Seagate collapses what NHK describes as Category 2 and Category 3 purchases as Seagate's Category B.[21] As defined by NHK, both Categories 2 and 3 involve HDD Suspensions that ended up in a finished product imported into the U.S. The distinction is that the direct purchaser was the importer for Category 3, whereas a foreign entity downstream of the direct

---

occurred downstream from a subset of Seagate's Category B purchases. ███████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████ Those
Seagate LLC purchases comprise Category C, and Seagate Thailand's upstream purchases of HDD Suspensions for those products are included in Category B. ████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████ Seagate Thailand's upstream purchases of HDD Suspensions for products that enter the U.S. via foreign third parties are also included in Category B.

[20] As set forth in NHK's motion (pp. 15–18), the Ninth Circuit has never endorsed finding import commerce based on conduct directed at a U.S. import market, and this Court should not do so either. But even if such "targeting" were a viable theory, the sales at issue here were still too disconnected to constitute "import commerce" because of the number of links in the chain before the HDD Suspensions entered the U.S., and because they were imported only via foreign entities that were not a defendant or the direct purchaser. Moreover, even under a "targeting" theory, Seagate's argument that NHK targeted the U.S. is based mainly on the assertion that ████████████████████████
████████████████████████████████████████ Opp'n at 13, 23. Seagate's own actions cannot be re-cast as targeting by NHK.

[21] Seagate characterizes its Category B as HDD Suspensions "purchased by Seagate LLC in the United States that entered the United States." Opp'n at 21. To be clear: Seagate LLC did not purchase any of the *HDD Suspensions* at issue in this motion, nor did any Seagate entity purchase them in the U.S. Seagate's phrasing is based on its fallacy that the "purchase" was complete before any purchase order was issued.

1   purchaser was the importer for Category 2. As reflected in the declarations filed with Seagate's

2   Opposition, however, ███████████████████████████████████████████████████

3   █████████████ entity other than Seagate Thailand. ███████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████.[22] It is

7   therefore NHK's understanding that all of Seagate's foreign purchases fall into Category 2.

8          Seagate relies on four cases to argue that HDD Suspensions that enter the U.S. in

9   downstream commerce constitute import commerce: *United States v. Hui Hsiung* ("*Hsiung*"), 778

10  F.3d 738 (9th Cir. 2015); *In re: Cathode Ray Tube Antitrust Litigation* ("*CRT*"), No. C-07-5944,

11  2016 WL 5725008 (N.D. Cal. Sept. 30, 2016); *In re Optical Disk Drive Antitrust Litigation*

12  ("*ODDs*"), No. 10-md-02143, 2017 WL 11513316 (N.D. Cal. Dec. 18, 2017); and *In re Capacitors*

13  *Antitrust Litigation* ("*Capacitors III*"), No. 17-md-02801, 2018 WL 4558265 (N.D. Cal. Sept. 20,

14  2018). None of these cases go as far as Seagate asks the Court to go here.[23]

15          In *Hsiung*, the defendants sold LCD panels directly to customers in the U.S., including HP,

16  Dell, and Apple. The Ninth Circuit held that "transactions between the foreign defendant producers

17  of TFT–LCDs and purchasers located in the United States" are "import commerce." 778 F.3d at 755.

18  Seagate stretches *Hsiung* far beyond its limits and puts words in the Ninth Circuit's mouth. First,

19  Seagate asserts that the Ninth Circuit "did *not* hold that the defendant needed to be the importer for

20  the import exclusion to apply." Opp'n at 22 (emphasis in original). But the Ninth Circuit also did not

21  hold that the import commerce exclusion could apply when a downstream non-conspirator is the

22  importer; the Ninth Circuit held only that the import exclusion applies *when a conspirator co-*

23  _____

24  [22] A visual depiction, where each arrow is a sale:

25
26
27  _____

[23] Arguably, the later district court cases (*ODDs* and *Capacitors III*) have gone too far past the
28  guidance by the Ninth Circuit in *Hsiung*, but this Court need not reach that conclusion to reject
    Seagate's argument here and decline extending import trade even further.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave   NW
Washington, DC 20037
(202) 955-1500

*defendant is the importer*. *Hsiung*, 778 F.3d at 756. Seagate also asserts that the Ninth Circuit recognized that the import commerce exclusion applies when conduct is directed at a U.S. import market, even if the defendants did not engage in importation of products into the U.S. Opp'n at 21–22. Not so—the Ninth Circuit simply noted that the Third Circuit had so held, but *expressly declined* to reach that conclusion. *Id.* at 755 n.8. Finally, Seagate asserts that the Ninth Circuit held that the import exclusion applied when the defendant negotiated with a company in the U.S. Opp'n at 22. But the Ninth Circuit did not find that the import exclusion applied *because* of negotiation in the U.S.; the import exclusion applied because the conspirator co-defendants sold and shipped price-fixed LCD panels directly to customers in the U.S.

*CRT* went a small step further than *Hsiung*—deeming sales of products containing a price-fixed component, as opposed to sales of the component itself, to constitute import commerce where the *defendants themselves* manufactured the finished products and sold them directly into the U.S. *See* 2016 WL 5725008, at *3.[24] The case involved direct action purchasers' ("DAPs") purchases of products containing cathode ray tubes ("CRT Products") directly from the defendants, who had imported CRT Products into the U.S. "The DAPs *paid for* and *took delivery of* all these products in the United States. The DAPs thus limit[ed] themselves to only transactions directly between DAPs and cartel members, which '*are* the import commerce of the United States.'" *Id.* (emphasis added) (quoting *Minn-Chem*, 683 F.3d at 855). On these facts, the court concluded that "on their face these transactions constitute 'import commerce' that is not subject to the FTAIA." *Id.*[25]

In *ODDs*, foreign entities directly purchased optical disk drives from the defendants, and later sold computers containing those drives to entities in the U.S. 2017 WL 11513316, at *1. Thus, the foreign direct purchaser, rather than a defendant manufacturer, was the importer. *Id.* at *4. The

---

[24] Unlike the defendants in *CRT*, Defendants here did not manufacture finished products incorporating the component at issue. Defendants did not import HDD Suspensions (conduct found to be import commerce in *Hsiung*) or products containing HDD Suspensions (conduct found to be import commerce in *CRT* when imported by the defendants).

