# Exhibit 1

## FILED UNDER SEAL

# Exhibit 2

## FILED UNDER SEAL

# Exhibit 3

## **FILED UNDER SEAL**

# Exhibit 4

The Wayback Machine - https://web.archive.org/web/20070630163044/http://www.seagate.com:80/w/v/index.jsp?locale=en-US&name=purchase_orders_thailand&vgnextoi...

## Purchase Orders Thailand

Download Purchase Order Form (PDF)

**INSTRUCTIONS:**

Read this entire order form, including the incorporated terms and conditions located at http://www.seagate.com/help/legal/po_Thailand.html. The terms and conditions located at the URL referenced above ("Terms") in effect on the Order Date appearing on this order are a material part of this order. Do not accept this order unless you accept the Terms. By accepting this order you agree that you have read, understood and accepted the Terms. If you cannot access the Terms, request them from the buyer.

**PURCHASE ORDER**

**1. ACCEPTANCE**
1.1. **Acceptance Must Mirror Offer**. This order is an offer to purchase goods or services under these exact terms only; this order is limited to acceptance of these exact terms without modification.
1.2. **Additional Terms Are Proposals**. Any additional or different terms in your acceptance will be construed as proposals and will not become part of our contract with you unless we agree in writing to your additional terms. All references in this order to "you" or "your" refer to the supplier designated above. All references in this authorization to "us" or "we" refer to Seagate.
1.3. **Existing Agreement**. If we have an existing formal written agreement with you governing our purchase of your goods or services, then the terms in the formal written agreement will supersede any contrary terms in this order.

**2. PRICES**
2.1. **Lowest Price**. Your prices may not be greater than any prices you offer to any other customer for the same goods or services in similar quantities and condition from the time when this order is placed with you and the time it is fully performed by you.
2.2. **Last Quoted Price**. If no price is specified in this order, your price must be equal to or less than the last price you previously quoted or charged us.
2.3. **Expenses**. If this order allows for reimbursement of your expenses, you must comply with our Corporate Travel Policy, located at http://www.seagate.com/help/legal/ctp.html, which is available from us upon request and incorporated into this order.
2.4. **Prepay & Add**. If this order says "prepay & add," then you must prepay all shipping costs and include the actual shipping costs on your invoice as a separate line item.
2.5. **Sales Tax**. If an item is designated as taxable, then include the actual sales tax on your invoice as a separate line item.
2.6. **Prices All Inclusive**. Except for "prepay & add", the total price in this order includes all value added taxes, income and corporate taxes, excise taxes, stamp duties and other taxes and charges and expenses related to the shipping and delivery of goods or the performance of services. If the price is based on weight of the goods, the weight ordered excludes the weight of any packaging.
2.7. **Invoices**. You will submit a separate invoice to us for each shipment. Your invoice must include this order number and may not cover more than one order.

**3. SHIPPING TERMS**
3.1. **Incoterms**. All shipping terms in this order refer to International Chamber of Commerce, Incoterms 2000. If the goods are to be delivered through a "Just-in-Time" (JIT), "Vendor Managed Inventory" (VMI) or "3rd Party Logistics" (3PL) facility, the delivery destination is not the JIT, VMI or 3PL facility, but the Seagate facility where the goods are shipped from the JIT, VMI or 3PL facility.
3.2. **Transfer of Title**. Title of goods will pass to Seagate when delivery is complete according to Paragraph A4 for the designated Incoterm as defined in Incoterms 2000.
3.3. **Cargo Insurance**. If the designated Incoterm requires cargo insurance, you must purchase cargo insurance under Clause A (formerly "all risks") of the London Underwriters Institute Cargo Clauses. If you do not purchase insurance under Clause A, you will bear the risk of loss for all risks that are covered under Institute Cargo Clauses, Clause A.
3.4. **Shipping Instructions**. Ship only the quantities specified in this order. Do not over-ship or under-ship. Ship your goods for arrival on the delivery date specified in this order. Enclose a packing slip with each shipment and print this order number on the packing slip and all invoices. Advise us immediately if you are unable to ship so that your goods arrive on the specified delivery date.
3.5. **Overshipments and Early Shipments**. If you ship more goods than ordered, or if you deliver the goods earlier than ordered, we may purchase some or all of the goods or return some or all of the goods to you at your risk and expense.
3.6. **Tax or Duty Refunds**. We reserve the right to any tax or duty refunds.

**4. PACKAGING AND LABELING**
4.1. **Packaging**. You must package all goods in accordance with good commercial practice and in a manner acceptable to common carriers for shipment at the lowest rate for the goods involved, and adequate to ensure safe arrival of the goods to their destination.
4.2. **Labeling**. Your packaging must be labeled with this order number, the date of shipment, and the names of any consignee and consignor. You must include an itemized packaging sheet with each shipment. You must mark each package with any required handling and shipping information.

**5. CANCELLATION AND RESCHEDULING**
5.1. **Cancellation for Default**. Time is of the essence under the order. We may cancel this order in whole or in part if you do not deliver the goods or perform the services in full conformance with the warranties in Section 6 within the time specified in this order. If we cancel this order for default and it is later determined that you were not in default, your rights will be construed as if the cancellation was for our convenience under Section 5.3.
5.2. **Cancellation of Government Contract**. If this order bears a United States government contract number, we may cancel this order and any related orders upon notice of termination of the prime contract from the government. If we cancel this order for termination of a US government prime contract, we will provide fair compensation, as provided for under the Contract Settlement Act of 1944 (Public Law 395, 78th Congress).
5.3. **Cancellation for Convenience**. We may cancel this order, in whole or in part, at any time for our convenience. If we cancel this order for our convenience and we give you less than 30 days" notice of cancellation, we will reimburse your actual reasonable out-of-pocket costs that are not capable of being mitigated. To be reimbursed, you must submit your request for reimbursement within 30 days after our notice of cancellation.
5.4. **Work in Progress**. Upon receipt of our notice of cancellation, regardless of the reason for the cancellation, you must immediately stop all work in progress and use your best efforts to mitigate any costs associated with the cancellation. We have the option to purchase your work in progress, including any raw materials you may have obtained to use in your work. Our price to purchase your work in progress will be a prorated price based on the percentage of work remaining to be completed. Our price to purchase any raw materials will be your actual cost. You are not entitled to any other remedy for cancellation of this order except as provided in this section.
5.5. **Rescheduling**. We may reschedule your delivery of goods or performance of services at any time without liability. The new date for delivery or performance will not be more than 180 days beyond the originally scheduled date.

**6. WARRANTIES**
6.1. **Warranty Period**. All warranties under this order continue for five years after the date of delivery to us, unless a different warranty period is stated on the face of this order.
6.2. **Warranties Regarding Goods**. You make the following warranties to us regarding all goods you provide under this order:
(a) The goods will function properly under normal use, will be of good workmanship, free from defect, of merchantable quality, and fit for our intended use.
(b) The goods will fully comply with any specifications provided by us, including without limitation our Product Stewardship specification, and any samples or documentation provided by you.
(c) The goods will be free of any encumbrances.
(d) The goods will not violate any intellectual property rights of any third party.
6.3. **Warranties Regarding Services**. You make the following warranties to us regarding all services you provide under this order:
(a) You will perform the services with reasonable skill and care in a professional manner and in full conformance with any specifications or statements of work provided by us.
(b) Your performance of the services will not violate any intellectual property rights of any third party or any duty of confidentiality you owe to any third party.
6.4. **Other Warranty Terms**. The warranties listed above are in addition to any other warranties expressly made by you or imposed by law. All warranties will survive inspection and payment by us and are assignable to our successors and assigns.
6.5. **Warranty Remedies**. If any goods or services do not meet the warranties, we may, at our option, and without additional cost to us,
(a) require you to repair or replace the goods until the goods meet the warranties,
(b) require you to re-perform any services until the services meet the warranties,
(c) return any of the goods to you at your expense for a full refund,
(d) correct the non-conformance and charge you for the cost to make the correction,
(e) engage a third party to provide substitute goods or services and charge you for the costs of obtaining the substitute goods or services from the third party.
(f) **Remedies Nonexclusive**. The remedies listed above are in addition to any other remedies available to us in law or equity. Our review and approval of your materials or designs will not relieve you of the warranties.

**7. LIMITATION OF LIABILITY**
7.1. **Limitation of Amount of Liability**. Our maximum liability to you arising out of this order, regardless of the basis of liability or the form of action, will not exceed the total price stated in this order plus goods and services tax and prepay & add charges.
7.2. **Limitation of Type of Liability**. We will not be liable to you for any indirect, special, incidental, or consequential damages, however caused, regardless of whether we are advised of the possibility of such damages.
7.3. **Exclusion of Liability of Our Employees**. Our officers, directors, employees, affiliates and other agents are not personally liable to you under this order, and will not be liable to you under any claim related to this order.
7.4. **Purpose**. The purpose of this section is to limit our potential liability arising out of this order, and that allocation of risk is reflected in the prices. This Section 7 will apply despite the failure of any remedy of its essential purpose.

8. **INTELLECTUAL PROPERTY RIGHTS**

8.1. **Preexisting Intellectual Property**. We own all intellectual property rights related to any information or items we provide you. You may not use our intellectual property except to benefit us.

8.2. **Developed Intellectual Property**. The goods or services ordered are specially ordered or commissioned by us and are works made for hire. You transfer to us, without further consideration, all right and interest in any intellectual property developed by you during your performance of any services or delivery of any goods under this order. You must immediately disclose to us any intellectual property developed by you arising out of your performance of the services. You agree to take all necessary actions to effect your grant and assign your interest in any intellectual property developed by you including but not limited to executing all documents as may be required under applicable laws.

8.3. **Intellectual Property Indemnification**. You will defend and indemnify us and our directors, officers, employees and affiliates against any claim alleging that your goods or services infringe or violate a patent, copyright, trademark, trade dress, trade secret, or any other contractual right, proprietary right or intellectual property right of any third party.

9. **CONFIDENTIALITY**

9.1. **Confidential Information**. Any information regarding our intellectual property is our commercial valuable confidential information. The existence of this order and the information in this order is our confidential information. Any other information that we provide to you that is identified as "confidential," or is identified with similar language, or which under the circumstances surrounding disclosure ought to be treated as confidential, is our commercial valuable confidential information.

9.2. **Nondisclosure**. Except as required by law, you may not disclose our confidential information to any third party or use our confidential information other than for the purpose of your performance under this order without our prior written consent. You must segregate our confidential information from all other information. You must destroy or return our confidential information to us upon our request.

10. **INDEMNIFICATION AND INSURANCE**

10.1. **General Indemnification**. You will defend and indemnify us and our directors, officers, employees and affiliates against any claim or action arising out of your performance of this order.

