# Exhibit 1

# <u>FILED UNDER SEAL</u>

# Exhibit 2

# <u>FILED UNDER SEAL</u>

# Exhibit 3

# <u>FILED UNDER SEAL</u>

# Exhibit 4

# FILED UNDER SEAL

# Exhibit 5

# <u>FILED UNDER SEAL</u>

# Exhibit 6

# <u>FILED UNDER SEAL</u>

# Exhibit 7

# <u>FILED UNDER SEAL</u>

# Exhibit 8

# <u>FILED UNDER SEAL</u>

# Exhibit 9

# FILED UNDER SEAL

# Exhibit 10

# <u>FILED UNDER SEAL</u>

# Exhibit 11

# FILED UNDER SEAL

# Exhibit 12

# FILED UNDER SEAL

# Exhibit 13

# FILED UNDER SEAL

# Exhibit 14

# FILED UNDER SEAL

# Exhibit 15

# **FILED UNDER SEAL**

# Exhibit 16

Kenneth R. O'Rourke, SBN 120144
Jeff VanHooreweghe, SBN 313371
Mikaela E. Evans-Aziz* (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:    (415) 947-2000
Facsimile:    (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com
mevansaziz@wsgr.com

*Admitted to practice only in New York,
supervised by members of the California Bar*

***Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC | **SEAGATE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Maxine M. Chesney |

E.  **Carrying Out the Conspiracy**[29]

95.  During the Conspiracy Period, Defendants conspired to suppress and eliminate competition for suspension assembly sales by fixing prices, exchanging bidding information, agreeing on bids, sharing Seagate confidential information, and allocating their sales, in order to raise, stabilize, and/or slow the decline of prices of suspension assemblies sold to Seagate.

96.  NHK and MPT had contacts through multiple channels to exchange competitively sensitive information and coordinate with regards to the manufacture and sale of suspension assemblies.  The exchange of competitively sensitive information included:  (i) actual, potential, and proposed prices; (ii) market shares and customer volumes; (iii) manufacturing capacities; (iv) utilization rates; (v) timing of bid responses and other general bid information; and (vi) information related to product design and development.

97.  These communications were carried out between personnel at various levels of Defendants' corporate families—including high-level executives, sales managers, and individuals with pricing authority—based in various geographic locations, including Minnesota, California, and other U.S. states, Japan, Thailand, and Hong Kong.

98.  At least one purpose of the conspiracy between TDK and NHK was to eliminate or ease any price war or price competition between TDK and NHK on sales of suspension assemblies to Seagate.  The purpose of at least some of the communications between NHK and TDK in furtherance of their conspiracy was to keep prices for suspension assemblies they sold to Seagate higher than they otherwise would have been.

99.  Contact between and among Defendants MPT, NHK, and HTI in the United States, including in California and Minnesota, began as early as 2001.

100.  From at least 2001 until 2008, MPT's Director of Sales and Account Management had contacts with competing suppliers of suspension assemblies.  During at least part of this time, this MPT Director was responsible for sales to Seagate.  These exchanges included discussions of

---

[29] Many allegations herein reflect information Seagate obtained from Defendants' own documents produced during this litigation.

-23-

competitively sensitive information including prices, capacities, and plans for customer programs. As an example, the MPT Director's contacts with NHK resulted in MPT receiving information on prices and capacity for certain Seagate programs. During this period the MPT Director was based in Minnesota. Many of these communications involved NHK International's California-based VP of Disk Drive Suspension and Component Sales, who had responsibility for U.S. sales, including NHK's sales to Seagate.

101.  In addition to his contacts with NHK, the MPT Director exchanged competitive information with HTI, where he was previously employed, between at least 2001/2002 and 2008. In one August 2005 email, the MPT Director referenced contacting old friends from HTI to see if they were getting the same demands from Seagate regarding Seagate's Alpine project. These old friends included HTI's Director of Strategic Business Unit Sales and Marketing, based in Minnesota, as well as two of HTI's Seagate sales representatives.

102.  For instance, in one March 2007 email, the MPT Director told several senior MPT executives and sales managers, including his superiors, that he would check with the HTI sales representatives for Seagate about prior prices HTI had offered on Seagate's Argon and Cadmium programs.

103.  In one December 2006 email, the MPT Director received pricing information for Seagate's Argon and Cadmium programs from HTI, which he conveyed to senior executives and sales managers at MPT.

104.  During this period, MPT also facilitated communications between NHK and HTI, including contacts in which all three Defendants participated. Several of these communications occurred in-person in California.

105.  The MPT Director introduced the HTI Director to the NHK VP of Sales in the early 2000s during a business trip to California. After that, the HTI Director and the NHK VP of Sales went to a hunting lodge in the United States every year between 2003 and 2012, during which time they had at least one discussion that touched on prices.

-24-

106.    Other MPT employees also exchanged competitive information with NHK during the early 2000s.  From at least 2005 until 2008, MPT's Senior Director of Sales and Account Management responsible for sales to WD communicated with the NHK VP of Sales at least quarterly about topics including suspension assembly customers, shipment volumes, and prices.  The MPT Senior Director had a good relationship with the NHK VP of Sales because they worked together previously and had known each other for many years.

107.    The MPT Senior Director relayed information learned from these conversations to senior executives and sales managers at MPT.

108.    The MPT Senior Director often reached out to the NHK VP of Sales at the specific behest of his superiors.

109.    Though the MPT Senior Director was in charge of sales to WD and often exchanged information with NHK about WD specifically, he also received information about other customers, including pricing and volume information about Seagate.  For example, in a May 2008 email, he shared a detailed recap of a discussion he had with NHK, which included NHK's sales volumes for Seagate.

110.    The MPT Senior Director and NHK at times reached agreements on prices.  In one August 2008 email, the MPT Senior Director recapped a conversation with NHK, indicating that he and NHK came to an understanding on pricing for WD's Mercury program.

111.    In 2008, the MPT Director and the MPT Senior Director left MPT during a round of large company layoffs.  Following their departure, their immediate superior, the VP of Sales and Account Management for MPT took over their responsibilities.  The MPT VP of Sales also began to play a more direct role in communications with the NHK VP of Sales.

112.    From at least 2008 until April 2016, the MPT VP of Sales communicated with the NHK VP of Sales via emails, text messages, and in-person meetings at least once per month and more frequently when customers issued requests for quotations on specific products.  They discussed topics such as prices, new product designs, actual and forecasted shipments, capacity,

-25-

utilization, and bids. One purpose of their discussions was to avoid price decreases. Sometimes MPT used NHK to check price information it had received from a customer.

113. The MPT VP of Sales also communicated directly with executives and sales people from numerous NHK subsidiaries. For example, he had multiple contacts with NHK Thailand's General Manager for HDD Sales, including conversations in which they discussed prices that would be quoted to customers. The NHK General Manager then relayed this information with employees of NHK Thailand's parent and sister companies.

114. The MPT VP of Sales also shared information he learned from the NHK VP of Sales directly with his superior, a senior MPT executive. In turn, the senior MPT executive shared information he received from his own communications with senior executives and sales managers at NHK.

115. Both prior to and following TDK's acquisition of MPT in 2007, the senior MPT executive also had contacts with various individuals at NHK, including Hiroyuki Tamura, Senior Sales Director for NHK's Disk Drive Suspension and Component Sales Division from 2007 through 2013, and Hitoshi Hashimoto, who took over the same role in 2013.

116. Both Mr. Tamura and Mr. Hashimoto were indicted by the Department of Justice in February 2020. The senior MPT executive's contacts with NHK involved exchanges of competitively sensitive information including customers, bids, capacity, utilization, technology, actual and potential bid prices, and component supplier issues.

117. The pricing information that MPT received from NHK, including Seagate's confidential information, allowed MPT to set baseline prices, avoid pricing too low, and avoid "overshooting the market" because customers were trying to drive prices down. The discussion allowed the companies not to "go crazy on prices" and to abstain from starting a price war. The purpose of the conversations was to keep prices higher than they otherwise would have been.

118. As early as 2003, the senior MPT executive and Mr. Tamura began communicating while negotiating a cross-licensing agreement between the companies. Thereafter, the senior MPT

-26-

executive began meeting with Mr. Tamura and other individuals to exchange information about suspension assemblies.

119.    Between 2005 and 2007, the senior MPT executive and Mr. Tamura met one or two times a year; their communications included discussions of prices, volumes, actual and projected shipments, customers, and component supplies.  After 2007 through 2013, they met four or five times per year, and more frequently around significant RFQs.

120.    As an example, in a December 5, 2005 meeting between the senior MPT executive and Mr. Tamura, the parties discussed Seagate and WD, among other topics.  During the meeting, NHK identified NHK's "starting price" for suspension assemblies to WD and confirmed that it was on Seagate's Titanium Program.  The senior MPT executive reported that he hoped to get indications of pricing from NHK.

121.    In another meeting in late 2005, the senior MPT executive and the U.S.-based MPT VP of Sales met with Mr. Tamura and an NHK executive at a Hawaiian coffee shop in Tokyo.  They discussed NHK's plan to build a suspension assembly facility in Thailand, which would add capacity and create an NHK presence in Thailand.  NHK assured the senior MPT executive that NHK would maintain its friendly relationship with MPT and not take market share away from them.

122.    Following TDK's acquisition of MPT in 2007, senior executives and sales managers from TDK and NHK met in Yokohama, Japan to discuss TDK's future plans for MPT and the suspension assembly business.  TDK assured NHK that the acquisition would not affect TDK and NHK's positive relationship.  The companies agreed to work together to grow both companies' market shares at the expense of their co-conspirator, HTI.  TDK and NHK further agreed to avoid a price war when they were trying to grow share at the expense of their co-conspirator, HTI.

123.    Thereafter, TDK and NHK senior executives and sales managers met at least quarterly.  During these meetings TDK and NHK discussed topics including specific customer bids or RFPs, information on capacity, utilization, customers, future expansion plans, and potential ways to lower suspension assembly production costs, including Seagate's confidential information.  The companies sometimes discussed their mutual desire to avoid a price war.

-27-

Minnesota, (ii) quoting price-fixed prices of suspension assemblies to Seagate LLC in Minnesota, (iii) selling price-fixed suspension assemblies to Seagate LLC in Minnesota, (iv) supplying price-fixed suspension assemblies to Seagate LLC in Minnesota, (v) entering into agreements in Minnesota with Seagate LLC for the supply of price-fixed suspension assemblies; (vi) engaging in conspiratorial communications in and from Minnesota, and (vii) as related to Defendants TDK and NHK, conspiring with, while also scheming to wound and then eliminating, their Minnesota-based co-conspirator, HTI.

154.    Seagate LLC purchased suspension assemblies affected by the conspiracy in Minnesota.   Seagate LLC entered agreements in Minnesota with Defendants for the supply of suspension assemblies affected by the conspiracy.   Defendants shipped suspension assemblies affected by the conspiracy to Seagate LLC in Minnesota.

155.    Seagate LLC's offices in Minnesota (specifically in Bloomington, Minnesota) were home to Seagate's Commodities Management Team ("CMT") for much of the Conspiracy Period. CMT holds, and held for much of the Conspiracy Period, primary responsibility for many aspects of procuring suspension assemblies along with employees in Seagate LLC's California office, including negotiating the pricing for and overseeing the acquisition of suspension assemblies, designing engineering specifications for the suspension assemblies (with Seagate engineering based in Minnesota), and overseeing the supply and quality of suspension assemblies delivered to Seagate.

156.    Seagate CMT made purchasing decisions regarding suspension assemblies from Minnesota, including agreeing on prices it would pay for suspension assemblies in Minnesota, setting forecasts for purchases of suspension assemblies in Minnesota, seeking budget approval for purchases of suspension assemblies in Minnesota, and determining volumes of purchases of suspension assemblies in Minnesota.

157.    Given Seagate CMT's presence in Minnesota and broad acquisition responsibilities, Defendants themselves maintained a presence in, and regularly traveled to or within, Minnesota to negotiate in person with members of Seagate CMT's team for Seagate's purchase of suspension assemblies during the Conspiracy Period.   Defendants also regularly communicated over the

-32-

telephone and electronic means with one another in Minnesota and with Seagate CMT in Minnesota to negotiate Seagate's purchase of suspension assemblies during the Conspiracy Period.

158. During negotiations with Seagate CMT in Minnesota, Defendants proposed prices, pricing terms, technologies and product designs, and other supply terms to Seagate, including prices, pricing terms, and technologies affected by the conspiracy.

159. After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Defendants, Seagate LLC purchased suspension assemblies affected by the conspiracy in Minnesota.

160. After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Defendants, Seagate LLC entered agreements in Minnesota with Defendants for the supply of suspension assemblies affected by the conspiracy.

161. After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Seagate CMT, Defendants shipped suspension assemblies affected by the conspiracy to Seagate LLC in Minnesota.

162. After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Seagate CMT, Defendants shipped suspension assemblies affected by the conspiracy to Seagate's offices outside of Minnesota for incorporation into hard disk drives delivered to Minnesota.

163. Defendants supplied suspension assemblies to Seagate LLC in Minnesota and to Seagate outside of Minnesota for incorporation into hard disk drives delivered to Minnesota on a regular basis every year since at least 2003, the beginning of the Conspiracy Period.

164. In part to facilitate the supply of suspension assemblies in Minnesota, all three Defendant suppliers of suspension assemblies—HTI, NHK, and TDK/MPT—maintained a presence in Minnesota during much of the Conspiracy Period.

165. Defendant HTI was headquartered in Minnesota throughout the Conspiracy Period, until eliminated by Defendant TDK in 2016. Defendant HTI employed thousands of employees in Minnesota during the Conspiracy Period, and manufactured and sold suspension assemblies in

-33-

confidential Seagate information received from other Defendants to inform and decide what prices and other supply terms to offer Seagate.

210.  Defendants used confidential information disclosed under the NDAs to advantage themselves at Seagate's expense.  This confidential Seagate information included, for example, Seagate's demand volumes (total available market, or "TAM"), preferred allocation of TAM among suppliers, price targets, actual pricing in current and prior projects, actual volumes used in current and prior projects, and technical requirements for upcoming programs.  This Seagate confidential information was often intended to be disclosed to only one of the Defendant suppliers, and Seagate disclosed it to that specific Defendant with the expectation and understanding that the Defendant would not share it with other Defendants, as required by the NDAs with that specific Defendant.

211.  As illustrative but not exhaustive examples:

    a.  In March 2010, MPT received confidential pricing information from NHK about the price Seagate paid NHK last quarter and NHK's pricing offer to Seagate for next quarter.  NHK shared this information in violation of the Supplement for Disclosure between Seagate and NHK which protected Seagate's and NHK's pricing information disclosed during this period.  This confidential information informed MPT's decision on pricing terms to offer Seagate, and MPT used the confidential information to offer higher prices than it otherwise would have but for NHK's disclosure of the information.

    b.  In January 2011, NHK provided information to MPT on NHK's price quote for Seagate's proposed TAM allocation, production volumes for current Seagate programs, and new capacity for upcoming Seagate programs, in violation of the Supplement for Disclosure between Seagate and NHK (protecting, *inter alia*, business and technical information related to the design and manufacture of disk drives and disk drive components, manufacturing processes, volume, and pricing).  This confidential information informed MPT's decision on what supply terms to offer (or not offer) Seagate, depriving Seagate of more favorable terms

-43-

1    the division of the suspension assemblies market. The commercially sensitive information

2    exchanged to charge Seagate higher prices included Seagate's confidential information protected

3    from disclosure by its NDAs with the Defendants.

