Victoria Sims
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
vicky@cuneolaw.com

Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
Telephone: (651) 312-6518
Facsimile: (651) 789-4818
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for
Reseller Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: HARD DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION | Case No. 19-md-02918-MMC<br><br>MDL No. 2918 |
| This Document Relates to:<br>RESELLER ACTIONS | **REPLY IN SUPPORT OF RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: To be Determined<br>Time: 9:00 am<br>Place: Courtroom 7, 19th Floor<br>Judge: Honorable Maxine M. Chesney |

REDACTED

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...............................................................................................**III**

**I.      INTRODUCTION** ..................................................................................................... **1**

**II.     ARGUMENT** ............................................................................................................. **1**

    A.      The Reseller Class is Ascertainable ................................................................ 1

    B.      Reseller Plaintiffs' Claims are Typical of those of the Class .................................... 3

    C.      Reseller Plaintiffs are Adequate Class Representatives ............................................. 6

    D.      Common Issues Predominate ......................................................................... 7

        1. Common Evidence Will be Used to Prove the Existence of the Conspiracy ..... 7

        2. Dr. Williams's Testimony Shows that Common Issues Predominate ................ 9

        3. Dr. Williams Presents a Viable Passthrough Regression.................................. 12

        4. Defendants Incorrectly Assert that there are Uninjured Class Members.......... 15

    E.      Fixing Prices of a Component Does not Shield Defendants from Liability........... 18

    F.      Class Members Are Allowed to Make Claims Under their Home States' Laws... 20

**III.    CONCLUSION** ...................................................................................................... **20**

**CERTIFICATE OF SERVICE** ................................................................................. **21**

REPLY IN SUPPORT OF RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. Mills*, 286 U.S. 397, 407, 52 S.Ct. 589, 76 L.Ed. 1184 (1932) .................................... 16

*Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) .............................................. 8

*Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-HSG, 2018 WL 4181896 (N.D. Cal. Aug. 31, 2018) ....................................................................................................................... 12

*Bazemore v. Friday*, 478 U.S. 385 (1986) ............................................................................ 10

*Bergen v. F/V St. Patrick*, 816 F.2d 1345 (9th Cir. 1987) ..................................................... 20

*Berlowitz v. Nob Hill Masonic Mgmt.*, No. 96-cv-01241-MHP, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996) ....................................................................................................................... 1

*California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, (N.D. Cal. Sept. 5, 2008) ..... 19

*Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) .............................. 7

*COORDINATION PROCEEDINGS SPECIAL TITLE (Rule 1550(b)) Microsoft I - V Cases.*, No. JCCP4106, 2000 WL 35568182 (Cal.Super. Aug. 29, 2000) ................................................. 14

*Costelo v. Chertoff*, 258 F.R.D. 600 (C.D. Cal. 2009) ........................................................... 1

*Cotton v. City of Eureka, Cal.*, 2010 WL 5154945 (N.D. Cal. 2010) ...................................... 20

*Cummings v. Connell*, 316 F.3d 886 (9th Cir. 2003) ............................................................ 7

*Davy v. Paragon Coin, Inc.*, No. 18-CV-00671-JSW, 2020 WL 4460446 (N.D. Cal. June 24, 2020) ........ 1

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006) ....................................................... 3

*DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010) ........................................ 15

*Douglas v. Bank of Am., N.A.*, No. C20-0193JLR, 2020 WL 6799010 (W.D. Wash. Nov. 19, 2020) ........ 1

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................................... 3

*Esparza v. SmartPay Leasing, Inc.*, No. C 17-03421 WHA, 2019 WL 2372447 (N.D. Cal. June 5, 2019). 1

*Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ... 11, 12, 13, 20

*Gordon v. Microsoft Corp.*, 2003 WL 23105550 (D. Minn. 2003) ........................................ 17

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839 (7th Cir. 2022) ........................... 8

REPLY IN SUPPORT OF RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

REDACTED

*Guidroz-Brault v. Missouri Pac. RR. Co.*, 254 F.3d 825 (9th Cir. 2001) ........................................ 20

*Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) ............................ 20

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir.1992) ...................................................... 3

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ...................................................... 10

*IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, No. C 13-05197 WHA, 2014 WL 6845197 (N.D. Cal. Dec. 4, 2014) ....................................................................................................... 12

*In re Aftermarket Automotive Lighting Products Antitrust Litigation*, 276 F.R.D. 364 (C.D. Cal. 2011).. 12

*In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012) ...................................................... 4

*In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982 (E.D. Mich. 2014) .................................. 20

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022).. 13, 15

*In re Cathode Ray Tube Antitrust Litig.*, No. 1917, 2013 WL 5429718 (N.D. Cal. June 20, 2013) 3, 14, 17

*In re Commercial Tissue Products Antitrust Litigation*, 183 F.R.D. 589 (N.D. Fla. 1998) ...................... 12

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 (N.D. Cal. June 5, 2006) .................................................................................................................. 4

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) . 11

*In re Glumetza Antitrust Litigation*, No. C 19-05822 WHA, 2021 WL 3773621, (N.D. Cal. Aug. 25, 2021) .................................................................................................................. 16

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ..................... passim

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ...................................... 9

*In re Industrial Diamonds Antitrust Litigation*, 167 F.R.D. 374 (S.D.N.Y. 1996) .......................... 12

*In re Intel Corp. Microprocessor Antitrust Litig.*, No. CV 05-485-LPS, 2014 WL 6601941 (D. Del. Aug. 6, 2014) .............................................................................................................. passim

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ........................................................................................... 9, 14, 15, 17

*In re Methionine Antitrust Litig.*, 204 F.R.D. 161 (N.D. Cal. 2001) .......................................... 13

*In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ............. 20

*In re Milk Products. Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999) .......................................... 4

*In re NASDAQ Mkt.-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996) .............. 12, 14, 15, 17

*In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)........................................................16

*In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064 (N.D. Cal. 2010)................................ 12, 13

*In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) ........................................4, 19

