IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: HARD DISK DRIVE SUSPENSION ASSEMBLIES ANTITRUST LITIGATION<br><br>_____<br><br>This Document Relates to:<br><u>Seagate Technology, LLC, et al. v. Headway Technologies, Inc., et al</u>., Case No. 3:20-cv-01217 MMC | Case No.  19-md-02918-MMC<br>Case No.  20-cv-01217-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART NHK DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. NO. 535]** |

Before the Court is the "Motion for Partial Summary Judgment Regarding Foreign Commerce" (Doc. No. 535), filed August 2, 2022, by defendants NHK Spring Co., Ltd. ("NHK Spring"), NHK International ("NHKI"), NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Peripheral (Dong Guan)"), NAT Peripheral (Hong Kong) Co., Ltd ("NAT Peripheral (Hong Kong)"), and NHK Spring (Thailand) Co., Ltd ("NHK Spring (Thailand)") (collectively, "NHK Defendants"), whereby said defendants seek partial summary judgment as to "certain categories of claims" (<u>see</u> NHK Defs.' Mot. at 1:6-7) asserted by plaintiffs. On October 14, 2022, plaintiffs Seagate Technology LLC ("Seagate LLC"), Seagate Technology (Thailand) Ltd. ("Seagate Thailand"), Seagate Singapore International Headquarters Pte. Ltd. ("Seagate Singapore"), and Seagate Technology International ("Seagate International") (collectively, "Seagate Plaintiffs") filed opposition, to which NHK Defendants replied. Thereafter, with leave of court, the parties filed supplemental briefing. Having read and considered the papers filed in support of and in

//

//

opposition to the motion, including the supplemental briefing, the Court rules as follows.[1]

**BACKGROUND**

In the operative pleading, the Second Amended Complaint ("SAC"), Seagate Plaintiffs allege NHK Defendants entered into a conspiracy with defendants TDK Corporation, Hutchinson Technology Inc., Magnecomp Precision Technology Public Co., Ltd., Magnecomp Corporation, and SAE Magnetics (H.K.) Ltd. (collectively, "TDK Defendants")[2] to "fix the prices and allocate market shares of suspension assemblies" (see SAC ¶ 5), "an indispensable component of computer hard disk drives" (see SAC ¶ 1). According to Seagate Plaintiffs, Seagate LLC "purchas[ed] affected suspension assemblies directly from [d]efendants at prices illegally fixed by [d]efendants" (see SAC ¶ 32), and Seagate Thailand, Seagate Singapore, and Seagate International "assisted [Seagate LLC] at times with Seagate's purchase of the affected suspension assemblies directly from certain [d]efendants at prices illegally fixed by [d]efendants" (see SAC ¶¶ 33-35). Seagate Plaintiffs further allege that, "[a]s a result of [defendants' conduct], Seagate's business and property were injured, in that Seagate paid more for suspension assemblies than it would have paid in the absence of [d]efendants' unlawful conduct." (See SAC ¶¶ 263, 272, 281; see also SAC ¶ 291.)

Based on said allegations, Seagate Plaintiffs assert four claims alleging antitrust violations, specifically, Count I, asserting a violation of the Sherman Act, Count II, asserting a violation of California's Cartwright Act, Count III, asserting a violation of California's Unfair Competition Law, and Count IV, asserting a violation of Minnesota's Antitrust Law of 1971. In addition, Seagate Plaintiffs assert a claim for breach of contract, specifically, Count V, alleging defendants disclosed Seagate Plaintiffs'

---

[1] By order filed February 21, 2023, the Court took the matter under submission.

