1
2
3
4

IN THE UNITED STATES DISTRICT COURT

5

FOR THE NORTHERN DISTRICT OF CALIFORNIA

6
7

IN RE: HARD DISK DRIVE
SUSPENSION ASSEMBLIES
ANTITRUST LITIGATION

8

Case No. 19-md-02918-MMC

**ORDER GRANTING MOTIONS FOR
CLASS CERTIFICATION;
DIRECTIONS TO PARTIES**

9
10

This Document Relates to:

11

ALL CLASS ACTIONS

12
13

14      Before the Court are the following motions:  (1) Reseller Plaintiffs' Motion for Class

15  Certification (Doc. No. 611); and (2) End-User Plaintiffs' Motion for Class Certification

16  (Doc. No. 605).  Defendants[1] have filed opposition to each motion; Reseller Plaintiffs and

17  End-User Plaintiffs (collectively, "Class Plaintiffs") have filed separate replies.

18      The matters came on regularly for hearing on December 12, 2023.  Victoria Sims

19  of Cuneo Gilbert & LaDuca, LLP, and Shawn M. Raiter of Larson King, LLP, appeared on

20  behalf of Reseller Plaintiffs.  Christopher T. Micheletti and Qianwei Fu of Zelle LLP and

21  William V. Reiss and Ellen Jalkut of Robins Kaplan LLP appeared on behalf of End-User

22  Plaintiffs.  Clayton Everett, Jr., and Michelle Park Chiu of Morgan, Lewis & Bockius LLP

23  appeared on behalf of TDK Defendants.  Craig Y. Lee and Noreen Mary Vereni of Paul

24  Hastings LLP appeared on behalf of NHK Defendants.  At the conclusion of the hearing,

25

26      [1] Defendants are (1) TDK Corporation, Hutchinson Technology Inc., Magnecomp
    Precision Technology Public Co., Ltd., Magnecomp Corporation, and SAE Magnetics
27  (H.K.) Ltd. (collectively, "TDK Defendants"), and (2) NHK Spring Co., Ltd., NHK
    International, NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (Hong Kong) Co.,
28  Ltd., and NHK Spring (Thailand) Co., Ltd. (collectively, "NHK Defendants").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the Court afforded the parties leave to file supplemental briefs, which they subsequently

2   filed.

3          Having read and considered the parties' respective written submissions filed both

4   before and after the hearing, having considered the testimony offered at the hearing by

5   Reseller Plaintiffs' expert Michael A. Williams, Ph.D. ("Dr. Williams"), End-User Plaintiffs'

6   expert Janet S. Netz, Ph.D. ("Dr. Netz"), and defendants' expert Lauren J. Stiroh, Ph.D.

7   ("Dr. Stiroh"), each of whom is an economist,[2] and having considered the parties' oral

8   argument at the hearing, the Court rules as follows.

9                                    **BACKGROUND**

10         In the above-titled actions, Class Plaintiffs allege that, from 2003 to 2016, TDK

11  Defendants and NHK Defendants engaged in a conspiracy to fix the prices of suspension

12  assemblies ("SAs"), a component contained in hard disk drives ("HDDs").

13  **A.  Reseller Plaintiffs**

14         Reseller Plaintiffs consist of three entities and two individuals.  In their operative

15  complaint, the Third Consolidated Amended Complaint ("TAC"), Reseller Plaintiffs allege

16  that TDK Defendants and NHK Defendants sold SAs to "HDD manufacturers" (see TAC

17  ¶ 51), which, in turn, sold the HDDs they made to distributors (see TAC ¶ 52), or,

18  alternatively, to "storage device and computer manufacturers" (see TAC ¶ 54), i.e.,

19  original equipment manufacturers (hereinafter, "OEMs").[3]  Reseller Plaintiffs further

20  allege that each said plaintiff "purchased thousands of [HDDs] and products containing

21  [HDDs]" (see TAC ¶ 11) from distributors, OEMs, and/or retailers (see TAC ¶¶ 23-27),

22  and, in so doing, "paid more . . . than they otherwise would have paid in a competitive

23

24         [2] By order filed December 13, 2023, the Court denied defendants' motions,
25  brought pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), to
    exclude the testimony and reports of Dr. Williams and Dr. Netz.  Class Plaintiffs did not
26  seek to exclude the testimony or reports of Dr. Stiroh.

27         [3] Reseller Plaintiffs define "OEM" as "a company that manufactures products for
    sale to the mass market by its customers."  (See Reseller Pls.' Mot. at 2:27-28; see also
28  Reseller Pls.' Proposed Order (Doc. No. 611-1) at 2:23-24.)

                                          2

market" (see TAC ¶ 12) as a result of the above-referenced conspiracy's "supracompetitive" prices, initially charged by defendants to HDD manufacturers, being "passed on" to them (see TAC ¶ 99).

Based on said allegations, Reseller Plaintiffs assert, on their own behalf and on behalf of a putative class, three Claims for Relief, specifically, (1) the First Claim for Relief, asserting violations of antitrust statutes under the laws of California, Michigan, Minnesota, New York, and North Carolina, (2) the Second Claim for Relief, asserting violations of consumer protection statutes under the laws of California, New York, and North Carolina, and (3) the Third Claim for Relief, asserting claims for unjust enrichment under the laws of Michigan, Minnesota, and New York.

**B. End-User Plaintiffs**

End-User Plaintiffs are fifty-two individuals.  In their operative pleading, the Fourth Amended Consolidated Class Action Complaint ("4AC"), End-User Plaintiffs allege that TDK Defendants and NHK Defendants sold SAs to HDD manufacturers that, in turn, sold the HDDs they made (1) as "bare HDDs" or (2) as components to OEMs that, in turn, "incorporated" the HDDs into "storage devices or computers."  (See 4AC ¶ 209.)  End-User Plaintiffs allege they purchased "finished products" from "HDD manufacturers (e.g. Western Digital)," from "OEMs (e.g., Dell, Apple)," or from "resellers (e.g., Best Buy, Newegg)" (see 4AC ¶ 211), and, in so doing, paid "supra-competitive prices" as a result of the conspiracy's "inflated prices" defendants charged to HDD manufacturers being "passed on" through the chain of distribution to them (see 4AC ¶¶ 249-50).

Based on said allegations, End-User Plaintiffs assert, on their own behalf and on behalf of a putative class, three Claims for Relief, specifically, (1) the First Claim for Relief, asserting violations of antitrust statutes under the laws of Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, (2) the Second Claim for Relief, asserting violations of consumer protection

United States District Court
Northern District of California

1  statutes under the laws of Arkansas, California, the District of Columbia, Florida, Hawaii,

2  Massachusetts, Minnesota, Montana, Nebraska, Nevada, New York, North Carolina,

3  North Dakota, Rhode Island, South Carolina, and Vermont, and (3) the Third Claim for

4  Relief, asserting claims for unjust enrichment under the laws of Arizona, Arkansas, the

5  District of Columbia, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota,

6  Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, Oregon, Rhode

7  Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and

8  Wisconsin.

9  **DISCUSSION**

10  In their motion, Reseller Plaintiffs seek certification of the following proposed class

11  ("Reseller Class"):

12  All persons or entities, in the Indirect Purchaser States,[4] except OEMs,
who, during the period from January 2003 through May 2016, purchased a

13  Standalone Storage Device or Computer for resale which included as a
component part one or more HDD suspension assemblies that were

14  manufactured or sold by the Defendants, any current or former subsidiary of
the Defendants, or any co-conspirator of the Defendants[,] or indirectly

15  purchased an HDD suspension assembly, for resale that was manufactured
or sold by the Defendants, any current or former subsidiary of the

16  Defendants, or any co-conspirator of the Defendants.

17  (See Reseller Pls.' Mot. at 2:10-14.)[5]  In addition to OEMs, the following are excluded

18  from the proposed class:  "Defendants, their parent companies, subsidiaries and

19  affiliates, any co-conspirators, federal governmental entities or instrumentalities of the

20

21  _____

    [4] For purposes of Reseller Plaintiffs' motion, the "Indirect Purchaser States" are
22  California, Michigan, Minnesota, New York, and North Carolina.

23      [5] Defendants contend Reseller Plaintiffs' motion should be denied on the ground
that the class definition in the motion differs from the definition in the TAC.  The sole
24  revision, however, is the exclusion of OEMs, a change defendants have not shown or
even suggested prejudices them in their ability to respond to the motion to certify.
25  Indeed, Reseller Plaintiffs' limitation aligns with defendants' argument, made in
connection with an earlier motion, that the class definition in the TAC does not
26  encompass companies that purchase HDDs for purposes of "manufactur[ing] a different
product," i.e., OEMs.  (See Defs.' Mot. to Dismiss Flextronic's Amended Complaint, filed
27  September 9, 2022 (Doc. No. 571) at 15).)  To the extent defendants also argue that the
exclusion of OEMs precludes a showing that Reseller Plaintiffs can establish the
28  superiority factor set forth in Rule 23(b)(3), the Court addresses such argument below.

United States District Court
Northern District of California

1  federal government, states and their subdivisions, agencies and instrumentalities, the

2  Court[,] and persons who purchased HDD suspension assemblies directly or not for the

3  purpose of resale."  (See Reseller Pls.' Proposed Order at 3:1-6.)

4        In their motion, End-User Plaintiffs seek certification of the following proposed

5  class ("End-User Class"):

6          All persons and entities who, during the time period January 1, 2003 to
   December 31, 2016 ("Class Period"), in the Indirect Purchaser States,[6]
7          purchased Standalone Storage Devices or Computers, not for resale, which
   included hard disk drive ("HDD") suspension assemblies ("SAs") that were
8          manufactured or sold by Defendants (the "Classes").

9  (See End-User Pls.' Mot. at 1:8-13.)  The following are excluded from the proposed class:

10  "Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators,

11  federal governmental entities or instrumentalities of the federal government, states and

12  their subdivisions, agencies and instrumentalities, and persons who purchased HDD

13  suspension assemblies directly or for resale."  (See End-User Pls.' Proposed Order at

14  1:27-28.)

15        Class Plaintiffs contend their respective proposed classes are properly certified

16  under the standards set forth in Rule 23 of the Federal Rules of Civil Procedure.

17        To be entitled to an order certifying a class, a plaintiff must first establish "the four

18  requirements of Rule 23(a)," namely, "(1) numerosity, (2) commonality, (3) typicality, and

19  (4) adequacy of representation," see Stromberg v. Qualcomm Inc., 14 F.4th 1059, 1066

20  (9th Cir. 2021), and show the putative class "meet[s] the requirements of at least one of

21  the three different types of classes set forth in Rule 23(b)," see id. (internal quotation and

22  citation omitted).  A plaintiff "must prove the facts necessary to carry the burden of

23  establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the

24  evidence."  See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31

25  _____

26        [6] For purposes of End-User Plaintiffs' motion, the "Indirect Purchaser States" are
   Arkansas, Arizona, California, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts,
27  Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New
   York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South
28  Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and District of Columbia.

F.4th 651, 665 (9th Cir. 2022).

**A.  Rule 23(a) Requirements**

As set forth below, the Court finds Class Plaintiffs have sufficiently established the four prerequisites set forth in Rule 23(a).

**1.  Numerosity and Commonality**

Rule 23(a)(1) requires a plaintiff to show "the class is so numerous that joinder of all members is impracticable."  See Fed. R. Civ. P. 23(a)(1).  Rule 23(a)(2) requires a plaintiff to show "there are questions of law or fact common to the class," see Fed. R. Civ. P. 23(a)(2), meaning the claims of all putative class members "depend upon a common contention" that "will resolve an issue that is central to the validity of each one of the claims in one stroke," see Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

In their oppositions, defendants do not challenge Class Plaintiffs' showing as to either numerosity or commonality, and the Court, having considered the matter, finds these requirements are satisfied.

First, as to numerosity, defendants do not dispute Reseller Plaintiffs' assertion that there exist "thousands" of putative class members (see Reseller Pls.' Mot. at 16:26-27), nor do they dispute End-User Plaintiffs' showing that "consumers in the U.S." collectively purchased, during the class period, products containing "2.71 billion" SAs (see Netz Decl., filed October 11, 2022 (Doc. No. 601-6) ("Netz Report") at 20).

Next, as to commonality, "[w]here an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist," see Wortman v. Air New Zealand, 326 F.R.D. 549, 556 (N.D. Cal. 2018) (citing cases) (internal quotation and citation omitted), and, here, defendants expressly acknowledge that common questions exist (see Defs.' Opp. to Reseller Pls.' Mot. at 13:16-18 (acknowledging "common relevant facts exist" in light of an "NHK plea agreement, [a] TDK leniency application, and related admissions in this case by [d]efendants")).

//

United States District Court
Northern District of California

**2. Typicality**

Rule 23(b)(3) requires a plaintiff to show "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  See Fed. R. Civ. P. 23(a)(3).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation and citation omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Id. (internal quotation and citation omitted).

**a. Reseller Plaintiffs**

As noted, Reseller Plaintiffs' claims are based on their respective purchases for resale of products containing SAs, the prices of which, they assert, were higher as a result of upstream sellers having passed on the overcharge defendants allegedly imposed on HDD manufacturers.  Reseller Plaintiffs argue that the putative class members experienced the same injury and were injured in the same manner.