[25] *See also Costco Wholesale Corp. v. AU Optronics Corp.*, No. C13-1207, 2014 WL 4718358, at *4 (W.D. Wash. Sept. 22, 2014) (relied on by *CRT*) ("Moreover, the *Hsiung* court's citation of *Minn–Chem* leaves this court with no doubt that *Hsiung* also stands for the proposition that, *provided the price-fixed product ultimately moved from a member of the conspiracy to a United States customer*, the conspirators have engaged in import trade regardless of prior movement of the price-fixed product in foreign commerce *among the conspirators*.") (emphasis added).

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

court found a genuine issue of material fact as to whether such sales constituted import commerce. *Id.* at *5.[26]

Finally, in *Capacitors III*, Flex's foreign sister companies were the direct purchasers of capacitors from the defendants. 2018 WL 4558265, at *4. These foreign direct purchasers incorporated the capacitors into products abroad and then sold and shipped those products into the U.S. *Id.* These facts "[left] open the possibility that all transactions in this category may be subject to the Sherman Act as 'import trade or commerce.'" *Id.* at *5.

Critically, in none of these cases did a court evince a willingness to find "import commerce" unless a defendant or direct purchaser imported the product containing the price-fixed component. Seagate implores this Court to go yet *another* step further than *Capacitors III* by finding that there could be import commerce even in the two scenarios that comprise Category 2/B. In the first, a foreign Seagate entity incorporated the component into a product (an HDD) abroad that Seagate sold to an unaffiliated foreign indirect purchaser (e.g., an OEM), who then incorporated that product into a larger product (e.g., a computer) that then entered the U.S. In the second, Seagate Thailand purchased HDD Suspensions, and a different Seagate entity later imported HDDs containing them. Finding import commerce under these facts goes too far. At some point the stretching of the scope of import commerce must stop, lest the FTAIA's effects exception be fully collapsed into and subsumed by the import commerce exclusion.[27] As the Second Circuit recently noted, "[i]t is apparent that Congress had in mind a simple, bright-line exception for import trade and commerce and an additional, more flexible exception for other conduct that would require a more fact-specific

---

[26] In *ODDs*, Judge Seeborg evinced an overly restrictive view of the FTAIA's application, stating that "the FTAIA only excludes from the antitrust laws conduct that has no domestic effects or does not affect import commerce." 2017 WL 11513316, at *2. That is not the applicable standard; the FTAIA requires not just *any* effect on domestic or import commerce, but rather a direct, substantial, and reasonably foreseeable effect that gives rise to the asserted antitrust claim.

[27] Seagate itself cites a decision from the LCD MDL for the proposition that limiting a direct effect to the financial harm caused by the first sale of a price-fixed product "would all but eviscerate the distinction between the 'domestic injury' exception and 'import commerce.'" Opp'n at 27 (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 963 (N.D. Cal. 2011)). Seagate thus recognizes that the *first* sale can be import commerce, but later sales must be analyzed under the effects test. Despite this, Seagate asks the Court to hold not just that the *second* sale of an HDD Suspension (from the direct purchaser into the U.S.) can be import commerce (Category 3), but that the *third* sale (from an indirect purchaser into the U.S.) also can be import commerce (Category 2).

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

1  analysis." *Biocad*, 942 F.3d at 98.[28]

2       Indeed, as recognized in *Capacitors III*, Flex could not pursue Sherman Act claims on the

3  indirect purchaser side, where capacitors were sold by the defendants to foreign distributors and then

4  re-sold by a distributor to a foreign Flex entity. 2018 WL 4558265, at *4, *7. That is because under

5  *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), only the direct purchaser of an allegedly price-

6  fixed product may bring suit under the Sherman Act. *Id.* at *7. It dovetails with the well-known

7  *Illinois Brick* rule not to categorize as "import commerce," for which a Sherman Act claim may lie,

8  products containing a price-fixed component that were imported into the U.S. by an entity other than

9  a defendant or the direct purchaser. Such sales do not constitute import commerce and therefore

10  must meet the effects test to be actionable. While the *ODDs* and *Capacitors III* construct

11  (recognizing as "import commerce" products containing price-fixed components sold into the U.S.

12  by the direct purchaser of the component) still goes further than the Ninth Circuit went in *Hsiung*

13  (and probably goes too far), it at least arguably carries out the intent of the FTAIA to prevent

14  overreach of U.S. law abroad. *See Empagran*, 542 U.S. at 164 (interpreting the FTAIA "to avoid

15  unreasonable interference with [other nations'] sovereign authority"). None of this precedent

16  supports a finding that Category 2 sales—involving importation by foreign entities other than the

17  defendants or the direct purchasers—constitute import commerce.