10.2. **Insurance**. You will maintain general commercial liability insurance in the minimum amount of US $1,000,000 combined single limit for personal injury and property damage. If you have employees, you must maintain employer's liability in a minimum amount of US $1,000,000 per occurrence and workers" compensation insurance in accordance with law. Your insurance must include a waiver of the insurer"s subrogation rights against us, unless prohibited by law.

11. **DISPUTE RESOLUTION**

11.1. **Good-Faith Negotiation Followed by Mediation**. The parties will attempt to resolve any dispute relating to this order through good faith, informal efforts. All disputes, controversies or differences arising out of or in connection with this order that are not resolved informally, must be submitted to the Singapore Mediation Centre and the Singapore International Arbitration Centre for resolution by mediation-arbitration in accordance with the SMC-SIAC Med-Arb Procedure for the time being in force, which procedure is deemed to be incorporated by reference into this clause.

11.2. **Exclusion for Equitable Relief for Confidentiality**. We may seek equitable relief at any time to enforce the provisions of Section 9 of this order.

12. **MISCELLANEOUS**

12.1. **Governing Law**. This order is governed by the laws of Singapore, without regard to its conflicts of laws rules. The United Nations Convention on Contracts for the International Sale of Goods will not apply.

12.2. **Compliance With Laws**. You must comply with all applicable laws in performing your obligations under this order. You must require that your sub-suppliers also comply with all applicable laws and regulations in effect. Upon request, you will certify that you comply with all applicable laws and regulations. We may audit you to confirm your compliance with this section.

12.3. **Assignment**. You may not assign your rights or delegate your duties under this order to any third party without our prior written consent, including without limitation those governing environment, health and safety, and labor and employment practices.

12.4. **Severability; Survival**. Sections 7, 8, 9 and 10.1 are material to this order, are not severable, and will survive termination or cancellation of this order. Section 6 will survive for 6 years after delivery of goods or completion of services. If any term or provision of this order is or becomes invalid under any applicable law, then the remainder of this order will not be affected thereby and the remaining terms and provisions of this order will remain in effect as if the invalid portion were not a part of this order.

12.5. **Contracts (Rights of Third Parties) Act 2001**. A person who is not a party to this Purchase Order has no rights under the Contracts (Rights of Third Parties) Act 2001 of Singapore to enforce any term of this Purchase Order.

(Thailand Rev 9 September 2005)

©2007, Seagate LLC   | About Seagate   |
Jobs at Seagate   | Contact Us   |
Privacy Policy   | Legal   | Site Index

# Exhibit 5



 **SEAGATE**

Products    Solutions    Innovation    Support    About

Legal  ›  Purchase Orders Legal Overview  ›  Purchase Orders  ›  Purchase Orders Thailand

‹ **Purchase Orders**

Purchase Orders USA ›

Purchase Orders China to Foreign ›

Purchase Orders China to China ›

**Purchase Orders Thailand**

Purchase Orders Singapore ›

Purchase Orders European Union ›

Purchase Orders Malaysia ›

# Purchase Orders Thailand

Download Purchase Order Form (PDF)

## Instructions

Read this entire order form, including the incorporated terms and conditions located at http://www.seagate.com/legal-privacy/purchase-orders-legal-overview/purchase-orders-thailand/. The terms and conditions located at the URL referenced above ("Terms") in effect on the Order Date appearing on this order are a material part of this order. Do not accept this order unless you accept the Terms. By accepting this order you agree that you have read, understood and accepted the Terms. If you cannot access the Terms, request them from the buyer.

## Purchase Order Terms

1. **ACCEPTANCE**

1.1. **Acceptance Must Mirror Offer**. This order is an offer to purchase goods or services under these exact terms only; this order is limited to acceptance of these exact terms without modification.

1.2. **Additional Terms Are Proposals**. Any additional or different terms in your acceptance will be construed as proposals and will not become part of our contract with you unless we agree in writing to your additional terms. All references in this order to "you" or "your" refer to the supplier designated above. All references in this authorization to "us" or "we" refer to Seagate.

1.3. **Existing Agreement**. If we have an existing formal written agreement with you governing our purchase of your goods or services, then the terms in the formal written agreement will supersede any contrary terms in this order.

2. **PRICES**

2.1. **Lowest Price**. Your prices may not be greater than any prices you offer to any other customer for the same goods or services in similar quantities and condition from the time when this order is placed with you and the time it is fully performed by you.

2.2. **Last Quoted Price**. If no price is specified in this order, your price must be equal to or less than the last price you previously quoted or charged us.

2.3. **Expenses**. If this order allows for reimbursement of your expenses, you must comply with our Corporate Travel Policy, located at

http://www.seagate.com/legal-privacy/corporate-travel-policy, which is available from us upon request and incorporated into this order.

2.4. **Prepay & Add**. If this order says "prepay & add," then you must prepay all shipping costs and include the actual shipping costs on your invoice as a separate line item.

2.5. **Sales Tax**. If an item is designated as taxable, then include the actual sales tax on your invoice as a separate line item.

2.6. **Prices All Inclusive**. Except for "prepay & add", the total price in this order includes all value added taxes, income and corporate taxes, excise taxes, stamp duties and other taxes and charges and expenses related to the shipping and delivery of goods or the performance of services. If the price is based on weight of the goods, the weight ordered excludes the weight of any packaging.

2.7. **Invoices**. You will submit a separate invoice to us for each shipment. Your invoice must include this order number and may not cover more than one order.

3. **SHIPPING TERMS**

3.1. **Incoterms**. All shipping terms in this order refer to International Chamber of Commerce, *Incoterms 2010*. If the goods are to be delivered through a "Just-In-Time" (JIT), "Vendor Managed Inventory" (VMI) or "3rd Party Logistics" (3PL) facility, the delivery destination is not the JIT, VMI or 3PL facility, but the Seagate facility that receives the after the goods are shipped from the JIT, VMI or 3PL facility.

3.2. **Transfer of Title**. Title of goods will pass to Seagate when delivery is complete according to the designated Incoterm as defined in *Incoterms 2010*.

3.3. **Cargo Insurance**. If the designated Incoterm requires cargo insurance, you must purchase cargo insurance under Institue Cargo Clauses, Clause A (formerly "all risks") of the International Underwriting Association of London, or its successor. If you do not purchase insurance under Clause A, you will bear the risk of loss for all risks that are covered under Institute Cargo Clauses, Clause A.

3.4. **Shipping Instructions**. Ship only the quantities specified in this order. Do not over-ship or under-ship. Ship your goods for arrival on the delivery date specified in this order. Enclose a packing slip with each shipment and print this order number on the packing slip and all invoices. Advise us immediately if you are unable to ship so that your goods arrive on the specified delivery date. In all shipments, you must comply with the Customs Clearance Documentation located at http://www.seagate.com/legal-privacy/encrypting-drive-export-import-compliance/customs-clearance-documentation, including any applicable country specific requirements identified in the Customs Clearance Documentation, which is also available from us upon request and incorporated into this order.

3.5. **Overshipments and Early Shipments**. If you ship more goods than ordered, or if you deliver the goods earlier than ordered, we may purchase some or all of the goods or return some or all of the goods to you at your risk and expense.

3.6. **Tax or Duty Refunds**. We reserve the right to any tax or duty refunds. You will provide us with any documents necessary to prove importation and to claim duty drawbacks or similar relief.

4. **PACKAGING AND LABELING**

4.1. **Packaging**. You must package all goods in accordance with good commercial practice and in a manner acceptable to common carriers for shipment at the lowest rate for the goods involved, and adequate to ensure safe arrival of the goods to their destination

4.2. **Labeling**. Your packaging must be labeled with your order number, the date of shipment, and the names of any consignee and consignor. You must include an itemized packaging sheet with each shipment. You must mark each package with any required handling and shipping information.

5. **CANCELLATION AND RESCHEDULING**

5.1. **Cancellation for Default**. Time is of the essence under the order. We may cancel this order in whole or in part if you do not deliver the goods or perform the services in full conformance with the warranties in Section 6 within the time specified in this order. If we cancel this order for default and it is later determined that you were not in default, your rights will be construed as if the cancellation was for our convenience under Section 5.3.

5.2. **Cancellation of Government Contract**. If this order bears a United States government contract number, we may cancel this order and any related orders upon notice of termination of the prime contract from the government. If we cancel this order for termination of a US government prime contract, we will provide fair compensation, as provided for under the Contract Settlement Act of 1944 (Public Law 395, 78th Congress).

5.3. **Cancellation for Convenience**. We may cancel this order, in whole or in part, at any time for our convenience. If we cancel this order for our convenience and we give you less than 30 days' notice of cancellation, we will reimburse your actual reasonable out-of-pocket costs that are not capable of being mitigated. To be reimbursed, you must submit your request for reimbursement within 30 days after our notice of cancellation.

5.4. **Work in Progress**. Upon receipt of our notice of cancellation, regardless of the reason for the cancellation, you must immediately stop all work in progress and use your best efforts to mitigate any costs associated with the cancellation. We have the option to purchase your work in progress, including any raw materials you may have obtained to use in your work. Our price to purchase your work in progress will be a prorated price based on the percentage of work remaining to be completed. Our price to purchase any raw materials will be your actual cost. You are not entitled to any other remedy for cancellation of this order except as provided in this section.

5.5. **Rescheduling**. We may reschedule your delivery of goods or performance of services at any time without liability. The new date for delivery or performance will not be more than 180 days beyond the originally scheduled date.

6. **WARRANTIES**

6.1. **Warranty Period**. All warranties under this order continue for five years after the date of delivery to us, unless a different warranty period is stated on the face of this order.

6.2. **Warranties Regarding Goods**. You make the following warranties to us regarding all goods you provide under this order:

1. a. The goods will are new and do not contain any used or refurbished parts.
2. b. The goods function properly under normal use, are of good workmanship, free from defect, of merchantable quality, and fit for our intended use.
3. c. The goods fully comply with any specifications provided by us, including without limitation our Product Stewardship specification, and any samples or documentation provided by you.
4. d. The goods are free of any encumbrances.
5. e. The goods do not violate any intellectual property rights of any third party.

6.2. **Warranties Regarding Services**. You make the following warranties to us

regarding all services you provide under this order:

1. a. You perform the services with reasonable skill and care in a professional manner and in full conformance with any specifications or statements of work provided by us.
2. b. Your performance of the services does not violate any intellectual property rights of any third party or any duty of confidentiality you owe to any third party.

**6.4. Other Warranty Terms**. The warranties listed above are in addition to any other warranties expressly made by you or imposed by law. All warranties will survive inspection and payment by us and are assignable to our successors and assigns.