4           214. Likewise, the JFTC found that TDK and NHK exchanged demand forecasts and

5    quoted pricing for RFQs to implement the conspiratorial agreement to fix prices and allocate

6    markets. Seagate's NDAs with Defendants encompass these types of information.

7           215. The Defendants exchanged Seagate's confidential information for their own benefit,

8    to unjustly enrich themselves, at Seagate's expense.

9           216. As a direct and proximate result of the Defendants' unlawful and inequitable conduct,

10   Seagate was damaged (and Defendants were unjustly enriched). Defendants charged and Seagate

11   paid supracompetitive prices for suspension assemblies, proximately caused by Defendants'

12   breaches of their NDAs with Seagate, throughout the Conspiracy Period.

13          217. Defendants used confidential Seagate business information—including pricing,

14   volumes, product roadmaps and technology timelines, trends and forecasts, development plans, sub-

15   supplier information, financial information, materials, and manufacturing volumes—in furtherance

16   of their conspiracy and in order to allocate market shares, raise prices, rig bids, and disadvantage

17   Seagate in negotiations.

18          218. Defendants' breaches of the NDAs allowed them to charge Seagate higher prices

19   than would have prevailed if the Defendants were actively competing to supply Seagate. The

20   Defendants undermined Seagate's ability to negotiate lower prices through the competitive bidding

21   process. Defendants had no reason to lower prices to increase (or at least maintain) their share of

22   TAM when they knew Seagate's target TAM allocations and pricing for other suppliers. By using

23   Seagate confidential information to coordinate bids and volumes, the Defendants could avoid a

24   "bloody price war for allocation" rather than submit competitive bids and try to undercut the prices

25   of their competitors. The Defendants illegally profited at Seagate's expense.

26          219. More specifically as related to Seagate's confidential prices, when one Defendant

27   learned what price Seagate demanded (in confidence) from another Defendant or discussed (in

28

<div align="center">-46-</div>

confidence) with another Defendant, the Defendant receiving that confidential price would use it to decide what price to offer Seagate.  Importantly, the Defendant receiving that confidential price would use it to set its own price at levels not too far below that price (or at times at or above that price).  Seagate would then lose the benefit of the difference between the price offered and the lower price it would have been offered, if not for the breach.  The exchanges of Seagate's confidential information allowed the Defendants to align their pricing rather than offer competitive pricing.  The Defendants offered higher pricing to Seagate than they would have absent the breach of the NDAs.

220.    For example, in one August 2005 email, MPT referenced contacting HTI to see if it was getting the same demands from Seagate regarding Seagate's Alpine project.  By learning Seagate's *confidential* demands to HTI, MPT had more certainty on what to offer to Seagate, and furthermore, MPT had more certainty that it did not need to offer anything *more competitive* (i.e., more favorable to Seagate) than what Seagate demanded *confidentially* from HTI.  Seagate suffered injury in the difference between what MPT offered to Seagate and what MPT would have offered to Seagate but for the breach.

221.    Seagate used the common negotiation tactic of playing the suppliers off of each other to obtain a lower price or other favorable term.  Defendants illegally subverted this strategy by sharing confidential information Seagate provided during negotiations, pursuant to the NDAs, and their planned responses to Seagate.  The breach of the NDAs allowed Defendants to continue to offer higher prices during negotiations than they otherwise would have offered.  As a result, Seagate paid higher prices for suspension assemblies than it would have if not for the breach.

222.    By sharing Seagate's confidential product roadmaps, development timing, and forecasts, the Defendants could conduct long-term planning for their conspiracy.  By knowing what projects were on the horizon and which suppliers were invited to bid, they could ensure the conspirators all benefited over the course of several Seagate projects.  Additionally, as with pricing, they could coordinate their utilization and costs across projects to inflate the material cost provided to Seagate and support a higher price.  With the suppliers aligned and Seagate in the dark about the

-47-

1  suppliers' conspiratorial planning, Seagate was more likely to accept the higher price, allowing the
2  Defendants to artificially increase their product margins at Seagate's expense.

3             **ii.**       **Product Supply Agreements**

4         223.    Seagate LLC and each Defendant (either itself or through its parent company) also
5  entered product supply agreements ("PSAs"). The PSAs provided negotiated pricing and other
6  terms and conditions under which the Defendants provided products to Seagate, including
7  Defendants' sales of suspension assemblies to Seagate LLC in Minnesota and Seagate LLC's
8  purchases in Minnesota of suspension assemblies from Defendants. All the PSAs included
9  provisions on confidentiality that governed disclosures of confidential and proprietary information
10  between the parties. All the PSAs also included a "compliance with all laws" provision, requiring
11  the supplier, all products it supplied, and all work it performed to "comply with all applicable laws
12  and regulations in effect."

13        **J.**     **Trade and Commerce Affected by the Conspiracy**

14         224.    The conduct of Defendants and their co-conspirators has taken place in, and affected
15  the continuous flow of interstate and foreign trade and commerce of, the United States.

16         225.    During the Conspiracy Period, Defendants collectively controlled approximately
17  90% of the global supply of suspension assemblies. The conspiracy alleged herein thus affected
18  billions of dollars of commerce.

19         226.    Defendants' sales in the United States and sales outside the United States of
20  suspension assemblies destined for the United States account for a significant portion of these
21  sizable revenues. U.S.-destined suspension assemblies were a major focus of the conspiracy.

22         227.    Each Defendant HTI, NHK, and TDK—itself and/or by or through one or more of
23  its subsidiaries—sold suspension assemblies in the United States in a continuous and uninterrupted
24  flow of interstate and international commerce, including through and into this judicial district and
25  through and into Minnesota. Each further sold suspension assemblies in the United States for
26  delivery to the United States and outside the United States for incorporation into HDDs destined for
27  sale worldwide, including the United States and including Minnesota, at collusive and

28

-48-

289.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in Minnesota and elsewhere.

290.    The anticompetitive acts were intentionally carried out in Minnesota, directed at suspension assemblies purchased by Seagate LLC in Minnesota and supplied to Seagate LLC in Minnesota, and had a substantial and foreseeable effect on trade and commerce in Minnesota by raising and fixing prices for suspension assemblies throughout Minnesota and elsewhere.

291.    As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate LLC's business and property were injured in Minnesota, in that Seagate LLC paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

292.    The alleged contract, combination, or conspiracy is a per se violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66.

## COUNT V

**Breach of Contract – Nondisclosure Agreements (Against All Defendants except Headway)**

293.    Seagate incorporates by reference the allegations in the preceding paragraphs.

294.    Defendants executed Master Nondisclosure Agreements with Seagate LLC, including Supplements thereto, during the Conspiracy Period which were valid and binding contracts.

295.    The parties contemplated disclosure of confidential business and technical information by Seagate LLC as well as its corporate affiliates as a necessary part of purchasing suspension assemblies from the Defendants.  Without providing design specifications, volume forecasts, capacity, product roadmaps, and pricing information, Seagate would not be able to ensure a steady supply of components for its current and future products.  Accordingly, Seagate and Defendants entered NDAs to protect these disclosures of proprietary and competitively sensitive information and to confer a direct benefit upon Seagate LLC as well as its corporate affiliates.

-60-

296.   Seagate provided Defendants with confidential business information pursuant to these NDAs as intended.

297.   Seagate LLC, and its affiliates, have fully performed all of their duties and obligations under the NDAs.

298.   Pursuant to the NDAs, Defendants were required to, among other things, use Seagate's confidential business information only as specified and protect Seagate's confidential business information from unauthorized disclosure.

299.   Defendants were not to use Seagate's confidential information to conspire with one another against Seagate or to illegally raise prices to Seagate or allocate supply shares among themselves.

300.   Defendants breached these obligations by misusing, exchanging, and/or disclosing Seagate's confidential business information, as set forth herein.  Throughout the Conspiracy Period, NHK, TDK, and HTI each shared information that Seagate had provided it under the NDAs with each of the other Defendant families, in violation of their NDAs with Seagate.

301.   The Defendants used the Seagate confidential information to avoid underbidding each other, keep sales prices above the competitive level that otherwise would have obtained, and maintain and implement their market share allocation.

302.   All Defendants breached their NDAs with Seagate by exchanging Seagate confidential information protected by those NDAs, and the breach caused injury to Seagate.  As a direct and proximate result of Defendants' breach of the NDAs, Seagate has suffered actual damages in the form of unlawfully inflated prices for suspension assemblies, and Defendants have been unjustly enriched at Seagate's expense.  Seagate paid more than it otherwise would have paid in the absence of the Defendants' improper use of Seagate's confidential information protected by the NDAs.

## IX.   DEMAND FOR JUDGMENT

WHEREFORE, Seagate demands judgment in Seagate's favor and against all Defendants adjudging and decreeing that:

-61-

1 | Dated:  April 15, 2021

2 |  | */s/ Kenneth R. O'Rourke*_____
Kenneth R. O'Rourke
3 | Jeff VanHooreweghe
Mikaela E. Evans-Aziz (admitted *pro hac vice*)
4 | **WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
5 | One Market Plaza
Spear Tower, Suite 3300
6 | San Francisco, CA 94105
Telephone:  (415) 947-2000
7 | Facsimile:   (415) 947-2099
korourke@wsgr.com
8 | jvanhooreweghe@wsgr.com
mevansaziz@wsgr.com

10 | *Counsel for Plaintiffs Seagate Technology LLC,*
*Seagate Technology (Thailand) Ltd., Seagate*
11 | *Singapore International Headquarters Pte. Ltd.,*
*and Seagate Technology International*

-63-

# Exhibit 17

# FILED UNDER SEAL

# Exhibit 18

# **FILED UNDER SEAL**

# Exhibit 19

# FILED UNDER SEAL

# Exhibit 20

# FILED UNDER SEAL

# Exhibit 21

# <u>FILED UNDER SEAL</u>

# Exhibit 22

# FILED UNDER SEAL

# Exhibit 23

# <u>FILED UNDER SEAL</u>

# Exhibit 24

# FILED UNDER SEAL

# Exhibit 25

# FILED UNDER SEAL

# Exhibit 26

Christopher T. Micheletti
**ZELLE LLP**
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zelle.com

Aaron M. Sheanin
**ROBINS KAPLAN LLP**
2440 West El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
asheanin@robinskaplan.com

*Interim Co-Lead Class Counsel for the
End-User Plaintiffs*

Victoria Sims
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
vicky@cuneolaw.com

Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
Telephone: (651) 312-6518
Facsimile: (651) 789-4818
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for the
Reseller Plaintiffs*

Kenneth R. O'Rourke
**WILSON SONSINI GOODRICH &
ROSATI**
**Professional Corporation**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
korourke@wsgr.com

*Counsel for Seagate Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>    3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | **PLAINTIFFS' FIRST JOINT SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |

**REQUEST FOR PRODUCTION NO. 50**

All Communications between TDK Corporation and other Defendant entities reflecting, memorializing, constituting, concerning or referring to TDK Corporation's acquisition of Hutchinson Technology Inc. or TDK Corporation's contemplation of the acquisition of Hutchinson Technology Inc. at any time during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 51**

All Documents and Communications reflecting, memorializing, constituting, containing or referring to analyses or reasons for not acquiring, merging with, or purchasing Hutchinson Technology Inc.

**REQUEST FOR PRODUCTION NO. 52**

All Documents reflecting, memorializing, constituting, concerning or referring to Communications between or amongst You or any other producer(s) or seller(s) of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies, including but not limited to Hutchinson Technology Inc., where the participants discussed production, capacity, utilization, customer product lines, product design development, customer technical requirements, component supplies, cross-licensing arrangements, HDD Suspension Assemblies-related patents, market share, customer volumes, pricing, bidding events, RFQs, distribution, inventory levels, shipment, or sale of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies during the Relevant Time Period.

**REQUEST FOR PRODUCTION NO. 53**

All Documents reflecting, memorializing, constituting, concerning or referring to Meetings attended by You or any other producer(s) or seller(s) of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies, including but not limited to Hutchinson Technology Inc., where the attendees discussed production, capacity, utilization, customer product lines, product design development, customer technical requirements, component supplies, cross-licensing arrangements, HDD Suspension Assemblies-related patents, market share, customer volumes, pricing, bidding events, RFQs, distribution, inventory levels, shipment, or sale of HDD

Dated:  August 3, 2020

/s/ Christopher T. Micheletti
Christopher T. Micheletti
**ZELLE LLP**
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Telephone:   (415) 693-0700
Facsimile:   (415) 693-0770
cmicheletti@zelle.com

/s/ Aaron M. Sheanin
Aaron M. Sheanin
**ROBINS KAPLAN LLP**
2440 West El Camino Real, Suite 100
Mountain View, CA 94040
Telephone:   (650) 784-4040
Facsimile:   (650) 784-4041
asheanin@robinskaplan.com

***Interim Co-Lead Class Counsel for the
End-User Plaintiffs***

/s/ Victoria Sims
Victoria Sims
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile:  (202) 789-1813
vicky@cuneolaw.com

/s/ Shawn M. Raiter
Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
Telephone:  (651) 312-6518
Facsimile:  (651) 789-4818
sraiter@larsonking.com

***Interim Co-Lead Class Counsel for the
Reseller Plaintiffs***

/s/ Kenneth R. O'Rourke
Kenneth R. O'Rourke
**WILSON SONSINI GOODRICH & ROSATI
Professional Corporation**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile:  (415) 947-2099
korourke@wsgr.com

***Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International***

PLAINTIFFS' FIRST JOINT SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
CASE NOS. 3:19-md-02918-MMC, 3:20-cv-01217-MMC

# Exhibit 27

Kenneth R. O'Rourke
Jeff VanHooreweghe
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:  (415) 947-2000
Facsimile:  (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com

Mikaela E. Evans-Aziz (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone:  (212) 497-7710
Facsimile:  (212) 999-5899
mevansaziz@wsgr.com

***Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | **SEAGATE'S FIRST SET OF INTERROGATORIES TO DEFENDANTS** |

(a)     all participants in the Meeting or Communication, and their employers at the time of the Meeting or Communication;

(b)     the date of the Meeting or Communication;

(c)     the topics addressed during or in the Meeting or Communication;

(d)     any information You provided or received;

(e)     the purpose of the Meeting or Communication;

(f)     whether or not the Meeting or Communication was part of a violation of the Sherman Act, California Cartwright Act, or Minnesota Antitrust Law;

(g)     all Persons You or Your representatives believe or have reason to believe have personal knowledge of the Meeting or Communication; and

(h)     all Documents that constitute, memorialize, reflect, or refer to the Meeting or Communication, or other information requested in this interrogatory.