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011) ......................................20

*In re Rail Freight Surcharge Antitrust Litigation* 725 F.3d 244 (D.C. Cir. 2013)..................................18

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ........................................15

*In re Static Random Access (SRAM) Antitrust Litig.*, C 07–1819 CW, 2008 WL 4447592 (Sept. 29, 2008)
........................................................................................................................................4, 12

*In re Static Random Access memory Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009).....................14, 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) ..............................4, 5, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) ............................3, 14, 17

*In Re: Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226 (N.D. Ohio 2014) ........................................13

*Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015)...............................................8

*Knutson v. Schwan's Home Serv.*, Inc., No. 3:12-CV-0964-GPC-DHB, 2013 WL 4774763 (S.D. Cal. Sept.
5, 2013) .............................................................................................................................. 1

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d (7th Cir.2009) ....................................................................3, 15

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir.
2001) ..................................................................................................................................6

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2014 WL 4774611
(N.D. Cal. Sept. 22, 2014) .....................................................................................................20

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC.*, 31 F.4th 651 (9th Cir. 2022)8, 13

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) .....................................................................................3

*Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) .........7

*Staley v. Gilead Scis., Inc.*, No. 19-CV-02573-EMC, 2022 WL 789123 (N.D. Cal. Mar. 14, 2022) .........16

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084 (9th Cir. 2015)....................................9

*Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2021) ...............................................................20

Case No. 19-md-02918-MMC
REPLY IN SUPPORT OF RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................................. 8

*Valley Drug Co. v. Geneva Pharms.*, Inc., 350 F.3d 1181 (11th Cir. 2003) ................................. 6

*Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168 (9th Cir. 2010) ................................. 7

**Other Authorities**

1 Herbert Newberg & Alba Conte, Newberg on Class Actions (3d ed.1992) ............................... 5

ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL PRACTICAL AND

    TECHNICAL ISSUES 220 (ABA Publishing 2005) ........................................................... 16

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................................. 1

Fed. R. Civ. P. 23(a)(3) ............................................................................................................. 3

Fed. R. Civ. P. 23(b) ................................................................................................................. 1

REPLY IN SUPPORT OF RESELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I.   Introduction

Reseller Class Plaintiffs ("Plaintiffs" or "Resellers") submit, in Support of their Motion for Class Certification. ECF No. 606-3, this Reply and Dr. Williams' Reply Report, Ex. 1 to Sims Declaration in Support of Reply in Support of Motion for Class Certification ("Sims Decl."). Class certification requires proof of four elements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Defendants do not contest that the Reseller Class meets the first two elements, and their arguments regarding the second two are confused and misguided, as are their arguments regarding the predominance requirements of Fed. R. Civ. P. 23(b). Plaintiffs respectfully request their motion be granted.

## II.   Argument

### A.   The Reseller Class is Ascertainable

Defendants first argue that the class is not ascertainable. These arguments go nowhere. First, Defendants inexplicably focus on the now inoperative class definition in Resellers Plaintiffs' complaint. That definition was superseded by a narrower definition set forth in Reseller Plaintiffs' Motion for Class Certification, ECF No. 606-3, at 2 as permitted by law. *Davy v. Paragon Coin, Inc.*, No. 18-CV-00671-JSW, 2020 WL 4460446, at *2 (N.D. Cal. June 24, 2020) (plaintiffs permitted to narrow class definition in class certification motion); *Esparza v. SmartPay Leasing, Inc.*, No. C 17-03421 WHA, 2019 WL 2372447 (N.D. Cal. June 5, 2019) (same); *Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-CV-0964-GPC-DHB, 2013 WL 4774763, at *3 (S.D. Cal. Sept. 5, 2013) (same).[1] That definition states that included in the class

---

[1] Defendants' citations to *Berlowitz* and *Costelo* are of no moment, as the definitions in the class certification motions in those cases expanded the class. Resellers' narrowing of their class, which required no additional discovery and placed no burden on Defendants is permissible in this district. *Berlowitz v. Nob Hill Masonic Mgmt.*, No. 96-cv-01241-MHP, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996); *Costelo v. Chertoff*, 258 F.R.D. 600, 600-05 (C.D. Cal. 2009). *Douglas* is also inapplicable because the changes to the class definition in that case were significant and required additional discovery, which this change does not. *Douglas v. Bank of Am., N.A.*, No. C20-0193JLR, 2020 WL 6799010, at *8 (W.D. Wash. Nov. 19, 2020).

are purchasers of computers and standalone storage devices for resale, save for OEMs, who are defined as follows: "[a]n Original Equipment Manufacturer ("OEM") is a company that manufactures products for sale to the mass market by its customers." ECF No. 606-3, FN 2. Meaning, OEMs do not include businesses like Mr. Medeiros, who manufactures custom devices for sale to his own customers, rather than for sale to retailers to sell on the mass market.

Defendants point to Flex and Seagate claiming "confusion." Opposition to Motion for Class Certification ("Opp."), ECF No.793-9 at 6. There is no confusion. Flextronics manufactures electronics as an OEM[2] and is therefore excluded from the Reseller Class. Seagate also manufactures products for sale on the mass market and is excluded. Ex. 2 to Sims Decl., Floeder Depo. 469:19-25 ██████████████████████████████████; Ex. 3 to Sims Decl. (Teh Depo 347:12-349:15).

Defendants also argue Class Members will be unable to determine the manufacturer of the SAs located in their computers and storage devices. They assert this matters because during the class period some SAs on the market were made by Hutchinson Technologies, Inc. ("HTI"). HTI, a part of TDK, is a Defendant in this case and therefore those who purchased products containing its SAs are members of the class. Defendants, with no citation to evidence, claim HTI did not participate in the conspiracy. But HTI admitted, without limitation, its participation and is a party to TDK's amnesty application. Ex. 4 to Sims Decl. (TDK Amnesty Letter). Defendants also state that approximately 3.5% to 4.4% of SAs on the market were manufactured by Suncall, an entity that did not participate in the conspiracy. The *CRT* court rejected the same argument and found Plaintiffs' class ascertainable where:

> defendants controlled approximately 90% of the CRT commerce worldwide. Thus, since approximately nine out of every ten finished CRT products sold in the United States contained a CRT made by one of the defendants or their co-conspirators the universe of products containing non-defendant CRTs is very small. Netz Decl., Exhs. 1, 5 and 6. Further, even if some individuals join the class and it is then determined that their units did not contain Defendants' CRTs, this does not preclude class certification.