[2] On April 8, 2022, Seagate Plaintiffs voluntarily dismissed their claims against the TDK Defendants (see Amended Stipulation and Order of Dismissal With Prejudice by Seagate Plaintiffs and TDK Defendants, filed April 8, 2022), leaving NHK Defendants as the sole remaining group of defendants.

confidential material in violation of nondisclosure agreements.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

## DISCUSSION

By the instant motion, NHK Defendants seek judgment as to Seagate Plaintiffs' "direct purchaser claims arising from component sales" (see NHK Defs.' Mot. at 1:12-14), namely, sales of suspension assemblies ("SAs"),[3] "that took place outside the U.S." (see

---

[3] In the SAC, Seagate Plaintiffs use no abbreviation for the term "suspension assemblies. In their opposition, however, Seagate Plaintiffs state suspension assemblies are also known as "trace gimbal assemblies" (see Seagate Pls.' Opp. at 4:15-16) and, throughout their briefing, refer to such components as "TGAs," whereas NHK

3

NHK Defs.' Mot. at 1:12-14).  NHK Defendants argue such claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA").[4]

    The FTAIA, in relevant part, provides:

> Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect--
>
> > (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> >
> > (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act].

See 15 U.S.C. § 6a.

    As explained by the Supreme Court, the FTAIA "initially lays down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach," see F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 162 (2004); "[i]t then brings such conduct back within the Sherman Act's reach provided that the conduct both (1) sufficiently affects American commerce, i.e., it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim,'" see id. (quoting 15 U.S.C. §§ 6a(1), 6a(2); alterations in original); see also United States v. Hsiung, 778 F.3d 738, 756 (9th

---

Defendants, in their briefing, use the abbreviation "HDD Suspensions."  For the sake of clarity, the Court will refer to the subject components as "SAs."

[4] NHK Defendants do not seek summary judgment as to claims based on sales of SAs that were "billed and shipped directly to the U.S.," i.e., claims based on "Seagate's purchases of unincorporated [SAs] that were imported directly into the U.S." (see NHK Defs.' Mot. at 6:8-10, 26-27), nor do NHK Defendants make reference to Seagate Plaintiffs' breach of contract claim.

Cir. 2015) (referring to statutory exception as "domestic effects exception"). The Ninth Circuit has further clarified that the FTAIA's "gives rise to" language "requires a direct or proximate causal relationship." See In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 988 (9th Cir. 2008).

Although, on its face, the FTAIA only sets forth limitations with respect to the Sherman Act, district courts to have considered the matter have found, and this Court agrees, that state law antitrust claims are "limited by the FTAIA to the same extent as any federal law claims." See In re Optical Disk Drive Antitrust Litig., 2017 WL 11513316, at *2 (N.D. Cal. December 18, 2017) (citing cases); see also In re Capacitors Antitrust Litig., 2016 WL 5724960, at *8 (N.D. Cal. September 30, 2016) (holding reach of state antitrust laws do not extend "beyond the FTAIA"); In re Static Random Access Memory (SRAM) Antitrust Litig., 2010 WL 5477313, at *4 (N.D. Cal. December 31, 2010) (rejecting argument that "FTAIA does not apply to [plaintiffs'] state law claims"; explaining "foreign commerce is preeminently a matter of national concern on which the federal government has historically spoken with one voice") (internal quotation and citation omitted).

**A. Direct Purchaser**

As noted, NHK Defendants seek summary judgment on Seagate Plaintiffs' direct purchaser claims that arise from sales of SAs outside the United States.[5] In support of their motion, NHK Defendants first offer evidence that such foreign sales occurred. Specifically, NHK Defendants offer evidence that (1) the four NHK Defendants that engage in sales, specifically, NHK Spring, a Japanese corporation (see Okuma Decl. ¶¶ 6, 7(a)), NAT Peripheral (Dong Guan), a Chinese corporation (see id. ¶ 7(b)), NAT Peripheral (Hong Kong), a Hong Kong corporation (see id. ¶ 7(c)), and NHK Spring (Thailand), a Thai corporation (see id. ¶ 7(d)), "billed and shipped" SAs to Seagate

---

[5] To establish a claim for price-fixing under the Sherman Act, the plaintiff must be a direct purchaser of the price-fixed item. See Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

Thailand (see id. ¶ 21, Ex. A),[6] and (2) two of the TDK Defendants, specifically, Magnecomp Precision Technology Public Co. Ltd., a Thai corporation (see Misuta Decl. ¶ 4), and Hutchinson Technology Inc., a Minnesota corporation (see id. ¶ 6), "sold" and "delivered" SAs to Seagate Thailand and Seagate Singapore (see id. ¶¶ 18, 21, 27, 29-30).