Defendants argue Reseller Plaintiffs "bear no resemblance" to those members of the putative class that defendants describe as "big-box retailers and large-volume purchasers" with the ability to "enter into negotiated contracts."  (See Defs.' Opp. to Reseller Pls.' Mot. at 10:13-15.)  In cases alleging price fixing, however, "the representative plaintiff's claim is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class."  See In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 2006 WL 1530166, at *4-*5 (N.D. Cal. June 5, 2006) (citing "substantial legal authority").  As explained by one district court, in rejecting an argument that the claims of the named plaintiffs, who were "small buyers," were "not typical" of putative class members who "purchased [price-fixed products] in large volumes" and had "more bargaining power," typicality was shown

because the claims of the named plaintiffs and the claims of all putative class members,

including large volume purchasers, were the same, namely that "defendants conspired to

fix prices for [the products at issue]," causing the "prices paid for all [products]" to be

"artificially inflated and supracompetitive."  See In re TFT-LCD (Flat Panel) Antitrust Litig.,

267 F.R.D. 291, 303-04 (N.D. Cal. 2010).  The same reasoning applies here.[7]

Defendants also argue Reseller Plaintiffs will be subject to "unique defenses" (see

Defs.' Opp. to Reseller Pls.' Mot. at 12:1-2), specifically, that they made purchases at

"focal-point pric[es] (or discounts)" (see id. at 12:6-7),[8] which circumstances, defendants

contend, may result in an overcharge not being passed through to such purchasers.

Although "a named plaintiff's motion for class certification should not be granted if there is

a danger that absent class members will suffer if their representative is preoccupied with

defenses unique to it," see Hanon, 976 F.2d at 508 (internal quotation and citation

omitted), defendants fail to identify any unique defense, see id. (referring to "unique"

defense as one "not typical of the defenses which may be raised against other members

of the proposed class").  Rather, the defense defendants identify will, they acknowledge,

be raised as to every putative class member who paid "retail prices from big-box retailers

or distributors" (see Defs.' Opp. to Reseller Pls.' Mot. at 12:5-6); in addition, defendants

acknowledge, "[e]ach transaction" by any reseller "may involve discounting (see id. at

3:13-15); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 (9th Cir. 2011) (explaining

---

[7] In arguing to the contrary, defendants rely on a case addressing typicality in the context of a monopolization claim, see Deiter v. Microsoft Corp., 436 F.3d 461 (4th Cir. 2006), which authority is distinguishable.  Proving a monopolization claim depends on whether the asserted monopolist has "monopoly power" in the "distribution channel[s]" used by the plaintiff, see In re Dynamic Random Access Memory, 2006 WL 1530166, at *5; consequently, as was the case in Deiter, the claim of a plaintiff who purchases from the defendant in one distribution channel may not be typical of the claims of putative class members who purchased from the defendant using "different" distribution channels, see Deiter, 436 F.3d at 468.

[8] As explained by Dr. Netz, focal point pricing is a "strategy in which firms set prices at specific points based on the 'left-digit effect,'" i.e., a theory that "people pay progressively less attention when reading from left to right, such that a price of "$10.99 is seen by customers as $10 rather than $11."  (See Netz Report at 82 and n.343.)

defense is not "unique" where defendant may raise it against named plaintiffs and "other members of the class").

Lastly, defendants argue that named plaintiff Mark Medeiros ("Medeiros") is not a member of the proposed class, as, they contend, he is not a reseller or, alternatively, he is a reseller who is an OEM, which, as noted, is a type of reseller excluded from the proposed class. Although a named plaintiff who is not a member of a proposed class would not meet the typicality requirement, see General Telephone Co. v. Falcon, 457 U.S. 147, 156 (1982) (holding "a class representative must be part of the class"), Medeiros, at his deposition, testified he purchased HDDs and computers from distributors and retailers, and then resold them to his customers (see Hamer Decl. (Doc. No. 793-6) Ex. 11 at 29, 35, 42-44, 59-60, 111). To the extent defendants rely on Medeiros' deposition testimony that, at some point in his career, he "interview[ed] customers to determine their specific needs when they need[ed] a new machine built" and then "built" and "delivered" a computer to them (see id. Ex. 11 at 25-26), defendants point to no testimony or other evidence that the computers he custom-built were sold to "the mass market" (see Reseller Pls.' Mot. at 2:27-28 (defining "OEM")), and, consequently, the cited testimony does not support a finding that Medeiros is an OEM.

Accordingly, the Court finds Reseller Plaintiffs have met the typicality requirement.

**b. End-User Plaintiffs**

End-User Plaintiffs' claims are based on their respective purchases for personal use of products containing SAs. End-User Plaintiffs argue that each putative class member's claim is based on the same conduct as those of the named End-User Plaintiffs, and that their claims and the claims of the putative class members will be established in the same manner.

Defendants argue End-User Plaintiffs, who allege each such plaintiff purchased products containing SAs at retail or online stores, are "not typical" of those putative class members that are "large corporate consumers," which according to defendants, "likely" purchased "pursuant to agreements with negotiated prices and terms." (See Defs.' Opp.

United States District Court
Northern District of California

to End-User Pls.' Mot. at 23:8, 19-20.)  For the reasons stated above with respect to Reseller Plaintiffs, the Court does not find such argument persuasive.

Accordingly the Court finds End-User Plaintiffs have met the typicality requirement.

### 3. Adequacy of Representation

As noted, Rule 23(a) requires a showing that the named plaintiffs "will fairly and adequately protect the interests of the class."  See Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997) (providing, as example, in employment litigation, named plaintiff "could not represent" class of both "employees and applicants who were denied employment," where "applicants, if granted relief, would compete with employees for fringe benefits or seniority"); see also Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (finding "fundamental conflict exists," thus precluding finding of adequacy, where "some party members claim to have been harmed by the same conduct that benefitted other members of the class").

Here, Class Plaintiffs argue they have the same interest as all putative class members, namely, to establish defendants' liability for the asserted price-fixing conspiracy, and that there is no conflict between them and the members of the respective putative classes.  Class Plaintiffs also argue they have been diligently prosecuting the cases and have provided all requested discovery, including, to the extent defendants have sought to depose any named plaintiffs, to provide testimony in support of the claims.[9]

Although defendants do not dispute that the named plaintiffs in both classes have diligently prosecuted their claims, defendants do argue that conflicts exist between the named plaintiffs and putative class members, which arguments the Court next considers.

_____

[9] All five Reseller Plaintiffs were deposed (see Hamer Decl. (Doc. No. 798) ¶¶ 10-14), as were nineteen End-User Plaintiffs (see Micheletti Decl. (Doc. No. 601-3) ¶ 89).

### a. Reseller Plaintiffs

HDDs and products containing HDDs "reach consumers" through various types of resellers (see Expert Report of Michael A. Williams ("Williams Report") (Sims Decl. Ex. 1, Doc. 608-2) ¶ 36), which Dr. Williams identifies as "OEM[s]," "Distributor[s]," "Retailer[s]," and "Value-adding Retailer[s]," the last being the term applicable to the named Reseller Plaintiffs (see id. Table 3). Dr. Williams also identifies a number of possible chains of distribution through which one of the subject products might travel, one being from an HDD manufacturer to a distributor, then to a retailer, and lastly to a consumer, with another example being from an HDD manufacturer to an OEM, next to a second OEM, then to a distributor, and lastly to a consumer. (See id. Table 12 (identifying 39 possible chains of commerce).)

Defendants argue that a conflict exists between Reseller Plaintiffs and the putative class members upstream from them. As defendants describe the asserted conflict, each Reseller Plaintiff "is incentivized to argue that those upstream Resellers passed through any overcharge to them," while "those upstream Resellers would be incentivized to argue the exact opposite – any overcharge was borne by them and was not passed down the line to [Reseller Plaintiffs]." (See Defs.' Opp. to Resellers' Mot. at 11:1-4.)

As Reseller Plaintiffs point out, however, district courts that have considered arguments similar to the above have found the named plaintiffs were adequate. In particular, those courts have held that any dispute regarding whether an overcharge was passed on from one class member to another does not pertain to the determination of issues central to the litigation, namely, liability and the aggregate amount of damages, and, consequently, does not pertain to the adequacy requirement that must be met at the class certification phase. Rather, those courts have concluded that any conflict about pass-through amounts would arise, if at all, at the time damages are allocated.

For example, in Sidibe v. Sutter Health, 333 F.R.D. 463, 470, 488-89 (N.D. Cal. 2006), the plaintiffs alleged a hospital overcharged health plans that, in turn, passed on the overcharge to putative class member employers that bought health insurance for

United States District Court
Northern District of California

putative class member employees.  The defendants therein argued that the named

plaintiffs, who were employees, were not adequate due to an asserted conflict, namely

that their employers would argue "they bore the entire brunt of any premium increase,"

while the employees would argue "the entire alleged increase was passed on to them."

See id. at 488.  The district court rejected the argument, finding the "[e]mployers and

employees [did] not have a conflict regarding the central issues," namely, whether the

defendant "overcharged health plans" and whether health plans "passed on those

overcharges," and, noting that, "[o]nly if the class collectively were to establish [the

defendant] [was] liable and should pay damages[,] would any purported conflicts arise

. . . regarding how those damages should be allocated."  See id. at 489 (holding conflict

regarding how "damages should be allocated . . . is not a conflict that is so fundamental

to the suit . . . as to render the plaintiffs inadequate to pursue their class claims").

Similarly, in In re Lidoderm Antitrust Litigation, 2017 WL 679367 (N.D. Cal. 2017),

where the plaintiffs alleged the defendants conspired to overcharge the putative class for

a prescription drug, the defendants argued a conflict existed between class members that

were health insurers and class members who were "end consumers," for the asserted

reason that those two groups were "in different positions in the distribution chain" and

"the amount of overcharge damages [would] need to be assigned between [those two

groups], putting the parties into conflict over who gets what recovery."  See id. at *26.

The district court rejected the challenge to adequacy, finding the alleged conflict would

not "permeate the aggregate damages calculation," but, rather, would "arise only at the

time damages [were] allocated."  See id.

The Court finds the reasoning set forth in the above-cited cases persuasive.

Indeed, the cases are wholly consistent with the approach taken by the Ninth Circuit in

Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975), which addressed an analogous issue.

There, the plaintiffs alleged the defendants conspired to "artificially inflate[ ]" the price of a

company's stock by making false statements about the company over a two-year period.

See id. at 902.  Observing that the putative class consisted of persons who bought and

sold at various times during the two-year period, the defendants argued that "conflicts among class members preclude[d] class certification," namely, that "some class members [would] desire to maximize the inflation existing on a given date while others [would] desire to minimize it." See id. at 908. The Ninth Circuit, while acknowledging "class members might at some point during [the] litigation have differing interests," see id., held, for purposes of class certification, the asserted conflict was "peripheral," as "[e]very class member share[d] an overriding common interest in establishing the existence and materiality of misrepresentations," and "any conflicting interests in tracing fluctuations in inflation [were] secondary," see id. at 910-11 (affirming district court's finding named plaintiffs would "adequately and fairly represent" class). As the Ninth Circuit explained, if any "potential conflicts" were to arise later in the litigation, the district court retained the "ability to decertify [the class] or create subclasses" at that time. See id. at 911; see also id. at 909 (referring to "subsequent creation of subclasses" as way to "deal with latent conflicts which may surface as [a] suit progresses").

Accordingly, the Court finds the adequacy requirement is satisfied.

### b. End-User Plaintiffs

Defendants contend a conflict exists among putative class members in light of there existing what defendants describe as three separate alleged conspiracies, namely (1) a conspiracy to "fix prices" of SAs, (2) a conspiracy to "kill" defendant Hutchinson Technology Inc. ("HTI"), and (3) a conspiracy to "share competitively sensitive information." (See Defs.' Opp. to End-User Pls.' Mot at 2:1-8.) Defendants argue that, in light of the asserted existence of these three "different" theories of liability, "there will be class members with different – and antagonistic – economic interests." (See id. at 24:3-4, 12-13.) As discussed below, however, defendants have failed to identify a conflict warranting a finding that the named End-User Plaintiffs are not adequate representatives.

First, although defendants assert that some class members may have bought products containing SAs sold by non-HTI defendants at "lower prices," set in an effort to "undercut" HTI, and, thus, such class members "likely benefitted" from the conspiracy to

harm HTI (<u>see</u> <u>id.</u> at 24:13-17), End-User Plaintiffs have alleged the non-HTI defendants "plotted to gain market share" from HTI "all while maintaining supra-competitive pricing to HDD manufacturers" (<u>see</u> 4AC ¶ 147), and ultimately accomplished their goal by "agree[ing] that TDK would acquire HTI to prevent an HDD manufacturer from acquiring and vertically integrating the company" (<u>see</u> 4AC ¶ 150).  Defendants have offered no evidence to the contrary, and, in particular, as End-User Plaintiffs point out, no evidence that any non-HTI defendant ever offered to any customer a below-competitive price.  In short, under End-User Plaintiffs' theory of the case, the alleged conspiracy by all defendants, including HTI, to fix prices of SAs and the alleged conspiracy by non-HTI defendants to take market share from HTI do not create a conflict.  <u>See</u> <u>Blackie</u>, 524 F.2d at 901 and n.17 (holding district courts, when considering motion to certify class, are "bound to take the substantive allegations of the complaint as true"; rejecting argument that motion to certify can be denied due to possibility plaintiff may be "unable to prove his allegations"); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 267 F.R.D. 583, 606-07 (N.D. Cal. 2010) (holding, for purposes of class certification, where "plaintiffs have consistently alleged a single, overarching conspiracy spanning the entire class period," defendants "may not recast" those allegations as asserting "separate conspiracies").