18       And, as it turns out, there are no Category 3 sales involving Seagate. Category 3 is where a

19  foreign direct purchaser purchased HDD Suspensions abroad, incorporated them into a product

20  abroad, and imported that product into the U.S. (i.e., *Capacitors III*). As explained above, the

21  furthest any judge in this District has stretched the definition of import commerce is where a foreign

22  direct purchaser itself sold the finished product into the U.S. But Seagate's purchases of HDD

23  Suspensions do not qualify even under that generous view. The direct purchaser of Defendants'

24  HDD Suspensions was Seagate Thailand. Seagate Thailand did not sell HDDs into the U.S.

25

26  [28] Because "the statutory language contemplates conduct that directly interferes with the act of
importing goods or services to the United States[,]" "the Sherman Act applies to a defendant's

27  conduct abroad that constitutes, includes, or has as a necessary consequence the movement of goods
into this country." *Biocad*, 942 F.3d at 96. Thus, "[c]onduct does not 'involve' import commerce if it

28  has no direct or immediate consequence for domestic markets and is intended merely to have a
domestic impact in the future." *Id.* at 97.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

13

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   market.[29] Rather, according to Seagate, ████████████████████████████████

2   ████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████ [30, 31] FL Decl. ¶¶ 77–83, ECF No. 622-6; SH Decl. ¶¶ 17 n.3, 19,

6   ECF No. 622-7. Because no Seagate HDDs were imported to the U.S. by the direct purchaser of the

7   HDD Suspensions, Category 3 sales are not present here.

8         Unlike the cases Seagate relies on for its import commerce argument, every mass-produced

9   HDD Suspension that entered the U.S. was imported by a foreign entity other than the Defendants or

10   the direct purchaser. This alone is sufficient to preclude a finding that Seagate Thailand's purchases

11   constitute import commerce.[32]

12         **B.    In Addition, Category 2/B and Category 3 Sales Do Not Constitute Import
              Commerce Under *Hsiung* and *Motorola*.**

14         Seagate also is incorrect that the Court should not follow *Motorola* in excluding the Category

15   2/B claims, for the reasons set forth on pages 14–18 of NHK's opening brief. In *Motorola*, the court

---

16   [29] When it suited Seagate's interests, Seagate found it "important to note [to the Department of
17   Commerce] that Seagate does *not* import the HSAs to support mass production of HDDs, but rather
    in low volumes to support new product development activity only." Lee Decl. Ex. 7 at 10, ECF No.
18   535-1. In other words, Seagate itself has denied to the U.S. Government being an importer of the
    more than 99% of HDD Suspensions purchased abroad by Seagate Thailand, yet here asks this Court
19   to find that Seagate did, in fact, purchase those same HDD Suspensions in import commerce.
    [30] Seagate makes clear that ███████████████████████████
20   ██████████████████████████████" SH Decl. ¶ 20, ECF No. 622-7.
         Seagate inaccurately characterizes NHK's Category 3. *See* Opp'n at 24 n.108. NHK's Category 3
21   is "sales between a foreign defendant manufacturer and a foreign direct purchaser, where the direct
    purchaser incorporated the component into a product it imported into the United States." Mot. at 12.
22   Here, a foreign defendant manufacturer (NHK subsidiaries) sold HDD Suspensions to a foreign
    direct purchaser (Seagate Thailand) █████████████████████████████████████████████████
23   ████████████████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████████████████
24         If the Court is inclined to find that because ██████████████ is within the Seagate family, its
25   status as a █████████████████████ does not cut off import commerce, the Court should still find
    that a downstream foreign indirect purchaser unaffiliated with Seagate does so. Where Seagate
26   ████████ sells HDDs to foreign indirect purchasers abroad (e.g., ██████) for incorporation into
    products that are then sold into the U.S., the sale to the U.S. is at least the *fourth* sale of the HDD
27   Suspension (Defendant → Seagate Thailand → ████████ → Foreign Indirect Purchaser that
    incorporates HDDs into a larger product → U.S. customer). If so inclined, the Court can effectively
28   split Category 2 into two subcategories—one for ████████████████████████ into the U.S., and
    another for imports by foreign indirect purchasers downstream from ████████.

14

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  held that there is no "import commerce" when "[i]t was [the U.S. plaintiff], rather than the

2  defendants, that imported [the price-fixed component] into the United States, as components of the

3  [consumer product] that its foreign subsidiaries manufactured abroad and sold and shipped to it."

4  775 F.3d at 818. Seagate falsely states that *Motorola* "directly conflicts with the Ninth Circuit in

5  *Hsiung*." Opp'n at 23 n.107.[33] As explained above, in *Hsiung* the Ninth Circuit recognized as

6  "import commerce" only LCD panels that were sold directly into the U.S. by the defendant

7  producers. 778 F.3d at 755.[34] That is the same holding as in *Motorola*.[35]

8        Although aligned, *Hsiung* was a criminal case, while *Motorola* was a civil case arising from

9  the same conspiracy to fix the prices of LCD panels. The Seventh Circuit noted in *Motorola* that

10  even the DOJ, FTC, State Department, and Department of Commerce did not appear to agree with