**6.5. Warranty Remedies**. If any goods or services do not meet the warranties, we may, at our option, and without additional cost to us,

1. a. require you to repair or replace the goods until the goods meet the warranties,
2. b. require you to re-perform any services until the services meet the warranties,
3. c. return any of the goods to you at your expense for a full refund,
4. d. correct the non-conformance and charge you for the cost to make the correction,
5. e. engage a third party to provide substitute goods or services and charge you for the costs of obtaining the substitute goods or services from the third party.

**6.6. Remedies Nonexclusive**. The remedies listed above are in addition to any other remedies available to us in law or equity. Our review and approval of your materials or designs will not relieve you of the warranties.

## 7. LIMITATION OF LIABILITY

**7.1. Limitation of Amount of Liability**. Our maximum liability to you arising out of this order, regardless of the basis of liability or the form of action, will not exceed the total price stated in this order plus goods and services tax and prepay & add charges.

**7.2. Limitation of Type of Liability**. We will not be liable to you for any indirect, special, incidental, or consequential damages, however caused, regardless of whether we are advised of the possibility of such damages.

**7.3. Exclusion of Liability of Our Employees**. Our officers, directors, employees, affiliates and other agents are not personally liable to you under this order, and will not be liable to you under any claim related to this order.

**7.4. Purpose**. The purpose of this section is to limit our potential liability arising out of this order, and that allocation of risk is reflected in the prices. This Section 7 will apply despite the failure of any remedy of its essential purpose.

## 8. INTELLECTUAL PROPERTY RIGHTS

**8.1. Preexisting Intellectual Property**. We own all intellectual property rights related to any information or items we provide you. You may not use our intellectual property except to benefit us.

**8.2. Developed Intellectual Property**. The goods or services ordered are specially ordered or commissioned by us and are works made for hire. You transfer to us, without further consideration, all right and interest in any intellectual property developed by you during your performance of any services or delivery of any goods under this order. You must immediately disclose to us any intellectual property developed by you arising out of your performance of the services. You agree to take all necessary actions to effect your grant and assign your interest in any intellectual property developed by

you including but not limited to executing all documents as may be required under applicable laws.

8.3. **Intellectual Property Indemnification**. You will defend and indemnify us and our directors, officers, employees and affiliates against any claim alleging that your goods or services infringe or violate a patent, copyright, trademark, trade dress, trade secret, or any other contractual right, proprietary right or intellectual property right of any third party.

## 9. CONFIDENTIALITY; DATA PROTECTION AND SECURITY

9.1. **Confidentiality**

9.1.1. **Confidential Information**. Any information regarding our intellectual property is our confidential information. The existence of this order and the information in this order is our confidential information. Any other information that we provide to you that is identified as "confidential," or is identified with similar language, or which under the circumstances surrounding disclosure ought to be treated as confidential, is our confidential information.

9.1.2. **Nondisclosure**. Except as required by law, you may neither disclose our confidential information to any third party nor use our confidential information for any purpose other than your performance under this order without our prior written consent. You must segregate our confidential information from all other information. You must destroy or return our confidential information to us upon our request.

9.2. **Data Protection and Security**. If this order allows for the processing of personal information, including access and transfer, you must comply with our Data Protection and Security Exhibits, located at https://www.seagate.com/legal-privacy/electronic-and-physical-security-and-data-protection/, which is also available from us upon request and incorporated into this order.

## 10. INDEMNIFICATION AND INSURANCE

10.1. **General Indemnification**. You will defend and indemnify us and our directors, officers, employees and affiliates against any claim or action arising out of your performance of this order.

10.2. **Insurance**. You will maintain general commercial liability insurance in the minimum amount of US $1,000,000 combined single limit for personal injury and property damage. If you have employees, you must maintain employer's liability in a minimum amount of US $1,000,000 per occurrence and workers' compensation insurance in accordance with law. Your insurance must include a waiver of the insurer's subrogation rights against us, unless prohibited by law.

## 11. DISPUTE RESOLUTION

11.1. **Good-Faith Negotiation Followed by Mediation**. The parties will attempt to resolve any dispute relating to this order through good faith, informal efforts. All disputes, controversies or differences arising out of or in connection with this order that are not resolved informally, must be submitted to the Singapore Mediation Centre and the Singapore International Arbitration Centre for resolution by mediation-arbitration in accordance with the SMC-SIAC Med-Arb Procedure for the time being in force, which procedure is deemed to be incorporated by reference into this clause.

11.2. **Exclusion for Equitable Relief for Confidentiality**. We may seek equitable relief at any time to enforce the provisions of Section 9 of this order.

## 12. MISCELLANEOUS

12.1. **Independent Contractor Status; Governing Law**. You and your employees are independent contractors and not employees, agents, joint venturers or partners of Seagate. This order is governed by the laws of

Singapore, without regard to its conflicts of laws rules. The United Nations Convention on Contracts for the International Sale of Goods will not apply.

12.2. **Compliance With Laws**. You must comply with all applicable laws in performing your obligations under this order, including without limitation those governing environment, health and safety, and labor and employment practices. You must require that your sub-suppliers also comply with all applicable laws and regulations in effect. Upon request, you will certify that you comply with all applicable laws and regulations. We may audit you to confirm your compliance with this section.

12.3. **International Trade Compliance**. The goods or services licensed or sold under this order, and the transaction contemplated by this order, which may include technology and software, are subject to the customs and export control laws and regulations of the United States ("U.S.") and may also be subject to the customs and export laws and regulations of the country in which the goods are manufactured or received. Further, under U.S. law, the goods shipped under this order may not be sold, leased or otherwise transferred to restricted countries, or used by a restricted end-user or an end-user engaged in activities related to weapons of mass destruction including, without limitation, activities related to designing, developing, producing or using nuclear weapons, materials, or facilities, missiles or supporting missile projects, or chemical or biological weapons. You acknowledge that it is your responsibility to comply with and abide by the laws and regulations referenced in this section, and that any person or entity to which you ask Seagate to send product has also been made aware of the associated export controls.

12.4. **Assignment**. You may not assign your rights or delegate your duties under this order to any third party without our prior written consent.

12.5. **Severability; Survival**. Sections 7, 8, 9 and 10.1 are material to this order, are not severable, and will survive termination or cancellation of this order. Section 6 will survive for 6 years after delivery of goods or completion of services. If any term or provision of this order is or becomes invalid under any applicable law, then the remainder of this order will not be affected thereby and the remaining terms and provisions of this order will remain in effect as if the invalid portion were not a part of this order.

12.6. **Contracts (Rights of Third Parties) Act 2001**. A person who is not a party to this Purchase Order has no rights under the Contracts (Rights of Third Parties) Act 2001 of Singapore to enforce any term of this Purchase Order.

(Thailand Rev 01 April 2011)

A SEAGATE REPORT

**Rethink Data: Put More of Your Business Data to Work** >

About Seagate

Our Story

Global Citizenship

Trust Center

Quality Assurance

Press Center

Support

Product Support

Software Downloads

Warranty & Replacements

Seagate Systems

Contact Us

Investors ↗

News

Media Kits

Brand Portal ↗

**Partners**

Indirect Partners & Resellers

Seagate Champions ↗

Seagate Direct & Suppliers

Seagate Technology Alliance
Program

**Where to Buy**

Product Finder

**Jobs**

Life at Seagate

Diversity, Equity, and Inclusion

University Programs

LaCie ↗                    Maxtor ↗                    Lyve Labs ↗                    Seagate Government Solutions ↗                    Site Map ↗

©2022 Seagate Technology LLC   Legal & Privacy   Vulnerability Disclosure   Cookies Settings

# Exhibit 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended June 30, 2006

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from      to

**Commission File No. 001-31560**

# SEAGATE TECHNOLOGY
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Cayman Islands** | **98-0355609** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**P.O. Box 309GT**
**Ugland House, South Church Street**
**George Town, Grand Cayman, Cayman Islands**
(Address of principal executive offices)
**Registrant's telephone number, including area code: (345) 949-8066**

Securities registered pursuant to Section 12 (b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Shares, par value $0.00001 per share** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒    NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒    NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐    NO ☒

The aggregate market value of the voting and non-voting common shares held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $2.4 billion based upon a closing price of $19.99 reported for such date by the New York Stock Exchange. Common shares held by each executive officer and director and by each person who owns 5% or more of the outstanding common shares have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding common shares of the registrant as of September 1, 2006 was 578,786,348.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Proxy Statement for its 2006 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated herein by reference in Part III.

Table of Contents

## ITEM 1A.   RISK FACTORS

### Risks Related to Our Business

*We expect the integration of Seagate and Maxtor will result in revenue attrition, significant cash expenditures and accounting charges, increased capital expenditures and operating inefficiencies that will have an adverse effect on our operating results and financial condition during fiscal year 2007 and potentially beyond.*

We expect to experience attrition of Maxtor revenue as we complete the integration of Maxtor's business into our operations. We will also incur significant cash expenditures and non-cash accounting charges in connection with the integration. The cash expenditures have been preliminarily estimated to be approximately $500 million and include restructuring and integration activities and retention bonuses. In addition to the anticipated cash expenditures, we expect significant non-cash charges, including those associated with the amortization of intangible assets and stock-based compensation, which we currently estimate at approximately $385 million (approximately $200 million of which is expected to be incurred in the first year following the closing). We anticipate that the majority of these cash expenditures and non-cash charges will occur in the 12 months following the closing of the merger. However, the timing of the stock-based compensation charge may be significantly affected by the effect of employee terminations as a result of restructuring activities. A substantial portion of the cash expenditures relating to restructuring activities will be recorded as liabilities assumed from Maxtor and will increase goodwill, while the non-cash charges will generally reduce earnings of the Company. We also anticipate approximately $580 million of incremental capital expenditures as we combine operations in the first 18 to 24 months after the closing. During the initial months after the closing of the acquisition as we are winding down the manufacture and sale of Maxtor-designed disc drive products and ramping up the manufacture of Seagate-designed disc drive products to meet Maxtor's customers' demands, we also expect to experience operating inefficiencies that will adversely impact our gross margin and operating results. As a result of the revenue attrition, cash expenditures, accounting charges, capital expenditures and operating inefficiencies described above, our operating results and financial condition have been and will be adversely affected, particularly in the first year following the closing of the Merger which occurred on May 19, 2006.