**INTERROGATORY NO. 2**

Identify all Meetings and Communications that You or someone on Your behalf or with Your knowledge or approval had with an Employee or representative of another Defendant during the Relevant Time Period at which or about which the forecasting, supply, demand, product lines, product plans, or product roadmaps with respect to the sale of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies to Seagate, Western Digital, Samsung, or Toshiba was a topic of the Meeting or Communication, other than Meetings and Communications restricted to only Employees or representatives of entities wholly owned by You at the time of the Meeting or Communication, including:

(a)     all participants in the Meeting or Communication, and their employers at the time of the Meeting or Communication;

(b)     the date of the Meeting or Communication;

(c)     the topics addressed during or in the Meeting or Communication;

(d)     any information You provided or received;

(e)     the purpose of the Meeting or Communication;

(f)     whether or not the Meeting or Communication was part of a violation of the Sherman Act, California Cartwright Act, or Minnesota Antitrust Law;

(g)     all Persons You or Your representatives believe or have reason to believe have personal knowledge of the Meeting or Communication; and

(h)     all Documents that constitute, memorialize, reflect, or refer to the Meeting or Communication, or other information requested in this interrogatory.

**INTERROGATORY NO. 3**

Other than agreements entered into with Seagate, Western Digital, Samsung, or Toshiba, identify each agreement (oral, written, or implied) that You or anyone on Your behalf or with Your knowledge or Your approval entered into during the Relevant Time Period concerning pricing or supply of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies to Seagate, Western Digital, Samsung, or Toshiba, including:

(a)     all parties to the agreement and to any amendment or renewal;

(b)     the date of the agreement and any amendment or renewal;

(c)     the Meeting(s) at which, or the Communication(s) in which, the agreement and any amendment or renewal were reached;

(d)     whether the agreement and any amendment or renewal was oral, written, or implied;

(e)     the terms of the agreement and any amendment or renewal;

(f)     the purpose of the agreement and any amendment or renewal;

(g)     the ending date, if any, of the agreement and any amendment or renewal;

(h)     the reason the agreement and any amendment or renewal came to an end;

(i)     whether or not the agreement and any amendment or renewal violated the Sherman Act, California Cartwright Act, or Minnesota Antitrust Law;

(j)     all Persons You or Your representatives believe or have reason to believe have personal knowledge of the agreement and any amendment or renewal, the existence, or terms of same; and

(k)     all Documents that constitute, memorialize, reflect, or refer to the agreement and any amendment or renewal, or terms thereof, or other information requested in this interrogatory.

**INTERROGATORY NO. 4**

Identify and describe any trade association show, trade association event, or other industry Meeting or event, including but not limited to any standard setting organization Meeting or event, attended by any of Your Employees who has or had any non-clerical responsibility for recommending, reviewing, setting, communicating, or approving prices for, price increase announcements, production, bids or quotes related to, or setting or restricting capacity utilization for facilities manufacturing, Your HDD Suspension Assemblies and/or HDD Components Incorporating Suspension Assemblies during the Relevant Time Period, including:

(a)     the date of the trade association show, trade association event, or other industry Meeting or event;

(b)     the location of the trade association show, trade association event, or other industry Meeting or event; and

(c)     the names and titles of each Employee with the responsibility described in this interrogatory that attended the trade association show, trade association event, or other industry Meeting or event.

**INTERROGATORY NO. 5**

Identify each instance in which You shared Seagate information regarding HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies, including but not limited to Seagate information regarding pricing, forecasting, supply, demand, product lines, product plans, or product roadmaps with any other Defendant, competitor, or manufacturer of HDD Suspension Assemblies or HDD Components Incorporating Suspension Assemblies, including, for each instance:

(a)     the date;

(b)     the contents of the shared information;

(c)     the nature of the Communication in which You shared the Seagate information;

(d)     the names and titles of the individuals who provided and received the information, and their employers;

(e)     whether or not the instance in which You shared Seagate information was part of a violation of the Sherman Act, California Cartwright Act, or Minnesota Antitrust Law; and

(f)     all Documents that constitute, memorialize, reflect, or refer to the shared information, Communication, or other information requested in this interrogatory.

## II.     DEFINITIONS

1.     The following rules of construction shall apply to all discovery requests:

(a)     The connectives "And" and "Or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope;

(b)     "Including" shall be construed to mean "without limitation";

(c)     "Relating to," "regarding," or "with respect to" mean, without limitation, the following concepts: discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part; and

(d)     The use of the singular form of any word includes the plural and vice versa.

2.     "Communication(s)" means, without limitation, any disclosure, transfer, or exchange of information, opinions, ideas or thoughts, by any means, including but not limited to face-to-face meetings; written, recorded, electronic, or oral communications; or otherwise, at any time or place under any circumstances.  This definition shall include communication via social media, including, but not limited to, information, opinions, ideas, or thoughts, posted on or transmitted through social networking platforms (e.g., LinkedIn, Facebook, Instagram), digital file-sharing services (e.g., Dropbox), blogs and microblogs (e.g., Twitter, Tumblr), Voice Over Internet Protocol services (e.g., Skype, Zoom), and/or instant messages (e.g., Facebook

Document using the applicable bates numbers or specifically identify the type of Document being produced (e.g., letter, memorandum, contract, invoice, etc.), its date and author(s), its custodian, and every person to whom such Document or any copy thereof was given or sent.  For all Documents produced pursuant to Rule 33(d), identify the name of the employee, officer, or agent certifying the Document as business records.

       3.     If any answer to an interrogatory or part thereof is withheld on a claim of privilege or constitutes attorney work product such that the responding party will not respond to the interrogatory, please provide a written statement describing each and every fact or basis upon which the purported privilege or claim of work product is asserted.

Dated:  August 3, 2020

*/s/ Kenneth R. O'Rourke*
Kenneth R. O'Rourke
Jeff VanHooreweghe
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:  (415) 947-2000
Facsimile:  (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com

Mikaela E. Evans-Aziz (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone:  (212) 497-7710
Facsimile:  (212) 999-5899
mevansaziz@wsgr.com

***Counsel for Plaintiffs Seagate Technology LLC, Seagate Technology (Thailand) Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International***

# Exhibit 28

Kenneth R. O'Rourke, SBN 120144
Jeff VanHooreweghe, SBN 313371
Mikaela E. Evans-Aziz* (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:    (415) 947-2000
Facsimile:    (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com
mevansaziz@wsgr.com

*Admitted to practice only in New York,*
*supervised by members of the California Bar*

***Counsel for Plaintiffs Seagate Technology LLC,***
***Seagate Technology (Thailand) Ltd., Seagate***
***Singapore International Headquarters Pte. Ltd.,***
***and Seagate Technology International***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC | **SEAGATE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Maxine M. Chesney |

1.      This antitrust and breach of contract action seeks to redress a longstanding conspiracy by the leading manufacturers of essential computer technology components called suspension assemblies.  Suspension assemblies are an indispensable component of computer hard disk drives ("HDDs").  The conspirators fixed, raised, and stabilized prices of suspension assemblies and allocated supply shares of these products with an overriding purpose of selling them for higher prices and making more money than they otherwise would have made if there had been robust competition rather than their conspiracy.  The conspirators carried out their price fixing and supply allocation conspiracy by *inter alia* routinely communicating and coordinating their businesses with one another and exchanging and using confidential information in breach of agreements that prohibited the improper disclosures and use of such information.

2.      Plaintiff Seagate Technology LLC ("Seagate LLC"), with Seagate Technology (Thailand) Ltd. ("Seagate Thailand"), Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore"), and Seagate Technology International ("Seagate International"), (collectively, "Seagate" or "Plaintiffs") purchased billions of dollars' worth of suspension assemblies from Defendants.  Seagate purchased these suspension assemblies to make hard drives, which are found in computers everywhere and serve as important technologies and products for major U.S. industries; key health, security, and safety sectors; large and small businesses; and U.S. households.

3.      Plaintiffs bring this action for damages and other relief under the antitrust laws of the United States and various states, as well as for breach of contract, against three Defendant groups:

**NHK Defendants**:  NHK Spring Co. Ltd., NHK International Corporation, NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring (Thailand) Co., Ltd. (collectively, "NHK");

**TDK Defendants**:  TDK Corporation, Headway Technologies, Inc., Magnecomp Precision Technology Public Co., Ltd., and SAE Magnetics (H.K.) Ltd. (collectively, "TDK"), and

**HTI Defendant**:  Hutchinson Technology Inc. ("HTI").

4.      Plaintiffs allege as follows on personal knowledge as to themselves and upon information and belief as to all others:

I.      **INTRODUCTION**

5.      Defendants and their co-conspirators knowingly conspired for more than 12 years not to compete with one another in the pricing and supply of suspension assemblies for hard disk drives.  Specifically, Defendants agreed to fix the prices and allocate market shares of suspension assemblies sold to Seagate from as early as 2003 through at least April 2016 with the effects continuing thereafter (the "Conspiracy Period").  Defendant TDK entered an agreement to acquire HTI on or about November 1, 2015, and completed the acquisition on or about October 6, 2016.[1] As a result of the Defendants' conspiracy, Seagate paid artificially high prices on billions of dollars of its purchases of suspension assemblies.

6.      At least five of the world's antitrust agencies have investigated or continue to investigate aspects of this conspiracy:  the United States Department of Justice ("DOJ"), the Japan Fair Trade Commission ("JFTC"), the Administrative Council for Economic Defense in Brazil ("CADE"), the Taiwan Fair Trade Commission ("TFTC"), and the Competition and Consumer Commission of Singapore ("CCCS").  On information and belief, these antitrust agencies initiated these investigations because TDK requested leniency from each of them and *admitted* to participating in the conspiracy.

7.      The agencies that have reported the results of their investigations have all found evidence of a conspiracy among the suppliers of suspension assemblies.  For example, on July 29, 2019, the DOJ filed a criminal charging document, an Information, against NHK for entering into a conspiracy to eliminate competition for suspension assemblies.

8.      On the same day, July 29, 2019, the DOJ announced that NHK entered into a criminal guilty plea agreement (dated July 26, 2019) whereby NHK *admitted* to participating in a conspiracy to price fix suspension assemblies violating the Sherman Act within the United States.

---

[1] References to "TDK" also include HTI, except where HTI is referenced individually.

-2-

85.     NHK further *admitted* as part of the plea agreement that an unnamed Company A also participated in a conspiracy which had the primary purpose of fixing the prices of HDD suspension assemblies sold in the United States and elsewhere.  NHK also admitted that Company A participated in the aforementioned activities for the purpose of forming and carrying out this conspiracy.  NHK further admitted that Company A, through its officers and employees, reached agreements with NHK to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies sold in the United States and elsewhere.[21]

86.     On information and belief, Company A described in NHK's plea agreement with DOJ is TDK.  Due to industry consolidation as described herein, including TDK's acquisition of HTI, there are now only two major global suppliers of suspension assemblies:  TDK and NHK.  Moreover, the JFTC issued a cease and desist order in 2018 describing an agreement "to fix the selling prices of suspensions" between those two remaining global suppliers:  NHK and TDK.[22]

87.     On February 13, 2020, DOJ filed an indictment in the United States District Court for the Northern District of California against Hiroyuki Tamura and Hitoshi Hashimoto, two former NHK executives involved in the sale and pricing of NHK's suspension assemblies.  Hiroyuki Tamura was the general manager of NHK Spring's disk drive suspension and component sales department from approximately 2007 through April 2013.  Hitoshi Hashimoto held the same position from April 2013 through April 2016.[23]  During the Conspiracy Period, Mr. Hashimoto also held a position at NAT.

88.     According to the indictment, the DOJ determined that Tamura, Hashimoto, and their co-conspirators engaged in the following activities:

          a.     attending meetings and engaging in other communications concerning their sales of, pricing of, and market shares for HDD suspension assemblies to be sold in the United States and elsewhere;

---

[21] *Id.* ¶ 4(c).
[22] Japan Fair Trade Commission, Year 2018 (Measure) No. 5, Cease and Desist Order ¶ 1 (Feb. 9, 2018) ("JFTC Cease and Desist Order").
[23] Indictment, United States of America v. Hitoshi Hashimoto and Hiroyuki Tamura, 3:20-cr-00070-JD, ¶2-4 (N.D. Cal. Feb. 13, 2020), ECF No. 1.

-20-

with the JFTC.[25]  In July 2016, the JFTC raided Defendant NHK and Defendant TDK (or certain of their subsidiaries) based on suspected coordinated price-fixing activity by the two companies.  On February 9, 2018, the JFTC issued a cease and desist order to NHK and fined NHK, finding that NHK and TDK substantially restrained competition in the suspension assembly market by agreeing to maintain sale prices.[26]  By that point in time, TDK had acquired HTI.

91.     The JFTC similarly concluded that at least TDK, NHK Spring Co. Ltd., and NAT Peripheral (H.K.) Co. substantially restrained competition in the suspension assembly market by agreeing to maintain sales prices.  The JFTC found that TDK and NHK coordinated with each other and agreed to fix prices of suspension assemblies "to secure the[ir] market share and profits," including by holding multiple meetings with sales managers between August 31, 2007 and January 28, 2009 to confirm their price-fixing strategy.[27]

92.     The JFTC further concluded that in order to implement the conspiratorial agreement, TDK and NHK would confirm the quoted prices and selling prices for Requests for Quotations ("RFQs") and "exchang[e] information on suspension demand forecasts and selling prices as well as the quoted prices presented when foreign HDD manufacturer-sellers issued RFQs."[28]  Again the JFTC explained that these information exchanges occurred in sales manager meetings.

93.     In sum, in order to raise, stabilize and/or slow the decline of prices of suspension assemblies sold to Seagate, Defendants TDK, NHK and HTI conspired to suppress and eliminate competition for suspension assembly sales by fixing prices, exchanging bidding information, agreeing on bids, and allocating their sales.

94.     Defendants TDK and NHK have admitted to the existence of this conspiracy in leniency applications and a guilty plea, respectively.  These admissions constitute direct evidence of the alleged conspiracy.

---

[25] JFTC Cease and Desist Order to the Manufacturers of Suspension for Hard Disk Drives (Feb. 9, 2018), available at https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1_files/201802betten.pdf (working translation).
[26] JFTC Press Release (Feb. 9, 2018), *available at* https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1.html.
[27] JFTC Cease and Desist Order ¶ 2.
[28] *Id.* ¶ 3.

E.     **Carrying Out the Conspiracy**[29]

95.     During the Conspiracy Period, Defendants conspired to suppress and eliminate competition for suspension assembly sales by fixing prices, exchanging bidding information, agreeing on bids, sharing Seagate confidential information, and allocating their sales, in order to raise, stabilize, and/or slow the decline of prices of suspension assemblies sold to Seagate.

96.     NHK and MPT had contacts through multiple channels to exchange competitively sensitive information and coordinate with regards to the manufacture and sale of suspension assemblies.  The exchange of competitively sensitive information included:  (i) actual, potential, and proposed prices; (ii) market shares and customer volumes; (iii) manufacturing capacities; (iv) utilization rates; (v) timing of bid responses and other general bid information; and (vi) information related to product design and development.

97.     These communications were carried out between personnel at various levels of Defendants' corporate families—including high-level executives, sales managers, and individuals with pricing authority—based in various geographic locations, including Minnesota, California, and other U.S. states, Japan, Thailand, and Hong Kong.

98.     At least one purpose of the conspiracy between TDK and NHK was to eliminate or ease any price war or price competition between TDK and NHK on sales of suspension assemblies to Seagate.  The purpose of at least some of the communications between NHK and TDK in furtherance of their conspiracy was to keep prices for suspension assemblies they sold to Seagate higher than they otherwise would have been.

99.     Contact between and among Defendants MPT, NHK, and HTI in the United States, including in California and Minnesota, began as early as 2001.