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2013 WL 5429718, at *8 (N.D. Cal.

---

[2] Case 5:22-cv-02798-NC, ECF No. 1, ¶ 29. Ex. 3 to Sims Decl. (Teh Depo. 350:25-351:3)

June 20, 2013) (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir.2009)), *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010), amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ("defendants made 89.7% to 96.3% of the panels" at issue). In any event, HDD makers have part numbers and programs showing which manufacturers' SAs went into their HDDs. SAs can be tracked to finished products. Ex. 5 to Sims Decl. (Misuta Depo. 102-103, 171-172, 179-180, 187-193, 197).

## B. Reseller Plaintiffs' Claims are Typical of Those of the Class

Defendants misstate the law of typicality, which requires, under Rule 23, that "the "*claims or defenses*" of the putative class representatives be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) (emphasis added) *compare with* Opp., at 7-8. The requirement is that the legal claims of the class representatives be typical, not that that class representatives themselves be typical. "Typicality refers to the nature of the claim . . . and not to the specific facts from which it arose or the relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The test of typicality is "'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). This remains the standard in the Ninth Circuit, after *Wal-Mart*.

Defendants rely on out-of-circuit cases to argue that resellers like the Plaintiffs cannot represent other resellers in the class because of certain differences in their businesses. But none of the cases they cite so hold. That is because Rule 23(a)(3) does not require that plaintiffs "be identically positioned to each other or to every class member." *Parsons*, 754 F.3d at 686. None of Defendants' case are on point. *Deiter* was a Fourth Circuit monopolization (not price-fixing) case where "the plaintiffs would have to define and prove a relevant market and then injury to competition in that market." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006). No such elements are required here and Defendants' authority is inapplicable. Judge Illston rejected defendants' reliance on *Deiter* in *TFT-LCD*, for this exact reason. *In re TFT-LCD (Flat Panel)*

3

*Antitrust Litig.*, 267 F.R.D. 291, 304 (N.D. Cal. 2010) ("plaintiffs' claims arise under § 1, not § 2, of the Sherman Act."), *abrogated on different grounds* by *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012). The *TFT-LCD* court also distinguished *GPU*, on which Defendants rely, stating it was not analogous as that case involved direct purchasers who purchased their products from only one defendant, in an unusual way. *TFT-LCD*, 267 F.R.D. at 304.

As stated by the court in *TFT-LCD*, "'[i]n cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class.'" *TFT-LCD*, 267 F.R.D. at 300 (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *4 (N.D. Cal. June 5, 2006); *see also In re Static Random Access (SRAM) Antitrust Litig.*, C 07–1819 CW, 2008 WL 4447592, at *2 (Sept. 29, 2008). The court went on to explain that "in conspiracy cases, plaintiffs' claims are typical of the class because proof of their section 1 claim will depend on proof of violation by defendants, and not on the individual positioning of the plaintiff." *TFT-LCD*, 267 F.R.D. at 304-305 (internal citations omitted). Defendants also cite *Milk Products*, a two-decade old direct purchaser case, that involved only one plaintiff who lacked standing, stated it only sought to represent one type of purchaser and operated in a very small market which the court determined did not encompass the entire market it sought to represent. *In re Milk Products. Antitrust Litig.*, 195 F.3d 430, 435-37 (8th Cir. 1999). Plaintiffs here are indirect purchasers, have standing, (ECF No. 390, at 7), and operate in the geographic markets where they bring claims. *Intel*, the Delaware case cited by Defendants, is even less applicable. It was an "indirect price-fixing" case, where the court stated: "Courts have recognized that satisfying the prerequisites to a class action is more difficult in a case involving indirect price-fixing . . ." *In re Intel Corp. Microprocessor Antitrust Litig.*, No. CV 05-485-LPS, 2014 WL 6601941, at *10 (D. Del. Aug. 6, 2014) (internal citations omitted).[3]

---

[3] Defendants cite *ODD*, another direct purchaser case, where the plaintiffs could not demonstrate that defendants fixed prices to them, specifically. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 317 (N.D. Cal. 2014). All Reseller Class members were subject to the same violations.

Defendants do not cite a single indirect purchaser price-fixing case from the Ninth Circuit holding that having a business or purchase volumes that differ in some respects from those of other class members renders a class representative atypical or inadequate. The law is to the contrary. As stated by Judge Illston in *TFT-LCD*, "even if large-volume purchasers interacted with and purchased from defendants in different ways than the proposed class representatives, because of the alleged price-fixing scheme, prices paid for all TFT–LCD panels and products were artificially inflated and supracompetitive." *TFT-LCD*, 267 F.R.D. at 305. Judge Illston concluded that "[b]ecause plaintiffs allege a horizontal price-fixing conspiracy, the claims of any class representative will necessarily be typical of other purchasers . . . ." *Id.* Defendants do not argue that the class representatives are bringing different claims than other class members.

Defendants cite *GPU*, a direct purchaser case where the plaintiffs purchased their GPUs from the defendants in a different way from class members and had no incentive to argue that defendants also fixed prices on GPUs sold in other ways. *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("*GPU*").