Seagate Plaintiffs offer no evidence to the contrary, but, as to sales made to Seagate Thailand, argue the direct purchaser is Seagate LLC, a company located in the United States, under the theory that, when Seagate Thailand purchased SAs from NHK Defendants and TDK Defendants, Seagate Thailand was acting as an agent for Seagate LLC.[7] In support of thereof, Seagate Plaintiffs rely on In re Cathode Ray Tube (CRT) Antitrust Litig., 2016 WL 7805628 (N.D. Cal. August 4, 2016), in which the district court concluded that, where the "first party to purchase a price-fixed good" is "merely a purchasing agent for the party to whom it later resells the price-fixed good," the "principal will have standing as the direct purchaser, not the agent." See id. at *14.

As to issues of agency, district courts have held, and this Court agrees, that federal common law is "guided by [the] principles set forth in the Restatement of Agency. See Sun Microsystems Inc. v. Hynix Semiconductor Inc., 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009) (citing cases). Under the Restatement of Agency, the party seeking to establish a principal-agent relationship must demonstrate:  "(1) a manifestation by the

---

[6] Seagate Plaintiffs' objection to the above statement, on grounds of lack of personal knowledge, improper lay opinion testimony, and hearsay, is hereby OVERRULED.  The declarant is the current Director of the Disk Drive Suspension, Component & Microcontactor Sales Department of NHK Spring.  (See id. ¶ 1.)  From 1992 to the present, he has held a position with an NHK entity and, with the exception of a couple of interstitial periods, has held a position as an officer in NHK Spring's sales department during the entire period of the alleged conspiracy.  (See id. ¶¶ 1-2.)  Under such circumstances, one would expect he would be familiar both with NHK Spring's sales and sales by its subsidiaries, particularly given the challenged statement is based on his own personal observations and experience (see id. ¶ 4), as well as records maintained by NHK Spring, such as orders from customers (see id. Ex. A).

[7] Seagate Plaintiffs do not contend Seagate Singapore, when purchasing SAs or engaging in any other activity, acted as the agent of Seagate LLC.

1    principal that the agent shall act for him; (2) that the agent has accepted the undertaking;
2    and (3) that there is an understanding between the parties that the principal is to be in
3    control of the undertaking." See id. (citing Restatement (Third) of Agency, § 1.01).)
4         Here, as to the question of agency, Seagate Plaintiffs offer evidence that Seagate
5    LLC employees negotiated with each seller of SAs the "price, allocation, and other terms"
6    of the "purchase process" to be applied to that seller's sales of SAs for a specified period
7    of time (see Floeder Decl. ¶¶ 31, 54; see also id. ¶¶ 32-53, Exs. F, L, N),[8] that both sides
8    acted through U.S. based employees (see id. ¶¶15, 31), and that, once an agreement
9    with a seller was reached, the terms were memorialized in a written agreement (see id.
10   ¶¶ 55-60, Exs. F-Q), which governed the sales when "purchase orders" for SAs were
11   placed by Seagate Thailand (see id. ¶¶ 63-72; Tangwongchai Decl. ¶¶ 10-13;
12   VanHooreweghe Decl. Ex. 4 at 389:16-20).  Seagate Plaintiffs also offer evidence that
13   Seagate LLC, rather than Seagate Thailand, addressed any questions from sellers about
14   receiving payment for the SAs (see Tangwongchai Decl. ¶¶ 20-22), that Seagate LLC
15   directed Seagate International to transfer to Seagate Thailand the funds needed to pay
16   for the SAs (see Floeder Decl. ¶ 62; Choi Decl. ¶¶ 7, 9), and that Seagate International
17   transferred to Seagate Thailand the necessary funds, using money held in Seagate
18   International's accounts (see Floeder Decl. ¶ 62).
19        The Court finds the evidence offered by Seagate Plaintiffs is insufficient to create a
20   triable issue as to whether Seagate Thailand, when purchasing and paying for SAs, acted
21   as an agent for Seagate LLC.  Although Seagate Plaintiffs analogize the relationship
22   between Seagate Thailand and Seagate LLC to that of a stockbroker purchasing
23   securities for investors, there is no evidence to support a finding that, similar to a