Second, although defendants argue that some class members may have bought products containing SAs sold by a defendant that lowered its prices after receiving "price sensitive information" from another defendant, and, thus, "would have benefitted" from the exchange of competitive information (<u>see</u> Defs.' Opp. to End-User Pls.' Mot. at 17:16-22), End-User Plaintiffs have alleged defendants "worked together to exchange information about price and market share" (<u>see</u> 4AC ¶ 125), such as the bids each made to customers (<u>see</u> 4AC ¶¶ 127, 131, 133-34), and that defendants did so to "avoid a 'price war'" and "avoid lowering prices for customers" (<u>see</u> 4AC ¶¶ 124, 131).  Defendants again offer no evidence they sold at a below-competitive price.  In short, under End-User Plaintiffs' theory of the case, the alleged conspiracy to fix prices for SAs and the alleged conspiracy to exchange information do not create a conflict.

1    Accordingly, the Court finds the adequacy requirement is satisfied.

2    **B.  Rule 23(b)(3) Requirements**

3    As noted, a party seeking an order certifying a class must show the putative class

4    is one of the "types of classes" set forth in Rule 23(b).  See Stromberg, 14 F.4th at 1066

5    (internal citation and quotation omitted).  Here, Class Plaintiffs rely on Rule 23(b)(3),

6    which Rule "cover[s] cases in which a class action would achieve economies of scale,

7    effort, and expense, and promote uniformity of decision as to persons similarly situated,

8    without sacrificing procedural fairness or bringing about other undesirable results."  See

9    Amchem, 521 U.S. at 615 (internal quotation, citation and alteration omitted).  In

10    particular, Rule 23(b)(3) applies where "the questions of law or fact common to class

11    members predominate over any questions affecting only individual members" and "a

12    class action is superior to other available methods for fairly and efficiently adjudicating

13    the controversy."  See Fed. R. Civ. P. 23(b)(3).

14    The Court next addresses whether the "predominance" and "superiority"

15    requirements set forth in Rule 23(b)(3), see Amchem, 521 U.S. at 615, are met.

16    **1.  Predominance**

17    "[C]onsidering whether questions of law or fact common to class members

18    predominate begins, of course, with the elements of the underlying cause of action,"

19    Olean, 31 F.4th at 665 (internal quotation, alteration, and citation omitted), which

20    elements, for a price-fixing claim, are "(1) the formation and operation of the conspiracy,

21    (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from

22    such act or acts," see id. at 665 n.8 (internal quotation and citation omitted; citing

23    California law).[10]  "Therefore, to prove there is a common question of law or fact that

24

25    _____

        [10] No party to any of the instant actions asserts that there exists any difference in
26    the elements required under California law and the elements required by the laws of the
      other states under which Class Plaintiffs have brought claims.  Further, as the claims
27    asserting violations of consumer protection statutes and those seeking restitution are
      derivative of the price-fixing claims (see Reseller Pls.' TAC ¶¶ 174-76, 179-81; End-User
28    Pls.' 4AC  ¶¶ 316-31, 334-36), and no party asserts that an additional element must be
      established to prove those other claims, the Court does not separately address those

United States District Court
Northern District of California

United States District Court
Northern District of California

1  relates to a central issue in an antitrust class action, [the moving] plaintiffs must establish

2  that essential elements of the cause of action, such as the existence of an antitrust

3  violation or antitrust impact, are capable of being established through a common body of

4  evidence, applicable to the whole class." See id. at 666 (internal quotation and citation

5  omitted).

6         Here, Class Plaintiffs argue, the existence of an antitrust violation, the existence of

7  antitrust impact, and the amount of aggregate damages can be established by evidence

8  common to the respective classes.

9                              **a. Existence of Antitrust Violation**

10        In arguing classwide evidence exists to prove defendants entered into the alleged

11  price-fixing conspiracy, Class Plaintiffs cite the following evidence that, they assert, would

12  be applicable to all putative class members:

13        (1) admissions by defendants, namely, (a) statements made in an agreement with

14  the Department of Justice, signed in December 2017, wherein defendant TDK

15  Corporation, on its own behalf and on behalf of the other TDK Defendants, stated it

16  "desire[d] to report . . . price fixing, market allocation, and other conduct constituting [an

17  antitrust violation] in the suspension assemblies industry," and that it had "terminated its

18  participation in the anticompetitive conduct being reported" (see Sims Decl. Ex. 42 at 1-2;

19  Micheletti Decl. Ex. 85), and (b) statements by defendant NHK Spring Co., Ltd. ("NHK

20  Spring"), in a "Rule 11 Plea Agreement," filed September 23, 2019, in United States v.

21  NHK Spring Co., Ltd., Case No. 2:19-cr-20503, United States District Court, Eastern

22  District of Michigan, that it had "reached agreements" with an entity identified as

23  "Company A" to "refrain from competing on prices for, fix the prices of, and allocate their

24  respective market shares for, HDD suspension assemblies to be sold in the United States

25  and elsewhere," and that, to "effectuate these agreements, employees and officers of

26  [NHK Spring] and Company A exchanged HDD suspension assemblies pricing

27  _____

28  other claims herein.

16

information, including anticipated pricing quotes, in the United States and elsewhere" (see Sims Decl. Ex. 46 at 4; Micheletti Decl. Ex. 80 at 4);

(2) findings issued by foreign agencies, namely, (a) findings in a "Cease and Desist Order," issued by the Japan Fair Trade Commission on February 9, 2018, wherein said Commission found that "TDK" and "2 NHK Spring Companies" held "multiple meetings" at which they "coordinated with each other and affirmed a mutual understanding that they would fix the selling prices of suspensions," that TDK instructed two other "TDK Companies" as to the arrangement, and that each of those NHK and TDK entities thereafter "collaborated in order to increase their market shares in the area of suspension sales" and "shar[ed] information on the selling prices of suspensions sold to HDD manufacturer-sellers and the market shares thereof" (see Sims Decl. Ex. 40 at 5; Micheletti Decl. Ex. 56 at 5), and (b) findings in a "Technical Report," issued in April 2018 by the Administrative Counsel for Economic Defense, a Brazilian agency, wherein said agency stated "compelling evidence" existed that, in the "global market of suspension assemblies," five companies, namely, HTI, NHK Spring, Magnecomp Precision Technology Public Co., Ltd, TDK Corporation, and SAE Magnetics, and their respective "subsidiaries," engaged in "(i) [p]rice fixing in response to customer quotation orders, [ii] [m]arket division," and (iii) [s]haring of commercial and competitively sensitive information," such as "[c]urrent, potential and proposed prices for suspension assemblies," for "the purposes of stabilizing prices and reducing competition in sales of suspension assemblies" (see Sims Decl. Ex. 51 at 1-2; Micheletti Decl. Ex. 88 at 1-2);

(3) evidence obtained during the course of discovery in the instant multidistrict litigation, namely, documents obtained from defendants, as well as deposition testimony provided by officers and employees of defendants, in which they state they agreed to fix prices at which SAs were sold, set market share targets for each defendant, and exchanged information about customers, such as shipping amounts and price quotations (see, e.g., Micheletti Decl. ¶¶ 14-27 (summarizing evidence obtained from defendants in discovery); Sims Decl. Exs. 25-26 (interrogatory responses by NHK Defendants and by

17

TDK Defendants identifying multiple meetings during which defendants exchanged information); Netz Report App. 1 (summarizing "meetings" and "communications" between defendants when information was exchanged)); and

(4) opinions by Dr. Williams and Dr. Netz that the structure of the SA market is conducive to collusion as a result of the market being highly concentrated (see Williams Report ¶¶ 79-88, Table 1; Netz Report at 39-44), the existence of barriers to entry by new competitors (see Williams Report ¶¶ 104-09; Netz Report at 39-41), SA's being a commodity-like product (see Williams Report ¶¶ 92-94; Netz Report at 44 (opining "suspension assemblies produced by different suppliers for the same HDD program are designed to be interchangeable")), and there being no significant substitutes for SAs (see Williams Report ¶¶ 98-103; Netz Report at 36, 38).

Defendants argue that the above-referenced evidence does not suffice to establish, on behalf of all individual class members, the existence of an antitrust conspiracy, for the asserted reason that Class Plaintiffs are alleging three conspiracies existed, namely, as discussed above, a conspiracy to fix prices, a conspiracy by non-HTI defendants to eliminate HTI, and a conspiracy to exchange information. According to defendants, each of these asserted conspiracies would have separate effects on prices paid by class members, and, consequently, each class member would need to establish which of the three conspiracies assertedly caused such class member's claimed loss.

As discussed above with respect to the adequacy requirement, however, End-User Plaintiffs do not assert that three conspiracies existed, but, rather, that one conspiracy to fix prices existed, which conspiracy was aided by the alleged information sharing and was not undermined, but, rather, advanced, by attempts to eliminate HTI. Reseller Plaintiffs likewise do not assert the existence of three conspiracies, but, rather one price-fixing conspiracy, which conspiracy is said to have been "effectuated" by defendants' "exchanging" SA "pricing information." (See TAC ¶ 60.)[11]

_____

[11] Reseller Plaintiffs do not allege there existed a conspiracy by non-HTI defendants to eliminate HTI, let alone that any such conspiracy existed separate from the

United States District Court
Northern District of California

In light of Class Plaintiffs' respective theories of the case, defendants' argument that separate conspiracies exist is, in essence, an argument that Class Plaintiffs will be unable to prove their allegations that the alleged agreement to exchange information was a part of the agreement to fix prices and not a separate agreement with a different or conflicting goal and/or that End-User Plaintiffs will be unable to prove their allegations that, although TDK and NHK agreed to eliminate HTI, such agreement did not undermine the price-fixing conspiracy. For purposes of Rule 23(b)(3), however, the plaintiff "need not, at that threshold, prove that the predominating question will be answered in their favor." See Amgen Inc. v. Connecticut Retirement Plans, 568 U.S. 455, 468 (2013).

Accordingly, the Court finds Class Plaintiffs have met their respective burdens to show that the existence of the antitrust violation alleged in the operative pleadings can be established by evidence common to the proposed classes.

### b. Existence of Antitrust Impact

"The question whether each of the [proposed] class[es] suffered antitrust impact is central to the validity of each one of [their] claims." Olean, 31 F.4th at 670 (internal quotation and citation omitted). Here, in contending the question whether the alleged price-fixing conspiracy impacted each putative class member can be determined on a classwide basis, Class Members rely on opinions proffered by their respective experts.

The Court considers whether the respective experts' opinions constitute evidence "capable of answering a common question on a class-wide basis." See id. at 665. In so doing, the Court does not consider the ultimate persuasiveness, or lack thereof, of the opinions. See id. at 667 (holding "a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive or unlikely to succeed in carrying the plaintiffs' burden of proof on that issue"). Rather, the Court must determine whether the opinions, if found persuasive by the trier of fact, are "capable of answering a common question for the entire class in one

_____

price-fixing conspiracy.

19

stroke," see id. at 668, in this instance, whether the putative class members were impacted by the alleged price-fixing conspiracy.

### (1)  Reseller Plaintiffs

According to Dr. Williams, by using "econometric methodologies and common evidence," his "analyses demonstrate that the anticompetitive effects of the alleged conspiracy were widespread across members of the proposed [Reseller] Class, impacting all or virtually all Class Members."  (See Williams Report ¶ 12.)

### (A)  Overcharge

To address whether common evidence shows direct purchasers of SAs were overcharged by defendants, Williams created a model employing "the well-known and widely accepted dummy variable multiple regression methodology," which methodology compares "prices during the period affected by the alleged unlawful conduct (referred to as the 'damages period') to competitive prices during a 'benchmark period,' i.e., prices in a market or during a time period likely unaffected by the alleged unlawful conduct," while "controlling for other factors that affect prices."  (See id. ¶¶ 145-46.)

Using data Reseller Plaintiffs obtained during discovery (see id. ¶¶ 151-52),[12] Dr. Williams included in the model the prices defendants charged HDD manufacturers during the "damages period," which is January 2003 through May 2016, and during the "benchmark period," which is March 2002 through December 2002, as well as January 2017 through December 2019 (see id. ¶ 156).[13]  Additionally, recognizing that "[b]asic economics demonstrate that [the] SA prices charged by [d]efendants are affected by

---

[12] The data "contains information on [SA] product codes, [SA] program/project names, HDD manufacturer names, total quantity sold per transaction, total sales per transaction, total cost per transaction, unit price, unit cost, and other information."  (See id. ¶ 152.)

[13] As noted, the "damages period" ends in May 2016.  Dr. Williams "treat[ed] the period of June 2016 through December 2016 as a contaminated period," and did not include those months in the damages period, for the stated reason that "cartels are known to have 'lingering effects'" after a price-fixing conspiracy ends, and, in addition, there is "a delay" before prices return to the level they would be in the absence of a conspiracy due to "existing contracts and agreements."  (See id. at ¶ 157.)