11

12  [33] *See also* Opp'n at 32 (asserting that there is a circuit split on what "involves import trade").
13  [34] The record in *Hsiung* is replete with distinctions between the direct versus indirect routes that
   LCD panels took to the U.S. The Government conceded that only sales of LCD panels directly to the
   U.S.—not panels sold abroad then incorporated into cell phones sold into the U.S.—constituted
14  import commerce. *See* Br. for the U.S. at 8 ("Gov't Br."), No. 12-10500 (9th Cir. Apr. 5, 2013), ECF
   No. 36-1 (explaining that defendants' LCD panels reached the U.S. in two ways: "First, 2.6 million
15  raw panels—sold for more than $638 million—were shipped from the conspiring manufacturers to
   customers in the United States. Second, $23.5 billion in panels were imported into the United States
16  as part of finished products, such as notebook computers and computer monitors."). The
   Government conceded, and the Ninth Circuit determined, that only this $638 million in sales
17  constituted import commerce. *Id.* at 36, 47, 55 ("The government relied on evidence of price-fixed
   raw panels imported into the United States for the import commerce exception, not on evidence of
18  panels incorporated into finished products."); *Hsiung*, 778 F.3d at 743 (noting that "sales of panels
   by [co-conspirators] to the United States generated over $600 million in revenue"). Consistent with
19  the Ninth Circuit's ruling in *Hsiung*, NHK does not seek summary judgment as to HDD Suspensions
   that it sold to Seagate for delivery in the U.S. (mainly prototypes).
20    The Ninth Circuit's remark that the "suggest[ion] . . . that AUO was not an 'importer' misses the
   point" had nothing to do with whether sales had to be directly to the U.S. to constitute import
21  commerce—they did. The comment was based on AUO's argument that it had. Its counsel also sold raw
   panels into the U.S.—its co-conspirators had. *See* Gov't Br. at 56 ("AUO need not be 'an importer'
22  to engage in anticompetitive conduct involving import commerce. It is sufficient that the
   *conspirators* sold price-fixed products for delivery to the United States, and the undisputed evidence
23  shows that they did.") (emphasis added).
   [35] Where there actually *is* a conflict between the Seventh and Ninth Circuits, the Ninth Circuit
24  interprets the FTAIA to exclude *more* commerce from the Sherman Act's reach than does the
   Seventh Circuit. Specifically, in applying the domestic effects test, the Ninth Circuit requires an
25  effect to "'follow[] as an immediate consequence of the defendant's activity'" to be "direct." *Hsiung*,
   778 F.3d at 758 (quoting *United States v. LSL Biotechs.*, 379 F.3d 672, 680 (9th Cir. 2004)). The
26  Seventh Circuit, on the other hand, requires "only a reasonably proximate causal nexus" for an effect
   to be "direct." *Minn-Chem*, 683 F.3d at 857.
27    The *Hsiung* court cited *Motorola* favorably in discussing the impact of many layers of commerce
   on whether a domestic effect is "direct." *Hsiung*, 778 F.3d at 760. Surely if the Ninth Circuit
28  perceived a conflict with *Motorola* as to the import exception, it would have said so—as it did vis-à-
   vis *Minn-Chem* when discussing the meaning of "direct."

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

15

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

the argument that Motorola made in that case and that Seagate is making now. *See* 775 F.3d at 825. To preserve its ability to invoke the criminal and injunctive provisions of the Sherman Act against the conspirators, the DOJ asked the Seventh Circuit to hold that the conspiracy to fix the price of LCD panels had a direct, substantial, and reasonably foreseeable effect on U.S. import and domestic commerce in cell phones incorporating these panels. *Id.* But the DOJ did *not* assert that Motorola could obtain damages for its foreign subsidiaries' purchases of LCD panels. *Id.* The Seventh Circuit granted the DOJ's wish and clarified that "Motorola's inability to mount the kind of private antitrust suit that it is attempting in this case does not foredoom the use of antitrust law [by the DOJ] to prevent and punish the kind of foreign cartelization harmful to Motorola's subsidiaries." *Id.* at 826.[36]

Seagate's foreign procurement, manufacturing, and distribution affiliates were strategically located, and 99% of NHK's sales to Seagate were billed and shipped abroad. Mot. at 6 n.23, 18. Both the Seventh and Ninth Circuits would agree that, having availed themselves of the laws and privileges of foreign nations, Seagate must seek its remedies abroad as well. *See generally* Mot. at 14–18.

### III.   The FTAIA's Effects Exception Is Not Met.

#### A.   No Domestic Effect "Gives Rise To" Seagate's Claims Based on Foreign Purchases (NHK Categories 1, 2, and 3; Seagate Categories A and B).[37]

To meet the domestic effects exception, there must be a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce and the effect must give rise to a federal antitrust claim. "It is essential to understand that these are two requirements. . . . The first requirement, if proved, establishes that there is an antitrust violation; the second determines who may bring a suit based on it." *Motorola*, 775 F.3d at 818. Seagate clings to the notion that if negotiations in the U.S. set the

---

[36] As the Seventh Circuit observed, Motorola was asserting a right to forum shop. "If some foreign country in which one of its subsidiaries operates happened to provide a more generous private damages remedy than American antitrust law provides, Motorola would direct that subsidiary to seek that remedy in that country." *Id.* at 826. The same is true here.

[37] Seagate does not separately address NHK's Category 4: HDD Suspensions exported from the U.S. by HTI. Seagate instead collapses these exports into its Categories A and B based on whether they ultimately ended up back in the U.S. To be excepted under the FTAIA, however, anticompetitive conduct affecting export commerce must have direct effects on an *exporter*. *See* 15 U.S.C. § 6a(1)(B) (requiring a direct, substantial, and reasonably foreseeable effect on export commerce "of a person engaged in such trade or commerce in the United States"); *Capacitors III*, 2018 WL 4558265, at *7 (excluding exported capacitors). Seagate has not demonstrated any such effect.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

global price for a component, the domestic "effect of eliminating competition in the United States" gives rise to a Sherman Act claim for every purchase of the component—even purchases made abroad, and even when the component never enters the U.S. Opp'n at 25. Seagate is wrong.

### 1. HDD Suspensions That Did Not Enter the U.S. Did Not Affect Domestic Commerce (NHK Category 1, Seagate Category A).

As an initial matter, no court has *ever* found that foreign purchases of component parts from foreign manufacturers by foreign entities have a direct, substantial, and reasonably foreseeable effect on domestic or import commerce that gives rise to a claim under the Sherman Act for components that never entered the U.S.—even if a global price was negotiated and established in the U.S. Negotiation and agreement within the U.S. "may be 'domestic' in the geographic sense that something happened within the U.S., but it is not a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic commerce." *Capacitors III*, 2018 WL 4558265, at *6. Rather,

> [t]he [component parts] in this category were sold abroad, incorporated into finished goods abroad, and the finished goods were sold abroad. There was no impact on a U.S. purchaser or consumer, and no allegation that anyone in the United States paid a supra-competitive price for these [components]. To impose the Sherman Act on overseas transactions of this sort would undermine Congress's intent in the FTAIA and "create[ ] a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs."