*The failure to successfully integrate Maxtor's business into our operations in the expected time frame, or at all, may adversely affect the Company's future results.*

We believe that the acquisition of Maxtor will result in certain benefits, including certain cost synergies and operational efficiencies. However, to realize these anticipated benefits, Maxtor's business must be successfully integrated into Seagate's operations by winding down the manufacture and sale of Maxtor-designed disc drive products and transitioning Maxtor's customers to Seagate disc drive products. The success of the Maxtor acquisition will depend on our ability to realize these anticipated benefits from integrating Maxtor's business into our operations. We may fail to realize the anticipated benefits of the Maxtor acquisition on a timely basis, or at all, for a variety of reasons, including the following:

- failure to successfully manage relationships with Maxtor's customers, distributors and suppliers and the possibility of unanticipated claims from such parties as we wind down the manufacture and sale of Maxtor-designed disc drive products;

- failure of Maxtor customers to accept Seagate-designed disc drive products or to continue as customers of the combined company, particularly in the near term as we seek to transfer Maxtor's customers' purchases to Seagate-designed disc drive products;

- failure to effectively coordinate sales and marketing efforts to communicate the capabilities of the Company;

- revenue attrition in excess of anticipated levels;

- potential incompatibility of operating systems;

- failure to leverage the increased scale of the Company quickly and effectively;

17

Table of Contents

- potential difficulties integrating and harmonizing financial reporting systems; and

- the loss of key employees.

In addition, although we are currently transitioning Maxtor's sales to Seagate-designed disc drive products and expect this transition to be substantially completed by the end of calendar 2006, we cannot assure you that we will be successful with this transition during the contemplated time frames or at all. The integration may result in additional and unforeseen expenses or delays. If the Company is not able to successfully integrate Maxtor's business and operations, the anticipated benefits of the Merger may not be realized fully or at all or may take longer to realize than expected.

***Competition—Our industry is highly competitive and our products have experienced and will continue to experience significant price erosion and market share variability, which may be even more pronounced in the near term as our competitors seek to increase their market share following our acquisition of Maxtor.***

Even during periods when demand is stable, the disc drive industry is intensely competitive and vendors typically experience substantial price erosion over the life of a product. Our competitors have historically offered existing products at lower prices as part of a strategy to gain or retain market share and customers, and we expect these practices to continue. We will need to continually reduce our prices to retain our market share, which could adversely affect our results of operations.

We believe this basic industry condition of continuing price erosion and market share variability has been even more acute recently in those markets served by Maxtor, particularly with respect to desktop disc drives, as our competitors engage in aggressive pricing actions targeted to encourage shifting of customer demand. As a result, the pricing environment in the June 2006 quarter was very competitive and we expect it to remain competitive for the remainder of fiscal year 2007 as our competitors continue these efforts.

In addition to the recent pricing activity discussed above, based on our recent experience in the industry with respect to new product introductions, we believe that the rate of growth in areal density, or the storage capacity per square inch on a disc, is slowing from its previous levels. This trend may contribute to increased average price erosion. To the extent that historical price erosion patterns continue, product life cycles may lengthen, our competitors may have more time to enter the market for a particular product and we may be unable to offset these factors with new product introductions at higher average prices. A second general industry trend that may contribute to increased average price erosion is the growth of sales to distributors that serve producers of non-branded products in the personal storage sector. These customers generally have limited product qualification programs, which increases the number of competing products available to satisfy their demand. As a result, purchasing decisions for these customers are based largely on price and terms. Any increase in our average price erosion would have an adverse effect on our result of operations.

Additionally, a significant portion of our success in the past has been a result of increasing our market share at the expense of our competitors, particularly in the notebook and small form factor markets. Our market share for our products can be negatively affected by our customers' diversifying their sources of supply as the slowing rate of growth in areal density has resulted in longer product cycles and more time for our competitors to enter the market for particular products. When our competitors successfully introduce product offerings, which are competitive with our recently introduced new products, our customers may quickly diversify their sources of supply. We expect market shares to be even more variable in the near term as customers adjust their purchasing practices in reaction to our acquisition of Maxtor, particularly in those markets served by Maxtor. Any significant decline in our market share would adversely affect our results of operations.

18

Table of Contents

*Principal Competitors—We compete with both independent manufacturers, whose primary focus is producing technologically advanced disc drives, and captive manufacturers, who do not depend solely on sales of disc drives to maintain their profitability.*

We have experienced and expect to continue to experience intense competition from a number of domestic and foreign companies, including other independent disc drive manufacturers and large captive manufacturers such as:

| Independent | Captive |
|---|---|
| Western Digital Corporation | Fujitsu Limited |
| Cornice Inc. | Hitachi Global Storage Technologies |
| GS Magicstor Inc. | Samsung Electronics Incorporated |
| Excelstor | Toshiba Corporation |

The term "independent" in this context refers to manufacturers that primarily produce disc drives as a stand-alone product, and the term "captive" refers to disc drive manufacturers who themselves or through affiliated entities produce complete computer or other systems that contain disc drives or other information storage products. Captive manufacturers are formidable competitors because they have the ability to determine pricing for complete systems without regard to the margins on individual components. Because components other than disc drives generally contribute a greater portion of the operating margin on a complete computer system than do disc drives, captive manufacturers do not necessarily need to realize a profit on the disc drives included in a computer system and, as a result, may be willing to sell disc drives to third parties at very low margins. Many captive manufacturers are also formidable competitors because they have more substantial resources than we do. In addition, Hitachi Global Storage Technologies (together with affiliated entities) and Samsung Electronics Incorporated also sell other products to our customers, including critical components like flash memory, ASICs and flat panel displays, and may be willing to sell their disc drives at a lower margin to advance their overall business strategy. This may improve their ability to compete with us. To the extent we are not successful competing with captive or independent disc drive manufacturers, our results of operations will be adversely affected.

In addition, in response to customer demand for high-quality, high-volume and low-cost disc drives, manufacturers of disc drives have had to develop large, in some cases global, production facilities with highly developed technological capabilities and internal controls. The development of large production facilities and industry consolidation can contribute to the intensification of competition. We also face indirect competition from present and potential customers who evaluate from time to time whether to manufacture their own disc drives or other information storage products.

In some emerging consumer applications, disc drives smaller than 1.8-inch form factor compete directly with alternative storage technologies, such as flash.

*Volatility of Quarterly Results—Our quarterly operating results fluctuate significantly from period to period, and this may cause our shares price to decline.*

In the past, our quarterly revenue and operating results have fluctuated significantly from period to period. We expect this fluctuation to continue for a variety of reasons, including:

- the impact of corporate restructuring activities that we may engage in, particularly, in the near term, the impact of expenses and charges resulting from our acquisition of Maxtor and the ongoing integration of its business into our operations;

- changes in purchases from period to period by our primary customers, particularly in the near term, as our customers reposition their demand following the closing of our acquisition of Maxtor and as, over the longer term, our competitors are able to introduce and produce in volume comparable product technology or alternative storage technology solutions, such as flash memory;

19

**Table of Contents**

- competitive pressures resulting in lower selling prices, including, in the near term, following the closing of our acquisition of Maxtor, pricing by our competitors specially targeted to encourage shifting of customer demand;

- changes in the demand for the computer systems, storage subsystems and consumer electronics that contain our disc drives, due to seasonality and other factors, particularly in the near term as such demand may be impacted by delays in new computer operating system software and new gaming consoles;

- increased costs or adverse changes in availability of supplies, particularly with respect to precious metals and scarce alloys used in producing media for products using perpendicular recording technology;

- delays or problems in the introduction of our new products due to inability to achieve high production yields, delays in customer qualification or initial product quality issues;

- shifting trends in customer demand which, when combined with overproduction of certain products, particularly at times such as the present, where the industry is served by multiple suppliers, results in supply/demand imbalances;

- adverse changes in the level of economic activity in the United States and other major regions in which we do business;

- our high proportion of fixed costs, including research and development expenses; and

- announcements of new products, services or technological innovations by us or our competitors.

As a result, we believe that quarter-to-quarter comparisons of our revenue and operating results may not be meaningful, and that these comparisons may not be an accurate indicator of our future performance. Our operating results in one or more future quarters may fail to meet the expectations of investment research analysts or investors, which could cause an immediate and significant decline in the trading price of our common shares.

> ***New Product Offerings—Market acceptance of new product introductions cannot be accurately predicted, and our results of operations will suffer if there is less demand for our new products than is anticipated.***

We are continually developing new products with the goal that we will be able to introduce technologically advanced and lower cost disc drives into the marketplace ahead of our competitors.

The success of our new product introductions is dependent on a number of factors, including market acceptance, our ability to manage the risks associated with product transitions, the effective management of inventory levels in line with anticipated product demand, and the risk that our new products will have quality problems or other defects in the early stages of introduction that were not anticipated in the design of those products. Accordingly, we cannot accurately determine the ultimate effect that our new products will have on our results of operations.

In addition, the success of our new product introductions is dependent upon our ability to qualify as a primary source of supply with our OEM customers. In order for our products to be considered by our customers for qualification, we must be among the leaders in time-to-market with those new products. Once a product is accepted for qualification testing, any failure or delay in the qualification process or a requirement that we requalify can result in our losing sales to that customer until new products are introduced. The limited number of high-volume OEMs magnifies the effect of missing a product qualification opportunity. These risks are further magnified because we expect competitive pressures to result in declining sales and declining gross margins on our current generation products. We cannot assure you that we will be among the leaders in time-to-market with new products or that we will be able to successfully qualify new products with our customers in the future.

Table of Contents

***Smaller Form Factor Disc Drives—If we do not continue to successfully market smaller form factor disc drives, our business may suffer.***

The disc drive industry is experiencing significant increases in sales of smaller form factor disc drives for an expanding number of applications, in particular notebook computers and consumer electronics devices, but also including personal computers and enterprise storage applications. Many of these applications have typically used disc drives with a 3.5-inch form factor, which we currently manufacture. Some of these applications, such as consumer electronics applications like digital music players and digital cameras, represent fast growing markets for disc drives. We initiated volume shipments of our first small form factor disc drive, the Momentus notebook disc drive, to a number of OEMs in the second quarter of fiscal year 2004. In June 2004, we announced our first 1-inch form factor disc drive, additional capacity models of our Momentus notebook disc drive and a 2.5-inch form factor disc drive for enterprise storage applications. Since then, we have introduced multiple higher-capacity versions of our 1-inch and 2.5-inch disc drives for mobile computing, consumer electronics and enterprise storage applications and we expect to begin offering a 1.8-inch form factor disc drive during fiscal 2007.

We have experienced competition from other companies that produce alternative storage technologies like flash memory, where increased capacity and lower cost of these technologies have resulted in competition with our lower capacity, smaller form factor disc drives.

If we do not suitably adapt our product offerings to successfully introduce additional smaller form factor disc drives, customers may decrease the amounts of our products that they purchase, which would adversely affect our results of operations.