100.     From at least 2001 until 2008, MPT's Director of Sales and Account Management had contacts with competing suppliers of suspension assemblies.  During at least part of this time, this MPT Director was responsible for sales to Seagate.  These exchanges included discussions of

---

[29] Many allegations herein reflect information Seagate obtained from Defendants' own documents produced during this litigation.

-23-

competitively sensitive information including prices, capacities, and plans for customer programs. As an example, the MPT Director's contacts with NHK resulted in MPT receiving information on prices and capacity for certain Seagate programs. During this period the MPT Director was based in Minnesota. Many of these communications involved NHK International's California-based VP of Disk Drive Suspension and Component Sales, who had responsibility for U.S. sales, including NHK's sales to Seagate.

101.    In addition to his contacts with NHK, the MPT Director exchanged competitive information with HTI, where he was previously employed, between at least 2001/2002 and 2008. In one August 2005 email, the MPT Director referenced contacting old friends from HTI to see if they were getting the same demands from Seagate regarding Seagate's Alpine project. These old friends included HTI's Director of Strategic Business Unit Sales and Marketing, based in Minnesota, as well as two of HTI's Seagate sales representatives.

102.    For instance, in one March 2007 email, the MPT Director told several senior MPT executives and sales managers, including his superiors, that he would check with the HTI sales representatives for Seagate about prior prices HTI had offered on Seagate's Argon and Cadmium programs.

103.    In one December 2006 email, the MPT Director received pricing information for Seagate's Argon and Cadmium programs from HTI, which he conveyed to senior executives and sales managers at MPT.

104.    During this period, MPT also facilitated communications between NHK and HTI, including contacts in which all three Defendants participated. Several of these communications occurred in-person in California.

105.    The MPT Director introduced the HTI Director to the NHK VP of Sales in the early 2000s during a business trip to California. After that, the HTI Director and the NHK VP of Sales went to a hunting lodge in the United States every year between 2003 and 2012, during which time they had at least one discussion that touched on prices.

-24-

124.    Several of the NHK employees involved in contacts with TDK, including Mr. Hashimoto, held dual roles at NHK and NAT (NHK's joint venture with SAE Magnetics) and exchanged competitively sensitive information while acting in both capacities to facilitate the agreed conspiracy.

125.    In several such meetings that took place between August 2007 through at least January 2009, senior executives and sales managers of NHK, NAT, and TDK agreed on a long-term strategy for the companies' relationship.

126.    TDK and NHK agreed (i) to eliminate or ease any price war or price competition; and (ii) to work together to obtain market share from their co-conspirator, HTI.

127.    TDK and NHK also agreed to a rough overall market share of 40-40-20, wherein NHK would have 40% of the market, TDK would have 40% of the market, and HTI would have 20% of the market.

128.    TDK and NHK agreed to exchange competitively sensitive information, including Seagate confidential information, as a means to continue their conspiracy and achieve this 40-40-20 market allocation.

129.    TDK communicated this plan to SAE Magnetics and MPT. All five companies— TDK, SAE Magnetics, MPT, NHK, and NAT—then worked together to share information, including information related to price and market share, to implement the agreed conspiracy.

130.    In addition to quarterly executive meetings, executives and sales managers from TDK and NHK met on other occasions from at least 2007 through 2014 to reaffirm their friendly relationship, including parties, New Year's events, and farewell and welcome dinners.

**F.    Defendants TDK and NHK Further Conspire to Wound and then Eliminate Their Co-Conspirator, Defendant HTI**

131.    In or around 2007, Defendants TDK and NHK started discussing how to profit more from their price-fixing conspiracy. As part of these discussions, Defendants TDK and NHK started plotting against their fellow co-conspirator, HTI. TDK and NHK began to view their co-conspirator HTI as a common threat, forming a conspiracy within a conspiracy to harm HTI.

-28-

132.    In an August 2007 meeting among senior executives, Defendants TDK and NHK agreed to "get more share from HTI together," as a way to profit more from their conspiracy.

133.    In this August 2007 meeting, Defendants TDK/MPT and NHK further agreed to avoid a price war with one another and to collectively take market share from HTI.

134.    In June 2009, Defendants TDK/MPT and NHK continued to plot against their co-conspirator HTI. NHK's Hitoshi Hashimoto, who was subsequently indicted by DOJ for his role in the conspiracy, spoke with TDK's President and CEO and agreed that "TDK and NHK should focus to kick out HTI ASAP."

135.    For several years thereafter, Defendants TDK/MPT and NHK continued to conspire on ways to "kick out" HTI. TDK/MPT and NHK secretly plotted for years to gain market share from their co-conspirator HTI and allocate the additional share between them, all while maintaining supracompetitive pricing to Seagate and others.

136.    On January 4, 2014, TDK Corp.'s President and CEO met with NHK senior executives to continue these discussions about their co-conspirator HTI. In reporting on the meeting, NHK observed "[s]omething needs to be done under mutual cooperation" to better control their co-conspirator HTI.

137.    The discussions among Defendants TDK and NHK about HTI culminated in a plan for TDK to acquire HTI. TDK and NHK agreed that TDK would acquire HTI in or around July 2014.

        a. On June 12, 2014, the president of TDK and a sales director at NHK had a telephone conversation to discuss HTI's "financial situation."

        b. In a June 26, 2014 meeting between TDK and NHK, the companies agreed with regard to "Company H" to continue "setting opportunities for discussion at both sides and making preparations for future."

        c. On July 22, 2014, senior executives from TDK and NHK met to discuss a potential acquisition of HTI. The companies agreed that TDK would acquire HTI to prevent an HDD manufacturer from acquiring and vertically integrating

-29-

147. A second senior executive was the President of Defendant MPT, who also served as the President of Hydra Merger Sub, the Headway subsidiary that effectuated the acquisition of Defendant HTI. In the time between the announcement of the HTI merger and its closing, this senior executive was appointed a TDK corporate officer. This senior executive regularly participated in meetings and communications with NHK about their co-conspirator HTI.

148. A third senior executive was the President of Defendant SAE Magnetics, who was a Director of Defendant Headway at the time of the HTI acquisition. This senior executive had discussions with NHK about how the Defendants could "kick out" HTI. Prior to closing, his direct report, a Senior VP at SAE Magnetics, met with NHK in California to discuss the status of the acquisition.

149. A fourth senior executive was a Senior Vice President of Defendant TDK Corp., who was also a Director of Defendant Headway at the time of the HTI acquisition. This senior executive regularly participated in conspiratorial meetings with NHK.

150. Headway's acquisition of HTI was intended to guarantee the continued success of the long-running conspiracy. The acquisition was intended to make it easier for the remaining co-conspirators to carry out and police their price-fixing and market allocation scheme. The remaining conspirators needed only to consult with each other when determining who should bid and at what price.

151. With this conspiratorial purpose in mind and during the Conspiracy Period, Headway entered an agreement to acquire HTI on or about November 1, 2015. The acquisition was completed on or about October 6, 2016.

**G.    The Conspiracy Was Implemented in Significant Part in Minnesota, Had Significant Effects in Minnesota, and Injured Seagate LLC in Minnesota**

152. Defendants formed, entered into, and implemented the suspension assembly conspiracy described in the preceding paragraphs in significant part in Minnesota.

153. Defendants formed, entered into, and implemented their conspiracy in significant part in Minnesota by, *inter alia*, (i) conducting "rigged" supply negotiations with Seagate LLC in

-31-

confidential Seagate information received from other Defendants to inform and decide what prices and other supply terms to offer Seagate.

210. Defendants used confidential information disclosed under the NDAs to advantage themselves at Seagate's expense. This confidential Seagate information included, for example, Seagate's demand volumes (total available market, or "TAM"), preferred allocation of TAM among suppliers, price targets, actual pricing in current and prior projects, actual volumes used in current and prior projects, and technical requirements for upcoming programs. This Seagate confidential information was often intended to be disclosed to only one of the Defendant suppliers, and Seagate disclosed it to that specific Defendant with the expectation and understanding that the Defendant would not share it with other Defendants, as required by the NDAs with that specific Defendant.

211. As illustrative but not exhaustive examples:

    a. In March 2010, MPT received confidential pricing information from NHK about the price Seagate paid NHK last quarter and NHK's pricing offer to Seagate for next quarter. NHK shared this information in violation of the Supplement for Disclosure between Seagate and NHK which protected Seagate's and NHK's pricing information disclosed during this period. This confidential information informed MPT's decision on pricing terms to offer Seagate, and MPT used the confidential information to offer higher prices than it otherwise would have but for NHK's disclosure of the information.

    b. In January 2011, NHK provided information to MPT on NHK's price quote for Seagate's proposed TAM allocation, production volumes for current Seagate programs, and new capacity for upcoming Seagate programs, in violation of the Supplement for Disclosure between Seagate and NHK (protecting, *inter alia*, business and technical information related to the design and manufacture of disk drives and disk drive components, manufacturing processes, volume, and pricing). This confidential information informed MPT's decision on what supply terms to offer (or not offer) Seagate, depriving Seagate of more favorable terms

-43-

1    it may otherwise have received but for NHK providing the confidential
2    information to MPT.

3    c.   In May 2012, an NHK employee reported internally on information learned from
4         MPT. MPT shared confidential Seagate information related to monthly capacity
5         for two Seagate projects, volumes pulled from inventory by Seagate, and total
6         project volumes. The information shared by MPT was Seagate's confidential
7         business and technical information protected by a Supplement between Seagate
8         and MPT. This confidential information informed NHK's decision on what
9         supply terms to offer (or not offer) Seagate.

10   d.   In October 2012, NHK provided to MPT Seagate's volume forecasts and
11        allocation for NHK for several quarters. NHK also shared its pricing for a
12        specific program and the pricing Seagate claimed it received from MPT. MPT
13        denied that its pricing was as low as Seagate said, meaning NHK could bid higher
14        without fear of losing (if it believed MPT). These exchanges were in breach of
15        Supplements between Seagate and each of MPT and NHK in effect at the time
16        and protecting Seagate's manufacturing, volume, and pricing information.

17   e.   In March 2013, SAE Magnetics provided NHK with Seagate's forecasts for
18        HGAs, as well as information on Seagate's current HGA, actuator pivot flex
19        assembly ("APFA"), head stack assembly ("HSA"), and HDD operations. NHK
20        discussed this information internally and considered how to use it in upcoming
21        discussions with Seagate, including to get a higher profit margin or larger volume
22        of business. SAE Magnetics breached the provisions of its Supplement with
23        Seagate covering this time period and Seagate's "pricing, volumes, trends and
24        forecasts."

25   f.   In January 2014, NHK and MPT met to compare the RFQs they received from
26        Seagate and discuss pricing and TAM allocations to prepare for upcoming
27        meetings with Seagate. In a report on the meeting, an NHK employee noted that

28

-44-

MPT confirmed its pricing and HTI's pricing, which had also been confirmed by SAE. NHK therefore had the benefit of pricing information from three other entities, and knowledge of the contents of MPT's RFQ from Seagate, to inform its RFQ response. In coordinating their pricing, NHK and MPT did not have to submit competitive bids to win Seagate's business but rather could charge supracompetitive prices. NHK, SAE Magnetics, and MPT's parent company TDK Corp. each had a Supplement in effect at the time of these mutual disclosures, and the disclosed business information was protected by the Supplements.

g. In June 2014, NHK and MPT discussed Seagate's RFQ for a program, including the utilization and yield needed and bill of materials cost. The companies planned to use the shared Seagate information to coordinate their RFQ responses and "figure out how much of a premium there will be" for the project. That is, by sharing Seagate's confidential information with each other, the two suppliers could engineer a pricing premium and inflated profit margin. NHK and MPT's parent company both had Supplements covering these disclosures during this time period, putting both parties in breach of their respective agreements.

212. That Defendants were willing to and did share otherwise confidential information is evident from the results of the government investigations. DOJ found that the conspirators improperly exchanged confidential information, as reflected in NHK's plea agreement, which states that the companies "exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes" in order to "effectuate" their conspiratorial agreements and charge higher prices.[31] NHK and TDK "used the exchanged pricing information *to inform their negotiations* with U.S. and foreign customers that purchased HDD suspension assemblies," including Seagate.[32]

213. As discussed above, CADE found that Defendants exchanged confidential information to soften or eliminate price competition in private bidding processes and to coordinate

---

[31] Plea Agreement ¶ 4(c).
[32] *Id.* (emphasis added).

the division of the suspension assemblies market. The commercially sensitive information exchanged to charge Seagate higher prices included Seagate's confidential information protected from disclosure by its NDAs with the Defendants.

214. Likewise, the JFTC found that TDK and NHK exchanged demand forecasts and quoted pricing for RFQs to implement the conspiratorial agreement to fix prices and allocate markets. Seagate's NDAs with Defendants encompass these types of information.

215. The Defendants exchanged Seagate's confidential information for their own benefit, to unjustly enrich themselves, at Seagate's expense.

216. As a direct and proximate result of the Defendants' unlawful and inequitable conduct, Seagate was damaged (and Defendants were unjustly enriched). Defendants charged and Seagate paid supracompetitive prices for suspension assemblies, proximately caused by Defendants' breaches of their NDAs with Seagate, throughout the Conspiracy Period.

217. Defendants used confidential Seagate business information—including pricing, volumes, product roadmaps and technology timelines, trends and forecasts, development plans, sub-supplier information, financial information, materials, and manufacturing volumes—in furtherance of their conspiracy and in order to allocate market shares, raise prices, rig bids, and disadvantage Seagate in negotiations.

218. Defendants' breaches of the NDAs allowed them to charge Seagate higher prices than would have prevailed if the Defendants were actively competing to supply Seagate. The Defendants undermined Seagate's ability to negotiate lower prices through the competitive bidding process. Defendants had no reason to lower prices to increase (or at least maintain) their share of TAM when they knew Seagate's target TAM allocations and pricing for other suppliers. By using Seagate confidential information to coordinate bids and volumes, the Defendants could avoid a "bloody price war for allocation" rather than submit competitive bids and try to undercut the prices of their competitors. The Defendants illegally profited at Seagate's expense.

219. More specifically as related to Seagate's confidential prices, when one Defendant learned what price Seagate demanded (in confidence) from another Defendant or discussed (in

-46-

confidence) with another Defendant, the Defendant receiving that confidential price would use it to decide what price to offer Seagate. Importantly, the Defendant receiving that confidential price would use it to set its own price at levels not too far below that price (or at times at or above that price). Seagate would then lose the benefit of the difference between the price offered and the lower price it would have been offered, if not for the breach. The exchanges of Seagate's confidential information allowed the Defendants to align their pricing rather than offer competitive pricing. The Defendants offered higher pricing to Seagate than they would have absent the breach of the NDAs.

220. For example, in one August 2005 email, MPT referenced contacting HTI to see if it was getting the same demands from Seagate regarding Seagate's Alpine project. By learning Seagate's *confidential* demands to HTI, MPT had more certainty on what to offer to Seagate, and furthermore, MPT had more certainty that it did not need to offer anything *more competitive* (i.e., more favorable to Seagate) than what Seagate demanded *confidentially* from HTI. Seagate suffered injury in the difference between what MPT offered to Seagate and what MPT would have offered to Seagate but for the breach.