---

[4] ECF No. 418, ¶¶23-27; Exs. to Sims Decl. Nos. 7 (Medeiros Dep. 87:6-9); 8 (Arvay Dep. 43:25), 9 (Now Micro Dep. 48:7-21); 10 (IT Worx Dep. 60:14-19), 11 (Network One Dep. 47:5-11).
[5] Exs. to Sims Decl. Nos. 7 (Medeiros Dep. 103:3-14, 105:5-8, 113:12-13); 8 (Arvay Deposition Transcript) (142:3-6); 9 (Now Micro Dep. 174:8-16); 10 (IT Worx Dep. 160:25-161:18); 11 (Network One Dep. 198:24-199:9, 201:10-17), *see also* Ex. 6 to Sims Decl., Stiroh Dep. 325:7-9.
[6] Exs. to Sims Decl. Nos. 7 (Medeiros Dep. 29:3-15, 29:16-18); 8 (Arvay Dep. 141:24-142:5); 9 (Now Micro Dep. 74:2); 10 (IT Worx Dep. 67:7-13); 11 (Network One Dep. 198:5-8). Defendants also criticize and misquote Resellers' Interrogatory Responses, which they demanded and for which they negotiated the due dates. Such critiques should be disregarded.

Defendants have not argued that Plaintiffs do not have the same incentives as other class members to litigate the case.

### C. Reseller Plaintiffs are Adequate Class Representatives

"Adequate representation 'depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Plaintiffs and Class members share a common interest—to demonstrate Defendants' liability for engaging in the conspiracy, there is no antagonism and the suit is not collusive. Defendants do not deny that Plaintiffs and class members all seek to demonstrate that Defendants engaged in the conspiracy to fix HDD SAs prices and rig bids with their competitors. Instead, they claim that Plaintiffs and other class members have a conflict. Defendants cite only one 20-year old case, *Valley Drug*, which is inapplicable. The *Valley Drug* court held that:

> the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a "fundamental" one going to the specific issues in controversy. A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class.

*Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citing 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.26 at 3–143 to 144 (3d ed. 1992). Defendants do not argue, nor can they, that their collusive conduct benefitted Plaintiffs or any members of the class. As Dr. Williams' damage model shows, there were damages to all manner of class members. The damage model does not favor any particular type of class member over any others. Plaintiffs' position in the chain of distribution has not caused them to argue that all overcharges were passed through to them and indeed, they and their expert acknowledge the extent to which the overcharge was absorbed at each level of distribution before the Value-Adding Retailers.( ECF No. 606-4, Table 3, at pages 79-80). Defendants' citation to Dr. Netz's report is of no moment: End-Users are represented by separate class representatives. Further "this circuit does not favor denial of class certification on the basis of speculative conflicts." *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (internal citations omitted).

Defendants also erroneously claim Mr. Medeiros is an OEM, having ignored the Motion's definition of that term. An OEM's definition as a "company that manufactures products for sale to the mass market by its customers," (ECF No. 606-3, at 2), encompasses all of the OEMs considered in Dr. Williams' expert report, including Dell, Lenovo and HP. (ECF No. 606-4, Table 3, at page 79). These are all entities that focus on making computers on a mass scale to sell to distributors and retailers, who then sell them to their customers. OEMs are not retailers that customize computers for their customers. Defendants' citation to a state court case where the parties stipulated to a slightly different definition of the term "OEM" does not change the facts. See Opp. at 12. Defendants also claim that because Reseller Plaintiffs purchased products from distributors or retailers they must have bought them at discounts or subject to focal point prices, but cannot point to any confirmation of that fact. In fact, Reseller Plaintiffs testified that they did not purchase at discounts and Dr. Stiroh admitted in her deposition that, without more information, she could only speculate that certain prices may have been focal point prices.[7] In any event, Defendants have made no showing that focal point pricing or discounts, if they took place, were unique to the Reseller Plaintiffs. "To be typical, a class member need not prove that he is immune from any possible defense, or that his claim will fail only if every other class member's claim also fails. Instead, he must establish that he is not subject to a defense that is "[a] typical of the defenses which may be raised against other members of the proposed class." *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643, at *49 (N.D. Cal. Apr. 23, 2020) (quoting *Cholakyan v. Mercedes-Benz, USA*, LLC, 281 F.R.D. 534, 556–57 (C.D. Cal. 2012)). Courts in the Ninth Circuit have held that the presence of discounts does not defeat typicality. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

### D. Common Issues Predominate

#### 1. Common Evidence Will be Used to Prove the Existence of the Conspiracy

The predominance inquiry is focused on whether "the common, aggregation-enabling,

---

[7] Ex. to Sims Decl. 6, (Stiroh Dep. 89:21-25-90:1-11, 92:3-8, 98:7-9 ("you would need additional information" beyond the price itself.); Exs. to Sims Decl. Nos. 7 (Medeiros Dep. 87:3); 8 (Arvay Dep. 90:4-7; 91:2-5), 9 (Now Micro Dep. 90:12-19); 10 (IT Worx Dep. 74:20-24); 11 (Network One Dep. 74:16-23, 74:12-15, 76:8-11).

issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The Rule requires a showing that questions common to the class predominate; but it does not require proof that those questions will be answered in the classes' favor on the merits. *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013). Plaintiffs alleging an antitrust class action need only demonstrate that "the existence of an antitrust violation or antitrust impact" are "capable of being established through a common body of evidence, applicable to the whole class." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022). Courts in this District, have recognized, including after *Wal-mart*, that this requirement is "readily met in certain cases alleging . . . violations of the antitrust laws." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 186 (N.D. Cal. 2015).

Defendants do nothing to rebut a finding of predominance—they only question the merits of Plaintiffs' allegations regarding the start date of the conspiracy and attack Plaintiffs for allegations regarding a conspiracy against HTI that appear nowhere in their pleadings, as their own expert acknowledged, Stiroh Depo (344:10-18), Ex. 6 to Sims Decl. or their Motion for Class Certification, and on which they do not rely. Opp. at 14.[8] Such merits issues do not defeat a finding of predominance. *Amgen*, 568 U.S. at 459; *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022) ("it is not the final merits . . . that matter for Rule 23(b)(3) purposes; it is the method of determining the answer and not the answer itself that drives the predominance consideration."). There are not different class members seeking to prove different conspiracies—all class members will seek to prove the conspiracy alleged in Plaintiffs' Complaint. Defendants find just two cases, where there were guilty pleas but class certification was denied. Not only are those inapplicable, the courts in those cases did not find that the existence of an antitrust conspiracy is not a fact that can be proven using common evidence. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at *8 n.6

---

[8] As shown in Dr. Williams' Reply Report, there is classwide impact whether the damages period begins in 2003 or 2008, provided the model properly determines the benchmark period. Ex.1, ¶116 and Figure 2.