---

[8] Because the Court has granted Seagate Plaintiffs' request to file under seal the details of the purchase process, as well as the manner by which Seagate Thailand placed orders for SAs, the manner in which Seagate Thailand paid for the SAs it ordered, and the use Seagate Thailand and other Seagate companies in foreign countries made of the SAs, the Court has not set forth those details, and, instead, has described them in the above paragraph and elsewhere herein using general terms.

7

stockbroker, Seagate Thailand's only part in the transaction was the purchase of products that then were to be transferred to another person or entity who was the intended owner of the products.  Rather, it is undisputed that Seagate Thailand, upon paying for the SAs with funds not belonging to Seagate LLC (see Shay Decl. second ¶ 2),[9] used the SAs for its own purposes, namely, to manufacture "head gimbal assemblies" ("HGAs") (see Floeder Decl. ¶¶ 1, 77-78; Lee Decl. Ex. 3 at 101:10-18, 102:14-103:4), a step in the manufacturing of HDDs (see Floeder Decl. ¶¶ 77-82) that was one of Seagate Thailand's corporate "functions" (see Lee Decl. Ex 1 at 82:3-22, 84:23-85:8, Ex. 2).  Further, it is undisputed that, after Seagate Thailand completed its part of the HDD manufacturing process, it issued an "invoice" to Seagate Singapore and received payment in return.  (See Shay Decl. ¶ 17 and n.3; id. ¶ 20.)

Under such circumstances, Seagate Plaintiffs have not shown a trier of fact reasonably could find Seagate Thailand's purchases of SAs constituted acts "for" Seagate LLC, see Restatement (Third) of Agency, § 1.01, as opposed to acts on its own behalf.  See Sun Microsystems Inc. v. Hynix Semiconductor, Inc., 608 F. Supp. 2d 1166, 1188-89 (N.D. Cal. 2009) (holding where plaintiff negotiated prices pursuant to "global procurement strategy," thus "control[ling]" prices its subsidiaries paid for price-fixed components, subsidiaries were not plaintiff's agents when they purchased price-fixed components; finding subsidiaries "took delivery of the [components] they purchased, and used [those components] to manufacture finished . . . products that were sold through the subsidiaries' own . . . sales offices").

Accordingly, as the plaintiffs with standing to assert the claims challenged by the instant motion are Seagate Thailand and Seagate Singapore, their purchases constitute international commerce, and, in the absence of a showing that such conduct constitutes import activity or that the FTAIA "brings [it] back within the Sherman Act's reach," see F. Hoffmann-La Roche, 542 U.S. at 162, claims based thereon are barred.  The Court next

---

[9] The Shay Declaration contains two paragraphs denominated "¶ 2."

1 turns to whether either such showing has been made.[10]

2 **B. Applicability of FTAIA**

3 As noted, the instant motion seeks summary judgment as to claims based on direct sales of SAs by NHK Defendants or their alleged conspirators to foreign purchasers, i.e., sales to Seagate Thailand and Seagate Singapore.