United States District Court
Northern District of California

supply and demand factors" (see id. ¶ 161), Dr. Williams identified a number of "variables" that could affect the price of SAs, namely, "total HDD units sold for each quarter," "HHI of HDD manufacturers,"[14] "material cost," "labor cost," "electricity [cost]," "crude oil price," "cumulative units sold since the introduction of a product," "calendar month," as well as a "Thailand flood indicator," to account for "potential effects of the 2011 Monsoon flooding in Thailand," a "[c]ontaminated period indicator," to "captur[e] the effect" of the period from April 2016 through December 2016, and "program-HDD-manufacturer combination," to "control[ ] for the possibility of major differences across products of different programs and different HDD manufacturers" (see id. ¶¶ 161-71). The results of the model show the alleged conspiracy increased the prices paid by HDD manufacturers by 13.6% (see id. ¶ 174 and Table 2), which estimate, Dr. Williams found, is "statistically significant at the 0.1% level" (see id. ¶ 174), meaning "there is a 0.1% chance that [d]efendants' conspiracy had no price effects" (see id. ¶ 217).

Dr. Williams also performed separate regressions "to allow the price effects to vary by [d]efendant and by major HDD manufacturer," for purposes of determining whether "the estimated price effects are positive and statistically significant." (See id. ¶ 219.) In the first such "modified regression," the model allowed prices charged by each of the two defendant groups to vary, and the results show the "estimated overcharge" by NHK Defendants and TDK Defendants was, respectively, 8.5% and 17.1%, which estimates, according to Dr. Williams, are "statistically significant" at the 0.1% level. (See id. ¶ 220 and Table 4.) In the second such modified regression, the model allowed prices paid by the "major HDD manufacturer[s]" to vary, and the results show the "estimated overcharge" incurred by Seagate, Toshiba, Western Digital - HGST, and Western Digital -

---

[14] "HHI," short for the Herfindahl-Hirschmann Index, is a measure used by economists "to quantify the degree of concentration in an industry." (See id. ¶ 82.) According to Dr. Williams, such measure controls for changes in price "associated with changes in the concentration of the HDD manufacturing industry" (see id. ¶ 163), in this case, a reduction in the number of HDD manufacturers over the course of the benchmark and damages periods (see id. ¶¶ 89-91).

WD was, respectively, 18.7%, 9.1%, 2.7%, and 17.8%, which estimates, in Dr. Williams' opinion, likewise are "statistically significant" at the 0.1% level.  (See id. ¶ 221 and Table 5.)[15]

Additionally, Dr. Williams considered whether "characteristics of the market structure" would support the conclusion he drew from the results of his application of the above-referenced regression models, specifically, his conclusion that HDD manufacturers "would have paid artificially inflated prices as a result of the alleged conspiracy."  (See id. ¶ 222.)  He found HDD manufacturers "would have very limited, if any, ability to avoid price effects caused by the alleged conspiracy" in light of "structural characteristics of the market" (see id. ¶ 224), and, consequently, that those market characteristics supported his conclusion.  Specifically, he identified the following market characteristics:  (1) the SA industry is "highly concentrated," meaning there are few sellers and few buyers, a circumstance that, in his view, makes the alleged conspiracy "less costly to create and maintain" (see id. ¶¶ 79, 86-87, 89-91, 223.a); (2) there are "no significant substitutes" for SAs, a circumstance that, he states, results in direct purchasers "not chang[ing] their demand for [SAs] significantly in response to changes" in SA pricing (see id. ¶ 223.b); and (3) there are "substantial . . . barriers" to entry into the SA market, in particular, "[h]eavy capital investments are required in order to enter the market" and "[d]efendants hold [the] majority of the patents" for manufacturing SAs, which barriers, he opines, "tend to make [the] market more conducive to the formation and maintenance of a conspiracy" (see id. ¶¶ 105-06, 223.c).

Defendants contend that Dr. Williams' opinions are not capable of establishing, by the use of common proof, that HDD manufacturers were overcharged by defendants.

//

---

[15] Dr. Williams states he had insufficient data to perform separate regressions for five other HDD manufacturers, namely, Fujitsu, Hitachi, Maxtor, Quantum, and Samsung.  (See id. ¶ 221 n. 212.)  Each of these other HDD manufacturers ceased producing HDDs during the damages period.  (See id. ¶¶ 89-91.)

United States District Court
Northern District of California

United States District Court
Northern District of California

First, defendants rely on the principle that, where "evidence contain[s] unsupported assumptions," expert evidence, "while otherwise admissible under Daubert, [is] inadequate to satisfy the prerequisites of Rule 23." See Olean, 31 F.4th at 666 n.9. In that regard, defendants argue, Dr. Williams' opinions are based on an unsupported assumption that SAs are "'commodity-like products with standard pricing." (See Defs.' Opp. to Reseller Pls.' Mot. at 16:7-8); see also id. at 17:5 (asserting Dr. Williams' report assumes SAs are "homogenous products priced consistently over the Class Period like widgets").)

Defendants fail to show, however, that Dr. Williams' opinions are based on such assumption. First, his model is based on the actual prices defendants' customers paid (see Williams' Report ¶¶ 151-52), not on assumptions as to pricing, let alone an assumption that prices were standardized at any time during the class period. Further, Dr. Williams' report, contrary to defendants' assertion, does not state that all SAs are or were interchangeable; rather, in the section of his report on which defendants rely, Dr. Williams cites deposition testimony provided by a manager employed by an HDD manufacturer, who testified that "[SAs] manufactured by different suppliers, for the *same programs* and applications, were 'interchangeable'" (see Williams Report ¶ 93 (emphasis added)), which testimony is wholly consistent with defendants' position that SAs are "commodity-like at the program-level" (see Defs.' Mot. to Exclude (Doc. No. 796-5) at 12:12-14), as well as with the position taken by Dr. Stiroh, defendants' expert, who states "[SAs] produced by different [defendants] for a specific program are interchangeable" (see Expert Report of Lauren J. Stiroh, Ph.D. ("Stiroh Report") (Everett Decl. Ex. 1, Doc. No. 791-2) ¶ 77). Indeed, as Reseller Plaintiffs point out, Dr. Williams' regression model includes a variable to account for the interchangeability of SAs solely within specific programs, namely, the "program-HDD-manufacturer combination" variable, which variable, Dr. Williams explains, "controls for the possibility of major differences across products of different programs and different HDD manufacturers." (See Williams Report ¶ 171; see also Expert Reply Report of Michael A. Williams, Ph.D. ("Williams' Reply

1    Report") (Sims Decl. Ex. 1, Doc. No. 888-4) ¶ 121 (same).)

2         Defendants also argue that Dr. Williams' model fails to account for the "significant

3    purchasing power" of the three major HDD manufacturers (see Defs.' Opp. to Reseller

4    Pls.' Mot. at 18:8-9), for the existence of "quarterly price negotiations" (see id. at 18:10),

5    and for the asserted fact that "prices tended to *fall* over the Class Period" (see id. at 18:3-

6    4) (emphasis in original).  Defendants' argument, however, is not supported by the

7    evidence.  In particular, defendants fail to show Dr. Williams assumed a lack of

8    purchasing power on the part of any HDD manufacturer, that quarterly negotiations did

9    not occur, or that prices did not fall over the class period; rather, as noted, the model

10   uses the actual prices paid to defendants, thereby including the effect on prices paid as a

11   result of purchasing power, negotiations, or any other reason.  As Dr. Williams has

12   explained, "[c]hanges in prices observed during periodic contract renegotiations are the

13   effect of changes in demand and cost factors for which [his] regression controls, and/or

14   the effect of the conspiracy."  (See Williams Reply Report ¶ 73; see also id. ¶ 87

15   (explaining "cumulative units sold since introduction" variable controls for "decreases in

16   price caused by increases in yield and the quarterly price renegotiations which take that

17   circumstance into account"); id. ¶ 94 (identifying variables in model that "control[ ]" for

18   "HDD manufacturers' purchasing power").)

19        To the extent defendants challenge the variables employed in Dr. Williams' model,

20   e.g., the variables Dr. Williams employed to account for the lack of interchangeability

21   outside of specific programs, the purchasing power HDD manufacturers have, and the

22   trend toward lower prices during the span of a program, by arguing he should have used

23   different or additional variables, such argument "go[es] to the weight, not the

24   admissibility" of, his opinion.  See Obrey v. Johnson, 400 F.3d 691, 695 (9th Cir. 2005)

25   (holding result of regression analysis "does not become inadmissible simply because [the

26   model] does not include every variable that is quantifiable and may be relevant to the

27   question presented") (internal quotation and citation omitted).

28   //

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1    Defendants also argue that other criticisms set forth in Dr. Stiroh's report show Dr.

2  Williams' opinions are not capable of establishing an overcharge on a classwide basis.

3  The Court next considers those criticisms.

4    Dr. Stiroh contends that Dr. Williams' model, which, as noted, found the alleged

5  conspiracy increased prices paid by HDD manufacturers by 13.6%, inappropriately

6  "estimate[s] an average overcharge across all sales during the class period."  (See Stiroh

7  Report ¶ 82.)  The Court disagrees.  A regression model's use of "averaging

8  assumptions," i.e., a model that assumes all direct purchasers were "overcharged by the

9  same uniform percentage," is not "inherently unreliable."  See Olean, 31 F.4th at 677.

10  Further, "[i]t is not implausible to conclude that a conspiracy could have a class-wide

11  impact, even when the market involves diversity in products, marketing, and prices,

12  especially where . . . there is evidence that the conspiracy artificially inflated the baseline

13  for price negotiations."  See id. at 677-78.  Here, there is such evidence, namely,

14  evidence that, during quarterly negotiations, direct purchasers would use the prices they

15  previously paid as a reference when negotiating the prices they sought to pay in the next

16  quarter (see Hamer Decl. (Doc. No. 794-3) Ex. 4 at 43; Micheletti Reply Decl. (Doc. No.

17  880-3) Ex. 1 at 363:4-8, 365:5-11), i.e., the fixed price was carried forward into later

18  negotiations.

19    Moreover, to the extent Dr. Stiroh challenges the use of averaging by pointing out

20  examples where overcharges for specific programs were less than the 13.6% average

21  (see Stiroh Report ¶¶ 82-83), such challenge "conflates the question whether evidence is

22  capable of proving an issue on a class-wide basis with the question whether the evidence

23  is persuasive," see Olean, 31 F.4th at 679 (rejecting argument that "uniform 10.28

24  percent overcharge" in expert report was "implausible" due to some purchasers' having

25  been charged more or less than average; holding "lack of persuasiveness is not fatal at

26  certification").

27    Dr. Stiroh also contends Dr. Williams' model is "flawed and unreliable" for the

28  reason the model is based on an assumption that the class period began in 2003, rather

than in 2008, the year in which she understands "defendants [made] admissions of improper communications." (See Stiroh Report ¶ 10.c.) As there is evidence from which a trier of fact could conclude the conspiracy began in 2003 (see Williams Reply Report ¶¶ 98-113 (identifying evidence)), however, this challenge conflates the question of whether Dr. Williams' opinion is capable of showing on a classwide basis that conspiratorial overcharges began in 2003 with the question of whether such classwide evidence will be persuasive. Moreover, although a regression performed by Dr. Stiroh, based on her assumption the class period began in May 2008, "yields a negative overcharge estimate" (see Stiroh Report ¶ 105), a separate regression performed by Dr. Williams based on the same assumption found an overcharge of 10.6% (see Williams Reply Report ¶ 115). Consequently, assuming the trier of fact were to find the class period did not begin until May 2008, the trier of fact's determination as to whether the direct purchasers were overcharged would be based on evidence applicable to the putative class as a whole, irrespective of whether such trier of fact was persuaded by the results obtained by Dr. Stiroh's methodology rather than the results obtained by Dr. Williams' methodology.

Additionally, Dr. Stiroh asserts, Dr. Williams had "no basis to assert that the conduct at issue," i.e., the price-fixing conspiracy, "would improperly raise the prices of [SAs] by HTI." (See Stiroh Report ¶ 72.) As there is evidence, however, that HTI was a member of the alleged conspiracy, namely, HTI's having repeatedly provided its prices to the alleged co-conspirators (see Williams Reply Report ¶ 109 and n.118 (citing evidence); see also id. ¶ 99-101, 103, 110 (same)), and TDK's having admitted to the Department of Justice that its subsidiary HTI had engaged in "price fixing . . . in the suspension assemblies industry" (see Sims Decl. Ex. 42 at 1; see also Williams Report ¶ 59), this challenge, again, conflates the question of whether Reseller Plaintiffs have evidence to establish their allegations on a classwide basis with the persuasiveness of such evidence.

//

United States District Court
Northern District of California

1    Accordingly, the Court finds Reseller Plaintiffs have met their burden to show the

2    evidence on which they rely is capable of establishing on a classwide basis that HDD

3    manufacturers, were, as a result of the conspiracy, overcharged for SAs.

4    **(B) Pass-Through**

5    The next issue is whether evidence common to the putative class members can be

6    used to establish that each of them was impacted by the conspiracy, namely, evidence

7    that the overcharge allegedly imposed on direct purchasers was passed through, at least

8    in part, to others in the chain of distribution.