*Id.* (quoting *Empagran*, 542 U.S. at 165).

Despite that Seagate's U.S.-based procurement team claims to have set global pricing for its foreign affiliates' Category 1/A purchases based on the same negotiations as for Category 2/B purchases, Category 1/A purchases—foreign sales of HDD Suspensions to Seagate Thailand for incorporation into HDDs that never entered the U.S.—"are too far removed and are not within the scope of either the federal or state antitrust laws." *ODDs*, 2017 WL 11513316, at *1.[38] As Judge Donato correctly concluded, "[t]he Category [1/A] purchases concern precisely the foreign consumers and producers, and wholly foreign transactions, that the FTAIA shields." *Id.* at *6. *See also Motorola*,

---

[38] For its import trade argument, Seagate argues that *ODDs* is nearly identical to this case. As explained above, *ODDs* is not dispositive of Seagate's import trade argument because the importer in *ODDs* had directly purchased the ODDs from the defendants. But if Seagate is going to characterize *ODDs* as nearly identical for purposes of its Category B, so too must it accept that its Category A is identical to the same category deemed "far too removed" to be actionable in *ODDs*. As Judge Posner said in *Motorola*, "take the good with the bad." 775 F.3d at 827.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

775 F.3d at 818–19 ("The panels—57 percent of the total—that never entered the United States neither affected domestic U.S. commerce nor gave rise to a cause of action under the Sherman Act."). Because HDD Suspensions that never entered the U.S. had no effect on domestic commerce, claims based on those purchases are barred by the FTAIA.

### 2. Negotiating and Setting Prices in the U.S. Does Not Give Rise to Seagate's Sherman Act Claims (NHK Categories 2 and 3, Seagate Category B).

Seagate strives mightily to "get through the eye of th[e] needle" for which "Sherman Act claims of foreign purchasers who were invoiced and received their [components] abroad are not barred as a matter of law." *Capacitors I*, 2016 WL 5724960, at \*6. To do so, Seagate theorizes that "eliminat[ing] all aspects of competition in the United States" was *both* the domestic effect of the alleged conspiracy *and* the injury to Seagate. Opp'n at 27 ("The conspiracy's effect to eliminate all aspects of competition in the United States *was* the injury to Seagate.").[39] This theory fails at the outset for two reasons.

First, antitrust injury cannot precede the initial sale of a price-fixed product. As explained in NHK's motion, the domestic effect of increased prices on products sold in the U.S. cannot give rise to Seagate's earlier-in-time injury of paying increased prices for HDD Suspensions abroad. Mot. at 19–22. Seagate does not disagree. Instead, Seagate cites *ODDs*, 2017 WL 11513316, at \*5, and *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 822 F. Supp. 2d 953, 963 (N.D. Cal. 2011), for the proposition that a conspiracy's injury cannot be isolated to a single point in time. But both cases held only that there can be additional injury *after* the initial sale of a price-fixed component—not that any injury can *precede* the initial sale. It cannot. After all, if Seagate Thailand never issued POs for HDD Suspensions, Seagate would have no injury and thus no claim. It is black letter law that "injury" under the Sherman Act is payment of the allegedly supracompetitive price. *E.g.*, *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101, 1115 (N.D. Cal. 2007) ("It is upon this payment that

---

[39] This contrasts with Seagate's operative Complaint, which clearly and exclusively sets forth its injuries as "having paid higher prices for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct." Seagate Pls.' Second Am. Compl. ¶ 249, ECF No. 352. *See also id.* ¶¶ 263, 272, 281, 291 (describing Seagate's harm as having "paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct").

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

any antitrust injury occurs."). Thus, "loss of competition" cannot constitute Seagate's injury.

Second, even if "loss of competition" in the U.S. could be considered both a domestic effect of an antitrust conspiracy and an injury, Seagate's argument still fails because a domestic effect cannot double as its own injury. Under the FTAIA, "the domestic effects *must occur first* and then proximately cause the foreign antitrust claim." *In re Hydrogen Peroxide Antitrust Litig.*, 702 F. Supp. 2d 548, 551 (E.D. Pa. 2010) (emphasis added) (expressly rejecting simultaneous effect and harm theory).

Even viewing the antitrust injury at the correct time—the time of purchase and payment— Seagate is wrong in its argument that if negotiations in the U.S. set the global price for a component, the domestic "effect of eliminating competition in the United States" (Opp'n at 25) gives rise to a Sherman Act claim for every foreign purchase of the component. Seagate cites three cases in support of its argument: (1) *In re TFT-LCD (Flat Panel) Antitrust Litigation* ("*Dell*"), 781 F. Supp. 2d 955 (N.D. Cal. 2011); (2) *In re TFT-LCD (Flat Panel) Antitrust Litigation* ("*Motorola III*"), No. M 07-1827, 2012 WL 3276932 (N.D. Cal. Aug. 9, 2012); and (3) *In re Lithium Ion Batteries Antitrust Litigation* ("*Lithium Ion Batteries*"), No. 13-md-02420, 2017 WL 2021361 (N.D. Cal. May 12, 2017). These cases do Seagate no favors; in the first, Judge Illston acknowledged that whether the negotiation in the U.S. of a contract setting global prices can satisfy the domestic effects exception was a matter of first impression subject to substantial ground for difference of opinion. In the second, Judge Illston's finding to that effect was held to be a clear error of law. And in the third, Judge Rogers expressly declined to reach the issue.