***Perpendicular Recording Technology—If our customers decide not to accept this new technology until either more disc drive manufacturers are providing it in their products, or there is more performance history for this new technology, our operating results will be adversely impacted. If products based on this technology suffer unanticipated or atypical reliability or operability problems, our operating results will be adversely impacted. In addition, products based on perpendicular technology require increased quantities of precious metals and scarce alloys like platinum and ruthenium which increases risk of higher costs and production delays that could adversely impact our operating results.***

To address the growing demand for higher capacity products, we have begun a transition to perpendicular recording technology to achieve continued growth in areal density. To date, we have announced perpendicular technology based products for the desktop, enterprise, notebook, consumer electronics and branded solutions markets and we believe that we are ahead of our competitors in transitioning our product offerings to perpendicular recording technology. We expect that by the end of fiscal 2007, more than half of our unit volume will consist of products using perpendicular recording technology. Perpendicular recording technology poses various technological challenges including a complex integration of the recording head, the disc, recording channel, drive software and firmware as a system. To the extent that our customers decide not to accept this new technology until either more disc drive manufacturers are providing it in their products, or there is more performance history for this new technology, our operating results will be adversely impacted.

In addition, if these perpendicular recording technology based products suffer unanticipated or atypical failures that were not anticipated in the design or testing of those products, our service and warranty costs may materially increase which would adversely impact our operating results.

Perpendicular recording technology also requires recording media with more layers and the use of more precious metals and scarce alloys like platinum and ruthenium to create such layers. These precious metals and scarce alloys have recently become increasingly expensive and at times difficult to acquire. As our product offerings shift increasingly to perpendicular recording technology, we will be exposed to increased risks that higher costs or reduced availability of these precious metals and scarce alloys could adversely impact our operating results.

Table of Contents

*Seasonality—Because we experience seasonality in the sales of our products, our results of operations will generally be adversely impacted during our fourth fiscal quarter.*

Because sales of computer systems, storage subsystems and consumer electronics tend to be seasonal, we expect to continue to experience seasonality in our business as we respond to variations in our customers' demand for disc drives. In particular, we anticipate that sales of our products will continue to be lower during our fourth fiscal quarter than the rest of the year. In the desktop computer, notebook computer and consumer electronics sectors of our business, this seasonality is partially attributable to our customers' increased sales of personal computers and consumer electronics during the winter holiday season. In the enterprise sector of our business, our sales are seasonal because of the capital budgeting and purchasing cycles of our end users. Because our working capital needs peak during periods in which we are increasing production in anticipation of orders that have not yet been received, our operating results will fluctuate seasonally even if the forecasted demand for our products proves accurate.

Furthermore, it is difficult for us to evaluate the degree to which this seasonality may affect our business in future periods because our overall growth may have reduced the impact of this seasonality in recent periods. For example, because of dramatic rates of growth exhibited by the consumer electronics applications in the March and June 2005 quarters followed by a period of component constraints during the September and December 2005 quarters which impacted our production capacity, we did not experience either a traditional seasonal decrease in sales of our products in the third and fourth quarter of fiscal year 2005 or a comparative seasonal increase in sales of our products in the first half of fiscal year 2006. The lack of seasonality in calendar year 2005 was atypical in the disc drive industry as evidenced by the modest seasonal decline we experienced in the March 2006 quarter, particularly with respect to disc drives for desktop and mobile applications, which continued in a more traditional pattern in the June 2006 quarter. Given the rate and unpredictability of product transitions and new product introductions in the consumer electronics market, we may experience significant variability in unit demand in future periods, which may be exacerbated by the highly seasonal nature of consumer electronics products generally.

*Difficulty in Predicting Quarterly Demand—If we fail to predict demand accurately for our products in any quarter, we may not be able to recapture the cost of our investments.*

The disc drive industry operates on quarterly purchasing cycles, with much of the order flow in any given quarter coming at the end of that quarter. Our manufacturing process requires us to make significant product-specific investments in inventory in each quarter for that quarter's production. Because we typically receive the bulk of our orders late in a quarter after we have made our investments, there is a risk that our orders will not be sufficient to allow us to recapture the costs of our investment before the products resulting from that investment have become obsolete. Our ability to accurately predict demand may be even more challenged in the near term as our customers reposition their demand following our acquisition of Maxtor, particularly in the markets served by Maxtor. We cannot assure you that we will be able to accurately predict demand in the future.

Other factors that may negatively impact our ability to recapture the cost of investments in any given quarter include:

- our inability to reduce our fixed costs to match sales in any quarter because of our vertical manufacturing strategy, which means that we make more capital investments than we would if we were not vertically integrated;

- the timing of orders from, and the shipment of products to, key customers;

- unanticipated fluctuations in unit volume purchases from our customers, particularly our distributor customers who from time to time constitute a large portion of our total sales, particularly in the near term as our customers reposition their demand following our acquisition of Maxtor;

- our product mix and the related margins of the various products;

22

Table of Contents

- accelerated reduction in the price of our disc drives due to technological advances and/or an oversupply of disc drives in the market, a condition that is exacerbated when the industry is served by multiple suppliers and shifting trends in demand which can create supply demand imbalances;

- manufacturing delays or interruptions, particularly at our major manufacturing facilities in China, Malaysia, Singapore and Thailand;

- variations in the cost of components for our products;

- limited access to components that we obtain from a single or a limited number of suppliers;

- the impact of changes in foreign currency exchange rates on the cost of producing our products and the effective price of our products to foreign consumers; and

- operational issues arising out of the increasingly automated nature of our manufacturing processes.

***Dependence on Supply of Equipment and Components—If we experience shortages or delays in the receipt of critical equipment or components necessary to manufacture our products, we may suffer lower operating margins, production delays and other material adverse effects.***

The cost, quality and availability of components, certain equipment and raw materials used to manufacture disc drives and key components like media and heads are critical to our success. The equipment we use to manufacture our products and components is frequently custom made and comes from a few suppliers and the lead times required to obtain manufacturing equipment can be significant. Particularly important components for disc drives include read/write heads, recording media, ASICs, spindle motors, printed circuit boards and suspension assemblies. We rely on sole suppliers or a limited number of suppliers for some of these components, including recording media that we do not manufacture, ASICs, spindle motors, printed circuit boards and suspension assemblies. In the past, we have experienced increased costs and production delays when we were unable to obtain the necessary equipment or sufficient quantities of some components and/or have been forced to pay higher prices or make volume purchase commitments or advance deposits for some components, equipment or raw materials, such as precious metals like platinum and ruthenium, that were in short supply in the industry in general.

In addition, the recent increases in demand for small form factor mobile products have led to shortages in the components used in smaller form factor disc drives such as the glass substrates used to make the recording media for such drives. Increasing unit growth for 3.5-inch and smaller form factor non-mobile disc drives could also lead to constraints for the supply of aluminum media and substrates.

Historically, the technology sector specifically, and the economy generally have experienced economic pressure, which has resulted in consolidation among component manufacturers and may result in some component manufacturers exiting the industry or not making sufficient investments in research to develop new components.

If there is a shortage of, or delay in supplying us with, critical components, equipment or raw materials, then:

- it is likely that our suppliers would raise their prices and, if we could not pass these price increases to our customers, our operating margin would decline;

- we might have to reengineer some products, which would likely cause production and shipment delays, make the reengineered products more costly and provide us with a lower rate of return on these products;

- we would likely have to allocate the components we receive to certain products and ship less of others, which could reduce our revenues and could cause us to lose sales to customers who could purchase more of their required products from manufacturers that either did not experience these shortages or delays or that made different allocations; and

Table of Contents

- we might be late in shipping products, causing potential customers to make purchases from our competitors, thus causing our revenue and operating margin to decline.

We cannot assure you that we will be able to obtain critical components in a timely and economic manner, or at all.

**Importance of Reducing Operating Costs—If we do not reduce our operating expenses, we will not be able to compete effectively in our industry.**

Our strategy involves, to a substantial degree, increasing revenue and product volume while at the same time reducing operating expenses. In this regard, we are continually engaged in ongoing, company-wide manufacturing efficiency activities intended to increase productivity and reduce costs. Our ongoing efforts to integrate Maxtor's business into our operations is a current focused instance of such activities. In the past, these activities have included closures and transfers of facilities, significant personnel reductions and efforts to increase automation. For example, in the fourth quarter of fiscal year 2004, we undertook significant restructuring activities to reduce the costs of our operations and we continue to look at opportunities for further cost reductions, which may result in additional restructuring activities in the future. We cannot assure you that our efforts will result in the increased profitability, cost savings or other benefits that we expect. Moreover, the reduction of personnel and closure of facilities may adversely affect our ability to manufacture our products in required volumes to meet customer demand and may result in other disruptions that affect our products and customer service. In addition, the transfer of manufacturing capacity of a product to a different facility frequently requires qualification of the new facility by some of our OEM customers. We cannot assure you that these activities and transfers will be implemented on a cost-effective basis without delays or disruption in our production and without adversely affecting our customer relationships and results of operations.

**Industry Demand—Changes in demand for computer systems and storage subsystems has caused and may cause in the future a decline in demand for our products.**

Our disc drives are components in computers, computer systems, storage subsystems and consumer electronics devices. The demand for these products has been volatile. In a weak economy, consumer spending tends to decline and retail demand for personal computers and consumer electronics devices tends to decrease, as does enterprise demand for computer systems and storage subsystems. Unexpected slowdowns in demand for computer systems and storage subsystems generally cause sharp declines in demand for disc drive products.

Additional causes of declines in demand for our products in the past have included announcements or introductions of major new operating systems or semiconductor improvements or changes in consumer preferences, such as the shift from desktop to notebook computers. We believe these announcements and introductions have from time to time caused consumers to defer their purchases and made inventory obsolete. Whenever an oversupply of disc drives causes participants in our industry to have higher than anticipated inventory levels, we experience even more intense price competition from other disc drive manufacturers than usual.

**Dependence on Distributors—We are dependent on sales to distributors, which may increase price erosion and the volatility of our sales.**

A substantial portion of our sales has been to distributors of desktop disc drive products. Product qualification programs in this distribution channel are limited, which increases the number of competing products that are available to satisfy demand, particularly in times of lengthening product cycles. As a result, purchasing decisions in this channel are based largely on price, terms and product availability. Sales volumes through this channel are also less predictable and subject to greater volatility than sales to our OEM customers. In the second half of fiscal year 2004, a number of disc drive manufacturers independently launched initiatives to improve the stability of the distribution channel, particularly with respect to the purchasing behavior of these distributors,

24

Table of Contents

while other disc drive manufacturers have not launched such initiatives. These actions have further increased the uncertainty as to demand within this market sector. To the extent that distributors reduce their purchases of our products or prices decline significantly in the distribution channel, our results of operations would be adversely affected.