221. Seagate used the common negotiation tactic of playing the suppliers off of each other to obtain a lower price or other favorable term. Defendants illegally subverted this strategy by sharing confidential information Seagate provided during negotiations, pursuant to the NDAs, and their planned responses to Seagate. The breach of the NDAs allowed Defendants to continue to offer higher prices during negotiations than they otherwise would have offered. As a result, Seagate paid higher prices for suspension assemblies than it would have if not for the breach.

222. By sharing Seagate's confidential product roadmaps, development timing, and forecasts, the Defendants could conduct long-term planning for their conspiracy. By knowing what projects were on the horizon and which suppliers were invited to bid, they could ensure the conspirators all benefited over the course of several Seagate projects. Additionally, as with pricing, they could coordinate their utilization and costs across projects to inflate the material cost provided to Seagate and support a higher price. With the suppliers aligned and Seagate in the dark about the

-47-

exercise of reasonable diligence, the existence of the conspiracy alleged herein until much later after the Conspiracy Period because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

241.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

242.    In particular, when Seagate needed to contract for suspension assemblies, it requested bids from representatives of each Defendant.  Those representatives represented that they were bidding in a serious attempt to secure the business and that their pricing reflected normal market factors like costs, demand for their products, capacity, and other lawful factors.

243.    Those representations were false because they failed to disclose that Defendants had agreed with one another not to engage in a "price war," exchanged information about their bids, agreed to allocate market volumes, and priced based on their conspiracy and the price-fixing agreements that they reached.  As such, the statements made by Defendants during bidding processes for Seagate's business constituted affirmative acts of concealment of their conduct by making false representations about each Defendant's desire to provide a competitive bid and justifications for its proposed prices.

244.    Seagate's reliance on those representations was reasonable because competing suppliers typically submit bids that reflect an effort to secure the potential business and do not unlawfully coordinate on price, customer volumes, and bidding.  Given these representations, Seagate was reasonably diligent in discovering the facts underlying its claims.  It had no reason to suspect anticompetitive agreements—including that that Defendants had agreed not to engage in price competition with one another—until the various government investigations brought those agreements to light.

245.    Moreover, by its very nature, the conspiracy was inherently self-concealing. Suspension assemblies are not exempt from antitrust regulation and, thus, Seagate reasonably considered the suspension assembly industry to be a competitive industry.  Seagate also reasonably

-51-

knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies, which had direct, substantial, and reasonably foreseeable effects on United States domestic and import commerce giving rise to Seagate's claims.

258.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to United States purchasers during the Conspiracy Period.

259.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

260.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in the United States and elsewhere.

261.    The anticompetitive acts were intentionally directed at the United States market for suspension assemblies and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for suspension assemblies throughout the United States.

262.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a.    Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b.    Allocating customers and market shares among themselves;

    c.    Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

-54-

d. Exchanging competitively sensitive information, including anticipated pricing quotes;

e. Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

f. Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

263. As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

264. The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## COUNT II

### Restraint of Trade in Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq. (Alleged against All Defendants)

265. Seagate incorporates by reference the allegations in the preceding paragraphs.

266. Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

267. In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold for incorporation into HDDs purchased in California during the Conspiracy Period.

268.   The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

269.   The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

270.   The anticompetitive acts were intentionally directed at the California market for HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

271.   For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

      a.   Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

      b.   Allocating customers and market shares among themselves;

      c.   Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

      d.   Exchanging competitively sensitive information, including anticipated pricing quotes;

      e.   Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

f. Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

272. As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

273. The alleged contract, combination, or conspiracy is a per se violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq.

## COUNT III

**Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200 et seq. (Alleged against All Defendants)**

274. Seagate incorporates by reference the allegations in the preceding paragraphs.

275. Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

276. In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to purchasers in California during the Conspiracy Period.

277. The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

-57-

278. The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

279. The anticompetitive acts were intentionally directed at the California market for suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

280. For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a. Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b. Allocating customers and market shares among themselves;

    c. Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d. Exchanging competitively sensitive information, including anticipated pricing quotes;

    e. Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

    f. Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

281. As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

282.    The alleged contract, combination, or conspiracy is an unlawful, fraudulent, and/or unfair act or practice constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq.

## COUNT IV

### Restraint of Trade in Violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66 (Alleged against All Defendants)

283.    Seagate incorporates by reference the allegations in the preceding paragraphs.

284.    Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66, by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in Minnesota and elsewhere.

285.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to and purchased by Seagate LLC in Minnesota during the Conspiracy Period.

286.    Additionally, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to and purchased by Seagate delivered outside of Minnesota for hard disk drives ordered from and delivered to Minnesota during the Conspiracy Period.

287.    Defendants and their co-conspirators negotiated and entered into agreements in Minnesota with Seagate LLC for the supply of suspension assemblies affected by the conspiracy.

288.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

-59-

296.    Seagate provided Defendants with confidential business information pursuant to these NDAs as intended.

297.    Seagate LLC, and its affiliates, have fully performed all of their duties and obligations under the NDAs.

298.    Pursuant to the NDAs, Defendants were required to, among other things, use Seagate's confidential business information only as specified and protect Seagate's confidential business information from unauthorized disclosure.

299.    Defendants were not to use Seagate's confidential information to conspire with one another against Seagate or to illegally raise prices to Seagate or allocate supply shares among themselves.

300.    Defendants breached these obligations by misusing, exchanging, and/or disclosing Seagate's confidential business information, as set forth herein.  Throughout the Conspiracy Period, NHK, TDK, and HTI each shared information that Seagate had provided it under the NDAs with each of the other Defendant families, in violation of their NDAs with Seagate.

301.    The Defendants used the Seagate confidential information to avoid underbidding each other, keep sales prices above the competitive level that otherwise would have obtained, and maintain and implement their market share allocation.

302.    All Defendants breached their NDAs with Seagate by exchanging Seagate confidential information protected by those NDAs, and the breach caused injury to Seagate.  As a direct and proximate result of Defendants' breach of the NDAs, Seagate has suffered actual damages in the form of unlawfully inflated prices for suspension assemblies, and Defendants have been unjustly enriched at Seagate's expense.  Seagate paid more than it otherwise would have paid in the absence of the Defendants' improper use of Seagate's confidential information protected by the NDAs.

## IX.    DEMAND FOR JUDGMENT

WHEREFORE, Seagate demands judgment in Seagate's favor and against all Defendants adjudging and decreeing that:

-61-

1  Dated:  April 15, 2021                                    */s/ Kenneth R. O'Rourke*_____

2                                                            Kenneth R. O'Rourke

3                                                            Jeff VanHooreweghe
                                                             Mikaela E. Evans-Aziz (admitted *pro hac vice*)

4                                                            **WILSON SONSINI GOODRICH & ROSATI**
                                                             Professional Corporation

5                                                            One Market Plaza
                                                             Spear Tower, Suite 3300

6                                                            San Francisco, CA 94105
                                                             Telephone:  (415) 947-2000

7                                                            Facsimile:   (415) 947-2099
                                                             korourke@wsgr.com

8                                                            jvanhooreweghe@wsgr.com
                                                             mevansaziz@wsgr.com

9

10                                                           *Counsel for Plaintiffs Seagate Technology LLC,*
                                                             *Seagate Technology (Thailand) Ltd., Seagate*

11                                                           *Singapore International Headquarters Pte. Ltd.,*
                                                             *and Seagate Technology International*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEAGATE PLS.' SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
CASE NOS. 3:19-md-02918-MMC, 3:20-cv-01217-MMC

# Exhibit 29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: |
| | Judge: |
| v. | |
| D-1:  NHK SPRING CO., LTD., | Violation:  15 U.S.C. § 1<br>Sherman Act Conspiracy |
| Defendant. | Maximum Fine:  Greater of $100 million, twice the gross gain, or twice the gross loss (15 U.S.C. § 1; 18 U.S.C. § 3571(c) and (d)) |
| | Maximum Period of Probation:  Five years |

_____ /

## RULE 11 PLEA AGREEMENT

The United States of America and NHK Spring Co., Ltd. (the "defendant"), a corporation organized and existing under the laws of Japan, hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."):

### RIGHTS OF DEFENDANT

1.      The defendant understands its rights:

      (a)      to be represented by an attorney;

      (b)      to be charged by indictment;

      (c)      to plead not guilty to any criminal charge brought against it;

      (d)      to have a trial by jury, at which it would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offense beyond a reasonable doubt for it to be found guilty;

      (e)      to confront and cross-examine witnesses against it and to subpoena witnesses in its defense at trial;

does not affect the rights or obligations of the United States as set forth in 18 U.S.C.

§ 3742(b)-(c).

Nothing in this paragraph will act as a bar to the defendant perfecting any legal remedies it may

otherwise have on appeal or collateral attack respecting claims of ineffective assistance of

counsel or prosecutorial misconduct. The defendant agrees that there is currently no known

evidence of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to Fed. R.

Crim. P. 7(b), the defendant will waive indictment and plead guilty to a one-count Information to

be filed in the United States District Court for the Eastern District of Michigan. The Information

will charge the defendant with participating in a conspiracy to suppress and eliminate

competition by fixing prices for hard disk drive suspension assemblies ("HDD suspension

assemblies") sold in the United States and elsewhere, from at least as early as May 2008 and

continuing until at least April 2016, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

      3.     The defendant will plead guilty to the criminal charge described in Paragraph 2

above, pursuant to the terms of this Plea Agreement, and will make a factual admission of guilt

to the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

## FACTUAL BASIS FOR OFFENSE CHARGED

      4.     The United States and the defendant agree that, had this case gone to trial, the

United States would have presented evidence sufficient to prove the following facts:

      (a)     For purposes of this Plea Agreement, the "relevant period" is that period

from at least as early as May 2008 and continuing until at least April 2016.

      (b)     During the relevant period, the defendant was a corporation organized and

existing under the laws of Japan, with its principal place of business in Yokohama, Japan,

and it employed more than 5,000 people. During the relevant period, the defendant was a

3

producer of HDD suspension assemblies and was engaged in the sale of HDD suspension assemblies in the United States and elsewhere. HDD suspension assemblies are components of hard disk drives, which are used to store information electronically and may be incorporated into computers or sold as stand-alone electronic storage devices. Hard disk drives use magnetic recording heads to read from and write onto rapidly spinning disks. HDD suspension assemblies hold the recording heads in close proximity to the disks and provide the electrical connection from the recording heads to the hard disk drives' circuitry.

(c)     During the relevant period, the defendant, through its officers and employees working in its hard disk drive division, including its high-level personnel, participated in a conspiracy with other persons and an entity (Company A) engaged in the production and sale of HDD suspension assemblies, the primary purpose of which was to fix the prices of HDD suspension assemblies sold in the United States and elsewhere. In furtherance of the conspiracy, the defendant, through certain of those officers and employees, engaged in discussions and attended meetings with Company A, through Company A's employees and officers. During these discussions and meetings, the defendant and Company A reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere. To effectuate these agreements, employees and officers of the defendant and Company A exchanged HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States and elsewhere. The defendant and Company A relied on their agreements not to compete and used the exchanged pricing information to inform their negotiations with U.S. and

4

25.    A facsimile or PDF signature will be deemed an original signature for the purpose
of executing this Plea Agreement.  Multiple signature pages are authorized for the purpose of
executing this Plea Agreement.

DATED: _7/26/19_

BY: _____
Toru Sugiyama
Representative Director
Executive Vice President
NHK Spring Co., Ltd.

BY: _____
CRAIG Y. LEE
PETER P. TOMCZAK
Baker & McKenzie LLP

AKIRA INOUE
Baker & McKenzie (Gaikokuho Joint Enterprise)

Counsel for NHK Spring Co., Ltd.

JAMES J. FREDRICKS
Chief, Washington Criminal II
Antitrust Division
U.S. Department of Justice

BY: _____
CHRISTINA J. BROWN
MICHAEL T. KOENIG
Trial Attorneys, Antitrust Division
U.S. Department of Justice
450 5th Street NW, Suite 11-300
Washington, DC 20001
Tel: (202) 598-8839
christina.brown@usdoj.gov

20

25.     A facsimile or PDF signature will be deemed an original signature for the purpose of executing this Plea Agreement.  Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

DATED:     7/26/19

BY: _____
    Toru Sugiyama
    Representative Director
    Executive Vice President
    NHK Spring Co., Ltd.

JAMES J. FREDRICKS
Chief, Washington Criminal II
Antitrust Division
U.S. Department of Justice

BY: _____
    CRAIG Y. LEE
    PETER P. TOMCZAK
    Baker & McKenzie LLP

    AKIRA INOUE
    Baker & McKenzie (Gaikokuho Joint Enterprise)

    Counsel for NHK Spring Co., Ltd.

BY: _____
    CHRISTINA J. BROWN
    MICHAEL T. KOENIG
    Trial Attorneys, Antitrust Division
    U.S. Department of Justice
    450 5th Street NW, Suite 11-300
    Washington, DC 20001
    Tel: (202) 598-8839
    christina.brown@usdoj.gov

20

25. A facsimile or PDF signature will be deemed an original signature for the purpose of executing this Plea Agreement. Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

DATED: _____7/26/19_____

BY: _____
    Toru Sugiyama
    Representative Director
    Executive Vice President
    NHK Spring Co., Ltd.

JAMES J. FREDRICKS
Chief, Washington Criminal II
Antitrust Division
U.S. Department of Justice

BY: _____
    CRAIG Y. LEE
    PETER P. TOMCZAK
    Baker & McKenzie LLP

    AKIRA INOUE
    Baker & McKenzie (Gaikokuho Joint Enterprise)

    Counsel for NHK Spring Co., Ltd.

BY: _____
    CHRISTINA J. BROWN
    MICHAEL T. KOENIG
    Trial Attorneys, Antitrust Division
    U.S. Department of Justice
    450 5th Street NW, Suite 11-300
    Washington, DC 20001
    Tel: (202) 598-8839
    christina.brown@usdoj.gov

20

# Exhibit 30

# FILED UNDER SEAL

# Exhibit 31

# **FILED UNDER SEAL**

# Exhibit 32

# **FILED UNDER SEAL**

# Exhibit 33

# FILED UNDER SEAL

# Exhibit 34

Kenneth R. O'Rourke, SBN 120144
Jeff VanHooreweghe, SBN 313371
Mikaela E. Evans-Aziz* (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone:    (415) 947-2000
Facsimile:    (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com
mevansaziz@wsgr.com

*Admitted to practice only in New York,*
*supervised by members of the California Bar*

***Counsel for Plaintiffs Seagate Technology LLC,***
***Seagate Technology (Thailand) Ltd., Seagate***
***Singapore International Headquarters Pte. Ltd.,***
***and Seagate Technology International***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC<br>3:20-cv-01217-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO<br><br>*Seagate Technology LLC et al. v. Headway Technologies, Inc. et al.*, Case No. 3:20-cv-01217-MMC | **SEAGATE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Maxine M. Chesney |

telephone and electronic means with one another in Minnesota and with Seagate CMT in Minnesota to negotiate Seagate's purchase of suspension assemblies during the Conspiracy Period.

158.    During negotiations with Seagate CMT in Minnesota, Defendants proposed prices, pricing terms, technologies and product designs, and other supply terms to Seagate, including prices, pricing terms, and technologies affected by the conspiracy.

159.    After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Defendants, Seagate LLC purchased suspension assemblies affected by the conspiracy in Minnesota.