(N.D. Cal. Apr. 12, 2017) *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321–22 (3d Cir. 2008), as amended (Jan. 16, 2009). Defendants cite *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015), but that case states information exchanges "can bolster the inference of conspiracy" if plaintiffs can demonstrate they had price effects. *Id.*

### 2. Dr. Williams's Testimony Shows that Common Issues Predominate

As stated in Dr. Williams' Opening Report, common evidence shows certain industry characteristics are conducive to cartel behavior, including "(1) the HDD SA industry is highly concentrated; (2) HDD SA products are commodity-like products; (3) the demand for HDD SA products has a low elasticity of demand; and (4) there exist substantial barriers to entry." ECF No. 606-4, at ¶139. Dr. Williams also finds common evidence shows that Defendants engaged in actions contrary to their independent self-interests but for the conspiracy. *Id.* at ¶140. Dr. Williams also recognizes Defendants admitted to price-fixing of SAs. *Id.* at ¶¶49-60.

Defendants criticize Dr. Williams on only one of these points, but their criticism misses the mark.

*See* Opp. at 14. What he says is that "[t]he more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure." ECF 606-4, at ¶92. And, Defendants *did* agree on prices in SA programs. ECF. No. 418, ¶¶133-134.

9

Defendants also claim that Dr. Williams does not control for necessary supply and demand factors in his overcharge regression. In fact, Dr. Williams controls for multiple supply (material cost, labor cost, electricity cost, crude oil price, Thailand flood, cumulative units since introduction) and demand factors (HDD units sold, HDD manufacturer HHI). ECF 606-4, at pp. 66-68, *see also* Table 2, at p. 70. In any event, it is not necessary to control for all possible factors, only ones that are important. *Bazemore v. Friday*, 478 U.S. 385 (1986); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (The law does not require eliminating all possible factors.). Further, Dr. Stiroh's program-by-program analysis, when fixed to exclude programs with insufficient data, demonstrates common impact. Ex. 1, Reply report, ¶124, Table 5.

---

[9] Ex. 12 to Sims Decl., Legendre Dep. 53:3-9; Ex. 13 to Sims Decl., Isom Dep. 116:19-117:17; 118:4-11; 394:15-18; Ex. 14 to Sims Decl., Sanders Dep. 355:23-356:2.

Williams's inclusion of variables to account for cumulative units sold since introduction and HDD units sold. Ex. 1, Reply Report, ¶87.

Defendants cite *Flash Memory*, but that case involved close to 2,000 different NAND flash memory chips, ranging in price from 1 cent to over $200, the defendants sold over 7,000 different types of NAND flash chips, chipsets and memory cards during the class period and there were thousands of products manufactured or sold by a multitude of vendors. *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *1-*2 (N.D. Cal. June 9, 2010). There is no indication any such differences were controlled for in the plaintiff's expert's regression as they are here. On the other hand, here there is one basic product, the SA, and two types of finished products: computers and storage devices. Defendants also cite *GPU*, where the court stated that "where plausibly reliable, [regression analyses] should be allowed as a means of common proof. To rule otherwise would allow antitrust violators a free pass in many industries." *GPU*, 253 F.R.D. at 491. The court in that case did not accept the analysis provided based on specific circumstances: plaintiffs' expert relied on correlation analyses, unlike Dr. Williams; did not use fixed effects in his regression analysis, as Dr. Williams did; failed to include variables to account for supply and demand factors as Dr. Williams does; failed to include variables to account for product attributes and variation in customers, as Dr. Williams does; plus he analyzed the plaintiffs' purchases in a separate model. *GPU*, 253 F.R.D. at 496.

Courts have, since these cases, rejected such arguments about variations in purchasing methods and prices. For instance, in *Sandisk*, the defendant argued "that individualized proof is required to determine whether a putative class member was impacted" because many of its flash product sales "were made pursuant to individually negotiated transactions." *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *18 (N.D. Cal. May 14, 2015). The Court rejected this argument, stating "[c]ourts have held that even if there is considerable individual variety in pricing because of individual price negotiations, plaintiffs may succeed in proving class-wide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised by anti-competitive actions of the

defendant." *Id.* (citing *In re Commercial Tissue Products Antitrust Litigation*, 183 F.R.D. 589, 595 (N.D. Fla. 1998); *In re Industrial Diamonds Antitrust Litigation*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996); *In re NASDAQ Mkt.-Makers Antitrust Litigation*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996)).

Defendants also cite *Ang v. Bimbo*, an inapplicable product-labeling case, where the plaintiffs' expert created a "product labeling characteristics model" and asserted that his model would need to control for a list of variables, but did not explain how it would do so. *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-HSG, 2018 WL 4181896, at *14 (N.D. Cal. Aug. 31, 2018).

As for Defendants' arguments about industry changes during the class period, namely the decrease in demand due to competition from SSDs, Dr. Williams controls for that by controlling for HDD demand (which creates the demand for SAs). Ex. 1, Reply Report ¶195. Dr. Williams also controls for "technological advancement that reduced the cost of storage" through the use of the HDD units sold variable, which controls for the demand for HDDs which, apart from competition from SSDs, would have increased as a result of cost reductions. *Id.* ¶194. Classes with similar class periods were certified. *IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, No. C 13-05197 WHA, 2014 WL 6845197, at *1 (N.D. Cal. Dec. 4, 2014) (11-year class); *SRAM*, 2008 WL 4447592, at *1 (nine-year class).