For purposes of analysis, NHK Defendants contend there are four "categories" of claims based on such direct sales: " 1. [c]laims based on component sales between a foreign defendant manufacturer and a foreign direct purchaser, where the direct purchaser incorporated the component into a product that it sold to a foreign indirect purchaser and that did not enter the United States;  2. [c]laims based on component sales between a foreign defendant manufacturer and a foreign direct purchaser, where the direct purchaser incorporated the component into a product that it sold to a foreign indirect purchaser, who then incorporated the component into a product that entered the United States;  3. [c]laims based on component sales between a foreign defendant manufacturer and a foreign direct purchaser, where the direct purchaser incorporated the component into a product that it imported into the United States; and 4. [c]laims based on component sales exported from the United States by a domestic defendant manufacturer to a foreign direct purchaser." (See NHK Defs.' Mot. at 12:1-9.)  Seagate Plaintiffs contend there are two categories of claims based on direct sales, namely claims based on "purchases of [SAs] that *do not* enter the United States (Category A)" and "purchases of [SAs] that *do* enter the United States (Category B)." (See Seagate Pls.' Opp. at 14:6-8

---

[10] In their supplemental briefing, Seagate Plaintiffs assert Seagate LLC was injured in ways other than paying supracompetitive prices for SAs.  In particular, Seagate Plaintiffs argue, defendants "depressed the quality of the [SAs]" (see Seagate Pls.' Response, filed January 20, 2023, at 5:6) and also that, if Seagate LLC is not deemed a direct purchaser, it nonetheless is entitled to assert injuries as an "indirect purchaser" (see id. at 6:18-19).  Given that the instant motion seeks judgment solely on direct purchaser claims arising from defendants' sales of SAs outside the United States, the Court does not further consider herein any other asserted claims and thus has not considered at this time NHK Defendants' argument that such other claims have not been timely disclosed.

(emphasis in original)).[11]

As NHK Defendants acknowledge in their reply, NHK Defendants' Category 1 and Seagate Plaintiffs' Category A cover the same set of sales, NHK Defendants' Categories 2 and 3 together cover the same set of sales as Seagate Plaintiffs' Category B, and the sales comprising NHK Defendants' Category 4 can be split into Seagate Plaintiffs' Categories A and B, depending on whether the SAs sold by exporter Hutchinson Technology, Inc. were incorporated into products that did or did not enter the United States. In light thereof, and given both parties focus on whether products containing SAs enter or do not enter the United States, the Court has analyzed the direct sales claims based on two categories, namely, products that did enter and products that did not enter the United States, and begins with the former.

**1. Products Entering the United States**

With regard to products containing SAs that entered the United States, the parties dispute whether claims based on sales of the SAs incorporated in those products are claims "involving . . . import trade or import commerce," and thus exempt from the prohibition set forth in the FTAIA. See 15 U.S.C. § 6a. As discussed below, the Court finds a trier of fact could conclude such claims are not barred by the FTAIA.

The Court does agree with NHK Defendants that the following facts are undisputed: that, after Seagate Thailand purchased SAs, it incorporated them into HGAs (see Lee Decl. Ex. 3 at 101:10-18, 102:14-103:4; Floeder Decl. ¶¶ 1, 77-78), that the HGAs were next incorporated into head stack assemblies ("HSAs") in a Seagate facility in Thailand or in another foreign country (see Lee Decl. Ex. 3 at 103:20-104:16; Floeder Decl. ¶¶ 80-81), that the HSAs were then assembled with other components into HDDs in a Seagate facility in Thailand or in another foreign country (see Misuta Decl. ¶ 35;

---

[11] Although Seagate Plaintiffs identify, as a third category, "Seagate LLC's internal purchase of HDDs in the United States for sale in the United States" (see id. at 14:8-9), those purchases constitute Seagate LLC's purchases of HDDs from Seagate Singapore, and, as noted above, the Court has not addressed herein Seagate LLC's indirect purchaser claims.