9    According to Dr. Williams, "[b]asic economic theory demonstrates that price

10   increases in cost components will be passed through to indirect purchasers" (see

11   Williams Report ¶ 225), citing a number of studies finding, "in all cases for all industries,"

12   that "price increases in important product components would be passed down the supply

13   chain" (see id. ¶¶ 227-28, App. IV Table 1A).  Dr. Williams opines that a positive pass-

14   through rate would be expected with respect to SAs, for the reasons that "downstream

15   firms" cannot avoid price increases in products containing SAs by "switching to a different

16   supplier," that "there is no substitute product" for SAs in HDD manufacturing, and that

17   "price increases" for SAs were "marketwide."[16]  (See id. ¶ 229.)  Additionally, according to

18   economic literature to which Dr. Williams cites, "the more competitive is an industry, the

19   higher is the pass-through rate," and, according to Dr. Williams, evidence obtained in

20   discovery by Reseller Plaintiffs, as well as statements in economic literature and public

21   statements made by companies in the field, show the markets for HDDs and for personal

22   computers are highly competitive.  (See id. ¶¶ 230-235, nn.221-22, 224-33.)

23   To determine whether, in this case, the alleged overcharge was, as might be

24   predicted by the economic literature Dr. Williams cites, passed through to the putative

25

26   _____

27   [16] As discussed below, an SA manufacturer known as Suncall Corporation
     ("Suncall") was not a member of the alleged conspiracy.  Its market share, however, was
     very small and the record does not indicate Suncall's prices were at any point lower than
28   those of defendants.

1  class members, Dr. Williams employed a "multivariate pass-through regression

2  methodology." (See id. ¶ 175.) In employing such an analysis, Dr. Williams used data

3  provided in discovery to Reseller Plaintiffs from forty entities, each of which he grouped

4  into one of five categories, namely, HDD manufacturers, OEMs, distributors, retailers,

5  and value-adding retailers. (See id. ¶¶ 178-213.)

6      Dr. Williams explained his methodology as follows:

7  In the pass-through regressions, the dependent variable is the logarithm of
   the sales price a firm charged to their customers for HDDs, Standalone
8  Storage Devices, or computers (hereinafter "sales price"). The explanatory
   variable of interest is the logarithm of unit cost for the corresponding
9  products (hereinafter "unit cost"). The coefficient on this variable measures
   the pass-through elasticity. For example, if the estimated coefficient is 0.9,
10 that shows that if the prices paid by a firm increased by 10% as a result of
   Defendants' alleged conspiracy, the prices the firm charged to its customers
11 would increase by 9%. I then calculate the pass-through rate of the
   overcharge passed through by this firm by multiplying the pass-through
12 elasticity and the price-cost ratio for the firm. For example, if the price-cost
   ratio for the firm is 110%, then a 0.9 pass-through elasticity leads to [a]
13 pass-through rate of 0.9 * 110% = 99%. That is, a one dollar increase in
   cost would lead to a price increase of 99 cents.

14 (See id. ¶ 176.)

15     Employing such methodology using the data provided by the above-referenced

16 entities, and including what he determined to be relevant variables (see id. ¶ 177 and

17 n.204 (identifying variables used)), Dr. Williams estimated the "pass-through rate for each

18 of the 40 datasets," and, in his opinion, the results for each dataset showed "pass-

19 through rates" that were "positive" and "statistically significant" (see id. ¶ 214). In

20 particular, he found the "average pass-through rates" for each of the five groups, i.e.,

21 HDD manufacturers, OEMs, distributors, retailers, and value-adding retailers, were,

22 respectively, 72.6%, 126.0%, 88.5%, 60.4%, and 84.9%. (See id. ¶ 214, Table 3.)[17]

23 These results, he opines, show the percentage of the overcharge passed through to the

24

25      [17] With respect to his opinion that the average pass-through rate for OEMs was
   126.0%, Dr. Williams states such outcome is "consistent with both economic theory" as
26 well as "empirical work" in which economists found excise taxes imposed on
   manufacturers and then passed through to retailers resulted in retail price increases in
27 excess of the amount of the tax. (See id. ¶ 215 and nn. 210-11 (citing two publications
   and six empirical studies).)

28

1   customers of each such group, for example, distributors, on average, passed through

2   88.5% of the overcharge to their customers.  (See id.)

3        Defendants argue Dr. Williams' opinions are not capable of establishing, on a

4   classwide basis, that the putative class members were impacted.  Rather, defendants

5   contend, such showing would require an individualized determination as to the

6   experiences of each reseller.

7        First, defendants argue, the multivariate regression employed by Dr. Williams is

8   "flawed" in that it fails to account for what defendants state is the "substantial buying and

9   selling power" of "large dominant entities such as Dell, Apple, Amazon, Wal-Mart, Best

10  Buy, [and] massive distributors."  (See Defs.' Opp. to Reseller Pls.' Mot. at 19:13-14,

11  20:26-27.)  In other words, defendants challenge the model's averaging the pass-through

12  rates of entities that may have significant negotiating power with entities that may not.[18]

13  Such challenge, however, is premature at this stage.  As the Ninth Circuit has explained,

14  in response to a challenge to an expert's use of averages to calculate whether an

15  overcharge was passed through to retailers even though "large retailers like Walmart

16  likely would have used their bargaining power to negotiate lower prices," a district court

17  "is not free to prefer its own views about the economics of the [relevant] market over the

18  statistical evidence submitted by the plaintiffs."  See Olean, 31 F.4th at 678.  Moreover,

19  although "individualized differences among the overcharges imposed on each [reseller]

20  may require a court to determine *damages* on an individualized basis, . . . such a task

21  would not undermine the regression model's ability to provide evidence of common

22  *impact*."  See id. at 679 (emphases in original).

23       Next, defendants argue, SAs constitute "a tiny percentage of finished product

24  prices" (see Defs.' Opp. to Reseller Pls.' Mot. at 23:4), and point to one case, involving a

25  component that represented approximately 20% of the cost of a product, in which a

26  _____

27       [18] As noted, Dr. Williams' model sets forth a weighted average pass-through rate
     for five types of entities that could be involved in the chain of distribution for a product
28   containing SAs, which averages are, in each instance, more than zero.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    motion for class certification was denied, see California v. Infineon Technologies AG,

2    2008 WL 4155665 (N.D. Cal. September 5, 2008), thus, apparently, suggesting a price-

3    fixing claim involving a small component cannot or should not be certified on behalf of a

4    class.  The denial in the cited case, however, was not based on the relationship between

5    the price of the component and the overall price of the product containing the component,

6    but, rather, on the plaintiff's having "failed to come forward with a sufficiently plausible

7    methodology" to show the evidence "would be sufficiently generalized so as to allow

8    common questions as to impact to predominate," see id., 2008 WL 4155665, at 9, an

9    omission that would have been fatal to the motion irrespective of the price-fixed

10   component's percentage of the overall cost of the product.

11        Defendants additionally argue that Dr. Williams' model "cannot identify or exclude"

12   putative class members that purchased products containing SAs manufactured by

13   Suncall, a company that is not alleged to be a member of the price-fixing conspiracy and

14   that manufactured and sold SAs in percentages that, according to Dr. Williams, ranged

15   from approximately 3.5 % to 4.4% during the class period.  (See Williams Report at 37

16   (Table 1).)  Citing Ninth Circuit authority, defendants argue that, as a result, Dr. Williams'

17   model is inadequate because his model demonstrates "false positives, i.e., injury to class

18   members who could not logically have been injured by a defendant's conduct."  See

19   Olean, 31 F.4th at 666 n.9 (noting "nonsensical results such as false positives" would

20   support finding expert evidence is "inadequate to satisfy the prerequisites of Rule 23").

21   Here, however, such concerns are not warranted, as Dr. Williams' models are based on

22   sales by defendants only (see Williams Report ¶ 152; Williams Reply Report ¶ 185

23   n.229), i.e., the model measures impact only caused by the alleged conspirators' sales to

24   direct purchasers, see Olean, 31 F.4th at 682 (finding plaintiffs, by offering expert

25   evidence to establish impact on classwide basis, demonstrated "all class members" had

26   "injury-in-fact traceable to . . . defendants").

27        Defendants also contend criticisms set forth in Dr. Stiroh's report show Dr.

28   Williams' opinions are not capable of establishing on a classwide basis that the alleged

overcharge was passed through.  The Court next considers those criticisms.

Dr. Stiroh points out that the results of Dr. Williams' model show that some members of the putative class, namely six distributors and one retailer, had a "pass-through rate" exceeding 100% (see Williams Report, Table 3), thus indicating to Dr. Stiroh that those putative class members did not sustain any injury by reason of the alleged price-fixing conspiracy.  Based on such premise, Dr. Stiroh asserts that an individualized inquiry must be undertaken to determine whether each reseller was impacted by the alleged conspiracy.  This criticism is misplaced, however, as under California law,[19] an indirect purchaser establishes a price-fixing claim where the direct purchaser passes on the overcharge to the indirect purchaser, i.e., the impact occurs upon the indirect purchaser's payment to its upstream supplier.  See Clayworth v. Pfizer, Inc., 49 Cal. 4th 758, 786-87 (2010) (interpreting Cartwright Act as incorporating federal "rule" that injury occurs upon payment of "overcharge"); see also Adams v. Mills, 286 U.S. 397, 406-07 (1932) (holding resellers' "claim for damages," based on allegation shippers overcharged them, "arose at the time the extra charge was paid," even though resellers were later "reimbursed" for such overcharge by their own customers).  Although individualized issues with respect to damages calculations may be necessary, for example, determining whether putative class members who, on average, had a pass-through rate of 100% or more, conducted some sales as to which they did not pass on all of the overcharge (see Williams Reply Report ¶¶ 147-155 (citing examples)), individualized determinations as to the amount of damages "do[ ] not defeat class action treatment," see Blackie, 524 F.2d at 905 (observing "[t]he amount of damages is invariably an individual question").

Dr. Stiroh also challenges the model's use of weighed averages, which use, she contends, results in the model's providing "a single, unchanging pass-through rate" (see

---

[19] As noted, see n.10, supra, no party takes the position that California law differs from the laws of the other states under which Reseller Plaintiffs assert claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

Stiroh Report ¶ 67) not indicative of market realities, such as "aggressive pricing" by HDD manufacturers in 2003 (see id. ¶ 68).  As Dr. Williams points out, however, the variables he used in constructing his model capture "differences in prices over time and across products" (see Williams Reply Report ¶ 157), and, as discussed above, criticism that Dr. Williams should have used different or additional variables challenges the ultimate persuasiveness of his opinions.  Further, the use of "averaged and aggregated data" in a regression model used to measure impact has been approved by multiple courts.  See In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 614 (N.D. Cal. 2009) (citing cases).  Indeed, the Ninth Circuit recently held that a district court did not err in rejecting the same type of criticisms aimed at a regression model employed by Dr. Williams on behalf of a class of resellers.  See Olean, 31 F.4th at 683 (finding results of regression model "capable of showing class-wide impact" where model "assum[ed] that all [resellers] paid a common overcharge and that the same overcharge was passed through to the individual [resellers]").

Additionally, Dr. Stiroh, in observing the pass-through rates shown by the model employed by Dr. Williams and by a model employed by Dr. Netz are different, argues such difference between the experts is "inconsistent with the purported 'finding' that impact is common to the Reseller Class or the End-User Class."  (See Stiroh Report ¶ 51.)  Any such difference, however, is a question for the trier of fact to resolve.  The trier of fact could find that neither expert is persuasive, that only one is persuasive, or that both are persuasive if a showing is made that any differences in their findings are explainable by, for example, the use of different variables in designing their respective models.

Accordingly, the Court finds Reseller Plaintiffs have met their burden to show the evidence on which they rely is capable of establishing on a classwide basis that the alleged overcharge was passed through to the putative members of the Reseller Class.

//

//

**(2) End-User Plaintiffs**

According to Dr. Netz, "economic theory predicts that the conduct [alleged by End-User Plaintiffs] would cause higher prices for [SAs]," that "common data support [such] prediction," and that "higher prices for [SAs] result[ed] in class members paying higher prices for products that contain [SAs]." (See Netz Report at 22.)

**(A) Overcharge**

Dr. Netz's opinion that "economic theory predicts that the conduct would cause higher prices for [SAs]" (see id.) is based in part on the same industry characteristics identified by Dr. Williams, namely, the SA market being highly concentrated, the lack of substitute products for SAs, and the existence of significant barriers to entry into the SA manufacturing market (see id. at 36-38, 43-47). Additionally, citing evidence obtained by End-User Plaintiffs in discovery, showing defendants, on hundreds of occasions, shared with each other the prices each was currently charging or planned to charge (see id. ¶¶ 32-34, 52, 55), Dr. Netz opines "[t]here is widespread agreement among economists that frequent communication and information sharing enables monitoring and is a feature of successful cartels" (see id. at 52 and n.241 (citing publications)).