First, in *Dell*, Judge Illston denied a motion to dismiss Dell's claims against Sharp, Hitachi, and Epson for a conspiracy to fix the price of LCD panels where "the transactions at issue include[d] foreign transactions between defendants and certain of Dell's foreign affiliates." 781 F. Supp. 2d at 960. Judge Illston found that, for pleading purposes, negotiating and executing, at Dell's Texas headquarters, Master Purchase Agreements setting the (fixed) price for all of Dell and its affiliates' purchases of LCD panels could be a domestic effect that proximately caused antitrust injury. *Id.* at 963–64. But Seagate neglects an important point: the defendants in *Dell* moved to certify an interlocutory appeal, which Judge Illston granted. *See* Order Granting Defs.' Mot. to Certify, No. 3:07-md-01827 (N.D. Cal. May 25, 2011), ECF No. 2811. Judge Illston recognized that the question of

"whether the negotiation within the United States of a contract setting a global, super-competitive price can satisfy the domestic-injury exception to the FTAIA's [] bar" was one of first impression—for which there was substantial ground for difference of opinion such that "the novelty of the issue merit[ed] appellate review." *Id.* at 2. Ultimately, the Ninth Circuit declined the interlocutory appeal. *Dell Inc. v. Sharp Corp.*, No. 11-80129 (9th Cir. Aug. 11, 2011), ECF No. 5.

Clarity came three years later. In *Motorola III*, Judge Illston, in the same MDL, followed the same reasoning to find that the defendants' conduct, including negotiating with Motorola in the U.S., could give rise to Motorola's Sherman Act claims, even for its subsidiaries' foreign purchases of LCD panels, based on Motorola's "domestic roots," "the locale of the transactions at issue," and the defendants' conspiratorial conduct in the U.S. 2012 WL 3276932, at *2–4. Seagate again neglects a critical point: ***the order was reversed on reconsideration*** after being returned from the MDL to the transferor court for trial. *See Motorola Mobility, Inc. v. AU Optronics Corp.*, No. 09 C 6610, 2014 WL 258154 (N.D. Ill. Jan. 23, 2014) ("*Motorola IV*"). The transferor court recognized that it could only grant the motion for reconsideration if there was a clear error of law—not merely if it would have decided the matter differently. *Id.* at *4. The transferor court found such a clear error of law: relying on *DRAM*—a Ninth Circuit case—the transferor court concluded that "domestic approval cannot fairly be said to give rise to Motorola's Sherman Act claim. For Sherman Act purposes, the injury arose when Motorola's foreign affiliates purchased LCD panels at inflated prices, not when Motorola decided at what price those purchases would be made." *Id.* at *9 (citing *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008)). This is the order that the Seventh Circuit affirmed in *Motorola*, recognizing that increased prices in the U.S. cannot give rise to claims based on earlier-in-time foreign component purchases. 775 F.3d at 823 (noting that foreign injury preceding the first U.S. sale does not "give rise to an antitrust cause of action").

Unsurprisingly, no subsequent case cites *Motorola III* for any legal proposition.[40] And only

---

[40] Moreover, no court—in this Circuit or elsewhere—has questioned the reversal. In fact, Judge Rogers in *In re Lithium Ion Batteries Antitrust Litig.*—in an order that post-dates *Hsiung*—cited the *Motorola IV* decision in articulating the FTAIA standard. 2016 WL 5793457, at *4. In *Costco*, another case that spun off from the LCD MDL proceedings in this District, the transferor court noted that Costco's claims could survive even though Motorola's could not because of the differences between their respective claims: "in contrast to Costco's import purchases from Panasonic [which passed FTAIA muster], as to all but a tiny fraction of the purchases, Motorola did not purchase the

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

one case has ever cited the earlier *Dell* order for the proposition that domestically negotiated and agreed prices could give rise to a Sherman Act claim based on foreign purchases: *Lithium Ion Batteries*—another order on a motion to dismiss. Judge Rogers in *Lithium Ion Batteries* stated that she found the allegations of proximate causation sufficient only as a pleading matter, and expressly "decline[d] to reach the merits of plaintiffs' theory [that prices set in the U.S. could proximately cause injury to Flex's affiliates abroad] without further factual development." 2017 WL 2021361, at *5.[41] Contrary to Seagate's representation, Judge Rogers *did not* hold that when a U.S. company negotiates and agrees on prices in the U.S., the domestic effects exception could be satisfied, even when purchase orders are issued by the company's foreign affiliates abroad. The only judge who has done so in this District (Judge Illston) expressly recognized that the issue was unsettled and that there was substantial ground for difference of opinion. That holding was found to constitute a clear error of law, and the only federal appellate court that has tackled the issue agreed.

Thus, despite Seagate's representations to the contrary, courts in this District have *not* blessed Sherman Act claims based on foreign purchases by foreign entities of foreign-made components from foreign manufacturers. Doing so would undermine the purpose of the FTAIA (comity concerns), as articulated by the Supreme Court in *Empagran* and the Ninth Circuit in *DRAM*. *See* Mot. at 13, 18. As was the case in *Motorola IV*, even if Seagate's U.S.-based negotiations constituted "domestic approval," such approval "was not the direct cause of [Seagate]'s foreign affiliates' claim; rather, that claim resulted from the overall price-fixing conspiracy itself." 2014 WL 258154, at *9.

**B.     No Effect on Import Commerce "Gives Rise to" Seagate's Claims Based on Foreign Purchases (NHK Categories 2 and 3, Seagate Category B).**

Claims based on conduct that has a direct, substantial, and reasonably foreseeable effect on

---

panels itself, it relied on its foreign subsidiaries." 2014 WL 4718358, at *6.