### *Longer Product Life Cycles—Lengthening of product life cycles can make planning product transitions difficult and may reduce the favorable impact of new product transitions.*

In contrast to historical trends, based on our recent experience in the industry with respect to new product introductions, we believe that the current rate of growth in areal density is slowing from the rate of the last several years. We believe that this slowdown in the rate of growth in areal density will continue until a significant advance in technology for the electronic storage of data, such as perpendicular recording technology, becomes commercially available.

When the rate of growth in areal density slows, it may contribute to increased average price erosion to the extent historical price erosion patterns continue, a limitation in our ability to introduce new products at higher prices and lengthened product life cycles which permits competitors more time to enter the market for a particular type of disc drive. In addition, the lengthening of product life cycles can make planning product transitions more difficult. To the extent that we prematurely discontinue a product, or do not timely introduce new products, our operating results may be adversely affected.

Because the rate of growth in areal density is slowing, the favorable impact of new product introductions on our results of operations may be minimized. Historically, the introduction of new products generally has had a favorable impact on our results of operations both because the new products are introduced at higher prices than existing competitive offerings and because advances in areal density technology have enabled lower manufacturing costs through a reduction in components such as read/write heads and discs. However, in contrast to when the rate of growth in areal density is increasing, a slowing rate of growth in areal density can limit the cost benefits of new products because it is technologically more difficult to reduce the number of read/write heads and discs in a particular drive. In addition, given the environment of intense price competition, in the absence of significant capacity or reliability increases, it is difficult to obtain higher prices for new products.

### *Importance of Time-to-Market—Our operating results may depend on our being among the first-to-market and achieving sufficient production volume with our new products.*

To achieve consistent success with our OEM customers, it is important that we be an early provider of new types of disc drives featuring leading, high-quality technology and lower per gigabyte storage cost. Historically, our operating results have substantially depended upon our ability to be among the first-to-market with new product offerings. However, during a period of slowing areal density growth, such as we are in now, the importance of time-to-market may be less critical. Our market share and operating results in the future may be adversely affected, particularly if the rate of growth in areal density resumes its historical pattern, if we fail to:

- consistently maintain our time-to-market performance with our new products;

- produce these products in sufficient volume;

- qualify these products with key customers on a timely basis by meeting our customers' performance and quality specifications; or

- achieve acceptable manufacturing yields, quality and costs with these products.

If delivery of our products is delayed, our OEM customers may use our competitors' products to meet their production requirements. If the delay of our products causes delivery of those OEMs' computer systems into which our products are integrated to be delayed, consumers and businesses may purchase comparable products from the OEMs' competitors.

Table of Contents

Moreover, we face the related risk that consumers and businesses may wait to make their purchases if they want to buy a new product that has been shipped or announced but not yet released. If this were to occur, we may be unable to sell our existing inventory of products that may have become less efficient and cost effective compared to new products. As a result, even if we are among the first-to-market with a given product, subsequent introductions or announcements by our competitors of new products could cause us to lose revenue and not achieve a positive return on our investment in existing products and inventory.

***Dependence on Key Customers—We may be adversely affected by the loss of, or reduced, delayed or cancelled purchases by, one or more of our larger customers.***

Some of our key customers, including Hewlett-Packard, Dell, EMC, Microsoft and IBM, account for a large portion of our disc drive revenue. Our recent acquisition of Maxtor may increase our business with certain of our larger customers. We have longstanding relationships with many of our customers, however, if any of our key customers were to significantly reduce their purchases from us, our results of operations would be adversely affected. While sales to major customers may vary from period to period, a major customer that permanently discontinues or significantly reduces its relationship with us could be difficult to replace. In line with industry practice, new customers usually require that we pass a lengthy and rigorous qualification process at the customer's cost. Accordingly, it may be difficult or costly for us to attract new major customers. Additionally, mergers, acquisitions, consolidations or other significant transactions involving our customers generally entail risks to our business. If a significant transaction involving any of our key customers results in the loss of or reduction in purchases by these key customers, it could have a materially adverse effect on our business, results of operations, financial condition and prospects.

***Dependence on Growth in Consumer Electronics Products—Our recent results have been materially benefited by significant growth in new consumer electronics products, which can experience significant volatility due to seasonal and other factors which could materially adversely impact our future results of operations.***

Our recent results have been materially benefited by significant growth in new consumer electronics applications like digital video recorders and digital music players which are experiencing unexpected growth after the typically high demand holiday season. While this growth enabled us in fiscal year 2005, and to a lesser extent in fiscal year 2006, to offset the traditional seasonal decline usually experienced in the March and June quarters, the demand for consumer electronics products can be even more volatile and unpredictable than the demand for compute products, which have been our traditional markets. This potential for unpredictable volatility is increased by the possibility of competing alternative storage technologies like flash memory, meeting the customers' cost and capacity metrics, resulting in a rapid shift in demand from our products and disc drive technology, generally, to alternative storage technologies. Unpredictable fluctuations in demand for our products or rapid shifts in demand from our products to alternative storage technologies in new consumer electronics applications could materially adversely impact our future results of operations.

***New Product Development and Technological Change—If we do not develop products in time to keep pace with technological changes, our operating results will be adversely affected.***

Our customers have demanded new generations of disc drive products as advances in computer hardware and software have created the need for improved storage products with features such as increased storage capacity, improved performance and reliability and lower cost. We, and our competitors, have developed improved products, and we will need to continue to do so in the future. For fiscal years 2006, 2005 and 2004, we had product development expenses of $805 million, $645 million and $666 million, respectively. Product development expenses for fiscal year 2006 included $28 million of non-cash charges associated with the acquisition of Maxtor. We cannot assure you that we will be able to successfully complete the design or introduction of new products in a timely manner, that we will be able to manufacture new products in sufficient volumes with acceptable manufacturing yields, that we will be able to successfully market these new products or

26

Table of Contents

that these products will perform to specifications on a long-term basis. In addition, the impact of slowing areal density growth may adversely impact our ability to be successful.

When we develop new products with higher capacity and more advanced technology, our operating results may decline because the increased difficulty and complexity associated with producing these products increases the likelihood of reliability, quality or operability problems. If our products suffer increases in failures, are of low quality or are not reliable, customers may reduce their purchases of our products and our manufacturing rework and scrap costs and service and warranty costs may increase. In addition, a decline in the reliability of our products may make us less competitive as compared with other disc drive manufacturers.

***Economic Risks Associated with International Operations—Our international operations subject us to risks related to currency exchange fluctuations, longer payment cycles for sales in foreign countries, seasonality and disruptions in foreign markets, tariffs and duties, price controls, potential adverse tax consequences, increased costs, our customers' credit and access to capital and health-related risks.***

We have significant operations in foreign countries, including manufacturing facilities, sales personnel and customer support operations. We have manufacturing facilities in China, Malaysia, Northern Ireland, Singapore and Thailand, in addition to those in the United States. A substantial portion of our desktop disc drive assembly occurs in our facility in China.

Our international operations are subject to economic risks inherent in doing business in foreign countries, including the following:

- *Disruptions in Foreign Markets* .   Disruptions in financial markets and the deterioration of the underlying economic conditions in the past in some countries, including those in Asia, have had an impact on our sales to customers located in, or whose end-user customers are located in, these countries.

- *Fluctuations in Currency Exchange Rates* .   Prices for our products are denominated predominately in U.S. dollars, even when sold to customers that are located outside the United States. Currency instability in Asia and other geographic markets may make our products more expensive than products sold by other manufacturers that are priced in the local currency. Moreover, many of the costs associated with our operations located outside the United States are denominated in local currencies. As a consequence, the increased strength of local currencies against the U.S. dollar in countries where we have foreign operations would result in higher effective operating costs and, potentially, reduced earnings. From time to time, fluctuations in foreign exchange rates have negatively affected our operations and profitability and there can be no assurance that these fluctuations will not adversely affect our operations and profitability in the future.

- *Longer Payment Cycles* .   Our customers outside of the United States are often allowed longer time periods for payment than our U.S. customers. This increases the risk of nonpayment due to the possibility that the financial condition of particular customers may worsen during the course of the payment period.

- *Seasonality* .   Seasonal reductions in the business activities of our customers during the summer months, particularly in Europe, typically result in lower earnings during those periods.

- *Tariffs, Duties, Limitations on Trade and Price Controls* .   Our international operations are affected by limitations on imports, currency exchange control regulations, transfer pricing regulations, price controls and other restraints on trade. In addition, the governments of many countries, including China, Malaysia, Singapore and Thailand, in which we have significant operating assets, have exercised and continue to exercise significant influence over many aspects of their domestic economies and international trade.

- *Potential Adverse Tax Consequences* .   Our international operations create a risk of potential adverse tax consequences, including imposition of withholding or other taxes on payments by subsidiaries.

27

Table of Contents

- *Increased Costs* .   The shipping and transportation costs associated with our international operations are typically higher than those associated with our U.S. operations, resulting in decreased operating margins in some foreign countries.

- *Credit and Access to Capital Risks* .   Our international customers could have reduced access to working capital due to higher interest rates, reduced bank lending resulting from contractions in the money supply or the deterioration in the customer's or its bank's financial condition, or the inability to access other financing.

### *Political Risks Associated with International Operations—Our international operations subject us to risks related to political unrest and terrorism.*

We have manufacturing facilities in parts of the world that periodically experience political unrest. This could disrupt our ability to manufacture important components as well as cause interruptions and/or delays in our ability to ship components to other locations for continued manufacture and assembly. Any such delays or interruptions could result in delays in our ability to fill orders and have an adverse effect on our results of operations and financial condition. U.S. and international responses to the terrorist attacks on September 11, 2001, the ongoing hostilities in Afghanistan, Iraq and Lebanon and the risk of hostilities elsewhere in the world could exacerbate these risks.

### *Legal and Operational Risks Associated with International Operations—Our international operations subject us to risks related to staffing and management, legal and regulatory requirements and the protection of intellectual property.*

Operating outside of the United States creates difficulties associated with staffing and managing our international manufacturing facilities, complying with local legal and regulatory requirements and protecting our intellectual property. We cannot assure you that we will continue to be found to be operating in compliance with applicable customs, currency exchange control regulations, transfer pricing regulations or any other laws or regulations to which we may be subject. We also cannot assure you that these laws will not be modified.