160.    After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Defendants, Seagate LLC entered agreements in Minnesota with Defendants for the supply of suspension assemblies affected by the conspiracy.

161.    After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Seagate CMT, Defendants shipped suspension assemblies affected by the conspiracy to Seagate LLC in Minnesota.

162.    After negotiating prices, pricing terms, supply terms, product designs, and production costs in Minnesota with Seagate CMT, Defendants shipped suspension assemblies affected by the conspiracy to Seagate's offices outside of Minnesota for incorporation into hard disk drives delivered to Minnesota.

163.    Defendants supplied suspension assemblies to Seagate LLC in Minnesota and to Seagate outside of Minnesota for incorporation into hard disk drives delivered to Minnesota on a regular basis every year since at least 2003, the beginning of the Conspiracy Period.

164.    In part to facilitate the supply of suspension assemblies in Minnesota, all three Defendant suppliers of suspension assemblies—HTI, NHK, and TDK/MPT—maintained a presence in Minnesota during much of the Conspiracy Period.

165.    Defendant HTI was headquartered in Minnesota throughout the Conspiracy Period, until eliminated by Defendant TDK in 2016. Defendant HTI employed thousands of employees in Minnesota during the Conspiracy Period, and manufactured and sold suspension assemblies in

-33-

supracompetitive prices. Defendants were fully aware that these suspension assemblies would be in products destined for customers in California, Minnesota, and elsewhere in the United States.

228. All three Defendants—HTI, NHK, and TDK—also primarily negotiated sales of suspension assemblies via in-person meetings in the United States, including in Minnesota and California, telephone and video conferences in the United States, including in Minnesota and California, and email communications sent from the United States, including in Minnesota and California.

229. For these and other reasons, Defendants therefore knowingly and intentionally sent price-fixed suspension assemblies into the stream of commerce of the United States, including the commerce of Minnesota and California. Such conduct was meant to produce and did in fact produce a direct, substantial, and reasonably foreseeable harmful effect on domestic and import commerce in the United States in the form of artificially high prices being paid for suspension assemblies by U.S. customers, including Seagate. Defendants engaged in illegal conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable anticompetitive effects on domestic and import commerce in the United States.

230. Defendants' unlawful activities with respect to Seagate's purchases of suspension assemblies had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States domestic and import commerce, including commerce in this judicial district and in Minnesota and California, that gives rise to the claims asserted herein.

231. The unlawful conduct described herein, and its anticompetitive effect on U.S. domestic and import commerce, caused antitrust injury to Seagate in the United States, including in Minnesota and California, in the form of supracompetitive prices for suspension assemblies, which were the natural, foreseeable, and intended consequence of Defendants' anticompetitive conduct. It also caused antitrust injury to Seagate arising directly from the unlawful conduct's impact on U.S. import trade and commerce in the form of supracompetitive prices for suspension assemblies purchased for incorporation into HDD products to be sold in the United States.

-49-

     d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

     e.  Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

     f.  Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

263.    As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

264.    The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## COUNT II

### Restraint of Trade in Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq. (Alleged against All Defendants)

265.    Seagate incorporates by reference the allegations in the preceding paragraphs.

266.    Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

267.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold for incorporation into HDDs purchased in California during the Conspiracy Period.

268.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

269.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

270.    The anticompetitive acts were intentionally directed at the California market for HDD suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

271.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a.  Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b.  Allocating customers and market shares among themselves;

    c.  Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d.  Exchanging competitively sensitive information, including anticipated pricing quotes;

    e.  Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing HDD suspension assemblies; and

f. Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

272. As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

273. The alleged contract, combination, or conspiracy is a per se violation of the Cartwright Act, California Business and Professions Code §§ 16720 et seq.

### COUNT III

**Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200 et seq. (Alleged against All Defendants)**

274. Seagate incorporates by reference the allegations in the preceding paragraphs.

275. Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq., by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in California and elsewhere.

276. In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to purchasers in California during the Conspiracy Period.

277. The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

278. The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in California and elsewhere.

279. The anticompetitive acts were intentionally directed at the California market for suspension assemblies and had a substantial and foreseeable effect on trade and commerce in California by raising and fixing prices for suspension assemblies throughout California and elsewhere.

280. For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators, through their officers and employees, including high-level personnel, did those things they contracted, combined, or conspired to do, including:

    a. Participating in meetings and conversations in the United States and elsewhere to discuss pricing and supply of suspension assemblies;

    b. Allocating customers and market shares among themselves;

    c. Agreeing to manipulate prices and supply of suspension assemblies sold in the United States in a manner that deprived Seagate of free and open competition;

    d. Exchanging competitively sensitive information, including anticipated pricing quotes;

    e. Relying on agreements not to compete and using exchanged information including information protected by confidentiality restrictions to inform negotiations with U.S. and foreign customers purchasing suspension assemblies; and

    f. Selling suspension assemblies to customers in the U.S. or elsewhere for incorporation into products sold in the U.S. at supracompetitive prices.

281. As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

282. The alleged contract, combination, or conspiracy is an unlawful, fraudulent, and/or unfair act or practice constituting unfair competition in violation of the Unfair Competition Law, California Business and Professions Code §§ 17200 et seq.

## COUNT IV

### Restraint of Trade in Violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66 (Alleged against All Defendants)

283. Seagate incorporates by reference the allegations in the preceding paragraphs.

284. Beginning as early as 2003 and continuing through at least April 2016 with the effects continuing thereafter (the exact dates being unknown to Seagate and exclusively within the knowledge of Defendants), Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66, by artificially reducing or eliminating competition for the pricing and supply of suspension assemblies with the purpose and/or effect of unreasonably restraining trade and commerce in Minnesota and elsewhere.

285. In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to and purchased by Seagate LLC in Minnesota during the Conspiracy Period.

286. Additionally, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of and allocate market shares for suspension assemblies sold to and purchased by Seagate delivered outside of Minnesota for hard disk drives ordered from and delivered to Minnesota during the Conspiracy Period.

287. Defendants and their co-conspirators negotiated and entered into agreements in Minnesota with Seagate LLC for the supply of suspension assemblies affected by the conspiracy.

288. The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

-59-

289.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and resulted in the fixing, raising, maintaining, and stabilizing of prices for suspension assemblies in Minnesota and elsewhere.

290.    The anticompetitive acts were intentionally carried out in Minnesota, directed at suspension assemblies purchased by Seagate LLC in Minnesota and supplied to Seagate LLC in Minnesota, and had a substantial and foreseeable effect on trade and commerce in Minnesota by raising and fixing prices for suspension assemblies throughout Minnesota and elsewhere.

291.    As a result of the unlawful conduct and acts undertaken in furtherance of the conspiracy by Defendants and their co-conspirators, Seagate LLC's business and property were injured in Minnesota, in that Seagate LLC paid more for suspension assemblies than it would have paid in the absence of Defendants' unlawful conduct.

292.    The alleged contract, combination, or conspiracy is a per se violation of the Minnesota Antitrust Law of 1971, Minnesota Statutes §§ 325D.49-.66.

## COUNT V

**Breach of Contract – Nondisclosure Agreements (Against All Defendants except Headway)**

293.    Seagate incorporates by reference the allegations in the preceding paragraphs.

294.    Defendants executed Master Nondisclosure Agreements with Seagate LLC, including Supplements thereto, during the Conspiracy Period which were valid and binding contracts.

295.    The parties contemplated disclosure of confidential business and technical information by Seagate LLC as well as its corporate affiliates as a necessary part of purchasing suspension assemblies from the Defendants.  Without providing design specifications, volume forecasts, capacity, product roadmaps, and pricing information, Seagate would not be able to ensure a steady supply of components for its current and future products.  Accordingly, Seagate and Defendants entered NDAs to protect these disclosures of proprietary and competitively sensitive information and to confer a direct benefit upon Seagate LLC as well as its corporate affiliates.

-60-

Dated: April 15, 2021

*/s/ Kenneth R. O'Rourke*

Kenneth R. O'Rourke
Jeff VanHooreweghe
Mikaela E. Evans-Aziz (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
korourke@wsgr.com
jvanhooreweghe@wsgr.com
mevansaziz@wsgr.com

*Counsel for Plaintiffs Seagate Technology LLC,
Seagate Technology (Thailand) Ltd., Seagate
Singapore International Headquarters Pte. Ltd.,
and Seagate Technology International*

-63-

# Exhibit 35

**HUNTON ANDREWS KURTH LLP**
Craig Y. Lee (*pro hac vice*)
craiglee@huntonak.com
Carter C. Simpson (*pro hac vice*)
csimpson@huntonak.com
Emily K. Bolles (*pro hac vice*)
ebolles@huntonak.com
2200 Pennsylvania Ave. NW
Washington, DC 20037
Tel.: (202) 955-1500

**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer, SBN 169077
amortimer@huntonak.com
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Tel.: (213) 532-2103

Attorneys for Defendants
*NHK Spring Co., Ltd., NHK International*
*Corporation, NHK Spring (Thailand) Co., Ltd.,*
*NAT Peripheral (Dong Guan) Co., Ltd. and*
*NAT Peripheral (H.K.) Co., Ltd.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case Nos. 3:19-md-02918-MMC 3:20-cv-01217-MMC |
| | MDL No. 2918 |
| THIS DOCUMENT RELATES TO | |
| *Seagate Technology LLC et al. v. Headway Technologies, Inc. et al., Case No. 3:20-cv-01217-MMC* | **AMENDED ANSWER OF NHK DEFENDANTS TO SEAGATE PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| | Hon. Maxine M. Chesney |

**THIRTEENTH DEFENSE**

(Remedies Unconstitutional, Unauthorized or Contrary to Public Policy)

Seagate Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because the remedies sought, particularly the recovery of legal and equitable relief under federal and California and Minnesota state law based on foreign manufacturing, marketing, and sales by and between foreign entities, or the recovery of duplicative or excessive relief, are unconstitutional, contrary to public policy, or are otherwise unauthorized. In addition, to the extent Seagate Plaintiffs have asserted claims for which they are seeking treble damages, and as to which Seagate Plaintiffs have passed on the alleged overcharge, then the recovery by Seagate Plaintiffs of treble damages without a reduction would lead to disproportionate punitive damages that are unconstitutional and contrary to public policy.

**FOURTEENTH DEFENSE**

(Unjust Enrichment and Pass-on)

Seagate Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because Seagate Plaintiffs would be unjustly enriched if they are allowed to recover the damages alleged in the complaint; and to the extent that Seagate Plaintiffs seek damages for any alleged overcharge that they passed on to other entities or individuals. Upon information and belief, Seagate Plaintiffs were aware or should have been aware of the conduct alleged in the complaint prior to 2016; they provided to third-parties, including other HDD Suspension manufacturers, information that they now claim was confidential and subject to non-disclosure agreements; and they passed on any overcharges to their customers and/or others in the distribution chain, including at least original equipment manufacturers, distributors, and retailers.

**RESERVATION OF RIGHTS**

NHK Defendants have not knowingly or intentionally waived any applicable defenses and explicitly reserve the right to move to amend under Federal Rule of Civil Procedure 15 to assert and rely on such other applicable defenses as may become available or apparent during discovery proceedings. NHK Defendants further reserve the right to move to amend their Answer and/or their

1  defenses accordingly and/or to delete defenses that they determine are not applicable during the

2  course of subsequent discovery.

3  <center>**PRAYER FOR RELIEF**</center>

4      WHEREFORE, NHK Defendants request entry of judgment in their favor, as follows:

5        1.  Dismissal of the Complaint with prejudice;

6        2.  For interests and costs pursuant to statute, contract, and based upon equitable

7           principles; and

8        3.  For such other and further relief as the Court deems just and equitable.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: July 6, 2021

Respectfully submitted,

*/s/ Craig Y. Lee*

**HUNTON ANDREWS KURTH LLP**
Craig Y. Lee (*pro hac vice*)
craiglee@huntonak.com
Carter C. Simpson (*pro hac vice*)
csimpson@huntonak.com
Emily K. Bolles (*pro hac vice*)
ebolles@huntonak.com
2200 Pennsylvania Ave. NW
Washington, DC 20037
Tel.: (202) 955-1500

**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer, SBN 169077
amortimer@huntonak.com
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Tel.: (213) 532-2103

*Attorneys for Defendants NHK Spring Co.,*
*Ltd., NHK International Corporation, NHK*
*Spring (Thailand) Co., Ltd., NAT Peripheral*
*(Dong Guan) Co., Ltd. and NAT Peripheral*
*(H.K.) Co., Ltd.*

AMENDED ANSWER OF NHK DEFENDANTS TO SEAGATE PLAINTIFFS' COMPLAINT
CASE NOS. 3:19-md-02918-MMC, 3:20-cv-01217-MMC

# Exhibit 36

**HUNTON ANDREWS KURTH LLP**
Craig Y. Lee (*pro hac vice*)
craiglee@huntonak.com
Carter C. Simpson (*pro hac vice*)
csimpson@huntonak.com
Emily K. Bolles (*pro hac vice*)
ebolles@huntonak.com
2200 Pennsylvania Ave. NW
Washington, DC 20037
Tel.: (202) 955-1500

**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer, SBN 169077
amortimer@huntonak.com
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Tel.: (213) 532-2103

*Attorneys for Defendants NHK Spring Co.,*
*Ltd., NAT Peripheral (Dong Guan) Co., Ltd.,*
*NAT Peripheral (H.K.) Co., Ltd., NHK Spring*
*(Thailand) Co., Ltd., NHK International Corp.*

**MORGAN, LEWIS & BOCKIUS LLP**
J. Clayton Everett, Jr.
clay.everett@morganlewis.com
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel.: (202) 739-5860

**MORGAN, LEWIS & BOCKIUS LLP**
Michelle Park Chiu
michelle.chiu@morganlewis.com
One Market, Spear Street Tower
San Francisco, GA 94105
Tel.: (415)442-1001

*Attorneys for TDK Corporation, Magnecomp*
*Precision Technology Public Co., Ltd., SAE*
*Magnetics (H.K.) Ltd., Headway Technologies,*
*Inc., and Hutchison Technology Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 3:19-md-02918-MMC<br><br>MDL No. 2918 |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING ORDER SETTING TRIAL [ECF No. 350] AND NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR A SCHEDULING ORDER**<br><br>Judge: Hon. Maxine M. Chesney<br>Date: May 21, 2021<br>Time: 9:00 AM<br>Courtroom: 7, 19th Floor |

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

## NOTICE OF CROSS-MOTION AND MOTION

PLEASE TAKE NOTICE that on May 21, 2021 at 9:00 am, or as soon thereafter as the matter may be heard, in Courtroom 7, 19th Floor, 4550 Golden Gate Ave., San Francisco, before the Hon. Maxine M. Chesney, Defendants TDK Corporation, Magnecomp Precision Technology Public Co., Ltd., SAE Magnetics (H.K.) Ltd., Hutchison Technology Inc., Headway Technologies, Inc., NHK Spring Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring (Thailand) Co., Ltd., and NHK International Corp. (collectively, "Defendants") will and hereby do move the Court for an order establishing a consolidated pretrial schedule for all cases in this MDL.

Pursuant to Federal Rules of Civil Procedure 16 and 42(a), along with the Court's inherent authority to manage this MDL, Defendants respectfully request that the Court enter the proposed schedule, attached as Exhibit A hereto.