### 3. Dr. Williams Presents a Viable Passthrough Regression

As a court in this district has stated "the question at this juncture [class certification]" "is not whether" the expert's regression analysis is correct or supported by reliable facts but rather whether his analysis is the product of a generally accepted method for demonstrating antitrust impact and damages through common evidence." *Sandisk*, 2015 WL 10890654, at *9-*10, *17 (citing *In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *10 (N.D. Cal. 2010); *In re Aftermarket Automotive Lighting Products Antitrust Litigation*, 276 F.R.D. 364, 373-374 (C.D. Cal. 2011) ("the Court is not supposed to decide at the certification stage which expert analysis or model is better")). Disputes over the results reached and assumptions made with respect to competing methodologies are issues to be decided by the trier of fact. *Sandisk*, 2015 WL 10890654 at *10 (citing *In re Online DVD Rental*, 2010 WL 5396064, at *10).

Dr. Williams created a pass-through model using a generally accepted regression methodology and data from forty class members, OEMs and HDD manufacturers, with product fixed effects to account for any product variation, and year-month fixed effects to account for any price variation over time. ECF No. 606-4, at ¶176-177. Dr. Williams uses this model to calculate the overcharges passed through and absorbed at each point in the chain of distribution. This method of calculating overcharges to the class has been approved in many other cases. *Olean Wholesale*, 31 F.4th at 665 (upholding district court's finding that Dr. Williams' regression used to determine if overcharges were passed through to indirect resellers "was reliable and capable of showing class-wide impact"); *Sandisk*, 2015 WL 10890654, at *9-*10, *17 (finding predominance based on regression analysis and upholding use of regression to measure passthrough of overcharge on NAND chips—components of solid state drives, memory cards, and music and video players); *TFT-LCD*, 267 F.R.D. at 313 ("courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis"); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *21 (N.D. Ill. May 27, 2022); *In Re: Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 278 (N.D. Ohio 2014).

Defendants cite *Methionine*, a case where the plaintiff's expert did not perform any passthrough regressions, and assumed a single pass-through rate for all direct and indirect resellers and *GPU*, a case where the expert's model was completely different from Dr. Williams' model. *In re Methionine Antitrust Litig.,* 204 F.R.D. 161, 165 (N.D. Cal. 2001); *GPU*, 253 F.R.D. at 489. Neither is applicable here, where Dr. Williams created a passthrough model, ran 40 regressions and calculated the passthrough rates at the levels in the chain of distribution preceding Class members as well as the passthrough rates of class members. Defendants also cite *Intel*, but only quote the opinion of the defendants' expert. Opp., at 20 (quoting *Intel*, 2014 WL 6601941, at *16). In any event, that case, where plaintiffs' expert relied "on economic theory" rather than doing a passthrough regression, involved not the tracing of an overcharge, but rather the price effects of loyalty payments to OEMs-a price reduction, which the court noted was "so unusual" and very different from a price-fixing case. *Id.* at *14, *19. Defendants also cite *Lithium Ion*, but only

include a quote about divergent pricing's serving as an obstacle to certification from *Infineon*, an 18-year old case where the expert's opinions were purely theoretical. In any event, this district has held that "divergent pricing and sales practices are not necessarily an impediment to measuring pass-through" and that "many other markets have the same features as the markets at issue here, and those markets are routinely tested for relationships among variables of interest." *In re Static Random Access memory ("SRAM I") Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009).

Further, *Lithium Ion* rejects Defendants' argument about the supposed difficulty of and need for tracing the overcharge through the chain of distribution to every class member, at class certification, to meet predominance requirements: "As the court in *SRAM* noted, the pass-through question is not about tracing a specific price increase through the distribution chain to a specific class member, but rather how the anti-competitive conduct affected the prices paid by the consumers." *LIB*, 2017 WL 1391491, at *11 (citing *SRAM I*, 264 F.R.D. at 614).

Courts in this district have held that assertions of long chains of distribution do not preclude class certification. *TFT-LCD.*, 267 F.R.D. 605 ("Numerous courts have held that variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers."); *SRAM I*, 264 F.R.D. 614 (Rejecting argument that the distribution chain was too complex to discern pass-through.); *COORDINATION PROCEEDINGS SPECIAL TITLE (Rule 1550(b)) Microsoft I - V Cases., No. JCCP4106,* 2000 WL 35568182 (Cal.Super. Aug. 29, 2000) (rejecting claim that injury could not be proven on a class-wide basis due to complexity and changes in the software industry and multi-layered distribution chain).

Nor does the presence of negotiations or contracts affect a court's ability to find the existence of predominance. "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally." *LIB*, 2017 WL 1391491, at *11 (quoting *In re NASDAQ*, 169 F.R.D. 523). *See also TFT-LCD.*, 267 F.R.D. 605, amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011); *CRT.*, No. 1917, 2013 WL 5429718, at *17, report and recommendation adopted, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013).

Defendants also claim the class is too broad, but it is simply a class of indirect resellers, no broader than other, similar classes that have been certified. *Broilers*, 2022 WL 1720468, at *1 (certifying class of indirect purchaser commercial and institutional indirect purchasers including restaurants and grocery and retail stores). Defendants also argue Dr. Williams does not take the buying and selling power of certain entities into account, but, as he explains, he used data from a "wide variety of firms" which "demonstrate[s] that my pass-through analysis captures different pricing mechanisms (e.g., pricing below cost, focal point pricing), different levels of buying and selling power, and as well as discounts and rebates across resellers. Firms with differences in pricing mechanisms, price negotiations, buying and selling power, and contract types may have different pass-through rates as reflected in my analysis, yet all firms in each supply chain passed through at least some of the overcharges." Ex. 1, Reply Report fn. 253, *see also* ¶199.