Floeder Decl. ¶¶ 82-83),[12] that the manufactured HDDs were shipped by Seagate Singapore to its customers and to four other Seagate entities, one being Seagate LLC, and that those four entities, in turn, shipped the HDDs to their customers (see Lee Decl. Ex. 3 at 104:17-20; Shay Decl. ¶¶ 10-11, 18-19).[13]

NHK Defendants, citing the above evidence and pointing to an absence of evidence that, other than shipments of SAs not challenged by the instant motion, any SAs or any products containing SAs were shipped by any defendant to the United States, argue Seagate Plaintiffs cannot establish the applicability of the import trade or commerce exclusion. Case authority, however, is to the contrary, in that district courts have found the import trade or commerce exclusion can be established without a showing that the defendants themselves shipped price-fixed goods into the United States.

For example, in In re Capacitors Antitrust Litig., 2018 WL 4558265 (N.D. Cal. September 20, 2018), the district court found a triable issue of fact existed as to the import trade or commerce exclusion, where the defendants sold price-fixed components to foreign purchasers, which in turn incorporated the components into products that were shipped to the United States. In so holding, the district court pointed to evidence that the defendants had negotiated in the United States the prices the foreign purchasers would pay for the components and that the defendants thereafter sold the components to plaintiff's foreign affiliates, "knowing [the components] would be incorporated into goods that were intended to be (and were) shipped to the U.S." for "specific U.S. customers" whose identities were known to defendants. See id. at *4-5.

---

[12] According to Seagate Plaintiffs, some HDDs were manufactured by a Seagate entity in the United States. (See Floeder Decl. ¶ 82.) As noted, however, the instant motion does not challenge claims arising from sales of SAs defendants shipped to the United States.

[13] As to SAs purchased by Seagate Singapore, said plaintiff's "involvement" in the HDD manufacturing process "was similar to that of [Seagate Thailand]." (See Floeder Decl. ¶ 9.)

11

Similarly, in Optical Disk Drive, the defendants sold price-fixed components to foreign purchasers and the components were incorporated into consumer products that the purchasers and their "affiliates" shipped to the United States; the district court found a triable issue of fact existed as to the import commerce exclusion, in light of evidence that the defendants negotiated in United States the prices the foreign purchasers would pay and defendants "knew that [the price-fixed components] they sold to [foreign direct purchasers] would be sold for the purpose of incorporation into [products] sold [in the United States]." See Optical Disk Drive, 2017 WL 11513316, at *4; see also In re Lithium Ion Batteries Antitrust Litig., 2017 WL 2021361, at *4 (May 12, 2017) (finding, at pleading stage, where plaintiff alleged its "affiliates" purchased price-fixed components for "purpose of manufacturing goods for their U.S. customers" and defendants "knew or should have known that a substantial portion of the products they sold to affiliates would be manufactured into goods sold to U.S. consumers," plaintiff "alleged a plausible basis for import trade or commerce") (internal quotation and citation omitted).

Here, similar to the evidence found sufficient in Capacitors and Optical Disk Drive, Seagate Plaintiffs, in addition to the above-cited evidence to which NHK Defendants cite, offer evidence that, during the negotiations, the alleged conspirators "required" Seagate LLC to disclose the names of Seagate customers, which included large companies located in the United States. (See VanHooreweghe Decl. Ex. 6 at 411:17-412:6, 413:15-415:7; see also id. Ex. 95 at 334:8-15, 338:3-5, 340:5-16 (NHK executive's testimony that, during negotiations, he learned from Seagate LLC identities of Seagate customers located in United States that were or would be using Seagate HDDs in their products).)

Accordingly, NHK Defendants have not shown they are entitled to summary judgment as to Seagate Plaintiffs' antitrust claims that are predicated on direct purchases of SAs made by Seagate Thailand and Seagate Singapore, where products containing those SAs were then shipped to the United States.

//

//

### 2. Products Not Entering the United States

NHK Defendants assert, and Seagate Plaintiffs do not disagree, that products containing SAs not entering the United States do not involve import trade or commerce. Consequently, claims based on direct purchases of SAs by Seagate Thailand and Seagate Singapore, where the SAs are components of products that do not enter the United States, are barred by the FTAIA unless the domestic effects exception set forth in the FTAIA applies.