Dr. Netz also conducted a "correlation analysis" to determine whether "the prices for the [SAs] at issue are related via market forces," i.e., whether the prices for SAs "tend to move together"; according to Dr. Netz, "[i]f the evidence shows that prices tend to move together, then the impact of the cartel on a subset of prices can be assumed to have affected all prices." (See id. at 58.) To conduct such analysis, Dr. Netz first "calculated the monthly average price for each [SA] model by each [d]efendant" during the class period; she next "identif[ied] the model-year for every [SA] model in the sales data" and then "calculate[d] the pairwise correlation between each [d]efendant's prices for [SA] models that entered mass production in the same model year." (See id. at 59.)[20]

_____

[20] Based on evidence produced by defendants, Dr. Netz determined that, during the class period, defendants "developed and sold 167 at-issue [SA] programs, which included 242 models." (See id.)

33

According to Dr. Netz, the results of her analyses (see id. Exs. 23-24) showed "the prices of [SAs] tend to move together over time, regardless of the [d]efendant, customer, or specific [SA] model."  (See id. at 58.)

Additionally, Dr. Netz employed a regression model to compare the prices HDD manufacturers paid during the period in which the conspiracy is not alleged to have been in existence with the prices paid during the period the conspiracy is alleged to have been in existence.  (See id. at 89.)  Her model included variables to "control for changes in supply conditions," such as "production costs" and "energy costs," as well as variables to "control for demand factors," such as the "demand for HDDs," and, additionally, variables to "control for various features of a specific transaction," such as the "specific model of [SA] being sold," the "calendar quarter in which the transaction [took] place," and "sales that occurred . . . during the 2011 monsoon season."  (See id. at 91-93.)  The results of her analysis, based on over 557,000 "observations," were that "[t]he overcharge for the period January 2003 through May 2016 is 7.93% and the overcharge for June 2016 through December 2016 is 3.64%,"[21] results she describes as "both positive and statistically significant" (see id. at 93, Ex. 20); in other words, she "found empirical evidence that [the alleged] collusion resulted in higher prices for [SAs]" (see id. at 57).

Dr. Netz also developed two "variation[s]" of her regression model, which she describes as "sensitivity analyses," the first of which measured overcharges by the two defendant groups, and the second of which "allow[ed] the overcharge to change year-to-year, in order to test whether the overcharge varied throughout the class period."  (See id. at 93.)  The results of the first variation showed "both the TDK- and NHK-specific overcharges were positive and significant for the period 2003 through May 2016 and

---

[21] To explain why she separately analyzed the period of June 2016 through December 2016, Dr. Netz, citing evidence that defendants learned in late April 2016 or early May 2016 that a Japanese government agency had begun an "investigation into their activities," states she wanted to determine whether defendants "changed their pricing behavior immediately" or whether any overcharge "persist[ed] from some time" thereafter.  (See id. at 90.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  June 2016 through December 2016" (see id. at 93, Ex. 31), and the results of the second

2  variation showed "positive and statistically significant overcharges in every year of the

3  class period" (see id. at 93, Ex. 32).  The results of the variations showed, for example,

4  that SAs sold by defendant NHK in 2008 and those sold by defendant Magnecomp

5  Precision Technology Public Co., Ltd. ("MPT") in 2014[22] were sold at "prices above the

6  competitive level."  (See id. at 57.)  Thus, in Dr. Netz's opinion, the results obtained from

7  the variations show defendants overcharged HDD manufacturers each year in the class

8  period.

9          Defendants argue that Dr. Netz's opinions are not capable of establishing, by the

10  use of common proof, that HDD manufacturers were overcharged by defendants.  In so

11  arguing, defendants and/or Dr. Stiroh make many of the same arguments discussed

12  above with respect to Dr. Williams, and, to such extent, those arguments are, for the

13  reasons stated above with regard to Dr. Williams' opinions, likewise unavailing.

14          The Court next considers arguments specific to Dr. Netz's opinions.

15          In that regard, defendants contend, Dr. Netz's overcharge analysis fails to account

16  for purchasers that "may have benefitted" from the alleged agreement between NHK and

17  TDK to eliminate HTI and/or the alleged agreement to share prices.  (See Defs.' Opp. to

18  End-User Pls.' Mot. at 17:1-3, 20-22.)  As discussed above in connection with the

19  question of adequacy, however, End-User Plaintiffs' theory is that the agreement to

20  eliminate HTI did not affect the conspiracy to charge supra-competitive prices and that

21  the agreement to share pricing information advanced, not undercut, said conspiracy, and

22  defendants have offered no evidence to the contrary.  Consequently, defendants'

23  challenge is a premature contention that End-User Plaintiffs will be unable to prove their

24  allegation that a single conspiracy existed.  See Olean, 31 F.4th at 666-67 (holding "a

25  district court is limited to resolving whether the evidence establishes that a common

26

27          [22] MPT was, according to End-User Plaintiffs, acquired by TDK in 2007.  (See 4AC

28  ¶ 189.)

35

1    question is capable of class-wide resolution, not whether the evidence in fact establishes

2    that plaintiffs would win at trial").

3        Additionally, defendants rely on Dr. Stiroh's opinion that Dr. Netz's pairwise

4    correlation analysis "does not indicate or even suggest that there was a price structure

5    across all . . . SAs that would support her contention that all . . . SAs would have been

6    uniformly impacted."  (See Stiroh Report ¶ 79.)  According to Dr. Stiroh, "the degree of

7    correlation that Dr. Netz appears to be relying on to draw her conclusions is fairly low"

8    and that, as Dr. Netz acknowledges, 62% of the pairwise correlations "fall below Dr.

9    Netz's 0.50 threshold" for statistical significance.  (See id. ¶ 78 (citing Dr. Netz's Report

10   Ex. 23).)  This argument, however, pertains to the ultimate persuasiveness of Dr. Netz's

11   correlation analysis.  A trier of fact could find, for example, that Dr. Stiroh's criticism can

12   be explained by Dr. Netz's statement that "many" of the pairwise correlations below the

13   threshold she set correspond to programs as to which only "small samples" of data exist

14   (see Netz Report at 59); in other words, when considering whether all direct purchasers

15   were overcharged, the trier of fact can determine what weight to give Dr. Netz's

16   correlation analysis, see, e.g., Olean, 31 F.4th at 673 (finding results of expert's "pricing

17   correlation" study, along with "findings about [relevant] market," defendants' "collusive

18   behavior," and results of "regression model," can be considered by trier of fact in

19   determining whether "impact was common to [direct purchasers] during the collusion

20   period").

21       Accordingly, the Court finds End-User Plaintiffs have met their burden to show the

22   evidence on which they rely is capable of establishing on a classwide basis that HDD

23   manufacturers were, as a result of the conspiracy, overcharged for SAs.

24                        **(B) Pass-Through**

25       According to Dr. Netz, an accepted economic theory is that, "as the degree of

26   competition in [an] industry increases, the pass-through rate approaches 100%."  (See id.

27   at 66; see also id. n.287 (citing economic literature).)  Dr. Netz opines that, at each step

28   in the distribution of products containing SAs, the industries are "highly competitive" (see

36

id. at 66), which opinion is based on statements by companies, at each level of distribution, that the market is highly competitive (see id. at 66-68 and Ex. 27 (quoting statements)),[23] as well as statements by such companies that they earn low profits, which statements, Dr. Netz opines, are "consistent with intense competition" (see id. at 68-69 and Ex. 28),[24] and statements by companies in the chain of distribution that they do pass on price increases (see id. at 71-74 and Ex. 29).[25]  Dr. Netz also opines that passing through price increases is "consistent with a variety of pricing practices" by retailers, such as selling products with "identical specifications" at "different prices," engaging in "discount pricing," and using "focal point pricing."  (See id. at 78-83.)  For those reasons, Dr. Netz would "expect pass-through of an industry-wide cartel overcharge to be positive and close to 100%."  (See id. at 87.)

        To test her theory, Dr. Netz engaged in a "regression analysis."  (See id. at 94.) Specifically, using "purchase and sales data from [d]efendants and third parties," which data "covers firms operating at all levels of the distribution chain, all types of resellers, and all types of at-issue HDD-containing products" (see id. at 98), she "regress[ed] the price from the downstream point in the channel on the cost at the upstream point in the channel" (see id. at 94).  For each regression, she "matched" the "cost of the upstream

---

[23] For example, an executive with Seagate, an HDD manufacturer, testified that the market for selling HDDs is "ultra competitive"; Lenovo, a computer manufacturer, stated in an annual report issued during the class period that it "operate[d] in a highly competitive industry" and "face[d] aggressive product and price competition"; and Bell Microproducts, a distributor, stated in a Form 10-K issued during the class period that it "experience[d] intense competition in pricing."  (See id. at 67.)

[24] For example, Sony, a manufacturer of personal computers, stated in a public document that, during the last four years of the class period, its "[a]nnual operating profit margin was 3.38%, 0.34%, 0.83%, and 3.62%," and Tech Data, a distributor, reported in a Form 10-K that, during the last three years of the class period, it had "operating margins" of, respectively, "0.85%, 0.97%, and 1.52%."  (See id. Ex. 28.)

[25] For example, Western Digital, an HDD manufacturer, stated in an earnings call during the class period that price increases imposed on it and its competitors were "immediately reflected in the full level of the increase to the consumer," and NetApp, a manufacturer of storage devices containing HDDs, stated in a Form 12-K issued during the class period, that, to the extent HDD prices increase in the future, it "intend[ed] to pass along those price increases."  (See id. Ex. 29.)

product" and "price of the downstream product" (see id. at 98-99), and the resulting "coefficient on the cost variable" provided "the pass-through rate" (see id. at 95). In total, Dr. Netz performed 53 "studies," which studies collectively "cover over 229 million transactions," and found "[m]ost of the estimated pass-through rates [were] approximately 100% or higher." (See id. at 100 and Ex. 7.) According to Dr. Netz, the pass-through rates were "consistent across different types of products and different levels of distribution," were "consistent over the entire class period," and, additionally, were "consistent" whether or not the data allowed her to "control for product attributes" (see id. at 100) such as capacity, speed, or cache size (see id. at 95). Based on said results, Dr. Netz opines that "100% of any overcharges [were] passed through to class members." (See id. at 101.)

As they argued with respect to Dr. Williams, defendants argue Dr. Netz's opinions are not capable of establishing, on a classwide basis, that the putative class members were impacted by the alleged conspiracy. In so arguing, defendants and/or Dr. Stiroh make many of the same arguments discussed above with respect to Dr. Williams, and, to such extent, those arguments, for the reasons stated above with regard to Dr. Williams' opinions, are unavailing. The Court next considers arguments specific to Dr. Netz's opinions.

Defendants argue that Dr. Netz's analysis "do[es] not purport to show and cannot show whether the purchases of particular putative class members were 'impacted' by [d]efendants' alleged conduct." (See Defs.' Opp. to End-User Pls.' Mot. at 1:12-14.) In that regard, defendants rely on arguments made by Dr. Stiroh, who first opines that Netz's model does not account for focal point pricing and, in particular, does not account for putative class members who may have paid a focal point price that a retailer decided not to raise in response to an overcharge. Dr. Netz, however, has addressed focal point pricing in detail in her reports and has set forth her opinion that a retailer's decision to use focal point pricing "does not impact whether the pass-through of cost changes does or does not occur." (See Netz Report at 82; see also id. at 83-86, Netz Reply at 35-43.)

United States District Court
Northern District of California

1    Further, Dr. Netz conducted a regression corresponding to each retailer from whom

2    discovery was obtained, and, in each instance, the results showed a pass-through rate of

3    100% or higher in almost all cases. (See Netz Report Ex. 7.) Consequently, if the trier of

4    fact finds Dr. Netz's opinions persuasive, the trier of fact could conclude that, to the

5    extent retailers did employ focal point pricing, they nonetheless passed through in large

6    part any price increases they incurred, and the Court does not find Dr. Netz's opinions to

7    be so "flawed," see Olean, 31 F.4th at 685, that they cannot be considered by the trier of

8    fact in determining whether classwide impact occurred, see, e.g., id. at 684 (rejecting

9    defendants' argument that, due to "averaging assumptions" and failure to control for

10    "focal point pricing," indirect purchasers' expert's opinions could not be used to establish

11    impact on classwide basis); In re TFT-LCD (Flat Panel) Antitrust Litig., 2012 WL 555090,

12    at *9 (N.D. Cal. February 21, 2012) (finding end-user class "may establish pass-through

13    by showing that companies in the manufacturing and distribution chains passed along

14    cost increases in general"; rejecting argument that plaintiff must "establish[ ] how every

15    intermediary treated every [subject] product").

16       Dr. Stiroh also argues that most of Dr. Netz's regression analyses did not "account

17    for the fact that products (e.g., external HDDs, notebooks) are composed of

18    characteristics valued by consumers and that the resulting bundle of characteristics –

19    often defined as product quality – is what is associated with a cost and price." (See

20    Stiroh Report ¶ 108.)[26] According to Dr. Stiroh, had Dr. Netz's regression analyses

21    always controlled for such "product characteristics," the results would have shown

22    "substantial variation in the pass-through across different products." (See id. ¶ 109.) In

23    response to such criticism, Dr. Netz "recalculated the pass-through rates for several of

24    the [regression] studies" by "adding product controls" (see Netz Reply at 47), and the

25    results showed "very small changes in the pass-through rates" (see id.); for example, one

26

27       [26] Defendants acknowledge that Dr. Netz controlled for "HDD product attributes" in

28    7 of her 53 regressions. (See Defs.' Opp. to End-User Pls.' Mot. at 11:26-28.)