[41] Flex then settled with some defendants (*see, e.g.*, Notice of Voluntary Dismissal, *Flextronics Int'l USA, Inc. v. LG Chem., Ltd.*, No. 4:16-cv-4018 (N.D. Cal. July 14, 2017), ECF No. 52; Order Granting Stipulation of Dismissal, *Flextronics Int'l USA, Inc. v. LG Chem., Ltd.*, No. 4:16-cv-4018 (N.D. Cal. Dec. 19, 2017), ECF No. 80), and was enjoined from pursuing claims against others because those claims had been released as part of a class settlement. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2017 WL 6497597 (N.D. Cal. Dec. 19, 2017). Judge Rogers clarified that she had denied the prior motion to dismiss under the FTAIA "based on Flex USA's allegations and arguments that a substantial portion of the purchases at issue for Flextronics and its affiliates were shipped to the United States or otherwise met the definition of 'import trade or commerce,'"—not because foreign purchases met the domestic effects test. *Id.* at *4.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

domestic or import commerce are not barred by the FTAIA if the effect gives rise to the claims. 15 U.S.C. § 6a. Seagate accuses NHK of failing to address import commerce, but the analysis is the same: to the extent Seagate casts the effect as "eliminating competition in the United States," (Opp'n at 29), that effect did not give rise to Seagate Thailand's injury for the same reasons set forth in the previous section. To the extent Seagate casts the effect as increased prices for products containing HDD Suspensions that eventually entered the U.S. (Opp'n at 29), that effect occurred downstream of Seagate Thailand's injury and thus did not give rise to its claims.

Seagate's argument hinges primarily on the plea agreement, in which NHK admitted effects on domestic and import commerce for HDD Suspensions. Opp'n at 30. Nothing in the plea agreement suggests that this admission extended to *all* HDD Suspensions that ever entered the U.S., far down the stream of commerce in products that incorporated HDDs. Quite the opposite: NHK admitted that it sold HDD Suspensions abroad "for incorporation into products—*namely, hard disk drives*—that were *sold in*, or *for delivery to*" the U.S., and that certain of these sales, together with HDD Suspensions sold directly to the U.S., "had a direct, substantial, and reasonably foreseeable effect on interstate [*i.e.*, domestic] and import trade and commerce." *United States v. NHK Spring Co.*, No. 2:19-cr-20503, at 5 (E.D. Mich. Sept. 23, 2019), ECF No. 15, at 5 (emphasis added). The plea agreement provides no basis to find the requisite effect on import commerce beyond HDDs sold in or delivered to the U.S.

Nor is there any such basis in law. Contrary to Seagate's hyperbole, there is no rule in this District or elsewhere that a conspiracy to fix the price of a component part manufactured and sold abroad automatically meets the FTAIA's effects exception as to every such part that ultimately ends up in the U.S. Each case must be analyzed on its unique facts to determine whether the effects exception to the FTAIA is met for each category of sales. In this case, it is not.

As to whether any effect was direct and substantial, Seagate concedes that HDD Suspensions entering the U.S. in products containing HDDs (e.g., computers) did not have any direct or substantial effect. *See* Opp'n at 31–32 (arguing that directness is satisfied only as to Seagate's own manufacturing of HDDs); *id.* at 32 (arguing that substantiality is met only as to HDDs). This makes sense, as HDD Suspensions make up only a tiny fraction of the cost of products that incorporate HDDs, and such products go through more layers of commerce than bare or standalone HDDs. *See* Mot. at 22–25.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

1    Thus, the portion of Seagate's Category B where Seagate sold HDDs abroad to foreign indirect

2    purchasers who then incorporated them abroad into larger products sold into the U.S. does not meet

3    the effects tests. For the portion of Seagate's Category B where foreign Seagate entities incorporated

4    HDD Suspensions into HDDs that were sold into the U.S., Seagate's claims fail because the effect did

5    not give rise to Seagate's injury, as explained in the previous section.

6          **C.    Seagate Cannot Pursue Claims as an Indirect Purchaser (Seagate Category C).**

7          For the very first time, Seagate, in little more than a page of its Opposition, insinuates that this

8    action includes claims of Seagate LLC as an *indirect purchaser*—effectively a member of the Reseller

9    Class. Seagate says that ████████████████████████████████████████████████████

10   ███████████████████████████████████████████, accounting for between one-quarter and

11   one-third of all Seagate sales worldwide. Opp'n at 33–34. Seagate defines Category C as comprising

12   those sales. *Id.* at 14. Having never pleaded or pursued claims in this action as an indirect purchaser,

13   Seagate cannot do so here. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 WL

14   5411590, at *2 (N.D. Cal. Nov. 6, 2012) (refusing to consider plaintiff's new, unpleaded theories in

15   opposition to summary judgment, finding that plaintiff not only failed to assert the theories in its third

16   amended complaint but provided no other indication prior to its opposition that it would rely on these

17   theories); *Newton v. Am. Debt Servs.*, 75 F. Supp. 3d 1048, 1063 (N.D. Cal. 2014) ("As the Ninth

18   Circuit has repeatedly held, 'summary judgment is not a procedural second chance to flesh out

19   inadequate pleadings.'") (quoting *Wasco Prods. v. Southwall Techs.*, 435 F.3d 989, 992 (9th Cir.

20   2006)); *Motorola*, 775 F.3d at 823–24. In *Motorola*, the Seventh Circuit found that Motorola had

21   waived any argument that it could base damages for price-fixed components on the cost to Motorola

22   of cell phones incorporating those components. Motorola had pleaded such a theory, but argued in the

23   district court only that its foreign subsidiaries overpaid for LCD panels based on the same argument

24   Seagate makes in this case: that the approval of a single, artificially inflated LCD panel price in the

25   U.S. proximately caused all of Motorola's damages, because that same price applied wherever and

26   whenever a Motorola facility placed a purchase order and paid for a panel. 775 F.3d at 823–24.