### *Risk of Intellectual Property Litigation—Our products may infringe the intellectual property rights of others, which may cause us to incur unexpected costs or prevent us from selling our products.*

We cannot be certain that our products do not and will not infringe issued patents or other intellectual property rights of others. Historically, patent applications in the United States and some foreign countries have not been publicly disclosed until the patent is issued, and we may not be aware of currently filed patent applications that relate to our products or technology. If patents are later issued on these applications, we may be liable for infringement. We may be subject to legal proceedings and claims, including claims of alleged infringement of the patents, trademarks and other intellectual property rights of third parties by us, or our licensees in connection with their use of our products.

We are currently subject to a lawsuit by Convolve, Inc. and the Massachusetts Institute of Technology and a lawsuit pending in Nanjing, China involving intellectual property claims. Also, Maxtor is subject to a lawsuit by Papst Licensing, GmbH involving patent infringement claims. Also, on August 23, 2006, Siemens AG, a German corporation, filed a complaint against us in the U.S. District Court for the Central District of California alleging that our current head technology infringes a Siemens U.S. patent.

In addition, Read-Rite Corporation, in a letter dated November 19, 2002 and in correspondence after that date, asserted that, as of November 22, 2000, we no longer had a license to Read-Rite Corporation patented head technology and that our disc drive products infringe at least two Read-Rite Corporation patents. Read-Rite filed for bankruptcy on June 17, 2003, and Western Digital Corporation purchased certain Read-Rite assets from the bankruptcy on July 23, 2003, including Read-Rite's alleged patent infringement claims against us. On December 20, 2005, the Bankruptcy Court ruled that we did not have a right to a license to Read-Rite

28

Table of Contents

Corporation patented head technology after November 22, 2000. The Bankruptcy Court order was affirmed by the U.S. District Court for the Northern District of California on May 8, 2006, and we have decided not to appeal this decision. Because of the Read-Rite bankruptcy, Western Digital also does not have a right to a license to our patented head technology. In addition, neither Western Digital nor Seagate otherwise has a license to the other's intellectual property. Intellectual property litigation is expensive and time-consuming, regardless of the merits of any claim, and could divert our management's attention from operating our business. In addition, intellectual property lawsuits are subject to inherent uncertainties due to the complexity of the technical issues involved, and we cannot assure you that we will be successful in defending ourselves against intellectual property claims. Moreover, software patent litigation has increased due to the current uncertainty of the law and the increasing competition and overlap of product functionality in the field. If we were to discover that our products infringe the intellectual property rights of others, we would need to obtain licenses from these parties or substantially reengineer our products in order to avoid infringement. We might not be able to obtain the necessary licenses on acceptable terms, or at all, or be able to reengineer our products successfully. Moreover, if we are sued for patent infringement and lose the suit, we could be required to pay substantial damages and/or be enjoined from using or selling the infringing products or technology. Any of the foregoing could cause us to incur significant costs and prevent us from selling our products which could adversely affect our results of operations and financial condition.

### Dependence on Key Personnel—The loss of some key executive officers and employees could negatively impact our business prospects.

Our future performance depends to a significant degree upon the continued service of key members of management as well as marketing, sales and product development personnel. The loss of one or more of our key personnel would have a material adverse effect on our business, operating results and financial condition. We believe our future success will also depend in large part upon our ability to attract, retain and further motivate highly skilled management, marketing, sales and product development personnel. We have experienced intense competition for personnel, and we cannot assure you that we will be able to retain our key employees or that we will be successful in attracting, assimilating and retaining personnel in the future.

### System Failures—System failures caused by events beyond our control could adversely affect computer equipment and electronic data on which our operations depend.

Our operations are dependent upon our ability to protect our computer equipment and the information stored in our databases from damage by, among other things, earthquake, fire, natural disaster, power loss, telecommunications failures, unauthorized intrusion and other catastrophic events. As our operations become more automated and increasingly interdependent, our exposure to the risks posed by these types of events will increase. A significant part of our operations is based in an area of California that has experienced power outages and earthquakes and is considered seismically active. We do not have a contingency plan for addressing the kinds of events referred to in this paragraph that would be sufficient to prevent system failures and other interruptions in our operations that could have a material adverse effect on our business, results of operations and financial condition.

### SOX 404 Compliance—While we believe that we currently have adequate internal control procedures in place, we are still exposed to future risks of non-compliance and will continue to incur costs associated with Section 404 of the Sarbanes-Oxley Act of 2002.

We have completed the evaluation of our internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 from which we excluded the internal control over financial reporting of Maxtor, which we acquired on May 19, 2006. Although our assessment, testing, and evaluation resulted in our conclusion that as of June 30, 2006, our internal controls over financial reporting were effective, we cannot predict the outcome of our testing in future periods. If our internal controls are ineffective in future periods, our financial results or the market price of our shares could be adversely affected. We will incur additional expenses and commitment of management's time in connection with further evaluations.

29

Table of Contents

*Future Sales—Additional sales of our common shares by certain equity investors affiliated with certain of our directors or our executive officers or issuances by us in connection with future acquisitions or otherwise could cause the price of our common shares to decline.*

If certain equity investors affiliated with certain of our directors or our executive officers sell a substantial number of our common shares in the future, the market price of our common shares could decline. The perception among investors that these sales may occur could produce the same effect. Any of Silver Lake Partners, Texas Pacific Group or August Capital can unilaterally require that we file registration statements covering common shares held by them, and they and other equity investors including some of our executive officers have rights to include their common shares in certain registration statements that we may file. By exercising their registration rights and selling a large number of common shares, any of these equity investors could cause the price of our common shares to decline. Furthermore, if they were to include common shares in a registration statement initiated by us, those additional shares could impair our ability to raise needed capital by depressing the price at which we could sell our common shares.

New SAC has disposed of all of its shares in us through quarterly and monthly staged distributions to its more than 200 shareholders. In particular, New SAC made quarterly distributions of 25 million of our common shares owned by it to the New SAC shareholders beginning in the spring of 2005 and continuing for the next three quarters thereafter, for a total distribution in this manner of approximately 100 million common shares through January 2006. Absent registration, these distributed shares will be illiquid and not eligible for re-sale in the public markets under Rule 144 until 12 months from the date of their distribution out of New SAC. The first of these quarterly distributed shares became eligible for resale under Rule 144 on May 16, 2006 and the second of these distributions became eligible for resale on July 26, 2006.

In addition to the distributions described in the previous paragraph, New SAC distributed approximately 50 million of our common shares by making monthly distributions of approximately 10 million of our common shares to New SAC shareholders from September 2005 through January 2006. Offers to the public by the selling shareholders named in our registration statement on Form S-3 of the approximately 50 million common shares distributed by New SAC on a monthly basis may be made pursuant to the registration statement on Form S-3. Any sales by former New SAC shareholders, their transferees or distributees, and in particular, certain equity investors affiliated with certain of our directors or our executive officers could cause the market price of our common shares to decline.

One component of our business strategy is to make acquisitions. In the event of any future acquisitions, we could issue additional common shares. For example, in May 2006, we issued approximately 97 million of our common shares and assumed options and nonvested stock in connection with our acquisition of Maxtor Corporation. Issuing shares in connection with acquisitions would have the effect of diluting your ownership percentage of the common shares and could cause the price of our common shares to decline.

*Volatile Public Markets—The price of our common shares may be volatile and could decline significantly.*

The stock market in general, and the market for technology stocks in particular, has recently experienced volatility that has often been unrelated to the operating performance of companies. If these market or industry-based fluctuations continue, the trading price of our common shares could decline significantly independent of our actual operating performance, and you could lose all or a substantial part of your investment. The market price of our common shares could fluctuate significantly in response to several factors, including among others:

- actual or anticipated variations in our results of operations;

- announcements of innovations, new products or significant price reductions by us or our competitors;

- our failure to meet the performance estimates of investment research analysts;

- the timing of announcements by us or our competitors of significant contracts or acquisitions;

Table of Contents

- general stock market conditions;

- the occurrence of major catastrophic events;

- changes in financial estimates by investment research analysts; and

- the sale of our common shares held by certain equity investors or members of management.

*Failure to Pay Quarterly Dividends—Our failure to pay quarterly dividends to our common shareholders could cause the market price of our common shares to decline significantly.*

We paid quarterly dividends of $0.08 per share on each of August 19, 2005, November 18, 2005, February 17, 2006, May 19, 2006 and September 1, 2006 to our common shareholders of record as of August 5, 2005, November 4, 2005, February 3, 2006, May 5, 2006 and August 18, 2006, respectively.

Our ability to pay quarterly dividends will be subject to, among other things, general business conditions within the disc drive industry, our financial results, the impact of paying dividends on our credit ratings, and legal and contractual restrictions on the payment of dividends by our subsidiaries to us or by us to our common shareholders, including restrictions imposed by the covenants contained in the indenture governing our senior notes and the credit agreement governing our revolving credit facility. Any reduction or discontinuation of quarterly dividends could cause the market price of our common shares to decline significantly. Our payment of dividends may also result in a conversion rate adjustment under Maxtor's 2.375% Convertible Senior Notes due 2012. Moreover, in the event our payment of quarterly dividends is reduced or discontinued, our failure or inability to resume paying dividends at historical levels could result in a persistently low market valuation of our common shares.

*Potential Governmental Action—Governmental action against companies located in offshore jurisdictions may lead to a reduction in the demand for our common shares.*

Recent federal and state legislation has been proposed, and additional legislation may be proposed in the future which, if enacted, could have an adverse tax impact on either Seagate or its shareholders. For example, the eligibility for favorable tax treatment of taxable distributions paid to U.S. shareholders of Seagate as qualified dividends could be eliminated.

*Securities Litigation—Significant fluctuations in the market price of our common shares could result in securities class action claims against us.*

Significant price and value fluctuations have occurred with respect to the publicly traded securities of disc drive companies and technology companies generally. The price of our common shares is likely to be volatile in the future. In the past, following periods of decline in the market price of a company's securities, class action lawsuits have often been pursued against that company. If similar litigation were pursued against us, it could result in substantial costs and a diversion of management's attention and resources, which could materially adversely affect our results of operations, financial condition and liquidity.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.   PROPERTIES

Our company headquarters is located in the Cayman Islands, while our U.S. executive offices are in Scotts Valley, California. Our principal manufacturing facilities are located in China, Malaysia, Northern Ireland, Singapore and Thailand and, in the United States, in California and Minnesota. Our principal disc drive design and research and development facilities are located in Colorado, Minnesota, Pennsylvania, Massachusetts and

## CERTIFICATION

I, Charles C. Pope, certify that:

1. I have reviewed this annual report on Form 10-K of Seagate Technology;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financing reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 8, 2006                                    /s/   CHARLES C. POPE

                                                          Name:      Charles C. Pope
                                                          Title:     Chief Financial Officer

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

This certification is not to be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and does not constitute a part of the Annual Report of Seagate Technology (the "Company") on Form 10-K for the fiscal year ended June 30, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report").

In connection with the Report we, William D. Watkins, Chief Executive Officer of the Company, and Charles C. Pope, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: September 8, 2006

/s/   WILLIAM D. WATKINS

**William D. Watkins
Chief Executive Officer**

Date: September 8, 2006

/s/   CHARLES C. POPE

**Charles C. Pope
Chief Financial Officer**

# Exhibit 7

## FILED UNDER SEAL

# Exhibit 8

## FILED UNDER SEAL

# Exhibit 9

## FILED UNDER SEAL

# Exhibit 10

1           UNITED STATES DISTRICT COURT

2       IN THE NORTHERN DISTRICT OF CALIFORNIA

3           Court File No.   3:19-md-02918-MMC
                             3:20-cv-01217-MMC

4    - - - - - - - - - - - - - - - - - - - - - - - -

5    IN RE:

6    HARD DRIVE SUSPENSION ASSEMBLIES

7    ANTITRUST LITIGATION

8    - - - - - - - - - - - - - - - - - - - - - - - -

9

10

11

12

13           VIDEOTAPED DEPOSITION OF

14               TAKEHIRO KAMIGAMA

15                   VOLUME I

16      Taken on behalf of the Plaintiffs at

17   the Hyatt Place Waikiki Beach, 175 Paoakalani Avenue,

18   Honolulu, Hawaii, commencing at 9:11 a.m. on Sunday,

19   July 10, 2022, pursuant to Notice.

20

21

22   Reported by:

23   JESSICA R. PERRY, RPR, CSR NO. 404
     Certified Shorthand Reporter

24

25   Job #:211677

1  known by others, but this was set up by other people

2  so that the presidents could get together, shake hands

3  in order to preserve a positive relationship.  So it

4  really had more of a social significance, but this was

5  a topic that came up in that context.

6       Q.  But to be clear, you were the one that wanted

7  to have a meeting with NHK to discuss the suspension

8  assembly strategy, correct?

9       A.  Well, that is because we had acquired

10  Magnecomp and it was reported to me that NHK was

11  nervous about that, so it was decided to create a

12  venue such as that.

13       Q.  And part of the win-win understanding that you

14  reached with NHK at this meeting in May of 2008 was

15  that the companies would work together to try to

16  achieve a 40 percent market share for NHK, a

17  40 percent market share for TDK and MPT, and then

18  20 percent for the others, mostly HTI.

19       A.  2008 or 2009, I don't really remember, but I

20  thought that through those things NHK would feel more

21  at ease if we can have a win-win relationship, and

22  because, due to various circumstances, the

23  relationship with HTI, Hutchinson, was really bad, we

24  talked about taking their share.

25       Q.  And so when you refer to "those things," you

1   mean the understanding with NHK that you would work

2   together with them to achieve a 40 percent market

3   share for NHK, a 40 percent market share for TDK MPT

4   and 20 percent for Hutchinson or anybody else?

5       A.  Yes, however, although I am repeating myself

6   again, it was the hard disk makers who set the

7   allocation and who they would use.  Although we may

8   try, we suspension makers may try to get 40/40/20,

9   this was actually not something that we can decide.

10      Q.  You both agreed to work together towards

11  40/40/20, correct?

12      A.  And if NHK would be comfortable with that,

13  then that would be fine.

14      Q.  And were they, at this meeting?

15              MS. SIMPSON:  Object to form.

16              THE WITNESS:  I think they were okay with

17  that.

18  BY MR. O'ROURKE:

19      Q.  And did you also discuss with NHK at this

20  meeting in May of 2008 that the two companies would

21  coordinate on suspension technology?

22              MR. EVERETT:  Object to the form.

23              THE WITNESS:  I'm not sure about

24  coordinate, but I think it includes R&D for a specific

25  technology, and I think it was for the Toshiba case.

1        UNITED STATES DISTRICT COURT

2      IN THE NORTHERN DISTRICT OF CALIFORNIA

3          Court File No.   3:19-md-02918-MMC
                             3:20-cv-01217-MMC

4    - - - - - - - - - - - - - - - - - - - - - - - -

5    IN RE:

6    HARD DRIVE SUSPENSION ASSEMBLIES

7    ANTITRUST LITIGATION

8    - - - - - - - - - - - - - - - - - - - - - - - -

9

10

11

12

13          VIDEOTAPED DEPOSITION OF

14             TAKEHIRO KAMIGAMA

15                 VOLUME II

16     Taken on behalf of the Plaintiffs at

17   the Hyatt Place Waikiki Beach, 175 Paoakalani Avenue,

18   Honolulu, Hawaii, commencing at 9:01 a.m. on Monday,

19   July 11, 2022, pursuant to Notice.

20

21

22   Reported by:

23   JESSICA R. PERRY, RPR, CSR NO. 404
     Certified Shorthand Reporter

24

25   Job #:211679

Page 153

1    forward were to be?

2                    MR. EVERETT:  Object to the form.

3                    THE WITNESS:  I was not aware.

4    BY MR. O'ROURKE:

5        Q.  So to carry out the win-win agreement that you

6    had with NHK of 40/40/20, the two companies would have

7    to know their market shares, correct?

8                    MS. SIMPSON:  Object to form.

9                    THE WITNESS:  Well, already from around

10   2014, in my mind we no longer had this concept of

11   40/40/20.

12   BY MR. O'ROURKE:

13       Q.  To know the market shares, it's helpful to

14   know what -- strike that.

15            As president of TDK, you had entered into an

16   agreement with NHK to try to achieve 40/40/20 for

17   suspension assemblies, correct?

18       A.  That is correct.

19       Q.  And so it's no surprise that employees in your

20   organization and employees in the NHK organization

21   would meet and exchange shipment information so they

22   could see market shares?

23                   MR. EVERETT:  Object to the form.

24                   THE WITNESS:  Yes, that certainly would

25   be the case.

# Exhibit 11

## **FILED UNDER SEAL**

KENNETH R. O'ROURKE, SBN 120144
JEFF VANHOOREWEGHE, SBN 313371
MIKAELA E. EVANS-AZIZ, SBN 339283
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:     (415) 947-2000
Facsimile:     (415) 947-2099
Email: korourke@wsgr.com
          jvanhooreweghe@wsgr.com
          mevansaziz@wsgr.com

*Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| This Document Relates to:<br><br>*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC | **DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPPOSITION TO NHK'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FOREIGN COMMERCE**<br><br>Judge:      Hon. Maxine M. Chesney<br>Date:       January 13, 2023<br>Time:       9:00 a.m.<br>Courtroom: 7, 19th Floor |

1   I, DANIEL FLOEDER, declare as follows:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

---

[redacted]

1 ██  ████████████████████████████████████████████
2 ███████████████████████████████████████████████████
3 ███████████████████████████████████████████████████
4 ████████
5 ██  ████████████████████████████████████████████
6 ███████████████████████████████████████████████████
7 ███████████████████████████████████████████████████
8 ███████████████████████████████████████████████████
9 ██████████████████  ███████████████████████████████
10 ███████████████████████████████████████████████████
11 ███████████████████████████████████████████████████
12 ███████████████████████████████████████████████████
13 ██████████████████████████████████████
14 ██  ████████████████████████████████████████████
15 ███████████████████████████████████████████████████
16 ███████████████████████████████████████████████████
17 ███████████████████████████████████████████████████
18 ██████████████████████████
19 ██  ████████████████████████████████████████████
20 ███████████████████████████████████████████████████
21 ███████████████████████████████████████████████████
22 ███████████████████████████████████████████████████
23 ███████████████████████████████████████████████████
24 ██████████████
25
26 █
27 ██████████████████████████████████████████████████████

Case No. 3:19-md-02918-MMC

28

DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE

███  ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

**C.  The Product: TGAs**

19.     An HDD is a computer storage device that electronically stores data, such as documents, pictures, application software, and operating systems, using magnetic recording heads to read and write to rapidly spinning disks.  HDDs can be "internal" (or "bare") or "external," and are primarily used in four broad segments: desktop HDDs, mobile (laptop) HDDs, enterprise HDDs, and consumer electronics HDDs.

20.     "Internal" or "bare" HDDs are HDDs that come with no cables or any other packaging that customers incorporate into storage products (e.g., computers).  "External" HDDs are HDDs that connect to a computer via a USB or FireWire connection using accompanying power cables.

21.     HDDs are made up of, among other things, magnetic disks, heads, and a motor.  A motor-driven spindle hub rotates the disks, each of which has data recorded electromagnetically in concentric circles, or tracks, on the disk.  A magnetic head, similar to a phonograph arm, reads or writes the information on the tracks.  Two heads, one on each side of a disk, read or write the data as the disk spins.

22.     TGAs hold the recording heads in close proximity to the disks and provide the electrical connection from the recording heads to the HDDs' circuitry.  ██████████████████



24. **TGA Technology.** TGAs are a critical component to the operation and performance of HDDs and electronic devices that incorporate HDDs. TGAs play the critical function in an HDD of holding the recording head down precisely over the media that stores data. For an HDD to record and recall data efficiently, the TGA must hold the head in the air about 12 nanometers above the jagged surface of the disk. The disk travels at speeds reaching 150-170 mph, creating an air bearing for which the TGA needs to account. The precision required is equivalent to a 747 aircraft flying full speed 1/16th of an inch above a desert surface. In flying, the 747 will need to adjust for surface variations, equipment vibrations, and wind, while reading and writing data into the desert grains of sand. The TGA allows for this adjustment in an HDD.

25. Without the TGA, an HDD would not record or recall data at all—the core and sole function of an HDD—and certainly not with precision. TGAs are critical technology to providing a best in class HDD. All other components of an HDD could be the best possible technology with the best possible performance, but with an underperforming TGA, the HDD will not function.

26. **TGA Cost.** The TGA is one of the more costly components of an HDD.



DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



11   Case No. 3:19-md-02918-MMC

DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE



DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S  MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE





17   Case No. 3:19-md-02918-MMC



DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE



DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE

1
2
3
4
5
6
7
8
9
10
11   By: _____
          Daniel Floeder
12
13       *Senior Director, Commodities Management*
          *Team, Seagate Technology LLC*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF DANIEL FLOEDER IN SUPPORT OF SEAGATE'S OPP'N TO
NHK'S MOT. FOR PARTIAL SUMM. JUDGMENT REGARDING FOREIGN COMMERCE











# Exhibits to the Declaration of Daniel Floeder

# FILED UNDER SEAL

# Exhibit 13

## <u>FILED UNDER SEAL</u>