This Cross-Motion is supported by this Notice of Cross-Motion, the Memorandum of Points and Authorities that follows, all pleadings and papers filed in this action, and such other and further argument as the Court may require.

Morgan, Lewis & Bockius LLP
Attorneys at Law
San Francisco

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

   I.   Coordination Among All Cases Should Continue Beyond Fact Discovery ................. 3

   II.  It Is Premature to Determine the Structure of the Trial or Trials ............................. 10

   III. If the Court Is Inclined to Determine the Structure of Trial Proceedings Now, the Facts and Law Favor a Consolidated Trial of All Claims ................................................ 11

      A. Seagate Concedes That Nearly All of Its Claims Overlap with the Class Cases ................ 12

      B. Pass-Through Evidence Is Relevant to Seagate's State Law and Contract Claims ............. 13

      C. Seagate's Argument for a Separate Trial Based on the Potential Use of Collateral Estoppel Does Not Create Efficiencies and Only Benefits Seagate .................................... 14

      D. A Consolidated Trial Will Not Prejudice Seagate ............................................................ 16

CONCLUSION ................................................................................................................... 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758, 787 (2010) ........................................................... 13-14

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JP Morgan Chase Bank, N.A.*,
No. 2:10-cv-01615, 2010 WL 11463182 (C.D. Cal. July 7, 2010) .........................15

*Hannover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ................................................................................13

*In re Brand Name Prescription Drugs Antitrust Litig.*,
No. 94-C-897, MDL No. 997, 1995 WL 399684 (N.D. Ill. July 7, 1995) .............16

*In re Capacitors Antitrust Litig.*,
No. 3:17-md-02801 (N.D. Cal.) ...........................................................7, 8, 16

*In re Cathode Ray Rube (CRT) Antitrust Litig.*,
No. 4:07-cv-05944 (N.D. Cal.) .............................................................7, 16

*In re Cathode Ray Rube (CRT) Antitrust Litig.*,
No. MDL 1917, 2016 WL 7800819 (N.D. Cal. Nov. 15, 2016) .............................13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. 4:02-md-01486 (N.D. Cal.) ...........................................................7, 8, 16

*In re Pheynylpropanolamine (PPA) Products Liability Litig.*,
460 F.3d 1217, 1250 (9th Cir. 2006) ..........................................................16

*In re: Lithium Ion Batteries Antitrust Litig.*,
No. 4:13-md-02420 (N.D. Cal.) ...........................................................7, 8, 16

*In re: Optical Disk Drive Products Antitrust Litig.*,
No. 3:10-md-2143, ECF No. 1866 (N.D. Cal.) ........................................7, 12, 16

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
No. 3:07-md-1827 (N.D. Cal.) ...........................................................7, 8, 14, 16

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
No. 3:07-md-1827, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012) .........................14

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ................................................................................17

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979) ..............................................................................15

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

*Romero v. Flowers Bakeries, LLC*,
   No. 14-cv-05189-BLF, 2016 WL 469370 (N.D. Cal. Feb. 8, 2016) ......................................14

**STATUTES**

28 U.S.C. § 1407 .................................................................................................................1, 17

California Cartwright Act, Cal. Bus. Prof. Code §§ 16270 et seq. ...................................13, 14

Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66 ......................................13, 14

**RULES**

Fed. R. Civ. P. 42(a) ...................................................................................................................10

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants TDK Corporation, Magnecomp Precision Technology Public Co., Ltd., SAE Magnetics (H.K.) Ltd., Hutchison Technology Inc., and Headway Technologies, Inc. (collectively, "TDK") and NHK Spring Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring (Thailand) Co., Ltd., and NHK International Corp. (collectively, "NHK" and, together with TDK, "Defendants") respectfully submit this memorandum in support of their cross-motion requesting that the Court enter the proposed schedule attached as Exhibit A hereto and in opposition to Plaintiffs Seagate Technology LLC, Seagate Technology (Thailand) Ltd., Seagate Singapore International Headquarters Pte. Ltd., and Seagate Technology International's (collectively, "Seagate") motion for a scheduling order setting trial ("Mot.") [ECF No. 350].

**INTRODUCTION**

Seagate's motion focuses on its preference to try its claims separately from the Class Plaintiffs, but gives short shrift to all that must come before trial. Seagate's proposed schedule omits important steps in the pretrial process and proposes unrealistic deadlines for others. It also abandons entirely any prospect of pretrial coordination after the close of merits discovery, which will lead to redundancy, inefficiency, wasted judicial resources, and prejudice to Defendants.[1] As Seagate acknowledges, there is substantial overlap in the substantive claims at issue here, and similar issues are likely to be raised in the Seagate and class cases at nearly every step of the pretrial process: with expert disclosures and discovery, summary judgment, and *Daubert* motions. Those pretrial proceedings should be coordinated across all three of the cases in the MDL, so that all of the cases can move forward in a "just and efficient manner" as contemplated by the MDL statute. *See* 28 U.S.C. § 1407.

A coordinated pretrial schedule need not delay the progress of the cases. Defendants have proposed a consolidated schedule that allows all of the cases to proceed together through pretrial proceedings, avoiding inefficiency and unnecessary prejudice, while still allowing the cases to be ready for trial only a few months after the (unrealistic) trial date proposed by Seagate. The schedule Defendants have proposed would allow all three cases in this MDL to be ready for trial much earlier

---

[1] The Seagate case was related to these MDL proceedings by order dated February 20, 2020. ECF No. 157.

than all of the antitrust MDL cases Seagate cites in its memorandum, or any other antitrust MDL of which Defendants are aware. Defendants' schedule does not truncate the class certification schedule, as Seagate alleges; it just starts those proceedings before the close of fact discovery and does not await resolution of class certification to continue with other pretrial proceedings.[2]

Seagate's request that the Court now determine how the trial or trials in these cases will be structured is premature. As Defendants' proposed schedule demonstrates, it is not necessary to decide now the scope of or participants in any trial in order to set an appropriate and complete schedule leading up to trial. The most efficient course would be for the Court first to decide threshold pretrial issues that will dictate the nature and scope of claims and evidence the parties will be presenting at trial before determining the structure of trial. That is the way other MDLs, including those that Seagate cites, have proceeded.

However, if the Court is inclined to decide the trial structure at this juncture, then the commonalities among the cases and the need for efficiency and fairness weigh in favor of consolidating the three cases in the MDL for trial. Despite Seagate's attempt to overstate the differences between its case and Class Plaintiffs' cases, Seagate is forced to admit that the substantive evidence of Defendants' alleged conduct will be largely the same for all of the cases in the MDL. It would be inefficient and unfair to address those liability issues separately. Seagate's invocation of the purported benefits of non-mutual offensive collateral estoppel is spurious and ignores the Supreme Court's admonition that courts should avoid these situations precisely because they result in prejudice to the party potentially subject to estoppel.

Seagate's primary argument that proof in its trial will differ from the class cases is that the issue of pass-through is central to Class cases but irrelevant to Seagate's Sherman Act claims. What this argument omits, however, is that Seagate is not only asserting Sherman Act claims. It also has brought claims under California and Minnesota antitrust statutes, as well as contract claims. Pass-

---

[2] Defendants provided a proposed pretrial schedule to Seagate and Class Plaintiffs on April 9, 2021, which was attached as Appendix C to Seagate's Motion. On April 20, 2021, Class Plaintiffs responded and provided Defendants with their proposed schedule. Defendants and Class Plaintiffs met and conferred on April 23, 2021, after which Defendants offered to adjust the briefing schedule for the motions for class certification. The schedule Defendants respectfully request that the Court enter, attached as Exhibit A, incorporates this update.

1    ==through evidence is relevant to each of those claims, leaving very little to distinguish the proof in a==

2    ==Seagate-only trial from the proof in a trial including Class Plaintiffs.==

3    Seagate's motion is not aimed at efficiency or judicial economy; quite the contrary. Seagate

4    asks the Court to set aside *four weeks* for its solo trial, undermining any notion that its case is simple

5    or straightforward. There is no reason why the Seagate and Class Plaintiffs cannot jointly try their

6    case in that (or close to that) amount of time. Defendants respectfully urge the Court to adopt the

7    schedule they have proposed, and to deny Seagate's motion.

8    ### ARGUMENT

9    ### I. Coordination Among All Cases Should Continue Beyond Fact Discovery.

10    A unified pretrial schedule for the three cases in this litigation would ensure that substantially

11    similar issues concerning expert disclosures and discovery, summary judgment, and *Daubert* issues

12    are addressed consistently and in a parallel, coordinated fashion. The Court has already set a schedule

13    that provides one deadline for all parties to complete fact discovery, and Seagate articulates no reason

14    for divergence at that juncture. Deadlines for other pretrial activities applicable to all three cases

15    should remain consistent. Specifically, the schedule should provide consistent deadlines for all parties

16    to make expert disclosures and take expert discovery; to brief and argue dispositive motions (excluding

17    one partial summary judgment motion that is scheduled to occur during fact discovery); and to prepare

18    the cases for trial (as necessary). Proceeding as Seagate's proposed schedule implies—with each of

19    these pretrial stages proceeding first in the Seagate case and then later in the Class cases—will lead to

20    duplication, inefficiency, wasted judicial resources, and prejudice to Defendants.

21    Seagate proposes a schedule with respect to its own action, but consideration of its Motion

22    requires the Court to consider the entirety of this multidistrict litigation, especially because Seagate

23    and the Class Plaintiffs have asserted claims involving the same underlying activity and their cases

24    are at the same stage of development, with all cases proceeding in parallel through discovery. A

25    piecemeal approach to case management (as Seagate proposes) following discovery will not promote

26    judicial efficiency and will not be fair to Defendants. Defendants' proposed schedule maintains

27    efficiencies that MDL proceedings are intended to promote and does not prejudice Seagate or the Class

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING    Case No. 3:19-md-02918-MMC
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Plaintiffs.

*First*, Seagate's proposal does not permit for efficient case management and will result in duplication and inefficiency for the parties and the Court. There is substantial overlap among the various Plaintiffs' claims before this Court. Plaintiffs' claims all are based on substantially similar (if not identical) alleged wrongful conduct and, therefore, will likely involve overlapping witnesses, documentary evidence, and certain expert testimony. In fact, Seagate's own motion notes how much overlap exists among the cases, including, for example: "the scope of the conspiracy"; "the length of the conspiracy"; "the conspiracy's effect on United States commerce"; "whether SAE participated in the conspiracy as a hub for facilitating information sharing; "which other TDK and NHK subsidiaries were members of the conspiracy"; "the amount of the overcharge paid by Seagate"; and "whether TDK acquired HTI as part of a plan with NHK to consolidate the market in furtherance of the conspiracy." Mot. at 8. Seagate also explains that "the conspiracy evidence in the Seagate cases and the class cases largely overlaps." *Id*. at 6. and provides a diagram showing that its entire case, except for its breach-of-contract claim[3] and Headway as a Defendant, is encompassed within Class Plaintiffs' cases. *Id*. at 7. The overlapping nature of Seagate's claims with those of Class Plaintiffs calls for a joint pretrial schedule that eliminates duplication and provides for the most efficient, resourceful, and fairest preparation of these cases for trial.

Moreover, while Seagate claims that "none" of the pass-through evidence that will be part of the Class Plaintiffs' cases will be relevant to its Sherman Act claim, Mot. at 6, Seagate omits that pass-through is at least relevant to three of its own claims—the claims it has brought under California and Minnesota law and its contract claims, as explained in Section III.B. Defendants will introduce expert testimony and evidence on pass-through in Seagate's and Class Plaintiffs' cases.

There is also likely to be substantial overlap in the dispositive motions filed by the parties following the close of expert discovery. As noted, the liability issues are largely, if not entirely, the

---

[3] This claim will not require a substantial expenditure of time at trial, particularly in light of the fact that its damages analysis will converge with that of the antitrust claims. Seagate alleges that the consequences of both are that Seagate "paid more than [they] otherwise would have paid in the absence of the Defendants' improper" conduct, and the Court denied Defendants' motion to dismiss the breach-of-claim claim in part because "the law recognizes that there may be multiple causes of a plaintiff's injury." ECF No. 321, at 6 (internal citation omitted).

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Dated: April 23, 2021

Respectfully submitted,

/s/ Craig Y. Lee
**HUNTON ANDREWS KURTH LLP**
Craig Y. Lee (pro hac vice)
craiglee@huntonak.com
Carter C. Simpson (pro hac vice)
csimpson@huntonak.com
Emily K. Bolles (pro hac vice)
ebolles@huntonak.com
2200 Pennsylvania Ave. NW
Washington, DC 20037
Tel.: (202) 955-1500

**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer, SBN 169077
amortimer@huntonak.com
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Tel.: (213) 532-2103

*Attorneys for Defendants NHK Spring Co.,*
*Ltd., NAT Peripheral (Dong Guan) Co., Ltd.,*
*NAT Peripheral (H.K.) Co., Ltd., NHK*
*Spring (Thailand) Co., Ltd., NHK*
*International Corp.*

/s/ J. Clayton Everett, Jr.
**MORGAN, LEWIS & BOCKIUS LLP**
J. Clayton Everett, Jr.
clay.everett@morganlewis.com
1111 Pennsylvania Ave., NW
Washington, DC 20004
Tel.: (202) 739-5860

**MORGAN, LEWIS & BOCKIUS LLP**
Michelle Park Chiu
michelle.chiu@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105
Tel.: (415) 442-1001

*Attorneys for TDK Corporation, Magnecorp.*
*Precision Technology Public Co., Ltd., SAE*
*Magnetics (H.K.) Ltd., Headway*
*Technologies, Inc., and Hutchison*
*Technology Inc.*

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

18

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

1

## PROOF OF SERVICE

2
        The undersigned hereby certified that on April 23, 2021, the foregoing document was filed

3
with the Clerk of the Court for the United States District Court for the Northern District of California,

4
San Francisco by using the CM/ECF system.  I certify that all participants in the case are registered

5
CM/ECF users and that service will be accomplished by the CM/ECF system.

6

7

8

    Dated:  April 23, 2021

9
                                                            _/s/ J. Clayton Everett, Jr._
                                                            J. Clayton Everett, Jr.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' OPPOSITION TO SEAGATE'S MOTION FOR A SCHEDULING
ORDER SETTING TRIAL AND CROSS-MOTION FOR A SCHEDULING ORDER

Case No. 3:19-md-02918-MMC

# Exhibit 37

# FILED UNDER SEAL

# Exhibit 38

**From:** Evans-Aziz, Mikaela
**Sent:** Monday, November 29, 2021 12:26 PM
**To:** Raol, Neaha P. <neaha.raol@morganlewis.com>; WSGR - Suspensions Lit Team <wsgrsuspensions@wsgr.com>
**Cc:** Glazer, Alexandra <AGlazer@hunton.com>; MLB_TDKHDD <MLB_TDKHDD@morganlewis.com>; Lee, Craig <CraigLee@hunton.com>; Simpson, Carter C. <csimpson@hunton.com>; Dufek, Christopher <CDufek@hunton.com>
**Subject:** RE: In re HDD - Seagate Custodians

Counsel,

To confirm the parties' resolution reached on today's meet and confer, below please find the final, agreed-upon list of Seagate sales-side custodians:

1. Patrick Shay
2. Frank Iarusci
3. Stephen Denmark
4. BS Teh
5. Futoshi Niizuma
6. Greg McIntosh
7. Blake Dawson
8. Brad Herbstreit

Thanks,
Mikaela

## WILSON SONSINI

**Mikaela E. Evans-Aziz | Associate | Wilson Sonsini Goodrich & Rosati**
One Market Plaza, Spear Tower, Suite 3300 | San Francisco, CA 94105 | mobile: 619.395.2439 | mevansaziz@wsgr.com

*Only admitted to practice in New York, supervised by members of the California bar*

# **Exhibit 39**

1   MORGAN, LEWIS & BOCKIUS LLP                HUNTON ANDREWS KURTH LLP
    J. Clayton Everett, Jr., (*pro hac vice*)      Craig Y. Lee (*pro hac vice*)
2   clay.everett@morganlewis.com                craiglee@huntonak.com
    Scott A. Stempel, (*pro hac vice*)             Carter C. Simpson (*pro hac vice*)
3   scott.stempel@morganlewis.com               csimpson@huntonak.com
    1111 Pennsylvania Ave., N.W.                Emily K. Bolles (*pro hac vice*)
4   Washington, D.C. 20004                      ebolles@huntonak.com
    Tel.: (202) 739-3000                        2200 Pennsylvania Ave., NW
5   Fax: (202) 739-3001                         Washington, DC 20037
                                                Tel.: (202) 955-1500
6   MORGAN, LEWIS & BOCKIUS LLP                Fax: (202) 778-2201
    C. Cecilia Wang, SBN 314125
7   cecilia.wang@morganlewis.com
    Jordan Mundell, SBN 324100                  HUNTON ANDREWS KURTH LLP
8   jordan.mundell@morganlewis.com              Anne Marie Mortimer, SBN 169077
    One Market, Spear Street Tower              amortimer@huntonak.com
9   San Francisco, CA 94105                     550 South Hope Street, Suite 2000
    Tel: (415) 442-1000                         Los Angeles, CA 90071
10  Fax: (415) 442-1001                         Tel.: (213) 532-2103
                                                Fax: (213) 532-2020
11  *Attorneys for Defendants TDK Corporation, SAE*   *Attorneys for Defendants NHK Spring Co.,*
    *Magnetics (H.K.) Ltd., Headway Technologies, Inc.*   *Ltd., NAT Peripheral (Dong Guan) Co.,*
12  *Hutchinson Technology, Inc., and Magnecomp*   *Ltd., NAT Peripheral (H.K.) Co., Ltd.,*
    *Precision Technology Public Co. Ltd.*       *NHK Spring (Thailand) Co., Ltd.,*
13                                              *NHK International Corp.*

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17  IN RE: HARD DISK DRIVE SUSPENSION
    ASSEMBLIES ANTITRUST LITIGATION
18                                              Case Nos.  19 MD 2918(MMC)
                                                           20 Civ. 1217(MMC)
19  THIS DOCUMENT RELATES TO:
                                                **DEFENDANTS' FIRST SET OF**
20  SEAGATE TECHNOLOGY LLC, *et al.*,           **REQUESTS FOR PRODUCTION**
                                                **OF DOCUMENTS TO SEAGATE**
21          Plaintiffs,

22      v.

23  HEADWAY TECHNOLOGIES, INC., *et al.*,

24          Defendants.

25          Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants TDK

26  Corporation, SAE Magnetics (H.K.) Ltd., Headway Technologies, Inc., Hutchinson Technology,

27  Inc., Magnecomp Precision Technology Public Co. Ltd., NHK Spring Co. Ltd, NHK International

28  Corporation, NHK Spring (Thailand) Co., Ltd., NAT Peripheral (Dong Guan) Co., Ltd., and NAT

                                                1        Case Nos. 19 MD 2918 & 20 Civ. 1217

surveys, market analyses, including market trends, conditions, and forecasts, and data used to formulate Your pricing strategy.

**Request No. 41**

Documents summarizing, describing, or referring to any analysis, study, or comparison of any supplier, producer, manufacturer, or distributor of Suspension Assemblies or Suspension Assembly Products.

**Request No. 42**

In a mutually agreeable electronic form, all transactional data showing, for each sale of a HDD by You, the following:

 a. the date You sold the HDD;

 b. the entity that sold the HDD;

 c. the internal tracking number, model number, SKU, capacity, product series, and/or other information used to identify each HDD You sold;

 d. the person or entity to whom You sold the HDD, including a description of the customer (*e.g.*, OEM, reseller, end-user, etc.);

 e. the factory where the HDD was manufactured;

 f. the address from which You shipped each HDD You sold;

 g. the address to which each HDD You sold was shipped;

 h. the address to which bills or invoices were sent for each HDD You sold;

 i. the invoiced unit price and currency in which each sale is expressed;

 j. any and all taxes, customs, tariffs, duties, or other fees You paid on each HDD You sold;

 k. the quantity of HDDs sold in each sale;

 l. the manufacturer of the Suspension Assembly incorporated into each HDD sold;

 m. the listed and negotiated price of each HDD sold (before the application of any rebates or discounts);

 n. The amounts of any rebates or discounts on the HDD sold;

o.   The net price per unit and net total dollars at which You sold each HDD (after the application of any rebates or discounts);

p.   the cost to You of manufacturing each HDD sold, on an itemized basis, including the costs of each component incorporated into the HDD;

q.   all terms and conditions that were part of each HDD sold; and

r.   whether any sales were made via broker/agent/distribution agreement and, if so, the terms of such agreements.

**Request No. 43**

In a mutually agreeable electronic form, all transactional data showing, for each purchase by You of a Suspension Assembly, the following:

a.   the date You purchased the Suspension Assembly;

b.   the entity that purchased the Suspension Assembly;

c.   the entity from whom You purchased the Suspension Assembly;

d.   the specific model number or other unique identifying information for each Suspension Assembly You purchased;

e.   the internal tracking number, model number, capacity, product series, or other information used to identify each HDD that the Suspension Assembly You purchased was incorporated into;

f.   the entity that shipped the Suspension Assembly to You;

g.   the address to which each Suspension Assembly You purchased was shipped;

h.   the address to which bills or invoices were sent for each Suspension Assembly You purchased;

i.   the invoiced unit price and currency in which each purchase is expressed;

j.   any and all taxes, customs, tariffs, duties, or other fees You paid on each Suspension Assembly You purchased;

k.   the quantity of Suspension Assemblies purchased;

l.   the manufacturer of each Suspension Assembly purchased;

m.   the listed and negotiated price of each Suspension Assembly purchased (before the

1    Dated: July 21, 2020

2                                                          */s/  J. Clayton Everett, Jr.*
                                                    J. Clayton Everett, Jr.
3                                                   **MORGAN, LEWIS & BOCKIUS LLP**
                                                    1111 Pennsylvania Ave., NW
4                                                   Washington, DC 20004
                                                    Telephone: (202) 739-5860
5                                                   Clay.everett@morganlewis.com

6                                                   *Counsel for Defendants TDK Corporation,*
                                                    *Hutchinson Technology Inc., Headway*
7                                                   *Technologies, Inc., Magnecomp Precision*
                                                    *Technology Public Co., Ltd., and SAE*
8                                                   *Magnetics (H.K.) Ltd.*

9                                                          */s/  Craig Y. Lee*
                                                    Craig Y. Lee
10                                                  **HUNTON ANDREWS KURTH LLP**
                                                    2200 Pennsylvania Ave., NW
11                                                  Washington, DC 20037
                                                    Telephone: (202) 419-2114
12                                                  craiglee@huntonak.com

13                                                  *Counsel for Defendants NHK Spring Co., Ltd.,*
                                                    *NAT Peripheral (Dong Guan) Co., Ltd., NAT*
14                                                  *Peripheral (H.K.) Co., Ltd., NHK Spring*
                                                    *(Thailand) Co., Ltd., NHK International Corp.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 40



HUNTON ANDREWS KURTH LLP
2200 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20037-1701

TEL   202 • 955 • 1500
FAX   202 • 778 • 2201

CRAIG LEE
DIRECT DIAL: 202 • 419 • 2114
EMAIL: craiglee@HuntonAK.com

November 24, 2020

**Via E-Mail**

Kenneth O'Rourke
Wilson Sonsini Goodrich & Rosati
1700 K Street NW, Fifth Floor
Washington, DC 20006
korourke@wsgr.com

**Re:    Defendants' Questions Regarding Seagate Data Samples**

This letter provides questions directed to the Seagate plaintiffs regarding their purchases of
HDD suspension assemblies.  Defendants reserve all rights to supplement or amend these
questions.  As proposed to plaintiffs, Defendants request responses by December 4, and
Defendants will endeavor to respond to plaintiffs' questions in the same time frame.

Defendants note that Seagate has not produced any samples of transactional sales data of
HDDs and have objected to such productions.  Defendants do not agree that it is proper to
withhold production of such data.  Sales data of HDDs is highly relevant to claims asserted
and likely to be asserted in this action.  Defendants request that Seagate produce samples of
downstream HDD sales data by Wednesday, December 2.

**Questions Regarding Seagate Purchase Data**

Defendants understand that the Seagate purchase data are organized in six Excel files, each
file contains 100 observations.

     i.    STX-Samp-00000001-HIGHLY CONFIDENTIAL.xlsx (tab = Magnecomp_11i)

     ii.   STX-Samp-00000002-HIGHLY CONFIDENTIAL.xlsx (tab = magnecomp_R12)

     iii.  STX-Samp-00000003-HIGHLY CONFIDENTIAL.xlsx (tab = NHK_11i)

     iv.   STX-Samp-00000004-HIGHLY CONFIDENTIAL.xlsx (tab = NHK_R12)

     v.    STX-Samp-00000005-HIGHLY CONFIDENTIAL.xlsx (tab = SAE_11i)

     vi.   STX-Samp-00000006-HIGHLY CONFIDENTIAL.xlsx (tab = SAE_R12)

# Exhibit 41



HUNTON ANDREWS KURTH LLP
2200 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20037-1701

TEL    202 • 955 • 1500
FAX   202 • 778 • 2201

CHRISTOPHER J. DUFEK
DIRECT DIAL: 202 • 419 • 2132
EMAIL: cdufek@HuntonAK.com

April 15, 2022

**Via E-Mail**

**Contains Information Designated by Seagate as Highly Confidential**

Mikaela E. Evans-Aziz
Wilson Sonsini Goodrich & Rosati
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
415-947-2000

Re:      *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*,
         No. 19-md-02918-MMC

Dear Counsel:

We write in response to Seagate's letter dated March 11, 2022, and production of transactional sales data at STX1336356.txt - STX1336371.txt, which covers the time period from January 2003 to December 2018.

In your March 11 letter, you represented that this data production should answer the questions raised in our February 7 correspondence and invited us to send you a revised set of sales data questions following our review of your production.  We have included a list of revised questions below based on our preliminary review of this data.  We reserve the right to supplement with additional questions as we work with the data in more detail.

We note that Seagate produced its transactional sales data as text files (.txt).  Your March 11 letter suggests that we should be able to convert this data from the .txt files into excel (.xls or .xlsx) using a pipe delimiter.  However, this was not possible due to the number of observations in the data exceeding Excel's limit.  We thus had to convert the original .txt files directly into a SAS database to properly view it.

To assist Seagate with understanding and responding to our questions below, we have created the enclosed excel file from the SAS database, titled "Addendum to April 15 Sales Data Letter" ("Addendum").  The material contained in this Addendum has not been manipulated or altered beyond copying it out of the SAS database.  The purpose of including this Addendum is to provide Seagate with an easy point of reference to interpret our questions.

# Exhibit 42

1   **HUNTON ANDREWS KURTH LLP**
2   Craig Y. Lee (*pro hac vice*)
    craiglee@huntonak.com
3   Christopher J. Dufek (*pro hac vice*)
    cdufek@huntonak.com
4   2200 Pennsylvania Ave., N.W.
    Washington, D.C. 20037
5   Telephone: (202) 955-1500

6   **HUNTON ANDREWS KURTH LLP**
7   Ann Marie Mortimer, SBN 169077
    amortimer@huntonak.com
8   550 South Hope Street, Suite 2000
    Los Angeles, CA 90071
9   Telephone: (213) 532-2000

10  ***Counsel for Defendants NHK***
11  ***International Corporation; NHK Spring Co.,***
    ***Ltd.; NAT Peripheral (Dong Guan) Co., Ltd.;***
12  ***NAT Peripheral (H.K.) Co., Ltd.; and NHK***
    ***Spring (Thailand) Co., Ltd.***

13

14

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17

18  IN RE: HARD DISK DRIVE SUSPENSION      )   Case Nos.      3:19-md-02918-MMC
    ASSEMBLIES ANTITRUST LITIGATION        )                  3:20-cv-01217-MMC
19                                          )
                                            )
20                                          )   MDL No. 2918
    THIS DOCUMENT RELATES TO:               )
21                                          )   **DEFENDANT NHK'S AMENDED**
    SEAGATE TECHNOLOGY LLC, *et al.*,        )   **NOTICE OF RULE 30(b)(6)**
22                                          )   **DEPOSITION OF SEAGATE**
               Plaintiffs,                  )   **TECHNOLOGY LLC, SEAGATE**
23                                          )   **TECHNOLOGY (THAILAND) LTD.,**
         v.                                 )   **SEAGATE SINGAPORE**
24                                          )   **INTERNATIONAL HEADQUARTERS**
    HEADWAY TECHNOLOGIES, INC., *et al.*,    )   **PTE. LTD., AND SEAGATE**
25                                          )   **TECHNOLOGY INTERNATIONAL**
               Defendants.                  )
26  _____)

27

28

# TOPICS OF EXAMINATION

## DESIGNEE: KADY LIM

8.      How Seagate received or shared competitive intelligence concerning Suspension Assemblies, head gimbal assemblies, head stack assemblies, and HDDs, including when, how, and from whom Seagate received such intelligence; when, how, and to whom Seagate shared such intelligence, including with its suppliers and customers; the topic of such intelligence; and how intelligence was used, shared, or communicated between Seagate's personnel, departments, or entities.[2]

14.     Seagate's general categories of HDD customers, including its top 10 HDD customers, and the locations where Seagate's customers receive delivery of HDDs, including a breakdown of whether those customers receive delivery of Seagate products in the United States or abroad, and the percentage of sales to each customer segment and the percentage of sales that go directly to foreign customer locations instead of the United States.[3]

15.     How the cost of Suspension Assemblies affects the price for HDDs, including the percentage of the HDD price attributable to Suspension Assemblies; the percentage of the HDD price attributable to HDD components that are not Suspension Assemblies; the extent to which cost of the Suspension Assembly is, or is attempted to be, passed on, including through any cost-plus arrangements; and whether and how Seagate's approach to incorporating the cost of Suspension Assemblies in its price for HDDs changed during the Relevant Time Period.

---

[2] Ms. Lim has only been designated for the portion of this topic concerning HDDs.
[3] As of October 19, 2022, a portion of this topic remains in dispute concerning "the percentage of sales to each customer segment and the percentage of sales that go directly to foreign customer locations instead of the United States."

# Exhibit 43

# FILED UNDER SEAL

# Exhibit 44

# <u>FILED UNDER SEAL</u>

# Exhibit 45

# FILED UNDER SEAL

# Exhibit 46

# FILED UNDER SEAL