### 4. Defendants Incorrectly Assert that there are Uninjured Class Members

Defendants claim that the Reseller Class could have uninjured class members. But as this district stated in *Lithium Ion*, "[e]ven if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class," as it has here, (Williams Opening Report ¶236 ("all or almost all Reseller Class Members were injured by Defendants' alleged conduct")). *LIB*, 2017 WL 1391491, at *11 (citing *In re NASDAQ*, 169 F.R.D. 523); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005) ("for purposes of class certification, it is not necessary for Plaintiffs to show that every single class member was injured by the alleged price-fixing conspiracy."); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010); *Kohen,* 571 F.3d 677.

In any event, as the Reply Report states, the results of Dr. Williams's regression and his passthrough model, which show "a portion of the overcharge was absorbed and passed through at each level", "do[] not indicate the existence of class members who were uninjured, or not damaged." Ex. 1, ¶145.

Defendants argue that Dr. Williams' analysis demonstrates the existence of uninjured class members, because individual passthrough rates calculated from samples of certain

distributors' data were above 100%. However, it is incorrect to argue lack of injury based on class members' passthrough rate, because "[An] antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.'" *In re Glumetza Antitrust Litigation*, No. C 19-05822 WHA, 2021 WL 3773621, at *7 (N.D. Cal. Aug. 25, 2021) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (holding "if a class member is overcharged, there is an injury." And that it is "incorrect[] [to] assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury . . . .") (citing *Adams v. Mills*, 286 U.S. 397, 407, 52 S.Ct. 589, 76 L.Ed. 1184 (1932)); *see also Staley v. Gilead Scis., Inc.*, No. 19-CV-02573-EMC, 2022 WL 789123, at *8 (N.D. Cal. Mar. 14, 2022) (same). Further, as Dr. Williams explains, the individual passthrough rates are:

> estimations limited to a sample of each entity's cost and sales data. This data has not been weighted to account for the scope or amount of data from each entity. It would not be correct to assume from the passthrough rate provided from this data that each entity with a rate over 100% does not have damages. However, the Weighted Average Passthrough rates in Table 3 of my Opening Report are weighted to account for how much data each entity produced and provide a valid statistical sample based on all relevant data available from which it is correct to infer that a reliable estimate of the pass-through rate for *all* distributors equals 88.5%.

Ex. 1, Reply Report, ¶142. Further, as Dr. Williams testified: "if the pass-through rate is greater than a hundred percent and the firm's making sales to a non-reseller class member, then it still would suffer damages." Ex. 16 to Sims Decl. Williams Dep. 194:4-10. Further, these distributors are entitled to damages for any overcharges that were not passed on to anyone with claims against Defendants even if they do have passthrough rates over 100%, and even if the Defendants were able to successfully advance the pass-on defense against Reseller Class Members, under the laws of each Reseller State. Ex. 1, Reply Report, ¶¶155. All of the distributors Defendants referred to made sales to entities that are not in the Reseller or End-User classes (i.e. government entities and persons or entities located outside the End-User and Reseller states). Ex. 1, Reply Report, ¶¶148-155.

Defendants criticize Dr. Williams for using weighted averages in his passthrough analysis, but "a number of courts have held that averaged and aggregated data may be used to demonstrate

pass-through." *TFT-LCD.,* 267 F.R.D. 605, amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (quoting *Gordon v. Microsoft Corp.*, 2003 WL 23105550, at *3 (D. Minn. 2003)), *see also CRT.*, No. 1917, 2013 WL 5429718, at *17, report and recommendation adopted, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (rejecting argument that expert could not use averaged data because "different customers could pay different prices for the same CRT product depending on the time of purchase, individualized discounts, product-bundling, and a wide variety of other reasons" and holding "analysis of common impact does not require individualized inquiries"); *SRAM I.*, 264 F.R.D. 614 (rejecting criticism that use of average and aggregated data in their structural model could yield "false-positive pass-through").

Further, courts have recognized that such arguments "go to the weight of" the expert's opinion "rather than its admissibility." *LIB,* 2017 WL 1391491, at *11 ("defendants argue that aggregate and averaged data masks important differences in the pass-through analysis . . . the Court finds that these differences go to the weight of Dr. Leamer's opinion rather than its admissibility.")

Defendants cite the *GPU* court's citation to a textbook, beginning "[s]ometimes the prices used by economists are averages of a number of different prices charged to different customers or for somewhat different products." *GPU*, 253 F.R.D. at 494 (quoting ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL PRACTICAL AND TECHNICAL ISSUES 220 (ABA Publishing 2005)). That did not occur. Dr. Williams did not average different prices charged to different customers; he created weighted averages of passthrough rates, by firm type, to use in his analysis. That is not only permissible, it has been accepted in numerous cases. *See supra.* As the *LIB* court stated "average pass through rates appear reasonable and even necessary to prove damages." *LIB*, 2017 WL 1391491, at *11 (quoting *In re NASDAQ*, 169 F.R.D. at 523).

Defendants also argue that Dr. Williams does not account for Suncall's SAs. Suncall made up less than 5% of the market, so its SAs would be in a *de minimus* number of HDD products. *See supra.* Further, it is possible to track Defendants' SAs using 1) their part numbers, which are provided to the HDD manufacturers who purchase them, as well as 2) the names of the programs

pursuant to which they were manufactured. Ex. 1, Reply Report ¶186.

The only Ninth Circuit case Defendants cite is a footnote of *Olean*, citing *In re Rail Freight Surcharge Antitrust Litigation* 725 F.3d 244, 252–55 (D.C. Cir. 2013) where the model showed damages for shipments that were not part of the class. That case had nothing to do with supposedly passed-on damages, as claimed here. Defendants also cite *Intel*, a case concerning class members who benefitted from Intel's lump sum payments; not entities who were injured, but may have passed on damages. *Intel*, 2014 WL 6601941, at *8*12. It, too, is inapplicable.

Defendants also fault Dr. Williams for using weighted averages, but, as he explains, this is the necessary and accepted method needed to account for the fact that different entities produced different amounts of data. It would be economically unreasonable to give all entities' data the same weight, given that some produced much more data than others. Ex. 1, Reply Report, ¶¶143-144

Finally, Defendants' claim that Dr. Williams "omits data" of some Plaintiffs is inaccurate. Dr. Williams explains that these Plaintiffs' data did not contain all of the information needed to conduct his analysis, *id.* ¶201, and, in any event, it is unlikely to have changed the outcome. *Id.* ¶¶ 205-211. Defendants complain about Dr. Williams's not examining data for entities who manufactured intermediate products containing SAs or hard drives on behalf of OEMs. Given that either they never took ownership of the SAs or their passthrough was 100%, it was unnecessary to run separate regressions for them. *Id.* ¶¶168, 170 (bill-to entities are HDD makers, even when ship-to entities are HGA and HSA makers, contract manufacturers either do not take ownership of HDD products purchased for OEMs or they function as OEMs in the supply chain), *Id.* ¶170.

### E. Fixing Prices of a Component Does not Shield Defendants from Liability

Defendants revive their already-rejected argument that because they fixed the price of a component comprising "a small percentage," of the end-products class members purchased they should escape liability for their misconduct. ECF No. 390 at 6 (internal quotations omitted). This Court rejected this argument in its order denying Defendants' Motion to Dismiss, stating: "defendants have cited no case setting a particular threshold percentage a plaintiff must meet to establish standing to challenge an alleged price-fixing conspiracy, and no such case appears to

exist." ECF No. 390 at 6-7 (citing *SRAM*, 264 F.R.D. at 614 ("[d]efendants may not shield themselves from liability by fixing prices on a relatively inexpensive item."); *In re Optical Disk Drive*, 2016 WL 467444, at *2, *7- 11 (allowing plaintiffs to proceed where component "represent[ed] a relatively small percentage of the cost of the product as a whole").

Defendants cite *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008). But in that case, the plaintiffs' expert did not provide a model that calculated the overcharges. *Id.* (Plaintiffs' expert explained his methodology "in general and broad terms" and did not explain "how he actually proposes to apply any particular methodology . . . ."). Dr. Williams has provided a model to calculate passthrough of Defendants' overcharges through the chain of distribution and has done so. Defendants complain that Dr. Williams regresses price on cost of hard drives, and argue that there are no SA prices in the data he used for the passthrough regression. Dr. Williams' regression of price on cost is a generally accepted method, including in this District and the Ninth Circuit. *See supra*, *see also* Ex. 1, Reply Report, ¶58. Further, as Dr. Williams states, "my pass-through analysis is robust to whether total cost or the cost of a component increased as well as the magnitude of cost increases." Ex. 1, Reply Report, ¶59. As Dr. Williams explains, running the same regression but limiting the cost changes to those that are 1) 10 cents and lower 2) 20 cents and lower and 1) $1 and lower still results in a positive passthrough. ¶61 ("even small cost changes are passed through."), Table 1. This analysis empirically disproves Defendants' arguments that small cost increases are not passed through.

Defendants cite one OEM's 10-K, and certain indications of negative profit margins, speculating that some costs may not be passed on. Opp. at 24. But there is no need to speculate when this Court has empirical proof of pass-on. Defendants also cite one out-of-circuit special master's report that was not adopted in *Intel*, and one 20-year old case, *Methionine*, where the expert did not perform any of the analyses he contended he would, such as a multiple regression analysis, at the time the class was certified. Opp. at 24 (citing *Intel*, 2014 WL 6601941, at *55) (recommending exclusion because model mixed various manufacturers' microprocessors rather

than breaking out Intel's); *In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232, at *11-*13 (N.D. Cal. Aug. 26, 2003) (stating that model linking manufacturer and end-user prices used products with a higher percentage of the affected product but not those with a lower percentage). Neither ruling demanded isolation of a given component cost.

### F. Class Members Are Allowed to Make Claims Under their Home States' Laws

Defendants, while agreeing that class members who purchased their HDD products in the Reseller States may make claims under their laws, attack Dr. Williams for assuming that Resellers headquartered in the Reseller States will be able to make claims under those states' laws. First, arguments about an expert's assumptions "go to the weight, not the admissibility, of" his models. *Sandisk*, 2015 WL 10890654, at *10 (citing *Cotton v. City of Eureka, Cal.*, 2010 WL 5154945, at *13 (N.D. Cal. 2010); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004); *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir. 1987)). Second, this assumption is entirely in keeping with the law, which permits residents of Reseller States to make claims under the laws of the states where they reside. *GPU,* 253 F.R.D. at 1027 (upholding right of indirect purchasers residing in CA, NY, MN and MI to make claims under their antitrust laws); *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014) (citing *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1011 (E.D. Mich. 2014) (North Carolina residents permitted to bring claims under the North Carolina Unfair Trade Practices Act). Defendants cite *Stromberg*, which evaluates "place of wrong" under a choice of law analysis, pursuant to a request for a nationwide California class, which Resellers do not seek. *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1073 (9th Cir. 2021) (place of wrong is not always controlling). It does not hold that residents cannot bring claims under the laws of their own states. Defendants also cite *Guidroz-Brault v. Missouri Pac. RR. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) which deals with factual, not legal assumptions.

### III.   Conclusion

Plaintiffs respectfully request that the Court grant their Motion for Class Certification.

Dated: 3/6/2023

/s/ Victoria Sims
Jonathan W. Cuneo
Victoria Sims
Joel Davidow
Daniel Cohen
**CUNEO GILBERT & LaDUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
vicky@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com

Shawn M. Raiter
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

*Attorneys for Plaintiffs and the Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2023, I electronically filed the foregoing document entitled

**RESELLER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS**

**CERTIFICATION** with the Clerk of the Court for the United States District Court,

Northern District of California using the CM/ECF system and served a copy of same upon

all counsel of record via the Court's electronic filing system.

/s/ Victoria Sims
Victoria Sims