As noted, the domestic effects exception applies where the conduct on which the plaintiff's claim is based has a "'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce," see Empagran, 542 U.S. at 162 (quoting 15 U.S.C. § 6(a)(1)), "the 'effect'" gives rise to a Sherman Act claim, see id. (quoting 15 U.S.C. § 6(a)(2)), and there is a "direct or proximate causal relationship" between the effect and the plaintiff's claim, see Dynamic Random Access Memory, 546 F.3d at 988.

Here, NHK Defendants argue that, where products containing SAs never entered the United States, any effect resulting from the direct purchases of SAs by Seagate Thailand or Seagate Singapore occurred overseas. Seagate Plaintiffs, by contrast, argue that the requisite domestic effect existed by reason of the direct purchasers' having paid prices that were determined during the "rigged" pricing negotiations in the United States. (See Seagate Pls.' Opp. at 25:12-13.)

At least two district courts in this district have considered claims substantially similar to those asserted here by Seagate Plaintiffs, i.e., claims based on direct purchases by foreign plaintiffs of price-fixed components that were incorporated into products that did not enter the United States, and found such claims barred by the FTAIA even though those foreign plaintiffs had purchased the components at prices negotiated in the United States. See Optical Disk Drive, 2017 WL 11513316, at *6 (distinguishing "conduct" from "effects"; finding purchases of products not entering the United States and purchases of products entering the United States "may be subject to the same conduct

by [d]efendants — collusion and price negotiation in the United States by U.S.-based employees" — but the "effects" of the former "are foreign sales of [price-fixed components] to foreign [purchasers] for incorporation into computers that were sold to foreign consumers"); Capacitors, 2018 WL 4558265, at *6-7 (finding price-fixed goods purchased abroad and then incorporated into finished goods sold outside United States had "no impact on a U.S. purchaser or consumer"; characterizing as "infirm" plaintiffs' argument that price agreements made in United States setting global price for component constituted "proximate cause" of foreign plaintiffs' claimed injuries).

       The Court finds the reasoning in the above-cited cases persuasive and that the conclusions reached therein are in "accord[ ] with the policy behind the FTAIA," see Optical Disk Drive, 2017 WL 11513316, at *6, namely, "that U.S. antitrust laws concern the protection of American consumers and American exporters, not foreign consumers or producers," see Dynamic Random Access Memory, 546 F.3d at 986.  Here, as to HDDs manufactured by Seagate entities outside the United States that never entered the United States, the direct purchaser claims arise from "wholly foreign transactions," as the subject products "never wind up in this country's stream of commerce," see Optical Disk Drive, 2017 WL 11513316, at *6-7, and, at least on the record presented, have not been shown to have "affected domestic U.S. commerce" such as to "g[i]ve rise to a cause of action under the Sherman Act," see Motorola Mobility LLC v. AU Optronics Corp., 775 F.3d 816, 819 (7th Cir. 2015); see also Empagran, 542 U.S. at 165 (noting "America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs").

       Accordingly, as to Seagate Plaintiffs' antitrust claims that are predicated on direct purchases of SAs by Seagate Thailand and Seagate Singapore, where products containing those SAs did not enter the United States, the motion will be granted.

//
//
//

**CONCLUSION**

For the reasons stated above, NHK Defendants' motion for partial summary judgment is hereby GRANTED in part and DENIED in part:

1. To the extent NHK Defendants seek summary judgment as to Seagate Plaintiffs' antitrust claims that are predicated on direct purchases of SAs by Seagate Thailand and Seagate Singapore, where products containing those SAs did not enter the United States, the motion is GRANTED.

2. To the extent NHK Defendants seek summary adjudication as to Seagate Plaintiffs' antitrust claims that are predicated on direct purchases of SAs by Seagate Thailand and Seagate Singapore, where products containing those SAs were then shipped to the United States, the motion is DENIED.

**IT IS SO ORDERED.**

Dated: May 15, 2023

MAXINE M. CHESNEY
United States District Judge