1   retailer's pass-through rate increased from 99% to 100%, while another retailer's pass-

2   through rate decreased from 104% to 102% (see id. (citing Ex. 53)).  In light of such

3   showing, the Court finds the criticism regarding a lack of control for product

4   characteristics is a challenge to the persuasiveness of Dr. Netz's opinions, as opposed to

5   a flaw that would entirely preclude use of the results of her regression analyses.

6       Accordingly, the Court finds End-User Plaintiffs have met their burden to show the

7   evidence on which they rely is capable of establishing on a class-wide basis that the

8   alleged overcharge was passed through to the putative members of the End-User Class.

9                              **c.  Aggregate Damages**

10      Reseller Plaintiffs and End-User Plaintiffs argue they can establish, on a classwide

11  basis, the aggregate damages to which the respective putative classes would be entitled

12  upon a finding of liability.

13                            **(1) Reseller Plaintiffs**

14      Dr. Williams has "present[ed] a methodology" that, he states, "can be applied to

15  calculate aggregate damages."  (See Weiss Decl. (Doc. No. 929-1) Ex. 1 at 191:25-

16  192:3.)  After applying his model, he determined the aggregate damages to be

17  $163,342,573 in the event defendants fail to establish a "pass-on defense" (see Williams

18  Report ¶ 237, Table 12) and $95,246,712 in the event defendants establish such defense

19  (see Williams Reply Report (Doc. No. 888-4) ¶ 188, Table 8).[27]

20      To calculate those figures, Dr. Williams first determined the "Global Overcharges

21  to direct purchasers" to be $1,460,116,203, constituting the product of the total number of

22  SA sales by defendants in the class period ($12,181,305,065) multiplied by .136.[28]  (See

23

24      [27] Under California law, although "a pass-on defense generally may not be
    asserted," an "exception" exists where "multiple levels of purchasers have sued" and
25  "damages must be allocated among the various levels of injured purchasers."  See
    Clayworth, 49 Cal. 4th at 787.  The parties appear to agree, for purposes of class
26  certification, that, under the laws of the other states on which Reseller Plaintiffs rely, a
    "pass-on defense" likewise can be raised where multiple levels of purchasers have sued.
27

28      [28] As noted, Dr. Williams found the overcharge was 13.6%.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Williams Report Table 6.)[29]  Second, he determined the amount of the overcharge

2  passed through to "1st Tier" indirect purchasers, i.e., entities that purchased HDDs from

3  HDD manufacturers.  (See id. ¶ 240, Table 6.)

4  Next, Dr. Williams determined for those "1st Tier" indirect purchasers the "sales

5  share by customer type," i.e., the percentage of products 1st Tier distributors sold to

6  OEMs, to other distributors, to retailers, to value-adding retailers, and to "end-payors."

7  (See id. ¶ 241, Tables 7, 8.)  Based on said figures, he then determined the number of

8  "sales for each node" located on an "overcharge flow chart" he developed, for example,

9  the "[o]vercharges incurred" by a retailer who purchased a product from a distributor,

10 who, in turn, had purchased the product from an OEM (see id. ¶ 242, Table 9), after

11 which he limited the overcharges to only those damages he understood could be claimed

12 under the laws of the five states at issue (see id. ¶ 245).

13 Lastly, to account for a possible successful pass-on defense, Dr. Williams

14 determined the amount of the overcharge that was "not passed on at all" or was "passed

15 on" to end users as to whom he understood a pass-on defense would not apply, "such as

16 government entities or customers in states outside the [End-User] class" (see id. ¶¶ 244,

17 246), and subtracted that figure from the total aggregate damages, to arrive at, as noted

18 above, an adjusted figure of $95,246,712.

19 "The use of aggregate damages calculations is well established in federal court

20 and implied by the very existence of the class action mechanism itself."  In re

21 Pharmaceutical Industry Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir.

22 2009).  An aggregate damages model, however, must "roughly reflect the aggregate

23 amount owed to class members."  See Seijas v. Republic of Argentina, 606 F.3d 53, 58-

24 59 (2nd Cir. 2010).  In that regard, defendants argue, Dr. Williams' damages model "uses

25

26 [29] In an appendix to his Report, Dr. Williams identified the sources he used to make the factual assumptions on which he based his calculations.  (See id. App. 3.)  For

27 example, he used "transaction data" produced by defendants, "annual reports" of two defendants, and an "internal company document" of one defendant to determine the total

28 number of SA sales defendants made during the class period.  (See id. App. 3 ¶ 252.)

1    improper assumptions that inflate reseller damages."  (See Defs.' Opp. to Reseller Pls.'

2    Mot. at 25:16.)  Specifically, defendants argue, the model does not accurately reflect

3    aggregate damages because Dr. Williams' calculations are based on two assumptions

4    that, according to defendants, are incorrect, namely, that (1) if a reseller has its

5    headquarters in one of the five states under which Reseller Plaintiffs bring claims, the

6    reseller can recover the overcharges incurred with respect to all purchases it made in the

7    United States, and, (2) to the extent a reseller sold products to an end-user who is not a

8    member of the putative End-User Class, defendants are not entitled to assert a pass-

9    through defense.

10           The above-discussed challenges, however, are not to the model itself, but, rather,

11    to the particular figures Dr. Williams used in the application of the model set forth in his

12    expert reports.  Whether an in-state resident can recover for sales it made outside of the

13    state in which it resides and whether defendants are entitled to assert a pass-through

14    defense as to sales resellers made to end-users who have not, or cannot, bring their own

15    claims, are merits issues to be resolved at a later stage prior to trial or in connection with

16    it.  Such merits issues need not be considered at this time, as any findings the Court may

17    make in the manner advocated by defendants would not result in the model's inability to

18    establish aggregate damages roughly reflecting the amount owed to the class; rather, the

19    model would be capable of establishing such aggregated damages, albeit in an amount

20    less than that presently calculated by Dr. Williams.[30]  See Amgen, 568 U.S. at 466

21    (holding, at class certification stage, "[m]erits questions may be considered to the extent

22

23    _____

         [30] Indeed, two examples support such finding.  First, in her report, Dr. Stiroh, in
24    assuming the above-referenced two legal issues would be resolved in the manner
      proposed by defendants, applied Dr. Williams' model, using differing figures that would
25    result from such assumptions, and arrived at an aggregate damages figure of $15.7
      million.  (See Stiroh Report ¶¶ 122-24, Fig. 12.)  Second, Dr. Williams, when initially
26    applying his model, determined an aggregate damages figure of $106,178,587, in the
      event defendants establish a pass-on defense (see Williams Report Table 12), but later
27    recalculated the figure to account for additional categories of sales as to which
      defendants could assert a pass-on defense, arriving at an aggregate damages figure of
28    $95,246,712 (see Williams Reply ¶ 188, Table 8).

1  – but only to the extent – that they are relevant to determining whether the Rule 23

2  prerequisites for class certification are satisfied").

3      Defendants also assert Dr. Williams' model cannot be used because individual

4  class members would be unable to calculate their damages by its use.  The model,

5  however, is not intended to be used for such purpose.  Rather, at a later stage of the

6  proceedings in which individual class members will have an opportunity to submit claims,

7  defendants will have "opportunities to individually challenge" those claims, a

8  circumstance that does not warrant denial of Reseller Plaintiffs' motion.  See Briseno v.

9  ConAgra Foods, Inc., 844 F.3d 1121, 1131-32 (9th Cir. 2017) (holding, where plaintiffs

10  proposed aggregate damages can be awarded at trial, "the need for individualized

11  damages determinations after liability has been adjudicated does not preclude class

12  certification"; noting "Rule 23 specifically contemplates the need for . . .  individualized

13  claim determinations after a finding of liability").

14      Lastly, defendants rely on Dr. Stiroh's assertion that the model "assign[s] positive

15  damages to purported class members who purchased products for which no overcharge

16  has been established," namely, class members who "purchased products containing SAs

17  sold by Suncall."  (See Stiroh Report ¶ 87.)  The proposed class definition, however, is

18  limited to resellers that purchased products containing SAs sold by defendants.  More

19  importantly, Dr. Williams' damages model, should the trier of fact find it appropriate to

20  use, calculates aggregate damages caused by purchases of products containing SAs

21  made by defendants (see Williams Report ¶¶ 252-54), not purchases of SAs in general.

22      Accordingly, the Court finds Reseller Plaintiffs have met their burden to show their

23  proposed damages model is capable of establishing the putative Reseller Class's

24  aggregate damages.

25      **(2) End-User Plaintiffs**

26      Dr. Netz, on behalf of End-User Plaintiffs, proposes the following four-step model

27  to determine the amount of aggregate damages of the putative class:

28  //

1.      Calculate the dollar value of Defendants' revenues for suspension assemblies that were incorporated into the relevant finished goods.

2.      Multiply the value from Step 1 by the share of relevant finished goods that were purchased by class members.

3.      Multiply the value from Step 2 by the overcharge percentage.

4.      Multiply the value from Step 3 by the relevant pass-through rate.

(See Netz Report at 102.)[31]

In their opposition, defendants make one argument, namely, that the above-referenced model cannot establish the aggregate damages incurred by the class, for the asserted reason that the model assumes the existence of a single conspiracy, not the three separate conspiracies defendants contend existed. For the reasons stated above with respect to adequacy of representation, the Court finds the argument unpersuasive.

Further, although not specifically referenced in their opposition, the Court understands defendants also to be relying on the criticisms of the model raised in Dr. Stiroh's report, which criticisms the Court next considers.

First, Dr. Stiroh, understanding Dr. Netz to be of the opinion that the pass-through rate applicable at the fourth step is 100%, argues Dr. Netz has failed to establish such pass-through rate is correct. To the extent the trier of fact might conclude the pass-through rate is lower than 100%, however, such finding would not affect the model itself, as, under those circumstances, the figure to be used at the last step would be a lower pass-through rate, as Dr. Netz acknowledges. (See Netz Reply at 57 n.195.)

Next, although Dr. Stiroh correctly points out that Dr. Netz's model does not measure the individual damages of any individual End-User, this observation is not, for

---

[31] Although Dr. Netz calculated the figure, after the first two steps are performed, to be $1,853,250,964 (see Netz Report at 105), she did not otherwise perform the steps necessary to determine an aggregate damages figure, and defendants do not challenge the model on those grounds. See Lytle v. Nutramax Laboratories, Inc., 114 F.4th 1011, 1024 (9th Cir. 2024) (holding plaintiff need not "actually prove that classwide damages exist in order to obtain class certification," as "class treatment [is] appropriate" where "damages *could* be calculated on a classwide basis, even where such calculations have not yet been performed") (emphasis in original).

United States District Court
Northern District of California

the reasons stated above with respect to Dr. Williams' model, a basis to find the model cannot be applied on a class-wide basis.

Lastly, contrary to Dr. Stiroh's argument that Dr. Netz's model "assign[s] positive damages" to class members who did not purchase products containing SAs sold by defendants, Dr. Netz's model, should the trier of fact find it appropriate to use, requires, as set forth above, the trier of fact to calculate at the first step "*[d]efendants'* revenues for [SAs] that were incorporated into the relevant finished goods" and then, at the second step, to multiply said value "by the share of relevant finished goods that were purchased by class members." (See Netz Report at 102 (emphasis added).)

Accordingly, the Court finds End-User Plaintiffs have met their burden to show their proposed damages model is capable of establishing the putative End-User Class's aggregate damages.

### 2. Superiority

The Court next addresses the remaining requirement of Rule 23(b)(3), namely, superiority.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998). "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." Id. (considering whether, under circumstances presented, resolution of putative class members' respective claims was better addressed collectively in class action or by way of "individual claims").

Here, Class Plaintiffs argue that, in antitrust actions where common questions predominate, the superiority requirement is easily established. Indeed, as Class Plaintiffs point out, "[i]f common questions are found to predominate in an antitrust action, courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied." See TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. at 314 (internal alterations, quotation, and citation omitted); see, e.g., In re Ethylene Propylene Diene Monomer (EPDM)

45

United States District Court
Northern District of California

Antitrust Litig., 256 F.R.D. 82, 104 (D. Conn. 2009) (finding, in antitrust case alleging price fixing, "class action [was] a superior method of adjudication" where "common liability questions predominate[d] over individual ones"; further finding "risk of inconsistent results and conservation of judicial resources dictate[d] . . . case should be litigated as a class action").  Defendants argue that, in the instant cases, the superiority requirement nonetheless has not been met, which argument the Court next addresses.

### a. Exclusion of OEMs from Reseller Class

Defendants contend "many absent class members will be confused as to whether they are a member of the Reseller class," in light of the exclusion of OEMs from the class (see Defs' Opp. to Reseller Mot. at 6:5-11, 14-15), which purported confusion, they argue, will render resolution of the claims of the putative members of the Reseller Class "unmanageable" (see id. at 7:20-21).  A "well-settled presumption" exists, however, that "courts should not refuse to certify a class merely on the basis of manageability concerns," see Briseno, 844 F.3d at 1128 (internal quotation and citation omitted), and, as set forth below, defendants fail to rebut such presumption.

First, defendants fail to identify an alternative mechanism for resolving the claims of putative members of the Reseller Class.  Nevertheless, even assuming defendants are implicitly contending that thousands of individual actions would be preferable, defendants fail to engage in the requisite "comparative evaluation," see Hanlon, 150 F.3d at 1023, of conducting, in connection with any issues arising as a result of the exclusion of OEMs from the putative class, a single class action versus thousands of individual actions.

Moreover, there is no showing the exclusion of "OEMs" would give rise to confusion on the part of putative class members, as "OEM" appears to be a generally known term in the field of commerce.  See, e.g., Federal Trade Comm'n v. Qualcomm Inc., 969 F.3d 974, 985 (9th Cir. 2020) (noting, in action challenging defendant's licensing of cell phone technology to OEMs, defendant was "not an OEM," as it did not "manufacture and sell cellphones and other end-use products . . . that consumers purchase and use"; identifying "Apple and Samsung" as examples of "OEMs" in cell

1    phone market).  Although defendants contend actual confusion exists, the two instances

2    they cite fail to support such contention.[32]

3          Lastly, as set forth below, the Court will direct the parties to meet and confer

4    regarding the notice that will be provided to the Reseller Class, and, in connection

5    therewith, the parties can determine the language that will best describe the exclusion of

6    OEMs from the Reseller Class.

7                    **b.  Effect of SAs Sold by Suncall**

8          The proposed classes consist of those who, during the class period in the relevant

9    states, purchased products containing SAs manufactured or sold by defendants.  The

10   class definitions are based on objective criteria and defendants do not contend otherwise.

11   Defendants argue, however, putative class members will be unable to determine if they

12   are members of one of the classes because, defendants contend, class members will be

13   unable to determine whether the products they purchased contain SAs manufactured by

14   defendants or by Suncall, a non-conspirator.

15         As defendants acknowledge, the Ninth Circuit, in Briseno v. ConAgra Foods,

16   rejected the argument that Rule 23 contains a "separate administrative feasibility

17   prerequisite to class certification," such that, in addition to showing that the requirements

18   of Rule 23(a) and (b) are met, a plaintiff would be required to "proffer a reliable way to

19   identify members of [a] certified class[ ]."  See Briseno, 844 F.3d at 1123; see also id. at

20   1124-25 (rejecting argument that, in case in which plaintiffs alleged seller of cooking oil

21   made false statement on label, class certification should have been denied on ground

22   putative class members "would not be able to reliably identify themselves," given that

23

24         [32] First, although defendants note that Flextronics International USA, an OEM, took
     the position, in a filing on October 22, 2022, that OEMs were members of the putative
25   class alleged by Reseller Plaintiffs in the TAC (see Doc. No. 599 at 28), subsequent to
     said filing, Reseller Plaintiffs unambiguously excluded OEMs from the class.  Second,
26   although defendants note that, in a filing on October 14, 2022, Seagate Plaintiffs stated
     Seagate LLC had indirectly purchased SAs (see Doc. No. 622 at 33-34), Seagate
27   Plaintiffs did not take a position therein as to whether Seagate LLC is or is not a member
     of the Reseller Class or suggest they were, in any manner, confused as to class
28   membership.

they might no longer possess "grocery receipts" or "remember details about individual purchases"). Rather, the Ninth Circuit has explained, where identification issues are raised, courts make "a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' for resolving the controversy." See id. at 1127-28 (quoting Rule 23(b)(3).)[33] In that regard, defendants contend class members cannot determine whether products they purchased contain SAs sold by defendants, and, consequently, "disputes and mini-trials over class membership are inevitable and will render the proposed class unmanageable." (See Defs.' Opp. to Reseller Pls.' Mot. at 7:19-21.)

As noted, a presumption exists that a motion for class certification should not be denied on the sole ground of lack of manageability. Indeed, such a ruling "is disfavored and should be the exception rather than rule." See Briseno, 844 F.3d at 1128 (internal quotation and citation omitted). To determine whether, in the instant cases, any asserted unmanageability rises to the level that warrants a denial of certification, the Court notes that defendants fail to engage in any attempt to compare the advantages of conducting a single class proceeding with the advantages of requiring class members to bring individual actions, or some other non-class proceeding, as a means of solving any manageability issues arising from Suncall's sale of SAs during the class period. Having failed to do so, defendants are, in effect, asking the Court to impose a "standalone administrative feasibility requirement," which is precluded. See id. at 1128 (holding "[t]he authors of Rule 23 opted not to make the potential administrative burdens of a class action dispositive and instead directed courts to balance the benefits of class adjudication against its costs"; noting superiority requirement likely would be met where, even if "administrative feasibility would be difficult to demonstrate," there "may be no realistic alternative to class treatment").

---

[33] To the extent defendants have contended Class Plaintiffs cannot establish predominance in light of Suncall's presence in the relevant markets, the Court has, as discussed above, examined and rejected such argument.

United States District Court
Northern District of California

1      Moreover, the issue of whether class members have purchases that qualify them

2  for membership in one of the classes does not arise unless and until liability is

3  determined on a classwide basis and an aggregate damages award is rendered, after

4  which a claims submission process would occur, and, as discussed below, the record

5  indicates defendants overstate manageability issues that might arise at that stage of the

6  proceedings.

7      In particular, it is undisputed that, during the class period, Suncall sold SAs only to

8  one HDD manufacturer, namely, Hitachi Global Storage Technologies ("HGST").  (See

9  Micheletti Decl., filed January 9, 2024 (Doc. No. 1071-3), ¶¶ 7-17 (summarizing evidence

10  obtained from defendants and third parties showing Suncall only sold to HGST); Sims

11  Decl., filed January 9, 2024 (Doc. No. 1078-4) ¶¶ 5-21 (same); Netz Decl., filed January

12  9, 2024 (Doc. No. 1071-6) ("Netz January 2024 Report") at 1 n.2 (stating sales data

13  obtained from HDD manufacturers Seagate and Western Digital show "zero" purchases

14  from Suncall during class period); Stiroh Decl., filed January 30, 2024 (Doc. No. 1097-3)

15  ("Stiroh January 2024 Report"), ¶ 4 and n.5 (stating "Suncall sold the SAs it

16  manufactured to a single firm, HGST, during the purported Class Period").)  As a result,

17  putative class members who, during the class period and in the relevant states,

18  purchased an HDD from any HDD manufacturer other than HGST are members of one of

19  the proposed classes, depending on whether the purchase was for resale or personal

20  use.  As to all such putative class members, the manageability issue defendants claim

21  warrants denial of the motions for class certification appears to be non-existent.

22      Further, putative class members who, during the class period and in the relevant

23  states, purchased a computer containing an HDD can perform non-complicated steps to

24  learn the name of the manufacturer of the HDD contained in such computer, and those

25  who purchased computers containing HDDs manufactured by an entity other than HGST,

26  the sole purchaser of Suncall SAs, are class members.  See, e.g., Netz January 2024

27  Report at 4-5 and n. 18 (explaining how owner of computer can perform simple "right

28  command" to learn manufacturer of HDD contained in computer); see also, e.g.,

United States District Court
Northern District of California

1   https://support.lenovo.com/us/en/solutions/ht513995-how-to-check-disk-drive-name-and-

2   information-windows-10 (instructing purchaser of Lenovo computer regarding how to

3   determine manufacturer of computer's HDD).

4        With respect to putative class members who purchased HDDs manufactured by

5   HGST or products containing HDDs manufactured by HGST, the vast majority of such

6   purchasers are likely to be class members, as "approximately 78% of HGST's total [SAs]"

7   were sold to HGST by defendants, not Suncall.  (See Netz January 2024 Report at 2 and

8   n.7.)  The Court next considers whether significant manageability concerns are likely to

9   arise in connection with identifying which claims are submitted by those putative class

10   members.

11        According to both Dr. Williams and Dr. Netz, and not disputed by Dr. Stiroh, a

12   number of HGST's internal HDD product lines sold during the class period contained only

13   SAs sold by a defendant (see Williams Decl., filed January 9, 2024 (Doc. No. 1078-5

14   ("Williams January 2024 Report") ¶¶ 6-7; Netz January 2024 Report at 4), and,

15   consequently, putative class members who purchased HGST models corresponding to

16   those product lines, or devices containing those models, would be class members.  With

17   respect to HGST's other internal HDD product lines, it is undisputed that those lines fall

18   into one of two categories: (1) product lines containing SAs sold only by Suncall (see

19   Williams January 2024 Report ¶¶ 6, 9; Netz January 2024 Report at 3 and n.11), and

20   (2) product lines containing SAs that could have been sold either by a defendant or by

21   Suncall (see Williams January 2024 Report ¶¶ 6, 8; Netz January 2024 Report at 4).  As

22   to the first category, any purchaser who only bought HGST models corresponding to

23   those product lines, or devices containing those models, would not be a class member;

24   as to the second category, given that neither Dr. Williams nor Dr. Netz has suggested a

25   methodology by which the maker of the SA in those products can be determined, any

26   purchaser who only bought HGST models corresponding to those product lines, or

27   devices containing those models, would be, at least on the present record, unable to

28   establish membership in one of the classes.  Consequently, provided a claim form is

1   properly designed, e.g., one directing putative class members who purchased HGST

2   internal HDDs or products containing HGST internal HDDs to include the product line or

3   model name, or other identifying information, no serious manageability issue appears

4   likely to arise as to purchasers of those types of HGST models.[34]

5          Lastly, Class Plaintiffs' experts acknowledge they are aware of no data or method

6   by which it can be determined whether external as opposed to internal HDDs sold by

7   HGST during the class period contained SAs made by a defendant rather than by

8   Suncall.  (See Williams January 2024 Report at 3 n.6; Netz January 2024 Report at 4

9   n.15.)  Consequently, those purchases are not qualifying purchases.  Further, no serious

10  manageability issue is raised thereby, as, for example, any claim form can state that no

11  purchase of an HGST external HDD is a qualifying purchase.

12              **c.  Summary as to Superiority**

13         The Court finds Class Plaintiffs have shown that resolving the claims of their

14  respective putative class members in a class action is superior to other methods of

15  adjudicating the claims of those putative class members.

16  //

17  //

18  //

19  //

20  //

21

22         [34] Indeed, with respect to named plaintiffs who purchased HGST internal HDDs or
    products containing them and identified the model name of the HDD or provided other
23  identifying information, both Dr. Netz and Dr. Stiroh were able to determine whether
    (1) the purchase would qualify for an award, in that the plaintiff purchased a model that
24  contained only SAs sold by defendants, or (2) the purchase could not be shown to be
    qualifying, either because the plaintiff purchased a model that only contained SAs sold by
25  Suncall, in which case the purchase would not be qualifying or, alternatively, the plaintiff
    purchased a model that could contain either SAs sold by defendants or by Suncall, in
26  which case a qualifying purchase could not be shown.  (See Netz Decl., filed February 6,
    2024, at 4-5 and nn. 3; Stiroh January 2024 Report ¶ 11 and n.16; see also Williams
27  January 2024 Report ¶ 12 and n.9 (identifying computer product line sold by OEM as to
    which all internal HDDs were supplied by HGST and contained only SAs sold by
28  defendants).)

United States District Court
Northern District of California

United States District Court
Northern District of California

**CONCLUSION**

For the reasons stated above:

1. Reseller Plaintiff's motion for class certification is hereby GRANTED.

    a. The following Reseller Class is certified: All persons or entities, in the Indirect Purchaser States, except OEMs, who, during the period from January 2003 through May 2016, purchased a Standalone Storage Device or Computer for resale which included as a component part one or more SAs that were manufactured or sold by defendants, any current or former subsidiary of defendants, or any co-conspirator of defendants, or who indirectly purchased an SA, for resale, that was manufactured or sold by defendants, any current or former subsidiary of defendants, or any co-conspirator of defendants.[35]

    b. Michael J. Flannery and Christian E. Hudson of Cuneo Gilbert & LaDuca, LLP, and Shawn Raiter of Larson King, LLP, are appointed as class counsel for the Reseller Class.

2. End-User Plaintiffs' motion for class certification is hereby GRANTED.

    a. The following End-User Class is certified: All persons and entities who, during the time period January 1, 2003, to December 31, 2016, in the Indirect Purchaser States, purchased Standalone Storage Devices or Computers, not for resale, which included SAs manufactured or sold by defendants.[36]

    b. Christopher T. Micheletti of Zelle LLP and William V. Reiss of Robins Kaplan LLP are appointed as class counsel for the End-User Class.

---

[35] In addition to OEMs, the following are excluded from the Reseller Class: Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities or instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, and persons who purchased HDD suspension assemblies directly or not for the purpose of resale.

[36] The following are excluded from the End-User Class: Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities or instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased HDD suspension assemblies directly or for resale.

3.  Class Plaintiffs and defendants are hereby DIRECTED to meet and confer, no later than February 21, 2025, and to file by said date a joint proposal (a) setting deadlines for merits expert reports (see Doc. No. 756 at 3), (b) setting a deadline for the parties to meet and confer regarding the process for giving notice to the classes pursuant to Rule 23(c)(2)(B), and (c) setting a date for a Further Case Management Conference, as well as a date for filing a Joint Case Management Statement, which Statement shall include, inter alia, a joint proposal or separate proposals for a referral to an alternative dispute resolution modality.

**IT IS SO ORDERED.**

Dated:  January 10, 2025

MAXINE M. CHESNEY
United States District Judge