27         Here, Seagate did not even plead an indirect purchaser theory.[42] In its Second Amended

28   _____

[42] Seagate's argument that "NHK is not moving on Category C" (Opp'n at 25 n.110) is thus a farce;

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

Complaint, Seagate describes its injuries as "having paid higher prices for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct." Seagate Pls.' Second Am. Compl. ¶ 249, ECF No. 352. Seagate alleges it was injured "as a purchaser of suspension assemblies," having "purchased suspension assemblies directly from certain Defendants at prices that were artificially inflated . . . ." *Id.* ¶¶ 250–51. In each of its claims for relief, Seagate describes its harm as having "paid more for *suspension assemblies* than it would have paid in the absence of Defendants' unlawful conduct." *Id.* ¶¶ 263, 272, 281, 291 (emphasis added). Those are the allegations upon which the case has proceeded for years and fact discovery was conducted. Regardless of whether it could have done so, Seagate simply has not brought indirect purchaser claims based on the price it paid for HDDs.

## IV.   Seagate's Objection to NHK's Evidence Is Meritless.

Seagate concludes its brief with a meritless attack on Akira Okuma's declaration supporting NHK's motion. Mr. Okuma is the Director of the DDS Sales Department for NHK Spring. Okuma Decl. ¶ 1, ECF No. 533-2. Mr. Okuma explained that based on his experience at NHK (dating back to 1992), he has personal knowledge of the matters set forth in his declaration, and where he does not have personal knowledge, he provided the source of the information. *Id.* ¶ 4. That alone establishes Mr. Okuma's personal knowledge. *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."); *Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F. Supp. 3d 932, 945 (C.D. Cal. 2014) ("Puleo states, under penalty of perjury, that the statements in the declaration are based on personal knowledge he has gained as Newhall Memorial's Vice President and Chief Human Resources Officer; this provides adequate foundation for the statements."); *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1037 (C.D. Cal. 2013) (personal knowledge of declarant who is both a percipient and 30(b)(6) witness "can be inferred from his position within the company"). Additionally, knowledge gained based on review of records available to Mr. Okuma as Director of the DDS Sales Department suffices to provide the foundation for his declaration. *Vasserman*, 65 F. Supp. 3d at 945.[43] Moreover, Seagate does not actually challenge the accuracy of

---

Seagate pleaded no claims based on its purchases of finished HDDs, so there is nothing to move on.
[43] The sole case cited by Seagate, *Anhing Corp. v. Thuan Phong Co.*, 215 F. Supp. 3d 919 (C.D. Cal. 2015), is inapposite. There, the declarant's statement that a trademark "has long been incontestable" was found to be a legal conclusion, while his statement that a city in Vietnam was not known for the production of rice noodles before 1975 went beyond the declarant's personal knowledge to the

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

the facts set forth in the declaration, nor does Seagate explain how any allegedly disputed fact is material to the FTAIA analysis.

Seagate's argument that only an expert can testify about sales data is also meritless, and Seagate does not deny that more than 99% of HDD Suspension purchases from Defendants were made abroad. That fact, ascertainable from NHK's sales data produced in this case, does not require "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. *See also Stockroom Inc. v. XR LLC*, No. 08-01046, 2009 WL 10674303, at *2 (C.D. Cal. Oct. 19, 2009) ("The Court does not find that interpretation of sales data requires 'scientific, technical, or other specialized knowledge.'").

Finally, Seagate's hearsay objection is equally meritless. As explained above, as a corporate director Mr. Okuma has ample personal knowledge of the relevant facts concerning his department's operations. He is permitted to testify as to that knowledge, even if it relates to processes in place before he became the Director of the DDS Sales Department. *See Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006) ("Plaintiff fails to appreciate that a declarant can testify about practices or procedures in place before the witness was employed with the organization about which he is relating information.") (citing *United States v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977) (finding a restaurant manager had ample personal knowledge to testify as to normal company procedures on a date prior to his employment)).[44] Accordingly, the Court should disregard Seagate's foundation objections to Mr. Okuma's declaration.

## CONCLUSION

For the reasons set forth in NHK's FTAIA Motion and above, NHK asks the Court to grant partial summary judgment as to Categories 1, 2, 3, and 4 of Seagate's claims.

---

extent it discussed the city's general reputation and association with rice products and not the declarant's own understanding of those topics. *Id.* at 928.

[44] In *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), the facts included in a diary had not been sworn to. As an out-of-court statement offered to prove the truth of the matter asserted therein, the diary was hearsay. *See* Fed. R. Evid. 801(c)(1) (setting forth that a statement can constitute hearsay only if "the declarant does not make [the statement] while testifying at the current trial or hearing"). Unlike in *Fraser*, Mr. Okuma swore to the facts in his declaration, so there is no attempt to use any out-of-court statement. As is clear from a plain reading, Mr. Okuma's declaration does not repeat statements made by others. The facts set forth in Mr. Okuma's declaration are within his personal knowledge gained during his employment, including review of records available to him as Director of the DDS Sales Department, and thus are not hearsay.

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave  NW
Washington, DC 20037
(202) 955-1500

Dated: December 7, 2022

Respectfully submitted,

By:  */s/ Craig Y. Lee*

Craig Y. Lee (*Pro Hac Vice*)
craiglee@huntonak.com
Carter C. Simpson (*Pro Hac Vice*)
csimpson@huntonak.com
Christopher J. Dufek (*Pro Hac Vice*)
cdufek@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone: (202) 955-1500

Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Telephone: (213) 532-2103

Laura T. Wagner (*Pro Hac Vice*)
lwagner@huntonak.com
**HUNTON ANDREWS KURTH LLP**
600 Peachtree Street, N.E., Suite 4100
Atlanta, GA 30308
Telephone: (404) 888-4000

*Counsel for Defendants NHK Spring Co., Ltd.,
NHK International, NHK Spring (Thailand) Co.,
Ltd., NAT Peripheral (Dong Guan) Co., Ltd. and
NAT Peripheral (H.K.) Co., Ltd.*

Hunton Andrews Kurth LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
(202) 955-1500

Case No. 3:19-md-02918-MMC
NHK DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT